IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 21-1338 (MFK) |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) | |
| Defendants. | ) ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
mdellinger@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Puma Biotechnology, Inc. and Wyeth LLC*

SHAW KELLER LLP
Karen E. Keller (#4489)
Andrew E. Russell (#5382)
Nathan R. Hoeschen (#6232)
Emily S. DiBenedetto (#6779)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for AstraZeneca Pharmaceuticals LP and AstraZeneca AB*

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ................................................................................................ 1

    A.   PLAINTIFFS' OPENING POSITION ................................................................ 1

    B.   DEFENDANTS' ANSWERING POSITION ......................................................... 3

    C.   PLAINTIFFS' REPLY POSITION ................................................................... 5

    D.   DEFENDANTS' SUR-REPLY POSITION .......................................................... 6

II.  BACKGROUND ................................................................................................. 6

    A.   PLAINTIFFS' OPENING POSITION ................................................................ 6

        1.   Plaintiffs' Technical Background ........................................................ 6

        2.   Patents-in-Suit ................................................................................... 9

    B.   DEFENDANTS' ANSWERING POSITION ......................................................... 9

        1.   Defendants' Technical Background ...................................................... 9

        2.   Patents-in-Suit ................................................................................. 10

III. DISPUTED CLAIM CONSTRUCTIONS IN THE PATENTS-IN-SUIT .................... 12

    A.   "A METHOD FOR TREATING GEFITINIB AND/OR ERLOTINIB RESISTANT NON-
        SMALL CELL LUNG CANCER IN A PATIENT IN NEED THEREOF" *OR* "A METHOD
        FOR TREATING GEFITINIB AND/OR ERLOTINIB RESISTANT NON-SMALL CELL
        LUNG CANCER HAVING A T790M MUTATION IN SEQ ID NO: 1 IN A
        PATIENT" ................................................................................................ 12

        1.   Plaintiffs' Opening Position ............................................................. 12

        2.   Defendants' Answering Position ....................................................... 15

        3.   Plaintiffs' Reply Position ................................................................. 23

        4.   Defendants' Sur-Reply Position ....................................................... 29

    B.   "GEFITINIB AND/OR ERLOTINIB RESISTANT NON-SMALL CELL LUNG CANCER"
        *OR* "GEFITINIB AND/OR ERLOTINIB RESISTANT NON-SMALL CELL LUNG
        CANCER HAVING A T790M MUTATION IN SEQ ID NO: 1" ................................. 32

        1.   Plaintiffs' Opening Position ............................................................. 32

        2.   Defendants' Answering Position ....................................................... 36

        3.   Plaintiffs' Reply Position ................................................................. 42

        4.   Defendants' Sur-Reply Position ....................................................... 46

# TABLE OF CONTENTS
(continued)

PAGE

C.   "IRREVERSIBLE EPIDERMAL GROWTH FACTOR RECEPTOR (EGFR) INHIBITOR THAT COVALENTLY BINDS TO CYSTEINE 773 RESIDUE IN THE LIGAND-BINDING POCKET OF EGFR OR CYSTEINE 805 RESIDUE IN THE LIGAND-BINDING POCKET OF ERB-B2 ('314 PATENT, CLAIM 1)" OR "IRREVERSIBLE EGFR INHIBITOR THAT COVALENTLY BINDS TO CYSTEINE 773 OF THE CATALYTIC DOMAIN WITHIN THE SEQ ID NO: 1 HAVING A T790M MUTATION ('162 PATENT, CLAIM 1)" .................................................. 48

    1.   Plaintiffs' Opening Position..................................................... 48

    2.   Defendants' Answering Position ............................................ 51

    3.   Plaintiffs' Reply Position ...................................................... 55

    4.   Defendants' Sur-Reply Position ............................................ 58

D.   "ADMINISTERING DAILY TO THE PATIENT" ......................................... 61

    1.   Plaintiffs' Opening Position..................................................... 61

    2.   Defendants' Answering Position ............................................ 61

    3.   Plaintiffs' Reply Position ...................................................... 62

    4.   Defendants' Sur-Reply Position ............................................ 62

E.   "A PHARMACEUTICAL COMPOSITION COMPRISING A UNIT DOSAGE"...................... 63

    1.   Plaintiffs' Opening Position..................................................... 63

    2.   Defendants' Answering Position ............................................ 64

    3.   Plaintiffs' Reply Position ...................................................... 65

    4.   Defendants' Sur-Reply Position ............................................ 66

IV.   DISPUTED CLAIM CONSTRUCTIONS IN WO'058 ............................ 67

A.   "GEFITINIB AND/OR ERLOTINIB RESISTANT CANCER" OR "CANCER THAT IS RESISTANT TO GEFITINIB AND/OR ERLOTINIB TREATMENT".................................. 67

    1.   Plaintiffs' Opening Position..................................................... 67

    2.   Defendants' Answering Position ............................................ 68

    3.   Plaintiffs' Reply Position ...................................................... 69

    4.   Defendants' Sur-Reply Position ............................................ 70

B.   "CANCER" ...................................................................................... 70

    1.   Plaintiffs' Opening Position..................................................... 70

    2.   Defendants' Answering Position ............................................ 71

    3.   Plaintiffs' Reply Position ...................................................... 71

# TABLE OF CONTENTS
### (continued)

**PAGE**

4.     Defendants' Sur-Reply Position ................................................ 72

C.     "EPITHELIAL CELL CANCER" .................................................... 72

     1.     Plaintiffs' Opening Position............................................. 72

     2.     Defendants' Answering Position ..................................... 72

     3.     Plaintiffs' Reply Position ................................................ 73

     4.     Defendants' Sur-Reply Position ..................................... 73

V.     CONCLUSION........................................................................... 73

A.     PLAINTIFFS' CONCLUSION .................................................... 73

B.     DEFENDANTS' CONCLUSION .................................................. 73

# TABLE OF AUTHORITIES

PAGE

CASES

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
618 F.3d 1354 (Fed. Cir. 2010)...................................................................... passim

*Amgen Inc. v. Sandoz Inc.*,
923 F.3d 1023 (Fed. Cir. 2019)........................................................................18

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007).......................................................................31

*Bayer Healthcare LLC v. Baxalta Inc.*,
No. 16-1122, 2019 WL 291143 (D. Del. Jan. 22, 2019) ........................................4

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001).......................................................................14

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006).........................................................................60

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1339 (Fed. Cir. 2003).......................................................................16

*Bracco Diagnostics Inc. v. Maia Pharms, Inc.*,
839 F. App'x 479 (Fed. Cir. 2020) ..............................................................51, 59

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
246 F.3d 1368 (Fed. Cir. 2001)...............................................................23, 25, 30

*Cadence Pharmaceuticals Inc. v. Exela PharmSci Inc.*,
780 F.3d 1364 (Fed. Cir. 2015).......................................................................28

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)...............................................................13, 18, 27

*Data Engine Techs. LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021) ...................................................................18, 31

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
803 F.3d 620 (Fed. Cir. 2015).........................................................................35

**TABLE OF AUTHORITIES**
(continued)

**PAGE**

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
    8 F.4th 1331 (Fed. Cir. 2021) ........................................................................... passim

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016)...................................................................3, 62

*Erbe Elektromedizin GmbH v. Int'l Trade Com'n*,
    566 F.3d 1028 (Fed. Cir. 2009)...............................................................................55

*Forest Labs. LLC. v. Apotex Corp.*,
    2016 WL 6645784 (D. Del. Nov. 8, 2016) .............................................................30

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
    918 F.3d 928 (Fed. Cir. 2019).........................................................................36, 43

*Fujinon Corp. v. Motorola, Inc.*,
    No. CIV.07-533-GMS-LPS, 2009 WL 2920808 (D. Del. Sept. 11, 2009)...........................28

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003).........................................................................41

*Genuine Enabling Tech. LLC v. Nintendo Co., Ltd.*,
    29 F.4th 1365 (Fed. Cir. 2022) ........................................................................55

*GPNE Corp. v. Apple Inc.*,
    830 F.3d 1365 (Fed. Cir. 2016).........................................................................37

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008).........................................................................40

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
    No. 16-C-651, 2017 WL 5891058 (N.D. Ill. Nov. 27, 2017) .................................65

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010).........................................................................34

*In re Cruciferous Sprout Litig.*,
    301 F.3d 1343 (Fed. Cir. 2002)...................................................................18, 27

*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003)...................................................................21, 29

# TABLE OF AUTHORITIES
(continued)

**PAGE**

*Lazare Kaplan Int'l Inc. v. Photoscribe Techs., Inc.*,
     628 F.3d 1359 (Fed. Cir. 2010)......................................................................59

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
     358 F.3d 898 (Fed. Cir. 2004)........................................................................54

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
     572 U.S. 898 (2014)................................................................................34, 45

*Nestle USA, Inc. v. Steuben Foods, Inc.*,
     686 F. App'x 917 (Fed. Cir. 2017) ...............................................................65

*Network Com., Inc. v. Microsoft Corp.*,
     422 F.3d 1353 (Fed. Cir. 2005)......................................................................55

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
     30 F.4th 1339 (Fed. Cir. 2022) ...............................................................34, 36

*Novartis Pharms. Corp. v. Abbott Labs.*,
     375 F.3d 1328 (Fed. Cir. 2004)......................................................................55

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
     778 F.3d 1021 (Fed. Cir. 2015)......................................................................20

*Phillips v. AWH Corp.*,
     415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................................................59

*Rapoport v. Dement*,
     254 F.3d 1053 (Fed. Cir. 2001).................................................................16, 26

*Renishaw PLC v. Marposs Societa' per Azioni*,
     158 F.3d 1243 (Fed. Cir. 1998).................................................................28, 63

*Sanofi Mature IP v. Mylan Labs. Ltd.*,
     757 F. App'x 988 (Fed. Cir. 2019) ...........................................................16, 26

*ScriptPro LLC v. Innovation Assocs., Inc.*,
     833 F.3d 1336 (Fed. Cir. 2016)......................................................................42

*Takeda Pharm. Co. Ltd. v. Actavis Labs FL, Inc.*,
     No. CV 15-451-RGA, 2016 WL 3193188 (D. Del. June 6, 2016) ............23, 24, 30

**TABLE OF AUTHORITIES**
(continued)

PAGE

*Thorner v. Sony Comput. Ent. Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012)..............................................................4, 36, 51, 61

*Trustees of Columbia Univ. in N.Y.C. v. Symantec Corp.,*
    811 F.3d 1359 (Fed. Cir. 2016).........................................................................68

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007).........................................................................36

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997)...........................................................................................60

**STATUTES**

35 U.S.C.
    § 154(d).............................................................................................................4
    § 154(d)(2) .................................................................................................. passim

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
| --- | --- |
| Opening or Op. | Plaintiffs' Opening Claim Construction Position |
| Answer or Ans. | Defendants' Answering Claim Construction Position |
| Reply | Plaintiffs' Reply Claim Construction Position |
| Sur-Reply | Defendants' Sur-Reply Claim Construction Position |
| POSA | person of ordinary skill in the art |
| EGFR | epidermal growth factor receptor |
| G/E or g/e | gefitinib and erlotinib |
| LMW | low molecular weight |
| NSCLC | non-small cell lung cancer |
| TK | tyrosine kinase |
| TKI | tyrosine kinase inhibitor |
| '314 patent | U.S. Patent No. 10,603,314 |
| '474 application | U.S. Patent Application No. 11/883,474 |
| '162 patent | U.S. Patent No. 10,596,162 |
| '349 application | U.S. Patent Application No. 15/207,349 |
| patents-in-suit | '314 and '162 patents |
| Asserted Claims | Claims 1, 3–6, and 9 of the '314 patent, and claims 1 and 4 of the '162 patent |
| WO'058 | WO 2006/084058 |

## I.      INTRODUCTION

### A.      Plaintiffs' Opening Position

The Patents-in-Suit—U.S. Patent Nos. 10,603,314 ("the '314 patent") and 10,596,162 ("the '162 patent")—cover a novel method of treating non-small cell lung cancer ("NSCLC"). NSCLC is a deadly disease, with only a 25% survival rate five years after diagnosis.  The approval of two Epidermal Growth Factor Receptor ("EGFR") inhibitors—gefitinib and erlotinib ("g/e")— in the early 2000s marked an advance in NSCLC treatment.  But these inhibitors were, or became, ineffective for many patients with g/e resistant NSCLC.

The inventors of the Patents-in-Suit were the first to discover that g/e resistance could be overcome using a class of compounds, called irreversible EGFR inhibitors, that form covalent chemical bonds with EGFR.  Defendants sell Tagrisso® (osimertinib):  an irreversible EGFR inhibitor indicated for treatment of g/e resistant NSCLC according to the methods claimed in the patents-in-suit.  After attempts to reach agreement with Defendants regarding licensing failed, Plaintiffs Puma Biotechnology, Inc. and Wyeth LLC (collectively, "Plaintiffs"), licensee and owner of the Patents-in-Suit respectively, filed this patent infringement suit.

Eight unique claim terms are in dispute.  Plaintiffs propose one term for construction, while Defendants propose the remaining seven, including three from the underlying international patent application ("the '058 Publication" or "WO '058").  Plaintiffs contend Defendants' proposed terms have well-understood ordinary meanings to persons of ordinary skill in the art ("POSA")[1] and require no further construction.  Plaintiffs have provided those ordinary meanings so that the Court can adopt them should it determine that construction is appropriate.  Plaintiffs' proposed constructions are supported by both intrinsic and extrinsic evidence; Defendants' are not.

---

[1]   *See* Supporting Declaration of Jeffrey D. Winkler, Ph.D. ("Winkler") ¶17.

Each asserted claim contains a nonlimiting preamble.  The preambles merely state the purpose of the claimed method—to treat g/e resistant NSCLC—and add nothing to the structural steps of the method, or body of the claims.  Nevertheless, Defendants improperly seek to read limitations into the claims via the preamble that require administering "an effective amount" to provide "a therapeutically beneficial effect."  Defendants' proposal is not supported by the intrinsic evidence and should be rejected.

The Patents-in-Suit explicitly teach that NSCLC can be g/e resistant either before *or* after initial g/e treatment.  Yet Defendants' proposed construction limits "g/e resistant [NSCLC]" to cancer that becomes resistant only *after* initial g/e treatment.  And despite the guidance in the intrinsic evidence on identifying g/e resistant NSCLC, and providing their own construction, Defendants incorrectly claim this term is indefinite.

Defendants' construction of the "irreversible EGFR inhibitor" terms in the claimed methods ignores the well-understood ordinary meaning of those terms to a POSA.  For example, the claims, specification, and prosecution history teach a POSA that irreversible EGFR inhibitors according to the claimed invention are low molecular weight ("LMW") N-(heteroaryl)-aniline compounds having Michael acceptors that bind to EGFR.  On the other hand, there is no support for the "permanent inhibition of EGFR" limitation Defendants seek to read into the meaning of these limitations.

Plaintiffs' proposed constructions of "unit dose," "cancer," "daily," and "epithelial cell cancer" faithfully follow explicit definitions of these terms in the patent specification or the well-understood ordinary meanings of these terms.  Accordingly, Plaintiffs' proposed claim constructions should be adopted and Defendants' litigation-inspired constructions should be rejected.

B.      **Defendants' Answering Position**

Tagrisso®, the novel drug at issue in this case, is a pioneering treatment for certain types of non-small cell lung cancer (NSCLC).  Plaintiffs did not invent or develop this drug.  Nor did Plaintiffs invent a method of using it.  In fact, Tagrisso® was developed, clinically tested, and approved by FDA nearly five years before any claim in the patents-in-suit issued.  Nonetheless Plaintiffs assert that they are entitled to damages based on all of AstraZeneca's sales of Tagrisso®, including for the years when there was no patent to be infringed.

Plaintiffs assert the '314 and '162 patents.  Each recites a method of treating gefitinib and/or erlotinib resistant NSCLC to a patient comprising administration of a pharmaceutical composition comprising an irreversible EGFR inhibitor.  Over a decade of substantive examination by the Patent Office, the applicants attempted to distinguish the prior art by narrowing their claims to a specific method of treating NSCLC, and by arguing that such effective treatments were not previously known or disclosed.  Plaintiffs now seek to rewrite those limitations through claim construction.

