## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **PUMA BIOTECHNOLOGY, INC.**<br>**and WYETH LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No. 21-cv-1338-MFK** |
| | ) | |
| **ASTRAZENECA**<br>**PHARMACEUTICALS LP and**<br>**ASTRAZENECA AB,** | )<br>)<br>) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Puma Biotechnology, Inc. and Wyeth LLC have sued AstraZeneca

Pharmaceuticals LP and AstraZeneca AB (collectively AstraZeneca) for infringement of

two patents:  United States Patent Nos. 10,603,314 (the '314 patent) and 10,596,162

(the '162 patent).  The plaintiffs contend that AstraZeneca's drug Tagrisso (osimertinib)

infringes at least claim 1 of both the asserted patents.  The parties dispute the meaning

of four terms in those claims.[1]  In this opinion, the Court sets forth its construction of the

disputed claim terms.

## Background

Puma and AstraZeneca are biopharmaceutical companies that commercialize

---

[1] The parties initially disputed eight terms but indicated in their Amended Joint Claim Construction Chart that they reached agreement on four of those terms.  In addition, the exact language of three of the four remaining claim terms differs slightly between the '314 and '162 patents, but neither party contends that those differences are material to their proposed constructions.

drugs to treat cancer and other illnesses.  Puma licensed the rights for the patents-in-suit from Wyeth, and both Puma and AstraZeneca have developed treatments for non-small cell lung cancer (NSCLC).  NSCLC is associated with overactivity of the epidermal growth factor receptor (EGFR), an enzyme that is involved in cell division and growth.  Drugs that treat this condition are known as EGFR tyrosine kinase inhibitors (TKIs), and these TKIs bind to certain parts of the EGFR to prevent the enzyme from triggering cancerous cell growth.

Some TKIs—including gefitinib and erlotinib—are "reversible inhibitors," which "form non-covalent bonds" with the EGFR or "bind to the [EGFR] in a way that may dissociate over time."  Joint Claim Constr. Br. at 8, 10.  Reversible inhibitors are effective in treating some but not all forms of NSCLC.  To treat gefitinib and/or erlotinib-resistant non-small cell lung cancer ("g/e-resistant NSCLC"), "irreversible inhibitors were developed that covalently bind to specific amino acid residues . . . that are located" at a specific part of the EGFR.  *Id.* at 8.  These "irreversible inhibitors form strong bonds that do not break under physiologic conditions."  *Id.* at 10.

The plaintiffs contend that AstraZeneca's irreversible EGFR inhibitor Tagrisso (osimertinib) infringes both the patents-in-suit.  The '314 patent claims methods of treating g/e-resistant NSCLC, and the '162 Patent claims methods of treating g/e-resistant NSCLC having a specific mutation—the "T790M mutation"—in the EGFR.  The claimed methods involve administering daily a "unit dosage" of an irreversible EGFR inhibitor that covalently binds to a specific part of the enzyme.[2]

---

[2] The '314 Patent refers to this part of the EGFR as the "cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2."  '314 Patent at 35:58–60.  The '162 Patent refers to it as "cysteine 773 of the

## Discussion

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  During claim construction, a court is to construe the words of a claim in accordance with their "ordinary and customary meaning," namely "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  Sometimes, the meaning of a term is not immediately apparent, and a court will need to look to other sources to determine "what a person of skill in the art would have understood disputed claim language to mean."  *Innova*, 381 F.3d at 1116.  These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.*  Expert testimony is one form of extrinsic evidence, but it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted).

Claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  But "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156

---

catalytic domain within the SEQ ID NO:  1 having a T790M mutation."  '162 Patent at 35:55–56.  The '162 Patent also specifies a "unit dosage of 2-500 mg."  *Id.* at 35:54.

F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also, Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Finally, there are two exceptions to the general rule that claim terms are given their ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014).  "To disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *See Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (internal quotation marks omitted); *see also*, *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").

1.   **"A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer [in a patient in need thereof / having a T790M mutation in SEQ ID NO: 1 in a patient]"[3]**

   a.   *The plaintiffs' proposed construction:*

      i.   The preamble is not limiting; plain and ordinary meaning.

