IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) | |
| | ) | **Redacted – Public Version** |
| Plaintiffs/Counterclaim-Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1338-MFK |
| | ) | |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) | ▆▆▆▆▆▆▆▆▆▆ |
| | ) | |
| Defendants/Counterclaim-Plaintiffs. | ) | |

## DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca Pharmaceuticals LP and AstraZeneca AB*

OF COUNSEL:
Christopher N. Sipes
Einar Stole
Megan P. Keane
Kaveh V. Saba
Pricilla Dodson
Melissa Keech
Ashley Winkler
Tobias Ma
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Dated: March 22, 2023

## <u>TABLE OF CONTENTS</u>

I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................. 1

II.    SUMMARY OF THE ARGUMENT ........................................................... 1

III.   STATEMENT OF THE FACTS .................................................................. 2

     A.    AstraZeneca's Pioneering Work to Develop Treatments for NSCLC................... 2

     B.    The Patents-in-Suit............................................................................. 3

     C.    AstraZeneca's Document Production ....................................................... 4

IV.   LEGAL STANDARD............................................................................. 5

V.    ARGUMENT ...................................................................................... 6

     A.    Plaintiffs Failed to Preserve a Claim of Willfulness................................... 6

     B.    Plaintiffs' Requests for "Research Efforts Regarding Gefitinib and/or
           Erlotinib Resistant NSCLC" and All Documents Related to Any Efforts to
           Develop an EGFR Inhibitor to Treat NSCLC Are Improper................................. 7

          1.    The Requested Discovery is Not Responsive to Plaintiffs' RFP
               Nos. 1, 3, and 4 or Relevant to Any Issue in This Case............................. 7

          2.    AstraZeneca Has Searched for and Produced Responsive
               Discovery .................................................................................. 10

          3.    The Burden to AstraZeneca Outweighs Any Showing of Relevance....... 11

     C.    Plaintiffs Are Not Entitled to Additional Discovery Regarding
           AstraZeneca's Knowledge of the Kwak Paper ....................................... 12

          1.    AstraZeneca's Knowledge of the Kwak Paper is Not Relevant to
               Any Issue in This Case ............................................................. 12

          2.    The Burden to AstraZeneca Outweighs Any Showing of Relevance....... 13

     D.    Plaintiffs Are Not Entitled to Additional Discovery Regarding
           AstraZeneca's Internal Communications Concerning the Patents-in-Suit,
           Related Patents and Patent Applications, and Foreign Counterpart ................... 14

          1.    The Requested Discovery is Not Responsive to Plaintiffs' RFP
               No. 73 or Relevant to Any Issue in This Case......................................... 14

          2.    The Burden to AstraZeneca Outweighs Any Showing of Relevance....... 16

E.   Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of Related Patent Applications and Foreign Counterpart ........................................................................................ 17

1.   The Requested Discovery is Not Responsive to Plaintiffs' RFP Nos. 10, 11, or 73 ...................................................................... 17

2.   Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of WO '058 or the Related Patent Applications .............................................................................. 17

3.   Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of the Foreign Counterpart or its Application ................................................................................. 19

VI.   CONCLUSION ................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bioverativ Inc. v. CSL Behring LLC*,
   C.A. No. 17-914-RGA, 2020 WL 1332921 (D. Del. Mar. 23, 2020)...............................5, 15

*Delaware Display Grp. LLC v. Lenovo Grp. Ltd.*,
   C.A. No. 13–2108–RGA, 2016 WL 720977 (D. Del. Feb. 23, 2016) ......................................5

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006).............................................................................................5

*Finjan, Inc. v. Juniper Network, Inc.*,
   C.A. No. 17-CV-05659-WHA (TSH), 2019 WL 2865942 (N.D. Cal. July 3,
   2019) .......................................................................................................................................8

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011)...........................................................................................................5, 12

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*,
   897 F.2d 508 (Fed. Cir. 1990)...............................................................................................7, 9

*Holmberg v. Stealth Cam, LLC*,
   Civ. No. 11-248, 2014 WL 1584484 (D. Minn. Apr. 18, 2014)...............................................6

*iFIT Inc. v. Peloton Interactive, Inc.*,
   C.A. No. 21-507-RGA, 2022 WL 609605 (D. Del. Jan. 28, 2022) ......................................7, 18

*Inventio AG v. ThyssenKrupp Elevator Am. Corp.*,
   662 F. Supp. 2d 375 (D. Del. 2009).........................................................................................5

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
   C.A. No. 19-1031-RGA-SRF, 2019 WL 5626647 (D. Del. Oct. 31, 2019),
   *report and recommendation adopted sub nom.*, C.A. No. 19-1031-RGA, 2019
   WL 11663798 (D. Del. Nov. 15, 2019) ..................................................................................13

*NNCrystal US Corp. v. Nanosys, Inc.*,
   C.A. No. 19-1307-RGA, 2022 WL 1091283 (D. Del. Apr. 12, 2022) ............................15, 18

*PPG Indus. Ohio, Inc. v. Axalta Coating Sys., LLC*,
   C.A. No. 21-346-LPS-SRF, 2022 WL 610740 (D. Del. Jan. 26, 2022) *report
   and recommendation adopted*, C.A. No. 21-346-LPS-SRF, 2022 WL 611260
   (D. Del. Feb. 18, 2022) .....................................................................................................15, 19

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
　　320 F.3d 1354 (Fed. Cir. 2003).............................................................................13

*Paoli v. Stetser*,
　　C.A. No. 12-66-GMS-CJB, 2013 WL 2154393 (D. Del. May 16, 2013).................................5

*Sonos, Inc. v. D&M Holdings Inc.*,
　　C.A. No. 14-1330-WCB, 2017 WL 5633204 (D. Del. Nov. 21, 2017)................................15

*State Indus., Inc. v. A.O. Smith Corp.*,
　　751 F.2d 1226 (Fed. Cir. 1985)..............................................................................18

*Välinge Innovation AB v. Halstead New England Corp.*,
　　C.A. No. 16-1082-LPS-CJB, 2018 WL 2411218 (D. Del. May 29, 2018) ,
　　*report and recommendation adopted*, C.A. No. 16-1082-LPS-CJB, 2018 WL
　　11013901 (D. Del. Nov. 6, 2018) .......................................................................5, 12

**Statutes**

35 U.S.C. § 154(d)(2) ...................................................................................................18

35 U.S.C. § 271(b) .........................................................................................................6

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)..........................................................................................14, 19, 20

## I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca AB ("AstraZeneca" or "Defendants") respectfully request that the Court deny Plaintiffs' motion to compel. Plaintiffs' requested discovery is not proportional to the scope of relevant discovery in this case, and Plaintiffs' requested relief would impose a significant burden on AstraZeneca that heavily outweighs the likelihood that additional relevant information would be discovered.

## II.    SUMMARY OF THE ARGUMENT

Plaintiffs' requests for additional discovery attempt to broaden discovery far beyond the scope of relevant discovery in this case. *See* Op. Br. 2. The sole accused product is AstraZeneca's drug Tagrisso®. However, Plaintiffs' requests cover a scope so broad that it would encompass AstraZeneca's research and development of other products, including at least its Iressa® product, which uses the reversible inhibitor gefitinib. Iressa® is not the subject of this litigation. It was developed over a decade before either the project that led to Tagrisso® began or the alleged priority date of the Patents-in-Suit.

Plaintiffs also request additional discovery related to AstraZeneca's knowledge of, and internal communications related to, U.S. and foreign patent applications and foreign patents related to the Patents-in-Suit, as well as AstraZeneca's knowledge of a publication by the named inventors ("the Kwak paper"). Plaintiffs assert that such documents are relevant to their claims of infringement and willfulness. As an initial matter, Plaintiffs have waived their ability to assert willfulness by failing to properly disclose the basis for their allegation in their infringement contentions as required under the Scheduling Order. *See* D.I. 30, ¶ 3(i). But even if Plaintiffs preserved their willfulness claim, the two Patents-in-Suit did not issue until 2020— nine years after osimertinib, the active ingredient in Tagrisso®, was first synthesized, and five years after Tagrisso® received FDA approval and was first marketed. Both induced infringement and willfulness require knowledge of infringement of *a patent*, which makes

1

AstraZeneca's knowledge of patent applications or journal publications prior to the 2020 issuance of the Patents-in-Suit of limited relevance.

To the extent there is any limited probative value in Plaintiffs' requested discovery, AstraZeneca already accomplished a reasonable search for such information. AstraZeneca has participated in discovery in good faith, having used the parties' agreed-upon ESI search terms across *more* than the ten custodians required by ¶ 3(a) of the Delaware Default Standard for Discovery, and conducted extensive searches of its non-custodial ESI for responsive, non-privileged documents, and produced those documents to Plaintiffs consistent with its discovery obligations. Despite AstraZeneca's efforts, Plaintiffs request relief that would require AstraZeneca to search the entirety of its non-custodial ESI for documents using the broad search terms already applied to expansive custodial discovery. Not only is such a search unduly burdensome, it is not feasible. Mark Lewish Declaration, Ex. 1 ("Lewish Decl.") ¶ 15. To the extent Plaintiffs request that AstraZeneca identify additional non-custodial or custodial sources to be searched, AstraZeneca is not able to do so because in complying with its discovery obligations, AstraZeneca has already identified the custodial and non-custodial sources likely to lead to relevant, responsive, and non-duplicative discovery.

## III.    STATEMENT OF THE FACTS

### A.    AstraZeneca's Pioneering Work to Develop Treatments for NSCLC

Tagrisso®, the novel drug at issue in this case, is a pioneering treatment for certain types of non-small cell lung cancer (NSCLC). Tagrisso® is the result of a development project initiated at AstraZeneca in 2009. A team of scientists on that project first synthesized the active ingredient osimertinib[1] in 2011. *See* Ex. 2 (Yver) at 1166 (Figure 1). And, in 2015, after

---

[1] Plaintiffs' assertion that "[t]here is no dispute" that Tagrisso® "contains an active ingredient of the very sort described and claimed in the Patents-in-Suit and works by the very same method invented and claimed by Plaintiffs to treat gefitinib/erlotinib resistant cancer" is incorrect. *See* Op. Br. 2. AstraZeneca strongly disputes this assertion.

2

AstraZeneca conducted clinical trials establishing Tagrisso®'s efficacy and safety, FDA approved Tagrisso® as the first—and still today, the only—pharmaceutical product FDA-approved for the treatment of patients with EGFR-mutated cancer that has tested positive for a T790M mutation in EGFR and has progressed following treatment with another EGFR tyrosine kinase inhibitor ("TKI"). Ex. 3 (FDA Press Release) at 1. Following additional clinical trials in 2018 and 2020, FDA approved Tagrisso® for two additional uses in patients with EGFR-mutated cancer that have not previously been treated with another EGFR TKI. Ex. 4 (FDA Press Release) at 1; Ex. 5 (FDA Press Release) at 1.

Apart from AstraZeneca's innovative work in developing Tagrisso®, AstraZeneca has spent decades researching novel oncology treatments for a variety of cancers, including various types of lung cancer and other cancers mediated by EGFR or related kinases. For example, by the early 1990s, scientists at AstraZeneca were studying EGFR, culminating in 1995 with the discovery of gefitinib. Ex. 6 (Kettle et al. (2016)) at 1599. Gefitinib, first approved in 2003 by FDA for the treatment of NSCLC, is a reversible EGFR TKI that AstraZeneca developed into its Iressa® product. *Id.* at 1604. When AstraZeneca initiated the project that led to Tagrisso®, separate research and development related to evaluating patient response to Iressa® and possible clinical uses of it were still ongoing.

### B. The Patents-in-Suit

U.S. Patent Nos. 10,603,314 ("the '314 Patent") and 10,596,162 ("the '162 Patent") (together, "the Patents-in-Suit"), generally claim methods of treating gefitinib and/or erlotinib resistant non-small cell lung cancers ("NSCLC") by administering an irreversible EGFR inhibitor. Both Patents-in-Suit claim priority to provisional applications filed in 2005. But neither Patent issued until March 2020—over a decade after AstraZeneca began the development project that led to osimertinib, nearly eight years after AstraZeneca began clinical trials for Tagrisso®, and almost five years after FDA first approved it.

3

### C.       AstraZeneca's Document Production

Throughout this case, AstraZeneca has repeatedly acquiesced to Plaintiffs' overbroad and burdensome demands for discovery by applying broad search terms across more than ten custodians, agreeing to search an additional custodian at Plaintiffs' request, and performing multiple targeted searches of its non-custodial ESI. For example, AstraZeneca searched both custodial and non-custodial ESI and has produced documents related to the research and development of Tagrisso® from the inception of the development project, through the pre-clinical and clinical development of the active ingredient and drug product, and including the launch and marketing of Tagrisso®. AstraZeneca also searched these sources for other EGFR inhibitors (both reversible and irreversible at Plaintiffs' request) that were considered or evaluated during the development of Tagrisso®. *See* Ex. 7 (Defs' Aug. 5, 2022 Ltr) at 1–2; *see also* Ex. 8 (Defs' Sept. 21, 2022 Ltr) at 3. Further still, in addition to searching its custodial ESI for references to the Patents-in-Suit, AstraZeneca also searched its custodial ESI for mentions of Kwak, the Related Patent Applications, and the Foreign Counterpart, despite objecting to their relevance. Ex. 9 (Defs' Oct. 14 Ltr) at 4; Ex. 10 (Defs' Oct. 17 Ltr) at 2; Ex. 11 (Defs' Dec. 23 Ltr) at 1–2.

AstraZeneca has engaged in these extensive efforts despite Plaintiffs' own repeated refusals to fulfill its discovery obligations. In contravention of Delaware's default discovery rules, Plaintiffs initially identified just four custodians. *See* Ex. 12 (Plfs' Paragraph 3 ESI Disclosures) at 2. Then, following AstraZeneca's repeated requests for additional custodians to address the full scope of relevant discovery within Plaintiffs' custody and control, Plaintiffs agreed to only two additional custodians, leaving substantial gaps in relevant custodial discovery that was not addressed by Plaintiffs' search of non-custodial sources. Plaintiffs' suggestion that AstraZeneca has not participated in good faith discovery is meritless.

## IV.    LEGAL STANDARD

"Generally, a party moving to compel discovery bears the burden of demonstrating the relevance of the requested information." *Delaware Display Grp. LLC v. Lenovo Grp. Ltd.*, C.A. No. 13–2108–RGA, 2016 WL 720977, at *2 (D. Del. Feb. 23, 2016) (citing *Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009)). "Once relevance is shown, the party opposing discovery may show why discovery, even if relevant, should not be permitted." *Paoli v. Stetser*, C.A. No. 12-66-GMS-CJB, 2013 WL 2154393, at *3 (D. Del. May 16, 2013) (citation omitted).

Induced infringement requires showing the alleged infringer "induced infringing acts" and "knew or should have known his actions would induce actual infringements." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006). The latter requires that the alleged infringer "[knew] of the existence of the patent" and "[knew] that the induced acts constitut[ed] patent infringement." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011).

A willful infringement claim requires "showing that as of the time of the claim's filing, the accused infringer: (1) knew of the patent-in-suit; (2) after acquiring that knowledge, it infringed the patent; and (3) in doing so, it knew, or should have known, that its conduct amounted to infringement of the patent." *Välinge Innovation AB v. Halstead New England Corp.*, C.A. No. 16-1082-LPS-CJB, 2018 WL 2411218, at *13 (D. Del. May 29, 2018), *report and recommendation adopted*, C.A. No. 16-1082-LPS-CJB, 2018 WL 11013901 (D. Del. Nov. 6, 2018). "[P]re-patent-issuance conduct" is of "generally limited relevance" "in determining willfulness." *Bioverativ Inc. v. CSL Behring LLC*, C.A. No. 17-914-RGA, 2020 WL 1332921, at *2 (D. Del. Mar. 23, 2020).

## V.     ARGUMENT

### A.     Plaintiffs Failed to Preserve a Claim of Willfulness

While Plaintiffs argue that several of their requests for additional discovery are relevant to a claim of willfulness, they failed to preserve such a claim when they chose not to include it in their Infringement Contentions. Thus, the requested discovery is not proper in this case. Plaintiffs are also incorrect that any of the requested information is legally relevant to a willfulness claim, as described *infra*.

Under ¶ 3(i) of the Scheduling Order (D.I. 30), "[i]f a party claiming patent infringement alleges willful infringement," that party must include "the basis for such allegation" in its infringement contentions. Plaintiffs' Infringement Contentions do not contain an allegation that AstraZeneca has willfully infringed the Patents-in-Suit. Indeed, there is no dispute that willfulness is not mentioned even a single time in Plaintiffs' Infringement Contentions. *See* Ex. 13 (Plfs' Infringement Contentions) at 4–5; *see also* Ex. 14 (Defs' Feb. 8, 2023 Ltr) at 1; Ex. 15 (Plfs' Feb. 2, 2023 Ltr) at 1.

Despite Plaintiffs' argument to the contrary, the minimal allegations in Plaintiffs' Infringement Contentions do not overcome Plaintiffs' failure to preserve willfulness. *See* Ex. 15 (Plfs' Feb. 2, 2023 Ltr) at 1 (citing Ex. 13 (Plfs' Infringement Contentions) at 3, 4–5). Plaintiffs' bare allegations of "knowledge" relate to their express allegation that AstraZeneca has induced infringement under 35 U.S.C. § 271(b). Nowhere in their Infringement Contentions do Plaintiffs provide notice that AstraZeneca's purported knowledge of the Patents-in-Suit is also a basis for Plaintiffs to allege willful infringement. *See, e.g.*, *Holmberg v. Stealth Cam, LLC*, Civ. No. 11-248, 2014 WL 1584484, at *6 (D. Minn. Apr. 18, 2014) (precluding an indirect infringement claim where the plaintiff's infringement contentions disclosed only "conclusory allegations" of inducement that did not "fully disclose[] or suggest[] that [plaintiff] intended to pursue a claim for indirect infringement"). Notably, an allegation of

6

"knowledge" of the Patents-in-Suit or the Related Patent Applications, standing alone, is not an allegation for willful infringement. *See, e.g.*, *iFIT Inc. v. Peloton Interactive, Inc.*, C.A. No. 21-507-RGA, 2022 WL 609605, at *2 (D. Del. Jan. 28, 2022) (holding that neither "[k]nowledge of a patent application alone" nor "mere knowledge of the patent" could support an allegation of willfulness).

Similarly, Plaintiffs' conclusory allegation that AstraZeneca knowingly "designed [Tagrisso®] to bind cysteine 773 in order to overcome certain resistance of NSCLC to tyrosine kinase therapy" cannot plausibly be read as an allegation of willful infringement. *See* Ex. 15 (Plfs' Feb. 2, 2023 Ltr) at 1 (citing Ex. 13 (Plfs' Infringement Contentions) at 3). Tagrisso®'s active ingredient was synthesized and the product was FDA-approved years before the Patents-in-Suit issued, making it impossible for AstraZeneca to have designed Tagrisso® "with knowledge" of the Patents-in-Suit. *See, e.g.*, Ex. 2 (Yver) at 1166 (Figure 1). One cannot willfully infringe a patent application where a patent has yet to issue. *See, e.g.*, *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510–11 (Fed. Cir. 1990). Therefore, because Plaintiffs failed to set forth an adequate basis for their willfulness claim, the Court should reject as waived their assertions that discovery requests are relevant.[2]

**B.    Plaintiffs' Requests for "Research Efforts Regarding Gefitinib and/or Erlotinib Resistant NSCLC" and All Documents Related to Any Efforts to Develop an EGFR Inhibitor to Treat NSCLC Are Improper**

**1.    The Requested Discovery is Not Responsive to Plaintiffs' RFP Nos. 1, 3, and 4 or Relevant to Any Issue in This Case**

Plaintiffs rely on their RFP Nos. 1, 3, and 4 to justify moving to compel AstraZeneca to produce documents related to "[Defendants'] efforts to research and understand gefitinib resistant NSCLC and treatment for it prior to 2009." *See* Op. Br. 10. These requests, however,

---

[2] Plaintiffs' suggestion that AstraZeneca has accepted that there is a live willfulness claim, *see* Op. Br. 9 n.3, is not consistent with the case record and ignores that the Scheduling Order in this action further provides that any amendment to Plaintiffs' Infringement Contentions "may be made only by order of the Court upon a timely showing of good cause." D.I. 30, ¶ 7.

relate to the development of EGFR inhibitors, not AstraZeneca's research to understand gefitinib resistant NSCLC generally. *See* D.I. 102-2, Ex. 11 at 9 (requesting information related to AstraZeneca's efforts to develop an EGFR inhibitor to treat NSCLC (RFP No. 1), AstraZeneca's consultations with others regarding any EGFR inhibitor for the treatment of NSCLC (RFP No. 3), and documents comparing Tagrisso® with any other EGFR inhibitor (RFP No. 4)). Moreover, Plaintiffs' RFP No. 4, which relates to comparisons with Tagrisso®— an inhibitor that was not even synthesized until 2011—could not reasonably be expected to request information prior to 2009. As such, Plaintiffs' broad request for information related to AstraZeneca's efforts to understand gefitinib resistant NSCLC is not within the scope of Plaintiffs' discovery requests and Plaintiffs' motion should be denied on this basis alone.

Even if Plaintiffs' request is within the scope of RFP Nos. 1, 3, and 4 (it is not), Plaintiffs have not shown that the requested information is relevant to any issue in this case. Plaintiffs argue that their request for additional discovery beyond AstraZeneca's development of EGFR inhibitors for the treatment of gefitinib resistant NSCLC is relevant to their allegations of infringement and willful infringement. However, any suggestion by Plaintiffs that they are entitled to any research or efforts to understand gefitinib resistance as a general principle is not credible. *See, e.g.*, *Finjan, Inc. v. Juniper Network, Inc.*, C.A. No. 17-CV-05659-WHA (TSH), 2019 WL 2865942, at *3 (N.D. Cal. July 3, 2019) ("RFPs 112, 113 and 125 are overbroad because they are in no way limited to the accused products or patents at issue."). Here, Plaintiffs have asserted infringement based on one accused product—i.e., Tagrisso®, and the Patents-in-Suit relate to the administration of *irreversible* EGFR inhibitors for the treatment of *gefitinib and/or erlotinib resistant* NSCLC. Thus, AstraZeneca's research efforts that are unrelated to developing or using an irreversible EGFR inhibitors to treat gefitinib resistant NSCLC fall outside the scope of the claims and issues to be litigated.

Moreover, even if Plaintiffs have preserved a willfulness claim in this case (which they have not), *see* Section V.A *supra*, Plaintiffs cannot show that AstraZeneca's general research of resistance to gefitinib is relevant to a willful infringement claim. To the extent there were any efforts to understand gefitinib resistance, or even to develop an irreversible EGFR inhibitor for the treatment of gefitinib resistant NSCLC prior to 2009, such efforts would have occurred more than ten years before the Patents-in-Suit issued. Such efforts therefore are not probative of willful infringement. *Gustafson*, 897 F.2d at 510–11.

Throughout discovery, AstraZeneca repeatedly asked Plaintiffs to clarify the information that they were seeking with respect to any efforts to overcome gefitinib resistance and the relevance of such information. Plaintiffs, however, failed to provide any meaningful clarification with respect to their RFP Nos. 1 and 4, Ex. 11 (Defs' Dec. 23, 2022 Ltr) at 2; Ex. 16 (Defs' Nov. 30, 2022 Ltr), at 2; Ex. 8 (Defs' Sept. 21, 2022 Ltr) at 4, or any clarification at all with respect to RFP No. 3, *see* Ex. 16 (Defs' Nov. 30, 2022), at 3.

Now, in their motion, Plaintiffs introduce for the first time



Op. Br. 8 (discussing D.I. 102-2, Exs. 2 & 7).

D.I. 102-2, Exs. 2 & 7. Plaintiffs also cite a 2005 paper by Daphne Bell et al., D.I. 102-2, Ex. 8 (Bell 2005), but contrary to Plaintiffs' mischaracterization, that paper is explicitly directed to evaluating whether cancers would respond to gefitinib—not be resistant to gefitinib—research that is outside the scope of the methods claimed by the Patents-in-Suit. *See, e.g.*, D.I. 102-2, Ex. 8 (Bell 2005) at 8081.

████████████████████████████████████████████████████

████████████████████████████████████ Op. Br. 8. None of these documents

Plaintiffs cite provide any justification for vastly expanding the scope of their requests to now

encompass all of AstraZeneca's documents "regarding its efforts to research and understand

gefitinib resistant NSCLC and treatment for it before 2009." Op. Br. 7.

Nonetheless, AstraZeneca is willing to perform additional searches relating to Plaintiffs'

Exhibit Nos. 2 and 7. In particular, AstraZeneca is willing to search for documents and

information related to █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Finally, Plaintiffs are wrong that AstraZeneca has taken inconsistent positions

regarding the appropriate scope of discovery. Op. Br. 10. As AstraZeneca has repeatedly

explained, including in the letter Plaintiffs cite, the scope of relevant discovery is not parallel

between Plaintiffs and AstraZeneca. *See* Ex. 17 (Defs' Feb. 24 Ltr) at 1–2. For example, the

relevant time period for certain invalidity or inventorship issues is likely to be related to the

date of the alleged invention, around 2005. The same period, however, is not necessarily

relevant to infringement when the discovery project that led to the accused product was not

even started for several more years.

### 2. AstraZeneca Has Searched for and Produced Responsive Discovery

Despite the breadth of Plaintiffs' RFP Nos. 1, 3, and 4 and AstraZeneca's objections to

them, AstraZeneca nevertheless agreed to (and did) perform a reasonable search for responsive,

non-privileged documents relating to its efforts to develop an EGFR inhibitor to overcome

gefitinib resistance—not limited to either Tagrisso® or irreversible inhibitors. *See* Section III.C,

*supra*; *see* Ex. 10 (Defs' Oct. 17, 2022 Ltr) at 3; *see* Ex. 11 (Defs' Dec. 23, 2022 Ltr), at 2.[3] Indeed, AstraZeneca's production in response to these and other requests covered more than ten years' worth of research and development efforts.[4] *See* Section III.C, *supra*; *see* Ex. 10 (Defs' Oct. 17, 2022 Ltr) at 2–3; *see also* Ex. 7 (Defs' Aug. 5, 2022 Ltr) at 2. In addition, AstraZeneca explained that it was not aware of "efforts at AstraZeneca to develop an EGFR inhibitor to overcome gefitinib resistance before the development project that led to Tagrisso®." Ex. 11 (Defs' Dec. 23, 2022 Ltr) at 2.

> **3.    The Burden to AstraZeneca Outweighs Any Showing of Relevance**

Plaintiffs' requests for additional discovery are unduly burdensome and far outweigh the likelihood of discovering additional relevant documents and should therefore be rejected. Plaintiffs' requests could potentially encompass an innumerable quantity of documents relating, for example, to AstraZeneca's efforts to develop and research *reversible* EGFR inhibitors for non-resistant NSCLC. Indeed, Plaintiffs' citation to the Yver paper (D.I. 102-2, Ex. 9) belies their assertion that their RFPs are "targeted." *Contra* Op. Br. 2. Yver, as Plaintiffs acknowledge, explains that the "exceptional speed" of the Tagrisso® project was enabled by AstraZeneca's accumulated experience with EGFR TKI inhibitors "extending back to the 1990s through the development of [gefitinib]." Ex. 2 (Yver) at 1169. Yver clearly demonstrates that Plaintiffs' efforts to obtain discovery of any efforts to "understand" gefitinib resistance or treating gefitinib resistant NSCLC would encompass decades of research efforts that are irrelevant to the claims and defenses in this case.

---

[4] Plaintiffs' allegation that "AstraZeneca simply will not produce the documents" in response to RFP Nos. 1, 3, and 4, *see* Op. Br. 10, is plainly incorrect.

In particular, Plaintiffs request that AstraZeneca apply the "parties' agreed-upon search terms to" AstraZeneca's non-custodial ESI, *see* Op. Br. 10–11, and otherwise broadly search non-custodial ESI for documents related to "gefitinib resistance" would be impracticable. Lewish Decl. ¶ 15. There is no meaningful way to narrow the non-custodial ESI for which AstraZeneca would have to search, therefore forcing AstraZeneca to effectively search the entirety of its non-custodial ESI, which is plainly unreasonable. Lewish Decl. ¶¶ 7–15 (describing burden of searching entirety of AstraZeneca's non-custodial ESI). In addition, a search for documents broadly related to "gefitinib resistance" would encompass over a decade of AstraZeneca's work that is unrelated to the development of Tagrisso® and far outside the scope of the claims of the Patents-in-Suit. *See* Section V.B.1, *supra*.

### C.   Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of the Kwak Paper

#### 1.   AstraZeneca's Knowledge of the Kwak Paper is Not Relevant to Any Issue in This Case

Plaintiffs' request for additional discovery related to AstraZeneca's knowledge of the Kwak paper is not relevant to any issue in this case. Plaintiffs argue that discovery concerning the Kwak paper is relevant to issues of infringement and willfulness. Op. Br. 12. Plaintiffs are wrong.

Setting aside whether Plaintiffs have preserved a willfulness claim (they have not), Section V.A *supra*, claims for induced infringement and willfulness each require that the accused infringer have knowledge of the patent and knowledge that the patent is being infringed. *See, e.g.*, *Glob.-Tech Appliances*, 563 U.S. at 765–66 (reciting standard for inducement); *Välinge Innovation*, 2018 WL 2411218, at *13, *report and recommendation adopted*, 2018 WL 11013901 (D. Del. Nov. 6, 2018) (reciting standard for willfulness). AstraZeneca's knowledge of the Kwak paper is irrelevant to both prongs.

Contrary to Plaintiffs' assertion that AstraZeneca's knowledge of the Kwak paper is

relevant because the paper discloses research concerning irreversible EGFR inhibitors to treat gefitinib resistant NSCLC, *see* Op. Br. 11, whether AstraZeneca was aware of the Kwak paper has no bearing on whether AstraZeneca was aware that the disclosed research was the subject of a patent. *See, e.g.*, *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, C.A. No. 19-1031-RGA-SRF, 2019 WL 5626647, at *1–4 (D. Del. Oct. 31, 2019), *report and recommendation adopted sub nom.*, C.A. No. 19-1031-RGA, 2019 WL 11663798 (D. Del. Nov. 15, 2019) (finding that an allegation of meetings in which patentee "provide[d] an overview of [his] technology" that was allegedly "covered by issued and pending patent applications" failed to plausibly allege knowledge of patents that had not issued at the time). Nor could it, given that the Patents-in-Suit did not issue until fifteen years after the Kwak paper was published. The fact that the named inventors are authors on the Kwak paper is also irrelevant. *See* Op. Br. 11. The Kwak paper names seventeen authors and nothing in the paper hints at the existence of a patent application or that any of the named authors are inventors on such a patent application.

Nor are Plaintiffs correct that AstraZeneca made the Kwak paper "independently relevant" by asserting it as prior art or seeking discovery from MGH. While Plaintiffs (incorrectly) claim their request is relevant to infringement and willfulness, *see, e.g.*, Op. Br. 11–12, AstraZeneca's citation of the Kwak paper as prior art and its discovery requests concerning the preparation of it relate to invalidity—a separate and distinct issue. *See, e.g.*, *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1365 (Fed. Cir. 2003) ("Similarly, this court has long recognized that patent infringement and invalidity are separate and distinct issues.").

### 2.     The Burden to AstraZeneca Outweighs Any Showing of Relevance

Despite contesting the relevance of Plaintiffs' discovery requests related to the Kwak paper, in an effort to compromise, AstraZeneca agreed to (and did) search its custodial discovery sources with the ESI term "Kwak." Ex. 9 (Defs' Oct. 14, 2022 Ltr) at 4. These

custodians included eleven individuals that were involved in various stages of Tagrisso®'s development, and then a twelfth custodian at Plaintiffs' request. *See* Ex. 10 (Defs' Oct. 17, 2022 Ltr) at 4; *see also supra* Section III.C.

Nevertheless, Plaintiffs insist that AstraZeneca search its non-custodial ESI for "Kwak." As discussed above, such a broad search of all non-custodial ESI is impracticable and unreasonable. Lewish Decl. ¶¶ 7–15. To the extent that Plaintiffs believe that AstraZeneca should be compelled to search for "Kwak" in the non-custodial ESI sources that they have already identified as likely to lead to relevant discovery, responsive, non-duplicative discovery, AstraZeneca has already produced *all* responsive documents from those sources and did not withhold otherwise responsive documents that mention "Kwak."

Finally, Plaintiffs claim that searching for "Kwak" across the entirety of AstraZeneca's non-custodial ESI cannot be burdensome because "only" 398 documents containing "Kwak" were produced across ten custodians. Applying search terms to an essentially limitless quantity of non-custodial ESI, however, creates the same burden regardless of how many documents hit on those terms. In fact, the "low" number of documents referencing Kwak in AstraZeneca's custodial ESI indicates that the likely benefit of additional searches of AstraZeneca's non-custodial ESI is heavily outweighed by the burden of Plaintiffs' proposed discovery. *See* Fed. R. Civ. P. 26(b)(1).

> **D.** **Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Internal Communications Concerning the Patents-in-Suit, Related Patents and Patent Applications, and Foreign Counterpart**

> **1.** **The Requested Discovery is Not Responsive to Plaintiffs' RFP No. 73 or Relevant to Any Issue in This Case**

Plaintiffs rely on their RFP No. 73 to justify moving to compel AstraZeneca's internal communications regarding the Patents-in-Suit, Related Patents and Patent Applications, and the Foreign Counterpart. *See* Op. Br. at 13. However, RFP No. 73 is directed to AstraZeneca's communications with "Plaintiffs" or "Third Parties"—not AstraZeneca's internal

communications. *See* D.I. 102-2, Ex. 19 (Plfs. RFP No. 73) at 2. As such, AstraZeneca's internal communications regarding the Patents-in-Suit, Related Patents and Patent Applications, and the Foreign Counterpart are not within the scope of Plaintiffs' discovery request. Plaintiffs' motion should be denied on that basis alone.

Even if Plaintiffs' request is within the scope of RFP No. 73 (it is not), Plaintiffs have not established that additional searches for internal communications would be expected to lead to information that is relevant to any issue in this case. First, Plaintiffs argue internal communications between AstraZeneca's scientists discussing the patents during the development of Tagrisso® would be relevant to Plaintiffs' contention that "AstraZeneca copied Plaintiffs' invention." *See* Op. Br. 13. But AstraZeneca could not have copied (or even discussed) Plaintiffs' patents during the development of Tagrisso® given that at that time, the Patents-in-Suit did not exist. *Bioverativ*, 2020 WL 1332921, at *3 ("Copying a product which is not protected by the patent laws is not illegal and does not constitute infringement.") (citing *Sonos, Inc. v. D&M Holdings Inc.*, 2017 WL 5633204, at *3 (D. Del. Nov. 21, 2017)). And pre-issuance knowledge of patent applications or foreign counterparts is not probative of copying of the issued patent. *See, e.g.*, *NNCrystal US Corp. v. Nanosys, Inc.*, C.A. No. 19-1307-RGA, 2022 WL 1091283, at *1 (D. Del. Apr. 12, 2022) (allegations that accused infringer was aware of a patent application and license agreements covering the same "technology" did not plausibly allege knowledge of the issued patent "as a matter of law"); *PPG Indus. Ohio, Inc. v. Axalta Coating Sys., LLC*, C.A. No. 21-346-LPS-SRF, 2022 WL 610740, at *5 (D. Del. Jan. 26, 2022), *report and recommendation adopted*, C.A. No. 21-346-LPS-SRF, 2022 WL 611260 (D. Del. Feb. 18, 2022) ("Knowledge of a foreign patent does not provide notice of a 'corresponding' U.S. patent.").

Setting all that aside, AstraZeneca has already fulfilled its discovery obligations and performed a reasonable search for internal communications by the scientists involved in the

development of Tagrisso®. *See supra* Section III.C. More particularly, AstraZeneca searched more than ten custodians, including eight scientists and researchers involved throughout the pre-clinical and clinical development of Tagrisso®, by applying a variety of ESI terms related to the Patents-in-Suit, the Related Patent Applications, and the Foreign Counterpart. Ex. 9 (Defs' Oct. 14, 2022 Ltr) at 5; *see also* Ex. 11 (Defs' Dec. 23, 2022 Ltr) at 2; Ex. 19 (Defs' Jan. 20, 2023 Ltr) at 2; Ex. 20 (Defendants' Initial Paragraph 3 Disclosures).[5]

Moreover, Plaintiffs' reliance on AstraZeneca's employment of Dr. Godin-Heymann, a named inventor of the Patents-in-Suit, as support for their copying allegations is similarly illogical given the undisputed fact that Dr. Godin-Heymann arrived at AstraZeneca in January 2018—long after osimertinib was first synthesized and years after Tagrisso® was first FDA approved. *See* Op. Br. 13. For the avoidance of doubt, AstraZeneca repeatedly explained that Dr. Godin-Heymann was neither involved in the development of Tagrisso®, nor hired in in connection to the development of Tagrisso®. Ex. 10 (Defs' Oct. 17, 2022 Ltr) at 5; Ex. 19 (Defs' Jan. 20, 2023 Ltr) at 2; Ex. 21 (Defs' 30(b)(6) Objs.) at Resps. to Topic Nos. 18 & 19.

Plaintiffs also argue that "non-privileged discussions regarding a licensing offer would be relevant to show that AstraZeneca has willfully infringed the claims." Op. Br. at 13. AstraZeneca, however, has already fulfilled its discovery obligations and searched for the requested communications. As AstraZeneca has explained to Plaintiffs, ███████████

███████████████████████████████████

███████████████████ Ex. 11 (Defs' Dec. 23, 2022 Ltr) at 1.

### 2.    The Burden to AstraZeneca Outweighs Any Showing of Relevance

Plaintiffs' demand that AstraZeneca search its non-custodial ESI for internal communications regarding the Patents-in-Suit, Related Patents and Patent Applications, and

---

[5] To be clear, to the extent that Plaintiffs argue that an allegation of copying is related to a claim of willful infringement (as opposed to induced infringement or otherwise), that argument was not preserved in Plaintiffs' Infringement Contentions. *See* Section V.A.

Foreign Counterparts should be rejected as the burden of Plaintiffs' request heavily outweighs any potential benefit. As discussed above, such a broad search of all non-custodial ESI is impracticable and unreasonable. Lewish Decl. ¶¶ 7–15.

E. **Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of Related Patent Applications and Foreign Counterpart**

1. **The Requested Discovery is Not Responsive to Plaintiffs' RFP Nos. 10, 11, or 73**

Plaintiffs rely in part on their RFP Nos. 10, 11, and 73 to justify requesting AstraZeneca's knowledge of the Related Patent Applications and the Foreign Counterpart. *See* Op. Br. at 13–14. However, none of these requests are reasonably targeted towards AstraZeneca's knowledge. Plaintiffs' reliance on these discovery requests to support their motion to compel should be rejected on this basis alone. RFP No. 11, which simply asks for "[a]ll documents and things concerning the Patents-in-Suit and Related Patents," is plainly overbroad. RFP No. 10 covers the circumstances under which AstraZeneca "first became aware of the Patents-in-Suit, the Related Patent Applications of the Patents-in-Suit, or any foreign counterparts," as well as "notice" of their existence or the possibility that AstraZeneca infringes the Patents-in-Suit. Finally, RFP No. 73, as previously explained, requests AstraZeneca's external communications between it and Plaintiffs or third parties regarding the Patents-in-Suit, the Related Applications, and Foreign Counterparts.

2. **Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of WO '058 or the Related Patent Applications**

As Plaintiffs acknowledge, AstraZeneca has already agreed to produce documents sufficient to show its knowledge of WO '058 and the Related Patent Applications. *See* Op. Br. at 14.[6] AstraZeneca has made clear that it would search for terms related to WO '058 and the

___

[6] Plaintiffs are incorrect that AstraZeneca does not contest the relevancy of these documents. *See* Ex. 23 (Defs' Sept. 21, 2022 Ltr) at 3 (emphasizing AstraZeneca's position that the (continued…)

Related Patent Applications across its ESI custodians. *See* Ex. 22 (Plfs' Dec. 14, 2022 Ltr) at

2; Ex. 19 (Defs' Jan. 20, 2023 Ltr) at 2. Plaintiffs' demand that AstraZeneca nonetheless search

its non-custodial ESI using the search terms AstraZeneca applied to its custodial ESI is

unjustified when considering the burden as compared to the likely benefit.

Plaintiffs are wrong that AstraZeneca's knowledge of WO '058 and the Related Patent

Applications is relevant to willfulness and Plaintiffs' claim that they are entitled to pre-issuance

damages. Op. Br. 14. Even if Plaintiffs have preserved a willfulness claim (they have not),

Section V.A, *supra*, AstraZeneca's knowledge of WO '058 and the Related Patent Applications

is irrelevant, as knowledge of a patent application cannot establish the necessary knowledge of

the issued patent. *See, e.g.*, *NNCrystal*, 2022 WL 1091283, at *1. This is in due in relevant part

to the fact that "[f]iling an application is no guarantee that any patent will issue" and that

"[w]hat the scope of claims in patents that do issue will be is something totally unforeseeable."

*See iFIT Inc.*, 2022 WL 609605, at *2 (citing *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d

1226, 1236 (Fed. Cir. 1985)). The difference in scope between claims in patent applications

versus claims in the issued patent is particularly salient here: the claims in WO '058 and the

Related Patent Applications—which Plaintiffs rely on for their pre-issuance damages claims

under 35 U.S.C. § 154(d)—are directed to the use of irreversible EGFR inhibitors to treat

gefitinib and/or erlotinib resistant *cancer*, whereas the claims of the issued patents are directed

to treating gefitinib and/or erlotinib resistant *NSCLC*. *See* Ex. 24 (WO '058) at 33.[7]

Moreover, Plaintiffs' demand that AstraZeneca search its non-custodial ESI for

documents relating to its knowledge of the applications to the Patents-in-Suit, the Patents-in-

---

requested information "is not relevant to this case" and confirming that AstraZeneca would
produce documents "in an effort to compromise and subject to [its] objections.").

[7] The issued claims are therefore not "substantially identical" to the claims published in
Plaintiffs' patent application, as required by 35 U.S.C. § 154(d)(2), and thus pre-issuance
damages are barred.

Suit, and WO '058 should be rejected as the burden of Plaintiffs' request heavily outweighs any potential benefit. As discussed above, such a broad search of all non-custodial ESI is impracticable and unreasonable. Lewish Decl. ¶¶ 7–15.

Plaintiffs' claim that searching for the agreed-upon search terms in AstraZeneca's non-custodial ESI cannot be burdensome because "fewer than 10 documents combined" containing those terms were produced across ten custodians again ignores the fact that the burden of applying search terms to an essentially limitless quantity of non-custodial ESI is the same regardless of how many documents hit on the search terms. Instead, the number of hits from searches of AstraZeneca's custodial ESI indicates that any benefit of additional searches of it would therefore be heavily outweighed by the burden of Plaintiffs' proposed discovery. *See* Fed. R. Civ. P. 26(b)(1).

> ### 3. Plaintiffs Are Not Entitled to Additional Discovery Regarding AstraZeneca's Knowledge of the Foreign Counterpart or its Application

Plaintiffs request discovery related to AstraZeneca's knowledge of the Foreign Counterpart (i.e., EP'414), or its Application, contending that such discovery is relevant to willfulness. *See* Op. Br. at 16–17. It is not. Even if Plaintiffs have preserved a willfulness claim (they have not), Section V.A, *supra*, AstraZeneca's knowledge of the Foreign Counterpart is irrelevant. Plaintiffs argue that the "totality of the circumstances" must be analyzed for willfulness but cite no binding authority showing that knowledge of foreign patents or applications fall within that analysis. AstraZeneca's knowledge of the Foreign Counterpart has no bearing on whether AstraZeneca knew about the Patents-in-Suit or that they infringed. *See, e.g.*, *PPG Indus. Ohio*, 2022 WL 610740, at *5, *report and recommendation adopted*, No. CV 21-346-LPS-SRF, 2022 WL 611260 ("Knowledge of a foreign patent does not provide notice of a 'corresponding' U.S. patent."). *See also supra* Section V.D.1.

Plaintiffs also again cite AstraZeneca's discovery requests to MGH, implying that Plaintiffs' requests related to the Foreign Counterpart are relevant. *See* Op. Br. at 16. But once again, Plaintiffs ignore that AstraZeneca's requests to MGH, an assignee of the Patents-in-Suit, are related to invalidity and inventorship and are not parallel to Plaintiffs' requests. *See supra* Section V.C.1.

In any event, despite disputing the relevance of the Foreign Counterpart, AstraZeneca already applied ESI search terms related to it to search AstraZeneca's twelve custodians. Ex. 9 (Defs' Oct. 14, 2022 Ltr), at 3–4, 5; *see also supra* Section III.C. Moreover, Plaintiffs' demand that AstraZeneca search its non-custodial ESI for documents relating to AstraZeneca's knowledge of the Foreign Counterpart or its Application should be rejected as the burden of Plaintiffs' request heavily outweighs any potential benefit. As discussed above, such a broad search of all non-custodial ESI is impracticable and unreasonable. Lewish Decl. ¶¶ 7–15. In addition, Plaintiffs' repeated implications that the total volume of documents produced referencing the Foreign Counterpart demonstrates that searching for additional responsive documents would not be burdensome should be rejected. Rather, the low volume indicates that any benefit of additional searches would be heavily outweighed by the burden of Plaintiffs' proposed discovery. *See* Fed. R. Civ. P. 26(b)(1).

## VI. CONCLUSION

For the foregoing reasons, AstraZeneca respectfully requests that the Court deny Plaintiffs' motion to compel.

20

OF COUNSEL:

Christopher N. Sipes
Einar Stole
Megan P. Keane
Kaveh V. Saba
Pricilla Dodson
Melissa Keech
Ashley Winkler
Tobias Ma
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Dated: March 22, 2023

/s/ Emily S. DiBenedetto
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca*
*Pharmaceuticals LP and*
*AstraZeneca AB*

21

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on March 22, 2023, this document was

served on Puma-TagrissoLitigation@jonesday.com and the persons listed below in the

manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Megan Elizabeth Dellinger
Rodger Dallery Smith, II
MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com
rsmith@morrisnichols.com

Sara T. Horton
Ren-How Harn
WILKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
(312) 728-9040
shorton@willkie.com
rharn@willkie.com

Shehla Wynne
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939
swynne@jonesday.com

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
(858) 314-1200
sngeise@jonesday.com
aminsogna@jonesday.com
meredithstewart@jonesday.com

Gasper J. LaRosa
Lisamarie LoGuidice
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
gjlarosa@jonesday.com
llogiudice@jonesday.com

Jason G. Winchester
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
(312) 782-3939
jgwinchester@jonesday.com

/s/ Emily S. DiBenedetto
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca Pharmaceuticals*

Dated: March 22, 2023
*LP and AstraZeneca AB*

23

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs/Counterclaim-Defendants, | ) ) | |
| v. | ) ) | C.A. No. 21-1338-MFK |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) ) | **HIGHLY CONFIDENTIAL** |
| Defendants/Counterclaim-Plaintiffs. | ) ) ) | |

**DECLARATION OF MARK LEWISH IN SUPPORT OF
DEFENDANTS' RESPONSIVE  BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL**

OF COUNSEL:

Christopher N. Sipes
Einar Stole
Megan P. Keane
Kaveh V. Saba
Priscilla Dodson
Ashley Winkler
Melissa Keech
Tobias Ma
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Dated: March 21, 2023

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for AstraZeneca Pharmaceuticals
LP and AstraZeneca AB*

**I, Mark Lewish, declare as follows:**

## I.      BACKGROUND

1.      I am the Senior Data Manager for eDiscovery at AstraZeneca and have held this position since 2020.  Prior to that, I spent twelve years as a contractor at AstraZeneca, managing technical tasks for eDiscovery.

2.      I have over fifteen years of experience working in eDiscovery, primarily focused on collection and preservation of electronically stored information.  Through my role at AstraZeneca, I am intimately familiar with the systems and applications that are used at AstraZeneca to store documents and data.

3.      I have been asked to provide this declaration in this case by AstraZeneca Pharmaceuticals LP and AstraZeneca AB (collectively, "AstraZeneca" or "Defendants").

## II.      ASTRAZENECA'S NON-CUSTODIAL ESI

4.      AstraZeneca has ███████ non-custodial data systems, which date from approximately 1998 to the present.

5.      ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████

6.      Examples of documents stored as non-custodial ESI include ███████
████████████████████████████████████████
████████████████████████████████

7.      ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

1

8. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**III.   SEARCHING THROUGH ALL OF ASTRAZENECA'S NON-CUSTODIAL ESI USING SEARCH TERMS WOULD BE IMPRACTICABLE**

9. ████████████████████████████████████████

████████████████████████████████████████████

████

10. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

11. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

12. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

13. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



14.

*     *     *

15.     For these reasons, a request to search all of AstraZeneca's non-custodial ESI systems would likely be impossible and entail astronomic cost and effort.

I declare that the foregoing is true and correct.

Dated: March 21, 2023

Mark Lewish

# EXHIBIT 2

# industry corner

*Annals of Oncology* 27: 1165 1170, 2016
doi:10.1093/annonc/mdw129
Published online 8 March 2016

## Osimertinib (AZD9291)—a science-driven, collaborative approach to rapid drug design and development

### introduction

Advances in understanding the molecular drivers of lung cancer have shown that 25% overall (10% 60% depending on ethnicity and clinical characteristics) of non small cell lung cancers (NSCLCs) are driven by specific activating mutations in the epi dermal growth factor receptor (EGFR) tyrosine kinase domain, leading to addiction of the tumour to signalling through this pathway. The presence of these mutations sensitises tumours to treatment with EGFR tyrosine kinase inhibitors (TKIs), of which gefitinib, erlotinib and afatinib are currently recom mended as first line therapy for patients with advanced NSCLC harbouring these mutations [1, 2].

Typically, most patients treated with a currently approved first line EGFR TKI develop resistance and in ∼60% of cases this is caused by a resistance mutation in the ATP binding domain of the EGFR gene, the T790M resistance mutation [3].

Osimertinib (TAGRISSO™, AZD9291; AstraZeneca PLC, London, UK) was designed to inhibit EGFR in a covalent irre versible manner, while harbouring preferential activity against sen sitising and T790M resistance mutations, relative to the wild type form of the receptor (in most cases, the T790M mutation exists to gether with a sensitising mutation in the EGFR molecule and there fore will be referred to as a double mutation). Osimertinib is a potent, oral, irreversible inhibitor selective for sensitising (EGFRm) and T790M resistance mutations that has demonstrated clinical efficacy in patients with advanced T790M positive NSCLC [4].

The development of osimertinib followed a science driven, adaptive approach that involved close collaboration with indus try partners and global regulatory bodies including the United States Food and Drug Administration (FDA) and the European Medicines Agency (EMA). Discussion here includes the key ele ments of the osimertinib development pathway, outlining how this approach led to the rapid development of this novel thera peutic agent. On 13 November 2015, osimertinib received FDA approval for patients whose tumours have a specific EGFR mutation (T790M) and whose disease has become worse after treatment with other EGFR blocking therapy, following a clinic al development period of just over 2.5 years (Figure 1). This was followed by a positive opinion from the Committee for Medicinal Products for Human Use on 18 December 2015, recommending the marketing authorisation of osimertinib for the treatment of adults with locally advanced or metastatic NSCLC with a specific mutation (T790M) of the EGFR. The European Commission ap proval was received on 2 February 2016, making osimertinib the

first new medicine to be approved under the EMA expedited process.

### science-driven drug design and engineering

The discovery of osimertinib began with finding a compound that would preferentially inhibit the EGFR TKI resistant, double mutant form of EGFR relative to the wild type form [5]. The ul timate goal was to develop a compound that would demonstrate clinical activity against single and double mutant EGFR, while reducing the toxicity caused by inhibiting wild type EGFR.

Several aspects of drug discovery were involved, including a novel and systematic approach to compound generation, struc ture based design of an irreversible inhibitor, physical property based evolution and structure activity relationship development to drive increased kinase selectivity, ultimately arriving at a promising clinical candidate (Figure 2). The project progressed with exceptional speed, starting in 2009 and delivering a candi date drug molecule in <36 months (Figure 1A) [5, 6].

The initial hypothesis was to target the mutant methionine in the T790M form of the EGFR receptor, commonly referred to as the 'gatekeeper' residue [5]. Early compounds had promising biochemical potency and selectivity versus wild type, but activ ity was reduced against the double mutant EGFR in cellular assays. It was thought that this was due to the ATP affinity of the double mutant form of EGFR, so work proceeded in an attempt to convert the promising candidates from reversible inhibitors to covalent, irreversible inhibitors while hopefully maintaining a good selectivity over wild type.

Further evolution achieved improved potency, while main taining intrinsic reactivity, and reducing off target activity against other kinases, such as insulin like growth factor 1 recep tor (IGF1R) and insulin receptor (IR), which can be a cause of toxicity that could limit clinical dose levels [5, 6]. Ultimately, the compound now known as osimertinib was chosen for further development.

### preclinical evaluation

Pre clinically, osimertinib potently inhibits signalling pathways and cellular growth of EGFRm and T790M resistant cell lines *in vitro* [7]. Osimertinib has high *in vitro* potency towards inhib ition of EGFR phosphorylation across cell lines harbouring EGFR mutations as well as significantly less activity against phospho EGFR in wild type cell lines. The compound demonstrates a good margin of selectivity against wild type EGFR activity and a high degree of selectivity against other kinases. *In vivo*, this trans lates into sustained tumour regression in EGFR mutant tumour

© The Author 2016. Published by Oxford University Press on behalf of the European Society for Medical Oncology.
All rights reserved. For permissions, please email: journals.permissions@oup.com.

industry corner



**Figure 1.** Key milestones in the (A) discovery and (B) development of osimertinib. AZ, AstraZeneca; CE IVD, Conformité Européene *In Vitro* Diagnostic; ctDNA, circulating tumour DNA; EGFR, epidermal growth factor receptor; FDA, Food and Drug Administration; PMA, premarket approval; PMDA, Pharmaceutical and Medical Devices Agency (Japan).

xenograft and transgenic single and double mutant models. These data confirmed osimertinib had the potential to be clinically active in tumours that harbour the T790M mutation fol lowing progression on currently approved EGFR TKIs and as a treatment in the first line setting for patients with EGFRm NSCLC. The margin of selectivity against the wild type EGFR receptor was expected to result in a favourable tolerability profile in the clinic.

Some of the most important preclinical characterisation was the pharmacokinetic (PK) and pharmacodynamic (PD) model ling of osimertinib [8]. A mathematical mouse model of PD and tumour growth inhibition was then combined with modelling of predicted human PK to simulate tumour growth inhibition and predict efficacious doses in man. These models suggested that osimertinib could have clinical activity at doses of 5 10 mg once daily, a key assessment in selecting the starting dose of osimerti nib to be used for clinical evaluation.

### phase I design and implementation

The AURA dose escalation and expansion study ( phase I com ponent; NCT01802632) was conducted with the primary object ive of determining the safety, tolerability and efficacy of osimertinib in patients with advanced EGFR mutated NSCLC whose disease had progressed on prior therapy with an EGFR TKI [4]. The novel study design used the standard phase I

'rolling six' design but also incorporated expansion cohorts (Figure 3) designed to provide information to guide the further clinical development of osimertinib.

The flexible/adaptive design with rolling enrolment was ex tremely important for the success of and rapid recruitment into the study because it allowed for parallel recruitment to dose escalation and biomarker defined expansion cohorts (Figure 3). The first patient was enrolled on 6 March 2013 (Figure 1). Patients were eligible for inclusion in the study if they had a known EGFR TKI sensitising mutation and/or had prior clin ical benefit from treatment with an EGFR TKI. EGFR T790M testing was optional for inclusion in the escalation cohorts. T790M status was determined before inclusion in the expan sion cohorts and was predominantly based on local testing of tumour tissue samples taken following progression on the latest line of therapy. Local test results were retrospectively confirmed by a central laboratory test. Blood samples for circu lating tumour (ct)DNA testing were tested retrospectively by a central laboratory to determine the clinical utility of this testing method. The 20 mg starting dose was selected on the basis of preclinical data and modelling, which predicted this dose would be sufficient to inhibit the T790M mutant form of the EGFR receptor [6].

There was a clear scientific rationale for each expansion cohort. Both T790M positive and T790M negative cohorts were included (40, 80 and 160 mg cohorts) to demonstrate any

Annals of Oncology

industry corner



| | Compound 1 | Compound 2 | Compound 3 | Compound 4 | Compound 5 (osimertinib) |
|---|---|---|---|---|---|
| EGFRm sensitising mutation cell IC50 (pEGF µM) | 0.39 | 0.016 | 0.021 | 0.002 | 0.017 |
| EGFRm/T790M double mutation cell IC50 (pEGF µM) | 0.091 | 0.002 | 0.004 | 0.0007 | 0.015 |
| EGFR wild-type cell IC50 (pEGFR µM) | 23.0 | 0.36 | 0.94 | 0.15 | 0.48 |
| IR kinase IC50 (µM) | 0.016 | 0.014 | 0.022 | 0.15 | 0.91 |
| IGFR cell IC50 (pIGFR µM) | 0.099 | 0.16 | 0.49 | 0.10 | 3.3 |
| **Ratio SM/IGFR cell selectivity** | **0.25** | **10** | **23** | **48** | **194** |

**Figure 2.** Steps in the development of osimertinib. Screening of insulin like growth factor 1 receptor (IGF1R) inhibitors led to the identification of compounds such as 1, which showed good affinity for the double mutant form of the epidermal growth factor receptor (EGFR) and selectivity over the wild type. In spite of this promising selectivity profile, these compounds failed to show a significant level of cellular potency in cell lines. Further modifications were necessary to develop this as an irreversible inhibitor and to improve the physical properties for balance of potency and lipophilicity. Compound 5 was identified, which showed double mutant xenograft activity at 5 mg/kg and the best overall balance of properties, including a dramatically improved IGF1R selectivity profile. Compound 5 was ultimately selected for further development and became known as osimertinib. IR, insulin receptor; p, phosphor; SM, sensitising mutation.

differences in outcome based on the presence or absence of this specific biomarker. This was also adapted as the study progressed, with the highest dose (240 mg) only tested in T790M positive cohorts. First line EGFRm cohorts could provide early clinical evidence and rationale for expanding the development of osimertinib into earlier treatment settings where it may have potential benefits compared with currently approved EGFR TKIs. Paired biopsy cohorts enabled translational analysis of tumour samples to characterise PD changes on treatment. The tablet cohort allowed characterisation of the PK of the to be commercialised tablet formulation, confirming the equivalence to the early development capsule formulation. The Japan only cytology cohort evaluated the use of a liquid cytology sample for detection of the T790M mutation, as not all patients are able to undergo biopsy of a solid tumour.

Building on knowledge and learnings from clinical studies of gefitinib (IRESSA®, AstraZeneca PLC, London, UK), the AURA study incorporated a biomarker defined patient selection from the outset, which improved the chances of demonstrating clinical activity. The first time in man dose escalation recruited patients with advanced NSCLC who had an EGFR TKI sensitising mutation or who had prior clinical benefit from treatment with an EGFR TKI. This meant that the study included patients with both T790M positive and negative disease. In recognition of the high unmet need, disease prevalence and varying practice patterns by region, the study deliberately included global sites recruiting Asian and Caucasian patients.

Results were highly encouraging. Among 31 patients enrolled in the dose escalation cohorts, no dose limiting toxic effects occurred at doses of 20 240 mg once daily. An additional 222 patients were treated in five expansion cohorts. The overall confirmed objective tumour response rate was 51% [95% confidence interval (CI) 45 58]. Among 127 patients with EGFR T790M mutation positive NSCLC confirmed by a central laboratory who could be evaluated for response, the response rate was 61% (95% CI 52 70) [4].

The final selection of the dose to be used for commercialisation, as well as phase III development, was made in February 2014, i.e. 11 months after the first dose in man (Figure 1B). It was based on an array of preclinical modelling together with clinical efficacy and safety data.

PK/PD models of cell lines indicated that maximum tumour growth inhibition would be at 80 mg once daily, a dose that could also potentially have an effect on brain metastases [9]; xenograft modelling indicated there would be no benefit of dosing above 80 mg. PK analyses showed that the 80 mg dose ensured exposure levels greater than that observed for the 20 mg or 40 mg dose, which also demonstrated clinical activity in the AURA phase I study. The 80 mg dose provided substantial clinical efficacy and was associated with fewer dose reductions and a lower incidence of skin disorders, nail effects and diarrhoea than the 160 and 240 mg doses, which appeared unlikely to provide additional efficacy. The 80 mg dose demonstrated the optimal benefit:risk profile, ensured that patients received a clinically

industry corner



**Figure 3.** AURA phase I/II design (NCT01802632). Patients in the dose escalation cohorts received a single dose of osimertinib (in capsule form) followed by a pharmacokinetic evaluation period; after 7 days, they received the same oral dose daily for the remainder of the study, with additional pharmacokinetic assessment after daily continuous dosing. The first dose tested was 20 mg daily and each subsequent dose cohort represented a 100% increase from the previous dose, with the exception of the final dose escalation, which was from 160 mg once daily to 240 mg once daily. If any evidence of clinical activity was observed in an escalation cohort, a dose expansion cohort for that dose could be opened. Expansion cohorts were opened at a particular dose only after that dose had been determined to have an acceptable side effect profile in the escalation cohort to permit dose escalation to the next dose level. In the expansion cohorts, daily continuous dosing commenced immediately, with pharmacokinetic assessments after continuous dosing. To be included in the dose expansion cohorts, patients had to undergo a tumour biopsy after disease progression during the most recent line of therapy to test for EGFR T790M. Patients continued osimertinib until disease progression, the development of unacceptable adverse events or withdrawal of consent. EGFR, epidermal growth factor receptor; NSCLC, non small cell lung cancer; TKI, tyrosine kinase inhibitor.

active dose regardless of inter patient variability in exposure, and allowed for dose reduction if necessary.

### early engagement with health authorities

Close communications with health authorities have allowed for on going discussions to define the overall programme design and plan and identify the type, scope, maturity and level of data that are required to meet regulatory requirements for initial approval.

Discussions with health authorities centred around four critical aspects identified as rate limiting for a rapid drug development: patient population; reproduction of evidence; chemistry, manufacturing and controls; and validation studies. Based on the initial clinical data from the phase I component of the AURA trial, the FDA granted osimertinib Breakthrough Therapy Designation on 16 April 2014 for the treatment of patients with metastatic, EGFR T790M mutation positive NSCLC, whose NSCLC has progressed during treatment with an FDA approved EGFR TKI.

Further to this, the development team at AstraZeneca was able to agree with regulators that a 13 week efficacy follow up of patients in the phase II studies would be sufficient for initial marketing application submissions, supported by the entire safety population. Additional follow up data were provided to regulators

during the application reviews as agreed during consultations. Regulatory submissions were supported by a large dataset from a clearly defined patient population. The evidence generated by the AURA phase II extension component was successfully reproduced through the set up and conduct almost in parallel of a nearly identical open label, single arm study (AURA2, NCT02094261).

To proceed quickly into confirmatory phase studies, a rapid transfer from clinical phase to commercial phase chemistry, manufacturing and controls, with associated scale up in scope, was needed; seven million dose units have been produced as of the end of 2015 in support of the clinical and early access programme. The phase I escalation and expansion components of the AURA study were mostly conducted using a capsule formulation, with one cohort receiving a tablet formulation. The commercial formulation, a film coated tablet, was developed in parallel and used in all subsequent clinical studies including the AURA extension and AURA2 phase II studies. The tablet has been shown to provide similar exposure to the capsule formulation; therefore, the results from the AURA phase I study are relevant to the commercialised tablet formulation and could be used as supportive evidence in marketing application submissions.

Finally, the scope of the definitive studies required to support the anticipated post marketing requirements were pre agreed

industry corner

with several major health authorities, including the need for a phase III study. AURA3 (NCT02151981), a phase III study comparing osimertinib 80 mg once daily versus platinum based doublet chemotherapy in patients with EGFRm and T790M positive advanced NSCLC whose disease has progressed following prior therapy with an EGFR TKI, was rapidly initiated. The first patient was dosed in August 2014, before the phase II studies completed recruitment in October 2014 (Figure 1B).

## timely development of accompanying diagnostic

Recently, there has been significant change in the diagnostic/testing environment for advanced NSCLC with current guidelines necessitating an EGFR mutation test to identify patients eligible for treatment with an EGFR TKI [1, 2]. In Europe, IRESSA* was the first approved therapy for NSCLC that required a diagnostic test to confirm the presence of the EGFR mutation in tumour DNA before first line treatment. Subsequently, IRESSA was the first EGFR TKI (in Europe) with a label allowing the use of ctDNA, obtained from a blood sample, to be used for the assessment of EGFR mutation status in those patients where a tumour sample was not an option.

Osimertinib was specifically designed to target both EGFR TKI sensitising mutations and T790M resistance mutations, so there was a need for a companion diagnostic test to support the identification of patients most likely to respond to therapy. In July 2014, AstraZeneca partnered with Roche Molecular Systems, Inc., to develop a companion diagnostic test for osimertinib that could identify patients with tumours containing the T790M mutation. The cobas* EGFR Mutation Test v2 is a real time polymerase chain reaction test for the qualitative detection and identification of somatic mutations in exons 18, 19, 20 and 21 of the tyrosine kinase domain of the EGFR gene in DNA derived from formalin fixed paraffin embedded human NSCLC tumour tissue.

The cobas* EGFR Mutation Test v2 is approved as a companion diagnostic for osimertinib in the United States. In September 2015, the test was launched as a Conformité Européene In Vitro Diagnostic (CE IVD) in the EU for use with both tissue and ctDNA plasma samples, therefore allowing patients who cannot provide a tissue biopsy upon diagnosis of progression (the current gold standard) to be tested. An application for use with both tissue and plasma samples has been submitted for Pharmaceutical and Medical Devices Agency (PMDA, Japan) approval.

## discussion

The development programme for osimertinib is the most rapid to date, taking just 24 months from filing the FDA Investigational New Drug Application to submitting the FDA New Drug Application and just 2 years, 8 months and 1 week from the first patient dosed to the first approval. This was made possible by multiple factors, the most relevant of which was the experience of developing gefitinib, an EGFR TKI indicated for the first line treatment of patients with metastatic NSCLC with EGFR mutations. AstraZeneca's experience meant that the company had accumulated strong, top level expertise in the biology of the EGFR and in the chemistry of EGFR TKI inhibitors, with experience extending back to the 1990s through the development

of the first in class EGFR TKI IRESSA. The acceptance and widespread clinical use of current EGFR TKIs and the understanding of resistance to these agents also played a role; understanding the patient population most likely to benefit from the treatment was key, but investigators' familiarity with this class of drugs also ensured that adverse events were well managed. A second factor was the changes implemented to the US Food, Drug and Cosmetic Act that allowed for Breakthrough Designation, which aimed to expedite the development and availability of drugs to treat serious diseases; osimertinib was granted a Breakthrough Therapy Designation in 2014. In addition, osimertinib was the first new medicine to be approved under the EMA accelerated assessment process. A final success factor was the high priority status of the project within the AstraZeneca oncology portfolio. The rapid and successful establishment of the manufacturing processes at the commercial supply sites was critical to ensure both robust long term supply of drug to patients and the ability to launch rapidly following regulatory approvals  bringing osimertinib to patients who desperately needed this new treatment option. In the United States, the first commercial drug shipments to distributors were made within 6 h of the approval by the FDA.

Patients with NSCLC whose tumours are shown to be T790M positive after treatment with a currently approved EGFR TKI represent a substantial unmet medical need. This, combined with the desire of AstraZeneca to build upon a strong legacy of developing targeted EGFR TKIs, led to the discovery and subsequent development of osimertinib, a potent, oral, irreversible inhibitor selective for EGFR TKI sensitising and T790M resistance mutations. The design and development of osimertinib was centred on a science driven, adaptive approach that involved close collaboration between AstraZeneca, industry partners and regulatory bodies.

A. Yver*

Global Medicines Development, AstraZeneca,
Cambridge, UK
(*E-mail: antoine.yver@astrazeneca.com)

## acknowledgements

The author thanks the investigators, patients and their families who participated in the clinical studies. Medical writing services were provided by Ewen Buckling, PhD, of iMed Comms, an Ashfield Company, part of UDG Healthcare PLC, and were funded by AstraZeneca.

## funding

This work was supported by AstraZeneca.

## disclosure

The author is an employee and shareholder of AstraZeneca.

## references

1. Reck M, Popat S, Reinmuth N et al. Metastatic non small cell lung cancer (NSCLC): ESMO Clinical Practice Guidelines for diagnosis, treatment and follow up. Ann Oncol 2014; 25(suppl 3): iii27 iii39.

industry corner

2. Masters GA, Temin S, Azzoli CG et al. Systemic therapy for stage IV non small cell lung cancer: American Society of Clinical Oncology Clinical Practice Guideline update. J Clin Oncol 2015; 33: 3488 3515.

3. Yu HA, Arcila ME, Rekhtman N et al. Analysis of tumor specimens at the time of acquired resistance to EGFR TKI therapy in 155 patients with EGFR mutant lung cancers. Clin Cancer Res 2013; 19: 2240 2247.

4. Jänne PA, Yang JC, Kim DW et al. AZD9291 in EGFR inhibitor resistant non small cell lung cancer. N Engl J Med 2015; 372: 1689 1699.

5. Ward RA, Anderton MJ, Ashton S et al. Structure  and reactivity based development of covalent inhibitors of the activating and gatekeeper mutant forms of the epidermal growth factor receptor (EGFR). J Med Chem 2013; 56: 7025  7048.

6. Finlay MR, Anderton M, Ashton S et al. Discovery of a potent and selective EGFR inhibitor (AZD9291) of both sensitizing and T790M resistance mutations that spares the wild type form of the receptor. J Med Chem 2014; 57: 8249 8267.

7. Cross DA, Ashton SE, Ghiorghiu S et al. AZD9291, an irreversible EGFR TKI, overcomes T790M mediated resistance to EGFR inhibitors in lung cancer. Cancer Discov 2014; 4: 1046 1061.

8. Ballard P, Ashton S, Cross D et al. Integrating the pre clinical pharmacokinetic, pharmacodynamics, and efficacy data for AZD9291, an oral, irreversible inhibitor of EGFR activating (EGFRm+) and resistant (EGFRm+/T790M) mutations and an active metabolite to predict the human pharmacokinetics and potential efficacious dose in patients. Mol Cancer Ther 2013; 12(11 suppl): B212.

9. Ballard P, Yang P, Cross D et al. Preclinical activity of AZD9291 in EGFR mutant NSCLC brain metastases. In Abstract at WCLC 2015, Denver, CO, USA, 6 9 September 2015.

# EXHIBIT 3

You are viewing an archived web page collected at the request of U.S Food and Drug Administration (//archive-it.org/organizations/1137) using Archive-It (//archive-it.org/). This page was captured on 16:07:57 Jan 11, 2017, and is part of the FDA.gov (//archive-it.org/public/collection.html?id=7993) collection. The information on this web page may be out of date. See All versions (https://wayback.archive-it.org/7993/*/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm472525.htm) of this archived page. Found 0 archived media items out of 0 total on this page.   hide

**FDA News Release**

# FDA approves new pill to treat certain patients with non-small cell lung cancer

Revised second paragraph for accuracy.

*New diagnostic test identifies specific gene mutation targeted by new drug*

## For Immediate Release

November 13, 2015

## Release

Today, the U.S. Food and Drug Administration granted accelerated approval for an oral medication to treat patients with advanced non-small cell lun_ cancer_ NSCLC_. Ta_risso_ osimertinib_ is now a_ roved for_ atients whose tumors have a s_ecific e_idermal_ rowth factor receptor (EGFR) mutation (T790M) and whose disease has gotten worse after treatment with other EGFR-blocking therapy.

Lung cancer is the leading cause of cancer death in the United States, with an estimated 221,200 new diagnoses and 158,040 deaths in 2015, according to the National Cancer Institute. The most common type of lung cancer, NSCLC occurs when cancer cells form in the tissues of the lung. EGFR is a protein involved in the growth and spread of cancer cells.

"Our understanding of the molecular basis of lung cancer and reasons these cancers become resistant to prior treatments is rapidly evolving," said Richard Pazdur, M.D., director of the Office of Hematology and Oncology Products in the FDA's Center for Drug Evaluation and Research. "This approval provides a new treatment for patients who test positive for the EGFR resistance mutation, T790M, and is based on substantial evidence from clinical trials that shows Tagrisso had a significant effect on reducing tumor size in over half of patients who were treated."

Today, the FDA also approved the first companion diagnostic test (cobas EGFR Mutation Test v2) to detect the type of EGFR resistance mutation that Tagrisso is known to target. The newly approved version (v2) of the test adds the T790M mutation to the clinically relevant mutations detected by the original cobas EGFR Mutation Test (v1).

"The approval of safe and effective companion diagnostic tests and drugs continue to be important developments in oncology," said Alberto Gutierrez, Ph.D., director of the Office of In Vitro Diagnostics and Radiological Health in the FDA's Center for Devices and Radiological Health. "The availability of the cobas EGFR Mutation Test v2 meets a need for the

detection of this important EGFR gene mutation, which can alter treatment effectiveness."

The safety and efficacy of Tagrisso were demonstrated in two multicenter, single-arm studies involving a total of 411 patients with advanced EGFR T790M mutation-positive NSCLC whose disease worsened after treatment with an EGFR-blocking medication. In these two studies, 57 percent of patients in the first study and 61 percent of patients in the second study experienced a complete or partial reduction in their tumor size (known as objective response rate).

Continued approval for this indication may be contingent upon further confirmatory studies.

The most common side effects of Tagrisso are diarrhea, skin and nail conditions such as dry skin, rash and infection or redness around the fingernails. Tagrisso may cause serious side effects, including inflammation of the lungs and injury to the heart. It also may cause harm to a developing fetus.

The FDA granted Astra Zeneca breakthrough therapy designation, priority review and orphan drug designation for Tagrisso. **Breakthrough therapy (https://wayback.archive-it.org/7993/20170111160757/http://www.fda.gov/forpatients/approvals/fast/ucm20041766.htm)** designation is granted for a drug that is intended to treat a serious condition when, at the time an application is submitted, preliminary clinical evidence indicates that a drug may demonstrate substantial improvement over available therapies. **Priority review (https://wayback.archive-it.org/7993/20170111160757/http://www.fda.gov/ForPatients/Approvals/Fast/ucm405405.htm)** designation is granted to drug applications that show a significant improvement in safety or effectiveness in the treatment of a serious condition. **Orphan drug designation (https://wayback.archive-it.org/7993/20170111160757/http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/ucm2005525.htm)** provides incentives such as tax credits, user fee waivers, and eligibility for market exclusivity to assist and encourage the development of drugs for rare diseases.

Tagrisso was approved under the agency's **accelerated approval program (https://wayback.archive-it.org/7993/20170111160757/http://www.fda.gov/ForPatients/Approvals/Fast/ucm405447.htm)**, which allows the approval of a drug to treat a serious or life-threatening disease based on clinical data showing the drug has an effect on a surrogate endpoint reasonably likely to predict clinical benefit to patients. This program provides earlier patient access to promising new drugs while the company conducts confirmatory clinical trials.

Tagrisso is marketed by Astra Zeneca Pharmaceuticals based in Wilmington, Delaware. The cobas EGFR Mutation Test v2 is marketed by Roche Molecular Systems of Pleasanton, California.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

###

| Inquiries |
| --- |

**Media**

✉ **Sarah Peddicord (https://wayback.archive-it.org/7993/20170111160757/mailto:sarah.peddicord)**
☎ 301-796--2805

---

**Consumers**

☎ 888-INFO-FDA

**Related Information**

- **FDA: Office of Hematology and Oncology Products
  (/7993/20170111160757/http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm091745.htm)**
- **FDA Approved Drugs: Questions and Answers
  (/7993/20170111160757/http://www.fda.gov/Drugs/ResourcesForYou/Consumers/ucm054420.htm)**
- **FDA: Companion Diagnostics
  (/7993/20170111160757/http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/InVitroDiagnostics/ucm407297.htm)**
- **NCI: Lung Cancer (https://wayback.archive-it.org/7993/20170111160757/http://www.cancer.gov/types/lung)**

**Follow FDA**

- **Follow @US_FDA (https://wayback.archive-it.org/7993/20170111160757/https://twitter.com/US_FDA)** &#x2750;
  **(/7993/20170111160757/http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/default.htm)**
- **Follow FDA (https://wayback.archive-it.org/7993/20170111160757/https://www.facebook.com/FDA)** &#x2750;
  **(/7993/20170111160757/http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/default.htm)**
- **Follow @FDAmedia (https://wayback.archive-it.org/7993/20170111160757/https://twitter.com/FDAMedia)** &#x2750;
  **(/7993/20170111160757/http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/default.htm)**

**More in Press Announcements
(/7993/20170111160757/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/default.htm)**

**2016 (/7993/20170111160757/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2016/default.htm)**

**2015 (/7993/20170111160757/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2015/default.htm)**

**2014 (/7993/20170111160757/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2014/default.htm)**

**2013 (/7993/20170111160757/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2013/default.htm)**

# EXHIBIT 4

# FDA approves osimertinib for first-line treatment of metastatic NSCLC with most common EGFR mutations

On April 18, 2018, the Food and Drug Administration approved osimertinib (Tagrisso, AstraZeneca Pharmaceuticals LP) for the first-line treatment of patients with metastatic non-small cell lung cancer (NSCLC) whose tumors have epidermal growth factor receptor (EGFR) exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test.

Approval was based on a multicenter, international, randomized, double-blind, active-controlled trial (FLAURA, NCT02296125) conducted in 556 patients with EGFR exon 19 deletion or exon 21 L858R mutation-positive, unresectable or metastatic NSCLC who had not received previous systemic treatment for advanced disease. Patients were randomized (1:1) to receive osimertinib 80 mg orally once daily or "standard-of-care (SOC)" treatment of gefitinib 250 mg or erlotinib 150 mg orally once daily. Of those randomized to SOC, 20% received osimertinib as the next line of antineoplastic therapy.

The estimated median progression-free survival (PFS) was 18.9 months (95% CI: 15.2, 21.4) in the osimertinib arm and 10.2 months (95% CI: 9.6, 11.1) in the SOC arm (hazard ratio 0.46 (95% CI: 0.37, 0.57), p0.0001).>

The most common adverse reactions (occurring in at least 20% of patients treated with osimertinib) were diarrhea, rash, dry skin, nail toxicity, stomatitis, and decreased appetite. Serious adverse reactions were reported in 4% of patients treated with osimertinib. The most common serious adverse reactions (≥1%) were pneumonia (2.9%), ILD/pneumonitis (2.1%), and pulmonary embolism (1.8%).

The recommended dose of osimertinib is 80 mg orally once daily, with or without food.

Full prescribing information is available at:
https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/208065s008lbl.pdf
(https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/208065s008lbl.pdf).

FDA granted this application Priority review and Breakthrough designation. A description of FDA expedited programs is in the Guidance for Industry: Expedited Programs for Serious Conditions-Drugs and Biologics, available at:
http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm358301.pdf
(/media/86377/download).

Healthcare professionals should report all serious adverse events suspected to be associated with the use of any medicine and device to FDA's MedWatch Reporting System by completing a form online at
http://www.fda.gov/medwatch/report.htm (http://www.fda.gov/medwatch/report.htm), by faxing (1-800-FDA-0178) or mailing the postage-paid address form provided online, or by telephone (1-800-FDA-1088).

Follow the Oncology Center of Excellence on Twitter @FDAOncology
(https://twitter.com/@FDAOncology) ↗ (http://www.fda.gov/about-fda/website-policies/website-
disclaimer)disclaimer icon
(http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/default.htm).

Check out recent approvals at the OCE's podcast, Drug Information Soundcast in Clinical Oncology
(D.I.S.C.O.), available at www.fda.gov/DISCO (http://www.fda.gov/DISCO).

# EXHIBIT 5

# FDA approves osimertinib as adjuvant therapy for non-small cell lung cancer with EGFR mutations

On December 18, 2020, the Food and Drug Administration approved osimertinib (TAGRISSO, AstraZeneca Pharmaceuticals LP) for adjuvant therapy after tumor resection in patients with non-small cell lung cancer (NSCLC) whose tumors have epidermal growth factor receptor (EGFR) exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test.

Efficacy was demonstrated in a randomized, double-blind, placebo-controlled trial (ADAURA, NCT02511106) in patients with EGFR exon 19 deletions or exon 21 L858R mutation-positive NSCLC who had complete tumor resection, with or without prior adjuvant chemotherapy. Eligible patients with resectable tumors (stage IB – IIIA) were required to have predominantly non-squamous histology and EGFR exon 19 deletions or exon 21 L858R mutations identified prospectively from tumor tissue in a central laboratory by the cobas® EGFR Mutation Test. A total of 682 patients were randomized (1:1) to receive osimertinib 80 mg orally once daily or placebo following recovery from surgery and standard adjuvant chemotherapy, if given.

The major efficacy outcome measure was disease-free survival (DFS) in patients with stage II – IIIA NSCLC determined by investigator assessment. Median DFS was not reached (38.8, NE) in patients on the osimertinib arm compared with 19.6 months (16.6, 24.5) on the placebo arm (HR 0.17 95% CI: 0.12, 0.23; <0.0001). DFS in the overall study population was a secondary efficacy outcome measure; the median was not reached (NE, NE) in patients on the osimertinib arm compared with 27.5 months (22, 36) on the placebo arm (HR 0.20 95% CI: 0.15, 0.27; <0.0001).

The recommended osimertinib dose for adjuvant treatment of early stage NSCLC is 80 mg orally once daily, with or without food, until disease recurrence, or unacceptable toxicity, or for up to 3 years.

Most common (>20%) adverse reactions in patients taking osimertinib, including laboratory abnormalities, were lymphopenia, leukopenia, thrombocytopenia, diarrhea, anemia, rash, musculoskeletal pain, nail toxicity, neutropenia, dry skin, stomatitis, fatigue, and cough.

View full prescribing information for TAGRISSO (https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/208065s021lbl.pdf).

This review was conducted under Project Orbis (/about-fda/oncology-center-excellence/project-orbis), an initiative of the FDA Oncology Center of Excellence. Project Orbis provides a framework for concurrent submission and review of oncology drugs among international partners. For this review, FDA collaborated with the Australian Therapeutic Goods

Administration (TGA), the Brazilian Health Regulatory Agency (ANVISA), Health Canada, Singapore's Health Sciences Authority, and Switzerland's Swissmedic. The application reviews are ongoing at the other regulatory agencies.

This review used the Real-Time Oncology Review (/about-fda/oncology-center-excellence/real-time-oncology-review) (RTOR) pilot program, which streamlined data submission prior to the filing of the entire clinical application, and the Assessment Aid (/about-fda/oncology-center-excellence/assessment-aid), a voluntary submission from the applicant to facilitate the FDA's assessment. The FDA approved this application two months ahead of the FDA goal date.

This application was granted breakthrough designation. A description of FDA expedited programs is in the Guidance for Industry: Expedited Programs for Serious Conditions-Drugs and Biologics (/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics).

Healthcare professionals should report all serious adverse events suspected to be associated with the use of any medicine and device to FDA's MedWatch Reporting System (https://www.accessdata.fda.gov/scripts/medwatch/index.cfm) or by calling 1-800-FDA-1088.

For assistance with single-patient INDs for investigational oncology products, healthcare professionals may contact OCE's Project Facilitate (/about-fda/oncology-center-excellence/project-facilitate) at 240-402-0004 or email OncProjectFacilitate@fda.hhs.gov (mailto:OncProjectFacilitate@fda.hhs.gov).

.

For information on the COVID-19 pandemic, see the following resources:

- FDA: Coronavirus Disease 2019 (COVID-19) (/emergency-preparedness-and-response/counterterrorism-and-emerging-threats/coronavirus-disease-2019-covid-19)

- NCI: Coronavirus: What People With Cancer Should Know (https://www.cancer.gov/contact/emergency-preparedness/coronavirus)

- CDC: Coronavirus (COVID-19) (https://www.cdc.gov/coronavirus/2019-ncov/index.html)

Follow the Oncology Center of Excellence (/about-fda/fda-organization/oncology-center-excellence) on Twitter @FDAOncology (http://www.twitter.com/@fdaoncology) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer).

# EXHIBIT 6

REVIEWS

Drug Discovery Today • Volume 21, Number 10 • October 2016

Reviews • FOUNDATION REVIEW



*Teaser In this article we reflect on two decades of kinase-focused drug discovery efforts within AstraZeneca and highlight the crucial role of the medicinal chemist in building the organisational knowledge around this important target family to drive increasingly more-efficient lead optimisation efforts.*



# Standing on the shoulders of giants: a retrospective analysis of kinase drug discovery at AstraZeneca

## Jason G. Kettle[1] and David M. Wilson[2]

[1] AstraZeneca, Oncology iMED, Mereside, Alderley Park, Stockport SK10 4TG, UK
[2] AstraZeneca, Oncology iMED, Hodgkin Building, Chesterford Research Campus, Little Chesterford, Saffron Walden, Cambridgeshire CB10 1XL, UK

Sir James Black famously said: 'The most fruitful basis of the discovery of a new drug is to start with an old drug', and this idea has featured in a significant number of kinase drug discovery programmes at AstraZeneca over the past two decades. Of the marketed kinase inhibitors and various clinically trialled agents, candidate drugs and multiple lead optimisation programmes delivered over this timeframe at AstraZeneca the overwhelming majority trace their origins back to a small handful of pioneering drug discovery programmes. Importantly, these projects not only laid the foundations of the organisational expertise on how to 'drug' this important target family but also provided a legacy of internal chemical equity that has had a profound influence on the many kinase-focused discovery efforts that have followed. For agents in late-stage clinical trials today, seemingly the product of rapid discovery phases, the reality is that these are often the products of decades of research. Crucial to the success of these projects has been the medicinal chemists involved, whose intimate knowledge and expertise around key kinase chemical scaffolds has enabled successful medicinal chemistry strategies to be rapidly identified and executed.

## Introduction

Drug discovery is a rewarding yet challenging endeavour. It has been estimated that one drug is approved for every 5000 10 000 compounds made in the discovery phase [1]. Most hypotheses are disproved, most compounds made do not survive the first rounds of profiling and many experiments ultimately spawn negative outcomes. Most researchers in industry today will spend an entire career without working on a single successful, launched therapy. Yet these combined failures are important, because without them our understanding would not advance. Each one leads to increased knowledge and to new hypotheses to test. For chemistry teams working with small molecules, an additional factor is of crucial importance   a legacy of physical samples with

**Jason G. Kettle** is currently Principal Scientist in Medicinal Chemistry within the oncology iMED at AstraZeneca, based in Cheshire, UK. He holds a BSc and a PhD from the University of Manchester and was the first post-doctoral researcher with Professor Stephen Clark working on the synthesis of brevetoxins while at the University of Nottingham. Jason joined Zeneca in 1996 and, following a brief period in the Respiratory and Inflammation department working on chemokine antagonists, moved to the Oncology department. He has worked extensively across lead generation and optimisation phases and published extensively in the field of kinase inhibition, an area of keen interest for the past 18 years, and more recently in diverse areas such as protein–protein interaction inhibitors and DNA-damage response targets.



**David M. Wilson** is currently Senior Director and Global Head of Oncology Chemistry at AstraZeneca, based in Cambridge, UK. He holds a BSc and a PhD from the University of Leeds and also completed post-doctoral studies with Professor Robert Holton working on the natural product taxol. David joined GlaxoSmithKline in 1997 and, over the course of a 19 year career as a medicinal chemist, he has worked across multiple therapy areas including neurodegeneration, immunoinflammation, infectious diseases and oncology. His many research interests include protein kinases, epigenetics, structure-based drug design, CNS-focused drug discovery and phenotypic screening. David is also currently AstraZeneca's chief chemist and chairs the global chemistry leadership team.



*Corresponding authors:* Kettle, J.G. (jason.kettle@astrazeneca.com), Wilson, D.M. (david.m.wilson@astrazeneca.com)

1359-6446/© 2016 Elsevier Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.drudis.2016.06.007

Drug Discovery Today • Volume 21, Number 10 • October 2016
REVIEWS

associated data and insights relating to the developability of specific lead series. Sir James Whyte Black, Nobel Prize for Medicine recipient, who led the research groups at ICI pharmaceuticals that discovered beta blocker propranolol and discovered H2 antagonist cimetidine while at Smith, Kline & French, famously stated: 'The most fruitful basis of the discovery of a new drug is to start with an old drug'. This idea has featured in a significant number of kinase drug discovery programmes at AstraZeneca over the past two decades. Of the marketed kinase inhibitors and various clinically trialled agents, candidate drugs and multiple lead optimisation programmes delivered over this timeframe at AstraZeneca, the overwhelming majority trace their origins back to a small handful of pioneering drug discovery programmes. The majority of these projects and compounds remain undisclosed. Importantly, these projects not only laid the foundations of the organisational expertise on how to 'drug' this important target family but also provided a legacy of internal chemical equity that has had a profound influence on the many kinase focused discovery efforts that have followed over the past two decades. For the many agents in late stage clinical trials today there is a perception that they were seemingly identified via a relatively short preclinical discovery phase. However, the reality is that they were strongly influenced by the legacy of research that had gone before. Crucial to the success of all of these projects has been the medicinal chemists involved, whose intimate knowledge and expertise around key kinase chemical scaffolds has enabled successful medicinal chemistry strategies to be rapidly identified and executed. In this review we show a snapshot of the 'family tree' of kinase research undertaken at AstraZeneca and how much of our proprietary chemical equity in this area is interconnected and can ultimately be traced back to a relatively small number of related scaffolds. In particular, the early discovery work on quinazoline based scaffolds helped lay the foundations of target class knowledge that would later prove crucial for research into other privileged kinase scaffolds, including the broad family of anilinopyrimidine based kinase inhibitors, which can be further divided into two subfamilies: *bis* anilinopyrimidines (BAPS) and *mono* anilinopyrimidines (MAPS). Fig. 1 shows how these three strategically important kinase scaffolds alone are able to provide broad coverage of the human kinome and, as such, have been extensively exploited across the industry over the past two decades as measured by patent filings.



**FIGURE 1**

Patent applications covering anilinoquinazolines and quinolines (AQZN), *bis* anilinopyrimidines (BAPS) and *mono* anilinopyrimidines (MAPS) in the period 1995–2014 aligned by kinase target. Size of circles indicates number of unique patent applications. *Data source*: [65].

REVIEWS                                                                                 Drug Discovery Today • Volume 21, Number 10 • October 2016

Reviews • FOUNDATION REVIEW

Since the first approval of imatinib in 2001, there have been more than 30 FDA approved kinase inhibitors brought to market [2,3]. Inhibitors based on a quinazoline or quinoline template represent by far the most exploited chemotype within this set, which includes important therapeutics such as gefitinib, erlotinib, lapatinib, cabozantinib, bosutinib, afatinib and lenvatinib. BAP inhibitors have also been heavily exploited in the patent literature as selective inhibitors of a wide range of kinase targets, although in contrast to the quinazoline and quinoline scaffold they are represented by just two approved drugs: pazopanib and ceritinib. The recent FDA approval of TAGRISSO™ (osimertinib) represents the first, and to date only, example of a kinase inhibitor from a MAP class. Here we outline that, for AstraZeneca, these three classes of kinase inhibitors represent a continuum of research spanning two decades that has created a legacy of organisational knowledge and knowhow, laid down year upon year and has spawned new medicinal chemistry and successfully enabled a large number of drug discovery projects over the past 20 years. The organisational journey started with the research that discovered IRESSA® (gefitinib) and continues to this day with the discovery of osimertinib.

## The emergence of the anilinoquinazoline and quinoline (AQZN) scaffolds and the discovery of IRESSA® (gefitinib)

Research into inhibitors of the tyrosine kinase of the epidermal growth factor receptor (EGFR) began within ICI Pharmaceuticals in the early 1990s. Before the advent of assay techniques that would allow screening of the full compound collection, computational techniques were used to prioritise small subsets of molecules for screening. Based on an emerging understanding of the important catalytic steps in this class of enzymes, a plan was developed to select compounds that satisfied at least two out of three molecular features that might mimic the multisubstrate complex [4]. These molecular features were in fact designed to select either for compounds that might mimic the key tyrosine residue of the substrate (aromatic ring or phenolic oxygen) or the nonbridging oxygens of the $\gamma$ phosphate motif. The key hit from this process, a simple chloroanilinoquinazoline (termed CAQ, **1**, Fig. 2) was found in a second iteration of this process and confirmed to be a potent inhibitor of the EGFR tyrosine kinase. It is easy to see how such a compound might be selected as a tyrosine mimic, although



**FIGURE 2**
AstraZeneca kinase programmes that exploit anilinoquinazoline templates trace their origins to an initial ICI screening hit from 1975. Analogues made as part of the original optimisation towards gefitinib went on to provide lead equity for kinases such as vascular endothelial growth factor (VEGF), Aurora, Src and ErbB2 and provided the first validation of anilinopyrimidines as kinase inhibitors. Dates indicate first year of synthesis.

Drug Discovery Today • Volume 21, Number 10 • October 2016   **REVIEWS**

Reviews • FOUNDATION REVIEW

more detailed mechanistic studies at the time clearly demonstrated competitive kinetics with respect to ATP rather than substrate, and the team at the time concluded 3D structural information would be required to give a definitive answer. Extensive structural work on this series by others [5] subsequently showed that the anilinoquinazoline motif in fact acts as a mimic of the adenosine core in the ATP co factor rather than the tyrosine of the substrate the right compound was selected for screening but not actually for the right reason.

The chloroanilinoquinazoline screening sample itself was actually an old ICI compound that found its way into the collection in 1975 and remained there during the corporate restructuring that has led to the AstraZeneca of today. It was first tested against the EGFR tyrosine kinase on 1 February 1991. In the evolution of this lead into the molecule that would ultimately become gefitinib (compound **10**) [6], an early breakthrough involved positioning of methoxy groups at the 6 and 7 positions of the quinazoline ring leading to significant increases in potency (compound **4**). It was noted at the time that this compound contained all the elements required to achieve potent inhibition within this scaffold   an anilinoquinazoline substituted with electron donating groups,   an aniline with a free *NH* and lipophilic *meta* substituent and no substituents in any of the 2 , 5   or 8 positions (the assumption that substitution at the 5 position was deleterious for activity will be revisited by later discovery teams). With potency requirements met, the question of *in vivo* activity was addressed by fluorination of the aniline ring to block an observed metabolic vulnerability, followed by introduction of a side chain at the 6 position containing a basic group to enhance solubility. All of this knowledge was established using conventional SAR studies in the absence of crystallographic information that today would be commonplace for most kinase focused drug discovery projects. The first chemical sample of gefitinib was synthesised at the Zeneca laboratories at Alderley Park in the UK on 9 February 1995. In 2011, inventors Andy Barker and Keith Gibson were awarded recognition for this discovery as American Chemical Society 'Heroes of Chemistry'. As part of the optimisation programme, changes made to the nature of the aniline group were wide ranging in scope, enabled by chemistry that was highly tractable and readily accessed a vast array of off the shelf reagents. This exercise led to a range of analogues possessing differing levels of target potency and a range of physicochemical and developability properties. Many of the analogues that were designed and made ultimately proved suboptimal as EGFR inhibitors or had flawed developability potential and thus were not progressed by the project team. However, having been synthesised, registered and tested, all of these analogues were added to the compound collection to be screened against other targets in the future. Fig. 2 shows the original CAQ screening hit, together with analogues that were synthesised contemporaneously with it during the period 1991   1993. Importantly, each of these analogues went on to provide key starting points for future kinase projects that, to date, have collectively delivered several marketed drugs, six clinical agents in ongoing human drug trials and numerous other candidate drug molecules (Figs. 3 and 4).

## Anilinoquinazoline EGFR inhibitors beyond gefitinib

It was while gefitinib was in Phase II clinical trials that a team was assembled to look at options to provide a chemical backup,

something that had briefly been considered at the time of the original EGFR candidate drug nomination but was ultimately not initiated. Exciting evidence of early clinical responses had started to emerge from ongoing clinical trials, thus there was a desire to find a back up in case gefitinib failed in clinical development for reasons that could be attributed to the chemical structure. At the time there were no data to indicate that the compound was not suitable for development; so, without a specific risk to resolve, the team settled upon reducing the long human pharmacokinetic (PK) half life that had been observed with gefitinib in the clinic. Two separate Phase I studies in cancer patients had observed a mean terminal PK half life of 41 h and 48 h (range 37   65 h). The basic side chain of gefitinib serves to improve physical properties (solubility, plasma protein binding) and impart an overall favourable DMPK profile on the molecule. However, a consequence of the introduction of a basic side chain into the anilinoquinazoline core is to increase the volume of distribution at steady state ($V_{DSS}$), which results in the long observed half life. Although a long half life is clearly desirable for increasing exposure and allowing once a day dosing, it was hypothesised that drug accumulation might potentially prove to be a concern, necessitating extended washout periods should drug treatment need to be discontinued. Focused on addressing this hypothetical risk, the team sought to revisit the SAR of this series, with a particular focus on reducing the basicity or even eliminating the basic side chain entirely from the molecule. What was unclear was how such a strategy would affect physical properties, and also any observed *in vivo* efficacy, because effective tissue penetration would still be required at the site of action.

The ultimately successful strategy involved two key transitions. The first of these was a switch of the fluorine atom of gefitinib from the 4 position of the aniline to the 2 position [7]. This apparently simple change led to some unexpected results, not least because the fluorine had originally been introduced to block the generation of an observed *in vivo* metabolite. When placed at the 2 position of the aniline the fluorine imparted greater target potency, increased free drug levels and improved the *in vivo* DMPK properties. The benefits of the 2 fluorine substituent could be rationalised in a number of different ways, including the potential for an internal H bond between the fluorine and aniline *NH* leading to a masking effect that could serve to improve intrinsic permeability. Alternatively, it could be rationalised that the presence of an *ortho* substituent could increase the twist in the aryl ring, leading to a change in the electronic nature of the aniline with a concomitant increase in metabolic stability. The 2 fluoro substituted aniline, an isomer of the gefitinib aniline, was never investigated during the original discovery programme. A second change was crucial to rescuing the low solubility that came as a consequence of moving to weakly or nonbasic side chains. This change involved conversion of the largely linear and flexible side chain of gefitinib into a directly linked piperidine ring. Introduction of a branched side chain, in the form of a piperidine, so close to the quinazoline core affected the crystal packing seen in the solid state, making it much less efficient, and thereby improving solubility, a feature that was monitored directly in the discovery phase by measuring melting points on all compounds made. This strategy was based on the general solubility equation proposed by Ran and Yalkowski [8], hypothesising that a reduction in melting

Drug Discovery Today • Volume 21, Number 10 • October 2016

Reviews • FOUNDATION REVIEW



**FIGURE 3**

With the benefit of knowing where programmes finished, a lineage of compounds and medicinal chemistry exists connecting first generation quinazoline based epidermal growth factor (EGFR) inhibitor gefitinib to its third generation anilinopyrimidine EGFR inhibitor osimertinib, covering 20 years of research. Anilinopyrimidine inhibitors of EGFR made within the gefitinib project provided lead equity that would be exploited against cyclin dependent kinase (CDK)2, insulin like growth factor 1 receptor (IGF1R), glycogen synthase kinase (GSK)3β and current generation EGFR inhibitors. From this work came several launched drugs and many agents currently in active clinical trials. Dates indicate first year of synthesis.

Drug Discovery Today • Volume 21, Number 10 • October 2016

REVIEWS

Reviews • FOUNDATION REVIEW



FIGURE 4

Medicinal chemistry strategies adopted in the development of selected AstraZeneca kinase inhibitors. (a) Derivation of ribose targeting saracatinib (AZD0530) from an early epidermal growth factor receptor (EGFR) synthesised quinazoline lead. (b) A strategy to lower predicted human half life of gefitinib leads to sapitinib (AZD8931), a mixed EGFR and ErbB2 inhibitor. (c) Overturning a cyclin dependent kinase (CDK2) bias in favour of insulin like growth factor 1 receptor (IGF1R) in a series of *mono* anilinopyrimidines. (d) Evolution towards osimertinib (AZD9291) from a hand picked IGF1R screening lead.

point of 100 °C would have the same beneficial effect on solubility as reducing the logP by 1 unit. Such a strategy might be preferable when there is a desire to stay in a particularly favourable lipophilicity region and not affect other important properties such as permeability. The candidate to arise from this work was designated AZD4769 (compound **16**), first synthesised in 2003, and met our criteria for a backup to gefitinib, although ultimately this compound was not required and not progressed following the approval of gefitinib in the same year. However, this work also produced a narrow subset of compounds that unexpectedly showed a pan EGFR/ErbB2/ErbB3 profile, and ultimately led to the nomination of AZD8931 (compound **15**, later named sapitinib) which was also first made in 2003 [9]. Preclinical data were generated that supported efficacy for AZD8931 in tumours where

Drug Discovery Today • Volume 21, Number 10 • October 2016

Reviews • FOUNDATION REVIEW

human epidermal growth factor receptor (HER) signalling is ligand driven [10], which is believed to be the dominant mechanism in low HER2 expressing cancers. Potentially it was believed that the profile of AZD8931 might provide differentiation over established therapies, such as the antibody Herceptin[®] (Roche), that have proved highly effective in high HER2 expressing tumours. However in the Phase II THYME breast cancer trial [11], AZD8931 failed to improve progression free survival in combination with pacli taxel versus paclitaxel alone. A similar outcome was observed in the Phase II MINT breast cancer trial looking at combination with the aromatase inhibitor anastrazole [12]. Inhibition of ErbB2 through a quinazoline template was subsequently independently established with the launch of lapatinib (GlaxoSmithKline) in 2007, although SAR indicated the requirement for a large extended aniline substituent to achieve potent and selective inhibition of ErbB2. However, this structural necessity unfortunately also had a negative impact on physical properties and overall PK properties not seen with sapitinib. Both of these AstraZeneca agents demon strated greatly reduced $V_D$ss and half lives in the intended man ner, and both compounds demonstrated very low in vivo clearance, necessary to ensure good exposure for compounds with shortened half lives. In a Phase I study in cancer patients, AZD8931 was rapidly absorbed and demonstrated a half life of approximately 11 h, validating the approach taken within medicinal chemistry to reduce this parameter relative to gefitinib [13]. In 2012, further value of the programme of work associated with the gefitinib project was realised when a team at AstraZeneca's Innovation Centre China (ICC) had the idea of generating a brain penetrant EGFR inhibitor to treat lung cancer patients that relapse on therapy with brain or leptomeningeal metastases. Importantly, the ICC group were able to exploit these legacy compounds and associated medicinal chemistry knowhow to identify highly per meable and metabolically stable compounds expediently, to serve as good starting points to begin the development of potential central nervous system (CNS) penetrant EGFR inhibitors. Achiev ing high levels of brain exposure for any kinase inhibitor was viewed as challenging because the property spaces occupied by CNS active drugs and by approved kinase inhibitors do not typi cally overlap. Nevertheless, this was achieved, and the develop ment programme resulted in the delivery of AZD3759 (compound 22), first made in 2012 and now in Phase I clinical trials [14]. Key steps leading to the ultimate discovery of AZD3759 proved to be a transposition of fluorine and a rigidification of the basic side chain, broad principles first demonstrated with sapitinib but ma nipulated here to result in an agent that showed profound regres sion in preclinical models of brain metastases to provide clear differentiation of clinical properties over gefitinib (and sapitinib), both of which have limited CNS exposure.

## Inhibitor of vascular endothelial kinase cediranib

Screening for inhibitors of vascular endothelial growth factor receptor (VEGFR) began in 1996 and simple analogues made within the gefitinib programme were found to have activity for this kinase family. This work led to pan VEGF inhibitor cediranib (compound 11) first synthesised in 1999 [15]. The medicinal chemistry development of this highly potent VEGFR inhibitor initially focused on 3 hydroxyaniline analogue 5 which was iden tified as a potent VEGFR inhibitor, albeit one that suffered from poor PK, because such groups render themselves susceptible to phase 2 metabolism through conjugation with, for example, glu coronic acid. This hit, which was synthesised as part of the gefitinib project in 1992, was first screened against VEGFR in 1996. Further exploration identified that replacement of the C4 nitrogen for oxygen resulted in greater potency for VEGFR and selectivity over EGFR. The para indole was found to be highly potent like the meta phenol, but with much improved DMPK characteristics. Addition of a 2 methyl group was seen to increase potency and reduce clearance, as did positioning of the fluorine atom on the indole at C4, both effects being independent and additive. Exploiting the knowledge from the preceding gefitinib development effort, which had demonstrated improved PK and in vivo activity following introduction of a basic side chain, a similar strategy was adopted for VEGFR with an amino group being installed at the 7 position of the quinazoline. Positioning the basic group in the 7 position, as opposed to the 6 position of gefitinib, was found to favour VEGFR activity. The indole of cediranib was also later adopted unchanged in the clinical candidate brivanib (compound 17), from Bristol Myers Squibb, but without attribu tion [16,17]. Cediranib has been tested in a number of clinical settings. Trials in renal cell carcinoma have demonstrated signifi cant antitumor activity in patients [18], although registration in this indication has not been pursued. Recent trial data for cedir anib in combination with platinum based chemotherapy for patients with relapsed serous ovarian carcinoma is supporting a renewed interest in this agent [19]. On 29 July 2014, orphan designation was granted by the European Commission to Astra Zeneca for cediranib for the treatment of ovarian cancer.

## Inhibitors of Src and Abl kinases: discovery of saracatinib and AZD0424

Src is a non receptor tyrosine kinase that has been shown to be a crucial component of diverse cell signalling pathways linked to proliferation, invasion and apoptosis [20]. The origins of this kinase can in fact be traced back over a century, with the pioneer ing work of Peyton Rous demonstrating that transplantation of tumours and cell free tumour extracts led to disease propagation in hens. Isolation of what became known as the Rous sarcoma virus (RSV) led to much intensive research and, although the idea that a virus could cause cancer was widely rejected by his peers, Rous would eventually be awarded the Nobel Prize in Physiology or Medicine in 1966 [21]. Cellular transformation caused by the virus was eventually confirmed to be due to a single proto onco gene c Src, which oncodes for the Src kinase, and in 1997 a project was established within Zeneca to search for inhibitors of this long studied kinase. A 3 methoxyanilinoquinazoline 3, first made in the gefitinib programme in 1993, was found to be a submicromolar inhibitor and represented an encouraging starting point for fur ther evolution. The aniline architecture was substantially modified from this initial hit by first adding a 5 chloro substituent to improve potency. Furthermore, modelling and crystallographic information was used to highlight that the methyl group of the methoxy substituent sat in an unusual orientation, being coplanar with the aromatic ring and pointing back towards the adjacent 2 position of the aniline rather than the expected 4 position. Both of these observations suggested a cyclisation strategy that was rea lised in the form of a benzodioxole motif that led to superior

potency, improved cross kinase selectivity and good PK properties [22]. Final development to deliver candidate drug AZD0530, later named saracatinib **8** [23] and first made in 2000, was achieved by probing the ribose pocket of ATP. This required development of novel chemistry to deliver quinazolines substituted at the 5 posi tion, even though earlier exploration had indicated that this might not be compatible with activity. In this respect, saracatinib positions a pyran group to mimic the ribose group of ATP in this pocket, which is partially open to solvent and lined by a series of hydrophobic and hydrophilic residues. Positioning of a second solubilising side chain at the 7 position, as previously explored for cediranib, completed the optimisation. Like many compounds with activity against c Src, saracatanib was also shown to potently inhibit other family members Fyn and Lyn, and also Abl kinase. AZD0424 (compound **9**), a second compound from this series, was also taken forward as a clinical candidate. As can be seen from its chemical structure, AZD0424 is an evolution of the learning derived from previous projects where a shift from a basic to a neutral side chain was driven in part by a desire to maintain an acceptable half life, but also in response to an emerging under standing of the importance of removing hERG ion channel activi ty to limit the potential for QT prolongation in the clinic. The discovery of AZD0424 has not been previously described and this compound is currently partnered with Cancer Research UK the sponsor of the ongoing clinical trials. c Src as a target in oncology was initially pursued by AstraZeneca as an anti invasive target but failed to deliver robust efficacy in clinical trials, including in gastric [24], castration resistant prostate [25], hormone receptor negative metastatic breast [26] and platinum resistant ovarian [27] cancers. It is interesting to note that other Src inhibitors developed contemporaneously with saracatinib, such as dasatinib (Bristol Myers Squibb) and bosutinib (Pfizer) were ultimately approved for the treatment of chronic myeloid leukaemia (CML) on the basis of their potent activity against Bcr Abl kinase rather than their Src activity. Bcr Abl and Src kinases share a high degree of sequence homology, and Src family inhibitors, including saracatinib, often cross react with this established oncogene in CML. Saracatinib was subsequently offered to collaborators under an AstraZeneca can didate drug repurposing initiative, and recent data have also emerged showing restoration of brain function in a mouse model of Alzheimer's disease (AD) which is most likely linked to its potent Fyn kinase activity and enabled by its good CNS exposure [28]. Recent data from a Phase Ib clinical trial of AZD0530 in AD patients has demonstrated compound levels in cerebrospinal fluid that correspond to levels in the brain that rescued memory deficits in this transgenic mouse model, supporting assessment in larger Phase II trials [29].

## Inhibitor of Aurora-B kinase barasertib

In cellular mitosis, the process whereby the duplicated genome is segregated by the microtubule spindle apparatus into two daugh ter cells, an array of checkpoints has evolved to ensure the coordi nation of this tremendously complex process, because errors in these mechanisms can lead to genomic instability and cell death [30]. The Aurora kinases are key mitotic regulators involved in regulating multiple steps of mitosis, including in centrosome duplication and alignment on the mitotic spindle, and are fre quently overexpressed in human tumours [31]. A search for inhibitors of the mitotic kinase Aurora B was initiated in 1998 and once again found a hit molecule that was first synthesised as part of the gefitinib programme. Although there were considerable data linking Aurora A and Aurora B to the progression of cancer, early studies using genetic silencing had indicated that the cellular phenotype ascribed to Aurora kinase inhibitors was best described by inhibition of Aurora B [32]. The quinazoline hit compound **6**, with a large 4 benzamide motif on the aniline, was made in 1992, although it was found to be inactive against EGFR ($IC_{50} > 1 \mu M$) and thus was not pursued further. Six years later, in 1998, it was tested against Aurora kinase and found to be a moderately potent inhibitor. In the development effort that followed, attention focused on replacement of the aniline ring itself with a variety of 5 and 6 membered heterocycles, which were targeted towards improving the relatively poor physical properties associated with such a large and lipophilic aniline group [33]. Replacement of the aniline with first a thiazole [34], then a pyrazole, and reversing and homologating the amide motif found in the initial hit led to the discovery of a selective Aurora B kinase inhibitor AZD1152 which was later named barasertib **12** [35]. This compound is notably delivered via the intravenous route to ensure consistent and predictable exposure given that Aurora kinase inhibitors were predicted to have a narrow therapeutic index in the clinic. To enable such delivery, barasertib features a phosphate prodrug to enhance aqueous solubility. This was positioned on a hydroxyl group incorporated into the basic side chain that projects out to solvent when the drug molecule is bound to Aurora kinase. In plasma the phosphate group is rapidly cleaved to reveal the parent drug AZD1152 hQPA following i.v. dosing. In addition to serving as a handle to append the phosphate group, the hydroxyl also serves to modulate the $pK_a$ of the adjacent amine, which is important for delivering optimal PK and attenuating hERG activi ty. Barasertib has entered clinical trials in elderly patients with acute myeloid leukaemia (AML) and has demonstrated clinically meaningful responses, including complete remission in some patients [36,37]. In 2013, an agreement was signed with BIND Therapeutics to further develop the active ingredient of AZD1152 (AZD1152 hQPA, recently designated AZD2811 (compound **18**) [38] using Accurin® nanoparticle technology and offering the potential to adapt the therapeutic regimen to different tumours while achieving an improved therapeutic index. AZD2811 has recently commenced Phase I clinical testing in patients with advanced solid tumours.

## Selective inhibitors of ErbB2 kinase: discovery of AZD3841 and AZD1719

Anilinoquinazoline inhibitor lapatinib (GlaxoSmithKline), an in hibitor of receptor tyrosine kinases ErbB2 and EGFR, was first approved by the FDA for the treatment of HER2 positive metastatic breast cancer in 2007 and was the third compound after gefitinib and erlotinib (OSI/Roche) to be approved as a drug from this structural class. Within AstraZeneca, a programme to target ErbB2 kinase selectively was initiated in 1999 with the lead for this research being an anilinoquinazoline containing compound **7** possessing an extended top group (related to lapatinib) that was first made in 1993 and featured on the shortlist of five compounds from which gefitinib was eventually prioritised. That this com pound had ErbB2 activity relative to compounds like gefitinib that

Drug Discovery Today • Volume 21, Number 10 • October 2016

did not was in fact known at the time because some limited profiling against this kinase had already taken place (anecdotal evidence has it that ErbB2 was our initially preferred target over EGFR but this was shelved owing to difficulties in protein produc tion and assay development). In the gefitinib campaign, this compound was deprioritised as the result of a number of factors including in vivo tolerability and poor physicochemical properties. This work predates the first publications on the lapatinib family of ErbB2 inhibitors from GlaxoSmithKline and indicates research into these scaffolds was probably progressing concurrently at GlaxoSmithKline and AstraZeneca. The further optimisation of this lead, which was inspired by knowledge shared from the c Src team whose project ran concurrently with the ErbB2 programme, led to the exploration of extended anilines in combination with a group targeting the ribose pocket and led to the first candidate drug AZD3841 (compound **13**). The medicinal chemistry of this discovery has previously been disclosed, although does not spe cifically refer to AZD3841, which is designated compound 8a in this referenced work [39]. Early inhibitors had featured a basic group in the ribose pocket to ensure appropriate physicochemical properties, although this resulted in hERG ion channel activity and adverse in vivo toxicity such as phospholipidosis [40]. Cross fertilisation of ideas with the team that led the work into sapitinib and gefitinib backups again meant a shift towards neutral side chains, where poor solubility was addressed using the same insights gained in those respective projects, namely introduction of chirality to reduce crystal packing and lower melting points. AZD1719 (compound **19**) was one such compound that arose from this work, although this compound was ultimately halted because of adverse preclinical safety findings judged to be off target. As above, the medicinal chemistry of this discovery has previously been disclosed, although does not specifically refer to AZD1719, which is designated compound 22 in this referenced work [41].

## From gefitinib to osimertinib (AZD9291): a two year evolution that took two decades

Gefitinib was first launched in Japan in 2002 under the brand name IRESSA®. The FDA approved gefitinib in 2003 as monother apy for the treatment of patients with locally advanced or meta static non small cell lung cancer (NSCLC) after failure of platinum based and docetaxel chemotherapies, but marketing authorisation was subsequently limited by the FDA in 2005 to patients already benefitting from gefitinib treatment, in view of a lack of evidence that it extended life across this broad target population. In the years that followed, translational research using clinical samples from responders eventually demonstrated that tumours harbouring certain mutations within the gene encoding EGFR, for example exon 19 deletions or exon 21 (L858R) substitu tions, so called activating or sensitising mutations, were sensitive to gefitinib treatment [42  44]. Based on the results from the IPASS [45] and IFUM [46] clinical trials, gefitinib was approved in Europe as a therapy in this specific mutation positive popula tion. On 13 July 2015, the FDA also approved gefitinib 250 mg tablets for the first line treatment of patients with metastatic NSCLC whose tumours had EGFR exon 19 deletions or exon 21 (L858R) substitution mutations as detected by an FDA approved test. On the same day the FDA also approved Qiagen's Therascreen® EGFR test; a companion diagnostic test for

gefitinib. Subsequently, second generation EGFR inhibitors emerged with a different mechanism of action in that they irre versibly inhibit the kinase through formation of a covalent adduct with C797 in the active site of the kinase. These agents, such as afatinib, benefit from high potency and specificity for EGFR, including improved in vitro activity against mutations known to cause resistance to first generation EGFR therapy such as gatekeep er mutation T790M. However they also inhibit wild type EGFR with high affinity and so have limited use in the resistance setting because dosing is limited by toxicities linked to wild type EGFR inhibition. In 2009, AstraZeneca initiated a project to derive chemical leads that would selectively target the sensitising and resistance (T790M) mutations while sparing wild type EGFR. Such an agent would conceivably represent a significant step forwards in treatment options   an agent not limited by the mutations that induce resistance to first generation inhibitors and not limited in dosing by the toxicities demonstrated in later therapies.

As part of the early exploration around the newly discovered anilinoquinazoline template in the gefitinib programme, alterna tive scaffolds were explored, including conversion of the quinazo line to a bis anilinopyrimidine motif. Conceptually this involves conversion of the quinazoline hinge binder, with its single H bond acceptor, into an anilinopyrimidine, which has the ability to form a 1,3 donor acceptor interaction with the kinase hinge region. The first such example, **14** retains the halogenated aniline seen in gefitinib, and was synthesised in 1993, two years before gefitinib was first prepared. Importantly, this switch to a 4,6 anilinopyr imidine scaffold retained potent EGFR activity and would ulti mately prove important in future discovery efforts targeting EGFR. The earliest disclosures of such pyrimidines as kinase inhibitors appear in the patent literature in 1995 (Zeneca) and would pave the way for this scaffold ultimately to go on to become one of the most heavily patented kinase inhibitor classes.

The process of cell division is highly regulated, and is charac terised by activation and deactivation of multiple members of the serine/threonine cyclin dependent kinases (CDKs), which togeth er control entry into, and transition through, every phase of the cell cycle [47]. CDKs also play a key part in DNA damage response in checkpoint activation and repair signalling initiation [48]. Nearly all cancer cells exhibit deregulation of CDK activity and cell cycle control, either through alteration of CDK function, upregulation of cyclin effector molecules or loss of negative reg ulators. Research into inhibitors of CDKs began at AstraZeneca in the late 1990s, with early efforts focused on CDK4 and CDK2. Screening of compounds from the gefitinib programme identified bis anilinopyrimidines as hits, although interestingly anilinoqui nazolines themselves do not appear to lend themselves to CDK inhibition. A short campaign of optimisation delivered further potent examples including introduction of a 4 sulfonamide group **21** in the aniline that extends along the kinase solvent channel and imparts significant potency for CDK2. Concurrent with this development, wider testing was being explored in the project and data were obtained on a small imidazopyridine fragment **20**. This compound, bought in from an external vendor as a screening compound in 1996, was eventually tested in the CDK2 assay in 1999 [49]. It had modest potency (15 μM) and, although not a concept used at the time, its ligand efficiency was good. The next step taken by the project was to hybridise the features of these two

Drug Discovery Today • Volume 21, Number 10 • October 2016                                                                                              REVIEWS

leads into a single agent **23** the combination of an imidazopyr idine with a sulfonamide solvent channel group, both mapped onto a 2,4 pyrimidine core, led to the first such internal examples of what we now term *mono* anilinopyrimidines. This early com pound, made in 1999 [50], proved itself a potent 2 nM inhibitor of CDK2, and would ultimately have a profound influence on many subsequent lead kinase discovery projects within AstraZeneca. From this point, further evolution delivered the CDK2 clinical candidate, AZD5438 (compound **24**), which was first synthesised in 2001 and was arrived at through further refining the aryl top group and conversion of the sulfonamide moiety to a sulfone [51]. Initial clinical data from healthy volunteer studies demonstrated that AZD5438 had a promising safety and efficacy profile despite having to be dosed four times daily because of a relatively short plasma half life [52,53]. However, in cancer patients, where con tinuous and intermittent dosing schedules were investigated, the tolerability profile proved challenging, with a number of treat ment related events that led to discontinuation of its development [54]. Across the industry a number of related CDK (CDK1/2) inhibitors have entered clinical trials; however demonstrating single agent activity combined with a favourable tolerability pro file has proved elusive. To date, no CDK2 inhibitors have reached the market, in contrast to the selective CDK4/6 inhibitor palbo ciclib (IBRANCE®, Pfizer) which in 2015 was granted accelerated approval by the FDA. Palbociclib is currently approved for use in combination with letrozole for the treatment of postmenopausal women with estrogen receptor (ER) positive, HER2 negative ad vanced breast cancer as initial endocrine based therapy for their metastatic disease [55]. As a side note, AZD5438, which was identified by the oncology medicinal chemistry department, was later identified as a lead molecule by colleagues working in diseases of the CNS looking for inhibitors of the kinase glycogen synthase kinase (GSK)3β. CDK2 and GSK3β share a high degree of homology, so inhibitors often cross react between the two kinases. This obser vation ultimately led to the discovery of AZD8926 **26** [56] which was delivered as a candidate GSK3β inhibitor in 2005 and contains much of the recognisable architecture of AZD5438, albeit with important structural modifications incorporated into the molecule to attenuate the CDK activity. These modifications include the fluorination of the pyrimidine ring, removal of the sulfone as well as installing a bulky pyran group to target the ribose pocket.

In 2006, AstraZeneca initiated a project to find kinase inhibitors of insulin like growth factor 1 receptor (IGF1R), and ran a cell based HTS that found the same imidazopyridine sulfonamide hit **23** that had proved a crucial stepping stone to the delivery of CDK2 inhibitor AZD5438. However, confirmation in enzyme assays indicated it was, unsurprisingly, over 1000 fold selective for CDK2 over IGF1R. Nevertheless, a medicinal chemistry pro gramme was initiated to overturn this bias, which, through inten sive investigation involving swapping out the sulfonamide group, introduction of an *ortho* methoxy group and incorporation of a 5 chloro substituent onto the pyrimidine core, ultimately proved successful and identified compound **25** which had a selective IGF1R profile [57]. Further evolution [58] of this template yielded two candidate drug molecules targeting IGF1R. The first, designat ed AZD7032 (compound **27**), was synthesised in 2007 and was followed up with a second, more structurally diverse, clinical candidate in 2009 (AZD9362, **29**) [59]. It is interesting to note

that the solubilising side chain present in AZD9362 mirrors closely that in the early backup to gefitinib, AZD4769, which was deliv ered 6 years earlier. This work involved the same chemists attempt ing to solve similar issues namely a strategy focused on delivering neutral compounds to achieve favourable PK and high solubility. The structure of AZD7032 has not previously been disclosed, with development of both assets now discontinued. As it turns out, the development of inhibitors of IGF1R across the industry appears largely to have stalled because, despite the early promise of pre clinical and early clinical data (primarily with antibodies), late stage trials have failed to demonstrate meaningful efficacy either alone or in combination [60,61].

In 2009, some 7 years after the launch of gefitinib, and with a greater mechanistic understanding of the key mutations in EGFR that drive dependence in EGFR mutant NSCLC as well as conferring resistance to first generation EGFR inhibitors such as gefitinib, a new project was initiated to target this resistant EGFR positive population (EGFR double mutant population) specifically. The pri mary aim of the project from the outset was to deliver a clinical candidate that not only effectively targeted the EGFR double mu tant but also had high selectivity over wild type EGFR, thus miti gating the risk of observing dose limiting rash and other toxicities associated with inhibition of wild type EGFR. The specific mutation that confers reduced sensitivity to ATP competitive quinazoline based EGFR inhibitors occurs at the so called gatekeeper residue with a methionine replacing the threonine present in the wild type kinase (EGFR T790M). This change affects the $K_m$ for ATP (increased affinity) such that the first generation inhibitors are rendered weakly active in the cell. To understand whether compounds that spare wild type EGFR but effectively inhibit EGFR T790M could be identified, a focused set of 40 compounds was tested in a biochem ical assay against EGFR T790M. This test set of compounds was supplemented with inhibitors from previous projects, together with literature and in house compounds that were known to be active against kinases that relied on a methionine gatekeeper. The aforementioned IGF1R inhibitors featured in this set given that the IGF1R kinase has a methionine gatekeeper residue. An indole pyrimidine analogue **28** that had been made for IGF1R in 2007, but had not progressed within that project, was tested against EGFR T790M in 2009. This compound was derived from a relatively broad SAR exploration targeting different heterocyclic head groups in the *mono* anilinopyrimidine core. Importantly, it showed potent bio chemical activity versus EGFR T790M but spared wild type EGFR, although not surprisingly the compound was also a very potent inhibitor of IGF1R given its link to this programme. Nevertheless, the important insight into how inhibitors can potentially cross react across different kinase families saved the project significant time in circumventing the usual need for a high throughput or kinase directed screen to identify an optimal hit to drive the project forwards. Furthermore, possessing internal knowledge around the heritage and background of the IGF1R hit compound, the medici nal chemistry team believed the series had the clear potential to deliver a clinical candidate based on the intrinsic understanding of how to attenuate IGF1R activity as well as deliver good develop ability properties including optimal PK.

The medicinal chemistry campaign rapidly delivered a clinical candidate where one key early step was the positioning of a reactive acrylamide group on the solvent channel aniline (compound **30**)

Reviews • FOUNDATION REVIEW

[62]. This modification allowed the inhibitor to bind covalently to C797 and was crucial in this series to ensure that potent enzyme activity translated into efficient cellular inhibition. Such a strategy had featured in second generation EGFR inhibitors such as caner tinib, afatinib and poziotinib, but these agents lack wild type selectivity and so, although they are able to maintain activity against the gatekeeper mutation *in vitro*, they appear to reach dose limiting toxicities before the required degree of pathway suppression can be realised. Early *in vivo* safety testing of analogues in the EGFR T790M targeting programme had indicated the poten tial for dose limiting hyperglycaemia that was linked to activity at the insulin receptor kinase (activity that generally tracked with IGF1R activity). Further development led to removal of this off target activity, achieved principally by deletion of the 5 chloro substituent in a reversal of the earlier evolution that saw the redirection of this template away from CDK2 inhibition. The drug candidate AZD9291 **31** (osimertinib) was first synthesised in 2011 [63], and selected as a clinical candidate in March 2012. It achieved first in patient dosing a year later in March 2013 and was granted Breakthrough Therapy designation by the FDA in April 2014. In the Phase I AURA trial, significant reductions in tumour burden were observed together with durable responses, with an overall response rate (ORR) of 59% in the T790M mutation positive versus 23% in the T790M mutation negative population [64]. Osimertinib was approved for the treatment of patients with EGFR T790M muta tion positive metastatic NSCLC whose disease has progressed after treatment with other EGFR blocking therapy in November 2015, under the brand name TAGRISSO$^{\text{TM}}$.

## Concluding remarks and future perspectives

Medicinal chemistry target class knowledge at AstraZeneca and much of the proprietary kinase scaffolds that exist within the organisation can trace their history back to the original research that led to gefitinib. The initial hit for this project was an ICI derived sample first synthesised in 1975 and screened some years later in 1991. Derivatives of this hit made in a short period between 1991 and 1993 to explore SAR went on to form the basis of several launched drugs and other drug candidates that remain in active clinical development. Particularly intriguing is the observation that three initial lead compounds with highly similar structures: 3 chloro (**4**), 3 hydroxy (**5**) and 3 methoxy (**3**), ultimately led to clinical compounds with entirely different inhibitor profiles targeting EGFR, pan VEGF and c Src, respectively. Moreover, analogues that dem onstrated no activity against their original intended target (EGFR) ultimately proved to be valuable starting points for other projects and in some cases going on to deliver clinical drug candidates (e.g., Aurora kinase). Attempts to diversify the newly discovered anilino quinazoline template in this programme led to the discovery of *bis* anilinopyrimidines in 1993. These proved of little interest to the gefitinib project but were identified as hits some years later when targeting CDK2. Hybridisation with commercial screening com pounds generated leads that delivered candidate drugs for CDK2, GSK3β and IGF1R. Although none remains in active development, these compounds served as informed leads for a newly started mutant EGFR project and were identified based upon an under standing of gatekeeper identity in helping to determine kinase scaffold selectivity. Importantly, part of the success in rapidly and efficiently delivering osimertinib can be directly attributed to the organisational knowledge derived from almost two decades of active kinase research. Research during this period cultivated a deep medicinal chemistry understanding that in turn enabled the ability to tune the properties and selectivity around this impor tant kinase scaffold. Whether it is the use of an *ortho* methoxy group to drive cross kinase selectivity or the installation or removal of a pyrimidine 5 substituent to modulate IGF1R affinity through to the skill to modulate p$K_a$ to deliver oral bioavailability or the insight needed to recognise the opportunity to target a cysteine residue to covalently inhibit the protein to drive high cellular affinity against EGFR mutants, institutional medicinal chemistry knowledge derived from years of ongoing research has proved to be the crucial factor in delivering project success. For a chemist working in industry today to be able to look at the structure of a molecule from a HTS and to be able to know not just which project it was originally made in but who made it and what issues they were trying to solve is something that is hard to put a value on, and is something we fear is increasingly rare. In many cases, as with osimertinib, this organisational knowhow can be observed in the quality of the medicinal chemistry output where many of the pitfalls that could halt clinical progression (e.g., selectivity) have been carefully designed out of the candidate molecule. Another clear benefit to possessing this organisational knowledge relates to the potential speed and efficiency of the lead optimisation phase. This not only saves money in the discovery of a novel clinical candidate but also helps deliver a competitive position for the project that could ultimately prove crucial for the medicine as it progresses through clinical development. The delivery of osimerti nib from first biochemical screen to first patient dosed took just under 4 years and to regulatory approval just over 2.5 years after that a total of 6.5 years. In reality this was largely enabled by the preceding 20 years of sustained research that has built up an organisational knowledge base that is delivering ever increasing business impact that can be measured in terms of quality, speed and, most importantly, benefit to patients.

The pharmaceutical industry has for at least the past decade been in a state of significant flux with mergers and acquisitions, down sizing of departments and outsourcing of various stages of the discovery process affecting the whole sector. Although these changes are necessary for the industry to evolve based on changing business models driven by external market pressures, they also present a significant risk that invaluable organisational knowledge that is important for the efficient discovery of future medicines is permanently lost. AstraZeneca has not been immune to these industry wide changes, and many of the people involved in the drug discovery programmes highlighted in this review have moved on from the organisation. However, there still remains a core inter nal knowledge base, comprising a relatively small number of highly skilled medicinal and computational chemists that possess the necessary knowhow derived from decades of internal research to drive current day projects. The benefit of this legacy organisational knowledge base was seen in the discovery of osimertinib and is evident in ongoing drug discovery efforts within AstraZeneca today. The challenge for the future, for AstraZeneca and the wider industry, will be to maintain, nurture and develop this precious knowledge base such that future drug discovery projects will also benefit and will be ever more efficiently transformed into promising new med icines to the benefit of society.

Drug Discovery Today • Volume 21, Number 10 • October 2016

REVIEWS

## References

1 Ding, M., ed. (2014) *Innovation and Marketing in the Pharmaceutical Industry Emerging Practices, Research and Policies*, Springer

2 Wu, P. *et al.* (2015) FDA-approved small-molecule kinase inhibitors. *Trends Pharmacol. Sci.* 36, 422–439

3 Wu, P. *et al.* (2016) Small-molecule kinase inhibitors: an analysis of FDA-approved drugs. *Drug Discov. Today* 21, 5–10

4 Ward, W.H.J. *et al.* (1994) Epidermal growth factor receptor tyrosine kinase. Investigation of catalytic mechanism, structure-based searching and discovery of a potent inhibitor. *Biochem. Pharmacol.* 48, 659–666

5 Shewchuk, L. *et al.* (2000) Binding mode of the 4-anilinoquinazoline class of protein kinase inhibitor: X-ray crystallographic studies of 4-anilinoquinazolines bound to cyclin-dependent kinase 2 and p38 kinase. *J. Med. Chem.* 43, 133–138

6 Barker, A.J. *et al.* (2001) Studies leading to the identification of ZD1839 (IRESSA™): an orally active, selective epidermal growth factor receptor tyrosine kinase inhibitor targeted to the treatment of cancer. *Bioorg. Med. Chem. Lett.* 11, 1911–1914

7 Ballard, P. *et al.* (2006) Inhibitors of epidermal growth factor receptor tyrosine kinase: optimisation of potency and in vivo pharmacokinetics. *Bioorg. Med. Chem. Lett.* 16, 4908–4912

8 Ran, Y. and Yalkowsky, S.H. (2001) Prediction of drug solubility by the general solubility equation (GSE). *J. Chem. Inf. Comput. Sci.* 41, 354–357

9 Barlaam, B. *et al.* (2013) Discovery of AZD8931, an equipotent, reversible inhibitor of signalling by EGFR, HER2, and HER3 receptors. *ACS Med. Chem. Lett.* 4, 742–746

10 Hickinson, M.D. *et al.* (2010) AZD8931, an equipotent, reversible inhibitor of signaling by epidermal growth factor receptor, ERBB2 (HER2), and ERBB3: a unique agent for simultaneous ERBB receptor blockade in cancer. *Clin. Cancer Res.* 16, 1159–1169

11 Baselga, J. *et al.* (2013) Abstract LB-146: a Phase II randomized placebo-controlled study of AZD8931, an inhibitor of EGFR, HER2, and HER3 signaling, plus paclitaxel (P) vs P alone in patients (pts) with low HER2-expressing advanced breast cancer (BC) (THYME). *Cancer Res.* 73, LB-146

12 Johnston, S.R.D. *et al.* (2013) Phase II randomized study of the EGFR, HER2, HER3 signaling inhibitor AZD8931 in combination with anastrozole (A) in women with endocrine therapy (ET) naïve advanced breast cancer (MINT). *J. Clin. Oncol.* 31 abstract 531

13 Tjulandin, S. *et al.* (2014) Phase I, dose-finding study of AZD8931, an inhibitor of EGFR (erbB1), HER2 (erbB2) and HER3 (erbB3) signaling, in patients with advanced solid tumors. *Invest. New Drugs* 32, 145–153

14 Zeng, Q. *et al.* (2015) Discovery and evaluation of clinical candidate AZD3759, a potent, oral active, central nervous system-penetrant, epidermal growth factor receptor tyrosine kinase inhibitor (EGFR TKI). *J. Med. Chem.* 58, 8200–8215

15 Wedge, S.R. *et al.* (2005) AZD2171: a highly potent, orally bioavailable, vascular endothelial growth factor receptor-2 tyrosine kinase inhibitor for the treatment of cancer. *Cancer Res.* 65, 4389–4400

16 Bhide, R.S. *et al.* (2006) Discovery and preclinical studies of (R)-1-(4-(4-fluoro-2-methyl-1H-indol-5-yloxy)-5-methylpyrrolo[2,1-f][1,2,4]triazin-6-yloxy)propan-2-ol (BMS-540215), an in vivo active potent VEGFR-2 inhibitor. *J. Med. Chem.* 49, 2143–2146

17 Cai, Z-W. *et al.* (2008) Discovery of brivanib alaninate ((S)-((R)-1-(4-(4-fluoro-2-methyl-1H-indol-5-yloxy)-5-methylpyrrolo[2,1-f][1,2,4]triazin-6-yloxy)propan-2-yl)2-aminopropanoate), a novel prodrug of dual vascular endothelial growth factor receptor-2 and fibroblast growth factor receptor-1 kinase inhibitor (BMS-540215). *J. Med. Chem.* 51, 1976–1980

18 Mulders, P. *et al.* (2012) Cediranib monotherapy in patients with advanced renal cell carcinoma: results of a randomised Phase II study. *Eur. J. Cancer* 48, 527–537

19 Ledermann, J.A. *et al.* (2016) Cediranib in patients with relapsed platinum-sensitive ovarian cancer (ICON6): a randomised, double-blind, palcebo-controlled phase 3 trial. *Lancet* 387, 1066–1074

20 Parson, S.J. and Parsons, J.T. (2004) Src family kinases, key regulators of signal transduction. *Oncogene* 23, 7906–7909

21 Martin, S.G. (2004) The road to Src. *Oncogene* 23, 7910–7917

22 Plé, P.A. *et al.* (2004) Discovery of a new class of anilinoquinazoline inhibitors with high affinity and specificity for the tyrosine kinase domain of c-Src. *J. Med. Chem.* 47, 871–887

23 Hennequin, L.F. *et al.* (2006) N-(5-chloro-1,3-benzodioxol-4-yl)-7-[2-(4-methylpiperazin-1-yl)ethoxy]-5- (tetrahydro-2H-pyran-4-yloxy)quinazolin-4-amine, a novel, highly selective, orally available, dual-specific c-Src/Abl kinase inhibitor. *J. Med. Chem.* 49, 6465–6488

24 Mackay, A.J. *et al.* (2012) A Phase II trial of the Src kinase inghibitor saracatinib (AZD0530) in patients with metastatic or locally advanced gastric or gastro esophageal junction (GEJ) adenocarcinoma: a trial of the PMH Phase II consortium. *Invest. New Dngs* 30, 1158–1163

25 Lara, P.N., Jr *et al.* (2009) A Phase II trial of the Src-kinase inhibitor AZD0530 in patients with advanced castration-resistant prostate cancer: a California Cancer Consortium study. *Anti Cancer Drug* 20, 179–184

26 Gucalp, A. *et al.* (2011) Phase II trial of saracatinib (AZD0530), an oral SRC-inhibitor for the treatment of patients with hormone receptor-negative metastatic breast cancer. *Clin. Breast Cancer* 11, 306–311

27 McNeish, I.A. *et al.* (2014) A randomised, placebo-controlled trial of weekly paclitaxel and saracatinib (AZD0530) in platinum-resistant ovarian, fallopian tube or primary peritoneal cancer. *Ann. Oncol.* 25, 1988–1995

28 Kaufman, A.C. *et al.* (2015) Fyn inhibition rescues established memory and synapse loss in Alzheimer mice. *Ann. Neurol.* 77, 953–971

29 Nygaard, H.B. *et al.* (2015) A Phase Ib multiple ascending dose study of the safety, tolerability, and central nervous system availability of AZD0530 (saracatinib) in Alzheimer's disease. *Alzheimers Res. Ther.* 7, 35

30 Lengauer, C. *et al.* (1998) Genetic instabilities in human cancers. *Nature* 396, 643–649

31 Bischoff, J.R. *et al.* (1998) A homologue of Drosophila aurora kinase is oncogenic and amplified in human colorectal cancers. *EMBO J.* 17, 3052–3065

32 Keen, N. and Taylor, S. (2004) Aurora-kinase inhibitors as anticancer agents. *Nat. Rev. Cancer* 4, 927–936

33 Heron, N.M. *et al.* (2006) SAR and inhibitor complex structure determination of a novel class of potent and specific Aurora kinase inhibitors. *Bioorg. Med. Chem. Lett.* 16, 1320–1323

34 Jung, F.H. *et al.* (2006) Discovery of novel and potent thiazoloquinazolines as selective Aurora A and B kinase inhibitors. *J. Med. Chem.* 49, 955–970

35 Mortlock, A.A. *et al.* (2007) Discovery, synthesis, and in vivo activity of a new class of pyrazoloquinazolines as selective inhibitors of Aurora B kinase. *J. Med. Chem.* 50, 2213–2224

36 Kantarjian, H.M. *et al.* (2013) Phase I study assessing the safety and tolerability of barasertib (AZD1152) with low-dose cytosine arabinoside in elderly patients with AML. *Clin. Lymphoma Myeloma Leuk.* 13, 559–567

37 Dennis, M. *et al.* (2012) Phase I study of the Aurora B kinase inhibitor barasertib (AZD1152) to assess the pharmacodynics, metabolism and excretion in patients with acute myeloid leukemia. *Cancer Chemother. Pharmacol.* 70, 461–469

38 Ashton, S. *et al.* (2016) Aurora kinase inhibitor nanoparticles target tumors with favorable therapeutic index in vivo. *Sci. Transl. Med.* 8, 325ra17

39 Ballard, P. *et al.* (2007) Neutral 5-substituted 4-anilinoquinazolines as potent, orally active inhibitors of erbB2 receptor tyrosine kinase. *Bioorg. Med. Chem. Lett.* 17, 6326–6329

40 Ballard, P. *et al.* (2005) 5-Substituted 4-anilinoquinazolines as potent, selective and orally active inhibitors of erbB2 receptor tyrosine kinase. *Bioorg. Med. Chem. Lett.* 15, 4226–4229

41 Barlaam, B. *et al.* (2008) Neutral 5-substituted 4-indazolylaminoquinazolines as potent, orally active inhibitors of erbB2 receptor tyrosine kinase. *Bioorg. Med. Chem. Lett.* 18, 1799–1803

42 Lynch, T.J. *et al.* (2004) Activating mutations in the epidermal growth factor receptor underlying responsiveness of non-small-cell lung cancer to gefitinib. *N. Engl. J. Med.* 350, 2129–2139

43 Paez, J.G. *et al.* (2004) EGFR mutations in lung cancer: correlation with clinical response to gefitinib therapy. *Science* 304, 1497–1500

44 Pao, W. *et al.* (2004) EGF receptor gene mutations are common in lung cancers from never smokers and are associated with sensitivity of tumors to gefitinib and erlotinib. *Proc. Natl. Acad. Sci. U. S. A.* 101, 13306–13311

45 Mok, T.S. *et al.* (2009) Gefitinib or carboplatin–paclitaxel in pulmonary adenocarcinoma. *N. Engl. J. Med.* 361, 947–957

46 Douillard, J-Y. *et al.* (2014) First-line gefitinib in Caucasian EGFR mutation-positive NSCLC patients: a Phase-IV, open-label, single-arm study. *Br. J. Cancer* 110, 55–62

47 Sherr, C.J. (1996) Cancer cell cycles. *Science* 274, 1672–1677

48 Fisher, R.P. (2013) The CDK network: linking cycles of cell division and gene expression. *Genes Cancer* 3, 731–738

49 Anderson, M. *et al.* (2003) Imidazo[1,2-a]pyridines: a potent and selective class of cyclin-dependent kinase inhibitors identified through structure-based hybridisation. *Bioorg. Med. Chem. Lett.* 13, 3021–3026

50 Byth, K.F. *et al.* (2004) Imidazo[1,2-a]pyridines. Part 2: SAR and optimisation of a potent and selective class of cyclin-dependent kinase inhibitors. *Bioorg. Med. Chem. Lett* 14, 2245–2248

51 Anderson, M. *et al.* (2008) Imidazoles: SAR and development of a potent class of cyclin-dependent kinase inhibitors. *Bioorg. Med. Chem. Lett.* 20, 5487–5492

52 Camidge, D.R. *et al.* (2007) A first-in-man Phase I tolerability and pharmacokinetic study of the cyclin-dependent kinase-inhibitor AZD5438 in healthy male volunteers. *Cancer Chemother. Pharmacol.* 60, 391–398

Reviews • FOUNDATION REVIEW

Drug Discovery Today • Volume 21, Number 10 • October 2016

Reviews • FOUNDATION REVIEW

53 Camidge, D.R. *et al.* (2007) A Phase I pharmacodynamic study of the effects of the cyclin-dependent kinase-inhibitor AZD5438 on cell cycle markers within the buccal mucosa, plucked scalp hairs and peripheral blood mononucleocytes of healthy male volunteers. *Cancer Chemother. Pharmacol.* 60, 479–488

54 Boss, D.S. *et al.* (2010) Safety, tolerability, pharmacokinetics and pharmacodynamics of the oral cyclin-dependent kinase inhibitor AZD5438 when administered at intermittent and continuous dosing schedules in patients with advanced solid tumours. *Ann. Oncol.* 21, 884–894

55 Toogood, P.L. *et al.* (2005) Discovery of a potent and selective inhibitor of cyclin-dependent kinase 4/6. *J. Med. Chem.* 48, 2388–2406

56 Witt, A. *et al.* (2013) A novel scalable process to the GSK3β inhibitor AZD8926 based on a heterocyclic Ziegler coupling. *Org. Process Res. Dev.* 17, 672–678

57 Ducray, R. *et al.* (2011) Discovery of novel imidazo[1,2-a]pyridines as inhibitors of the insulin-like growth factor-1 receptor tyrosine kinase. *Bioorg. Med. Chem. Lett.* 21, 4698–4701

58 Ducray, R. *et al.* (2011) Novel imidazo[1,2-a]pyridine based inhibitors of the IGF-1 receptor tyrosine kinase: optimization of the aniline. *Bioorg. Med. Chem. Lett.* 21, 4702–4704

59 Degorce, S.L. *et al.* (2016) Discovery of a potent, selective, orally bioavailable and efficacious novel 2-(pyrazol-4-ylamino)-pyrimidine inhibitor of the insulin-like growth factor-1 receptor (IGF-1R). *J. Med. Chem.* 59, 4859–4866

60 Chen, H.X. and Sharon, E. (2013) IGF-1R as an anti-cancer target – trials and tribulations. *Chin. J. Cancer* 32, 242–252

61 Pillai, R.N. and Ramalingam, S.S. (2013) Inhibition of insulin-like growth factor receptor: end of a targeted therapy? *Transl. Lung Cancer Res.* 2, 14–22

62 Ward, R.A. *et al.* (2013) Structure- and reactivity-based development of covalent inhibitors of the activating and gatekeeper mutant forms of the epidermal growth factor receptor (EGFR). *J. Med. Chem.* 56, 7025–7048

63 Finlay, M.R.V. *et al.* (2014) Discovery of a potent and selective EGFR inhibitor (AZD9291) of both sensitizing and T790M resistance mutations that spares the wild type form of the receptor. *J. Med. Chem.* 57, 8249–8267

64 Remon, J. and Planchard, D. (2015) AZD9291 in EGFR-mutant advanced non-small-cell lung cancer patients. *Future Oncol.* 11, 3069–3081

65 Integrity database from Thomson Reuters. Illustration reproduced and adapted using Cell Signalling Technology (http://www.cellsignal.com).

# EXHIBIT 7

**COVINGTON**

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**By Electronic Mail**                                          August 5, 2022

Shehla Wynne
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

Re: ***Puma Biotechnology, Inc. et al. v. AstraZeneca Pharmaceuticals
LP et al.** (No. 1:21-cv-01338-MFK)*

Counsel:

Further to our correspondence dated August 4, 2022 related to the parties' July 25, 2022 meet and confer as to Defendants' First Set of Requests for Production (Nos. 1–94), we now write to memorialize the parties' July 25, 2022 meet and confer with respect to Plaintiffs' First Set of Requests for Production (Nos. 1–72) and First Set of Interrogatories (Nos. 1–15) and to correct certain statements made in Plaintiffs' correspondence dated August 1, 2022 related to same.

**I.      Plaintiffs' Requests for Production**

**A.      Discovery Scope and EGFR inhibitors**

As Defendants have previously explained, including in our letter dated June 13, 2022, numerous of Plaintiffs' RFPs seek documents and things related to EGFR inhibitors that are overly broad, unduly burdensome, and/or disproportionate to the needs of the case. Defendants have thus agreed to produce documents relating to Tagrisso® and irreversible EGFR inhibitors identified in the Patents-in-Suit or their prosecution histories.

During the parties' July 25 meet and confer, Plaintiffs expressed their concern that Defendants' production of documents will be limited to documents and information related to Tagrisso® or limited to *irreversible* EGFR inhibitors. Defendants explained that Defendants' production will not be limited to the Tagrisso® (osimertinib)

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 2

com_ound, but will include, to the extent the_ exist, documents and information related to EGFR inhibitors, including reversible EGFR inhibitors, that were considered or evaluated durin_ the_ ro ect that led to Ta_risso®.  In _our letter dated Au_ust 1, 2022, _ou asked us to clarif_ what is meant b_ reference to the Ta_risso® " ro ect." Defendants are referrin_ to the research and develo_ment efforts at AstraZeneca that be_an in 2009 and resulted in the FDA approval of Tagrisso® on November 13, 2015.  As such Defendants'_roduction, at least in res_onse to Plaintiffs' RFP No._1, will include documents and thin_s, to the extent the_ exist, related to EGFR inhibitors considered or evaluated from the_ ro ect's initiation in 2009 throu_h the_ ro ect's selection of osimertinib as the lead candidate and Tagrisso®'s FDA approval on November 13, 2015.

## B.    RFP Nos. 8 and 32

In response to Plaintiffs' RFP Nos. 8 and 32, Defendants have agreed to produce "representative samples" of documents provided to or intended for AstraZeneca's sales representatives concerning Tagrisso®, and actual or proposed labels, package inserts, package outserts, medication guides, use instructions, and prescribing information for Tagrisso® within the United States.  At the July 25 meet and confer, Plaintiffs sought clarification as to the scope of documents that Defendants' will produce in response to these RFPs.  Plaintiffs expressed concern that Defendants would withhold specific documents within the categories of documents provided in the requests.  Defendants confirmed that Defendants will use reasonably diligent efforts to collect and produce unique documents within the categories of documents provided in these RFPs.

## C.    RFP No. 10

Plaintiffs' RFP No. 10 generally requests documents concerning the circumstances under which AstraZeneca first became aware of the Patents-in-Suit and related patents and applications.  Defendants previously agreed to produce documents concerning when AstraZeneca first became aware of the Patents-in-Suit. At the July 25 meet and confer, Plaintiffs requested that Defendants also produce documents concerning Defendants' awareness of related patent applications and stated that Defendants' knowledge of these applications is relevant to Plaintiffs' claim for pre-issuance damages.  Defendants maintain that Plaintiffs are not entitled to pre-issuance damages and that pre-issuance damages are not properly asserted in this case.  Nonetheless, Defendants additionally agree to produce, to the extent they exist and can be found after a reasonable search, copies of non-privileged responsive documents in their possession, custody, or control sufficient to show the circumstances under which Defendants first became aware of WO 2006/084058.

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 3

### D.    RFP No. 11

Plaintiffs' RFP No. 11 requests all documents and things "concerning the Patents-in-Suit and Related Patents." Defendants previously objected to the scope of this request because, among other reasons, it is vague, overly broad, and unduly burdensome. At the July 25 meet and confer, Defendants reasserted our objection that RFP No. 11 is overly broad and specifically inquired as to the scope of term "concerning." Plaintiffs acknowledged Defendants' concern and requested that Defendants produce documents that "mention" the Patents-in-Suit.

In Plaintiffs' August 1 letter, you state that it is your position that "RFP 11 encompasses any documents that mention the Patents-in-Suit, Related Patents, or Related Patent Applications." Defendants do not agree that the scope of Plaintiffs' RFP No. 11—which is directed to "Patents-in-Suit and Related Patents," not "Related Patent Applications"—encompasses "Related Patent Applications."

Defendants confirm that they will produce, to the extent they exist and can be found after a reasonable search, copies of non-privileged responsive documents in their possession, custody, or control documents that mention the Patents-in-Suit and Related Patents.

### E.    RFP No. 23

Plaintiffs' RFP No. 23 requests documents and things concerning communications or contacts between AstraZeneca and third parties relating to the Patents-in-Suit or the Action. As an initial matter, Plaintiffs' August 1 letter incorrectly states that we agreed to follow-up with respect to this request by July 25, 2022. In addition, Plaintiffs' letter states that we will follow-up with respect to the issues raised in your letter. Plaintiffs' July 15, 2022 letter, however, does not raise any substantive issues related to RFP No. 23 but only acknowledges that "AstraZeneca has agreed to meet and confer regarding RFP 23." At the July 25 meet and confer, you did not raise any substantive concerns regarding this request. Defendants' confirm that we will produce, to the extent they exist and can be found after a reasonable search, non-privileged, non-immune documents concerning communications between Defendants and third parties relating to the Patents-in-Suit. Defendants' otherwise maintain our objections and response to RFP No. 23.

### F.    RFP No. 44

With respect to Plaintiffs' RFP No. 44, Plaintiffs have asked Defendants to agree to produce documents "constituting, reflecting, or referring to communications or contacts between AstraZeneca and FDA concerning Tagrisso®." At the July 25 meet and confer, Defendants explained that the meaning of "contacts" with FDA, as opposed to communications with FDA, is not clear to Defendants. Defendants thus agree to produce,

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 4

to the extent they exist, non-privileged responsive documents constituting, reflecting, or referring to communications between AstraZeneca and FDA concerning Tagrisso®.

### G.   RFP Nos. 25, 26, and 61

Plaintiffs' RFP Nos. 25, 26, and 61 generally relate to analyses, opinions, and reports regarding infringement, validity, and the scope of the claims. At the July 25 meet and confer, Plaintiffs expressed their concern that Defendants' proposed productions are limited to opinions of counsel. In Plaintiffs' August 1 letter, Plaintiffs stated that you are "entitled to any non-privileged documents."

Defendants' RFP No. 49 generally requests all documents related to any search on the subject matter of the Patents-in-Suit and all prior art or publications or other materials identified. In response, Plaintiffs refused to produce documents beyond those being produced in response to other requests. Defendants' No. 61, like Plaintiffs' No. 61, generally requests studies, investigations, or assessments regarding the possible infringement of the Patents-in-Suit. In response, Plaintiffs stated that you are willing to meet and confer regarding the scope of this request.

Defendants maintain their objections to Plaintiffs' RFP Nos. 25, 26, and 61. But, in an effort to compromise, Defendants will agree to produce, to the extent they exist and can be found, responsive, non-privileged, non-immune documents in Defendants' possession, custody, or control falling within Plaintiffs' RFP Nos. 25, 26, and 61, if Plaintiffs will likewise agree to produce any non-privileged documents, to the extent they exist, responsive to Defendants' RFP Nos. 49 and 61.

### H.   RFP Nos. 29–31

Defendants have agreed to produce NDA Modules 1–3 for Tagrisso® in response to Plaintiffs' RFP Nos. 29–31. Plaintiffs asked Defendants to indicate when Defendants intend to complete the production of the NDA such that Plaintiffs can evaluate the sufficiency of such a production. Defendants note that they have already produced NDA Module 2–3. Contrary to Plaintiffs' statements in your August 1 letter, on the July 25 meet and confer, Defendants did not confirm that we would complete our production obligations in advance of the November deadline. Defendants will produce NDA Module 1 consistent with their obligations under the scheduling order to substantially complete document production by November 10, 2022.

Nonetheless, Defendants are willing to consider a proposal whereby the parties mutually exchange certain document productions in advance of the substantial completion deadline. Defendants propose that Defendants will produce our proposed productions responsive to Plaintiffs' RPF Nos. 29–31, and Plaintiffs will produce your proposed production responsive to Defendants' RFP Nos. 86 and 87 no later than October

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 5

10, 2022.  In order to ensure that we can meet this deadline, please confirm whether Plaintiffs agree to this proposal by August 10, 2022.

### I.    RFP Nos. 42, 43, and 64

With respect to RFP Nos. 42, 43, and 64, Plaintiffs ask Defendants to clarify whether Defendants intend to limit their proposed production "to agreements that *AstraZeneca contends* are comparable to a license that would result from a hypothetical negotiation." *See* Plaintiffs Aug. 1 Letter at 4 (emphasis in original).

As an initial matter, Defendants note that in our response to RFP No. 43, we did not so limit our proposed production but agreed to "produce, to the extent they exist and can be found after a reasonable search, copies of non-privileged patent license agreements relating to the sale of Tagrisso® in the United States."  Defendants maintain our objections and response to RFP No. 43.

With respect to Plaintiffs' RFP No. 42, this RFP generally requests documents sufficient to show royalties and license fees paid by AstraZeneca to any third party in connection with Tagrisso®.  Defendants confirm that we will produce, to the extent they exist and can be found after a reasonable search, agreements that are comparable to a license that would result from a hypothetical reasonable royalty negotiation.

Plaintiffs' RFP No. 64 generally requests documents and things relating to Defendants' policies and practices regarding licensing of patents or other intellectual property directed to Tagrisso®.  Defendants' RFP No. 67 similarly requests documents and things relating to Plaintiffs' policies and practices regarding licensing of patents or other intellectual property directed to inventions claimed in the Patents-in-Suit.  In response to Defendants' RFP No. 67, Plaintiffs stated you are willing to meet and confer regarding the scope of this request.  Defendants are willing to meet and confer with Plaintiffs regarding the scope of discovery with respect to Plaintiffs' RFP No. 64 and Defendants' RFP No. 67.

### II.    Plaintiffs' Interrogatories

### A.    Interrogatory No. 3

Plaintiffs' August 1 letter requests a date certain by which Defendants will provide a more fulsome response to Plaintiffs Interrogatory No. 3.  Plaintiffs' request is premature.  Consistent with our response to Plaintiffs' Interrogatory No. 1, Defendants are willing to meet and confer regarding a schedule for responding to contention interrogatories, including Plaintiffs' Interrogatory Nos. 1 and 3 as well as Defendants' Interrogatory Nos. 1 and 4.

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 6

### B.      Interrogatory Nos. 5–7

Plaintiffs' August 1 letter asks Defendants to provide clarification on the scope of our Rule 33(d) citation for Plaintiffs Interrogatory Nos. 5, 6, and 7 because "they ask for similar information."  Defendants do not understand or agree with Plaintiffs' statement that these interrogatories "ask for similar information."  As an initial matter, Plaintiffs have not clarified what requests Plaintiffs believe are "similar" to Interrogatory Nos. 5, 6, and 7.  And, in any event, Interrogatory Nos. 5, 6, and 7 are distinct interrogatories to which Defendants have provided clear objections and responses.  Defendants maintain their objections and responses.

### C.      Interrogatory No. 11

Plaintiffs' Interrogatory No. 11 requests information related to revenue and profits for Tagrisso® by indication.  Defendants confirm that we will produce information sufficient to show sales of Tagrisso® by indication.  We are still exploring what specific revenue and/or profits information that will be available by indication.

### D.      Interrogatory No. 4

Plaintiffs' Interrogatory No. 4 broadly seeks "all agreements Defendants have with any entity related to the development, supply, manufacturing, selling, distributing, importation, use, or marketing of Tagrisso® and identify the person(s) most knowledgeable about such agreements."  At the July 25 meet and confer, we did not state that the subject matter of this ROG is the "same as" RFPs related to licensing agreements as you state in your August 1 letter, but we reiterated our position, as stated in our objections and response to this interrogatory, that the scope of Plaintiffs' Interrogatory No. 4 is overly broad and seeks information not relevant to this case.  We asked Plaintiffs to explain, for example, why Plaintiffs need information related to manufacturing agreements. Plaintiffs' August 1 letter states that you are still considering this and will provide a response shortly.  If Plaintiffs can narrow the scope of Interrogatory No. 4 to a specific category of agreements and explain why such information is relevant to this case, Defendants are willing to consider Plaintiffs' narrowed interrogatory.

### E.      Interrogatory No. 10

Plaintiffs' Interrogatory No. 10 seeks information relating to the facts and circumstances relating to AstraZeneca's knowledge of Kwak (2005). Plaintiffs stated during the July 25 meet and confer that Defendants' knowledge of Kwak is relevant at least insofar as it was information that AstraZeneca considered in its decision to develop an irreversible EGFR inhibitor.  In Plaintiffs' Aug. 1 letter, Plaintiffs further stated that Kwak is relevant, among other reasons, because "it includes work of the inventors."

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 7

While we do not agree that Defendants' knowledge of Kwak is relevant to this case, we have already provide information responsive to it.  We stated in our response to Plaintiffs' Interrogatory No. 10 that "Nadia Godin-Heymann is a named author of Kwak 2005 and began employment with an affiliate of Defendants years after Kwak 2005 published."   To the extent that Plaintiffs are requesting information related to the knowledge of other employees of Defendants, we maintain our objection that Plaintiffs' interrogatory is over broad, unduly burdensome, and disproportionate to the needs of the case.  As further stated in our response "AstraZeneca has thousands of employees, and it would not be possible to determine if and when each employee became aware of Kwak 2005."  Beyond these thousands of employees, Plaintiffs' interrogatory also concerns the knowledge of Defendants' former employees based on an article that published more than fifteen years ago.  Plaintiffs' request that Defendants search the knowledge of each of these current and former employees is not reasonable, yet you have made no effort to narrow the scope your request.

Moreover, we note that despite Plaintiffs' assertion that Kwak is relevant to various issues—including the work of the inventors—Plaintiffs have unjustifiably limited your own response to Defendants' RFP No. 53. Defendants' RFP No. 53 generally requests documents related to Kwak, including drafts, submissions to journals (whether accepted or rejection), comments from any peer review, and correspondence.  Plaintiffs' response limits your proposed production related to Kwak to documents relating to the preparation of Kwak.

Defendants are willing to meet and confer regarding the scope of discovery related to Kwak Plaintiffs' Interrogatory No. 10 and Defendants' RFP No. 53.

### F.    Interrogatory No. 15

Plaintiffs' Interrogatory No. 15 requests that Defendants describe all irreversible EGFR inhibitors known to Defendants prior to February 3, 2005. Defendants have agreed to produce information that is responsive to this interrogatory and that can be located after a reasonable search of Defendants' files and a reasonable inquiry of Defendants' employees. Defendants have agreed to provide information from individuals who were involved in the development of Tagrisso® and are current employees.

Plaintiffs have asked Defendants to represent that responsive information produced would constitute an exhaustive list of the irreversible EGFR inhibitors known to Defendants prior to February 3, 2005.  We have explained that Defendants cannot reasonably provide an exhaustive list of all of the irreversible EGFR inhibitors known to Defendants, including to each of Defendants' thousands of employees, in February 2005, more than fifteen years ago.

**COVINGTON**

Shehla Wynne and Sara T. Horton
August 5, 2022
Page 8

Plaintiffs' August 1 letter requests that Defendants provide a "rationale for limiting the search to individuals currently employed when the ROG specifies a time period prior to February 3, 2005." As an initial matter, and as Defendants have already explained, Defendants' search will not be limited only to our current employees but will also include the documents and information within Defendants' possession, custody, and control in Defendants' files. In any event, Defendants' commitment to perform a reasonable inquiry of Defendants' current employees is consistent with Defendants' discovery obligations to produce documents that are reasonably within our possession, custody, and control.

Sincerely,

Melissa Keech

# EXHIBIT 8

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**By Electronic Mail**                                        September 21, 2022

Shehla Wynne
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> **Re:**   ***Puma Biotechnology, Inc. & Wyeth LLC v.***
> ***AstraZeneca Pharmaceuticals LP & AstraZeneca AB***
> **(D.Del. C.A. No. 21-1338-MFK)**

Counsel:

We write to follow-up regarding certain ongoing discovery disputes, including those identified in Plaintiffs email to Defendants dated September 16, 2022.

## I.   Contention Interrogatories: Defendants' ROG Nos. 1 and 4 and Plaintiffs' ROG Nos. 1 and 3

Both parties have served certain contention interrogatories. Specifically, Defendants have served ROG Nos. 1 and 4, related, respectively, to Plaintiffs' validity contentions and bases for any secondary considerations or objective indicia.  Plaintiffs have served ROG Nos. 1 and 3, related, respectively, to Defendants' non-infringement contentions and bases for our Fifth Affirmative Defense.  At the August 31 meet and confer, the parties agreed to consider a schedule for responding to these interrogatories.

Defendants propose that the parties serve responses no later than February 10, 2023. Please promptly confirm your agreement with this proposal.

## II.   Plaintiffs' Discovery Requests Related to the Patents-in-Suit, Related Patent Applications, and Foreign Counterpart

Plaintiffs request that Defendants produce documents related to Defendants' knowledge or communications regarding Related Patent Applications or Foreign Counterpart EP '414, including in response to Plaintiffs' RFP Nos. 10–11, 73, and 74 and Interrogatory Nos. 16 and 17. You assert in your September 1 letter that "Defendants have not provided any basis for their refusal" to provide discovery with respect to patent applications and/or foreign counterparts

**COVINGTON**

September 21, 2022
Page 2

related to the Patents-in-Suit." To the contrary, we have repeatedly explained, including during the August 31 and September 14 meet and confers and June 13 and August 5 letters, that Defendants' knowledge of the related patent applications or EP '414 and communications mentioning these applications and foreign patent are not relevant to this case.

Your September 1 letter alleges that discovery related to Defendants' knowledge of the related patent applications and EP '414 is relevant to pre-issuance damages and willfulness. According to 35 U.S.C. § 154(d), to prove your claim for pre-issuance damages, Plaintiffs must show that the invention claimed in the patent is substantially identical to the invention claimed in the published patent application. The published patent application identified in your Complaint was WO '058. *See* DI 1, DI 58. Defendants' have already agreed to produce relevant discovery related to this published application. Defendants' knowledge of other patents or applications are thus not relevant. Nor is Defendants' knowledge relevant to willfulness. Notably, willfulness requires knowledge *of infringement of the Patents-in-Suit. See, e.g.*, *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987–88 (Fed. Cir. 2021); *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. CV 19-1031, D.I. 20, *3–4 (D. Del. Oct. 31, 2019), *report and recommendation adopted sub nom. Nexstep, Inc. v. Comcast Cable Commc'n, LLC*, No. CV 19-1031, D.I. 27 (D. Del. Nov. 15, 2019). We have already agreed to produce relevant discovery related to the Patents-in-Suit. Defendants' knowledge of unrelated patents or applications, especially as to foreign counterpart EP '414, are not relevant. *See, e.g.*, *Biomerieux, S.A. v. Hologic, Inc.*, No. 18-cv-21, D.I. 406, *24 (D. Del. Feb. 13, 2020) (Defendants' "knowledge of the existence of related foreign counterpart patents to the patents-in-suit (and prolonged efforts to invalidate those patents) . . . [are not] adequate to support a finding of willful infringement.") (citing *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510–11 (Fed. Cir. 1990) ("[A] party cannot be liable for 'infringement,' and thus not for 'willful' infringement, of a nonexistent patent")); *iFit Inc. v. Peloton Interactive Inc.* No. 21-507, D.I. 34, *3–4 (D. Del. Jan. 28, 2022) ("Knowledge of a patent application alone, however, is not enough to establish knowledge of the patent(s) that issued from that application and therefore not enough to establish willfulness."); *see also PPG Industries Ohio, Inc. v. Axalta Coating Sys., LLC*, No. 21-cv-346, D.I. 34, *10 (D. Del. Jan. 26, 2022), *report and recommendation adopted*, D.I. 37 (D. Del. Feb. 17, 2022) (holding that knowledge of a foreign opposition proceeding does not support a reasonable inference that defendant learned of the patent-in-suit).

In addition, as we have also repeatedly explained, including at least at the August 31 and September 14 meet and confers, Defendants' knowledge and documents concerning related patent applications and foreign counterpart proceedings are not analogous to Plaintiffs' knowledge and documents.  Plaintiffs are the patentee or licensees of the Patents-in-Suit, and Plaintiffs are the parties that brought this lawsuit asserting the Patents-in-Suit. Defendants' entitlement to pursue relevant discovery from the patentee or licensee related to the Patents-in-Suit, and statements made or positions taken with respect to the Patents-in-Suit and any related application or foreign counterpart—including any representation to regulatory authorities, foreign or otherwise—is not analogous to Plaintiffs' pursuit of discovery related to Defendants' knowledge of the Patents-in-Suit. Defendants' discovery requests bear on the patentee's interpretation and representations with respect to the scope of the patent and are relevant to a number of issues in this litigation, including at least claim construction, infringement, and invalidity. Plaintiffs' discovery requests are not.

**COVINGTON**

September 21, 2022
Page 3

Accordin_l_, as Defendants _reviousl_ ex_lained, includin_ durin_ the Au_ust 31 meet and confer, Defendants' knowled_e of the Related Patent A__lications of the Patents-in-Suit or an EP '414 is not relevant to this case. However, in an effort to com_romise and sub_ect to our ob_ections, Defendants will a_ree to _roduce, to the extent the_ exist and can be found after a reasonable search, res_onsive, non-_rivile_ed, non-immune documents in Defendants' _ossession, custod_, or control sufficient to show the circumstances under which Defendants first became aware of U.S. Application Nos. 11/883,474 and 15/207,349. To the extent such information is available, Defendants further agree to supplement Plaintiffs' ROG No. 16 with respect to U.S. Application Nos. 11/883,474 and 15/207,349.[1] Defendants will also produce to the extent they exist and can be found after a reasonable search, responsive, non-privileged, non-immune documents in Defendants' possession, custody, or control that mention U.S. Application Nos. 11/883,474 and 15/207,349.

We maintain our objections as to any foreign counterpart, including EP '414.

### III.    Other Discovery Requests

#### A.    Plaintiffs' RFP Nos. 25, 26, and 61 and Defendants' RFP Nos. 49 and 61

In your August 31 letter you confirmed that in response to Defendants' RFP Nos. 49 and 61, Plaintiffs will produce non-privileged documents concerning any searches conducted by, for, or on behalf of Puma, Wyeth, and/or Pfizer concerning the Patents-in-Suit and all prior art identified or discovery in connection therewith that can be located after a reasonable search. Consistent with our August 5 letter, we confirm that we will produce in response to Plaintiffs' RFP Nos. 25, 26, and 61, responsive, non-privileged, non-immune documents in Defendants' possession, custody, or control. We understand that this dispute has been resolved.

#### B.    Discovery Scope and EGFR Inhibitors: Plaintiffs' RFP Nos. 1, 4, 15, 27, 28, 37, and 58 and ROG Nos. 5–7

In response to the above-listed requests, Plaintiffs' August 26 letter asks Defendants to confirm that we will apply the same scope of discovery that was agreed to for RFP No. 1 to these requests.  As an initial matter, we note that these re_uests are not identical in scope to, and do not seek the same information as, RFP No. 1. In an_ event, we confirm that sub_ect to our ob_ections and res_onses with res_ect to RFP Nos. 1, 4, 27, 28, 37, and 58, Defendants will _roduce relevant, _rivile_ed, res_onsive documents to the extent the_ exist, from the research and development of Tagrisso® during the period of January 2009 through November 13, 2015.

---

[1] Plaintiffs' September 16 email refers to ROG No. 9 with respect to the Related Patent Applications.  ROG No. 9 does not appear in your August 26 or September 1 letters, and ROG No. 9 does not request information related to the Related Patent Applications.  Accordingly, our response refers to ROG No. 16, which is directed to Defendants' knowledge of the Related Patent Applications.

**COVINGTON**

September 21, 2022
Page 4

As previously explained, we do not agree to produce documents in response to RFP No. 15. With respect to ROG Nos. 5–7, we do not agree that specific information or documents are responsive or relevant. *See infra* III.D.

### C.    Plaintiffs' RFP No. 1

At the parties' September 14 meet and confer, Plaintiffs seemed to ask Defendants to perform additional searches in response to Plaintiffs' RFP No. 1. Plaintiffs' September 16 email states that your request is "for documents relating to Defendants' efforts relating to gefitinib resistance, including the study of compounds to address this issue."

As an initial matter, Plaintiffs' new request is vague and ambiguous as least because it requests information that is not clearly within the scope of Plaintiffs' RFP No. 1. Plaintiffs' RFP No. 1 requests "documents and things related to any efforts in *develop in an EGFR inhibitor* to treat NSCLC (including NSCLC that is resistant to tyrosine kinase inhibitors), including Tagrisso®." Plaintiffs, however, now broadly request "efforts relating to gefitinib resistance" or "the *study* of compounds to address [gefitinib resistance]."

In any event, Defendants objected to Plaintiffs' RFP No. 1, among other reasons, because it is vague, overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to any party's claims or defenses. The parties have spent months discussing the scope of Plaintiffs' RFP No. 1 and, as explained at the September 14 meet and confer, Defendants have agreed to broad discovery with respect to the documents requested by Plaintiffs' RFP No. 1. In particular, Defendants have agreed to broad discovery related to AstraZeneca's efforts to develop an (irreversible) EGFR inhibitor, Tagrisso®—i.e., the product accused of practicing the methods of the Asserted Claims in this case. In addition to documents related to Tagrisso®, we have agreed to produce documents related to other EGFR inhibitors (irreversible and reversible) considered or evaluated during the course that development. We therefore maintain our objections and responses to Plaintiffs' RFP No. 1, including as articulated in our August 5 letter.

### D.    Plaintiffs' RPF No. 42

This request generally relates to any royalties and license fees paid by AstraZeneca to third parties in connection with Tagrisso®. Defendants have previously agreed to produce agreements that are comparable to a license that would result from a hypothetical reasonable royalty negotiation. During the August 31 meet and confer, Plaintiffs represented that the dispute would be resolved if Defendants confirmed that it has not agreed to pay any royalties or licenses fees. Defendants hereby confirm that AstraZeneca has not agreed to pay patent royalties or license fees in connection with Tagrisso® to any third party not affiliated with AstraZeneca.

### E.    Plaintiffs' ROG Nos. 5–7

In response to Plaintiffs' ROG Nos. 5–7, Plaintiffs' August 26 letter requests that Defendants confirm whether we will be producing "invention brochures, grant proposals, draft manuscripts, and decisions to put Tagrisso® into development, as well as documents reflecting the reasons for pursuing the development of an irreversible, rather than reversible, EGFR inhibitor for the treatment of gefitinib and/or erlotinib-resistant NSCLC." As an initial matter,

**COVINGTON**

September 21, 2022
Page 5

Defendants object to Plaintiffs efforts to convert an interrogatory into a request for production. In addition, we object to Plaintiffs' request as vague and ambiguous as it is not clear what documents are being requested or how these documents are necessarily responsive to the specific requests. In any event, Defendants cannot confirm that we will produce and/or identify these documents or certain information in response to Plaintiffs' ROG Nos. 5–7. Pursuant to Federal Rule of Civil Procedure 33(d), we have agreed to produce non-privileged, non-immune documents, to the extent they exist and can be found, sufficient to respond to these interrogatories. Plaintiffs' attempt to control Defendants' response, including with respect to Defendants' decisions or motivations, is improper. Defendants maintain our objections and responses to these interrogatories.

### F.    Plaintiffs' ROG No. 10

Plaintiffs' ROG No. 10 seeks information relating to the facts and circumstances relating to AstraZeneca's knowledge of Kwak (2005). We previously explained, including in our August 5 letter, that Plaintiffs request is not relevant and over broad, unduly burdensome, and disproportionate to the needs of the case. Kwak (2005) is not a Patent-in-Suit and Plaintiffs have not explained why you are entitled to discovery regarding knowledge of it.

In Plaintiffs' August 26 letter, you proposed limiting the scope of ROG No. 10 to the knowledge of the inventors of the Tagrisso® patents and the individuals "involved with the Tagrisso® 'project' in 2009 through the project's selection of osimertinib as the lead candidate and Tagrisso®'s FDA approval on November 13, 2015." Defendants do not agree that Plaintiffs' proposal reasonably limits the scope of this request. To the extent that Plaintiffs use the term "Tagrisso® patents" to refer to the patents that have been listed in the Orange Book with respect to Tagrisso®, Defendants do not agree that the knowledge of the inventors of those patents—which are not asserted in this case and are directed to inventions that are not at issue in this case—are relevant to this litigation. Defendants maintain our objections and responses to this request, including as provided in our August 5 letter.

### G.    Plaintiffs' ROG No. 15

Plaintiffs' ROG No. 15 requests that Defendants describe all irreversible EGFR inhibitors known to Defendants prior to February 3, 2005. As Defendants previously explained, including in our August 5 letter, the scope of this request is unreasonable. We have agreed to produce information that is responsive to this interrogatory and that can be located after a reasonable search. In Plaintiffs' August 26 letter, you requested Defendants confirm that the scope of Plaintiffs' ROG 15 includes "information from Defendants' former employees, insofar as the information is within the scope of ROG 15 and within 'Defendants' possession, custody, and control in Defendants' files.'" We do not understand what is not clear from our prior objections and responses, which we maintain.

**COVINGTON**

September 21, 2022
Page 6

Sincerely,

/s/ *Ashley Winkler*

Ashley Winkler


cc: Counsel of Record

# EXHIBIT 9

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**<u>Via Electronic Mail</u>**                                                October 14, 2022

Shehla Wynne
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> **_Re_:**   ***Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca***
> ***Pharmaceuticals LP & AstraZeneca AB***
> **(D.Del. No. 21-1338-MFK)**

Counsel,

Defendants disclosed 42 ESI search terms to Plaintiffs nearly seven weeks ago in a letter dated August 26, 2022. Defendants' proposed terms were reasonably focused to search for documents that are consistent with Defendants' objections and responses to Plaintiffs' discovery requests.

Since that time, we have negotiated in good faith to address Plaintiffs' requests for modifications and additions. With respect to several requests, however, Plaintiffs have maintained positions that are unreasonable, unduly burdensome, and not reasonably focused to the scope of discovery agreed to by Defendants or proportional to the relevant issues in this case. Still, in an effort to compromise and address Plaintiffs' concerns, we have repeatedly offered counter-proposals. Yet Plaintiffs continue to advance unreasonable requests.

As we have repeatedly explained, Defendants have been diligently working to perform our discovery obligations and meet the substantial completion deadline of November 10. Plaintiffs' delays followed by repeated unreasonable requests have prejudiced Defendants in our efforts to meet this deadline.

In view of the impending deadline, Defendants' will be performing proposed search numbers 1-42, as outlined in Defendants' August 26, 2022 letter. In addition, Defendants confirm that we will perform the following additional searches:

- Search numbers 1, 2, 14, and 24, as modified in Defendants' letter dated September 21, 2022.

**COVINGTON**

October 14, 2022
Page 2

- Search number 43 as modified in Defendants' email dated October 7, 2022.
- Search numbers 2, 6, 8, 16–21, 44, and 45 as described below.

Defendants maintain that these additional searches are irrelevant to the issues in the case and are unreasonably broad, but Defendants are willing to perform them in an effort to compromise. Defendants decline the remainder of Plaintiffs' proposed additions and modifications to our search terms, as these proposals remain unreasonable, unduly burdensome, and not reasonably focused to the scope of discovery agreed to by Defendants or proportional to the relevant issues in this case. To avoid any confusion, we have also attached a complete list of Defendants' searches as Appendix A.

**Defendants' Search No. 6**

Plaintiffs' requested search, including as proposed in your October 11 letter, is unduly burdensome and not reasonably focused to the issues of this case.  In light of the large number of custodial and non-custodial sources that Defendants have collected from and will search using search terms, a broad search for osimertinib terms is not reasonable unless sufficiently focused. Without limitations like "AND egfr" or "w/20", which Plaintiffs omit or modify, Plaintiffs' proposed search hits hundreds of thousands of documents, the vast majority of which are not likely to be relevant to any issue in this case. Even without accounting for the related family members, Defendants' modified search will already capture a large volume of documents. Moreover, as we further emphasized during the parties' October 7 meet and confer, Defendants' have proposed a number of additional searches that will also target responsive documents, to the extent they exist, related to Tagrisso®.

Defendants confirm that we will perform the following search:  ((NSCLC OR "non-small cell lung cancer" OR (lung w/5 cancer)) AND egfr AND (tagrisso OR osimertinib OR mereletinib OR AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) w/20 (T790M OR T766M).

**Defendants' Search No. 8**

As explained at the parties' October 7 meet and confer, Plaintiffs' requested search, including as proposed in your October 11 letter, is unduly burdensome and not reasonably focused at least because Plaintiffs request that Defendants modify Defendants' search number 8 to encompass, among other things, any and all documents that refer to the EGFR sensitizing mutations (i.e., exon 19 deletions or L858R mutations)—which are not recited in any of the Asserted Claims—without being limited by other terms that are reasonably related to the Asserted Claims. In an effort to compromise, we have already agreed to expand the scope of this search to reflect other modifications requested by Plaintiffs.

Defendants confirm that we will perform the following search: ((egfr w/2 mutat*) OR (egfr w/2 mutant*) AND ("exon 19" OR ex19del OR L858R) AND (T790M OR T766M) w/20 (detect* OR diagnos*)) AND (NSCLC OR "non-small cell lung cancer" OR (lung w/5 cancer)).

**COVINGTON**

October 14, 2022
Page 3

## Defendants' Search Nos. 16–21

Plaintiffs' requested search, including as proposed in your October 11 letter, is unduly burdensome and is not reasonably focused at least because Plaintiffs request that Defendants modify Defendants' searches 16–21 from a search of osimertinib terms "w/10" of other irreversible EGFR inhibitors to a search of osimertinib terms "or" other inhibitors.[1] In an effort to compromise, we previously offered to modify "w/10" to "w/20."

In Plaintiffs' October 3 letter, requesting a similar modification, Plaintiffs stated that Plaintiffs proposed modification is required to search for documents in response to Plaintiffs' RPF No. 4. As we explained during the parties' October 7 meet and confer related to Defendants' and Puma's proposed search terms, Plaintiffs' RFP No. 4 requests "documents and things concerning any *comparison* . . . of Tagrisso® with any EGFR inhibitor." Defendants proposed search using a conjunctive term connecting Tagrisso® to other EGFR inhibitors reasonably pursues a search for such comparisons, whereas Plaintiffs' proposed search using the alternative "or" does not. In addition, as we further emphasized during the parties' meet and confer, Defendants have proposed a number of other searches that are also likely to target documents, to the extent they exist, responsive to Plaintiffs' RFPs, including RFP No. 4.

Accordingly, Defendants confirm that we will perform the following search: (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso OR mereletinib)) w/20 ("CL-387,785" OR CL387785 OR CL-387785 OR EKB-569 OR EKB569 OR "EKB 569" OR pelitinib OR HKI-272 OR HKI272 OR "HKI272" OR neratinib OR nerlynx OR HKI-357 OR HKI357 OR "HKI357" OR dacomitinib OR vizimpro OR CI-1033 OR CI1033 OR "CI 1033" or canertinib).

## Defendants' Search No. 2

Defendants maintain that Plaintiffs' requested search is not reasonably focused to the issues in this case as least because it seeks discovery of a foreign patent that is not asserted in this case nor relevant to any issue in this case. As Defendants have repeatedly explained through numerous letters and at various meet and confers, Plaintiffs have not provided any reason that the foreign patent is relevant to any issue. The only basis Plaintiffs have provided for searching the foreign patent is because, according to Plaintiffs, it is relevant to willfulness. But, as we have previously explained, knowledge (if any) of a foreign patent is not relevant to knowledge of infringement of the Patents-in-Suit. Thus, contrary to Plaintiffs' assertions, the foreign patent is not relevant to willfulness.

---

[1] We note that Plaintiffs' October 11 letter appears to use red font to indicate modifications. Even though Plaintiffs do not emphasize this change with red, it is clearly a modification to Defendants' proposed search.

**COVINGTON**

October 14, 2022
Page 4

In an effort to compromise with Plaintiffs and resolve the dispute, Defendants will perform the following search: ("EP1848414" OR "1848414" OR (414 w/2 pat*) OR (EP 414 w/2 pat*) OR "06720163.2" OR 1,848,414 OR (EP w/5 414)).

Defendants are undertaking this search only in an effort to compromise. Defendants maintain that it is not relevant to any issue in this case.

**Defendants' Search No. 45**

Defendants maintain that Plaintiffs' requested search is not reasonably focused to the issues in this case at least because it purportedly seeks discovery of various scientific publications. For example, these publications are not the Patents-in-Suit, were not published by Defendants, and do not relate to Tagrisso®. With respect to Kwak, Defendants have repeatedly requested in numerous letters and during various meet and confers, for Plaintiffs' rationale as to why Kwak is relevant to any issue in this case. Plaintiffs still have not provided any reasonable response to these requests. As Plaintiffs are well aware, knowledge of a publication is not knowledge of infringement of the Patents-in-Suit, and is not relevant to any issue in this case. Likewise, with respect to Plaintiffs' request to search "Lynch," Plaintiffs have not articulated any reason why this term is reasonable or relevant. Indeed, Dr. Lynch is not a named inventor on either of the Patents-in-Suit. Moreover, as addressed with Defendants' Search No. 44, we do not understand Plaintiffs' statement that you are entitled to a search of non-custodial documents.

In an effort to compromise with Plaintiffs and resolve the dispute, Defendants will perform the following search: Kwak.

Defendants are undertaking this search only in an effort to compromise. Defendants maintain that it is not relevant to any issue in this case.

**Defendants' Search No. 44**

In your October 11 letter, Plaintiffs confirmed you will search: Puma AND (licen* OR patent* OR ip OR "intellectual property" OR agreement).

Defendants confirm that we will search: Puma AND (licens* OR agree*) AND (patent* OR "IP" OR "Intellectual Property" OR "FTO" or "freedom to operate" OR (freedom w/2 operate)).

Sincerely,

Ashley Winkler

Ashley Winkler

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T   +1 202 662 6000

## APPENDIX A

| No. | Defendants' Search |
|---|---|
| 1a | "10,596,162" OR 10596162 OR "10,603,314" OR 10603314 |
| 1b | "10 596 162" OR "10,596,162" OR 10596162 OR (162 w/2 patent*) OR ("10 603 314" OR "10,603,314" OR 10603314 OR (314 w/2 patent*)) OR (15207349 OR "15/207,349" OR "15/207349" OR (349 w/2 app*)) OR 11883474 OR "11/883,474" OR "11/883474" OR (474 w/2 app*) |
| 2a | "WO 2006/084,058" OR "WO 2006/084058" |
| 2b | WO2006084058 OR "WO 2006/084,058" OR "WO 2006/084058" OR (WO w/5 058) |
| 2c | ("EP1848414" OR "1848414" OR (414 w/2 pat*) OR (EP 414 w/2 pat*) OR "06720163.2" OR 1,848,414 OR (EP w/5 414)) |
| 3 | "egfrm project" |
| 4 | "egfrm pt" |
| 5 | "egfrm ptm" |
| 6a | ("metastatic NSCLC" OR  "metastatic non-small cell lung cancer") w/20 (egfr AND (tagrisso OR osimertinib) AND T790M AND progress*) |
| 6b | ((NSCLC OR "non-small cell lung cancer" OR (lung w/5 cancer)) AND egfr AND (tagrisso OR osimertinib OR mereletinib OR AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) w/20 (T790M OR T766M) |
| 7 | ("metastatic NSCLC" OR  "metastatic non-small cell lung cancer") w/20 (egfr AND (tagrisso OR osimertinib) AND T790M AND resist*) |
| 8a | ((egfr AND (mutat* OR mutant*) AND (detect* OR diagnos*)) w/20 ("exon 19" OR ex19del OR L858R) AND T790M |
| 8b | ((egfr w/2 mutat*) OR (egfr w/2 mutant*) AND ("exon 19" OR ex19del OR L858R) AND (T790M OR T766M) w/20 (detect* OR diagnos*)) AND (NSCLC OR "non-small cell lung cancer" OR (lung w/5 cancer)) |
| 9 | ((egfr AND T790M) AND (NSCLC OR "non-small cell lung cancer")) w/20 (erbb2 OR erb-b2 OR "erb b2" OR "cysteine 805" OR cys805 OR cys-805 OR C805 OR C-805) |
| 10 | ((egfr AND covalent*) AND (NSCLC OR "non-small cell lung cancer")) w/20 (erbb2 OR erb-b2 OR "erb b2" OR "cysteine 805" OR cys805 OR cys-805 OR C805 OR C-805) |
| 11 | ((egfr AND permanent*) AND (NSCLC OR "non-small cell lung cancer")) w/20 (erbb2 OR erb-b2 OR "erb b2" OR "cysteine 805" OR cys805 OR cys-805 OR C805 OR C-805) |
| 12 | ((egfr AND irreversibl*) AND (NSCLC OR "non-small cell lung cancer")) w/20 (erbb2 OR erb-b2 OR "erb b2" OR "cysteine 805" OR cys805 OR cys-805 OR C805 OR C-805) |
| 13 | (((tagrisso OR osimertinib) AND ("metastatic NSCLC" OR  "metastatic non-small cell lung cancer")) w/20 ("exon 19" OR ex19del OR L858R)) AND T790M |
| 14a | (NDA OR "new drug application") w/20 208065 |
| 14b | (NDA OR "new drug application" OR tagrisso OR osimertinib OR mereletinib OR |

**COVINGTON**

October 14, 2022
Page 6

| No. | Defendants' Search |
|---|---|
| | AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291) w/20 208065 |
| 15a | ((egfr AND ("metastatic NSCLC" OR "metastatic non-small cell lung cancer")) w/20 ("exon 19" OR ex19del OR L858R)) AND T790M |
| 16a | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso) w/10 ("CL-378,785" OR CL-378785 OR CL378785) |
| 17a | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso)) w/10 (EKB-569 OR EKB569 OR "EKB 569" OR pelitinib) |
| 18a | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso)) w/10 (HKI-272 OR HKI272 OR "HKI 272" OR neratinib OR nerlynx) |
| 19a | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso)) w/10 (HKI-357 OR HKI357 OR "HKI 357") |
| 20a | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso)) w/10 (dacomitinib OR vizimpro) |
| 21a | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso)) w/20 (CI-1033 OR CI1033 OR "CI 1033" OR canertinib) |
| 16a to 21b | (egfr AND (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291 OR osimertinib OR tagrisso OR mereletinib)) w/20 ("CL-387,785" OR CL387785 OR CL-387785 OR EKB-569 OR EKB569 OR "EKB 569" OR pelitinib OR HKI-272 OR HKI272 OR "HKI272" OR neratinib OR nerlynx OR HKI-357 OR HKI357 OR "HKI-357" OR dacomitinib OR vizimpro OR CI-1033 OR CI1033 OR "CI 1033" or canertinib) |
| 22 | ((egfr AND (NSCLC OR "non-small cell lung cancer")) w/20 ("exon 19" OR ex19del OR L858R)) AND (T790M w/5 ("de novo" or pretreat*)) |
| 23 | ((egfr AND (NSCLC OR "non-small cell lung cancer")) w/30 ("exon 19" OR ex19del OR L858R)) AND (tumor w/5 resect*) AND T790M |
| 24a | (egfr AND (permanent* OR irreversibl*)) w/20 ("cysteine 773" OR cys773 OR cys-773 OR C773 OR C-773 OR "cysteine 797" OR cys797 OR cys-797 OR c797 OR c-797) |
| 24b | (egfr AND inhibit*) AND ("cysteine 773" OR cys773 OR cys-773 OR C773 OR C-773 OR "cysteine 797" OR cys797 OR cys-797 OR c797 OR c-797) |
| 25 | (egfr AND T790M) w/20 ("cysteine 773" OR cys773 OR cys-773 OR C773 OR C-773 OR "cysteine 797" OR cys797 OR cys-797 OR c797 OR c-797) |
| 26 | (egfr AND covalent*) w/20 ("cysteine 773" OR cys773 OR cys-773 OR C773 OR C-773 OR "cysteine 797" OR cys797 OR cys-797 OR c797 OR c-797) |
| 27 | (egfr AND irreversibl*) w/20 ("cysteine 773" OR cys773 OR cys-773 OR C773 OR C-773 OR "cysteine 797" OR cys797 OR cys-797 OR c797 OR c-797) |
| 28 | egfr AND T790M AND ((erlotinib OR tarceva) w/10 ((resist* OR progress*) w/5 (NSCLC OR "non-small cell lung cancer"))) |
| 29 | egfr AND T790M AND ((gefitinib OR iressa) w/10 ((resist* OR progress*) w/5 (NSCLC OR "non-small cell lung cancer"))) |
| 30 | egfrm AND ((erlotinib OR tarceva) w/10 (progress* w/5 (NSCLC OR "non-small cell lung cancer"))) |
| 31 | egfrm AND ((erlotinib OR tarceva) w/10 (resist* w/5 (NSCLC OR "non-small cell lung cancer"))) |
| 32 | egfrm AND ((gefitinib OR iressa) w/10 (progress* w/5 (NSCLC OR "non-small cell lung cancer"))) |
| 33 | egfrm AND ((gefitinib OR iressa) w/10 (resist* w/5 (NSCLC OR "non-small cell lung cancer"))) |

**COVINGTON**

October 14, 2022
Page 7

| No. | Defendants' Search |
|-----|--------------------|
| 34 | egfrm AND (T790M w/20 (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) |
| 35 | egfrm AND (covalent* w/20 (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) |
| 36 | egfrm AND (inhibit* w/20 (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) |
| 37 | egfrm AND (irreversibl* w/20 (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) |
| 38 | egfrm AND (permanent* w/20 (AZ2748 OR AZ'2748 OR AZ13552748 OR AZD9291)) |
| 39 | egfrm AND covalent* AND (T790M w/20 (L858R OR "exon 19" OR ex19del)) |
| 40 | egfrm AND inhibit* AND (T790M w/20 (L858R OR "exon 19" OR ex19del)) |
| 41 | egfrm AND irreversibl* AND (T790M w/20 (L858R OR "exon 19" OR ex19del)) |
| 42 | egfrm AND permanent* AND (T790M w/20 (L858R OR "exon 19" OR ex 19del)) |
| 43 | (gefitinib OR erlotinib OR tarceva OR iressa) w/10 (resist* OR progress* OR respon* OR non-respons*) AND (NSCLC or "non-small cell lung cancer" OR (lung w/5 cancer)) |
| 44 | Puma AND (licens* OR agree*) AND (patent* OR "IP" OR "Intellectual Property" OR "FTO" or "freedom to operate" OR (freedom w/2 operate)) |
| 45 | Kwak |

# EXHIBIT 10

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

**<u>Via Electronic Mail</u>**                                           October 17, 2022

Shehla Wynne
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> ***Re***:   ***Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca***
> ***Pharmaceuticals LP & AstraZeneca AB***
> **(D. Del. No. 21-1338-MFK)**

Counsel,

We write in response to Plaintiffs' letter dated October 4.

## I.      Scheduled for Contention Interrogatories

Plaintiffs have proposed that the parties agree to respond to contention interrogatories no later than December 15, 2022. We do not agree that responses to these interrogatories should be as early as December. Moreover, to avoid any doubt, any agreed-upon deadline to respond should not preclude amendment or supplementation through the end of fact discovery, in accordance with governing Federal and Local Rules.

Nor do Defendants agree that the deadline for contention interrogatories should simultaneously apply to responses to Plaintiffs' Interrogatory No. 13 and Defendants' Interrogatory No 6. These interrogatories relate to determining what constitutes a reasonable royalty. If a deadline is set, as the party asserting patent infringement and entitlement to damages, Plaintiffs' deadline to respond to Defendants' Interrogatory No. 6 should precede Defendants' response to Plaintiffs' Interrogatory No. 13.

## II.     Plaintiffs' Interrogatory No. 16

Plaintiffs ask that Defendants confirm that we will supplement our response to Plaintiffs' Interrogatory No. 16.  Plaintiffs incorrectly suggest that a failure to do so is a failure to comply with our discovery obligations.  Defendants will perform a search consistent with our discovery obligations and will supplement our response to the extent relevant, non-privileged information

**COVINGTON**

October 17, 2022
Page 2

is discovered. Plaintiffs also ask that we identify the person(s) most knowledgeable concerning the information requested in Interrogatory No. 16. We note that Defendants' Interrogatory Nos. 6, 8, and 9 ask that Plaintiffs identify the individuals most knowledgeable to those interrogatories. Yet you have not done so. We expect that Plaintiffs will likewise comply with your discovery obligations by supplementing your responses to these interrogatories.

## III.   Plaintiffs' Discovery Related to EP'414

Plaintiffs continue to assert that you are entitled to discovery of Defendants' knowledge of EP'414. As we have repeatedly explained, Plaintiffs have not provided any basis that such discovery is relevant or reasonably proportional to the claims and defenses in this case. Even in your October 4 letter, Plaintiffs summarily assert that information related to EP'414 is relevant to preissuance damages but again fail to explain how that could be true. It is not. Though preissuance damages require a published application with substantially similar claims, 35 U.S.C. § 154(d), Plaintiffs (unsurprisingly) do not rely on claims published in EP'414 patent. *See* Plaintiffs' Complaint (D.I. 1); Plaintiffs' Objections and Responses to Defendants' Interrogatory No. 12 (Aug. 24, 2022). The foreign counterpart is irrelevant to Plaintiffs' claim for preissuance damages.

Nor is the foreign counterpart relevant to willfulness. Notably, Defendants have already agreed to produce discovery related to Defendants' knowledge of the patents-in-suit and related patent applications, including WO'058. Your October 4 letter asserts without legal support that Plaintiffs may pursue discovery of a foreign counterpart merely as part of the totality of the circumstances of willfulness. That the totality of relevant circumstances may be used to evaluate willfulness does not entitle Plaintiffs to discovery of irrelevant evidence. Indeed, in *Biomerieux, S.A. v. Hologic, Inc.*, No. 18-cv-21, D.I. 406, *22–24 (D. Del. Feb. 13, 2020), the Court considered the totality of the circumstances—citing among other cases *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 107 (2016)—and concluded that knowledge of a foreign counterpart did not support a finding of willfulness. And contrary to Plaintiffs' unsupported arguments, nothing in the record establishes that the patentee in that case was entitled to discovery of the defendant's knowledge of the foreign counterpart. *See Biomerieux, S.A. v. Hologic, Inc.*, No. 18-cv-21, D.I. 132, ¶¶42-43 (D. Del. Sept. 28, 2018).

As explained in our October 14 letter related to Defendants' ESI search terms, we have a_reed to a__l  Plaintiffs' re_uested search for EP'414 terms, but onl_ in an attem_t to compromise.  Defendants' maintain that Defendants' knowledge of EP'414 is irrelevant to any issue and that Plaintiffs have not shown otherwise.

## IV.   Discovery Scope Concerning EGFR Inhibitors

Contrary to Plaintiffs' misrepresentations, Defendants do not impose a disproportionate discovery burden on Plaintiffs. Rather, it is Plaintiffs, not Defendants, who continue to unreasonably limit the discovery you will pursue and produce.

Defendants have alread_ a_reed to broad discovery related to the issues in this case.  In _articular, Defendants have a_reed to broad discover_ related to the develo_ment of the Ta_risso®—the marketin_ of which Plaintiffs assert induces infringement of certain method of treatment claims—as well as other irreversible EGFR inhibitors considered or evaluated during

**COVINGTON**

October 17, 2022
Page 3

the develo_ment of Ta_risso®. For exam_le, we have a_reed to _roduce documents _re-datin_ the identification of osimertinib as a lead candidate for the active ingredient, documents through pre-clinical and clinical development, documents and communications related to re_ulator_ approval, and information related to marketin_ Ta_risso®. We have disclosed ten different custodians to cover the various stages of Tagrisso®'s development and marketing. We have also agreed to search non-custodial sources.

As to Plaintiffs' requests for discovery, your requests have continued to shift and have been vague and ambiguous. We have negotiated in good faith and we do not understand what additional information Plaintiffs are seeking.

As previously explained, to the extent Plaintiffs request that Defendants' identify particular documents in response to Plaintiffs' Interrogatory Nos. 5-7, we object to Plaintiffs' attempt to convert an interrogatory into a request for production. In addition, as we have further previously explained, these interrogatories are related to AstaZeneca's decision-making. We object to Plaintiffs' attempt to compel Defendants to rely on particular documents to explain Defendants' decision-making. Thus, as provided in our response to these interrogatories, pursuant to Federal Rule of Civil Procedure 33(d), we will produce non-privileged, non-immune documents, to the extent they exist and can be found, sufficient to respond to these interrogatories.

Plaintiffs appear to request that we confirm that we intend to produce certain documents that you assert are responsive to at least your RFP Nos. 1 and 59. Plaintiffs' RFP No. 1 requests "documents and things related to any efforts in developing an EGFR inhibitor to treat NSCLC (including NSCLC that is resistant to tyrosine kinase inhibitors), including Tagrisso®." The parties' previously discussed the over-broad nature of this request and after meeting and conferring, months ago we agreed to produce documents and things, to the extent they exist, related to EGFR inhibitors (reversible and irreversible) considered or evaluated during the development of Tagrisso®. In contrast, and in spite of Plaintiffs' argument that Defendants' discovery burden is disproportionate, Plaintiffs have seemingly limited your discovery to only the inhibitors identified in the patents-in-suit and their prosecution histories, even after Defendants specifically identified other irreversible EGFR inhibitors developed by Plaintiffs and their affiliate Pfizer.

Plaintiffs' RFP No. 59 is a broad and ambiguous request seeking documents "related to any efforts in developing any irreversible EGFR inhibitor not specifically addressed in Request Nos. 1-57." As explained in Defendants' objections and response to RFP No. 59, this request is vague, overly broad, unduly burdensome, disproportionate to the needs of the case, and seeks information not relevant to any party's claims or defenses. Plaintiffs have not made any efforts to narrow or clarify this request. Thus, we have not agreed to search for documents beyond those being produced in response to Plaintiffs' (many) other requests. Plaintiffs cannot rely on this request to pursue vague and burdensome discovery that was not included in your requests for production.

Your October 4 letter (for the first time), requests that we confirm that we intend to produce investigator brochures. We confirm that we intend to produce investigator brochures related to Tagrisso®. Based on your position that investigator brochures are relevant to the development of EGFR inhibitors, we understand that Plaintiffs will likewise produce investigator

**COVINGTON**

October 17, 2022
Page 4

brochures related to EGFR inhibitors developed by Plaintiffs, including neratinib and dacomitinib. Please confirm that you will do so.

Plaintiffs also ask us to confirm that we "intend to produce . . . invention disclosure forms, grant proposals, draft manuscripts, and decisions to put Tagrisso® or other EGFR reversible inhibitors into pre-clinical or clinical development, as well as documents reflecting the reasons for pursuing such further studies of an irreversible, rather than reversible, EGFR inhibitor for the treatment of gefitinib and/or erlotinib-resistant NSCLC." Plaintiffs' request is not clear.

Beyond our agreement to produce and identify documents sufficient to answer Plaintiffs' Interrogatory Nos. 5-7, in response to Plaintiffs' requests for production, we have also already agreed to produce at least the following:

- In response to Plaintiffs' RFP No. 27, we already agreed to produce, to the extent they exist and can be found after a reasonable search, "copies of non-privileged responsive documents . . . related to the efficacy or therapeutic effectiveness of Tagrisso® or irreversible inhibitors identified in the patents-in-suit or their prosecution histories."

- In response to Plaintiffs' RFP No. 28, we already agreed to produce, to the extent they exist and can be found after a reasonable search, "copies of non-privileged documents . . . evidencing or reflecting the factors Defendants considered in deciding to seek FDA approval to market Tagrisso®."

- In response to Plaintiffs' RFP No. 37, we already agreed to produce, to the extent they exist and can be found after a reasonable search, "copies of non-privileged responsive documents . . . concerning AstraZeneca's reasons for seeking to produce and/or market Tagrisso®."

We do not understand what additional discovery Plaintiffs are asking for, how you expect us to conduct such a search, or where such discovery was included in your requests for production.

Moreover, consistent with Plaintiffs' pattern of shiftin_ discover_ re_uests, our October 4 letter asserts (for the first time), that Defendants should have disclosed Antoine Yver, Raymond Finlay, and Egle Avizienyte as ESI custodians. Your assertion is remarkable in light of the substantially narrower scope of discovery that Plaintiffs have proposed. For example, our ESI disclosures already identify a number of scientists that were involved in the development of Tagrisso®. In contrast, Plaintiffs have identified only a single named inventor, and despite being the patent assignees and licensees, Plaintiffs have not made any effort to provide a reasonable scope of discovery related to the invention and licensing of the patents-in-suit. Nor is it clear whether Plaintiffs have identified scientists or other individuals related to the development of irreversible EGFR inhibitors as a treatment for NSCLC, including those identified in the patents-in-suit and their prosecutions histories, and includin_ neratinib and dacomitinib, which are marketed by Plaintiffs and Pfizer. Despite being burdensome and duplicative, we are willing to search the custodial files of Dr. Finlay if Plaintiffs will likewise expand your search for responsive information by identifying another relevant custodian related to the development of the technology claimed in the patents-in-suit. Plaintiffs should also respond to Defendants'

**COVINGTON**

October 17, 2022
Page 5

September 12 letter confirming that you will search for and produce documents and information related to Pfizer's irreversible EGFR inhibitors mavelertinib and PF-06459988, consistent with your prior agreement to produce information related to other inhibitors identified through discovery.

## V.   Plaintiffs' Request for Production No. 15

In Plaintiffs' October 4 letter, you stated that our refusal to produce documents related to Nadia Godin-He mann is not ustified. We have repeatedly explained that Dr. Godin-Heymann was not involved in the development of Tagrisso®. ████████████████████████████████████
████████████████████████████████████████████████████████████████████

## VI.   Other Discovery Requests

### A.   Plaintiffs' Request for Production No. 43 and Interrogatory No. 4

In your October 4 letter, you offer to narrow the scope of these requests to "all the agreements related to intellectual property for the research, development, offers to sell, and sale of Tagrisso® in the United States, including agreements involving patents, patent applications, and know-how." We are considering your proposal and will follow up.

### B.   Plaintiffs' Interrogatory Nos. 5-7

Plaintiffs' October 4 letter asks (for the first time) that Defendants "confirm whether [our] responses to these interrogatories are limited to the research and development of Tagrisso®." We do not understand your request.

Plaintiffs' Interrogatory Nos. 6 and 7 relate to Tagrisso®. For example, Interrogatory No. 6 requests information related to "Defendants' decision to develop Tagrisso® as an irreversible inhibitor of EGFR," and Interrogatory No. 7 requests information related to Defendants' decision to pursue FDA approval to market Tagrisso®." Thus, these requests do not seek information beyond the research and development of Tagrisso®.

As to Plaintiffs' Interrogatory No. 5, which requests information related to "Defendants' efforts to develop irreversible EGFR inhibitors for treatment of gefitinib- and/or erlotinib-resistant NSCLC," we have been clear that we will produce information related to other irreversible EGFR inhibitors considered or evaluated during the development of Tagrisso®. Thus, your statement that "[i]t is clear that Defendants are not intending to produce any documents pertaining to the research and development of any EGFR inhibitors other than Tagrisso®" is plainly false. We do not understand what additional information you want us to search for or produce, or how you expect us to conduct such a search. We note that Plaintiffs have refused to search for or produce documents related to irreversible EGFR inhibitors that are not expressly disclosed by the patents-in-suit or their prosecution histories. ████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████

**COVINGTON**

October 17, 2022
Page 6

      **C.**      **Plaintiffs' Interrogatory No. 10**

      Plaintiffs still cannot show why Defendants' knowledge of a scientific publication is relevant to the issues in this case.  In your October 4 letter, you assert without any legal support that Defendants' knowledge of Kwak is relevant to copying.  It is not.  As Plaintiffs are well aware, the Kwak publication is not a patent-in-suit.  Nor does Plaintiffs' argument that Dr. Avizienyte cited Kwak in a publication unrelated to Tagrisso® show that the requested information would be relevant to the issues in this case.

      As explained in our October 14 letter related to Defendants' ESI search terms, we have agreed to apply the term "Kwak," but only in an attempt to compromise.  Defendants' maintain that Defendants' knowledge of the Kwak publication is irrelevant to any issue and that Plaintiffs have not shown otherwise.

                                                          Regards,

                                                       */s/ Ashley Winkler*

                                                       Ashley Winkler

cc: Counsel of Record

# EXHIBIT 11

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

**Via Electronic Mail**                                    December 23, 2022

Gasper J. LaRosa
Jones Day
250 Vesey Street
New York, NY 10281

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> **Re:**   ***Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca***
> ***Pharmaceuticals LP & AstraZeneca AB***
> **(D. Del. No. 21-1338-MFK)**

Counsel,

We write to address certain inaccuracies in Plaintiffs' letters dated December 2 and 14, 2022. We reserve our right to address other issues.

## I.   Discovery Related to the Patents-in-Suit, Related Patents, and Related Patent Applications

Plaintiffs' December 14 letter incorrectly states that Defendants have limited our responses to Defendants' "first knowledge" of the Patents-in-Suit and the applications leading to the Patents-in-Suit. For example, Plaintiffs' RFP No. 11 broadl re uests "[a]ll documents and thin s concerning the Patents-in-Suit and Related Patents." Followin corres ondence and conferences between the arties related to clarif in the sco e of Plaintiffs' re uest, in our Au ust 5 letter to Defendants, we a reed to roduce in response to RFP No. 11, to the extent the exist and can be found after a reasonable search, non- rivile ed, non-immune documents that mention the Patents-in-Suit and Related Patents. We have done so.

To the extent Plaintiffs also demand that, in response

In Plaintiffs' December 14 letter, ou i nore that, at least in response to Plaintiffs' ROG No. 16, Defendants a reed to erform a reasonable search to roduce, to the extent the exist and can be found, responsive, non-privileged, non-immune documents in Defendants' possession, sufficient

**COVINGTON**

December 23, 2022
Page 2

to show the circumstances related to Defendants' knowledge of WO 2006/084058. Again, we have done so. *See* Letter to Plaintiffs (dated November 30, 2022).

## II.   Discovery Related to the Foreign Counterpart

Plaintiffs have not shown that Defendants' knowledge of EP'414 is relevant to any issue in this case. Nonetheless, as you acknowledge, we endeavored to compromise and searched the files of more than ten custodians related to various states of the Tagrisso®'s development with searches that included the numbers of the patents and applications related to the Patents-in-Suit, including EP'414.

## III.   Discovery Scope Concerning EGFR Inhibitors (RFP Nos. 1, 4, 12, 15, 27, 28, 37, 58 and ROG Nos. 5–7, 10, 15)

For months, Defendants have explained that we do not understand what additional searches Plaintiffs are requesting with regard to our correspondence related to the "discovery scope concerning EGFR inhibitors." We have repeatedly asked, including at the parties' meet-and-confer on December 7, 2022, that Plaintiffs clarify what specific information Plaintiffs are requesting us to search.

Based on your statements at the December 7 meet-and-confer and in your December 14 letter, we understand that Plaintiffs are now asking us to confirm whether there were any other efforts at AstraZeneca to overcome gefitinib resistance beyond AstraZeneca's efforts to develop Tagrisso®. As an initial matter, we object to Plaintiffs' attempt to impose a greater discovery burden on Defendants by demanding searches beyond Tagrisso®, where, despite repeated requests and conferences, Plaintiffs have refused to perform any search for Plaintiffs' efforts to develop irreversible EGFR inhibitors beyond those expressly identified by Defendants. *See, e.g.*, Letter to Plaintiffs (Sept. 12, 2022); Letter to Defendants (Aug. 23, 2022); Letter to Plaintiffs (Aug. 4, 2022).

We further note that, unlike Plaintiffs, our search for documents related to the development of Tagrisso® was not limited to the osimertinib compound, but further included a search for any EGFR inhibitors (reversible and irreversible) that were considered and evaluated during the development project that led to Tagrisso®. And, unlike Plaintiffs, Defendants' applied broad search terms across more than ten custodians, including numerous searches that were not restricted to Tagrisso®. By your demand for additional searches, we understand that Plaintiffs will likewise search for other efforts to develop irreversible EGFR inhibitors beyond those that have specifically been identified.

Nonetheless, in effort to compromise, we confirm that we are not aware of any efforts at AstraZeneca to develop an EGFR inhibitor to overcome gefitinib resistance before the development project that led to Tagrisso®. To be clear, we do not agree that this information is relevant or responsive to each of the RFPs identified by Plaintiffs and by providing this information to Plaintiffs we do not waive any objection for an individual request.

**COVINGTON**

December 23, 2022
Page 3

## IV.    Plaintiffs' RFP No. 17

In Defendants' November 30 letter, we explained that we were willing to meet and confer regarding the scope of Plaintiffs' RFP No. 17, if Plaintiffs are likewise willing to confer regarding the scope of documents you will produce in response to Defendants' RFP No. 84. Your December 14, 2022 letter is not responsive. Please advise if Plaintiffs are willing to confer regarding the scope of discovery related to these requests.

## V.    Defendants' RFP Nos. 40–41, and Plaintiffs' RFP Nos. 71–72

During the December 7 meet and confer, Plaintiffs acknowledged that statements and representations that the Plaintiffs and patentees have made regarding the Patents-in-Suit and any Related Patent are directly relevant to a variety of issues in this case. Today, more than one month after the substantial completion deadline, Plaintiffs finally produced substantial discovery related to Plaintiffs' and patentees' statements made to governmental authorities during the prosecution of applications related to the Patents-in-Suit. We are reviewing this production.

At the December 7 meet-and-confer, Defendants reiterated, as previously explained, that Plaintiffs' and patentees' statements related to the Foreign Counterpart in a request or application for Supplementary Patent Certification are statements made to a governmental body or regulatory authority and are relevant to several issues, including claim construction, infringement, and invalidity. Plaintiffs, however, have refused to produce such documents.

In an effort to compromise, at the December 7 meet and confer, we asked whether Plaintiffs would consider a proposal whereby Plaintiffs would produce documents and information related to any request or application for a Supplementary Protection Certification related to the EP '414 patent, *see* Defendants' RFP No. 41, and in exchange Defendants would produce documents "related to statements made by or on behalf of [AstraZeneca] in Civil Action No. 1:20-cv-00202-UNA about the history and need for the development of Tagrisso® and the mechanism of action of Tagrisso®," *see* Plaintiffs' RFP Nos. 71–72; Plaintiffs' Letter to Defendants (dated December 2, 2022). At the December 7 meet and confer, Plaintiffs indicated that you would confer regarding our proposal, but Plaintiffs' December 14 letter is silent as to it. Please advise whether Plaintiffs are willing to agree to an exchange as discussed at the December 7 meet-and-confer and described herein.

## VI.    Custodial Documents of Mark Anderton

We confirm that we searched for custodial documents of Mark Anderton, and we produced non-duplicative documents with Defendants' Production Volume AZ-PW-TAG007 bearing bates numbers AZ-PW-TAG00317375 through AZ-PW-TAG00340347.

## VII.    Plaintiffs' RFP No. 75

Plaintiffs' RFP No. 75 seeks information concerning the tests for the detection of EGFR mutations, including exon 19 deletions or exon 21 L858R mutations, including, but not limited to laboratory methods and FDA-approved diagnostic testing methods, such as Cobas® EGFR Mutation Test. As we have repeatedly explained through prior correspondence and conferences, exon 19 and exon 21 L858R mutations are not relevant to any issue in this case, and the request

**COVINGTON**

December 23, 2022
Page 4

directed generally to "EGFR mutations" is vague and ambiguous. Plaintiffs have not shown otherwise. Nor have Plaintiffs disputed that the Asserted Claims do not recite exon 19 deletions or exon 21 L858R mutations.

In Plaintiffs' December 2 letter, Plaintiffs stated that you understand that Defendants are no longer pursuing an invalidity defense based on the methodology used to determine resistance because Defendants stated that "EGFR sensitizing mutations (including exon 19 deletions and exon 21 L858R mutations) are not relevant." Plaintiffs are mistaken.

As explained in our letter dated November 30, 2022, Plaintiffs' RFP No. 75 is unrelated to Defendants' invalidity contention. Defendants' indefiniteness contention is analyzed from *the time of the invention*, which Plaintiffs' assert was no later than February 3, 2005, *see* Plaintiffs' Response to Defendants' Interrogatory No. 2 (dated Mar. 28, 2022). Indeed, Plaintiffs' November 10 letter recognizes that Defendants' invalidity contention involves whether "a person of ordinary skill *at the time of invention* could [] determine whether a patient has 'gefitinib and/or erlotinib resistant cancer.'" Plaintiffs' Letter to Defendants (dated November 10, 2022) (citing Defendants' Invalidity Contentions at 336) (emphasis added). FDA-approved diagnostic testing approved after the time of invention is not relevant to what a POSA would have known at the time of invention of the Patents-in-Suit. For example, the Cobas® EGFR Mutation Test was not approved for more than 10 years after Plaintiffs' alleged time of invention for the Asserted Claims.

Defendants maintain the full scope of our invalidity contentions. We will produce information related to our contentions consistent with Defendants' discovery responses and with the scheduling order, including through expert discovery.

Regards,

*/s/ Ashley Winkler*

Ashley Winkler

cc: Counsel of Record

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 21-1338-CFC |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO
PARAGRAPH 3(a)-(c) OF DEFAULT STANDARD FOR DISCOVERY**

Pursuant to Paragraph 3(a)–(c) of the Default Standard for Discovery, plaintiffs and counterclaim defendants Puma Biotechnology, Inc. ("Puma") and Wyeth LLC ("Wyeth") (collectively, "Plaintiffs") hereby make the following initial disclosures without prejudice to Plaintiffs' right to supplement or amend these disclosures as discovery continues.

**A.       Paragraph 3(a):  Custodians**

Plaintiffs identify the following custodians who they presently believe are most likely to have discoverable information relevant to this case in their possession, custody, or control.

1

| Name & Title | Role in the Dispute & Subject Matter of Information |
|---|---|
| **Sridhar Krishna Rabindran**<br><br>Clinical Trial Lead, Oncology Clinical Development, Bristol Myers Squibb (Former Associate Director, Biology Discovery Team Leader, Wyeth) | Co-inventor of each of the Patents-in-Suit.<br><br>Certain information concerning the research, development, conception, and reduction to practice of the inventions disclosed and/or claimed in the Patents-in-Suit. |
| **Alvin Wong**<br><br>Chief Scientific Officer, Puma | Certain information concerning the research and development relating to the technology claimed in the Patents-in-Suit. |
| **Douglas Hunt**<br><br>Senior Vice President, Regulatory Affairs, Puma | Certain information concerning the regulatory affairs relating to the technology claimed in the Patents-in-Suit. |
| **Alan Auerbach**<br><br>CEO, Puma | The agreements between Puma and Wyeth concerning the Patents-in-Suit. |

Plaintiffs do not represent that these custodians have relevant documents or tangible things in their possession, custody, or control, and do not waive the right to object to their production on the basis of privilege, including the work product and common interest doctrines, relevance, immunity, their prior production to AstraZeneca in other litigations, or any other valid objection.

**B.     Paragraph 3(b):  Non-Custodial Data Sources**

Plaintiffs identify the following non-custodial data sources in their possession, custody, or control that they presently believe are most likely to have non-duplicative discoverable information relevant to this case: documents relating to the conception and reduction to practice of the claimed invention, regulatory documents, patent files and prosecution histories, and the agreements between Puma and Wyeth concerning the Patents-in-Suit.

2

Plaintiffs do not waive the right to object to the production of documents from these non-custodial data sources on the basis of privilege, including the work product and common interest doctrines, relevance, immunity, their prior production to AstraZeneca in other litigations, or any other valid objection.

### C.      Paragraph 3(c):  Notice

(i)      Inaccessible ESI:  Plaintiffs' files maintained for backup or disaster recovery reasons are not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i) because they are unreasonably cumulative or duplicative, or they can be obtained directly from the custodians in a way that is more convenient, less burdensome, and less expensive.

(ii)      Third-party discovery:  Plaintiffs may seek third-party discovery from the inventors of the Patents-in-Suit, or additional discovery pursuant to Fed. R. Civ. P. 45 in connection with the instant actions.  Should the need arise, Plaintiffs' counsel will meet and confer with AstraZeneca's counsel regarding the scope, timing, and sequencing of third-party discovery.

(iii)      Privacy protections:  At present, Plaintiffs have not identified any basis in U.S. or foreign privacy law to withhold any responsive, non-privileged documents in their possession, custody, or control.  Plaintiffs reserve the right to do so where such laws apply.

Dated:  March 18, 2022

OF COUNSEL:

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121-3134
(858) 314-1200

Gasper J. LaRosa
Lisamarie LoGiudice
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939

Jason Winchester
JONES DAY
77 West Wacker, Suite 3500
Chicago, Illinois 60601-1692
(312) 782-3939

Shehla Wynne*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
*Admitted in New York; not admitted in
District of Columbia; practice limited to
cases in federal court and agencies

*Attorneys for Puma Biotechnology, Inc.*

Sara T. Horton
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
(312) 728-9040

*Attorneys for Wyeth LLC*

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

/s/ *Gasper J. LaRosa*
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box. 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiffs*

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-1338-MFK |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS REGARDING U.S. PATENT NOS. 10,603,314 AND 10,596,162**

Pursuant to the Scheduling Order (D.I. 30, C.A. No. 21-1338-MFK) ("Scheduling Order"), Plaintiffs and Counterclaim Defendants Puma Biotechnology, Inc. ("Puma") and Wyeth LLC ("Wyeth") (collectively, "Plaintiffs") hereby serve their Infringement Contentions on Defendants and Counterclaimants AstraZeneca Pharmaceuticals LP and AstraZeneca AB (collectively, "AstraZeneca" or "Defendants"), based on information reasonably available at this time with respect to Plaintiffs' claims and defenses, and Defendants' counterclaims, concerning U.S. Patent Nos. 10,603,314 ("the '314 Patent") and 10,596,162 (the "'162 Patent") (collectively, the "Patents-in-Suit"). The Patents-in-Suit both claim priority on their face to United States Provisional Application No. 60/649,483, filed on Feb. 3, 2005, and United States Provisional Application No. 60/671,989, filed on Apr. 15, 2005.

The disclosures made herein are based on information currently available to Plaintiffs. Plaintiffs reserve the right to amend and/or supplement these disclosures based on information provided during the course of this litigation, including during the course of fact discovery that

has yet to take place.  In particular, Plaintiffs reserve the right to supplement and/or amend these

contentions following production of Defendants' internal documents, any production of

documents by third parties, and fact and expert testimony to be taken based on such documents.

Plaintiffs intend to supplement and/or amend these contentions, if necessary, to the extent

required by the Scheduling Order or any amendments thereto.  Plaintiffs also reserve the right to

supplement and/or amend these contentions should the Court construe any claim terms that are

disputed by the parties and to the extent that such claim construction affects any of the assertions

set forth in the charts below.  In the event that a claim limitation is deemed to be missing under a

literal-infringement analysis (e.g., due to claim construction), Plaintiffs reserve the right to

demonstrate the presence of an equivalent of such a limitation and to pursue infringement under

the doctrine of equivalents.

Moreover, statements made herein are not intended as admissions regarding the meaning

of any claim term of the Patents-in-Suit, or whether any reference identified by Defendants is

"prior art" to the Patents-in-Suit, including whether any such reference is publicly available.

Statements made herein are also not intended as admissions regarding the admissibility or

authenticity of any documents cited or otherwise relied upon in support of these contentions.

### <u>USE OF ASTRAZENECA'S TAGRISSO® ACCORDING TO THE TAGRISSO®<br>PRODUCT LABEL INFRINGES THE PATENTS-IN-SUIT</u>

The claims of the Patents-in-Suit recite methods for treatment of patients with non-small

cell lung cancer ("NSCLC") that is resistant to gefitinib and/or erlotinib, which method uses an

irreversible epidermal growth factor receptor ("EGFR") inhibitor that covalently binds to the

cysteine 773[1] residue in the ligand-binding pocket of EGFR.  Defendants have infringed, and

---

[1] In the literature, cysteine 797 ("cys 797") and cysteine 773 ("cys 773") refer to the same
cysteine in EGFR, depending on whether the sequence referred to includes the EGFR signal
peptide (a short amino acid sequence translated from the mRNA).  *See, e.g.*, Ullrich, A., et al.,

continue to infringe, the Patents-in-Suit arising out of Defendants' commercial manufacture, use, importation, marketing, sale, and/or offer for sale of osimertinib (an irreversible EGFR inhibitor), osimertinib mesylate, and TAGRISSO® (osimertinib dosage forms, 40 and 80 mg tablets) (together, "TAGRISSO®") in the United States prior to the expiration of the Patents-in-Suit. Indeed, Defendants had knowledge of the Patents-in-Suit, as well as the published patent applications corresponding to the Patents-in-Suit. With this knowledge, Defendants designed osimertinib to bind cysteine 773 in order to overcome certain resistance of NSCLC to tyrosine kinase therapy.

Defendants' infringement began at least as early as TAGRISSO®'s first approval on November 13, 2015 and is ongoing. Defendants' TAGRISSO® was first approved in November 2015 "for the treatment of patients with metastatic epidermal growth factor receptor (EGFR) T790M mutation positive non-small cell lung cancer (NSCLC), as detected by an FDA approved test, who have progressed on or after EGFR TKI therapy" ("Second-Line Treatment"). In April 2018, FDA approved TAGRISSO® for a second indication ("First-Line Treatment"): "the first-line treatment of patients with metastatic non-small cell lung cancer (NSCLC) whose tumors have epidermal growth factor receptor (EGFR) exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test." In December 2020, FDA approved TAGRISSO® for a

---

*Human Epidermal Growth Factor Receptor cDNA Sequence and Aberrant Expression of the Amplified Gene in Epidermoid Carcinoma Cells*, NATURE 309:31, 418–425 (1984) at PUMA-TAG00000545-552;'314 Patent File History, July 14, 2010 Applicant Amendment at PUMAWYETH-TAG00000903 ("Cysteine 773 corresponds to Cysteine 797 of the EGFR amino acid sequence recited in SEQ ID NO: 2, discussed in further detail below[.]"), at PUMAWYETH-TAG00000905–906 ("[B]inding of the irreversible EGFR inhibitors to the EGFR polypeptide is typically made in the art in reference to the mature EGFR polypeptide, which does not contain the leader sequence. As such, reference is made to binding to cysteine 773 of EGFR (e.g., *see* Discafani et al., cited by the Examiner). Cysteine 797 of SEQ ID NO: 2 corresponds to cysteine 773 of the mature EGFR polypeptide (without the leader sequence)[.]").

third indication ("Adjuvant Treatment"): "adjuvant therapy after tumor resection in adult patients with non-small cell lung cancer (NSCLC) whose tumors have epidermal growth factor receptor (EGFR) exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test." Through the TAGRISSO® Label, AstraZeneca knowingly and intentionally instructs end users to administer TAGRISSO® to humans to treat gefitinib and/or erlotinib resistant NSCLC, including T790M mutation-positive NSCLC, using an irreversible EGFR tyrosine kinase inhibitor ("TKI").  TAGRISSO® Label at § 12.1 (PUMA-TAG00000528).  The use of TAGRISSO®, as directed by the TAGRISSO® Label, is therefore covered by at least claims 1, 3–6, and 9 of the '314 Patent and at least claims 1 and 4 of the '162 Patent (together, the "Asserted Claims").

| Patents-in-Suit | Asserted Claims |
| --- | --- |
| '314 Patent | 1, 3–6, 9 |
| '162 Patent | 1, 4 |

The TAGRISSO® Label instructs healthcare providers and patients to use TAGRISSO® according to the methods of the Asserted Claims.  Accordingly, Defendants' commercial manufacture, use, importation, marketing, sale, and/or offer for sale of TAGRISSO®, including tablets of 40 mg and 80 mg dosage strength, in or into the United States, directly infringes, contributes to the infringement of, and/or actively induces the infringement by others of the Asserted Claims under 35 U.S.C. § 271(a)–(c).

On information and belief, Defendants have known of the Patents-in-Suit at least as early as April 6, 2011, the date of issuance of European Patent 1 848 414 B1, which is in the same patent family (or respectively, the underlying PCT application publication WO 2006/084058), which included the same or similar claims as the Patents-in-Suit, and has the same owner

(Plaintiff Wyeth LLC) and exclusive licensee (Plaintiff Puma).  Two patents that are listed in the FDA Orange Book for TAGRISSO®, US 8,946,235 and US 9,732,058, recite WO 2006/084058 as important prior art.  Defendants cause infringement of the Patents-in-Suit and have knowledge that the sale of TAGRISSO® infringes the Patents-in-Suit.  Thus, Defendants are liable for at least inducing infringement under 35 U.S.C. § 271(b).  The label is provided to doctors and other healthcare providers, and is available to patients on Defendants' websites, *see, e.g.*, "Prescribing Information" at https://www.tagrisso.com/, as well as on the FDA's approved drug website, *see* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.  Thus, healthcare providers, including physicians and other medical care workers, patients, and any other persons administering TAGRISSO® pursuant to the approved label or other instructions, will directly infringe the Asserted Claims.

Further, Defendants know that TAGRISSO® is especially adapted to infringe the Patents-in-Suit and that TAGRISSO® and the accompanying TAGRISSO® Label are not suitable for any substantial noninfringing use.  Thus, Defendants are liable for contributory infringement of the Asserted Claims under 35 U.S.C. § 271(c).

The Exhibits below set forth the bases for Defendants' infringement of the Asserted Claims of the '314 Patent (Exhibit A) and the '162 Patent (Exhibit B).  Based on the information presently available, Plaintiffs contend that each limitation of the Asserted Claims of the Patents-in-Suit are infringed, literally or under the doctrine of equivalents, by the use of TAGRISSO®.  Plaintiffs expect that Defendants' internal documents and communications with, for example the FDA, will provide further evidence of intentional infringement and intent to induce infringement.  Citations to particular documents or portions of documents in the claim charts are by no means exhaustive and are merely representative.

Dated:  March 18, 2022

OF COUNSEL:

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121-3134
(858) 314-1200

Gasper J. LaRosa
Lisamarie LoGiudice
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939

Jason Winchester
JONES DAY
77 West Wacker, Suite 3500
Chicago, Illinois 60601-1692
(312) 782-3939

Shehla Wynne*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
*Admitted in New York; not admitted in
District of Columbia; practice limited to
cases in federal court and agencies*

*Attorneys for Puma Biotechnology, Inc.*

Sara T. Horton
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
(312) 728-9040

*Attorneys for Wyeth LLC*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Gasper J. LaRosa
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box. 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiffs*

**EXHIBIT A**

**Infringement Chart – '314 Patent**

Claims 1, 3–6, 9

| CLAIM 1 | DEFENDANTS' INFRINGEMENT OF THE '314 PATENT |
|---|---|
| [1p] A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, comprising | Defendants' TAGRISSO® products are used according to a method that meets this claim. The labeling for TAGRISSO® instructs healthcare providers, including physicians, to treat patients with gefitinib and/or erlotinib resistant NSCLC with TAGRISSO®. *See* TAGRISSO® Label at §§ 1.1– 1.3, 2.1 (PUMA-TAG00000512) (describing TAGRISSO®'s First-Line Treatment, Second-Line Treatment, and Adjuvant Treatment). Gefitinib and erlotinib are known EGFR TKI treatments for NSCLC. A portion of NSCLC patients are resistant to treatment with gefitinib and/or erlotinib. The T790M mutation is a known mutation that confers resistance to gefitinib and/or erlotinib. This mutation occurs in patients before and after treatment with gefitinib and/or erlotinib. TAGRISSO® Label at § 14.2 (PUMA-TAG00000533–537) (describing AstraZeneca's FLAURA Trial where five patients who had never been treated with another EGFR had a T790M mutation); Cross, D.E., et al., *AZD9291, An Irreversible EGFR TKI, Overcomes T790M-Mediated Resistance to EGFR Inhibitors in Lung Cancer*, CANCER DISCOVERY 4(9): 1046–1061 (2014) ("Cross (2014)") at PUMA-TAG00000462 ("The T790M mutation is believed to render the receptor refractory to inhibition by these reversible EGFR TKIs through exerting effects on both steric hindrance (22) and increased ATP affinity (23)."), at PUMA-TAG00000471–472 ("The existence of cell populations harboring [EGFR] T790M [mutation positive NSCLC] within a proportion of TKI-naïve EGFRm+ tumors has been reported, although the prevalence depends on the diagnostic assay being used. . . . . [O]verall, the data support the hypothesis that T790M clones may preexist in a proportion of EGFRm+ tumors before TKI treatment."); Sequist, L.V., et al., *First-Line Gefitinib in Patients With Advanced Non– Small-Cell Lung Cancer Harboring Somatic EGFR Mutations*, CLIN ONCOL 26:15, 2442–2449 (2008) ("Sequist (2008)") at PUMA-TAG00000571.

Defendants know that the commercial manufacture, use, importation, marketing, sale, and/or offer for sale of TAGRISSO® will cause direct infringement of this claim. Defendants' TAGRISSO® Label induces healthcare providers, including doctors and other healthcare workers, as well as patients, to directly infringe the Patents-in-Suit through all three approved indications. |

Defendants' TAGRISSO® Label encourages healthcare providers and patients to directly infringe the Patents-in-Suit by promoting the use of TAGRISSO® for treatment of metastatic NSCLC when the patient has an EGFR-sensitizing mutation (EGFR exon 19 deletions or exon 21 L858R mutations). *See* TAGRISSO® Label at §§ 1.2, 2.1 (PUMA-TAG0000512) (indicating use of TAGRISSO® for "first-line treatment of adult patients with metastatic NSCLC whose tumors have EGFR exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test").

Defendants' TAGRISSO® Label also encourages healthcare providers and patients to directly infringe the Patents-in-Suit by promoting the use of TAGRISSO® for treatment of NSCLC after surgery and when the patient has an EGFR-sensitizing mutation (EGFR exon 19 deletions or exon 21 L858R mutations). *See* TAGRISSO® Label at §§ 1.1, 2.1 (PUMA-TAG0000512) (indicating use of TAGRISSO® for "adjuvant treatment of adult patients with metastatic NSCLC whose tumors have EGFR exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test").

Defendants' TAGRISSO® Label encourages healthcare providers and patients to directly infringe the Patents-in-Suit by promoting the use of TAGRISSO® for treatment of NSCLC with a T790M mutation when the patient's disease has progressed on or after another EGFR tyrosine kinase inhibitor. *See* TAGRISSO® Label at § 1.3 (PUMA-TAG0000512) (indicating second-line "treatment of adult patients with metastatic EGFR T790M mutation-positive NSCLC, as detected by an FDA-approved test, whose disease has progressed on or after EGFR tyrosine kinase inhibitor (TKI) therapy."). The TAGRISSO® Label further instructs healthcare providers, including physicians, to "[s]elect patients for the treatment of metastatic EGFR T790M mutation-positive NSCLC with TAGRISSO following progression on or after EGFR TKI therapy based on the presence of an EGFR T790M mutation in tumor or plasma specimens." *Id.*, §§ 1.3, 2.1 (PUMA-TAG0000512). The TAGRISSO® Label also details the results of clinical studies where TAGRISSO® was administered daily to patients who "had progressive [NSCLC] disease following first line EGFR TKI treatment." TAGRISSO® Label at § 14 (PUMA-TAG0000531–537) (discussing results of AstraZeneca's AURA3 Trial); *see also* Jänne, P.A., et al., *AZD9291 in EGFR Inhibitor–Resistant Non–Small-Cell Lung Cancer*, N ENGL J MED 372:18, 1689–1699 (2015) ("AURA Trial") at PUMA-TAG0000486 ("AZD9291 [TAGRISSO]² was associated with tumor responses in the majority of patients with advanced NSCLC in whom T790M-mediated drug

---

² Osimertinib was known as AZD9291 during its development. *See* https://www.astrazeneca-us.com/media/press-releases/2015/tagrisso-osimertinib-azd9291-approved-by-the-us-fda-20151113.html#!.

resistance had developed.") at PUMA-TAG00000480 ("All the patients had received at least one prior EGFR tyrosine kinase inhibitor (Table 1)[.]"); Mok, T.S., et al., *Osimertinib or Platinum– Pemetrexed in EGFR T790M-Positive Lung Cancer*, N ENGL J MED 376:7, 629–640 (2017) ("Mok 2017") at PUMA-TAG00000499–510.

Defendants' publications confirm that gefitinib and erlotinib are known EGFR TKI treatments for NSCLC. *See* Cross (2014) at PUMA-TAG00000463–464 (describing gefitinib and erlotinib as "reversible small-molecule ATP analogues originally designed to inhibit the tyrosine kinase (TK) activity of wild-type EGFR," but that though patients "show good initial responses to first-generation TKIs," they later have disease progression).

Defendants' publications also confirm that a portion of NSCLC patients are resistant to treatment with gefitinib and/or erlotinib. AURA Trial at PUMA-TAG00000478 ("Despite initial responses to EGFR tyrosine kinase inhibitors, the majority of patients will have disease progression within 1 to 2 years after treatment initiation (acquired resistance)."); Mok (2017) at PUMA-TAG00000500 ("Despite high tumor response rates with first-line EGFR-TKIs, disease progresses in a majority of patients after 9 to 13 months of treatment."); Sequist (2008) at PUMA-TAG00000573 (identifying six of 34 TKI-naïve patients as having an "L858R mutation plus T790M" and concluding that "two patients harbor[ed] known activating EGFR mutations that also possessed known mechanisms of acquired TKI resistance at diagnosis. Both the exon 20 EGFR mutation T790M and MET amplification were initially described as acquired resistance mechanisms arising in mutation-positive patients after exposure to EGFR TKIs. T790M has also been observed rarely in previously untreated patients with NSCLC, where similar to our case, both T790M and L858R were identified and subsequent gefitinib therapy was ineffective.").

The T790M mutation is known to be associated with gefitinib and/or erlotinib resistance. Mok (2017) at PUMA-TAG00000500 ("At the time of progression [following treatment with first-line EGFR-TKIs like gefitinib or erlotinib], about 60% of patients (regardless of race or ethnic background) are found to have a p.Thr790Met point mutation (T790M) in the gene encoding EGFR.").

Moreover, the presence of the T790M mutation is known to be associated with gefitinib and/or erlotinib resistance even in patients who have never previously received gefitinib or erlotinib. TAGRISSO® Label at § 14.2 (PUMA-TAG00000533–537) (describing AstraZeneca's FLAURA Trial where five patients who had never been treated with another EGFR had a T790M mutation); Cross (2014) at PUMA-TAG00000462 ("The T790M mutation is believed to render the receptor

refractory to inhibition by these reversible EGFR TKIs through exerting effects on both steric hindrance (22) and increased ATP affinity (23).") at PUMA-TAG0000471–472 ("The existence of cell populations harboring [EGFR] T790M [mutation positive NSCLC] within a proportion of TKI-naïve EGFRm+ tumors has been reported, although the prevalence depends on the diagnostic assay being used. . . . [O]verall, the data support the hypothesis that T790M clones may preexist in a proportion of EGFRm+ tumors before TKI treatment."); Sequist (2008) at PUMA-TAG0000571.

The TAGRISSO® Label instructs healthcare providers, including physicians, to select patients for treatment with TAGRISSO® "following progression on or after EGFR TKI therapy based on the presence of an EGFR T790M mutation in tumor or plasma specimens [see Clinical Studies (14)]." TAGRISSO® Label at § 2.1 (PUMA-TAG0000512). *See also* AstraZeneca's TAGRISSO® healthcare provider website at https://www.tagrissohcp.com/efficacy/aura3-data.html (instructing healthcare providers to test patients for T790M "[w]hen patients progress on a first- or second-generation EGFR" to determine eligibility for treatment with TAGRISSO®).

The TAGRISSO® Label instructs healthcare providers, including physicians, and their patients to administer TAGRISSO® "orally once daily." TAGRISSO® Label at 1 ("Dosage and Administration") (PUMA-TAG0000511), §§ 2.2, 6.1, 12.3 (PUMA-TAG0000512–513, PUMA-TAG00000516–524, PUMA-TAG00000528–530); *see also* https://www.tagrisso.com/after-surgery.html (stating that TAGRISSO® provides "[t]he convenience of a once-daily pill.").

Defendants contribute to the direct infringement of the Patents-in-Suit because Defendants' TAGRISSO® is especially adapted for use according to a method that meets this claim, as described, and there are no substantial non-infringing uses for TAGRISSO®.

In each approved use, Defendants choose to use the patented technology for the purpose of avoiding or overcoming TKI resistance to mutations such as T790M in NSCLC patients by irreversibly binding cysteine 773 of EGFR. As such, Defendants are knowing infringers.

*See Claim* [1p].

The TAGRISSO® Label instructs healthcare providers, including physicians, and their patients to administer TAGRISSO® "orally once daily." TAGRISSO® Label at 1 ("Dosage and Administration) (PUMA-TAG0000511), §§ 2.2, 6.1, 12.3 (PUMA-TAG0000512–513, PUMA-TAG00000516–524, PUMA-TAG00000528–530); *see also* https://www.tagrisso.com/after-surgery.html (stating that TAGRISSO® provides "[t]he convenience of a once-daily pill.")

[1a] administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer,

A-4

| [1b] a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2. | *See* Claim [1p].<br><br>According to the TAGRISSO® Label, TAGRISSO® is a pharmaceutical composition available in two dosage forms: 40 mg and 80 mg, which are both unit dosages. TAGRISSO® Label at §§ 2.2, 3, 11, 16 (PUMA-TAG0000512–513, PUMA-TAG00000514, PUMA-TAG0000527–528, PUMA-TAG00000540).<br><br>According to the TAGRISSO® Label, the active ingredient in TAGRISSO® is osimertinib, "a kinase inhibitor of the epidermal growth factor receptor (EGFR), which binds irreversibly to certain mutant forms of EGFR (T790M, L858R, and exon 19 deletions) . . . ." TAGRISSO® Label at § 12.1 (PUMA-TAG00000528). AstraZeneca developed TAGRISSO® as an irreversible inhibitor starting in 2009, *see* Yver, A., *Osimertinib (AZD9291)—a Science–Driven, Collaborative Approach to Rapid Drug Design and Development*, ANNALS OF ONCOLOGY 27:6, 1165–1170 (2016) ("Yver (2016)") at PUMA-TAG00000626 (AstraZeneca employee describing that "Osimertinib (TAGRISSO™, AZD9291; AstraZeneca PLC, London, UK) was designed to inhibit EGFR in a covalent irreversible manner[.]"). This was three years after Plaintiffs' PCT application PCT/US2006/003717 published in 2006, and four years after the inventors of the Patents-in-Suit published their findings of the effectiveness of irreversible EGFR inhibitors against gefitinib-resistant NSCLC. Kwak, E.L., et al., *Irreversible Inhibitors of the EGF Receptor May Circumvent Acquired Resistance to Gefitinib*, PROC. NAT'L ACAD. SCI. 102:21, 7665–7670 (2005) ("Kwak (2005)") at PUMA-TAG0000563–568.<br><br>Osimertinib covalently binds to cysteine 773 in the ligand-binding pocket of EGFR. Cross (2014) at PUMA-TAG00000463–464 ("AZD9291 [osimertinib] makes a covalent bond with Cys797 in EGFR" and "[irreversible small-molecule inhibitors, including osimertinib] bind to the EGFR kinase irreversibly by targeting the cysteine-797 residue in the ATP binding site via covalent bond formation[.]"). *See also* Cross (2014) at PUMA-TAG00000463.<br><br>**Figure 1** (Cross (2014) at PUMA-TAG00000463) |

A-5



**"Figure 1.** AZD9291 binding mode and structure. A, structural model showing the covalent mode of binding of AZD9291 to EGFRT790M via Cys797. Shown is the pyrimidine core forming two hydrogen bonds to the hinge region (Met793), orientation of the indole group adjacent to the gatekeeper residue, the amine moiety positioned in the solvent channel, and the covalent bond formed to Cys797 via the acrylamide group of AZD9291. B, chemical structure of AZD9291." Cross (2014) at PUMA-TAG0000463.

Defendants' publications highlight the homology between cysteine 773 in EGFR and cysteine 805 in HER2. TAGRISSO® Label at § 12.1 (PUMA-TAG00000528) ("In vitro, osimertinib also inhibited the activity of HER2, HER3, HER4, ACK1, and BLK at clinically relevant concentrations."); Cross (2014) at PUMA-TAG00000464 (testing osimertinib against "other kinases that have a cysteine residue in the analogous kinase domain portion," identifying ERBB2 as a "kinase[] present within the human kinome with the analogous Cys797 to EGFR," and finding osimertinib showed significant activity against ERBB2). *See also* Liu, S., et al., *Targeting HER2 Aberrations in Non–Small Cell Lung Cancer with Osimertinib*, CLIN CANCER RES 24:11, 2594–2604 (2018) at PUMA-TAG00000489 ("Considering the homology between HER2 and EGFR, we speculate that the

A-6

|  |  |
|---|---|
|  | covalent binding site for osimertinib may be C805 (analogous Cys797 to EGFR) of human HER2, which requires future investigation."). |
| **CLAIM 3** | **DEFENDANTS' INFRINGEMENT OF THE '314 PATENT** |
| The method of claim 1, | *See* claim 1. |
| wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR. | Osimertinib covalently binds to cysteine 773 in the ligand-binding pocket of EGFR.  Cross (2014) at PUMA-TAG00000463–464  ("AZD9291 [osimertinib] makes a covalent bond with Cys797 in EGFR" and "[irreversible small-molecule inhibitors, including osimertinib] bind to the EGFR kinase irreversibly by targeting the cysteine-797 residue in the ATP binding site via covalent bond formation[.]").  *See also* Cross (2014) at PUMA-TAG00000463.<br><br>**Figure 1** (Cross (2014) at PUMA-TAG00000463)<br><br><br><br>"**Figure 1.** AZD9291 binding mode and structure. A, structural model showing the covalent mode of binding of AZD9291 to EGFRT790M via Cys797. Shown is the pyrimidine core forming two |

A–7

| | hydrogen bonds to the hinge region (Met793), orientation of the indole group adjacent to the gatekeeper residue, the amine moiety positioned in the solvent channel, and the covalent bond formed to Cys797 via the acrylamide group of AZD9291. B, chemical structure of AZD9291." |
|---|---|
| **CLAIM 4** | **DEFENDANTS' INFRINGEMENT OF THE '314 PATENT** |
| The method of claim 1, | *See* claim 1. |
| wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2. | Defendants' publications highlight the homology between cysteine 773 in EGFR and cysteine 805 in HER2. TAGRISSO® Label at § 12.1 (PUMA-TAG00000528) ("In vitro, osimertinib also inhibited the activity of HER2, HER3, HER4, ACK1, and BLK at clinically relevant concentrations."); Cross (2014) at PUMA-TAG00000464 (testing osimertinib against "other kinases that have a cysteine residue in the analogous kinase domain portion," identifying ERBB2 as a "kinase[] present within the human kinome with the analogous Cys797 to EGFR," and finding osimertinib showed significant activity against ERBB2). *See also* Liu (2018) at PUMA-TAG00000489 ("Considering the homology between HER2 and EGFR, we speculate that the covalent binding site for osimertinib may be C805 (analogous Cys797 to EGFR) of human HER2, which requires future investigation."). |
| **CLAIM 5** | **DEFENDANTS' INFRINGEMENT OF THE '314 PATENT** |
| The method of claim 1, | *See* claim 1. |
| wherein the method further comprises administering at least one other tyrosine kinase inhibitor. | According to its label, TAGRISSO® is indicated "for the treatment of adult patients with metastatic EGFR T790M mutation-positive NSCLC, as detected by an FDA-approved test, whose disease has progressed on or after EGFR tyrosine kinase inhibitor (TKI) therapy." TAGRISSO® Label at §§ 1.3, 2.1 (PUMA-TAG00000512, PUMA-TAG00000533–537).  The TAGRISSO® Label also describes AstraZeneca's FLAURA trial where "[o]ut of the 180 patients randomized to erlotinib or gefitinib who received subsequent treatment, 85 (47%) patients received TAGRISSO as first subsequent therapy." and 38 patients who initially received TAGRISSO later received another EGFR-TKI. TAGRISSO® Label at § 14.2 (PUMA-TAG00000533–537); Soria, J.C., et al., *Osimertinib in Untreated EGFR-Mutated Advanced Non–Small-Cell Lung Cancer*, N ENGL J MED 378:2, 113-125 (2018) at PUMA-TAG00000615–616 and Supplementary Material at PUMA-TAG00000595.<br><br>Defendants have also studied and reported positive results to the medical community of using TAGRISSO® and another TKI.  *See* Rotow, J.K., et al., *Concurrent osimertinib plus gefitinib for first-line treatment of EGFR-mutated non-small cell lung cancer (NSCLC)*, J CLIN ONC 38:15 Suppl (2020), https://ascopubs.org/doi/abs/10.1200/JCO.2020.38.15  suppl.9507 (reporting on Clinical |

A–8

| | Trial No. NCT03122717, which lists AstraZeneca as collaborator). *See also* AstraZeneca Clinical Trial No. NCT03944772, *available at* https://clinicaltrials.gov/ct2/show/NCT03944772 (including a group of patients that had progressed on first-line osimertinib therapy that were given "osimertinib taken in combination with gefitinib."). |
|---|---|
| **CLAIM 6** | **DEFENDANTS' INFRINGEMENT OF THE '314 PATENT** |
| The method of claim 1, | *See* claim 1. |
| wherein the method further comprises administering radiation. | The TAGRISSO® Label encourages the use of TAGRISSO® with radiation therapy because AstraZeneca's FLAURA trial included patients who had previously been treated with radiation. TAGRISSO® Label at § 14.2 (PUMA-TAG0000533–537) ("Patients with CNS metastases not requiring steroids and with stable neurologic status for at least two weeks after completion of definitive surgery or radiotherapy were eligible [for treatment with TAGRISSO® in the FLAURA Trial]."). Indeed, Defendants also know that a substantial number of NSCLC patients will be treated with radiation. *See also* Wang, N., et al., *Osimertinib (AZD9291) Increases Radio-Sensitivity in EGFR T790M Non-Small Cell Lung Cancer*, ONCOLOGY REPORTS 41:1, 77–86 (2019) at PUMA-TAG00000553–562 (AstraZeneca research concluding "that osimertinib has therapeutic potential as a radiation-sensitizer in lung cancer cells harboring the EGFR T790M mutation, providing a rationale for clinically combining osimertinib with irradiation in EGFR T790M non-small cell lung cancer."); Clinical Trial No. NCT03667820, *available at* https://clinicaltrials.gov/ct2/show/NCT03667820 ("[E]valuat[ing] the combination of two well-tolerated therapies, osimertinib and Stereotactic Ablative Radiation (SABR)" and listing AstraZeneca as a collaborator.); Clinical Trial No. NCT05089916, *available at* https://clinicaltrials.gov/ct2/show/NCT05089916 ("[A]ssess[ing] the safety of osimertinib treatment continuation during irradiation therapy for palliation or oligoprogressive disease by assessment of grade 3-5 AEs during and after concomitant osimertinib and irradiation of tumor sites" and listing AstraZeneca as a collaborator.). |
| **CLAIM 9** | **DEFENDANTS' INFRINGEMENT OF THE '314 PATENT** |
| The method of claim 1, | *See* claim 1. |
| wherein the route of administering is oral. | The TAGRISSO® Label instructs healthcare providers, including physicians, and their patients to administer TAGRISSO® "orally once daily." TAGRISSO® Label at 1 ("Dosage and Administration") (PUMA-TAG00000511), §§ 2.2, 6.1, 12.3 (PUMA-TAG00000512–513, PUMA- |

TAG00000516–524, PUMA-TAG00000528–530); *see also* https://www.tagrisso.com/after-surgery.html ("The convenience of a once-daily pill.").

A-10

**EXHIBIT B**

**Infringement Chart – '162 Patent**

Claims 1 & 4

| CLAIM 1 | DEFENDANTS' INFRINGEMENT OF THE '162 PATENT |
|---|---|
| [1p] A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient, comprising | Defendants' TAGRISSO® products are used according to a method that meets this claim. The labeling for TAGRISSO® instructs healthcare providers, including physicians, to treat patients with gefitinib and/or erlotinib resistant NSCLC with TAGRISSO®. *See* TAGRISSO® Label at §§ 1.1–1.3, 2.1 (PUMA-TAG00000512) (describing TAGRISSO®'s First-Line Treatment, Second-Line Treatment, and Adjuvant Treatment). Gefitinib and erlotinib are known EGFR TKI treatments for NSCLC. A portion of NSCLC patients are resistant to treatment with gefitinib and/or erlotinib. The T790M mutation is a known mutation that confers resistance to gefitinib and/or erlotinib. This mutation occurs in patients before and after treatment with gefitinib and/or erlotinib. TAGRISSO® Label at § 14.2 (PUMA-TAG00000533–537) (describing AstraZeneca's FLAURA Trial where five patients who had never been treated with another EGFR had a T790M mutation); Cross (2014) at PUMA-TAG00000462 ("The T790M mutation is believed to render the receptor refractory to inhibition by these reversible EGFR TKIs through exerting effects on both steric hindrance (22) and increased ATP affinity (23).") at PUMA-TAG00000471–472 ("The existence of cell populations harboring [EGFR] T790M [mutation positive NSCLC] within a proportion of TKI-naïve EGFRm+ tumors has been reported, although the prevalence depends on the diagnostic assay being used. . . . . [O]verall, the data support the hypothesis that T790M clones may preexist in a proportion of EGFRm+ tumors before TKI treatment."); Sequist (2008) at PUMA-TAG00000571.

Defendants know that the commercial manufacture, use, importation, marketing, sale, and/or offer for sale of TAGRISSO® will cause direct infringement of this claim. Defendants' TAGRISSO® Label induces healthcare providers, including doctors and other healthcare workers, as well as patients, to directly infringe the Patents-in-Suit through all three approved indications.

Defendants' TAGRISSO® Label encourages healthcare providers and patients to directly infringe the Patents-in-Suit by promoting the use of TAGRISSO® for treatment of metastatic NSCLC when the patient has an EGFR-sensitizing mutation (EGFR exon 19 deletions or exon 21 L858R mutations). TAGRISSO® Label at §§ 1.2, 2.1 (PUMA-TAG00000512) (indicating use of |

TAGRISSO® for "first-line treatment of adult patients with metastatic NSCLC whose tumors have EGFR exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test").

Defendants' TAGRISSO® Label also encourages healthcare providers and patients to directly infringe the Patents-in-Suit by promoting the use of TAGRISSO® for treatment of NSCLC after surgery and when the patient has an EGFR-sensitizing mutation (EGFR exon 19 deletions or exon 21 L858R mutations). TAGRISSO® Label at §§ 1.1, 2.1 (PUMA-TAG00000512) (indicating use of TAGRISSO® for "adjuvant treatment of adult patients with metastatic NSCLC whose tumors have EGFR exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test").

Defendants' TAGRISSO® Label encourages healthcare providers and patients to directly infringe the Patents-in-Suit by promoting the use of TAGRISSO® for treatment of NSCLC with a T790M mutation when the patient's disease has progressed on or after another EGFR tyrosine kinase inhibitor. TAGRISSO® Label at § 1.3 (PUMA-TAG00000512) (indicating second-line "treatment of adult patients with metastatic EGFR T790M mutation-positive NSCLC, as detected by an FDA-approved test, whose disease has progressed on or after EGFR tyrosine kinase inhibitor (TKI) therapy."). The TAGRISSO® Label further instructs healthcare providers, including physicians, to "[s]elect patients for the treatment of metastatic EGFR T790M mutation-positive NSCLC with TAGRISSO following progression on or after EGFR TKI therapy based on the presence of an EGFR T790M mutation in tumor or plasma specimens." *Id.*, §§ 1.3, 2.1 (PUMA-TAG00000512). The TAGRISSO® Label also details the results of clinical studies where TAGRISSO® was administered daily to patients who "had progressive [NSCLC] disease following first line EGFR TKI treatment." TAGRISSO® Label at § 14 (PUMA-TAG00000531–537) (discussing results of AstraZeneca's AURA3 Trial); *see also* AURA Trial at PUMA-TAG00000486 ("AZD9291 [TAGRISSO®] was associated with tumor responses in the majority of patients with advanced NSCLC in whom T790M-mediated drug resistance had developed.") at PUMA-TAG00000480 ("All the patients had received at least one prior EGFR tyrosine kinase inhibitor (Table 1[.]"). *See also* Mok (2017) at PUMA-TAG00000499–510.

SEQ ID NO: 1 in the Patents-in-Suit is the amino acid sequence for EGFR.

Defendants' publications confirm that gefitinib and erlotinib are known EGFR TKI treatments for NSCLC. *See* Cross (2014) at PUMA-TAG00000463–464 (describing gefitinib and erlotinib as "reversible small-molecule ATP analogues originally designed to inhibit the tyrosine kinase (TK)

activity of wild-type EGFR," but that though patients "show good initial responses to first-generation TKIs," they later have disease progression).

Defendants' publications also confirm that a portion of NSCLC patients are resistant to treatment with gefitinib and/or erlotinib. AURA Trial at PUMA-TAG00000478 ("Despite initial responses to EGFR tyrosine kinase inhibitors, the majority of patients will have disease progression within 1 to 2 years after treatment initiation (acquired resistance)."); Mok (2017) at PUMA-TAG00000500 ("Despite high tumor response rates with first-line EGFR-TKIs, disease progresses in a majority of patients after 9 to 13 months of treatment."); Sequist (2008) at PUMA-TAG00000573 (identifying six of 34 TKI-naïve patients as having an "L858R mutation plus T790M" and concluding that "two patients harbor[ed] known activating EGFR mutations that also possessed known mechanisms of acquired TKI resistance at diagnosis. Both the exon 20 EGFR mutation T790M and MET amplification were initially described as acquired resistance mechanisms arising in mutation-positive patients after exposure to EGFR TKIs. T790M has also been observed rarely in previously untreated patients with NSCLC, where similar to our case, both T790M and L858R were identified and subsequent gefitinib therapy was ineffective.").

The T790M mutation is known to be associated with gefitinib and/or erlotinib resistance. Mok (2017) PUMA-TAG00000500 ("At the time of progression [following treatment with first-line EGFR-TKIs like gefitinib or erlotinib], about 60% of patients (regardless of race or ethnic background) are found to have a p.Thr790Met point mutation (T790M) in the gene encoding EGFR.").

Moreover, the presence of the T790M mutation is known to be associated with gefitinib and/or erlotinib resistance even in patients who have never previously received gefitinib or erlotinib. TAGRISSO® Label at § 14.2 (PUMA-TAG00000533–537) (describing AstraZeneca's FLAURA Trial where five patients who had never been treated with another EGFR had a T790M mutation); Cross (2014) at PUMA-TAG00000462 ("The T790M mutation is believed to render the receptor refractory to inhibition by these reversible EGFR TKIs through exerting effects on both steric hindrance (22) and increased ATP affinity (23).") at PUMA-TAG00000471–472 ("The existence of cell populations harboring [EGFR] T790M [mutation positive NSCLC] within a proportion of TKI-naïve EGFRm+ tumors has been reported, although the prevalence depends on the diagnostic assay being used. . . . [O]verall, the data support the hypothesis that T790M clones may preexist in a proportion of EGFRm+ tumors before TKI treatment."); Sequist (2008) at PUMA-TAG00000571.

B-3

| | |
|---|---|
| [1a] administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 | The TAGRISSO® Label instructs healthcare providers, including physicians, to select patients for treatment with TAGRISSO® "following progression on or after EGFR TKI therapy based on the presence of an EGFR T790M mutation in tumor or plasma specimens [see Clinical Studies (14)]." TAGRISSO® Label at § 2.1 (PUMA-TAG00000512). *See also* AstraZeneca's TAGRISSO® healthcare provider website at https://www.tagrissohcp.com/efficacy/aura3-data.html (instructing healthcare providers to test patients for T790M "[w]hen patients progress on a first- or second-generation EGFR" to determine eligibility for TAGRISSO®).<br><br>The TAGRISSO® Label instructs healthcare providers, including physicians, and their patients to administer TAGRISSO® "orally once daily." TAGRISSO® Label at 1 ("Dosage and Administration") (PUMA-TAG00000511), §§ 2.2, 6.1, 12.3 (PUMA-TAG00000512–513, PUMA-TAG00000516–524, PUMA-TAG00000528–530). *See also* https://www.tagrisso.com/after-surgery.html ("The convenience of a once-daily pill.").<br><br>Defendants contribute to the direct infringement of the Patents-in-Suit because Defendants' TAGRISSO® Product is especially adapted for use according to a method that meets this claim, as described, and there are no substantial non-infringing uses for TAGRISSO®.<br><br>In each approved use, Defendants choose to use the patented technology for the purpose of avoiding or overcoming TKI resistance to mutations such as T790M in NSCLC patients by irreversibly binding cysteine 773 of EGFR. As such, Defendants are knowing infringers. |
| [1b] a pharmaceutical composition comprising a unit dosage of 2-500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID | *See* [1p].<br><br>The TAGRISSO® Label instructs healthcare providers, including physicians, and their patients to administer TAGRISSO® "orally once daily." TAGRISSO® Label at 1 ("Dosage and Administration") (PUMA-TAG00000511), §§ 2.2, 6.1, 12.3 (PUMA-TAG00000512–513, PUMA-TAG00000516–524, PUMA-TAG00000528–530). *See also* https://www.tagrisso.com/after-surgery.html ("The convenience of a once-daily pill.")<br><br>*See* [1p].<br><br>According to the TAGRISSO® Label, TAGRISSO® is a pharmaceutical composition available in two dosage forms: 40 mg and 80 mg, which are both unit dosages and are within the claimed range of 2–500 mg. TAGRISSO® Label at §§ 2.2, 3, 11, 16 (PUMA-TAG00000512–514, PUMA-TAG00000527–528, PUMA-TAG00000540). |

| NO: 1 having a T790M mutation; | According to the TAGRISSO® Label, the active ingredient in TAGRISSO® is osimertinib, "a kinase inhibitor of the epidermal growth factor receptor (EGFR), which binds irreversibly to certain mutant forms of EGFR (T790M, L858R, and exon 19 deletions) . . . ." TAGRISSO® Label at § 12.1 (PUMA-TAG00000528). AstraZeneca developed TAGRISSO® as an irreversible inhibitor starting in 2009, *see* Yver (2016) at PUMA-TAG00000626 (AstraZeneca employee describing that "Osimertinib (TAGRISSO™, AZD9291; AstraZeneca PLC, London, UK) was designed to inhibit EGFR in a covalent irreversible manner[.]"). This was three years after Plaintiffs' PCT application PCT/US2006/003717 published in 2006, and four years after the inventors of the Patents-in-Suit published their findings of the effectiveness of irreversible EGFR inhibitors against gefitinib-resistant NSCLC. Kwak (2005) at PUMA-TAG00000563–568.<br><br>Osimertinib covalently binds to cysteine 773 in the ligand-binding pocket of EGFR. Cross (2014) at PUMA-TAG00000463–464 ("AZD9291 [osimertinib][3] makes a covalent bond with Cys797 in EGFR" and "[irreversible small-molecule inhibitors, including osimertinib] bind to the EGFR kinase irreversibly by targeting the cysteine-797 residue in the ATP binding site via covalent bond formation[.]"). *See also* Cross (2014) at PUMA-TAG00000463.<br><br>**Figure 1** (Cross (2014) at PUMA-TAG00000463) |

---

[3] Osimertinib was known as AZD9291 during its development. *See* https://www.astrazeneca-us.com/media/press-releases/2015/tagrisso-osimertinib-azd9291-approved-by-the-us-fda-20151113.html#!.

"**Figure 1**. AZD9291 binding mode and structure. A, structural model showing the covalent mode of binding of AZD9291 to EGFRT790M via Cys797. Shown is the pyrimidine core forming two hydrogen bonds to the hinge region (Met793), orientation of the indole group adjacent to the gatekeeper residue, the amine moiety positioned in the solvent channel, and the covalent bond formed to Cys797 via the acrylamide group of AZD9291. B, chemical structure of AZD9291." Cross (2014) at PUMA-TAG0000463.

SEQ ID NO: 1 in the Patents-in-Suit is the amino acid sequence for EGFR.

Osimertinib is not CL-387,785.

| [1c] wherein the irreversible EGFR inhibitor is not CL-387,785. |

| CLAIM 4 | DEFENDANTS' INFRINGEMENT OF THE '162 PATENT |
|---|---|
| The method of claim 1, | *See* claim 1. |
| wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand binding pocket of ERBB2. | Defendants' publications highlight the homology between cysteine 773 in EGFR and cysteine 805 in HER2.  TAGRISSO® Label at § 12.1 (PUMA-TAG00000528) ("In vitro, osimertinib also inhibited the activity of HER2, HER3, HER4, ACK1, and BLK at clinically relevant concentrations."); Cross (2014) at PUMA-TAG00000464 (testing osimertinib against "other kinases that have a cysteine residue in the analogous kinase domain portion," identifying ERBB2 as a "kinase[] present within the human kinome with the analogous Cys797 to EGFR," and finding osimertinib showed significant activity against ERBB2). *See also* Liu (2018) at PUMA-TAG00000489 ("Considering the homology between HER2 and EGFR, we speculate that the covalent binding site for osimertinib may be C805 (analogous Cys797 to EGFR) of human HER2, which requires future investigation."). |

# EXHIBIT 14

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**<u>Via Electronic Mail</u>**                              February 8, 2023

Gasper J. LaRosa
Jones Day
250 Vesey Street
New York, NY 10281

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> **Re:**   ***Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca***
> ***Pharmaceuticals LP & AstraZeneca AB***
> **(D. Del. No. 21-1338-MFK)**

Counsel,

We write to correct certain inaccuracies in Plaintiffs' letter dated February 2, 2023.  We reserve the right to address other issues through separate correspondence or otherwise.

### A.    Plaintiffs' Failure to Preserve a Willfulness Claim

Contrar  to the statements in  our Februar  2 letter, Plaintiffs have not preserved a claim based on willful infrin_ement. The Schedulin_ Order, a_reed to b_ the _arties and entered b_ the Court in this case, required Plaintiffs to disclose that you alle_e willful infrin_ement in _our Infrin_ement Contentions, if _ou so alle_e. D.I. 30, ¶ 3.  You did not do so.  Indeed, Plaintiffs do not dis_ute that _our Infrin_ement Contentions did not state that Plaintiffs allege that AstraZeneca willfully infringed the Patents-in-Suit.  Throughout the last eleven months since Plaintiffs served your Infringement Contentions, in conducting discovery and developing our case, Defendants have relied on the allegations raised in Plaintiffs' Infringement Contentions, which did not include an assertion of willful infringement.  Defendants are therefore prejudiced by Plaintiffs' belated attempt to introduce a willfulness claim that was not preserved through timely disclosure in your Infringement Contentions.

Nor does Plaintiffs' citation to two isolated sentences from _our Infrin_ement Contentions suggest that Plaintiffs adequately preserved a willfulness claim.  Based on the _lain allegations made in _our Infrin_ement Contentions, we understood (and continue to understand) both statements to relate to allegations other than willful infringement, including, for example, Plaintiffs' allegation that AstraZeneca has induced infringement of the Patents-in-Suit.  Setting

**COVINGTON**

February 8, 2023
Page 2

aside that Defendants dispute any allegation of inducement, Plaintiffs have not—and cannot—point to any disclosure in your Infringement Contentions that plainly alleges willful infringement.

If Plaintiffs continue to dispute preservation of a willfulness claim in your Infringement Contentions, please provide your availability for a meet and confer on February 15 or 16.

### B.     Discovery Related to the Patents-in-Suit and Related Patents

Plaintiffs' letter dated January 6 incorrectly suggested that we limited our discovery efforts to exclude "communications between scientists at AstraZeneca referring to any of the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts." We wrote on January 20 to correct this statement and other inaccuracies. We explained that Defendants performed a reasonable search that included internal communications between scientists at AstraZeneca referring to the Patents-in-Suit or Related Patent Applications. Plaintiffs' February 2 letter now states that you understand that Defendants have not withheld any responsive documents from certain individuals who are neither AstraZeneca scientists nor ESI custodians. To the extent Plaintiffs are (again) seeking documents related to communications between Puma and AstraZeneca, we previously explained that we are not aware of any communications between AstraZeneca and Puma other than those that Plaintiffs have already produced in this litigation. Moreover, Plaintiffs' demand that Defendants should now conduct additional unidentified and non-custodial sources with the numbers for the Patents-in-Suit and Related Patent Applications is both burdensome and not reasonably targeted.

### C.     Defendants' RFP Nos. 40–41 and Plaintiffs' RFP Nos. 71–72

Plaintiffs' February 2 letter misstates the parties' communications with regard to Defendants' RFP Nos. 40–41 and Plaintiffs' RFP Nos. 71–72. Specifically, your February 2 letter incorrectly states that Defendants only "recent[ly]" requested Plaintiffs' and patentees' statements (including statements made on behalf of Plaintiffs and patentees) related to the foreign counterpart EP'414 in a request or application for a Supplementary Patent Certificate ("SPC"). Defendants' RFP No. 40, served on February 25, 2022, expressly requests documents relating to the preparation or prosecution of the Patents-in-Suit and all Related Patents (which include any foreign counterparts). Defendants' RFP No. 41, which was also served on February 25, 2022, specifically requests documents and things related to EP'414. In a letter dated August 10, 2022, Defendants expressly stated our request that Plaintiffs produce documents related to a request or application for a SPC related to EP'414. Throughout the following months, we have repeatedly explained (at meet and confers and through correspondence) that Plaintiffs' and patentees' statements related to SPC requests for EP'414 are responsive to Defendants' RFP Nos. 40–41 and are relevant to several issues in this case (including, e.g., claim construction, infringement, and invalidity) because they are statements made by the patentee to a governmental body or regulatory authority about a Related Patent. Accordingly, Plaintiffs are incorrect that Defendants' request for Plaintiffs' and patentees' statements in SPC requests related to EP'414 is not relevant or responsive to any pending discovery request. Nonetheless, if Plaintiffs maintain this position, we will serve an additional request for production specifically requesting this information.

Defendants thus remain willing to meet and confer regarding a reciprocal production of documents in response to Defendants' RFP Nos. 40–41 (and, if needed, an RFP specifically

**COVINGTON**

February 8, 2023
Page 3


requesting Plaintiffs' and patentees' statements related to EP'414 in a request for a SPC), and
Plaintiffs' RFP Nos. 71–72.

Regards,

*/s/ Ashley Winkler*
Ashley Winkler


cc: Counsel of Record

# EXHIBIT 15

# JONES DAY

110 NORTH WACKER DRIVE • SUITE 4800 • CHICAGO, ILLINOIS 60606

TELEPHONE: +1.312.782.8585 • JONESDAY.COM

Direct Number:  1.312.269.1565
MSMIT@JONESDAY.COM

February 2, 2023

VIA E-MAIL

Ashley Winkler, Esq.
COVINGTON & BURLING
One City Center
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-5108
awinkler@cov.com

Re:     *Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca Pharmaceuticals LLP &*
        *AstraZeneca AB*, 21-1338-MFK

Counsel,

We write in response to your January 20, 2023 letter.

## A.      Plaintiffs' Willful Infringement Claim

As an initial matter, we disagree with your posturing regarding Plaintiffs' willful
infringement claims.  Plaintiffs alleged willful infringement in their Complaint.  Dkt. 1 ¶¶ 58, 70.
The Scheduling Order provides, with respect to infringement contentions, that "a party claiming
patent infringement shall serve on all parties a 'Disclosure of Asserted Claims and Infringement
Contentions'" on or before March 18, 2022, and that, "[i]f a party claiming patent infringement
alleges willful infringement, the basis for such allegation."  Dkt. 30 ¶ 3(i).  Accordingly, on
March 18, 2022, Plaintiffs served contentions including their then-known bases for their willful
infringement allegation.  *See, e.g.*, Plaintiffs' Infringement Contentions, at 3 ("Indeed,
Defendants had knowledge of the Patents-in-Suit, as well as the published patent applications
corresponding to the Patents-in-Suit. With this knowledge, Defendants designed osimertinib to
bind cysteine 773 in order to overcome certain resistance of NSCLC to tyrosine kinase
therapy."); *see also id.* at 4-5 ("On information and belief, Defendants have known of the
Patents-in-Suit at least as early as April 6, 2011, the date of issuance of European Patent 1 848
414 B1, which is in the same patent family (or respectively, the underlying PCT application
publication WO 2006/084058), which included the same or similar claims as the Patents-in-Suit,
and has the same owner (Plaintiff Wyeth LLC) and exclusive licensee (Plaintiff Puma).").

We understand that you are nevertheless refusing to produce documents responsive to
Plaintiffs' requests relating to their claim of willful infringement.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO • SAN FRANCISCO
SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Ashley Winkler, Esq.
February 2, 2023
Page 2

Accordingly, and based on the parties' previous correspondence and meet and confers, we remain at an impasse on this issue, and others raised in our letter dated January 6, 2023.

**B.      Discovery Related to the Patents-in-Suit and Related Patents**

With respect to our request for AstraZeneca's internal communications regarding the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts, we understand from your letter that Defendants' production is complete and you have not withheld any responsive documents, including those in the possession of Benjamin McDonald, Scott Alban, Chris Sheldon, Pascal Soriot, and Jeff Pott. Please confirm by February 6, 2023, that no such documents are within Defendants' possession, custody, or control, or else produce them. We also understand that you are refusing to search non-custodial sources for this information even though searches for the numbers of the Patents-in-Suit and Related Patent Applications would be targeted and non-burdensome. Plaintiffs have always maintained that limiting these targeted searches to custodial sources is improper. The parties are at an impasse.

**C.      Defendants' RFP Nos. 40–41 and Plaintiffs' RFP Nos. 71–72**

Plaintiffs' requests for statements made by or on behalf of Defendants in Civil Action No. 1:20-cv-00202-UNA about the history and need for the development of Tagrisso® and the mechanism of action of Tagrisso®, including, but not limited to, expert reports and testimony, have been pending since March 18, 2022. To date, Defendants have not represented that no such statements were made by or on behalf of Defendants in that action. Nor have Defendants fulfilled their duty to investigate whether any responsive documents exist.

With respect to Defendants' recent request for Plaintiffs' and patentees' statements (including statements made on behalf of Plaintiffs and patentees) related to the foreign counterpart EP'414 in a request or application for Supplementary Patent Certificate ("SPC"), in addition to Plaintiffs' position that such information is not relevant, it is also not responsive to any pending discovery request served by Defendants.

JONES DAY

Ashley Winkler, Esq.
February 2, 2023
Page 3

Sincerely

*/s/ Michelle Smit*
Michelle Smit

cc:     Sara Horton
        Ren-How Harn
        *Counsel for Wyeth LLC*

# EXHIBIT 16

# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**<u>Via Electronic Mail</u>**                                         November 30, 2022

Shehla Wynne
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> ***Re***:    ***Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca***
> ***Pharmaceuticals LP & AstraZeneca AB***
> **(D. Del. No. 21-1338-MFK)**

Counsel,

We write in response to Plaintiffs' letters dated November 9 and 10, 2022.

## I.    Plaintiffs' November 9 Letter

### A.    Schedule for Responding to Contention Interrogatories

We do not agree with Plaintiffs' proposal to respond to contention interrogatories related to non-infringement or invalidity prior to the Court's *Markman* order. Nor do we agree with Plaintiffs' proposal that Defendants be given just one week to respond to Plaintiffs' contentions related to damages.

In an effort to compromise, we will agree that, no later than January 13, 2023, Defendants will respond to Plaintiffs' Interrogatory No. 3 related to Defendants' Fifth Affirmative Defense, and that Plaintiffs will respond to Defendants' Interrogatory No. 6 related to damages. We further propose that the parties respond to the remaining contention interrogatories (i.e., Plaintiffs' Interrogatory Nos. 1 and 13 and Defendants' Interrogatory Nos. 1 and 4) no later than two weeks after issuance of the Court's *Markman* order.  In addition, it is our understanding that the parties will respond to contention interrogatories at a level of detail and/or generality consistent with that of the contention being responded to.

**COVINGTON**

November 30, 2022
Page 2

### B.  Discovery Related to Patent Applications and Foreign Counterparts

Plaintiffs ask that we confirm that we will address each of Plaintiffs' specific questions relating to knowledge of the Related Patents and that we will identify the persons most knowledgeable in response to Plaintiffs' Interrogatory Nos. 16 and 17.  We will respond to these interrogatories consistent with our previous objections, responses, and correspondence to Plaintiffs.  As to identification of knowledgeable individuals, we note that Plaintiffs' request is inconsistent with your failure to identify knowledgeable individuals in response to Defendants' Interrogatory Nos. 6, 8, and 9 despite repeated requests that you do so.

### C.  Discovery Scope Concerning EGFR Inhibitors

As an initial matter, we reassert that we do not understand what additional information Plaintiffs are seeking.  We further note that Defendants provided a timeframe for the "Tagrisso® Project" in response to Plaintiffs' request that we do so, not in an effort to avoid discovery related to Tagrisso®.  As should be evident from our document production, we have searched for documents beyond this timeframe.

### D.  Plaintiffs' Interrogatory Nos. 5–7

In Plaintiffs' November 9 letter, you stated that Defendants do not intend to produce any documents pertaining to the research and development of any EGFR inhibitors other than Tagrisso®. As an initial matter, and as previously repeatedly explained, we object to Plaintiffs' attempt to convert these interrogatories into requests for production and compel Defendants' response.  In any event, your statement is plainly false and misrepresents months of correspondence. *See* Defendants' Letter to Plaintiffs (Oct. 17, 2022); Defendants' Letter to Plaintiffs (Sept. 21, 2022); Defendants' Letter to Plaintiffs (Aug. 5, 2022).

### E.  Plaintiffs' RFP No. 43 and Interrogatory No. 4

As previously discussed, Defendants objected to these requests, among other reasons, because they are unreasonably broad and because Plaintiffs have not explained why they are relevant to any issue in this case. Plaintiffs now ask that Defendants produce "all the agreements related to intellectual property for the research, development, offers to sell, and sale of Tagrisso® in the United States, including agreements involving patents, patent applications, and know-how," which you assert is relevant to Damages.  In our September 21, 2022 letter we represented that AstraZeneca has not agreed to pay patent royalties or license fees in connection with Tagrisso® to any third party not affiliated with AstraZeneca.  It is not clear what additional information you need.

## II.  Plaintiffs' November 10 Letter

### A.  Defendants' General Objections

As an initial matter, Defendants note that the ESI Order agreed to by the parties and entered in this case states that the parties may redact documents or ESI, among other bases, for "data governed by EU Data Privacy Directive and/or other applicable privacy law or regulation." D.I. 41 ¶ 5.4; *see also id.*, ¶ 1.6.  We therefore reserve the right to withhold information or redact

**COVINGTON**

November 30, 2022
Page 3

documents or ESI consistent with the ESI Order and Protective Order in this case. Nonetheless, in an effort to compromise, we confirm that Defendants are not aware of any specific document that has been withheld based on the EU Data Privacy Directive.

### B.     Plaintiffs' Interrogatory Nos. 1 and 3

Plaintiffs request that we identify individuals most knowledgeable in response to Interrogatory Nos. 1 and 3. We note that the parties have not yet agreed to a schedule to respond to these interrogatories. In addition, we note that Plaintiffs' request is inconsistent with your failure to identify knowledgeable individuals in response to Defendants' Interrogatory Nos. 6, 8, and 9 despite repeated requests that you do so.

### C.     Plaintiffs' RFP No. 3

Defendants have searched more than ten different custodians and non-custodial sources and have produced tens of thousands of documents related to Tagrisso® and the EGFR inhibitors evaluated durin_ the develo_ment of Tagrisso®. We do not understand what additional information Plaintiffs are seeking.

### D.     Plaintiffs' RFP No. 13

Plaintiffs' conclusory assertions that "[t]he Lynch 2004 paper reflects important findings about the role of certain EGFR mutations and the response to gefitinib and/or erlotinib in NSCLC" or that "[s]everal of the authors are also inventors on the Patents-in-Suit" fail to demonstrate the Lynch paper is relevant to any issue in this case. Indeed, Plaintiffs do not dispute that the EGFR mutations described by the Lynch paper are not recited by the Asserted Claims. Thus, even if such a publication was relevant to infringement or willful infringement analyses (which it is not), there is no relationship between the Lynch paper and the claims in this case.

### E.     Plaintiffs' RFP No. 14

Contrary to your November 9 letter, we previously explained, including in our responses and objections to Plaintiffs' RFP No. 14 and in our letter dated October 27, 2022, this request is over broad and fails to target information relevant to this case. Yet, Plaintiffs have made no effort to narrow your request.

### F.     Plaintiffs' RFP Nos. 17

Plaintiffs' RFP No. 17 requests all documents and things relating to the sale, purchase, assignment, licensing, transfer, and/or contemplation of sale, purchase, assignment, licensing, or transfer of any patent or patent application, whether issued, pending, abandoned, or not yet filed, concerning any irreversible EGFR inhibitor owned or otherwise assigned to Defendants. We objected to this request as over broad, unduly burdensome, and disproportional to the needs of the case. You have not attempted to narrow or clarify the scope of this request. Nor have you produced, or agreed to produce, documents in response to Defendants' request for licenses and agreements related to patents or patent applications cited in the Patents-in-Suit that Plaintiffs filed or that have been assigned to Plaintiffs, including U.S. Patent Application Publication 2006/0235046, International Patent Application Publication WO 2006/113151, International

**COVINGTON**

November 30, 2022
Page 4

Patent Application Publication WO 2006/084058, International Patent Application Publication WO 2005/094357, and any continuations of the applications.  *See* Defendants' RFP No. 84.  We are willing to meet and confer regarding the scope of Plaintiffs' RFP No. 17, but Plaintiffs must likewise be willing to confer regarding the production of documents in response to Defendants' RFP No. 84.

### G.      Plaintiffs' RFP No. 33

As explained in our responses and objections, Plaintiffs' request is vague, overly broad, unduly burdensome, and disproportionate to the needs of the case.  Plaintiffs' conclusory assertion that this request is relevant to damages does not narrow or clarify the scope of your request.  We maintain our objections to Plaintiffs' RFP No. 33.

### H.      Plaintiffs' RFP No. 34−38

Plaintiffs ask that we confirm that we do not have specific documents to particular indications of Tagrisso® that we are planning to withhold from production.  We do not understand what Plaintiffs are asking.  Defendants' have searched for and produced substantial discovery related to each of Tagrisso®'s approved indications.

### I.      Plaintiffs' RFP No. 75

It is not clear from your November 10 letter what Plaintiffs are asking.  We have repeatedly explained that discovery related to the EGFR sensitizing mutations (including exon 19 deletions and exon 21 L858R mutations), which are not recited by the Asserted Claims, is not relevant to any issue in this case.  Plaintiffs have not shown otherwise.  Nor does the quoted statement from Defendants' Invalidity Contentions suggest that EGFR sensitizing mutations are recited by the Asserted Claims.  Defendants' objections to Plaintiffs' RFP No. 75 are directed at least to the sensitizing mutations, which are the mutations specifically identified in RFP No. 75.  To the extent Plaintiffs' RFP No. 75 requests documents and things related to "other EGFR mutations," Defendants further object to Plaintiffs' request as vague and ambiguous.

Sincerely,

Ashley Winkler

Ashley Winkler

Cc: Counsel of Record

# EXHIBIT 17

**COVINGTON**

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**By Electronic Mail**                                February 24, 2023

Lisa Schlatz
Jacquelyn Held
The General Hospital Corporation
399 Revolution Dr.
Somerville, MA 02145

      Re:     ***Puma Biotechnology, Inc. & Wyeth LLC v.***
            ***AstraZeneca Pharmaceuticals LP & AstraZeneca AB***
            **(D.Del. C.A. No. 21-1338-MFK)**

Counsel:

      We write to follow-up on our ongoing discussions relating to the collection and review of Dr. Haber's custodial files. We appreciate the information that GHC has provided thus far concerning documents collected from Dr. Haber. In an effort to reach a resolution on the production of his documents, we address the review of Dr. Haber's documents further below.

**I.    The Time Period for GHC's Document Review**

      During our February 10 call, GHC proposed narrowing its review to Dr. Haber's documents collected the 2004–2006 time period. In follow-up correspondence dated February 14, GHC indicated that there are 100 documents (including document hits and families) falling within this time period.[1]

      AstraZeneca appreciates GHC's suggestions and efforts to reach a speedy resolution on Dr. Haber's document review. However, limiting the production of documents from Dr. Haber's files to the 2004–2006 time period would exclude a significant number of responsive documents. For one, the 100 documents within that time frame represent only a small fraction of the documents (approximately 57,000 in total) collected from Dr. Haber.

      Documents dated after our proposed cutoff of 2006 are responsive for several reasons. Irreversible inhibitors, including those identified in the Patents-in-Suit, were investigated in clinical studies of patients with non-small cell lung cancer ("NSCLC") after 2006. The Patents-in-Suit relate to the administration of irreversible inhibitors to certain patients with NSCLC. Accordingly, documents and communications relating to those clinical studies, including the

---

[1] AstraZeneca understands that the 100 document hits do not include hits for Search Term No. 16. In the same February 14 correspondence, GHC indicated that there was a syntax error with that search term, which AstraZeneca corrected on February 16.

**COVINGTON**

February 24, 2023
Page 2

safety and effectiveness of irreversible inhibitors in treating NSCLC, are highly relevant to this litigation. Also, in 2015, FDA approved the accused product—Tagrisso—for the treatment of certain patients with NSCLC. Documents and correspondence relating to Tagrisso—such as communications between the named inventors comparing Tagrisso to the inhibitors mentioned in the Patents-in-Suit—are also relevant to this litigation.

Given the considerations above, AstraZeneca believes the full set of documents collected from Dr. Haber using the proposed search terms should be reviewed.

## II.   The Scope of GHC's Production

As we mentioned on our calls on January 19 and January 26, we would like to clarify and confirm the scope of documents that GHC will be producing from Dr. Haber's custodial collection.

GHC submitted its responses and objections to AstraZeneca's subpoena on October 27, 2022. In a follow-up call and correspondence, we explained that GHC's responses to several requests were unduly narrow. We addressed these objections and responses in our November 18 letter, detailing categories of documents that are relevant to this matter and should be produced.

GHC indicated that its original responses were based, at least in part, on the fact that GHC did not know what responsive documents it possessed or where to find them. At GHC's invitation and consistent with our November 18 letter, we proposed custodians and search terms, including search terms that have been used to identify and collect Dr. Haber's documents.

We understand from this history that GHC does not intend to adhere strictly to its original responses and objections to AstraZeneca's subpoena. Indeed, on a more recent call, GHC indicated that it generally intends to produce documents relating to this matter. Consistent with the explanations in our November 18 letter and the proposed search terms, please confirm that GHC will produce the following documents, in addition to the documents it agreed to produce in its original Subpoena responses, to the extent they can be located in the custodial files collected from Dr. Haber using our proposed search terms.

- **Documents Relating to "Related Patents" (Request Nos. 1, 3, and 30):** In its original responses, GHC agreed to produce documents relating to the Patents-in-Suit. In our November 18 letter, we explained the relevance of documents concerning *related patents and patent applications*, including communications between the GHC inventors and Wyeth concerning such patents and applications. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Documents Relating to Tagrisso® or Osimertinib (Request Nos. 5 and 17):** As explained above and in our November 18 letter, documents relating to Tagrisso (osimertinib), including documents relating to comparisons between Tagrisso (osimertinib) and other irreversible EGFR inhibitors, are relevant to this matter. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Documents Relating to Efforts to Develop EKB-569, HKI-357, HKI-272, CL-387,785, and CI-1033 (Request Nos. 7–16):** GHC originally agreed to produce

**COVINGTON**

February 24, 2023
Page 3

"summary documents relating to the testing" of EKB-569, HKI-357, HKI-272, CL-387,785, and CI-1033 "for use in humans." As we explained in our November 18 letter, the full scope of documents falling within these requests is relevant to this matter. In that letter, we provided non-limiting examples of likely relevant documents, such as laboratory notebooks, preclinical testing reports, meeting minutes, presentations, clinical trial protocols, clinical trial reports, IND documents, and correspondence relating to the effectiveness or safety of these inhibitors, including correspondence involving the named GHC inventors. Documents relating to any decision to discontinue further development of these inhibitors, which may be included in correspondence, clinical trial reports, or internal meeting notes/presentations, are also relevant to this matter. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Documents Relating to Research, Dosing, and Development of Products Whose Use Would Fall Within the Patents-in-Suit (Request Nos. 6, 18–20):** GHC originally agreed to produce documents relating to the "conception and reduction to practice" of the inventions claimed in the Patents-in-Suit. As explained in our November 18 letter, additional documents falling within these requests are relevant to this matter, for reasons similar to Request Nos. 7–16. We previously provided a non-limiting list of exemplary documents that would fall within this request, such as preclinical testing reports, meeting minutes, presentations, clinical trial protocols, clinical trial reports, IND documents, and correspondence relating to the effectiveness or safety of irreversible inhibitors. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Laboratory Notebooks or Other Experimental Documents Prior to April 15, 2006 (Request Nos. 22–23) and Invention Disclosure Forms (Request Nos. 24–25):** GHC originally agreed to produce documents relating to "conception and reduction to practice of the inventions claimed in the Patents-in-Suit." AstraZeneca interprets GHC's response to encompass laboratory notebooks, other experimental documents, and invention disclosure forms prior to April 15, 2006. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Communications Between GHC and Third Parties Prior to April 15, 2006 (Request Nos. 26–27):** Documents relating to communications between GHC and third parties concerning irreversible EGFR inhibitors or treatments for gefitinib and/or erlotinib resistant NSCLC prior to April 15, 2006 are directly related to the subject matter of the Patents-in-Suit and are highly relevant to this matter. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Documents Relating to Patent Applications Filed by GHC (Request Nos. 28–29):** Request Nos. 28 and 29 concern patent applications filed by or assigned to GHC relating to the subject matter of the Patents-in-Suit: that is, relating to irreversible EGFR inhibitors or treatments for gefitinib and/or erlotinib resistant NSCLC. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

**COVINGTON**

February 24, 2023
Page 4

- **Documents Relating to Prior Art and Prior Knowledge (Request Nos. 37, 39, and 41):** For the reasons set forth in our November 18 letter, please confirm that GHC will produce documents relating to prior art searches, prior publications, and prior knowledge of the Patents-in-Suit, to the extent such documents are located in Dr. Haber's collection.

- **Documents Relating to Enforcement of Patents in Suit (Request Nos. 44–45):** For the reasons set forth in our November 18 letter, please confirm that GHC will produce documents relating to the enforcement of the Patents-in-Suit, to the extent such documents are located in Dr. Haber's collection.

- **Documents Relating to Licensing or Agreements Concerning the Patents-in-Suit (Request Nos. 47–49, and 51):** GHC has already agreed to produce agreements or licenses related to the Patents-in-Suit, agreements or assignments between GHC, Puma, Wyeth, and/or Pfizer transferring an interest in the Patents-in-Suit, and any requests for or offers for licenses of the Patents-in-Suit. As explained in our November 18 letter, documents relating to negotiations for licenses and assignments are also relevant to this matter. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Documents Relating to Licenses or Assignments of Related Patents (Request Nos. 47–49, and 51):** As set forth in November 18 letter, documents relating to licenses and assignments of *related* patents are also relevant to this matter. In our November 18 letter we provided an exemplary license entered into by Dr. Haber—a license between Drs. Bell, Settleman, and Haber and Genzyme Genetics for a patent relating to the discovery of EGFR mutations. Please confirm that GHC will produce documents falling within these requests, including documents relating to the Genzyme Genetics license, to the extent they can be located within Dr. Haber's collection.

- **Documents Related to Kwak and Bell Publications (Request Nos. 54–55):** We understand that GHC has already agreed to produce documents relating to the preparation of Kwak 2005, including documents relating to submissions to journals and comments from peer review to the extent such documents could be located. As explained in our November 18 letter, the same scope of documents concerning the Bell 2005 publication is also relevant to this matter. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

- **Documents Relating to Grant Applications (Request Nos. 56–57):** We provided a non-limiting set of exemplary grants that relate to the subject matter of this case in our November 18 letter, including the following grants to Dr. Haber: National Institutes of Health Grant P01 95281, Doris Duke Charitable Foundation, Sandler Family Foundation. Please confirm that GHC will produce such documents to the extent they can be located within Dr. Haber's collection.

**COVINGTON**

February 24, 2023
Page 5

Sincerely,

/s/ *Melissa Keech*

Melissa Keech

# EXHIBIT 18

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**By Electronic Mail**                                    September 12, 2022

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

Gasper J. LaRosa
Jones Day
250 Vesey Street
New York, NY 10281

 Re: ***Puma Biotechnology, Inc. & Wyeth LLC v.***
 ***AstraZeneca Pharmaceuticals LP & AstraZeneca AB***
 **(D. Del. C.A. No. 21-1338-MFK)**

Counsel:

 Following the parties' August 31, 2022 meet and confer, we write to follow-up regarding Defendants' Requests for Production Nos. 10, 11, 33, 36, 37, and 86, which were most recently addressed in Defendants' August 4, 2022 letter and Plaintiffs' August 23, 2022 letter.

 These RFPs seek documents and information related, inter alia, to research and development of other irreversible EGFR inhibitors beyond the six inhibitors that are specifically identified in the Patents-in-Suit and their prosecution histories (i.e., EKB-569, HKI-272, HKI-357, CL-387,785, CI-1033, or dacomitinib). Plaintiffs do not dispute the relevance of these requests but have requested that Defendants narrow their scope. In particular, during the parties' July 25 meet and confer, Plaintiffs requested that Defendants limit the scope of these requests to a particular date range. In an effort to compromise, in our August 4 letter, Defendants offered to limit the scope of these requests to "documents dated before Tagrisso®'s approval on November 13, 2015." In your August 23, 2022 letter, Plaintiffs rejected this proposal without offering any counter-proposal.

 During the August 31 meet and confer, Defendants offered yet another compromise, requesting that Plaintiffs search and produce documents during the period of 2009 until Tagrisso®'s approval on November 13, 2015. Despite your request for a date restriction, this time Plaintiffs stated that you are not amenable to a date limitation for these requests. ███████████ ████████████████████████████████ you stated that you will not conduct a search for any inhibitors other than the six specifically identified inhibitors, but that you will not withhold documents and information that reference other EGFR inhibitors. However, you stated your willingness to

**COVINGTON**

September 12, 2022
Page 2

produce documents and information related to such inhibitors, if discovery reveals other irreversible EGFR inhibitors.

e reserve the right to identify additional irreversible EGFR inhibitors to which we are entitled to discovery.

Sincerely,

/s/ Ashley Winkler

Ashley Winkler

cc: Counsel of Record

# EXHIBIT 19

# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

**<u>Via Electronic Mail</u>**                                              January 20, 2023

Gasper J. LaRosa
Jones Day
250 Vesey Street
New York, NY 10281

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

> **_Re_**:    **_Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca_**
> **_Pharmaceuticals LP & AstraZeneca AB_**
> **(D. Del. No. 21-1338-MFK)**

Counsel,

We write to correct certain inaccuracies in Plaintiffs' letter dated January 6, 2023.

## A.    Discovery Related to Foreign Counterpart

In Plaintiffs' January 6 letter, you assert that Plaintiffs' discovery requests related to Defendants' knowledge of EP 1,848,414 are relevant to willfulness. We reiterate, as we have previously explained, that AstraZeneca's knowledge of the foreign counterpart is not relevant to willfulness. Moreover, Plaintiffs' infringement contentions served on March 18, 2022 pursuant to Paragraph 3 of the Scheduling Order do not state that Plaintiffs "allege[] willful infringement" or provide "the basis for such allegation." D.I. 30, ¶ 3(i).

To the extent that Plaintiffs summarily assert that requests related to knowledge of EP'414 are relevant to pre-issuance damages, Plaintiffs are again incorrect. As we have also previously explained—and Plaintiffs have not disputed—Plaintiffs do not rely on claims published in EP'414 as a basis for pre-issuance damages. _See_ Plaintiffs' Complaint (D.I. 1); Plaintiffs' Objections and Responses to Defendants' Interrogatory No. 12 (Aug. 24, 2022). Plaintiffs have not otherwise provided any explanation as to how knowledge of a foreign counterpart is relevant to pre-issuance damages.

**COVINGTON**

January 20, 2023
Page 2

### B.   Discovery Related to the Patents-in-Suit and Related Patent Applications

In Plaintiffs' January 6 letter, you ignore our prior correspondence and suggest that Defendants have refused to produce internal communications regarding the Patents-in-Suit and Related Patent Applications, including internal communications between scientists at AstraZeneca referring to them. Plaintiffs are incorrect. Indeed, Defendants performed a reasonable search, including searching more than ten custodians at AstraZeneca related to the development of Tagrisso® (including numerous scientists) with broad search terms, which included the numbers of the Patents-in-Suit and Related Patents Applications.

### C.   Discovery Scope Concerning EGFR Inhibitors

In Plaintiffs' January 6 letter, you state that Plaintiffs' discovery requests that you characterize as encompassing "documents showing Defendants' knowledge of the inventors' research efforts to treat NSCLC resistant to gefitinib and/or erlotinib," "bear[] directly" on willful infringement. Although Defendants have explained that we performed a reasonable search for documents consistent with our objections and responses to Plaintiffs' discovery requests, we also write to clarify that Plaintiffs' requested discovery is not relevant to a claim of willful infringement. And, even were such discovery relevant to willful infringement (which it is not), Plaintiffs have not maintained a willful infringement claim in this case. *See supra* § A.

### D.   Plaintiffs' RFP No. 12

In Plaintiffs' January 6 letter, Plaintiffs summarily assert that your discovery request related to Kwak 2005 "is relevant" and you demand additional searches. As an initial matter, Plaintiffs have not shown that discovery related to Kwak 2005 is relevant to any issue in this case. But, even were it relevant (which it is not), Defendants already performed a reasonable search. Indeed, as we previously explained, in an effort to comprise, while maintaining that discovery related to Kwak 2005 is not relevant to any issue, we searched more than ten custodians with the broad term "kwak." *See, e.g.*, Defendants' Letter to Plaintiffs (Oct. 14, 2022).

### E.   Discovery Related to Nadia Godin-Heymann and Jeffrey Settleman

Plaintiffs' January 6 letter complains that Defendants have not produced any documents in response to Plaintiffs' RFP No. 15, which requests documents concerning Nadia Godin-Heymann. Setting aside the fact that we have repeatedly explained that Dr. Godin-Heymann was not involved in the development of Tagrisso®, Plaintiffs' complaint is inconsistent with your refusal to search for and produce responsive documents concerning Jeffrey Settleman, who is a named inventor of the Patents-in-Suit and an employee of Pfizer.

Please confirm that Plaintiffs are searching documents related to Dr. Settleman using the same search terms agreed upon in Defendants' January 3 letter to Plaintiffs. When you so confirm, we agree to meet and confer regarding a reciprocal production of these documents and Defendants' production of documents related to Dr. Godin-Heymann.

**COVINGTON**

January 20, 2023
Page 3

### F.  Defendants' RFP Nos. 40–41 and Plaintiffs' RFP Nos. 71–72

With respect to Defendants' RFP Nos. 40–41, Defendants have repeatedly requested that Plaintiffs produce Plaintiffs' and patentees' statements (including statements made on behalf of Plaintiffs and patentees) related to the foreign counterpart EP'414 in a request or application for Supplementary Patent Certificate ("SPC").  Plaintiffs cannot show that we are not entitled to such discovery.  Plaintiffs' January 6 letter summarily asserts that documents concerning SPCs related to EP'414 are not relevant to this case, but Plaintiffs completely ignore (as we have repeatedly explained) that these documents include statements made by the patentee to a governmental body or regulatory authority and thus are relevant to several issues, including claim construction, infringement, and invalidity.  Plaintiffs' failure to produce such relevant discovery is not justified.

With respect to Plaintiffs' RFP Nos. 71–72, Plaintiffs seek statements made by or on behalf of Defendants in Civil Action No. 1:20-cv-00202 about the history and need for the development of Tagrisso® and the mechanism of action of Tagrisso®.  We previously explained that the referenced litigation involved a single patent related to pharmaceutical compositions comprising osimertinib.  However, in an effort to compromise, at the parties' December 7, 2022, we proposed that the parties agree to reciprocal discovery related to Defendants' RPF Nos. 40–41 and Plaintiffs' RFP Nos. 71–72.

Please confirm that Plaintiffs will produce the discovery requested in response to Defendants' RFP Nos. 40–41 related to any requests or applications for SPC for EP'414. When you so confirm, in an effort to compromise, we agree to meet and confer regarding a reciprocal production of these documents and documents related to Plaintiffs' RFP Nos. 71–72.


Regards,

*/s/ Ashley Winkler*
Ashley Winkler


cc: Counsel of Record

# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-1338-CFC-MFK |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) | |
| Defendants. | ) ) | |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) | |
| Counterclaim Plaintiffs, | ) ) | |
| v. | ) ) | |
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Counterclaim Defendants. | ) ) | |

**DEFENDANTS' PARAGRAPH 3 INITIAL DISCLOSURES**

Pursuant to Paragraph 3 of this Court's Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI") ("Default Standard"), Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca AB (collectively, "AstraZeneca" or "Defendants") hereby submit the following Paragraph 3 Initial Disclosures to Plaintiffs/Counterclaim Defendants Puma Biotechnology, Inc. and Wyeth LLC (collectively, "Plaintiffs"). These Initial Disclosures are based on information reasonably available to Defendants at this time and reasonably believed to be relevant to the claims or defenses in the above-captioned action ("the Action"). Defendants reserve the right to supplement and/or amend these disclosures as the case progresses and should additional information become available.

Defendants' Initial Disclosures are made without waiving (1) any claim of privilege or work product; (2) the right to object on grounds of competency, relevancy, materiality, hearsay, or any other proper ground, to the use of any such information, for any purpose, in whole or in part, in this or any other action; and (3) the right to object on any and all grounds, at any time, to any discovery request or proceeding involving or relating to the subject matter of these disclosures.

The disclosures set forth below are made subject to these objections and qualifications.

I.      **Custodians**

Pursuant to ¶ 3(a) of the Default Standard, Defendants identify the following custodians that Defendants believe may have potentially discoverable information in this case. Defendants do not represent that these custodians have relevant documents or admissible evidence in their possession, custody, or control, and do not waive their right to object to the production of any document or tangible thing in the possession of these custodians on the basis of privilege, the work product doctrine, relevance, or any other objection.

Discovery in this case is just beginning, and Defendants' investigation is ongoing. In addition, Plaintiffs have not yet fully disclosed the theories underlying their claims.

2

| Name | Title/Role | Subject Matter of Information |
|------|-----------|------------------------------|
| Richard Ward | Team Leader and Principal Scientist for Osimertinib | Information relating to the research and development of osimertinib |
| Darren Cross | Team Leader and Principal Scientist for Osimertinib | Information relating to the research and development of osimertinib |
| Teresa Klinowska | Project Development Leader for Osimertinib | Information relating to the research and development of osimertinib |
| Mark Anderton | Discovery Toxicologist for Osimertinib | Information relating to preclinical safety and toxicology studies performed during the development of osimertinib |
| Serban Ghiorghiu | Global Development Lead, EGFR Franchise for Tagrisso® and Global Clinical Lead Osimertinib | Information relating to clinical studies of osimertinib |
| Yuri Rukazenkov | Global Development Lead, EGFR Franchise for Tagrisso® | Information relating to clinical studies of osimertinib |
| Jeffrey Gustaitis | Tagrisso® Insights and Analytics Senior Director | Information relating to sales and prescribing practices of, and market research and internal forecasting for, Tagrisso® in the United States |
| Katy Miller | VP US Franchise Head, Tagrisso® | Information relating to sales and marketing of Tagrisso® |
| Philip Jewsbury | Senior Project Director, Oncology Department | Information related to the preclinical research and development of osimertinib |
| Nabil Chebab | Medical Franchise Head, Lung US | Information related to sales and marketing of Tagrisso® in the United States |

By making this disclosure, Defendants do not consent to or authorize Plaintiffs to communicate with this custodian. Instead, all such communications must be made through counsel for Defendants.

## II.    Non-Custodial Data Sources

Pursuant to ¶ 3(b) of the Default Standard, Defendants identify the following non-custodial data sources that may contain non-duplicative discoverable information: regulatory databases (e.g.,

ANGEL), marketing databases (e.g., VEEVA), financial databases (e.g., Oracle), and other legacy databases (e.g., PKT and Sharepoint), hard copy document repositories, and shared access drives. In so doing, Defendants do not waive their rights to object to the production of any document or tangible thing located within these data sources on the basis of the attorney-client privilege, the work product doctrine, relevance, or any other objection.

Defendants reserve the right to supplement or amend their disclosures regarding non-custodial sources at a later time as the case proceeds.

### III.   Notice

Pursuant to Paragraph 3(c)(i) of the Default Standard, to the extent Defendants maintain backup tapes of their electronic data systems, such tapes are not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(B). Moreover, pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i), Defendants will not produce documents already in Plaintiffs' possession, custody, or control. Defendants will also not produce documents from the sources identified in Schedule A of the Default Standard. Defendants' investigation is ongoing; Defendants will identify to Plaintiffs any additional issues with ESI as discovery progresses and after it receives Plaintiffs' discovery requests, as it is not clear at this time the full scope of ESI that Plaintiffs may seek.

Pursuant to Paragraph 3(c)(ii) of the Default Standard, any third party discovery will be conducted pursuant to the scheduling order in the Action. Defendants anticipate that third-party discovery may be needed with respect to issues of invention of U.S. Patent Nos. 10,596,162 and 10,603,314 and research and development of irreversible tyrosine kinase inhibitors, including Nerlynx® (neratinib or HKI-272), Vizimpro® (dacomitinib or PF299804), pelitinib (EKB-569), HKI-357, CL-387,785 (EKI-785), and canertinib (CI-1033). Defendants will identify parties from whom discovery will be sought as soon as the parties are known.

4

Pursuant to Paragraph 3(c)(iii) of the Default Standard, Defendants state that the transfer of potentially responsive documents from entities or custodians in the United Kingdom and/or the European Economic Area, including Sweden, may implicate data privacy laws and protections, including the General Data Protection Regulation (EU) 2016/679 of the European Parliament and of the Council adopted on April 14, 2016, the UK General Data Protection Regulation, and the UK Data Protection Act of 2018. Defendants also state that potentially responsive documents from one or more entities or custodians may implicate patient privacy concerns, and in particular the Health Insurance Portability and Accountability Act.

## IV.    Insurance agreements under Federal Rule of Civil Procedure 26(a)(1)(A)(iv)

At this time, Defendants are unaware of any insurance agreement relevant to this action. However, Defendants reserve the right to supplement this disclosure if any pertinent insurance agreements are identified.

|  |  |
|---|---|
|  | */s/ Karen E. Keller*_____ |
|  | Karen E. Keller (No. 4489) |
|  | Nathan R. Hoeschen (No. 6232) |
| OF COUNSEL: | SHAW KELLER LLP |
| Christopher N. Sipes | I.M. Pei Building |
| Einar Stole | 1105 North Market Street, 12th Floor |
| Megan P. Keane | Wilmington, DE 19801 |
| Ashley Winkler | (302) 298-0700 |
| Jason Reinecke | kkeller@shawkeller.com |
| Melissa Keech | nhoeschen@shawkeller.com |
| COVINGTON & BURLING LLP | *Attorneys for AstraZeneca Pharmaceuticals* |
| One CityCenter | *LP and AstraZeneca AB* |
| 850 Tenth Street NW |  |
| Washington, DC 20001-4956 |  |
| (202) 662-6000 |  |

Dated: March 18, 2022

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on March 18, 2022, this document was served on

Puma-TagrissoLitigation@jonesday.com and the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Megan Elizabeth Dellinger
Rodger Dallery Smith, II
MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com
rsmith@morrisnichols.com
*Attorneys for Plaintiffs*

Gasper J. LaRosa
Lisamarie LoGuidice
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
gjlarosa@jonesday.com
llogiudice@jonesday.com
*Attorneys for Plaintiff Puma
Biotechnology, Inc.*

Shehla Wynne
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939
swynne@jonesday.com
*Attorneys for Plaintiff Puma
Biotechnology, Inc.*

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
(858) 314-1200
sngeise@jonesday.com
aminsogna@jonesday.com
meredithstewart@jonesday.com
*Attorneys for Plaintiff Puma
Biotechnology, Inc.*

Sara T. Horton
WILKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
(312) 728-9040
shorton@willkie.com
*Attorneys for Plaintiff Wyeth LLC*

Jason G. Winchester
JONES DAY
77 West Wacker, Suite 3500
Chicago, IL 60601-1692
(312) 782-3939
jgwinchester@jonesday.com
*Attorneys for Plaintiff Puma
Biotechnology, Inc.*

6

<u>/s/ Karen E. Keller</u>
 Karen E. Keller (No. 4489)
 Nathan R. Hoeschen (No. 6232)
 SHAW KELLER LLP
 I.M. Pei Building
 1105 North Market Street, 12th Floor
 Wilmington, DE 19801
 (302) 298-0700
 kkeller@shawkeller.com
 nhoeschen@shawkeller.com
 *Attorneys for AstraZeneca Pharmaceuticals*
 *LP and AstraZeneca AB*

Dated: March 18, 2022

7

# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs/Counterclaim-Defendants, | ) ) | |
| v. | ) ) | C.A. No. 21-1338-MFK |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) ) | |
| Defendants/Counterclaim-Plaintiffs. | ) ) | |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)**

Pursuant to Federal Rules of Civil Procedure 26 and 30, Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca AB (collectively, "AstraZeneca" or "Defendants") hereby object and respond to the Corrected Notice of Deposition dated January 31, 2023 (the "Notice") served by Plaintiffs Puma Biotechnology Inc. and Wyeth LLC (collectively, "Plaintiffs").

**GENERAL OBJECTIONS**

1.     AstraZeneca objects to the Notice, including the definitions and instructions therein, to the extent it purports to impose discovery obligations greater than those required by, or inconsistent with, the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the District of Delaware, any Court order, or any applicable agreement between the parties.

2.     AstraZeneca objects to the date and location noticed on the ground and to the extent that the date and location are not mutually agreeable and not coordinated with AstraZeneca.

AstraZeneca will identify one or more witnesses in response to the Notice and will work with Plaintiffs to identify a mutually-agreeable date and location for its witness(es).

3.       AstraZeneca objects to each Topic to the extent that it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. Nothing in these objections is intended to be, or in any way shall be deemed, a waiver of any applicable privilege or immunity.

4.       AstraZeneca objects to each Topic to the extent that it is vague and ambiguous, or fails to state with "reasonable particularity the matters for examination" as required by Fed. R. Civ. P. 30(b)(6).

5.       AstraZeneca objects to each Topic to the extent that it seeks information not relevant to any claim, counterclaim, or defense pleaded by any party in this action and that is not proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1).

6.       AstraZeneca objects to each Topic to the extent that it calls for AstraZeneca to provide information that is not known or reasonably available to AstraZeneca or that is not within AstraZeneca's possession, custody, or control.

7.       AstraZeneca objects to each Topic to the extent that it seeks detailed testimony beyond any witness's reasonable ability, knowledge, or recall, including due to the passage of time.

8.       AstraZeneca objects to each Topic to the extent that it is overly broad and unduly burdensome because the scope encompasses so much material that it makes preparing a witness to answer questions covered by the Topic impracticable, including to the extent it calls for testimony regarding "each," "all," or "any" type of documentation or things.

9.     AstraZeneca objects to each Topic to the extent that it requests information that is subject to protective orders in other litigation or confidentiality or non-disclosure agreements with persons or entities that are not parties to this action.

10.    AstraZeneca objects to each Topic to the extent that it is duplicative of other discovery taken in this case or calls for discovery that is more readily available through less burdensome means, including, but not limited to, interrogatories, requests for admission, or requests for production.

11.    AstraZeneca objects to each Topic to the extent it calls for expert testimony or information that is the subject of expert discovery.

12.    AstraZeneca objects to each Topic to the extent it seeks testimony on AstraZeneca's legal contentions, legal conclusions, and/or presents questions of law.

13.    AstraZeneca objects to each Topic to the extent it seeks the disclosure of information for which AstraZeneca has an obligation to third parties with respect to confidential or proprietary business information.

14.    AstraZeneca objects to each Topic on the ground that is neither relevant nor proportional to the needs of the case to the extent it seeks information related to a claim of willful infringement because Plaintiffs have not preserved such a claim in this case.

15.    AstraZeneca objects to each Topic on the ground that is neither relevant nor proportional to the needs of the case to the extent it seeks information related to ongoing research efforts as AstraZeneca for pharmaceutical products not related to Tagrisso® or NDA No. 208065 and/or that will not be approved by FDA to be marketed in the U.S. before the expiration of the Patents-in-Suit.

16.     AstraZeneca objects to the definition of "Asserted Claim(s)" as vague and ambiguous, overly broad, unduly burdensome, and seeking or purporting to require information that is not relevant to the claims or defenses in this action, to the extent it calls for information beyond the claims identified in Plaintiffs' Infringement Contentions, served on March 18, 2022 (i.e., Claims 1–3, 6, and 9 of the '314 Patent and Claims 1 and 4 of the '162 Patent).

17.     AstraZeneca objects to any use of undefined terms that are subject to multiple interpretations, thus rendering a request vague and ambiguous. AstraZeneca's responses are based on its interpretation of undefined terms, which may differ from Plaintiffs' interpretations. AstraZeneca reserves the right to supplement, amend, or modify its responses, including its objections, in the event a dispute arises over the meaning of an undefined term.

18.     In making these objections, AstraZeneca does not waive its right to make any and all objections to specific questions that Defendant may ask at a deposition. Nothing in AstraZeneca's responses should be construed as a waiver of any rights or objections that would otherwise be available to AstraZeneca. AstraZeneca's responses should not be deemed as an admission of relevancy, materiality, or admissibility into evidence of any discovery requests or responses.

19.     If AstraZeneca agrees to make a witness available to testify in response to a Topic, it is agreeing, to the extent that AstraZeneca has any such knowledge relating to the Topic, to provide testimony concerning relevant and non-privileged information in AstraZeneca's possession, custody, or control that is identified after a reasonable search.

20.     The above Recurring Objections are hereby incorporated into each of AstraZeneca's Specific Responses and Objections set forth below. AstraZeneca's Specific Objections and Responses may repeat or restate a Recurring Objection for emphasis or some other

reason; however, the failure to repeat or restate a Recurring Objection in AstraZeneca's Specific Objections and Responses shall not constitute a waiver of any Recurring Objection as to that or any other Topic.

21.     AstraZeneca will meet and confer regarding the objections and responses herein at Plaintiffs' request.

## SPECIFIC OBJECTIONS AND RESPONSES

### TOPIC NO. 1:

Any non-infringing alternatives to the subject matter claimed in the Patents-in-Suit and Defendants' efforts to operate or design around any of the Asserted Claims of the Patents-in-Suit.

### RESPONSE TO TOPIC NO. 1:

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it suggests the existence of "[a]ny non-infringing alternatives to the subject matter claimed in the Patents-in-Suit" are (or may be) related to "Defendants' efforts to operate or design around any of the Asserted Claims of the Patents-in-Suit," or implies that any non-infringing alternatives are the result of efforts to design around the Patents-in-Suit. AstraZeneca further objects to this Topic to the extent that it seeks information that is publicly available or otherwise equally or more easily accessible to Plaintiffs; information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access; or information already within Plaintiffs' knowledge or control. AstraZeneca further objects to this Topic to the extent it calls for expert testimony or information that is the subject of expert discovery. AstraZeneca further objects to this Topic to the

extent it seeks legal conclusions regarding the scope of the subject matter claimed by the Asserted

Claims, or improperly seeks contention testimony from a Rule 30(b)(6) designee.

Subject to and without waiving the foregoing objections, AstraZeneca will make available

one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location

agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product

information known or reasonably available to AstraZeneca relating to the facts and circumstances

concerning uses of Tagrisso®.

Separately, subject to and without waiving the foregoing objections, AstraZeneca will

make available one or more witnesses to testify, at a reasonable level of detail and at a date, time,

and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-

product information known or reasonably available to AstraZeneca relating to the facts and

circumstances of AstraZeneca's efforts to design around the Asserted Patents.

## TOPIC NO. 2:

Any opinions, analyses, and investigations regarding the Patents-in-Suit, including but not
limited to infringement, noninfringement, validity, invalidity, enforceability, unenforceability,
freedom-to-operate, and/or scope of any claim of any of the Patents-in-Suit, including any legal
opinion upon which Defendants intend to rely.

## RESPONSE TO TOPIC NO. 2:

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca

further objects to this Topic to the extent it seeks information and/or documents protected by the

attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or

other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent

that it seeks information that is neither relevant nor proportional to the needs of the case, including

to the extent it is not limited to the Asserted Claims. AstraZeneca further objects to this Topic as

overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks testimony regarding "[a]ny opinions, analyses, and investigations" and "any legal opinion."
AstraZeneca further objects to this Topic to the extent it seeks testimony on AstraZeneca's legal
contentions, legal conclusions, and/or presents questions of law. AstraZeneca further objects to
this Topic to the extent it seeks information relevant to a claim of willful infringement because
Plaintiffs have not preserved such a claim in this case. Even if Plaintiffs had a preserved a claim
of willful infringement, this Topic would be premature because to the extent that AstraZeneca may
rely on advice of counsel in defense to a charge of willful infringement, such disclosure would be
disclosed in accordance with the governing Scheduling Order.

Based on the foregoing objections, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 3:**

Defendants' decision to pursue research and development of tyrosine kinase inhibitors for
cancers resistant to gefitinib and/or erlotinib, including, for example, the osimertinib and/or
Tagrisso® project, or any predecessor or successor thereto.

**RESPONSE TO TOPIC NO. 3:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca
further objects to this Topic to the extent it seeks information and/or documents protected by the
attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or
other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent
that it seeks information that is neither relevant nor proportional to the needs of the case, including
to the extent it is not limited to irreversible EGFR inhibitors for treating gefitinib and/or erlotinib
resistant NSCLC, and to the extent that it seeks information related to ongoing research for
pharmaceutical products not related to Tagrisso® or NDA No. 208065 and/or that will not be
approved by FDA to be marketed in the U.S. before the expiration of the Patents-in-Suit.
AstraZeneca further objects to this Topic to the extent that it seeks information that has previously
been disclosed to Plaintiffs or to which Plaintiffs have already been granted access. AstraZeneca

7

further objects to this Topic on the ground that the scope of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable. AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic Nos. 7 and 9.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's decision to pursue the research and development project that led to the development of Tagrisso®.

**TOPIC NO. 4:**

Defendants' knowledge of mutations in EGFR, including mutations conferring sensitivity to gefitinib and/or erlotinib (also known as "activation mutations") and mutations conferring resistance to gefitinib and/or erlotinib.

**RESPONSE TO TOPIC NO. 4:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it encompasses any mutation in EGFR including "mutations conferring sensitivity to gefitinib and/or erlotinib" and is not limited to mutations conferring resistance to gefitinib and/or erlotinib in a patient having NSCLC. AstraZeneca further objects to this Topic to the extent that it seeks information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access. AstraZeneca further objects to this Topic on the ground that the scope

of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable.

Subject to and without waiving the foregoing objections, AstraZeneca is willing to make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's knowledge of mutations in EGFR that may confer resistance to gefitinib and/or erlotinib in a patient having NSCLC following a meet and confer between the Parties regarding a reasonable date restriction for such testimony.

**TOPIC NO. 5:**

Defendants' research and development of tyrosine kinase inhibitors for NSCLC resistant to gefitinib and/or erlotinib prior to commencement of the study of osimertinib for that purpose and/or the Tagrisso® project.

**RESPONSE TO TOPIC NO. 5:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it is not limited to irreversible EGFR inhibitors for treating gefitinib and/or erlotinib resistant NSCLC. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable. AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic Nos. 3 and 15.

Subject to and without waiving the foregoing objections, AstraZeneca is willing to meet and confer regarding this Topic.

9

**TOPIC NO. 6:**

Defendants' knowledge of gefitinib and/or erlotinib sensitizing mutations and gefitinib and/or erlotinib resistance mutations as of 2005.

**RESPONSE TO TOPIC NO. 6:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it is not limited to EGFR, encompasses "gefitinib and/or erlotinib sensitizing mutations," and is not limited to mutations conferring resistance to gefitinib and/or erlotinib in a patient having NSCLC. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic No. 4.

Subject to and without waiving the foregoing objections, AstraZeneca is willing to meet and confer regarding this Topic.

**TOPIC NO. 7:**

The research and development of osimertinib and/or Tagrisso®, including but not limited to all other irreversible EGFR inhibitor products or formulations considered, studied, manufactured, or tested in arriving at osimertinib and/or Tagrisso®; and the decision to research and develop osimertinib and/or Tagrisso®.

**RESPONSE TO TOPIC NO. 7:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic on the ground and to the extent that the term "other irreversible EGFR inhibitor products" is vague and

ambiguous. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent that it seeks information related to formulations of Tagrisso®. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written, including seeking testimony regarding "all other irreversible EGFR inhibitor products or formulations," encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic Nos. 3 or 9.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the irreversible EGFR inhibitors considered or evaluated in arriving at osimertinib to be used in the Tagrisso® drug product.

**TOPIC NO. 8:**

Internal and external identifiers for osimertinib and/or Tagrisso® during development, including product names, product numbers, code numbers, compounds, and any other similar identification systems.

**RESPONSE TO TOPIC NO. 8:**

AstraZeneca incorporates its General Objections as if set forth fully herein.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to internal and external identifiers for osimertinib during its development.

11

**TOPIC NO. 9:**

Defendants' decision to develop osimertinib and/or Tagrisso® as an irreversible inhibitor of EGFR, as opposed to a reversible inhibitor.

**RESPONSE TO TOPIC NO. 9:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic Nos. 3 and 7.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's decision to develop osimertinib as an irreversible inhibitor of EGFR, as opposed to a reversible inhibitor.

**TOPIC NO. 10:**

All facts and circumstances concerning the decision to pursue osimertinib and/or Tagrisso® as a preclinical candidate.

**RESPONSE TO TOPIC NO. 10:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic Nos. 3 and 7. AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks testimony regarding "[a]ll facts and circumstances."

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location

agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the facts and circumstances concerning the decision to pursue osimertinib as a preclinical candidate.

**TOPIC NO. 11:**

All facts and circumstances concerning the decision to pursue osimertinib and/or Tagrisso® as a clinical candidate.

**RESPONSE TO TOPIC NO. 11:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic Nos. 3 and 7. AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks testimony regarding "[a]ll facts and circumstances."

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the facts and circumstances concerning the decision to pursue osimertinib as a clinical candidate.

**TOPIC NO. 12:**

All facts and circumstances concerning Defendants' knowledge of the resistance to gefitinib or erlotinib, including the first recognition of such resistance.

**RESPONSE TO TOPIC NO. 12:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic on the ground and to the extent that the term "the resistance to gefitinib

or erlotinib" is vague and ambiguous. AstraZeneca further objects to this Topic to the extent that

it seeks information that is neither relevant nor proportional to the needs of the case. AstraZeneca

further objects to this Topic as overly broad, unduly burdensome, and not proportional to the needs

of the case to the extent it seeks testimony regarding "[a]ll facts and circumstances concerning

Defendants' knowledge of the resistance to gefitinib or erlotinib" and to the extent that it is not

reasonably limited as to the relevant time of AstraZeneca's knowledge. AstraZeneca further

objects to this Topic on the ground that the scope of this Topic as written encompasses so much

material that it makes preparing a witness to answer questions covered by this Topic impracticable.

AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including

Topic Nos. 4 and 6.

Subject to and without waiving the foregoing objections, AstraZeneca is willing to meet

and confer regarding this Topic.

**TOPIC NO. 13:**

The proposal to draft, the drafting, approval of and publication of the following: (a) Antoine Yver, *Osimertinib (AZD9291)—A Science-Driven, Collaborative Approach to Rapid Drug Design and Development*, 27 ANNALS OF ONCOLOGY 1165 (2016); (b) M. Raymond V. Finlay et al., *Discovery of a Potent and Selective EGFR Inhibitor (AZD9291) of Both Sensitizing and T790M Resistance Mutations that Spares the Wild Type Form of the Receptor*, 57 J. Med. Chem. 8249 (2014); (c) Michael J. Waring, *The Discovery of Osimertinib (TAGRISSO™): An Irreversible Inhibitor of Activating and T790M Resistant Forms of the Epidermal Growth Factor Receptor Tyrosine Kinase for the Treatment of Non-Small Cell Lung Cancer*, 3 Successful Drug Discovery 341 (2018); (d) Darren A.E. Cross et al., *AZD9291, an Irreversible EGFR TKI, Overcomes T790M-Mediated Resistance to EGFR Inhibitors in Lung Cancer*, 4 Cancer Discovery 1046 (Sept. 2014); and, (e) Egle Avizienyte et al., *Comparison of the EGFR Resistance Mutation Profiles Generated by EGFR-Targeted Tyrosine Kinase Inhibitors and the Impact of Drug Combinations*, 415 Biochem. J. 197 (2008).

**RESPONSE TO TOPIC NO. 13:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca

further objects to this Topic to the extent it seeks information and/or documents protected by the

attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or

other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case. AstraZeneca further objects to this Topic to the extent that it calls for discovery that is more readily available through less burdensome means, including, but not limited to, interrogatories. AstraZeneca further objects to this Topic to the extent that is seeks information that is not in AstraZeneca's possession, custody, or control. AstraZeneca further objects to this Topic to the extent it calls for information that is subject to the privacy and/or confidentiality rights of third parties that AstraZeneca may not disclose without the consent of such third parties. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the publication of M. Raymond V. Finlay et al., *Discovery of a Potent and Selective EGFR Inhibitor (AZD9291) of Both Sensitizing and T790M Resistance Mutations that Spares the Wild Type Form of the Receptor*, 57 J. Med. Chem. 8249 (2014); and Darren A.E. Cross et al., *AZD9291, an Irreversible EGFR TKI, Overcomes T790M-Mediated Resistance to EGFR Inhibitors in Lung Cancer*, 4 Cancer Discovery 1046 (Sept. 2014).

**TOPIC NO. 14:**

Defendants' decision to pursue and efforts to overcome the resistance to gefitinib, and any EGFR inhibitors researched, developed, or tested during such efforts.

**RESPONSE TO TOPIC NO. 14:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it is not limited to irreversible EGFR inhibitors for treating gefitinib and/or erlotinib resistant NSCLC. AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks testimony regarding "[a]ny EGFR inhibitors researched, developed, or tested." AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic No. 3.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's decision to pursue the project that led to the development of Tagrisso® and efforts during that project to overcome resistance to gefitinib, including the EGFR inhibitors researched or evaluated during such efforts.

**TOPIC NO. 15:**

Defendants' efforts to develop irreversible EGFR inhibitors for treatment of gefitinib- and/or erlotinib-resistant NSCLC, including each irreversible EGFR inhibitor researched or developed prior to February 3, 2005, and including the research, design, manufacture, formulation, and testing of such compounds.

**RESPONSE TO TOPIC NO. 15:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca

further objects to this Topic to the extent that it seeks information that is neither relevant nor

proportional to the needs of the case, including to the extent it seeks information related to "each

irreversible EGFR inhibitor researched or developed prior to February 3, 2005." AstraZeneca

further objects to this Topic to the extent it is duplicative of other Topics, including Topic Nos. 3

and 5.

Subject to and without waiving the foregoing objections, AstraZeneca is willing to meet

and confer regarding this Topic.

**TOPIC NO. 16:**

All facts and circumstances relating to Defendants' knowledge of the Patents-in-Suit, the
Related Patent Applications of the Patents-in-Suit or any Foreign counterparts (including European
Patent 1 848 414 B1 and/or the underlying PCT application publication WO 2006/084058),
including, but not limited to, when and how Defendants first learned of the foregoing, any
monitoring by Defendants of the Patents-in-Suit, the Related Patent Applications of the Patents-
in-Suit or any Foreign counterparts, or any other patents of Plaintiffs, and any communications
between Defendants and Plaintiffs regarding osimertinib and/or Tagrisso®.

**RESPONSE TO TOPIC NO. 16:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca

further objects to this Topic to the extent it seeks information and/or documents protected by the

attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or

other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent

that it calls for discovery that is more readily available through less burdensome means, including,

but not limited to, interrogatories. AstraZeneca further objects to this Topic to the extent that it

seeks information that is neither relevant nor proportional to the needs of the case, including to the

extent it seeks information regarding AstraZeneca's knowledge of European Patent 1 848 414 B1.

AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not

17

proportional to the needs of the case to the extent it seeks testimony regarding "[a]ll facts and circumstances relating to Defendants' knowledge," "any monitoring by Defendants," "any other patents of Plaintiffs," and "any communications between Defendants and Plaintiffs regarding osimertinib and/or Tagrisso®." AstraZeneca further objects to this Topic to the extent that it seeks information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access. AstraZeneca further objects to this Topic to the extent that it seeks information that is publicly available or otherwise equally or more easily accessible to Plaintiffs; information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access; or information already within Plaintiffs' knowledge or control. AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic No. 17.

Based on the foregoing objections, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 17:**

Defendants' communications (internal or otherwise) concerning the Patents-in-Suit, the Related Patent Applications of the Patents-in-Suit, or any Foreign counterparts (including European Patent 1 848 414 B1 and/or the underlying PCT application publication WO 2006/084058); including, but not limited to, any communications concerning potential license agreements regarding any of the foregoing, and including, but not limited to communications with Puma and/or Wyeth concerning the same.

**RESPONSE TO TOPIC NO. 17:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it seeks information regarding AstraZeneca's communications concerning any Foreign Counterpart, including European Patent 1 848 414 B1. AstraZeneca further objects to this

18

Topic as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks testimony regarding "any communications concerning potential license agreements." AstraZeneca further objects to this Topic to the extent that it seeks information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access. AstraZeneca further objects to this Topic to the extent that it seeks information that is publicly available or otherwise equally or more easily accessible to Plaintiffs; information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access; or information already within Plaintiffs' knowledge or control. AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic No. 16.

Based on the foregoing objections, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 18:**

The circumstances relating to the recruitment, interviewing, hiring of and/or offer of employment to Nadia Godin-Heymann, Ph.D., by Defendants.

**RESPONSE TO TOPIC NO. 18:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case.

Subject to and without waiving the foregoing objections, AstraZeneca states that hiring of Dr. Nadia Godin-Heymann was not related to the development of Tagrisso®. Accordingly, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 19:**

Nadia Godin-Heymann, Ph.D.'s duties, responsibilities, and work during her employment by Defendants, including (but not limited to) her role in any research and/or development of EGFR inhibitors for use in treatment of NSCLC.

**RESPONSE TO TOPIC NO. 19:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it is not limited to irreversible EGFR inhibitors for treating gefitinib and/or erlotinib resistant NSCLC. AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks testimony regarding "any research and/or development."

Subject to and without waiving the foregoing objections, AstraZeneca states Dr. Nadia Godin-Heymann was not involved in the development of Tagrisso®. Accordingly, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 20:**

All facts and circumstances relating to Defendants' knowledge of Kwak et al., *Irreversible Inhibitors of the EGF Receptor May Circumvent Acquired Resistance to Gefitinib*, 102 PNAS 7665 (2005) ("Kwak 2005"), including when and how Defendants first learned of Kwak 2005.

**RESPONSE TO TOPIC NO. 20:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case. AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not

20

proportional to the needs of the case to the extent it seeks testimony regarding "[a]ll facts and circumstances" related to the subject matter of the Topic.

Based on the foregoing objections, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 21:**

Defendants' NDA No. 208065, including but not limited to (a) the preparation, submission, and approval of NDA No. 208065; (b) all correspondence between Defendants and the FDA concerning NDA No. 208065; (c) the approved labeling for Defendants' Tagrisso® Products, including the preparation, submission, and approval of the labeling and the prescribing information for NDA No. 208065; and (d) any planned or anticipated amendments to NDA No. 208065.

**RESPONSE TO TOPIC NO. 21:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it seeks information related to uses of Tagrisso® that have not been approved by FDA to be marketed in the U.S. AstraZeneca further objects to this Topic as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks testimony regarding "all correspondence between Defendants and the FDA" and "any planned or anticipated amendments to NDA No. 208065." AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic No. 22.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's NDA No. 208065, including the preparation, submission, and approval of NDA No. 208065,

correspondence between AstraZeneca and the FDA concerning NDA No. 208065, and the approved labeling for Tagrisso®.

**TOPIC NO. 22:**

Any planned and actual amendments to the labeling for Defendants' Tagrisso® Products.

**RESPONSE TO TOPIC NO. 22:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it seeks information related to uses of Tagrisso® that have not been approved by FDA to be marketed in the U.S. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic No. 21.

Based on the foregoing objections, AstraZeneca will not designate a witness on this Topic.

**TOPIC NO. 23:**

The decision to pursue the following indications for the use of Tagrisso®: (a) an adjuvant therapy after tumor resection in adult patients with non-small cell lung cancer (NSCLC) whose tumors have epidermal growth factor receptor (EGFR) exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test; (b) the first-line treatment of adult patients with metastatic NSCLC whose tumors have EGFR exon 19 deletions or exon 21 L858R mutations, as detected by an FDA-approved test; (c) the treatment of adult patients with metastatic EGFR T790M mutation-positive NSCLC, as detected by an FDA-approved test, whose disease has progressed on or after EGFR TKI therapy.

**RESPONSE TO TOPIC NO. 23:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or

22

other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic No. 24.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to this Topic.

**TOPIC NO. 24:**

Separately, for each FDA-approved indication of use for Tagrisso®, Defendants' decision and efforts to pursue FDA approval to market Tagrisso®, including when and how Defendants first considered pursuing FDA approval to market Tagrisso®, including, but not limited to, the decision to file NDA No. 208065.

**RESPONSE TO TOPIC NO. 24:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic No. 23.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's decision to file NDA No. 208065.

23

**TOPIC NO. 25:**

For each FDA-approved indication of use for Tagrisso®, the facts, circumstances, information and documents concerning the commercial success, commercial performance, customer satisfaction, benefits, advantages, disadvantages, critiques, problems, shortcomings, challenges, technical success, technical performance, technical benefits, suitability, competitive position, and market position of Tagrisso®.

**RESPONSE TO TOPIC NO. 25:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca

further objects to this Topic to the extent it seeks information and/or documents protected by the

attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or

other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent

that it seeks information that is neither relevant nor proportional to the needs of the case.

AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written

encompasses so much material that it makes preparing a witness to answer questions covered by

this Topic impracticable. AstraZeneca further objects to this Topic to the extent it calls for expert

testimony or information that is the subject of expert discovery. AstraZeneca further objects to this

Topic to the extent that it is duplicative of other Topics, including Topic No. 27. AstraZeneca

further objects to this Topic to the extent it seeks testimony on AstraZeneca's legal contentions,

legal conclusions, and/or presents questions of law, including to the extent it seeks testimony

regarding "commercial success."

Subject to and without waiving the foregoing objections, AstraZeneca will make available

one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location

agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product

information known or reasonably available to AstraZeneca relating to the commercial performance

and technical performance of each FDA-approved indication of Tagrisso® in the U.S.

**TOPIC NO. 26:**

For each FDA-approved indication of use for Tagrisso®, Defendants' marketing of Tagrisso®, including promotional and marketing materials, press releases, and interactions with prescribers regarding Tagrisso®.

**RESPONSE TO TOPIC NO. 26:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is publicly available or otherwise equally or more easily accessible to Plaintiffs; information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access; or information already within Plaintiffs' knowledge or control. AstraZeneca further objects to this Topic to the extent it seeks the disclosure of information for which AstraZeneca has an obligation to third parties with respect to confidential or proprietary business information.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the marketing and promotion of each FDA-approved indication of Tagrisso® in the U.S.

**TOPIC NO. 27:**

For each FDA-approved indication of use for Tagrisso®, the features and benefits of Tagrisso® compared to other competitive products that are or were on the market, the factors that lead to consumer demand for Tagrisso®, and any comparative testing, consumer feedback, or surveys comparing Tagrisso® with other competitive products that were on the market.

**RESPONSE TO TOPIC NO. 27:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or

other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case. AstraZeneca further objects to this Topic to the extent it calls for information that is subject to the privacy and/or confidentiality rights of third parties that AstraZeneca may not disclose without the consent of such third parties. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable. AstraZeneca further objects to this Topic to the extent it calls for expert testimony or information that is the subject of expert discovery. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic No. 25.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the features and benefits of Tagrisso® compared to other competitive products that are or were in the U.S. market for each FDA-approved indication of Tagrisso®.

## TOPIC NO. 28:

For each FDA-approved indication of use for Tagrisso®, market studies, forecasts, or projections of the U.S. market for Tagrisso®, including forecasts concerning the expected sales and profitability of Tagrisso® in the U.S.

## RESPONSE TO TOPIC NO. 28:

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent that it seeks forecasts or projections without any connection to the date of first alleged infringement. AstraZeneca further objects to

this Topic to the extent it calls for expert testimony or information that is the subject of expert discovery. AstraZeneca further objects to this Topic to the extent that is seeks information that is not in AstraZeneca's possession, custody, or control. AstraZeneca further objects to this Topic to the extent it calls for information that is subject to the privacy and/or confidentiality rights of third parties that AstraZeneca may not disclose without the consent of such third parties. AstraZeneca further objects to this Topic to the extent that it seeks information that is publicly available or otherwise equally or more easily accessible to Plaintiffs; information that has previously been disclosed to Plaintiffs or to which Plaintiffs have already been granted access; or information already within Plaintiffs' knowledge or control. AstraZeneca further objects to this Topic to the extent that it is duplicative of other Topics, including Topic Nos. 25, 27 and 29.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to U.S. demand trends for each FDA-approved indication of Tagrisso®.

**TOPIC NO. 29:**

For each FDA-approved indication of use for Tagrisso®, Defendants' present and historical understanding of what constitutes the market for Tagrisso®, including market shares, competitors, market studies, market demand, business plans, business reports, forecasts, marketing plans, and competition, and how Defendants used their understanding of the market for Tagrisso® in Defendants' sales and marketing forecasts.

**RESPONSE TO TOPIC NO. 29:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent

that it seeks information that is neither relevant nor proportional to the needs of the case, including

to the extent it seeks testimony regarding future business plans or to the extent is seeks testimony

regarding sales of Tagrisso® outside the United States. AstraZeneca further objects to this Topic

to the extent that it is duplicative of other Topics, including Topic Nos. 25 and 27–28.

Subject to and without waiving the foregoing objections, AstraZeneca will make available

one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location

agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product

information known or reasonably available to AstraZeneca relating to AstraZeneca's

understanding of the U.S. market for each FDA-approved indication of Tagrisso®.

**TOPIC NO. 30:**

For each FDA-approved indication of use for Tagrisso®, Defendants' pricing of
Tagrisso®, including any methodologies and/or strategies in setting the price, pricing changes,
target profit margins, and price competition.

**RESPONSE TO TOPIC NO. 30:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca

further objects to this Topic to the extent that it seeks information that is neither relevant nor

proportional to the needs of the case, including to the extent it is not limited to the U.S. market for

Tagrisso®. AstraZeneca further objects to this Topic to the extent that it seeks information that is

neither relevant nor proportional to the needs of the case, including to the extent it seeks

information prior to March 2020 when the Patents-in-Suit issued. Plaintiffs lack a good faith basis

to assert infringement prior to this date. Furthermore, such data is not relevant to any hypothetical

negotiation as the negotiation is conducted "at the time infringement began." *Rite-Hite Corp. v.*

*Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995). AstraZeneca further objects to this Topic on

the ground that the scope of this Topic as written, including seeking testimony regarding "any

28

methodologies and/or strategies," encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable.

Subject to and without waiving the foregoing objections, AstraZeneca is willing to meet and confer regarding this Topic.

**TOPIC NO. 31:**

For each FDA-approved indication of use for Tagrisso®, from the first sale to the present on a quarterly basis, Defendants' gross revenue, net revenue, gross units sold, net units sold, gross profit, operating profit, and net profit derived from sales of Tagrisso® in the U.S.; costs related to the sales of Tagrisso® in the U.S., including variable costs, fixed costs, cost of sales, operating costs, sales and marketing costs, any allocated costs (and the basis for such allocation), and any other research and development or general and administrative costs.; and the method by which such amounts were computed, and the source of such information.

**RESPONSE TO TOPIC NO. 31:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case. AstraZeneca further objects to this Topic to the extent it seeks the disclosure of information for which AstraZeneca has an obligation to third parties with respect to confidential or proprietary business information.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the following information related to sales of Tagrisso® in the U.S. beginning in November 2015: 1) U.S. gross Tagrisso® product sales; 2) U.S. Tagrisso® total revenue; 3) U.S. Tagrisso® cost of sales; 4) U.S. Tagrisso® gross profit; 5) U.S. Tagrisso® selling, general, and administrative costs; and 6) U.S. Tagrisso® operating profit.

**TOPIC NO. 32:**

For each FDA-approved indication of use for Tagrisso®, Defendants' accounting practices with respect to Tagrisso®, including but not limited to Defendants' methods of accounting for revenues, costs and profits, methods of depreciation, allocation of expenses, inventory measurements, profit allocation, losses, and assignment of debts, and Defendants' methods of allocating between U.S. and worldwide revenue.

**RESPONSE TO TOPIC NO. 32:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it is not limited to the U.S. market for Tagrisso® and AstraZeneca's accounting practices are not relevant to any issue. AstraZeneca further objects to this Topic to the extent it is duplicative of other Topics, including Topic No. 31. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable.

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to AstraZeneca's calculation of the gross revenue for sales of each FDA-approved indication of Tagrisso® in the U.S.

**TOPIC NO. 33:**

Any settlement agreements, licenses, or patent acquisitions executed by Defendants (including affiliates) or for the benefit of Defendants, regarding EFGR inhibitors and/or any other therapeutic compound, formulation, composition, or method directed to treatment of NSCLC including but not limited to (i) any agreement, license, or patent acquisition that Defendants

contend is comparable to a license for the Patents-in-Suit such that it would be relevant to a hypothetical negotiation analysis.

**RESPONSE TO TOPIC NO. 33:**

AstraZeneca incorporates its General Objections as if set forth fully herein. AstraZeneca further objects to this Topic to the extent it seeks information and/or documents protected by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, and/or other applicable privileges and protections. AstraZeneca further objects to this Topic to the extent that it seeks information that is neither relevant nor proportional to the needs of the case, including to the extent it is not limited to irreversible EGFR inhibitors and methods for using such inhibitors to treat gefitinib and/or erlotinib resistant NSCLC. AstraZeneca further objects to this Topic as cumulative and duplicative of other discovery requests, including discovery produced pursuant to the Scheduling Order. AstraZeneca further objects to this Topic on the ground that the scope of this Topic as written, including seeking testimony regarding "[a]ny settlement agreements, licenses, or patent acquisitions executed by Defendants (including affiliates)" and "any agreement, license, or patent acquisition that Defendants contend is comparable to a license for the Patents-in-Suit," encompasses so much material that it makes preparing a witness to answer questions covered by this Topic impracticable. AstraZeneca further objects to this Topic to the extent it seeks the disclosure of information for which AstraZeneca has an obligation to third parties with respect to confidential or proprietary business information. AstraZeneca further objects to this Topic to the extent it calls for expert testimony or information that is the subject of expert discovery, or improperly seeks contention testimony from a Rule 30(b)(6) designee. AstraZeneca further objects to this Topic to the extent it seeks testimony on AstraZeneca's legal contentions, legal conclusions, and/or presents questions of law, including to the extent it seeks testimony regarding "any

agreement, license, or patent acquisition that Defendants contend is comparable to a license for the Patents-in-Suit such that it would be relevant to a hypothetical negotiation analysis."

Subject to and without waiving the foregoing objections, AstraZeneca will make available one or more witnesses to testify, at a reasonable level of detail and at a date, time, and location agreed upon by the parties, as to non-privileged, non-immune, and/or non-work-product information known or reasonably available to AstraZeneca relating to the facts and circumstances related to any agreement involving AstraZeneca that AstraZeneca identified in its disclosures pursuant to Paragraphs 6(c) and 6(e) of the Scheduling Order (D.I. 30).

|  | */s/ Ashley Winkler* |
|---|---|
|  | Karen E. Keller (#4489) |
|  | Andrew E. Russell (#5382) |
| OF COUNSEL: | Nathan R. Hoeschen (#6232) |
| Christopher Sipes | Emily S. DiBenedetto (#6779) |
| Einar Stole | SHAW KELLER LLP |
| Megan Keane | I.M. Pei Building |
| Kaveh Saba | 1105 North Market Street, 12th Floor |
| Priscilla Dodson | Wilmington, DE 19801 |
| Ashley Winkler | (302) 298-0700 |
| Melissa Keech | kkeller@shawkeller.com |
| Tobias Ma | arussell@shawkeller.com |
| COVINGTON & BURLING LLP | nhoeschen@shawkeller.com |
| One CityCenter | edibenedetto@shawkeller.com |
| 850 Tenth Street NW | |
| Washington, DC 20001-4956 | *Attorneys AstraZeneca Pharmaceuticals LP* |
| (202) 662-6000 | *and AstraZeneca AB* |

Dated: February 16, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023, I caused the foregoing *Defendants' Objections and Responses to Plaintiffs' Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6)* to be served by electronic mail on the following counsel of record:

**BY EMAIL**

Jack B. Blumenfeld
Megan Elizabeth Dellinger
Rodger Dallery Smith, II
MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com
rsmith@morrisnichols.com
*Attorneys for Plaintiffs*

Sara T. Horton
Ren-How Harn
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
(312) 728-9040
shorton@willkie.com
rharn@willkie.com
*Attorneys for Plaintiff Wyeth LLC*

Shehla Wynne
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939
swynne@jonesday.com
*Attorneys for Plaintiff Puma
Biotechnology, Inc.*

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
(858) 314-1200
sngeise@jonesday.com
aminsogna@jonesday.com
meredithstewart@jonesday.com
*Attorneys for Plaintiff Puma Biotechnology,
Inc.*

Gasper J. LaRosa
Lisamarie LoGuidice
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
gjlarosa@jonesday.com
llogiudice@jonesday.com
*Attorneys for Plaintiff Puma Biotechnology,
Inc.*

Jason G. Winchester
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
(312) 782-3939
jgwinchester@jonesday.com
*Attorneys for Plaintiff Puma Biotechnology,
Inc.*

/s/ Ashley Winkler
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca Pharmaceuticals*
*LP and AstraZeneca AB*

Dated: February 16, 2023

# EXHIBIT 22

# JONES DAY

4655 EXECUTIVE DRIVE • SUITE 1500 • SAN DIEGO, CALIFORNIA 92121.3134

TELEPHONE: +1.858.314.1200 • JONESDAY.COM

DIRECT NUMBER:  8583141155
MEREDITHSTEWART@JONESDAY.COM

December 14, 2022

VIA E-MAIL

Ashley Winkler, Esq.
COVINGTON & BURLING
One City Center
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-5108
awinkler@cov.com

Re:   _Puma Biotechnology, Inc. & Wyeth LLC v. AstraZeneca Pharmaceuticals LLP & AstraZeneca AB_, 21-1338-MFK

Counsel,

        We write to memorialize our meet and confer on December 7, 2022, where the parties discussed discovery issues raised by Plaintiffs related to Defendants' production of documents and information in response to Plaintiffs' requests.  Our understanding regarding the areas of agreement and disagreement between the parties is summarized below.

## A.      Discovery Related to the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts (RFP Nos. 10–11, 73-74 and Rog Nos. 16-17)

        The Parties are at an impasse on several issues related to the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts.

        First, Defendants continue to assert that EP 1,848,414 and WO 2006/084058 are not relevant.  Not so.  Plaintiffs are entitled to discovery showing Defendants' knowledge of Related Patents, Related Patent Applications and Foreign counterparts, as defined in Plaintiffs' requests,[1] at least due to their relationship to willfulness and pre-issuance damages, as already explained in our October 4, 2022, letter.

---

[1] Specifically, Plaintiffs' requests define "Related Patents" or "Related Patent Applications" as any patent or patent applications in the same family of patents as the referenced patent . . ." and "Foreign counterpart" as "any patent, patent application, inventor's certificate, or disclosure document that claims, discloses, describes, or discusses any invention claimed in the referenced patent-in-suit and filed or submitted to any agency, official, or entity of any government or jurisdiction other than the PTO."  Plaintiffs' First Set of RFPs.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO • SAN FRANCISCO
SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Ashley Winkler, Esq.
December 14, 2022
Page 2

Second, during the meet and confer, you stated that, despite maintaining they are not relevant and refusing to respond to the relevant interrogatories, you nevertheless searched for terms related to EP'414 and WO'058 across your custodians. As we have consistently maintained throughout negotiations regarding Defendants' search terms, including in our October 11 and October 26 letters regarding Defendants' proposed ESI search terms, we are entitled to a search of non-custodial documents using these terms as well.

Third, Defendants have also improperly limited their responses to RFP No. 11 and Rog Nos. 9, 16, and 17 to "first knowledge" of the Patents-in-Suit and the applications leading to the Patents-on-Suit. These discovery requests are broader than first knowledge or awareness; they encompass Defendants' knowledge of the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts generally.

Last, Defendants also refuse to produce internal communications within AstraZeneca regarding the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts or produce communications between Defendants and Plaintiff Puma regarding the Patents-in-Suit, Related Patents, Related Patent Applications, and Foreign Counterparts. At least RFP Nos. 73 and 11 encompass all documents and things about licensing communications or communications with Defendants and Puma, both externally and internally.

Despite months of correspondence and multiple meet and confers between the parties, Defendants continue to refuse to produce these relevant documents. Yet, at the same time, Defendants insist that *Plaintiffs* must produce documents regarding related patents, including EP'414. Besides the one-sidedness of Defendants' position, as you know, Plaintiffs have previously agreed to produce "responsive, non-privileged copies of documents relating to the prosecution of EP'414 and the opposition proceedings before the EPO relating to the same patent." Plaintiffs' October 14, 2022, Letter.

We intend to seek relief from the Court on these issues.

**B.    Discovery Scope Concerning EGFR Inhibitors (RFP Nos. 1, 4, 12, 15, 27, 28, 37, and 58, and Rog Nos. 5-7, 10, 15)**

These discovery requests seek information regarding Defendants' efforts to address the problem that some patients taking Defendants' drug gefitinib for treatment of NSCLC were or became resistant to gefitinib. Such efforts would reveal Defendants' reasons for pursuing irreversible inhibitors, as opposed to reversible inhibitors (like the compound gefitinib), which would encompass documents and communications showing Defendants' knowledge of the inventors' research efforts to treat NSCLC resistant to gefitinib and/or erlotinib. Such knowledge bears directly on the issues of infringement and willful infringement.

JONES DAY

Ashley Winkler, Esq.
December 14, 2022
Page 3

To date, you have improperly narrowed your responses to discovery requests concerning EGFR inhibitors considered during the development of Tagrisso® (the "Tagrisso® Project"). We reiterated that our discovery requests seek *any* work done to overcome gefitinib-resistance, whether it was done within the context of the Tagrisso® Project or not. You refused to confirm or deny whether you had searched for and/or produced documents or things about efforts to overcome gefitinib-resistance outside the Tagrisso® Project. As we stated during the call, the Parties remain at an impasse. We intend to seek relief from the Court.

### C.   Plaintiffs' RFP No. 17 Regarding "Comparable" Licenses

Prior to the meet and confer, we have repeatedly requested that Defendants identify the criteria you are using to determine what licenses you have deemed "comparable," and whether you are withholding any licenses or agreements you deemed "not comparable." You refused to substantively answer our inquiry and instead responded that the issue was whether Plaintiffs intended to produce reciprocal discovery to Defendants' RFP No. 84.

You cannot sidestep your obligation to respond to our substantive questions about your response to RFP No. 17. Please specify the criteria you are using to determine whether a license is comparable and to identify any licenses you are excluding.

### D.   Plaintiffs' RFP Nos. 34–38 Regarding Tagrisso® Indications

We previously asked you to address whether you have produced documents for each of the three FDA-approved indications for Tagrisso® and that you are not withholding responsive documents specific to each indication in response to RFP No. 37. During the meet and confer, you stated that you searched for documents and information for all three FDA-approved indications. Plaintiffs believe this resolves the parties' dispute on RFP No. 37.

With respect to RFP Nos. 34-36 and 38, Plaintiffs are reviewing Defendants' production and will raise any issues.

### E.   Plaintiffs' RFP Nos. 71-72 Regarding Civil Action No. 1:20-cv-00202-UNA

Plaintiffs have repeatedly asked for documents reflecting statements made by or on behalf of Defendants in Civil Action No. 1:20-cv-00202-UNA about the history and need for the development of Tagrisso® and the mechanism of action of Tagrisso®, including, but not limited to, expert reports and testimony. Your only substantive response to these requests has been that the patents at issue in Civil Action No. 1:20-cv-00202-UNA are formulation patents for Tagrisso®. You have not represented, however, that no statements were made by or on behalf of Defendants in that action about the history and need for the development of Tagrisso® and the mechanism of action of Tagrisso®.

JONES DAY

Ashley Winkler, Esq.
December 14, 2022
Page 4

During the meet and confer, we reiterated that our requests are relevant, targeted, and not burdensome. You stated that you are not willing to even "investigate" whether there were any relevant materials in Civil Action No. 1:20-cv-00202-UNA until we produce documents related to EP'414 and statements made in the SPC filings related to EP'414. Again, Plaintiffs have already agreed to produce "responsive, non-privileged copies of documents relating to the prosecution of EP '414 and the opposition proceedings before the EPO relating to the same patent." Plaintiffs' October 14, 2022 Letter. We also previously stated that we will not produce documents concerning supplementary protection certificates ("SPC") concerning EP'414 because they are not relevant to the case.

You have not even fulfilled your most basic obligation to determine if relevant materials exist in response to our reasonable requests. Please confirm that you will search for and produce statements made by or on behalf of Defendants in Civil Action No. 1:20-cv-00202-UNA about the history and need for the development of Tagrisso® and the mechanism of action of Tagrisso®, including, but not limited to, expert reports and testimony.

**F.      Custodial Documents of Mark Anderton**

In your Rule 26(a) Initial Disclosures, you identified Mark Anderton as a custodian likely to have documents and information "relating to preclinical safety and toxicology studies performed during the development of osimertinib." Yet your productions prior to the meet and confer have included zero documents where the custodian is Mark Anderton.

Thank you for confirming during the meet and confer that there are a small number of non-duplicative custodial documents where Mark Anderton is the custodian, and that you will produce these documents promptly. Please provide Bates ranges when you have done so.

Sincerely

*/s/ Meredith Stewart*
Meredith Stewart

cc:     Sara Horton
        Ren-How Harn
        *Counsel for Wyeth LLC*

# EXHIBIT 23

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**By Electronic Mail**                                        September 21, 2022

Shehla Wynne
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001

Sara T. Horton
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406

     Re:    ***Puma Biotechnology, Inc. & Wyeth LLC v.***
           ***AstraZeneca Pharmaceuticals LP & AstraZeneca AB***
           **(D.Del. C.A. No. 21-1338-MFK)**

Counsel:

     We write to follow-up regarding certain ongoing discovery disputes, including those identified in Plaintiffs email to Defendants dated September 16, 2022.

**I.    Contention Interrogatories: Defendants' ROG Nos. 1 and 4 and Plaintiffs' ROG Nos. 1 and 3**

     Both parties have served certain contention interrogatories. Specifically, Defendants have served ROG Nos. 1 and 4, related, respectively, to Plaintiffs' validity contentions and bases for any secondary considerations or objective indicia.  Plaintiffs have served ROG Nos. 1 and 3, related, respectively, to Defendants' non-infringement contentions and bases for our Fifth Affirmative Defense.  At the August 31 meet and confer, the parties agreed to consider a schedule for responding to these interrogatories.

     Defendants propose that the parties serve responses no later than February 10, 2023. Please promptly confirm your agreement with this proposal.

**II.   Plaintiffs' Discovery Requests Related to the Patents-in-Suit, Related Patent Applications, and Foreign Counterpart**

     Plaintiffs request that Defendants produce documents related to Defendants' knowledge or communications regarding Related Patent Applications or Foreign Counterpart EP '414, including in response to Plaintiffs' RFP Nos. 10–11, 73, and 74 and Interrogatory Nos. 16 and 17. You assert in your September 1 letter that "Defendants have not provided any basis for their refusal" to provide discovery with respect to patent applications and/or foreign counterparts

**COVINGTON**

September 21, 2022
Page 2

related to the Patents-in-Suit." To the contrary, we have repeatedly explained, including during the August 31 and September 14 meet and confers and June 13 and August 5 letters, that Defendants' knowledge of the related patent applications or EP '414 and communications mentioning these applications and foreign patent are not relevant to this case.

Your September 1 letter alleges that discovery related to Defendants' knowledge of the related patent applications and EP '414 is relevant to pre-issuance damages and willfulness. According to 35 U.S.C. § 154(d), to prove your claim for pre-issuance damages, Plaintiffs must show that the invention claimed in the patent is substantially identical to the invention claimed in the published patent application. The published patent application identified in your Complaint was WO '058. *See* DI 1, DI 58. Defendants' have already agreed to produce relevant discovery related to this published application. Defendants' knowledge of other patents or applications are thus not relevant. Nor is Defendants' knowledge relevant to willfulness. Notably, willfulness requires knowledge *of infringement of the Patents-in-Suit. See, e.g.*, *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987–88 (Fed. Cir. 2021); *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. CV 19-1031, D.I. 20, *3–4 (D. Del. Oct. 31, 2019), *report and recommendation adopted sub nom. Nexstep, Inc. v. Comcast Cable Commc'n, LLC*, No. CV 19-1031, D.I. 27 (D. Del. Nov. 15, 2019). We have already agreed to produce relevant discovery related to the Patents-in-Suit. Defendants' knowledge of unrelated patents or applications, especially as to foreign counterpart EP '414, are not relevant. *See, e.g.*, *Biomerieux, S.A. v. Hologic, Inc.*, No. 18-cv-21, D.I. 406, *24 (D. Del. Feb. 13, 2020) (Defendants' "knowledge of the existence of related foreign counterpart patents to the patents-in-suit (and prolonged efforts to invalidate those patents) . . . [are not] adequate to support a finding of willful infringement.") (citing *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510–11 (Fed. Cir. 1990) ("[A] party cannot be liable for 'infringement,' and thus not for 'willful' infringement, of a nonexistent patent")); *iFit Inc. v. Peloton Interactive Inc.* No. 21-507, D.I. 34, *3–4 (D. Del. Jan. 28, 2022) ("Knowledge of a patent application alone, however, is not enough to establish knowledge of the patent(s) that issued from that application and therefore not enough to establish willfulness."); *see also PPG Industries Ohio, Inc. v. Axalta Coating Sys., LLC*, No. 21-cv-346, D.I. 34, *10 (D. Del. Jan. 26, 2022), *report and recommendation adopted*, D.I. 37 (D. Del. Feb. 17, 2022) (holding that knowledge of a foreign opposition proceeding does not support a reasonable inference that defendant learned of the patent-in-suit).

In addition, as we have also repeatedly explained, including at least at the August 31 and September 14 meet and confers, Defendants' knowledge and documents concerning related patent applications and foreign counterpart proceedings are not analogous to Plaintiffs' knowledge and documents.  Plaintiffs are the patentee or licensees of the Patents-in-Suit, and Plaintiffs are the parties that brought this lawsuit asserting the Patents-in-Suit. Defendants' entitlement to pursue relevant discovery from the patentee or licensee related to the Patents-in-Suit, and statements made or positions taken with respect to the Patents-in-Suit and any related application or foreign counterpart—including any representation to regulatory authorities, foreign or otherwise—is not analogous to Plaintiffs' pursuit of discovery related to Defendants' knowledge of the Patents-in-Suit. Defendants' discovery requests bear on the patentee's interpretation and representations with respect to the scope of the patent and are relevant to a number of issues in this litigation, including at least claim construction, infringement, and invalidity. Plaintiffs' discovery requests are not.

**COVINGTON**

September 21, 2022
Page 3

Accordin_l_ , as Defendants _reviousl_ ex_lained, includin_ durin_ the Au_ust 31 meet and confer, Defendants' knowled_e of the Related Patent A__lications of the Patents-in-Suit or an EP '414 is not relevant to this case. However, in an effort to com_romise and sub_ect to our ob_ections, Defendants will a_ree to _roduce, to the extent the_ exist and can be found after a reasonable search, res_onsive, non-_rivile_ed, non-immune documents in Defendants' _ossession, custod_, or control sufficient to show the circumstances under which Defendants first became aware of U.S. Application Nos. 11/883,474 and 15/207,349. To the extent such information is available, Defendants further agree to supplement Plaintiffs' ROG No. 16 with respect to U.S. Application Nos. 11/883,474 and 15/207,349.[1] Defendants will also produce to the extent they exist and can be found after a reasonable search, responsive, non-privileged, non-immune documents in Defendants' possession, custody, or control that mention U.S. Application Nos. 11/883,474 and 15/207,349.

We maintain our objections as to any foreign counterpart, including EP '414.

### III.    Other Discovery Requests

#### A.    Plaintiffs' RFP Nos. 25, 26, and 61 and Defendants' RFP Nos. 49 and 61

In your August 31 letter you confirmed that in response to Defendants' RFP Nos. 49 and 61, Plaintiffs will produce non-privileged documents concerning any searches conducted by, for, or on behalf of Puma, Wyeth, and/or Pfizer concerning the Patents-in-Suit and all prior art identified or discovery in connection therewith that can be located after a reasonable search. Consistent with our August 5 letter, we confirm that we will produce in response to Plaintiffs' RFP Nos. 25, 26, and 61, responsive, non-privileged, non-immune documents in Defendants' possession, custody, or control. We understand that this dispute has been resolved.

#### B.    Discovery Scope and EGFR Inhibitors: Plaintiffs' RFP Nos. 1, 4, 15, 27, 28, 37, and 58 and ROG Nos. 5–7

In response to the above-listed requests, Plaintiffs' August 26 letter asks Defendants to confirm that we will apply the same scope of discovery that was agreed to for RFP No. 1 to these requests. As an initial matter, we note that these requests are not identical in scope to, and do not seek the same information as, RFP No. 1. In any event, we confirm that subject to our objections and responses with respect to RFP Nos. 1, 4, 27, 28, 37, and 58, Defendants will produce relevant, privileged, responsive documents to the extent they exist, from the research and development of Tagrisso® during the period of January 2009 through November 13, 2015.

---

[1] Plaintiffs' September 16 email refers to ROG No. 9 with respect to the Related Patent Applications. ROG No. 9 does not appear in your August 26 or September 1 letters, and ROG No. 9 does not request information related to the Related Patent Applications. Accordingly, our response refers to ROG No. 16, which is directed to Defendants' knowledge of the Related Patent Applications.

**COVINGTON**

September 21, 2022
Page 4

As previously explained, we do not agree to produce documents in response to RFP No. 15. With respect to ROG Nos. 5–7, we do not agree that specific information or documents are responsive or relevant. *See infra* III.D.

### C.     Plaintiffs' RFP No. 1

At the parties' September 14 meet and confer, Plaintiffs seemed to ask Defendants to perform additional searches in response to Plaintiffs' RFP No. 1. Plaintiffs' September 16 email states that your request is "for documents relating to Defendants' efforts relating to gefitinib resistance, including the study of compounds to address this issue."

As an initial matter, Plaintiffs' new request is vague and ambiguous as least because it requests information that is not clearly within the scope of Plaintiffs' RFP No. 1. Plaintiffs' RFP No. 1 requests "documents and things related to any efforts in ***developing an EGFR inhibitor*** to treat NSCLC (including NSCLC that is resistant to tyrosine kinase inhibitors), including Tagrisso®." Plaintiffs, however, now broadly request "efforts relating to gefitinib resistance" or "the ***study*** of compounds to address [gefitinib resistance]."

In any event, Defendants objected to Plaintiffs' RFP No. 1, among other reasons, because it is vague, overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to any party's claims or defenses. The parties have spent months discussing the scope of Plaintiffs' RFP No. 1 and, as explained at the September 14 meet and confer, Defendants have agreed to broad discovery with respect to the documents requested by Plaintiffs' RFP No. 1. In particular, Defendants have agreed to broad discovery related to AstraZeneca's efforts to develop an (irreversible) EGFR inhibitor, Tagrisso®—i.e., the product accused of practicing the methods of the Asserted Claims in this case. In addition to documents related to Tagrisso®, we have agreed to produce documents related to other EGFR inhibitors (irreversible and reversible) considered or evaluated during the course that development. We therefore maintain our objections and responses to Plaintiffs' RFP No. 1, including as articulated in our August 5 letter.

### D.     Plaintiffs' RPF No. 42

This request generally relates to any royalties and license fees paid by AstraZeneca to third parties in connection with Tagrisso®. Defendants have previously agreed to produce agreements that are comparable to a license that would result from a hypothetical reasonable royalty negotiation. During the August 31 meet and confer, Plaintiffs represented that the dispute would be resolved if Defendants confirmed that it has not agreed to pay any royalties or licenses fees. Defendants hereby confirm that AstraZeneca has not agreed to pay patent royalties or license fees in connection with Tagrisso® to any third party not affiliated with AstraZeneca.

### E.     Plaintiffs' ROG Nos. 5–7

In response to Plaintiffs' ROG Nos. 5–7, Plaintiffs' August 26 letter requests that Defendants confirm whether we will be producing "invention brochures, grant proposals, draft manuscripts, and decisions to put Tagrisso® into development, as well as documents reflecting the reasons for pursuing the development of an irreversible, rather than reversible, EGFR inhibitor for the treatment of gefitinib and/or erlotinib-resistant NSCLC." As an initial matter,

**COVINGTON**

September 21, 2022
Page 5

Defendants object to Plaintiffs efforts to convert an interrogatory into a request for production. In addition, we object to Plaintiffs' request as vague and ambiguous as it is not clear what documents are being requested or how these documents are necessarily responsive to the specific requests. In any event, Defendants cannot confirm that we will produce and/or identify these documents or certain information in response to Plaintiffs' ROG Nos. 5–7. Pursuant to Federal Rule of Civil Procedure 33(d), we have agreed to produce non-privileged, non-immune documents, to the extent they exist and can be found, sufficient to respond to these interrogatories. Plaintiffs' attempt to control Defendants' response, including with respect to Defendants' decisions or motivations, is improper. Defendants maintain our objections and responses to these interrogatories.

### F.     Plaintiffs' ROG No. 10

Plaintiffs' ROG No. 10 seeks information relating to the facts and circumstances relating to AstraZeneca's knowledge of Kwak (2005). We previously explained, including in our August 5 letter, that Plaintiffs request is not relevant and over broad, unduly burdensome, and disproportionate to the needs of the case. Kwak (2005) is not a Patent-in-Suit and Plaintiffs have not explained why you are entitled to discovery regarding knowledge of it.

In Plaintiffs' August 26 letter, you proposed limiting the scope of ROG No. 10 to the knowledge of the inventors of the Tagrisso® patents and the individuals "involved with the Tagrisso® 'project' in 2009 through the project's selection of osimertinib as the lead candidate and Tagrisso®'s FDA approval on November 13, 2015." Defendants do not agree that Plaintiffs' proposal reasonably limits the scope of this request. To the extent that Plaintiffs use the term "Tagrisso® patents" to refer to the patents that have been listed in the Orange Book with respect to Tagrisso®, Defendants do not agree that the knowledge of the inventors of those patents— which are not asserted in this case and are directed to inventions that are not at issue in this case— are relevant to this litigation. Defendants maintain our objections and responses to this request, including as provided in our August 5 letter.

### G.     Plaintiffs' ROG No. 15

Plaintiffs' ROG No. 15 requests that Defendants describe all irreversible EGFR inhibitors known to Defendants prior to February 3, 2005. As Defendants previously explained, including in our August 5 letter, the scope of this request is unreasonable. We have agreed to produce information that is responsive to this interrogatory and that can be located after a reasonable search. In Plaintiffs' August 26 letter, you requested Defendants confirm that the scope of Plaintiffs' ROG 15 includes "information from Defendants' former employees, insofar as the information is within the scope of ROG 15 and within 'Defendants' possession, custody, and control in Defendants' files.'" We do not understand what is not clear from our prior objections and responses, which we maintain.

**COVINGTON**

September 21, 2022
Page 6

Sincerely,

/s/ *Ashley Winkler*

Ashley Winkler


cc: Counsel of Record

# EXHIBIT 24

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau



(43) International Publication Date
10 August 2006 (10.08.2006)

PCT



(10) International Publication Number
WO 2006/084058 A2

(51) International Patent Classification:
*A61K 38/17* (2006.01)

(21) International Application Number:
PCT/US2006/003717

(22) International Filing Date: 2 February 2006 (02.02.2006)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
60/649,483   3 February 2005 (03.02.2005)   US
60/671,989   15 April 2005 (15.04.2005)   US

(71) Applicants *(for all designated States except US)*: **THE GENERAL HOSPITAL CORPORATION** [US/US]; 55 Fruit Street, Boston, Massachusetts 02114 (US). **WYETH** [US/US]; Five Giralda Farms, Madison, New Jersey 07940 (US).

(72) Inventors; and

(75) Inventors/Applicants *(for US only)*: **HABER, Daniel** [US/US]; 34 Manadnock Road, Chestnut Hill, Massachusetts 02467 (US). **BELL, Daphne Winifred** [US/US]; 7

Arizona Terrece, Apt. 3, Arlington, Massachusetts 02474 (US). **SETTLEMAN, Jeffrey E.** [US/US]; 140 Waverly Avenue, Newton, Massachusetts 02458 (US). **SORDELLA, Raffaella** [IT/US]; 38 Sunset Road, Bedford, Massachusetts 01730 (US). **GODIN-HEYMANN, Nadia G.** [US/US]; 8 Plympton Street, Apt. 47, Cambridge, Massachusetts 02138 (US). **KWAK, Eunice L.** [US/US]; 47 Butler Circle, Marlborough, Massachusetts 01752 (US). **RABINDRAN, Sridhar Krishna** [IN/US]; Two Pamela Drive, Chestnut Ridge, New York 10977 (US).

(74) Agents: RESNICK, David et al.; NIXON PEABODY LLP, 100 Summer Street, Boston, Massachusetts 02110 (US).

(81) Designated States *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AT, AU, AZ, BA, BB, BG, BR, BW, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, LY, MA, MD, MG, MK, MN, MW, MX, MZ, NA, NG, NI,

*[Continued on next page]*

(54) Title: METHOD FOR TREATING GEFITINIB RESISTANT CANCER



(57) **Abstract:** The present invention is directed to methods for the treatment of gefitinib and/or erlotinib resistant cancer. An individual with cancer is monitored for cancer progression following treatment with gefitinib and/or erlotinib. Progression of the cancer is indicative that the cancer is resistant to gefitinib and/or erlotinib. Once progression of cancer is noted, the subject is administered a pharmaceutical composition comprising an irreversible epidermal growth factor receptor (EGFR) inhibitor. In preferred embodiments, the irreversible EGFR inhibitor is EKB-569, HKI-272 and HKI-357.

WO 2006/084058 A2

WO 2006/084058 A2

NO, NZ, OM, PG, PH, PL, PT, RO, RU, SC, SD, SE, SG, SK, SL, SM, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, YU, ZA, ZM, ZW.

(84) **Designated States** *(unless otherwise indicated, for every kind of regional protection available):* ARIPO (BW, GH, GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HU, IE, IS, IT, LT, LU, LV, MC, NL, PL, PT,

RO, SE, SI, SK, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published:**

—   *without international search report and to be republished upon receipt of that report*

*For two-letter codes and other abbreviations, refer to the "Guidance Notes on Codes and Abbreviations" appearing at the beginning of each regular issue of the PCT Gazette.*

PUMAWYETH-TAG00030550

# METHOD FOR TREATING GEFITINIB RESISTANT CANCER

## BACKGROUND

[001]     Epithelial cell cancers, for example, prostate cancer, breast cancer, colon cancer, lung cancer, pancreatic cancer, ovarian cancer, cancer of the spleen, testicular cancer, cancer of the thymus, etc., are diseases characterized by abnormal, accelerated growth of epithelial cells. This accelerated growth initially causes a tumor to form. Eventually, metastasis to different organ sites can also occur. Although progress has been made in the diagnosis and treatment of various cancers, these diseases still result in significant mortality.

[002]     Lung cancer remains the leading cause of cancer death in industrialized countries.  Cancers that begin in the lungs are divided into two major types, non-small cell lung cancer and small cell lung cancer, depending on how the cells appear under a microscope. Non-small cell lung cancer (squamous cell carcinoma, adenocarcinoma, and large cell carcinoma) generally spreads to other organs more slowly than does small cell lung cancer. About 75 percent of lung cancer cases are categorized as non-small cell lung cancer (e.g., adenocarcinomas), and the other 25 percent are small cell lung cancer.  Non-small cell lung cancer (NSCLC) is the leading cause of cancer deaths in the United States, Japan and Western Europe. For patients with advanced disease, chemotherapy provides a modest benefit in survival, but at the cost of significant toxicity, underscoring the need for therapeutic agents that are specifically targeted to the critical genetic lesions that direct tumor growth (Schiller JH et al., N Engl J Med, 346: 92-98, 2002).

[003]     Epidermal growth factor receptor (EGFR) is a 170 kilodalton (kDa) membrane-bound protein expressed on the surface of epithelial cells. EGFR is a member of the growth factor receptor family of protein tyrosine kinases, a class of cell cycle regulatory molecules. (W. J. Gullick et al., 1986, Cancer Res., 46:285-292). EGFR is activated when its ligand (either EGF or TGF-α) binds to the extracellular domain, resulting in autophosphorylation of the receptor's intracellular tyrosine kinase domain (S. Cohen et al., 1980, J. Biol. Chem., 255:4834-4842; A. B. Schreiber et al., 1983, J. Biol. Chem., 258:846-853).

PUMAWYETH-TAG00030551

Case 1:21-cv-01338-MFK   Document 122   Filed 03/29/23   Page 215 of 257 PageID #: 2947

[004]     EGFR is the protein product of a growth promoting oncogene, erbB or ErbB1, that is but one member of a family, i.e., the ERBB family of protooncogenes, believed to play pivotal roles in the development and progression of many human cancers. In particular, increased expression of EGFR has been observed in breast, bladder, lung, head, neck and stomach cancer as well as glioblastomas. The ERBB family of oncogenes encodes four, structurally-related transmembrane receptors, namely, EGFR, HER-2/neu (erbB2), HER-3 (erbB3) and HER-4 (erbB4). Clinically, ERBB oncogene amplification and/or receptor overexpression in tumors have been reported to correlate with disease recurrence and poor patient prognosis, as well as with responsiveness in therapy. (L. Harris et al., 1999, Int. J. Biol. Markers, 14:8-15; and J. Mendelsohn and J. Baselga, 2000, Oncogene, 19:6550-6565).

[005]     EGFR is composed of three principal domains, namely, the extracellular domain (ECD), which is glycosylated and contains the ligand-binding pocket with two cysteine-rich regions; a short transmembrane domain, and an intracellular domain that has intrinsic tyrosine kinase activity. The transmembrane region joins the ligand-binding domain to the intracellular domain. Amino acid and DNA sequence analysis, as well as studies of nonglycosylated forms of EGFR, indicate that the protein backbone of EGFR has a mass of 132 kDa, with 1186 amino acid residues (A. L. Ullrich et al., 1984, Nature, 307:418-425; J. Downward et al., 1984, Nature, 307:521-527; C. R. Carlin et al., 1986, Mol. Cell. Biol., 6:257-264; and F. L. V. Mayes and M. D. Waterfield, 1984, The EMBO J., 3:531-537).

[006]     The binding of EGF or TGF-$\alpha$ to EGFR activates a signal transduction pathway and results in cell proliferation. The dimerization, conformational changes and internalization of EGFR molecules function to transmit intracellular signals leading to cell growth regulation (G. Carpenter and S. Cohen, 1979, Ann. Rev. Biochem., 48:193-216). Genetic alterations that affect the regulation of growth factor receptor function, or lead to overexpression of receptor and/or ligand, result in cell proliferation. In addition, EGFR has been determined to play a role in cell differentiation, enhancement of cell motility, protein secretion, neovascularization, invasion, metastasis and resistance of cancer cells to chemotherapeutic agents and radiation. (M.-J. Oh et al., 2000, Clin. Cancer Res., 6:4760-4763).

2

PUMAWYETH-TAG00030552

[007]     A variety of inhibitors of EGFR have been identified, including a number already undergoing clinical trials for treatment of various cancers. For a recent summary, see de Bono, J. S. and Rowinsky, E. K. (2002), "The ErbB Receptor Family: A Therapeutic Target For Cancer", *Trends in Molecular Medicine*, 8, S19-26.

[008]     A promising set of targets for therapeutic intervention in the treatment of cancer includes the members of the HER-kinase axis. They are frequently upregulated in solid epithelial tumors of, by way of example, the prostate, lung and breast, and are also upregulated in glioblastoma tumors. Epidermal growth factor receptor (EGFR) is a member of the HER-kinase axis, and has been the target of choice for the development of several different cancer therapies. EGFR tyrosine kinase inhibitors (EGFR-TKIs) are among these therapies, since the reversible phosphorylation of tyrosine residues is required for activation of the EGFR pathway. In other words, EGFR-TKIs block a cell surface receptor responsible for triggering and/or maintaining the cell signaling pathway that induces tumor cell growth and division. Specifically, it is believed that these inhibitors interfere with the EGFR kinase domain, referred to as HER-1. Among the more promising EGFR-TKIs are three series of compounds: quinazolines, pyridopyrimidines and pyrrolopyrimidines.

[009]     Two of the more advanced compounds in clinical development include Gefitinib (compound ZD1839 developed by AstraZeneca UK Ltd.; available under the tradename IRESSA; hereinafter "IRESSA") and Erlotinib (compound OSI-774 developed by Genentech, Inc. and OSI Pharmaceuticals, Inc.; available under the tradename TARCEVA; hereinafter "TARCEVA"); both have generated encouraging clinical results. Conventional cancer treatment with both IRESSA and TARCEVA involves the daily, oral administration of no more than 500 mg of the respective compounds. In May, 2003, IRESSA became the first of these products to reach the United States market, when it was approved for the treatment of advanced non-small cell lung cancer patients.

PUMAWYETH-TAG00030553

[0010]     IRESSA is an orally active quinazoline that functions by directly inhibiting tyrosine kinase phosphorylation on the EGFR molecule. It competes for the adenosine triphosphate (ATP) binding site, leading to suppression of the HER-kinase axis. The exact mechanism of the IRESSA response is not completely understood, however, studies suggest that the presence of EGFR is a necessary prerequisite for its action.

[0011]     A significant limitation in using these compounds is that recipients thereof may develop a resistance to their therapeutic effects after they initially respond to therapy, or they may not respond to EGFR-TKIs to any measurable degree at all. The response rate to EGFR-TKIs varies between different ethnic groups.  At the low end of EGFR-TKI responders, in some populations, only 10-15 percent of advanced non-small cell lung cancer patients respond to EGFR kinase inhibitors. Thus, a better understanding of the molecular mechanisms underlying sensitivity to IRESSA and TARCEVA would be extremely beneficial in targeting therapy to those individuals whom are most likely to benefit from such therapy.

[0012]     There is a significant need in the art for a satisfactory treatment of cancer, and specifically epithelial cell cancers such as lung, ovarian, breast, brain, colon and prostate cancers, which incorporates the benefits of TKI therapy and overcoming the non-responsiveness exhibited by patients. Such a treatment could have a dramatic impact on the health of individuals, and especially older individuals, among whom cancer is especially common.

SUMMARY

[0013]     The inventors of the present invention have surprisingly discovered that irreversible EGFR inhibitors are effective in the treatment of cancer in subjects who are no longer responding to gefitinib and/or erlotinib therapies.  Thus, in one embodiment, the present invention provides a method for the treatment of gefitinib and/or erlotinib resistant cancer.  In this embodiment, progression of cancer in a subject is monitored at a time point after the subject has initiated gefitinib and/or erlotinib treatment.  Progression of the cancer is indicative of cancer that is resistant to gefitinib and/ or erlotinib treatment

4

PUMAWYETH-TAG00030554

and the subject is administered a pharmaceutical composition comprising an irreversible epidermal growth factor receptor (EGFR) inhibitor.

[0014]    In preferred embodiments, the irreversible EGFR inhibitor EKB-569, HKI-272 or HKI-357. Alternatively, the irreversible EGFR inhibitor may be any compound which binds to cysteine 773 of EGFR (SEQ ID NO: 1).

[0015]    The progression of cancer may be monitored by methods well known to those of skill in the art. For example, the progression may be monitored by way of visual inspection of the cancer, such as, by means of X-ray, CT scan or MRI. Alternatively, the progression may be monitored by way of tumor biomarker detection.

[0016]    In one embodiment, the patient is monitored at various time points throughout the treatment of the cancer. For example, the progression of a cancer may be monitored by analyzing the progression of cancer at a second time point and comparing this analysis to an analysis at a first time point. The first time point may be before or after initiation of gefitinib and/ or erlotinib treatment and the second time point is after the first. An increased growth of the cancer indicates progression of the cancer.

[0017]    In one embodiment, the progression of cancer is monitored by analyzing the size of the cancer. In one embodiment, the size of the cancer is analyzed via visual inspection of the cancer by means of X-ray, CT scan or MRI. In one embodiment, the size of the cancer is monitored by way of tumor biomarker detection.

[0018]    In one embodiment, the cancer is epithelial cell cancer. In one embodiment, the cancer is gastrointestinal cancer, prostate cancer, ovarian cancer, breast cancer, head and neck cancer, esophageal cancer, lung cancer, non-small cell lung cancer, cancer of the nervous system, kidney cancer, retina cancer, skin cancer, liver cancer, pancreatic cancer, genital-urinary cancer and bladder cancer.

[0019]    In one embodiment, the size of the cancer is monitored at additional time points, and the additional time points are after the second time point.

[0020]    In one embodiment, the later time point is at least 2 months after the preceding time point. In one embodiment, the later time point is at least 6 months after preceding time point. In one embodiment, the later time point is at least 10 months after

5

preceding time point. In one embodiment, the later time point is at least one year after preceding time point.

[0021]    In another embodiment, the present invention provides a method of treating cancer, comprising administering to a subject having a mutation in EGFR, namely, a substitution of a methionine for a threonine at position 790 (T790M) of SEQ ID. No. 1, a pharmaceutical composition comprising an irreversible EGFR inhibitor. The T790M mutation confers resistance to gefitinib and/ or erlotinib treatment.

BRIEF DESCRIPTION OF THE FIGURES

[0022]    Figures 1A-1B show EGFR sequence analysis in recurrent metastatic lesions from two NSCLC patients with acquired gefitinib resistance. Figure 1A shows sequence analysis for Case 1. The T790M mutation in EGFR is present in a recurrent liver lesion after the development of clinical gefitinib resistance. (Left) The mutation was not detected in the primary lung lesion at the time of diagnosis. (Right) Both the primary lung tumor and the recurrent liver lesion harbor the L858R gefitinib-sensitizing mutation. Of note, the L858R mutation is present in the expected ratio for a heterozygous mutation in both primary and recurrent lesions, whereas T790M is detectable at low levels compared with the wild-type allele. A polymorphism (G/A) is shown in the same tracing to demonstrate equivalent representation of the two alleles in the uncloned PCR product. Figure 1B shows sequence analysis for Case 2. The T790M mutation is present within a small minority of gefitinib-resistant cells. (Left) The T790M mutation was undetectable either in the lung primary tumor or in eight recurrent liver lesions from this case by sequencing uncloned PCR products. Heterozygosity at an adjacent polymorphism (G/A) confirms amplification of both EGFR alleles from these specimens. The heterozygous gefitinib-sensitizing mutation, L861Q, was detected at the expected ratio within the primary lung tumor as well as each of the eight recurrent liver lesions.

[0023]    Figures 2A-2C show acquired resistance to gefitinib in bronchoalveolar cancer cell lines and persistent sensitivity to irreversible ERBB family inhibitors. Figure 2A shows inhibition by tyrosine kinase inhibitors of proliferation of bronchoalveolar cancer cell lines with wild-type EGFR (NCI-H1666), the activating

PUMAWYETH-TAG00030556

delE746-A750 mutation in EGFR (NCI-H1650), or two representative gefitinib-resistant subclones of NCI-H1650 (G7 and C11). The effect of the reversible inhibitor gefitinib is compared with that of the irreversible inhibitor HKI-357. Comparable results were observed with the other irreversible inhibitors. Cell numbers were measured by crystal violet staining, after culture in 5% FCS, with 100 ng/ml EGFR, at 72 h after exposure to indicated drug concentrations. Each data point represents the mean of four samples. Figure 2B shows the chemical structure of gefitinib, a reversible inhibitor of EGFR; EKB-569, an irreversible inhibitor of EGFR; and HKI-272 and HKI-357, two irreversible dual inhibitors of EGFR and ERBB2. Figure 2C shows generation of drug-resistant NCI-H1650 cells after treatment with varying concentrations of gefitinib or the irreversible ERBB inhibitor EKB-569. Colonies were stained after 12 days in culture in the presence of inhibitors.

[0024]    Figures 3A-3D show persistent dependence on EGFR and ERBB2 signaling in gefitinib-resistant cells, and altered receptor trafficking. Figure 3A shows cell viability after siRNA-mediated knockdown of EGFR and ERBB2 in bronchoalveolar cell lines with wild-type EGFR (NCI-H1666), compared with cells with the activating delE746-A750 mutation in EGFR (NCI-H1650) and two gefitinib-resistant derivatives (G7 and C11). Viable cells were counted 72 h after treatment with double-stranded RNA and are shown as a fraction relative to cells treated with nonspecific siRNA, with standard deviations based on triplicate samples. Figure 3B shows inhibition of EGFR autophosphorylation (Y1068) and phosphorylation of downstream effectors AKT and MAPK (ERK) in cells treated with increasing concentrations of gefitinib or the irreversible inhibitor HKI-357, followed by a 2-h pulse with EGF. The parental cell line NCI-H1650 is compared with a representative gefitinib-resistant line, G7. Total AKT and MAPK are shown as controls; tubulin is used as loading control for total EGFR levels, which are at the lower limit of detection in these cells. Figure 3C shows altered EGFR internalization in gefitinib-resistant NCI-H1650 (G7) cells, compared with the sensitive NCI-H1650 parental cell line. Rhodamine-tagged EGF is used to label EGFR at 5 and 20 min, after addition of ligand. The increased internalization of EGFR in NCI-H1650 (G7) cells is most evident at 20 min. (Zeiss microscope, ×63 magnification). Figure 3D shows immunoblotting of internalized EGFR from NCI-H1650 parental cells and the resistant

PUMAWYETH-TAG00030557

derivative G7 after pulse labeling of cell surface proteins by biotinylation and chase over 20 min. The increased intracellular EGFR in NCI-H1650 (G7) cells is compared with the unaltered transferrin receptor (TR) internalization.

[0025]    Figures 4A-4B show Effectiveness of irreversible ERBB inhibitors in suppressing the T790M EGFR mutant. Figure 4A shows comparison of gefitinib and two irreversible inhibitors, HKI-357 and HKI-272, in their ability to suppress EGFR autophosphorylation (Y1068) and phosphorylation of downstream effectors AKT and MAPK (ERK) in the NCI-H1975 bronchoalveolar cell line, harboring both a sensitizing mutation (L858R) and the resistance-associated mutation (T790M). Total EGFR, AKT, and MAPK are shown as loading controls. Figure 4B shows suppression of proliferation in NCI-H1975 cells harboring the L858R and T790M mutations by the three irreversible ERBB family inhibitors, compared with gefitinib.

[0026]    Figure 5 shows the nucleotide sequence (SEQ ID NO: 2) and the amino acid sequence (SEQ ID NO: 1) of EGFR.

[0027]    Figure 6 shows that like gefitinib, HKI 357  and EKB 569 (labeled "Wyeth") demonstrated increased cell killing of NSCLC cells harboring an EGFR mutation, but unlike gefitinib, clones resistant to these drugs were not readily generated in vitro and they retained their effectiveness against gefitinib-resistant clones.

DETAILED DESCRIPTION

Gefitinib and erlotinib resistant cancers

[0028]    Gefitinib (compound ZD1839 developed by AstraZeneca UK Ltd.; available under the tradename IRESSA) and erlotinib (compound OSI-774 developed by Genentech, Inc. and OSI Pharmaceuticals, Inc.; available under the trade name TARCEVA) induce dramatic clinical responses in cases of non-small cell lung cancers (NSCLCs) harboring activating mutations in the EGF receptor (EGFR) (1–3), which is targeted by these competitive inhibitors of ATP binding (4, 5). The effectiveness of these tyrosine kinase inhibitors may result both from alterations in the ATP cleft associated with these mutations, which lead to enhanced inhibition of the mutant kinase by these

8

drugs, and from biological dependence of these cancer cells on the increased survival signals transduced by the mutant receptors, a phenomenon described as "oncogene addiction" (6, 7).

[0029]    Although therapeutic responses to both gefitinib and erlotinib can persist for as long as 2–3 years, the mean duration of response in most cases of NSCLC is only 6–8 months (8–10). The mechanisms underlying acquired drug resistance are not well understood. By analogy with imatinib (GLEEVEC), which inhibits the BCR-ABL kinase involved in chronic myeloid leukemias (CMLs), the C-KIT kinase implicated in gastrointestinal stromal tumors (GISTs), and the FIP1L1-PDGFR-α kinase in idiopathic hypereosinophilic syndrome (HES), secondary kinase domain mutations can potentially suppress drug binding (11–16). However, recurrent NSCLC is not readily biopsied; hence, only limited clinical specimens are available for analysis. Recently, a single secondary mutation, T790M, within the EGFR kinase domain has been reported in three of six cases with recurrent disease after gefitinib or erlotinib therapy (17, 18). Codon 315 of *BCR-ABL*, which is analogous to *EGFR* codon 790, is frequently mutated in imatinib-resistant CML (11, 12), and mutation of the corresponding residue in *C-KIT* (codon 670) and *FIP1L1-PDGFR-α* (codon 674) is associated with imatinib-resistant GIST and HES, respectively (15, 16). Early *in vitro* modeling of resistance to EGFR inhibitors indicated that mutation of codon 790 within the wild-type receptor would similarly suppress inhibition by an EGFR tyrosine kinase inhibitor (19). Recently, transfected EGFR proteins containing activating mutations together with the T790M substitution were shown to exhibit reduced inhibition by gefitinib and erlotinib (17, 18). Although the T790M mutation seems to contribute to acquired resistance in some cases of NSCLC, the mechanisms underlying treatment failure in cases lacking secondary EGFR mutations remain unexplained.

[0030]    In contrast to the cytoplasmic kinase BCR-ABL, signaling by the membrane-bound EGFR involves a complex pathway of ligand binding, receptor homodimerization, and heterodimerization with ERBB2 and other family members, followed by internalization and recycling of the ligand-bound receptor or ubiquitin-mediated receptor degradation (20). Significant EGF-dependent signaling is thought to occur during the process of internalization, which is also associated with the dissociation

9

PUMAWYETH-TAG00030559

of EGFR complexes at the low pH of intracellular vesicles. As such, multiple factors modulate the strength and quality of the signal transduced by the receptor, and alterations in EGFR trafficking have been closely linked with the regulation of EGF-dependent cellular responses (20).

[0031]    The present invention is based on the discovery that gefitinib resistant cancers can include those wherein the T790M EGFR mutation is only present in a subset of resistant tumor cells and those wherein the T790M mutation is not observed, but increased EGFR internalization is observed.  The invention is further based on the discovery that irreversible EGFR inhibitors, which covalently crosslink the receptor, are effective in inhibiting cancers with the T790M mutation and in cancers with altered EGFR trafficking that can make such cancers resistance to treatment with gefitinib and/ or erlotinib.  Accordingly, the present invention provides a method of treating gefitinib and/or erlotinib resistant cancers comprising administering irreversible EGFR inhibitors.

Method of Treating a Patient

[0032] In one embodiment, the invention provides a method for treating gefitinib/erlotinib resistant cancer.  The method comprises administering to a patient in need of such treatment an effective amount of certain irreversible EGFR inhibitors, including EKB-569 (4-anilinoquinoline-3-carbonitrile; Greenberger et al., 11th NCI-EORTC-AACR Symposium on New Drugs in Cancer Therapy, Amsterdam, November 7-10, 2000, abstract 388; Wyeth), HKI-357 (a derivative of 4-anilinoquinoline-3-carbonitrile; Tsou et al. J. Med. Chem. 2005, 48: 1107–1131; Wyeth) and/or  HKI-272 (a derivative of 4-anilinoquinoline-3-carbonitrile; Rabindran et al., Cancer Res. 2004, 64, 3958-3965; Wyeth).  In one preferred embodiment, the invention provides a method comprising administering to a patient in need of such treatment an effective amount of EKB-569.  In one preferred embodiment, the invention provides a method comprising administering to a patient in need of such treatment an effective amount of HKI-357.

[0033] The treatment may also involve a combination of treatments, including, but not limited to a tyrosine kinase inhibitor in combination with other tyrosine kinase inhibitors, chemotherapy, radiation, etc..

10

PUMAWYETH-TAG00030560

[0034] Cancers may initially be diagnosed as gefitinib/ erlotinib sensitive or predicted to be gefitinib/ erlotinib sensitive by means of the methods described in Lynch et al., 2004; 350:2129-2139. Gefitinib/ erlotinib sensitivity may be predicted by the presence in the tumor of EGFR mutations including, for example, deletion of residues 747 (lysine) to 749 (glutamic acid) combined with a mutation in 750 (alanine), deletion of residues 747 (lysine) to 750 (alanine), substitution of arginine for leucine at residue 858, of substitution of glutamine for leucine at residue 861.

[0035] Cancers may be diagnosed as gefitinib and/or erlotinib resistant after treatment with gefitinib and/or erlotinib has commenced. Alternatively, cancers may be diagnosed as gefitinib and/or erlotinib resistant prior to initiation of treatment with such compounds. Gefitinib and/or erlotinib resistance in the tumor may occur after, e.g., 6 months or longer of gefitinib and/or erlotinib treatment. Alternatively, gefitinib and/or erlotinib resistance of the tumor may be diagnosed less than 6 months after gefitinib and/or erlotinib treatment has commenced. Diagnosis of gefitinib and/or erlotinib resistance may be accomplished by way of monitoring tumor progression during gefitinib and/or erlotinib treatment. Tumor progression may be determined by comparison of tumor status between time points after treatment has commenced or by comparison of tumor status between a time point after treatment has commenced to a time point prior to initiation of gefitinib and/or erlotinib treatment. Tumor progression may be monitored during gefitinib and/or erlotinib treatment visually, for example, by means of radiography, for example, X-ray, CT scan, or other monitoring methods known to the skilled artisan, including palpitation of the cancer or methods to monitor tumor biomarker levels. Progression of the cancer during treatment with gefitinib and/or erlotinib indicates gefitinib and/or erlotinib resistance. A rise in level of tumor biomarkers indicates tumor progression. Thus, a rise in tumor biomarker levels during treatment with gefitinib and/or erlotinib indicates gefitinib and/or erlotinib resistance. Detection of new tumors or detection of metastasis indicates tumor progression. Cessation of tumor shrinkage indicates tumor progression. Growth of the cancer is indicated by, for example, increase in tumor size, metastasis or detection of new cancer, and/or a rise in tumor biomarker levels.

11

PUMAWYETH-TAG00030561

[0036] The development of gefitinib and/or erlotinib resistance may be monitored by means of testing for presence of a gefitinib and/or erlotinib resistance associated mutation in circulating tumor cells obtained from the circulation, or other bodily fluid, of the subject.  Presence of gefitinib and/or erlotinib resistance associated mutations in tumor cells from the subject is indicative of a gefitinib and/or erlotinib resistant tumor.

[0037] In one embodiment, the subject's tumor harbors mutations indicative of gefitinib and/or erlotinib sensitivity, yet it is resistant to gefitinib and/or erlotinib treatment.  In one embodiment, the subject's tumor harbors mutations indicative gefitinib and/or erlotinib sensitivity and harbors mutations indicative of gefitinib and/or erlotinib resistance, e.g., the T790M mutation, that is, where a methione residue is substituted for the native threonine residue, in EGFR, e.g. increased EGFR internalization.  In one embodiment, the subject's tumor does not harbor mutations indicative of gefitinib and/or erlotinib sensitivity and does harbor mutations indicative of gefitinib and/or erlotinib resistance, e.g., the T790M mutation in EGFR, e.g., increased EGFR internalization.

[0038] In connection with the administration of the drug, an "effective amount" indicates an amount that results in a beneficial effect for at least a statistically significant fraction of patients, such as a improvement of symptoms, a cure, a reduction in disease load, reduction in tumor mass or cell numbers, extension of life, improvement in quality of life, or other effect generally recognized as positive by medical doctors familiar with treating the particular type of disease or condition.

[0039] The effective dosage of active ingredient employed may vary depending on the particular compound employed, the mode of administration and the severity of the condition being treated. The skilled artisan is aware of the effective dose for each patient, which may vary with disease severity, individual genetic variation, or metabolic rate. However, in general, satisfactory results are obtained when the compounds of the invention are administered at a daily dosage of from about 0.5 to about 1000 mg/kg of body weight, optionally given in divided doses two to four times a day, or in sustained release form. The total daily dosage is projected to be from about 1 to 1000 mg, preferably from about 2 to 500 mg. Dosage forms suitable for internal use comprise from about 0.5 to 1000 mg of the active compound in intimate admixture with a solid or liquid pharmaceutically acceptable carrier. This dosage regimen may be adjusted to provide the

12

PUMAWYETH-TAG00030562

optimal therapeutic response. For example, several divided doses may be administered daily or the dose may be proportionally reduced as indicated by the exigencies of the therapeutic situation.

[0040]    The route of administration may be intravenous (I.V.), intramuscular (I.M.), subcutaneous (S.C.), intradermal (I.D.), intraperitoneal (I.P.), intrathecal (I.T.), intrapleural, intrauterine, rectal, vaginal, topical, intratumor and the like. The compounds of the invention can be administered parenterally by injection or by gradual infusion over time and can be delivered by peristaltic means.

[0041] Administration may be by transmucosal or transdermal means. For transmucosal or transdermal administration, penetrants appropriate to the barrier to be permeated are used in the formulation. Such penetrants are generally known in the art, and include, for example, for transmucosal administration bile salts and fusidic acid derivatives. In addition, detergents may be used to facilitate permeation. Transmucosal administration may be through nasal sprays, for example, or using suppositories. For oral administration, the compounds of the invention are formulated into conventional oral administration forms such as capsules, tablets and tonics.

[0042] For topical administration, the pharmaceutical composition (inhibitor of kinase activity) is formulated into ointments, salves, gels, or creams, as is generally known in the art.

[0043] The therapeutic compositions of this invention, e.g. irreversible EGFR inhibitors, are conventionally administered intravenously, as by injection of a unit dose, for example. The term "unit dose" when used in reference to a therapeutic composition of the present invention refers to physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle.

[0044] The compositions are administered in a manner compatible with the dosage formulation, and in a therapeutically effective amount. The quantity to be administered and timing depends on the subject to be treated, capacity of the subject's system to utilize the active ingredient, and degree of therapeutic effect desired. Precise

13

PUMAWYETH-TAG00030563

amounts of active ingredient required to be administered depend on the judgment of the practitioner and are peculiar to each individual.

[0045] The therapeutic composition useful for practicing the methods of the present invention, e.g. irreversible EGFR inhibitors, are described herein. Any formulation or drug delivery system containing the active ingredients, which is suitable for the intended use, as are generally known to those of skill in the art, can be used. Suitable pharmaceutically acceptable carriers for oral, rectal, topical or parenteral (including inhaled, subcutaneous, intraperitoneal, intramuscular and intravenous) administration are known to those of skill in the art. The carrier must be pharmaceutically acceptable in the sense of being compatible with the other ingredients of the formulation and not deleterious to the recipient thereof.

[0046] As used herein, the terms "pharmaceutically acceptable", "physiologically tolerable" and grammatical variations thereof, as they refer to compositions, carriers, diluents and reagents, are used interchangeably and represent that the materials are capable of administration to or upon a mammal without the production of undesirable physiological effects.

[0047] Formulations suitable for parenteral administration conveniently include sterile aqueous preparation of the active compound which is preferably isotonic with the blood of the recipient. Thus, such formulations may conveniently contain distilled water, 5% dextrose in distilled water or saline. Useful formulations also include concentrated solutions or solids containing the compound which upon dilution with an appropriate solvent give a solution suitable for parental administration above.

[0048] For enteral administration, a compound can be incorporated into an inert carrier in discrete units such as capsules, cachets, tablets or lozenges, each containing a predetermined amount of the active compound; as a powder or granules; or a suspension or solution in an aqueous liquid or non-aqueous liquid, e.g., a syrup, an elixir, an emulsion or a draught. Suitable carriers may be starches or sugars and include lubricants, flavorings, binders, and other materials of the same nature.

[0049] A tablet may be made by compression or molding, optionally with one or more accessory ingredients. Compressed tablets may be prepared by compressing in a suitable machine the active compound in a free-flowing form, e.g., a powder or granules,

14

PUMAWYETH-TAG00030564

optionally mixed with accessory ingredients, e.g., binders, lubricants, inert diluents, surface active or dispersing agents. Molded tablets may be made by molding in a suitable machine, a mixture of the powdered active compound with any suitable carrier.

[0050] A syrup or suspension may be made by adding the active compound to a concentrated, aqueous solution of a sugar, e.g., sucrose, to which may also be added any accessory ingredients. Such accessory ingredients may include flavoring, an agent to retard crystallization of the sugar or an agent to increase the solubility of any other ingredient, e.g., as a polyhydric alcohol, for example, glycerol or sorbitol.

[0051] Formulations for rectal administration may be presented as a suppository with a conventional carrier, e.g., cocoa butter or Witepsol S55 (trademark of Dynamite Nobel Chemical, Germany), for a suppository base.

[0052] Formulations for oral administration may be presented with an enhancer. Orally-acceptable absorption enhancers include surfactants such as sodium lauryl sulfate, palmitoyl carnitine, Laureth-9, phosphatidylcholine, cyclodextrin and derivatives thereof; bile salts such as sodium deoxycholate, sodium taurocholate, sodium glycochlate, and sodium fusidate; chelating agents including EDTA, citric acid and salicylates; and fatty acids (e.g., oleic acid, lauric acid, acylcarnitines, mono- and diglycerides). Other oral absorption enhancers include benzalkonium chloride, benzethonium chloride, CHAPS (3-(3-cholamidopropyl)-dimethylammonio-1-propanesulfonate), Big-CHAPS (N, N-bis(3-D-gluconamidopropyl)-cholamide), chlorobutanol, octoxynol-9, benzyl alcohol, phenols, cresols, and alkyl alcohols. An especially preferred oral absorption enhancer for the present invention is sodium lauryl sulfate.

[0053] Alternatively, the compound may be administered in liposomes or microspheres (or microparticles). Methods for preparing liposomes and microspheres for administration to a patient are well known to those of skill in the art. U.S. Pat. No. 4,789,734, the contents of which are hereby incorporated by reference, describes methods for encapsulating biological materials in liposomes. Essentially, the material is dissolved in an aqueous solution, the appropriate phospholipids and lipids added, along with surfactants if required, and the material dialyzed or sonicated, as necessary. A review of known methods is provided by G. Gregoriadis, Chapter 14, "Liposomes," Drug Carriers in Biology and Medicine, pp. 287-341 (Academic Press, 1979).

15

[0054] Microspheres formed of polymers or proteins are well known to those skilled in the art, and can be tailored for passage through the gastrointestinal tract directly into the blood stream. Alternatively, the compound can be incorporated and the microspheres, or composite of microspheres, implanted for slow release over a period of time ranging from days to months. See, for example, U.S. Pat. Nos. 4,906,474, 4,925,673 and 3,625,214, and Jein, TIPS 19:155-157 (1998), the contents of which are hereby incorporated by reference.

[0055] In one embodiment, the tyrosine kinase inhibitor of the present invention can be formulated into a liposome or microparticle which is suitably sized to lodge in capillary beds following intravenous administration. When the liposome or microparticle is lodged in the capillary beds surrounding ischemic tissue, the agents can be administered locally to the site at which they can be most effective. Suitable liposomes for targeting ischemic tissue are generally less than about 200 nanometers and are also typically unilamellar vesicles, as disclosed, for example, in U.S. Pat. No. 5,593,688 to Baldeschweiler, entitled "Liposomal targeting of ischemic tissue," the contents of which are hereby incorporated by reference.

[0056] Preferred microparticles are those prepared from biodegradable polymers, such as polyglycolide, polylactide and copolymers thereof. Those of skill in the art can readily determine an appropriate carrier system depending on various factors, including the desired rate of drug release and the desired dosage.

[0057] In one embodiment, the formulations are administered via catheter directly to the inside of blood vessels. The administration can occur, for example, through holes in the catheter. In those embodiments wherein the active compounds have a relatively long half life (on the order of 1 day to a week or more), the formulations can be included in biodegradable polymeric hydrogels, such as those disclosed in U.S. Pat. No. 5,410,016 to Hubbell et al. These polymeric hydrogels can be delivered to the inside of a tissue lumen and the active compounds released over time as the polymer degrades. If desirable, the polymeric hydrogels can have microparticles or liposomes which include the active compound dispersed therein, providing another mechanism for the controlled release of the active compounds.

PUMAWYETH-TAG00030566

[0058] The formulations may conveniently be presented in unit dosage form and may be prepared by any of the methods well known in the art of pharmacy. All methods include the step of bringing the active compound into association with a carrier which constitutes one or more accessory ingredients. In general, the formulations are prepared by uniformly and intimately bringing the active compound into association with a liquid carrier or a finely divided solid carrier and then, if necessary, shaping the product into desired unit dosage form.

[0059] The formulations may further include one or more optional accessory ingredient(s) utilized in the art of pharmaceutical formulations, e.g., diluents, buffers, flavoring agents, binders, surface active agents, thickeners, lubricants, suspending agents, preservatives (including antioxidants) and the like.

[0060] Compounds of the present methods (i.e. irreversible EGFR inhibitors) may be presented for administration to the respiratory tract as a snuff or an aerosol or solution for a nebulizer, or as a microfine powder for insufflation, alone or in combination with an inert carrier such as lactose. In such a case the particles of active compound suitably have diameters of less than 50 microns, preferably less than 10 microns, more preferably between 2 and 5 microns.

[0061] Generally for nasal administration a mildly acid pH will be preferred. Preferably the compositions of the invention have a pH of from about 3 to 5, more preferably from about 3.5 to 3.9 and most preferably 3.7. Adjustment of the pH is achieved by addition of an appropriate acid, such as hydrochloric acid.

[0062] The preparation of a pharmacological composition that contains active ingredients dissolved or dispersed therein is well understood in the art and need not be limited based on formulation. Typically such compositions are prepared as injectables either as liquid solutions or suspensions, however, solid forms suitable for solution, or suspensions, in liquid prior to use can also be prepared. The preparation can also be emulsified.

[0063] The active ingredient can be mixed with excipients which are pharmaceutically acceptable and compatible with the active ingredient and in amounts suitable for use in the therapeutic methods described herein. Suitable excipients are, for example, water, saline, dextrose, glycerol, ethanol or the like and combinations thereof. In

17

PUMAWYETH-TAG00030567

addition, if desired, the composition can contain minor amounts of auxiliary substances such as wetting or emulsifying agents, pH buffering agents and the like which enhance the effectiveness of the active ingredient.

[0064] The irreversible kinase inhibitors of the present invention can include pharmaceutically acceptable salts of the components therein. Pharmaceutically acceptable salts include the acid addition salts (formed with the free amino groups of the polypeptide) that are formed with inorganic acids such as, for example, hydrochloric or phosphoric acids, or such organic acids as acetic, tartaric, mandelic and the like. Salts formed with the free carboxyl groups can also be derived from inorganic bases such as, for example, sodium, potassium, ammonium, calcium or ferric hydroxides, and such organic bases as isopropylamine, trimethylamine, 2-ethylamino ethanol, histidine, procaine and the like.

[0065] Physiologically tolerable carriers are well known in the art. Exemplary of liquid carriers are sterile aqueous solutions that contain no materials in addition to the active ingredients and water, or contain a buffer such as sodium phosphate at physiological pH value, physiological saline or both, such as phosphate-buffered saline. Still further, aqueous carriers can contain more than one buffer salt, as well as salts such as sodium and potassium chlorides, dextrose, polyethylene glycol and other solutes.

[0066] Liquid compositions can also contain liquid phases in addition to and to the exclusion of water. Exemplary of such additional liquid phases are glycerin, vegetable oils such as cottonseed oil, and water-oil emulsions.

Definitions:

[0067]      The terms "ErbB1", "epidermal growth factor receptor" and "EGFR" are used interchangeably herein and refer to native sequence EGFR as disclosed, for example, in Carpenter et al. Ann. Rev. Biochem. 56:881-914 (1987), including variants thereof (e.g. a deletion mutant EGFR as in Humphrey et al. PNAS ( USA) 87:4207-4211 (1990)). erbB1 refers to the gene encoding the EGFR protein product.  As used herein, the EGFR protein is disclosed as GenBank accession no. NP_005219 (SEQ ID NO: 1)

18

PUMAWYETH-TAG00030568

which is encoded by the erbB1 gene, GenBank accession no. NM_005228 (SEQ ID NO: 2). Nucleotide and amino acid sequences of erbB1/EGFR may be found in Figure 5.

[0068]     The term "kinase activity increasing nucleic acid variance" as used herein refers to a variance (i.e. mutation) in the nucleotide sequence of a gene that results in an increased kinase activity.  The increased kinase activity is a direct result of the variance in the nucleic acid and is associated with the protein for which the gene encodes.

[0069]     The term "drug" or "compound" as used herein refers to a chemical entity or biological product, or combination of chemical entities or biological products, administered to a person to treat or prevent or control a disease or condition. The chemical entity or biological product is preferably, but not necessarily a low molecular weight compound, but may also be a larger compound, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof.

[0070]     As used herein, the terms "effective" and "effectiveness" includes both pharmacological effectiveness and physiological safety. Pharmacological effectiveness refers to the ability of the treatment to result in a desired biological effect in the patient. Physiological safety refers to the level of toxicity, or other adverse physiological effects at the cellular, organ and/or organism level (often referred to as side-effects) resulting from administration of the treatment. "Less effective" means that the treatment results in a therapeutically significant lower level of pharmacological effectiveness and/or a therapeutically greater level of adverse physiological effects.

[0071]     Nucleic acid molecules can be isolated from a particular biological sample using any of a number of procedures, which are well-known in the art, the particular isolation procedure chosen being appropriate for the particular biological sample. For example, freeze-thaw and alkaline lysis procedures can be useful for obtaining nucleic acid molecules from solid materials; heat and alkaline lysis procedures can be useful for obtaining nucleic acid molecules from urine; and proteinase K extraction can be used to obtain nucleic acid from blood (Rolff, A et al. PCR: Clinical Diagnostics and Research, Springer (1994).

PUMAWYETH-TAG00030569

[0072]     As used herein, a "cancer" in a subject or patient refers to the presence of cells possessing characteristics typical of cancer-causing cells, such as uncontrolled proliferation, immortality, metastatic potential, rapid growth and proliferation rate, and certain characteristic morphological features.  In some circumstances, cancer cells will be in the form of a tumor, or such cells may exist locally within an animal, or circulate in the blood stream as independent cells.

EXAMPLES

[0073]     **Compounds.** Compounds used herein, including EKB-569, HK1-357, and HK1-272 as described in U.S. Pat. No. 6,002,008; Greenberger et al., Proc. 11th NCI EORTC-AACR Symposium on New Drugs in Cancer Therapy, Clinical Cancer Res. Vol. 6 Supplement, Nov. 2000, ISSN 1078-0432; in Rabindran et al., Cancer Res. 64: 3958-3965 (2004); Holbro and Hynes, Ann. Rev. Pharm. Tox. 44:195-217 (2004); and Tejpar et al., J. Clin. Oncol. ASCO Annual Meeting Proc. Vol. 22, No. 14S: 3579 (2004).

[0074]     **Analysis of Recurrent NSCLC and Generation of Gefitinib-Resistant NCI-H1650 Cells.** Clinical specimens of recurrent NSCLC were obtained at autopsy after appropriate consent. The entire kinase domain of *EGFR* was sequenced after analysis of uncloned PCR products. Multiple clones of exon 20 were sequenced to examine codon 790. Mutational analysis of *EGFR* (exons 1–28), ERBB2 (exons 1–24), *PTEN* (exons 1–9), *Kras* (codons 12, 13, and 61), and *p53* (exons 5–8) in gefitinib-resistant clones as well as the parental NCI-H1650 cell line was performed by automated sequencing of individual exons and flanking intronic sequence (PCR conditions available on request) with bidirectional sequencing by using dye terminator chemistry (BIGDYE version 1.1, Applied Biosystems). Sequencing reactions were run on an ABI3100 sequencer (Applied Biosystems), and electropherograms were analyzed by using SEQUENCE NAVIGATOR and FACTURA software (Applied Biosystems).

[0075]     To generate resistant subclones of NCI-H1650 cells, these were treated with ethyl methane sulfonate (EMS; 600 µg/ml), allowed to recover for 72 h, and then seeded at a density of $6 \times 10^4$ cells per 10-cm$^2$ dish in 20 µM gefitinib. Relative resistance

20

PUMAWYETH-TAG00030570

of these cells to gefitinib, compared with the irreversible inhibitors, was achieved by seeding $5 \times 10^4$ cells in six-well plates in 5% FCS and 100 ng/ml EGF (Sigma), in the presence of varying concentrations of drugs, followed after 72 h by fixing cells with 4% formaldehyde, staining with 0.1% crystal violet, and quantifying cell mass by using the Odyssey Infrared Imaging System (LI-COR Biosciences, Lincoln, NE). For small interfering RNA (siRNA) knockdown experiments, cells were transfected with double-stranded RNA oligonucleotides targeting *EGFR, ERBB2* (both SMARTpool from Dharmacon, Lafayette, CO), or nonspecific control (LRT1B), using X-treme GENE transfection reagent (Roche Applied Science). After 72 h, cells were stained with crystal violet and analyzed on the Odyssey Infrared scanner.

[0076]    **Immunoblotting and Signaling Studies.** Inhibition of EGFR signaling by increasing concentrations of gefitinib or the irreversible inhibitors was determined by seeding $9 \times 10^4$ cells in 24-well plates, adding the drugs to medium containing 5% FCS for 15 min, followed by a 2-h pulse with 100 ng/ml EGF, and harvesting of lysates. Lysates were prepared in 2× gel loading buffer, sonicated, boiled, and then separated by 10% SDS/PAGE, followed by electrotransfer to polyvinylidene fluoride (PVDF) membranes, and immunoblotting. Antibodies used were phospho-EGFR Y1068 and phospho-mitogen-activated protein kinase (MAPK) (Cell Signaling Technology, Beverly, MA), phospho-AKT (BioSource International, Camarillo, CA), and total EGFR, MAPK, AKT, and tubulin (Santa Cruz Biotechnology).

[0077]    **Analysis of EGFR Internalization.** To demonstrate internalization of EGFR by fluorescence microscopy, cells were grown on coverslips and incubated with 1 ng/ml recombinant human (rh) EGF (Molecular Probes, Eugene, OR) for various intervals before fixing in 4% paraformaldehyde for 10 min. Coverslips were washed in PBS and mounted with ProLong Gold antifade reagent (Molecular Probes). To quantify EGFR internalization by cell surface biotinylation, cells were grown to confluency, pretreated with cyclohexamide, incubated on ice for 1 h with 1.5 mg/ml sulfosuccinimidyl-2-(biotinamido)ethyl-1,3-dithiopropionate (sulfo-NHS-SS-biotin; Pierce), and washed with blocking buffer (50 nM $NH_4CL$/1 mM $MgCl_2$/0.1 mM $CaCl_2$ in PBS) to quench free

21

sulfo-NHS-SS-biotin, followed by several further washes with PBS. The cells were then incubated in culture medium at 37°C for various intervals to allow internalization of the biotinylated molecules, washed twice for 20 min in a glutathione solution (50 mM glutathione/75 mM NaCl/75 mM NaOH/1% BSA) on ice to strip all of the biotinyl groups from the cell surface, and then scraped and lysed in 500 μM radioimmunoprecipitation assay (RIPA) buffer (25 mM Tris·HCl, pH 7.4, with 150 mM NaCL/0.1% SDS/1% Triton X-100) supplemented with NaF, Na-orthovanadate, and protease inhibitors. Cell extracts were centrifuged, and the supernatants were incubated with streptavidin beads (Sigma) to collect the biotinylated proteins, which were then analyzed by SDS/PAGE and immunoblotting with anti-EGFR antibody (SC-03, Santa Cruz Biotechnology) or antibody against transferrin receptor (Santa Cruz Biotechnology).

[0078]    **Results and Discussion**

[0079]    **Analysis of Recurrent Lung Cancers with Acquired Resistance to Gefitinib.** Recurrent gefitinib-resistant NSCLC developed in two patients whose tumors had harbored an activating mutation of the EGFR kinase at the time of diagnosis and who had shown a dramatic initial clinical response to the drug (1). In both cases, progressive metastatic disease in the liver led to the patients' demises, 1–2 years after initiation of treatment. In case 1, analysis of the major liver metastasis obtained at the time of autopsy indicated persistence of the sensitizing *EGFR* mutation (L858R), as well as the presence of a newly acquired T790M mutation (Fig. 1A). Interestingly, analysis of uncloned PCR products showed the initial L858R mutation to be present at an abundance consistent with a heterozygous mutation that is present in all tumor cells, whereas the secondary T790M mutation was seen at approximately one-fifth the abundance of the corresponding wild-type allele. Thus, this resistance-associated mutation seems to be present in only a fraction of cells within the recurrent tumor.

[0080]    Case 2 involved eight distinct recurrent metastases in the liver after the failure of gefitinib therapy. In all of these independent lesions, the sensitizing L861Q *EGFR* mutation was present at the expected ratio for a heterozygous mutation. No secondary *EGFR* mutation was detectable by analysis of uncloned PCR products from any

22

PUMAWYETH-TAG00030572

of these metastases. However, after subcloning of the PCR products, the T790M mutation was found to be present at very low frequency in two of the four metastatic tumors analyzed (T790M, 2 of 50 clones sequenced from lesion 1 and 1 of 56 from lesion 2), but not from two other recurrent metastases (0 of 55 clones from lesion 3 and 0 of 59 from lesion 4), or the primary tumor (0 of 75 clones) (Fig. 1*B* and Table 1). Taken together, these results are consistent with previous reports that the T790M mutation is present in some, but not all, cases of acquired gefitinib resistance (three of seven tumors; see refs. 17, 18, and 21). Furthermore, as previously noted (18), even in some cases with this resistance-associated mutation, it seems to be present in only a small fraction of tumor cells within a recurrent lesion. These observations suggest that additional mechanisms of resistance are involved in cases without a secondary *EGFR* mutation and that such mechanisms coexist with the T790M mutation in other cases.

[0081]    **Generation of Gefitinib-Resistant Cell Lines with Susceptibility to Irreversible Inhibitors.** Given the excellent correlation between the clinical responsiveness of EGFR-mutant NSCLC and the enhanced gefitinib-sensitivity of NSCLC cell lines with these mutations (2, 6, 22, 23), and the limited availability of clinical specimens from relapsing patients, we modeled gefitinib resistance *in vitro*. We cultured the bronchoalveolar cancer cell line NCI-H1650, which has an in-frame deletion of the EGFR kinase (delE746-A750), in 20 μM gefitinib, either with or without prior exposure to the mutagen ethyl methane sulfonate. This cell line exhibits 100-fold increased sensitivity to gefitinib, compared with some NSCLC lines expressing wild-type EGFR (6). Whereas the vast majority of these cells are efficiently killed by 20 μM gefitinib, drug-resistant colonies were readily observed at a frequency of $\approx10^{-5}$, irrespective of mutagen treatment. Forty-nine independent drug-resistant clones were isolated, showing an average 50-fold decrease in gefitinib sensitivity (Fig. 2*A*). All of these showed persistence of the sensitizing mutation without altered expression of EGFR, and none had acquired a secondary *EGFR* mutation or new mutations in *ERBB2, p53, Kras*, or *PTEN*. Gefitinib-resistant clones demonstrated comparable resistance to related inhibitors of the anilinoquinazoline class. Remarkably, however, they displayed persistent sensitivity to three inhibitors of the ERBB family (Fig. 2*A*): HKI-272 (24) and HKI-357

23

PUMAWYETH-TAG00030573

(compound 7f in ref. 25), which are dual inhibitors of EGFR and ERBB2 ($IC_{50}$ values of 92 and 34 nM, respectively, for EGFR and 59 and 33 nM, respectively, for ERBB2), and EKB-569 (26), a selective inhibitor of EGFR ($IC_{50}$ values of 39 nM for EGFR and 1.3 μM for ERBB2) (Wyeth) (Fig. 2*B*). All three drugs are irreversible inhibitors, most likely via a covalent bond with the cys773 residue within the EGFR catalytic domain or the cys805 of ERBB2. Like gefitinib, these compounds demonstrate increased killing of NSCLC cells harboring an *EGFR* mutation, compared with cells expressing wild-type receptor (Fig. 2*A*). However, in contrast to gefitinib, against which resistant clones are readily generated, even at high drug concentrations, we were unable to establish clones of cells that were resistant to the irreversible inhibitors at concentrations above 10 μM, even after ethyl methane sulfonate mutagenesis (Fig. 2*C*).

[0082]    **Dependence of Gefitinib-Resistant Cells on EGFR and ERBB2 Expression.** To gain insight into the mechanisms underlying the acquisition of gefitinib resistance and the persistent sensitivity to the irreversible inhibitors, we first determined whether resistant cell lines remain dependent upon EGFR for their viability. We have previously shown that siRNA-mediated knockdown of EGFR triggers apoptosis in cells harboring mutant EGFRs, but not in those with wild-type alleles (6). Significantly, parental NCI-H1650 cells as well as their gefitinib-resistant derivatives showed comparable reduction in cell viability after transfection with siRNA targeting EGFR (Fig. 3*A*). Thus, acquisition of gefitinib-resistance does not involve EGFR-independent activation of downstream effectors. Because HKI-272 and HKI-357 target both EGFR and ERBB2, we also tested suppression of this related receptor. Knockdown of ERBB2 in NCI-H1650 and its gefitinib-resistant derivatives also caused loss of viability (Fig. 3*A*), suggesting a role for EGFR–ERBB2 heterodimers in transducing essential survival signals in tumor cells harboring *EGFR* mutations. Inhibition of EGFR alone by an irreversible inhibitor seems to be sufficient to induce apoptosis in gefitinib-resistant cells, as demonstrated by the effectiveness of EKB-569, which primarily targets EGFR (26). However, given the potentially complementary effects of targeting both EGFR and ERBB2 by using siRNA and the availability of irreversible inhibitors that target both of these family members, the potential benefit of dual inhibition warrants consideration.

24

PUMAWYETH-TAG00030574

[0083]     We compared the ability of gefitinib and irreversible ERBB family inhibitors to suppress signaling via downstream effectors of EGFR that mediate its proliferative and survival pathways. HKI-357 was 10-fold more effective than gefitinib in suppressing EGFR autophosphorylation (measured at residue Y1068), and AKT and MAPK phosphorylation in parental NCI-H1650 cells harboring the delE746-A750 EGFR mutation (Fig. 3B). In a gefitinib-resistant derivative, NCI-H1650(G7), gefitinib exhibited considerably reduced efficacy in suppressing AKT phosphorylation, a key EGFR signaling effector linked to gefitinib responsiveness (6), whereas HKI-357 demonstrated persistent activity (Fig. 3B).

[0084]     **Altered EGFR Internalization in Gefitinib-Resistant Clones.** Given the absence of secondary mutations in *EGFR* and the persistent susceptibility of gefitinib-resistant cells to siRNA-mediated suppression of EGFR, we tested whether the mechanism underlying the differential inhibition of EGFR signaling in gefitinib-resistant cells by reversible and irreversible inhibitors might be correlated with alterations in receptor trafficking, a well documented modulator of EGFR-dependent signaling (20). Indeed, analysis of EGFR trafficking in NCI-H1650-derived resistant cells demonstrated a consistent increase in EGFR internalization, compared with the parental drug-sensitive cells, as measured both by internalization of fluorescein-labeled EGF (Fig. 3C) and quantitation of cytoplasmic biotinylated EGFR (Fig. 3D). No such effect was observed with the transferrin receptor, suggesting that this did not result from a generalized alteration in all receptor processing. Although further work is required to define the precise mechanism for this alteration in EGFR trafficking, a complex process in which numerous regulatory proteins have been implicated, these results suggest that gefitinib's ability to inhibit EGFR activation is compromised in these cells, whereas the action of the irreversible inhibitors are not detectably affected.

[0085]     **Inhibition of T790M EGFR Signaling and Enhanced Cell Killing by Irreversible Inhibitors.** The enhanced suppression of EGFR signaling by irreversible ERBB inhibitors raised the possibility that these drugs may also exhibit persistent activity in the context of cells harboring the T790M secondary mutation in EGFR. We therefore

25

tested the effect of these inhibitors on the NCI-H1975 bronchoalveolar cancer cell line, which harbors both L858R and T790M mutations in *EGFR* (18). Significantly, this cell line was derived from a patient that had not been treated with an EGFR inhibitor, indicating that this mutation is not uniquely associated with acquired drug resistance. Both HKI-357 and HKI-272 were considerably more effective than gefitinib in suppressing ligand-induced EGFR autophosphorylation and its downstream signaling, as determined by AKT and MAPK phosphorylation (Fig. 4*A*). Similarly, all three irreversible inhibitors suppressed proliferation in this cell line under conditions where it is resistant to gefitinib (Fig. 4*B*). Thus, irreversible ERBB inhibitors seem to be effective in cells harboring the T790M EGFR as well as in cells with altered trafficking of the wild-type receptor.

[0086]    Our results confirm the report of T790M mutations in *EGFR* as secondary mutations that arise in previously sensitive NSCLCs harboring an activating mutation, associated with the emergence of acquired resistance (17, 18). However, this mutation is present only in a subset of cases, and even tumors that harbor the T790M mutation may contain only a small fraction of cells with this mutation. These observations imply that multiple resistance mechanisms can coexist in recurrent tumors after an initial response to gefitinib or similar reversible *EGFR* inhibitors. Moreover, these findings suggest that T790M-independent resistance mechanisms may be equally, if not more, effective than the T790M substitution itself in conferring drug resistance and may explain why recurrent tumors rarely exhibit clonality for T790M (17, 18). *In vitro* mechanisms of acquired gefitinib resistance do not involve secondary EGFR mutations at a significant frequency, but instead are correlated with altered receptor trafficking. However, it should be noted that we have not examined EGFR trafficking in all of the resistant clones that we established *in vitro*, and it remains possible that additional mechanisms may contribute to gefitinib resistance in some of the clones. Nonetheless, virtually all gefitinib-resistant clones exhibited comparable sensitivity to the irreversible ERBB inhibitors.

[0087]    Our results indicate striking differences between competitive EGFR inhibitors such as gefitinib, whose effectiveness is limited by the rapid development of

PUMAWYETH-TAG00030576

WO 2006/084058                                        PCT/US2006/003717

drug resistance *in vitro*, and irreversible inhibitors, to which acquired resistance appears to be rare (Fig. 2*C*). We speculate that increased internalization of ligand-bound EGFR in resistant cells may be linked to dissociation of the gefitinib–EGFR complex at the low pH of intracellular vesicles. In contrast, irreversible cross-linking of the receptor would be unaffected by such alterations in receptor trafficking. Acquired resistance to gefitinib is stably maintained after passage of cells for up to 20 generations in the absence of drug, suggesting that genetic or epigenetic alterations in genes that modulate EGFR turnover may underlie this phenomenon. Because receptor trafficking cannot be readily studied by using available clinical specimens, identification of such genomic alterations may be required before clinical correlations are possible. Nonetheless, such a mechanism may contribute to *in vivo* acquired gefitinib-resistance in patients with recurrent disease who do not have secondary mutations in *EGFR*.

[0088]     Irreversible ERBB inhibitors also seem to be effective in overcoming gefitinib resistance mediated by the T790M mutation, an effect that presumably results from the preservation of inhibitor binding despite alteration of this critical residue. While this work was in progress, another irreversible inhibitor of EGFR [CL-387,785, Calbiochem (27)] was shown to inhibit the kinase activity of the T790M EGFR mutant (17). The effectiveness of CL-387,785 in the context of T790M was proposed to result from the absence of a chloride at position 3 of the aniline group, which is present in gefitinib and was postulated to interfere sterically with binding to the mutant methionine at codon 790. However, EKB-569, HKI-272, and HKI-357 all have chloride moieties at that position in the aniline ring, suggesting that their shared ability to bind irreversibly to EGFR is likely to explain their effectiveness, rather than the absence of a specific steric interaction with T790M (24–26). Thus, these irreversible inhibitors may prove to be broadly effective in circumventing a variety of resistance mechanisms, in addition to the T790M mutation.

PUMAWYETH-TAG00030577

Case 1:21-cv-01338-MFK   Document 122   Filed 03/29/23   Page 241 of 257 PageID #: 2973

Table 1.   Presence of EGFR T790M mutation at very low frequency in recurrent tumors from case 2

|  | No. of clones | |
| --- | --- | --- |
| Tumor | T790M mutant | Wild type |
| Primary | 0 | 75 |
| Recurrent 1 | 2 | 48 |
| Recurrent 2 | 1 | 55 |
| Recurrent 3 | 0 | 55 |
| Recurrent 4 | 0 | 59 |

[0089]    Sequencing of large numbers of cloned PCR products revealed that a minority of alleles within two of four liver lesions contain the T790M mutation.

[0090]    The references cited throughout the application are incorporated herein by reference in their entirety.

PUMAWYETH-TAG00030578

[0091]    REFERENCES

1.    Schiller JH, Harrington D, Belani CP, et al. Comparison of four chemotherapy regimens for advanced non-small cell lung cancer. N Engl J Med 2002; 346:92-98.

2.    Druker BJ, Talpaz M, Resta DJ et al. Efficacy and safety of a specific inhibitor of the BCR-ABL tyrosine kinase in Chronic Myeloid Leukemia. N Engl J Med 2001;344:1031-1037.

3.    Arteaga CL. ErbB-targeted therapeutic approaches in human cancer. Exp Cell Res. 2003; 284:122-30.

4.    Jorissen RN, Walker F, Pouliot N, Garrett TP, Ward CW, Burgess AW. Epidermal growth factor receptor: mechanisms of activation and signaling. Exp Cell Res 2003;284:31-53

5.     Luetteke NC, Phillips HK, Qui TH, Copeland NG, Earp HS, Jenkins NA, Lee DC. The mouse waved-2 phenotype results from a point mutation in the EGF receptor tyrosine kinase. Genes Dev 1994;8:399-413.

6.    Nicholson RI, Gee JMW, Harper ME. EGFR and cancer prognosis. Eur J Cancer. 2001;37:S9-15

7.    Wong AJ, Ruppert JM, Bigner SH, et al. Structural alterations of the epidermal growth factor receptor gene in human gliomas. Proc Natl Acad Sci. 1992;89:2965-2969.

8.    Ciesielski MJ, Genstermaker RA. Oncogenic epidermal growth factor receptor mutants with tandem duplication: gene structure and effects on receptor function. Oncogene 2000; 19:810-820.

9.    Frederick L, Wang W-Y,Eley G, James CD. Diversity and frequency of epidermal growth factor receptor mutations in human glioblastomas. Cancer Res 2000; 60:1383-1387.

29

WO 2006/084058                                                    PCT/US2006/003717

10.   Huang H-JS, Nagane M. Klingbeil CK, et al. The enhanced tumorigenic activity
      of a mutant epidermal growth factor receptor common in human cancers is
      mediated by threshold levels of constitutive tyrosine phophorylation and
      unattenuated signaling. J Biol Chem 1997;272:2927-2935

11.   Pegram MD, Konecny G, Slamon DJ. The molecular and cellular biology of
      HER2/neu gene amplification/overexpression and the clinical development of
      herceptin (trastuzumab) therapy for breast cancer. Cancer Treat Res 2000;103:57-
      75.

12.   Ciardiello F, Tortora G. A novel approach in the treatment of cancer targeting the
      epidermal growth factor receptor. Clin Cancer Res. 2001;7:2958-2970

13.   Wakeling AE, Guy SP, Woodburn JR et al. ZD1839 (Iressa): An orally active
      inhibitor of Epidermal Growth Factor signaling with potential for cancer therapy.
      Cancer Res 2002;62:5749-5754.

14.   Moulder SL, Yakes FM, Muthuswamy SK, Bianco R, Simpson JF, Arteaga CL.
      Epidermal growth factor receptor (HER1) tyrosine kinase inhibitor ZD1839
      (Iressa) inhibits HER2/neu (erbB2)-overexpressing breast cancer cells *in vitro* and
      *in vivo*. Cancer Res 2001;61:8887-8895.

15.   Moasser MM, Basso A, Averbuch SD, Rosen N. The tyrosine kinase inhibitor
      ZD1839 ("Iressa") inhibits HER2-driven signaling and suppresses the growth of
      HER-2 overexpressing tumor cells. Cancer Res 2001;61:7184-7188.

16.   Ranson M, Hammond LA, Ferry D, et al. ZD1839, a selective oral epidermal
      growth factor receptor-tyrosine kinase inhibitor, is well tolerated and active in
      patients with solid, malignant tumors: results of a phase I trial. J Clin Oncol. 2002;
      20: 2240-2250.

17.   Herbst RS, Maddox A-M, Rothernberg ML, et al. Selective oral epidermal growth
      factor receptor tyrosine kinase inhibitor ZD1839 is generally well tolerated and
      has activity in non-small cell lung cancer and other solid tumors: results of a phase
      I trial. J Clin Oncol. 2002;20:3815-3825.

PUMAWYETH-TAG00030580

18.   Baselga J, Rischin JB, Ranson M, et al. Phase I safety, pharmacokinetic and pharmacodynamic trial of ZD1839, a selective oral Epidermal Growth Factor Receptor tyrosine kinase inhibitor, in patients with five selected solid tumor types. J Clin Onc 2002;20:4292-4302.

19.   Albanell J, Rojo F, Averbuch S, et al. Pharmacodynamic studies of the epidermal growth factor receptor inhibitor ZD1839 in skin from cancer patients: histopathologic and molecular consequences of receptor inhibition. J Clin Oncol. 2001; 20:110-124.

20.   Kris MG, Natale RB, Herbst RS, et al. Efficacy of Gefitinib, an inhibitor of the epidermal growth factor receptor tyrosine kinase, in symptomatic patients with non-small cell lung cancer: A randomized trial. JAMA 2003;290:2149-2158.

21.   Fukuoka M, Yano S, Giaccone G, et al. Multi-institutional randomized phase II trial of gefitinib for previously treated patients with advanced non-small-cell lung cancer. J Clin Oncol 2003;21:2237-2246.

22.   Giaccone G, Herbst RS, Manegold C, et al. Gefitinib in combination with gemcitabine and cisplatin in advanced non-small-cell lung cancer: A phase III trial-INTACT 1. J Clin Oncol 2004;22:777-784.

23.   Herbst RS, Giaccone G, Schiller JH, et al. Gefitinib in combination with paclitaxel and carboplatin in advanced non-small-cell lung cancer: A phase III trial – INTACT 2. J Clin Oncol 2004;22:785-794.

24.   Rich JN, Reardon DA, Peery T, et al. Phase II Trial of Gefitinib in recurrent glioblastoma. J Clin Oncol 2004;22:133-142

25.   Cohen MH, Williams GA, Sridhara R, et al. United States Food and Drug Administration Drug Approval Summary: Gefitinib (ZD1839;Iressa) Tablets. Clin Cancer Res. 2004;10:1212-1218.

26.   Cappuzzo F, Gregorc V, Rossi E, et al. Gefitinib in pretreated non-small-cell lung cancer (NSCLC): Analysis of efficacy and correlation with HER2 and epidermal

31

PUMAWYETH-TAG00030581

growth factor receptor expression in locally advanced or Metastatic NSCLC. J Clin Oncol. 2003;21:2658-2663.

27.    Fitch KR, McGowan KA, van Raamsdonk CD, et al. Genetics of Dark Skin in mice. Genes & Dev 2003;17:214-228.

28.    Nielsen UB, Cardone MH, Sinskey AJ, MacBeath G, Sorger PK. Profiling receptor tyrosine kinase activation by using Ab microarrays. Proc Natl Acad Sci USA 2003;100:9330-5.

29.    Burgess AW, Cho H, Eigenbrot C, et al. An open-and-shut case? Recent insights into the activation of EGF/ErbB receptors. Mol Cell 2003;12:541-552.

30.    Stamos J, Sliwkowski MX, Eigenbrot C. Structure of the epidermal growth factor receptor kinase domain alone and in complex with a 4-anilinoquinazoline inhibitor. J Biol Chem. 2002;277:46265-46272.

31.    Lorenzato A, Olivero M, Patrane S, et al. Novel somatic mutations of the MET oncogene in human carcinoma metastases activating cell motility and invasion. Cancer Res 2002; 62:7025-30.

32.    Davies H, Bignell GR, Cox C, et al. Mutations of the BRAF gene in human cancer. Nature 2002;417:906-7.

33.    Bardelli A, Parsons DW, Silliman N, et al. Mutational analysis of the tyrosine kinome in colorectal cancers. Science 2003;300:949.

34.    Daley GQ, Van Etten RA, Baltimore D. Induction of chronic myelogenous leukemia in mice by the P210bcr/abl gene of the Philadelphia chromosome. Science 1990;247:824-30.

35.    Heinrich, MC, Corless CL, Demetri GD, et al. Kinase mutations and imatinib response in patients with metastatic gastrointestinal stromal tumor. J Clin Oncol 2003;21:4342-4349.

36.    Li B, Chang C, Yuan M, McKenna WG, Shu HG. Resistance to small molecule inhibitors of epidermal growth factor receptor in malignant gliomas. Cancer Res 2003;63:7443-7450.

PUMAWYETH-TAG00030582

CLAIMS

1.  A method for treating gefitinib and/or erlotinib resistant cancer, comprising the steps
    of:

    a.    monitoring progression of a cancer in a subject at a time point after the
          subject has initiated gefitinib and/or erlotinib treatment, wherein
          progression of the cancer is indicative of cancer that is resistant to
          gefitinib and/ or erlotinib treatment; and

    b.    administering to the subject having a cancer that is resistant to gefitinib
          and/ or erlotinib treatment a pharmaceutical composition comprising an
          irreversible epidermal growth factor receptor (EGFR) inhibitor.

2.  The method of claim 1, wherein the irreversible EGFR inhibitor is selected from the
    group consisting of EKB-569, HKI-272 and HKI-357.

3.  The method of claim 1, wherein the irreversible EGFR inhibitor binds to cysteine 773
    of EGFR (SEQ ID NO: 1).

4.  The method of claim 1, wherein progression of the cancer is monitored by way of
    visual inspection of the cancer.

5.  The method of claim 4, wherein visual inspection of the cancer is by means of X-ray,
    CT scan or MRI.

6.  The method of claim 1, wherein the progression of the cancer is monitored by way of
    tumor biomarker detection.

7.  The method of claim 1, wherein monitoring progression of a cancer comprises
    comparing the cancer at a second time point with the cancer at a first time point,
    wherein the second time point is after the first time point, wherein the first time point
    is before or after initiation of gefitinib and/ or erlotinib treatment, wherein increased
    growth of the cancer indicates progression of the cancer.

33

PUMAWYETH-TAG00030583

WO 2006/084058                                                    PCT/US2006/003717

8. The method of claim 7, wherein at additional time points the cancer is compared with preceding time points.

9. The method of claim 1, wherein the cancer is epithelial cell cancer.

10. The method of claim 1, wherein the cancer is gastrointestinal cancer, prostate cancer, ovarian cancer, breast cancer, head and neck cancer, esophageal cancer, lung cancer, non-small cell lung cancer, cancer of the nervous system, kidney cancer, retina cancer, skin cancer, liver cancer, pancreatic cancer, genital-urinary cancer and bladder cancer.

11. A method of treating cancer, comprising the steps of:

    a. administering gefitinib and/ or erlotinib to a subject with cancer;

    b. monitoring progression of the subject's cancer; and

    c. administering to the subject an irreversible EGFR inhibitor upon indication of progression of the cancer.

12. The method of claim 11, wherein the irreversible EGFR inhibitor is selected from the group consisting of EKB-569, HKI-272 and HKI-357.

13. The method of claim 11, wherein the irreversible EGFR inhibitor binds to cysteine 773 of EGFR (SEQ ID NO: 1).

14. The method of claim 11, wherein progression of the cancer is monitored by way of visual inspection of the cancer.

15. The method of claim 14, wherein visual inspection of the cancer is by means of X-ray, CT scan or MRI.

16. The method of claim 11, wherein the progression of the cancer is monitored by way of tumor biomarker detection.

17. The method of claim 11, wherein monitoring progression of a cancer comprises comparing the cancer at a second time point with the cancer at a first time point, wherein the second time point is after the first time point, wherein the first time point

34

PUMAWYETH-TAG00030584

is before or after initiation of gefitinib and/ or erlotinib treatment, wherein increased growth of the cancer indicates progression of the cancer.

18. The method of claim 17, wherein at additional time points the cancer is compared with preceding time points.

19. The method of claim 11, wherein the cancer is epithelial cell cancer.

20. The method of claim 11, wherein the cancer is gastrointestinal cancer, prostate cancer, ovarian cancer, breast cancer, head and neck cancer, esophageal cancer, lung cancer, non-small cell lung cancer, cancer of the nervous system, kidney cancer, retina cancer, skin cancer, liver cancer, pancreatic cancer, genital-urinary cancer and bladder cancer.

21. The method of claim 11, wherein the irreversible EGFR inhibitor is administered simultaneously with a reversible EGFR inhibitor.

22. The method of claim 21, wherein the reversible EGFR inhibitor is gefitinib or erlotinib.

23. A method of treating cancer, comprising administering to a subject with a cancer having a mutation in EGFR (SEQ ID NO: 1), wherein the mutation is substitution of a methionine for a threonine at position 790, a pharmaceutical composition comprising an irreversible EGFR inhibitor.

24. The method of claim 23, wherein the EGFR inhibitor is selected from the group consisting of EKB-569, HKI-272 and HKI-357.

25. The method of claim 23, wherein the irreversible EGFR inhibitor bind to cysteine 773 of EGFR (SEQ ID NO: 1).

26. The method of claim 23, wherein the cancer is epithelial cell cancer.

27. The method of claim 23, wherein the cancer is gastrointestinal cancer, prostate cancer, ovarian cancer, breast cancer, head and neck cancer, esophageal cancer, lung cancer, non-small cell lung cancer, cancer of the nervous system, kidney cancer, retina cancer, skin cancer, liver cancer, pancreatic cancer, genital-urinary cancer and bladder cancer.

35

Case 1:21-cv-01338-MFK   Document 122   Filed 03/29/23   Page 249 of 257 PageID #: 2981



Fig. 1.

PUMAWYETH-TAG00030586

WO 2006/084058    2/9    PCT/US2006/003717



Fig. 2.

PUMAWYETH-TAG00030587

Fig. 3.





Fig. 4.

Figure 5                          5/9

```
CCCGGCGCAGCGCGGCCGCAGCAGCCTCCGCCCCCCGCACGGTGTGAGCGCCCGACGCGG -185
.............................................................

CCGAGGCGGCCGGAGTCCCGAGCTAGCCCCGGCGGCCGCCGCCGCCCAGACCGGACGACA -125
.............................................................

GGCCACCTCGTCGGCGTCCGCCCGAGTCCCCGCCTCGCCGCCAACGCCACAACCACCGCG -65
.............................................................

CACGGCCCCCTGACTCCGTCCAGTATTGATCGGGAGAGCCGGAGCGAGCTCTTCGGGGAG -5
.............................................................

CAGCGATGCGACCCTCCGGGACGGCCGGGGCAGCGCTCCTGGCGCTGCTGGCTGCGCTCT  55
...... -M--R--P--S--G--T--A--G--A--A--L--L--A--L--L--A--A--L--  18

GCCCGGCGAGTCGGGCTCTGGAGGAAAAGAAAGTTTGCCAAGGCACGAGTAACAAGCTCA  115
C--P--A--S--R--A--L--E--E--K--K--V--C--Q--G--T--S--N--K--L--  38

CGCAGTTGGGCACTTTTGAAGATCATTTTCTCAGCCTCCAGAGGATGTTCAATAACTGTG  175
T--Q--L--G--T--F--E--D--H--F--L--S--L--Q--R--M--F--N--N--C--  58

AGGTGGTCCTTGGGAATTTGGAAATTACCTATGTGCAGAGGAATTATGATCTTTCCTTCT  235
E--V--V--L--G--N--L--E--I--T--Y--V--Q--R--N--Y--D--L--S--F--  78

TAAAGACCATCCAGGAGGTGGCTGGTTATGTCCTCATTGCCCTCAACACAGTGGAGCGAA  295
L--K--T--I--Q--E--V--A--G--Y--V--L--I--A--L--N--T--V--E--R--  98

TTCCTTTGGAAAACCTGCAGATCATCAGAGGAAATATGTACTACGAAAATTCCTATGCCT  355
I--P--L--E--N--L--Q--I--I--R--G--N--M--Y--Y--E--N--S--Y--A--  118

TAGCAGTCTTATCTAACTATGATGCAAATAAAACCGGACTGAAGGAGCTGCCCATGAGAA  415
L--A--V--L--S--N--Y--D--A--N--K--T--G--L--K--E--L--P--M--R--  138

ATTTACAGGAAATCCTGCATGGCGCCGTGCGGTTCAGCAACAACCCTGCCCTGTGCAACG  475
N--L--Q--E--I--L--H--G--A--V--R--F--S--N--N--P--A--L--C--N--  158

TGGAGAGCATCCAGTGGCGGGACATAGTCAGCAGTGACTTTCTCAGCAACATGTCGATGG  535
V--E--S--I--Q--W--R--D--I--V--S--S--D--F--L--S--N--M--S--M--  178

ACTTCCAGAACCACCTGGGCAGCTGCCAAAAGTGTGATCCAAGCTGTCCCAATGGGAGCT  595
D--F--Q--N--H--L--G--S--C--Q--K--C--D--P--S--C--P--N--G--S--  198

GCTGGGGTGCAGGAGAGGAGAACTGCCAGAAACTGACCAAAATCATCTGTGCCCAGCAGT  655
C--W--G--A--G--E--E--N--C--Q--K--L--T--K--I--I--C--A--Q--Q--  218

GCTCCGGGCGCTGCCGTGGCAAGTCCCCCAGTGACTGCTGCCACAACCAGTGTGCTGCAG  715
C--S--G--R--C--R--G--K--S--P--S--D--C--C--H--N--Q--C--A--A--  238

GCTGCACAGGCCCCCGGGAGAGCGACTGCCTGGTCTGCCGCAAATTCCGAGACGAAGCCA  775
G--C--T--G--P--R--E--S--D--C--L--V--C--R--K--F--R--D--E--A--  258

CGTGCAAGGACACCTGCCCCCCACTCATGCTCTACAACCCCACCACGTACCAGATGGATG  835
T--C--K--D--T--C--P--P--L--M--L--Y--N--P--T--T--Y--Q--M--D--  278

TGAACCCCGAGGGCAAATACAGCTTTGGTGCCACCTGCGTGAAGAAGTGTCCCCGTAATT  895
V--N--P--E--G--K--Y--S--F--G--A--T--C--V--K--K--C--P--R--N--  298
```

```
ATGTGGTGACAGATCACGGCTCGTGCGTCCGAGCCTGTGGGGCCGACAGCTATGAGATGG 955
Y--V--V--T--D--H--G--S--C--V--R--A--C--G--A--D--S--Y--E--M--  318

AGGAAGACGGCGTCCGCAAGTGTAAGAAGTGCGAAGGGCCTTGCCGCAAAGTGTGTAACG 1015
E--E--D--G--V--R--K--C--K--K--C--E--G--P--C--R--K--V--C--N--  338

GAATAGGTATTGGTGAATTTAAAGACTCACTCTCCATAAATGCTACGAATATTAAACACT 1075
G--I--G--I--G--E--F--K--D--S--L--S--I--N--A--T--N--I--K--H--  358

TCAAAAACTGCACCTCCATCAGTGGCGATCTCCACATCCTGCCGGTGGCATTTAGGGGTG 1135
F--K--N--C--T--S--I--S--G--D--L--H--I--L--P--V--A--F--R--G--  378

ACTCCTTCACACATACTCCTCCTCTGGATCCACAGGAACTGGATATTCTGAAAACCGTAA 1195
D--S--F--T--H--T--P--P--L--D--P--Q--E--L--D--I--L--K--T--V--  398

AGGAAATCACAGGGTTTTTGCTGATTCAGGCTTGGCCTGAAAACAGGACGGACCTCCATG 1255
K--E--I--T--G--F--L--L--I--Q--A--W--P--E--N--R--T--D--L--H--  418

CCTTTGAGAACCTAGAAATCATACGCGGCAGGACCAAGCAACATGGTCAGTTTTCTCTTG 1315
A--F--E--N--L--E--I--I--R--G--R--T--K--Q--H--G--Q--F--S--L--  438

CAGTCGTCAGCCTGAACATAACATCCTTGGGATTACGGCTCCCTCAAGGAGATAAGTGATG 1375
A--V--V--S--L--N--I--T--S--L--G--L--R--S--L--K--E--I--S--D--  458

GAGATGTGATAATTTCAGGAAACAAAAATTTGTGCTATGCAAATACAATAAACTGGAAAA 1435
G--D--V--I--I--S--G--N--K--N--L--C--Y--A--N--T--I--N--W--K--  478

AACTGTTTGGGACCTCCGGTCAGAAAACCAAAATTATAAGCAACAGAGGTGAAAACAGCT 1495
K--L--F--G--T--S--G--Q--K--T--K--I--I--S--N--R--G--E--N--S--  498

GCAAGGCCACAGGCCAGGTCTGCCATGCCTTGTGCTCCCCCGAGGGCTGCTGGGGCCCGG 1555
C--K--A--T--G--Q--V--C--H--A--L--C--S--P--E--G--C--W--G--P--  518

AGCCCAGGGACTGCGTCTCTTGCCGGAATGTCAGCCGAGGCAGGGAATGCGTGGACAAGT 1615
E--P--R--D--C--V--S--C--R--N--V--S--R--G--R--E--C--V--D--K--  538

GCAACCTTCTGGAGGGTGAGCCAAGGGAGTTTGTGGAGAACTCTGAGTGCATACAGTGCC 1675
C--N--L--L--E--G--E--P--R--E--F--V--E--N--S--E--C--I--Q--C--  558

ACCCAGAGTGCCTGCCTCAGGCCATGAACATCACCTGCACAGGACGGGGACCAGACAACT 1735
H--P--E--C--L--P--Q--A--M--N--I--T--C--T--G--R--G--P--D--N--  578

GTATCCAGTGTGCCCACTACATTGACGGCCCCCACTGCGTCAAGACCTGCCCGGCAGGAG 1795
C--I--Q--C--A--H--Y--I--D--G--P--H--C--V--K--T--C--P--A--G--  598

TCATGGGAGAAAACAACACCCTGGTCTGGAAGTACGCAGACGCCGGCCATGTGTGCCACC 1855
V--M--G--E--N--N--T--L--V--W--K--Y--A--D--A--G--H--V--C--H--  618

TGTGCCATCCAAACTGCACCTACGGATGCACTGGGCCAGGTCTTGAAGGCTGTCCAACGA 1915
L--C--H--P--N--C--T--Y--G--C--T--G--P--G--L--E--G--C--P--T--  638

ATGGGGCCTAAGATCCCGTCCATCGCCACTGGGATGGTGGGGGCCCTCCTCTTGCTGCTGG 1975
V--G--P--K--I--P--S--I--A--T--G--M--V--G--A--L--L--L--L--L--  658

CGGTGGCCCTGGGGATCGGCCTCTTCATGCGAAGGCGCCACATCGTTCGGAAGCGCACGC 2035
V--V--A--L--G--I--G--L--F--M--R--R--R--H--I--V--R--K--R--T--  678
```

Figure 5 (cont.)

```
TGCGGAGGCTGCTGCAGGAGAGGGAGCTTGTTGGAGCCTCTTACACCCAGTGGAGAAGCTC  2095
L--R--R--L--L--Q--E--R--E--L--V--E--P--L--T--P--S--G--E--A--   698

CCAACCAAGCTCTCTTGAGGATCTTGAAGGAAACTGAATTCAAAAAGATCAAAGTGCTGG   2155
P--N--Q--A--L--L--R--I--L--K--E--T--E--F--K--K--I--K--V--L--   718

GCTCCGGTGCGTTCGGCACGGTGTATAAGGGACTCTGGATCCCAGAAGGTGAGAAAGTTA   2215
G--S--G--A--F--G--T--V--Y--K--G--L--W--I--P--E--G--E--K--V--   738

AAATTCCCGTCGCTATCAAGGAATTTAAGAGAAGCAACATCTCCGAAAGCCAACAAGGAAA   2275
K--I--P--V--A--I--K--E--L--R--E--A--T--S--P--K--A--N--K--E--   758

TCCTCGATGAAGCCTACGTGATGGCCAGCGTGGACAACCCCCACGTGTGCCGCCTGCTGG   2335
I--L--D--E--A--Y--V--M--A--S--V--D--N--P--H--V--C--R--L--L--   778

GCATCTGCCTCACCTCCACCGTGCAGCTCATCACGCAGCTCATGCCCTTCGGCTGCCTCC   2395
G--I--C--L--T--S--T--V--Q--L--I--T--Q--L--M--P--F--G--C--L--   798

TGGACTATGTCCGGGAACACAAAGACAATATTGGCTCCCAGTACCTGCTCAACTGGTGTG   2455
L--D--Y--V--R--E--H--K--D--N--I--G--S--Q--Y--L--L--N--W--C--   818

TGCAGATCGCAAAGGGCATGAACTACTTGGAGGACCGTCGCTTGGTGCACCGCGACCTGG   2515
V--Q--I--A--K--G--M--N--Y--L--E--D--R--R--L--V--H--R--D--L--   838

CAGCCAGGAACGTACTGGTGAAAACACCGCAGCATGTCAAGATCACAGATTTTGGGCTGG   2575
A--A--R--N--V--L--V--K--T--P--Q--H--V--K--I--T--D--F--G--L--   858

CCAAACTGCTGGGTGCGGAAGAGAAAGAATACCATGCAGAAGGAGGCAAAGTGCCTATCA   2635
A--K--L--L--G--A--E--E--K--E--Y--H--A--E--G--G--K--V--P--I--   878

AGTGGATGGCATTGGAATCAATTTTACACAGAATCTATACCCACCAGAGTGATGTCTGGA   2695
K--W--M--A--L--E--S--I--L--H--R--I--Y--T--H--Q--S--D--V--W--   898

GCTACGGGGTGACTGTTTGGGAGTTGATGACCTTTGGATCCAAGCCCATATGACGGGAATCC   2755
S--Y--G--V--T--V--W--E--L--M--T--F--G--S--K--P--Y--D--G--I--   918

CTGCCAGCGAGATCTCCTCCATCCTGGAGAAAGGAGAACGCCTCCCTCAGCCACCCATAT   2815
P--A--S--E--I--S--S--I--L--E--K--G--E--R--L--P--Q--P--P--I--   938

GTACCATCGATGTCTACATGATCATGGTCAAGTGCTGGATGATAGACGCAGATAGTCGCC   2875
C--T--I--D--V--Y--M--I--M--V--K--C--W--M--I--D--A--D--S--R--   958

CAAAGTTCCGTGAGTTGATCATCGAATTCTCCAAAATGGCCCGAGACCCCCAGCGCTACC   2935
P--K--F--R--E--L--I--I--E--F--S--K--M--A--R--D--P--Q--R--Y--   978

TTGTCATTCAGGGGGATGAAAGAATGCATTTGCCAAGTCCTACAGACTCCAACTTCTACC   2995
L--V--I--Q--G--D--E--R--M--H--L--P--S--P--T--D--S--N--F--Y--   998

GTGCCCTGATGGATGAAGAAGACATGGACGACGTGGTGGATGCCGACGAGTACCTCATCC   3055
R--A--L--M--D--E--E--D--M--D--D--V--V--D--A--D--E--Y--L--I--   1018

CACAGCAGGGCTTCTTCAGCAGCCCCTCCACGTCACGGACTCCCCTCCTGAGCTCTCTGA   3115
P--Q--Q--G--F--F--S--S--P--S--T--S--R--T--P--L--L--S--S--L--   1038

GTGCAACCAGCAACAATTCCACCGTGCGTTGCATTGATAGAAATGGGCTGCAAAGCTGTC   3175
S--A--T--S--N--N--S--T--V--R--A--C--I--D--R--N--G--L--Q--S--C--   1058
```

PUMAWYETH-TAG00030592

Figure 5 (cont.)

```
CCATCAAGGAAGACAGCTTCTTGCAGCGATACAGCTCAGACCCCACAGGCGCCTTGACTG 3235
P--I--K--E--D--S--F--L--Q--R--Y--S--S--D--P--T--G--A--L--T-- 1078

AGGACAGCATAGACGACACCTTCCTCCCAGTGCCTGAATACATAAACCAGTCCGTTCCCA 3295
E--D--S--I--D--D--T--F--L--P--V--P--E--Y--I--N--Q--S--V--P-- 1098

AAAGGCCCGCTGGCTCTGTGCAGAATCCTGTCTATCACAATCAGCCTCTGAACCCCGCGC 3355
K--R--P--A--G--S--V--Q--N--P--V--Y--H--N--Q--P--L--N--P--A-- 1118

CCAGCAGAGACCCACACTACCAGGACCCCCACAGCACTGCAGTGGGCAACCCCGAGTATC 3415
P--S--R--D--P--H--Y--Q--D--P--H--S--T--A--V--G--N--P--E--Y-- 1138

TCAACACTGTCCAGCCCACCTGTGTCAACAGCACATTCGACAGCCCTGCCCACTGGGCCC 3475
L--N--T--V--Q--P--T--C--V--N--S--T--F--D--S--P--A--H--W--A-- 1158

AGAAAGGCAGCCACCAAATTAGCCTGGACAACCCTGACTACCAGCAGGACTTCTTTCCCA 3535
Q--K--G--S--H--Q--I--S--L--D--N--P--D--Y--Q--Q--D--F--F--P-- 1178

AGGAAGCCAAGCCAAATGGCATCTTTAAGGGCTCCACAGCTGAAAATGCAGAATACCTAA 3595
K--E--A--K--P--N--G--I--F--K--G--S--T--A--E--N--A--E--Y--L-- 1198

GGGTCGCGCCACAAAGCAGTGAATTTATTGGAGCATGA 3633  (SEQ ID NO 2  )
R--V--A--P--Q--S--S--E--F--I--G--A--*- 1210  (SEQ ID NO 1  )
```

PUMAWYETH-TAG00030593

Fig. 6



PUMAWYETH-TAG00030594