In light of the invalidity and infringement issues in this case, eight claim terms require construction.  Five terms appear in the '314 and '162 patents.  Most notably, the intrinsic evidence compels Defendants' positions that the preamble term is limiting and requires actually "treating" gefitinib and/or erlotinib resistant NSCLC, and that the "irreversible EGFR inhibitor" term is a functional limitation.  Yet Plaintiffs' seek to strike out the former in its entirety, and to rewrite the latter to be a structural term in an effort to avoid invalidity for lack of enablement and adequate written description.  Moreover, Plaintiffs' argument that the plain meaning suffices for several of the identified terms is belied by the parties' inability to agree on the correct meaning of these terms. *See, e.g.*, *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) ("A determination that a claim term 'needs no construction' or has the 'plain and

ordinary meaning' may be inadequate … when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

In addition, certain claim terms from the patents-in-suit and three terms from WO'058, require construction to resolve Plaintiffs' claim that they are entitled to pre-issuance damages. Plaintiffs are required to show, among other things, that the Asserted Claims are "substantially identical" to claims in a published application.  D.I. 57, 3 (citing 35 U.S.C. § 154(d)(2)).  If the scope of the Asserted Claims is narrower than the published claims, the claims are not substantially identical and Plaintiffs' pre-issuance damages claim is barred.  *See* D.I. 51, 14-15 (citing *Prestige Pet Prods., Inc. v. Pingyang Huaxing Leather & Plastic Co.*, 767 F. Supp. 2d 806, 812 (E.D. Mich. 2011) ("[A]n amendment that narrows the scope of a claim is a substantial change.")).  Here, Plaintiffs assert that the Asserted Claims are "substantially identical" to certain claims published in WO'058.[2]  Despite the fact that there is no credible dispute that the Asserted Claims (reciting, e.g., "NSCLC," one specific type of cancer) are narrower than the published claims (reciting, e.g., "cancer," "epithelial cell cancer," or a list of numerous types of cancer), Plaintiffs nonetheless insisted claim construction was necessary to resolve this issue.  D.I. 59, 3, 5-7; *see also* Ex. 1, 6:16-25.

Each of Defendants' proposed constructions is the plain and ordinary meaning of the term, as understood by a POSA in the context of the patent specification and prosecution history. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a

---

[2]  Following the Court's July 8, 2022 order, Plaintiffs responded to an interrogatory identifying the claims they assert are substantially identical within § 154(d). Plaintiffs point to claims published in WO'058, or alternatively, pending claims from the '474 and '349 applications that led to the patents-in-suit. *See* Ex. 2, 8. Such pending claims, however, are not published within § 154(d)(2). *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-1122, 2019 WL 291143, *2 (D. Del. Jan. 22, 2019).

claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."). Plaintiffs' attempts to rewrite the claims, to assert infringement and avoid fatal invalidity challenges, should be rejected.

      **C.**     **Plaintiffs' Reply Position**

      While Plaintiffs' proposed constructions are fixed in the intrinsic evidence, each of Defendants' proposed constructions strays far from it, often by ignoring or mischaracterizing the express disclosures of the specification and the prosecution history.  For example, for the g/e resistance terms, Defendants try to limit the scope of the claims (and therefore their infringement) by ignoring embodiments directed to primary g/e resistance, in favor of only acquired resistance. This is contrary to black-letter Federal Circuit law.  And for the irreversible EGFR inhibitor term, Defendants divorce the term entirely from the teachings of the specification and the prosecution history, as well as the knowledge of a person of ordinary skill in the art ("POSA"), to remove all context for how the term would have been understood in view of the patent specification.

      Defendants' arguments around the remaining five terms are little more than a rehash of their pre-issuance damages defense.  Instead of focusing on their proffered constructions, Defendants repeatedly argue that these disputed terms are not substantially identical to the claims in the WO 2006/084058 Publication ("WO'058"), and thus Plaintiffs cannot recover pre-issuance damages.  *See, e.g.*, Defendants' Answering Position ("Ans. Br.") at 61.  As the Court has already decided, Defendants' motion against pre-issuance damages is premature, and "may be filed as a summary judgment at the appropriate time."  July 8, 2022 Minute Entry Denying Defendants' Motion for Judgment on the Pleadings; Defendants' Ex. 1, 7:4-25.  As to the issue at hand, Defendants' proposed constructions are incorrect.

The Court should reject Defendants' proposed constructions in favor of Plaintiffs', which are firmly rooted in the intrinsic evidence.

### D.    Defendants' Sur-Reply Position

Defendants' proposed constructions are rooted in the intrinsic evidence and should be adopted.  Plaintiffs, on the other hand, acknowledge the centrality of intrinsic evidence but propose constructions that defy that evidence.  Plaintiffs would negate the preamble and expand the claims to require just the administration of a medicament despite that the intrinsic evidence emphasizes the purported invention as a method of treating resistant cancer.  And, while the intrinsic evidence describes the irreversible inhibitors in functional terms, Plaintiffs propose a structural definition found nowhere in the intrinsic evidence (or the extrinsic literature) and that directly contradicts the patent's teaching that the inhibitor can be "any compound" and its examples of possible "larger compounds."

As to the terms relevant to Plaintiffs' pre-issuance damages claim, Plaintiffs denigrate construction as "premature" despite previously arguing to this Court that claim construction is required.  Because the intrinsic evidence defines the scope of the published claims, and shows them to be broader than the issued claims, construction is appropriate.

## II.    BACKGROUND

### A.    Plaintiffs' Opening Position

#### 1.    Plaintiffs' Technical Background

EGFR is a protein that regulates cell division and cell death.  A00030 at 1:64-2:1, 2:27-40, 2:52-60;[3]  Winkler ¶22.   Mutations to EGFR can lead to cancer, which includes rapid or uncontrolled cell growth.  *Id.*; *see also* A00036 at 13:37-42.  Particular mutations, like the T790M

---

[3]   The '314 and '162 patents share a common specification. Plaintiffs have limited their citations to the '314 patent; the corresponding passages in the '162 patent would equally apply.

mutation, are associated with g/e resistance in NSCLC.  A00031 at 4:37-38; A00033 at 8:23-30.  ErbB2 is another protein similar to EGFR.  A00030 at 2:3-10; Winkler ¶22.  The EGFR and erbB2 proteins have three distinct sections, known as domains:  a domain outside the cell ("extracellular domain"), a domain spanning from outside to inside the cell ("transmembrane domain"), and a domain inside the cell ("intracellular domain").   A00030 at 2:13-19; Winkler ¶¶23-24.   The intracellular domain contains the tyrosine kinase ("TK") domain, also referred to as the "catalytic domain."  A00037 at 16:17-20; Winkler ¶23.

The TK domain has a binding site for adenosine triphosphate ("ATP"), a molecule that cells use to store energy.  A00030 at 2:13-19; A00031 at 3:11-15; Winkler ¶¶23-24.  When ATP is bound in the ATP-binding site it can trigger cell signaling pathways that are essential for cancer development and progression.  A00030 at 2:27-40; A00031 at 3:11-15; Winkler ¶¶24-25.  EGFR inhibitors like g/e and the claimed irreversible EGFR inhibitors act at the ATP-binding site, affecting ATP binding and subsequent signaling.  A00030 at 2:27-64; A00031 at 3:11-18; A00032 at 6:16-30; Winkler ¶¶26, 30.  This mechanism is responsible for these compounds' ability to treat NSCLC.



So-called reversible EGFR inhibitors, like g/e, were developed to compete with ATP for the ATP-binding site of the EGFR intracellular TK domain.  A00031 at 3:11-15; A00033 at 7:43-46; A00036 at 13:55-56 (citing Winkler Ex. C); Winkler ¶¶26-27, 30, 34.  Reversible inhibitors form non-covalent bonds with the ATP-binding site.  *Id.* ¶34.  Not all NSCLC patients respond to reversible EGFR inhibitors, and some initially respond but then stop responding.  A00031 at 3:19-24, 3:32-36; Winkler ¶37.  Irreversible EGFR inhibitors were developed that covalently bind to specific amino acid residues—cysteine 773 ("Cys773") or cysteine 805 ("Cys805")—that are located near the ATP-binding site of the intracellular TK domain.  *E.g.,* A00033 at 7:15-20; A00037 at 16:9-20; Winkler ¶35.  These irreversible EGFR inhibitors were structurally similar to existing reversible EGFR inhibitors like g/e, but included an additional piece—a Michael acceptor—which forms a covalent bond with the claimed cysteine residue of the EGFR intracellular TK domain.  *Id.*; Winkler ¶¶35-36.  When bound to the specified cysteine residue,

irreversible EGFR inhibitors block ATP from binding and circumvent g/e resistance.  *See* A00033 at 8:29-34, 8:40-45.

> ## 2.      Patents-in-Suit

The '314 Patent claims methods for treating g/e resistant NSCLC by administering an irreversible EGFR inhibitor that covalently binds to the Cys773 residue of EGFR or the Cys805 residue of erbB2.  The irreversible EGFR inhibitor is administered daily in a unit dosage.

The '162 Patent claims methods for treating g/e resistant NSCLC having a particular EGFR mutation—the T790M mutation—using an irreversible EGFR inhibitor that covalently binds to Cys773 within EGFR (referred to in '162 Claim 1 by its amino acid sequence, SEQ ID NO:  1).[4] The irreversible EGFR inhibitor is administered daily with a unit dosage of 2–500 mg.  NSCLC with a T790M EGFR mutation is resistant to g/e.  A00031 at 4:37-38; Winkler ¶37.

> ## B.      Defendants' Answering Position

> ### 1.      Defendants' Technical Background

The patents-in-suit relate to the use of compounds that inhibit the activity of the epidermal growth factor receptor (EGFR).  '314 patent, abstract (A00002), 3:43-55 (A00031); Reider Decl.  ¶17.  EGFR is an enzyme involved in cell division and growth.  '314 patent, 1:53-63 (A00030); Reider Decl. ¶17.  Because overactivity of EGFR is associated with many cancers, including epithelial cell cancers like NSCLC, by the 1990's, drug development programs began researching compounds to inhibit, or block, EGFR activity.  '314 patent, 1:24-2:64 (A00030); Reider Decl. ¶¶19-21.  Based on this function, these compounds are called EGFR tyrosine kinase inhibitors (TKIs).  '314 patent, 2:54-62 (A00030); Reider Decl. ¶20.

---

[4]   A00032 at 6:4-5 and A00035 at 12:62-63 (referring to Figure 5).

EGFR TKIs can be split into two classes:  reversible and irreversible inhibitors.  Reider Decl. ¶22.  Reversible inhibitors bind to the target enzyme in a way that may dissociate over time.  *Id*.  In contrast, irreversible inhibitors form strong bonds that do not break under physiologic conditions.  *Id*.

In 2003, FDA approved gefitinib as the first EGFR inhibitor for the treatment of NSCLC.  '314 patent, 3:8-10 (A00031); Reider Decl. ¶23.  Gefitinib was developed and marketed by AstraZeneca as Iressa®.  '314 patent, 2:65-3:1 (A00030-31); Reider Decl. ¶23.  In 2004, FDA approved a second EGFR inhibitor erlotinib, which was marketed as Tarceva®.  '314 patent, 2:65-3:1 (A00030-31); Reider Decl. ¶23.  Gefitinib and erlotinib are reversible inhibitors.  Reider Decl. ¶23.  Researchers also worked on developing irreversible EGFR inhibitors to treat NSCLC, including CL-387,785, CI-1033, HKI-272, EKB-569, and HKI-357.  '314 patent, 3:56-59 (A00031); *see also* Reider Decl. ¶¶22-23, 36.  However, no irreversible EGFR inhibitor was approved for the treatment of NSCLC, until 2013, when FDA approved afatinib, which is an irreversible EGFR inhibitor that is not disclosed in the intrinsic record.  Reider Decl. ¶23.

### 2.    Patents-in-Suit

The terms requiring construction are recited in a single patent family sharing a common specification.  The applicants filed a PCT application in 2006, claiming priority to two provisional applications filed in February and April 2005.[5]  The PCT application published as WO'058 (addressed in further detail below).  The applicants subsequently filed a U.S. application—the '474 application—claiming priority to the PCT application.  The '474 application eventually issued as the '314 patent.  A continuation of the '474 application resulted in the '162 patent.

---

[5]   For purposes of claim construction only, Defendants will assume for the '314 patent a priority date as of February 3, 2005, and for the '162 patent a priority date of April 15, 2005. Defendants dispute that the patents-in-suit are entitled to these priority dates.

(a)     '314 and '162 Patents

During prosecution of the '474 application, the applicants pursued claims reciting a method of treating gefitinib and/or erlotinib resistant cancer.  In March 2020, fifteen years after the first provisional application was submitted, the '314 patent issued from the '474 application.

In 2016, while prosecution of the '474 application was ongoing, the applicants filed a continuation application—the '349 application—to seek claims directed to a particular type of gefitinib and/or erlotinib resistant cancer—cancer having a T790M mutation.  The '162 patent issued from the '349 application also in March 2020.

During prosecution for both applications, the applicants had to overcome numerous rejections based on various prior art references that taught prior art irreversible EGFR inhibitors and the administration of such inhibitors to treat cancer.  In attempting to overcome these rejections and distinguish the prior art, the applicants repeatedly emphasized the ability of the claimed method to treat, or effectively treat, a patient with gefitinib and/or erlotinib resistant cancer (or, once amended, NSCLC).  *E.g.*, '474 application, A00195-96; *see infra* §III(A)(2)(b).  The applicants also repeatedly emphasized the function of irreversible EGFR inhibitors as "a necessary component" to the claimed method of treating.  *E.g.*, '474 application, A00149; *see infra* §III(C)(2).  And the applicants substantially narrowed the pending method of treating, including by narrowing the cancer treated to NSCLC and adding limitations reciting, for example, daily administration and a pharmaceutical composition comprising a unit dosage.  *E.g.*, '474 application, A00218 (narrowing to NSCLC); A00225 (narrowing to "unit dosage"), A00258 (narrowing to "daily"); '349 application, A00277 (narrowing to "gefitinib and/or erlotinib resistant NSCLC"), A00167 (narrowing to "daily" and limiting unit dosage to "2-500 mg"), A00283 (narrowing to recite NSCLC "in a patient," "unit dosage," and excluding the CL-387,785 inhibitor), A00287 (amending to recite "a patient" in preamble, providing antecedent basis for "the patient" in body);

11

*see infra* §§III(D)(2), (E)(2).  Thus, when the patents-in-suit eventually issued in 2020, their claims had been narrowed through a lengthy prosecution history to recite specific methods of treating NSCLC.

### (b)   WO'058

WO'058 is the international publication of the PCT application to which the patents-in-suit claim priority.  It published with the same claims initially filed in the '474 application, which led to the '314 patent.  Specifically, WO'058 published with three independent claims directed to methods of treating gefitinib and/or erlotinib resistant cancer (claim 1) or methods of treating cancer (claims 11 and 23).  Each independent claim was narrowed by two claims reciting either a specific class of cancer (i.e., epithelial cell cancer) or specific types of cancers (e.g., breast cancer, head and neck cancer, lung cancer).  *See* WO'058, claims 9-10 (narrowing claim 1), 19-20 (narrowing claim 11), 26-27 (narrowing claim 23) (A00130-32).

## III.   DISPUTED CLAIM CONSTRUCTIONS IN THE PATENTS-IN-SUIT

### A.   "A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof" *or* "A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO:  1 in a patient"

#### 1.   Plaintiffs' Opening Position

Claim 1 of the '314 Patent and Claim 1 of the '162 Patent are representative, and the disputed terms are highlighted below in context.

#### '314 Patent

1.   **A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof**, comprising **administering daily to the patient** having **gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage** of an **irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-**

12

binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2.

**'162 Patent**

1.   **A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient**, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2-500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation; wherein the irreversible EGFR inhibitor is not CL-387,785.

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| The preamble is not limiting and requires no construction. | The preamble is limiting; |
| | "Administration of an effective amount of drug to a patient diagnosed with gefitinib and/or erlotinib resistant non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1 ('162 Patent, Claim 1)] for the purpose of providing a therapeutically beneficial effect on the gefitinib and/or erlotinib resistant non-small cell lung cancer. An effective amount is an amount that results in a beneficial effect for at least a statistically significant fraction of patients considering both its pharmacologic effectiveness and its physiological safety" |

A preamble is not limiting unless "it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted). Moreover, a preamble is not construed as a separate limitation "[i]f the preamble is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim[.]" *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010) (citation omitted).

The preambles of Claim 1 of the Patents-in-Suit merely indicate the purpose of the invention: to treat patients with g/e resistant NSCLC by a particular method. The essential structure and steps of the claimed method are contained in the body of each claim, which recite administration to a patient of a unit dosage of an irreversible EGFR inhibitor that covalently binds to cys773 of EGFR or cys805 of erb-B2 in the ligand-binding domain.[6] '314 Patent, Claim 1; '162 Patent, Claim 1. The preambles recite a method of treating g/e resistant NSCLC, and the body of the claims recite the steps that comprise such a method. The preambles do not give life, meaning, and vitality to the claims, nor do they recite essential steps. As in *Am. Med. Sys.*, "[r]emoval of the duplicative preamble language would neither alter the scope of the claims nor introduce ambiguity as to their coverage." *Id.* at 1360. To illustrate this, Claim 1 of each of the Patents-in-Suit is color-coded below to show the duplicative limitations in the preambles and the body of the claims.

| '314 Claim 1 Preamble | '314 Claim 1 Body |
|---|---|
| A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, | comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer . . . . |

| '162 Claim 1 Preamble | '162 Claim 1 Body |
|---|---|
| A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient, | comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 . . . . |

Defendants' proposal impermissibly reads limitations into the claims via the preamble. Though claims must be read in light of the specification, "limitations from the specification may not be read into the claims." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262

---

[6]   The terms ligand-binding pocket, ATP-binding pocket, and catalytic domain are synonymous.