---

[3] The brackets indicate language that differs between the two patents.  The '314 Patent claims "a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof."  '314 Patent at 35:51–52.  The '162 Patent claims "a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient."  '162 Patent at 35:48–51.

b.      *AstraZeneca's proposed construction:*

i.      The preamble is limiting; "Administration of an effective amount of drug to a patient diagnosed with gefitinib and/or erlotinib resistant non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1 ('162 Patent, Claim 1)] for the purpose of providing a therapeutically beneficial effect on the gefitinib and/or erlotinib resistant non-small cell lung cancer.  An effective amount is an amount that results in a beneficial effect for at least a statistically significant fraction of patients considering both its pharmacologic effectiveness and its physiological safety."

c.      *The Court's construction:*

i.      The preamble is limiting; plain and ordinary meaning

As a threshold matter, the Court agrees with AstraZeneca that the claims' preambles are limiting.  "[C]laim construction analysis of statements of intended purpose in methods of using apparatuses or compositions has tended to result in a conclusion that such preamble language is limiting."  *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1341 (Fed. Cir. 2021).  This is because "claims to methods of using such apparatuses or compositions are *not directed to what the method 'is,'* but rather they typically rely entirely on *what the method 'does[,]'*" which "is usually recited in [the claim's] preamble."  *Id.* (emphasis added).  On patents that "are directed to methods, and more specifically to methods of using a composition for a specific purpose[,]" the Federal Circuit "ha[s] generally construed statements of intended purpose in such method claims as limiting."  *Id.*

In this case, the intrinsic evidence reflects that the patents are directed to "methods of using a composition for a specific purpose."  *Id.*  Both patents are titled

5

"*Method* for Treating Gefitinib Resistant Cancer," they repeatedly state that the invention "provides a *method* for treating gefitinib/erlotinib resistant cancer" in at least one embodiment, and they both claim "administering daily . . . a pharmaceutical *composition* . . . ." '314 Patent at 1:1–2, 3:46–48, 7:25–26, 35:54–56; '162 Patent at 1:1–2, 3:51–53, 7:28–29, 35:48–54 (emphasis added).  In light of these statements, and considering that the preambles expressly recite "[a] *method* for treating gefitinib and/or erlotinib resistant non-small cell lung cancer," *id.* at 35:52–53; *id.* at 35:48–49 (emphasis added), the Court concludes that the preambles are "statements of intended purpose" that the Federal Circuit has "generally construed . . . as limiting." *Lilly*, 8 F.4th at 1341.

The plaintiffs argue that *Lilly* is inapplicable because in this case "[t]he body of the claims fully recites how g/e-resistant NSCLC is treated."  Joint Claim Constr. Br. at 25.  Yet although the claims in *Lilly* "reference [the claimed treatment] . . . only in the preambles," the Federal Circuit concluded that "[t]he preambles limit the scope of the claims because these claims would not read on, for example, the performance of the same method step to treat other conditions."  *Lilly*, 8 F.4th at 1342.  In reaching that conclusion, the court in *Lilly* held that "the treatment . . . [was] central to the inventions of the challenged patents" because there were "extensive discussions of [the] treatment in every section of the patents' written description."  *Id.*  The same is true in this case: the Summary describes the claimed treatment method, lists compounds used in preferred embodiments, and describes various other embodiments about monitoring and analyzing the cancer; the Detailed Description is divided into a "Gefitinib and Erlotinib Resistant Cancers" section and a "Method of Treating a Patient" section; and the Examples include an "Analysis of Recurrent [non-small cell lung cancer] and

6

Generation of Gefitinib-Resistant NCI-H1650 Cells" and an "Analysis of Recurrent Lung Cancers with Acquired Resistance to Gefitinib."  '314 Patent at 3–4, 6–12, 13–15; '162 Patent at 3–4, 6–12, 13–15.  This indicates that "the preambles [were] not merely statements of effect but rather statements of *the intentional purpose for which the methods must be performed*."  *Lilly*, 8 F.4th at 1342 (emphasis added).  The Court concludes that the preamble is limiting, just as the Federal Circuit "has not hesitated to hold preambles limiting when they state an intended purpose for methods of using a compound."  *Id.*

Although the preamble is limiting, AstraZeneca's proposed construction is unduly narrow.  *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.") (internal quotation marks omitted).  AstraZeneca is correct that "the preambles should be construed consistent with the plain meaning," Joint. Claim Constr. Br. at 22, but its proposed construction would require (1) the method to involve administering an "effective amount" of the drug "for the purpose of providing a therapeutically beneficial effect," and (2) the patient to be diagnosed with g/e-resistant NSCLC.  Federal Circuit precedent similarly precludes the Court from adopting either of these limitations.