F.3d 1258, 1270 (Fed. Cir. 2001).   Yet that is exactly what Defendants advocate, adding requirements for a patient to be "diagnosed with" g/e resistant NSCLC and to be treated for a "therapeutic[] benefit" with "an effective amount" of the claimed irreversible EGFR inhibitors. This is unsupported by the intrinsic record.   First, the purpose is clearly stated in the claims themselves, and there is no recitation of "providing a therapeutically beneficial effect."   The specification does not even include the term "therapeutically beneficial."   Second, the claims require administering a daily unit dosage ('314 Patent) or a daily unit dosage of 2-500 mg ('162 Patent), not Defendants' proposed "effective amount."   Third, the claims do not require the patient to be "diagnosed" as g/e resistant.

Defendants' importation of limitations into the nonlimiting preamble contradicts the intrinsic evidence and violates settled Federal Circuit law.   The Court should conclude that the disputed preambles are not limiting and decline to construe them.

### 2.    Defendants' Answering Position

The parties dispute whether the preambles of independent claim 1 of each of the patents-in-suit are limiting.   They are.   If the court decides that the preambles are limiting, the Court should enter Defendants' proposed construction, which accords with the intrinsic evidence and the plain meaning of the preamble.   Plaintiffs have not proposed an alternative construction.

### (a)    The Federal Circuit routinely finds preambles for methods of treating to be limiting

The preambles of the patents-in-suit recite methods of treating gefitinib and/or erlotinib resistant NSCLC in a patient.   The Federal Circuit has repeatedly held that the preambles for methods, and specifically similar methods of treating, are limiting.   As the Court recently explained in *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1341 (Fed. Cir. 2021):

> In contrast to apparatus and composition claims, claims to methods
> of using such apparatuses or compositions are not directed to what

the method "is," but rather they typically rely entirely on what the method "does." And what a method does is usually recited in its preamble. Accordingly, our claim construction analysis of statements of intended purpose in methods of using apparatuses or compositions has tended to result in a conclusion that such preamble language is limiting.

*Id.* (citing *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003); *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003)); *see also, e.g.*, *Rapoport v. Dement*, 254 F.3d 1053, 1059 (Fed. Cir. 2001); *Sanofi Mature IP v. Mylan Labs. Ltd.*, 757 F. App'x 988, 992 (Fed. Cir. 2019).

In *Lilly*, the parties disputed whether preambles reciting "[a] method for treating headache in an individual" were limiting. 8 F.4th at 1340. Lilly, like Plaintiffs here, argued that the preamble contained only a statement of purpose. *Id.* The Court disagreed. The Court found that the format of the claims—which provided a preamble reciting a method for treating and a body reciting a single step of administering a composition—to be highly relevant. *Id.* The Court recognized that "we have generally construed statements of intended purpose in such method claims as limiting," and found that the preamble was a statement of the intentional purpose for which the methods must be performed. *Id.* at 1340, 1342. The Court also considered the emphasis of treatment in the written description of the patents' specification, which was referenced only in the preambles of the claims. *Id.* at 1342.

Here, the preambles recite "[a] method for treating gefitinib and/or erlotinib resistant [NSCLC] in a patient in need thereof" ('314 patent, claim 1) and "[a] method for treating gefitinib and/or erlotinib resistant [NSCLC] having a T790M mutation in SEQ ID NO: 1 in a patient" ('162 patent, claim 1). The bodies of both claims recite a single method step, comprising, among other limitations "administering daily to the patient … a pharmaceutical composition." Thus, just as in *Lilly*, the independent claims are written in a format with a preamble reciting a method for

16

treating and a body reciting a single step of administering a composition.  This format provides the statement of intentional purpose for which the administration step must be performed.  Indeed, Plaintiffs readily admit that the preambles of the patents-in-suit "indicate the purpose of the invention:  to treat patients with g/e resistant NSCLC."  Op. Br., 14; *see also id.*, 2.

In addition, as in *Lilly*, the specification of the patents-in-suit emphasizes that **the purpose of the claimed methods are treating** gefitinib and/or erlotinib NSCLC, **not merely administering** inhibitors as recited in the bodies of the claims.  The title of the patents-in-suit is "**Method for Treating** Gefitinib Resistant Cancer," and throughout the specification, beginning with the abstract, the inventors state that "**[t]he present invention is directed to methods for treatment** of gefitinib and/or erlotinib resistant cancer."  '314 patent, title, abstract (A00002) (emphases added); *see also, e.g., id.*, 3:32-39 (A00031) ("There is a significant need in the art for **a satisfactory treatment of cancer**."), 3:43-46 (A00031) ("The inventors of the present invention have surprisingly discovered that irreversible EGFR inhibitors are **effective in the treatment of cancer** in subjects who are no longer responding to gefitinib and/or erlotinib therapies."), 7:20-23 (A00033) ("[T]he present invention provides **a method of treating** gefitinib and/or erlotinib resistant cancers comprising administering irreversible EGFR inhibitors.") (emphases added).

Plaintiffs' citation to *American Medical Systems, Inc. v. Biolitec, Inc.*, 618 F.3d 1354 (Fed. Cir. 2010), is inapposite.  *See* Op. Br., 13-14.  There, the claims were not directed to a method of treating, but a "method for photoselective vaporization of tissue."  *Am. Medical*, 618 F.3d at 1356.  Unlike the requirement for treatment in *Lilly* and other analogous method of treating claims, in *American Medical*, the Federal Circuit found that the descriptor "photoselective" was not a separate, essential component of the invention.  *Id.* at 1359.  Rather, if limiting, it would be either "redundant or in conflict with" the body of the claims.  *Id*.  Here, "treating" is neither redundant

to, nor in conflict with, the method step of administering, but instead, like other method of treating claims, describes the intended purpose of administering (i.e., to treat).  *See also Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1031-32 (Fed. Cir. 2019) (a limiting preamble reciting a method of treating a disease in a patient "must be performed to treat an underlying disease").  Moreover, in *American Medical*, the Federal Circuit concluded the preamble was not limiting for two additional reasons:  (1) the inventors had not relied on the preamble to distinguish prior art in the prosecution history; and (2) the preamble was not a necessary antecedent basis.  618 F.3d at 1359.  As described below, the opposite circumstances exist here.

> **(b)** **During prosecution, the applicants distinguished prior art based on the prior art's failure to "effectively treat" the claimed cancer**

The applicants' arguments during prosecution of the patents-in-suit confirm the preambles are limiting.  The applicants repeatedly distinguished prior art on the basis that it allegedly failed to "**effectively treat**" the gefitinib and/or erlotinib cancer recited in the pending claims.  As the Federal Circuit recognized (in a case that Plaintiffs rely on), "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002); *see also, e.g.*, *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1383 (Fed. Cir. 2021) (holding preamble limiting based on the patentee's arguments during prosecution); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1347-48 (Fed. Cir. 2002) (holding preamble limiting in light of prosecution arguments "show[ing] a clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention is not anticipated by the prior art").

Here, during prosecution the examiner repeatedly rejected the pending claims over prior art that taught irreversible EGFR inhibitors, including the inhibitors described in the specification

and pending claims, as well as administration of those inhibitors to patients. In an effort to overcome this prior art, the applicants distinguished the disclosure of an inhibitor or administration of an inhibitor based on the prior art's alleged failure to "treat" or "effectively treat" gefitinib and/or erlotinib resistant cancer as recited in the preambles. For example, the applicants made the following arguments during prosecution to distinguish prior art (emphases added):

- "Kobayashi **does not even suggest** that CL-387,785 would be **effective in treating** gefitinib resistant cancer." '474 application, A00196; *see also id.*, A00195-97.

- "Agus **fails to recognize** or appreciate **the solution of the amended claims for treating** gefitinib and/or erlotinib resistant [NSCLC]" and "it was known in the art that irreversible EGFR inhibitors (i.e., CI-1033) were **not effective against resistant forms of cancer**." '474 application, A00222-23.

- "Agus **[does not]** provide the POSA a reasonable expectation of success to **achieve the benefits of the amended claims**" and "Smaill **fails** to provide the POSA the necessary information to arrive at the claims methods … **[to] be effective in a method of treating a patient** having gefitinib and/or erlotinib resistant [NSCLC]." '474 application, A00265-66.

- "**[N]either** Discafani nor Freeman cure the above-noted deficiencies of Kobayashi, as neither suggest the method of the amended claims … **could be effective in treating a patient** having cancer having a T790M mutation in EGFR." '349 application, A00274.

- "Agus … provides **no reasonable basis for a POSA to conclude** that an irreversible EGFR inhibitor would, much less could, be **effective in treating** a patient having gefitinib and/or erlotinib resistant [NSCLC] having a EGFR T790M mutation." '349 application, A00174; *see also id.*, A00175.

In addition, the applicants argued that the prior art failed to teach the purported "benefits" of treating and failed to teach "overcoming resistance," which is needed for effective treatment. *See, e.g.*, '474 application, A00203-04, A00206 ("Bell also **fails to teach**, much less recognize, **any benefit** an irreversible EGFR inhibitor may have **in treating** the cancer specified in the pending claims.") (emphases added); '474 application, A00147-48 ("**[S]tandard of care treatments** [are] **no longer effective** for patients that have developed gefitinib and/or erlotinib resistant [NSCLC]. To meet this unmet medical need, **Applicants have identified a method of**

19

**treatment that overcomes this resistance**.") (emphases added).  The applicants also emphasized the ability to effectively treat a specific cancer.  For example, applicants distinguished the prior art on the basis that it taught "treating **any** cancer," and in so doing, failed to teach treating the specific cancer recited in the pending claims.  '474 application, A00205.

The applicants' repeated emphasis on the claimed methods' ability to effectively treat gefitinib and/or erlotinib cancer during prosecution, including by distinguishing prior art on this basis, further confirms that the preambles are limiting.  Plaintiffs should not now be permitted to remove from the claims, the very limitations that Plaintiffs relied upon during prosecution of the patents.

> **(c)**     **The preambles provide antecedent basis for the "the patient" recited in the bodies of the claims**

There is yet an additional reason that the preambles are limiting here.  The preambles provide an antecedent basis for "the patient" that is in need of treatment in the body of the claims. Preambles are limiting "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble."  *Pacing Techs., LLC v. Garmin Int'l, Inc*., 778 F.3d 1021, 1024 (Fed. Cir. 2015).  In *Lilly*, for example, "in addition to giving life and meaning to the method step of each claim, the preambles also provide[d] antecedent basis for at least one later claim term in the independent claims." *Lilly*, 8 F.4th at 1343.  There, the preambles of the claims recited "treating … in **an individual**," and the bodies of the claims referred back to "administering to **the individual**." *Id.* at 1335-36, 1343.

The preambles here likewise provide antecedent basis for at least one later claim term in each independent claim 1.  The preambles recite "treating … **a patient** in need thereof" ('314 patent, claim 1) and "treating … **a patient**" ('162 patent, claim 1), and the bodies of both claims recite "administering daily **to the patient**."  Thus, just as in *Lilly*, the recitation of "the patient"

receiving administration in the bodies of the claims refers back to and derives antecedent basis from the preamble.  Accordingly, for this additional reason, the preambles of claim 1 of the patents-in-suit are limiting.

**(d)**     **Defendants' proposed construction captures the plain and ordinary meaning in the context of the intrinsic record**

Defendants' proposed construction is the plain and ordinary meaning of the preamble. Plaintiffs argue that Defendants' proposed construction impermissibly reads limitations into the claims.  Op. Br., 14-15.  It does not.  Instead, Defendants' construction directly addresses what it means to be "[a] method for treating gefitinib and/or erlotinib resistant [NSCLC] in a patient" or "[a] method for treating gefitinib and/or erlotinib resistant [NSCLC] having a T790M mutation in SEQ ID NO:  1 in a patient."  Specifically, the term refers to treatment that is intended to administer an effective amount of drug to a patient diagnosed with the claimed gefitinib and/or erlotinib resistant NSCLC for the purpose of providing a therapeutically beneficial effect that is both pharmacologically effective and physiologically safe.  *See, e.g.*, *Jansen*, 342 F.3d at 1334-35 (Fed. Cir. 2003) (construing method of treatment claim to require intentional treatment of an identified medical need and observing, in the case of a prescription drug, that "a prescription is evidence of a diagnosis and a knowing need to use the product for the stated purpose").

The shared specification of the patents-in-suit is instructive.  The specification devotes an entire section to the "Method of Treating a Patient."  '314 patent, 7:24 (A00033).  *First*, the specification describes methods of treating as comprising "administering to a patient in need of such treatment an effective amount of certain irreversible EGFR inhibitors[.]" '314 patent, 7:26-27 (A00033).  "Effective amount" is defined by the specification as:

> an amount that results in a beneficial effect for at least a statistically significant fraction of patients, such as improvement of symptoms, a cure, a reduction in disease load, reduction in tumor mass or cell numbers, extension of life, improvement in quality of life, or other

21

> effect generally recognized as positive by medical doctors familiar
> with treating the particular type of disease or condition.

'314 patent, 8:45-53 (A00033).  In addition, the specification further defines "effective" to include both pharmacological effectiveness and physiological safety.  '314 patent, 13:14-21 (A00036).  Thus, consistent with the applicants' emphasis during prosecution on effective treatment that provides a benefit to the patient, *see supra*, the specification leaves no doubt that the claimed method of treating provides a therapeutic benefit to a patient.

*Second*, the specification makes clear that diagnosing a patient is part of a method of treating.  The "Method of Treating a Patient" section of the specification devotes nearly a column to a discussion of how to diagnose gefitinib and/or erlotinib resistant cancer.  '314 patent, 7:57-8:44 (A00033).  Also, during prosecution, the applicant distinguished prior art that taught "treating **any** cancer," emphasizing that the claimed methods relate to treating a particular type of cancer—a POSA practicing the claimed method would thus be required to diagnose the claimed cancer in a patient to know that she is treating that cancer.  '474 application, A00205.  Moreover, the fact that a method of treating requires diagnosis is confirmed by the claim language.  The claims recite treatment for "a patient in need thereof" or "a patient," which underscores that treatment is directed to a person that has a recognized need, i.e., has been diagnosed with, "gefitinib and/or erlotinib resistant [NSCLC]."

In light of the intrinsic evidence, the preambles should be construed consistent with the plain meaning.  Plaintiffs' attempt to rewrite the claims to ignore the preambles—which is inconsistent with both Federal Circuit's precedent and the intrinsic evidence—should be rejected.

### 3.      Plaintiffs' Reply Position

#### (a)      The preambles are not limiting

Contrary to Defendants' arguments, there is no blanket rule that method of treatment preambles are claim limitations.  The Federal Circuit has repeatedly cautioned that there is "no simple test" to determine whether a preamble is limiting, and "[w]hether to treat a preamble as a claim limitation is 'determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'"  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)). In method of treatment claims, statements of intended result or purpose (like in the asserted claims) are generally nonlimiting, particularly where the method is performed the same way regardless of whether the intended result is accomplished, where the language of the claim suggests independence of the preamble from the body of the claim, and where the applicants did not rely on the preamble for patentability.  *See, e.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001).  Consistent with these principles, courts often conclude that method of treating preambles are nonlimiting.

#### (b)      The body of the claims are complete without reference to the preamble

In *Bristol-Myers,* for example, the Federal Circuit affirmed the district court's decision that a method of treatment preamble was nonlimiting where the body of the claim fully set forth the claimed method, and the steps of the method were performed the same way regardless of whether the patient experienced the health effect recited in the preamble.  *Id.*  Similarly, in *Takeda Pharm. Co. Ltd. v. Actavis Labs FL, Inc.*, No. CV 15-451-RGA, 2016 WL 3193188 (D. Del. June 6, 2016), the court found a disputed term in the method of treatment preamble not limiting in part because

the body of the claim "describes all the steps required to completely and adequately carry out the invented method." *Id.* at *7.

The same is true for the disputed preambles here, as illustrated below.

| ***Bristol-Myers*** | ***Takeda*** | **Patents-in-Suit (Representative Claim 1 of '162 Patent)** |
|---|---|---|
| "*A method for reducing hematologic toxicity in a cancer patient undergoing [t]axol treatment* comprising parenterally administering to said patient an antineoplastically effective amount of about 135–175 mg/m2 taxol over a period of about three hours." <br><br> "*A method for treating a cancer patient to effect regression of a taxol-sensitive tumor, said method being associated with reduced hematologic toxicity,* said method comprising: <br><br> (i)  premedicating said patient with a medicament that reduces or eliminates hypersensitivity reactions; and <br><br> (ii) parenterally administering to said patient about 135–175 mg/m2 taxol over about 3 hours." | "*A method of treating overweight or obesity having reduced adverse effects* comprising orally administering daily about 32 mg of naltrexone and about 360 mg of bupropion, or pharmaceutically acceptable salts thereof, to a person in need thereof, wherein the bupropion or pharmaceutically acceptable salt thereof is administered as a sustained-release formulation, wherein the naltrexone or pharmaceutically acceptable salt thereof is administered as a sustained-release formulation . . ." | *A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient,* comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO:  1 a pharmaceutical composition comprising a unit dosage of 2-500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO:  1 having a T790M mutation; wherein the irreversible EGFR inhibitor is not CL-387,785. |

Here, as in *Bristol-Myers* and *Takeda,* the body of the claims sets forth the steps of the method and the patient population without need for any reference to the preamble.  Like the "reducing hematologic toxicity" and "effect regression of a taxol-sensitive tumor" language in the preambles at issue in *Bristol-Myers*, here, "treating gefitinib and/or erlotinib resistant non-small

cell lung cancer[,]" is merely "a statement of purpose and intended result," and does not make a "manipulative difference in the steps of the claim." *Bristol-Myers*, 246 F.3d at 1376. And, like in *Takeda*, all the steps required to completely and adequately carry out the invented method are recited in the body of the claims. Accordingly, the Court should conclude that the preambles are nonlimiting.