AstraZeneca argues that the preamble requires administering an "effective amount" of the drug.  It points out that the phrase "effective amount" appears several times in the specification, which states that the term "indicates an amount that results in a beneficial effect for at least a statistically significant fraction of patients[.]"  '314 Patent at 8:46–47; '162 Patent at 8:49–50.  AstraZeneca contends that because the specification states that "the terms 'effective' and 'effectiveness' includes both

7

pharmacological effectiveness and physiological safety," *id.* at 13:14–16; *id.* at 13:15–17, the treatment must be administered with the purpose of providing a therapeutically beneficial effect.

Yet as the plaintiffs note, neither the preambles nor the claims at issue include the words "effective amount" or "therapeutically beneficial," and the claims use different language—either "a unit dosage" or "a unit dosage of 2-500 mg"—to describe the amount of the pharmaceutical composition to administer.  *Id.* at 35:56; *id.* at 35:54.  The term "unit dose" also appears in the specification, which defines it as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents[.]"  *Id.* at 34–38; *id.* at 38–42.  Although the plaintiffs' reliance on *Bristol-Meyers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368 (Fed. Cir. 2001), is misplaced because this case is "not like cases in which the administration of a specified amount is the same regardless of the purpose," *Lilly*, 8 F.4th at 1342 (citing *Bristol-Myers Squibb*, 246 F.3d at 1375), this definition of "unit dose" does not support AstraZeneca's assertion that the preamble requires administration of an "effective amount."  The definitions of both "effective amount" and "unit dosage" concern an amount or quantity of the drug, which means that the term "unit dosage" in the claims would be superfluous if the preamble already required administering an "effective amount."  "Claims must be interpreted with an eye toward giving effect to all terms in the claim," *Becton, Dickinson & Co. v. Tyco Healthcare Group*, 616 F.3d 1249, 1257 (Fed. Cir. 2010), and adopting AstraZeneca's construction would "be contrary to the principle that claim language should not be treated as meaningless."  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006).

8

*Becton* and *Bicon* thus preclude the Court from interpreting the patents to require an "effective amount" when the claims expressly use the term "unit dosage."  And because AstraZeneca's argument for a "therapeutically beneficial" purpose depends on the specification's definition of the word "effective," there is also no basis to read in a specific purpose—"therapeutically beneficial" or otherwise.

The Court also declines to read the claims as only encompassing treatment of patients already diagnosed with g/e-resistant NSCLC.  The claims describe administering the drug "to the patient *having* [g/e-resistant NSCLC]," but the words "diagnose" or "diagnosis" do not appear in the preamble or the body of the claims.  '314 Patent at 35:54–55; '162 Patent at 35:50–52 (emphasis added).  AstraZeneca supports its argument by pointing to a section of the specification discussing the process of diagnosing gefitinib and/or erlotinib sensitivity or resistance.  Yet "it is long-settled that even though 'claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim.'"  *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (quoting *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1237 (Fed. Cir. 2001)).  If the Court limited the claims to only those patients diagnosed with g/e resistant NSCLC, then the term "having" would be superfluous because any patient who is diagnosed with the disease necessarily "has" the condition.  Such an interpretation would be impermissible for the same reasons that limiting the claims to administering an "effective amount" would make the term "unit dosage" meaningless.  *See Becton*, 616 F.3d at 1257, *Bicon,* 441 F.3d at 951.  As a result, the Court will not construe the preamble to only include patients diagnosed with the disease.

Lastly, AstraZeneca appeared to contend at oral argument that the preamble

required construction because otherwise a doctor with no intention to treat g/e-resistant NSCLC—or even knowledge that a patient has the condition—could infringe the patent. But "questions that do not go to claim scope, but instead go to infringement" at claim construction. *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).