The *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331 (Fed. Cir. 2021) case heavily relied upon by Defendants does not support a different result. Exemplary Claim 1 in *Lilly* recites:

> A method for <u>reducing incidence of or treating at least one vasomotor symptom</u> in an individual, comprising administering to the individual an effective amount of an anti-CGRP antagonist antibody, wherein said anti-CGRP antagonist antibody is a human monoclonal antibody or a humanized monoclonal antibody.

*Id.* at 1335. *Lilly* found the preamble limiting because a central feature of the invention (i.e., the treatment of vasomotor symptoms) ***only appeared in the preambles***. *Id.* at 1342.

Here the preambles are not "the portions of the claims that embody the essence of the claimed invention." *Id.* Rather, the body of the claims requires that the irreversible EGFR inhibitor be administered to a specific type of patient, i.e., with g/e-resistant NSCLC, and covalently bind to a specific portion of EGFR. The body of the claims fully recites how g/e-resistant NSCLC is treated, so Defendant cannot contend that the preambles embody the essence of the claimed invention as was true in *Lilly*.

Further, the body of the *Lilly* claims recited administering "an effective amount" of the drug at issue. *Id.* The Federal Circuit reasoned that if the preamble was nonlimiting—i.e., the claims were not limited to effective treatment of at least one vasomotor symptom—a POSA could not determine what the "effective amount" referred to in the body of the claim was meant to be. *Id.* Similarly, the body of the claim in *Lilly* merely cited "administering to the individual." 8 F.4th at 1335. Without the preamble's reference to treating "at least one vasomotor symptom in an

25

individual," *id.*, a POSA would not know the individual to be treated (someone with at least one vasomotor symptom). The preamble therefore provided necessary antecedent basis for both terms in the body of the claims, and was found limiting. *Id.* at 1343. And Defendants' other similar cases, *Rapoport v. Dement*, 254 F.3d 1053, 1059 (Fed. Cir. 2001) and *Sanofi Mature IP v. Mylan Labs. Ltd.*, 757 F. App'x 988, 993 (Fed. Cir. 2019), fail for the same reason.

Here, by contrast, the amount of irreversible EGFR inhibitor administered is not tied to the language of the preamble and instead appears directly in the body of the claim. Nor does the body of the claims need to reference the preamble to define the "patient" because the body of the claims explicitly states that treatment is provided to "the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1 ('162 Patent, Claim 1)]." '314 Patent, Claim 1. Unlike the *Lilly* claims, here, the claim body recites all of the necessary details standing alone: what to administer (an irreversible EGFR inhibitor that binds according to the claims), how much ("a unit dosage" ('314 Patent) and "a unit dosage of 2-500 mg" ('162 Patent), and to whom (a g/e-resistant patient). *Lilly* and Defendants' other cited authorities are simply not applicable.

### (c) The inventors did not rely on the preambles to distinguish the prior art

The Court should also reject Defendants' contention that the preambles are limiting because the inventors allegedly relied on the "claimed methods' ability to effectively treat gefitinib and/or erlotinib cancer," and "distinguish[ed] prior art on this basis" during prosecution. Ans. Br. at 19-21. The inventors did no such thing, and Defendants' arguments to the contrary amount to nothing more than acontextual, cherry-picked quotes.

The case law requires "*clear* reliance on the preamble during prosecution to distinguish the claimed invention from the prior art [in order to] transform[] the preamble into a claim

26

limitation. . . ." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (emphasis added).  In *In re Cruciferous Sprout Litig.*, 301 F.3d 1343 (Fed. Cir. 2002), for example, the patentee argued during prosecution that the term "rich in glucosinolates" was limiting *even though it was in the preamble* because "it breathes life and meaning into the claim."  *Id.* at 1347-48.  The district court found, and the Federal Circuit affirmed, that this rose to the level of clear reliance.

Here, none of Defendants' alleged prosecution history examples come close to such reliance on the preamble, particularly when viewed in their full context.  None of the inventors' responses specifically cite to or point out how the preamble limits the claims.  For example, Defendants cite to the inventors' arguments in response to an obviousness rejection over the Kobayashi reference in combination with Discafani and Freeman.  Ans. Br. at 19 (citing A00274).  But the inventors' response made no reference to the preamble; in fact, the only relevant amendment (to pending claim 23) involved only the body of the claim and was directed to covalent binding, not treatment.  *See* A00271, A00273-00274.  Similarly, Defendants' citation to the prosecution history's discussion of the Agus reference misrepresents the entire context of the inventors' responses, which were not based on the preamble but were instead focused on Agus's failure to teach the claimed type of TKI to be administered, or the claimed dosage, to overcome g/e resistance.  *E.g.*, A00173-A00175, A00220-23, A00235-39.  Defendants also cite to the inventors' response to a rejection of pending claims 43-46 in a February 27, 2014, office action response involving the Kobayashi reference.  Ans. Br. at 19 (citing A00195-197).  But even the examiner recognized that pending claim 43 (where the preamble was not the same as the claims at issue here, and the claim was cancelled six months later, A00308) was "not limited to clinical treatment or even treatment of humans."  A00303.  Defendants citations do not show that the

27

inventors relied on the preambles to distinguish the claims during prosecution, let alone clearly relied on them, and therefore they should be found nonlimiting.

Even if the Court were to find the preambles limiting, which it should not, Defendants' construction should be rejected because it is substantively incorrect.  As Plaintiffs explained in their opening brief, Defendants improperly add requirements to administer "an effective amount of drug to a patient diagnosed with" g/e-resistant NSCLC "for the purpose of providing a therapeutically beneficial effect" on the g/e-resistant NSCLC.[7]  The claim language simply does not support this construction.

The terms "effective" and "therapeutically beneficial" do not appear in the preamble (or the body of the claims).  Given that the inventors knew how to use "effective," since it is defined in the specification, its omission in the claims contradicts Defendants' proposed construction. A00033 at 8:45-53; A00036 at 13:14-25.  *Accord Fujinon Corp. v. Motorola, Inc.*, No. CIV.07-533-GMS-LPS, 2009 WL 2920808, at *6 (D. Del. Sept. 11, 2009), as corrected (Sept. 18, 2009) (reasoning that "[c]learly, the inventor knew how to say" a particular term, but chose not to, and therefore that choice was significant).  *See also Cadence Pharmaceuticals Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) (affirming district court's refusal to construe "buffering agent" to include an effective amount in part because there was "nothing in the intrinsic record to warrant adding requirements of effective concentration").

Nor does the intrinsic evidence support Defendants' requirement that the patient having g/e-resistant NSCLC should first be "diagnosed" as part of the claimed methods.  Ans. Br. at 22. While the specification provides examples of determining g/e sensitivity and resistance, *see, e.g.*,

---

[7]  Even if the claims recited the phrase "an effective amount" (which they do not), Defendants' definition of this term directly contradicts the specification's definition of this term.  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

A00033 at 7:50-8:45, no such requirement appears as a step in the claimed methods.  Moreover, the inventors understood how to incorporate a diagnosis limitation into the claims.  Earlier versions of the claims included diagnosis steps, including steps to monitor for progression followed by treatment, which were later removed from the claims during prosecution, signaling to a POSA that diagnosis is not a required method step.  *Compare* A00130 (claims 1, 4-7 including monitor progression followed by treatment) *with* A00191 (cancelling claims 1-28).

### 4.      Defendants' Sur-Reply Position

#### (a)      The Preambles are Limiting

Though "there is no blanket rule" that method-of-treating preambles are claim limitations, the Federal Circuit has "generally construed statements of intended purpose in such method claims as limiting."  *Lilly*, 8 F.4th at 1340.  Plaintiffs provide no justification for departing from this standard practice.

Plaintiffs attempt to distinguish Lilly as involving a "central feature" of the invention appearing only in the preamble.  Reply Br., 25-26.  Here, however, the preamble serves to define the intentional purpose for which the method is carried out:  specifically, the treatment of resistant NSCLC.  *E.g.*, *Jansen*, 342 F.3d at 1333 (method-of-treating preamble defines "the intentional purpose for which the method must be performed" and is limiting).  Both the specification and file history emphasize that the claimed invention is a new method of treatment; the intrinsic record acknowledges that the irreversible EGFR inhibitors described in the patent were known and asserts only the use of those inhibitors to treat resistant NSCLC as inventive.  Thus, the specific intent to treat stated in the preamble is central to the claimed invention and consequently is limiting. *Lilly*, 8 F.4th at 1342 ("First and foremost, the treatment of vasomotor symptoms such as migraine is central to the inventions of the challenged patents.").

Plaintiffs are incorrect that the "claim body recites all necessary details standing alone." Reply Br., 26.  To the contrary, the preambles here provide necessary antecedent basis for the amount to be administered.  Plaintiffs assert that the claimed "unit dosage" defines the amount administered, but that term defines the unit dose as "a predetermined quantity of active material calculated to produce the desired therapeutic effect."  '314 patent, 9:36-37 (A00034).  The claimed unit dose is thus defined by the prescribing physician's therapeutic intent—his or her "desired therapeutic effect"—and that intent is set forth in the preamble:  the specific intent to treat resistant NSCLC.  This too makes clear that the preamble is limiting. *Lilly*, 8 F.4th at 1342 (preambles are limiting where they "provide the only metric by which one practicing the claim could determine whether the amount administered is an 'effective amount'"); *see also Forest Labs. LLC. v. Apotex Corp.*, 2016 WL 6645784, at *1 n.5 (D. Del. Nov. 8, 2016) ("When the court reads the body of the claims at issue without the preamble, it is left with the same question Judge Andrews was left with in Sanofi:  effective for what?" (citing *Sanofi v. Lupin Atlantis Holdings S.A.*, 2016 WL 5842327, at *2 (D. Del. Oct. 3, 2016)).[8]

Plaintiffs are also incorrect that the applicants did not, during prosecution, argue that the prior art failed to teach irreversible EGFR inhibitors as effective for treating resistant NSCLC. Plaintiffs assert that applicants instead argued that the prior art failed to teach "the claimed type of TKI to be administered, or the claimed dosage, to overcome g/e resistance."  Reply Br., 27.  But as Defendants showed, applicants repeatedly argued that the prior art did not teach irreversible EGFR inhibitors as a treatment for resistant NSCLC.  Ans. Br., 18-19.  For example, applicants

---

[8]  Plaintiffs' reliance on *Bristol-Myers* and *Takeda* is misplaced. In both, the body of the claim itself recited the dosage amounts, such that the preamble statement of purpose did not alter the claimed method. *Bristol-Myers*, 246 F.3d at 1375 (preamble "essentially duplicates the dosage amounts recited in the claims"); *Takeda*, 2016 WL 3193188 at *8 (claims recited "a detailed method," including "specific dosages" and a "specific dissolution profile").

distinguished the Kobayashi reference as describing only cellular assays that "do[] not correlate with **therapeutic** effect on cancer" and "[a]ccordingly, any reference within Kobayashi to [that assay] does not allow [a POSA] to draw any conclusion with respect to treating gefitinib resistant cancer." '474 application, A00197 (applicants' emphasis).

Moreover, Plaintiffs' assertion that applicants distinguished prior art on other bases is irrelevant.  The assertion of multiple bases for distinguishing prior art does not negate the limiting effect of each (otherwise an applicant could avoid the effect of its arguments simply by asserting multiple grounds).  *E.g.*, *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("[A]s we have made clear, an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well."); *see also Data Engine Techs. v. Google LLC*, 10 F.4th 1375, 1383 (Fed. Cir. 2021) ("[W]e have held patentees to distinguishing statements made during prosecution even if they said more than needed to overcome a prior art rejection."). Having argued the prior art failed to teach treatment of resistant NSCLC with irreversible EGFR inhibitors to obtain their claims, patentees cannot now assert their claims are not limited to methods of treatment.  *Id.* at 1381 ("[W]here the preamble is relied on to distinguish prior art during prosecution, it cannot later be argued that the preamble has no weight.").

### (b)    Defendants' Proposals Reflect the Intrinsic Record

Plaintiffs challenge Defendants' proposal but offer no construction.

Plaintiffs assert that the claimed method of treating does not require administration of an effective amount of medicament.  Reply Br., 28.  But, as Defendants explained, Ans. Br., 21-22, this contradicts both the ordinary meaning of treating and the specification, which expressly defines the claimed method to include administration of an effective amount:

> In one embodiment, the invention provides a method for treating gefitinib/erlotinib resistant cancer. **The method comprises administering to a patient in need of such treatment an effective amount of certain irreversible EGFR inhibitors**.

'314 patent, 7:25-27 (A00033) (emphasis added).  Plaintiffs ignore this controlling description.

Plaintiffs also assert that the claimed method of treatment does not require diagnosis. Reply Br., 28-29.  But settled case law construes method-of-treating preambles to state the "intentional purpose" of the method, a "knowing need" to administer treatment, and the specification reinforces that diagnosis is part of the claimed method.  And Plaintiffs acknowledge that the "unit dosage" of the claims requires administration of an amount "calculated to produce the desired therapeutic effect," Reply Br., 65-66, which implies both a diagnosis to establish the desired therapeutic effect and administration of an amount to achieve it (an effective amount). Absent from Plaintiffs' reply is any explanation of what the claimed "method for treating" would be without a diagnosis and administration of an effective amount of drug.

**B.     "gefitinib and/or erlotinib resistant non-small cell lung cancer" *or* "gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1"**

**1.     Plaintiffs' Opening Position**

| Plaintiffs' Proposal | Defendants' Proposal |
| --- | --- |
| This term requires no construction.<br><br>If the court construes it:  "Non-small cell lung cancer (NSCLC) [having a T790M mutation in SEQ ID NO:  1] that will not respond to gefitinib and/or erlotinib treatment, including NSCLC that is no longer responding to gefitinib and/or erlotinib treatment after a period of initial response." | "non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1] that has progressed after initiation of treatment with gefitinib and/or erlotinib"<br><br>Indefinite |

Plaintiffs contend that this term has a plain and ordinary meaning, which is "NSCLC [having a T790M mutation in SEQ ID NO:  1] that will not respond to g/e treatment, including

NSCLC that is no longer responding to g/e treatment after a period of initial response." Defendants, on the other hand, insist on limiting the term to just one embodiment—NSCLC that has progressed after initiation of treatment with g/e. Alternatively, Defendants contend that the term is indefinite. Defendants are incorrect.

The claim language supports Plaintiffs' proposed construction. The claims of the Patents-in-Suit recite cancer that is g/e resistant, whether the g/e resistance exists before g/e treatment ("primary resistance"), or develops after g/e treatment ("acquired resistance"). Nothing in the claim language requires initial treatment with g/e, or that the g/e treatment caused the resistance. Moreover, the claims of the '162 Patent further describe a specific type of g/e resistant NSCLC: NSCLC having a T790M mutation in EGFR—i.e., where the amino acid threonine at position 790 of the EGFR protein is substituted for a methionine. This mutation confers resistance to g/e, and can be found in both treatment naive patients as well as patients that have received initial g/e treatment. A00031 at 4:32-38; A00038 at 17:33-39. The claims therefore encompass both primary resistance and acquired resistance. Limiting the claims to acquired resistance is unsupported by the claim language.

The specification also supports Plaintiffs' position and contradicts Defendants' position. The Detailed Description states:

> Cancers may be diagnosed as [g/e] resistant after treatment with [g/e] has commenced. *Alternatively*, cancers may be diagnosed as [g/e] resistant *prior to initiation of treatment with such compounds*.

A00033 at 7:57-61 (emphases added). Other portions of the specification likewise teach that g/e resistance, as contemplated by the invention, encompasses both primary and acquired resistance. The Background, for example, teaches that "[a] significant limitation in using [g/e] is that recipients thereof may develop a resistance to their therapeutic effects after they initially respond to therapy, *or they may not respond to EGFR-TKIs to any measurable degree at all.*" A00031 at

33

3:19-24.  The Summary teaches that in one embodiment, the invention provides a method of treating a patient population that has a g/e resistance-conferring mutation in EGFR (the T790M mutation).  *Id.* at 4:32-38.  Other embodiments include those where cancer progression is measured both before and after initiation of g/e treatment, and increased growth of the cancer indicates progression of the cancer.  *Id.* at 3:66-4:7.  In describing a cell-line containing the resistance-conferring T790M mutation, moreover, the specification states that "[s]ignificantly, this cell line was derived from a patient that had not been treated with an EGFR inhibitor, indicating that this mutation is not uniquely associated with acquired drug resistance."  A00038 at 17:36-39. Accordingly, the court should construe "[g/e] resistant NSCLC" as including both NSCLC that is no longer responding to g/e treatment after a period of initial response to g/e and NSCLC with primary g/e resistance.