In short, AstraZeneca's proposed construction of the preambles inappropriately seeks to import limitations from the specification. *See Phillips*, 415 F.3d at 1323 (there is a "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification.").  The Court concludes that the preambles do not require further construction; they retain their plain and ordinary meaning.

        **2.**     **"gefitinib and/or erlotinib resistant non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1]"[4]**

          a.     *The plaintiffs' proposed construction*

               i.     plain and ordinary meaning

          b.     *AstraZeneca's proposed construction:*

               i.     "non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1] that has progressed after initiation of treatment with gefitinib and/or erlotinib."

          c.     *The Court's construction:*

               i.     plain and ordinary meaning

At its core, the parties' dispute regarding this term concerns the meaning of the

---

[4] The '314 Patent states "gefitinib and/or erlotinib resistant non-small cell lung cancer." '314 Patent at 35:54–55.  The '162 Patent states "gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1."  '162 Patent at 35:51–53.

word "resistant."  The plaintiffs contend that the Court need not construe this term, while AstraZeneca argues that the phrase "gefitinib and/or erlotinib resistant" only encompasses treatment of cancers that have already been determined to be resistant to gefitinib and/or erlotinib.  To support its argument, AstraZeneca points to one embodiment claiming a method of treating non-small cell lung cancer in a subject "after the subject has initiated gefitinib and/or erlotinib treatment."  '314 Patent at 3:50–52; '162 Patent at 3:55–56.

But although "[c]ancers may be diagnosed as gefitinib and/or erlotinib resistant after treatment with gefitinib and/or erlotinib has commenced," they may also be "diagnosed as gefitinib and/or erlotinib resistant *prior to treatment* with such compounds." *Id.* at 7:57–61; *id.* at 7:60–64 (emphasis added).  The specification states that "[i]n another embodiment, the present invention provides a method of treating cancer, comprising administering to a subject having a mutation in EGFR."  *Id.* at 5:32–34; *Id.* at 5:36–38.  It then makes it clear that this mutation—which it refers to as the "T790M mutation"—"confers resistance to gefitinib and/or erlotinib" treatment.  *Id.* at 5:37–38; *Id.* at 5:41–42.  AstraZeneca's proposed construction, which limits the claims to treatment of cancers that have *already* been treated with gefitinib and/or erlotinib, would exclude this embodiment, in contravention of controlling Federal Circuit precedent.  *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.").

The Court is not persuaded by the evidence that AstraZeneca cites to justify its position.  AstraZeneca appears to argue that it is proper to exclude the embodiment

discussing the T790M mutation (the "T790M Embodiment") because that embodiment "provides a method of treating *cancer*" rather than "a method of treating *gefitinib and/or erlotinib resistant cancer*."  Joint Claim. Const. Br. at 46 (emphasis added).  Although not all forms of non-small cell lung cancer resist gefitinib and/or erlotinib, AstraZeneca fails to explain why patents that specifically claim a method of treating g/e-resistant NSCLC would include an embodiment that encompasses a form of cancer other than what the claimed method treats.[5]  Considering that both the embodiment encompassing treatment "after the subject has initiated gefitinib and/or erlotinib treatment" and the T790M Embodiment concern the same method—administering "a pharmaceutical composition comprising an irreversible [EGFR] inhibitor"—the absence of the word "resistant" is not a sufficient basis to exclude the T790M Embodiment.  '314 Patent at 3:53–55, 4:36–37; '162 Patent at 3:58–60, 4:40–41.

AstraZeneca's other arguments are similarly unavailing.  It appeared to concede at oral argument that its construction would render the T790 Embodiment meaningless, and it argued that the prosecution history justifies such an interpretation because the inventors initially sought a claim with the language "a method of treating cancer" but later cancelled that claim.  Joint Claim Const. Br. at 47.  Yet to the extent that AstraZeneca is arguing that the inventors disclaimed any interpretation encompassing the T790M Embodiment, the inventors' actions were not "so clear as to show reasonable clarity and deliberateness" and "so unmistakable as to be unambiguous

---

[5] The patents are titled "Method for Treating Gefitinib Resistant Cancer," the preambles state that the invention claimed is "[a] method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer," and AstraZeneca points to no evidence suggesting that the patents claim treatment of cancer that is not resistant to gefitinib or erlotinib. '314 Patent at 1:1–2, 35:51–53; '162 Patent at 1:1–2, 35:48–50.

evidence of disclaimer":  the inventors did not specify their reasons for cancelling that specific claim in their amendment, and the final patents still include that language as an embodiment.  *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (internal citation and quotation marks omitted).