Defendants' litigation-inspired efforts to limit the claims to one embodiment—acquired g/e resistance—should be rejected as unsupported by the claim language and contrary to the teachings of the specification.  "[A] claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a 'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction.'"  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) (citation omitted).  No expression of manifest exclusion exists here.  To the contrary, the intrinsic evidence explicitly includes primary g/e resistance.

Defendants alternatively propose that this term is indefinite, but this too is incorrect.  The intrinsic record sufficiently informs a skilled artisan, with reasonable certainty, of the meaning of the term "[g/e] resistant NSCLC."  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014).  A claim is not indefinite if it provides a skilled artisan with examples with which she could compare an allegedly infringing method to determine whether it infringes.  *Niazi Licensing Corp.*

34

*v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022).  Here, the claim language itself provides guidance on what this term means:  Claim 1 of the '162 Patent recites the T790M mutation, providing an example of g/e resistant NSCLC.  The specification also provides guidance, including various examples of g/e resistant NSCLC.  It teaches that there are two types of g/e resistant cancers:  those that develop resistance after an initial period of responsiveness to the compounds, and those that have resistance to the compounds before g/e treatment has begun.  A00033 at 7:57–61.  It teaches that tumors may have "mutations indicative of [g/e] resistance, e.g., the T790M mutation," *id.* at 8:31-44, and analyzes tumor cells from two g/e resistant patients that had the T790M mutation, A00037 at 15:8-52.  The specification teaches that methods for determining g/e resistance are "well known to those of skill in the art[,]" A00031 at 3:60-61, and lists several examples.  *See id.* at 3:43-65, 4:32-39; A00033 at 7:66-8:30.  The specification teaches methods for determining both primary and acquired resistance, and that any of these methods may be employed in determining g/e resistance, and that such methods are well known to a POSA.

In their invalidity contentions, Defendants argue that the disclosed methods of measuring tumor progression give "conflicting results" is unsupported by the intrinsic record.  But this is not a situation where different test results would give conflicting results above or below a required threshold value.  *Cf. Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 634 (Fed. Cir. 2015) (holding the term "a slope of strain hardening coefficient greater than or equal to 1.3" indefinite because each of the four possible measurement methods would provide a different result, and none of the intrinsic evidence "provide[d] any guidance as to which method should be used").  Rather, the specification teaches that cancer progression while on g/e treatment, as measured by known methods, indicates g/e resistance.

Finally, it is "highly relevant that the examiner understood this phrase throughout prosecution." *Niazi*, 30 F.4th at 1348.  No rejections were made about which g/e resistant patients would or would not be included in the claims' coverage.

Thus, a POSA reading the intrinsic evidence would not find this term indefinite.  The Court should decline to construe this term, or adopt Plaintiffs' proposed construction.

### 2.     Defendants' Answering Position

The parties' dispute of these terms concerns whether gefitinib and/or erlotinib resistance requires administration of gefitinib and/or erlotinib (Defendants' contention) or not (Plaintiffs' contention).  If gefitinib and/or erlotinib administration is not required (as Plaintiffs argue), the Asserted Claims are invalid for indefiniteness.

### (a)     Defendants' proposed construction is the only proposal supported by the intrinsic record

A POSA would understand that "gefitinib and/or erlotinib resistant NSCLC" refers to NSCLC that has progressed after treatment with these compounds.  *See Thorner*, 669 F.3d at 1365.  Contrary to Plaintiffs' argument, a POSA would not understand the term to refer to NSCLC that has never been treated with either inhibitor.

The specification of the patents-in-suit describes the claimed invention stating:

> The inventors of **the present invention** have surprisingly discovered that irreversible EGFR inhibitors **are effective in the treatment of cancer in subjects who are no longer responding to gefitinib and/or erlotinib therapies**.  Thus, in one embodiment, the present invention provides a method for the treatment of gefitinib and/or erlotinib resistant cancer.

'314 patent, 3:43-49 (A00031) (emphases added); *see also id.*, abstract.  "When a patent [such as here] ... describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed.

Cir. 2007) (same).  Thus, the "present invention" describes gefitinib and/or erlotinib resistant NSCLC consistent with Defendants' proposed construction.

The remainder of the specification likewise teaches that gefitinib and/or erlotinib resistant NSCLC treated according to the claimed method is NSCLC that has progressed following treatment with these compounds.  For example, the specification teaches that various methods of monitoring progression while on gefitinib and/or erlotinib treatment would have been known to a POSA. '314 patent, 3:60-4:39 (A00031), 7:57-8:30 (A00033).  Critically, each of these "known methods" requires administration of gefitinib and erlotinib **followed by monitoring for progression**.  Plaintiffs cite these same methods in their brief.  *See* Op. Br. 35 ("[T]he specification teaches that cancer **progression while on g/e treatment**, as measured by known methods, **indicates g/e resistance**.").

Indeed, the examples and experiments in the specification consistently use the term "gefitinib-resistant cancer" to describe cancer that has progressed after treatment with gefitinib. In one described example, two patients who initially responded developed "gefitinib-resistant NSCLC" based on progression after initiating gefitinib treatment. '314 patent, 15:9-15 (A00037). In other experiments, the inventors describe that they "modeled gefitinib resistance in vitro," by culturing NSCLC cells with gefitinib and then probing with gefitinib to determine clone resistance to gefitinib. *Id.*, 15:54-59 (A00037); *see also id.*, 14:1-28 (A00036).  The colonies that were not killed by gefitinib were "drug-resistant."  *Id.*, 15:65-16:1 (A00037).  Thus, the specification consistently uses the term "gefitinib resistant" and "gefitinib and/or erlotinib resistant" to refer to NSCLC that progresses following gefitinib treatment. *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370-71 (Fed. Cir. 2016) (Where a patent "repeatedly and consistently" characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization).

Plaintiffs make much of the specification's statement that "cancers may be diagnosed as gefitinib and/or erlotinib resistant prior to **initiation of treatment with such compounds**" or that some patients "**may not respond**" at all to gefitinib or erlotinib treatment.  Op. Br., 33-34 (quoting respectively, '314 patent, 7:57-61 (A00033), 3:19-24 (A00031)).  Plaintiffs, however, ignore that each of these disclosures, like others in the specification, describe initiating treatment with these compounds, followed by cancer progression.  That is, even where the specification teaches diagnosing resistance of gefitinib and/or erlotinib prior to treatment, it also teaches that treatment with those compounds will be initiated and monitored for response or progression.

Next, Plaintiffs focus on the specification's discussion of T790M.  Plaintiffs appear to argue that the presence of T790M, regardless of whether gefitinib and/or erlotinib have been administered is enough to establish to a POSA whether a patient's cancer is resistant.  Op. Br., 32-35.  The specification is clear that it is not.  *See infra* §III(B)(2)(b). To the contrary, the specification repeatedly refers to T790M in patients as an acquired resistance mechanism that arises after treatment with gefitinib and or erlotinib.  *See, e.g.*, '314 patent, 4:42-49 (A00031) ("The T790M mutation in EGFR is present in a recurrent liver lesion after the development of clinical gefitinib resistance."); *id.*, 6:43-46 (A00032), 15:40-43 (A00037), 17:50-53 (A00038).[9] Plaintiffs cite to a report on in vitro studies of a cell line harboring a T790M mutation, purportedly

---

[9]   Though Plaintiffs also cite the specification's description of an embodiment comprising administering to a subject having a T790M mutation, Op. Br., 34, Plaintiffs further ignore that here the specification describes "a method for treating cancer," NOT a method for treating gefitinib and/or erlotinib resistant cancer, '314 patent, 4:32-33 (A00031). The specification's distinction between treating **resistant** cancer and treating cancer is not surprising, given that at the time of invention, resistance required progression following treatment. *See infra* §III(B)(2)(b); Ex. 3, 33.

without prior gefitinib treatment.  Op. Br., 33 (citing '314 patent, 17:33-39 (A00038)).[10]  Tellingly, however, the specification reports simply that irreversible inhibitors were "considerably more effective than gefitinib" in that cell line; not that the cell line was resistant to gefitinib.  To the contrary, the patent only describes T790M as a resistance mechanism in the case of acquired resistance, after the patient has been treated with gefitinib—including in the applicants' summary of their results immediately following the passage cited by Plaintiffs.  *See* '314 patent, 17:50-53 (A00038) ("Our results confirm the report of T790M mutations in EGFR as secondary mutations that arise in previously sensitive NSCLCs harboring an activating mutation, **associated with the emergence of acquired resistance**.") (emphasis added).

> **(b)** **If the Asserted Claims are not construed to require initiation of gefitinib or erlotinib treatment, they are indefinite**

If these terms do not require progression of cancer after administration of gefitinib or erlotinib, the Asserted Claims are indefinite.  As explained above, without cancer progression following initiation of treatment with gefitinib and/or erlotinib, a POSA could not determine (and a different POSA would disagree with) whether a patient's cancer would respond to gefitinib.  The specification does not provide any example of a patient having gefitinib or erlotinib resistant cancer prior to treatment, nor does it describe a method of determining whether a patient's cancer is resistant without administering gefitinib or erlotinib.  Accordingly, if progression is not required, a POSA would not be able to determine whether a patient's NSCLC is within the scope of the

---

[10] In the cited example, the inventors recount earlier research reported in Pao. *See* Winkler Ex. G. Pao studied a particular cell line, and found, in contrast to other research, it harbored T790M. *Id.*, 230, 232-33. The authors determined that their cells were not as sensitive to gefitinib, but only after growing the cells in the presence of gefitinib. *Id.*, 232. They explained these "seemingly contradictory" observations stating that their cells "represent a subclone that emerged over time," following multiple passes with gefitinib in vitro. *Id.*, 233. Thus, contrary to Plaintiffs' argument, the reported research describes acquired resistance and supports Defendants' construction, requiring progression after initiation of gefitinib.

Asserted Claims. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008) ("Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.").

While Plaintiffs readily admit the patents-in-suit teach that cancer progression while on gefitinib and/or erlotinib treatment indicates resistance, Plaintiffs also argue that tumors may have mutations indicative of resistance, e.g., T790M.   Op. Br., 35.   But Plaintiffs ignore the specification's express warning that "even tumors that harbor the T790M mutation may contain only a small fraction of cells with this mutation" and that "multiple resistance mechanisms can coexist in recurrent tumors after an initial response to gefitinib." '314 patent, 17:53-58 (A00038). Indeed, the patent concludes that "these findings suggest that T790M-independent resistance mechanisms may be equally, if not more, effective than the T790M substitution itself in conferring drug resistance and may explain why recurrent tumors rarely exhibit clonality for T790M." *Id.*, 17:60-18:3 (A00038).  The specification thus acknowledges that the presence of T790M in some cells of a tumor is not itself sufficient to indicate that the cancer will not respond to gefitinib and hence that a POSA cannot reliably determine gefitinib or erlotinib resistance from the presence of T790M alone.

In addition, the specification teaches that detection of particular mutations would still require initiation of treatment with gefitinib or erlotinib to determine resistance.  For example, in one embodiment, a patient's tumor may harbor a mutation indicative of gefitinib and/or erlotinib sensitivity and "yet [be] resistant to gefitinib and/or erlotinib treatment." '314 patent, 3:31-33 (A00031).  That is, the specification suggests that a cancer could appear to be sensitive to gefitinib treatment based on detection of particular mutations, but may nonetheless progress following initiation of treatment and be resistant.  Thus, according to the specification, before initiating

treatment with gefitinib or erlotinib, a POSA would not be able to predict which patients will benefit from therapy.

Moreover, as to patients who respond initially but eventually stop responding to treatment with gefitinib and/or erlotinib, *see, e.g.*, '314 patent, 3:19-27 (A00031), 6:31-34 (A00032), the specification again teaches that "[t]he mechanisms underlying acquired drug resistance are not well understood." '314 patent, 6:34-35 (A00032). The specification repeatedly explains that there appear to be many different mechanisms of resistance—some that are caused by various unidentified secondary mutations and some that are caused by other mechanisms that remain unexplained. *See* '314 patent, 6:59-62 (A00032), 15:48-51 (A00037), 17:53-18:4 (A00038). The specification, however, does not fill the gap of knowledge in the art. Thus, the only way to determine gefitinib resistance according to the teaching of the patent is actual progression at some point after initiation of treatment.

Extrinsic evidence also confirms that a POSA could not use mutations to determine whether a patient's cancer was within the scope of the claims. Indeed, even in the years following application, a POSA could not use mutation status to make treatment decisions. For example, in 2007, one author observed that "[i]n daily clinical practice, there is currently no data to support the use of EGFR mutation … status" in determining "who should receive EGFR TKI therapy." Ex. 3, abstract; *see id.*, 33. Rather, as the authors further explain, it was still being "investigat[ed]" whether EGFR mutations have predictive value in TKI therapy." *Id.*, 32. At the time of invention, therefore, the only test of resistance was progression following treatment.

Thus, if NSCLC is not required to progress following initiation of gefitinib and/or erlotinib treatment, the Asserted Claims are indefinite because a POSA would not be able to ascertain the scope of gefitinib and/or erlotinib resistant NSCLC. *See, e.g.*, *Geneva Pharms., Inc. v.*

*GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (refusing to adopt a proposed construction because the construction would have been indefinite).[11]

### 3.   Plaintiffs' Reply Position

#### (a)   The specification explicitly teaches that g/e-resistant NSCLC includes both primary and acquired resistance

The specification and prosecution history of the Patents-in-Suit leave no doubt that the claims encompass primary g/e resistance.  The Detailed Description states:  "[C]ancers may be diagnosed as [g/e] resistant *prior to initiation of treatment with such compounds [g/e]*."  A00033 at 7:59-61 (emphasis added).  And the specification reports the existence of an NSCLC cell line with the T790M mutation from a patient "that had not been treated with an EGFR inhibitor, indicating that *this mutation is not uniquely associated with acquired drug resistance*."  A00038 at 17:36-39.

Defendants' attempts to circumvent the specification's clear teaching of embodiments of primary *and* acquired resistance amount to nothing more than impermissibly limiting the claimed invention based on a subset of embodiments, contrary to black-letter Federal Circuit law.  "[A] specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes."  *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016).  Defendants focus on embodiments representing acquired g/e resistance to the exclusion of the express teaching that these represent only a subset of potential embodiments, including primary g/e resistance

---

[11] Nor can the Asserted Claims avoid indefiniteness under Plaintiffs' construction because the examiner did not make an indefiniteness rejection based on the term "gefitinib and/or erlotinib resistant NSCLC."  *See* Op. Br., 36. Tellingly, Plaintiffs cite nothing suggesting the examiner understood the term to encompass their construction, including cancer that has not progressed following gefitinib/erlotinib treatment.

embodiments.  For example, Defendants quote a portion of the Summary that characterizes the treatment of acquired g/e resistance as only one embodiment.  Ans. Br. at 36 (quoting A00031 at 3:43-49) ("Thus, *in one embodiment*, the present invention provides a method for the treatment of gefitinib and/or erlotinib resistant cancer.") (emphasis added).  And the specification is replete with alternative embodiments representing primary g/e resistance, most notably:

> In another embodiment, the present invention provides a method of treating cancer, comprising administering to a subject having a mutation in EGFR, namely, a substitution of a methionine for a threonine at position 790 (T790M) of SEQ ID. No. 1, a pharmaceutical composition comprising an irreversible EGFR inhibitor.  The T790M mutation confers resistance to gefitinib and/or erlotinib treatment.

A00031 at 4:32-38.  *See also* A00033 at 7:59-61 ("Alternatively, cancers may be diagnosed as gefitinib and/or erlotinib resistant ***prior to initiation*** of treatment with such compounds [g/e]."); *id.* at 8:23-30 ("Presence of gefitinib and/or erlotinib resistance associated mutations in tumor cells from the subject is indicative of a gefitinib and/or erlotinib resistant tumor."); *id.* at 8:31-44 (teaching various embodiments of g/e resistance based on the mutations of the subject's tumor, including T790M).

Defendants' cited "present invention" caselaw cannot save their argument.  Ans. Br. at 36-37.  Unlike the Patents-in-Suit, the patents in these "present invention" cases contain repeated and consistent statements characterizing the invention in a singular way.  For example, in *Forest Labs., LLC v. Sigmapharm Labs.*, LLC, 918 F.3d 928, 933 (Fed. Cir. 2019), the Federal Circuit held that the patent's repeated and consistent statements characterizing the invention in only one way—"relat[ing] to a sublingual or buccal pharmaceutical composition"—limited the involved claims to buccal or sublingual administration.  But here, the specification refers to the "present invention" as encompassing *both* primary and acquired resistance.  *See, e.g.*, A00031 at 3:43-55 (describing the "present invention" as including an embodiment of treating an NSCLC patient that

43

is no longer responding to g/e treatment); *id.* at 4:32-38 (describing the "present invention" as including an embodiment of treating an NSCLC patient with the T790M mutation, which "confers resistance to [g/e] treatment").  Defendants cannot use selective quotations to read out the specification's complete characterizations of the invention.