AstraZeneca also contends that if the claim term does not require prior treatment with gefitinib or erlotinib, the claims are invalid for indefiniteness.  The Court declines to decide a validity issue at this stage.  The appropriate course is to construe the patents properly and determine validity later; not to use a validity-based argument as a means of claim construction.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014) ("Courts should be cautious not to allow claim construction to morph into a mini-trial on validity.").

The Court therefore concludes that the terms "gefitinib and/or erlotinib resistant non-small cell lung cancer" and "gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1" have their plain and ordinary meaning; no further construction is needed.

3.    **"irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to [cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2 / to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation]"[6]**

a.    *The plaintiffs' proposed construction:*

i.    A low molecular weight N-(heteroaryl)-aniline compound

---

[6] The '314 Patent claims an "irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2."  '314 Patent at 35:57–60.  The '162 Patent claims an "irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation."  '162 Patent at 35:54–56.

having a Michael acceptor that covalently binds to [cysteine

773 residue in the ligand-binding pocket of EGFR or cysteine

805 residue in the ligand-binding pocket of erb-B2 / cysteine

773 of the catalytic domain within the SEQ ID NO: 1 having

a T790M mutation]."

   b.    *AstraZeneca's proposed construction:*

        i.    "A compound that permanently inhibits EGFR and covalently

binds to [cysteine 773 residue in the ligand-binding pocket of

EGFR or cysteine 805 residue in the ligand-binding pocket of

erb-B2 / cysteine 773 of the catalytic domain within the SEQ

ID NO: 1 having a T790M mutation]."

   c.    *The Court's construction:*

        i.    "A compound that irreversibly inhibits EGFR and covalently

binds to [cysteine 773 residue in the ligand-binding pocket of

EGFR or cysteine 805 residue in the ligand-binding pocket of

erb-B2 / cysteine 773 of the catalytic domain within the SEQ

ID NO: 1 having a T790M mutation]."

The parties also disagree regarding the proper construction of the term

"irreversible epidermal growth factor receptor (EGFR) inhibitor."  The plaintiffs argue

that the term should be construed as "a low molecular weight N-(heteroaryl)-aniline

compound having a Michael acceptor," but the Court agrees with AstraZeneca that the

intrinsic evidence does not support this interpretation.

"When a patentee explicitly defines a claim term in the patent specification, the

patentee's definition controls."  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d

14

1363, 1380 (Fed. Cir. 2009).  As AstraZeneca points out, the specification states that "the irreversible EGFR inhibitor may be any compound which binds to cysteine 773 of EGFR (SEQ ID NO:  1)."  '314 Patent at 3:57–59; '162 Patent at 3:62–64.  The specification also defines the terms "drug" or "compound" as "a chemical entity or biological product, or combination of chemical entities or biological products" that is "*preferably, but not necessarily a low molecular weight compound, but may also be a larger compound*, for example, an oligomer of nucleic acids, amino acids, or . . . lipoproteins, aptamers, and modifications and combinations thereof."  '314 Patent at 9:3–13; '162 Patent at 13:4–14 (emphasis added).  Based on these statements, AstraZeneca contends that an irreversible EGFR inhibitor is "any compound"— regardless of its molecular weight—that performs the claimed function.