Given the specification's teachings cited above, Defendants' argument that each of the teachings of primary g/e resistance "describe initiating treatment with these compounds, followed by cancer progression," Ans. Br. at 38, squarely contradicts the specification.  It also defies logic. No POSA would identify a treatment-naïve NSCLC patient as resistant to g/e, for example, by detecting the presence of the T790M mutation, *but then want to treat that patient with g/e anyway.*

> **(b)** **The specification teaches that the T790M mutation indicates resistance**

Defendants similarly mischaracterize the specification's black-and-white teachings about the role of the T790M mutation.  Ans. Br. at 38-39.  Again, the specification could not be clearer: "The T790M mutation confers resistance to gefitinib and/or erlotinib treatment."  A00031 at 4:38-39.  And, while the specification teaches that T790M is present in tumors of NSCLC patients that have been treated with g/e (acquired resistance), it also explicitly teaches that the mutation is "not uniquely associated with acquired drug resistance" because it is also found in g/e treatment-naïve NSCLC patients. A00038 at 17:36-39.  The specification then goes on to report experiments on a g/e treatment-naïve NSCLC cell line containing the T790M mutation (the NCI-H1975 line), and reports that irreversible EGFR inhibitors succeeded "under conditions where it [the NCI-H1975 cell line] is resistant to gefitinib."  *Id.* at 17:44-46.  Defendants' assertion that "the patent only describes T790M as a resistance mechanism in the case of acquired resistance," Ans. Br. at 39, is refuted by the intrinsic evidence.

       **(c)**      **Defendants provide no evidence that, without g/e pretreatment, a POSA would find the terms indefinite**

Defendants argue that if the terms encompass primary g/e resistance, then the Asserted Claims are indefinite. Ans. Br. at 39. Defendants' arguments are legally flawed and factually incorrect.

First, Defendants offer no evidence of indefiniteness from the perspective of a POSA. Defendants' attorney argument and characterizations of extrinsic evidence cannot establish clear and convincing evidence of indefiniteness. For that reason alone, Defendants' argument should be rejected.

Second, Defendants' indefiniteness argument mischaracterizes the specification. The specification *does* provide an example of a patient having g/e-resistant NSCLC prior to treatment, as evidenced by the previous discussion in the specification of the NCI-H1975 cell line derived from a g/e-resistant patient never treated with g/e. And, again, the specification *does* teach a method of determining whether a patient's NSCLC is g/e resistant prior to g/e treatment—namely testing for resistance-associated mutations, like T790M. A00033 at 8:23-44 (teaching testing for g/e resistance mutations and that the "presence of [g/e] resistance associated mutations in tumor cells from the subject is indicative of a [g/e] resistant tumor"). Both of these examples show that this term is not indefinite. They inform a POSA, "with reasonable certainty . . . about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Recognizing that the specification does in fact teach testing for g/e resistance mutations, Defendants focus on the teachings that there may be a small number of mutated cells or that multiple resistance mechanisms can coexist in a tumor. Ans. Br. at 40. Neither of these teachings contradicts the existence of primary g/e resistance, nor does either one render the terms indefinite. To the contrary, the specification's teachings highlight that the inventors recognized the potential

variations in the presence of the T790M mutation in resistant cells.  For example, the specification presents data on the relative frequency of cells with the T790M mutation versus additional so-called "sensitizing" mutations in cells from patients with acquired g/e resistance, and highlights that the T790M mutation "is detectable at low levels."  A00031 at 4:42-58.  But the specification still characterizes these cells as g/e resistant.  *See also* A00038 at 17:53-56 (teaching that g/e-resistant NSCLC tumors "may contain only a small fraction of cells with this [T790M] mutation").  A POSA would therefore understand from the specification that the presence of the T790M mutation indicates resistance.

### 4.    Defendants' Sur-Reply Position

Plaintiffs' focus on primary versus acquired resistance is a red herring.  The relevant question is whether treating a patient never administered gefitinib or erlotinib is treatment of gefitinib and/or erlotinib resistant NSCLC.  The specification answers this question in the negative: treating a treatment-naïve patient is described as treatment of cancer, not treatment of resistant cancer.  Only treatment of a patient whose cancer has progressed on gefitinib or erlotinib is described as treatment of resistant cancer.

This distinction is manifest by juxtaposing the specification's discussion of treatment of gefitinib and/or erlotinib resistant cancer with the passage Plaintiffs quote at length concerning treatment of T790M positive cancer:

| | |
|---|---|
| [I]n one embodiment, the present invention provides **a method for the treatment of gefitinib and/or erlotinib resistant cancer**. **In this embodiment**, progression of cancer in a subject is monitored at a time point after the subject has initiated gefitinib and/or erlotinib treatment. Progression of the cancer is indicative of cancer that is resistant to gefitinib and/or erlotinib treatment and the subject is administered a pharmaceutical | **In another embodiment**, the present invention provides **a method of treating cancer**, comprising administering to a subject having a mutation in EGFR, namely, a substitution of a methionine for a threonine at position 790 (T790M) of SEQ ID. No. 1, a pharmaceutical composition comprising an irreversible EGFR inhibitor. |

| composition comprising an irreversible [EGFR] inhibitor. | |
|---|---|

*Compare* '314 patent, 3:46-55 (A00031), *with id.*, 4:32-37 (A00031) (emphases added). Strikingly, Plaintiffs originally sought claims to a "method of treating cancer" with the T790M mutation but abandoned them.  *Compare* A00132 (pending claims 23-27), *with* A00191 (cancelling claims).  They should not be able to recapture that subject matter through claim construction.

Further, the patent describes diagnosing gefitinib and/or erlotinib resistant cancer either "prior to" or "after" treatment with gefitinib or erlotinib, indicating that treatment with those compounds occurs in either case.  Ans. Br., 38 (citing 7:57-61 (A00033)).  Plaintiffs reply— without support—that "[n]o POSA would identify a treatment-naïve NSCLC patient as resistant to g/e, for example, by detecting the presence of the T790M mutation, but then want to treat that patient with g/e anyway."  Reply Br., 44.  This ignores Defendants' showing that, in 2005, biomarkers, including T790M, were not sufficiently predictive to warrant denying gefitinib or erlotinib treatment.  Ans. Br., 41.  The patent itself describes irreversible inhibitors as "more effective" than gefitinib in a purportedly treatment-naïve T790M-positive cell line; it does not describe gefitinib as ineffective. '314 patent, 17:33-39 (A00038).  Indeed, a 2008 publication by several named inventors reported that the T790M mutation "did not preclude dramatic responses to" gefitinib or erlotinib.  Ex. 4, 374.

Thus, Plaintiffs are wrong that T790M-positive NSCLC was not treated with gefitinib or erlotinib, wrong that the presence of T790M in treatment-naïve patients established gefitinib and/or erlotinib resistance, and wrong that the patent describes administration of an irreversible inhibitor to treatment-naïve patients with the T790M mutation as treatment of gefitinib and/or

erlotinib resistant cancer.  Plaintiffs' proposal is thus contrary to the POSA's understanding of the

intrinsic evidence and would render the claims indefinite.

**C.** **"irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2 ('314 Patent, Claim 1)"** *or* **"irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO:  1 having a T790M mutation ('162 Patent, Claim 1)"**

**1.** **Plaintiffs' Opening Position**

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| "A low molecular weight N-(heteroaryl)-aniline compound having a Michael acceptor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." ('314 Patent, Claim 1)<br><br>**or**<br><br>"A low molecular weight N-(heteroaryl)-aniline compound having a Michael acceptor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO:  1 having a T790M mutation." ('162 Patent, Claim 1) | "a compound that permanently inhibits EGFR and covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2" ('314 Patent, Claim 1)<br><br>**or**<br><br>"a compound that permanently inhibits EGFR and covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO:  1 having a T790M mutation" ('162 Patent, Claim 1) |

The parties' dispute over this term is whether it specifies compounds with structural

features to bind as claimed.  It does.  Plaintiffs' construction represents the plain and ordinary

meaning of the irreversible EGFR inhibitor term as represented by the intrinsic evidence:  low

molecular weight N-(heteroaryl)-aniline compounds having a Michael acceptor that will bind as

required by the claims.  Defendants' construction is contrary to a POSA's understanding and the

intrinsic evidence, including in its unnecessary requirement for "permanent inhibition of EGFR."

***Low Molecular Weight***.  Claim 1 of the '314 Patent requires the use of an irreversible

EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of

48

EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." Claim 1 of the '162 Patent also recites covalent binding via cys773. A POSA would know that these irreversible EGFR inhibitors must be LMW because the specified cysteine residues (*i.e.*, 773 and 805) of Claim 1 are within the *intracellular* kinase domain of EGFR. *See* A00037 at 16:17-20; A00032 at 6:4-5; A00035 at 12:62-63; Winkler ¶¶25, 34-36. A POSA would know only LMW compounds could enter the cell and access the intracellular kinase domain to bind the cysteine residues specified in the claims. Winkler ¶48.

A POSA would also have recognized that the reversible and irreversible EGFR inhibitors exemplified in the specification were LMW EGFR inhibitors: gefitinib, erlotinib, EKB-569, HKI-357, HKI-272, CI-1033, and CL-387,785. A00019 (Fig. 2B); A00033 at 7:25-36; A00024 (Fig. 4B); A00038 at 18:29-40; A00005-06; *see also* A00030 at 2:41-46; A00036 at 13:50-58; A00038 at 18:66-67; Winkler ¶¶48-49.

And, during prosecution, the Inventors repeatedly argued that the irreversible EGFR inhibitors used in the claimed methods must be small molecule compounds, which a POSA would understand as synonymous to LMW compounds, and not other molecules such as antibodies. A00148-49; A00174; A00182-83; Winkler ¶50.

*N-(heteroaryl)-aniline*. A POSA would understand that compounds capable of irreversibly binding to the ATP-binding pocket of the EGFR intracellular TK domain, as required by the asserted claims and as exemplified in the specification, have an N-(heteroaryl)-aniline structure. This structure is similar to ATP, which is what normally binds in the same location, and is present in the reversible and irreversible EGFR inhibitors exemplified in the specification. A00019 (Fig. 2B); Winkler ¶¶51-55.

49

The specification also supports that the irreversible EGFR inhibitors used in the claimed methods must be N-(heteroaryl)-aniline compounds.  First, the specification refers to the "aniline ring" of the irreversible EGFR inhibitors EKB-569, HKI-272, HKI-357, and CL-387,785, indicating that the claimed irreversible EGFR inhibitors contain an aniline ring.  A00038 at 18:29-48; Winkler ¶52.  All of the aforementioned irreversible EGFR inhibitors in the specification that bind according to the claims are N-(heteroaryl)-aniline compounds.  Winkler ¶¶51-55.  Second, the specification discloses:  "[a]mong the more promising EGFR-TKIs are three series of compounds:  quinazolines, pyridopyrimidines and pyrrolopyrimidines."  A00030 at 2:62-64.  A POSA would have known that these nitrogen-substituted heteroaryl rings were attached to aniline rings to create N-(heteroaryl)-aniline EGFR inhibitors like gefitinib, erlotinib, HKI-272, HKI-357, and EKB-569 in the prior art.  A00033 at 7:25-36; Winkler ¶53.

***Michael Acceptor***.  Third, a POSA reading Claim 1 would also know that the claim required an irreversible EGFR inhibitor that covalently binds to the specified cysteine residue in the ATP-binding pocket of EGFR, that all of the irreversible EGFR inhibitors listed in the Patent-in-Suits' dependent claims had Michael acceptors, all of the exemplified irreversible EGFR inhibitors in the specification have a Michael acceptor, and that the known irreversible EGFR inhibitors had Michael acceptors.  *See* A00033 at 7:34-36 (citing Winkler Ex. I); A00037 at 16:9-20; Winkler ¶¶36, 57-61.  The prosecution history also teaches that the claims required an irreversible EGFR inhibitor having a Michael acceptor.  The Inventors argued, for example, that the Michael acceptor "allows the compound to conjugate to EGFR, and therefore be considered an irreversible inhibitor."  A00187; Winkler ¶62.  Similarly, during prosecution of the '314 Patent, the Inventors argued that Tagrisso® was representative among irreversible EGFR inhibitors, "owing to the presence of a conjugating moiety (Michael acceptor) that allows for covalently

binding to the cysteine 773 residue in the ligand-binding pocket of EGFR."  A00155-56; Winkler ¶62.

Defendants' proposed construction is incorrect on multiple fronts.  By using the term "compound" without any additional qualifier, Defendants entirely ignore the shared structure of the LMW EGFR inhibitors taught in the claims and specification, and within the knowledge of a POSA reading the specification.  Winkler ¶69.  Defendants' construction also adds the unnecessary limitation that the claimed inhibitors "permanently inhibit[] EGFR."  Neither the claims nor the specification require permanent inhibition of EGFR.  Winkler ¶70.  What the claims do require is covalent bonding to cys773 or cys805.  *Id.*  To the extent Defendants are using the word "permanent" as a synonym for covalent binding or irreversible inhibition, their limitation is unnecessary. *Id.* ¶71.  There is no need for the additional, and incorrect, limitations of Defendants' proposed construction.

In view of the foregoing, the Court should adopt Plaintiffs' proposed construction.

## 2.     Defendants' Answering Position

Both parties' proposed constructions incorporate the claim requirement that the administered "irreversible EGFR inhibitor" covalently bond to the specified residue of the protein. The parties' dispute focuses on construction of the term "irreversible EGFR inhibitor" itself and whether that term should be construed functionally (as Defendants propose) or structurally (as Plaintiffs propose).

Defendants' construction is the plain and ordinary meaning of "irreversible EGFR inhibitor" as understood by a POSA and accords with the way the term is used in the intrinsic evidence. *Thorner*, 669 F.3d at 1365.  Plaintiffs' construction, by contrast, improperly rewrites the term into a structural limitation, defying the express teachings of the specification and the term's plain meaning.  Reider Decl. ¶¶40-67.  Plaintiffs' construction should be rejected. *See, e.g.*, *Bracco*

51

*Diagnostics Inc. v. Maia Pharms, Inc.*, 839 F. App'x 479, 486 (Fed. Cir. 2020) ("Listing numerous compounds that meet the language of a functional term in a claim confuses construing what the function is with what compounds perform that function.  The latter is not the task of claim construction, which is to provide definitional meaning to claim language.").

(a)      <strong>The intrinsic record demonstrates that "irreversible EGFR inhibitors" of the claims are compounds that permanently block EGFR</strong>

The plain and ordinary meaning of "irreversible EGFR inhibitor," as understood by the POSA, is a compound that permanently inhibits EGFR.  Reider Decl. ¶¶25-32; Ex. F.  The term "inhibitor" in the context of medicinal chemistry, has a well understood meaning to a POSA— "inhibitor" refers to a compound's function, i.e., that the compound inhibits a particular enzyme. Reider Decl. ¶26.  Thus, an "EGFR inhibitor" refers to a compound that inhibits the EGFR enzyme. An "irreversible EGFR inhibitor" is one that permanently inhibits the EGFR enzyme, i.e., "permanently eliminating existing kinase activity that returns only when new receptor is synthesized."  Reider Decl. ¶¶29-30; Ex. F.  The term unquestionably conveys to a POSA what the claimed compound does, not what the structure is.

Use of "irreversible EGFR inhibitor" throughout the specification is consistent with the plain and ordinary meaning and is repeatedly described by its function.  The patent specification states that "EGFR-TKIs [that is EGFR inhibitors] **block** a cell surface receptor responsible for triggering and/or maintaining the cell signaling pathway that induced tumor cell growth and division [i.e., the EGFR protein]."  *See, e.g.*, '314 patent, 2:57-60 (A00030) (emphasis added); *id.*, 2:60-62 (A00030) ("It is believed that these inhibitors **interfere** with the EGFR kinase domain.") (emphasis added).  And the specification attributes the claimed effectiveness of EGFR inhibitors to their function of permanently inhibiting EGFR, for example theorizing that irreversible EGFR inhibitors are "effective in overcoming gefitinib resistance" due to "the preservation of inhibitor

52

binding." '314 patent, 18:29-34 (A00038); *see also id.*, 16:49-53 (A00037) ("[I]nhibition of EGFR alone by an irreversible inhibitor seems to be sufficient to induce apoptosis in gefitinib-resistant cells."), 17:6-27 (A00038) ("[G]efitinib's ability to inhibit EGFR activation is compromised in these cells, whereas the action of the irreversible inhibitors are not detectably affected.").

The functional meaning of "irreversible EGFR inhibitor" is also clear from the prosecution history.  In pursuing their patent claims, the applicants repeatedly cited to the function and mechanism of action of irreversible EGFR inhibitors as underlying the claimed invention and distinguishing it from the prior art.  *See* '474 application, A00211-12 ("Agus fails to recognize, and nowhere does Agus teach, that the administered TKI's mechanism of action—specifically, irreversible inhibition of EGFR (as in the pending claims)—would, much less could, provide any benefit or have any impact in overcoming the patient's resistance to 'conventional TKI therapy.'"); *see also* '474 application, A00220-21 (explaining that it is the "mechanism of action of the TKI that is the necessary feature to overcome a patient's resistance to treatment"); '474 application, A00237-38 (same).