The plaintiffs respond that the definition of "compound" does not preclude their construction because an irreversible EGFR inhibitor is "any compound *which binds to cysteine 773 of EGFR*."  Joint Claim Constr. Br. at 55 n.13 (emphasis in original).  They then rely on the declaration of their expert Dr. Jeffrey Winkler to argue that a person of ordinary skill in the art would understand the phrase "binds to cysteine 773 of EGFR" as referring only to "low molecular weight N-(heteroaryl)-aniline compound[s] having a Michael acceptor."  *Id.*  AstraZeneca cites to the declaration of its expert Dr. Paul Reidler to dispute this assertion, contending that "were the claim to be so construed, the structural class encompassing the examples of the patent is far narrower—the class of 4-anilino-quinazolines and 4-anilino-quinoline-3-carbonitrile."  Joint. Claim Const. Br. at 54 n.12. The Court need not decide this issue, however, because it is only where the intrinsic evidence is ambiguous that a court may rely on extrinsic evidence to construe a claim term.  *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711

F.3d 1348, 1360 (Fed. Cir. 2013).  In this case, the intrinsic evidence is sufficiently clear—particularly when considered in light of the parties' technology tutorials and arguments at the claim construction hearing—that the Court should construe the term "irreversible EGFR inhibitor" structurally rather than functionally.

The "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Eon Corp.*, 815 F.3d at 1318 (internal citation and quotation marks omitted).  At oral argument, the plaintiffs contended that their definition of the term aligns with the patent's description because Figure 2-B shows that the irreversible inhibitors in the preferred embodiments have the structure they propose.  Yet "claims should not be limited 'to preferred embodiments or specific examples in the specification,'" *VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 653 (Fed. Cir. 2022) (internal citation omitted), and the only express mention of the compounds' structure in the specification itself is a reference to the "chloride moieties" and "aniline" ring of those same three inhibitors.  '314 Patent at 18:41–42; '162 Patent at 18:35–36.  In contrast, the specification repeatedly discusses irreversible inhibitors in the context of their role and effectiveness in treating g/e-resistant NSCLC.[7]  This focus on what the irreversible inhibitors *do*—rather than what

---

[7] (1) The Summary states "[t]he inventors of the present invention have surprisingly discovered that irreversible EGFR inhibitors are effective in the treatment of [g/e-resistant NSCLC];" (2) Figures 4A and 4B "show Effectiveness of ERBB inhibitors in suppressing the T790M EGFR mutant;" (3) the Detailed Description notes that "irreversible EGFR inhibitors, which covalently cross-link the receptor, are effective in inhibiting cancers with the T790M mutation;" (4) the inventors "compared the ability of gefitinib and irreversible ERBB family inhibitors to suppress signaling via downstream effectors of EGFR" and found that the irreversible inhibitors were more effective; and (5) the specification includes a subsection regarding "Inhibition of T790M EGFR Signaling and Enhanced Cell Killing by Irreversible Inhibitors."  '314 Patent at 3:43–46, 5:58–59, 7:16–20, 16:58–17:3, 17:28–18:67; '162 Patent at 48–51, 5:61–62, 7:19–23, 16:53–65, 17:23–18:61.

they *are*—leads the Court to conclude that a functional definition of the term "stays true to the claim language" and "most naturally aligns with the patent's description." *Eon Corp.*, 815 F.3d at 1318.  The Court therefore declines to adopt the plaintiffs' proposed construction.

There is more support for AstraZeneca's proposed construction.  "[C]laims are interpreted with an eye toward giving effect to all terms in the claim," *Bicon*, 441 F.3d at 950, and the Federal Circuit "instructs that different claim terms are presumed to have different meanings."  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).

In this case, the patents state that the claimed method involves an "irreversible EGFR inhibitor that covalently binds[.]"  '314 Patent at 35:57–58; '162 Patent at 35:54– 55.  The plaintiffs appear to argue that AstraZeneca's proposed construction is unnecessary because covalent binding and irreversible inhibition are the same, and "[t]he patent claims require only that the irreversible EGFR inhibitor covalently bind with the specified cysteine residues."  Joint Claim Const. Br. at 57.  Although courts have declined to give meaning to all terms where the terms "are very similar in meaning" and "where the patentee used different words to express similar concepts," *Innova*, 381 F.3d at 1119, the plaintiffs point to no intrinsic evidence indicating that the patents treat inhibiting an enzyme and binding to a cysteine residue as similar concepts.  Rather, the implication of claiming irreversible inhibitors that covalently bind is that there are also irreversible inhibitors that do not, and the specification suggests as much when it states that "[a]ll three drugs are irreversible inhibitors, *most likely* via a covalent bond with the cys773 residue . . . or the cys805 of ERBB2."  '314 Patent at 16:17-19; '162 Patent at 16:13–15 (emphasis added).  An irreversible inhibitor therefore must be more than just

17

an inhibitor that "covalently binds to cysteine 773 residue," as otherwise the term "covalently binds" would be "unnecessary and superfluous as the patentee could have easily used the term [irreversible EGFR inhibitor] alone."  *Innova*, 381 F.3d 1111, 1119.