**(b)    Plaintiffs' construction is refuted by the clear language of the specification**

Plaintiffs' proposed construction, which would limit the "irreversible EGFR inhibitors" of the claims to the (albeit enormous) structural class of "low molecular weight N-(heteroaryl)-aniline compounds, is also directly contradicted by the specification.  The patent could not be clearer that the "irreversible EGFR inhibitors" of the claimed invention are NOT limited to any particular structural class, but instead encompasses "any compound" that inhibits EGFR by bonding to the specified residue.  Thus, while the specification instructs that there are preferred irreversible EGFR inhibitors:

> In preferred embodiments, the irreversible EGFR inhibitor [is] EKB-569, HKI-272 or HKI-357.  Alternatively, **the irreversible**

53

> **EGFR inhibitors may be any compound** which binds to cysteine
> 773 of EGFR.

'314 patent, 3:57-59 (A00031) (emphasis added).[12]   The patent is thus unambiguous that the

"irreversible EGFR inhibitors" of the claims are not limited to particular embodiments.

Similarly, while Plaintiffs assert the irreversible inhibitors of the claims are limited to "low

molecular weight" compounds, the specification instructs otherwise.   Not only does the

specification instruct that the irreversible EGFR inhibitor "may be any compound," '314 patent,

3:57-59 (A00031), it goes on to define "compound" to be "a chemical entity or biological product"

and instruct that "[t]he chemical entity or biological product is preferably, **but not necessarily**, a

low molecular weight compound, but may also be **a larger compound**, for example, an oligomer

of nucleic acids, amino acids, or carbohydrates including without limitation proteins,

oligonucleotides, ribozymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications

and combinations thereof," *id.*, 3:3-13 (A00031) (emphases added).   This express definition of the

compounds of the invention refutes not just Plaintiffs' proposed "low molecular weight"

limitation, but their entire proposed structural class, since, as Dr. Reider explains in his declaration,

the exemplified "larger compounds" are not "N-(heteroaryl)-aniline compounds having a Michael

acceptor."   Reider Decl. ¶44.

In sum, Plaintiffs' proposed construction of "irreversible EGFR inhibitor" should be

rejected as contrary to the plain meaning of the term, the term's usage in the specification and

---

[12]  Moreover, Plaintiffs' proposed structural class, which is purportedly derived from the examples
of irreversible EGFR inhibitors in the patent, runs afoul of the well-settled rule that claims are
not construed to be limited to the specific embodiment in the specification. *See, e.g.*, *Liebel-
Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Moreover, as Dr. Reider
explains in his declaration, were the claim to be so construed, the structural class encompassing
the examples of the patent is far narrower—the class of 4-anilino-quinazolines and 4-anilino-
quinoline-3-carbonitrile. Reider Decl. ¶¶51-61.

prosecution history, and express statements in the specification concerning the meaning of the term. *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1335 (Fed. Cir. 2004) ("[Extrinsic evidence] may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history."); *Erbe Elektromedizin GmbH v. Int'l Trade Com'n*, 566 F.3d 1028, 1034-37 (Fed. Cir. 2009) (courts "generally do not construe claim language to be inconsistent with the clear language of the specification; 'usually [the specification] is dispositive'"). Plaintiffs cannot rely on expert testimony to contradict this controlling intrinsic evidence. *See Genuine Enabling Tech. LLC v. Nintendo Co., Ltd.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022) ("[E]xpert testimony may not be used to diverge significantly from the intrinsic record."); *Network Com., Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005) ("[E]xpert testimony at odds with the intrinsic evidence must be disregarded.").

### 3.     Plaintiffs' Reply Position

There is no dispute that the irreversible EGFR inhibitor used in the claimed methods must covalently bind to the specified cysteine residues, located within the intracellular tyrosine kinase domain. Ans. Br. at 51-52. However, by arguing that the irreversible EGFR inhibitor may be *any* compound, Defendants' proposed construction effectively divorces "irreversible EGFR inhibitor" from the remainder of the disputed term (the binding requirements) and from the intrinsic evidence.[13] Not *every* compound can bind in the manner and place that the claims require. Instead, the specification and prosecution history, as properly viewed from the perspective of a POSA,

---

[13] Defendants' arguments are contradicted by the very portion of the specification that they highlight, i.e., "the irreversible EGFR inhibitors may be any compound **which binds to cysteine 773 of EGFR**." '314 patent, 3:57-59 (A00031) (emphasis added). As Plaintiffs have previously explained, a POSA would understand that the claimed EGFR inhibitors that bind according to the claims are low molecular weight ("LMW") N-(heteroaryl)-aniline compounds having a Michael acceptor. Op. Br. at 48-51; *see also generally,* Winkler.

instruct that the irreversible EGFR inhibitors that bind according to the claims are low molecular weight ("LMW") N-(heteroaryl)-aniline compounds having a Michael acceptor.

**(a)  The irreversible EGFR inhibitors used in the claimed methods must be LMW compounds**

First, as Plaintiffs extensively detailed in the opening brief, the specification and prosecution history are clear that the compounds used in the claimed methods are LMW.  The irreversible EGFR inhibitors that bind according to the claims must enter the cell and reach the ATP-binding site of the tyrosine kinase domain.  Winkler ¶48.  In light of the intrinsic evidence, *see, e.g.*, A00036 at 13:7-8, 13:50-58; A00037 at 16:9-20, A00038 at 18:29-40, A00148-49; A00174; A00181-83, this means that these irreversible EGFR inhibitors are LMW in order to enter the cell and bind to the specified cysteine residues, which is also the preferred definition, A00036 at 13:7-8; Winkler ¶48.  The reversible and irreversible EGFR inhibitors exemplified in the specification are also LMW.  A00036 at 13:50-58; Winkler ¶49.  And during prosecution, the inventors repeatedly argued that the irreversible EGFR inhibitors used in the claimed methods must be small molecule compounds, which a POSA would understand as synonymous to LMW compounds, and not larger molecules such as antibodies.  A00148-49; A00174; A00181-83; Winkler ¶50.

Defendants do not dispute that the claimed inhibitor must have the ability to access the intracellular tyrosine kinase domain, (*see* Reider ¶¶18-20), and they do not identify any examples in the art of "larger compounds" that meet the binding requirements of the claims.  Yet their proposed construction still encompasses larger molecules or compounds, like biologics, which Defendants have not shown can enter the cell and bind to the specified cysteine residues therein.  Winkler Dec. ¶¶26, 48.  Defendants' construction is therefore wholly inconsistent with what even they acknowledge are the basic requirements of the claims, and therefore should be rejected.

56

The specification is also clear that a POSA would understand the specification's reference to reversible and irreversible EGFR inhibitors as limited to LMW compounds.  For example, the specification cites the contemporaneous literature, which refers to EGFR inhibitors as small molecules (LMW).  For example, an article cited in the specification at 13:55-56 (A00036) describes the state of the field in 2004:

> Over the past few years, several approaches, including targeting with *antagonistic antibodies or small-molecule tyrosine kinase inhibitors*, have been developed and are currently under intense clinical investigation (9, 10).

> For clinical use, the most promising and advanced strategies include *small chemical inhibitors that compete with ATP in the receptor kinase domain* and antibodies that prevent ligand-binding, receptor activation and/or induce receptor internalization.   Table 2 summarizes some of the compounds currently in clinical trials or, in the case of Herceptin, in wide therapeutic use.  Interestingly, some of the *small-molecule tyrosine kinase inhibitors* (see Table 2) irreversibly block the kinase activity of the target ErbB receptor through direct binding to a specific cysteine in the ATP-pocket (106).

Holbro and Hynes, *ErbB Receptors:  Directing Key Signaling Networks Throughout Life*, ANN. REV. PHARMACOLOGY & TOXICOLOGY (2004) 44:195-217, 196, 204 (emphases added) (Winkler Exhibit C).

### (b)   The claims do not require "permanent" EGFR inhibition separate and apart from covalent binding

Defendants argue that the plain and ordinary meaning of "irreversible EGFR inhibitor" requires permanent inhibition of EGFR.  Ans. Br. at 52-53.  First, the word "permanent" appears nowhere in the intrinsic evidence.  The patent claims require only that the irreversible EGFR inhibitor covalently bind with the specified cysteine residues.  That should end the issue.

Second, Defendants' argument that this term should be defined by reference to its effect on the EGFR enzyme and not the nature of the required bond (covalent), is contradicted by

Defendants' own expert, Dr. Reider.  Dr. Reider cites a text that defines "[t]he most effective irreversible inhibitors . . . as those that can react with an amino acid at the active site *to form a covalent bond*."  Reider ¶29 (citing Reider Exhibit F at 54).  Moreover, this reference's definition of irreversible inhibitor refers to the nature of the bond, not the effect on the enzyme.  Reider Exhibit F at 703 ("An enzyme inhibitor that binds so strongly to the enzyme that it cannot be displaced.").  And it does not include "permanent."  *Id.*  Simply put, Defendants have not shown why this term's construction should include *permanent* EGFR inhibition, whatever that means, when the claims carefully detail the requirement for covalent binding with the target cysteines.

Finally, the Court should reject Defendants' construction given that it provides no way for a POSA to determine when the EGFR inhibition is permanent, to the extent that term is even understood.  For example, does the permanence refer to EGFR inhibition in one cell, or must it be all cells in the subject's body?  And how would one ever know if the required state of "permanence" had been achieved?  The Court should refuse to adopt a claim construction that fails to provide the finder of fact, here the jury, with a reasonable means to determine what is covered by the claims.  The goal of claim construction is to clarify, not to obfuscate.

### 4.    Defendants' Sur-Reply Position

Plaintiffs' reply does not attempt to defend their proposed construction as the meaning of "irreversible EGFR inhibitor that covalently binds [to the specified residue]."  Their reply leaves undisputed Defendants' showing that the ordinary meaning of irreversible EGFR inhibitor—the usage consistent with both the intrinsic and extrinsic evidence—is a compound that permanently inhibits EGFR.

Instead of focusing on the proper meaning of the terms, Plaintiffs appear to argue that, as a factual matter, the compounds that will perform the function specified in the claims are N-(heteroaryl)-anilines with a Michael acceptor.  Even were Plaintiffs correct, this would not save

their proposed construction.  Claim construction requires the claim term to be given **the meaning** it would have to a POSA reading the intrinsic evidence—a separate inquiry from how to carry out the claimed method. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a [POSA] at the time of the invention.") (internal quotation marks omitted); *Bracco*, 839 F. Appx. at 486 ("Listing numerous compounds that meet the language of a functional term in a claim confuses construing what the function is with what compounds perform that function.  The latter is not the task of claim construction, which is to provide definitional meaning to claim language."); *Lazare Kaplan Int'l Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (distinguishing between "factual questions relating to the test for infringement" and "the legal inquiry of the appropriate scope of the [claim] limitation").

Plaintiffs also fail to reconcile their proposal with the teachings of the specification, which expressly state "the irreversible EGFR inhibitor may be **any compound** which binds to cysteine 773 of EGFR." '314 patent, 3:57-59 (A00031) (emphasis added).  Plaintiffs respond that "[n]ot **every** compound can bind in the manner and place that the claims require."  Reply Br., 55.  Of course the claimed inhibitors must function by binding to EGFR in the manner (irreversibly) and place (the cysteine residue) required.  But the specification makes express that "any compound" that does so falls within the claim, regardless of its structural class.

Plaintiffs are tellingly silent concerning the specification's statement that the claimed compound "is preferably, **but not necessarily**, a low molecular weight compound, but **may also be a larger compound**, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '314 patent, 13:3-

13 (A00036) (emphases added).  This refutes Plaintiffs' proposed construction, since the identified compounds are neither low molecular weight nor N-(heteroaryl)-anilines.  Ans. Br., 54.  Indeed, while Plaintiffs complain that Defendants did not "identify any examples in the art of 'larger compounds' that meet the binding requirements of the claim," Reply Br., 56, they simply ignore the list of larger compounds set forth in the patent.  Plaintiffs' complaint that a POSA could not determine which larger compounds would function as required goes to validity, not claim construction.

Plaintiffs quote Holbro & Hynes for the statement that "the most promising and advanced strategies include **small chemical inhibitors**."  Reply Br., 57 (emphasis in original).  But claims are not limited to the "most promising" inhibitors, and Holbro & Hynes' repeated use of the term "small-molecule tyrosine kinase inhibitor" demonstrates that an "EGFR inhibitor" itself is not limited to low molecular weight compounds, else the "small molecule" modifier would be redundant.

Plaintiffs also ignore the patent's text in arguing that "[t]he claims do not require 'permanent' EGFR inhibition separate and apart from covalent binding."  Reply Br., 57-58.  The claim language itself requires that the EGFR inhibitor both (1) be irreversible, and (2) covalently bind to the specified residue.  Plaintiffs' attempt to equate irreversibility with covalent binding improperly renders the former requirement superfluous.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention.").  As the intrinsic and extrinsic evidence shows, an irreversible EGFR inhibitor is one that permanently inhibits EGFR.  Ans. Br., 52-53.

### D.   "administering daily to the patient"

#### 1.   Plaintiffs' Opening Position

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| This term requires no construction. If the court construes it:  "Prescribing, managing or supervising the daily execution or use of the compound(s) of the '314 Patent to the patient."<br><br>OR:<br><br>"Prescribing, managing or supervising the daily execution or use of the compound(s) of the '162 Patent to the patient." | "administering to a patient at least once a day for at least two consecutive days"<br><br>Indefinite |

The parties' primary dispute is whether the term "daily" requires construction.  It does not. Rather than agree that "daily" means "daily," Defendants would have the Court import an unnecessary limitation, requiring that the irreversible inhibitors of the claimed method be administered "for at least two consecutive days."  Defendants' proposed construction is unnecessary, contrary to the plain meaning of the word, and should be rejected.

#### 2.   Defendants' Answering Position

Construction of this term is needed to resolve at least Plaintiffs' pre-issuance damages claim.  The "daily" requirement was added during prosecution.  This limitation, as properly construed, establishes that the WO'058 claims are not "substantially identical" to any Asserted Claim, and therefore, Plaintiffs are not entitled to pre-issuance damages.  *See* 35 U.S.C. § 154(d)(2).

In accordance with the plain and ordinary meaning of "daily," *Thorner*, 669 F.3d at 1365, Defendants' proposed construction defines a minimum frequency (at least once a day) and duration (at least two consecutive days).  Plaintiffs' proposed construction, in contrast, is silent as to frequency and duration, and merely repeats the word "daily."  In addition, Defendants'

construction is supported by the prosecution history, in which the applicants added "daily" to distinguish prior art that did not teach dosing once-a-day for two or more consecutive days.  *See* '474 application, A00258, A00262-63 (adding "daily" to overcome prior art that taught weekly/semi-weekly dosing, but not "conventional daily dosing"); '349 application, A00167, A00171-72 (same); *see also* '314 patent, 8:59-9:6 (A00033) (describing daily dosage).  The Court should thus adopt Defendants' construction to resolve the parties' dispute on pre-issuance damages.  *See, e.g.*, *Eon Corp.*, 815 F.3d at 1318.

### 3.      Plaintiffs' Reply Position

#### (a)      This term does not require construction

Plaintiffs maintain that this term requires no construction.  Daily administration is a well-understood practice, especially where the specification refers to the known, "conventional" prior art treatments as being administered "daily" as well.  A00031 at 3:5-7.

Additionally, Defendants' proposed construction introduces an unnecessary duration requirement to this disputed term (e.g., dosing for two or more days).  Defendants' only support for this requirement is the inventors' distinction between a prior art reference's teaching of weekly/semi-weekly dosing and "conventional daily dosing."  A000263.  That the applicants distinguished daily administration over "less frequen[t]" dosing schedules, like weekly/semi-weekly, does not create a specific treatment duration requirement, and it certainly does not create Defendants' particular requirement of dosing for two or more days.  The Court should decline to construe this term.

### 4.      Defendants' Sur-Reply Position

Plaintiffs' reply leaves unclear what is disputed.  Plaintiffs assert the term does not include "a specific treatment duration requirement."  *See* Reply Br., *supra*.  But administration just once

is certainly not "daily."  Thus, Plaintiffs' position also seems to require administration for two or more days.

### E.   "a pharmaceutical composition comprising a unit dosage"

#### 1.   Plaintiffs' Opening Position

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| This term requires no construction.  If the court construes it:<br><br>"Physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." | "a pharmaceutical composition comprising a physically discrete unit suitable as unitary dosage for the patient, each unit containing an effective amount of the irreversible inhibitor in association with the required diluents; i.e. carrier, or vehicle.  An effective amount is an amount that results in a beneficial effect for at least a statistically significant fraction of patients considering both its pharmacologic effectiveness and its physiological safety" |

The parties do not dispute the term "pharmaceutical composition."  The parties dispute the term "unit dosage."  It is black-letter law that where a patent applicant provides "an explicit definition in the specification for a claim term . . . the definition selected by the patent applicant controls."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).  Plaintiffs assert that "unit dosage" is defined and therefore need not be construed.

> The term "unit dose" when used in reference to a therapeutic composition of the present invention refers to physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle.

A00034 at 9:33-38.

Defendants propose a meaning contrary to this explicit definition.  The image below shows how Defendants have extensively altered the Patents' definition.