The Court therefore adopts AstraZeneca's proposed construction—with one modification.  The plaintiffs are correct that there is no mention of "permanent" or "permanently inhibit" in the claim, specification, or prosecution history, and AstraZeneca conceded at oral argument that it believes "irreversible" and "permanent" have the same meaning.  Because "merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction," *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004), the Court sees no basis to adopt the phrase "permanently inhibits" in its claim construction.  Rather, the Court will construe the term in question as "a compound that irreversibly inhibits EGFR" but otherwise adopt AstraZeneca's construction.

4.    **"a pharmaceutical composition comprising a unit dosage "**

a.    *The plaintiffs' proposed construction:*

i.    The specification's definition controls; no further construction necessary.

b.    *AstraZeneca's proposed construction:*

i.    "a pharmaceutical composition comprising a physically discrete unit suitable as unitary dosage for the patient, each unit containing an effective amount of the irreversible inhibitor in association with the required diluents; i.e. carrier, or vehicle.  An effective amount is an amount that results in a beneficial effect for at least a statistically significant fraction

18

of patients considering both its pharmacologic effectiveness and its physiological safety."

c.   *The Court's construction:*

i.   The specification's definition controls; no further construction necessary.

The parties do not dispute the meaning of "pharmaceutical composition," but AstraZeneca argues that the term "unit dosage" requires construction.  The Court agrees with the plaintiffs that the definition of "unit dosage" as stated in the specification does not require further construction.

As discussed previously, "[w]hen a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."  *Martek*, 579 F.3d at 1380.  "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term.  *Id.* (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

In this case, the specification expressly defines a "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e. carrier, or vehicle."  '314 Patent at 9:34–38; '162 Patent at 9:38–42.  AstraZeneca does not dispute that a patentee's

definition of a term controls, but it proposes construing the phrase "a predetermined quantity of active material calculated to produce the desired therapeutic effect" in the patent's definition as "an effective amount of the irreversible inhibitor."  Joint Claim Constr. Br. at 64–65.  AstraZeneca argues that this construction is both necessary and based on the specification, which (1) states that the compositions are administered "in a therapeutically effective amount" immediately after defining "unit dose," and (2) defines "effective" or "effectiveness" as including "both pharmacologic effectiveness and physiological safety."  '314 Patent at 9:40–41, 13:15–16; '162 Patent at 9:43–45, 13:16–17.

AstraZeneca's belief that the plaintiffs wish to "maintain ambiguity of the 'therapeutic effect' that may or may not be required," Joint Claim Constr. Br. at 65, is not a basis for rewriting the definition of "unit dosage" as stated in the specification. Considering that the patents both defined the term "effective amount" and used it repeatedly in other parts of the specification, the inventors "could easily have included the word[s] '[effective amount]' in the claim language" when defining a "unit dosage." *Takeda Pharm. Co. Ltd. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014).  "In the absence of their decision to do so, however," the Court will not "take it upon [itself] to rewrite the claim that way."  *Id.*; *see also Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x. 961, 965-66 (Fed. Cir. 2014) ("Contrary to Appellants' suggestion, the patentee's use of the prefix in the tables demonstrates that it knew how to specify racemic 3-isobutylGABA as distinguished from the compound generally and chose not to do so in claim 2.").  Consequently, the Court holds that the term "unit dosage" does not require construction beyond the definition as stated in the specification.

**Conclusion**

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order.  The parties are directed to file by April 7, 2023 a joint status report addressing any scheduling issues going forward and reporting on the history and current status of any settlement discussions.  The Court will set a further status hearing if necessary after reviewing the joint status report.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 29, 2023