The term "un...                                    ...rapeutic
composition of ...                                 ...physically
discrete units suitable a... ...y dosage for the subject, each
unit containing a predetermined quantity of active material
calculated to produce the desired therapeutic effect in asso-
ciation with the required diluents; i.e., carrier, or vehicle.

**REPLACED WITH**
"an effective amount of the irreversible inhibitor"

**ADDED**
"An effective amount is an amount that results in a beneficial effect for at least a statistically significant fraction of patients considering both its pharmacologic effectiveness and its physiological safety."  '314 Patent at 8:45-53 and 13:14-25.

The definition of "unit dose" does not include "an effective amount" or a "therapeutic effect."  The Court should decline to construe this disputed term because it is defined and because Defendants' construction is fabricated and unnecessary.

## 2. Defendants' Answering Position

Construction of this term is necessary to resolve Plaintiffs' pre-issuance damages claim and issues of invalidity.  Like the daily administration limitation, this term was added during prosecution, did not appear in any WO'058 claim, and thus precludes any pre-issuance damages. *See* '474 application, A00225; '349 application, A00283; *see also* 35 U.S.C. § 154(d)(2).

Defendants' proposed construction is rooted in the patentee's own lexicography.  The parties agree that the specification defines "unit dose" to contain an amount of drug intended to "produce the desired therapeutic effect," Op. Br., 63-64, but only Defendants' construction properly incorporates the specification's further guidance on "desired therapeutic effect." '314 patent, 9:30-41 (A00034).    In particular, the specification defines "effective" or "effectiveness" to include both "pharmacologic effectiveness" and "physiological safety."

'314 patent, 13:14-21 (A00036).   Plaintiffs' construction ignores this explicit teaching, presumably to maintain ambiguity on the "therapeutic effect" that may or may not be required.

Defendants' construction is further supported by the specification's teaching, immediately following the definition of "unit dose," that the "compositions are administered in a manner compatible with the dosage formulation, and **in a therapeutically effective amount**." '314 patent, 9:39-41 (A00034) (emphasis added).  Consistent with Defendants' construction, the specification defines an "effective amount" as "an amount that results in a beneficial effect for at least a statistically significant fraction of patients."  '314 patent, 8:45-48 (A00033).   Accordingly, Defendants' construction properly gives effect to the specification's description of this term as a whole.

The Court should reject Plaintiffs' attempt to introduce ambiguity, and instead, should incorporate the specification's definition of the desired therapeutic effect, consistent with Defendants' construction.  *See, e.g.*, *Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 (Fed. Cir. 2017) (construing "aseptic," and further construing "FDA level of aseptic," where the specification defined "aseptic" with that phrase); *see also Hospira, Inc. v. Fresenius Kabi USA, LLC*, No. 16-C-651, 2017 WL 5891058, at *5 (N.D. Ill. Nov. 27, 2017) (relying on specification's definition of "premixed" to construe "ready to use" where specification defined "ready to use" with that term).   In addition, Plaintiffs' position ignores the applicants' arguments during prosecution, which repeatedly criticized the prior art for lack of effectiveness in contrast to the requirements of the Asserted Claims, *see supra* §III(A)(2)(b).

### 3.    Plaintiffs' Reply Position

#### (a)    This term does not require construction

Plaintiffs maintain that this term requires no construction because it is defined in the Patents-in-Suit.  A00034 at 9:33-38 ("Physically discrete units suitable as unitary dosage for the

subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle.").

Defendants acknowledge that binding Federal Circuit precedent holds that where a patentee defines a term, the patentee's definition controls. Ans. Br., at 65 (citing *Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 (Fed. Cir. 2017) (declining to adopt a definition contrary to the patent's explicit definition)). Here, the specification's definition of "unit dose" does not contain the term "effective," yet Defendants proposed construction repeats "effective" three times. Defendants argue their extensive modifications to the specification's definition are appropriate because of the term "desired therapeutic effect." But the specification does not define "therapeutic effect," *contra* Ans. Br., 64-66, and Defendants cannot simply transform this term into "effective" or "effectiveness" to serve their purpose. The Court should decline to construe this term.

### 4.   Defendants' Sur-Reply Position

The parties agree that the specification's definition of "unit dose" requires the administered composition to contain "a predetermined quantity of active material calculated to produce the desired therapeutic effect." Reply Br., 65-66. (quoting '314 patent, 9:33-38 (A000034)). But Plaintiffs decline to state what this phrase means, except to assert incorrectly that it does not require an effective amount. *Id.* However, the sentence immediately following the definition in the specification explains: "The compositions are administered in a manner compatible with the dosage formulation, **and in a therapeutically effective amount**." '314 patent, 9:33-41 (A00034) (emphasis added). Thus, the amount "calculated to produce the desired therapeutic effect" is an effective dose.

## IV.   DISPUTED CLAIM CONSTRUCTIONS IN WO'058

### A.   **"gefitinib and/or erlotinib resistant cancer"** *or* **"cancer that is resistant to gefitinib and/or erlotinib treatment"**

#### 1.   **Plaintiffs' Opening Position**

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| This term requires no construction.  "If the court construes it:  Cancer that will not respond to gefitinib and/or erlotinib treatment, including cancer that is no longer responding to gefitinib and/or erlotinib treatment after a period of initial response." | "cancer that has progressed after initiation of treatment with gefitinib and/or erlotinib"  Indefinite |

Plaintiffs contend that this term has a plain and ordinary meaning to a POSA and needs no construction.  Defendants, on the other hand, insist on limiting the term to just one embodiment—cancer that has progressed after initiation of treatment with g/e.  Alternatively, Defendants contend that the term is indefinite.  Defendants are again incorrect on both counts.

The language of the claims of the '058 Publication supports the conclusion that they cover primary *and* acquired g/e resistance, like the claims of the Patents-in-Suit.  A00130-32, Claims 1, 7, 11, 17, 23.  Certain claims of the '058 Publication further describe g/e resistant cancer having a T790M mutation, which confers resistance regardless of initial treatment with g/e.  A00130, Claim 23; *see also* A00031 at 4:37-39.  As such, nothing in the claim language limits g/e resistance to acquired resistance.

The '058 Publication specification also supports that the term is not limited to acquired g/e resistance.  The '058 Publication includes nearly identical disclosures as those discussed in relation to g/e resistant NSCLC in the specification of the Patents-in-Suit.  A00101 at [0011-0012]; A00102 at [0016]; A00114 at [0035], A00122-23 at [0085].  There is no support for limiting the term to acquired resistance.

Defendants' alternative argument that this term is indefinite fares no better than its argument against the g/e resistant NSCLC term in the Patents-in-Suit. Again, the claims themselves provide a POSA guidance on the term's meaning. A00130-32, Claims 4-8, 14-18, 23. So, too, does the specification, which teaches methods for determining g/e resistance are known to those of skill in the art, A00102 at [0015], [0017], A00103-04 at [0022-0023], A00108-09 at [0035-0036], and various examples of g/e resistant cancer, A00109 at [0036], A00119 at [0079], A00120-21 at [0081]. A POSA would not find this term indefinite.

The Court should decline to construe this term. Or, if the Court does construe it, it should adopt Plaintiffs' proposal.

### 2. Defendants' Answering Position

Terms from WO'058 require construction because they refute Plaintiffs' assertion of pre-issuance damages. Consistent with the plain and ordinary meaning, the intrinsic record leaves no doubt that terms reciting "cancer" are broader than NSCLC and include various cancer types. *See, e.g.*, WO'058, [001]-[002], [004], [007]-[008], [0012], [0018], [0072] (A00098-124). In addition, dependent claims 9-10 narrow "cancer" in claim 1 to recite specific types, confirming that "cancer" is not so limited. WO'058, claims 9-10 (A00130-31); *see also, e.g., Trustees of Columbia Univ. in N.Y.C. v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) ("[D]ependent claims … are presumed to be narrower than the independent claims on which they depend."). The Court should therefore adopt Defendants' constructions and clarify that the WO'058 "cancer" terms are broader than "NSCLC," and thus are not substantially identical to "gefitinib and/or erlotinib resistant NSCLC" recited in the patents-in-suit. *See* 35 U.S.C. § 154(d)(2).

### 3.      Plaintiffs' Reply Position

#### (a)      Defendants' "substantially identical" Arguments For The '058 Terms Are Misplaced

Defendants have proposed terms from WO'058 in order to "resolve at least Plaintiffs' pre-issuance damages claim" and to "establish[] that the WO'058 claims are not 'substantially identical' to any Asserted claim" such that Plaintiffs are not entitled to pre-issuance damages under 35 U.S.C. § 154(d)(2). *See, e.g.*, Ans. Br. at 62.  This argument reveals Defendants' claim construction positions on the majority of the disputed terms for what they are—a pretense to argue their pre-issuance damages defense before the time already ordered by the Court.  But this briefing is not the place for Defendants' arguments.  Whether any of the following terms are "substantially identical" to the WO'058 claims, and therefore whether Plaintiffs are entitled to pre-issuance damages, is not at issue here.  The Court should decline to entertain Defendants' premature attempts to argue its pre-issuance damages defense during claim construction briefing.

Additionally, Defendants' proposed constructions are wrong on the merits.  They either propose constructions which contradict definitions in the patent specification, or for which a POSA would readily understand the plain and ordinary meaning.  And several of Defendants' arguments ask the Court to compare terms not in dispute, like "NSCLC" and "lung cancer", to determine whether they are broader or narrower than the actually disputed terms. Ans. Br. at 68.  The Court should thus adopt Plaintiffs' proposals regarding these terms.

#### (b)      The WO'058 G/E Resistance Terms Require No Construction

Plaintiffs maintain that these terms require no construction.  As Plaintiffs have explained extensively, *supra*, Defendants' construction wrongly limits the construction to one embodiment (acquired g/e resistance following g/e treatment).  Defendants' sole argument regarding this term

is not about the construction of this term, but instead whether it is broader or narrower than NSCLC, a term not in dispute.  Ans. Br. at 68.  The Court should decline to construe this term.

### 4.    Defendants' Sur-Reply Position

Plaintiffs opposed dismissal of their pre-issuance damages claim by arguing that "issues of claim construction, which your Honor has not gotten to yet" are "important" to determine "whether there is a substantial change in the claims from the original published application to the claims as they issued." Ex. 1, 6:16-25.  Yet, now Plaintiffs assert that no construction is required.  Because the intrinsic evidence establishes the scope of the published claims, including establishing that the published claims encompass more than the treatment of NSCLC, claim construction is both warranted and appropriate.  Plaintiffs' assertion that Defendants' constructions are "unnecessary" because the term NSCLC is not disputed, Reply Br., *supra*, is nonsensical.

### B.    "cancer"

### 1.    Plaintiffs' Opening Position

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| This term requires no construction.<br><br>If the court is inclined to construe the term: "The presence of cells possessing characteristics typical of cancer-causing cells, such as uncontrolled proliferation, immortality, metastatic potential, rapid growth and proliferation rate, and certain characteristic morphological features." | "the presence of cells in a patient possessing characteristics typical of cancer-causing cells, such as uncontrolled proliferation, immortality, metastatic potential, rapid growth and proliferation rate, and certain characteristic morphological features. Cancer includes epithelial cell cancers, such as lung, ovarian, breast, brain, colon and prostate cancers, as well as gastrointestinal cancer, prostate cancer, ovarian cancer, breast cancer, head and neck cancer, esophageal cancer, lung cancer, non-small cell lung cancer, cancer of the nervous system, kidney cancer, retina cancer, skin cancer, liver cancer, pancreatic cancer, genital-urinary cancer and bladder cancer" |

70

Defendant proposes that term "cancer" requires construction.  Plaintiffs disagree that any construction is necessary.  A POSA would understand at once the plain and ordinary meaning of "cancer."  Nonetheless, if the Court construes "cancer," it should adopt Plaintiffs' proposal:  the definition provided by the '058 Publication and well known to a POSA.  A00117 at [0072].  The Court should reject Defendants' attempt to add an unnecessary list of specific cancers to the construction, where none are required nor supported by the intrinsic evidence.

### 2.     Defendants' Answering Position

Construction of this term is required to resolve Plaintiffs' pre-issuance damages claim, for the same reasons as the WO'058 terms above.  *See supra*.  Consistent with the plain and ordinary meaning, the intrinsic record of WO'058 is clear that the term "cancer" is broader than NSCLC and includes various types.  *See, e.g.*, WO'058, [001]-[002], [004], [007]-[008], [0012], [0018], [0072] (A00098-124); *see also* WO'058, claims 19-20, 26-27 (A00131-32) (narrowing "cancer").  In spite of this record, Plaintiffs have refused to agree that various types of cancer are included within the term.

### 3.     Plaintiffs' Reply Position

Plaintiffs maintain that this term requires no construction both because it is a well-known term to a POSA and because it is defined in the WO'058 Publication.  A00117 at [0072].  Defendants' proposed construction unnecessarily appends a list of specific cancers to the WO'058 Publication's definition.  And again, Defendants' sole argument for its proposal is that "cancer" is broader than NSCLC, a term not in dispute.  The Court should decline to construe this term, or, if the Court does construe the term, it should adopt Plaintiffs' proposal:  the definition provided by the WO'058 Publication and well known to a POSA.

### 4. Defendants' Sur-Reply Position

Defendants' construction comes directly from the intrinsic evidence, which specifies that the scope of "cancer" is broader than NSCLC. *Supra.*

### C. "epithelial cell cancer"

### 1. Plaintiffs' Opening Position

| Plaintiffs' Proposal | Defendants' Proposal |
| --- | --- |
| This term requires no construction.<br><br>If the court construes it: "Diseases characterized by abnormal, accelerated growth of epithelial cells." | "a disease characterized by abnormal, accelerated growth of epithelial cells, including prostate cancer, breast cancer, colon cancer, lung cancer, pancreatic cancer, ovarian cancer, cancer of the spleen, testicular cancer, cancer of the thymus" |

"Epithelial cell cancer" has a well-known meaning and requires no construction. The '058 Publication uses the term consistent with its plain and ordinary meaning, and discloses that epithelial cell cancers are "diseases characterized by abnormal, accelerated growth of epithelial cells." Defendants do not dispute this, but insist on a construction that unnecessarily adds specific types of cancers. The court should decline to construe this term. If the Court does construe it, it should adopt Plaintiffs' proposal which does not add extraneous words.

### 2. Defendants' Answering Position

Like the cancer terms, construction of this term is required to resolve Plaintiffs' pre-issuance damages claim. *See supra.* Specifically, construction is required to clarify that "epithelial cell cancer" encompasses different types and is broader than "NSCLC." Consistent with the plain and ordinary meaning, the intrinsic record is clear that "epithelial cell cancer" includes different types, including lung cancer, which is further subdivided into two major types (NSCLC and small cell lung cancer). *See, e.g.*, WO'058, [001]-[002], [004], [007]-[008], [0018] (A00098-124). In

spite of this record, Plaintiffs have refused to agree that types of epithelial cell cancer are included within the term.

### 3.    Plaintiffs' Reply Position

Plaintiffs maintain that this term requires no construction because the WO'058 Publication uses the term consistent with its plain and ordinary meaning, and discloses that epithelial cell cancers are "diseases characterized by abnormal, accelerated growth of epithelial cells."  A00098 at [001].  And again, Defendants' sole argument for its proposal is that "epithelial cell cancer" is broader than "lung cancer," a term not in dispute.  Answer at 72.  The Court should decline to construe this term, or, if the Court does construe the term, it should adopt Plaintiffs' proposal:  the definition provided by the WO'058 Publication and well known to a POSA.

### 4.    Defendants' Sur-Reply Position

Here, too, the intrinsic evidence specifies that the scope of "epithelial cell cancer" is broader than NSCLC.  *Supra*.

## V.    CONCLUSION

### A.    Plaintiffs' Conclusion

Plaintiffs' proposals regarding the disputed claim terms should be adopted.

### B.    Defendants' Conclusion

Defendants' proposals should be adopted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Megan E. Dellinger

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
Travis J. Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
mdellinger@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Puma Biotechnology, Inc.
and Wyeth LLC*

OF COUNSEL:

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA  92121-3134
(858) 314-1200

Gasper J. LaRosa
Lisamarie LoGiudice
JONES DAY
250 Vesey Street
New York, NY  10281
(212) 326-3939

Jason Winchester
JONES DAY
77 West Wacker, Suite 3500
Chicago, IL  60601-1692
(312) 782-3939

SHAW KELLER LLP

/s/ Andrew E. Russell

_____

Karen E. Keller (#4489)
Andrew E. Russell (#5382)
Nathan R. Hoeschen (#6232)
Emily S. DiBenedetto (#6779)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for AstraZeneca Pharmaceuticals
LP and AstraZeneca AB*

OF COUNSEL:

Christopher Sipes
Einar Stole
Megan Keane
Kaveh Saba
Priscilla Dodson
Ashley Winkler
Melissa Keech
Tobias Ma
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC  20001-4956
(202) 662-6000

Shehla Wynne*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001-2113
(202) 879-3939

*Admitted in New York; not admitted in
 District of Columbia; practice limited to cases
 in federal court and agencies

Attorneys for Puma Biotechnology, Inc.
Sara T. Horton
Ren-How Harn
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL  60654-3406
(312) 728-9040

Attorneys for Wyeth LLC


December 2, 2022