IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WYETH LLC,

             Plaintiff,

      v.

ASTRAZENECA PHARMACEUTICALS
LP and ASTRAZENECA AB,

             Defendants.

**Redacted - Public Version**

C.A. No. 21-1338 (MFK)

**ASTRAZENECA'S RESPONSES TO WYETH'S OBJECTIONS TO EXHIBITS FOR
WEDNESDAY MAY 15, 2024**

OF COUNSEL:
Christopher N. Sipes
Einar Stole
Eric S. Sonnenschein
Megan P. Keane
Kaveh V. Saba
Priscilla Dodson
Alexander Trzeciak
Ashley Winkler
Melissa Keech
Tobias Ma
Elaine Nguyen
Robert T. McMullen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca*
*Pharmaceuticals LP and AstraZeneca AB*

Dated: May 15, 2024

Pursuant to the dispute resolution procedure in ¶ 63 of the Proposed Joint Pretrial Order (D.I. 381), AstraZeneca responds to Wyeth's objections to certain exhibits AstraZeneca intends to use with Dr. Paul Reider, Dr. Pasi Jänne, Dr. David R. Taft, Dr. Trever Bivona (and a related demonstrative), and Ms. Carla Mulhern.

The objected to exhibits are:

- DTX-105 (Jänne) (Exhibit A)

- DTX-116 (Reider) (Exhibit B)

- DTX-140 (Jänne) (Exhibit C)

- DTX-145 (Jänne and Taft) (Exhibit D)

- DTX-196 (Jänne) (Exhibit E)

- DTX-0616 (Bivona) (Exhibit F) (and related demonstrative Ex. G, DDX5-17)

- DTX-0636 (Mulhern) (Exhibit H)

- DTX-1290 to DTX-1300 (Mulhern).[1]

## I.    DTX-105, DTX-116, DTX-140, DTX-145, DTX-196

DTX-105 (Sequist 2010)

Wyeth's position:   In its Order on Defendants' Motion for Reconsideration and/or Clarification, the Court confirmed exclusion of this exhibit.  D.I. 436 at 5.

AstraZeneca's position: AstraZeneca agrees to withdraw DTX-105 for the purposes of Dr. Jänne's testimony today.

DTX-116 (Learn)

Wyeth's position:  FRE 401-403; March 29, 2024 case-narrowing agreement.  AstraZeneca withdrew this reference from its asserted prior art grounds.  Ex.  I [Mar. 29, 2024, AZ Case

---

[1] With respect to DTX-1290 – DTX-1300 (Mulhern), which are voluminous Flatiron Excel spreadsheets, Wyeth can make available to the Court native copies of the exhibits on a flash drive.

Narrowing Letter].  Its intent to use this document to interpret a reference it has maintained (Allen) is an improper end-run of the prior-art-narrowing process and limits.  It also would violate the anticipation standard for AstraZeneca to use this reference with its anticipatory reference.  *See*, *e.g.*, *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.").

AstraZeneca's position: AstraZeneca made clear in its letter that its disclosed prior art references "shall not otherwise limit AstraZeneca's arguments, evidence, and defenses at trial" and "do not limit the information or evidence that AstraZeneca may introduce at trial to demonstrate the state of the art." D.I. 440, Ex. I at 1. It is well-established law that "[e]xtrinsic evidence may be used to interpret the allegedly anticipating reference and to shed light on what it would have meant to [a person of ordinary skill in the art]." *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018). Here, AstraZeneca's expert Dr. Reider will testify, consistent with his expert report, both that a POSA reading Allen would have understood that Allen's reference to a type of EGFR called "EGFRvIII" was referring to a type of gefitinib resistance as exemplified by the teachings of Learn and that Allen inherently discloses the treatment of gefitinib and/or erlotinib resistant non-small cell lung cancer. *See, e.g.*, Ex. 2 (Reider Opening ¶ 530 ("As explained in Section XI.M, EGFRvIII is a mutated form of EGFR that is associated with gefitinib resistance"); ¶¶ 294–97 (describing the teachings of Learn); Ex. 3 (Reider Reply ¶ 186). As all of the elements of the asserted claims of the '314 patent are either explicitly or inherently disclosed in Allen, AstraZeneca's use of Learn is proper and the exhibit is admissible.

DTX-140 (Reckamp)

<u>Wyeth's position</u>:  FRE 401-403.  This exhibit is not relevant because it concerns "A Phase 2 Trial," governed by FDA requirements rather than patentability, and even if relevant, the likelihood of jury confusion and unfair prejudice outweighs any potential relevance.

<u>AstraZeneca's position</u>: AstraZeneca agrees to withdraw DTX-140 for the purposes of Dr. Jänne's testimony today.

DTX-145 (Settleman)

<u>Wyeth's position</u>:  FRE 401-403.  This exhibit describes the FDA approval process, which the Court has recognized has different requirements than patentability.  D.I. 419 at 3.

<u>AstraZeneca's position</u>: AstraZeneca agrees to withdraw DTX-196 for the purposes of Dr. Jänne's and Dr. Taft's testimony today.

DTX-196 (Li)

<u>Wyeth's position</u>:  FRE 401-403.  This exhibit is solely focused on FDA clinical trial results in a small patient population.  Any potential relevance is significantly outweighed by its unfair prejudice and potential for confusion.

<u>AstraZeneca's position</u>: AstraZeneca agrees to withdraw DTX-196 for the purposes of Dr. Jänne's testimony today.

**II.      DTX-0616, DTX-0636, & DTX-1290 – DTX-1300**

<u>Wyeth's position</u>: Wyeth objects, pursuant to Fed. R. Evid. 402/403, 602, 901, and Fed. R. Civ. P. 26, to Exhibits DTX-0636, DTX-1290 – DTX-1300, third-party data that is created and kept by a company called Flatiron, DTX-0616 (Ms. Mulhern's summary of the underlying Flatiron), and demonstrative DDX5-17.  It is unclear how the data in these Flatiron spreadsheets is recorded or even what the data means. AstraZeneca cannot authenticate this data or provide foundation and has made no effort to do so.  There is no one from Flatiron to tell us how this data is gathered or kept, whether it is reliable, or even to tell us what it is.

4

None of AstraZeneca's witnesses shed any light on these issues.  Dr. Bivona never even reviewed the underlying data.  Ex. J [Bivona's Materials Considered] (not listing Flatiron documents).  Instead, he takes Ms. Mulhern's summary table (DTX-0616) at face value.  Ex. K [Report] at ¶ 116.

Ms. Mulhern was provided the data from AstraZeneca.  She does not know where AstraZeneca obtained this third-party data from, whether AstraZeneca manipulated the Flatiron data before production, or what exactly is even recorded in the data.  Ex. L [Mulhern Dep.] at 117:7-9, 117:16-20, 118:11-15, 127:13-19, 130:17-132:4, 137:16-141:14, 145:5-15.  She has no knowledge from Flatiron regarding the data.  █████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████  *Id.* at 101:18-25, 139:9-16.

Ms. Miller, AstraZeneca's remaining fact witness, cannot solve these authentication and foundation issues.  Ms. Miller testified that a different group within AstraZeneca, one she is not part of, may use Flatiron data in some capacity, but she did not offer any testimony to resolve the authenticity issues surrounding these documents.  Ex. M [Miller Dep.] 96:01-08, 110:14-111:05.  Moreover, the Flatiron data was not produced until after Ms. Miller's deposition, so Wyeth was not able to ask her questions about it, so she should not be permitted to offer any testimony regarding this data during the middle of trial, as it would constitute a late disclosure that would unfairly prejudice Wyeth.

Finally, given the sheer lack of authentication of these exhibits, there is a substantial risk of juror confusion should the exhibits be show to the jury, particularly because AstraZeneca's experts will be relying on these exhibits and will be telling the jury that the documents and data are what they say they are, when the witnesses themselves do not actually know.

AstraZeneca's position:

Wyeth's belated objections should be overruled. Wyeth's complaint that Ms. Mulhern "does not know where AstraZeneca obtained this third-party data from, whether AstraZeneca manipulated the Flatiron data before production, or what exactly is even recorded in the data" recycles arguments that it made at the *Daubert* stage and that the Court has rejected. *See* D.I. 279 (Wyeth's *Daubert* Op. Br.) at 11 (alleging that Ms. Mulhern "*d[id] not know*" "where AstraZeneca obtained the Flatiron data," "whether AstraZeneca processed or otherwise manipulated the Flatiron data before it was given to Ms. Mulhern," and "whether all first-line and adjuvant Tagrisso® patients in the Flatiron data were tested for the T790M mutation"). The Court properly rejected Wyeth's arguments and should do so again. *See* D.I. 372 (Memorandum Opinion and Order) at 45 ("The Court disagrees that these potential flaws with the Flatiron data justify the exclusion of Mulhern's opinion as unreliable."); 46 ("Because the Court has concluded that Mulhern's testimony is admissible and Wyeth offers no independent rationale for exclusion, the Court declines to exclude Dr. Bivona's testimony.").

Wyeth's remaining objections, all of which rely on deposition testimony that was not cited in Wyeth's *Daubert* motion—and identified in a position statement Wyeth shared with AstraZeneca at 3:40 AM this morning—are unpersuasive and waived. Moreover, far from supporting their objection, the deposition testimony of Ms. Miller cited by Wyeth confirms that AstraZeneca relies on Flatiron data (Miller Tr. 110:21-11:5). Ms. Miller is available to testify to that effect at trial. These data were produced from AstraZeneca's files, AstraZeneca's experts have deemed them to be reliable, and, as the Court has already recognized, Wyeth is free to cross examine AstraZeneca's experts. D.I. 372 at 45 ("Wyeth's critiques of the limitations of the Flatiron data are more appropriately explored on cross-examination.").

                                          /s/ Andrew E. Russell
                                          Karen E. Keller (No. 4489)
                                          Andrew E. Russell (No. 5382)
                                          Nathan R. Hoeschen (No. 6232)
                                          Emily S. DiBenedetto (No. 6779)
OF COUNSEL:                               SHAW KELLER LLP
Christopher N. Sipes                      I.M. Pei Building
Einar Stole                              1105 North Market Street, 12th Floor
Eric S. Sonnenschein                      Wilmington, DE 19801
Megan P. Keane                            (302) 298-0700
Kaveh V. Saba                             kkeller@shawkeller.com
Priscilla Dodson                          arussell@shawkeller.com
Alexander Trzeciak                        nhoeschen@shawkeller.com
Ashley Winkler                            edibenedetto@shawkeller.com
Melissa Keech                             *Attorneys for AstraZeneca*
Tobias Ma                                 *Pharmaceuticals LP and AstraZeneca AB*
Elaine Nguyen
Robert T. McMullen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Dated: May 15, 2024

7

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, this document was served on Puma-

TagrissoLitigation@jonesday.com, Wyeth-TagrissoLitigation@willkie.com, and the persons

listed below in the manner indicated:

**BY EMAIL:**

Jack B. Blumenfeld
Rodger D. Smith, II
Megan E. Dellinger
MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com
mdellinger@morrisnichols.com

Steven N. Geise
Anthony M. Insogna
Meredith A. Stewart
Miguel A. Alvarez
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
(858) 314-1200
sngeise@jonesday.com
aminsogna@jonesday.com
meredithstewart@jonesday.com
miguelalvarez@jonesday.com

Sara T. Horton
Ren-How Harn
Henry C. Thomas
WILKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
(312) 728-9040
shorton@willkie.com
rharn@willkie.com
hthomas@wilkie.com

Daniele San Román
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939
dsanroman@jonesday.com

Alexis Adian Smith
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
(213) 489-3939
asmith@jonesday.com

Gasper J. LaRosa
Lisamarie LoGuidice
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
gjlarosa@jonesday.com
llogiudice@jonesday.com

John C. Evans, Ph.D.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939
jevans@jonesday.com

8

Jason G. Winchester
Jennifer L. Swize
John M. Michalik
Bethany K. Biesenthal
Michelle B. Smit
Jeffrey S. Messing
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
(312) 782-3939
jgwinchester@jonesday.com
jswize@jonesday.com
jmichalik@jonesday.com
bbiesenthal@jonesday.com
msmit@jonesday.com
jmessing@jonesday.com

/s/ Andrew E. Russell
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca Pharmaceuticals LP and AstraZeneca AB*

# Exhibit 1

**Raffaella Sordella**

| Exhibit Number | AZ's Objections |
|---|---|
| JTX-001 | |
| JTX-002 | |
| PX-050 | |
| PX-128 | |
| PX-172 | |
| PX-174 | |
| PX-176 | |
| PX-178 | |
| PX-219 | |
| PX-222 | |
| PX-231 | |
| PX-459 | |

**Fred Hausheer**

| Exhibit Number | AZ's Objections |
|---|---|
| JTX-001 | |
| JTX-002 | |
| JTX-003 | |
| JTX-004 | |
| JTX-016 | |
| JTX-017 | |
| JTX-028 | |
| JTX-035 | |
| PX-044 | |
| PX-050 | |
| PX-128 | |
| PX-143 | |
| PX-168 | |
| PX-170 | |
| PX-172 | |
| PX-174 | |
| PX-175 | |
| PX-176 | |
| PX-178 | |
| PX-211 | |
| PX-218 | |
| PX-219 | |
| PX-221 | |
| PX-222 | |
| PX-225 | |
| PX-231 | |

| PX-234 | |
| PX-396 | |
| PX-398 | |
| PX-437 | |
| PX-459 | |
| PX-476 | |
| PX-477 | |
| PX-484 (redacted version) | |
| DTX-0071 | |
| DTX-0073 | |
| DTX-0116 | |
| DTX-0100 | |
| DTX-0112 | |
| DTX-0143 | |
| DTX-0144 | |

## William Jorgensen

| Exhibit Number | AZ's Objections |
| --- | --- |
| JTX-001 | |
| JTX-002 | |
| JTX-018 | |
| JTX-027 | |
| JTX-028 | |
| JTX-030 | |
| JTX-035 | |
| JTX-039 | |
| JTX-041 | |
| PX-070 | |
| PX-125 | |
| PX-400 | |
| PX-401 | |
| PX-408 | |
| PX-459 | |
| PX-537 | |
| DTX-0384 | |
| DTX-0388 | |
| DTX-0392 | |
| DTX-0876 | |

Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC.<br>and WYETH LLC, | ) | |
| | ) | |
| Plaintiffs/Counterclaim-Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1338-MFK |
| | ) | |
| ASTRAZENECA<br>PHARMACEUTICALS<br>LP and ASTRAZENECA AB, | ) | |
| | ) | |
| Defendants/Counterclaim-Plaintiffs. | ) | |
| | ) | |

**OPENING EXPERT REPORT OF DR. PAUL J. REIDER REGARDING INVALIDITY
OF U.S. PATENT NOS. 10,596,162 AND 10,603,314**

Dated: July 28, 2023

Paul J. Reider, Ph.D.

███████████████████

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 2

II.     SCOPE OF OPINIONS ...................................................................................... 3

III.    EDUCATION AND EXPERIENCE ................................................................ 3

IV.     MATERIALS CONSIDERED ......................................................................... 8

V.      LEGAL STANDARDS ..................................................................................... 10

        A.      Burden of Proof ................................................................................ 10

        B.      Priority Date ..................................................................................... 10

        C.      Enablement ........................................................................................ 11

        D.      Written Description ........................................................................... 13

        E.      Anticipation ....................................................................................... 15

        F.      Anticipation by Prior Invention of Another ................................. 16

        G.      Obviousness ....................................................................................... 16

        H.      Level of Skill in the Art ................................................................... 18

VI.     CLAIM CONSTRUCTION ............................................................................ 20

VII.    BACKGROUND ON EGFR INHIBITOR DEVELOPMENT ................... 21

        A.      First Generation EGFR Inhibitors ................................................ 23

        B.      Second Generation EGFR Inhibitors ............................................ 25

        C.      Osimertinib ....................................................................................... 27

        D.      Other Attempted Third Generation EGFR Inhibitors ................ 37

VIII.   THE PATENTS-IN-SUIT ............................................................................... 41

        A.      Asserted Claims ................................................................................ 42

        B.      Specification ...................................................................................... 43

        C.      Prosecution History ......................................................................... 46

i

██████████████████████████████

1.    **The Provisional Applications** ................................................................ 46

2.    **The '717 PCT Application** .................................................................... 47

3.    **The '474 Application** .......................................................................... 48

4.    **The '349 Application** .......................................................................... 60

D.    "Cysteine 773," "Cysteine 805," and the "Ligand-Binding Pocket" of
      EGFR/erbB-2 .................................................................................... 66

IX.   SUMMARY OF OPINIONS ................................................................ 69

A.    Priority Date ...................................................................................... 69

B.    Enablement ........................................................................................ 69

C.    Written Description ............................................................................ 70

D.    Anticipation ....................................................................................... 70

E.    Obviousness ....................................................................................... 71

X.    PRIORITY DATE ............................................................................... 71

A.    The Asserted Claims of the '162 and '314 Patents Are Not Entitled to
      a Priority Date of February 3, 2005 ...................................................... 71

B.    The Asserted Claims of the '162 and '314 Patents Are Not Entitled to
      a Priority Date of April 15, 2005 .......................................................... 76

1.    The '483 and '989 provisionals do not describe or enable a
      method of treating gefitinib and/or erlotinib resistant NSCLC. ........ 76

2.    The '483 and '989 provisionals do not describe or enable daily
      administration of irreversible EGFR inhibitors. ............................ 78

XI.   SELECTED PRIOR ART REFERENCES ........................................... 80

A.    Agus 2003 ......................................................................................... 80

B.    Allen 2003 ......................................................................................... 81

C.    Calvo 2004 ........................................................................................ 83

D.    Carter 2005 ....................................................................................... 84

E.    Cockerill 2002 .................................................................................... 85

███████████████████████████

**F.**      **Dancey 2004** ................................................................. 87

**G.**      **Denny 2002** ................................................................... 87

**H.**      **Discafini 1999** .............................................................. 89

**I.**       **Grünwald 2003** ............................................................ 90

**J.**       **Hidalgo 2002** ............................................................... 91

**K.**      **Kobayashi NEJM 2005** ................................................. 91

**L.**       **Kwak 2005** ................................................................... 92

**M.**     **Learn 2004** ................................................................... 94

**N.**      **NCT00266877** .............................................................. 95

**O.**      **Rabindran 2004** ............................................................ 96

**P.**      **Shin 2001** ..................................................................... 97

**Q.**      **Wissner 2002** ................................................................ 98

**R.**      **Yoshimura 2005** ............................................................ 99

**S.**       **Zacharchuk US 2005** ..................................................... 100

**XII.**   **THE ASSERTED CLAIMS ARE NOT ENABLED** ............... 102

    **A.**   **The '162 Patent Specification Fails to Enable The Asserted Claims Because the POSA Would Not Have Been Able to Make And Use The Full Scope Of The Claimed Method** ................................. 102

        1.   **The Breadth of the Claims** ................................. 103

        2.   **The Nature of the Invention and Level of Predictability in the Art** ................................................................. 109

        3.   **The State of the Prior Art** ................................. 122

        4.   **The Level of Ordinary Skill in the Art** ............... 126

        5.   **The Amount of Guidance or Direction Provided by the Specification and the Presence or Absence of Working Examples** ..................................................... 127

        6.   **The Quantity of Experimentation Needed to Make or Use the Invention Based on the Content of the Disclosure** ........................... 136

███████████████

**B.** **The '162 Patent Specification Does Not Disclose Any General Quality Running Through the Class That May Reliably Enable the POSA to Make and Use All of What Is Claimed** ............................................................ 138

**C.** **The '314 Patent Specification Fails to Enable The Asserted Claims of the '314 Patent Because the POSA Would Not Have Been Able to Make And Use The Full Scope Of The Claimed Method** .............................. 141

    1. **The Breadth of the Claims** ................................................................. 142

    2. **The Nature Of The Invention and the Level of Predictability In The Art** ................................................................................................. 144

    3. **The State Of The Prior Art** ............................................................... 146

    4. **The Level of Ordinary Skill in the Art** ........................................... 147

    5. **The Amount of Guidance or Direction Provided by the Specification and the Presence or Absence of Working Examples** ........................................................................................... 148

    6. **The Quantity of Experimentation Needed to Make or Use the Invention Based on the Content of the Disclosure** ............................ 150

**D.** **The '314 Patent Specification Does Not Disclose Any General Quality Running Through the Class That May Reliably Enable the POSA to Make and Use All of What Is Claimed.** ........................................................... 152

**XIII.** **THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION** .......................... 154

**A.** **The Asserted Claims of the '162 Patent Are Invalid for Lack of Written Description** ............................................................................... 154

    1. **No Description of a Class of Compounds Suitable for Use in the Claimed Method of Treating Gefitinib and/or Erlotinib Resistant NSCLC Having a T790M Mutation** ................................... 157

    2. **No Description of a Method of Treating Comprising Administration of a Unit Dose Calculated to Achieve the Desired Therapeutic Effect** .................................................................. 170

**B.** **The Asserted Claims of the '314 Patent Are Invalid for Lack of Written Description** ............................................................................... 177

    1. **No Description of a Class of Compounds Suitable for Use in the Claimed Method of Treating Gefitinib and/or Erlotinib Resistant NSCLC** ............................................................................. 179

  2. **No Description of a Method of Treating Comprising Administration of a Unit Dose Calculated to Achieve the Desired Therapeutic Effect** ..................... 187

**XIV.** **THE ASSERTED CLAIMS ARE ANTICIPATED** ................... 190

 A. **The Asserted Claims of the '162 and '314 Patents Are Anticipated By the Prior Art** ................... 190

  1. **Allen 2003** ................... 191

  2. **Zacharchuk US 2005** ................... 195

  3. **Yoshimura 2005** ................... 207

 B. **To the Extent Plaintiffs Contend That a Portion of Patients with NSCLC Have Gefitinib and/or Erlotinib Resistant NSCLC, the Asserted Claims of the '162 and '314 Patents Are Anticipated by Additional Prior Art References** ................... 214

  1. **Allen 2003** ................... 215

  2. **Calvo 2004** ................... 217

  3. **Grünwald 2003** ................... 223

  4. **Hidalgo 2002** ................... 228

  5. **Shin 2001** ................... 232

 C. **The Asserted Claims of the '162 and '314 Patents Are Anticipated by Prior Use of EKB-569 and CI-1033** ................... 237

  1. **Prior Use of CI-1033** ................... 237

  2. **Prior Use of EKB-569** ................... 243

**XV.** **THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS** ................... 247

 A. **The Asserted Claims of the '162 Patent Would Have Been Obvious** ................... 248

  1. **Kobayashi 2005 in Combination with One or More of Wissner 2002, Allen 2003, and/or Rabindran 2004** ................... 248

  2. **Kwak 2005 in Combination with One or More of Hidalgo 2002 and/or Rabindran 2004** ................... 253

  3. **Carter 2005 in Combination with Allen 2003, Hidalgo 2002, and/or Wissner 2002** ................... 256

███████████████████████████████

**B.**   **The Asserted Claims of the '314 Patent Would Have Been Obvious**........... 260

1.   **Agus 2003 in Combination with One or More of Calvo 2004, Wissner 2002, Hidalgo 2002, Denny 2002, and/or Dancey 2004**....... 260

2.   **Allen 2003 Alone or in Combination with One or More of Learn 2004 and/or Agus 2003**................................................. 270

3.   **Zacharchuk US 2005 Alone or in Combination with One or More of Discafani 1999 and/or Wissner 2002**................................... 277

4.   **Yoshimura 2005 Alone or in Combination with One or More of Wissner 2002, Agus 2003, and/or Dancey 2004**................................. 286

5.   **NCT00266877 2005 in Combination with Rabindran 2004 and one or more of Zacharchuk US 2005 and/or Dancey 2004**............... 292

**C.**   **The Simultaneous Inventions by Kobayashi *et al.*, Carter *et al.*, and Yoshimura *et al.* Support the Obviousness of the Asserted Claims** ............. 299

**XVI.**   **CONCLUSION** ............................................................................................. 304

**XVII.**   **SUPPLEMENTATION** ................................................................................. 305

██████████████████████████████

## I.    **INTRODUCTION**

1.      I, Paul J. Reider, Ph.D., have been retained as an expert witness on behalf of Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca AB (collectively, "Defendants" or "AstraZeneca") in this patent litigation.

2.      In particular, I have been asked to offer opinions on U.S. Patent Nos. 10,596,162 (the "'162 patent") and 10,603,314 (the "'314 patent"). I understand that Plaintiffs Puma Biotechnology, Inc. ("Puma") and Wyeth LLC ("Wyeth") (collectively, "Plaintiffs") have sued AstraZeneca for infringement of the '162 and '314 patents based on AstraZeneca's manufacture, marketing, and sale of its Tagrisso® (osimertinib mesylate) pharmaceutical product.

3.      I understand that claims 1 and 4 of the '162 patent and claims 1, 3–6, and 9 of the '314 patent (collectively, the "asserted claims") are asserted against AstraZeneca. I have been asked to consider whether the asserted claims are valid. This report explains my opinions regarding the invalidity of the asserted claims, including my opinions that the asserted claims are not enabled, lack written description, are anticipated, and would have been obvious.

4.      I am being compensated at my usual and customary hourly rate of $800 per hour. My compensation does not depend, in any way, on the outcome of this case.

5.      I reserve the right to provide testimony—including at a hearing, in deposition, or through declaration—that explains, elaborates upon, or provides background and context regarding: (a) the opinions and information set forth in this report; (b) the testimony that I might give in deposition or through declaration; (c) the testimony that other fact witnesses or expert witnesses may give or have given at a hearing, in deposition, or through declaration; (d) additional opinions that I form in response to opening expert reports, rebuttal expert reports, briefs, arguments, or other materials submitted by or on behalf of any party to this litigation; (e) additional opinions relating to facts that come to light through discovery after the date of this

████████████████████████████

expert report; and (f) additional opinions in response to any arguments that Plaintiffs or their expert(s) may assert.

6. I also reserve the right to prepare, present, and testify, including at a hearing, in deposition, or through declaration, concerning demonstrative exhibits that illustrate, explain, elaborate upon, or provide background and context regarding any of (a) through (f) above.

## II.   SCOPE OF OPINIONS

7. I have been asked by counsel for AstraZeneca to offer my opinions regarding the validity of the asserted claims of the '162 and '314 patents. In particular I have been asked to consider whether the asserted claims are entitled to claim priority to Provisional Application Nos. 60/649,483 (filed February 3, 2005) (the "'483 provisional") or 60/671,989 (filed April 15, 2005) (the "'989 provisional"). I have also been asked to consider whether the asserted claims are enabled, adequately described, anticipated, or rendered obvious by the prior art.

## III.   EDUCATION AND EXPERIENCE

8. My curriculum vitae is attached as Exhibit A.

9. I have over 35 years of work experience in the field of organic chemistry.

10. From 2008–2021, I was a Lecturer in the Department of Chemistry at Princeton University. In 2015, I attained the rank of Professor. I taught numerous courses in organic chemistry, from introductory level to advanced levels, both to undergraduate and to graduate students. I retired from teaching in June 2021.

11. I also have over 25 years of industry experience as a chemist including in the roles of Vice President of Chemistry Research & Discovery and Process Research at pharmaceutical companies Amgen and Merck.

████████████████████████████

12.     In 1972, I graduated with a degree in Psychology, with a minor in Chemistry, from Washington Square College (New York University). In 1978, I was awarded a Ph.D. in organic chemistry from the University of Vermont. I obtained my Ph.D. on the total synthesis of ibogamine, which is an alkaloid natural product. My work on ibogamine was subsequently published in the Journal of Organic Chemistry.

13.     From 1978 to 1980, I was a NIH Postdoctoral Fellow at Colorado State University (National Research Service Award).

14.     After my postdoctoral fellowship, I worked for 22 years at Merck Research Laboratories. I began as a senior research chemist and eventually became the Vice President of Process Research in 1995, in which capacity I served until 2002. As Vice President of Process Research, I oversaw approximately 160 chemists working at three sites: one in the United States, a second in the United Kingdom, and a third in Canada. I was also involved in all aspects of drug discovery and development as a Vice President on the Research Management Committee at Merck, where I helped to select molecules presented from the medicinal chemistry departments for development. I also served on the Development Coordinating Committee at Merck, whose role was to coordinate interactions among groups handling early clinical trials, marketing, manufacturing, and regulatory aspects of new drug development. I was also a founding member of the Drug Process Council at Merck, which coordinated drug development activities among R&D, manufacturing and commercial. As part of my work with Merck, I have reviewed the chemistry, manufacturing, and control (CMC) portions of numerous New Drug Applications.

15.     During my time at Merck, I discovered a total synthesis of thienamycin, a naturally-occurring antibiotic with three chiral centers. Further, in my role as vice president of

4

process chemistry and as a member of the research management committee and the development coordinating committee, I identified and reviewed the development of potential drugs through all stages of preclinical and clinical development, including regulatory submission. As part of this work, I reviewed and evaluated clinical data and reviewed and signed off on new drug applications, including the chemistry, manufacturing, and controls sections of these applications.

16.     While at Merck, I directly contributed to the research and development of the following fourteen approved drugs: SINGULAIR, CRIXIVAN, PRIMAXIN, SUSTIVA/STOCRIN, INVANZ, COZAAR, AGGRASTAT, CANCIDAS, VIOXX, ARCOXIA[1], MAXALT, JANUVIA, and EMEND.

17.     In 2002, I transferred to Amgen, Inc., where I served as Amgen's worldwide Vice President of Chemistry Research and Discovery, reporting directly to the President of Research and Development. I remained there until 2007. I was hired for this role with a mission to build small-molecule drug discovery and development at Amgen, which at the time was renowned for its biotechnology (large-molecule) portfolio. My aim was to lead Amgen in developing small-molecule drugs to complement Amgen's large-molecule therapies. When I arrived at Amgen, the small-molecule program consisted of 150 scientists. Five years later, I had grown the program to more than 600 scientists, many of whom (approximately 200 scientists) focused on kinase inhibition as therapies in oncology and inflammation. At Amgen, I helped to advance a number of small-molecule compounds into clinical development.

18.     While at Amgen, I directly contributed to the development and FDA-approval of the company's first small molecule, SENSIPAR.

_____

[1] ARCOXIA is not FDA-approved in the United States, but it is approved and sold elsewhere around the world.

5

███████████████████████████

19.     In 2007, I wanted to focus on infectious diseases and neglected diseases, such as tuberculosis and malaria. Princeton University created a position for me to be able to perform that research and to teach students about drug development. At Princeton, I designed and developed an upper-level undergraduate course in drug discovery and development that I taught for twelve years. It covers all aspects of the process of drug discovery and development. For six years, I also taught a freshman seminar (From Snake Venoms to Medicine) to non-scientists; this course highlighted the complexity and challenges of developing new drugs. In addition to teaching, I have supervised undergraduate research focusing on malaria and tuberculosis.

20.     I also am an advisor to the Bill and Melinda Gates Foundation. Through that organization, I serve on the scientific advisory boards of other organizations, such as the TB Alliance and the Medicines for Malaria Venture, helping them to develop new treatments for tuberculosis and malaria. As an example, I helped design the chemical synthesis of pretonamid (PA-824), a drug developed by TB Alliance and approved in 2019 by FDA for combination treatment for certain tuberculosis patients.

21.     My career has primarily focused on the development of compounds to treat a number of disorders and diseases with a focus on unmet medical needs.

22.     Over the course of my research, I have authored over 180 peer-reviewed publications, including publications on kinase inhibition and the synthesis of kinase inhibitors. *See, e.g.*, Noel D. D'Angelo et al., *Design, Synthesis, and Biological Evaluation of Potent c-Met Inhibitors*, 51 J. Med. Chem. 5766 (2008) (Exhibit B); X. Wang et al., *A Practical Synthesis of 2-((Pyrrolo[2,3-b]pyridine-4yl)methylamino)-5-fluoronicotinic Acid*, 71 J. Organic Chem. 4021 (2006) (Exhibit C); Noel D. D'Angelo et al., *Effect of Microwave Heating on Ullmann-Type Heterocycle-Aryl Ether Synthesis Using Chloro-Heterocycles*, 47 Tetrahedron Letters 5045

6

██████████████████████

(2006) (Exhibit D); L. Liu et al., *A Soluble Base for the Copper-Catalyzed Imidazole N-Arylations with Aryl Halides*, 70 J. Organic Chem. 10135 (2005) (Exhibit E); N. Xi et al., *Regio-Controlled Synthesis of N-substituted Imidazoles*, 46 Tetrahedron Letters 7315 (2005) (Exhibit F).

23.     I am a named inventor on more than thirty patents.

24.     I have been an invited lecturer speaking extensively on my work, both domestically and internationally. I chaired the Gordon Research Conference on Heterocyclic Compounds in 1996, and I have been an invited speaker at numerous Gordon Research Conferences, including at the Conference on Medicinal Chemistry in 2008 and 2009.

25.     I have been a member of the editorial boards of a number of the leading international scientific journals in chemistry, including Journal of Organic Chemistry, Organic Letters, and Journal of the American Chemical Society. I have been a Senior Editor of (1) Science of Synthesis and (2) Current Opinion in Drug Discovery & Development.

26.     I also served in an advisory capacity to a number of other organizations, including IDEAYA[2], Emory Institute for Drug Discovery, Tetraphase Pharmaceuticals, Satori Pharmaceuticals, and Chemical & Engineering News. I have served as an Executive Board member of the American Chemical Society since 2004 and served on the Steering Committee and Board of the National Research Council's report to the nation (Board of Chemical Sciences and Technology): the 2002 and 2003 "Challenges for the Chemical Sciences in the 21st Century" reports. I was the chair of the selection committee for the American Chemical Society's Arthur C. Cope Award, which recognizes outstanding achievement in organic chemistry and is one of the ACS's highest honors. I have served on the visiting committees, which advise and support

---

[2] IDEAYA is an oncology-focused biotechnology company that develops cancer treatments that block proliferation of cancer cells.

████████████████████████

universities, for Harvard University, California Institute of Technology, and the University of

California, Santa Barbara.

27.     Over the course of my career, I have received a number of awards.

Foremost among them are:

> National Academy of Sciences Award for Chemistry in Service to Society in 2011 "[f]or his contributions to the discovery and development of numerous approved drugs, including those for treating asthma and for treating AIDS." NAS Award for Chemistry in Service to Society, NATIONAL ACADEMY OF SCIENCES, http://www.nasonline.org/programs/awards/chemistry-in-service-to-society.html (last visited Sept. 10, 2019) (Exhibit G).

> Earle B. Barnes Award for Leadership in Chemical Research (ACS National Award) in 2003.

> Prix Galien Innovative Product Award, "presented to the company that has developed a drug product launched on the Canadian market and judged by the Jury to have made the most significant overall contribution to patient care in Canada in terms of efficacy, safety, benefits and innovation," in June 2000 for my work on SINGULAIR. Home, PRIX GALIEN CANADA, http://eng.prix-galien-canada.com/home_page.html (last visited Aug. 26, 2019) (Exhibit H) ("Prix Galien Home").

> Prix Galien Research Team Award, "presented to the researcher or the research team judged by the Jury to have made the most significant contribution to pharmaceutical research in Canada," in June 2000 for my work on SINGULAIR. Prix Galien Home.

> Merck Board of Directors Scientific Award in 1998 for my work on Crixivian.

28.     I have consulted with numerous drug development companies, including

Biogen, Genentech, and Gilead.

29.     Exhibit I provides a full list of the litigation matters in which I have

testified or given deposition testimony within the last four years.

IV.   **MATERIALS CONSIDERED**

30.     In providing this report, I have considered the materials listed in Exhibit J.

████████████████████████████

31.     I have further relied upon my education and my knowledge and experience from decades of practicing, researching, and teaching chemistry, including chemical synthesis.

32.     My opinions are informed by the collection of materials I have considered. In setting forth my opinion, I have discussed in particular a number of these documents. In the body of my report, I have specified illustrative documents. In doing so, I have not provided an exhaustive discussion of all documents in the materials I have considered, which may further support my opinions and which I may be asked to testify on throughout this litigation. I further understand that expert discovery is ongoing, and that I may be asked to testify regarding other materials that further support my opinions but have not yet been provided to me or to AstraZeneca's counsel.

33.     I reserve the right to modify and/or supplement any of my opinions as needed, in response to (a) new information and evidence I receive, (b) further scientific analysis demonstrating a need to supplement, (c) new issues that may arise, (d) any additional discovery, arguments, evidence, or testimony presented in this case, and (e) any decisions or orders by the Court.

34.     In response to any assertions made by any party or its experts in any submissions or during discovery, I expect to respond as appropriate or to provide additional evidence or testimony.

35.     If asked to testify, I may be required to explain the opinions and analyses described in the body of this report. I reserve the right to use demonstratives in support of my testimony.

██████████████████████████████

## V.     LEGAL STANDARDS

36.     In forming my opinions, I applied the following legal standards, which were provided to me and explained to me by counsel for Defendants.

### A.     Burden of Proof

37.     I have been informed that claims of an issued patent are presumed to be valid. To overcome the presumption of validity, the party challenging the patent's validity must present "clear and convincing evidence" that the patent claims are invalid. I have been informed that "clear and convincing evidence" is such evidence, for example, that would cause a trier of fact to be persuaded that it is highly probable that the fact is true, or such evidence that would leave a trier of fact with a clear conviction that the fact has been proven.

38.     My opinions that the asserted claims of the '162 and '314 patents are invalid take the clear and convincing burden of proof into account. In other words, I believe that there is clear and convincing evidence that the asserted claims are invalid.

### B.     Priority Date

39.     I have been informed that the issues of enablement, written description, anticipation, and obviousness are evaluated from the perspective of a person of ordinary skill ("POSA") in the art at the time of patent's effective filing date. I understand that the effective filing date is the date of the earliest application that provides support for the claims of the later application. In particular, I have been informed that the earlier application must provide both written description and enablement for the claims in the later application.

40.     I have been informed that a patent applicant may also be able to "swear behind" certain prior art available before the applicant filed its priority-eligible patent application if the applicant had (1) beforehand conceived of the invention and (2) either reduced the invention

███████████████████████████████

to practice before the prior art or exercised reasonable diligence in reducing the invention to practice after the prior art.

41.     I have been informed that "conception" means that the named inventor(s) formed in their mind(s) the idea of the invention as it is later applied in practice. Conception must include every feature or limitation of the claimed invention, and it is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation. An idea is sufficiently definite for conception when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue.

42.     I have been informed that an applicant's assertion of conception must be corroborated by evidence which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled in the art to make the invention. Corroborating evidence may be in the form of records made contemporaneously with the inventive process, circumstantial evidence of an independent nature, or oral testimony from someone other than the alleged inventor.

43.     I have been informed that one way in which a patent applicant may meet the reduction-to-practice requirement is by filing a patent application describing the invention; this is called "constructive" reduction to practice. In order for an earlier patent application to qualify as a constructive reduction to practice, however, it must provide written description and enablement support for the claims at issue.

C.     **Enablement**

44.     I have been informed that an applicant for a United States patent is required to disclose in the application a description of the invention in such full, clear, concise, and exact terms that any person skilled in the art could make and use the claimed invention. This

is known as the "enablement requirement." Failure to provide an enabling disclosure for a claimed invention means that the claim is invalid.

45.    A patent claim is not enabled if, at the time of the effective filing date, the disclosures of the patent did not contain a description of the claimed invention that is sufficiently full and clear to enable a person of ordinary skill in the field at the time to make and use, or practice, the full scope of the claimed invention. The term "full scope" in this context requires the applicant for a patent to disclose in the application enough information for a person of ordinary skill in the art to practice all of a claim's embodiments using his or her skill, knowledge of the art, and routine experimentation. In other words, if a patent claims the use of an entire class of compounds, the patent's specification must enable a person skilled in the art to make and use the entire class. The more a patent claims, the more it must enable.

46.    I have been informed that a claim to a class may be enabled if the specification both gives a few examples of embodiments and also discloses some general quality running through the class that gives it a peculiar fitness for the particular purpose and disclosure of that general quality reliably enables a person skilled in the art to make and use all of what is claimed, and not merely a subset.

47.    I have been informed that a patent claim is not enabled if, at the effective filing date of the patent, a person of ordinary skill in the art could not practice the full scope of the invention without undue experimentation. I have been informed that a specification may call for a reasonable amount of experimentation to make and use a patented invention, and what is reasonable in any case will depend on the nature of the invention and the underlying art. I have been informed that a claim is not enabled if the specification forces the skilled artisan to engage in

██████████████████████████████

research assignments, random trial-and-error discovery, or painstaking experimentation to see what works.

48.     I have been informed that one way to determine whether undue experimentation is required to practice the full scope of the claims in light of the patent disclosure is to consider the "*Wands* factors," which are: (1) the breadth of the claims; (2) the nature of the invention; (3) the state of the prior art; (4) the relative skill of those in the art; (5) the predictability or unpredictability of the art; (6) the amount of direction or guidance presented in the specification; (7) the presence or absence and number of working examples in the specification; and (8) the quantity of experimentation necessary to practice the full scope of the claim.

49.     I also understand that a patent claim drawn to a method of treatment is not enabled if the patent lacks evidence that a claimed method would be effective or useful. I further understand that the claims cannot rely on mere hunch or hypothesis but instead must provide enough information for a POSA to accept the assertions as correct and that the specification must do more than merely propose an unproven hypothesis, or set forth a plan to conduct further research.

D.     **Written Description**

50.     I have been informed that a patent claim is invalid if the patent does not contain an adequate written description of the claimed invention. I have been informed that the purpose of this "written description requirement" is to demonstrate that the inventor was in possession of the invention at the time the application for the patent was filed. I have been informed that the adequacy of a patent's written description is considered from the perspective of a person of ordinary skill in the art.

13

███████████████████████████████████

51.    I have been informed that a claim is invalid for failure to satisfy the written description requirement if the patent does not reasonably convey to a person of ordinary skill in the art that the inventor possessed the full scope of the claimed invention. Stated another way, I have been informed that the specification must describe an invention understandable to a skilled artisan and show that the inventor actually invented the invention claimed.

52.    I have also been informed that a claim may not satisfy the written description requirement if it merely recites a description of the problem to be solved while claiming all solutions to it. Patents are not awarded for academic theories, no matter how groundbreaking or necessary to the later patentable inventions of others.

53.    As to claims directed to methods of treatment using a genus of compounds, I have been informed that the specification must direct the person of ordinary skill in the art to the specific set of compounds that can be used to practice the claimed method, with all of its functional limitations. I have been informed that sufficient description of a genus requires the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can "visualize or recognize" the members of the genus. Factors for evaluating the adequacy of the disclosure include the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, and the predictability of the aspect at issue.

54.    Adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus sufficient to distinguish the genus from other materials. Whereas functional claim language can meet the written description requirement when the art has established a correlation between structure and function, merely drawing a fence around the outer limits of a

███████████████████████████

purported genus is not an adequate substitute for describing a variety of materials constituting the genus and showing that one has invented a genus and not just a species. I have been informed that the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology.

55.     I have been informed that, although evidence illuminating the state of the art subsequent to the priority date is not relevant to written description, post-priority date evidence may be relevant to show that a patent does not disclose a representative number of species of a claimed genus.

56.     I have been informed that negative claim limitations—for example, limitations that require the absence of an element—must be supported by written description. Negative claim limitations are adequately supported when the specification describes a reason to exclude the relevant limitation. I have been informed that a reason to exclude an element could be found in statements in the specification expressly listing the disadvantages of using that element. Another reason could be that the specification distinguishes among the element and alternatives to it. Negative limitations may not be supported, however, when the patentee arbitrarily dissects its invention in order to avoid the prior art.

E.     **Anticipation**

57.     I have been informed that for a patent to be valid, the invention claimed must be novel (i.e., new). A claimed invention that is not novel is said to be "anticipated" by the prior art.

58.     I have also been informed that for a claim to be anticipated, every limitation of the claimed invention must be found in a single prior art reference, either expressly or inherently. I have been informed that a prior art reference may inherently anticipate a claimed

15

███████████████████████████████

invention if the claim's limitations are necessarily present in the prior art reference. I have been informed that the words of a prior art reference do not have to be in the same words as the claim, but that all the requirements of the claim must be there.

### F.    Anticipation by Prior Invention of Another

59.    I have been informed that a patent may be shown to be invalid as anticipated if (a) the invention was invented by another in the United States; and (b) if that other person made reasonably diligent efforts to commercialize the invention and did not conceal the invention, suppress it, or keep it a secret.

60.    I further understand that one may establish that a prior invention was not abandoned, suppressed, or concealed by showing that the prior inventor made the invention publicly known. I further understand that a public disclosure may occur in many forms, but some common forms are the filing of a patent application, publication of results, and commercialization of the product that practices the invention.

### G.    Obviousness

61.    I understand that an alleged invention is invalid if it would have been obvious to a person of ordinary skill in the art at the time the invention was made. I understand that it is improper to conduct the analysis by working backwards from the claimed invention with the aid of hindsight.

62.    I have been informed that the factors to be considered in analyzing whether a claim was obvious are (i) the scope and content of the prior art; (ii) the differences between the prior art and the claimed invention; (iii) the level of ordinary skill in the art; and (iv) any asserted secondary considerations.

63.    I understand that obviousness may be shown by demonstrating that it would have been obvious to modify what is taught in a single piece of prior art to arrive at the

████████████████████████

claimed invention, or by showing that it would have been obvious to combine the teachings of more than one item of prior art. I have also been informed that in order for a claimed invention to be considered obvious, there must be some supporting rationale for combing or modifying the prior art references. The following are examples of approaches and rationales that may be considered: (i) combination of prior art elements according to known methods to yield predictable results; (ii) simple substitution of one known element for another to obtain predictable results; (iii) use of a known technique to improve similar methods or products in the same way; (iv) application of a known technique to a known method or product ready for improvement to yield predictable results; (v) application of a technique or approach that would have been "obvious to try" (choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success); (vi) known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art; or (vii) some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

64.     I understand from counsel that an analysis of whether there are any relevant differences between the prior art and the claimed subject matter is performed from the view of a POSA at the time of the alleged invention. I understand that, in analyzing any differences between the claimed subject matter and the prior art, inferences and creative steps a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the alleged invention may be taken into account.

██████████████████████████

65.     I have also been informed that it is relevant to consider whether the prior art includes references that "teach away" from the claimed invention. A reference teaches away when the POSA, upon reading the reference, would have been discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the claim.

66.     I have been informed that certain secondary considerations must also be taken into account in determining whether a claimed invention would have been obvious. I have been informed that the patentee may argue that an invention would not have been obvious in view of these secondary considerations, and that those considerations may include, among other things: (1) commercial success; (2) a long-felt, but unsatisfied need for the invention; (3) failure of others to find the solution provided by the claimed invention; (4) deliberate copying of the invention by others; (5) unexpected results achieved by the invention; and (6) praise of the invention by others skilled in the art. I also understand that these secondary considerations are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims.

67.     I have been informed that evidence that others independently invented the same or similar subject matter around the same time as the asserted claims can support a finding that the asserted claims are obvious. I have been informed that such simultaneous inventions may inform the level of knowledge in the art at the time the invention was made and is persuasive evidence that a person of ordinary skill in the art understood the problem and a solution to that problem.

H.      **Level of Skill in the Art**

68.     I have considered the qualifications of the person of ordinary skill in the art for the '162 and '314 patents. In my opinion, the POSA who would have been working at the

18

████████████████████████

time of the claimed priority of the patents (2005) to develop the method of the asserted patents would have had either a (1) a medical degree with three to five years of experience consulting with a team including a chemist with a masters or post-graduate degree in chemistry, including medicinal chemistry, organic chemistry, biochemistry, pharmaceutical science, or a related discipline and experience designing and evaluating pharmaceutical compounds; or (2) a masters or postgraduate degree in chemistry, including medicinal chemistry, organic chemistry, biochemistry, pharmaceutical science, or a related discipline, with about three to five years' work experience in this area designing and evaluating medicinal pharmaceutical compounds consulting with a team including a physician.

69.     In my opinion, the POSA would have these same qualifications regardless of whether the priority date for the '162 and/or '314 patents is found to be 2005 or 2006. I used this definition for the POSA in forming my opinions provided in this report.

70.     I understand from counsel for AstraZeneca that Plaintiffs have provided their own definition for the POSA, stating that he or she would: "(a) have a doctoral degree in a discipline such as organic or medicinal chemistry, medicine, pharmacology, biochemistry, pharmaceutical sciences, and/or related disciplines and at least three years of practical experience in drug discovery and development, including for cancers that may benefit from kinase inhibition, or a B.S. or M.S. degree in at least one of the disciplines above and at least five years of practical experience in drug discovery and development, including for cancers that may benefit from kinase inhibition; and (b) work together with one or more team members with experience developing cancer treatments, including biologists, molecular biologists, geneticists, medicinal chemists, preclinical researchers, cancer treating clinicians, and/or oncologists in a multidisciplinary team to

███████████████████

solve a given problem." Plaintiffs' Supplemental Responses and Objections to AstraZeneca's

Interrogatory No. 1 (May 19, 2023).

71.     My opinions provided in this report would not change if I applied

Plaintiffs' definition for the POSA.

## VI.    CLAIM CONSTRUCTION

72.     I understand that the Court has construed three claim terms from the '162

and '314 patents.

| Claim Term | Court's Construction |
|---|---|
| "irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation" ('162 patent) | *A compound that irreversibly inhibits EGFR and covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation* |
| "irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2" ('314 patent) | *A compound that irreversibly inhibits EGFR and covalently binds to [cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2* |
| "a pharmaceutical composition comprising a unit dosage" ('162 patent, '314 patent) | *The specification's definition controls: a pharmaceutical composition comprising a physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e. carrier, or vehicle.* |

73.     I have applied these claim constructions in rendering my opinions

provided in this report.

74.     I also understand that the Court has concluded that the preambles—a

method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in

need thereof ('314 patent) / a method for treating gefitinib and/or erlotinib resistant non-small cell

lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient ('162 patent)—are limiting but should be given their plain and ordinary meaning.

75.     I further understand that the Court has concluded that the gefitinib and/or erlotinib resistance terms—gefitinib and/or erlotinib resistant non-small cell lung cancer ('314 patent) / gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 ('162 patent)—are to be afforded their plain and ordinary meaning.

76.     I have applied the plain and ordinary meaning to the terms in paragraphs 74–75, and all other terms in the claims in rendering my opinion.

## VII.   BACKGROUND ON EGFR INHIBITOR DEVELOPMENT

77.     The protein kinases are a large family of enzymes that play important roles in critical cellular processes, including mitogenesis, gene transcription, protein translation, cell cycle progression, and differentiation. *See* D. Fry, *Site-Directed Irreversible Inhibitors of the erbB Family of Receptor Tyrosine Kinases as Novel Chemotherapeutic Agents for Cancer*, 15 Anti-Cancer Drug Design 3 (2000) ("Fry 2000") at 3; *See* P. Traxler, *Tyrosine Kinases as Targets in Cancer Therapy – Successes and Failures*, 7 Expert Op. Therapeutic Target 215, 220 (2003) ("Traxler 2003") at Abstract. Protein kinases are capable of phosphorylating a wide variety of functional proteins, thereby affecting intra- and extra-cellular signaling pathways, and regulating enzyme activities. Fry 2000 at 3. Protein tyrosine kinases ("PTKs") are a subset of the protein kinase family, recognized as having involvement in tumor formation and progression. *Id.*; *see also* Traxler 2003 at 215 ("(PTKs) play a crucial role in signal transduction pathways that regulate a number of cellular functions (e.g., differentiation, proliferation) both under normal cell function as well as under disordered conditions.").  From the early 1990s, PTKs became an "attractive therapeutic target[]," generating "extensive effort to develop specific inhibitors of these enzymes

███████████████████████

as chemotherapeutic agents." Fry 2000 at 3; *see also* Traxler 2003 at 215 ("[P]rotein kinases,

especially tyrosine kinases, have become such attractive targets for drug discovery.").

78.     The erbB receptor family of tyrosine kinases ("TKs") in particular has

attracted substantial attention. *See* Fry 2000 at 4; Traxler 2003 at 219. This family is thought to be

"strongly implicated in the development and progression of numerous human tumours, including

breast, lung, colorectal, ovarian, glioma, prostate, bladder, and head and neck." Traxler 2003 at

218–219. The erbB receptor family includes four distinct membrane glycoproteins: epidermal

growth factor receptor ("EGFr" or "erbB1" or "HER1"), erbB2 ("HER2"), erbB3 ("HER3"), and

erbB4 ("HER4"). Fry 2000 at 4; Traxler 2003 at 217. Each of these receptors are made up of an

extracellular ligand-binding domain, a single transmembrane region, and an intracellular domain

possessing PTK activity. *See, e.g.*, Fry 2000 at 4. This family of receptors is widely expressed in

epithelial, mesenchymal, and neuronal tissues, and is capable of "produc[ing] a highly diverse

network of signals associated with mitogenesis, differentiation and cell survival." *Id.*

79.     Development of compounds that inhibit EGFR as an approach to cancer

therapy was first proposed in the late 1980s. Fry 2000 at 5. The next decade led to the discovery

of many, diverse chemical structures that inhibit EGFR, however these compounds lacked

potency and specificity. *Id.* The EGFR inhibitor field of drug discovery was "revolutionized" in

the mid-1990s with the discovery of 4-anilinoquinazolines, which exhibited vast improvement in

potency and specificity over their predecessors. *See id.* "[S]tudies reported potencies as low as 6

pM against the EGFr TK with almost total specificity relative to other receptor and intracellular

TKs, as well as potent, specific inhibition of all EGF-mediated processes in viable cells." *Id.* In

addition to small molecules, antibodies were also investigated early on. *See* Traxler 2003 at 219

22

███████████████████████████

("[M]any reviews have described antibodies and low molecular weight compounds with promising *in vitro* and *in vivo* preclinical profiles.").

### A.     First Generation EGFR Inhibitors

80.     Gefitinib and erlotinib were the first approved EGFR tyrosine kinase inhibitors ("TKIs") in the U.S. for treatment of NSCLC. F. Wittlinger & S. Laufer, *The pre-clinical discovery and development of osimertinib used to treat non-small cell lung cancer*, 16 Expert Opinion on Drug Discovery 1091 (2021) ("Wittlinger 2021") at 1092. Gefitinib and erlotinib are considered to be "first generation" EGFR inhibitors. *See id.* Both are based on a 4-amino quinazoline scaffold. *Id.*

81.     Gefitinib was first synthesized by Zeneca Laboratories on February 9, 1995, and eventually launched first in Japan in 2002 as "IRESSA®." J. Kettle & D. Wilson, *Standing on the shoulders of giants: a retrospective analysis of kinase drug discovery at AstraZeneca* 21 Drug Discovery Today (2016) ("Kettle 2016") at 1599, 1604. Gefitinib was first approved by the FDA in 2003 for monotherapy in the treatment of patients with locally advanced or metastatic NSCLC after failure of platinum-based and docetaxel chemotherapies. *Id.* at 1604. The FDA subsequently limited gefitinib's indication in 2005, however, to patients who had previously benefitted from treatment with gefitinib due to "a lack of evidence that it extended life across this broad target population." *Id.*

82.     Researchers were later able to demonstrate that certain "sensitizing" or "activating" mutations within the gene encoding EGFR—exon 19 deletions ("ex19del") and/or exon 21 substitutions ("L858R")—were associated with patient response to gefitinib. Kettle 2016 at 1604; T. Lynch, *Activating Mutations in the Epidermal Growth Factor Receptor Underlying Responsiveness of Non–Small-Cell Lung Cancer to Gefitinib*, 350(21) New England Journal of Medicine 2129–2139 (2004) ("Lynch 2004"); *see also* Wittlinger 2021 at 1092. These mutations

███████████████████████████

account for ~90% of sensitizing mutations in tumors that respond to gefitinib. Wittlinger 2021 at 1092. In 2015, the FDA approved gefitinib for first-line treatment of patients with metastatic NSCLC "whose tumours have [EGFR] exon 19 deletions or exon 21 (L858R) substitution mutations as detected by an FDA-approved test."IRESSA Prescribing Information, July 2015; Kettle 2016 at 1604.

83.     Erlotinib was approved by the FDA in 2004 broadly for "treatment of locally advanced or metastatic Non Small-Cell Lung Cancer (NSCLC) after failure of at least one prior chemotherapy regimen." Nov. 18, 2004 FDA Approval Letter. This indication was later amended to require the presence of an EGFR sensitizing mutation: "treatment of patients with metastatic non-small cell lung cancer (NSCLC) whose tumors have epidermal growth factor receptor (EGFR) exon 19 deletions or exon 21 (L858R) substitution mutations as detected by an FDA-approved test receiving first-line, maintenance, or second or greater line treatment after progression following at least one prior chemotherapy regimen." Tarceva Prescribing Information, October 2016.

84.     Most NSCLC patients with a sensitizing mutation respond to gefitinib and erlotinib with positive results, including, *e.g.*, substantial tumor shrinkage. *See* Wittlinger 2021 at 1092. Essentially all of these patients, however, eventually develop resistance to these inhibitors and stop responding. *Id.* More than 60% of resistant tumors were shown to have the secondary "T790M" mutation in exon 20. *Id.* The T790M mutation is sometimes referred to as the "gatekeeper" mutation. *Id.* Amplification of the MET proto-oncogene has also been associated with acquired resistance in patients who initially responded to EGFR tyrosine kinase inhibitors. C. Ma et al., *T790M and acquired resistant to EGFR TKI: a literature review of clinical reports*, J. Thoracic Disease (2011) ("Ma 2011") at Abstract.

24

███████████████████████████████████

### B.     Second Generation EGFR Inhibitors

85.     While the first generation inhibitors were based on reversible binding and competitive replacement of ATP, second generation EGFR inhibitors were designed to irreversibly inhibit EGFR through covalent binding at cysteine 797 ("C797") in the active site of EGFR. *See* Wittlinger 2021 at 1092; Kettle 2016 at 1604. This irreversible binding was designed to overcome resistance to first generation EGFR inhibitors, including gefitinib. Wittlinger 2021 at 1092. As a class, these second generation inhibitors showed "improved *in vitro* activity against mutations known to cause resistance to first-generation EGFR therapy such as gatekeeper mutation T790M." Kettle 2016 at 1604.

86.     These compounds also inhibited wild-type EGFR, in addition to inhibiting EGFR with resistance mutations, such as T790M. Kettle 2016 at 1604. As a result, these compounds were generally limited in usefulness due to their toxicity. Wittlinger 2021 at 1092 ("[T]hese agents do not only potently inhibit mutated EGFR, but also achieve high activity on the EGFR wild-type (wt) enzyme, which limits their therapeutical utilization due to associated dose-limiting side effects like diarrhea and skin rash"); *see also* Kettle 2016 at 1604 ("[Second-generation EGFR inhibitors] also inhibit wild-type EGFR with high affinity and so have limited use in the resistance setting because dosing is limited by toxicities linked to wild-type EGFR inhibition."). As I explain in more detail in Section XII.A.2.e), most attempts to develop second-generation irreversible EGFR inhibitors for the treatment of NSCLC—including Wyeth's attempts to develop EKB-569 and HKI-272—failed.

87.     Currently second generation inhibitors approved in the U.S. for treatment of NSCLC include afatinib and dacomitinib. *See* Wittlinger 2021 at 1092. Both are based on a 4-amino quinazoline scaffold. *Id.*

████████████████████████

88.     Afatinib was approved by the FDA in 2013 for "[f]irst-line treatment of patients with metastatic non-small cell lung cancer (NSCLC) whose tumors have non-resistant epidermal growth factor receptor (EGFR) mutations as detected by an FDA-approved test." Gilotrif Prescribing Information April 2022. Afatinib's therapeutic window is narrow, however, as demonstrated by the fact that in clinical trials in patients with T790M, "high-dose[s]" of afatinib "resulted in high rates of grade 3 adverse events." Wittlinger 2021 at 1092.

89.     Dacomitinib was approved by the FDA in 2018 for "first-line treatment of patients with metastatic non-small cell lung cancer (NSCLC) with epidermal growth factor receptor (EGFR) exon 19 deletion or exon 21 L858R substitution mutations as detected by an FDA-approved test." Vizimpro Prescribing Information, December 2020.

90.     Though approved for treatment of certain patients with NSCLC, the dose limiting toxicities for these compounds also rendered them ineffective in treating patients with NSCLC having the T790M mutation. *See* M. Li et al., *A Detouring Experience Not Recommended: Lessons Learned from PF00299804*, 82 CANCER RES. 3662, at 3662-63 (2022) ("Li 2022") ("Another important lesson learned is the lack of a clinically relevant toxicity profile from preclinical data. Despite attractive data on T790M inhibition, it was not feasible to determine clinical tolerability based on $IC_{50}$ and xenograft model. However, the low $IC_{50}$ on EGFR wild-type tumors could have been an important hint on significant toxicity in skin and mucosal cells that harbor EGFRs. The early clinical data demonstrated this point well, leading to an end of further investigation on T790M mutation."); Helena A. Yu et al., *Phase 2 study of intermittent pulse dacomitinib in patients with advanced non-small cell lung cancers*, 112 LUNG CANCER 195 (2017) ("Yu 2017") ("The study assessed the dosing schedule in patients with lung cancers harboring EGFR T790M as well as in separate not molecularly-defined cohort. We did

26

████████████████████████

not see sufficient efficacy of this treatment in either cohort. . . . . The high peak concentrations of dacomitinib noted in preclinical studies that would be required to eradicate EGFR T790M may not be achievable in patients."); Ho-June Lee et al., *Noncovalent Wild-type-Sparing Inhibitors of EGFR T790M*, 3 CANCER DISC. 168, 169–70 (Feb. 2013) ("Lee & Settleman 2013") at 169–170; *see also* Lee & Settleman at 177 ("[S]uch inhibitors [i.e., 'second generation irreversible EGFR inhibitors, including BIBW2992'] may not reach sufficient plasma concentrations to effectively inhibit EGFR T790M in patients.").

91.     Similar to first generation EGFR inhibitors, resistance to second generation EGFR inhibitors will develop, following an initial period of efficacy. Wittlinger 2021 at 1092 ("[Q]uantification of the allele harboring the EGFR T790M mutation in xenograft models showed, that initially effective 2nd generation inhibitors acquire resistance due to amplification of the gene over time.").

### C.     Osimertinib

92.     This case involves the compound osimertinib, which is the active ingredient in AstraZeneca's drug product, Tagrisso®. Osimertinib is a mono-anilinopyrimidine that has unique structure and properties as compared to previously developed EGFR inhibitors. The compound was the result of a project at AstraZeneca that originated with the novel goal of developing a compound that would selectivity and potently inhibit double-mutant forms of EGFR (L858R/T790M)/(Ex19del/T790M) with limited activity against wild-type EGFR.

93.     I have reviewed documents relating to the development of osimertinib, which speak to the challenges and complexities involved in designing EGFR inhibitors that can be used to treat non-small cell lung cancer. AstraZeneca's scientists synthesized a number of compounds, with a variety of structural features, focusing on both the covalent and non-covalent interactions with EGFR, pharmacological properties, and toxicological risks. ████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ AstraZeneca's

reported experience in developing a treatment for certain patients with NSCLC, which I discuss at

a high level below, is evidence of the level of experimentation required to develop a suitable

inhibitor, the variety of structural features that may be considered in designing an inhibitor, and

the unpredictability of the art even many years after the applicable priority date for the patents-in-

suit.

> 94.    In 2009, AstraZeneca started the EGFRM project to develop a new EGFR

TKI for patients with advanced NSCLC. April 2009 "Inhibitor of Mutation Activated &

Gatekeeper EGFR (IMAGE)" PPT at 4, 9 (AZ-PW-TAG00317425–51). AstraZeneca scientists

recognized that EGFR T790M was associated with acquired resistance to Iressa but that agents in

development for this target were not showing clinical utility, at least in part due to toxicity

associated with EGFR wild-type inhibition. *Id.* at 4, 9. Team leads Richard Ward and Darren

Cross proposed a novel target profile: a compound that could selectively target double mutant

forms of EGFR with limited activity against wild-type EGFR. *Id.* at 10; R. Ward et al., *Structure-

and Reactivity-Based Development of Covalent Inhibitors of the Activating and Gatekeeper

Mutant Forms of the Epidermal Growth Factor Receptor (EGFR)*, J. of Medicinal Chemistry

(2013) ("Ward 2013") at 7027. ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

■■■■■■■■■■■■■■■■■■■■■■■■■■■

95.    To identify a lead series, the project team screened a variety of compounds

in EGFR wild-type and double mutant biochemical assays. Ward 2013 at 7029; April 2009

"Inhibitor of Mutation Activated & Gatekeeper EGFR (IMAGE)" PPT at 11 (AZ-PW-

TAG00317425–51). The tested compounds included both reversible and irreversible kinase

inhibitors. Ward 2013 at 7029; April 2009 "Inhibitor of Mutation Activated & Gatekeeper EGFR

(IMAGE)" PPT at 11 (AZ-PW-TAG00317425–51). The results for this set of compounds are

shown in the figure below:



Ward 2013, Figure 3

96.    A set of reversible compounds from AstraZeneca's internal library—

shown in blue in the figure above—exhibited greater inhibition of the EGFR double-mutant over

EGFR wild-type. Ward 2013 at 7029. These compounds had been selected from AstraZeneca

projects targeting other kinases, such as Insulin Growth Factor Receptor 1 (IGF1R), with

methionine gatekeeper residues like T790M. *Id.*; April 2009 "Inhibitor of Mutation Activated & Gatekeeper EGFR (IMAGE)" PPT at 11 (AZ-PW-TAG00317425–51).

97.     From this testing, AstraZeneca identified mutant-selective reversible inhibitors with a unique pyrimidine core. An example of a test compound, with the pyrimidine structure shown in blue, is below:



Ward 2013 at Table 3

98.     Using this exemplary compound and the crystal structure of the EGFR-T790M mutant, AstraZeneca modeled the binding mode of this series to understand the interactions between this structure and the kinase binding domain. *See, e.g.*, Ward 2013 at 7030;

For example, AstraZeneca hypothesized that the pyrimidine core formed a hydrogen bond with the kinase hinge. *Id.* AstraZeneca also suspected, from the modeling, that the chlorine attached to the pyrimidine core was positioned to interact with the methionine gatekeeper. Ward 2013 at 7030. With the modeling, AstraZeneca also predicted the proper placement for a reactive warhead to target cysteine 797. *Id.*

99.     The EGFRM team explored a number of substituents for this pyrimidine core, including reactive warheads to allow covalent binding to EGFR. Although the reversible pyrimidine compounds were active in the biochemical assay, their activity in cellular assays was

███████████████████████████████

significantly reduced, which AstraZeneca hypothesized was due to the high ATP affinity for

EGFR with the T790M mutation. Ward 2013 at 7030. AstraZeneca thus aimed to develop a series

of irreversible inhibitors with a pyrimidine core to improve the potency. *Id.* The scientists

modeled a range of reactive warheads and placements on the pyrimidine scaffold for covalent

inhibition. *Id.* From this, the project team pursued acrylamide warheads on the meta position of

the pyrimidine. The positioning of the acrylamide was "critical," as moving the acrylamide to the

para position "appear[ed] not to result in covalent inhibition." *See, e.g.*, Ward 2013 at 7030;

████████████████████████████████

█████████████████████████████████

██████████████

100.    The project team also focused on pharmacological properties of the series,

such as solubility and lipophilicity. Ward 2013 at 7030. High lipophilicity can be associated with

poor pharmacodynamic and pharmacokinetic performance. During the project, AstraZeneca saw a

correlation between potency and lipophilicity—increasing potency in the compounds was

typically accompanied by increasing lipophilicity. *See* M. Finlay et al., Discovery of a Potent and

Selective EGFR Inhibitor (AZD9291) of Both Sensitizing and T790M Resistance Mutations That

Spares the Wild Type Form of the Receptor, 57 J. Med. Chem. (2014) 8249−8267, 8250 ("Finlay

2014"). To improve the lipophilicity of this lead series, the project team investigated different

"head groups" for the pyrimidine, including a pyrollopyridine and an indole. Ward 2013 at 7030;

████████████████████████████████

█████████████████████████████████

██████████████    The team also considered the effect of different reactive warheads on

lipophilicity, finding that adding basic functionality to the acrylamide warhead resulted in a

█████████████████████████████████

"marked reduction" in lipophilicity. *Id.* at 7031; ███████████████████████████

███████████████████████████████████████

██████████████████████████████

101.    The team further explored different substituents for the "5-position" on the pyrimidine, shown as R1 in the figure below, finding that double-mutant selectivity was highest with a chlorine attached. Ward 2013 at 7031–33; "Inhibition of EGF receptor signalling: The Discovery of AZD9291" PPT at 18 (AZ-PW-TAG00126754–805).

102.    The EGFRM team identified an *in vivo* probe compound, shown below, in which the "head group" is a pyrazolo pyridine, the acrylamide has basic functionality, and R1 is a chlorine:



Ward 2013 at Table 7

103.    AstraZeneca developed additional series candidates, with an aim to improve potency and properties. Ward 2013 at 7037, 7040 ("[T]he relatively poor solubility (1.6 uM) and the hERG IC50 of 4.2uM demonstrated the need for further development efforts for this compound and across the scaffold more generally."); █████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

████████████████████████████ "Inhibition of EGF receptor signalling: The

Discovery of AZD9291" PPT at 25 (AZ-PW-TAG00126754–805) ("Aim was to further improve

potency and properties."). For example, the team explored compounds with a piperazine

substituent on the para position of the aniline and, again, tested various substituents for the head

group and 5-position of this series, as shown in the example compounds below:



Finlay 2014 at Table 1

104.    These compounds were of interest, in part, because they offered improved

potency with no increase in lipophilicity. Ward 2013 at 7038; Finlay 2014 at 8250; "Inhibition of

EGF receptor signalling: The Discovery of AZD9291" PPT at 25–31 (AZ-PW-TAG00126754–

805). This series was further developed with, for example, examination of piperazine amides.

Ultimately, AstraZeneca concluded that the piperazine amides "did not offer the levels of potency

to justify additional investigation." Finlay 2014 at 8250. The team also explored "[a] number of

other carbon and oxygen linked basic side chains," but determined that these "offered little

advantage in terms of potency, physical properties, or oral exposure." Finlay 2014 at 8251.

105.    The team looked at additional substituents, particularly nitrogen

containing substituents shown below, for the para position of the aniline. Finlay 2014 at 8253.

Finlay 2014 at 8253 (Table 3)

106.   A variety of the most potent examples from this testing were selected for further investigation in *in vivo* rodent studies. Finlay 2014 at 8251–52.

107.   Throughout its series developments, in addition to testing the potency and efficacy of compounds and their pharmacological properties, the EGFRM team assessed potential toxicological effects, such as off-target activity on other kinases, glutathione reactivity, and hERG activity. Ward 2013 at Table 7; Finlay 2014 at 8250; "Inhibition of EGF receptor signalling: The Discovery of AZD9291" PPT at 19–22, 24–25, 35–36 (AZ-PW-TAG00126754–805);

108.   Compounds that AstraZeneca developed were screened across 70 different kinases to understand the potential for off target activity that could lead to toxicity.

"Inhibition of EGF receptor signalling: The Discovery of AZD9291" PPT at 36 (AZ-PW-TAG00126754–805); Ward 2013 at 7033 ("[I]t is important to aim for compounds of sufficient chemical reactivity toward an active-site residue (in this example cysteine) while balancing

███████████████████████████████████████

against unwanted off-target binding that could lead to high compound clearance and or idiosyncratic toxicity.").

109.    The project team also extensively studied glutathione reactivity of structures used throughout the project, again to assess the potential toxicity of developed compounds. Ward 2013 at 7033–37; █████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ Glutathione is a naturally occurring antioxidant that the body produces to protect more sensitive biological materials like proteins and DNA from electrophiles. *See, e.g.*, Clayden at 1357 ("Glutathione also detoxifies some of the compounds we have earlier described as very dangerous carcinogens such as Michael acceptors and 2,4-dinitrohalobenzenes. In both cases the thiol acts as a nucleophile for these electrophiles. Most of the time there is enough glutathione present in our cells to attack these poisons before they attack DNA or an enzyme."); D. Williams, Drug Metabolism, in Principles of Medicinal Chemistry, 83, 122–33 (William O. Foye et al. eds., 4th ed. 1995) ("Foye 1995") ("A wide range of functional groups yield thioether conjugates of GSH [or glutathione], as well as products other than thioethers. The reaction may be viewed as the result of nucleophilic attack by GSH on electrophilic carbons with leaving groups such as halogen (alkyl, alkenyl, aryl, or aralkyl halides), sulfate (alkylmethanesulfonates), and nitro (alkyl nitrates) groups, ring opening of small ring ethers (epoxides, β-lactones, such as β-propiolactone), and the addition to the activated β-carbon of an α,β-unsaturated carbonyl compound."). Accordingly, glutathione reactivity is frequently used to assess a compound's reactivity and toxicity. *See, e.g.*, Wissner 2002 at 52.

110.    AstraZeneca also examined activity against the hERG potassium channel and associated QT prolongation, both of which are indicators of dangerous cardiovascular risks.

█████████████████████

*See, e.g.*, Ward 2013 at 7030; Finlay 2014 at 8250, 8255–56 ("We . . . performed a preliminary cardiovascular safety evaluation of the final two lead compounds.").

111.    These toxicity and safety assessments played a significant role in the project team's development of series compounds and ultimate selection of a clinical candidate. For example, compounds 20 and 21 pictured above, although showing "pronounced tumor growth inhibition" with little impact on wild type EGFR in *in vivo* models, "led to marked hyperglycemia and hyperinsulinemia," consistent with these compounds' off-target activity against IGF1R. Finlay 2014 at 8256. And compound 22 "was associated with a pronounced QT prolongation," consistent with its affinity for the hERG ion channel. *Id.*

112.    AstraZeneca ultimately selected AZD9291, later named "osimertinib", as a clinical candidate. AZD9291 is pictured below.



D. Cross et. al., *AZD9291, an Irreversible EGFR TKI, Overcomes T790M-Mediated Resistance to EGFR Inhibitors in Lung Cancer*, Cancer Discovery 1047–61, Figure 1b. (2014) ("Cross 2014")

113.    Osimertinib has an aminopyrimidine scaffold with an N-methylated indole head group, a hydrogen on the 5 position, and an aniline attached to the amine. It has a three

████████████████████████████████

carbon Michael acceptor, a basic chain on the ortho position of the aniline, and a methoxy group on the para position.

114.    AZD9291 was studied extensively in *in vitro*, *in vivo*, and clinical studies. *See, e.g.*, Finlay 2014, Cross 2014; June 2023 Tagrisso Prescribing Information at 22–32. In cellular assays, AZD9291 showed "nearly 200 time greater potency against L858R/T790M than wild type, consistent with the design goal of a mutant EGFR-selective agent in comparison with early generation TKIs." Cross 2014 at 1049. As compared to other compounds AstraZeneca developed, AZD9291 showed "improved rat PK, reduced hERG affinity, and improved IGF1R margins." *See* Finlay 2014 at 8255. AZD9291 also showed less potency to wild-type cell lines as compared to first and second generation EGFR TKIs. *Id.* at 1049–50. In *in vivo* testing, AZD9291 induced "profound shrinking at low doses against both EGFR drug-sensitizing and T790M+ resistant EGFR-mutant disease models." *Id.* at 1052. AZD9291 also demonstrated good bioavailability. *Id.* at 1051.

115.    In a screen of 280 other kinases, AZD9291 showed "minimal off-target kinase activity." *Id.* In particular, AZD9291 did not exhibit significant activity against the IGF1R, and in *in vivo* studies was not associated with effects on glucose or insulin levels. *Id.*

**D.    Other Attempted Third Generation EGFR Inhibitors**

116.    During and after AstraZeneca's efforts to develop osimertinib, several other attempts to develop a third-generation irreversible EGFR inhibitor were reported. Many of these groups similarly attempted to develop inhibitors that could target mutant EGFR while sparing EGFR wild-type. The majority of these compounds are no longer in development, and the efforts to develop novel inhibitors further exemplify the variety of structures that may be "irreversible EGFR inhibitors," the amount of experimentation required, and the unpredictability in the art.

117.    Some of these inhibitors are pictured below:



D. Das & J. Hong, *Irreversible Kinase Inhibitors Targeting Cysteine Residues and their Applications in Cancer Therapy*, 20 Mini-Reviews in Medicinal Chemistry, 1732–53, 1737 Figure 4 (2020) ("Das 2020")

118.    The third generation EGFR inhibitors described below are illustrative of the variety of chemical structures that have been explored. This background section is not, nor intended to be an exhaustive summary of the development of 3rd generation EGFR inhibitors.

119.    ***WZ-4002***: The Dana-Farber Cancer Institute developed WZ 4002, a 4-aminopyrimidine scaffold with an acrylamide warhead. See X. Lu et al, *Targeting EGFRL858R/T790M and EGFRL858R/T790M/C797S resistance mutations in NSCLC: Current*

38

███████████████████

*developments in medicinal chemistry*, 38 Med. Res. 1550–81, 1555 (2018) ("Lu 2017"). WZ-4002 did not progress to clinical trials. *Id.* at 1556.

120. ***Rociletinib (CO-1686)***: Clovis Oncology developed rociletinib, a 2, 4-diamino-5-trifluoromethyl pyrimidine scaffold with an acrylamide warhead. Rociletinib was reported to potently inhibit cells with the double mutant (H1975), with selectivity over wild-type. Lu 2017 at 1559. Rociletinib also reportedly showed antitumor activity against the double mutant *in vivo. Id.* However, rociletinib did not have a sufficient objective response rate in patients with NSCLC and its development was terminated. *Id.* at 1560; N. Wright and G. Goss, *Third-generation epidermal growth factor receptor tyrosine kinase inhibitors for the treatment of non-small cell lung cancer*, 8 Translational lung cancer research, S247–S264, S255 (2019) ("Wright 2019 " )

121. ***Lazertinib (YH25448)***: Lazertinib has an amino pyrimidine based scaffold with a 4-phenyldimethyl-1-pyrazole and a dimethylaminoethyl-N-methyl chain on the phenyl ring. Lazertinib was approved in South Korea in 2021 for "non-small cell lung cancer patients who had advanced epidermal growth factor receptor mutation, as well as T790M mutations, even after receiving first and second-generation EGFR tyrosine kinase inhibitor therapies." Yuhan's Lung Cancer Treatment Lazertinib Wins Approval, THE KOREA HERALD, http://www.koreaherald.com/view.php?ud=20210118001003 (last visited July 28, 2023). Lazertinib is currently being evaluated in combination with amivantamab "for patients with relapsed or refractory *EGFR*-mutant NSCLC" in a Phase I study. Amivantamab and Lazertinib as a Potential Option for EGFR-Mutant NSCLC, TARGETED ONCOLOGY, https://www.targetedonc.com/view/amivantamab-and-lazertinib-as-a-potential-option-for-egfr-mutant-nsclc (last visited July 28, 2023). Due to its ability to penetrate the central nervous system,

it is also currently in early stage clinical trials for brain metastases. M. Hong *et al.*, *Phase II trial of lazertinib in epidermal growth factor receptor (EGFR) mutation-positive (M+), metastatic non-small cell lung cancer (NSCLC) patients with asymptomatic or mild symptomatic brain metastases after failure of EGFR tyrosine kinase inhibitor*, 2023 ASCO Annual Meeting – Poster Session (2023).

122.    ***Nazartinib (EGF816)***: Novartis develop nazartinib, an aminobenzimidazole-based compound with dimethylmethyl amine and methylpyridyl substituents. Lu 2017 at 1562–64; Das 2020 at 1737. Nazartinib reportedly showed good activity against double mutant cells (H1975) and exhibited anti-tumor activity *in vivo*. Lu 2017 at 1563. However, in 2018, in a "strategy decision by the company," Novartis withdrew a Phase III study of Nazartinib versus gefitinib and erlotinib and was last reported as being studied only in combination with other agents. Wright 2019 at S252.

123.    ***Avitinib (AC0010)***: Avitinib is a pyrrolopyrimidine-based scaffold. Lu 2017 at 1564. Avitinib has not been approved for use in patients with NSCLC in the United States.

124.    ***Olmutinib (HM61713/BI 1482694)***: Olmutinib is a thieno[3,2,-*d*]pyrimidine inhibitor that was developed by Hanmi Pharmaceutical. Das 2020 at 1736–37. South Korea's Ministry of Food and Drug Safety issued a safety letter following cases of toxic epidermal necrolysis, which halted clinical studies. Wright 2019 at S256. The development of olmutinib was reportedly halted in 2018. Das 2020 at 1737.

125.    ***PF-06459988***: PF-06459988 is a compound from a pyrrolopyrimidine-based series reported by Pfizer. Lu 2017 at 1560. The initial compound in this series reportedly inhibited H1975 cells, but had poor permeability and potent hERG activity. *Id.* A second

40

███████████████████████

compound in the series had high ligand efficiency, but was further modified to reduce warhead reactivity. *Id.* Two additional compounds in the series, though also showing antiproliferative activity *in vitro* had poor pK properties. *Id.* Further modifications resulted in PF-06459988, which showed high potency in H1975 cells, tumor growth inhibition, and good PK/PD properties. *Id.* at 1561. Although PF-06459988 was selected for a Phase I clinical study, the study was terminated prior to enrollment. *Id.*

126.    ***Maverlitinib (PF-06747775)***: Maverlitinib is another pyrrolopyrimidine inhibitor. An initial compound in this series showed potency against the double mutant EGFR, but was inactive in the H1975 anti-proliferative assay. Lu 2017 at 1562. Another compound in this series showed high potency for the H1975 cell line, but displayed poor kinase selectivity, with activity against 58% of a 38-membered kinase panel. *Id.* at 1561. Maverlitinib was last reportedly in clinical studies, with a maximum recommended dose of 200 mg to avoid adverse effects. Das 2020 at 1737.

127.    ***Naquotinib***: Astellas Pharma, Inc. developed a 3-aminopyrazine based compound with potent inhibitory activity and antiproliferative activity *in vivo*. Lu 2017 at 1565. Naquotinib proceeded to a Phase III clinical trial for the treatment of EGFR mutation positive NSCLC, but its development was discontinued based on the recommendation of an independent data monitoring committee. *Id.*; Wright 2019 at S257.

## VIII.    THE PATENTS-IN-SUIT

128.    The '162 patent, entitled "Method of Treating Gefitinib Resistant Cancer" issued on March 24, 2020. The '162 patent issued from U.S. Patent Application No. 15/207,349 (the "'349 application") filed on July 11, 2016. The patent purports to claim priority to the '483 provisional (filed February 3, 2005) and the '989 provisional (filed April 15, 2005). The named

██████████████████████████

inventors of the '162 patent are Daniel A. Haber, Daphne Winifred Bell, Jeffrey E. Settleman, Raffaela Sordella, Nadia G. Godin-Heymann, Eunice L. Kwak, and Sridhar Krishna Rabindran.

129.    The '314 patent, entitled "Method for Treating Gefitinib Resistant Cancer," issued on March 31, 2020. The '314 patent issued from U.S. Patent Application No. 11/883,474 (the "'474 application"), a national stage application of PCT/US2006/003717 (the "'717 PCT"), which was filed on February 2, 2006. The patent purports to claim priority to the '483 and '989 provisionals. The named inventors of the '162 patent are Daniel A. Haber, Daphne Winifred Bell, Jeffrey E. Settleman, Raffaela Sordella, Nadia G. Godin-Heymann, Eunice L. Kwak, and Sridhar Krishna Rabindran. The named assignees of the '314 patent are The General Hospital Corporation and Wyeth LLC.

### A.    Asserted Claims

130.    I understand that Plaintiffs in this case have asserted claims 1 and 4 of the '162 patent against AstraZeneca. These claims are as follows:

> 1.    A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient, comprising administering daily to the patient having gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2-500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation, wherein the irreversible EGFR inhibitor is not CL-387,785.

> 4.    The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2.

131.    I also understand that Plaintiffs in this case have asserted claims 1, 3–6, and 9 of the '314 patent. These claims are as follows:

> 1.    A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor

████████████████████████

receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2.

**3.** The method of claim **1**, wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR.

**4.** The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2.

**5.** The method of claim 1, wherein the method further comprises administering at least one other tyrosine kinase inhibitor.

**6.** The method of claim 1, wherein the method further comprises administering radiation.

**9.** The method of claim 1, wherein the route of administration is oral.

## B.    Specification

132.    The '162 and '314 patents share the same specification.

133.    The specification states that the claims are directed to "methods for the treatment of gefitinib and/or erlotinib resistant cancer." '162 patent, abstract; '314 patent, abstract. The specification explains that EGFR has been the "target of choice for the development of several different cancer therapies," such as EGFR tyrosine kinase inhibitors that "block a cell-surface receptor responsible for triggering and/or maintaining the cell signaling pathway that induces tumor cell growth and division." '162 patent, 2:57–65; '314 patent, 2:52–60.

134.    The specification states that quinazolines, pyridopyrimidines, and pyrrolopyrimidines were "[a]mong the more promising EGFR-TKIs" and identifies gefitinib and erlotinib as "two of the more advanced compounds in clinical development." '162 patent, 3:3–10;'314 patent, 2:63–3:4. The specification notes that gefitinib is an "orally active quinazoline" that "competes for the adenosine triphosphate (ATP) binding site, leading to suppression of the HER-kinase axis." '162 patent, 3:16–19; '314 patent, 3:11–15.

███████████████████████████████████

135.     The specification also explains that a significant limitation in using gefitinib and erlotinib is "recipients thereof may develop a resistance to their therapeutic effects after they initially respond to therapy, or they may not respond to EGFR-TKIs to any measurable degree at all." '162 patent, 3:24–28; '314 patent, 3:19–23. The specification notes, however, that the "exact mechanism of [gefitinib] response is not completely understood" and "a better understanding of the molecular mechanisms underlying sensitivity to [gefitinib and erlotinib] would be extremely beneficial in targeting therapy to those individuals whom are most likely to benefit from such therapy." '162 patent, 3:20–24, 32–36; '314 patent, 3:15–18, 27–31.

136.     The specification similarly states that the "mechanisms of underlying acquired drug resistance are not well understood." '162 patent, 6:37–38; '314 patent, 6:34–35. The specification "speculate[s] that increased internalization of ligand-bound EGFR inhibitors may be linked to dissociation of the gefitinib-EGFR complex at the low pH of intracellular vesicles." '162 patent, 18:5–8; '314 patent, 18:11–16. The specification also states that the T790M mutation "seems to contribute to acquired resistance in some cases of NSCLC," but T790M is not present in all cases of acquired gefitinib resistance, and that "the mechanisms underlying treatment failure in cases lacking secondary EGFR mutations remain unexplained." '162 patent, 6:62–65; '314 patent, 6:59–62.

137.     The specification states that the applicants "discovered that irreversible EGFR inhibitors are effective in treatment of cancer in subjects who are no longer responding to gefitinib and/or erlotinib therapies." '162 patent, 3:48–51; '314 patent, 3:43–46. The specification provides three preferred embodiments: EKB-569, HKI-272, and HKI-357. '162 patent, 3:61–63; '314 patent, 3:56–57. The specification notes that EKB-569 is a "4-anilinoquinoline-3-carbonitrile and states that EKB-569 is an "irreversible inhibitor of EGFR"; it notes that HKI-272

44

███████████████████████████

and HKI-357 are "derivative[s] of 4-anilinoquinoline-3-carbonitrile" and are irreversible inhibitors of EGFR and ERBB2. '162 patent, 5:22–24, 7:33–38; '314 patent, 5:19–21, 7:29–36. The specification states that these compounds are irreversible inhibitors "**most likely** via a covalent bond with cys773 residue within the EGFR catalytic domain or the cys805 of ERBB2." '162 patent, 16:12–15 (emphasis added); '314 patent, 16:17–20 (emphasis added).

138.    The specification also references work performed by others on an irreversible EGFR inhibitor, CL-387,785. '162 patent, 18:27–30; '314 patent, 18:33–36. The specification does not provide the structure for CL-387,785 nor does it state whether CL-387,785 binds to the designated cysteine residues.

139.    The specification further states that the irreversible EGFR inhibitors claimed "may be any compound which binds to cysteine 773 of EGFR." '162 patent, 3:62–63; '314 patent, 3:58–59. The specification also states that the claimed compounds are "preferably, but not necessarily a low molecular weight compound, but may also be a larger compound, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '162 patent, 13:4–14; '314 patent, 13:2–13.

140.    The specification includes results of *in vitro* testing of the inhibitors. For example, the specification states that the applicants "modeled gefitinib resistance in vitro" by generating drug-resistant colonies from the NCI-H1650 cell line. '162 patent, 15:54–66; '314 patent, 15:56–16:3. None of these drug resistant colonies had the T790M mutation. '162 patent, 16:1–2; '314 patent, 16:5–6. The specification states that the gefitinib-resistant clones demonstrated sensitivity to the three preferred embodiments. '162 patent, 16:3–12; '314 patent,

████████████████████████████

16:6–15. The specification also states that the applicants "compared the ability of gefitinib and irreversible ERBB family inhibitors to suppress signaling via downstream effectors of EGFR that mediate its proliferative and survival pathways." '162 patent, 17:52–56; '314 patent, 17:58–62. The specification states that HKI-357 was more effective than gefitinib in suppressing EGFR autophosphorylation and AKT and MAPK phosphorylation in NCI-1650 cell lines. '162 patent, 17:56–60; '314 patent, 17:61–65. Thirdly, the specification discloses that the applicants tested the effect of irreversible inhibitors in the NCI-H1975 cell line, which harbors L858R and T790M mutations, and was derived from a patient not previously treated with an EGFR inhibitor. '162 patent, 18:28–33. The specification states that HKI-357 and HKI-272 were more effective than gefitinib in suppressing ligand-induced EGFR autophosphorylation and downstream signaling. '162 patent, 18:34–38. All three inhibitors suppressed proliferation. '162 patent, 18:38–40.

### C.    Prosecution History

#### 1.    The Provisional Applications

141.    The '483 provisional was filed on February 3, 2005. The '483 provisional claimed a "method of treating gefitinib [*sic*] and/or erlotinib resistant cancer comprising administering to a patient in need of treatment a pharmaceutical composition comprising an irreversible EGFR inhibitor." '483 provisional, claim 1.

142.    The applicants stated that "mechanisms underlying acquired drug resistance are unknown" but theorized that "resistance to gefitinib emerges rapidly in vitro and is associated with altered receptor trafficking, which may reduce drug binding." '483 application, [0069]. The specification describes two "relapsed gefitinib responder[s]" who had no secondary EGFR mutations that could be associated with gefitinib resistance. *Id.*, [0064]. The specification also states that the applicants "modeled gefitinib resistance in vitro," generating 40 drug resistant

███████████████████████████████

clones. *Id.*, [0066]. None contained a secondary EGFR mutation, altered expression of EGFR, or an acquired mutation in erbB2, p53, H-ras, Fas or PTEN. *Id.*, [0066].

143.    The provisional identifies two irreversible EGFR inhibitors—EKB-569 and HKI-357—and includes limited *in vitro* data with these compounds. '483 provisional, [0013], [0063]–[0068]. The specification notes that gefitinib-resistant clones "displayed persistent sensitivity" to these inhibitors. *Id.*, [0066]. The specification also states that the applicants tested the ability of gefitinib and HKI-357 to inhibit EGFR signaling in gefitinib resistant cells, the results of which suggested that "the ability of gefitinib to inhibit EGFR activation is compromised in these cells, whereas the irreversible inhibitor HKI 357 is unaffected." *Id.*, [0068].

144.    The '989 provisional was filed on April 15, 2005. The claims of the '989 provisional were identical to the '483 provisional. The specification was substantially the same as the '483 provisional. However, it added a third irreversible inhibitor—HKI-272. '989 provisional, [0033]. The '989 provisional also included a manuscript later published as E. Kwak et al., *Irreversible inhibitors of the EGF receptor may circumvent acquired resistant to gefitinib*, 102 Proc. Natl. Acad. Sci. 7665 (April 6, 2005) ("Kwak 2005"). '989 provisional at 23–48. Kwak 2005 was authored, in part, by the applicants of the patents-in-suit, and contains some of the same content as the patents-in-suit.

### 2.    The '717 PCT Application

145.    The '717 PCT, the first utility application, was filed on February 2, 2006. The '717 PCT was filed with 27 claims, including representative claim 1:

> 1. A method for treating gefitinib and/or erlotinib resistant cancer, comprising the steps of:
>
> a.   Monitoring progression of a cancer in a subject at a time point after the subject has initiated gefitinib and/or erlotinib treatment, wherein progression of the cancer is indicative of cancer that is resistant to gefitinib and/or erlotinib; and

███████████████████████████

> b.  administering to the subject having a cancer that is resistant to gefitinib and/or erlotinib treatment a pharmaceutical composition comprising an irreversible epidermal growth factor receptor (EGFR) inhibitor.

146.    The specification of the '717 PCT incorporated figures and statements from Kwak 2005, including discussion of the T790M mutation. *See, e.g.*, '727 PCT, [0029], Figs. 1, 2(b)-(c), 4, 5. The specification also added statements about the claimed method. For example, the specification discusses monitoring the progression of cancer and diagnosing patients as gefitinib/erlotinib sensitive or resistant. *Id.*, [0015]–[0017], [0019], [0034]–[0037]. The '717 PCT also added statements regarding effective dosing, noting that "effective dosage of active ingredient may vary," but that "in general, satisfactory results are obtained when the compounds are administered at a daily dosage of from about 0.5 to about 1000 mg/kg of body weight." *Id.*, [0039].

### 3.    The '474 Application

147.    The '474 application was filed with 28 method claims, including representative claim 1:

> 1.    A method for treating gefitinib and/or erlotinib resistant cancer, comprising the steps of:
>
> (a) monitoring progression of a cancer in a subject at a time point after the subject has initiated gefitinib and/or erlotinib treatment, wherein progression of the cancer is indicative of cancer that is resistant to gefitinib and/ or erlotinib treatment; and
>
> (b) administering to the subject having a cancer that is resistant to gefitinib and/ or erlotinib treatment a pharmaceutical composition comprising an irreversible epidermal growth factor receptor (EGFR) inhibitor.

148.    On April 9, 2010, the examiner rejected each of pending claims 1–27 in a non-final rejection. The examiner rejected certain claims as indefinite. The examiner further determined that the claims were entitled to a priority date of February 2, 2006 based on the '717

█████████████████████████████████

PCT application. April 9, 2010 Non-Final Rejection at 2–3. In light of this priority date, the

examiner found certain claims, including independent claim 1, obvious and anticipated. On July

14, 2010, the applicants amended certain claims. July 14, 2010 Amendment, claims 3, 13, 25.

149.   On September 14, 2010, the examiner issued a final rejection. The

examiner maintained a priority date of February 6, 2006 for all pending claims. September 14,

2010 Final Rejection at 2. In doing so, the examiner noted that "although the threonine to

methionine mutation at position 790 was known in the art, the '483 specification does not teach or

suggest treating a patient with such a mutation." September 14, 2010 Final Rejection at 11. The

examiner maintained all other anticipation and obviousness rejections. September 14, 2010 Final

Rejection at 12–28.

150.   On October 13, 2010, the applicants submitted the first of many requests

for continued examination. The applicants amended the claims and contested the examiner's

findings of priority date, anticipation, and obviousness. October 13, 2010 Response to Non-Final

Office Action at 6–8.

151.   On September 27, 2013, the examiner issued another non-final rejection.

The examiner agreed that certain claims were entitled to priority as of the '989 application, but

again rejected claims as anticipated. September 27, 2013 Non-Final Rejection at 3–6. The

examiner further found claims obvious over Kobayashi[3] and Discafani[4]. September 27, 2013

Non-Final Rejection at 6. In particular, the examiner determined that the references, together,

teach that CL-387,785 is an irreversible inhibitor that inhibits activity of a T790M mutant EGFR

---

[3] S. Kobayashi et al., *EGFR Mutation and Resistance of Non-Small-Cell Lung Cancer to Gefitinib*, N Engl. J. Med. 786–792 (2005)

[4] C. Discafani et al. *Irreversible Inhibition of Epidermal Growth Factor Receptor Tyrosine Kinase with In Vivo Activity by N-[4-[(3-Bromophenyl)amino]-6-quinazolinyl]-2-butynamide (CL-387,785)*, 57 Biochemical Pharmacology 917–925 (1999)

███████████████████████

and that the inhibitor inhibits proliferation and tumor growth of EGFR expressing cells.

September 27, 2013 Non-Final Rejection at 7. Further, the examiner found that Discafani teaches

that CL-387,785 binds to cysteine-773 of EGFR and inhibits cell proliferation in EGFR-

expressing cells *in vivo*. September 27, 2013 Non-Final Rejection at 7. The examiner further

rejected claims as obvious over Kobayashi and Discafani in view of Rabindran[5], which discloses

that HKI-272 is an irreversible inhibitor of HER-2 tyrosine kinase and inhibits the activity of

EGFR. September 27, 2013 Non-Final Rejection at 9. The examiner found that it would have

been obvious to substitute HKI-272 in the method taught by Kobayashi because Rabindran

teaches that HKI-272, like CL-387,785 "inhibits EGFR activity and phosphorylation in an

irreversible manner and inhibits EGFR cell and tumor growth, likely through cysteine-773 of

EGFR . . . ." September 27, 2013 Non-Final Rejection at 9–10.

152.    On February 27, 2014, the applicants filed an amendment and request for

reconsideration after non-final rejection, cancelling all pending claims and adding new claims 29–

46. Independent claims 29 and 43 recite as follows:

> **Claim 29:**  A method for treating gefitinib and/or erlotinib resistant
> cancer in a patient in need thereof, comprising administering to the
> patient a pharmaceutical composition comprising an irreversible
> epidermal growth factor receptor (EGFR) inhibitor.
>
> **Claim 43:** A method for treating cancer having a T790M mutation
> in EGFR in a patient in need thereof, comprising administering to
> the patient a pharmaceutical composition comprising an irreversible
> EGFR inhibitor.

153.    The applicants argued the claims 29–42 were entitled to priority as of the

'483 application while claims 43–46 were entitled priority as of the '989 application. February 27,

---

[5] Rabindran et al., *Antitumor Activity of HKI-272, an Orally Active, Irreversible Inhibitor HER-2 Tyrosine Kinase*, 64 Cancer Res. 3958 (2004)

███████████████████████

2014 Request for Reconsideration at 5. With respect to claims 43-46, the applicants asserted that Kobayashi did not teach a method of treating cancer in a patient with cancer having a T790M mutation in EGFR because Kobayashi relates to "laboratory work performed in an attempt to elucidate the mechanisms of secondary drug resistance observed with the treatment of cancer using gefitinib" and that Kobayashi speculates on whether the T790M mutation might have clinical relevance. February 27, 2014 Request for Reconsideration at 6–7. The applicants summarily stated that Kobayashi does not teach that CL-387,785 would be effective in treating gefitinib-resistant cancer. February 27, 2014 Request for Reconsideration at 8.

154. On May 2, 2014, the examiner issued a final rejection. The examiner agreed that claims 29–42 are entitled to a priority date as of the '483 provisional application, i.e. February 3, 2005, and that claims 43–46 are entitled to a priority date of the '989 application. May 2, 2014 Final Rejection at 3–4. The examiner maintained the obviousness rejections over Kobayashi, Discafani, and Rabindran, stating that a POSA would have taken the statements in the Kobayashi as motivation to use other EGFR inhibitors like CL-387,785 or HKI-272 to treat gefitinib resistant cancers. May 2, 2014 Final Rejection at 4–10.

155. On August 20, 2014, the applicants filed a second request for continued examination with claim amendments cancelling claims 43–46. August 20, 2014 Request for Continued Examination.

156. On September 29, 2014, the examiner issued another non-final rejection of pending claims 29-42 as anticipated and obvious over Bell[6]. September 29, 2014 Non-Final Rejection at 2. The examiner explained that Bell teaches treating gefitinib or erlotinib resistance with tyrosine kinase inhibitors like EKB-569, HKI-357 and/or HKI-272, which act via a covalent

---

[6] WO 2005/094357 (published October 13, 2005, effectively filed April 27, 2004).

███████████████████████

bond with the cys773 residue within the EGFR catalytic domain or the cys805 of ERBB2.
September 29, 2014 Non-Final Rejection at 4–8.

157.    On March 30, 2015, the applicants filed a response arguing that Bell does not teach the claimed method, asserting that Bell "discuss[es] nothing more than general research and discovery concepts that may identify an inhibitor" and that Bell discloses an entire class of compounds that amounts to nothing more than a mere invitation to investigate. March 30, 2015 Response to Office Action at 4–6. The applicants further argued that Bell fails to teach any benefit that one class of compounds may have over the other and questioned whether Bell enables its own claims. March 30, 2015 Response to Office Action at 7–8. The applicants also suggested that the *in vitro* testing showing HKI-357 had a 10-fold increase over gefitinib in suppressing EGFR autophosphorylation and AKT and MAPK phosphorylation in NCI-H1650 cells was an unexpected result. *Id.* at 8.

158.    On May 21, 2015, the examiner issued a final rejection, maintaining both the anticipation and obviousness rejections for all pending claims over Bell. May 21, 2015 Final Rejection at 7. The examiner also rejected the applicants' arguments regarding unexpected results. May 21, 2015 Final Rejection at 17. First, the examiner stated that applicants' first study relating to HKI-357 was not commensurate with the claims, particularly because "the example does not show treatment of any cancer in a patient with an irreversible EGFR inhibitor." May 21, 2015 Final Rejection at 17. The examiner further noted that the claims were drawn to treating gefitinib and/or erlotinib resistant cancer with a ***very broad genus of irreversible inhibitors***." May 21, 2015 Final Rejection at 18 (emphasis added).

159.    On August 20, 2015, the applicants filed a response asserting that Bell could not be considered a prior art reference. August 20, 2015 Response to Office Action at 4.

███████████████████████████████

160.    On September 10, 2015, the examiner issued a notice of allowance of pending claims 29–42. The examiner stated only that the applicants' arguments were found persuasive. September 10, 2015 Notice of Allowance at 2.

161.    On October 13, 2015, the applicants filed a request for continued examination with a revised list of cited references.

162.    On December 9, 2015, the examiner issued a non-final rejection. The examiner rejected all pending claims as anticipated or obvious. December 9, 2015 Non-Final Rejection at 2–6. The examiner rejected claims 29–38, 40, and 42 as anticipated by Agus[7] because Agus teaches a method of treating cancers that are resistant to gefitinib or erlotinib with irreversible tyrosine kinase inhibitors EKB-569 or CI-1033, and EKB-569 acts via a covalent bond with the cys773 residue within the EGFR catalytic domain or the cys805 of erb-B2. December 9, 2015 Non-Final Rejection at 2–3.

163.    On March 9, 2016, the applicants responded to the examiner's anticipation and obviousness rejections. In its response, the applicants argued that Agus teaches a "laundry list" of agents, including CI-1033 which has "failed to overcome resistance in EGFR mutants, such as in the presence of C797S with T790M mutations in EGFR." March 9, 2016 Response to Office Action at 5–6.

164.    On May 9, 2016, the examiner issued a final rejection, maintaining both the anticipation and obviousness rejections. May 9, 2016 Final Rejection at 2–9. The examiner noted that while the applicants refer to a "laundry list" of agents, Agus only recites five species in addition to gefitinib and erlotinib. May 9, 2016 Final Rejection at 5.

165.    On August 1, 2016, the applicants amended claim 29 as follows:

---

[7] WO 2003/103676 (December 18, 2003).

████████████████████████████

> Claim 29: A method for treating gefitinib and/or erlotinib <u>non-small cell lung</u> resistant cancer in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising an irreversible epidermal growth factor receptor (EGFR) inhibitor <u>that binds to a cysteine residue of EGFR or a cysteine residue of erb-B2</u>.

166. The applicants largely reiterated its prior arguments. The applicants further argued that Agus did not recognize that irreversible inhibition through binding to a cysteine residue could provide any benefit in overcoming a patient's resistance to conventional TKI therapy. August 1, 2016 Response to Office Action at 5. The applicants further noted that Agus included CI-1033 and it **"was known in the art that irreversible EGFR inhibitors (i.e., CI-1033) were not effective against resistant forms of cancer."** August 1, 2016 Response to Office Action at 6 (emphasis added). On September 9, 2016, the applicants filed another request for continued examination based on the amendments and arguments filed with its August 1, 2016 response.

167. On September 26, 2016, the examiner issued a non-final rejection of all pending claims. First, the examiner determined that claims 29, 38–42 and 47 were entitled to a priority date as of February 2, 2006 (the filing date of the '717 PCT) on the basis that the earlier provisional applications did not support the claim for an EGFR inhibitor that binds to a cysteine residue of Erb-B2 or binds to the cysteine residue in a cysteine rich region of EGFR. September 26, 2016 Non-Final Rejection at 3. The examiner further rejected claims 29, 38–42 and 47 for lack of written description with respect to the claims' recitation of an "an EGFR inhibitor that binds to a cysteine residue of EGFR, binds a cysteine residue of Erb-B2 or binds to the cysteine residue in a cysteine-rich region of EGFR." September 26, 2016 Non-Final Rejection at 4–5. The

███████████████████████████████

examiner then rejected claims 29, 38, 42, and 47 as anticipated by Yoshimura[8] stating that Yoshimura teaches treating non-small cell lung carcinoma resistant to gefitinib with oral administration of EKB-569. September 26, 2016 Non-Final Rejection at 7. The examiner also rejected claims 29, 38, 40–42, and 47 as obvious over the '046 Application ("Zacharchuk")[9], which also teaches treating NSCLC patients resistant to gefitinib with EKB-569. September 26, 2016 Non-Final Rejection at 7–8. Finally, the examiner rejected claims 29–34, 38, 49, 42 as obvious over Agus, as evidenced by Smaill.[10] September 26, 2016 Non-Final Rejection at 9. The examiner reiterated that Agus teaches treating gefitinib/erlotinib resistant cancer with irreversible inhibitors EKB-569 and CI-1033. September 26, 2016 Non-Final Rejection at 15–17.

168.    On December 27, 2016, the applicants responded and further amended claim 29 to require the inhibitor "*covalently* bind[s] to cysteine 773 residue *in the ligand binding pocket of EGFR* or cysteine 805 residue in the ligand binding pocked of erb-B2." The applicants asserted that the written description and indefiniteness arguments were moot in view of these amendments. December 27, 2016 Request for Reconsideration at 5. The applicants further reasserted that the claims had priority to the '483 application, and therefore the anticipation rejections based on Yoshimura and Zacharchuk should be withdrawn. December 27, 2016 Request for Reconsideration at 5. Finally, the applicants argued that the claims are not obvious over Agus as evidenced by Smaill and further in view of Harari, asserting that Agus's solution to

---

[8] Yoshimura et al. (Lung Cancer, 20 Dec. 2005 51: 363-368).

[9] U.S. Patent Application Publication 2006/0235046 (April 14, 2005);

[10] J. Smaill et al., *Tyrosine Kinase Inhibitors. 17. Irreversible Inhibitors of the Epidermal Growth Factor Receptor: 4-(Phenylamino)quinazoline- and 4-(Phenylamino)pyrido[3,2-d]pyrimidine-6-acrylamides Bearing Additional Solubilizing Functions*, 43 J. Med. Chem. 1380 (2000)

████████████████████████████

the problem of resistance is "devoid of any consideration to specific, directed, and irreversible inhibition of neither EGFR or erb-B2." December 27, 2016 Request for Reconsideration at 7–9.

169.    On March 28, 2017, the examiner issued another final rejection. Though the examiner agreed that the pending claims were entitled to priority as of the '483 application, the examiner maintained the obviousness rejections over Agus, including as evidenced by Smaill and further in view of Harari. March 28, 2017 Final Rejection at 2–9.

170.    On July 28, 2017, through the After Final Consideration Pilot (AFCP) Program, the applicants proposed an amendment to claim 29 as follows:

> Claim 29:  A method for treating gefitinib and/or erlotinib non-small cell lung resistant cancer in a patient in need thereof, comprising administering to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to a cysteine 773 residue in the ligand-binding pocket of EGFR or a cysteine 805 residue in the ligand-binding pocked of erb-B2.

171.    The applicants then argued that the POSA considering Agus "would not consider administering a 'unit dosage' of any TKI, much less specifically select an irreversible [EGFR] inhibitor." July 28, 2017 Response to Office Action at 4. Moreover, the applicants argued that the "vastness of Agus' TKI selection criteria . . . fails to provide the skilled artisan any guidance as to why one would select an irreversible inhibitor over any other TKI." July 28, 2017 Response to Office Action at 6–7.

172.    On August 14, 2017, the examiner and applicants had an interview to discuss the applicants' view of the difference between "unit dosage" and the doses of irreversible inhibitors claimed in Agus. August 16, 2017 Applicant Initiated Interview Summary at 1. In an AFCP Decision, the examiner decided that the final amendment would not overcome all of the rejections in the most recent final office action. In an August 16, 2017 advisory action, the

██████████████████████████████

examiner explained that the obviousness rejections based on Agus were maintained, explaining

the definition of "unit dose" and that Agus teaches doses that overlap with the scope of doses

encompassed by the claims. August 16, 2017 Advisory Action.

173. On February 23, 2018, the applicants filed another request for continued

examination. The applicants reasserted its previous arguments with respect to obviousness.

February 23, 2018 Request for Continued Examination at 4. In addition, the applicants argued that

unexpected results supported the non-obviousness of the pending claims, and submitted the

Declaration of Alan Auerbach ("Auerbach Declaration"). Relying on the Auerbach Declaration,

the applicants asserted:

> Tagrisso (osimertinib) is an EGFR inhibitor that binds irreversibly
> to certain mutant forms of EGFR, exhibits anti-tumor activity
> against NSCLC cultured cell lines having EGFR-mutations, and has
> been demonstrated to have achieved a major efficacy outcome in
> providing a statistically significant improvement in progression-free
> survival (PFS) in patients with metastatic EGFR T790M mutation-
> positive NSCLC who had progressed on prior systemic therapy,
> including an EGFR TKI (AURA3 Trial).

February 23, 2018 Request for Continued Examination at 4.

174. Further pointing to the Auerbach Declaration, the applicants asserted that

based on the teachings of Agus, "a POSA would not have expected an irreversible EGFR

inhibitor administered within the claimed unit dosage (e.g., 80 mg unit dose of Tagrisso

(osimertinib) administered orally once daily) to show statistically significant and clinically

meaningful improvement in progression-free survival in patients with metastatic EGFR T790M

mutation-positive NSCLC who had progressed on prior systemic therapy, including an EGFR

TKI." February 23, 2018 Request for Continued Examination at 8.

175. On June 14, 2018, the examiner issued another non-final rejection. The

examiner maintained the obviousness rejection over Agus. June 14, 2018 Response to Office

███████████████████████

Action at 2. In response to the applicants' arguments based on the Auerbach Declaration, the examiner explained that the Auerbach Declaration "only presents evidence with a single irreversible inhibitor Tagrisso (osimertinib) at a single dose." The examiner went on:

> Cross[11] teach that Tagrisso/AZD9291 is structurally and pharmacologically distinct from other tyrosine kinase/EGFR inhibitors. See abstract and p. 1048-both columns. Thus **the activity of the Tagrisso/AZD9291 appears not to be representative of the broadly claimed irreversible EGFR inhibitors**. Further, the resistant NSCLC in the Declaration contained an EGFR T790M mutation. While the EGFR T790M mutation is a common mechanism of resistance, there are numerous mechanisms for the development of EGFR resistance such MET amplification, erb-b2 amplification, and PI3-kinase or B-Raf mutation. *See* Tan.[12]

June 14, 2018 Final Rejection at 10 (emphasis added, citations omitted). The examiner further rejected the claims on the basis of non-statutory double patenting over co-pending '349 application, which ultimately issued as the '162 patent. June 14, 2018 Final Rejection at 11–13.

176. On December 13, 2018, the applicants responded, again emphasizing that Agus requires a "resistance-surmounting quantity" between 500–3000 mg of a TKI and requires an amount significantly higher than daily dosing. December 13, 2018 Response to Office Action at 4. The applicants also again argued that the Auerbach Declaration, as well as Cheng[13] were evidence of unexpected results because "the activity of Tagrisso (AZD9291) is representative among irreversible EGFR inhibitors effective according to the claimed methods, as detailed in Cheng, owing to the presence of a conjugating moiety (Michael acceptor) that allows for covalently binding to the cysteine 773 residue in the ligand-binding pocket of EGFR." December 13, 2018 Response to Office Action at 5–6.

---

[11] Cross et al. (Cancer Discovery June 3, 2014, 4:1046-1061).

[12] Tan et al. (J. Thoracic Oncology July 2016 11(7): 946-963).

[13] H. Cheng, et al., (Bioorg. Med. Chem. Lett., 26 (2016) 1861-1868).

███████████████████████████████

177.    On February 14, 2019, the examiner issued another final rejection. The examiner maintained that the claims were obvious over Agus, and were also invalid for double patenting. February 14, 2019 Final Rejection at 2–9. The examiner explained that although the doses of Agus were higher than a conventional dose, the limitation of "unit dosage" in the claims did not meaningfully differentiate the claims from the prior art. February 14, 2019 Final Rejection at 6. The examiner also stated that the applicants' arguments based on the Auerbach Declaration were unpersuasive. The examiner explained:

> the pending claims recite "treating **any** of gefitinib and/or erlotinib resistant non-small cell lung cancer with **any** unit dosage of **any** irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds . . . ." (emphasis added. The examiner also stated that Cheng, similar to Cross, teaches that "while the second generation EGFR covalent inhibitors potently inhibit wild type EGFR and cause toxicities, the third generations of EGFR TKI is like Tagrisso/AZD9291 have high potency against the T790M mutant EGFR and selectivity over wild type EGFR." The examiner thus concluded that the "**the activity of the Tagrisso/AZD9291 appears not to be representative of the broadly claimed irreversible EGFR inhibitors**."

 February 14, 2019 Final Rejection at 9 (emphasis added).

178.    On August 14, 2019, the applicants filed another request for continued examination and amended claim 29 to recite a "daily administration" limitation. August 14, 2019 Amendment, Claim 29. The applicants asserted, in part, that Agus "provides no reasonable basis for a POSA to conclude that an irreversible inhibitor would, much less could, be effective in treating a patient with gefitinib and/or erlotinib resistant non-small cell lung cancer." August 14, 2019 Request for Continued Examination at 10.

179.    On September 17, 2019, the examiner issued a non-final rejection. The examiner withdrew the obviousness based rejections but maintained the double patenting

███████████████████████

rejections. September 17, 2019 Non-Final Rejection at 2–4. The applicants subsequently filed a

Terminal Disclaimer over co-pending '349 application. December 17, 2019 Applicant Response.

180.    On January 30, 2020, the examiner issued a notice of allowance for

Claims 29–31, 33, and 38–42.

### 4.    The '349 Application

181.    The '349 application included six method claims. Independent claim 23 is

representative:

> **Claim 23**: A method of treating cancer, comprising administering
> to a subject a cancer having a mutation in EGFR (SEQ ID No: 1),
> wherein the mutation is substitution of a methionine for a threonine
> at position 790, a pharmaceutical composition comprising an
> irreversible EGFR inhibitor.

182.    On August 12, 2016, the examiner rejected all pending claims in a non-

final rejection. The examiner determined that the '483 provisional failed to provide written

description or enablement support for claiming a cancer with a T790M mutation, and therefore

established a priority date of April 15, 2005 based on the '989 application. August 12, 2016 Non-

Final Rejection at 3–4. The examiner rejected several claims as indefinite, explaining that "[a]n

irreversible EGFR inhibitor is functional language because it described the composition by what it

does rather than by what it is" and "the claims provide no boundaries as to the structure that

provides the function of irreversible inhibition of EGFR." August 12, 2016 Non-Final Rejection

at 4. The examiner further rejected claim 25 as indefinite, finding that the claim recites an

irreversible EGFR inhibitor that binds to cys773 of EGFR (SEQ ID NO: 1) but SEQ ID NO: 1 is a

nucleic acid sequence and does not contain a cysteine at position 773. August 12, 2016 Non-Final

Rejection at 5.

███████████████████████

183.     The examiner also rejected certain claims, including independent claim 23, as obvious over Kobayashi in view of Discafani in view of Freeman[14]. August 12, 2016 Non-Final Rejection at 5–6. The examiner found, in part, that Kobayashi teaches an irreversible inhibitor that inhibits the activity of a T790M mutant EGFR in non-small cell lung cancer cells. August 12, 2016 Non-Final Rejection at 6. The examiner further determined that Discafani predicted that CL-387,785 binds to cysteine-773 of EGFR and teaches that CL-387,785 inhibits cell proliferation of EGFR expressing cells *in vivo*. August 12, 2016 Non-Final Rejection at 7.

184.     The examiner further rejected all pending claims as obvious over Kobayashi in view of Discafani in view of Freeman and further in view of Rabindran. August 12, 2016 Non-Final Rejection at 7–8. In addition to the teachings above, Rabindran teaches that HKI-272 is an irreversible inhibitor of HER-2 tyrosine kinase and inhibits activity of EGFR. August 12, 2016 Non-Final Rejection at 8.

185.     On November 14, 2016, the applicants responded by amending independent claim 23 according to the following:

> **Claim 23**: A method of treating cancer, comprising administering to a subject a cancer having a mutation in EGFR (SEQ ID No: 1), wherein the mutation is substitution of a methionine for a threonine at position 790, a pharmaceutical composition comprising an irreversible EGFR inhibitor <u>that covalently binds to cysteine 773 of the catalytic domain within the EGFR</u>.

186.     The applicants also added dependent claims 29–31, added limitations to the type of cancer treated, and added a daily dosage limitation for the irreversible inhibitor.

187.     The applicants asserted that the amendment rendered the claims valid, though the applicants did not address the examiner's determination that the claims were defined

---

[14] US 2007/0048754 (Freeman et al. published Mar. 1, 2007, effectively filed Feb. 24, 2005).

by functional language. November 14, 2016 Response to Office Action at 5. The applicants also disputed the examiner's findings of obviousness. Specifically, the applicants asserted that CL-387,785 disclosed in Kobayashi only had 1/10th of its potency against cells with T790M mutations as compared to cells without the mutation, and that Kobayashi was not able to determine CL-387,785 had activity on the T790M mutation due to covalent binding to the cysteine residue. November 14, 2016 Response to Office Action at 5–6.

188.    On January 17, 2017, the examiner issued a final rejection. The examiner maintained the rejection of the claims as obvious. January 17, 2017 Final Rejection at 4–6. In particular, the examiner explained that although Kobayashi teaches that CL-387,785 has reduced potency with respect to the T790M mutation, it was still the only inhibitor identified as effective in the presence of the T790M mutation. January 17, 2017 Final Rejection at 9–10. The examiner further reiterated that both Discafani and Rabindran teach irreversible inhibitors that inhibit likely through cysteine-773 of EGFR. January 17, 2017 Final Rejection at 9.  The examiner thus concluded that the POSA would have been motivated to treat lung cancer having a T790M mutation in EGFR with a T790M mutation. January 17, 2017 Final Rejection at 10.

189.    On July 28, 2017, the applicants filed a request for After Final Consideration. The applicants again amended Independent claim 23 as follows

> **Claim 23**: A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in EGFR (SEQ ID NO: 1), comprising administering to a subject a gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in EGFR (SEQ ID No: 1), wherein the mutation is a substitution of a methionine for a threonine at position 790, a pharmaceutical composition comprising an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the T790M EGFR mutant.

190.    The applicants argued that the pending claims were not obvious over Kobayashi in view of Discafani and in view of Freeman, or further in view of Rabindran. July 28,

2017 Response to Office Action at 3. The applicants asserted that Kobayashi included an "open-ended inquiry" as to the cause of CL-387,785's sensitivity for the T790M mutation and does not address whether administering an irreversible inhibitor would, much less could, be effective in treating patient having gefitinib and/or erlotinib resistant non-small cell lung cancer. July 28, 2017 Response to Office Action at 4. With respect to Discafani, the applicants argued that Discafani is not directed towards irreversible inhibition of EGFR *mutants*, and does not teach a method of treating gefitinib and or erlotinib resistant non-small cell lung cancer. July 28, 2017 Response to Office Action at 5. The applicants finally argued that Freeman does not suggest the claimed method because it does not suggest the use of irreversible inhibitors as recited in the pending claims.

191.    On August 14, 2017, the examiner interviewed the applicants. Both the examiner and the applicants reiterated their previous positions. August 17, 2017 Applicant-Initiated Interview Summary at 1.

192.    On February 22, 2018, the applicants filed a request for continued examination with another amendment to claim 23, as follows:

> **Claim 23**: A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in EGFR (SEQ ID NO: 1), comprising administering to the patient having a subject a gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in EGFR (SEQ ID No: 1), wherein the mutation is a substitution of a methionine for a threonine at position 790, a pharmaceutical composition comprising a unit dosage of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the T790M EGFR mutant wherein the irreversible EGFR inhibitor is not CL-387,785.

193.    The applicants argued that the claims as amended were not obvious over Kobayashi in view of Discafani, Freeman, or Rabindran. February 22, 2018 Response to Office Action at 3.

████████████████████

194.    On June 8, 2018, the examiner issued a non-final rejection. The examiner found certain claims, including Claim 23, obvious over Rabindran, in view of Freeman, Kobayashi, and Discafani. June 8, 2018 Non-Final Rejection at 4. The examiner found, in part, that HKI-272 and CL-387,785 were known to be functionally equivalent irreversible inhibitors of EGFR and thus it would have been obvious to combine those references to arrive at the claimed invention. June 8, 2018 Non-Final Rejection at 6–8.

195.    On December 7, 2018, the applicants responded. The applicants argued that the examiner had not met its burden of demonstrating a *prima facie* obviousness case "especially in view of the unpredictability of the art." December 7, 2018 Response to Office Action at 5. In particular, the applicants argued that Kobayashi was indecisive on whether sterics or binding was necessary to inhibit the T790M mutant. December 7, 2018 Response to Office Action at 7–10. The applicants further noted that inhibition of EGFR wild-type was known to be associated with dose limiting adverse events and, because CL-387,785 was 7–8 times more potent against EGFR wild type than the T790M mutant, the POSA would not consider the inhibition profile of CL-387,785 as beneficial. December 7, 2018 Response to Office Action at 10. The applicants also disagreed that CL-387,785 and HKI-272 were functionally equivalent irreversible inhibitors of EGFR T790M mutant. December 7, 2018 Response to Office Action at 10–12.

196.    On February 8, 2019, the examiner issued another non-final rejection. The examiner rejected certain claims as obvious over Agus, as evidenced by Smaill, in view of Pao[15]. February 8, 2019 Non-Final Rejection at 5. The examiner stated that Agus teaches treating resistant cancers with irreversible TKIs EKB-569 and CI-1033. February 8, 2019 Non-Final

---

[15] W. Pao et al., *Acquired Resistance to Lung Adenocarcinomas to Gefitinib or Erlotinib is Associated with a Second Mutation in the EGFR Kinase Domain*, 2 PLOS Medicine 225–35 (2005) (BATES) ("Pao 2005").

████████████████████████████████

Rejection at 6. The examiner further found that Pao teaches that T790M confers resistance over gefitinib or erlotinib, and that it would have been obvious to combine the teachings of Pao and Agus to treat T790M mutation positive non-small cell lung cancers that are resistant to gefitinib or erlotinib treatment. February 8, 2019 Non-Final Rejection at 6.

197.    On May 7, 2019, the applicants responded by adding a specific daily-administered dosage amount, as follows:

> **Claim 23**: A method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in EGFR (SEQ ID NO: 1), comprising administering <u>daily</u> to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in EGFR (SEQ ID No: 1) a pharmaceutical composition comprising a unit dosage of 2–500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the T790M EGFR mutant wherein the irreversible EGFR inhibitor is not CL-387,785.

198.    The applicants argued that Agus teaches weekly/semi-weekly dosing and teaches away from daily dosing. May 7, 2019 Response to Office Action at 5–8.

199.    On June 27, 2019, the examiner issued a non-final rejection. First, the examiner established a priority date of February 2, 2006 based on the '717 PCT application. June 27, 2019 Non-Final Rejection at 5. The examiner again rejected the claims as indefinite, noting that the specification incorrectly refers to SEQ ID NO: 1 as the EGFR protein and SEQ ID NO: 2 as the EGFR nucleotide sequence and the claim recites EGFR (SEQ ID NO: 1), thus it is unclear where the T790M protein mutation would occur in the SEQ ID NO: 1 nucleic acid sequence. June 27, 2019 Non-Final Rejection at 5–7. As for obviousness, the examiner rejected the claims as obvious over Kwak[16] in view of Wissner[17]. June 27, 2019 Non-Final Rejection at 7–9. The

---

[16] Kwak 2005.

[17] US 2005/0059678 (Wissner et al. Mar. 17, 2005).

████████████████████████

examiner stated that Kwak teaches that irreversible inhibitors HKI-272, HKI-357, and EKB-569

inhibit activity of the T790M mutant EGFR in non-small cell lung cancer cell lines and that these

inhibitors bind EGFR via cys773 and cys805 of ERBB2. June 27, 2019 Non-Final Rejection at 7–

9. The examiner further found that Wissner taught the dosing limitation. June 27, 2019 Non-Final

Rejection at 8.

200.    The examiner interviewed the applicants on October 10, 2019.

201.    On October 28, 2019, the applicants responded with yet another claim

amendment amending claim 23 as follows:

> **Claim 23**: A method of treating gefitinib and/or erlotinib resistant
> non-small cell lung cancer having a T790M mutation in <u>SEQ ID
> NO: 1</u> ~~EGFR (SEQ ID NO: 1)~~ in a patient, comprising administering
> daily to the patient having gefitinib and/or erlotinib resistant non-
> small cell lung cancer having a T790M mutation in <u>SEQ ID NO: 1</u>
> ~~EGFR (SEQ ID NO: 1)~~ a pharmaceutical composition comprising a
> unit dosage of 2–500 mg of an irreversible EGFR inhibitor that
> covalently binds to cysteine 773 of the catalytic domain within the
> <u>SEQ ID NO: 1 having a</u> T790M <u>mutation</u>~~EGFR mutant~~ wherein the
> irreversible EGFR inhibitor is not CL-387,785.

202.    The applicants argued that the claims were entitled to priority at least as of

the '989 provisional application. October 28, 2019 Response to Office Action at 5–6.

203.    The examiner issued a notice of allowance on December 30, 2019.

**D.    "Cysteine 773," "Cysteine 805," and the "Ligand-Binding Pocket" of
EGFR/erbB-2**

204.    As explained in paragraphs 130–131 above, claim 1 of the '162 patent and

claims 1 and 3 of the '314 patent and recite that the claimed irreversible EGFR inhibitor must

bind to a "cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M

mutation" ('162 patent, claim 1)" or "cysteine 773 residue in the ligand-binding pocket of erb-

B2" ('314 Patent, claims 1 and 3).

66

███████████████████████████

205.     I understand that Plaintiffs have argued that "[i]n the literature cysteine

797 . . . and cysteine 773 . . . refer to the same cysteine in EGFR, depending on whether the

sequence referred to includes the EGFR signal peptide (a short amino acid sequence translated

from the mRNA.)." Plaintiffs' Supplemental Infringement Contentions at 3 (internal citations

omitted). I have not been asked to provide an opinion on Plaintiffs' position, and do not provide

an opinion on such position. I have analyzed the asserted claims according to the breadth asserted

by Plaintiffs.

206.     As stated in paragraphs 130–131 above, claim 4 of the '162 patent and

claims 1 and 4 of the '314 patent also encompass irreversible EGFR inhibitors that bind to

"cysteine 805 in the ligand-binding pocket of ERBB2" ('162 patent, claim 4) or "cysteine 805

residue in the ligand-binding pocket of erb-B2" ('314 patent, claims 1 and 4). If, as Plaintiffs

assert, the cysteine 773 of EGFR as recited in the claims is equivalent to the cysteine 797 of

EGFR without the leader sequence, then the cysteine 805 of erbB2 is equivalent to cysteine 784

with the leader sequence. I assume, for purposes of providing my opinions, that the asserted

claims encompass an irreversible EGFR inhibitor that covalently binds to the cysteine 784

residue.

207.     As stated above, *see* paragraphs 130–131 above, claim 4 of the '162 patent

and claims 1, 3, and 4 of the '314 patent recite that the claimed irreversible EGFR inhibitor must

bind to the designated cysteine residue in the "ligand-binding pocket of EGFR" ('314 patent,

claims 1 and 3) or the "ligand-binding pocket of" erbB2 ('162 patent, claim 4 and '314 patent,

claims 1 and 4). The specification of the '162 and '314 patents teaches that "EGFR is composed

of three principal domains, namely, **the extracellular domain (ECD), which is glycosylated and**

**contains the ligand-binding pocket with two cysteine-rich regions**; a short transmembrane

domain, and an intracellular domain that has intrinsic tyrosine kinase activity." '162 patent, 2:18–24 (emphasis added). I understand, however, that Plaintiffs have argued that the asserted claims encompass binding to the designated cysteine residues in the *intracellular* domain. *See* Plaintiffs' Supplemental Infringement Contentions at A-7 to A-11, B-9.

208. I understand that another expert has been asked to opine on whether the term "irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2" in claim 4 of the '162 patent, irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR" in claims 1 and 3 of the 314 patent, and "irreversible EGFR inhibitor that covalently binds to cysteine 805 residue in the ligand-binding pocket of erb-B2" in the claims 1 and 4 of the '314 patent are indefinite. I do not offer an opinion on this issue in my report. I have analyzed the asserted claims according to the breadth asserted by Plaintiffs.

209. Put together, I assume for purposes of this report that "irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation" ('162 patent, claim 1) and "irreversible [EGFR] inhibitor covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR" ('314 patent, claim 1) encompass irreversible EGFR inhibitors that bind to cysteine 773/cysteine 797 in the intracellular region of EGFR. I similarly assume, for purposes of this report, that "irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2" ('162 patent, claim 4) and "irreversible EGFR inhibitor covalently binds to cysteine 805 residue in the ligand-binding pocket of erb-B2" ('314 patent, claim 1 and 4) encompasses irreversible EGFR inhibitors that bind to the cysteine 784/cysteine 805 in the intracellular region of erbB2.

████████████████████████████████

IX. **SUMMARY OF OPINIONS**

A. **Priority Date**

210. As I will discuss in further detail below, it is my opinion that the asserted claims are not entitled to claim priority to the '483 or the '989 provisionals. *See* Section X. The asserted claims are not entitled to claim priority to the '483 provisional (filed February 3, 2005) at least because the '483 provisional fails to disclose the T790M mutation or patients having gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* Section X.A. The asserted claims are not entitled to claim priority to the '989 provisional (filed April 15, 2005) at least because the '989 provisionals fails to describe the "daily" dosing limitation and the treatment of patients having gefitinib and/or erlotinib resistant NSCLC who have not previously been treating with gefitinib and/or erlotinib.

B. **Enablement**

211. As I explain in Section XII, the asserted claims are invalid because they are not enabled. The specification of the patents-in-suit fails to enable the POSA to make and use the full scope of the claimed method.

212. As I have described above, the asserted claims are directed to methods of treating a patient having gefitinib and/or erlotinib resistant NSCLC by administering daily any compound that functions as an irreversible EGFR inhibitor and covalently binds to at least one of the designated cysteine residue(s) in a unit dose—a predetermined amount calculated to produce the desired therapeutic effect. *See* Section VI, VIII.A. The number of compounds that potentially function as irreversible EGFR inhibitors and covalently bind to the designated cysteine residues is vast and essentially limitless. *See* Section XII.A.1. The task of determining which of those candidates function as required by the asserted claims—that is, that irreversibly inhibit EGFR and covalently bind to a designated cysteine residue—and determining for any particular candidate the

69

███████████████████████

dose calculated to achieve the desired therapeutic effect is highly challenging, unpredictable, and highly burdensome. *See* Section XII.A.2–XII.A.6. By contrast, the patent specification provides extremely limited guidance, as it describes only three compounds for carrying out the asserted claims, all having similar structure, no working example of the treatment of a patient having gefitinib and/or erlotinib resistant NSCLC is provided, and no guidance is given as to how to determine a unit dose of any irreversible EGFR inhibitor. *See* Section XII.A.5.

### C.      Written Description

213.    As I discuss in further detail below, *see* Section XIII, the asserted claims are also invalid for lack of written description.

214.    The specification fails to describe either irreversible EGFR inhibitors that fall within the claimed method, or a method of treating patients having gefitinib and/or erlotinib resistant NSCLC with a unit dose calculated to achieve the desired therapeutic effect. As such, the POSA would *not* have understood the applicants to have been in possession of either the irreversible EGFR inhibitors that fall within the claims or the claimed method of treating.

### D.      Anticipation

215.    It is my opinion that the asserted claims are invalid because they are anticipated by the prior art. *See* Section XIV. As described in more detail below, the prior art disclosed a method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO: 1 in a patient, comprising administering daily to the patient a pharmaceutical composition comprising a unit dosage of 2-500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation, wherein the irreversible EGFR inhibitor is not CL-387,785. The prior art also disclosed a method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient comprising administering daily to the patient having gefitinib and/or erlotinib

███████████████████████████

resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2.

216.    The asserted claims are also anticipated by the prior use of the irreversible inhibitors CI-1033 and EKB-569 in patients with gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* Section XIV.C.

E.    **Obviousness**

217.    As I explain in Section XV, the asserted claims are also invalid because they are obvious over the prior art. To the extent that the asserted claims are adequately described and enabled by the disclosure of the '162 and '314 patents (which I disagree with), those claims would have been obvious. The POSA would have been motivated to modify the teachings of the prior art references identified in Section XV to arrive at the claimed inventions with a reasonable expectation of success.

218.    The obviousness of the asserted claims is further supported by the simultaneous "invention" of the claimed method by multiple other groups in the industry. *See* Section XV.C.

X.    **PRIORITY DATE**

A.    **The Asserted Claims of the '162 and '314 Patents Are Not Entitled to a Priority Date of February 3, 2005**

219.    The asserted claims of the '162 and '314 patents are not entitled to a priority date of February 3, 2005 (the filing date of the '483 provisional) because the '483 provisional application does not describe: i) the T790M mutation, ii) NSCLC with a T790M mutation, iii) gefitinib and/or erlotinib resistant NSCLC with a T790M mutation, or iv)

███████████████████████████

irreversible EGFR inhibitors as a treatment for gefitinib and/or erlotinib resistant NSCLC with a T790M mutation.

220.    The '162 patent claims a method of treating patients having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation. '162 patent, claim 1. A method of treating patients having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation is also an embodiment of the '314 patent, under Plaintiffs' construction of "gefitinib and/or erlotinib resistant." D.I. 82 at 33 ("The Summary teaches that in one embodiment, the invention provides a method of treating a patient population that has a g/e resistance-conferring mutation in EGFR (the T790M mutation).").

221.    During prosecution of the application that led to the '162 patent, the Examiner concluded that the '483 provisional did *not* support the claims of the '162 patent and therefore the '162 patent was not entitled to claim priority to the '483 provisional. *See, e.g.*, '389 application, August 12, 2016 Non-Final Rejection at 3 ("[A] review of application 60/649,483 does not support . . . the claimed method."); '389 application, January 17, 2017 Final Rejection at 2–3; '389 application, June 8, 2018 Non-Final Rejection at 2–3; '389 application, February 8, 2019 Non-Final Rejection at 2. I have reviewed the applicants' responses to these non-final rejections, and I am not aware that the applicants provided any substantive response to the Examiner's determination that the '162 patent was not entitled to claim priority to the filing date of the '483 provisional. I agree with the Examiner's conclusion that the '483 provisional does not provide support for the claims of the '162 patent. In addition, to the extent that a method of treating patients having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation is an embodiment of the '314 patent under Plaintiffs' construction, it is also my opinion that the '483 provisional does not provide support for the claims of the '314 patent.

███████████████████████████████████

222.     The '483 provisional does not describe the T790M mutation. The only

EGFR mutations described in the '483 provisional are activating mutations associated with

*responsiveness* to treatment with gefitinib and/or erlotinib. *See, e.g.*, '483 provisional, [0064]

("[Gefitinib and erlotinib] . . . induce dramatic clinical responses in non-small cell lung cancers

(NSCLC) harboring activating mutations in the EGFR kinase domain."). The POSA would

understand such mutations to refer to the exon 19 deletion and L858R mutations. The T790M

mutation is not mentioned anywhere in the '483 provisional. *See generally* '483 provisional.

223.     The '483 provisional likewise fails to describe NSCLC with the T790M

mutation, including, in particular, *gefitinib and/or erlotinib resistant* NSCLC with a T790M

mutation. Far from it, the '483 provisional suggests that gefitinib and/or erlotinib resistance is *not*

associated with secondary mutations, like T790M. The applicants looked for, but did not find,

secondary mutations in NSCLC patients or in gefitinib and/or erlotinib resistant cell lines. '483

provisional, [0064] (finding no secondary EGFR mutations in tumor DNA from relapsed gefitinib

responder); '483 provisional, [0064] ("None of the 40 drug resistant clones contained a secondary

EGFR mutation . . . ."); '483 provisional, [0068]. Finding no evidence of secondary mutations in

resistance models, the '483 provisional instead points out that gefitinib resistant cancer cells

exhibited a "significant increase in EGFR internalization." '483 provisional, [0068]. The

applicants then theorize that "resistance to gefitinib emerges rapidly *in vitro* and is associated

with altered receptor trafficking, which may reduce drug binding." '483 application, [0069]. The

POSA would have understood that the '483 provisional contradicts, rather than demonstrates, that

the applicants understood T790M as a mechanism of gefitinib and/or erlotinib resistance in

NSCLC.

████████████████████████████████████████

224.    The POSA would further have understood that the applicants were not in

possession of a method of treating a patient having gefitinib and/or erlotinib resistant NSCLC

with a T790M mutation. The '483 provisional reports only *in vitro* data, and particularly *in vitro*

data on the effects of irreversible EGFR inhibitors in NSCLC *without* a secondary mutation such

as T790M. The '483 provisional does not provide any evidence that an irreversible EGFR

inhibitor may be useful in a method of treating a patient having gefitinib and/or erlotinib resistant

NSCLC with a T790M mutation.

225.    Indeed, internal documents, email correspondence and testimony from the

applicants appears to confirm that they were *not* in possession of the claimed methods of treating

as of the February 3, 2005 filing date. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

 R. Sordella, *Gefitinib-Sensitizing EGFR Mutations in Lung Cancer Activate Anti-Apoptotic Pathways*, 305 Science 1163 (2004) (identifying the H1975 cell line as gefitinib sensitive).

226.    It appears that the applicants added information relating to testing irreversible EGFR inhibitors in cancer cell lines with the T790M mutation to the application *after* learning from published literature that such cell lines were associated with gefitinib and/or erlotinib resistance. S. Kobayashi et al., EGFR *Mutation and Resistance of Non-Small-Cell Lung Cancer to Gefitinib*, N Engl. J. Med. 786–792 (2005) ("Kobayashi NEJM 2005").

227.    The applicants' second provisional application—the '989 provisional, filed on April 15, 2005—mentions T790M for the first time.

■■■■■■■■■■

B.    **The Asserted Claims of the '162 and '314 Patents Are Not Entitled to a Priority Date of April 15, 2005**

228.    The asserted claims of the '162 and '314 patents are also not entitled to a priority date of April 15, 2005 (the filing date of the '989 provisional) for at least two separate reasons, discussed below in Sections X.B.1 and X.B.2. The earliest priority date to which the asserted claims of the '162 and '314 patents are entitled is February 2, 2006, which is the filing date of the '717 PCT.

229.    Under Plaintiffs' construction of "gefitinib and/or erlotinib resistant [NSCLC]" (D.I 82 at 32–36) *neither* of the provisional applications—the '483 provisional (filed February 3, 2005) or the '989 provisional(filed April 15, 2005)—describe or enable the "method of treating gefitinib and/or erlotinib resistant NSCLC" required by each of the asserted claims. D.I. 82 at 33. The '483 and '989 provisionals also fail to describe daily administration of irreversible EGFR inhibitors, which is required by each of the asserted claims.

1.    **The '483 and '989 provisionals do not describe or enable a method of treating gefitinib and/or erlotinib resistant NSCLC.**

230.    I understand that Plaintiffs have argued that the plain and ordinary meaning of "gefitinib and /or erlotinib resistant NSCLC" is "NSCLC that will not respond to gefitinib and/or erlotinib treatment, including NSCLC that is no longer responding to gefitinib / erlotinib treatment after a period of initial response." D.I 82 at 32–33. Neither the '483 provisional nor the '989 provisional describe resistance to gefitinib and/or erlotinib *prior to treatment* with gefitinib and/or erlotinib, nor do the provisionals enable a method of treating patients having resistant NSCLC *prior to treatment* with gefitinib and/or erlotinib.

231.    The '483 provisional does not provide any examples of patients having primary resistance to gefitinib and/or erlotinib—that is, resistance to gefitinib and/or erlotinib prior to any treatment with gefitinib and/or erlotinib. While the '483 provisional states that

76

patients may not respond to EGFR-TKIs to any measurable degree, it does not identify a single patient having primary resistance. The lone example in the specification describes "relapsed" gefitinib responders, *i.e.*, patients who developed resistance to gefitinib *after* responding to gefitinib. '483 provisional, [0064].

232.     The '989 provisional similarly fails to provide any examples of patients having primary resistance to gefitinib and/or erlotinib. Like the '483 provisional, the '989 provisional refers only to "relapsed" gefitinib responders, and does not identify a single patient having primary resistance. '989 provisional, [0064].

233.     The Kwak manuscript appended to the '989 provisional similarly lacks any discussion of, or examples of, patients having primary resistance to gefitinib and/or erlotinib. The Kwak manuscript mentions, in concluding remarks, that HKI-272 is in clinical studies to determine whether it "potentially induces longer lasting responses in untreated patients," but it does not suggest or characterize the "untreated patients" as resistant patients. '989 provisional, 37–38.

234.     While the Kwak manuscript discusses the T790M mutation, it does not describe any patients having primary resistance to gefitinib and/or erlotinib, or otherwise associate the T790M mutation with such primary resistance. In fact, the Kwak manuscript repeatedly refers to T790M as a mechanism of *acquired* resistance. '989 provisional at 25 (stating that T790M is found in "some recurrent tumors"); *id.* at 27 (explaining that the T790M mutation appears to contribute to "acquired resistance" and describing T790M as an "acquired mutation"). The Kwak manuscript *only* mentions gefitinib and/or erlotinib resistance in reference to cancer cell lines with T790M that had been treated with gefitinib and/or erlotinib. *See* '989 provisional at 35.

███████████████████████████████

235. It was not until the February 2, 2006 filing of the '717 PCT that the applicants first stated that cancers may be diagnosed as gefitinib and/or erlotinib resistant "prior to initiation of treatment with such compounds." '717 PCT, [0035]. The '717 PCT adds that some patients harbor "mutations indicative of gefitinib and/or erlotinib resistance," such as the T790M mutation. '717 PCT, [0037]. While this description in the '717 PCT is wholly insufficient to describe or enable a method of treating patients having gefitinib and/or erlotinib resistant NSCLC, it is at least *necessary* to describe and enable the claimed method.

2. **The '483 and '989 provisionals do not describe or enable daily administration of irreversible EGFR inhibitors.**

236. The '483 and '989 provisionals also fail to describe the scope of the asserted claims because they fail to disclose "daily" administration of an irreversible EGFR inhibitor.

237. Each of the asserted claims of the '162 and '314 patents require daily administration of an irreversible EGFR inhibitor. *See* '162 patent, claim 1; '314 patent, claim 1. The '483 and '989 provisionals, however, nowhere describe daily administration of an irreversible EGFR inhibitor. The applicants did not limit the claimed method to daily administration limitation until nearly 15 years *after* the filing dates of the '483 and '989 provisionals. The daily administration claim limitation was apparently added in an effort to overcome the Examiner's rejections of the pending claims as obvious over Agus 2003. '474 application, August 14, 2019 Amendment and Response, Claim 29; *id.* at 6–8 (arguing that Agus 2003 taught away from daily dosing of irreversible inhibitors); '349 application, May 7, 2019 Amendment and Response, Claim 23; *id.* at 5–8. Indeed, prior to the applicants' 2019 amendments to the pending claims to add the "daily administration" limitation, the Examiner repeatedly noted during prosecution of the '162 and '314 patents that the pending claims were *not*

78

████████████████████

limited to any particular dose and that the claims overlapped with prior art disclosing weekly or semi-weekly administration of irreversible inhibitors. '474 application, March 28, 2017 Final Rejection at 8; June 14, 2018 Non-Final Rejection at 9 ("The claims encompass treating any of gefitinib and/or erlotinib resistant non-small cell lung cancer with <u>any</u> unit dosage of <u>any</u> irreversible epidermal growth factor (EGFR) inhibitor . . . ."); August 16, 2017 Advisory Action.

238.    Indeed, the '483 and '989 provisionals as-filed on February 3, 2005 and April 15, 2005, respectively, lack any *mention* of daily administration of irreversible EGFR inhibitors. Rather, the specifications explain that timing of administration depends on several factors including "the subject to be treated, capacity of the subject's system to utilize the active ingredient, and degree of therapeutic effect." '483 provisional, [0040]; '989 provisional, [0040]. It was not until filing the '717 PCT application on February 2, 2006, that the applicants finally stated that "in general, satisfactory results are obtained when the compounds of the invention are administered at a daily dosage of from about 0.5 to about 1000 mg/kg of body weight . . . ." '717 PCT, [0039].

239.    The *only* reference to daily administration in either the '483 or '989 provisionals is in connection with administration of gefitinib and/or erlotinib. '483 provisional, [009]; '989 provisional, [009]. Such reference to gefitinib and/or erlotinib, which were well-known reversible EGFR inhibitors (*see* Section VII), would not have described or enabled daily administration of *irreversible* EGFR inhibitors, which operate by a different mechanism. In particular, the POSA may not have expected that daily administration of irreversible EGFR inhibitors would be necessary, since the POSA would have known that such inhibitors permanently inactive cells until new EGFR is generated. In addition, the POSA would have understood that covalent inhibitors presented significant toxicity concerns and, due to their

mechanism of action, patients may not be able to tolerate daily dosing. In any event, the POSA

would have understood that a variety of dosing schedules were available for cancer therapies,

including weekly or sporadic dosing. Episodic dosing was customary for other cytotoxic agents to

balance toxicity and efficacy. D. Hanahan et al, *Less is more, regularly: metronomic dosing of

cytotoxic drugs can target tumor angiogenesis in mice*, 105(8) The Journal of Clinical Medicine

1045–47 (2000) ("Hanahan 2000").

XI.    **SELECTED PRIOR ART REFERENCES**

A.    **Agus 2003**

240.    International Patent Publication No. WO 2003/103676 ("Agus 2003") was

published on December 18, 2003 and is therefore available as prior art to both the '314 and '162

patents. *See* Section X, above. Agus 2003 is titled "Method of Treating Cancer Using Kinase

Inhibitors." Agus 2003 at 1.

241.    Agus 2003 discloses that IRESSA (gefitinib) and TARCEVA (erlotinib)

are indicated for administration in a "daily regimen" for the treatment of cancer at dosages

intended to block activation of EGFR. Agus 2003, 5:16–18. However, Agus 2003 explains that

patients frequently develop resistance to gefitinib and erlotinib. Agus 2003, 1:18–19. Agus 2003

thus discloses, and claims, a method of treating cancer, including lung cancer, resistant to

conventional tyrosine kinase inhibitors, such as gefitinib and erlotinib. Agus 2003, 1:3–6, 3:4–6

("Embodiments of the present invention provide a therapy for the treatment of disease conditions,

such as cancer, and, **in particular, for the treatment of cancer in individuals who have

developed a resistance to conventional TKI therapy or who are not responsive thereto** *ab

initio***.**") (emphasis added); 6:25–27 ("In particular embodiments, a once- or twice-weekly

increased dosage of a TKI may be effective in treating cancer, and especially **lung** . . . cancer, in

an individual who is resistant to conventional TKI therapy.") (emphasis added), Claim 12.

80

██████████████████████████████████████

242.     Agus 2003 claims a method of treating resistant cancer, including lung cancer, by administering a "resistance-surmounting quantity" of the kinase inhibitor to the patient, ranging from 500 mg to 3,000 mg. *Id.*, Claim 1, Claim 12.

243.     Agus 2003 hypothesizes that the claimed method may be beneficial to patients with resistant cancer because, under the claimed method, HER-2 kinase is inhibited as well." *Id.*, 6:18–20. For example, Agus 2003 states that "it is believed that higher weekly doses inhibit both HER-2 kinase as well as EGFR, or HER-1 kinase; whereas conventional dosing only inhibits HER-1 kinase." *Id.*, 6, 10–15 ("Since it is further believed that the co-stimulatory effect (i.e., heterodimerization) of the HER-2 kinase with another member of the kinase family (*e.g.*, HER-1, HER-3 or HER-4) is required for simulation of cell signaling pathways responsible for cell proliferation, it is also believed that the additional inhibition of the HER-2 kinase by the variant dosing regimen of the present invention is effective in inhibiting or downregulating this cell signaling."). Thus, in some claims, the "resistance-surmounting quantity" is an amount sufficient to block HER-2 kinase in the patient." *Id.*, Claim 8.

244.     Agus 2003 also claims the "oral[]" administration of TKIs. *Id.*, Claim 11.

245.     Agus 2003 discloses CI-1033 and EKB-569 as TKIs for use in the claimed method. Agus 2003, 7:1–5. Agus 2003 notes that both inhibitors have been tested in clinical studies. *Id.*, 7:6–7.

**B.     Allen 2003**

246.     Allen et al., *CI-1033, an Irreversible pan-erbB Receptor Inhibitor and its Potential Application for the Treatment of Breast Cancer*, 30(5) Seminars in Oncology 65–78 (2003) ("Allen 2003") is dated October 2003 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Allen 2003 was not before the examiner during prosecution of the '314 or '162 patents.

███████████████████████████

247.     Allen 2003 discloses preclinical and Phase I clinical studies of CI-1033. It explains that CI-1033 is an "irreversible, pan-erbB tyrosine kinase inhibitor" that is "brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 and 778 in erbB-2 and -4, respectively)," which "facilitates the rapid formation of a covalent bond." Allen 2003 at 70.

248.     Allen 2003 explains that tyrosine kinase inhibitors have been used in cancer therapy. Allen 2003 at 70. According to Allen 2003, CI-1033's ability to block multiple erbB receptors "could provide CI-1033 with greater efficacy and a broader spectrum of antitumor activity than inhibitors that target one of the erbB family members." Allen 1003 at 71. Allen 2003 states that there is "evidence to suggest . . . that co-expression of erbB-2 receptors with either erbB-1 or erbB-3 receptors results in the development of enhanced drug resistance." *Id.* at 70 ("The potential to develop drug resistance to selective erbB inhibitors exists in tumors that overexpress multiple erbB receptor subtypes because of continued activation of erbB signaling through one of the other erbB family members not inhibited by the drug.").

249.     Allen 2003 also explains that, in preclinical studies, CI-1033 could "effectively inhibit mutant erbB receptors (eg, EGFRvIII)" and was shown to inhibit EGFRvIII expressed in breast tumors. Allen 2003 at 71. As reported in Allen 2003, EGFRvIII is also found in patients with NSCLC. *Id.*

250.     Allen 2003 reports that oral CI-1033 had been studied in "several phase I studies" to "determine the dose-limiting toxicities, maximum tolerated dose, and effects of CI-1033 on tumor growth and biomarkers at a variety of doses and dosing schedules . . . ." Allen 2003 at 72. These studies included more than 250 cancer patients, including particularly patients with colon cancer, non-small cell lung cancer, head and neck cancer, and breast cancers. *Id.* Some patients in these studies received daily doses of 2 mg/day to 1,000 mg CI-1033. *Id.*

251.    Allen 2003 concludes that the phase I studies showed CI-1033 had "antitumor activity" and an "acceptable side effect profile." Allen 2003 at 74–75 ("CI-1033 is expected to have clinical activity in solid tumors that either overexpress one erbB receptor family member, co-express multiple members of the erbB family, or express constitutively activated, mutated forms of these receptors."). For example, tumor biopsies of some phase I patients "showed the ability of CI-1033 to inhibit tumor erbB-1 phosphorylation by 40% to 50% after 7 days treatment with doses from 50 to 450 mg/d." *Id* at 73. "Further evidence of antitumor activity in phase I studies was suggested by the frequency of stable disease in patients with non-small cell lung cancer who were dosed daily for 7 days and then given 14 days off." *Id* at 74.

C.    **Calvo 2004**

252.    Calvo et al., *Administration of CI-1033, an Irreversible Pan-erbB Tyrosine Kinase Inhibitor, is Feasible on a 7-day On, 7-Day Off Schedule: A Phase I Pharmacokinetic and Food Effect Study*, 10 Clin. Canc. Res. 7112-7120 (2004) ("Calvo 2004") is dated November 1, 2004 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Calvo 2004 was not before the examiner during prosecution of the '314 or '162 patents.

253.    Calvo 2004 discloses a Phase I clinical study of CI-1033. It describes CI-1033 as an "oral 4-anilinoquinazoline that irreversibly inhibits the tyrosine kinase domain of all erbB subfamilies . . . ." Calvo 2004 at 7112. Calvo 2004 further explains that "[w]hen bound into the ATP pocket, the acrylamide side-chain at C6 of CI-1033 is brought into close proximity with cysteine 773 of erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4, respectively), which facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically active erbB1, erbB2, and erbB4 family members and effectively blocks erbB3-dependent signaling . . . ." *Id.* at 7113.

83

254.     Calvo 2004 states that CI-1033's function as an irreversible inhibitor "may afford a greater therapeutic advantage relative to other erbB TK inhibitors, which have reversible actions and target one specific erbB subfamily." *Id.* For example, Calvo 2004 also states that CI-1033's covalent bonding "results in more prolonged suppression of erbB activity compared with reversible inhibitors in preclinical studies." *Id.* at 7113, 7118 ("It was felt that irreversible inhibitors might be more advantageous than reversible inhibitors in permanently eliminating existing receptor TK activity that would regenerate only when new receptors are synthesized."). Calvo 2004 also emphasizes CI-1033's "unique mechanistic features" as an " irreversible pan-erbB inhibitor." *Id.* at 7113, 7118 ("Another major impetus for developing CI-1033 is its potential to irreversibly bind to the ATP-binding pocket of all erbB TKs, thereby inhibiting activation, cross-activation, and downstream signaling emanating from erbB1, erbB2, erbB3, and erbB4.").

255.     According to Calvo 2004, CI-1033 was selected for clinical trials "based on both *in vitro* and *in vivo* evidence that the antitumor activity of erbB-targeted therapeutics is maximum after prolonged suppression of the receptor TK activity." *Id.* at 7118. Calvo 2004 thus reports the results from a phase I clinical study in patients with advanced solid malignancies, including patients with NSCLC. *Id.* at 7115 (Table 1). In this study, patients were administered daily, oral administrations of 250 mg or 300 mg of CI-1033. *Id.* at 7114–15. Calvo 2004 concludes that the results of the phase I and pharmacological study "indicate that daily oral treatment with CI-1033 on a 7-day-on, 7-day-off schedule is well tolerated." *Id.* at 7119.

**D.     Carter 2005**

256.     T. Carter et al., *Inhibition of drug-resistant mutants of ABL, KIT, and EGF receptor kinases*, 102(31) PNAS 11011–16 (2005) ("Carter 2005") is dated August 2005 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Carter 2005 was not before the examiner during prosecution of the '314 or '162 patents.

███████████████████████████████

257.     Carter 2005 describes inhibition of drug resistant mutant receptor kinases. With respect to EGFR, Carter 2005 discloses that resistance mutations have been observed in EGFR in patients treated with gefitinib and erlotinib. Carter 2005 at 11011. Carter 2005 particularly discloses the T790M mutation as a drug-resistant mutation. *Id.* at 11011, 11014. Carter 2005 thus notes that it is important to develop "alternative compounds that will be effective against mutated targets resistant to first-line inhibitors." *Id.* at 11011.

258.     Carter 2005 tested 47 kinase inhibitors in a double-mutant form of EGFR (L858R/T790M, H1975) for the ability to inhibit proliferation. *Id.* at 11014. Carter 2005 identified three compounds with a significant effect on proliferation: CL-387,785, EKB-569, and CI-1033. *Id.* at 11014 ("CL-387785, EKB-569, and CI-1033 were >100-fold more effective at inhibiting H1975 growth than gefitinib . . . or erlotinib . . . with $IC_{50}$ . . . ."). Carter 2005 discloses that CL-387785, EKB-569, and CI-1033 were the only tested compounds "known to inhibit EGFR irreversibly." *Id.* at 11016. Carter 2005 also discloses HKI-272, a "close derivative of EKB-569" with "potent activity against both EGFR and ERBB2," stating that HKI-272 is "also an irreversible inhibitor and may therefore inhibit EGFR with the T790M mutation." *Id.* at 11016.

259.     Carter 2005 notes that EKB-569 and CI-033 have completed phase I clinical trials for NSCLC, and hypothesizes that "[t]he finding that EGFR inhibitors already in clinical trials can inhibit EGFR (L858R/T790M) suggests that refractory or relapsed patients with the T790M mutation may benefit from treatment with EKB-569 or CI-1033." *Id.* at 11014, 11016. Carter 2005 cautions, however, that "the compounds [they] identified must be tested further in additional cell and animal models, and their utility in the clinic explored . . . ." *Id.* at 11016.

### E.     Cockerill 2002

260.     G.S. Cockerill & K.E. Lackey, *Small Molecule Inhibitors of the Class 1 Receptor Tyrosine Kinase Family*, 2 Current Topics in Medicinal Chem. 1001–1010 (2002)

████████████████████████

("Cockerill 2002") is dated October 2002 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Cockerill 2002 was not before the examiner during prosecution of the '314 or '162 patents.

261.    Cockerill 2002 reviews emerging strategies in the development of tyrosine kinase inhibitors. Cockerill 2002 at 1001. In particular, Cockerill 2002 highlights "irreversible TK inhibition." *Id.* Cockerill 2002 also explains that the "complexity of the homo- and heterodimerization [*sic*] may make a pan-erbB family or dual erbB2/EGFR tyrosine kinase inhibitor a more efficacious approach." Cockerill 2002 at 1002. Cockerill 2002 explains that the "tyrosine kinase domain of EGFR and erbB2 are 82% homologous based on amino acid sequence." *Id.*

262.    Cockerill 2002 discloses four irreversible inhibitors—CI-1033, CL-387785, EKB-569, and an unnamed inhibitor by Boehringer Ingelheim. *Id.* at 1004 (Table 2), 1006-07. Cockerill 2002 discloses that CI-1033 showed "rapid and irreversible inhibition of the EGFR kinase." *Id.* at 1006. Cockerill 2002 further discloses that CI-1033 was "highly effective in vivo . . . at oral doses of 60 to 100 mg/kg, thereby causing a delay of tumor regrowth compared to reversible inhibitors." *Id.* at 1006. Cockerill 2002 also disclosed that significant responses to CI-1033 were observed in NSCLC specimens, and that, in September 2001, CI-1033 was reported to be in Phase II trials.

263.    Cockerill 2002 further notes that CL-387,785 was "undergoing preclinical investigation of . . . cancers" and EKB-569 was in phase I development for colon cancer. *Id.* at 1006-7. Cockerill 2002 describes the structure of EKB-569, stating that the compound was an "interesting modification in the Class 1 RTK inhibitor field with the concepts of irreversibility

███████████████████████████████

and amine solubilising functionality (at low pH at least) being incorporated at the 6 position, into a cyanoquinoline template." *Id.* at 1007.

264.     Cockerill 2002 also explains that "small changes in kinase inhibitor structure do result in dramatic selectivity and potency differences," and therefore molecules that appear similar in structure may have different effectiveness "due to their inhibition profiles, drug properties, and dosing properties." Cockerill 2002 at 1004.

### F.     Dancey 2004

265.     J. Dancey, *Epidermal Growth Factor Receptor Inhibitors in Clinical Development*, 58(3) Int. J. Radiation Oncology Bio. Phys. 1003-1007 (2004) ("Dancey 2004") is dated November 2004 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Dancey 2004 was not before the examiner during prosecution of the '314 or '162 patents.

266.     Dancey 2004 reports EGFR inhibitors in clinical development, including irreversible inhibitors CI-1033 (Phase I-II) and EKB-569 (Phase I). Dancey 2004 at 1003, Table 1. Dancey 2004 notes that "CI-1033 is of interest, because it is not only an irreversible inhibitor that covalently binds to a cysteine residue near the adenosine triphosphate binding site of the EGFR, but also inhibits EGFR, Her2, and Her4." *Id.* at 1003–04. Dancey 2004 cautions, however, that "[w]hether irreversible inhibition will result in an improved therapeutic index or will remove the requirement for continuous dosing requires additional clinical study." *Id.* at 1004.

267.     Dancey 2004 also reports that "[a]lthough interesting single-agent antitumor effects have been seen in preclinical studies, the most promising laboratory data have been from combining these targeted inhibitors with standard chemotherapy or radiotherapy (RT)." *Id*. at 1004.

### G.     Denny 2002

████████████████████████████

268. Denny, *Irreversible Inhibitors of the erbB family of protein tyrosine kinases*, 9 Pharmacology and Therapeutics 253 (2002) ("Denny 2002") is dated in 2002 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Denny 2002 was not before the examiner during prosecution of the '314 or '162 patents.

269. Denny 2002 discusses the development of reversible inhibitors, including anilinoquinazolines like gefitinib. Denny 2002 also discusses the development of irreversible EGFR inhibitors, "sparked by the observation that the erbB family of enzymes contains a unique Cys residue (Cys773) close to the entrance to the ATP binding site." Denny 2002 at 255–56. Denny 2002 explains that the 4-anilinoquinazolines were "seen as suitable templates from which to append substituents designed to also target this erbB-specific Cys residue."

270. In describing the development of irreversible inhibitors, Denny 2002 highlights extensive work done to identify the appropriate placement for alkylating agents and the options for alkylating agents. Denny 2002 at 255–57. Denny 2002 also notes that "previous work with reversible inhibitors showed that solubising side chains were necessary to achieve the necessary physicochemical properties . . . ." Denny 2002 at 257.

271. Denny 2002 discloses the irreversible inhibitor CI-1033, which was "shown to alklylate selectively at Cys773" and was developed as a clinical agent. *Id.* at 258. Denny 2002 reports that CI-1033 "demonstrated long-term cytostatic activity in A431 xenographs on oral dosing at 2.5 mg/kg/day, and long-lasting regressions at 5 mg/kg/day." *Id.* Denny 2002 also provides the interim reports from two Phase I clinical trials of orally-dosed CI-1033. "Both studies report that the drug is well tolerated . . . and that CI-1033 holds promise as a novel anticancer agent." *Id.* at 259.

████████████████████████████

272.     Denny 2002 compares CI-1033 to another irreversible inhibitor

(Compound 32), a pyrimidopyridine, that was also "shown to alkylate selectively at Cys 773," but

"was much less effective," with "greater amide instability and acrylamide reactivity." *Id.* at 258.

273.     Denny 2002 also discloses that CI-1033 can "synergise with a variety of

other anticancer drugs" and was "synergistic with . . . ionizing radiation." *Id.*

**H.     Discafini 1999**

274.     C. Discafani et al., *Irreversible Inhibition of Epidermal Growth Factor

Receptor Tyrosine Kinase with In Vivo Activity by N-[4-[(3-Bromophenyl)amino]-6-

quinazolinyl]-2-butynamide (CL-387,785)*, 57 BIOCHEMICAL PHARMACOLOGY 917 917–925

(1999) ("Discafani 1999") is dated in 1999 and is therefore available as prior art to both the '314

and '162 Patents-in-Suit. *See* Section X, above.

275.     Discafani 1999 discloses the use of an irreversible inhibitor CL-387,785

for the treatment of tumors, including tumors of the lung, that are caused by overexpression of

EGFR. Discafani explains that one approach for treatment of such cancers is the use of "small

molecules that inhibit the tyrosine kinase activity in these receptors." Discafani 1999 at 917.

276.     Discafani 1999 discusses molecules that are "potent inhibitors of EGF-R"

and whose inhibitor action is "mediated, in part, by competition of ATP with the kinase domain

of EGF-R." *Id.* at 918. Discafani 1999 states that example competitive inhibitors "have good

activity in tissue culture" but only one inhibited the growth of tumors *in vivo. Id.* Accordingly,

Discafani 1999 "attempted to develop irreversible inhibitors in which the action of the drug would

be sustained after the drug was cleared from plasma or tumor." *Id.* at 918. Discafani 1999 states

that "irreversible inhibitors of EGF-R may be advantageous, since the drug will sustain its

inhibitory effect on EGF-R even after the drug is cleared." *Id.* at 924.

277.     In particular, Discafani 1999 discloses CL-387,785, a "novel irreversible inhibitor of EGF-R with *in vivo* activity." *Id.* at 918. Discafani 1999 explains that CL-387,785 "alkylates Cys773, which is located in the ATP binding region of the protein." *Id.* at 920 (Figure 1), 923.  Discafani 1999 also states that it is "likely that CL-387,785 inhibits c-*erb*B-2." *Id.* at 923. "The cysteine residue in the kinase domain . . . is unique to EGF-R and c-erbB-2 and would explain, in part, why CL-387,785 selectively interacts with these two tyrosine kinases." *Id.*

**I.     Grünwald 2003**

278.     V. Grünwald & M. Hidalgo, *Developing Inhibitors of the Epidermal Growth Factor Receptor for Cancer Treatment*, 95 J. Nat'l Cancer Institute 851–867(June 18, 2003) ("Grünwald 2003") was published on June 18, 2002 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

279.     Grünwald 2003 discloses the use of small-molecule inhibitors for the treatment of cancer, including NSCLC. Grünwald 2003 at 856–57. Grünwald 2003 particularly discloses that ""[v]ariant forms of EGFR that contain mutations in the extracellular domain have recently been described" including "EGFR variant III (EGFRvIII)" which has been "detected in . . . non-small-cell lung . . . cancers." *Id.* at 852.

280.     Grünwald 2003 states that small-molecule inhibitors of the intracellular TK domain of the receptor can be used to target EGFR. *Id.* at 853. Grünwald 2003 notes "early studies us[ed] naturally occurring small molecules that inhibited the TK moiety of EGFR *in vitro*," but "the *in vivo* antitumor effects of those agents were limited." *Id.* at 854.

281.     Grünwald 2003 discloses CI-1033 and EKB-569 as specific inhibitors of the EGF family that had entered clinical studies. *Id.* Grünwald 2003 discloses that in one Phase I study, CI-1033 was administered to patients with NSCLC in doses of 50–750 mg daily for 10 days, and in another Phase I study, CI 1-033 was administered in doses of 100–560 mg weekly.

90

████████████████████████

*Id.* at 856–57 (Table 1). Grünwald 2003 further discloses that EKB-569 was administered to patients with NSCLC in doses of 25–125 mg daily. *Id.*

### J.      Hidalgo 2002

282.     M. Hidalgo et al., *Phase 1 trial of EKB-569, an irreversible inhibitor of the epidermal growth factor receptor (EGFR), in patients with advanced solid tumors*, 21 Proceedings of ASCO 17a 63–66 (2002) ("Hidalgo 2002") is dated in 2002 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

283.     Hidalgo 2002 is a published poster abstract from the American Society of Clinical Oncology proceedings in 2002. Hidalgo 2002 reports on a phase I trial of EKB-569, a "potent, selective, low molecular weight, irreversible inhibitor of the EGFR tyrosine kinase." Hidalgo 2002 at 65. Hidalgo 2002 explains that EKB-569 "inhibits the growth of tumor cells that overexpress EGFR or HER2 in vitro and in vivo." *Id.* Hidalgo 2002 also states that EKB-569 was administered to patients with advanced stage cancers, including non-small cell lung cancer, orally, once daily for 14 days. *Id.* Patients received dosages of 25 mg, 50 mg, 75 mg, and 125 mg. *Id.* Hidalgo 2002 concludes that EKB-569 was generally well tolerated, with an acceptable PK and safety profile, and offers a promising targeted approach to the treatment of solid tumors." *Id.*

### K.      Kobayashi NEJM 2005

284.     Kobayashi NEJM 2005 is dated February 24, 2005 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

285.     Kobayashi NEJM 2005 discloses the T790M mutation as a mechanism of gefitinib resistance in NSCLC. Kobayashi NEJM 2005 notes that although some patients respond to ATP-competitive anilinoquinazoline inhibitors, "it appears that all cases eventually progress despite such treatment." Kobayashi NEJM 2005 at 786. Kobayashi NEJM 2005 performed genomic DNA sequencing on tumor specimens from a patient with adenocarcinoma of the lung

███████████████████████

who responded to gefitinib treatment, and later experience disease progression. *Id.* at 787.

Sequencing revealed the T790M mutation in a biopsy tumor biopsy following the patient's

relapse. *Id.* at 788–89. Kobayashi NEJM 2005 hypothesized that the T790M would "lead to

a . . . steric clash with the gefitinib molecule." *Id.* at 789. Kobayashi NEJM 2005 also developed

cell constructs with the T790M mutation, finding that all four constructs "demonstrated high-level

resistance." *Id.* at 789–91.

286.    Kobayashi NEJM 2005 further discloses that an irreversible EGFR

inhibitor—CL-387,785—could effectively inhibit EGFR with the T790M mutation. Kobayashi

NEJM 2005 at 789–90 ("[T]he corresponding T790M mutation of EGFR does not seem to confer

such universal resistance, given the fact that in the context of the delL747–S752 mutation, it can

effectively be inhibited by CL-387,785."). Kobayashi NEJM 2005 explains that CL-387,785 was

a "specific and irreversible anilinoquinazoline EGFR inhibitor." *Id.* at 790. Kobayashi NEJM

2005 suggests that "[t]he sensitivity of the delL747–S752+T790M construct to CL-387,785 might

be explained by either its altered binding to the kinase domain or its covalent binding to EGFR."

*Id.*

287.    Kobayashi NEJM 2005 concludes that these findings should "motivate the

development of alternative EGFR inhibitors," including specifically "second-line EGFR-inhibitor

therapy." *Id.* at 791.

**L.    Kwak 2005**

288.    E. Kwak, et al., *Irreversible inhibitors of the EGF receptor may

circumvent acquired resistance to gefitinib*, 102 PNAS 7665–70 (2005) ("Kwak 2005") is dated

May 25, 2005 and is therefore available as prior art to both the '314 and '162 patents. *See* Section

X, above.

███████████████████████████████████

289.     Kwak 2005 discusses the use of irreversible EGFR inhibitors for gefitinib and/or erlotinib resistant NSCLC. Kwak 2005 notes that mechanisms of acquired resistance to gefitinib and erlotinib are "not well understood." Kwak 2005 at 7665 ("[M]echanisms underlying treatment failure in cases lacking secondary EGFR mutations remain unexplained."). Kwak 2005 states that the secondary T790M had been reported in some cases of recurrent disease after gefitinib and/or erlotinib therapy, and *in vitro* studies of the T790M mutation showed reduced inhibition by gefitinib and erlotinib. *Id.*

290.     Kwak 2005 states that "multiple resistance mechanisms can coexist in recurrent tumors after an initial response to gefitinib or similar reversible *EGFR* inhibitors." Kwak 2005 at 7669. For example, Kwak 2005 discloses that, when present, the T790M is "only present in a subset of the resistant tumor cells" and discloses an *in vitro* model of acquired gefitinib resistance in which T790M was not observed. *Id.* at 7665, 7667. Kwak 2005 also discuss two patients with recurrent gefitinib-resistant NSCLC, wherein T790M was observed in only a fraction of recurrent tumors, and a fraction of cells within the recurrent tumors. *Id.* at 7667.

291.     Kwak 2005 describes the generation of gefitinib-resistant cell lines *in vitro*. *Id.* Forty-nine drug-resistant clones were generated, none had acquired a secondary EGFR mutation. *Id.* Kwak 2005 states that the gefitinib-resistant clones "displayed persistent sensitivity" to HKI-272, HKI-357, and EKB-569. *Id.* at 7668. "All three drugs are irreversible inhibitors, most likely via a covalent bond with the cys773 residue within the EGFR catalytic domain or the cys805 of ERBB2." *Id.* at 7668. Kwak 2005 further reported that gefitinib-resistant cells demonstrated "a consistent increase in EGFR internalization" which might compromise gefitinib's ability to inhibit EGFR activation. *Id.* at 7669–70.

███████████████████████

292.　　Kwak 2005 also discusses inhibition of cells with the T790M mutation by irreversible inhibitors. Using the NCI-H1975 cell line, derived from a patient who had not previously been treated with gefitinib or erlotinib and which harbors both L858R and T790M mutations, Kwak 2005 found that "[b]oth HKI-357 and HKI-272 were considerably more effective than gefitinib in suppressing autophosphorylation and downstream signaling, and suppressed proliferation of the cell line under conditions where it is resistant to gefitinib. *Id.* at 7669.

293.　　Kwak 2005 notes that HKI-272 and EKB-569 have been subjected to Phase I clinical testing. *Id.* at 7669.

## M.　　Learn 2004

294.　　Learn et al., *Resistance to Tyrosine Kinase Inhibition by Mutant Epidermal Growth Factor Receptor Variant III Contributes to the Neoplastic Phenotype of Gliobastoma Multiform*, 10 CLIN. CANCER RESEARCH 3216 (2004) ("Learn 2004") is dated May 2004 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

295.　　Learn 2004 discloses that tumors expressing EGFR variant III (EGFRvIII) are resistant to the EGFR tyrosine kinase inhibitor gefitinib. Learn 2004 at 3216. Learn 2004 demonstrates that even prolonged exposure of EGFRvIII expressing cells to gefitinib is not correlated with "meaningful reductions in DNA synthesis, growth, or invasion promoted by mutant EGFRvIII" and that cells expressing EGFRvIII "demonstrate greater invasive capability with increasing gefitinib concentration when compared with cells expressing EGFR after treatment." *Id.* at 3216, 3222.

296.     Learn 2004 suggests that mutant receptors may be more resistant to inhibition with EGFR TKIs "due to their altered structure and corresponding modification to the active site upon which the drug works." *Id.* at 3221.

297.     Learn 2004 also states that EGFRvIII is the "most frequent mutation" of EGFR. *Id.*

N.     **NCT00266877**

298.     NCT00266877 is clinical study of HKI-272 first posted on clinicaltrials.gov on December 19, 2005, and is therefore available as prior art to both the '314 and '162 Patents-in-Suit. *Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell Lung Cancer*, ClinicalTrials.gov (Dec. 16, 2005), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&tab=history&a=1 ("NCT00266877 2005"), *See* Section X, above. NCT00266877 was not before the examiner during the prosecution of the '314 and '162 patents.

299.     NCT00266877 on clinicaltrials.gov was last updated on April 13, 2018. *Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell Lung Cancer*, ClinicalTrials.gov (April 6, 2018), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&a=18&tab=history ("NCT00266877 2018"). The study is also further described in L.V. Sequist et al., *Neratinib, an Irreversible Pan-ErbB Receptor Tyrosine Kinase Inhibitor: Results of a Phase II Trial in Patients with Advanced Non-Small Cell Lung Cancer*, 28 J. Clin Oncology 3076–3083 (2010) ("Sequist 2010").

300.     NCT00266877 was a Phase II study of HKI-272 in subjects with advanced non-small cell lung cancer, with the purpose to "learn whether HKI-272 was safe and useful in treating non-small cell lung cancer." NCT00266877 2005.

301.     The study originally enrolled 138 participants, *see* NCT00266877 2005, and completed with 172 participants with advanced NSCLC. NCT00266877 2018. The study included two experimental groups comprised of patients whose disease progressed following treatment with gefitinib or erlotinib and who had an EGFR mutation in screening. *See* NCT00266877 2005; NCT00266877 2018; Sequist 2010 at 3076. Patients were administered 320 mg or 240 mg HKI-272 daily by mouth. Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell Lung Cancer, ClinicalTrials.gov (April 13, 2018), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&a=1&tab=table ("NCT00266877 2018 Table View")

**O.     Rabindran 2004**

302.     Rabindran et al., *Antitumor Activity of HKI-272, an Orally Active, Irreversible Inhibitor HER-2 Tyrosine Kinase*, 64 Cancer Res. 3958 (2004) ("Rabindran 2004") was published on June 1, 2004 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

303.     Rabindran 2004 discloses EKB-569, explaining that it is an "irreversible-binding inhibitor of EGFR" and "has been previously shown to form a covalent adduct with EGFR . . . most likely because of the interaction between the Michael acceptor functional group of EKB-569 with cysteine-773 within the ATP-binding site of EGFR." *Id.* at 3958, 3960. Rabindran 2004 also discloses a "structurally related irreversible-binding ErbB inhibitor . . . shown to covalently bind to cysteine 773 of EGFR," PD 168393. *Id.* at 3964.

304.     Rabindran 2004 explains that a compound that is "more potent than EKB-569 in HER-2 expressing tumors will complement the activity of this compound in the clinic." *Id.* at 3958. Rabindran 2004 observes that "HER-2 is highly homologous to EGFR in the catalytic domain, with the conservation of the targeted cysteine residue (as cysteine-805[)]," and therefore

███████████████████████████

"synthetic efforts were focused on the chemical scaffold of EKB-569 (4-anilinoquinoline-3-carbonitrile), which was modified to improve the inhibitory activity against HER-2." Rabindran 2004 at 3958.

305.    Rabindran 2004 also discloses HKI-272 as the "lead compound from this effort." *Id.* Rabindran 2004 explains that HKI-272 "functions as an irreversible binding inhibitor, most likely by targeting a cysteine residue in the ATP-binding pocket of the receptor" and that it is a "highly selective inhibitor of HER-2 and EGFR." *Id.* at 3958, 3960.

306.    Rabindran 2004 discloses the antitumor activity of orally administered daily doses of HKI-272. For example, Rabindran 2004 reports that in xenografts of 3T3/*neu* cells in mice, "HKI-272 reduced tumor growth in a dose-dependent manner when administered orally between 20 mg/kg/day . . . and 80 mg/kg/day." *Id.* at 3962. Rabindran 2004 also reports that HKI-272 inhibited tumor growth in A431 xenografts (EGFR-overexpressing cells) at doses from 5 mg/kg/day to 20 mg/kg/day, though the "repression of growth in this tumor model was less than that seen with comparable doses in HER-2 dependent tumors." *Id.* Rabindran 2004 observed that "HKI-272 is less potent against EGFR-dependent tumors than HER-2 dependent tumors *in vivo*, although it has equivalent activity against the two kinases *in vitro*." *Id.*

307.    Rabindran 2004 concludes that HKI-272 "may be useful to treat tumors that overexpress both HER-2 and EGFR." *Id.* at 3965.

**P.      Shin 2001**

308.    Shin et al, *A Phase I Clinical and Biomarker Study of CI-1033, a Novel Pan-ErbB Tyrosine Kinase Inhibitor in Patients with Solid Tumors*, 37 Proceedings of ASCO 82a (2001) ("Shin 2001") was published in 2002 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above. Shin 2001 was not before the examiner during the prosecution of the '314 and '162 patents.

97

███████████████████████████████████

309.    Shin 2001 is a published poster abstract from the American Society of Clinical Oncology proceedings in 2001. Shin 2001 describes a Phase I clinical study of CI-10133, "an orally active 4-anilinoquinazoline that acts as a pan-erbB tyrosine kinase inhibitor." Shin 2001 at 324. Shin 2001 states that CI-1033 was orally administered, daily, to patients with incurable solid tumors, including non-small cell lung carcinomas. *Id.* Nine dose levels were tested—50–560 mg/day. *Id.* Shin 2001 concludes that CI-1033 "has been generally well tolerated with a favorable pharmacokinetic profile and evidence of biomarker modulation" and therefore "holds promise as a novel anti-cancer agent." *Id.*

**Q.    Wissner 2002**

310.    Allan Wissner et al., *Synthesis and Structure—Activity Relationships of 6,7-Disubstituted 4-Anilinoquinoline-3-carbonitriles. The Design of an Orally Active, Irreversible Inhibitor of the Tyrosine Kinase Activity of the Epidermal Growth Factor Receptor (EGFR) and the Human Epidermal Growth Factor Receptor-2 (HER-2)*, 46 J. Med. Chem. 49–63 (2002) ("Wissner 2002") was published on online on December 2, 2002 and the Journal of Medicinal Chemistry in 2003, and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

311.    Wissner 2002 describes efforts by the authors, and others, to develop irreversible EGFR inhibitors. Wissner 2002 at 49. Wissner 2002 explains that the authors and others have described irreversible EGFR inhibitors "based on the 4-anilinoquinazoline core structure that have a Michael acceptor at the 6-position." Wissner 2002 at 49.

312.    Wissner 2002 particularly describes the synthesis of 6,7,-disubstituted-4-anilinoquinoline-3-carbonitriles, including EKB-569, that are "potent, irreversible inhibitors of EGFR and Her-2." Wissner 2002 at 49–50. Wissner 2002 "propos[es] that these inhibitors function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." *Id.* at 52;

98

█████████████████████████████████

*id.* at 49. Wissner 2002 also explains that "EGFR and HER-2 kinases have a high sequence homology in their catalytic domains" and the "Cys 773 is conserved in HER-2 (numbered Cys 805)." *Id.* at 52.

313. Wissner 2002 discloses *in vivo* testing of EKB-569 in xenograft models bearing A431 cell lines. *Id.* at 56. EKB-569 was orally administered every day for 10 days at doses ranging from 1 mg/kg to 80 mg/kg. *Id.* Wissner 2002 notes that EKB-569 was in phase I clinical trials for the treatment of cancer, particularly EGFR dependent cancers. *Id.* at 50, 56.

314. Wissner 2002 concludes that "[t]hese compounds are effective irreversible inhibitors of EGFR and HER-2 kinases." *Id.* at 56.

**R.      Yoshimura 2005**

315. N. Yoshimura et al., EKB-569, *A new irreversible epidermal growth factor receptor tyrosine kinase activity in patients with non-small cell lung cancer with acquired resistance to gefitinib*, 51 Lung Cancer 363–368, (December 10, 2005) ("Yoshimura 2005") was published on December 10, 2005 and is therefore available as prior art to both the '314 and '162 patents. *See* Section X, above.

316. Yoshimura 2005 discloses the use of EKB-569 for the treatment of non-small cell lung cancer. Yoshimura 2005 describes EKB-569 as a "potent, low molecular weight, and irreversible inhibitor of epidermal growth factor receptor (EGFR)." Yoshimura 2005 at 363.

317. Yoshimura 2005 explains that EKB-569 was evaluated in a phase I, dose escalation study, in which it was "administered orally, once daily, in 28-day cycles, to patients with advanced-stage malignancies known to overexpress EGFR." *Id.* In the study, which included patients with NSCLC, patients were treated with 25 mg, 35 mg, or 50 mg of EKB-569. *Id.*

318. Yoshimura explains that some patients with NSCLC experience "acquired resistance" to gefitinib and erlotinib. *Id.* at 366. Yoshimura 2005 describes in detail two patients

from that study: Case #1, a 63-year-old man with adenocarcinoma of the lung whose disease

progressed after treatment with gefitinib, and Case #2, a 49-year-old woman with adenocarcinoma

whose cancer progressed after treatment with gefitinib. *Id.* at 365–66. Yoshimura 2005 states that

EKB-569 was "effective in [the] two patients after resistance to gefitinib and cytotoxic therapy."

*Id.* at 366.

319.    Yoshimura 2005 notes that a "second mutation in the *EGFR* kinase

domain, which is associated with acquired resistance of non-small cell lung cancer to gefitinib or

erlotinib" had been reported. *Id.* at 366 (citing Pao 2005). Yoshimura 2005 also discusses

Kobayashi NEJM 2005's finding with CL-387,785. *Id.* at 367. Yoshimura 2005 explains that CL-

387,785 is a "specific and irreversible anilinoquinazoline EGFR inhibitor" that strongly inhibited

EGFR cells with the T790M mutation, and that Kobayashi *et al.* speculated that "CL-387,785

inhibited the EGFR kinase of the double mutant because of its altered binding of the kinase

domain or its covalent bonding to EGFR." *Id.* Yoshimura 2005 further discusses Kwak 2005,

explaining that the gefitinib-resistant clones did not have acquired secondary EGFR mutations but

were "sensitive to the irreversible, anilinoquinoline EGFR inhibitor EKB-569." *Id.*

**S.    Zacharchuk US 2005**

320.    United States Published Patent Application No. 2006/023046

("Zacharchuk US 2005") was published on October 19, 2006. It claims priority to Provisional

Application No. 60/671,287 ("the '287 provisional"), filed in the United States on April 14, 2005.

Accordingly, Zacharchuk US 2005 is available as prior art to the '314 and '162 patents.

321.    Zacharchuk US 2005 is titled "Use of an Epidermal Growth Factor

Receptor Kinase Inhibitor (EGFR) in Gefitinib Resistant Patients." Zacharchuk US 2005

discloses a method of treating cancer in patients with gefitinib and/or erlotinib resistant NSCLC

through administration of an EGFR inhibitor. Zacharchuk US 2005, [0002] ("This invention

100

███████████████████████

relates to the use of an epidermal growth factor receptor (EGFR) kinase inhibitor in gefitinib resistant patients."), Claim 1, 2, and 7; '287 provisional, 2:14–15. Zacharchuk US 2005 explains that mutations in exon 20 of the EGFR kinase domain are associated with gefitinib resistance. Zacharchuk US 2005, [0043]; '287 provisional, 13:17–18.

322.     Zacharchuk US 2005 states that it is "preferred that the EGFR kinase inhibitor irreversibly inhibits EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." Zacharchuk US 2005, [0018]; 287 provisional, 2:5–6; 13:19–21. Zacharchuk US 2005 discloses irreversible EGFR inhibitors with a variety of structures. *See, e.g.*, Zacharchuk US 2005, [0021].

323.     Zacharchuk US 2005 also discloses two irreversible EGFR inhibitors, CL-387,785 and EKB-569. Zacharchuk US 2005, [0044] ("387,785, a specific and irreversible anilinoquinazoline EGFR inhibitor, strongly inhibited activity of EGFR encoded by a gene containing a second mutation in the kinase domain."), [0045] ("EKB-569, another irreversible EGFR inhibitor, may abrogate the resistance mechanism to gefitinib."); '287 provisional, 2:5–6; 13:19–21. Zacharchuk US 2005 further discloses that EKB-569 was effective in two patients with NSCLC "after treatment with gefitinib and reoccurrence of NSCLC." Zacharchuk US 2005, [0041]; '287 provisional, 12:25–13:7.

324.     Zacharchuk US 2005 also discloses a method of administering to patients "gefitinib alone or in combination with other cytotoxic agents or chemotherapeutic agents and an effective amount of EGFR kinase inhibitor." Zacharchuk US 2005, [0006]; '287 provisional, 2:18–20.

███████████████████████████████

## XII.   THE ASSERTED CLAIMS ARE NOT ENABLED

### A.   The '162 Patent Specification Fails to Enable The Asserted Claims Because the POSA Would Not Have Been Able to Make And Use The Full Scope Of The Claimed Method

325.   The POSA would not have been able to make and use the full scope of the asserted claims of the '162 patent. As I will describe more fully below, the asserted claims are directed to methods of treating a patient having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1 by administering daily any compound (whether small molecule or larger compound) that functions as an irreversible EGFR inhibitor and covalently binds to the designated cysteine residue in a unit dose—a predetermined amount calculated to produce the desired therapeutic effect—of 2 to 500 mg. *See* '162 patent, claim 1, 9:37–42 (defining "unit dose"). The number of compounds that potentially function as irreversible EGFR inhibitors and covalently bind to the designated cysteine residue is vast and essentially limitless, as discussed below. The task of determining which of those candidates function as required by the asserted claims—that is, that irreversibly inhibit EGFR and covalently bind to the designated cysteine residue—as well as the further required task of determining for any particular candidate the dose calculated to achieve the desired therapeutic effect (the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1) are highly challenging, unpredictable, and highly burdensome. By contrast, the patent specification provides extremely limited guidance, as it describes only three compounds for carrying out the asserted claims of the '162 patent, all having similar structure, no working example of the treatment of a patient having gefitinib and/or erlotinib resistant NSCLC (let alone a patient having the T790M mutation) is

████████████████████████████████████████

provided, and no guidance is given as to how to determine a unit dose of any irreversible EGFR inhibitor.

326.     In short, it is readily apparent that the specification drastically fails to enable the POSA to make and use the full scope of the claimed method, since he or she could not, from the teachings of the patent specification and the POSA's knowledge, select from the many trillions of possible irreversible EGFR inhibitors those that will irreversibly inhibit EGFR and covalently bind to the designated cysteine residue *and then* treat a patient with gefitinib and/or erlotinib resistant NSCLC by administering a unit dose of the compound containing a predetermined amount of the drug calculated to achieve the desired therapeutic effect.

327.     My opinion that the patent specification fails to enable the asserted claims of the '162 patent is supported by consideration of the *Wands* factors described above in Section V.C.

### 1.     The Breadth of the Claims

328.     The asserted claims of the '162 patent (claims 1 and 4) are extraordinarily broad. The asserted claims are directed to methods of treating patients by administering certain compounds. The asserted claims limit the potential compounds to be used in the claimed method only by their function. *See* Section VI, above. Specifically, the asserted claims require the compounds to irreversibly inhibit EGFR and to covalently bind "to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1. In addition, the asserted claims require the compounds to treat gefitinib and/or erlotinib resistant NSCLC and to be administered as a unit dose "containing a predetermined quantity of active material calculated to produce the desired therapeutic effect." '162 patent, 9:37–42; ¶ 72 *supra*.

329.     The '162 patent makes clear that the asserted claims extend to any compound meeting the functional requirements: "the irreversible EGFR inhibitor may be any

compound which binds to cysteine 773 of EGFR (SEQ ID NO: 1)." ('162 patent, 3:62–64; *see also* '314 patent, 3:57–59). The '162 patent instructs that the claims are not limited to small molecule compounds but extend as well to proteins, oligonucleotides, and other "larger" compounds ('162 patent, 13:8–14; *see also* '314 patent, 13:3–13):

> The term "drug" or "compound" as used herein refers to a chemical entity or biological product, or combination of chemical entities or biological products, administered to a person to treat or prevent or control a disease or condition. The chemical entity or biological product is preferably, but not necessarily a low molecular weight compound, but may also be a larger compound, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof.

330.    Because the asserted claims of the '162 patent are limited only by function, not structure, they potentially encompass the use of many trillions of compounds. For example, the patent cites to U.S. Patent No. 6,002,008 ("the '008 patent") as describing EKB-569, HKI-357, and HKI-272. *See* '162 patent, 13:50–51; *see also* '314 patent, 13:50–51.

a)      3-Cyano-Quinolines of the '008 Patent

331.    The '008 patent, which is assigned to American Cyanamid (now Wyeth/Pfizer) is entitled "Substituted 3-Cyano-Quinolines," and describes a genus of compounds having the quinoline-3-carbonitrile scaffold (3-cyano-quinoline is a chemical synonym for quinoline-3-carbonitrile). The '008 patent describes (and claims) the compounds as inhibitors of EGFR and HER2. *See* '008 patent, 1:38–44, claim 23. The genus of compounds described in the '008 patent have the general structure of "formula 1" (shown below) with R1, R2, R3, R4, Y, X, and n representing substituents that may be added to the cyanoquinoline scaffold.

'008 patent, 5:10–20.

332.     The '008 patent describes vast options for substitutions at each of these positions, R1, R2, R3, R4, Y, and X. *See* '008 patent, 5:45–7:26. For example, substitutions at each of R1, R2, R3, and R4 alone would lead to an enormous universe of compounds. The '008 patent recites 398 example compounds—'008 patent, 42:31–132:28—a small sample of the possibilities for substituents around the 3-cyanoquinoline core.

333.     The POSA would have recognized that the genus described in the '008 patent encompasses at least billions of compounds, many of which, due to the presence of an alkylating agent or "warhead" such as a Michael acceptor, may bind to cysteine 773 of EGFR. It would have been beyond the capacity of the POSA (and certainly far from routine) to determine which of the many compounds within the genus described in the '008 patent irreversibly inhibit EGFR and covalently bind to the designated cysteine residue. And it would then require additional, burdensome work to evaluate whether the compound was suitable for use in patients and capable of treating gefitinib and/or erlotinib resistant NSCLC with a T790M mutation, and, if so, to determine a dose expected to achieve a desirable therapeutic effect.

███████████████████████████████

b)      Substituted Quinazoline Derivatives of the '912 Patent

334.    As another example, U.S. Patent No. 6,251,912 (the "'912 patent"), a patent assigned to American Cyanamid (Wyeth/Pfizer) that issued in June 2001 with the title "Substituted Quinazoline Derivatives," describes a genus of quinazoline compounds represented to be EGFR inhibitors. The genus of compounds described by the '912 patent have the general structure of "formula 1" (shown below) with R1, R2, R3, R4, Z, and X, representing substituents that may be added to the cyanoquinoline scaffold.



'912 patent, 3:50–57

335.    The '912 patent describes vast options for substitutions at each of these positions, R1, R2, R3, R4, Z, and X. *See* '912 patent, 3:61-8:3. For example, substitutions at each of R1, R3, and R4 alone would lead to an enormous universe of compounds. The POSA would have recognized that the genus described by the '912 patent includes at least billions of compounds having a quinazoline scaffold. The irreversible EGFR inhibitor afatinib falls within the genus described (and claimed) in the '912 patent, though that compound is not expressly disclosed in the patent. *See* '912 patent, 3:46–8:3 (formula 1 having $R_1$ = hydrogen; $R_2$ = α, β-unsaturated carbonyl substituent shown at 5:20, where two $R_5$'s are hydrogen and the third $R_5$ is $R_7$—$(C(R_6)_2)_s$—, where $R_6$ is hydrogen, where $s$ is 1, and where $R_7$ is –$NR_6R_6$, where $R_6$ is

106

████████████████████████████

methyl; $R_3$ = Het-W—$(C(R_6)_2)_k$—Y—, where Het is tetrahydrofuran, where W is "a bond", where $k$ is 0, where Y is —O—; $R_4$ = hydrogen; Z = NH; $n$ = 0; and X = phenyl disubstituted with halogen, specifically F and Cl, as a pharmaceutically acceptable dimaleate salt).

336.    The POSA would have recognized that many of the compounds encompassed by the '912 patent, due to the presence of an alkylating agent or "warhead" such as a Michael acceptor, may bind to the cysteine 773 of EGFR. It would have been beyond the capacity of the POSA (and certainly far from routine) to determine which of the many compounds within the genus described in the '912 patent irreversibly inhibit EGFR and covalently bind to the designated cysteine residue. And it would then require additional, burdensome work to evaluate whether the compound was suitable for use in patients and capable of treating gefitinib and/or erlotinib resistant NSCLC with a T790M mutation, and, if so, to determine a dose expected to achieve a desirable therapeutic effect.

*              *              *

337.    Thus, even focusing on the categories of certain quinazolines and 3-cyanoquinoline derivatives alone would likely include billions of compounds that the POSA would have understood may be irreversible EGFR inhibitors that covalently bind to the designated cysteine residue. However, the asserted claims of the '162 patent are not limited to those two categories but extend to the use of any compound that irreversibly inhibits EGFR and covalently binds to the designated cysteine residue. It would have been impossible for the POSA to determine how many such compounds fell within the functional limitations of the asserted claims—since the full scope of potential compounds has not been determined even as of today. It is clear, however, that the asserted claims potentially encompass the use of many trillions of compounds, even limiting consideration to just small molecule compounds.

███████████████████████████████████

### c) Larger Compounds Falling Within the Asserted Claims

338.     Moreover, as noted above in this Section, the '162 patent also expressly states that it encompasses "larger compound[s], for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '162 patent, 13:8–14. It would have been impossible to even estimate how many such "larger compounds" there were—the '162 patent does not describe any, and the prior art also focuses on small molecule inhibitors.

339.     As such, the '162 patent is entirely forward-looking, attempting to capture the use of compounds not described in the '162 patent or known in the art. The range of potential larger compounds, such as "an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof" ('162 patent, 13:8–14) is essentially limitless and certainly encompasses many trillions more possible compounds that meet the functional limitations of the asserted claims. As one example, any of the trillions of small molecule compounds that meet the functional limitations of the asserted claims could theoretically be combined with an antibody to form trillions of antibody-drug-conjugates that meet the functional requirements of the asserted claims.

*          *          *

340.     In summary, the POSA reading the '162 patent as of its priority date (whether in 2005 or 2006), would have recognized that the scope of the asserted claims is extraordinarily vast. He or she would have understood that many trillions of compounds—both small molecules and larger compounds, including unknown compounds—would potentially meet the functional limitations of the asserted claims, *i.e.*, functioning as an irreversible EGFR inhibitor

████████████████████████

that covalently binds to cysteine 773 of SEQ ID NO:1 having a T790M mutation, though he or she could not possibly envision them all, let alone synthesize and test them.

### 2.     The Nature of the Invention and Level of Predictability in the Art

341.     The nature of the invention claimed in the asserted claims of the '162 patent is the treatment of patients having gefitinib and/or erlotinib resistant NSCLC with the T790M mutation by administering a unit dose of an irreversible EGFR inhibitor that covalently binds to a particular cysteine (cysteine 773 in SEQ ID NO:1 with a T790M mutation). The asserted claims are not limited to specific, identified compounds of known therapeutic effect, but instead encompass the use of any compound, whether known or unknown, meeting the functional limitations of the asserted claims. Thus the nature of the invention includes both drug development (the discovery of new drug candidates and their development for clinical use) and treatment (the administration of drugs to patients to achieve therapeutic effects).

#### a)     Drug Development Is an Unpredictable Art

342.     Drug development is a highly unpredictable art, and the development of kinase inhibitors is no exception. Not only must a drug candidate be active with respect to its intended target, it must also be selective to that target (so as not to cause unwanted effects or be depleted by unintended targets), it must have suitable pharmacokinetics and bioavailability, it must be able to permeate the cell membrane (when the target is within the cell), and it must be safe and tolerable, among other things. *See, e.g.*, A. Levitzki & A. Gazit, *Tyrosine Kinase Inhibition: An Approach to Drug Development*, 267 Science 1782, 1783 (1995) ("Levitzki 1995") ("[C]riteria for successful inhibitors are selectivity, cell permeability, bioavailability, appropriate pharmacokinetic properties, and nontoxicity."). These requirements are significant hurdles, as many companies seeking to develop an erbB family inhibitor experienced. *See, e.g.*, A Bridges, *The Rationale and Strategy Used to Develop a Series of Highly Potent, Irreversible, Inhibitors of*

███████████████████████████

*the Epidermal Growth Factor Receptor Family of Tyrosine Kinases*, 6 Current Medicinal

Chemistry 825, 833 (1999) ("Bridges 1999") ("[W]e had to produce compounds which were

active on the enzyme, potent against the enzyme and proliferation in cellular assays, and which

could demonstrate blood levels in in vivo testing as well as in vivo inhibition of EGFr TK

activity, and an antitumour effect with some sort of therapeutic index."). Yet, these criteria are not

predictable based on the structure of a compound, and finding a compound that meets them is a

difficult and unpredictable process.

343.    The unpredictability of drug development is reflected in its burdensome

and time-consuming nature. In the pharmaceutical industry, a typical drug development program

involves: (1) a very large number of new compounds synthesized in an exploratory search for

possible starting points to drug candidates; (2) only five in 5,000 compounds that enter preclinical

testing make it to clinical trials in humans; and (3) only one of five compounds in clinical trials

achieves FDA approval. *See* J. DiMasi, et al., *Innovation in the pharmaceutical industry: New*

*estimates of R&D costs*, 47 Journal of Health Economics 20–33 (2016) ("DiMasi 2016").

344.    A typical drug development program requires synthesizing hundreds to

thousands of compounds, most of which will fail because of toxicity, unfavorable

pharmacokinetics, or lack of appropriate level of activity, with preclinical studies ultimately

eliminating all but a handful of compounds for possible clinical testing. As a result, drug

discovery has a very high attrition rate, is very unpredictable, and fails far more often than it

succeeds—a point one of the applicants himself recognized, once he had left academia and

experienced actual drug development. *See, e.g.,* J. Settleman *et al.*, *Communication in Drug*

*Development: "Translating" Scientific Discovery* 164 Cell 1101, 1101 (2016) ("Settleman 2016")

███████████████████████████

("There is also the challenge of the drug discovery and development process itself—a byzantine and expensive undertaking that fails far more than it succeeds.").

345.    The development of cancer treatments is among the most challenging and most unpredictable of all therapeutic areas. *See* G. Begley & L. Ellis, *Raise Standards for Preclinical Cancer Research,* Nature, vol. 483, pp. 531–33, 531 (Mar. 29, 2012) (Begley & Ellis 2012) ("[H]istorically, our ability to translate cancer research to clinical success has been remarkably low. Sadly, clinical trials in oncology have the highest failure rate compared with other therapeutic areas."). "Although success rates vary considerably within the pharmaceutical industry, oncology drugs have the highest failure rates among the various therapeutic areas." R. Govindan, MD, *Phase III Failure Rates in Oncology Drugs Unacceptable*, 16 ONCOLOGY NEWS INT'L at 1 (Aug. 1, 2007), https://www.cancernetwork. com/articles/phase-iii-failure-rates-oncology-drugs-unacceptable ("Govindan 2007"). Only about 5% of new cancer treatment drugs that are studied in clinical trials reach FDA approval. *Id.* For example, between 1990 and 2005, more than 1600 new drugs for the treatment of non-small cell lung cancer were studied in Phase II clinical trials, yet only seven of them became FDA-approved. *Id.*

346.    All of these challenges would apply with full force to the development in 2005 or 2006 of an irreversible EGFR inhibitor for the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation.

        b)    Development of Selective TKI Inhibitors Suitable for
              Pharmaceutical Use Was Challenging and Unpredictable

347.    In addition, the POSA would have recognized that an important consideration in the development of an inhibitor compound would have been its selectivity for the target enzyme(s). It was understood, for example, that, in addition to their role in cancers, "tyrosine kinases are also important in many signalling pathways involved in normal cellular

111

████████████████████

function." J. Baselga & S. D. Averbuch, *ZD1839 ('Iressa') as an Anticancer Agent*, 60 Supp. 1 Drugs 33–40, Abstract (2000) ("Baselga 2000") at 34 (footnote omitted). The human genome is estimated to have more than 1000 different kinases and many of them are involved in important biological processes. *See, e.g.*, S. Hanks & T. Hunter, *Protein Kinases 6: The Eukaryotic Protein Kinase Superfamily: Kinase (Catalytic) Domain Structure and Classification*, 9 FAESB J. 576–596, 576 (1995) ("Hanks 1995"). Thus, selectivity to a target enzyme or enzymes was a significant consideration. Fry 2000 at 6.

348.    However, a compound's selectivity toward a particular enzyme, and its potency toward that enzyme, were unpredictable. Selectivity toward a particular target enzyme was highly sensitive to small changes in the compound in ways that could not be predicted. P. M. Traxler, *Protein Tyrosine Kinase Inhibitors in Cancer Treatment*, 7 Exp. Opin. Ther. Patents 571 (1997) ("Traxler 1997"), for instance, explained that "[i]t has been demonstrated in several cases that minor modification in a molecule can completely alter the selectivity profile with respect to tyrosine kinases, thus indicating the sensitive structural requirements for binding at the catalytic domain." Traxler 1997 at 585; *see also, e.g.*, D. Fry, *Inhibition of the Epidermal Growth Factor Receptor Family of Tyrosine Kinases as an Approach to Cancer Chemotherapy: Progression from Reversible to Irreversible Inhibitors*, 82 Pharmacol. Ther. 207, 213 (1999) ("Fry 1999") (explaining "there has been a distinct convergence to certain common chemical features, regardless of the kinase" and "[s]ubstitutions, which confer selectivity and dramatically increase potency for a specific kinase, however, begin to diverge and may be a function of the subtle structural differences between these kinases"); Smaill 2001 at 432 (Table 1), 434 (showing compounds with a substitution on the α-carbon of an acrylamide would not irreversibly inhibit EGFR, while compounds with a substitution on the β-carbon could).

███████████████████████

349.     Development of compounds selective to the target was challenging and unpredictable. *See, e.g.*, P. Traxler, *Tyrosine kinase inhibitors in cancer treatment (Part II)*, 8(12) Exp. Opin. Ther. Patents 1599, 1620 (1998) ("Traxler 1998") ("[W]ith more and more protein kinase assays available it is getting more and more difficult to obtain absolute selectivity."); Levitzki 1995 at 1784 ("Improving the selectivity of PTK blockers remains a continuing learning process.").

350.     Yet even if a compound could be made selective, it would be unpredictable whether it was suitable for pharmaceutical use. To take the example of EGFR, "many normal cells express EGFR, for example, skin, liver, and gastrointestinal epithelium, and may be affected by such an inhibitor." James D. Moyer et al., *Induction of Apoptosis and Cell Cycle Arrest by CP-358,774, an Inhibitor of Epidermal Growth Factor Receptor Tyrosine Kinase*, 57 Cancer Research 4838, 4838 (1997) ("Moyer 1997"). Even a selective inhibitor may inhibit kinases necessary to the functioning of healthy cells. Thus, even if a selective kinase inhibitor could be developed, it was unpredictable whether the compound would inhibit kinases in cancer cells sufficiently to have a therapeutic effect without causing undue side effects by inhibiting the same kinases in their functions to maintain healthy cells.

c)     Modeling Inhibitor Binding Was Challenging

351.     The development of new EGFR inhibitors was made more difficult and challenging by the fact that modeling of the inhibitor-kinase interaction was difficult and varied substantially depending upon the structures being studied. At the time, the proposed binding models for EGFR developed by different research groups were inconsistent with one another. For example, researchers at Ciba-Geigy/Novartis and Parke-Davis independently proposed models for ATP-competitive EGFR inhibitors. *See* Traxler 1998 at 1600–02. These models were not consistent. *See* Traxler 1998 at 1602 (describing the differences between the Novartis and Parke-

113

████████████████████████████

Davis models); Brian D. Palmer et al., *Tyrosine Kinase Inhibitors. 11. Soluble Analogues of Pyrrolo- and Pyrazoloquinazolines as Epidermal Growth Factor Receptor Inhibitors: Synthesis, Biological Evaluation, and Modeling of the Mode of Binding*, 40 J. Medicinal Chemistry 1519, 1522–25 (1997) ("Palmer 1997") (describing the Parke-Davis model and explaining the differences between the Novartis and Parke-Davis models). These researchers acknowledged that certain inhibitor compounds were inconsistent with proposed binding modes. *See, e.g.*, Traxler 1998 at 1602 ("[T]here is no consistent way other than [Parke Davis's] proposed binding mode to accommodate the pyrido[2,3-*d*]pyrimidine inhibitors in the ATP-binding site of a tyrosine kinase . . . ."); Palmer 1997 at 1525 ("The extensive SAR data presented in the current paper clearly exclude [Novartis's] binding mode.").

352.    Modeling would have been made even more difficult by the fact that the POSA would not have known the structure of the target enzyme. Crystal structures for EGFR with resistance-associated mutations, such as the T790M mutation, were not known in 2005-2006. *See* Suzuki 2007 at 1981 ("[T]here is so far no report revealing the crystal structure of EGFR containing the T790M mutation, so that the precise mechanism of inhibition by MP-412 remains unclear.").

353.    These difficulties in modeling also created uncertainty as to the possible binding mode for an irreversible inhibitor. *See* Bridges 1999 at 835 ("At that time no models were available to us to explain the binding mode, so a series of alkylating groups were attached to the quinazoline nucleus, and the resulting compounds were examined for potency against the enzyme, and whether inhibition in a cellular assay was readily reversed after drug removal."); Suzuki 2007 at 1981 ("[F]urther determination of the structure of the T790M mutant complexed with MP-412

████████████████████████

will be needed to reveal which position in the reactive side chain of MP-412 really forms a

covalent bond").

　　　　　　　　　　　　d)　　*In Vivo* Activity Was Not Predictable Based on *In Vitro* Activity

　　　　　354.　　Even if the POSA were able to design a compound that turned out to be

active in *in vitro* assays, the POSA would have understood that the degree of that compound's *in*

*vivo* suitability and its utility as a treatment in patients was highly unpredictable. There is

extensive literature about the inability of preclinical studies, including studies in cells or non-

human animals, to predict successful treatment of humans. For example, in 2006 FDA reported

that "nine out of ten experimental drugs fail in clinical studies because we cannot accurately

predict how they will behave in people based on laboratory and animal studies." *FDA Issues*

*Advice to Make Earliest Stages of Clinical Drug Development More Efficient*, January 12, 2006

("FDA 2006"), available at

http://web.archive.org/web/20060207140647/http://www.fda.gov/bbs/topics/news/2006/NEW012

96.html.

　　　　　355.　　In addition, results reported in animal models were often not reproducible.

For example, scientists at Amgen attempted to confirm the results reached in 53 "landmark"

studies. The Amgen scientists found that "scientific findings were confirmed in only 6 (11%)

cases. Even knowing the limitations of preclinical research, this was a shocking result." Begley &

Ellis 2012 at 532. Similarly, a team at Bayer HealthCare in Germany found that only about 5% of

published preclinical data could be validated to the point at which projects could continue. F.

Prinz *et al.*, *Believe it or not: how much can we rely on published data on potential drug targets*,

Nature Rev. Drug Discov., Vol. 10, 712 (2011). Thus, even results in animal studies fail to

adequately predict clinical utility.

███████████████████████████

356.     In fact, many compounds described in the prior art were promising *in vitro* but disappointments *in vivo*. *See, e.g.*, Traxler 1997 at 585 ("[P]harmacological properties such as stability in biological media, bioavailability, metabolism or formulability are significant hurdles."). Discrepancies between initial *in vitro* activity and *in vivo* suitability was a widely recognized challenge in developing EGFR inhibitors. *See, e.g.*, P. Traxler et al., *Use of a Pharmacophore Model for the Design of EGF-R Tyrosine Kinase Inhibitors: 4-(Phenylamino)pyrazolo[3,4-d]pyrimidines*, 40 J. Med. Chem. 3601, 3608 (1997) ("Traxler 1997b") ("Unfortunately, many of the potent inhibitors at the enzyme as well as the cellular level of this series showed insufficient plasma levels (Cmax < 1 μM) after oral administration to mice (data not shown) to be of interest for *in vivo* testing.").

357.     For example, the rate at which a compound forms a covalent bond with EGFR, though not reflected in typical *in vitro* testing, can affect that compound's properties *in vivo*. Singh et al., *The resurgence of covalent drugs*, 10 Nature Reviews 307, 313 (Box 1) (2011) ("Singh 2011"). Irreversible inhibitors interact with EGFR in a time-dependent manner. *Id.* at 310–13. Inhibition occurs in two phases: "the compound must first bind non-covalently to the target protein, placing its moderately reactive electrophile close to a specific nucleophile on the protein. The resulting complex then undergoes specific bond formation." *Id.* at 310. Compounds that form the covalent complex with EGFR more slowly have more limited duration of action, which can result in poor potency or other pharmacokinetic properties that limit the compound's usefulness *in vivo*. *Id.* at 313 (Box 1). Thus even if a compound is capable of covalently binding and irreversibly inhibiting EGFR, it's slow kinetics can render it ineffective *in vivo* or clinically.

358.     Slight differences in a compound's structure, such as placement of the alkylating moiety, can result in drastically different rates of bond formation. *See* D.W. Fry, et al,

116

███████████████████████

*Specific, irreversible inactivation of the epidermal growth factor receptor and erbB2, by a new class of tyrosine kinase inhibitor*, 95 Proc. Natl. Acad. Sci., 12022, 12024 (1998) ("Fry 1998") (showing that moving the acrylamide of an example compound from the 6 position of a quinazoline to the 7 position increased the time to complete irreversible inhibition of EGFr autophosphorylation from 1 minute to 2 hours).

359.    There are many examples in the prior art literature (and undoubtedly many more never revealed publicly) of compounds developed as EGFR inhibitors reported as having promising activity in *in vitro* assays that failed to be therapeutic at non-toxic doses *in vivo*. This is what happened with the quinazoline compound, PD 0153035. Bridges 1999 at 829.



14. PD 0153035

360.    PD 0153035 was reported to have "almost incredible potency against the enzyme" and "very good" activity in cell assays. Bridges 1999 at 833; *see also* D. Fry et al., *A Specific Inhibitor of the Epidermal Growth Factor Receptor Tyrosine Kinase*, 265 Science 1093, 1093–95 (1994) ("Fry 1994"). But when the Parke-Davis researchers tested it *in vivo* in mice, they found that it was "without any trace of efficacy, as the effect was that at high doses several of the mice would convulse and die on handling." Bridges 1999 at 833. Parke-Davis then discontinued development of that compound. *Id.*; *see also, e.g.*, Traxler 1998 at 1603 ("Probably due to its rather unsatisfactory bioavailability and rapid metabolism, the compound only showed weak *in vivo* activity in A431 tumours in athymic mice and was therefore not further developed as an anticancer agent." (citation omitted)).

117

■■■■■■■■■■■■■■■■■■■■■■

361.   A similar story involved another Parke-Davis compound, PD 0158780. This compound was reported to be "even more potent" than PD 0153035, but was a "major disappointment" *in vivo* because the researchers "never saw a good dose curve with this compound, the results were inconsistent from experiment to experiment, and similar doses sometimes produced deaths." Bridges 1999 at 833; *see also* Traxler 1998 at 1607; Traxler 1997 at 581.



Bridges 1999 at 831.

      e)    Clinical Utility Was Not Predictable From *In Vitro* or *In Vivo* Activity

362.   This same discrepancy between *in vitro* and *in vivo* activity, as well as between early *in vivo* studies and clinical utility plagued the development of irreversible EGFR inhibitors as well. For example, Parke Davis (and subsequently Pfizer) pursued clinical development of CI-1033 (canertinib or PD 183805), an irreversible EGFR inhibitor that covalently binds to cysteine 773 of wild-type EGFR, because it showed better *in vivo* activity than other candidates similarly potency in *in vitro* studies. Fry 2000 at 9 (reporting that CI-1033 was an irreversible inhibitor of EGFR and HER2 *in vitro* and that it had efficacy against eight tumor xenografts *in vivo*).

363.    Table 1 of J. Smaill et al., *Tyrosine Kinase Inhibitors. 17. Irreversible Inhibitors of the Epidermal Growth Factor Receptor: 4-(Phenylamino)quinazoline- and 4-(Phenylamino)pyrido[3,2-d]pyrimidine-6-acrylamides Bearing Additional Solubilizing Functions*, 43 J. Med. Chem. 1380 (2000) ("Smaill 2000") reports quinazoline compounds 18 (canertinib) and 8 (similar structure, but different substituent on the 4-aniline group), which had similar potencies in *in vitro* assays. *See* Smaill 2000 at 1384. Despite these similarities *in vitro*, canertinib was deemed "much more potent" than "the other analogues" in mice. *See* Smaill 2000 at 1386 ("Both 8 and 18 showed impressive activity when dosed orally for 14 days, but the derivative 18 was much more potent (optimal dose 5 mg/kg/day) compared to the other analogues.").

364.    Parke Davis/Pfizer began clinical trials of CI-1033 in 2000. *See, e.g.*, Fry 2000 at 9–10. Parke-Davis/Pfizer subsequently reported that CI-1033, however, failed to "meet its primary endpoint" in a Phase II clinical study evaluating the drug "in patients with advanced-stage NSCLC who experienced treatment failure after or were refractory to platinum-based chemotherapy." P. Jänne et al., *Multicenter, Randomized, Phase II Trial of CI-1033, an Irreversible Pan-ERBB Inhibitor, for Previously Treated Advanced Non–Small-Cell Lung Cancer*, 25 J. Clinical Oncology 3936, 3936 (2007) ("Jänne 2007"). In particular, "the study demonstrated marginal efficacy of the agent, with a response rate of 2% to 4% in each arm, but failed to meet its primary statistical end point. These observations suggest a lower efficacy . . . than for gefitinib or

119

███████████████████████████████

erlotinib in similar patient populations." Jänne 2007 at 3941. Pfizer subsequently withdrew CI-1033 from development. Thanyanan Reungwetwattana & Grace Kho Dy, *Targeted Therapies in Development for Non-Small Cell Lung Cancer*, 12 J. Carcinogenesis 22 (2013) ("Reungwetwattana 2013"). CI-1033 has never been FDA-approved, and it was a failure. During prosecution, the applicants themselves cited to CI-1033 as an irreversible inhibitor that "has failed to overcome resistance in EGFR mutants, such as in the presence of C797S with T790M mutations in EGFR." March 9, 2016 Response to Office Action; *see also* August 1, 2016 Response to Office Action ("[I]t was known in the art that irreversible EGFR inhibitors (i.e., CI-1033) were not effective against resistant forms of cancer").

365. The Novartis group progressed a pyrrolo-pyrimidine compound, PKI-166, into Phase I clinical studies:



PKI166
Novartis

Traxler 2003 at 218. PKI 166 had been reported to be an inhibitor of "both the EGFR (IC50 = 1 nM) and the c-ErbB2 tyrosine kinases (IC50 = 11 nM) in the low nanomolar range." Traxler 2003 at 220; *see also, e.g.*, P. Traxler et al., *Preclinical Profile of PKI166 – a Novel and Potent EGFR Tyrosine Kinase Inhibitor for Clinical Development*, 5 Clin. Cancer Res. 3750(s), Abstract # 100 (1999) ("Traxler 1999"); C.. Bruns et al., *Blockade of the Epidermal Growth Factor Receptor*

120

████████████████████████

*Signaling by a Novel Tyrosine Kinase Inhibitor Leads to Apoptosis of Endothelial Cells and Therapy of Human Pancreatic Carcinoma*, 60 Cancer Res. 2926–35, 2929 (2000) ("Bruns 2000"). The Phase 1 study reported that "approximately 17% of patients showed Grade 3 elevated liver transaminases. This unexpected high incidence of liver toxicity led to the decision by Novartis to stop the further development of PKI166." Traxler 2003 at 220.

366.    Wyeth progressed EKB-569 (pelitinib), one of the irreversible EGFR inhibitors preferred in the '314 and '162 patents, into clinical studies. In 2000, EKB-569 was reported to have *in vivo* efficacy against xenografts in mice. *See, e.g.*, Torrance 2000 at 1026. EKB-569 was studied in a Phase 2 clinical trial in advanced non-small cell lung cancer. *See* Study Evaluating EKB-569 in Advanced Non-Small Cell Lung Cancer, ClinicalTrials.gov (Aug. 20, 2009) https://clinicaltrials.gov/ct2/show/NCT00067548 ("NCT00067548"). No results from this study were reported, and Pfizer subsequently abandoned development of EKB-569. *See, e.g.*, Reungwetwattana 2013.

367.    A similar outcome was seen with HKI-272 (neratinib), another of the irreversible EGFR inhibitors preferred in the '314 and '162 patents. In a Phase 2 clinical study investigating neratinib for the treatment of advanced non-small cell lung cancer that was sponsored by Wyeth, the compound demonstrated "low activity in patients with prior benefit from TKIs and in TKI-naïve patients, potentially because of insufficient bioavailability from diarrhea-imposed dose limitation." Sequist 2010 at 3076. "No patients with known T790M responded." *Id.* HKI-272 is not approved for the treatment of NSCLC.

368.    While HKI-272 was subsequently (in 2017) approved for the treatment of certain breast cancers, its clinical utility continues to be questioned, as it is associated with severe side effects, and it has received criticism from doctors. *See, e.g.*, Steven Vogl, *Neratinib Is*

███████████████████████████

*Approved: Should We Reject It Anyway?*, The ASCO Post (December 25, 2017),

http://www.ascopost.com/issues/december-25-2017/neratinib-is-approved-should-we-reject-it-

anyway/ ("Should we recommend extended adjuvant neratinib therapy to patients? 'No!' is the

short answer.").

<p style="text-align:center">*        *        *</p>

369.     In short, the claimed method here implicates tasks—the development and

implementation of new treatments for cancer that can be administered to patients in doses

"calculated to produce the desired therapeutic effect" ('162 patent, 9:37)—that are both

extraordinarily challenging and highly unpredictable. As one of the applicants later described it in

a 2016 publication in Cell, drug discovery is even more unpredictable than putting a man on the

moon:

> Putting a man on the moon should not have required good luck—
> rather it required accurate calculations and quantitative
> measurements of well-understood physical systems. Biology, on the
> other hand, is still very much incompletely understood, and the
> results of various perturbations of biological systems remains
> largely unpredictable.

Settleman 2016 at 1103. This applies with full force to the development in 2005 or 2006 of

irreversible EGFR inhibitors that covalently bind to the designated residue to be administered in a

unit dose to patients with gefitinib and/or erlotinib NSCLC with a T790M mutation.

3.     **The State of the Prior Art**

370.     As the prior Section XII.A indicates, the scope of the asserted claims goes

far beyond the teachings of the prior art. For example, the asserted claims encompass the use of

an irreversible EGFR inhibitor that covalently binds to the designated cysteine residue, without

limitation as to structure. In addition, the asserted claims require the administration of the

irreversible EGFR inhibitor in a unit dose that contains an amount of the irreversible EGFR

<p style="text-align:center">122</p>

inhibitor calculated to produce the desired therapeutic effect. The prior art would have provided little or no guidance to the POSA in carrying out the full scope of the claimed method, since both the range of appropriate structures and the appropriate dosing for each structure would be highly variable and unpredictable and could not be determined from the prior art.

371.    First, as discussed above, the prior art describes many compounds that the POSA would have recognized as possible irreversible EGFR inhibitors, but provides little guidance concerning which of those will covalently bind to the designated cysteine residue to irreversibly inhibit EGFR, which are suitable for administration to patients having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation, and which can be administered in a dose calculated to produce a desired therapeutic effect. For example, as discussed above in Section XII.A.1, Wyeth's '008 patent describes a genus encompassing at least billions of 3-cyanoquinoline (quinoline-3-carbonitrile) compounds. While those billions of compounds are described as EGFR inhibitors (*see, e.g.*, '008 patent, 1:7–12), the '008 patent does not identify which of those compounds function as irreversible EGFR inhibitors, which form a covalent bond with EGFR and, for those that do, where that bond forms, and does not describe either the suitability of the compounds for administration to patients nor the appropriate dosing. These matters cannot be predicted from structure and are challenging to determine.

372.    Thus, the prior art provides minimal guidance for carrying out the method of treatment in the asserted claims of the '162 patent even with regard to the genus of potential 3-cyanoquinoline irreversible EGFR inhibitors described in the '008 patent. Indeed, as discussed above in Section XII.A.2, even after conducting Phase I and Phase 2 clinical trials, Wyeth was not able to determine a dose calculated to achieve a desired therapeutic effect in patients with NSCLC having a T790M mutation using HKI-272, the 3-cyanoquinoline irreversible EGFR inhibitor

████████████████████████

described as "preferred" in the '162 patent. '162 patent, 3:61–62; *see also* '314 patent, 3:56–57; *see, e.g.*, Sequist 2010; *see also* N. Godin-Heymann *et al.*, *The T790M 'gatekeeper' mutation in EGFR mediates resistance to low concentrations of an irreversible EGFR inhibitor*, 7 Mol. Can. Ther. 874–79 (2008) ("Godin-Heymann 2008"); E. Kwak, *The Role of Irreversible HER Family Inhibition in the Treatment of Patients with Non-Small Cell Lung Cancer*, The Oncologist 16:1498, 1501–02 (2011) ("Kwak 2011").

373.     The same is true with regard to the at least billions of compounds falling within the genus of potential quinazoline irreversible EGFR inhibitors described in the '912 patent. *See* Section XII.A above. The POSA would have found minimal guidance in the prior art for determining which of the compounds within the genus encompassed by the asserted claims function as irreversible EGFR inhibitors that covalently bind to the designated cysteine residue and then, for those that do, determining whether there exists a dose that can be administered to a patient, and if so, what dose would produce the desired therapeutic effect.

374.     With regard to irreversible EGFR inhibitor compounds *not* described in the prior art, there is even less guidance for the POSA in identifying a compound that covalently binds to the designated cysteine residue and irreversibly inhibits EGFR, that is effective in treating gefitinib and/or erlotinib resistant NSCLC, and that is suitable for administration to a patient in a unit dose that produces a desired therapeutic effect.

375.     Plaintiffs argue that use of osimertinib, the active ingredient of Tagrisso®, falls within the asserted claims. Osimertinib selectively inhibits mutant EGFR over wild-type. *See* Tagrisso Prescribing Information, Section 12.1 ("Osimertinib is a kinase inhibitor of the epidermal growth factor receptor (EGFR), which binds irreversibly to certain mutant forms of

EGFR (T790M, L858R, and exon 19 deletions) at approximately 9-fold lower concentrations than wild-type."). It has the following structure (*id.*, Section 11):



The prior art does not describe any EGFR inhibitors with a structure similar to osimertinib.

376.    Nor does the prior art describe the concept of an EGFR inhibitor that selectively binds to mutant forms of EGFR at concentrations that spare the wild type. Indeed, the POSA following the prior art would likely not identify osimertinib as a potential EGFR inhibitor for use in treating disease, since the standard assays in 2005 and 2006 looked for activity against wild-type EGFR. The prior art in 2005 and 2006 thus would have given the POSA neither the guidance nor the tools to identify mutant selective EGFR inhibitors, like osimertinib, that Plaintiffs argue fall within the asserted claims.

377.    Similarly, as discussed above in Section XII.A.1, the '162 patent states that the claimed irreversible EGFR inhibitors are "not necessarily a low molecular weight compound, but may also be a larger compound, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '162 patent, 13:8–14; '314 patent, 13:3–13. I am not aware that the prior art describes any such larger compounds as irreversible EGFR inhibitors, and the POSA would have found no guidance in the prior art in attempting to identify or use such larger compounds to carry out the claimed method.

125

███████████████████████████████

### 4. The Level of Ordinary Skill in the Art

378.   While the level of skill of workers in the field of developing new cancer treatments generally was high, gefitinib and erlotinib themselves were only approved in 2003 and 2004, respectively, and therefore the POSA would have had only limited experience with, or knowledge about, gefitinib and/or erlotinib resistant NSCLC. May 5, 2003 Approval Letter for NDA No. 021399 (IRESSA (gefitinib tablets); November 18, 2004 Approval Letter for NDA No. 021743 (TARCEVA (erlotinib) tablets). Moreover, the T790M mutation had first been reported as a mechanism for gefitinib and/or erlotinib resistance in February 2005. *See* Kobayashi NEJM 2005; Pao et al., *Acquired Resistance to Lung Adenocarcinomas to Gefitinib or Erlotinib is Associated with a Second Mutation in the EGFR Kinase Domain*, 2 PLOS MEDICINE 225 (Feb. 22, 2005) ("Pao 2005"). The POSA would have had even more limited experience with, and knowledge about, gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. As discussed above in Section XII.A.2, crystal structures of EGFR with the T790M mutation were not available in 2005-2006. Suzuki 2007 at 1981. Similarly, while irreversible EGFR inhibitors had been described in the literature as of the late 1990s, none had been FDA approved by 2005 or 2006. The first irreversible EGFR inhibitor to be FDA approved was afatinib, in 2013. July 12, 2013 Approval Letter for NDA No. 201292 (GILOTRIF (afatinib) tablets). As a result, the POSA would have had only limited experience with, and concerns about, identifying a suitable compound for use in a method of treating, and determining the dose calculated to produce the desired therapeutic effect in NSCLC patients, let alone those having gefitinib and/or erlotinib resistant NSCLC with the T790M mutation.

███████████████████████████

5.    **The Amount of Guidance or Direction Provided by the Specification and the Presence or Absence of Working Examples**

379.    The patent specification gives very little guidance for practicing the full scope of the method claimed in the asserted claims.

380.    As an initial matter, the patent specification lacks a working example. There is no example in the '162 patent of a patient having gefitinib and/or erlotinib resistant NSCLC being administered a unit dose of any irreversible EGFR inhibitor. Indeed, while the '162 patent acknowledges that "[t]he effective dosage of active ingredient employed may vary depending on the particular compound employed, the mode of administration and the severity of the condition being treated" ('162 patent, 8:57–60), it does not identify any specific dose of any irreversible EGFR inhibitor for any patient that is calculated to produce the desired therapeutic effect. The patent thus lacks meaningful description of how to carry out the method claimed in the asserted claims with any irreversible EGFR inhibitor.

381.    The patent specification also fails to provide guidance regarding many of the essential elements of the claimed method. For example, the patent specification provides no guidance concerning how to determine the unit dose to be administered to a patient in carrying out the claimed method. The experiments with irreversible EGFR inhibitors reported in the patent specification are all *in vitro* experiments conducted on isolated cell lines. The patent does not describe how to determine a unit dose (a dose calculated to produce the desired therapeutic effect) in a patient even for those irreversible EGFR inhibitors (HKI-272, HKI-257, and EKB-569) for which *in vitro* data are provided. The POSA would not have been able to determine such a dose from the information in the patent. The dose necessary to achieve intracellular concentrations in a patient is extremely challenging to determine, and depends upon a wide variety of factors, including the route of administration, drug solubility and bioavailability (particularly for oral

127

administration), the drug's pharmacokinetics (including absorption, distribution, metabolism, and excretion), and its pharmacodynamics (such as its *in vivo* potency and toxicity), to name a few. These factors cannot be predicted from the information in the patent, and the POSA would have found it both challenging and laborious to determine them even for the three identified irreversible EGFR inhibitors, assuming that such a dose even exists—it may be that there is no dose of the three irreversible EGFR inhibitors that can be calculated to produce the desired therapeutic effect.

382.    The '162 patent specification states that "[t]he effective dosage of active ingredient employed may vary depending on the particular compound employed, the mode of administration and the severity of the condition being treated" but then asserts that "[t]he skilled artisan is aware of the effective dose for each patient, which may vary with disease severity, individual genetic variation, or metabolic rate." '162 patent, 8:57–62; *see also* '314 patent, 8:52–57. While it is true that the effective dose of a compound, if there is such a dose, may vary depending upon the compound, the mode of administration, the severity of the disease, individual genetic variation, and/or the patient's metabolic rate, the '162 patent is incorrect that the POSA would have been aware of the effective dose even for any of the irreversible EGFR inhibitors identified in the patent, let alone the many trillions of possible irreversible EGFR inhibitors *not* described in the patent.

383.    Indeed, despite years of investigation and several clinical studies, no dose of HKI-272 (neratinib) has been found that can be expected to achieve a desirable therapeutic effect. *See, e.g.,* Sequist 2010 at 3080 (Wyeth/Pfizer publication reporting that in Wyeth's Phase II trial of HKI-272 in NSCLC patients, none with a known T790M mutation responded); Godin-Heymann 2008 at 877 ("Our findings suggest that the effectiveness seen with this drug at

concentrations required *in vitro* may not be achievable in patients due to drug toxicity, and hence, HKI-272 might not effectively inhibit EGFR T790M at a clinically achievable concentration."). This failure with regard to HKI-272, one of the "preferred" compounds of the '162 patent, 3:60–61, reflects the well-known fact that the development of cancer treatments was, and is, very unpredictable and suffers from a high rate of failure. In 2005-2006 (as now), discovering and developing a new cancer drug that can be administered to achieve a desirable therapeutic effect was extremely challenging, unpredictable, and rife with failure—it was the opposite of routine.

384. Similarly, no dose that achieves a desirable therapeutic effect in patients has been reported for either of the other preferred embodiments of the '162 patent—EKB-569 and HKI-357. *See* Section XII.A.2.e) above (discussing Pfizer's abandonment of EKB-569 following a Phase II trial for which results were never reported); *see Study Evaluating the Safety, Tolerability, and Pharmacokinetics (PK) of HKI-357 Administered Orally to Healthy Subjects*, ClinicalTrials.gov, *available at* https://www.clinicaltrials.gov/study/NCT00550381 (no clinical study results reported for HKI-357).

a) The Specification Does Not Provide Guidance For Determining a Unit Dose

385. The '162 patent's statement that "in general, satisfactory results are obtained when the compounds of the invention are administered at a daily dosage of from about 0.5 to about 1000 mg/kg of body weight," '162 patent, 8:67–9:2, does not remedy this problem, both because it appears to be untrue (no dose of most irreversible EGFR inhibitors, including all those identified in the patent, has been found to provide satisfactory results) and because the suggested range is so broad as to provide no useful guidance for any particular inhibitor. The same is true of the claim limitation that unit dose of the irreversible EGFR inhibitor be between 2 and 500 mg ('162 patent, claim 1), and the '162 patent's similar statement that "[t]he total daily

129

███████████████████████████

dosage is projected to be from about 1 to 1000 mg, preferably from about 2 to 500 mg." *Id.* 8:67–9:2. Those statements do not provide any guidance as to how to determine which irreversible EGFR inhibitors that covalently bind to the designated cysteine residue can be administered as a unit dose (containing a predetermined amount calculated to achieve the desired therapeutic effect) in that range, let alone how to "predetermine" the specific amount to be administered.

b) The Specification Has No Working Examples

386. Indeed, the applicants' own experience with HKI-272 shows both that the information in the '162 patent does not suffice to permit determination of a unit dose of that inhibitor, and that no such dose may exist. In the Spring of 2008, a number of the applicants (Drs. Godin-Heymann, Settleman, and Haber) along with colleagues published additional *in vitro* studies on HKI-272. *See* Godin-Heymann 2008. A then-recently completed Phase I clinical trial had determined that HKI-272 produced dose-limiting toxicity in patients at about 0.2 micromoles/liter. *Id.* at 877. They observed that their earlier *in vitro* studies had been conducted at much higher concentrations (roughly 5-times higher, at 1 micromoles/liter or above) and that the lower 0.2 micromoles/liter dose was sufficient only to inhibit cells with wild-type EGFR and not those expressing EGFR with the T790M mutation. *Id.* Based on these studies, the applicants concluded that it was likely not possible to find a dose of HKI-272 that produced a desirable therapeutic effect—that any dose high enough to inhibit the growth of NSCLC cells expressing the T790M mutation would be toxic to patients. In the authors' words, "[o]ur findings suggest that the effectiveness seen with this drug [HKI-272] at concentrations required *in vitro* may not be achievable in patients due to drug toxicity, and hence, HKI-272 might not effectively inhibit EGFR T790M at a clinically achievable concentration." *Id.*; *see also id.* ("Thus, it is possible that HKI-272 can overcome T790M only at relatively high doses that are not possible to safely achieve in patients."). As discussed above, the authors' conclusions were subsequently confirmed

130

███████████████████████████████████

in a Phase 2 clinical study, which found that NSCLC patients with the T790M mutation did not respond to HKI-272. *See supra* (discussing Sequist 2010).

387.   A unit dose that produces a desirable therapeutic effect in a patient was also never reported for either EKB-569 or HKI-357. *See* Section XII.A.5 above.

388.   Even more challenging to the POSA would have been determining a unit dose (if one exists) for any of the many irreversible EGFR inhibitors *not* described in the patent specification. The '162 patent does not give any guidance concerning how to determine a unit dose. Yet to find a unit dose—"a predetermined quantity of active material calculated to produce the desired therapeutic effect" ('162 patent, 9:40–41)—for any irreversible EGFR inhibitor found to covalently bind to the designated cysteine residue, the POSA would have to determine whether it is active against NSCLC cancer cells having the T790M mutation *in vivo* (including, for example, whether it is able to permeate the cell membrane and achieve adequate drug concentrations inside the cell), whether it is selective to that target (so as not to cause unwanted effects or be depleted by unintended targets), whether it has suitable pharmacokinetics and bioavailability, and whether it is safe and tolerable at effective doses, among other things. *See, e.g.*, Levitzki 1995 at 1783 ("[C]riteria for successful inhibitors are selectivity, cell permeability, bioavailability, appropriate pharmacokinetic properties, and nontoxicity."); Bridges 1999 at 833 ("[W]e had to produce compounds which were active on the enzyme, potent against the enzyme and proliferation in cellular assays, and which could demonstrate blood levels in in vivo testing as well as in vivo inhibition of EGFr TK activity, and an antitumour effect with some sort of therapeutic index."). These determinations are challenging even for individual compounds, let alone for the essentially limitless genus of compounds whose use is claimed in the asserted claims, and experience teaches that, for the vast majority of compounds, no therapeutic dose will

ultimately be found. *See, e.g.,* FDA 2006 ("[N]ine out of ten experimental drugs fail in clinical studies because we cannot accurately predict how they will behave in people based on laboratory and animal studies."); Settleman 2016 at 1101  ("There is also the challenge of the drug discovery and development process itself—a byzantine and expensive undertaking that fails far more than it succeeds.").

<blockquote>
c)   The Specification Does Not Provide Adequate Guidance on Identifying Compounds that Function as Irreversible EGFR Inhibitors and Bind to the Cysteine Residue, Including Mutant-Selective Irreversible EGFR Inhibitors
</blockquote>

389.   In addition to the challenge of finding a unit dose for any irreversible EGFR inhibitor that covalently binds to the designated cysteine residue, the POSA seeking to carry out the method claimed in the asserted claims would also have the challenge of finding compounds that function as irreversible EGFR inhibitors and that bind to the designated cysteine residue in the first place. Here, too, the patent specification gives no guidance to the POSA seeking to carry out the full scope of the claims. The specification identifies only three irreversible EGFR inhibitors for carrying out the method claimed in the asserted claims of the '162 patent: HKI-272, HKI-357, and EKB-569. (Although the specification mentions a fourth irreversible EGFR inhibitor, CL-387,785, use of that inhibitor does not fall within the method claimed by the asserted claims, as it is expressly excluded from the claims, *see* '162 patent, claim 1.) The specification provides no guidance as to how to find other irreversible EGFR inhibitors for carrying out the claimed method.

390.   The three irreversible EGFR inhibitors described in the patent (HKI-272, HKI-357, and EKB-569) are all very similar in structure, as can be seen by examining Figure 2B of the patent. '162 patent, Fig. 2B. All are 4-anilinoquinoline-3-carbonitriles, as the patent specification acknowledges. *See* '162 patent, 7:28–38, *see also* '314 patent, 7:26–36. All have a

███████████████████████████

4-carbon Michael acceptor, dimethlyaminobutenamide, at the 6-position on the quinoline ring. All have an ethoxy at the 7-position of the quinoline ring. All have a chlorine at the meta-position on the aniline ring. The sole difference between the three inhibitors is the substituent at the para position on the aniline ring. The POSA would have recognized these three irreversible EGFR inhibitors as being very similar in structure and would not find in the specification any guidance on how to construct an irreversible EGFR inhibitor for carrying out the method outside of the three expressly described.

391.    In 2008, when the authors (including three of the applicants) published their *in vitro* work showing that HKI-272 was unlikely to be suitable for treating NSCLC with the T790M mutation, they recognized a need for new irreversible EGFR inhibitors beyond those then available. *See* Godin-Heymann 2008 at 877 ("Thus, there is clearly a need to develop a more potent irreversible EGFR inhibitor, with potentially reduced toxicity, to overcome the drug resistance associated with secondary T790M mutations."). Despite recognizing the need for new irreversible EGFR inhibitors, however, the authors did not suggest what such an irreversible EGFR inhibitor would look like. Indeed, their stated focus on increased potency suggests that they still had not recognized the need for greater selectivity for mutant EGFR over wild-type. Only after learning of the work of others demonstrating the potential utility of later developed irreversible EGFR inhibitors with reduced potency against wild-type EGFR and increased potency for mutant did the applicants recognize the utility of these new, "wild-type sparing, mutant selective" inhibitors.

392.    For example, in Dr. Settleman's February 2013 publication "Noncovalent Wild-type-Sparing Inhibitors of EGFR T790M," he wrote:

> [A]ll of these [second generation] irreversible inhibitors currently
> undergoing clinical testing, such as BIBW2992, PF00299804, and

133

█████████████████████████████

> HKI-272, have thus far shown limited clinical efficacy, possibly because of their potency against wild-type EGFR, leading to skin rash and gastrointestinal toxicity, which has limited their maximal dosing to levels less than those that may be required to achieve drug exposure sufficient to overcome the EGFR T790M mutation. An encouraging recent study, however, showed a preclinical irreversible pyrimidine-based mutant selective EGFR inhibitor with greater potency against EGFR T790M than current clinical quinazoline-based irreversible inhibitors.

H-J Lee *et al.*, *Noncovalent Wild-type-Sparing Inhibitors of EGFR T790M*, 3 Cancer Disc. 168–81, 170 (2013) ("Lee 2013"). For the "encouraging recent study" of an irreversible pyrimidine-based mutant selective EGFR inhibitor, Dr. Settleman cited to a 2009 publication from researchers at the Dana Farber Cancer Institute and Brigham and Women's Hospital, W. Zhou *et al.*, *Novel mutant-selective EGFR kinase inhibitors against EGFR T790M*, 462 Nature: 1070–74 (2009).

393.    Similarly, in 2010, when Dr. Haber learned that Clovis Oncology and Avila Therapeutics were developing an irreversible mutant-selective EGFR inhibitor to treat T790M-positive NSCLC patients, he stated "[t]he development of a drug that is both mutant-specific and capable of irreversibly binding the enzyme is one of the most exciting new developments in this field" and "[s]uch an inhibitor could overcome this resistance mutation at dosage levels that would spare the wild type EGFR in normal tissues. This could prove to be of major clinical significance." News Release, "Clovis Oncology and Avila Therapeutics Sign $209 Million Partnership for the Worldwide Development and Commercialization of EGFR Mutant-Selective Inhibitor" at 1–2 (May 25, 2010) (MGH000033455-58). Dr. Haber thus recognized irreversible mutant-selective EGFR inhibitors as a new development in 2010.

394.    The '162 patent specification does not describe either irreversible pyrimidine-based EGFR inhibitors or irreversible mutant-selective EGFR inhibitors. Nor does the specification contain any guidance that would lead the POSA to such inhibitors or assist in their development. To the contrary, as noted, the irreversible EGFR inhibitors described in the

████████████████████

specification for carrying out the method claimed in the asserted claims of the '162 patent are all

4-anilinoquinoline-3-carbonitriles, a structure that is very different from pyrimidine-based EGFR

inhibitors and that are adapted to inhibiting wild-type EGFR, not mutant EGFR. As Dr. Settleman

confirmed in his own testing reported in his February 2013 Cancer Discovery publication, HKI-

272 is "in fact more potent against wild-type EGFR than the T790M-containing mutants." Lee

2013 at 177; *see also id.* at 173 ("HKI-272 displayed significantly less potency on EGFR T790M

than wild-type EGFR").

395.    The '162 patent specification would lead the POSA away from mutant-

selective EGFR inhibitors. The specification states that the irreversible EGFR inhibitor for

carrying out the claimed method "may be any compound which binds to cysteine 773 of EGFR

(SEQ ID NO: 1)." '162 patent, 3:62–64. As SEQ ID NO:1 is wild-type EGFR ('162 patent,

12:59–63), the POSA would have understood the specification to be instructing that the

irreversible EGFR inhibitors to be used with the claimed method are those that irreversibly inhibit

and covalently bind to *wild-type* EGFR, not those that spare wild-type and bind selectively to

mutant EGFR.

396.    The '162 specification describes wild-type EGFR as predominant, even in

tumor specimens having the T790M mutation. *See, e.g.*, *id.* 18:51–61 (Table 1). The '162

specification observes that:

> this [T790M] mutation is present only in a subset of cases, and
> *even tumors that harbor the T790M mutation may contain only a*
> *small fraction of cells with this mutation*. These observations imply
> that multiple resistance mechanisms can coexist in recurrent
> tumors after an initial response to gefitinib or similar reversible
> EGFR inhibitors. Moreover, these findings suggest that T790M-
> independent resistance mechanisms may be equally, if not more,
> effective than the T790M substitution itself in conferring drug
> resistance and may explain why recurrent tumors rarely exhibit
> clonality for T790M."

135

███████████████████████████

'162 patent, 17:54-64 (emphasis added).

397.    The POSA would have understood the specification to be instructing that, even in NSCLC with the T790M mutation, other mechanisms of resistance, such as the "altered trafficking of the wild-type receptor" proposed in the '162 patent ('162 patent, 17:58–61), are important and that therefore irreversible inhibition of wild-type EGFR would be important in treating NSCLC with the T790M mutation.

### 6.    The Quantity of Experimentation Needed to Make or Use the Invention Based on the Content of the Disclosure

398.    The asserted claims of the '162 patent claim methods of treating patients having gefitinib and/or erlotinib resistant NSCLC with the T790M mutation in SEQ ID NO:1 by administering daily any compound (whether small molecule or larger compound) that functions as an irreversible EGFR inhibitor and covalently binds to the designated cysteine in a unit dose—a predetermined amount calculated to produce the desired therapeutic effect—of 2 to 500 mg. As described above in Section XII.A.1, the number of compounds that potentially function as irreversible EGFR inhibitors that covalently bind to the designated cysteine residue is vast and essentially limitless. By contrast, the guidance in the specification is extremely limited: the specification describes only three irreversible EGFR inhibitors for carrying out the claimed method of the asserted claims, and all three inhibitors have very similar structures. Similarly, the specification provides no meaningful guidance with regard to the unit dose (the amount calculated to produce the desired therapeutic effect) even for the three irreversible EGFR inhibitors described in the specification, let alone the vast inhibitors falling within the claim but not described.

399.    The specification thus leaves the POSA to his or her own devices in attempting to make and use the full scope of the asserted claims. The task of determining which

compounds function as required by the asserted claims—that is, that irreversibly inhibit EGFR and covalently bind to the designated cysteine residue—would have been unpredictable, burdensome, and time-consuming. Moreover, the further required task of determining for any particular candidate the dose calculated to achieve the desired therapeutic effect (the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1) is also highly challenging, unpredictable, and highly burdensome. In 2005-2006 (as now), discovering and developing a new cancer drug that could be administered to achieve a desirable therapeutic effect was extremely challenging, unpredictable, and rife with failure—it was the opposite of routine.

400.    It is readily apparent that determining the full scope of the asserted claims of the '162 patent would have been an overwhelming and practically impossible task for the POSA. Neither the patent specification nor the teachings of the prior art would have led him or her to pyrimidine-based, mutant-selective irreversible EGFR inhibitors, such as those described in Zhou 2009 or pursued by Clovis Oncology. Finding and developing such inhibitors would not have been routine, but rather the opposite. In Dr. Haber's words, such inhibitors even in 2010 were "one of the most exciting new developments" that were potentially of "major clinical significance." Clovis/Avila News Release 2010. Development of such inhibitors was clearly not routine as of 2005-2006, and required overcoming long odds—the compounds described in Zhou and that pursued by Clovis Oncology ultimately failed. Development of an irreversible wild-type sparing, mutant selective EGFR inhibitor was a very challenging and unpredictable task.

401.    Similarly, it would have been far from routine for the POSA to make and use the "larger compounds," that the '162 patent specification states fall within the asserted claims ('162 patent, 13:8–14). The patent does not identify such larger compounds that act as

████████████████████████

irreversible EGFR inhibitors and bind to the designed cysteine residue. I am unaware of any such compounds, even today. It would have been a truly innovative step, and far from routine, to develop a "larger compound" as an irreversible EGFR inhibitor that binds to the designated cysteine residue.

402.    In short, the amount of experimentation that the POSA reading the '162 patent specification would have required to make and use the full scope of the asserted claims would be extreme. Even today, it is unlikely that we know the full scope of compounds that can function as irreversible EGFR inhibitors and covalently bind to the designated cysteine residue, let alone determine which of those compounds is suitable to be used therapeutically in patients having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation, and what the unit dose would be. It would have been a major achievement to find and use one such compound; finding the full scope would have been beyond the capacity even of current science.

403.    In summary, it is my opinion that it would have been far from routine for the POSA reading the '162 patent specification to make and use the full scope of the asserted claims. It is my opinion the patent specification clearly fails to enable the full scope of the claims.

**B.    The '162 Patent Specification Does Not Disclose Any General Quality Running Through the Class That May Reliably Enable the POSA to Make and Use All of What Is Claimed**

404.    As noted above in Section V.D, I have been informed that a claim to a class may be enabled if the specification both gives a few examples of embodiments and also discloses some general quality running through the class that gives it a peculiar fitness for the particular purpose which may reliably enable the POSA to make and use all of what is claimed, and not merely a subset.

405.    There is no general quality running through the class that gives the claimed inhibitors a peculiar fitness for the claimed methods of treating. I am not aware that

████████████████████████

Plaintiffs have pointed to any such general quality running through the class; nor can they. It is not that the case that being an irreversible EGFR inhibitor that covalently binds to the designated residue is a general quality running through the class that gives it a peculiar fitness for the particular purpose which may reliably enable a person skilled in the art to make and use all of what is claimed. *See* § V.C

406.   First, being an irreversible EGFR inhibitor that binds to a particular residue is not a general quality running through the class that may reliably enable a person skilled in the art to make and use all of what is claimed. Those are functions that a compound may have under certain conditions. The POSA would not have been able to determine what compounds will function as irreversible EGFR inhibitors that covalently bind to the designated cysteine residue merely by looking at the structure; it would have required considerable experimental work and would have been unpredictable to identify compounds that satisfy those functions. Thus, the POSA would not have been enabled to make and use all of what is claimed in the asserted claims simply by knowing that the compounds to be used should be irreversible EGFR inhibitors that covalently bind to the designated residue. As discussed above, finding the full range of such compounds would have been far from routine, unpredictable, and a task essentially unaided (and, in the case of wild-type sparing, mutant selective EGFR inhibitors, hindered) by the '162 patent specification.

407.   Moreover, being an irreversible EGFR inhibitor that binds to the designated cysteine residue does not give a compound a peculiar fitness for the method claimed in the asserted claims of the '162 patent such that the POSA would have been enabled to reliably make and use all of what is claimed. The asserted claims require the irreversible EGFR inhibitor compound to be administered daily in a unit dose to treat patients having gefitinib and/or erlotinib

███████████████████████████████

resistant NSCLC with the T790M. *See* '162 patent, claim 1. A unit dose is defined in the specification to include a predetermined amount of the compound calculated to produce the desired therapeutic effect. '162 patent, 9:37–42. The vast majority of irreversible EGFR inhibitors that bind to the designated residue likely cannot be administered in such a dose because the compound either is unsuitable for administration to patients, is toxic, unstable, or lacks a therapeutic index (that is, its minimum effective dose is significantly above the maximum tolerated dose).

408.     Most irreversible EGFR inhibitors tested have failed to treat patients having gefitinib and/or erlotinib resistant NSCLC having a T790M mutation. As noted above, HKI-272 failed in such patients with the T790M mutation. *See, e.g.*, ¶¶ 367–368, 383. So did Pfizer's next attempt, dacomitinib. *See, e.g.*, ¶ 26. Pfizer's first attempt, CI-1033 (canertinib) also failed. *See, e.g.*, ¶¶ 362–364. The applicants acknowledged during prosecution that CI-1033 fails to treat gefitinib and/or erlotinib resistant NSCLC. U.S. '474 application, March 9, 2016 Response ("[I]t should be noted that CI-1033 has failed to overcome resistance in EGFR mutants, such as in the presence of C797S with T790M mutations in EGFR."); '474 application, August 1, 2016 Amendment and Response at 7 ("[I]t was known in the art that irreversible EGFR inhibitors (i.e. CI-1033) were not effective against resistant forms of cancer.").

409.     The POSA thus could not have merely relied on a compound's function as an irreversible inhibitor that covalently binds to the designated cysteine residue to practice the full scope of the asserted claims of the '162 patent. To the contrary, for the vast majority of such compounds, a unit dose either does not exist or cannot be found. *See, e.g.*, ¶ 388. Even were the POSA to determine that a compound functions as an irreversible EGFR inhibitor and covalently binds to the designated cysteine residue, he or she still could not practice the claimed method

without first determining whether the compound could be administered to patients to achieve the desired therapeutic effect and, if so, what the dose would be to achieve that effect. Merely being an irreversible EGFR inhibitor that covalently binds to the designated cysteine residue is demonstrably *not* a reliable indicator of fitness for use in the claimed method.

### C.   The '314 Patent Specification Fails to Enable The Asserted Claims of the '314 Patent Because the POSA Would Not Have Been Able to Make And Use The Full Scope Of The Claimed Method

410.   A person of ordinary skill in the art would not be enabled to make and use the full scope of the asserted claims of the '314 patent. As I will describe more fully below, the asserted claims claim methods of treating patients having gefitinib and/or erlotinib resistant NSCLC by administering daily any compound (whether small molecule or larger compound) that functions as an irreversible EGFR inhibitor and covalently binds to a designated cysteine in a unit dose—a predetermined amount calculated to produce the desired therapeutic effect. The number of compounds that potentially function as irreversible EGFR inhibitors that covalently bind to one of the designated residues is vast and essentially limitless, and the task of determining which of those candidates function as required by the claim—that is, that irreversibly inhibit EGFR and covalently bind to one of the designated residues—as well as the further required task of determining for any particular candidate the dose calculated to achieve the desired therapeutic effect (the treatment of gefitinib and/or erlotinib resistant NSCLC) are highly challenging, unpredictable, and highly burdensome. By contrast, the patent specification provides extremely limited guidance, as it describes only three compounds for carrying out the asserted claims of the '314 patent, all of similar structure, no working example of the treatment of a patient with gefitinib and/or erlotinib resistant NSCLC is provided, and no guidance is given as to how to determine a unit dose of any irreversible EGFR inhibitor.

141

███████████████████████████

411.     In short, it is readily apparent that the specification drastically fails to enable a person of ordinary skill in the art to make and use the full scope of the claimed method, since he or she could not, from the teachings of the patent and the knowledge at the time, select from the many trillions of possible irreversible EGFR inhibitors those that will irreversibly inhibit EGFR and covalently bind to the designated residue and then treat a patient with gefitinib and/or erlotinib resistant NSCLC by administering a unit dose of the compound containing a predetermined amount of the drug calculated to achieve the desired therapeutic effect.

412.     My opinion that the patent specification fails to enable the asserted claims of the '314 patent is supported by consideration of the *Wands* factors described above.

1.     **The Breadth of the Claims**

413.     Like the '162 patent (claims 1, 3–6, and 9), the claims of the '314 patent are incredibly broad and are directed to treating patients by administering certain compounds defined only by their function. Claims 1, 3–6, and 9 require the compound to irreversibly inhibit EGFR and to covalently bind either to "cysteine 773 residue in the ligand-binding pocket of EGFR" or "cysteine 805 residue in the ligand-binding pocket of erb-B2." In addition, the claim requires the compound to be administered as a unit dose "containing a predetermined quantity of active material calculated to produce the desired therapeutic effect." '314 patent, 9:33–38.

414.     The '314 patent makes clear that the asserted claims extend to any compound meeting the functional requirements: "the irreversible EGFR inhibitor may be any compound which binds to cysteine 773 of EGFR (SEQ ID NO: 1)." '314 patent, 3:57–59. And, like the '162 patent, the '314 patent instructs that the claims are not limited to small molecule compounds. *See* '314 patent, 13:3–13, ¶ 329. The '314 patent also potentially encompasses the billions of compounds disclosed in the '008 patent and the '912 patent (*See* §§ XII.A.1.a)–XII.A.1.b), as well as any other compounds that irreversibly inhibit EGFR and covalently bind to

142

the cysteine 773 residue (*See* ¶ 337, § XII.A.1.c). As with the '162 patent, it would be beyond the capacity of the POSA to determine which of the trillions of compounds that may fall within the '314 patent inhibit EGFR, let alone evaluate whether the compound was suitable for use in patients and capable of treating gefitinib and/or erlotinib resistant NSCLC and, if so, to determine a dose expected to achieve a desirable therapeutic effect.

415.    The '314 patent shares the same specification as the '162 patent and has the same limited guidance and disclosures. Accordingly, as with the '162 patent, a person of ordinary skill in the art reading the patent at the time of filing (whether in 2005 or 2006), would recognize that the scope of the asserted claims was extraordinarily vast. *See* ¶ 340. He or she would understand that many trillions of compounds—both small molecule and larger and both known and unknown—might potentially function as an irreversible EGFR inhibitor that covalently binds to cysteine 797 of SEQ ID NO:1 having a T790M mutation, though he or she could not possibly envision them all, let alone synthesize and test them. *See* ¶ 340.

416.    Unlike the '162 patent, claims 1, 4–6, and 9 of the '314 patent also encompass any compound that irreversibly inhibits EGFR and covalently binds to "cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. Thus on top of the many trillions of compounds that may irreversibly inhibit EGFR and covalently bind to cysteine 773 residue in EGFR, there could be additional compounds that irreversibly inhibit EGFR and covalently bind to the cysteine 805 residue of erb-B2 but not cysteine 773 of EGFR. It would be beyond the capacity of a person of ordinary skill in the art (and certainly far from routine) to determine which of the many potential structures covalently bind to the cysteine 805 residue of erbB-2, without binding to cysteine 773 of EGFR, and inhibit EGFR. And it would then require additional, burdensome work to evaluate whether the compound was suitable for use in patients

████████████████████████

and capable of treating gefitinib and/or erlotinib resistant NSCLC, and, if so, to determine a dose expected to achieve a desirable therapeutic effect.

      2.    **The Nature Of The Invention and the Level of Predictability In The Art**

417.    The nature of the invention claimed in the asserted claims of the '314 patent is the treatment of patients with gefitinib and/or erlotinib resistant NSCLC by administering a unit dose of an irreversible EGFR inhibitor that covalently binds to at least one of (a) the "cysteine 773 residue in the ligand-binding pocket of EGFR" or (b) the "cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1.  Because the asserted claims are not limited to specific, identified compounds of known therapeutic effect, but instead encompass the use of any compound meeting the functional requirements, whether known or unknown, the nature of the invention includes both drug development (the discovery of new drug candidates and their development for clinical use) and treatment (the administration of drugs to patients to achieve therapeutic effects).

418.    As explained above, drug development is a highly unpredictable art, with significant and burdensome challenges in developing drug candidates that are active with respect to an intended target, selective to the target, having suitable pharmacokinetics and bioavailability, ability to permeate the cell membrane, and are safe and tolerable. *See, e.g.*, § XII.A.2.a). Development of cancer treatments are among the most challenge and unpredictable of all therapeutic areas. *See, e.g.*, ¶¶ 345–346.

419.    These challenges would apply with full force to the development in 2005 and 2006 of an irreversible EGFR inhibitor for the treatment of gefitinib and/or erlotinib resistant NSCLC. *See, e.g.*, § XII.A.2.b)

420.     As explained in paragraphs 347–349, the POSA would have recognized that an inhibitor should be selective for its target enzymes, which is an unpredictable endeavor. It would be further unpredictable whether any such compound was suitable for pharmaceutical use. *See, e.g.*, ¶ 350. These pursuits were made more difficult by the fact that modeling of inhibitor-kinase interactions were difficult and varied in 2005 and 2006. *See, e.g.*, § XII.A.2.c)

421.     In addition to challenges in developing selective drug candidates in *in vitro* models, the POSA would have understood that the degree of that compound's *in vivo* suitability and its utility as a treatment in patients was high unpredictable. *See, e.g.*, § XII.A.2.d)–XII.A.2.e). Results reported using animal models are also often not reproducible. *See, e.g.*, ¶ 355. The literature is replete with examples of compounds showing promising *in vitro* or preclinical data that ultimately failed for clinical use, including compounds developed as irreversible EGFR inhibitors. *See, e.g.*, ¶¶ 356-368.

422.     In short, the claimed method here implicates tasks—the development and implementation of new treatments for cancer that can be administered to patients in doses "calculated to produce the desired therapeutic effect" ('314 patent, 9:37)—that are both extraordinarily challenging and highly unpredictable. As one of the applicants later described it in a 2016 publication in Cell, drug discovery is even more unpredictable than putting a man on the moon:

> Putting a man on the moon should not have required good luck— rather it required accurate calculations and quantitative measurements of well-understood physical systems.  Biology, on the other hand, is still very much incompletely understood, and the results of various perturbations of biological systems remains largely unpredictable.

███████████████████████████

Settleman 2016 at 1103. This applies with full force to the development in 2005 or 2006 of irreversible EGFR inhibitors that covalently bind to the designated residue to be administered in unit dose to patients with gefitinib and/or erlotinib NSCLC.

### 3. The State Of The Prior Art

423. As with the '162 patent, the scope of the asserted claims of the '314 patent goes far beyond the teachings of the prior art. The asserted claims of the '314 patent encompass the use of an irreversible EGFR inhibitor that covalently binds to a designated cysteine residue, without limitation as to structure. The claims also require the administration of the irreversible EGFR inhibitor calculated to produce the desired therapeutic effect. The prior art would provide little to no guidance to a person of ordinary skill in carrying out the full scope of the claimed method; both the range of appropriate structures and the appropriate dosing for each structure would be highly variable and unpredictable and could not be determined from the prior art.

424. First, as discussed above, the prior art describes many compounds that a person of ordinary skill at the time would recognize as possible irreversible EGFR inhibitors, but provides little guidance concerning which of those will covalently bind to at least one of the designated residues, which are suitable for administration to patients with gefitinib and/or erlotinib resistant NSCLC, and which can be administered in a dose calculated to produce a desired therapeutic effect. As discussed in Sections XII.A.1.a)–XII.A.1.b), the example '008 patent and '912 patent disclose billions of compounds that a POSA in 2005 or 2006 would recognize as *possible* EGFR inhibitors. Neither patent identifies which of the compounds are an irreversible inhibitor, which form a covalent bond with EGFR, which form a covalent bond with erb-B2, and, for those that do, where the bond forms, and do not describe either the suitability of the compounds for administration to patients nor the appropriate dosing. These matters cannot be predicted from structure and are challenging to determine. *See* ¶¶ 371–373. As explained in

146

█████████████████████████████

paragraph 372, even Wyeth was not able to determine a dose calculated to achieve a desired therapeutic effect of HKI-272 in patients with NSCLC having one form of resistant NSCLC—the T790M. Thus, the prior art provides minimal guidance for carrying out the method of treatment claimed in the asserted claims of the '314 patent even with regard to potential irreversible EGFR inhibitors described in the prior art. Likewise, the prior art also provides little guidance on the development of irreversible EGFR inhibitors that covalently bind to erbB-2.

425.    As with the '162 patent, the prior art gives even less guidance with regard to irreversible EGFR inhibitors not described in the prior art. *See* ¶ 374.

426.    As described in paragraphs 375–377, the prior art would not give the POSA guidance on developing compounds with a structure similar to osimertinib, compounds that selectively binds to mutant forms of EGFR, and or larger compounds as irreversible EGFR inhibitors that can carry out the claimed method.

4.    **The Level of Ordinary Skill in the Art**

427.    While the level of skill of workers in the field of developing new cancer treatments generally was high, gefitinib and erlotinib themselves were only approved in 2003 and 2004, respectively, and therefore a person of ordinary skill in the field would have had only limited experience with, or knowledge about, gefitinib and/or erlotinib resistant NSCLC. May 5, 2003 Approval Letter for NDA No. 021399 (IRESSA (gefitinib tablets); November 18, 2004 Approval Letter for NDA No. 021743 (TARCEVA (erlotinib) tablets). Moreover, mechanisms of resistance to treatment with gefitinib and/or erlotinib were very poorly understood in 2005. The '314 patent itself acknowledges that "[t]he mechanisms of acquired drug resistance are not well understood." '314 patent, 6:34–35. For example, the T790M mutation had first been reported as a potential mechanism for gefitinib and/or erlotinib resistance in February 2005 (in Kobayashi NEJM 2005 and Pao PLOS 2005), so a person of ordinary skill will have had even more limited

experience with, and knowledge about, gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. Other mechanisms of resistance—such as MET amplifications—were identified after 2005/2006, and more resistance mechanisms remain to be discovered. *See, e.g.,* J. Engelman et al., MET *Amplification Leads to Gefitinib Resistance in Lung Cancer by Activating ERBB2 Signaling*, 316 SCIENCE 1039 (2007) ("Engelman 2007"). Similarly, while irreversible EGFR inhibitors had been described in the prior art in the late 1990s, none had been FDA approved by 2005 or 2006 (the first, afatinib, was only FDA approved in 2013). July 12, 2013 Approval Letter for NDA No. 201292 (GILOTRIF (afatinib) tablets). As a result, a person of ordinary skill would have had only limited experience with, and knowledge about, determining the dose of an irreversible EGFR inhibitor calculated to produce the desired therapeutic effect in NSCLC patients, let alone those with gefitinib and/or erlotinib resistant NSCLC.

### 5. The Amount of Guidance or Direction Provided by the Specification and the Presence or Absence of Working Examples

428. The patent specification gives very little guidance for practicing the full scope of the invention claimed in the asserted claims.

429. As explained in paragraph 380 and Section XII.A.5.b), the patent specification lacks a working example.

430. For the reasons provided in Section XII.A.5.a), the patent specification also fails to provide guidance regarding how to determine the unit dose to be administered to a patient while carrying out the claimed method. As evidenced in part by the applicants' own failure to identify a unit dose of HKI-272 (or EKB-569 or HKI-357) in patients with NSCLC having the T790M mutation, discovering and developing a new cancer drug that can be administered to achieve a desirable therapeutic effect was extremely challenging, unpredictable, and rife with failure. It was the opposite of routine.

148

████████████████████████

431.     Determining a unit dose (if one exists) for the many irreversible EGFR inhibitors not described in the patent specification would have been particularly challenging. *See, e.g.*, ¶ 388. To a find a unit dose—"a predetermined quantity of active material calculated to produce the desired therapeutic effect"—for any irreversible EGFR inhibitor found to bind to either of the designated residues, a person of ordinary skill must determine whether the inhibitor is active against NSCLC cancer cells resistant to gefitinib *in vivo* (including, for example, whether it is able to permeate the cell membrane and achieve adequate drug concentrations inside the cell), whether it is selective to that of the target (so as not to cause unwanted effects or be depleted by unintended targets), whether it has suitable pharmacokinetics and bioavailability, and whether it is safe and tolerable at affective doses, among other things. *See id*. These determinations are challenging even for individual compounds, let alone for the essentially limitless genus of compounds whose use is claimed in  the asserted claims, and experience teaches that, for the vast majority of compounds, no therapeutic dose will ultimately be found. *See id*.

432.     For the reasons provided in Section XII.A.5.c), the patent specification fails to provide adequate guidance on finding compounds that function as irreversible EGFR inhibitors and that bind to the designated cysteine residues. The irreversible EGFR inhibitors described in the specification for carrying out the method claimed in the '314 patent are all 4-anilinoquinoline-3-carbonitriles of similar structure. ¶ 390. A person of ordinary skill in the art in 2005 or 2006 would recognize the three irreversible EGFR inhibitors as being very similar in structure and would not find in the specification any guidance on how to construct an irreversible EGFR inhibitor for carrying out the method outside of the three expressly described, including,

███████████████████████

for example, irreversible mutant-selective EGFR inhibitors. In fact, the patent specification would lead the POSA away from mutant-selective EGFR inhibitors. ¶¶ 391–397.

<div align="center">

6.    **The Quantity of Experimentation Needed to Make or Use the Invention Based on the Content of the Disclosure**

</div>

433.    The asserted claims of the '314 patent claim methods of treating patients having gefitinib and/or erlotinib resistant NSCLC by administering daily any compound (whether small molecule or larger compound) that functions as an irreversible EGFR inhibitor and covalently binds to s designated cysteine in a unit dose. As described above, the number of compounds that potentially function as irreversible EGFR inhibitors that covalently bind to the designated residues is vast and essentially limitless. By contrast, the guidance in the specification is extremely limited: the specification describes only three irreversible EGFR inhibitors for carrying out the claimed method of the asserted claims of the '314 patent, and all three have very similar structures. Similarly, the specification gives no meaningful guidance with regard to the unit dose (the amount calculated to produce the desired therapeutic effect) even for the irreversible EGFR inhibitors described in the specification, let alone the many inhibitors falling with the claim but not described.

434.    The specification thus leaves a person of ordinary skill to his or her own devices in attempting to make and use the full scope of the asserted claims. The task of determining which compounds function as required by the claim—that is, that irreversibly inhibit EGFR and covalently bind to at least one of the designated residues—is unpredictable, burdensome, and time-consuming. Moreover, the further required task of determining for any particular candidate the dose calculated to achieve the desired therapeutic effect (the treatment of gefitinib and/or erlotinib resistant NSCLC) is also highly challenging, unpredictable, and highly burdensome. In 2005 or 2006, as now, discovering and developing a new cancer drug that can be

<div align="center">150</div>

██████████████████████████████████

administered to achieve a desirable therapeutic effect was extremely challenging, unpredictable, and rife with failure. It was the opposite of routine.

435.     It is readily apparent that determining the full scope of the asserted claims of the '314 patent would be an overwhelming and probably impossible task for a person of ordinary skill. Neither the patent specification nor the teachings of the prior art would lead him or her to the pyrimidine-based, mutant-selective irreversible EGFR inhibitors, such as those described in Zhou 2009 or pursued by Clovis Oncology. Finding and developing such inhibitors would not be routine, but rather the reverse. *See* ¶¶ 398–403.

436.     Similarly, it would be far from routine for a person of skill in the art to make and use the "larger compounds," that the patent specification asserts fall within the asserted claims ('314 patent, 13:3–13). No such larger compounds that act as irreversible EGFR inhibitors that bind to the designed residue are known, even today. It would be a very innovative step, and far from routine, to develop a larger compound as an irreversible EGFR inhibitor that binds to the designated residue.

437.     In short, the amount of experimentation that a person of ordinary skill reading the '314 patent specification would need to make and use the full scope of the claimed method would be extreme. Even today, it is unlikely that we know the full scope of compounds that can function as irreversible EGFR inhibitors and covalently bind to one of the designated residues, let alone determine which of those can be used therapeutically in patients with gefitinib and/or erlotinib resistant NSCLC and, for those, what that dose would be. It would be major achievement to find and use one such compound; finding the full scope would be beyond the capacity even of current science.

████████████████████████████████

438.    In sum, it is my opinion that it would not be routine experimentation for a person of ordinary skill reading the '314 patent specification to make and use the full scope of the claimed method of the asserted claims.  It is my opinion the patent specification thus fails to enable the full scope of the claims.

> ### D.    The '314 Patent Specification Does Not Disclose Any General Quality Running Through the Class That May Reliably Enable the POSA to Make and Use All of What Is Claimed.

439.    As noted, I have been informed that a claim to a class may be enabled if the specification both gives a few examples of embodiments and also discloses some general quality running through the class that gives it a peculiar fitness for the particular purpose which may reliably enable a person skilled in the art to make and use all of what is claimed, and not merely a subset.

440.    There is no general quality running through the class that renders that gives the claimed inhibitors a peculiar fitness for a particular purpose. Plaintiffs have not specified any such general quality. It is not that the case being an irreversible EGFR inhibitor that covalently binds to one of the designated residues is a "general quality running through the class that gives it a peculiar fitness for the particular purpose which may reliably enable a person skilled in the art to make and use all of what is claimed." First, being an irreversible EGFR inhibitor that binds to a particular residue is not a "general quality running through the class " that "may reliably enable a person skilled in the art to make and use all of what is claimed." Those are functions that a compound may have under certain conditions. A person of ordinary skill cannot determine what compounds will function as irreversible EGFR inhibitors that covalently bind to one of the designated residues by looking at the structure alone, and it requires considerable experimental work and is unpredictable to find those compounds that function in that way. Thus, a person of ordinary skill is not reliably enabled to make and use all of what is claimed simply by

████████████████████████████████

being told that the compounds to be used should be irreversible EGFR inhibitors that covalently

bind to the designated residue.  As discussed above, finding the full range of such compounds

would be far from routine, unpredictable, and a task essentially unaided (and, in the case of wild-

type sparing, mutant selective EGFR inhibitors, hindered) by the patent specification.

      441.    Moreover, being an irreversible EGFR inhibitor that binds to the

designated residue does not give a compound a peculiar fitness for the method claimed in the

asserted claims of the '314 patent which may reliably enable a person skilled in the art to make

and use all of what is claimed. The claims require the compound to be administered daily in a unit

dose to treat patients with gefitinib and/or erlotinib resistant NSCLC. A unit dose is defined in the

specification to include a predetermined amount of the compound calculated to produce the

desired therapeutic effect. The vast majority of irreversible EGFR inhibitors that bind to one of

the designated residues likely cannot be administered in such a dose because the compound either

is unsuitable for administration to patients, toxic, or lacks a therapeutic index (that is, its

minimum effective dose is significantly above the maximum tolerated dose).

      442.    Most irreversible EGFR inhibitors tested have failed to treat gefitinib

and/or erlotinib resistant NSCLC.  As noted above, HKI-272 failed in such patients with the

T790M mutation.  So did Pfizer's next attempt, dacomitinib.  And Pfizer's first attempt, CI-1033

(canertinib) also failed.  The applicants acknowledged during prosecution that CI-1033 fails to

treat gefitinib and/or erlotinib resistant NSCLC. '474 application, March 9, 2016 Response ("[I]t

should be noted that CI-1033 has failed to overcome resistance in EGFR mutants, such as in the

presence of C797S with T790M mutations in EGFR."); '474 application, August 1, 2016

Amendment and Response at 7 ("[I]t was known in the art that irreversible EGFR inhibitors (i.e.

CI-1033) were not effective against resistant forms of cancer.").

443.    A person of ordinary skill in the art thus cannot rely on a compound being an irreversible inhibitor that covalently binds to one of the designated residues to practice the full scope of the asserted claims of the '314 patent. To the contrary, for the vast majority of such compounds, a unit dose either does not exist or cannot be found. Even were a person of ordinary skill able to determine that a compound functions as an irreversible EGFR inhibitor and covalently binds to the designated residue, he or she still could not practice the claimed method without first determining whether the compound can be administered to patients to achieve the desired therapeutic effect and, if so, what the dose should be to achieve that effect. Being an irreversible EGFR inhibitor that covalently binds to the enzyme is not a reliable indicator of fitness for use in the claimed method.

## XIII.  THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION

### A.    The Asserted Claims of the '162 Patent Are Invalid for Lack of Written Description

444.    The '162 patent is invalid for lack of written description because it fails to describe either the irreversible EGFR inhibitors that fall within the claimed method, or a method of treating patients having gefitinib and/or erlotinib resistant NSCLC having a T790M mutation with a unit dose calculated to achieve the desired therapeutic effect. As such, the POSA would *not* have understood the applicants to have been in possession of either the irreversible EGFR inhibitors encompassed by the asserted claims or the claimed method of treating.

445.    The asserted claims potentially encompass any compound that irreversibly inhibits EGFR and covalently binds to the cysteine 773 residue of EGFR. The compounds that fall within the asserted claims are not defined by their structure, but only by their function. Indeed, I understand that, in construing the claim term "irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a

154

████████████████████████

T790M mutation " the Court expressly stated that this term encompasses compounds that perform a particular function. D.I. 121 at 16–17 ("This focus on what the irreversible inhibitors *do*—rather than what they *are*—leads the Court to conclude that a functional definition of the term 'stays true to the claim language' and 'most naturally aligns with the patent's description."). As explained in Section XII.A.1 above, the compounds that function as irreversible EGFR inhibitors by covalently binding to the designated cysteine residues in EGFR are essentially limitless in number. The specification makes clear that the compounds covered by the asserted claims are not limited to small molecules, but also encompass "larger compound[s], for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '162 patent, 13:8–14.

446.     There is no useful description[18] in the specification of how these functionally-defined compounds would be suitable for use in the claimed "method of treating gefitinib and/or erlotinib resistant [NSCLC] having the T790M mutation." '162 patent, claim 1. In particular, there is no description of how compounds meeting the functional limitations of irreversible EGFR inhibition and covalent binding to the designated cysteine residue provide a method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation.

---

[18] The patent speculates that irreversible inhibitors that covalently bind are superior to reversible inhibitors because "increased internalization of ligand-bound EGFR in resistant cells may be linked to dissociation of the gefitinib-EGFR complex at low pH of intracellular vesicles. In contrast, irreversible cross-linking of the receptor would be unaffected by such alterations in receptor trafficking." '314 patent, 18:5–10. The applicants' speculation provides no guidance on selecting any particular irreversible EGFR inhibitor useful in the treatment of patients with gefitinib and/or erlotinib resistant NSCLC. And, in any event, Plaintiffs' speculation was incorrect.

447.    The *only* examples provided in the patent specification are structures and initial *in vitro* data for three example compounds—EKB-569, HKI-272, and HKI-357. *See, e.g.*, '162 patent, 3:61–64. These small molecule inhibitors are not structurally diverse, but have very similar structures that are not representative of the vast array of compounds that can irreversibly inhibit EGFR by covalently binding to the designated cysteine residue. Moreover, the specification does not otherwise describe any structural features common across the irreversible EGFR inhibitors encompassed by the asserted claims. Based on this very limited description in the specification, the POSA would not have understood the applicants to have been in possession of the irreversible EGFR inhibitors encompassed by the asserted claims, suitable for use in a method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation.

448.    The POSA also would not have understood the applicants to have been in possession of a method of treatment comprising administration of a unit dose of an irreversible EGFR inhibitor, calculated to provide a therapeutic effect. The specification reports only limited *in vitro* data for the three example compounds in two cancer cell lines. The specification does not provide any explanation for how that *in vitro* data demonstrates the suitability of any of the three example compounds for use in a *method of treating* a patient with gefitinib and/or erlotinib resistant NSCLC, let alone the suitability of any irreversible EGFR inhibitor that covalently binds to the designated cysteine residue. In particular, the POSA would have been aware of significant hurdles that such compounds would have faced in being used in a method of treating comprising a unit dosage—that is, a "unit containing a predetermined quantity of active material calculated to produce the desired *therapeutic effect* . . . ." '162 patent, 9:37–42 (emphasis added). Due to the covalent binding function of these compounds, toxicity attributable to alkylating agents and lack of selectivity would have been significant concerns. The patent specification does not provide any

███████████████████████████

explanation for how the irreversible EGFR inhibitors encompassed by the asserted claims would overcome these hurdles, and likewise does not contain any indication that the applicants were in possession of any such compounds.

449.   Thus, the POSA would not have understood the applicants to have been in possession of either the irreversible EGFR inhibitors encompassed by the asserted claims, suitable for use in the claimed methods, or in possession of the claimed methods of treating comprising administration of a unit dose calculated to produce a therapeutic effect.

1.   **No Description of a Class of Compounds Suitable for Use in the Claimed Method of Treating Gefitinib and/or Erlotinib Resistant NSCLC Having a T790M Mutation**

450.   The patent specification does not provide any explanation for how compounds meeting the functional limitations of irreversible EGFR inhibition and covalent binding at the designated cysteine residue would be suitable for use in treating—broadly— gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO: 1. In fact, the applicants themselves admit that they did not understand the mechanisms of gefitinib and/or erlotinib resistance, including resistance mediated by the T790M mutation. '162 patent, 6:37–38 ("The mechanisms underlying acquired drug resistance are not well understood."), 18:19–25 ("[i]rreversible EGFR inhibitors also **seem** to be effective in overcoming gefitinib resistance mediated by the T790M mutation") (emphasis added).

451.   There is no description in the patent specification for how compounds meeting the functional limitations of irreversible EGFR inhibition and covalent binding to the designated cysteine residue may theoretically interact with EGFR to treat gefitinib and/or erlotinib resistant NSCLC having a T790M mutation. For example, the patent specification does not provide any models to show how these compounds may irreversibly inhibit, let alone treat, gefitinib and/or erlotinib resistant NSCLC having a T790M mutation. Nor could it do so because

████████████████████████

crystal structures for EGFR having the T790M mutation were not available in 2005-2006. *See* Suzuki 2007 at 1981 ("[T]here is so far no report revealing the crystal structure of EGFR containing the T790M mutation, so that the precise mechanism of inhibition by MP-412 remains unclear.").

452.     Since the specification clearly demonstrates the applicants' lack of understanding of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation, including how to treat such resistance, the POSA would not have understood the applicants to have been in possession of all irreversible EGFR inhibitors that covalently bind to the designated cysteine residue, that are supposedly suitable for use in treating such gefitinib and /or erlotinib resistant NSCLC having a T790M mutation.

453.     In addition, the specification fails to even describe or identify the compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine residue, which are encompassed by the claimed methods. As discussed in the subsections below, the specification does not describe structural features common to these compounds, nor provide representative species, such that the POSA would have understood the applicants to have been in possession of the irreversible EGFR inhibitors encompassed by the asserted claims.

a)     No Structural Features Common to the Genus

454.     The '162 patent does not describe any structural features common to irreversible EGFR inhibitors that covalently bind to the designated cysteine residue. The '162 patent discloses only three irreversible EGFR inhibitors—HKI-272, HKI-357, and EKB-569— which are all 4-anilinoquinoline-3-carbonitriles, bearing a dimethlyaminobutenamide Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring, and a chlorine at the meta position of the aniline ring. These structural features are not common across all compounds that irreversibly inhibit EGFR and covalently bind at the

158

████████████████████████████

designated cysteine residue. The POSA would not have understood the applicants to have been in possession of any compounds for use in carrying out the claimed method of treatment beyond those explicitly described in the '162 patent, and certainly no more than compounds sharing the same structural features of: a 4-anilinoquinoline-3-carbonitrile scaffold having a dimethlyaminobutenamide Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring, and a chlorine at the meta position of the aniline ring.

455. The POSA would have appreciated that whether a given compound is capable of irreversibly inhibiting EGFR and covalently binding to the designated cysteine residue, as required by the asserted claims, would be highly dependent on small changes in the compound's structure. For example, Wissner 2002 reported that an EKB-569 derivative, highly analogous in structure to the three example compounds of the '162 patent, but which lacked the dimethylamino group on the dimethylaminobutenamide Michael acceptor, was unable to form a covalent bond with EGFR and did not function as an irreversible EGFR inhibitor. Wissner 2002 at 52 (discussing compound 50), 55 (Table 2). As another example, Smaill 2001 reported, in an attempt to "define the structural requirements of the Michael acceptor necessary to provide irreversible inhibition of EGFR," that while quinazoline compounds with a substitution on the β-carbon of an acrylamide alkylating agent would irreversibly inhibit EGFR, analogous compounds with a substitution on the α-carbon of the acrylamide would *not* irreversibly inhibit EGFR. *See* Smaill 2001 at 432 (Table 1), 434; *see also*, Smaill 2000 at 1384 (Table 1) (showing compounds 5 and 6 are "reversible inhibitors" but have highly similar structure to irreversible inhibitors). Changes in the position of an acrylamide alkylating agent have also shown significant effects on a compound's ability to irreversibly inhibit EGFR. In examining analogs of irreversible inhibitor

159

██████████████████████

PD 160678, Fry 2000 reported "that the location of the acrylamide was critical not only for irreversibility to occur but also for efficient and rapid interaction with the enzyme." Fry 2000 at 7. Fry 2000 concluded that alkylation of cysteine 773 in EGFR is dependent on "fairly precise spatial orientation and molecular distances" and requires that the side chain be "clearly limited in length as well as position." Fry 2000 at 8.

456.    Indeed, the specification does not even confirm that the three example compounds covalently bind to cysteine 773 of EGFR, as required by the asserted claims. The '162 patent states only that HKI-272, HKI-357, and EKB-569 are irreversible inhibitors "**most likely via a covalent bond with the cys773 residue with the EGFR catalytic domain or the cys805 of ERBB2.**" '162 patent, 16:12–15 (emphasis added).

457.    The specification does not describe any common structural features that would be necessary to achieve the claimed functions of irreversible inhibition of EGFR and covalently binding to the designated cysteine residue. Even if the features common to the three example compounds—a 4-anilinoquinoline-3-carbonitrile scaffold having a dimethlyaminobutenamide Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring, and a chlorine at the meta position of the aniline ring—could be considered the common structural features of compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine residue, a POSA would not have understood the applicants to be in possession of the claimed method of treatment using irreversible EGFR inhibitors lacking those features.

458.    A POSA's understanding that the applicants were not in possession of the claimed method of treatment using irreversible EGFR inhibitors lacking a 4-anilinoquinoline-3-carbonitrile scaffold having a dimethlyaminobutenamide Michael acceptor at the 6-position of the

quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring would have been

supported by the references cited in the specification as describing irreversible EGFR inhibitors.

For example, the '162 patent specification cites H.R. Tsou *et al.*, *Optimization of 6,7-*

*Disubstituted-4-(arylamino)quinoline-3-carbonitriles as Orally Active, Irreversible Inhibitors of*

*Human Epidermal Growth Factor Receptor-2 Kinase Activity*, 48 J. Med. Chem. 1107 (2005)

("Tsou 2005").  *See* '162 Patent, 7:30-32. Tsou 2005, in describing the development of

irreversible EGFR inhibitors at Wyeth, states the "importance of a basic dialkylamino group at the

end of the Michael acceptor for activity." *Id.* at Abstract; *id.* at 1118 ("In our earlier work, we

found that adding a basic dialkylamino group at the terminus of the crotonamide side chain at the

6-position of 4-anilinoquinoline-3-carbonitrile significantly increased the activity in both kinase

and cell proliferation assays."). Tsou 2005 also reports that "a number of inhibitors that have a 7-

*methoxy* substituent showed a very weak positive response in an AMES test after microsomal

incubation while the corresponding ethoxy derivatives did not. Because of this observation, the

majority of compounds prepared possessed the 7-ethoxy substituent." Tsou 2005 at 1115–16.  A

POSA thus would have understood from the applicants' citation to Tsou 2005 the structural

features common to the three irreversible EGFR inhibitors identified in the '162 patent for use in

carrying out the claimed method were present because they were considered important both to

effective covalent binding to the enzyme and to avoidance of toxicity concerns.  A POSA would

not have understood the applicants to be in possession of the claimed method using irreversible

EGFR inhibitors that lacked these features.

459.    Moreover, there is no description in the specification of any structure-

activity relationship ("SAR") analysis demonstrating how those common structural features

would provide the claimed functions in any *other* compound, and certainly no description of how

those common structural features are functionally analogous to the structural elements of every other irreversible EGFR inhibitor that covalently binds to the designated cysteine residue.

460.    At a high level, an SAR analysis is conducted by synthesizing many compounds that have small structural differences and screening those compounds in *in vitro* assays for activity for the purpose of showing how particular structural features may affect activity. There is no such SAR analysis described in the patent specification demonstrating a relationship between any common structural features and the claimed functions of irreversible EGFR inhibition and covalent binding to the designated cysteine residue for the compounds encompassed by the asserted claims.

461.    Without a description of any common structural features among compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine residue, or any demonstration of how those common structural features provide the claimed functions, the POSA would not have understood the applicants to have been in possession of such compounds suitable for use in the claimed methods.

b)    No Representative Species

462.    The chemical structures for the three example compounds described in the '162 patent—EKB-569, HKI-272, and HKI-357—are also not representative of the irreversible EGFR inhibitors potentially encompassed by the asserted claims. The three example compounds are similar in structure and cannot represent the vast, structurally diverse, and essentially limitless number of potential irreversible EGFR inhibitors "that covalently bind[] to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1. For example, as discussed below, the three example compounds are not even representative of the potential irreversible EGFR inhibitors encompassed by the asserted claims having a quinoline scaffold—the scaffold that the three example compounds share. To the extent that *other* structures

162

may function as irreversible EGFR inhibitors that covalently bind at the designated cysteine residue, they are nowhere described or suggested in the patent specification. In particular, the three example compounds are in no way representative of the chemical structure of osimertinib— an inhibitor developed many years after the priority date of the '162 patent that Plaintiffs now contend falls within the asserted claims. In addition, the three example small molecule compounds *cannot* be representative of the "larger compound[s]" falling within the claimed genus—e.g., "an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '162 patent, 13:8–14.

463. The example irreversible EGFR inhibitors described in the '162 patent all have the same a) 4-anilinoquinoline-3-carbonitrile scaffold, b) the same dimethlyaminobutenamide Michael acceptor alkylating substituent, c) at the same 6- position of the quinoline scaffold, d) a 7-ethoxy side chain, and e) a meta-positioned chlorine on the aniline ring (circled in green below). The *only* difference in the three example compounds is the choice of para- substituent on the aniline ring (circled in red below).



'314 patent, Fig. 2B.

464. These inhibitors are not representative of the compounds encompassed by the asserted claims—that is, compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine. Even focusing, for example, on only the 3-cyanoquinolines described in the

'008 patent, which is described in the '162 patent specification as "including EKB-569, HKI-357, and HKI-272" ('162 patent, 13:49–51), the three example compounds are not representative of the irreversible EGFR inhibitors encompassed by the asserted claims having a 3-cyanoquinoline structure. As discussed above in Section XII.A.1, the genus of 3-cyanoquinolines described in the '008 patent encompasses billions of compounds, which include vast options for Michael acceptors or other alkylating substituents, as well as for side chains or other substituents.

465.    The '008 patent describes a genus of "Substituted 3-Cyanoquinolines," depicted by the general structure below:



'008 patent, 5:10–20.

466.    As described in the '008 patent, there is an extraordinary number of available substituents that may be attached to the 3-cyanoquinoline scaffold. '008 patent, 5:8–8:16. The '008 patent reports nearly 400 example compounds, all having the 3-cyanoquinoline scaffold. '008 patent, 42:33–132:28. The available substituents include vast options for alkylating agents that may form the necessary covalent bond(s) with the designated cysteines, as well as other substituents that could be used to modulate the activity or pharmaceutical properties of the

164

███████████████████████████

molecule. In contrast, the three example compounds of the '314 patent are limited to a single

alkylating agent (dimethlyaminobutenamide at the 6- position of the quinoline scaffold) and

specific substituent choices (a 7-ethoxy side chain, and a meta-positioned chlorine on the aniline

ring). Given the sheer size and structural diversity within the '008 patent class, the POSA would

not have understood the applicants of the '162 patent to have been in possession of all of the 3-

cyanoquinoline compounds that meet the functional limitations of irreversible EGFR inhibition

and covalent binding to the designated cysteine residue.

467.    In fact, the three example compounds represent a highly specific subset of

3-cyanoquinolines within the '008 patent genus. The dimethlyaminobutenamide Michael acceptor

that the three example compounds share is not only *not* representative of the universe of

alkylating agents described in the '008 patent ('008 patent, 5:45–7:13), it represents a highly

specific choice of 3-cyanoquinolines bearing a notably weak alkylating agent. The POSA would

have understood that the substituent on the Michael acceptor of the three example compounds

substantially reduces the ability of those compounds to covalently bind. This is in contrast to the

many options for alkylating agents provided in the '008 patent, which include strongly reactive

options such as the haloalkyls ('008 patent, 6:57–58). The '008 patent also lists alkylating agents

that form sulfur-sulfur bonds, rather than the carbon-sulfur bonds that the

dimethylaminobutenamides may form ('008 patent, 133:28–30), as well as non-Michael acceptor

options. If anything, the POSA would have understood the three example compounds to be

representative of a class of 3-cyanoquinoline irreversible EGFR inhibitors that covalently bind the

designated cysteine residue with a weak alkylating agent such as a dimethylaminobutenamide.

468.    As discussed above, the POSA would have understood that the applicants

believed this dialkylamino crotonamide Michael acceptor to be critical to the activity of the

claimed inhibitors also from the specification's citation to Tsou 2005, which emphasizes the "importance of a basic dialkylamino group at the end of the Michael acceptor for activity." *Id.* at Abstract; *id.* at 1118 ("In our earlier work, we found that adding a basic dialkylamino group at the terminus of the crotonamide side chain at the 6-position of 4-anilinoquinoline-3-carbonitrile significantly increased the activity in both kinase and cell proliferation assays."). Given the stated "significant" effect of the alkylating agent on a compound's activity, the POSA would not have understood the applicants of the '162 patent to have been in possession of irreversible EGFR inhibitors having other alkylating groups.

469.    The three example compounds also possess the same substituent at the 7-position of the quinoline ring. The same Tsou 2005 article cited in the specification explains that "a number of inhibitors that have a 7-*methoxy* substituent showed a very weak positive response in an AMES test after microsomal incubation while the corresponding ethoxy derivatives did not. Because of this observation, the majority of compounds prepared possessed the 7-ethoxy substituent." Tsou 2005 at 1115–16. A POSA would understand a positive AMES test as raising a significant toxicity concern.  As with the choice of alkylating agent, the POSA would have expected that the applicants would not have known whether compounds with other 7-position excipients could be safe for use in treating patients and would not have understood the applicants of the '162 patent to be have been in possession of irreversible EGFR inhibitors having other substituents at the 7 position.

470.    In any event, the compounds encompassed by the asserted claims of the '162 patent are not limited to 3-cyanoquinolines, and potentially include compounds having *any* scaffold that can be shown to irreversibly inhibit EGFR and covalently bind to the designated cysteine residue—none of which is described in the specification. For example, a number of

scaffold options had been published for EGFR inhibitors as of 2005-2006. However, there would have been no way for the POSA to know which of these scaffolds—in combination with an alkylating agent and other substituents—would function as irreversible EGFR inhibitors that covalently bind the designated cysteine residue without making and testing each of them. Such scaffold options as of 2005-2006 for EGFR inhibitors, included, *e.g.*, various quinazoline-based scaffolds such as 4-anilinoquinazolines, and tricyclic imidazoloquinazolines, pyrroloquinazolines, and pyrazoloquinazolines, as well as certain pyridopyrimidine-based scaffolds, including the 4-(phenylamino)pyrrolopyrimidines. Fry 2000 at 5–6.

471.    In addition, each scaffold type, which would include not only those options published as of 2005-2006, but any that could be shown to meet the functional limitations, would additionally have vast options for the selection of an alkylating agent, including placement of the alkylating moiety on the scaffold. Some of the alkylating moieties explored in irreversible EGFR inhibitors included, for example acrylamides, vinylsulfonamides, and vinylsulfones. *See* Smaill 2001, Table 1. Some of the options for alkylating substituents are shown in the chart below. These examples are not exhaustive. In contrast, the '162 patent specification describes a single alkylating moiety—a dimethlyaminobutenamide Michael acceptor.



G. Rishton, *Reactive compounds and in vitro false positives in HTS,* 2(9) Elsevier Science Ltd., 382–84, Fig. 1 (1997) ("Rishton 1997").

472. In addition, each scaffold type would have practically limitless options for, and placement of substituents, which may be added to achieve better activity or pharmacological properties. The '162 patent, however, describes a single substitution pattern on the 4-anilinoquinoline-3-carbonitrile scaffold: a 7-ethoxy side chain, and meta-positioned chlorine on

the aniline ring. The *only* substituent that differs between the three example structures described in the '314 patent is the choice of para- substituent on the aniline ring.

473.    Thus, there are practically limitless options for scaffolds, alkylating agents, and substituents—and permutations of those structural elements—that could potentially meet the functional limitations of irreversible EGFR inhibition and covalent binding to the designated cysteine residue. Yet, the specification provides no description or demonstration of which of those compounds would possess the claimed functionalities beyond the three example compounds.

474.    In particular, the compound that Plaintiffs now contend is encompassed by the asserted claims—osimertinib—has a substantially different structure than the three example inhibitors described in the '162 patent. First, osimertinib has a pyrimidine-based scaffold, not a 4-anilinoquinoline-3-carbonitrile scaffold. Second, osimertinib has a propenamide Michael acceptor, not a dimethlyaminobutenamide. In addition, osimertinib has a completely different set of substituents, including a 7-methoxy substitution and an indole on the pyrimidine ring. The three example compounds described in the '162 patent are in no way representative of the structure of osimertinib. Indeed, the osimertinib scaffold is completely different and there are *no* common structural elements. The POSA would not have understood the applicants of the '162 patent to have been in possession of osimertinib.

*Compare* June 2023 Tagrisso Prescribing Information at 19



*with* '162 patent, Fig. 2B.

475.    In addition, the POSA would not have understood the applicants to have been in possession of *any* of the "larger compound[s]" encompassed by the asserted claims: "an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof" because the three example small molecule EGFR inhibitors are not representative of any of these classes of compounds. '162 patent, 13:8–14. The '162 patent does not include any examples of these larger compounds.

476.    Thus, the three example irreversible EGFR inhibitors described in the '162 patent do not represent the vast, structurally diverse, and essentially limitless number of compounds potentially encompassed by the asserted claims, and would not suggest to the POSA that the applicants were in possession of these compounds.

2.    **No Description of a Method of Treating Comprising Administration of a Unit Dose Calculated to Achieve the Desired Therapeutic Effect**

477.    The specification also does not provide any description of a method of treating a patient having gefitinib and/or erlotinib resistant NSCLC with a unit dose calculated to produce a therapeutic effect, such that the POSA would have understood the applicants to have been in possession of such methods of treating using *any* irreversible EGFR inhibitor encompassed by the asserted claims. In particular, the patent specification does not provide any

explanation for how the three example compounds and their *in vitro* data demonstrate suitability of any irreversible EGFR inhibitor encompassed by the asserted claims in a method of treating comprising administration of a unit dosage calculated to produce a *therapeutic effect*. The POSA would have understood that drug development, and the development of cancer treatments in particular, is highly unpredictable. *See* Section XII.A.2. Developing compounds having adequate selectivity and lack of toxicity that also have suitable pharmacological properties for dosing to a patient, is and continues to be, a very difficult challenge. *See id.*

478.    In contrast to the essentially limitless number of irreversible EGFR inhibitors encompassed by the asserted claims, the specification discloses only three example compounds, and limited testing data for those compounds—from two *in vitro* tests in two cancer cell lines, *see* Section VIII, only one of which (the NCI-H1975 bronchoalveolar cell line) comprises the T790M mutation. From these examples alone, the POSA would not have understood the applicants to have been in possession of *any* compounds suitable for use in the claimed methods let alone any irreversible EGFR inhibitor encompassed by the asserted claims.

479.    *First*, drug discovery is a highly unpredictable field, and identifying even one compound suitable for use in a method of treating, particularly a treatment for cancer, would have been a very difficult and unpredictable task. As discussed above in Section XII.A.2.a), not only must a drug candidate be active with respect to its intended target, it must also be selective to that target (so as not to cause unwanted effects or be depleted by unintended targets), it must have suitable pharmacokinetics and bioavailability, it must be able to permeate the cell membrane (when the target is within the cell), and it must be safe and tolerable, among other things. *See, e.g.*, Levitzki 1995) ("[C]riteria for successful inhibitors are selectivity, cell permeability, bioavailability, appropriate pharmacokinetic properties, and nontoxicity."). The POSA would not

███████████████████████████████████

have concluded from the *in vitro* data in two cell lines reported in the specification that the applicants were in possession of any compounds suitable for use in the claimed method of treatment.

480.   *Second*, the unpredictability of drug discovery also means that even if one compound were identified as suitable for use in a method of treating that would not mean that an essentially limitless number of compounds having particular functionality had been identified as suitable for that use. This is because even small changes in structural features can have an enormous impact on a compound's activity and other properties. Thus even if the POSA were to conclude that the three disclosed inhibitors were suitable for use in the claimed method of treating, the POSA could not have understood the applicants to have been in possession of such methods of treating using *any* irreversible EGFR inhibitor encompassed by the asserted claims.

481.   In particular, the POSA would have been aware that the very nature of irreversible inhibition gives these compounds tremendous potential for toxicity. As Fry 2000 explains: "The inevitable liability of this class of inhibitor, however, lies with the intrinsic chemical reactivity that is needed to modify and inactivate the enzyme. Thus specificity and toxicity have always been the main encumbrance when considering these types of molecules." Fry 2000 at 6. The POSA developing a potential drug candidate would have been concerned, based on the understandings and teachings in the art, that any chemical structure with an alkylating agent such as a Michael acceptor may have problems with safety, tolerability, and/or toxicity.

482.   For example, the art taught that nucleophiles react with Michael acceptors indiscriminately. Nucleophiles are present throughout the body, including in enzymes involved in DNA replication. Jonathan Clayden et al., Organic Chemistry at 584 (2001) ("Clayden

172

2001"). Michael acceptors were also believed to be genotoxic to DNA and cause genetic

mutations in the body, potentially even leading to cancer. As an illustration, the organic chemistry

textbook, Clayden, contains an entire section discussing the dangers of Michael acceptors:



Clayden 2001 at 584

483.    "Any compound capable of conjugate addition (a Michael acceptor—

conjugate additions are also knowns as Michael additions) is potentially dangerous to living

things. Even simple compounds like ethylacrylate are labelled 'cancer suspect agent'. They attack

enzymes, particularly the vital DNA polymerase involved in cell division by conjugate addition to

thiol and amino groups in the enzyme. Any compound that is good at conjugate addition is

probably toxic and carcinogenic (cancer-causing)." Clayden at 584.

484.    Other references before 2000 also taught that these reactive compounds

are highly toxic. For example, E. Eder et al., *The Possible Role of α,β-unsaturated Carbonyl*

*Compounds in Mutagenesis and Carcinogenesis*, 67 Toxicology Letters 87, 87–88, 100 (1993)

("Eder 1993") explains that α,β-unsaturated carbonyl compounds "interact with proteins and

173

███████████████████

enzymes" and "are considered to play an important role in human cancer," that "[i]nteractions of these reactive carbonyl compounds with proteins and enzymes not only lead to cytotoxicity but can also contribute indirectly to genotoxicity," that "α,β-unsaturated carbonyl compounds play a significant role in some human cancers," and that "α,β-unsaturated carbonyl compounds can be mutagenic and . . . they react with DNA." Eder 1993 at 87–88, 100. Similarly, J. Ashby & D. Paton, *The Influence of Chemical Structure on the Extent and Sites of Carcinogenesis for 522 Rodent Carcinogens and 55 Different Human Carcinogen Exposures*, 286 Mutation Res. 3–72, 3, 4, 8, 16 (1993) ("Ashby 1993") teaches that acrylamide, a Michael acceptor, is a "natural electrophile[]," and explains that it is an alkylating agent that is carcinogenic in rodents. Ashby 1993 at 3, 4, 8, 16; *see also, e.g.*, K. Dearfield et al., *Genotoxicity in Mouse Lymphoma Cells of Chemicals Capable of Michael Addition*, 6 Mutagenesis 519, 524 (1991) ("Dearfield 1991") (explaining that "the direct-acting Michael addition mechanism has activity relevant to genetic toxicity" and "[s]ince acrylamide is a potent germ cell mutagen and induces cancer in experimental animals, this mechanism has important implications for heritable risk and cancer induction.") (citations omitted); Foye 1995 at 83, 357 ("An old but powerful drug in this class is phenoxybenzamine, a β-haloalkylamine that alkylates α-receptors. . . . Unfortunately, other biomolecules besides the target α-receptor are also alkylated. Because of its nonselectivity and toxicity, the use of phenoxybenzamine is limited to alleviating the effects of pheochromocytoma.").

485.    Reactive compounds such as those containing Michael acceptors were also known to react with and, in some cases, "known to deplete glutathione" in the body. Dearfield 1991 at 519; *see* ¶ 109 *supra*. The POSA would have understood that glutathione depletion would be harmful to humans and that compounds should be designed in a way to avoid the possibility of

reactive metabolites or reactive intermediates. "The formation of chemically reactive metabolites is important because they frequently cause a number of different toxicities, including tumorigenesis, mutagenesis, tissue  necrosis, and hypersensitivity reactions." Foye 1995 at 130–33. For example, drugs such as acetaminophen and bromobenzene were known to have toxicity issues due to their propensity to form reactive metabolites, which, in turn, are toxic. *See, e.g.*, B.K. et al., *Role of Drug Disposition in Drug Hypersensitivity: A Chemical, Molecular, and Clinical Perspective,* 11 Chem. Res. Toxicol. 969, 969, 972–74 (1998) ("Park 1998") (discussing Tienilic Acid, a drug that had been approved by the FDA, but was withdrawn from the market when it was found to form "an unstable, protein-reactive" metabolite that caused liver toxicity by "combin[ing] with nucleophilic groups on the enzyme and effect[ing] suicide activation.").

486.     Throughout my career as a research manager and as a Professor, I taught my colleagues and students about these real-world concerns about Michael acceptors.

487.     There is no information in the patent specification from which the POSA could have concluded that the applicants were in possession of an essentially limitless number of irreversible EGFR inhibitors that avoided these toxicity problems such that they could be administered in a unit dose calculated to produce a *therapeutic effect*. The POSA certainly could not have concluded from the reported *in vitro* data for the three example compounds that the applicants were in possession of an essentially limitless number of irreversible EGFR inhibitors that could be used in the claimed method. The POSA would have understood that a significant amount of drug discovery research would need to be performed to develop any given compound for use in a method of treatment, particularly compounds with significant toxicity concerns such as irreversible EGFR inhibitors. For one, as explained §§ XII.A.2.d)–XII.A.2.e), compounds that perform well in *in vitro* studies frequently fail in *in vivo* or clinical settings. Rather, the POSA

175

would have understood that the degree of a compound's efficacy *in vivo* and its utility in patients was highly unpredictable. The literature is replete with examples of EGFR inhibitors having promising *in vitro* activity that failed *in vivo* or clinical studies. *See, e.g.*, ¶¶ 356–368.

488.    In fact, it was not appreciated until well after 2005-2006 that the key to avoiding unacceptable levels of toxicity in the treatment of gefitinib and/or erlotinib resistant NSCLC is *targeting double-mutant* EGFR (bearing a sensitizing mutation and a resistance-associated mutation such as T790M), *and* sparing wild-type EGFR. *See, e.g.*, Kettle 2016. This idea is not presented anywhere in the specification. The POSA certainly would not have understood the applicants to have been in possession of such an idea, which was not published until many years later. *See id.*

489.    Even as to the three example compounds, the patent specification does not provide sufficient data from which the POSA could have concluded that the applicants were in possession of the claimed methods of treating comprising a unit dosage calculated to produce a therapeutic effect. As discussed above in Section VIII, the specification reports only limited *in vitro* data, supposedly showing that these compounds inhibited cell proliferation and EGFR signaling, suppressed EGFR autophosphorylation, and increased killing of gefitinib-resistant cells. The specification does not report any *in vivo* or clinical testing.

490.    The specification does not provide any working examples of the claimed method. The specification does not provide any examples of an irreversible EGFR inhibitor that has been administered to a patient having gefitinib and/or erlotinib NSCLC, let alone any example of treatment with a unit dosage that delivers a *therapeutic effect*. The specification certainly does not provide any explanation for how the reported *in vitro* data could be extrapolated to a unit dosage calculated to produce a therapeutic effect as to any of the three example compounds.

███████████████████████████████

491.     That the specification fails to adequately describe the invention is consistent with the fact that the applicants were not in possession of the claimed method as to any irreversible EGFR inhibitor. As discussed above in Section XII.A.5, none of the three example compounds are capable of administration in a unit dose calculated to produce a therapeutic effect. Thus, the applicants were not in possession of the claimed method of treatment using the three disclosed inhibitors, let alone any irreversible EGFR inhibitor encompassed by the asserted claims.

B.     **The Asserted Claims of the '314 Patent Are Invalid for Lack of Written Description**

492.     The '314 patent is invalid for lack of written description because it fails to describe either the irreversible EGFR inhibitors that fall within the claimed method, or a method of treating patients having gefitinib and/or erlotinib resistant NSCLC with a unit dose calculated to achieve the desired therapeutic effect. As such, the POSA would *not* have understood the applicants to have been in possession of either the irreversible EGFR inhibitors encompassed by the asserted claims or the claimed method of treating.

493.     The asserted claims potentially encompass any compound that irreversibly inhibits EGFR and covalently binds to the cysteine 773 residue of EGFR or the cysteine 805 residue of erbB2. *See* '314 patent, claim 1. The compounds that fall within the asserted claims are not defined by their structure, but only by their function. *See, e.g.*, ¶ 445. As explained in Section XII.C.1 above, the compounds that function as irreversible EGFR inhibitors by covalently binding to the designated cysteine residues in EGFR are essentially limitless in number. *See, e.g.*, ¶ 445.

494.     There is no useful description (see ¶ 446, FN 18) in the specification of how these functionally-defined compounds would be suitable for use in the claimed "method of treating gefitinib and/or erlotinib resistant [NSCLC]." '314 patent, claim 1. In particular, there is

no description of how compounds meeting the functional limitations of irreversible EGFR

inhibition and covalent binding to the designated cysteine residues provides a method of treating

gefitinib and/or erlotinib resistant NSCLC.

495.    The *only* examples provided in the patent specification are structures and

initial *in vitro* data for three example compounds—EKB-569, HKI-272, and HKI-357. *See, e.g.*,

'314 patent, 3:56-59. These small molecule inhibitors are not structurally diverse, but have very

similar structures that are not representative of the vast array of compounds that can irreversibly

inhibit EGFR by covalently binding to the designated cysteine residues. Moreover, the

specification does not otherwise describe any structural features common across the irreversible

EGFR inhibitors encompassed by the asserted claims. Based on this very limited description in

the specification, the POSA would not have understood the applicants to have been in possession

of the irreversible EGFR inhibitors encompassed by the asserted claims suitable for use in a

method of treating gefitinib and/or erlotinib resistant NSCLC.

496.    The POSA also would not have understood the applicants to have been in

possession of a method of treating comprising administration of a unit dose of an irreversible

EGFR inhibitor, calculated to provide a therapeutic effect. The specification reports only limited

*in vitro* data for the three example compounds in two cancer cell lines. The specification does not

provide any explanation for how that *in vitro* data demonstrates the suitability of any of the three

example compounds for use in a *method of treating* a patient with gefitinib and/or erlotinib

resistant NSCLC, let alone the suitability of any irreversible EGFR inhibitor that covalently binds

to the designated cysteine residue. In particular, the POSA would have been aware of significant

hurdles that such compounds would have faced in being used in a method of treating comprising a

unit dosage—that is, a "unit containing a predetermined quantity of active material calculated to

produce the desired *therapeutic effect* . . . ." '162 patent, 9:37–42 (emphasis added). Due to the covalent binding function of these compounds, toxicity attributable to alkylating agents and lack of selectivity would have been significant concerns. The patent specification does not provide any explanation for how the irreversible EGFR inhibitors encompassed by the asserted claims would overcome these hurdles, and likewise does not contain any indication that the applicants were in possession of any such compounds.

497.   Thus, the POSA would not have understood the applicants to have been in possession of either the irreversible EGFR inhibitors encompassed by the asserted claims, suitable for use in the claimed methods, or in possession of the claimed methods of treating comprising administration of a unit dose calculated to produce a therapeutic effect.

1.   **No Description of a Class of Compounds Suitable for Use in the Claimed Method of Treating Gefitinib and/or Erlotinib Resistant NSCLC**

498.   The patent specification does not provide any explanation for how compounds meeting the functional limitations of irreversible EGFR inhibition and covalent binding at the designated cysteine residue would be suitable for use in treating—broadly— gefitinib and/or erlotinib resistant NSCLC. In fact, the applicants themselves admit that they did not understand the mechanisms of gefitinib and/or erlotinib resistance. '162 patent, 6:37–38 ("The mechanisms underlying acquired drug resistance are not well understood."). The applicants point to two *potential* sources of resistance—the T790M mutation and increased internalization of ligand-bound EGFR. *Id.*, 17:51–53; 18:5–10. The applicants merely suggest that "[i]rreversible EGFR inhibitors also **seem** to be effective in overcoming gefitinib resistance mediated by the T790M mutation," and "increased internalization of ligand-bound EGFR "**may contribute** to in vivo acquired gefitinib-resistance in patients with recurrent disease who do not have secondary mutations in EGFR." *Id.,* 18:19–25 (emphasis added). The applicants do not suggest that these are

certainly mechanisms of resistance, that they are the only mechanisms of resistance, or explain

what other mechanisms of gefitinib and/or erlotinib resistance may exist.

499. The applicants acknowledge that "multiple resistance mechanisms can

coexist in recurrent tumors after an initial response to gefitinib or similar reversible EGFR

inhibitors," but do not provide any explanation as to what those additional acquired resistance

mechanisms might be. *Id.*, 17:51–53; 18:5–10. Indeed, the applicants propose that resistance

mechanisms other than T790M "may be equally, ***if not more***, effective than the T790M

substitution itself in conferring drug resistance," yet do not identify those other resistance

mechanisms. *Id.*, 17:53–56 (emphasis added). The applicants admit that "the mechanisms

underlying treatment failure in cases lacking secondary EGFR mutations remain unexplained."

'162 patent, 6:62–65. Although mechanisms of resistance to gefitinib and/or erlotinib *continue* to

elude researchers, a number of additional mechanisms have been proposed beyond those

described in the specification, such as: EGFRvIII, HER2 amplification, MET amplification,

PIK3CA mutation, BRAF mutation, NF1 loss, and FGFR signaling. *See* Learn 2004 at 3216;

Cross 2014 at 1047.

500. There is otherwise no description in the patent specification for how

compounds meeting the functional limitations of irreversible EGFR inhibition and covalent

binding to the designated cysteine residues may theoretically interact with EGFR to treat gefitinib

and/or erlotinib resistant NSCLC. For example, the patent specification does not provide any

models to show how these compounds may irreversibly inhibit, let alone treat, *any type* of

gefitinib and/or erlotinib resistant EGFR. Nor could it do so because crystal structures for at least

EGFR bearing resistance mechanisms, such as EGFR having the T790M mutation, were not

available in 2005-2006. *See* Suzuki 2007 at 1981 ("[T]here is so far no report revealing the crystal

████████████████████████████████████

structure of EGFR containing the T790M mutation, so that the precise mechanism of inhibition by

MP-412 remains unclear.").

501.     Since the specification clearly demonstrates the applicants' lack of

understanding of gefitinib and/or erlotinib resistance, let alone how to treat such resistance, the

POSA would not have understood the applicants to have been in possession of all irreversible

EGFR inhibitors that covalently bind to the designated cysteine residue, that are supposedly

suitable for use in treating any type of gefitinib and /or erlotinib resistance.

502.     In addition, the specification fails to even describe or identify the

compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine residues,

which are encompassed by the claimed methods. As discussed in the subsections below, the

specification does not describe structural features common to these compounds, nor provide

representative species, such that the POSA would have understood the applicants to have been in

possession of the irreversible EGFR inhibitors encompassed by the asserted claims.

a)     No Structural Features Common to the Genus

503.     The '314 patent does not describe any structural features common to

irreversible EGFR inhibitors that covalently bind to the designated cysteine residues. The '314

patent discloses only three irreversible EGFR inhibitors—HKI-272, HKI-357, and EKB-569—

which are all 4-anilinoquinoline-3-carbonitriles, bearing a dimethlyaminobutenamide Michael

acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the

quinoline ring, and a chlorine at the meta position of the aniline ring. The POSA would not have

understood the applicants to have been in possession of any compounds beyond those explicitly

described in the '314 patent, and certainly no more than compounds sharing the same structural

features of: a 4-anilinoquinoline-3-carbonitrile scaffold having a dimethlyaminobutenamide

████████████████████

Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring, and a chlorine at the meta position of the aniline ring.

504.    The POSA would have appreciated that whether a given compound is capable of irreversibly inhibiting EGFR and covalently binding to the designated cysteine residue, as required by the asserted claims, would be highly dependent on small changes in the compound's structure. *See, e.g.*, ¶ 455.

505.    Indeed, the specification does not even confirm that the three example compounds covalently bind to cysteine 773 of EGFR, as required by the asserted claims. The '314 patent states only that HKI-272, HKI-357, and EKB-569 are irreversible inhibitors "***most likely*** via a covalent bond with the cys773 residue with the EGFR catalytic domain or the cys805 of ERBB2." '314 patent, 16:16–19.

506.    The specification does not describe any common structural features that would be necessary to achieve the claimed functions of irreversible inhibition of EGFR and covalently binding to the designated cysteine residues. Even if the features common to the three example compounds—a 4-anilinoquinoline-3-carbonitrile scaffold having a dimethlyaminobutenamide Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring, and a chlorine at the meta position of the aniline ring—could be considered the common structural features of compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine residues, a POSA would not have understood the applicants to be in possession of the claimed method of treatment using irreversible EGFR inhibitors lacking those features.

507.    A POSA's understanding that the applicants were not in possession of the claimed method of treatment using irreversible EGFR inhibitors lacking a 4-anilinoquinoline-3-

carbonitrile scaffold having a dimethlyaminobutenamide Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring would have been supported by the references cited in the specification as describing irreversible EGFR inhibitors. For example, the '162 patent specification cites H.R. Tsou *et al.*, *Optimization of 6,7-Dibsutituted-4-(arylamino)quinoline-3-carbonitriles as Orally Active, Irreversible Inhibitors of Human Epidermal Growth Factor Receptor-2 Kinase Activity*, 48 J. Med. Chem. 1107 (2005) ("Tsou 2005"). *See* '162 Patent, 7:30–32. Tsou 2005, in describing the development of irreversible EGFR inhibitors at Wyeth, states the "importance of a basic dialkylamino group at the end of the Michael acceptor for activity." *Id.* at Abstract; *id.* at 1118 ("In our earlier work, we found that adding a basic dialkylamino group at the terminus of the crotonamide side chain at the 6-position of 4-anilinoquinoline-3-carbonitrile significantly increased the activity in both kinase and cell proliferation assays."). Tsou 2005 also reports that "a number of inhibitors that have a 7-*methoxy* substituent showed a very weak positive response in an AMES test after microsomal incubation while the corresponding ethoxy derivatives did not. Because of this observation, the majority of compounds prepared possessed the 7-ethoxy substituent." Tsou 2005 at 1115–16. A POSA thus would have understood from the applicants' citation to Tsou 2005 the structural features common to the three irreversible EGFR inhibitors identified in the '162 patent for use in carrying out the claimed method were present because they were considered important both to effective covalent binding to the enzyme and to avoidance of toxicity concerns.  A POSA would not have understood the applicants to be in possession of the claimed method using irreversible EGFR inhibitors that lacked these features.

508.    Moreover, there is no description in the specification of any structure-activity relationship ("SAR") analysis demonstrating how those common structural features

would provide the claimed functions in any *other* compound, and certainly no description of how those common structural features are functionally analogous to the structural elements of every other irreversible EGFR inhibitor that covalently binds to the designated cysteine residue.

509.    At a high level, an SAR analysis is conducted by synthesizing many compounds that have small structural differences and screening those compounds in *in vitro* assays for activity for the purpose of showing how particular structural features may affect activity. There is no such SAR analysis described in the patent specification demonstrating a relationship between any common structural features and the claimed functions of irreversible EGFR inhibition and covalent binding to the designated cysteine residues for the compounds encompassed by the asserted claims.

510.    Without a description of any common structural features among compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteine residues, or any demonstration of how those common structural features provide the claimed functions, the POSA would not have understood the applicants to have been in possession of such compounds suitable for use in the claimed methods.

b)    No Representative Species

511.    The chemical structures for the three example compounds described in the '314 patent—EKB-569, HKI-272, and HKI-357—are also not representative of the irreversible EGFR inhibitors potentially encompassed by the asserted claims. The three example compounds are similar in structure and cannot represent the vast, structurally diverse, and essentially limitless number of potential irreversible EGFR inhibitors "that covalently bind[] to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. For example, as discussed below, the three example compounds are not even representative of the potential irreversible EGFR inhibitors encompassed by the asserted

claims having a quinoline scaffold—the scaffold that the three example compounds share. To the extent that *other* structures may function as irreversible EGFR inhibitors that covalently bind at the designated cysteine residues, they are nowhere described or suggested in the patent specification. In particular, the three example compounds are in no way representative of the chemical structure of osimertinib—an inhibitor developed many years after the priority date of the '314 patent that Plaintiffs now contend falls within the asserted claims. In addition, the three example small molecule compounds *cannot* be representative of the "larger compound[s]" falling within the claimed genus—e.g., "an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '314 patent, 13:3–13.

512. The example irreversible EGFR inhibitors described in the '314 patent all have the same a) 4-anilinoquinoline-3-carbonitrile scaffold, b) the same dimethlyaminobutenamide Michael acceptor alkylating substituent, c) at the same 6- position of the quinoline scaffold, d) a 7-ethoxy side chain, and e) a meta-positioned chlorine on the aniline ring (circled in green below). The *only* difference in the three example compounds is the choice of para- substituent on the aniline ring (circled in red below).



'314 patent, Fig. 2B.

185

████████████████████████████████

513.     These inhibitors are not representative of the compounds encompassed by the asserted claims—that is, compounds that irreversibly inhibit EGFR and covalently bind to the designated cysteines. Even focusing, for example, on only the 3-cyanoquinolines described in the '008 patent, which is described in the '314 patent specification as "including EKB-569, HKI-357, and HKI-272" ('314 patent, 13:50–58), the three example compounds are not representative of the irreversible EGFR inhibitors encompassed by the asserted claims having a 3-cyanoquinoline structure. *See, e.g.*, Section XIII.A.1.b) above.

514.     In fact, the three example compounds represent a highly specific subset of 3-cyanoquinolines within the '008 patent genus. *See, e.g.*, Section XIII.A.1.b) above. As discussed above, the POSA would have understood that the applicants believed this dialkylamino crotonamide Michael acceptor to be critical to the activity of the claimed inhibitors from the specification's citation to Tsou 2005. *Id.* As with the choice of alkylating agent, the POSA would have expected that the applicants would not have known whether compounds with other 7-position excipients could be safe for use in treating patients and would not have understood the applicants of the '162 patent to be have been in possession of irreversible EGFR inhibitors having other substituents at the 7 position.

515.     In any event, the compounds encompassed by the asserted claims of the '314 patent are not limited to 3-cyanoquinolines, and potentially include compounds having *any* scaffold that can be shown to irreversibly inhibit EGFR and covalently bind to the designated cysteine residue—none of which is described in the specification. *See, e.g.*, Section XIII.A.1.b) above.

516.     In particular, the compound that Plaintiffs now contend is encompassed by the asserted claims—osimertinib—has a substantially different structure than the three example

inhibitors described in the '314 patent. *See, e.g.*, Section XIII.A.1.b) above. The POSA would not

have understood the applicants of the '314 patent to have been in possession of osimertinib. In

addition, the POSA would not have understood the applicants to have been in possession of *any*

of the "larger compound[s]" encompassed by the asserted claims: "an oligomer of nucleic acids,

amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes,

DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations

thereof" because the three example small molecule EGFR inhibitors are not representative of any

of these classes of compounds. '314 patent, 13:3–13. The '314 patent does not include any

examples of these larger compounds.

517.    Thus, the three example irreversible EGFR inhibitors described in the '314

patent do not represent the vast, structurally diverse, and essentially limitless number of

compounds potentially encompassed by the asserted claims, and would not suggest to the POSA

that the applicants were in possession of these compounds.

2.    **No Description of a Method of Treating Comprising Administration of a Unit Dose Calculated to Achieve the Desired Therapeutic Effect**

518.    The specification also does not provide any description of a method of

treating a patient having gefitinib and/or erlotinib resistant NSCLC with a unit dose calculated to

produce a therapeutic effect, such that the POSA would have understood the applicants to have

been in possession of such methods of treating using *any* irreversible EGFR inhibitor

encompassed by the asserted claims. In particular, the patent specification does not provide any

explanation for how the three example compounds and their *in vitro* data demonstrate suitability

of any irreversible EGFR inhibitor encompassed by the asserted claims in a method of treating

comprising administration of a unit dosage calculated to produce a *therapeutic effect*. The POSA

would have understood that drug development, and the development of cancer treatments in

████████████████████████████

particular, is highly unpredictable. *See* Section XII.A.2. Developing compounds having adequate selectivity and lack of toxicity that also have suitable pharmacological properties for dosing to a patient, is and continues to be, a very difficult challenge. *See id.*

519.    In contrast to the essentially limitless number of irreversible EGFR inhibitors encompassed by the asserted claims, the specification discloses only three example compounds, and limited testing data for those compounds—from two *in vitro* tests in two cancer cell lines, *see* Section VIII, including one with the T790M mutation(NCI-H1975 bronchoalveolar cell line). From these examples alone, the POSA would not have understood the applicants to have been in possession of *any* compounds suitable for use in the claimed methods let alone any irreversible EGFR inhibitor encompassed by the asserted claims.

520.    *First*, drug discovery is a highly unpredictable field, and identifying even one compound suitable for use in a method of treating, particularly a treatment for cancer, would have been a very difficult and unpredictable task. *See, e.g.*, ¶ 479. The POSA would not have concluded from the *in vitro* data in two cell lines reported in the specification that the applicants were in possession of any compounds suitable for use in the claimed method of treatment.

521.    *Second*, the unpredictability of drug discovery also means that even if one compound were identified as suitable for use in a method of treating that would not mean that an essentially limitless number of compounds having particular functionality had been identified as suitable for that use. This is because even small changes in structural features can have an enormous impact on a compound's activity and other properties. Thus even if the POSA were to conclude that the three disclosed inhibitors were suitable for use in the claimed method of treating, the POSA could not have understood the applicants to have been in possession of such methods of treating using *any* irreversible EGFR inhibitor encompassed by the asserted claims.

████████████████████████████████████████

522.     In particular, the POSA would have been aware that the very nature of irreversible inhibition gives this these compounds tremendous potential for toxicity. *See* Section XIII.A.2 above.

523.     There is no information in the patent specification from which the POSA could have concluded that the applicants were in possession of an essentially limitless number of irreversible EGFR inhibitors that avoided these toxicity problems such that they could be administered in a unit dose calculated to produce a *therapeutic effect*. The POSA certainly could not have concluded from the reported *in vitro* data for the three example compounds that the applicants were in possession of an essentially limitless number of irreversible EGFR inhibitors that could be used in the claimed method. The POSA would have understood that a significant amount of drug discovery research would need to be performed to develop any given compound for use in a method of treatment, particularly compounds with significant toxicity concerns such as irreversible EGFR inhibitors. *See, e.g.*, ¶ 487.

524.     In fact, it was not appreciated until well after 2005-2006 that the key to avoiding unacceptable levels of toxicity in the treatment of gefitinib and/or erlotinib resistant NSCLC is *targeting double-mutant* EGFR (bearing a sensitizing mutation and a resistance-associated mutation such as T790M), *and* sparing wild-type EGFR. *See, e.g.*, Kettle 2016. This idea is not presented anywhere in the specification. The POSA certainly would not have understood the applicants to have been in possession of such an idea, which was not published until many years later. *See id.*

525.     Even as to the three example compounds, the patent specification does not provide sufficient data from which the POSA could have concluded that the applicants were in possession of the claimed methods of treating comprising a unit dosage calculated to produce a

189

therapeutic effect. As discussed above in Section VIII, the specification reports only limited *in vitro* data, supposedly showing that these compounds inhibited cell proliferation and EGFR signaling, suppressed EGFR autophosphorylation, and increased killing of gefitinib-resistant cells. The specification does not report any *in vivo* or clinical testing.

526. The specification does not provide any working examples of the claimed method. The specification does not provide any examples of an irreversible EGFR inhibitor that has been administered to a patient having gefitinib and/or erlotinib NSCLC, let alone any example of treatment with a unit dosage that delivers a *therapeutic effect*. The specification certainly does not provide any explanation for how the reported *in vitro* data could be extrapolated to a unit dosage calculated to produce a therapeutic effect as to any of the three example compounds.

527. That the specification fails to adequately describe the invention is consistent with the fact that the applicants were not in possession of the claimed method as to any irreversible EGFR inhibitor. As discussed above in Section XII.A.5, none of the three example compounds are capable of administration in a unit dose calculated to produce a therapeutic effect. Thus, the applicants were not in possession of the claimed method of treatment using the three disclosed inhibitors, let alone any irreversible EGFR inhibitor encompassed by the asserted claims.

## XIV.   THE ASSERTED CLAIMS ARE ANTICIPATED

### A.   The Asserted Claims of the '162 and '314 Patents Are Anticipated By the Prior Art

528. To the extent that the asserted claims are adequately described and enabled by the disclosure of the '162 and '314 patents (which I disagree with), those claims are anticipated by the following prior art references. In particular, to the extent that the *in vitro* data and other disclosures of the '162 and '314 patents adequately describe and enable the use of an

190

███████████████████████

irreversible EGFR inhibitor in a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer, such use is also disclosed by the prior art references listed below. To the extent that the *in vitro* data and other disclosures of the '162 and '314 patents adequately describe and enable a unit dosage of an irreversible EGFR inhibitor, such dosage is also disclosed by the prior art references listed below.

529.    Each of the prior art references listed below discloses every limitation of the asserted claims, either expressly or inherently.

1.    **Allen 2003**

a)    Asserted Claims 1, 3, 4, 6, and 9 of the '314 Patent Are Anticipated by Allen 2003

530.    *Allen 2003 describes every limitation of claim 1 of the '314 patent, either expressly or inherently.* Allen 2003 describes the use of an irreversible EGFR inhibitor—CI-1033—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. Allen 2003 explains that "CI-1033 is a highly potent and selective pan-erbB inhibitor that efficiently blocks signal transduction through all four members of the erbB receptor family. In addition, it covalently binds to these receptors, irreversibility [sic] inhibiting them . . . ." Allen 2003 at Abstract; *see also id.* at 70 ("CI-1033 (canertinib) is an orally available 3-chloro, 4-fluoro, 4-anilinoquinazoline that possesses two key features . . . (1) irreversible binding to the tyrosine kinase active site, and (2) pan-erbB specificity."). Allen 2003 clarifies that "[t]he erbB family of receptors contains four cell surface receptor proteins" including "erbB-1 (epidermal growth factor receptor [EGFR] or HER1)." *Id.* at 65. Allen 2003 also explains that CI-1033 has been shown to inhibit the constitutively activated and highly tumorigenic variant of erbB-1, EGFRvIII. *Id.* at 72. As explained in Section XI.M, EGFRvIII is a mutated form of EGFR that is associated with gefitinib resistance.

███████████████████████████████

531.     Allen 2003 reports several Phase I clinical studies of CI-1033, including in patients having non-small cell lung cancer (16% of "more than 250 cancer patients"), among other cancers, showing "evidence of target modulation and antitumor activity." Allen 2003 at 72–74. Allen 2003 states that "[f]urther evidence of antitumor activity in phase I studies was suggested by the frequency of stable disease ($\geq$ 12 wks) in patients with non-small cell lung . . . cancers." *Id.* at 74. Allen 2003 also states that "[c]linically, [CI-1033] has been shown to have an acceptable side effect profile at potentially therapeutic doses and schedules." *Id.* at Abstract. Allen 2003 also describes preclinical study data showing that CI-1033 is a potent inhibitor of EGFR. *See id.* at 71–72 (reporting *in vitro* EGFR inhibition, $IC_{50}$ = 0.8 nmol/L, and *in vivo* EGFR inhibition with "50% inhibitory concentration ($IC_{50}$) values in the low nmol/L range"). To the extent that the *in vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed method of treating NSCLC, Allen 2003 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof. Allen 2003 explains that EGFRvIII is expressed in 16% of NSCLC (*id.* at 67, Table 1), thus Allen 2003's description of Phase I clinical studies including at least 40 NSCLC patients (16% of "more than 250 cancer patients") necessarily includes patients resistant to treatment with gefitinib and/or erlotinib—which CI-1033 has been shown to inhibit (i.e., EGFRvIII). Plaintiffs themselves acknowledge that "[a] portion of NSCLC patients are resistant to treatment with gefitinib and/or erlotinib" (Plaintiffs' Infringement Contentions Ex. A at A-1).

532.     Allen 2003 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" CI-1033. '314 patent, claim 1. Allen 2003 reports Phase I clinical studies wherein patients were administered oral, daily doses ranging from 2 mg/day to 1000

mg/day. Allen 2003 at 72. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Allen 2003 describe a "unit dose" of CI-1033.

533.    Allen 2003 also describes CI-1033 as an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003 at 70-71. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Allen 2003 describes CI-1033 as an irreversible EGFR inhibitor that covalently binds to the designated cysteine residues. *See* Section VIII.D.

534.    *Allen 2003 describes every limitation of claim 3 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Allen 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof,

██████████████████████████████

"wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR."

'314 patent, claim 3. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate

pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into

close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ).

This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine

kinase domain of the erbB receptors." Allen 2003 at 70–71. To the extent "irreversible EGFR

inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses

irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR,

Allen 2003 describes CI-1033 as an irreversible EGFR inhibitor that covalently binds to that

designated cysteine residue. *See* Section VIII.D.

535. *Allen 2003 describes every limitation of claim 4 of the '314 patent, either*

*expressly or inherently*. For the reasons discussed above in this Subsection, Allen 2003 describes

a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof,

"wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2."

'314  patent, claim 4. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate

pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into

close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ).

This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine

kinase domain of the erbB receptors." Allen 2003 at 70–71. To the extent "irreversible EGFR

inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2"

encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region

of erbB2, Allen 2003 describes CI-1033 as an irreversible EGFR inhibitor that covalently binds to

the designated cysteine residues. *See* Section VIII.D.

536.     *Allen 2003 describes every limitation of claim 6 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Allen 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the method further comprises administering radiation." '314 patent, claim 6. Allen 2003 explains that "[p]reclinical studies have also shown CI-1033 to have significant radiosensitizing effects. Growth delays, greater than that produced by either CI-1033 or fractionated radiation alone, were observed **when both agents were used in combination**." Allen 2003 at 72 (emphasis added).

537.     *Allen 2003 describes every limitation of claim 9 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Allen 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the route of administration is oral." '314 patent, claim 9. Allen 2003 explains that CI-1033 is administered orally. *See, e.g.*, Allen 2003 at 70 ("CI-1033 (canertinib) is [] orally available..."), 72 ("Several phase I studies of oral CI-1033 have been conducted . . . .").

2.   **Zacharchuk US 2005**

a)     Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by Zacharchuk US 2005

538.     *Zacharchuk US 2005 describes every limitation of claim 1 of the '162 patent, either expressly or inherently*. Zacharchuk US 2005 describes the use of an irreversible EGFR inhibitor that is not CL-387,785 in a ""method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 patent, claim 1; Zacharchuk US 2005, [0005] ("The present invention relates to a method of treating or inhibiting cancer in a human treated with gefitinib or iressa."); *id.*, [0010] ("The cancer of this invention comprises non-small cell lung cancer."). Zacharchuk US 2005 discloses EGFR

inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." Zacharchuk US 2005, [0018]. In addition to claiming a broad class of irreversible EGFR inhibitors with a quinazoline scaffold, Zacharchuk US 2005 explicitly discloses three specific irreversible EGFR inhibitors— HKI-272, EKB-569, and CL-387,785. Zacharchuk US 2005, [0004], [0007]–[0009], [0044]–[0045].

539.    Zacharchuk US 2005 reports the use of EKB-569 in two patients with NSCLC after these patients were treated with gefitinib and had recurrence of NSCLC. Zacharchuk US 2005, [0041]. It further discloses that CL-387,785 "strongly inhibited" the activity of EGFR containing a secondary mutation. Zacharchuk US 2005, [0044]. To the extent that the *in vitro* testing data provided in the '162 patent is sufficient to describe and enable the claimed method of treating gefitinib and/or erlotinib resistant NSCLC, Zacharchuk US 2005 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC. Zacharchuk specifically identifies the *clinical* use of EKB-569 in two patients with gefitinib-resistant NSCLC.

540.    The '287 application, to which Zacharchuk US 2005 claims priority, provides support for the above disclosures. The '287 application discloses a "method of treating or inhibiting cancer in a human treated with gefitinib," including the particular "use of an epidermal growth factor receptor (EGFR) kinase inhibitor in gefitinib resistant patients." '287 application, 1:4–5; 2:14–15. The '287 application prefers EGFR kinase inhibitors that "irreversibly inhibits EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." '287 application, 6:11–15. Like Zacharchuk US 2005, the '287 application broadly claims the use of an irreversible EGFR inhibitor, '287 application, claim 2, and it particularly discloses EKB-569 and CL-387,785. '287 application, 2:5–6; 13:19–21. As with Zacharchuk US 2005, the '287 application also describes the

196

administration of EKB-569 in two patients with recurrence of NSCLC after treatment with

gefitinib. '287 application, 13:13–14, 22–24 ("EKB-569, another irreversible EGFR inhibitor,

may abrogate the resistance mechanism to gefitinib.").

541.   Zacharchuk US 2005 also discloses gefitinib and/or erlotinib resistant

NSCLC having the T790M mutation. The specification states that "[a]cquired resistance to

gefitinib is associated with a second mutation in exon 20 encoding the EGFR kinase domain."

Zacharchuk US 2005, [0043] (citing Pao 2005); *see* '287 provisional, 13:17–18. It further

discloses that "387,785, a specific and irreversible anilinoquinazoline EGFR inhibitor, strongly

inhibited the activity of EGFR encoded by a gene containing a second mutation in the kinase

domain." Zacharchuk US 2005, [0044] (citing Kobayashi 2005); *see* '287 provisional, 13:19–21.

The POSA would understand that the "second mutation in exon 20" is the T790M mutation. *See*

Pao 2005 at Abstract ("[A] secondary mutation in exon 20 . . . leads to substitution of methionine

for threonine at position 790 (T790M") in the kinase domain.").

542.   Zacharchuk US 2005 also describes "administering daily to the patient

having gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation

in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2–500 mg" EKB-

569. '162 patent, claim 1. According to the reference, the compounds disclosed therein, including

EKB-569 are preferably administered "in the form of a unit dose." Zacharchuk US 2005, [0023].

Zacharchuk US 2005 further specifies that the unit dose "may contain from 0.1 to 300 mg of a

compound of the invention and preferably from 2 to 100 mg" and "may be administered from 1 to

6 times a day." *Id.* The two patients described in Zacharchuk US 2005 were administered 25

mg/day EKB-569 (Case 1) and 35 mg/day (Case 2). Zacharchuk US 2005, [0036], [0038]. To the

extent that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR

███████████████████████████████████████

inhibitor, so too does Zacharchuk US 2005 describe a "unit dose" of EKB-569. The '287

application provides support for these disclosures. *See* '287 application, 12:25–13:7 (describing

the daily administration of EKB-569 to two patients with recurrent NSCLC).

543.    Zacharchuk US 2005 also discloses an irreversible EGFR inhibitor "that

covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO: 1." '162

patent, claim 1. As state above, Zacharchuk US 2005 discloses inhibitors that "irreversibly

inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor)

**that can form a covalent bond with EGFR**." Zacharchuk US 2005, [0018] (emphasis added).

Zacharchuk US 2005 also describes the use of EKB-569 as an irreversible EGFR inhibitor. As

discussed above in paragraphs 303, 312, EKB-569 irreversibly inhibits EGFR by forming a

covalent bond with cysteine 773 residue in the EGFR kinase domain. Thus, Zacharchuk US 2005

inherently discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the

catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1. The

'287 application recites the same preference for EGFR kinase inhibitors that "irreversibly inhibit[]

EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can

form a covalent bond with EGFR" and also discloses EKB-569 and CL-387,785. '287

application, 2:5–6; 6:11–15; 13:19–21.

544.    *Zacharchuk US 2005 describes every limitation of claim 4 of the '162

patent, either expressly or inherently*. For the reasons discussed above in this Subsection,

Zacharchuk US 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC

having the T790M mutation, "wherein the irreversible EGFR inhibitor covalently binds

to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. Zacharchuk US

2005 discloses EKB-569. As discussed above in paragraphs 312, EKB-569 reportedly forms a

███████████████████

covalent bond with cysteine 805 of erbB-2. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Zacharchuk US 2005 inherently discloses an irreversible EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

b)   Asserted Claims 1, 3, 4, 5, and 6 of the '314 Patent Are Anticipated by Zacharchuk US 2005

545.   *Zacharchuk US 2005 describes every limitation of claim 1 of the '314 patent, either expressly or inherently.* Zacharchuk US 2005 describes the use of an irreversible EGFR inhibitor in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. Zacharchuk US 2005 teaches that "[t]he present invention relates to a method of treating or inhibiting cancer in a human treated with gefitinib or iressa," specifically, "[t]he cancer of this invention comprises non-small cell lung cancer." Zacharchuk US 2005, [0005], [0010]. Zacharchuk US 2005 describes a broad class of EGFR inhibitors having a quinazoline scaffold and states a preference for EGFR inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." *Id.*, [0007]–[0009], [0018]. Zacharchuk US 2005 broadly claims a method of treating or inhibiting cancer that comprises administration of "an effective amount of EGFR kinase inhibitor" and more specifically "wherein the EGFR kinase inhibitor irreversibly inhibits EGFR kinase." *Id.*, claims 1, 2. Zacharchuk US 2005 describes three specific irreversible EGFR inhibitors— HKI-272, EKB-569, and CL-387,785. *See*, *e.g.*, *id.*, [0004], [0044]–[0045].

546.   Zacharchuk US 2005 explains that "[t]he compounds herein may be administered orally" and "administration can take the form of dosing a reversible EGFR kinase

199

inhibitor, for example but not limited to gefitinib or iressa alone **until resistance is detected**

during clinical monitoring at which time an effective amount of an irreversible EGFR kinase

inhibitor, for example but not limited to EKB or HKI is administered." Zacharchuk US 2005,

[0024] – [0025] (emphasis added). Zacharchuk US 2005 further explains that "[a]cquired

resistance to gefitinib is associated with a second mutation in exon 20 encoding the EGFR kinase

domain." *Id.*, [0043].

547.    Zacharchuk US 2005 reports the use of EKB-569 in two patients with

NSCLC after these patients were treated with gefitinib and had recurrence of NSCLC.

Zacharchuk US 2005, [0041]. Zacharchuk US 2005 reports that "EKB-569 was effective in these

two patients after treatment with gefitinib and recurrence of NSCLC." *Id.* To the extent that the *in*

*vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed

method of treating NSCLC, Zacharchuk US 2005 also sufficiently describes a method of treating

gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof. Zacharchuk US 2005

specifically identifies the *clinical* use of EKB-569 in two patients with gefitinib-resistant NSCLC.

548.    In addition, Zacharchuk US 2005 describes the activity of irreversible

EGFR inhibitor CL-387,785, stating that it "strongly inhibited" the activity of EGFR containing a

secondary mutation. Zacharchuk US 2005, [0044].

549.    The '287 application, to which Zacharchuk US 2005 claims priority,

contains the same information. The '287 application also discloses a "method of treating or

inhibiting cancer in a human treated with gefitinib," including the particular "use of an epidermal

growth factor receptor (EGFR) kinase inhibitor in gefitinib resistant patients." '287 application,

2:14–15; 1:4–5. The '287 application states that "[t]he cancer of this invention comprises non-

small cell lung cancer." *Id.*, 5:24. The '287 application describes a broad class of quinazoline

███████████████████████████

EGFR inhibitors, and states a preference for "EGFR kinase inhibitor[s] that irreversibly inhibit[]EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." *Id.*, 6:11–15. Like Zacharchuk US 2005, the '287 application broadly claims a method of treating or inhibiting cancer comprising administration of an irreversible EGFR inhibitor. *Id.*, Claim 2. Zacharchuk US 2005 describes EKB-569 and CL-387,785 specifically. *Id.*, 2:5–6; 13:19–21. As with Zacharchuk US 2005, the '287 application also describes the administration of EKB-569 in two patients, reporting that "EKB-569 was effective in these two patients after treatment with gefitinib and recurrence of NSCLC." *Id.*, 13:13–14, 22–24 ("EKB-569, another irreversible EGFR inhibitor, may abrogate the resistance mechanism to gefitinib."). The '287 application also describes the activity of irreversible EGFR inhibitor CL-387,785, stating that it "strongly inhibited" the activity of EGFR containing a secondary mutation. *Id.*, 13:19–21.

550. Zacharchuk US 2005 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" EKB-569. '314 patent, claim 1. Zacharchuk US 2005 explains that the compounds disclosed therein, including EKB-569, are preferably administered "in the form of a unit dose." Zacharchuk US 2005, [0023]. Zacharchuk US 2005 further specifies that the unit dose "may contain from 0.1 to 300 mg of a compound of the invention and preferably from 2 to 100 mg" and "may be administered from 1 to 6 times a day." *Id.* The two patients described in Zacharchuk US 2005 were administered 25 mg/day EKB-569 (Case 1) and 35 mg/day (Case 2). *Id.*, [0036], [0038]. To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Zacharchuk US 2005 describe a "unit dose" of EKB-569.

███████████████████████████████

551. The '287 application, to which Zacharchuk US 2005 claims priority, also describes daily administration of a unit dosage of EKB-569 to a patient having gefitinib resistant NSCLC. *See* '287 application, 12:25–13:7 (describing the daily administration of EKB-569 to two patients with recurrent NSCLC).

552. Zacharchuk US 2005 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. As stated above, Zacharchuk US 2005 states a preference for EGFR inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor **that can form a covalent bond with EGFR**." Zacharchuk US 2005, [0018] (emphasis added). Zacharchuk US 2005 describes the use of EKB-569 and CL-387,785 as irreversible EGFR inhibitors. As discussed above in paragraphs 303 and 312, EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain and inhibits erb-B2 by forming a covalent bond with cysteine 805. Similarly, as discussed above in paragraph 277, CL-387,785 covalently binds to cysteine 773 and likely covalently binds to the analogous cysteine 805 residue. The POSA would have known that CL-387,785 covalently binds to cysteine 773 and likely inhibits erb-B2 through covalent binding to analogous cysteine 805 residue. *See* Discafani 1999 at 923 (predict[ing] that CL-387,785 alkylates Cys$^{773}$, which is located in the ATP-binding region of the protein, and hypothesizing that "[i]t is likely that CL-387,785 inhibits c-erb-B2"); *id.* ("[C]ysteine [773] residue in the kinase domain . . . is unique to EGF-R and c-erbB-2 and would explain, in part, why CL-387,785 selectively interacts with these two tyrosine kinases."). Indeed, I understand that Plaintiffs may contend that there is considerable homology between the cysteine 773 residue of EGFR and the cysteine 805 residue of erb-B2 (Plaintiffs' Infringement Contentions

████████████████████████

at A-6), such that compounds that covalently bind to cysteine 773, such as CL-387,785, will similarly bind to the cysteine 805 residue of erbB-2. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 805 in the intracellular region of erbB2, Zacharchuk US 2005 inherently discloses irreversible EGFR inhibitors that covalently bind to the designated cysteine residues. *See* Section VIII.D.

553. The '287 application recites the same preference for EGFR kinase inhibitors that "irreversibly inhibit[]EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." '287 application, 6:11–15. The '287 application also discloses EKB-569 and CL-387,785. *Id.*, 2:5–6; 13:19–21.

554. *Zacharchuk US 2005 describes every limitation of claim 3 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Zacharchuk US 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3.

555. Zacharchuk US 2005 states a preference for inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) **that can form a covalent bond with EGFR**." Zacharchuk US 2005, [0018] (emphasis added). Zacharchuk US 2005 also describes the use of EKB-569 and CL-387,785 as irreversible EGFR inhibitors. As explained above in this Subsection, EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain. Similarly, as

████████████████████

discussed above in this Subsection CL-387,785 covalently binds to cysteine 773. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, Zacharchuk US 2005 inherently discloses irreversible EGFR inhibitors that covalently bind to the designated cysteine residue. *See* Section VIII.D.

556.    *Zacharchuk US 2005 describes every limitation of claim 4 of the '314 patent, either expressly or inherently*. For the reasons discussed above and in this Subsection, Zacharchuk US 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314  patent, claim 4.

557.    Zacharchuk US 2005 states a preference for inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor)." Zacharchuk US 2005, [0018]. Zacharchuk US 2005 also describes the use of EKB-569 and CL-387,785 as irreversible EGFR inhibitors. As explained above in this Subsection, EKB-569 inhibits erb-B2 by forming a covalent bond with cysteine 805. Similarly, as discussed above in this Subsection, CL-387,785 covalently binds to cysteine 773 and likely covalent binds to the analogous cysteine 805 residue. To the extent "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784/805 in the intracellular region of erbB2, Zacharchuk US 2005 inherently discloses irreversible EGFR inhibitors that covalently bind to that designated cysteine residue. *See* Section VIII.D.

558.    *Zacharchuk US 2005 describes every limitation of claim 5 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection,

████████████████████████

Zacharchuk US 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the method further comprises administering at least one other tyrosine kinase inhibitor." '314 patent, claim 5.

559. Zacharchuk US 2005 claims a "method of treating . . . [non-small cell lung cancer] in a human . . . comprising administering to said human gefitinib . . . and an effective amount of an EGFR kinase inhibitor." *See* Zacharchuk US 2005, claims 1, 7; *see also id.*, Abstract, [0006]. Further, I understand that Plaintiffs may contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 5 of the '314 patent if the patient had been administered gefitinib and/or erlotinib in a prior treatment regimen. Zacharchuk US 2005 describes methods of administering gefitinib and then administering an irreversible inhibitor in the specification. Zacharchuk US 2005, [0024] (teaching the administration of a reversible EGFR kinase inhibitor such as gefitinib "until resistance is detected . . . at which time an effective amount of an irreversible EGFR kinase inhibitor . . . is administered"); *id.*, [0025] (teaching the administration of a reversible EGFR kinase inhibitor such as gefitinib until resistance is detected, then administering an irreversible EGFR kinase inhibitor, "followed by another round of dosing with the reversible EGFR kinase inhibitor"). Accordingly, under Plaintiffs' theory, Zacharchuk 2005 discloses the method of claim 5 of the '314 patent.

560. The '287 application, to which Zacharchuk US 2005 claims priority, contains the same information. The '287 application claims "a method of treating or inhibiting [non-small cell lung cancer] . . . comprising administered to said human gefitinib . . . and an effective amount of EGFR kinase inhibitor." '287 application, claim 1. The '287 application specification also describes methods of administering gefitinib and an irreversible EGFR inhibitor

patients with recurrent NSCLC. '287 application, Fig. 2, Fig. 5 (showing administration of both gefitinib and EKB-569 to a patient with NSCLC); 13:15–16 ("In some cases, re-treatment with gefitinib is effective when NSCLC recurs in patients treated with gefitinib.").

561.    *Zacharchuk US 2005 describes every limitation of claim 6 of the '314 patent, either expressly or inherently.* For the reasons discussed above in this Subsection, Zacharchuk US 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the method further comprises administering radiation." '314 patent, claim 6.

562.    Zacharchuk US 2005 discloses a patient with adenocarcinoma who was treated with "RT 60Gy" and later treated with EKB-569. Zacharchuk US 2005 at Fig. 5, [0037]– [0038]; *see also* Zacharchuk US 2005, claim 1 ("[M]ethod of treating or inhibiting cancer in a human . . . comprising administering to said human gefitinib or iressa alone or in combination with other cytotoxic agents . . . and an effective amount of an EGFR kinase inhibitor [wherein the EGFR kinase inhibitor irreversibly inhibits EGFR kinase]."). "RT" is a common abbreviation for radiation therapy and 60 gy refers to the ionizing radiation dose. *See* Bradley, *A review of radiation dose escalation trials for non-small cell lung cancer within the Radiation Therapy Oncology Group,* Semin. Oncology (2005) at S111. Zacharchuk US 2005 also claims a "method of treating or inhibiting cancer in a human . . . comprising administering to said human gefitinib or iressa alone or in combination with other cytotoxic agents . . . and an effective amount of an EGFR kinase inhibitor [wherein the EGFR kinase inhibitor irreversibly inhibits EGFR kinase]." Zacharchuk US 2005, Claim 1 (emphasis added). To the extent Plaintiffs contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 6 of the '314 patent if the patient had been administered radiation in a

███████████████████████████████

prior treatment regimen, then Zacharchuk US 2005 discloses such prior administration of radiation.

563.   The '287 application, to which Zacharchuk US 2005 claims priority, also describes the use of an irreversible EGFR inhibitor in combination with radiation. '287 application, fig. 5, claim 1.

### 3.   **Yoshimura 2005**

a)   Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by Yoshimura 2005

564.   Yoshimura 2005 describes the use of an irreversible EGFR inhibitor—EKB-569—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 patent, claim 1. Yoshimura 2005 explains that "EKB-569 is a potent, low molecular weight, selective and irreversible inhibitor of epidermal growth factor receptor (EGFR) . . . ." Yoshimura 2005 at 363; *id.* at 364 ("EKB-569 is an irreversible inhibitor of EGFR, while other small-molecule EGFR inhibitors bind EGFR reversibly.").

565.   Yoshimura 2005 reports that EKB-569 was used in a phase 1 study of patients with advanced stage malignancies, including patients with non-small cell lung cancer. *Id.* at 364. "The most frequently occurring tumor types included non-small cell lung . . . ." *Id.* Yoshimura 2005 describes two of the patients from the Phase I study in detail. *Id.* at 365. In Case #1, a 63-year old man with adenocarcinoma of the lung was started on oral gefitinib, experienced multiple pulmonary metastases two years later, and was started on EKB-569 in March 2003. *Id.* During treatment with EKB-569, the patient had stable disease and radiographic tumor regression. *Id.* In Case #2, a 49-year-old woman with adenocarcinoma was started on oral gefitinib, discontinued treatment just over a year later after developing grade 3 oral mucositis, and entered

███████████████████████

the phase I study of EKB-569 in February 2004. *Id.* at 365–66. During treatment, the multiple

pulmonary metastases, as well as brain metastases, had decreased in size. *Id* at 366. According to

Yoshimura 2005, EKB-569 was "effective in these two patients after resistance to gefitinib . . . ."

*Id.* at 366. Yoshimura concludes that "irreversible EGFR inhibitors may be an effective therapy

for patients with EGFR-mutant advanced non-small cell lung cancer who have relapsed with

treatment with gefitinib." *Id.* at 370.

566.    Yoshimura 2005 also discloses the T790M mutation and discloses that the

T790M mutation was associated with acquired resistance to gefitinib or erlotinib. Yoshimura

2005 at 366–67 ("Recently, a second mutation in the *EGFR* kinase domain, which is associated

with acquired resistance of non-small cell lung cancer to gefitinib or erlotinib, was

reported. . . . . This mutation leads to a substitution of methionine for threonine at position 790

(T790M) in the kinase domain."). Yoshimura 2005 summarizes the results from Kobayashi

NEJM 2005, which found CL-387,785 strongly inhibited cells with the T790M point mutation,

and Kwak 2005, which reported that gefitinib-resistant clones without the T790M mutation were

sensitive to EKB-569. Yoshimura 2005 at 367. Yoshimura 2005 concludes that "irreversible

EGFR inhibitors may be an effective therapy for patients with EGFR-mutant advanced non-small

cell lung cancer who have relapsed after treatment with gefitinib." *Id.* To the extent that the *in*

*vitro* testing data provided in the '162 patent is sufficient to describe and enable the claimed

method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation,

Yoshimura 2005 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant

NSCLC in a patient in need thereof.

567.    Yoshimura 2005 also describes "administering daily to the patient . . . a

pharmaceutical composition comprising a unit dosage of 2–500 mg" EKB-569. '162 patent, claim

██████████████████████████

1. Yoshimura 2005 explains that patients in the Phase I study received "once daily" treatment of 25 mg, 35 mg, or 50 mg EKB-569. Yoshimura 2005 at 364. The two patients specifically described as having gefitinib-resistant NSCLC were administered once daily 25 mg (Case #1) and 35 mg (Case #2) EKB-569. *Id.* at 365–66. The '162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Yoshimura 2005 describe a "unit dose" of EKB-569.

568.    Yoshimura 2005 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1. As discussed above in paragraphs 303, 312, EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain. Thus, Yoshimura 2005 inherently discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1.

569.    *Yoshimura 2005 describes every limitation of claim 4 of the '162 patent, either expressly or inherently*. For the reasons discussed in this Subsection, Yoshimura 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation in a patient, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As discussed above in paragraphs 312, EKB-569 reportedly forms a covalent bond with cysteine 805. To the extent that irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of

██████████████████████████████

ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784/805 in the

intracellular region of erbB2, Yoshimura 2005 discloses an irreversible EGFR inhibitor that binds

to that cysteine. *See* Section VIII.D. Thus, Yoshimura 2005 inherently discloses an irreversible

EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162

patent, claim 4.

> b)    Asserted Claims 1, 3–6, and 9 of the '314 Patent Are Anticipated
> by Yoshimura 2005

570.    *Yoshimura 2005 describes every limitation of claim 1 of the '314 patent,*

*either expressly or inherently*. Yoshimura 2005 describes the use of an irreversible EGFR

inhibitor—EKB-569—in a "method for treating gefitinib and/or erlotinib resistant non-small cell

lung cancer in a patient in need thereof." '314 patent, claim 1. Yoshimura 2005 explains that

"EKB-569 is a potent, low molecular weight, selective and irreversible inhibitor of epidermal

growth factor receptor (EGFR) . . . ." Yoshimura 2005 at 363; *id.* at 364 ("EKB-569 is an

irreversible inhibitor of EGFR, while other small-molecule EGFR inhibitors bind EGFR

reversibly.").

571.    Yoshimura 2005 reports that EKB-569 was used in a phase 1 study of

patients with advanced stage malignancies, including patients with non-small cell lung cancer. *Id.*

at 364. "The most frequently occurring tumor types included non-small cell lung . . . ." *Id.*

Yoshimura 2005 describes two of the patients from the Phase I study in detail. *Id.* at 365. In Case

#1, a 63-year old man with adenocarcinoma of the lung was started on oral gefitinib, experienced

multiple pulmonary metastases two years later, and was started on EKB-569 in March 2003. *Id.*

During treatment with EKB-569, the patient had stable disease and radiographic tumor regression.

*Id.* In Case #2, a 49-year-old woman with adenocarcinoma was started on oral gefitinib,

discontinued treatment just over a year later after developing grade 3 oral mucositis, and entered

███████████████████████████

the phase I study of EKB-569 in February 2004. *Id.* at 365–66. During treatment, the multiple

pulmonary metastases, as well as brain metastases, had decreased in size. *Id* at 366. According to

Yoshimura 2005, EKB-569 was "effective in these two patients after resistance to gefitinib . . . ."

*Id.* at 366. Yoshimura concludes that "irreversible EGFR inhibitors may be an effective therapy

for patients with EGFR-mutant advanced non-small cell lung cancer who have relapsed with

treatment with gefitinib." *Id.* at 370. To the extent that the *in vitro* testing data provided in the

'314 patent is sufficient to describe and enable the claimed method of treating gefitinib and/or

erlotinib resistant NSCLC, Yoshimura 2005 also sufficiently describes a method of treating

gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof.

572.    Yoshimura 2005 also describes "administering daily to the patient having

gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition

comprising a unit dosage of" EKB-569. '314 patent, claim 1. Yoshimura 2005 explains that

patients in the Phase I study received "once daily" treatment of 25 mg, 35 mg, or 50 mg EKB-

569. Yoshimura 2005 at 364. The two patients specifically described as having gefitinib-resistant

NSCLC were administered once daily 25 mg (Case #1) and 35 mg (Case #2) EKB-569. *Id.* at

365–66. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary

dosage for the subject, each unit containing a predetermined quantity of active material calculated

to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or

vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an

irreversible EGFR inhibitor, so too does Yoshimura 2005 describe a "unit dose" of EKB-569.

573.    Yoshimura 2005 also discloses an irreversible inhibitor "that covalently

binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the

ligand-binding pocket of erb-B2." '314 patent, claim 1. As discussed above in paragraphs 303,

███████████████████████████

312, EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain and cysteine 805 of erbB-2. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784/805 in the intracellular region of erbB2, Yoshimura inherently discloses an irreversible EGFR inhibitor that covalently binds to the designated cysteine residues. *See* Section VIII.D.

574. *Yoshimura 2005 describes every limitation of claim 3 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Yoshimura 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As discussed above in paragraphs 303, 312, EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, Yoshimura inherently discloses an irreversible EGFR inhibitor that covalently binds to that designated cysteine residue. *See* Section VIII.D.

575. *Yoshimura 2005 describes every limitation of claim 4 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Yoshimura 2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314 patent, claim 4. As discussed above in paragraphs 312, EKB-569 forms a covalent

bond with cysteine 805 of erbB-2. To the extent "irreversible EGFR inhibitor that covalently

binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses

irreversible EGFR inhibitors that bind to the cysteine 784/805 in the intracellular region of erbB2,

Yoshimura inherently discloses an irreversible EGFR inhibitor that covalently binds to that

designated cysteine residue. *See* Section VIII.D.

576. *Yoshimura 2005 describes every limitation of claim 5 of the '314 patent,*

*either expressly or inherently*. For the reasons discussed above in this Subsection, Yoshimura

2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in

need thereof, "wherein the method further comprises administering at least one other tyrosine

kinase inhibitor." '314 patent, claim 5. Yoshimura 2005 discloses at least two patients in the

Phase I study who were treated with gefitinib and a "new EGFR tyrosine kinase inhibitor (TAK-

165)" prior to treatment with EKB-569. *See* Yoshimura 2005 at 365–66 (Case #1 and Case #2).

To the extent Plaintiffs contend that treatment of a patient with an irreversible EGFR inhibitor

according to claim 1 of the '314 patent, would meet the limitation of claim 5 of the '314 patent if

the patient had been administered gefitinib and/or erlotinib in a prior treatment regimen, then

Yoshimura 2005 discloses such prior administration of gefitinib and/or erlotinib.

577. *Yoshimura 2005 describes every limitation of claim 6 of the '314 patent,*

*either expressly or inherently*. For the reasons discussed above in this Subsection, Yoshimura

2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in

need thereof, "wherein the method further comprises administering radiation" '314 patent, claim

6. Yoshimura 205 discloses at least one patient—the patient in Case #2—who was administered

radiation prior to treatment with EKB-569. *See* Yoshimura 2005 at 366 ("Radiotherapy for the

metastases (60 Gy/30 fractions) was done . . . ."). To the extent Plaintiffs contend that treatment

████████████████████

of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would

meet the limitation of claim 6 of the '314 patent if the patient had been administered radiation in a

prior treatment regimen, then Yoshimura 2005 discloses such prior administration of radiation.

578.    *Yoshimura 2005 describes every limitation of claim 9 of the '314 patent,*

*either expressly or inherently*. For the reasons discussed above in this Subsection, Yoshimura

2005 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in

need thereof, "wherein the route of administration is oral." '314 patent, claim 9. Yoshimura 2005

explains that EKB-569 was administered orally in the Phase I study. *See, e.g.*, Yoshimura 2005 at

364 ("EKB-569 was administered orally . . . .").

B.    **To the Extent Plaintiffs Contend That a Portion of Patients with NSCLC Have Gefitinib and/or Erlotinib Resistant NSCLC, the Asserted Claims of the '162 and '314 Patents Are Anticipated by Additional Prior Art References**

579.    I understand that Plaintiffs may assert that the treatment of NSCLC

patients who have not been treated with gefitinib and/or erlotinib and will not respond to such

treatment falls within the scope of the asserted claims. For one, Plaintiffs have asserted that the

plain and ordinary meaning of "gefitinib and /or erlotinib resistant NSCLC" includes "NSCLC

that will not respond to gefitinib and/or erlotinib treatment . . . ." D.I. 82 at 32; *id.* at 34

(explaining Plaintiffs' view that "gefitinib and erlotinib resistant NSCLC" includes "NSCLC with

primary [gefitinib and/or erlotinib] resistance"). Plaintiffs' infringement contentions similarly

state that "a portion of NSCLC patients are resistant to treatment with gefitinib and/or erlotinib,"

including patients who have never previously received gefitinib and/or erlotinib. May 19, 2023

Infringement Contentions at B-4–B-5. Plaintiffs' further assert that the "presence of the T790M

mutation is known to be associated with gefitinib and/or erlotinib resistance," including in

214

█████████████████████████████████

patients who have never previously received gefitinib and/or erlotinib. May 19, 2023

Infringement Contentions at B-5.

580.     Under Plaintiffs' theory that a portion of NSCLC patients are resistant to

gefitinib and/or erlotinib regardless of prior treatment with gefitinib and/or erlotinib, references

disclosing the use of an irreversible inhibitor for the treatment of NSCLC necessarily disclose the

use of an irreversible inhibitor for the treatment of gefitinib and/or erlotinib resistant NSCLC.

Similarly, under Plaintiffs' theory that a portion of NSCLC patients have gefitinib and/or erlotinib

resistant NSCLC having the T790M mutation, regardless of prior treatment with gefitinib and/or

erlotinib, references disclosing the use of an irreversible inhibitor for the treatment of NSCLC

necessarily disclose the use of an irreversible inhibitor for the treatment of gefitinib and/or

erlotinib resistant NSCLC having the T790M mutation.

    1.    **Allen 2003**

        a)    Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by
            Allen 2003

581.     According to Plaintiffs' theory, Allen 2003 describes the use of an

irreversible EGFR inhibitor that is not CL-387,785—CI-1033—in a "method of treating gefitinib

and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1

in a patient." '162 patent, claim 1. As discussed in Section XIV.A.1.a) above, Allen 2003 explains

that "CI-1033 is a highly potent and selective pan-erbB inhibitor that efficiently blocks signal

transduction through all four members of the erbB receptor family. In addition, it covalently binds

to these receptors, irreversibility [sic] inhibiting them . . . ." Allen 2003 at Abstract; *see also id.* at

70 ("CI-1033 (canertinib) is an orally available 3-chloro, 4-fluoro, 4-anilinoquinazoline that

possess two key features . . . (1) irreversible binding to the tyrosine kinase active site, and (2) pan-

erbB specificity."). Allen 2003 clarifies that "[t]he erbB family of receptors contains four cell

████████████████████████

surface receptor proteins" including "erbB-1 (epidermal growth factor receptor [EGFR] or

HER1)." *Id.* at 65.

582.    As discussed in Section XIV.A.1.a), Allen 2003 reports several Phase I

clinical studies of CI-1033, including in patients having non-small cell lung cancer (16% of "more

than 250 cancer patients"), among other cancers, showing evidence of target modulation and

antitumor activity. Allen 2003 at 72–74. Under Plaintiffs' theory, Allen 2003's disclosure of the

use of CI-1033 to treat patients having non-small cell lung cancer inherently discloses a method

of treating gefitinib and/or erlotinib resistant NSCLC have the T790M mutation by administering

an irreversible EGFR inhibitor. *See* ¶¶ 579–580.

583.    Allen 2003 also describes "administering daily to the patient having

gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ

ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2–500 mg" CI-1033. '162

patent, claim 1. Allen 2003 reports Phase I clinical studies wherein patients were administered

oral, daily doses ranging from 2 mg/ day to 1000 mg/day. Allen 2003 at 72. The '162 patent

defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each

unit containing a predetermined quantity of active material calculated to produce the desired

therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent

that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR

inhibitor, so too does Allen 2003 describe a "unit dose" of CI-1033.

584.    Allen 2003 also describes CI-1033 as an irreversible EGFR inhibitor "that

covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO:1." '162

patent, claim 1. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of

erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close

████████████████████████

proximity to cysteine 773 of erbB-1 . . . . This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003 at 70–71.

585.   *Allen 2003 describes every limitation of claim 4 of the '162 patent, either expressly or inherently.* For the reasons discussed below and in this Subsection, Allen 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (**or the analogous cysteines 784 . . . in erbB-2** . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003 at 70–71 (emphasis added). To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Allen 2003 inherently discloses an irreversible EGFR inhibitor that covalently binds to that residue. *See* Section VIII.D.

2.   **Calvo 2004**

a)   Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by Calvo 2004

586.   *Calvo 2004 describes every limitation of claim 1 of the '162 patent, either expressly or inherently.* Calvo 2004 describes the use of an irreversible EGFR inhibitor that is not CL-387,785—CI-1033—in a "method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 patent, claim 1. Calvo 2004 explains that CI-1033 was developed to "irreversibly bind" and forms a covalent bond with

217

███████████████████████

"cysteine 773 of erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4, respectively)." Calvo 2004 at 7113. Calvo 2004 further explains that this covalent bond "permanently inactivates the catalytically active erbB1 . . . ." *Id.; see also id.* at Abstract ("CI-1033, an oral 4-anilinoquinazoline that irreversibly inhibits the tyrosine kinase domain of all erbB subfamilies."). According to Calvo 2004, the covalent binding of CI-1033 "results in a more prolonged suppression of erbB activity compared with reversible inhibitors in preclinical studies." Calvo 2004 at 7113.

587. Calvo 2004 reports Phase I clinical studies of CI-1033, including patients with non-small cell lung cancer. Calvo 2004 at 7114–15 (Table 1). Calvo 2004 also discloses that CI-1033 had "[b]road and impressive activity against human tumor xenografts of . . . lung . . . origin," Calvo 2004 at 7113, and further suggests "[l]arge, multicenter disease-directed studies in patients with advanced carcinomas of the lung . . . ." Calvo 2004 at 7119. Calvo 2004 reports that CI-1033 was "well-tolerated." Calvo 2004 at 7119. To the extent that the *in vitro* testing data provided in the '162 patent is sufficient to describe and enable the claimed method of treating NSCLC, Calvo 2004 also sufficiently describes a method of treating NSCLC. Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Calvo 2004's disclosure of the use of CI-1033 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* ¶¶ 579–580.

588. Calvo 2004 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2–500 mg" CI-1033. '162 patent, claim 1. Calvo 2004 reports a Phase I clinical study in which patients were administered in

daily oral doses of 250 mg or 300 mg of CI-1033. Calvo 2004 at 7114–15. The '162 patent

defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each

unit containing a predetermined quantity of active material calculated to produce the desired

therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent

that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR

inhibitor, so too does Calvo 2004 describe a "unit dose" of CI-1033.

589.     Calvo 2004 also describes CI-1033 as an irreversible EGFR inhibitor "that

covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO:1." '162

patent, claim 1. Calvo 2004 explains that CI-1033 forms a covalent bond with "cysteine 773 of

erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4, respectively)" which

"facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically

active erbB1, erbB2, and erbB4 family members." Calvo 2004 at 7113. Thus, Calvo 2004

inherently discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the

catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1.

590.     *Calvo 2004 describes every limitation of claim 4 of the '162 patent, either

expressly or inherently*. For the reasons discussed above in this Subsection, Calvo 2004 describes

a method for treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation,

"wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding

pocket of ERBB2." '162 patent, claim 4. Calvo 2004 explains that CI-1033 forms a covalent bond

with "cysteine 773 of erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4,

respectively)" which "facilitates the rapid formation of a covalent bond that permanently

inactivates the catalytically active erbB1, erbB2, and erbB4 family members." Calvo 2004 at

7113. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in

███████████████████████

the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the

cysteine 784 in the intracellular region of erbB2, Calvo 2004 inherently discloses an irreversible

EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

> b)      Asserted Claims 1, 3, 4, and 9 of the '314 Patent Are Anticipated
> by Calvo 2004

591.    *Calvo 2004 describes every limitation of claim 1 of the '314 patent, either*

*expressly or inherently*. Calvo 2004 describes the use of an irreversible EGFR inhibitor—CI-

1033—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a

patient in need thereof." '314 patent, claim 1. Calvo 2004 explains that CI-1033 was developed to

"irreversibly bind" and forms a covalent bond with "cysteine 773 of erbB1 (or the analogous

cysteines 784 and 778 of erbB2 and erbB4, respectively)." Calvo 2004 at 7113. Calvo 2004

further explains that this covalent bond "permanently inactivates the catalytically active erbB1."

*Id.; see also id.* at Abstract ("CI-1033, an oral 4-anilinoquinazoline that irreversibly inhibits the

tyrosine kinase domain of all erbB subfamilies."). According to Calvo 2004, the covalent binding

of CI-1033 "results in a more prolonged suppression of erbB activity compared with reversible

inhibitors in preclinical studies." Calvo 2004 at 7113.

592.    Calvo 2004 reports Phase I clinical studies of CI-1033, including patients

with non-small cell lung cancer. Calvo 2004 at 7114–15 (Table 1). Calvo 2004 also discloses that

CI-1033 had "[b]road and impressive activity against human tumor xenografts

of . . . lung . . . origin," Calvo 2004 at 7113, and further suggests "[l]arge, multicenter disease-

directed studies in patients with advanced carcinomas of the lung." Calvo 2004 at 7119. Calvo

2004 reports that CI-1033 was "well-tolerated." Calvo 2004 at 7119. To the extent that the *in*

*vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed

method of treating NSCLC, Calvo 2004 also sufficiently describes a method of treating NSCLC.

███████████████████████████████

Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC, Calvo 2004's disclosure of the use of CI-1033 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC. *See* ¶¶ 579–580.

593.    Calvo 2004 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" CI-1033. '314 patent, claim 1. Calvo 2004 reports a Phase I clinical study in which patients were administered daily oral doses of 250 mg or 300 mg of CI-1033. Calvo 2004 at 7114–15. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Calvo 2004 describe a "unit dose" of CI-1033.

594.    Calvo 2004 also describes CI-1033 as an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. Calvo 2004 explains that CI-1033 forms a covalent bond with "cysteine 773 of erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4, respectively)" which "facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically active erbB1, erbB2, and erbB4 family members." Calvo 2004 at 7113. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses

221

██████████████████████████

irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2,
Calvo 2004 inherently discloses an irreversible EGFR inhibitor that binds to the designated
cysteine residues. *See* Section VIII.D.

595.    *Calvo 2004 describes every limitation of claim 3 of the '314 patent, either
expressly or inherently*. For the reasons discussed above in this Subsection, Calvo 2004 describes
a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof,
"wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR."
'314 patent, claim 3. Calvo 2004 explains that CI-1033 forms a covalent bond with "cysteine 773
of erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4, respectively)" which
"facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically
active erbB1, erbB2, and erbB4 family members." Calvo 2004 at 7113. To the extent "irreversible
EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR"
encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region
of EGFR, Calvo 2004 inherently discloses an irreversible EGFR inhibitor that covalently binds to
that residue. *See* Section VIII.D.

596.    *Calvo 2004 describes every limitation of claim 4 of the '314 patent, either
expressly or inherently*. For the reasons discussed above in this Subsection, Calvo 2004 describes
a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof,
"wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2."
'314 patent, claim 4. Calvo 2004 explains that CI-1033 forms a covalent bond with "cysteine 773
of erbB1 (or the analogous cysteines 784 and 778 of erbB2 and erbB4, respectively)" which
"facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically
active erbB1, erbB2, and erbB4 family members." Calvo 2004 at 7113. To the extent "irreversible

EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Calvo 2004 inherently discloses an irreversible EGFR inhibitor that covalently binds to that residue. *See* Section VIII.D.

597.   *Calvo 2004 describes every limitation of claim 9 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Calvo 2004 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the route of administration is oral." '314 patent, claim 9. Calvo 2004 explains that CI-1033 is administered orally. *See, e.g.*, Calvo 2004 at 7113 ("CI-1033 . . ., an orally available 3-chloro, 4-fluoro, 4-anilinoquinazoline . . . ."); *id.* at 7119 (describing "daily oral treatment with CI-1033").

3.   **Grünwald 2003**

a)   Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by Grünwald 2003

598.   *Grünwald 2003 describes every limitation of claim 1 of the '162 patent, either expressly or inherently*. Grünwald 2003 describes the use of irreversible EGFR inhibitors that are not CL-387,785—CI-1033 and EKB-569—in a "method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 patent, claim 1. As explained in paragraphs 247, 253, 262, 266, 283 (CI-1033), 303, 312, 315, 323 (EKB-569), CI-1033 and EKB-569 are both irreversible EGFR inhibitors. *See also* Grünwald 2003 at 856, Table 4 (explaining that CI-1033 and EKB-569 are not reversible inhibitors).

599.   Grünwald 2003 reports that both CI-1033 and EKB-569 had been used in patients with NSCLC. Grünwald 2003 at 856, Table 4 (reporting that both CI-1033 and EKB-569

223

were in Phase I studies); *id.* at 857, Table 5 (disclosing CI-1033 and EKB-569 administered to "non-small cell lung cancer" tumor types). Grünwald 2003 further discloses that CI-1033 showed 1.8% overall response and 24% stable disease in at least one phase I study including patients with non-small cell lung cancer. Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC, Grünwald 2003's disclosure of the use of CI-1033 and EKB-569 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* ¶¶ 579–580.

600.     Grünwald 2003 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2–500 mg" CI-1033. '162 patent, claim 1. In Table 5, Grünwald 2003 states that CI-1033 was administered to patients with non-small cell lung cancer in daily doses ranging from 50-750 mg and EKB-569 was administered to patients with non-small cell lung cancer in daily doses ranging from 25-125 mg. The '162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Grünwald 2003 sufficiently describe a "unit dose" of CI-1033 and EKB-569.

601.     Grünwald 2003 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO:1." '162 patent, claim 1. As shown in paragraphs 247, 253, 271, 277, (CI-1033) 303, 312 (EKB-569), CI-1033 and EKB-569 reportedly form a covalent bond with the cysteine 773 of EGFR. Thus,

███████████████████████████

Grünwald 2003 inherently discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1.

602.   *Grünwald 2003 describes every limitation of claim 4 of the '162 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Grünwald 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As explained in ¶¶ 247, 253, 277, (CI-1033) 304, 312 (EKB-569), CI-1033 and EKB-569 reportedly form covalent bonds with the cysteine 784/805 of erbB2. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Grünwald 2003 inherently discloses an irreversible EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

b)   Asserted Claims 1, 3, and 4 of the '314 Patent Are Anticipated by Grünwald 2003

603.   *Grünwald 2003 describes every limitation of claim 1 of the '314 patent, either expressly or inherently*. Grünwald 2003 describes the use of irreversible EGFR inhibitors—CI-1033 and EKB-569—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. As shown in paragraphs 247, 253, 262, 266, 283 (CI-1033), 303, 312, 315, 323 (EKB-569), CI-1033 and EKB-569 are both irreversible EGFR inhibitors. *See also* Grünwald 2003 at 856, Table 4 (stating that CI-1033 and EKB-569 are not reversible inhibitors).

604.   Grünwald 2003 reports that both CI-1033 and EKB-569 had been used in patients with NSCLC. Grünwald 2003 at 856, Table 4 (reporting that both CI-1033 and EKB-569

████████████████████████

were in Phase I studies); *id.* at 857, Table 5 (disclosing CI-1033 and EKB-569 were administered to "non-small cell lung cancer" tumor types). Grünwald 2003 further discloses that CI-1033 showed a 1.8% overall response and 24% stable disease in at least one phase I study including patients with non-small cell lung cancer. Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC, Grünwald 2003's disclosure of the use of CI-1033 and EKB-569 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC. *See* ¶¶ 579–580.

605.   Grünwald 2003 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" EKB-569. '314 patent, claim 1. In Table 5, Grünwald 2003 states that CI-1033 was administered to patients with non-small cell lung cancer in daily doses ranging from 50-750 mg and EKB-569 was administered to patients with non-small cell lung cancer in daily doses ranging from 25-125 mg. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Grünwald 2003 sufficiently describe a "unit dose" of CI-1033 and EKB-569.

606.   Grünwald 2003 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. As explained in paragraphs 247, 253, 271, 277, (CI-1033) 303, 304, 312 (EKB-569), CI-1033 and EKB-569 reportedly form a covalent bond with the cysteine 773 of EGFR and the cysteine 805/784 of erbB-2. To the extent

226

██████████████████████

"irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Grünwald 2003 inherently discloses an irreversible EGFR inhibitor that binds to the designated cysteine residues. *See* Section VIII.D.

607. *Grünwald 2003 describes every limitation of claim 3 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Grünwald 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As shown in paragraphs 247, 253, 271, 277, (CI-1033) 303, 312 (EKB-569), CI-1033 and EKB-569 reportedly form a covalent bond with the cysteine 773 of EGFR. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, Grünwald 2003 inherently discloses an irreversible EGFR inhibitor that covalently binds to that residue. *See* Section VIII.D.

608. *Grünwald 2003 describes every limitation of claim 4 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Grünwald 2003 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314 patent, claim 4. As explained in ¶¶ 247, 253, 277, (CI-1033) 304, 312 (EKB-569), CI-1033 and EKB-569 reportedly form covalent bonds with the cysteine 784/805 of erbB2. To the extent "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-

binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784

in the intracellular region of erbB2, Grünwald 2003 inherently discloses an irreversible EGFR

inhibitor that binds to that cysteine. *See* Section VIII.D.

4. **Hidalgo 2002**

a) Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by
Hidalgo 2002

609. *Hidalgo 2002 describes every limitation of claim 1 of the '162 patent,*

*either expressly or inherently*. Hidalgo 2002 discloses the use of an irreversible EGFR inhibitor

that is not CL-387,785—EKB-569—in a "method of treating gefitinib and/or erlotinib resistant

non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 patent,

claim 1. Hidalgo 2002 explains that EKB-569 is an "irreversible inhibitor of the EGFR tyrosine

kinase." Hidalgo 2002 at 65. Hidalgo 2002 describes the use of EKB-569 in a Phase I trial in

patients with advanced solid tumors, including patients with non-small cell lung cancer. *Id.*

(disclosing 4 patients with lung tumors and "[o]ne pt with non-small cell lung cancer completed 9

treatment cycles"). According to Hidalgo, EKB-569 "inhibits the growth of tumor cells that

overexpress EGFR or HER2 in vitro and in vivo." *Id.* Under Plaintiffs' arguments regarding the

scope of gefitinib and/or erlotinib resistant NSCLC, Hidalgo 2002's disclosure of the use of EKB-

569 to treat patients having non-small cell lung cancer inherently discloses a method of treating

gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* ¶¶ 579–580.

610. Hidalgo 2002 also describes "administering daily to the patient having

gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ

ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2–500 mg" EKB-569. '314

patent, claim 1. Hidalgo 2002 reports that patients in the Phase I clinical study in which patients

were administered in daily doses of 25 mg, 50 mg, 75 mg, and 125 mg. Hidalgo 2002 at 65. The

'162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Hidalgo 2002 sufficiently describe a "unit dose" of EKB-569.

611.    Hidalgo 2002 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO:1." '162 patent, claim 1.

612.    As shown in paragraphs 303, 312 (EKB-569), EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR. Thus, Hidalgo 2002 inherently discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1.

613.    *Hidalgo 2002 describes every limitation of claim 4 of the '162 patent, either expressly or inherently*. Hidalgo 2002 describes every limitation of claim 4 of the '162 patent, either expressly or inherently. For the reasons discussed above in this Subsection, Hidalgo 2002 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As explained in¶¶ 304, 312 (EKB-569), EKB-569 reportedly forms a covalent bond with the cysteine 805 of erbB2. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Hidalgo 2002 inherently discloses an irreversible EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

229

███████████████████████████████████

> b)      Asserted Claims 1, 3, 4, and 9 of the '314 Patent Are Anticipated
> by Hidalgo 2002

614.    *Hidalgo 2002 describes every limitation of claim 1 of the '314 patent, either expressly or inherently*. Hidalgo 2002 describes the use of an irreversible EGFR inhibitor— EKB-569—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. Hidalgo 2002 explains that EKB-569 is a "potent . . . irreversible inhibitor of the EGFR tyrosine kinase that inhibits the growth of tumor cells that overexpress EGFR." Hidalgo 2002 at 65.

615.    Hidalgo 2002 reports a Phase I clinical study of EKB-569, including patients with non-small cell lung cancer. Hidalgo 2002 at 65 (disclosing 4 patients with lung tumors and "[o]ne pt with non-small cell lung cancer completed 9 treatment cycles"). Hidalgo 2002 notes that EKB-569 was "generally well tolerated, with an acceptable PK and safety profile, and offers a promising targeted approach to the treatment of solid tumors." *Id.* Hidalgo 2002 further discloses that EKB-569 was potent and inhibited the growth of tumors cells that overexpress EGFR *in vitro* and *in vivo. Id.* To the extent that the *in vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed method of treating NSCLC, Hidalgo 2002 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof. Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC, Hidalgo 2002's disclosure of the use of EKB-569 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC. *See* ¶¶ 579–580.

616.    Hidalgo 2002 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" EKB-569. '314 patent, claim 1. Hidalgo 2002 reports that patients in

███████████████████████

the Phase I clinical study in which patients were administered in daily doses of 25 mg, 50 mg, 75 mg, and 125 mg. Hidalgo 2002 at 65. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Hidalgo 2002 sufficiently describe a "unit dose" of EKB-569.

617. Hidalgo 2002 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. As explained in paragraphs 303, 304, 312, EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805 of erbB-2. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Hidalgo 2002 inherently discloses an irreversible EGFR inhibitor that binds to the designated cysteine residues. *See* Section VIII.D.

618. *Hidalgo 2002 describes every limitation of claim 3 of the '314 patent, either expressly or inherently.* For the reasons discussed above in this Subsection, Hidalgo 2002 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As shown in paragraphs 303, 312, EKB-569 reportedly forms a

████████████████████████

covalent bond with the cysteine 773 of EGFR. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, Hidalgo 2002 inherently discloses an irreversible EGFR inhibitor that covalently binds to that residue. *See* Section VIII.D.

619.    *Hidalgo 2002 describes every limitation of claim 4 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Hidalgo 2002 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314 patent, claim 4. As explained in ¶¶ 304, 312, EKB-569 reportedly form covalent bonds with the cysteine 805 of erbB2. To the extent "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Hidalgo 2002 inherently discloses an irreversible EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

620.    *Hidalgo 2002 describes every limitation of claim 9 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Hidalgo 2002 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the route of administration is oral." '314 patent, claim 9. Hidalgo 2002 discloses that EKB-569 was administered "orally once daily . . . ." Hidalgo 2002 at 65.

5.    **Shin 2001**

a)    **Asserted Claims 1 and 4 of the '162 Patent Are Anticipated by Shin 2001**

621.    *Shin 2001 describes every limitation of claim 1 of the '162 patent, either expressly or inherently*. Shin 2001 describes the use of an irreversible EGFR inhibitor that is not

███████████████████████████████

CL-387,785—CI-1033—in a "method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 patent, claim 1. Shin explains that CI-1033 is a "4-anilinoquinazoline that acts as a pan-erbB tyrosine kinase inhibitor." Shin 2004 at 324. As shown in paragraphs 247, 253, 262, 266, 283 above, CI-1033 inhibits EGFR through irreversible inhibition.

622.     Shin 2001 reports that CI-1033 was administered in a Phase I study of patients with incurable solid tumors, including non-small cell lung carcinomas. Shin 2001 at 324. Shin 2001 also states that preliminary results indicated that CI-1033 was "generally well tolerated," had a "favorable pharmacokinetic profile" and held "promise as a novel anti-cancer agent." *Id.* To the extent that the *in vitro* testing data provided in the '162 patent is sufficient to describe and enable the claimed method of treating gefitinib and/or erlotinib resistant NSCLC, Shin 2001 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC. Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Shin 2001's disclosure of the use of CI-1033 for treatment of non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* ¶¶ 579–580.

623.     Shin 2001 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2–500 mg" CI-1033. '162 patent, claim 1. In the Phase I study described in Shin 2001, patients were administered daily doses of CI-1033 at nine different dosage strengths (50-560 mg/day). Shin 2001 at 324. The '162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired

therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Shin 2001 describe a "unit dose" of CI-1033.

624.  Shin 2001 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO:1." '162 Patent, Claim 1. As shown in paragraphs 247, 253, 271, 277, CI-1033 reportedly forms a covalent bond with the cysteine 773 of EGFR. Thus, Shin 2001 inherently discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 patent, claim 1.

625.  *Shin 2001 describes every limitation of claim 4 of the '162 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Shin 2001 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As shown in ¶¶ 247, 253, 277, CI-1033 reportedly forms covalent bonds with the cysteine 784/805 of erbB2. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Shin 2001 inherently discloses an irreversible EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

> b)  Asserted Claims 1, 3, 4, and 9 of the '314 Patent Are Anticipated by Shin 2001

626.  *Shin 2001 describes every limitation of claim 1 of the '314 patent, either expressly or inherently*. Shin 2001 describes the use of an irreversible EGFR inhibitor—CI-1033—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a

234

███████████████████

patient in need thereof." '314 patent, claim 1. Shin 2001 explains that CI-1033 is a "4-anilinoquinazoline that acts as a pan-erbB tyrosine kinase inhibitor." Shin 2004 at 324. As shown in paragraphs 247, 253, 262, 266, 283 above, CI-1033 inhibits EGFR through irreversible inhibition.

627.     Shin 2001 reports that CI-1033 was administered in a Phase I study of patients with incurable solid tumors, including non-small cell lung carcinomas. Shin 2001 at 324. Shin 2001 also states that preliminary results indicated that CI-1033 was "generally well tolerated," had a "favorable pharmacokinetic profile" and held "promise as a novel anti-cancer agent." *Id.* To the extent that the *in vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed method of treating gefitinib and/or erlotinib resistant NSCLC, Shin 2001 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC. Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC, Shin 2001's disclosure of the use of CI-1033 for treatment of non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC. *See* ¶¶ 579–580.

628.     Shin 2001 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" CI-1033. '314 patent, claim 1. In the Phase I study described in Shin 2001, patients were administered daily doses of CI-1033 at nine different dosage strengths (50-560 mg/day). Shin 2001 at 324. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and

███████████████████████████

enables a unit dose of an irreversible EGFR inhibitor, so too does Shin 2001 describe a "unit dose" of CI-1033.

629.    Shin 2001 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. As explained in paragraphs 247, 253, 271, 277, CI-1033 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805/784 of erbB-2. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Shin 2001 inherently discloses an irreversible EGFR inhibitor that binds to the designated cysteine residues. *See* Section VIII.D.

630.    *Shin 2001 describes every limitation of claim 3 of the '314 patent, either expressly or inherently.* For the reasons discussed above in this Subsection, Shin 2001 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As shown in paragraphs 247, 253, 271, 277, CI-1033 reportedly forms a covalent bond with the cysteine 773 of EGFR. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, Shin 2001 inherently discloses an irreversible EGFR inhibitor that covalently binds to that residue. *See* Section VIII.D.

631.     *Shin 2001 describes every limitation of claim 4 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Shin 2001 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314 patent, claim 4. As shown in ¶¶ 247, 253, 277, CI-1033 reportedly forms a covalent bond with the cysteine 784/805 of erbB2. To the extent "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, Shin 2001 inherently discloses an irreversible EGFR inhibitor that binds to that cysteine. *See* Section VIII.D.

632.     *Shin 2001 describes every limitation of claim 9 of the '314 patent, either expressly or inherently*. For the reasons discussed above in this Subsection, Shin 2001 describes a method for treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof, "wherein the route of administration is oral." '314 patent, claim 9. Shin 2001 discloses that CI-1033 was administered orally. *See, e.g.*, Shin 2001 at 324.

C.     **The Asserted Claims of the '162 and '314 Patents Are Anticipated by Prior Use of EKB-569 and CI-1033**

1.     **Prior Use of CI-1033**

a)     Prior Use of CI-1033 According to the Method of Asserted Claims 1 and 4 of the '162 Patent

633.     *CI-1033 was used in the United States according to the method of claim 1 of the '314 patent prior to any applicable priority date.* CI-1033—an irreversible EGFR inhibitor—was administered in unit doses to patients with gefitinib and/or erlotinib resistant NSCLC prior to any effective priority date for the asserted claims. As shown in paragraphs 247, 253, 262, 266, 283 above, CI-1033 inhibits EGFR through irreversible inhibition. Also, as

237

███████████████████████

explained in paragraphs 247, 253, 271, 277, CI-1033 reportedly forms a covalent bond with the

cysteine 773 of EGFR.

634. CI-1033 was administered to patients with gefitinib and/or erlotinib

resistant NSCLC having the T790M mutation prior to any applicable filing date. For example,

Shin 2001 reports that, prior to May 12, 2001, CI-1033 had been administered to patients with

lung cancer, including non-small cell lung cancer, in a Phase I Clinical and Biomarker Study.

Shin 2001 at 324. Shin 2001 reported that preliminary results indicated that CI-1033 was

"generally well tolerated," had a "favorable pharmacokinetic profile" and held "promise as a

novel anti-cancer agent." *Id. M*oreover, according to Allen 2003, CI-1033 was studied in

"[s]everal phase I studies," including in patients with non-small cell lung cancer, prior to

November 20, 2003. Allen 2003 concluded that CI-1033 showed "evidence of target modulation

and antitumor activity" and had an "acceptable side effect profile at potentially therapeutic doses

and schedules." Allen 2003 at 72–72 ("Further evidence of antitumor activity in phase I studies

was suggested by the frequency of stable disease ($\geq$ 12 wks) in patients with non-small cell

lung . . . cancers . . . ."). CI-1033 was also administered to patients in the United States in a Phase

II clinical study, specifically a Phase II, Randomized, Open-Label Study of Single Agent CI-1033

in Patients with Advanced Non-Small Cell Lung Cancer, between January 2003 and November

2005. *A Phase 2, Randomized, Open-Label Study Of Single Agent CI-1033 In Patients With*

*Advanced Non-Small Cell Lung Cancer*, ClinicalTrials (June 23, 2005)

https://clinicaltrials.gov/study/NCT00050830?term=NCT00050830&rank=1&tab=history&a=1.

In 2004, Calvo *et al*, reported the administration of CI-1033 in a Phase I Pharmacokinetic and

Food Effect Study. *See* Calvo 2004 at 7112. Calvo also disclosed that CI-1033 had "[b]road and

impressive activity against human tumor xenografts of . . . lung . . . origin." Calvo 2004 at 7119.

███████████████████████████████

635.     Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, the prior use of CI-1033 in patients with NSCLC, as described in Shin 2001, Allen 2003, NCT00050830,  and Calvo 2004, constituted prior use of CI-1033 to treat patients having gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* ¶¶ 579–580.

636.     In these studies, a "pharmaceutical composition comprising a unit dosage of 2–500 mg" of CI-1033 was "administer[ed] daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ ID NO: 1" '162 patent, claim 1. In the Phase I study described in Shin 2001, daily doses of CI-1033 were administered at nine different dosage strengths (50-560 mg/day). Shin 2001 at 324. In the Phase I studies described in Allen 2003, patients were administered daily doses ranging from 2 mg/day to 1000 mg/day. Allen 2003 at 72. And in the Phase I study described in Calvo 2004, patients were administered daily oral doses of 250 mg or 300 mg of CI-1033. Calvo 2004 at 7114–15. The '162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle."

637.     *CI-1033 was administered according the method of claim 4 of the '162 patent before any applicable priority date.* For the reasons discussed above in this Subsection, CI-1033 was used according to the method of claim 4 prior to any effective filing date. As shown in ¶¶ 247, 253, 277, CI-1033 reportedly forms covalent bonds with the cysteine 784/805 of erbB2. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, an irreversible EGFR inhibitor falling within

███████████████████████

claim 4 of the '162 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

> b) Prior Use of CI-1033 According to the Method of Asserted Claims 1, 3, 4, and 9 of the '314 Patent

638. *CI-1033 was used in the United States according to the method of claim 1 of the '314 patent prior to any applicable priority date.* CI-1033—an irreversible EGFR inhibitor—was administered in unit doses to patients with gefitinib and/or erlotinib resistant NSCLC prior to any effective priority date for the asserted claims.

639. As shown in paragraphs 247, 253, 262, 266, 283 above, CI-1033 inhibits EGFR through irreversible inhibition. Also, as shown in paragraphs 247, 253, 271, 277, CI-1033 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805/784 of erbB-2. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, an irreversible EGFR inhibitor falling within claim 1 of the '314 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

640. CI-1033 was administered to patients with gefitinib and/or erlotinib resistant NSCLC prior to any effective filing date. For example, Shin 2001 reports that, prior to May 12, 2001, CI-1033 had been administered to patients with lung cancer, including non-small cell lung cancer, in a Phase I Clinical and Biomarker Study. Shin 2001 at 324. Shin 2001 reported that preliminary results indicated that CI-1033 was "generally well tolerated," had a "favorable pharmacokinetic profile" and held "promise as a novel anti-cancer agent." *Id.* Moreover,

according to Allen 2003, CI-1033 was studied in "[s]everal phase I studies," including in patients

with non-small cell lung cancer, prior to November 20, 2003. Allen 2003 concluded that CI-1033

showed "evidence of target modulation and antitumor activity" and had an "acceptable side effect

profile at potentially therapeutic doses and schedules." Allen 2003 at 72–72 ("Further evidence of

antitumor activity in phase I studies was suggested by the frequency of stable disease (≥ 12 wks)

in patients with non-small cell lung . . . cancers . . . ."). CI-1033 was also administered to patients

in the United States in a Phase II clinical study, specifically a Phase II, Randomized, Open-Label

Study of Single Agent CI-1033 in Patients with Advanced Non-Small Cell Lung Cancer, between

January 2003 and November 2005. NCT00050830. In 2004, Calvo *et al*, reported the

administration of CI-1033 in a Phase I Pharmacokinetic and Food Effect Study. *See* Calvo 2004 at

7112. Calvo also disclosed that CI-1033 had "[b]road and impressive activity against human

tumor xenografts of . . . lung . . . origin." Calvo 2004 at 7119.

      641.    Under Plaintiffs' arguments regarding the scope of gefitinib and/or

erlotinib resistant NSCLC, the prior use of CI-1033 in patients with NSCLC, as described in Shin

2001, Allen 2003, NCT00050830, and Calvo 2004, constituted prior use of CI-1033 to treat

patients having gefitinib and/or erlotinib resistant NSCLC. *See* ¶¶ 579–580.

      642.    In these studies, a "pharmaceutical composition comprising a unit dosage

of" CI-1033 was  "administer[ed] daily to the patient having gefitinib and/or erlotinib resistant

non-small cell lung cancer." '314 patent, claim 1. In the Phase I study described in Shin 2001,

daily doses of CI-1033 were administered at nine different dosage strengths (50-560 mg/day).

Shin 2001 at 324. In the Phase I studies described in Allen 2003, patients were administered daily

doses ranging from 2 mg/day to 1000 mg/day. Allen 2003 at 72. And in the Phase I study

described in Calvo 2004, patients were administered daily oral doses of 250 mg or 300 mg of CI-

███████████████████████████

1033. Calvo 2004 at 7114–15. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle."

643. *CI-1033 was administered according the method of claim 3 of the '314 patent before any applicable priority date.* For the reasons discussed above in this Subsection, CI-1033 was used according to the method of claim 3 prior to any applicable priority date. As shown in paragraphs 247, 253, 271, 277, CI-1033 reportedly forms a covalent bond with the cysteine 773 of EGFR. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, an irreversible EGFR inhibitor falling within claim 3 of the '314 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

644. *CI-1033 was administered according the method of claim 4 of the '314 patent before any applicable priority date.* For the reasons discussed above in this Subsection, CI-1033 was used according to the method of claim 4 prior to any applicable priority date. As shown in ¶¶ 247, 253, 277, CI-1033 reportedly forms covalent bonds with the cysteine 784/805 of erbB2. To the extent that "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, an irreversible EGFR inhibitor falling within claim 4 of the '314 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

███████████████████████████

645.     *CI-1033 was administered according the method of claim 9 of the '314*

*patent before any applicable priority date.* In the studies described in Shin 2001, Allen 2003, and

Calvo 2004, CI-1033 was administered orally. *See* Shin 2001 at 314 ("CI-1033 is an orally active

4-anilinoquinazoline . . . .); *id.* ("This Phase I study aims to determine the dose limiting toxicities

(DLT), maximum tolerated dose (MTD), pharmacokinetics, and the effects of CI-1033 on tumor

biomarkers, when orally administered . . . ."); Allen 2003 at 70 ("CI-1033 (canertinib) is [] orally

available..."); 72 ("Several phase I studies of oral CI-1033 have been conducted . . . ."); Calvo

2004 at 7113 ("CI-1033 . . ., an orally available 3-chloro, 4-fluoro, 4-anilinoquinazoline . . . .");

*id.* at 7119 (describing "daily oral treatment with CI-1033").

2.     **Prior Use of EKB-569**

a)     Prior Use of EKB-569 According to the Method of Asserted
Claims 1 and 4 of the '162 Patent

646.     *EKB-569 was used in the United States according to the method of claim 1*

*of the '314 patent prior to any applicable priority date.* EKB-569—an irreversible EGFR

inhibitor—was used administered in unit doses to patients with gefitinib and/or erlotinib resistant

NSCLC prior to any effective priority date for the asserted claims. As explained in paragraphs

303, 312, 315, 323, EKB-569 is an irreversible EGFR inhibitor. As shown in paragraphs 303,

312, EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR.

647.     EKB-569 was administered to patients with gefitinib and/or erlotinib

resistant NSCLC having the T790M mutation prior to February 2, 2005. According to Hidalgo

2002, EKB-569 was used in a Phase I clinical study that included patients with NSCLC. Hidalgo

2002 at 65 (disclosing 4 patients with lung tumors and "[o]ne pt with non-small cell lung cancer

completed 9 treatment cycles"). Hidalgo 2002 further discloses that EKB-569 was potent and

inhibited the growth of tumors cells that overexpress EGFR in vitro and in vivo. *Id.* EKB-569 was

█████████████████████

also administered to patients in the United States in a Phase II clinical study, in particular a Phase 2 Study of EKB-569 in Subjects with Advanced Non-Small Cell Lung Cancer, that completed in January 2005. NCT00067548.

648.    Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, the prior use of EKB-569 in patients with NSCLC, as described in Hidalgo 2002, constituted prior use of EKB-569 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *See* ¶¶ 579–580.

649.    In these studies, a "pharmaceutical composition comprising a unit dosage of 2–500 mg" of EKB-569 was "administer[ed] daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having the T790M mutation in SEQ ID NO: 1" '162 patent, claim 1. Hidalgo 2002 reports that patients in the Phase I clinical study in which patients were administered in daily doses of 25 mg, 50 mg, 75 mg, and 125 mg. Hidalgo 2002 at 65. The '162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." In the Phase II study, patients also took "EKB-569 daily."

650.    *EKB-569 was administered according the method of claim 4 of the '162 patent before any applicable priority date.* EKB-569 was administered according the method of claim 4 of the '162 patent before any applicable priority date. For the reasons discussed above in this Subsection, EKB-569 was used according to the method of claim 4 prior to any applicable priority date. As explained in ¶¶ 304, 312, EKB-569 reportedly covalently bonds with the cysteine 784/805 of erbB2. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine

███████████████████████

805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, an irreversible EGFR inhibitor falling within claim 4 of the '162 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

> b)      Prior Use of EKB-569 According to the Method of Asserted
> Claims 1, 3, 4, and 9 of the '314 Patent

651.      *EKB-569 was used in the United States according to the method of claim 1 of the '314 patent prior to any applicable priority date.* EKB-569—an irreversible EGFR inhibitor—was used administered in unit doses to patients with gefitinib and/or erlotinib resistant NSCLC prior to any effective priority date for the asserted claims.

652.      As explained in paragraphs 303, 312, 315, 323, EKB-569 is an irreversible EGFR inhibitor. As explained in paragraphs 303, 304, 312, EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805/784 of erbB-2. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, an irreversible EGFR inhibitor falling within claim 1 of the '314 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

653.      EKB-569 was administered to patients with gefitinib and/or erlotinib resistant NSCLC prior to any applicable filing date. According to Hidalgo 2002, EKB-569 was used in a Phase I clinical study that included patients with NSCLC. Hidalgo 2002 at 65 (disclosing 4 patients with lung tumors and "[o]ne pt with non-small cell lung cancer completed 9

245

treatment cycles"). Hidalgo 2002 further discloses that EKB-569 was potent and inhibited the growth of tumors cells that overexpress EGFR in vitro and in vivo. *Id.* EKB-569 was also administered to patients in the United States in a Phase II clinical study, in particular a Phase 2 Study of EKB-569 in Subjects with Advanced Non-Small Cell Lung Cancer, that completed in January 2005. NCT00067548.

654.    Under Plaintiffs' arguments regarding the scope of gefitinib and/or erlotinib resistant NSCLC, the prior use of EKB-569 in patients with NSCLC, as described in Hidalgo 2002 and NCT00067548, constituted prior use of EKB-569 to treat patients having non-small cell lung cancer inherently discloses a method of treating gefitinib and/or erlotinib resistant NSCLC. *See* ¶¶ 579–580.

655.    In these studies, a "pharmaceutical composition comprising a unit dosage of" EKB-569 was "administer[ed] daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer." '314 patent, claim 1. Hidalgo 2002 reports that patients in the Phase I clinical study in which patients were administered in daily doses of 25 mg, 50 mg, 75 mg, and 125 mg. Hidalgo 2002 at 65. In the Phase II study, patients were also to take "EKB-569 daily." NCT00067548. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle."

656.    *EKB-569 was administered according the method of claim 3 of the '314 patent before any applicable priority date.* For the reasons discussed above in this Subsection, EKB-569 was used according to the method of claim 3 prior to any applicable priority date. As shown in paragraphs 303, 312, EKB-569 reportedly forms a covalent bond with the cysteine 773

████████████████████████

of EGFR. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, an irreversible EGFR inhibitor falling within claim 3 of the '314 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

657.  *EKB-569 was administered according the method of claim 4 of the '314 patent before any applicable priority date.* For the reasons discussed above in this Subsection, EKB-569 was used according to the method of claim 4 prior to any applicable priority date. As explained in ¶¶ 304, 312, EKB-569 reportedly forms a covalent bond with the cysteine 805 of erbB2. To the extent that "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, an irreversible EGFR inhibitor falling within claim 4 of the '314 patent was used according to the claimed method prior to any effective filing date. *See* Section VIII.D.

658.  *EKB-569 was administered according the method of claim 9 of the '314 patent before any applicable priority date.* In the Phase I study described in Hidalgo 2002, EKB-569 was administered orally. Hidalgo 2002 discloses that EKB-569 was administered "orally once daily . . . ." Hidalgo 2002 at 65. EKB-569 was also administered "orally" in the Phase 2 study. NCT00067548.

## XV.   THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS

659.  To the extent that the asserted claims are adequately described and enabled by the disclosure of the '162 and '314 patents (which I disagree with), those claims would have been obvious over the following combinations of prior art references. In particular, to the extent that the *in vitro* data and other disclosures of the '162 and '314 patents adequately

██████████████████████████

describe and enable the use of an irreversible EGFR inhibitor in a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer, such use is also disclosed by, and would have been obvious over the prior art references listed below. To the extent that the *in vitro* data and other disclosures of the '162 and '314 patents adequately describe and enable a unit dosage of an irreversible EGFR inhibitor, such dosage is also disclosed by, and would have been obvious over the prior art references listed below.

660.     The POSA would have been motivated to modify the teachings of the following prior art references to arrive at the claimed method with a reasonable expectation of success.

### A.     The Asserted Claims of the '162 Patent Would Have Been Obvious

#### 1.     Kobayashi 2005 in Combination with One or More of Wissner 2002, Allen 2003, and/or Rabindran 2004

661.     *Claim 1 of the '162 patent would have been obvious*. Claim 1 of the '162 patent requires: a "method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2-500 mg of an irreversible EGFR inhibitor that covalently binds to cysteine 773 residue of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation, wherein the irreversible EGFR inhibitor is not CL-387,785." '162 patent, claim 1.

662.     Kobayashi 2005 describes the use of an irreversible EGFR inhibitor— CL-387,785—in a "method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID No: 1 in a patient." '162 patent, claim 1. Kobayashi 2005 describes the T790M mutation—"an acquired, second mutation in the EGFR gene that conferred

248

███████████████████████

resistance to gefitinib"—and discloses that the T790M mutation was identified in a patient whose NSCLC had relapsed after treatment with gefitinib. Kobayashi 2005 at Abstract, 787. Kobayashi 2005 explains that the "T790M substitution is predicted to lead to a [] steric clash with the gefitinib molecule." Kobayashi 2005 at 789. Kobayashi 2005 also notes that that the "C-to-T base-pair change" expected to lead to the T790M mutation was "observed with either wild-type or delL747-S752 sequences." Kobayashi 2005 at 788–89. Thus, Kobayashi 2005 discloses "gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1."

663. Kobayashi 2005 further describes the use of CL-387,785 in cell constructs having the T790M mutation, noting that CL-387,785 "strongly inhibited EGF-induced phosphorylation." Kobayashi 2005 at 790. Kobayashi 2005 states that these findings should "motivate the development of *alternative* EGFR inhibitors . . . for patients with EGFR-mutant tumors with acquired resistance to anilinoquinazoline inhibitors" and "may guide the selection of second-line EGFR-inhibitor therapy." Kobayashi 2005 at 791. Gefitinib and erlotinib are "anilinoquinazoline inhibitors." The POSA would understand Kobayashi's statement to suggest the use of irreversible EGFR inhibitors—including irreversible EGFR inhibitors that are not CL-387,785—to treat gefitinib and/or erlotinib resistant NSCLC. To the extent that the *in vitro* testing data provided in the '162 patent is sufficient to describe and enable the claimed method of treating NSCLC, Kobayashi 2005 also sufficiently describes and enables a method of treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof.

664. Based on Kobayashi 2005's teaching that irreversible EGFR inhibitor CL-387,785 "strongly inhibited" NSCLC having a T790M mutation (Kobayashi 2005 at 790), and recommendation that this result should "motivate the development of alternative EGFR inhibitors" (*id.* at 791), the POSA would have been motivated with a reasonable expectation of

success to combine Kobayashi 2005 with their knowledge of other known irreversible EGFR

inhibitors, including EKB-569 (described in Wissner 2002), CI-1033 (described in Allen 2003),

and HKI-272 (described in Rabindran 2004) to arrive at the use of an irreversible EGFR inhibitor

in a "method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a

T790M mutation in SEQ ID No: 1 in a patient." '162 patent, claim 1.

665.    Wissner 2002 reports EKB-569 as a "potent, irreversible inhibitor[] of

EGFR and HER-2" that was "currently in phase I clinical trials for the treatment of cancer."

Wissner 2002 at 49–50. Wissner 2002 reports "very good antitumor activity" of EKB-569 in a

nude mouse xenograft model bearing A431 human tumors that overexpress EGFR." *Id.* at 56.

EKB-569 was administered orally at doses ranging from 1 mg/kg to 80 mg/kg every day for the

first 10 days of the experiment. *Id.* at 56, Figure 2. Wissner 2002 also reports that EKB-569 also

showed efficacy in "a number of other tumor models." *Id.* at 56.

666.    Allen 2003 reports CI-1033 as a "a highly potent and selective pan-erbB

inhibitor that efficiently blocks signal transduction through all four members of the erbB receptor

family . . . by covalently bind[ing] to these receptors, irreversibility [sic] inhibiting them." Allen

2003 at Abstract. Allen 2003 reports several Phase I clinical studies of CI-1033, including in

patients having non-small cell lung cancer (16% of "more than 250 cancer patients"), among

other cancers, showing "evidence of target modulation and antitumor activity." *Id.* at 72–74.

Allen 2003 states that "[f]urther evidence of antitumor activity in phase I studies was suggested

by the frequency of stable disease (≥ 12 wks) in patients with non-small cell lung . . . cancers." *Id.*

at 74. Allen 2003 also states that "[c]linically, [CI-1033] has been shown to have an acceptable

side effect profile at potentially therapeutic doses and schedules." *Id.* at Abstract. Allen 2003 also

describes preclinical study data showing that CI-1033 is a potent inhibitor of EGFR. *See id.* at 71–

72 (reporting *in vitro* EGFR inhibition, $IC_{50}$ = 0.8 nmol/L, and *in vivo* EGFR inhibition with "50% inhibitory concentration ($IC_{50}$) values in the low nmol/L range").

667.     Rabindran 2004 reports HKI-272 as a "potent inhibitor" of HER-2 and EGFR through irreversible binding "most likely targeting a cysteine residue in the ATP-binding pocket of the receptor." Rabindran 2004 at Abstract. Rabindran 2004 reports that HKI-272 "inhibits the growth of HER-2 dependent tumors *in vivo*. The minimum dose, which causes a statistically significant inhibition of tumour growth, is estimated to be 5-10 mg/kg/day." *Id.* at 3964. Rabindran 2004 also reports that "HKI-272 was well tolerated by the animals." *Id.*

668.     Wissner 2002, Allen 2003, and Rabindran 2004 each report "administering daily" "a pharmaceutical composition comprising a unit dosage of 2-500 mg of" irreversible EGFR inhibitors EKB-569, CI-1033, and HKI-272, respectively. Wissner 2002 reports that EKB-569 was administered orally at doses ranging from 1 mg/kg to 80 mg/kg every day for the first 10 days in a "nude mouse xenograft model bearing A431 human tumors that overexpress EGFR." Wissner 2002 at 56, Figure 2. Allen 2003 reports Phase I clinical studies wherein patients were administered oral, daily doses ranging from 2 mg/day to 1000 mg/day. Allen 2003 at 72. Rabindran 2004 reports a "minimum dose, which causes a statistically significant inhibition of tumour growth, is estimated to be 5-10 mg/kg/day." Rabindran 2004 at 3964.

669.     The POSA would have known that at least irreversible inhibitors EKB-569 and CI-1033 "covalently bind[] to cysteine 773 of the catalytic domain." '162 patent, claim 1. Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner

2002 at 50, 52. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003, 70-71.

670.    Thus, the POSA would have been motivated with a reasonable expectation of success to modify Kobayashi 2005 in view of one or more of Wissner 2002, Allen 2003 and/or Rabindran 2004 to arrive at claim 1 of the '162 patent.

671.    *Claim 4 of the '162 patent would have been obvious*. Claim 4 of the '162 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As discussed above in this Subsection, the method of claim 1 would have been obvious over Kobayashi 2005 in view of one or more of Wissner 2002, Allen 2003 and/or Rabindran 2004.

672.    The additional limitation of claim 4 of the '162 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2," would also have been obvious in view of Wissner 2002, Allen 2003 and/or Rabindran 2004. Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner 2002 at 50, 52. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . .). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine

kinase domain of the erbB receptors." Allen 2003 at 70–71. To the extent irreversible EGFR

inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2"

encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region

of erbB2, this limitation would have been obvious over Wissner 2002, Allen 2003 and/or

Rabindran 2004. *See* Section VIII.D.

673. Rabindran 2004 reports that HKI-272 was designed to irreversibly bind to

cysteine 805 of HER-2 based on EKB-569's binding to cysteine 773 within the ATP-binding site

of EGFR and "the presence of the same Michael acceptor group in HKI-272 and conservation of a

cysteine residue at an analogous position in HER-2 (cysteine-805 . . . .)." Rabindran 2004 at

3960–61.

### 2.   Kwak 2005 in Combination with One or More of Hidalgo 2002 and/or Rabindran 2004

674.   *Claim 1 of the '162 patent would have been obvious*. Claim 1 of the '162

patent requires: a "method of treating gefitinib and/or erlotinib resistant non-small cell lung

cancer having a T790M mutation in SEQ ID NO: 1 in a patient, comprising administering daily to

the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M

mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2-500 mg

of an irreversible EGFR inhibitor that covalently binds to cysteine 773 residue of the catalytic

domain within the SEQ ID NO: 1 having a T790M mutation, wherein the irreversible EGFR

inhibitor is not CL-387,785." '162 patent, claim 1.

675.   Kwak 2005 describes the use of an irreversible EGFR inhibitor—

including HKI-272, and HKI-357, and EKB-569—in a "method of treating gefitinib and/or

erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID No: 1." '162

patent, claim 1. Kwak 2005 reports that HKI-272, HKI-357, and EKB-569 are "irreversible

inhibitors" that "suppressed proliferation in [the NCI-H1975 bronchoalveolar cell cancer cell line, which harbors both L858R and T790M mutations in EGFR] under conditions where it is resistant to gefitinib." Kwak 2005 at 7668–7669. Kwak 2005 explains that "irreversible ERBB inhibitors seem to be effective in cells harboring the T790M EGFR as well as in cells with altered trafficking of the wild-type receptor." *Id.* at 7669. Kwak 2005 associates both the T790M mutation and altered trafficking of the wild-type receptor with acquired resistance to gefitinib. *See* Kwak 2005 at 7665 ("Some recurrent tumors have a common secondary mutation in the EGFR kinase domain, T790M, conferring drug resistance . . . ."); *id.* ("These drug-resistant cells . . . display increased internalization of ligand-activated EGFR, consistent with altered receptor trafficking.").

676.    Kwak 2005 reports *in vitro* testing of irreversible EGFR inhibitors in purportedly gefitinib-resistant models. The authors state that they "modeled gefitinib resistance *in vitro*" by generating gefitinib-resistant clones of the NCI-H1650 bronchoalveolar cell line. Kwak 2005 at 7667. The authors report that the gefitinib-resistant clones "displayed persistent sensitivity" to HKI-272, HKI-357, and EKB-569. *Id.* at 7668. The authors also report "suppressed proliferation" in the NCI-H1975 bronchoalveolar cancer cell line harboring a T790M mutation by all three irreversible inhibitors—HKI-272, HKI-357, and EKB-569. The authors conclude that "[t]hese inhibitors also show effective inhibition of signaling by T790M-mutant EGFR and killing of NSCLC cells with the T790M mutation." *Id.* at Abstract. Kwak 2005 further discloses that both HKI-272 and EKB-569 "had been subjected to phase I clinical testing." *Id.* at 7669.

677.    Hidalgo 2002 and Rabindran 2004 report "administering daily" to a patient "a pharmaceutical composition comprising a unit dosage of 2-500 mg of" irreversible EGFR inhibitors EKB-569 and HKI-272, respectively. Hildalgo 2002 reports a Phase I trial of

███████████████████████████████

EKB-569 in 30 patients with advanced solid tumors, including non-small cell lung cancer. Hidalgo 2002 at 65. EKB-569 was administered orally once daily for 14 days (of a 28-day treatment cycle) at doses of 25 mg, 50 mg, 75 mg, and 125 mg. *Id.* Hidalgo 2002 concludes that "EKB-569 was generally well-tolerated, with an acceptable PK and safety profile." *Id.* Rabindran 2004 reports that "*[i]n vivo*, HKI-272 is active in HER-2- and EGFR-dependent tumor xenograft models when dosed orally on a once daily schedule." Rabindran 2004 also reports that the "minimum dose, which causes a statistically significant inhibition of tumor growth, is estimated to be 5-10 mg/kg/day. In these xenograft studies, HKI-272 was well tolerated by the animals, and no weight loss or other compound-related toxicity was observed." Rabindran 2004 at 3964.

678.    The '162 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '162 Patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Rabindran 2004 describe a "unit dose" of HKI-272.

679.    The POSA would have been motivated with a reasonable expectation of success based on Kwak 2005 to combine the use of irreversible EGFR inhibitors, including HKI-272, HKI-357, and EKB-569 in the described method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation with the daily administration of a pharmaceutical composition comprising a unit dosage taught in Hidalgo 2002 and Rabindran 2004.

680.    The POSA would have known that irreversible EGFR inhibitors HKI-272, HKI-357, and EKB-569 "covalently bind[] to cysteine 773 of the catalytic domain." '162 patent,

██████████████████████

claim 1. Kwak 2005 reports that HKI-272, HKI-357, and EKB-569 are "irreversible inhibitors, most likely via a covalent bond with the cys773 residue within the EGFR catalytic domain or the cys805 of ERBB2." Kwak 2005 at 7666.

681.    Thus, the POSA would have been motivated with a reasonable expectation of success to modify Kwak 2005 in view of one or more of Hidalgo 2002 and/or Rabindran 2004 to arrive at claim 1 of the '162 patent.

682.    *Claim 4 of the '162 patent would have been obvious.* Claim 4 of the '162 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As discussed above in this Subsection, the method of claim 1 would have been obvious over Kwak 2005 in view of one or more of Hidalgo 2002 and/or Rabindran 2004.

683.    The additional limitation of claim 4 of the '162 Patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2," would also have been obvious over Kwak 2005. Kwak 2005 reports that HKI-272, HKI-357, and EKB-569 are "irreversible inhibitors, most likely via a covalent bond with the cys773 residue within the EGFR catalytic domain or the cys805 of ERBB2." Kwak 2005 at 7666. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, this limitation would have been obvious over Kwak 2005. *See* Section VIII.D

3.    **Carter 2005 in Combination with Allen 2003, Hidalgo 2002, and/or Wissner 2002**

684.    *Claim 1 of the '162 patent would have been obvious.* Claim 1 of the '162 patent requires: a "method of treating gefitinib and/or erlotinib resistant non-small cell lung

██████████████████████████████

cancer having a T790M mutation in SEQ ID NO: 1 in a patient, comprising administering daily to

the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M

mutation in SEQ ID NO: 1 a pharmaceutical composition comprising a unit dosage of 2-500 mg

of an irreversible EGFR inhibitor that covalently binds to cysteine 773 residue of the catalytic

domain within the SEQ ID NO: 1 having a T790M mutation, wherein the irreversible EGFR

inhibitor is not CL-387,785." '162 patent, claim 1.

685.    Carter 2005 describes the use of irreversible EGFR inhibitors—CL-

387,785, CI-1033 and EKB-569—in a "method of treating gefitinib and/or erlotinib resistant non-

small cell lung cancer having a T790M mutation in SEQ ID No: 1." '162 patent, claim 1. Carter

2005 reports that CL-387,785, CI-1033 and EKB-569 "showed a significant effect on

proliferation" of "the non-small cell lung cancer (NSCLC) cell line H1975, which contains

L858R and T790M mutations in EGFR." Carter 2005 at 11014. Carter 2005 explains that "the

T790M mutation results in resistance to [gefitinib and erlotinib]." *Id.* Carter 2005 explains that

"the three inhibitors of EGFR (L858R/T790M) identified in our screen, CL-387785, EKB-569,

and CI-1033, are the only compounds we tested that are known to inhibit EGFR irreversibly." *Id.*

at 11016. Carter 2005 reports that "CL-387785 is a commercially available research compound,

and is the only previously known inhibitor of both wild-type EGFR and EGFR with the T790M

mutation. EKB-569 and CI-1033 are EGFR inhibitors that have completed Phase 1 clinical trials

for NSCLC." *Id.* (internal citations omitted). The authors recommend that EKB-569 and CI-1033

"should be considered for testing in the treatment of gefitinib/erlotinib resistant non-small cell

lung cancer" and that "refractory or relapsed patients with the T790M mutation may benefit from

treatment with EKB-569 or CI-1033." *Id.* at Abstract, 11016.

█████████████████████████████

686.     Hidalgo 2002 and Allen 2003 report "administering daily" to a patient "a pharmaceutical composition comprising a unit dosage of 2-500 mg of" irreversible EGFR inhibitors EKB-569 and CI-1033, respectively. Hildalgo 2002 reports a Phase I trial of EKB-569 in 30 patients with advanced solid tumors, including non-small cell lung cancer. Hidalgo 2002 at 65. EKB-569 was administered orally once daily for 14 days (of a 28-day treatment cycle) at doses of 25 mg, 50 mg, 75 mg, and 125 mg. *Id.* Hidalgo 2002 concludes that "EKB-569 was generally well-tolerated, with an acceptable PK and safety profile." *Id.* Allen 2003 reports several Phase I clinical studies of CI-1033, including in patients having non-small cell lung cancer (16% of "more than 250 cancer patients"), among other cancers, showing "evidence of target modulation and antitumor activity." *Id.* at 72–74. Patients were administered oral, daily doses ranging from 2 mg/day to 1000 mg/day. Allen 2003 at 72. Allen 2003 states that "[f]urther evidence of antitumor activity in phase I studies was suggested by the frequency of stable disease (≥ 12 wks) in patients with non-small cell lung . . . cancers." *Id.* at 74. Allen 2003 also states that "[c]linically, [CI-1033] has been shown to have an acceptable side effect profile at potentially therapeutic doses and schedules." *Id.* at Abstract.

687.     The '162 Patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '162 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too do Hidalgo 2002 and Allen 2003 describe a "unit dose" of EKB-569 and CI-1033, respectively.

688.     The POSA would have been motivated with a reasonable expectation of success based on Carter 2005 to combine the use of irreversible EGFR inhibitors EKB-569 and

████████████████████

CI-1033 in the described method of treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation with the daily administration of a pharmaceutical composition comprising a unit dosage taught in Hidalgo 2002 and Allen 2003.

689.     The POSA would have known that irreversible EGFR inhibitors EKB-569 and CI-1033 "covalently bind[] to cysteine 773 of the catalytic domain." '162 patent, claim 1. Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner 2002 at 50, 52. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003, 70–71.

690.     Thus, the POSA would have been motivated with a reasonable expectation of success to modify Carter 2005 in view of one or more of Hidalgo 2002, Allen 2003, and/or Wissner 2002 to arrive at claim 1 of the '162 patent.

691.     *Claim 4 of the '162 patent would have been obvious*. Claim 4 of the '162 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of ERBB2." '162 patent, claim 4. As discussed above in this Subsection, the method of claim 1 would have been obvious over Carter 2005 in view of one or more of Hidalgo 2002, Allen 2003, and/or Wissner 2002.

692.     The additional limitation of claim 4 of the '162 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 in the ligand-binding pocket of

████████████████████████████

ERBB2," would also have been obvious over Allen 2003 and/or Wissner 2002. Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner 2002 at 50, 52. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003, 70–71. To the extent irreversible EGFR inhibitor that "covalently binds to cysteine 805 residue in the ligand-binding pocket of ERBB2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, this limitation would have been obvious over Allen 2003 and/or Wissner 2002. *See* Section VIII.D

**B.    The Asserted Claims of the '314 Patent Would Have Been Obvious**

1.    **Agus 2003 in Combination with One or More of Calvo 2004, Wissner 2002, Hidalgo 2002, Denny 2002, and/or Dancey 2004**

693.    *Claim 1 of the '314 patent would have been obvious*. Claim 1 of the '314 patent requires: a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1.

694.    Agus 2003 describes a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. Agus 2003

teaches that a "significant limitation in using [gefitinib and/or erlotinib] is that recipients thereof may develop resistance to their therapeutic effects after they initially respond to therapy." Agus 2003 at 2. Agus 2003 further teaches "a method that is surprisingly effective in treating cancer, and especially . . . lung . . . cancers, after such a resistance manifests." *Id.* at 3. Agus 2003 explains that "[t]he method includes administering to patients a resistance-surmounting quantity of a TKI, which may be administered with less frequency than conventional TKI treatments . . . it is believed that this variant treatment regimen effectively blocks different members of the HER-kinase family," including EGFR and HER-2. *Id.*

695.    Agus 2003 teaches that "TKIs suitable for use in accordance with the method of the present invention may include . . . TKIs that are generally known for use in the treatment of cancer, and specifically, breast, *lung* and prostate cancer." *Id.* at 6–7 (emphasis added). "[S]uch TKIs may include . . . CI1033 . . .EKB569." *Id.* at 7. Agus 2003 reports that these TKIs among others are "currently at the Phase I or Phase II clinical trial stage." *Id.*

696.    The POSA would have known that both CI-1033 and EKB-569 were irreversible EGFR inhibitors in clinical development. *See, e.g.*, Calvo 2004 at Abstract (reporting a Phase I study to the determine the maximum tolerated dose on an intermittent schedule of CI-1033, "an oral 4-anilinoquinazoline that irreversibly inhibits the tyrosine kinase domain of all erbB subfamilies"); Wissner 2002 at 49–50 (reporting EKB-569 as a "potent, irreversible inhibitor[] of EGFR and HER-2," and "currently in phase I clinical trials for the treatment of cancer").

697.    To the extent that the *in vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed method of treating NSCLC, Agus 2003 also

████████████████████████████

sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof.

698.    Agus 2003 also describes administering to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer "a pharmaceutical composition comprising a unit dosage of an irreversible [EGFR] inhibitor." '314 patent, claim 1. Agus 2003 teaches that a TKI, including irreversible EGFR inhibitors CI-1033 and EKB-569 "may be administered to a patient with cancer who is resistant to conventional TKI therapy in a 'resistance-surmounting quantity,' which . . . is defined as an amount of from about 500 mg to about 3,000 mg, administered as a bolus once or twice per week." Agus 2003 at 7. Agus 2003 explains that the appropriate dosage amount depends on a number of factors, including "age and weight of the individual to be treated, whether the compound is being used as single agent or adjuvant therapy, the type of cancer . . ., the progression of the cancer . . ., the nature of the tumor(s) to be treated . . . and other factors well known to those skilled in the art of oncology." *Id.*

699.    The POSA would have been motivated based on their knowledge of Phase I dosing studies of CI-1033 (reported in Calvo 2004) to modify the suggested weekly (or biweekly) dosing schedule of Agus 2003 to arrive at daily administration of irreversible EGFR inhibitor CI-1033 with a reasonable expectation of success.

700.    Calvo 2004 reports a Phase I study in 24 patients with advanced solid malignancies, including non-small cell lung cancer, to determine the maximum tolerated dose of CI-1033 on an intermittent schedule. Calvo 2004 at Abstract, Table 1. Calvo 2004 explains that this Phase I study was "designed to evaluate the feasibility of administering CI-1033 daily on a 7-day-on, 7-day-off schedule because intermittent schedules have been associated with prominent activity in preclinical studies, possibly due in part to the irreversible binding of the agent to erbB

TK. Furthermore, schedules in which CI-1033 is administered either daily on a less interrupted schedule with lower doses or weekly with higher doses have been associated with preclusive toxicity." *Id.* at 7118. CI-1033 was supplied in 5 mg, 25 mg, and 250 mg tablets. *Id.* at 7114. The starting dose level of CI-1033 was 300 mg/day, which led to "relatively high incidences of both moderate and severe events, many of which were subjectively intolerable." *Id.* at 7115. The dose level was subsequently decreased to 250 mg/day, which Calvo 2004 ultimately recommended as the maximum tolerated dose for CI-1033. *Id.* Calvo 2004 stated that "[a]t the recommended dose of 250 mg/day, adverse events were prevented or managed successfully in most cases without the need for interruption of treatment." *Id.* at 7119. Calvo 2004 concluded that "daily oral treatment with CI-1033 on a 7-day-on, 7-day-off schedule is well tolerated and devoid of relevant hematologic toxicity and hypersensitivity reactions." *Id.* Calvo recommended 250 mg/day as the dose for Phase II studies. *Id.*

701.    While Agus 2003 provides general suggestions for dosing TKIs, it also acknowledges that appropriate dosage amounts will depend on a variety of factors. *See* Agus 2003 at 7. The POSA also would have known that for CI-1033, weekly schedules with higher doses, such as those generally suggested by Agus 2003 were reported to be associated with "preclusive toxicity." Calvo 2004 at 7188. The POSA would have looked to clinical dosing studies for CI-1033, including Calvo 2004, to determine an appropriate dosage amount, and would have arrived at Calvo 2004's recommended daily administration of 250 mg/day for CI-1033. *See, e.g.*, Calvo 2004 at Abstract.

702.    Similarly, the POSA would have been motivated based on their knowledge of reported preclinical and clinical studies of EKB-569 (reported in Wissner 2002 and Hildalgo 2002) to modify the suggested weekly (or biweekly) dosing schedule of Agus 2003 to

███████████████████████

arrive at daily administration of irreversible EGFR inhibitor EKB-569 with a reasonable expectation of success.

703.    Wissner 2002 reports "very good antitumor activity" of EKB-569 in a nude mouse xenograft model bearing A431 human tumors that overexpress EGFR." *Id.* at 56. EKB-569 was administered orally at doses ranging from 1 mg/kg to 80 mg/kg every day for the first 10 days of the experiment. *Id.* at 56, Figure 2. Wissner 2002 reports that EKB-569 also showed efficacy in "a number of other tumor models." *Id.*at 56. Wissner 2002 also reports that EKB-569 was currently in Phase I clinical trials for the treatment of cancer. *See* Wissner 2002 at Abstract.

704.    Hildalgo 2002 reports a Phase I trial of EKB-569 in 30 patients with advanced solid tumors, including non-small cell lung cancer. Hidalgo 2002 at 65. EKB-569 was administered orally once daily for 14 days (of a 28-day treatment cycle) at doses of 25 mg, 50 mg, 75 mg, and 125 mg. *Id.* Hidalgo 2002 concludes that "EKB-569 was generally well-tolerated, with an acceptable PK and safety profile." *Id.*

705.    While Agus 2003 provides general suggestions for dosing TKIs, it also acknowledges that appropriate dosage amounts will depend on a variety of factors. *See* Agus 2003 at 7. The POSA would have looked to the reported preclinical and clinical studies of EKB-569, including Wissner 2002 and Hidalgo 2002, to determine an appropriate dosage amount, and would have arrived at daily administration of EKB-569 doses ranging from 25 mg to 125 mg/day. *See* Wissner 2002 at 56; Hidalgo 2002 at 65.

706.    To the extent that the '314 patent sufficiently describes and enables a unit dosage of an irreversible EGFR inhibitor, such a unit dosage would have been obvious over Agus 2003 in combination with one or more of Calvo 2004, Wissner 2002, and/or Hidalgo 2002.

███████████████████████████████████

707.　　In addition, the POSA would have known that both CI-1033 and EKB-569 are irreversible EGFR inhibitors "that covalently bind [] to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. Calvo 2004 reports that "[w]hen bound into the ATP pocket, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity with cysteine 773 of erbB1 (or the analogous cysteines 784 . . . of erbB2 . . . ), which facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically active erbB1, erbB2 . . . family members." Calvo 2004 at 7113. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, this limitation would have been obvious over Calvo 2004 and/or Wissner 2002. *See* Section VIII.D.

708.　　Thus, the POSA would have been motivated with a reasonable expectation of success to modify Agus 2003 in view of Calvo 2004, Wissner 2002, and/or Hidalgo 2002 to arrive at claim 1 of the '314 patent.

709.　　*Claim 3 of the '314 patent would have been obvious*. Claim 3 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As discussed above in this Subsection, the method of claim 1 would have been obvious over Agus 2003 in view of Calvo 2004, Wissner 2002, and/or Hidalgo 2002.

710.　　The additional limitation of claim 3 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR," would also have

████████████████████████

been obvious in view of Calvo 2004 and/or Wissner 2002. As discussed above in this Subsection,

Calvo 2004 reports that "[w]hen bound into the ATP pocket, the acrylamide side-chain at position

C6 of CI-1033 is brought into close proximity with cysteine 773 of erbB1 (or the analogous

cysteines 784 . . . of erbB2 . . . ), which facilitates the rapid formation of a covalent bond that

permanently inactivates the catalytically active erbB1, erbB2 . . . family members." Calvo 2004 at

7113. Similarly, Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-

carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and

HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-

2)." Wissner 2002 at 50, 52. To the extent "irreversible EGFR inhibitor that binds to cysteine 773

residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that

bind to the cysteine 773 in the intracellular region of EGFR, such limitation would have been

obvious over Calvo 2004 and/or Wissner 2002. *See* Section VIII.D.

711.    *Claim 4 of the '314 patent would have been obvious*. Claim 4 of the '314

patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds

to cysteine 805 residue of erb-B2." '314 patent, claim 4. As discussed above in this Subsection,

the method of claim 1 would have been obvious over Agus 2003 in view of Calvo 2004, Wissner

2002, and/or Hidalgo 2002.

712.    The additional limitation of claim 4 of the '314 patent, "wherein the

irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2," would also have

been obvious in view of Calvo 2004 and/or Wissner 2002. Calvo 2004 reports that "[w]hen bound

into the ATP pocket, the acrylamide side-chain at position C6 of CI-1033 is brought into close

proximity with cysteine 773 of erbB1 (or the analogous cysteines 784 . . . of erbB2 . . . ), which

facilitates the rapid formation of a covalent bond that permanently inactivates the catalytically

266

active erbB1, erbB2 . . . family members." Calvo 2004 at 7113. Similarly, Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to  . . . (Cys 805 of HER-2)." Wissner 2002 at 50, 52. To the extent "irreversible EGFR inhibitor that covalently binds to cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, such limitation would have been obvious over Calvo 2004 and/or Wissner 2002. *See* Section VIII.D.

713.    *Claim 5 of the '314 patent would have been obvious*. Claim 5 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering at least one other tyrosine kinase inhibitor." '314 patent, claim 5. As discussed above in this Subsection, the method of claim 1 would have been obvious over Agus 2003 in view of Calvo 2004, Wissner 2002, and/or Hidalgo 2002.

714.    The additional limitation of claim 5 of the '314 patent, "wherein the method further comprises administering at least one other tyrosine kinase inhibitor," would also have been obvious over Agus 2003. Agus 2003 claims a method for treating a patient who is resistant or non-responsive to conventional kinase inhibitor therapy, comprising administration of a "resistance-surmounting quantity" of a kinase inhibitor, "wherein the kinase inhibitor is selected from the group consisting of Gefitinib (IRESSA), Erlotinib (TARCEVA), compound CI1033, compound PKI166, compound GW2016, compound EKB569, compound IMC-C225, a pharmaceutically acceptable salt thereof, a pharmaceutically acceptable equivalent thereof, *and a combination thereof*." Agus 2003, claim 7 (emphasis added). Thus, Agus 2003 teaches a method

of treatment comprising administration of an irreversible EGFR inhibitor, and further comprising administration of at least one other tyrosine kinase inhibitor.

715.    In addition, to the extent that Plaintiffs may contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 5 of the '314 patent requiring administration of "at least one other tyrosine kinase inhibitor" if the patient had previously been administered gefitinib and/or erlotinib in a prior treatment regimen, then Agus 2003 also describes such prior administration of gefitinib and/or erlotinib. *See*, *e.g.*, Agus 2003 at 3:5–6 ("Embodiments of the present invention provide a therapy for the treatment of disease conditions, such as cancer, and, in particular, for the treatment of cancer in individuals *who have developed a resistance to conventional TKI therapy* . . . .") (emphasis added); 2:4–6 (identifying gefitinib and erlotinib as conventional TKI therapies).

716.    *Claim 6 of the '314 Patent would have been obvious*. Claim 6 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering radiation." '314 patent, claim 6. As discussed above in this Subsection, the method of claim 1 would have been obvious over Agus 2003 in view of Calvo 2004, Wissner 2002, and/or Hidalgo 2002.

717.    The additional limitation of claim 6 of the '314 patent, "wherein the method further comprises administering radiation," would also have been obvious over Denny 2002 and/or Dancey 2004. Denny 2002 reports that CI-1033 "was synergistic with both ionizing radiation . . . and with cisplatin." Denny 2002 at 258. Dancey 2004 reports that "potent, irreversible inhibitors of EGFR kinases such as CI 1033 and EKB-569 have been developed" and teaches that "the most promising laboratory data have been from combining these targeted inhibitors with standard chemotherapy or radiotherapy." Dancey 2004 at 1003, 1004. Dancey

2004 explains that "[i]n laboratory xenograft experiments, additivity or synergy between EGFR inhibitors and standard cytotoxic therapies results in improved response rates, duration, and survival." *Id.* at 1004. Thus, the POSA would have been motivated with a reasonable expectation of success to combine the method of claim 1 of the '314 patent with radiation.

718.    *Claim 9 of the '314 patent would have been obvious.* Claim 9 of the '314 patent requires: "The method of claim 1, wherein the route of administration is oral." '314 patent, claim 9. As discussed above in this Subsection, the method of claim 1 would have been obvious over Agus 2003 in view of Calvo 2004, Wissner 2002, and/or Hidalgo 2002.

719.    The additional limitation of claim 9 of the '314 patent, "wherein the route of administration is oral" would also have been obvious over one or more of Agus 2003, Calvo 2004, Wissner 2002, and/or Hidalgo 2002. Agus 2003 teaches that "[o]ne may administer TKI compounds of the present invention orally." Agus 2003 at 8. Agus 2003 lists examples of the "TKIs suitable for use in accordance with the methods of the present invention," including CI-1033 and EKB-569. *Id.* at 6–7. The POSA would have known that irreversible EGFR inhibitors CI-1033 and EKB-569 were administered orally. For example, Calvo 2004 reports that CI-1033 is "an *oral* 4-anilinoquinazoline that irreversibly inhibits the tyrosine kinase domain of all erbB subfamilies." Calvo 2004 at Abstract (emphasis added). Wissner 2002 reports that EKB-569 "shows excellent oral in vivo activity," such that it "was selected for further studies and is currently in phase I clinical trials for the treatment of cancer." Wissner 2002 at Abstract. In addition, Hidalgo 2002 reports that EKB-569 was "administered orally once daily for 14 days" in a Phase I trial. Hidalgo 2002 at 65. Thus, the POSA would have been motivated with a reasonable expectation of success to combine the method of claim 1 of the '314 patent with oral administration.

████████████████████████████████

## 2. Allen 2003 Alone or in Combination with One or More of Learn 2004 and/or Agus 2003

720.   *Claim 1 of the '314 patent would have been obvious*. Claim 1 of the '314 patent requires: a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1.

721.   As discussed above in Section XIV.A.1, Allen 2003 describes the use of an irreversible EGFR inhibitor—CI-1033—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. Allen 2003 explains that "CI-1033 is a highly potent and selective pan-erbB inhibitor that efficiently blocks signal transduction through all four members of the erbB receptor family. In addition, it covalently binds to these receptors, irreversibility [sic] inhibiting them." Allen 2003 at Abstract; *see also id.* at 70 ("CI-1033 (canertinib) is an orally available 3-chloro, 4-fluoro, 4-anilinoquinazoline that possesses two key features . . . (1) irreversible binding to the tyrosine kinase active site, and (2) pan-erbB specificity."). Allen 2003 clarifies that "[t]he erbB family of receptors contains four cell surface receptor proteins" including "erbB-1 (epidermal growth factor receptor [EGFR] or HER1)." *Id.* at 65. Allen 2003 also explains that CI-1033 has been shown to inhibit the constitutively activated and highly tumorigenic variant of erbB-1, EGFRvIII. *Id.* at 72.

722.   The POSA would have known that EGFRvIII is a mutated form of EGFR that is associated with gefitinib resistance, based on the teachings of Learn 2004. *See, e.g.*, Learn 2004 at 3221 ("The data presented here provide evidence that gefitinib, an EGFR TK inhibitor,

270

███████████████████████████████████

effectively inhibits cell cycle progression, growth, and invasion of cells expressing wild-type EGFR but not mutant EGFRvIII *in vitro*."), 3222 ("[W]e believe that mutant EGFRvIII receptors are more resistant to EGFR TK inhibitor therapy . . . ."), 3223 ("The most significant finding in our study is that . . . the neoplastic phenotype conferred by mutant EGFRvIII is more resistant to treatment with gefitinib than wild-type EGFR.").

723.    Allen 2003 reports several Phase I clinical studies of CI-1033, including in patients having non-small cell lung cancer (16% of "more than 250 cancer patients"), among other cancers, showing "evidence of target modulation and antitumor activity." Allen 2003 at 72–74. Allen 2003 states that "[f]urther evidence of antitumor activity in phase I studies was suggested by the frequency of stable disease ($\geq$ 12 wks) in patients with non-small cell lung . . . cancers." *Id.* at 74. Allen 2003 also states that "[c]linically, [CI-1033] has been shown to have an acceptable side effect profile at potentially therapeutic doses and schedules." *Id.* at Abstract. Allen 2003 also describes preclinical study data showing that CI-1033 is a potent inhibitor of EGFR. *See id.* at 71–72 (reporting *in vitro* EGFR inhibition, $IC_{50} = 0.8$ nmol/L, and *in vivo* EGFR inhibition with "50% inhibitory concentration ($IC_{50}$) values in the low nmol/L range"). To the extent that the *in vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed method of treating NSCLC, Allen 2003 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof. Allen 2003 explains that EGFRvIII is expressed in 16% of NSCLC (*id.* at 67, Table 1), thus Allen 2003's description of Phase I clinical studies including at least 40 NSCLC patients (16% of "more than 250 cancer patients") necessarily includes patients resistant to treatment with gefitinib and/or erlotinib—which CI-1033 has been shown to inhibit (i.e., EGFRvIII).

724.    In addition, as discussed above in Section XV.B.1, the POSA would have known that Agus 2003 teaches the use of irreversible EGFR inhibitors, including CI-1033, for use in the treatment of gefitinib and/or erlotinib resistant non-small cell lung cancers. *See, e.g.*, Agus 2003 at 2 ("[a] significant limitation in using [gefitinib and/or erlotinib] is that recipients thereof may develop resistance to their therapeutic effects..."), 6–7 ("TKIs suitable for use in accordance with the method of the present invention may include . . . TKIs that are generally known for use in the treatment of cancer, and specifically, breast, *lung* and prostate cancer"), 7 ("[S]uch TKIs may include . . . CI1033.").

725.    Thus, the POSA would have been motivated with a reasonable expectation of success to use irreversible EGFR inhibitor CI-1033 in a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer based on Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003.

726.    Allen 2003 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" CI-1033. '314 patent, claim 1. Allen 2003 reports Phase I clinical studies wherein patients were administered oral, daily doses ranging from 2 mg/day to 1000 mg/day. Allen 2003 at 72. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Allen 2003 describe a "unit dose" of CI-1033.

███████████████████████

727.     Allen 2003 also describes CI-1033 as an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003 at 70–71. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, limitation would have been obvious over Allen 2003. *See* Section VIII.D.

728.     Thus, the POSA would have been motivated with a reasonable expectation of success by Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003 to arrive at claim 1 of the '314 patent.

729.     *Claim 3 of the '314 patent would have been obvious*. Claim 3 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As discussed above in this Subsection, the method of claim 1 would have been obvious over Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003.

730.     The additional limitation of claim 3 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR," would also have

████████████████████████

been obvious in view of Allen 2003. As discussed above in this Subsection, Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003, 70-71. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, such limitation would have been obvious over Allen 2003. *See* Section VIII.D.

731.    *Claim 4 of the '314 patent would have been obvious*. Claim 4 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314 patent, claim 4. As discussed above in this Subsection, the method of claim 1 would have been obvious over Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003.

732.    The additional limitation of claim 4 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2," would also have been obvious in view of Allen 2003. Allen 2003 explains that "[w]hen bound into the adenosine triphosphate pocket of erbB receptors, the acrylamide side-chain at position C6 of CI-1033 is brought into close proximity to cysteine 773 of erbB-1 (or the analogous cysteines 784 . . . in erbB-2 . . . ). This facilitates the rapid formation of a covalent bond, thus permanently inactivating the tyrosine kinase domain of the erbB receptors." Allen 2003 at 70–71. To the extent "irreversible EGFR inhibitor that covalently binds to cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the

███████████████████████████

intracellular region of erbB2, such limitation would have been obvious over Allen 2003. *See* Section VIII.D.

733.     *Claim 5 of the '314 patent would have been obvious*. Claim 5 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering at least one other tyrosine kinase inhibitor." '314 patent, claim 5. As discussed above in this Subsection, the method of claim 1 would have been obvious over Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003.

734.     The additional limitation of claim 5 of the '314 patent, "wherein the method further comprises administering at least one other tyrosine kinase inhibitor," would also have been obvious over Agus 2003. Agus 2003 claims a method for treating a patient who is resistant or non-responsive to conventional kinase inhibitor therapy, comprising administration of a "resistance-surmounting quantity" of a kinase inhibitor, "wherein the kinase inhibitor is selected from the group consisting of Gefitinib (IRESSA), Erlotinib (TARCEVA), compound CI1033, compound PKI166, compound GW2016, compound EKB569, compound IMC-C225, a pharmaceutically acceptable salt thereof, a pharmaceutically acceptable equivalent thereof, *and a combination thereof*." Agus 2003, claim 7 (emphasis added). Thus, Agus 2003 teaches a method of treatment comprising administration of an irreversible EGFR inhibitor, such as CI-1033, and further comprising administration of at least one other tyrosine kinase inhibitor.

735.     In addition, to the extent that Plaintiffs may contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 5 of the '314 patent requiring administration of "at least one other tyrosine kinase inhibitor" if the patient had previously been administered gefitinib and/or erlotinib in a prior treatment regimen, then Agus 2003 also describes such prior administration of gefitinib

and/or erlotinib. *See*, *e.g.*, Agus 2003 at 3:5–6 ("Embodiments of the present invention provide a therapy for the treatment of disease conditions, such as cancer, and, in particular, for the treatment of cancer in individuals *who have developed a resistance to conventional TKI therapy* . . . .") (emphasis added); 2:4–8 (identifying gefitinib and erlotinib as conventional TKI therapies).

736.    *Claim 6 of the '314 patent would have been obvious*. Claim 6 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering radiation." '314 patent, claim 6. As discussed above in this Subsection, the method of claim 1 would have been obvious over Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003.

737.    The additional limitation of claim 6 of the '314 patent, "wherein the method further comprises administering radiation," would also have been obvious over Allen 2003. Allen 2003 explains that "[p]reclinical studies have also shown CI-1033 to have significant radiosensitizing effects. Growth delays, greater than that produced by either CI-1033 or fractionated radiation alone, were observed *when both agents were used in combination*." Allen 2003 at 72 (emphasis added). Thus, Allen 2003 teaches a method of treatment comprising administration of irreversible EGFR inhibitor CI-1033, further comprising administering radiation.

738.    *Claim 9 of the '314 patent would have been obvious*. Claim 9 of the '314 patent requires: "The method of claim 1, wherein the route of administration is oral." '314 patent, claim 9. As discussed above in this Subsection, the method of claim 1 would have been obvious over Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003.

739.    The additional limitation of claim 9 of the '314 patent, "wherein the route of administration is oral" would also have been obvious over Allen 2003. As discussed above in

███████████████████████████

this Subsection, Allen 2003 reports Phase I clinical studies wherein patients were administered

oral, daily doses of CI-1033 ranging from 2 mg/day to 1000 mg/day. Allen 2003 at 72. Thus, the

POSA would have been motivated with a reasonable expectation of success to combine the

method of claim 1 of the '314 patent with oral administration.

### 3. Zacharchuk US 2005 Alone or in Combination with One or More of Discafani 1999 and/or Wissner 2002

740.    *Claim 1 of the '314 patent would have been obvious*. Claim 1 of the '314

patent requires: a "method for treating gefitinib and/or erlotinib resistant non-small cell lung

cancer in a patient in need thereof, comprising administering daily to the patient having gefitinib

and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a

unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently

binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the

ligand-binding pocket of erb-B2." '314 patent, claim 1.

741.    As discussed above in Section **Error! Reference source not found.**,

Zacharchuk US 2005 describes the use of an irreversible EGFR inhibitor in a "method for treating

gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314

patent, claim 1. Zacharchuk US 2005 teaches that "[t]he present invention relates to a method of

treating or inhibiting cancer in a human treated with gefitinib or iressa," specifically, "[t]he cancer

of this invention comprises non-small cell lung cancer." Zacharchuk US 2005, [0005], [0010].

Zacharchuk US 2005 describes a broad class of EGFR inhibitors having a quinazoline scaffold

and states a preference for EGFR inhibitors that "irreversibly inhibit[] EGFR kinase, typically by

possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with

EGFR." *Id.*, [0007]–[0009], [0018]. Zacharchuk US 2005 broadly claims a method of treating or

inhibiting cancer that comprises administration of "an effective amount of EGFR kinase

███████████████████████

inhibitor" and more specifically "wherein the EGFR kinase inhibitor irreversibly inhibits EGFR kinase." *Id.*, claims 1, 2. Zacharchuk US 2005 describes three specific irreversible EGFR inhibitors—HKI-272, EKB-569, and CL-387,785. *See*, *e.g.*, *id.*, [0004], [0044]–[0045].

742.    Zacharchuk US 2005 explains that "[t]he compounds herein may be administered orally" and "administration can take the form of dosing a reversible EGFR kinase inhibitor, for example but not limited to gefitinib or iressa alone *until resistance is detected* during clinical monitoring at which time an effective amount of an irreversible EGFR kinase inhibitor, for example but not limited to EKB or HKI is administered." Zacharchuk US 2005, [0023]–[0024] (emphasis added). Zacharchuk US 2005 further explains that "[a]cquired resistance to gefitinib is associated with a second mutation in exon 20 encoding the EGFR kinase domain." *Id.*, [0043].

743.    Zacharchuk US 2005 reports the use of EKB-569 in two patients with NSCLC after these patients were treated with gefitinib and had recurrence of NSCLC. Zacharchuk US 2005, [0041]. Zacharchuk US 2005 reports that "EKB-569 was effective in these two patients after treatment with gefitinib and recurrence of NSCLC." *Id.* To the extent that the *in vitro* testing data provided in the '314 patent is sufficient to describe and enable the claimed method of treating NSCLC, Zacharchuk US 2005 also sufficiently describes a method of treating gefitinib and/or erlotinib resistant NSCLC in a patient in need thereof. Zacharchuk US 2005 specifically identifies the *clinical* use of EKB-569 in two patients with gefitinib-resistant NSCLC.

744.    In addition, Zacharchuk US 2005 describes the activity of irreversible EGFR inhibitor CL-387,785, stating that it "strongly inhibited" the activity of EGFR containing a secondary mutation. Zacharchuk US 2005, [0044].

███████████████████████████

745. The '287 application, to which Zacharchuk US 2005 claims priority, contains the same information. The '287 application also discloses a "method of treating or inhibiting cancer in a human treated with gefitinib," including the particular "use of an epidermal growth factor receptor (EGFR) kinase inhibitor in gefitinib resistant patients." '287 application, 1:4–5; 2:14–15. The '287 application states that "[t]he cancer of this invention comprises non-small cell lung cancer." *Id,* 5:24. The '287 application describes a broad class of quinazoline EGFR inhibitors, and states a preference for "EGFR kinase inhibitor[s] that "irreversibly inhibit[]EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." *Id.*, 6:11–15. Like Zacharchuk US 2005, the '287 application broadly claims a method of treating or inhibiting cancer comprising administration of an irreversible EGFR inhibitor. *Id.*, claim 2. Zacharchuk US 2005 describes EKB-569 and CL-387,785 specifically. *Id.*, 2:5–6; 13:19–21. As with Zacharchuk US 2005, the '287 application also describes the administration of EKB-569 in two patients, reporting that "EKB-569 was effective in these two patients after treatment with gefitinib and recurrence of NSCLC." *Id.*, 13:13–14, 22–24 ("EKB-569, another irreversible EGFR inhibitor, may abrogate the resistance mechanism to gefitinib."). The '287 application also describes the activity of irreversible EGFR inhibitor CL-387,785, stating that it "strongly inhibited" the activity of EGFR containing a secondary mutation. *Id.*, 13:19–21.

746. The POSA would have known that both EKB-569 and CL-387,785 were irreversible EGFR inhibitors, and that EKB-569 was in clinical development. *See* Wissner 2002 at 49–50 (reporting EKB-569 as a "potent, irreversible inhibitor[] of EGFR and HER-2," and "currently in phase I clinical trials for the treatment of cancer"); Discafani 1999 at Abstract (describing CL-387,785 as an irreversible EGFR inhibitor that "profoundly blocked the growth of

a tumor that overexpresses EGF-R in nude mice (when given orally at 80 mg/kg/day for 10 days, daily).").

747. Zacharchuk US 2005 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" EKB-569. '314 patent, claim 1. Zacharchuk US 2005 explains that the compounds disclosed therein, including EKB-569, are preferably administered "in the form of a unit dose." Zacharchuk US 2005, [0023]. Zacharchuk US 2005 further specifies that the unit dose "may contain from 0.1 to 300 mg of a compound of the invention and preferably from 2 to 100 mg" and "may be administered from 1 to 6 times a day." *Id.* The two patients described in Zacharchuk US 2005 were administered 25 mg/day EKB-569 (Case 1) and 35 mg/day (Case 2). *Id.*, [0036], [0038]. To the extent that the '314 Patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Zacharchuk US 2005 describe a "unit dose" of EKB-569.

748. The '287 application, to which Zacharchuk US 2005 claims priority, also describes daily administration of a unit dosage of EKB-569 to a patient having gefitinib resistant NSCLC. *See* '287 application, 12:25–13:7 (describing the daily administration of EKB-569 to two patients with recurrent NSCLC).

749. Zacharchuk US 2005 also discloses an irreversible EGFR inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. As stated above, Zacharchuk US 2005 states a preference for EGFR inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) *that can form a covalent bond with EGFR*." Zacharchuk US 2005, [0018] (emphasis added). Zacharchuk US 2005

describes the use of EKB-569 and CL-387,785 as irreversible EGFR inhibitors. As discussed

above, *see, e.g.*, paragraph 669, the POSA would have known that EKB-569 irreversibly inhibits

EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain and

inhibits erb-B2 by forming a covalent bond with cysteine 805. *See* Wissner 2002 at 50, 52

(reporting a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including

EKB-569, as "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a

covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)."). The POSA would have known

that CL-387,785 covalently binds to cysteine 773 and likely inhibits erb-B2 through covalent

binding to analogous cysteine 805 residue. *See* Discafani 1999 at 923 (predict[ing] that CL-

387,785 alkylates Cys$^{773}$, which is located in the ATP-binding region of the protein, and

hypothesizing that "[i]t is likely that CL-387,785 inhibits c-erb-B2"); *id.* ("[C]ysteine [773]

residue in the kinase domain . . . is unique to EGF-R and c-erbB-2 and would explain, in part,

why CL-387,785 selectively interacts with these two tyrosine kinases."). Indeed, I understand that

Plaintiffs may contend that there is considerable homology between the cysteine 773 residue of

EGFR and the cysteine 805 residue of erb-B2 (Plaintiffs' Infringement Contentions at A-6), such

that compounds that covalently bind to cysteine 773, such as CL-387,785, will similarly bind to

the cysteine 805 residue of erbB-2. To the extent Plaintiffs' theory is correct, Kobayashi 2005's

disclosure of CL-387,785 discloses a compound that binds to the cysteine 805 residue of erbB-2.

To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding

pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the

intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to cysteine

805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors

that bind to the cysteine 784 in the intracellular region of erbB2, limitation would have been

████████████████████████████

obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002. *See* Section VIII.D.

750.    The '287 application recites the same preference for EGFR kinase inhibitors that "irreversibly inhibit[]EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) that can form a covalent bond with EGFR." '287 application, 6:11–15. The '287 application also discloses EKB-569 and CL-387,785. *Id.*, 2:5–6; 13:19–21.

751.    Thus, the POSA would have been motivated with a reasonable expectation of success by Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002 to arrive at claim 1 of the '314 patent.

752.    *Claim 3 of the '314 patent would have been obvious*. Claim 3 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As discussed above in this Subsection, the method of claim 1 would have been obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002.

753.    The additional limitation of claim 3 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR," would also have been obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002. As discussed above in this Subsection, Zacharchuk US 2005 states a preference for EGFR inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) *that can form a covalent bond with EGFR*." Zacharchuk US 2005, [0018] (emphasis added). Zacharchuk US 2005 describes the use of EKB-569 and CL-387,785 as irreversible EGFR inhibitors. As discussed in paragraph 749, the POSA would have known that EKB-569 irreversibly inhibits EGFR by forming a covalent bond with

███████████████████████

cysteine 773 residue in the EGFR kinase domain and inhibits erb-B2 by forming a covalent bond

with cysteine 805. *See* Wissner 2002 at 50, 52 (reporting a series of 6,7-disubstituted-4-

anilinoquinoline-3-carbonitrile derivatives, including EKB-569, as "potent, irreversible inhibitors

of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and

Cys 805 of HER-2)."). Similarly, as discussed above in in paragraph 749, the POSA would have

known that CL-387,785 covalently binds to cysteine 773 and likely inhibits erb-B2 through

covalent binding to analogous cysteine 805 residue. *See* Discafani 1999 at 923 ("predict[ing] that

CL-387,785 alkylates Cys[773], which is located in the ATP-binding region of the protein, and

hypothesizing that "[i]t is likely that CL-387,785 inhibits c-erb-B2..."); *id.* ("[C]ysteine [773]

residue in the kinase domain...is unique to EGF-R and c-erbB-2 and would explain, in part, why

CL-387,785 selectively interacts with these two tyrosine kinases."). To the extent "irreversible

EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR"

encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region

of EGFR, such limitation would have been obvious over Zacharchuk US 2005 alone or in

combination with one or more of Discafani 1999 and/or Wissner 2002. *See* Section VIII.D.

754.    *Claim 4 of the '314 patent would have been obvious*. Claim 4 of the '314

patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds

to cysteine 805 residue of erb-B2." '314 patent, claim 4. As discussed above in this Subsection,

the method of claim 1 would have been obvious over Zacharchuk US 2005 alone or in

combination with one or more of Discafani 1999 and/or Wissner 2002.

755.    The additional limitation of claim 4 of the '314 patent, "wherein the

irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2," would also have

been obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani

1999 and/or Wissner 2002. As discussed above in this Subsection, Zacharchuk US 2005 states a preference for EGFR inhibitors that "irreversibly inhibit[] EGFR kinase, typically by possessing a reactive moiety (such as a Michael acceptor) *that can form a covalent bond with EGFR*." Zacharchuk US 2005, [0018] (emphasis added). Zacharchuk US 2005 describes the use of EKB-569 and CL-387,785 as irreversible EGFR inhibitors. As discussed above in above in in paragraph 749, the POSA would have known that EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue in the EGFR kinase domain and inhibits erb-B2 by forming a covalent bond with cysteine 805. *See* Wissner 2002 at 50, 52 (reporting a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, as "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)."). Similarly, as discussed above in above in in paragraph 749, the POSA would have known that CL-387,785 covalently binds to cysteine 773 and likely inhibits erb-B2 through covalent binding to analogous cysteine 805 residue. *See* Discafani 1999 at 923 (predict[ing] that CL-387,785 alkylates Cys[773], which is located in the ATP-binding region of the protein, and hypothesizing that "[i]t is likely that CL-387,785 inhibits c-erb-B2"); *id.* ("[C]ysteine [773] residue in the kinase domain . . . is unique to EGF-R and c-erbB-2 and would explain, in part, why CL-387,785 selectively interacts with these two tyrosine kinases."). To the extent "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, such limitation would have been obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002. *See* Section VIII.D.

███████████████████████████████

756. *Claim 5 of the '314 patent would have been obvious*. Claim 5 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering at least one other tyrosine kinase inhibitor." '314 patent, claim 5. As discussed above in this Subsection, the method of claim 1 would have been obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002.

757. The additional limitation of claim 5 of the '314 patent, "wherein the method further comprises administering at least one other tyrosine kinase inhibitor," would also have been obvious over Zacharchuk US 2005. Zacharchuk US 2005 claims a "method of treating . . . [non-small cell lung cancer] in a human . . . comprising administering to said human gefitinib . . . and an effective amount of an EGFR kinase inhibitor." *See* Zacharchuk US 2005, Claims 1, 7; *see also id.* at Abstract, [0006]. Zacharchuk US 2005 further describes methods of administering gefitinib and an irreversible inhibitor in the specification. Zacharchuk US 2005 at [0024] (teaching the administration of a reversible EGFR kinase inhibitor such as gefitinib "until resistance is detected . . . at which time an effective amount of an irreversible EGFR kinase inhibitor . . . is administered"); *id.* at [0025] (teaching the administration of a reversible EGFR kinase inhibitor such as gefitinib until resistance is detected, then administering an irreversible EGFR kinase inhibitor, "followed by another round of dosing with the reversible EGFR kinase inhibitor").

758. *Claim 6 of the '314 patent would have been obvious*. Claim 6 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering radiation." '314 patent, claim 6. As discussed above in this Subsection, the method of claim 1 would have been obvious over Zacharchuk US 2005 alone or in combination with one or more of Discafani 1999 and/or Wissner 2002.

759.     The additional limitation of claim 6 of the '314 patent, "wherein the method further comprises administering radiation," would also have been obvious over Zacharchuk US 2005. Zacharchuk US 2005 discloses a patient with adenocarcinoma who was treated with "RT 60Gy" and later treated with EKB-569. Zacharchuk US 2005 at Fig. 5, [0037]–[0038]; *see also* Zacharchuk US 2005, claim 1 ("[M]ethod of treating or inhibiting cancer in a human . . . comprising administering to said human gefitinib or iressa alone or in combination with other cytotoxic agents . . . and an effective amount of an EGFR kinase inhibitor [wherein the EGFR kinase inhibitor irreversibly inhibits EGFR kinase]."). "RT" is a common abbreviation for radiotherapy and "gy" stands for "gray," the unit of ionizing radiation dose. *See* Bradley, *A review of radiation dose escalation trials for non-small cell lung cancer within the Radiation Therapy Oncology Group,* Semin. Oncology (2005). To the extent Plaintiffs contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 6 of the '314 patent requiring administration of radiation if the patient had previously been administered radiation in a prior treatment regimen, then Zacharchuk US 2005 discloses such prior administration of radiation.

### 4.     Yoshimura 2005 Alone or in Combination with One or More of Wissner 2002, Agus 2003, and/or Dancey 2004

760.     *Claim 1 of the '314 patent would have been obvious*. Claim 1 of the '314 patent requires: a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1.

███████████████████████

761.     As discussed above in Section XIV.A.3, Yoshimura 2005 describes the use of an irreversible EGFR inhibitor—EKB-569—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. Yoshimura 2005 explains that "EKB-569 is a potent, low molecular weight, selective and irreversible inhibitor of epidermal growth factor receptor (EGFR)." Yoshimura 2005 at 363; *id.* at 364 ("EKB-569 is an irreversible inhibitor of EGFR, while other small-molecule EGFR inhibitors bind EGFR reversibly.").

762.     Yoshimura 2005 reports that EKB-569 was used in a Phase I, open-label, dose-escalation study in Japanese patients with "advanced stage malignancies known to overexpress EGFR." *Id.* at 364. The study included patients with non-small cell lung cancer. At least two patients with non-small cell lung cancer in the study were administered EKB-569 after being treated with gefitinib and their non-small cell lung cancer progressed. *Id.* at 365–66 (Case #1 and #2). According to Yoshimura 2005, EKB-569 was "effective in these two patients after resistance to gefitinib." *Id.* at 366. Yoshimura concludes that "irreversible EGFR inhibitors may be an effective therapy for patients with EGFR-mutant advanced non-small cell lung cancer who have relapsed with treatment with gefitinib." *Id.* at 370.

763.     Yoshimura 2005 also describes "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" EKB-569. '314 patent, claim 1. Yoshimura 2005 explains that patients in the Phase I study received "once daily" treatment of 25 mg, 35 mg, or 50 mg EKB-569. Yoshimura 2005 at 364. The two patients specifically described as having gefitinib-resistant NSCLC were administered once daily 25 mg (Case #1) and 35 mg (Case #2) EKB-569. *Id.* at 365–66. The '314 patent defines "unit dose" as "physically discrete units suitable as unitary

███████████████████████████████

dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Yoshimura 2005 describe a "unit dose" of EKB-569.

764.    Yoshimura 2005 also discloses an irreversible inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. As described in paragraphs 303, 312 EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805 of erbB2. In particular, the POSA would have known that Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner 2002 at 50, 52. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, such limitation would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002. *See* Section VIII.D.

765.    Thus, the POSA would have been motivated with a reasonable expectation of success by Yoshimura 2005 alone or in combination with Wissner 2002 to arrive at claim 1 of the '314 patent.

766.    *Claim 3 of the '314 patent would have been obvious*. Claim 3 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds

288

████████████████████

to cysteine 773 residue of EGFR." '314 patent, claim 3. As discussed above in this Subsection, the method of claim 1 would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002.

767.    The additional limitation of claim 3 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR," would also have been obvious in view of Yoshimura 2005 alone or in combination with Wissner 2002. As discussed above in paragraphs 303, 312, the POSA would have known that EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805 of erbB2. In particular, the POSA would have known that Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner 2002 at 50, 52. To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, such limitation would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002. *See* Section VIII.D.

768.    *Claim 4 of the '314 patent would have been obvious*. Claim 4 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2." '314 patent, claim 4. As discussed above in this Subsection, the method of claim 1 would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002.

769.    The additional limitation of claim 4 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2," would also have

███████████████████████████████

been obvious in view of Yoshimura 2005 alone or in combination with Wissner 2002. As discussed above in paragraphs 303, 312, the POSA would have known that EKB-569 reportedly forms a covalent bond with the cysteine 773 of EGFR and the cysteine 805 of erbB2. In particular, the POSA would have known that Wissner 2002 reports that a series of 6,7-disubstituted-4-anilinoquinoline-3-carbonitrile derivatives, including EKB-569, are "potent, irreversible inhibitors of EGFR and HER-2," that "function by forming a covalent linkage to Cys 773 of EGFR (and Cys 805 of HER-2)." Wissner 2002 at 50, 52. To the extent "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, such limitation would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002. *See* Section VIII.D.

770.    *Claim 5 of the '314 patent would have been obvious*. Claim 5 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering at least one other tyrosine kinase inhibitor." '314 patent, claim 5. As discussed above in this Subsection, the method of claim 1 would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002.

771.    The additional limitation of claim 5 of the '314 patent, "wherein the method further comprises administering at least one other tyrosine kinase inhibitor," would also have been obvious over Agus 2003. Agus 2003 claims a method for treating a patient who is resistant or non-responsive to conventional kinase inhibitor therapy, comprising administration of a "resistance-surmounting quantity" of a kinase inhibitor, "wherein the kinase inhibitor is selected from the group consisting of Gefitinib (IRESSA), Erlotinib (TARCEVA), compound CI1033, compound PKI166, compound GW2016, compound EKB569, compound IMC-C225, a

███████████████████████

pharmaceutically acceptable salt thereof, a pharmaceutically acceptable equivalent thereof, *and a combination thereof*." Agus 2003, claim 7 (emphasis added). Thus, Agus 2003 teaches a method of treatment comprising administration of an irreversible EGFR inhibitor, and further comprising administration of at least one other tyrosine kinase inhibitor.

772. In addition, to the extent that Plaintiffs may contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 5 of the '314 patent requiring administration of "at least one other tyrosine kinase inhibitor" if the patient had previously been administered gefitinib and/or erlotinib in a prior treatment regimen, then Yoshimura 2005 also describes such prior administration of gefitinib and/or erlotinib. *See* Yoshimura 2005 at 365–66 (describing at least two patients—Case #1 and Case #2—in a Phase I study who were treated with gefitinib and a "new EGFR tyrosine kinase inhibitor (TAK-165)" prior to treatment with EKB-569).

773. *Claim 6 of the '314 patent would have been obvious*. Claim 6 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering radiation." '314 patent, claim 6. As discussed above in this Subsection, the method of claim 1 would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002.

774. The additional limitation of claim 6 of the '314 patent, "wherein the method further comprises administering radiation," would also have been obvious over Dancey 2004. Dancey 2004 reports that "potent, irreversible inhibitors of EGFR kinases such as CI 1033 and EKB-569 have been developed" and teaches that "the most promising laboratory data have been from combining these targeted inhibitors with standard chemotherapy or radiotherapy." Dancey 2004 at 1003, 1004. Dancey 2004 explains that "[i]n laboratory xenograft experiments, additivity or synergy between EGFR inhibitors and standard cytotoxic therapies results in

███████████████████████

improved response rates, duration, and survival." *Id.* at 1004. Thus, the POSA would have been motivated with a reasonable expectation of success to combine the method of claim 1 of the '314 patent with radiation.

775.    In addition, to the extent that Plaintiffs may contend that treatment of a patient with an irreversible EGFR inhibitor according to claim 1 of the '314 patent, would meet the limitation of claim 6 of the '314 patent requiring administration of radiation if the patient had previously been administered radiation in a prior treatment regimen, then Yoshimura 2005 also describes such prior administration of radiation. Yoshimura 205 discloses at least one patient— the patient in Case #2—who was administered radiation prior to treatment with EKB-569. *See* Yoshimura 2005 at 366 ("Radiotherapy for the metastases (60 Gy/30 fractions) was done . . . .").

776.    *Claim 9 of the '314 patent would have been obvious*. Claim 9 of the '314 patent requires: "The method of claim 1, wherein the route of administration is oral." '314 patent, claim 9. As discussed above in this Subsection, the method of claim 1 would have been obvious over Yoshimura 2005 alone or in combination with Wissner 2002.

777.    The additional limitation of claim 9 of the '314 patent, "wherein the route of administration is oral" would also have been obvious over Yoshimura 2005. Yoshimura 2005 explains that EKB-569 was administered orally in the Phase I study. *See, e.g.*, Yoshimura 2005 at 364 ("EKB-569 was administered orally . . . .").

### 5.    NCT00266877 2005 in Combination with Rabindran 2004 and one or more of Zacharchuk US 2005 and/or Dancey 2004

778.    *Claim 1 of the '314 patent would have been obvious*. Claim 1 of the '314 patent requires: a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof, comprising administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a

unit dosage of an irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1.

779.    NCT00266877 2005 describes the use of an irreversible EGFR inhibitor—HKI-272—in a "method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 patent, claim 1. NCT00266877 2005 describes "A Phase 2 Study of HKI-272 in Subjects with Advanced (NSCLC) Non-Small Cell Lung Cancer." NCT00266877 2005 at 7. NCT00266877 explains that "[t]he purpose of this study is to learn whether HKI-272 is safe and useful in treating non-small cell lung cancer." The inclusion criteria for "Arms A and B" required "[p]rogression following at least 12 weeks of treatment with Tarceva or Iressa." NCT00266877 2005 at 12. Thus, NCT00266877 2005 reports a Phase II clinical trial in which HKI-272 is administered to patients who are not, or no longer responding to Tarceva (erlotinib) or Iressa (gefitinib)—i.e., patients having gefitinib and/or erlotinib resistant non-small cell lung cancer.

780.    The POSA would have known that HKI-272 was an irreversible EGFR inhibitor. Rabindran 2004 describes HKI-272 as a "potent inhibitor of HER-2 . . . [i]t also inhibits the epidermal growth factor receptor (EGFR) kinase." Rabindran 2004 at Abstract. Rabindran 2004 explains that HKI-272 "functions as an irreversible binding inhibitor, most likely by targeting a cysteine residue in the ATP-binding pocket of the receptor." *Id.* Rabindran 2004 reports that "HKI-272 inhibits the growth of HER-2 dependent tumors *in vivo*." *Id.* at 3964.

781.    Rabindran 2004 describes daily administration of a unit dosage of HKI-272 in *in vivo* models. Rabindran reports that "*[i]n vivo*, HKI-272 is active in HER-2- and EGFR-dependent tumor xenograft models when dosed orally on a once daily schedule." Rabindran 2004

at Abstract. Rabindran also reports that the "minimum dose, which causes a statistically significant inhibition of tumor growth, is estimated to be 5-10 mg/kg/day. In these xenograft studies, HKI-272 was well tolerated by the animals, and no weight loss or other compound-related toxicity was observed." Rabindran 2004 at 3964.  The '314 patent defines "unit dose" as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents; i.e., carrier, or vehicle." To the extent that the '314 patent sufficiently describes and enables a unit dose of an irreversible EGFR inhibitor, so too does Rabindran 2004 describe a "unit dose" of HKI-272.

782.    The POSA would have been motivated with a reasonable expectation of success to combine the teachings of NCT00266877 2005 with Rabindran 2004 to arrive at a method of treating comprising "administering daily to the patient having gefitinib and/or erlotinib resistant non-small cell lung cancer a pharmaceutical composition comprising a unit dosage of" HKI-272. '314 patent, claim 1.

783.    The POSA also would have known from Rabindran 2004 that HKI-272 was an irreversible inhibitor "that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 patent, claim 1. Rabindran 2004 explains that HKI-272 inhibits erb-B2 by covalently binding to the cysteine 805 residue. Rabindran 2004 at 3964 ("HKI-272 interacts directly with its target enzyme and forms a covalent complex . . . . On the basis of the binding model, cysteine-805, located within the catalytic cleft of HER-2, is ideally positioned for covalent interaction with HKI-272..."). Rabindran 2004 suggests that HKI-272 binds to cysteine 773 residue of EGFR. *Id.* at 3960 (noting that HKI-272 has the same Michael acceptor as EKB-569 and "EKB-569 has been

████████████████████████████████

previously shown to form a covalent adduct with EGFR . . . most likely because of the interaction between the Michael acceptor functional group of EKB-569 with cysteine 773 within the ATP binding site of EGFR"); *see also id.* at 3963 ("HKI-272 is a potent inhibitor of the HER-2 and EGFR kinases *in vitro.*"). To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and "irreversible EGFR inhibitor that covalently binds to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, such limitation would have been obvious over NCT00266877 in combination with Rabindran 2004. *See* Section VIII.D.

784. Thus, the POSA would have been motivated with a reasonable expectation of success to modify NCT00266877 2005 in view of Rabindran 2004 to arrive at claim 1 of the '314 patent.

785. *Claim 3 of the '314 patent would have been obvious*. Claim 3 of the '314 patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR." '314 patent, claim 3. As discussed above in this Subsection, the method of claim 1 would have been obvious over NCT00266877 2005 in view of Rabindran 2004.

786. The additional limitation of claim 3 of the '314 patent, "wherein the irreversible EGFR inhibitor covalently binds to cysteine 773 residue of EGFR," would also have been obvious in view of Rabindran 2004. As discussed above in this Subsection, Rabindran 2004 suggests that HKI-272 binds to cysteine 773 residue of EGFR. *Id.* at 3960 (noting that HKI-272 has the same Michael acceptor as EKB-569 and "EKB-569 has been previously shown to form a

covalent adduct with EGFR . . . most likely because of the interaction between the Michael

acceptor functional group of EKB-569 with cysteine 773 within the ATP binding site of EGFR");

*see also id.* at 3963 ("HKI-272 is a potent inhibitor of the HER-2 and EGFR kinases *in vitro*.").

To the extent "irreversible EGFR inhibitor that binds to cysteine 773 residue in the ligand-binding

pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the

intracellular region of EGFR encompasses irreversible EGFR inhibitors that bind to the cysteine

784 in the intracellular region of erbB2, such limitation would have been obvious over

NCT00266877 2005 in combination with Rabindran 2004. *See* Section VIII.D.

787.   *Claim 4 of the '314 patent would have been obvious*. Claim 4 of the '314

patent requires: "The method of claim 1, wherein the irreversible EGFR inhibitor covalently binds

to cysteine 805 residue of erb-B2." '314 patent, claim 4. As discussed above in this Subsection,

the method of claim 1 would have been obvious over NCT00266877 2005 in view of Rabindran

2004.

788.   The additional limitation of claim 4 of the '314 patent, "wherein the

irreversible EGFR inhibitor covalently binds to cysteine 805 residue of erb-B2," would also have

been obvious in view of Rabindran 2004. Rabindran 2004 explains that HKI-272 inhibits erb-B2

by covalently binding to the cysteine 805 residue. Rabindran 2004 at 3964 ("HKI-272 interacts

directly with its target enzyme and forms a covalent complex . . . . On the basis of the binding

model, cysteine-805, located within the catalytic cleft of HER-2, is ideally positioned for covalent

interaction with HKI-272 . . . ."). To the extent "irreversible EGFR inhibitor that covalently binds

to . . . cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible

EGFR inhibitors that bind to the cysteine 784 in the intracellular region of erbB2, such limitation

███████████████████████████████████

would have been obvious over NCT00266877 2005 in combination with Rabindran 2004. *See* Section VIII.D.

789.    *Claim 5 of the '314 patent would have been obvious*. Claim 5 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering at least one other tyrosine kinase inhibitor." '314 patent, claim 5. As discussed above in this Subsection, the method of claim 1 would have been obvious over NCT00266877 2005 in view of Rabindran 2004.

790.    The additional limitation of claim 5 of the '314 patent, "wherein the method further comprises administering at least one other tyrosine kinase inhibitor," would also have been obvious over Zacharchuk US 2005. As discussed above in Section XIV.A.2, Zacharchuk US 2005 reports a method of treating cancer using an EGFR inhibitor, including HKI-272, in gefitinib-resistant patients. *See, e.g.*, Zacharchuk US 2005, Title, [0006]; *see also id.*, [0024] (teaching the administration of a reversible EGFR kinase inhibitor such as gefitinib "until resistance is detected . . . at which time an effective amount of an irreversible EGFR kinase inhibitor . . . is administered"); *id.*, [0025] (teaching the administration of a reversible EGFR kinase inhibitor such as gefitinib until resistance is detected, then administering an irreversible EGFR kinase inhibitor, "followed by another round of dosing with the reversible EGFR kinase inhibitor"). Zacharchuk US 2005 claims a "method of treating . . . cancer in a human . . . comprising administering to said human gefitinib . . . and an effective amount of an EGFR kinase inhibitor." *See* Zacharchuk US 2005, claims 1, 7; *see also id.*, Abstract, [0006]. Zacharchuk US 2005 explains that "[t]he cancer of this invention comprises non-small cell lung cancer." *Id.*, [0010]. Zacharchuk US 2005 lists HKI-272 as an "EGFR kinase inhibitor[] of interest." *Id.*, [0004]. Thus, the POSA would have been motivated with a reasonable expectation

■■■■■■■■■■

of success to combine the method of claim 1 of the '314 patent with at least one other tyrosine kinase inhibitor—gefitinib.

791.    *Claim 6 of the '314 patent would have been obvious*. Claim 6 of the '314 patent requires: "The method of claim 1, wherein the method further comprises administering radiation." '314 patent, claim 6. As discussed above in this Subsection, the method of claim 1 would have been obvious over NCT00266877 2005 in view of Rabindran 2004.

792.    The additional limitation of claim 6 of the '314 patent, "wherein the method further comprises administering radiation," would have been obvious over Dancey 2004. Dancey 2004 reports the clinical development of EGFR inhibitors, including irreversible EGFR inhibitors. *See* Dancey 2004 at 1003. Dancey explains that "the most promising laboratory data have been from combining these targeted inhibitors with standard chemotherapy or radiotherapy." Dancey 2004 at 1003, 1004. "In laboratory xenograft experiments, additivity or synergy between EGFR inhibitors and standard cytotoxic therapies results in improved response rates, duration, and survival." *Id.* at 1004. Thus, the POSA would have been motivated with a reasonable expectation of success to combine the method of claim 1 of the '314 patent with radiation.

793.    *Claim 9 of the '314 patent would have been obvious*. Claim 9 of the '314 patent requires: "The method of claim 1, wherein the route of administration is oral." '314 patent, claim 9. As discussed above in this Subsection, the method of claim 1 would have been obvious over NCT00266877 2005 in view of Rabindran 2004.

794.    The additional limitation of claim 9 of the '314 patent, "wherein the route of administration is oral" would also have been obvious over Rabindran 2004. Rabindran 2004 reports that HKI-272 is administered orally. Rabindran 2004 at Abstract ("*In vivo*, HKI-272 is

███████████████████████████

active in HER-2- and EGFR-dependent tumor xenograft models when dosed orally on a once daily schedule.").

### C. The Simultaneous Inventions by Kobayashi *et al.*, Carter *et al.*, and Yoshimura *et al.* Support the Obviousness of the Asserted Claims

795.     The obviousness of the asserted claims of the '162 and '314 patents is further supported by the contemporaneous "invention" of the claimed subject matter by Kobayashi *et al.*, Carter *et al.*, and Yoshimura *et al.* As the applicants purportedly did, Kobayashi *et al.* and Carter *et al.* identified the T790M mutation as a mechanism of gefitinib and/or erlotinib resistance, developed *in vitro* data showing that irreversible inhibitors could inhibit EGFR with the T790M mutation, and concluded that irreversible inhibitors could be useful in treating gefitinib and/or erlotinib resistance. Yoshimura *et al.* went beyond *in vitro* data and collected clinical data on the use of EKB-569 in patients with gefitinib and/or erlotinib resistant NSCLC, also concluding that administering an irreversible inhibitor could be useful in treating such patients.

796.     ***Kobayashi et al.*** Researchers at Beth Israel Deaconess Medical Center, Harvard Medical School, and the Dana-Farber Cancer Institute independently conceived of a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof by administering irreversible EGFR inhibitors that bind to the "cysteine 773 residue in the ligand-binding pocket of EGFR" or "cysteine 805 residue in the ligand-binding pocket of erb-B2" before the earliest applicable priority date of the asserted claims.

797.     At least as early as February 24, 2005, Kobayashi *et al.* recognized that despite the success of gefitinib and erlotinib in patients with NSCLC, "all cases eventually progress despite treatment." Kobayashi NEJM 2005 at 787. Kobayashi *et al.* also identified the

T790M mutation—"an acquired, second mutation in the EGFR gene that conferred resistance to gefitinib." Kobayashi NEJM 2005 at 787–88.

798.    Kobayashi *et al.* also found that an irreversible EGFR inhibitor—CL-387,785—"strongly inhibited EGF-induced phosphorylation" in cell constructs with the T790M mutation. Kobayashi NEJM 2005 at 790. Kobayashi *et al.* recognized that CL-387,785's efficacy in the T790M construct may be attributable to its "covalent binding to EGFR." As explained in paragraph 277, CL-387,785 reportedly forms a covalent bond with the cysteine 773 of the kinase domain of EGFR. *See* Discafani 1999 at 923 ("CL-387,785 alkylates Cys773, which is located in the ATP-binding region of the protein."). To the extent "irreversible [EGFR] inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR, Kobayashi *et al.*'s work related to irreversible EGFR inhibitors that bind to the cysteine in EGFR required by the asserted claims.

799.    Similarly, I understand that Plaintiffs may contend that there is considerable homology between the cysteine 773 residue of EGFR and the cysteine 805 residue of erb-B2 (Plaintiffs' Infringement Contentions at A-6), such that compounds that covalently bind to cysteine 773, such as CL-387,785, will similarly bind to the cysteine 805 residue of erbB-2. To the extent Plaintiffs' theory is correct and to the extent irreversible EGFR inhibitor that covalently binds to "cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 805 in the intracellular region of erb-B2, Kobayashi *et al.*'s work was related to irreversible EGFR inhibitors that bind the residue of erb-B2 required by the asserted claims.

███████████████████████████████████

800.   Having shown that an irreversible EGFR inhibitor inhibited phosphorylation in T790M cell constructs, Kobayashi *et al.* concluded that this result should "motivate the development of ***alternative*** EGFR inhibitors . . . for patients with EGFR-mutant tumors with acquired resistance to anilinoquinazoline inhibitors" and "may guide the selection of second-line EGFR-inhibitor therapy." Kobayashi NEJM 2005 at 791. Gefitinib and erlotinib are "anilinoquinazoline inhibitors." Thus Kobayashi suggests administering alternative EGFR inhibitors—*i.e.*, irreversible EGFR inhibitors that bind to the designated cysteine residues—for the treatment of gefitinib and/or erlotinib resistant NSCLC.

801.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████

802.   The applicants of the '314 patent themselves recognized Kobayashi *et al.*'s parallel discovery in the Kwak 2005 publication. Kwak 2005 at 7670 ("***While this work was in progress***, another irreversible inhibitor of EGFR [CL-387,785, Calbiochem (27)] was shown to inhibit the kinase activity of the T790M EGFR mutant (17).").

803.   ***Carter et al.:*** A group from institutions such as Howard Hughes Medical Center and Memorial Sloan-Kettering Cancer Center, also independently "invented" a method of treating gefitinib and/or erlotinib resistant NSCLC by administering irreversible EGFR inhibitors that covalently bind to "cysteine 773 residue in the ligand-binding pocket of EGFR" or "cysteine

301

███████████████████████████████████

805 residue in the ligand-binding pocket of erb-B2", submitting the results of their work for

publication less than 4 months after the earliest applicable priority date. *See* Carter 2005

(contributed June 13, 2005).

804.    Carter *et al.*, recognized the existence of resistance mutations in patients

treated with gefitinib or erlotinib, including the T790M mutation, and emphasized the importance

of developing "alternative compounds that will be effective against mutated targets resistant to

first-line inhibitors." Carter 2005 at 11011, 11014 ("[T]he T790M mutation results in resistance to

both drugs."). Carter *et al.* screened 47 compounds for the ability to inhibit proliferation of cells

with the T790M mutation, and found that three irreversible inhibitors—CL387,785, EKB-569,

and CI-1033—"showed a significant effect on proliferation." Carter 2005 at 11014. Carter *et al.*

recognized that CI-1033, EKB-569, and CL-387,785 are "known to inhibit EGFR irreversibly."

Carter 2005 at 11016. Indeed, CI-1033, EKB-569, and CL-387,785 have been reported to inhibit

EGFR irreversibly by binding to the cysteine 773 of the kinase domain of EGFR. *See, e.g.*, ¶¶

247, 253, 271, 277, 303, 312. CI-1003 and EKB-569 also reportedly bind to the cysteine 784/805

of erbB-2. *See, e.g.*, ¶¶ 247, 253, 277, 304, 312. To the extent "irreversible [EGFR] inhibitor that

covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses

irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and

irreversible EGFR inhibitor that covalently binds to "cysteine 805 residue in the ligand-binding

pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 784/805 in

the intracellular region of erb-B2, Carter *et al.*'s work was related to irreversible EGFR inhibitors

that bind the residues required by the asserted claims.

805.    At the time Carter *et al.* published their work, CI-1033 and EKB-569 had

already completed phase I clinical trials. Carter 2005 at 11011. Carter *et al.* concluded that "[t]he

███████████████████████████████

finding that EGFR inhibitors already in clinical trials can inhibit EGFR (L858R/T790M) *suggests that refractory or relapsed patients with the T790M mutation may benefit from treatment with EKB-569 or CI-1033.*" Carter 2005 at 11016. Carter *et al.* thus suggested a method of treating patients with gefitinib and/or erlotinib resistant NSCLC through administration of EKB-569 or CI-1033. *See also* Carter 2005 at 11016 ("[T]his approach [could] help lead quickly to new treatment options for patients with resistance mutations . . . .").

806.    Carter *et al.*'s discovery was independent of the work performed by the applicants. *See* Carter 2006 at 11016 ("*While this manuscript was under review*, EKB-569 and HKI-272 were independently reported as potent inhibitors of EGFR variants with the T790M mutation.") (citing Kwak 2005).

807.    *Yoshimura et al.*: Naruo Yoshimura *et al.* also independently conceived of a method of treating gefitinib resistant NSCLC by administering an irreversible EGFR inhibitor that covalently binds to "cysteine 773 residue in the ligand-binding pocket of EGFR" or "cysteine 805 residue in the ligand-binding pocket of erb-B2." Yoshimura *et al.* began investigating the use of EKB-569—one of the three inhibitors discussed in the '314 patent—in patients with gefitinib and/or erlotinib resistant NSCLC at least as early as March 2003, and submitted the study results for publication less than 6 months after the earliest applicable priority date. *See* Yoshimura 2005 at 365 (Case #1: Patient who received gefitinib and experienced disease progression entered the phase I study of EKB-569 in March 2003). Yoshimura *et al.* recognized that "EKB-569 may provide certain advantages over other EGFR inhibitors" including because it "is an irreversible inhibitor of EGFR, while other small molecule EGFR inhibitors bind EGFR reversibly." Yoshimura 2005 at 364. As of March 2003, it had been reported that EKB-569 acted as an irreversible inhibitor by binding to the cysteine 773 of the kinase domain of EGFR and cysteine

████████████████████████

805 of erbB-2. *See, e.g.*, ¶ 312. To the extent "irreversible [EGFR] inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR" encompasses irreversible EGFR inhibitors that bind to the cysteine 773 in the intracellular region of EGFR and irreversible EGFR inhibitor that covalently binds to "cysteine 805 residue in the ligand-binding pocket of erb-B2" encompasses irreversible EGFR inhibitors that bind to the cysteine 805 in the intracellular region of erb-B2, Yoshimura *et al.*'s work was related to irreversible EGFR inhibitors that bind the residues required by the asserted claims.

808.    Yoshimura *et al.* determined that EKB-569 was "effective in . . . two patients after resistance to gefitinib." Yoshimura 2005 at 366. Having shown EKB-569 "had clinical activity in two patients with advanced non-small cell lung cancer with EGFR mutations and acquired gefitinib resistance," Yoshimura *et al.* concluded that "irreversible EGFR inhibitors may be an effective therapy for patients with EGFR-mutant advanced non-small cell lung cancer who have relapsed after treatment with gefitinib." Yoshimura 2005 at 367. As with Kobayashi *et al.* and Carter *et al.*, Yoshimura *et al.* thus suggested a method of treating patients with gefitinib and/or erlotinib resistant NSCLC through administration of an irreversible EGFR inhibitor that covalently binds to cysteine 773 residue of EGFR.

809.    Yoshimura *et al.*'s use of EKB-569 in a method of treating gefitinib and/or erlotinib resistant cancer, and their recognition that irreversible EGFR inhibitors could be an effective therapy in patients with resistance to gefitinib before and around the earliest applicable priority date are further evidence that the asserted claims were obvious.

XVI.    **CONCLUSION**

810.    For the reasons set forth above, it is my opinion that the asserted claims are invalid. As I have explained, the asserted claims are not entitled to claim priority to either the

████████████████████████████

'483 or '989 provisional and therefore the earliest priority date to which the asserted claims are entitled is February 2, 2006.

811.     The asserted claims are invalid because they are not enabled. The specification of the patents-in-suit fails to enable the POSA to make and use the full scope of the claimed method, including determining what compounds function as required by the asserted claims and determining the unit dose for any particular compound.

812.     The asserted claims are also invalid because they are not adequately described. The specification of the patents-in-suit fails to describe irreversible EGFR inhibitors that fall within the claimed method or the method of using those irreversible EGFR inhibitors to treat patients having gefitinib and/or erlotinib resistant NSCLC.

813.     To the extent the asserted claims are enabled and adequately described, they are invalid as either anticipated or rendered obvious by the prior art. Irreversible EGFR inhibitors had been used to treat patients with gefitinib resistant NSCLC—and such uses has been discussed in the art—well before any applicable priority date.

## XVII.  SUPPLEMENTATION

814.     All of my opinions set forth above are based on my review of the patents-in-suit, the materials listed in the Materials Considered in Exhibit J, and my professional experience. I reserve the right to modify my opinions, if necessary, based on further review and analysis of evidence in this case, including review and analysis of any information that may be provided to me subsequent to the date of this report. Any such modifications or supplementation would be reflected in any testimony I might give. I also reserve the right to prepare demonstratives, charts, and other visual aids for use at any subsequent hearings or at trial.

# EXHIBIT A

# CURRICULUM VITAE

## Paul J. Reider, Ph.D.
United States of America Citizenship

**BUSINESS**
Princeton University
Department of Chemistry
Frick Laboratory
Princeton, NJ 08544
(609) 258-5027
e-mail: **preider@princeton.edu**



## EMPLOYMENT HISTORY

| **PRINCETON UNIVERSITY** | **From — To** |
|---|---|
| Lecturer at the Rank of Professor | 7/15 - 6/21 [Retired] |
| Department of Chemistry | |
| | |
| Pharmaceutical Specialist & Lecturer | 8/08-7/15 |
| Department of Chemistry | |

| **AMGEN, INC.** | **From – To** |
|---|---|
| Vice President, | 4/02 – 11/07 |
| Chemistry Research & Discovery | |

| **MERCK/MRL** | **From – To** |
|---|---|
| Vice President, Process Research | 2/95 -  4/02 |
| Executive Director | 2/91 -  1/95 |
| Director | 5/89 -  2/91 |
| Assistant Director | 1/87 -  5/89 |
| Research Fellow | 5/84 -  12/86 |
| Senior Research Chemist | 9/80 -  5/84 |

**EDUCATION**

| School | Date | Major/Minor/Courses | Degree |
|---|---|---|---|
| Washington Square College (NYU) | 1972 | Psychology/Chemistry | A. B. |
| University of Vermont | 1978 | Organic Chemistry | Ph.D. |
| Colorado State University | 1978-1980 | NIH Postdoctoral Fellow | |

## ACADEMIC AND PROFESSIONAL HONORS

17.   2011 National Academy of Sciences Award for *Chemistry in Service to Society* (May 2011)
16.   B. R.  Baker Memorial Lecturer of 2006 – June 2006
15.   Earle B. Barnes Award for Leadership in Chemical Research (ACS National Award) -2003
14.   Novartis Chemistry Lectureship – 2003
13.   Senior Editor – "Science of Synthesis"  -- 2003 -- present

12.   Prix Galien 2000 Innovative Product Award – June 2000 (Singulair™)
11.   Prix Galien 2000 Research Team Award- June 2000 (Singulair™)
10.   Merck Board of Directors Scientific Award – 1998 (Crixivan™)
9.    Senior Editor - "Current Opinion in Drug Discovery & Development"
8.    National Research Council - Board of Chemical Sciences & Technology (1998-2001)
7.    Herman S. Bloch Memorial - University of Chicago – 1996
6.    Chair - 1996 Gordon Research Conference - Heterocyclic Compounds
5.    Vice Chair - 1995 Gordon Research Conference - Heterocyclic Compounds
4.    NSF Workshop on Synthesis July 1988
3.    MRL Ambassador Program (to Colorado State University) (1982-1990)
2.    Merck Speakers List (1982 - 2002)
1.    National Research Service Award (NIH Postdoctoral Fellow) 1979-1980

## EDITORIAL AND ADVISORY BOARDS

12.   Medicines for Malaria Venture  -- Expert Scientifc Advisory Committee  -2010 -- present
11.   TB Alliance  -- Scientific Advisory Committee  - 2010 - present
10.   Emory Institute For Drug Discovery – Advisory Board  - 2009 – 2013
9.    Tetraphase Pharmaceuticals  --  Scientific Advisor   2009 -- present
8.    Satori Pharmaceuticals  -- Advisory Board  -- 2009 -- 2013
7.    Chemical & Engineering News Advisory Board – 2006 to 2009
6.    ACS Executive Directors' 2010 Committee – 2004 to present
5.    Steering Committee BCST – Challenges for the Chemical Sciences in the 21st Century – 2003
4.    Steering Committee & BCST – Challenges for the Chemical Sciences in the 21st Century – Workshop on Health and Medicine (National Research Council) – 2002
3.    Editorial Advisory Board – "Journal Organic Chemistry"
2.    Editorial Advisory Board - "Organic Letters"
1.    Editorial Advisory Board – Journal of the American Chemical Society

## ACADEMIC VISITING COMMITTEES

3.  Chemical Engineering Advisory Board, University of California Santa Barbara
2.  Member – California Institute of Technology Division of Chemistry & Chemical Engineering
1.  Harvard Overseers' Committee to Visit the Department of Chemistry & Chemical Biology

## PUBLICATIONS

182.   **Diastereoselective syntheses of substituted cis-hydrindanones featuring sequential inter-and intramolecular Michael reactions**; **J** Liu, MA Marsini, TA Bedell, PJ **Reider**, EJ Sorensen - Tetrahedron, 72, 3713, 2016

181.   **Targeting NAD+ Metabolism in the Human Malaria Parasite *Plasmodium falciparum***           Jessica K. O'Hara, Lewis J. Kerwin, Simon A. Cobbold, Jonathan Tai, Thomas A. Bedell, Paul J. Reider,  Manuel Llinás;  PLoS ONE; 2014 April; 9(4):e94061

180. **Highly Loaded Nanoparticulate formulation of Progesterone for Emergency Traumatic brain Injury Treatment; Carlos E. Figueroa, Paul J. Reider, Panee Burckel, A. Alan Pinkerton & Robert K. Prud'homme; *Therapeutic Delivery;* 2012, 3 (11), p.1269**

179. **A Concise and Convergent Synthesis of PA-824  Maurice A. Marsini, Paul J. Reider*, and Erik**

J. Sorensen*; *J. Org. Chem.*, 2010, *75* (21), pp 7479–7482

178. **Stereoselective Synthesis of *anti*-*N*-Protected 3-Amino-1,2-epoxides by Nucleophilic Addition to *N-tert*-Butanesulfinyl Imine of a Glyceraldehyde Synthon[†]** Scott S. Harried, Michael D. Croghan, Matthew R. Kaller, Patricia Lopez, Wenge Zhong, Randall Hungate and Paul J. Reider *J. Org. Chem.*, 2009, *74* (16), pp 5975–5982

177. "Practical synthesis of the calcimimetic agent, cinacalcet", Tetrahedron Letters, (2008), 49(1), 13, Oliver R. Thiel·, Charles Bernard, Wanda Tormos, Alan Brewin, Shuji Hirotani[a], Kazuo Murakami[a], Kenji Saito[a], Robert D. Larsen[a], Michael J. Martinelli[a] and Paul J. Reider[a]

176. "Design, Synthesis, and Biological Evaluation of Potent c-Met Inhibitors", J. Med.Chem, (2008), *51* (18), 5766–5779, Noel D. D'Angelo[*,‡], Steven F. Bellon[‡], Shon K. Booker[‡], Yuan Cheng[‡], Angela Coxon[§], Celia Dominguez[‡], Ingrid Fellows[‡], Douglas Hoffman[¶], Randall Hungate[‡], Paula Kaplan-Lefko[§], Matthew R. Lee[‡], Chun Li[⊥], Longbin Liu[‡], Elizabeth Rainbeau[‡], Paul J. Reider[‡], Karen Rex[§], Aaron Siegmund[‡], Yaxiong Sun[‡], Andrew S. Tasker[‡], Ning Xi[‡], Shimin Xu[‡], Yajing Yang[§], Yihong Zhang[§], Teresa L. Burgess[§], Isabelle Dussault[§] and Tae-Seong Kim

175. "An Integrated High-Throughput Screening Approach for Purification of Solid Organic Compounds by Trituration and Crystallization in Solvents", Organic Process Research & Development (2008), 12, 58–65, Helming Tan,* Maggie Reed, Kyung H. Gahm, Tony King, Mina Dilmeghani Seran, Tracy Bostick, Van Luu, David Semin, Janet Cheetham, Rob Larsen, Mike Martinelli, and Paul Reider

174. "Identification of a Nonpeptidic and Conformationally Restricted Bradykinin B1 Receptor Antagonist with Anti-Inflammatory Activity", J. Med. Chem, (2007), 50, 607-610, D. D'Amico, T. Aya, J. Human, C. Fotsch, J.J. Chen, K. Biswas, B. Riahi, M.H. Norman, C.A. Willoughby, R. Hungate, P.J. Reider, G. Biddlecome, D Lester-Zeiner, C. Van Staden, E. Johnson, A. Kamassah, L. Arik, J. Wang, V.N. Viswanadhan, R.D. Groneberg, J. Zhan, H. Sizuke, A. Toro, D.A. Mareska, D.E. Clarke, D.M. Harvey, L.E. Burgess, E.R. Laird, B. Askew, G. Ng

173. "New Air-Stable Catalysts for General and Efficient Suzuki-Miyaura Cross-Coupling Reactions of Heteroaryl Chlorides", Organic Letters, (2006), 8,9, 1787-1789, A.S. Guram, A.O. King, J.G. Allen, X. Wang, L.B. Schenkel, J. Chan, E.E. Bunel, M.M. Faul, R.D. Larsen, M.J. Martinelli, P.J. Reider

172. A Practical Synthesis of 2-((Pyrrolo[2,3-b]pyridine-4yl)methylamino)-5-fluoronicotinic Acid, J. Org. Chem, 2006, 71, 4021-4023, X Wang, B Zhi, J Baum, Y. Chen, R. Crockett, L. Huang, S. Eisenberg, J. Ng, R. Larsen, M. Martinelli, P.J. Reider

171. "Effect of Microwave Heating on Ullmann-Type Heterocycle-Aryl Ether Synthesis Using Chloro-Heterocycles", Tetrahedron Letters, (2006), 47,29, 5045-5048, N.D. D'Angelo, J.J. Peterson, S.K. Booker, I. Fellows, C. Dominguez, R. Hungate, P.J. Reider, T-S. Kim

170. "A Highly Enantioselective Catalyst for Asymmetric Hydroformylation of [2.2.1]-Bicyclic Olefins", Tetrahedron Letters, (2005), 46,45, 7831-7834, J. Huang, E. Bunel, A. Allgeier, J. Tedrow, T. Storz, J. Preston, T. Correll, D. Manley, T. Soukup, R. Jensen, P.J. Reider

169. "A Soluble Base for the Copper-Catalyzed Imidazole N-Arylations with Aryl Halides", J. Org. Chem., 2005, 70, 10135-10138, L. Liu, M. Frohn, N. Xi, C. Dominguez, R. Hungate, P.J. Reider

| 168. | "Synthesis of a Substance P Antagonist:  An Efficient Synthesis of 5-Substituted-4-*N,N*-dimethylamino-1,2,3-triazoles", <u>Organic Process Research & Development</u>, 2005, 9,4,  490-498, M. Journet, D. Cai, D.L. Hughes, J.J. Kowal, R.D. Larsen, P.J. Reider |
|---|---|
| 167. | "Regio-Controlled Synthesis of *N*-substituted Imidazoles", <u>Tetrahedron Letters,</u> (2005), 46,43, 7315-7319, N. Xi, S. Xu, Y. Cheng, A.S. Tasker, R.W. Hungate, P.J. Reider |
| 166. | "An Efficient Synthesis of an $\alpha_v\beta_3$ Antagonist", <u>J. Org.Chem.</u>, 2004, 69, 1959-1966, N. Yasuda, Y. Hsiao, M.S. Jensen, N.R. Rivera, C. Yang, K.M. Wells, J. Yau, M. Palucki, L. Tan, P.G. Dormer, R.P. Volant, D.L. Hughes, P.J. Reider |
| 165. | "Efficient Synthesis of NK$_1$ Receptor Antagonist Aprepitant Using a Crystallization-Induced Diastereoselective Transformation", <u>J. Am. Chem. Soc.</u>, 2003, 125, 2129-3135, K.M.J. Brands, J.F. Payack, J.D. Rosen, T.D. Nelson, A. Candelario, M.A. Huffman, M.M. Zhao, J. Li, B. Craig, Z.J. Song, D.M. Tschaen, K. Hansen, P.N. Devine, P.J. Pye, K. Rossen, P.G. Dormer, R.A. Reamer, C.J. Welch, D.J. Mathre, N.N. Tsou, J.M. McNamara, P.J. Reider |
| 164. | "Highly Regioselective Friedländer Annulations with Unmodified Ketones Employing Novel Amine Catalysts:  Syntheses of 2-Substituted Quinolines, 1,8-Naphthyridines, and Related Heterocycles", <u>J. Org. Chem.</u>, 2003, 68, 467-477, P.G. Dormer, K.K. Eng, R.N. Farr, G.R. Humphrey, J.C. McWilliams, P.J. Reider, J.W. Sager, R.P. Volante |
| 163. | "A Practical Synthesis for the Core Structure of a Family of Selective Prostaglandin D$_2$ Receptor Antagonists", <u>J. Org. Chem.</u>, 2003, 68, 2338-2342, K.R. Campos, M. Journet, D. Cai, J.J. Kowal, S. Lee, R.D. Larsen, P.J. Reider |
| 162. | "Novel synthesis of sulfones from $\alpha$, $\alpha$-dibromomethyl aromatics", <u>Tetrahedron Letters</u> (2003), 44, 1283-1286, Feng Xu, Kimberly Savary, J. Michael Williams, E.J.J. Grabowski, P.J. Reider. |
| 161. | "Practical Routes to the Triarylsulfonyl Chloride Intermediate of a ß$_3$ Adrenergic Receptor Agonist", <u>Tetrahedron Letters </u>(2003), 59,8, 1317-1325, N. Ikemoto, J Liu, K.M.J. Brands, J.M. McNamara and P.J. Reider |
| 160. | "Preparation of a Clinically Investigated Ras Farnesyl Transferase Inhibitor", <u>J of Heterocyclic Chemistry</u>, (2003), 40, 229-241, P.E. Maligres, M.S. Waters, S.A. Weissman, J.C. McWilliams, S Lewis, J Cowen, R.A. Reamer, R.P. Volante, P.J. Reider, D Askin |
| 159. | "An Efficient Synthesis of a Doxorubicin-Peptide Conjugate", <u>Synlett</u> (2003), 05, Y-J Shi, M Cameron, U.H. Dolling, D.R. Lieberman, J.E. Lynch, R.A.Reamer, M.A. Robbins, R.P. Volante, P.J. Reider |
| 158. | "A Stereoselective Aldol Reaction Via Diisopinocampheyl Boron-Enolate in Preparation of Chromane Carboxylate with Quaternary Carbon", <u>Tetrahedron Letters</u>, (2003), 44,28, 5285-5288, F. Lang, D. Zewge, Z.J. Song, B. Mirlinda, P. Dormer, D. Tschaen, R.P. Volante, P.J. Reider |
| 157. | "Asymmetric Synthesis of Cyclic Hydroxy Ketones Derived from Enol Ethers via Sharpless Asymmetric Dihydroxylation. A Study in the Correlation of the Enol Ether Chain Length and Enantioselectivity.", <u>J. Org. Chem.</u> (2003)**,** 68, 8088, Benjamin F. Marcune, Sandor Karady, Paul J. Reider, Ross A. Miller, Mirlinda Biba, Lisa DiMichele, and Robert A. Reamer. |
| 156. | "Stereoselective Synthesis from a Process Research Perspective",  <u>Drug Discovery Today</u>, (2002) 7,5, 303-314, M.C. Hillier, P.J. Reider |

| | |
|---|---|
| 155. | "Efficient One-Pot Synthesis of the 2-Aminocarbonylpyrrolidin-4-ylthio-Containing Side Chain of the New Broad-Spectrum Carbapenem Antibiotic Ertapenem", 2002, J. Org. Chem., 67, 4771-4776, K.M.J. Brands, R.B. Jobson, K.M. Conrad, J.M. Williams, B. Pipik, M. Cameron, A.J. Davies, P.G. Houghton, M.S. Ashwood, I.F. Cottrell, R.A. Reamer, D.J. Kennedy, U-H. Dolling, P.J. Reider |
| 154. | "Solvent-Dependent Dynamic Kinetic Asymmetric Transformation/Kinetic Resolution in Molybdenum-catalyzed Asymmetric Allylic Alkylations", 2002, J. Org. Chem., 67, 2762-2768, D.L. Hughes, M. Palucki, N. Yasuda, R.A. Reamer, P.J. Reider |
| 153. | "Development of a New and Practical Route to Chiral 3,4-Disubstituted Cyclopentanones: Asymmetric Alkylation and Intramolecular Cyclopropanation as Key C-C Bond-Forming Steps", 2002, J. Org. Chem., 67, 5508-5516, M. Palucki, J.M. Um, N. Yasuda, D.A. Conlon, F-R Tsay, F.W. Hartner, Y. Hsiao, B Marcune, S. Karady, D.L. Hughes, P.G. Dormer, P.J. Reider |
| 152. | "Efficient Synthesis of 6-mono-bromo-1,1'-bi-2naphthol", Tetrahedron Letters (2002), 43,22, 4055-4057, D Cai, R.D. Larsen, P.J. Reider. |
| 151. | "Practical Enantioselective Synthesis of a COX-2 Specific Inhibitor", Tetrahedron Letters, (2002), 58,37, 7403-7410, L Tan, C-Y Chen, W Chen, L Frey, A.O. King, R.D. Tillyer, F Xu, D Zhao, E.J.J. Grabowski, P.J. Reider, et al. |
| 150. | "Aza-Diels-Alder/intramolecular Heck Cyclization Approach to the Tetrahydro-ß-Carboline Skeleton of the Ajmaline/Sarpagine Alkaloids", Tetrahedron Letters (2002), 43,21, 3871-3874, J.T. Kuethe, A. Wong, I.W. Davies, P.J. Reider |
| 149. | "Asymmetric Aza-Diels-Alder Reactions of Indole 2-carboxaldehydes", Tetrahedron Letters (2002), 43,1, 29-32, J.T. Kuethe, I.W. Davies, P.G. Dormer, R.A. Reamer, D.J. Mathre, P.J. Reider |
| 148. | "Practical Asymmetric Synthesis of Aprepitant, a Potent Human NK-1 Receptor Antagonist, via a Stereoselective Lewis Acid-Catalyzed Trans Acetalization Reaction, J. Org. Chem. (2002), 67, 6743-6747, M.M. Zhao, J.M. McNamara, G-J Ho, K.M. Emerson, Z.J. Song, D.M. Tschaen, K.M.J. Brands, U-H. Dolling, E J.J. Grabowski, P.J. Reider. |
| 147. | "A general method for the highly diastereoselective, kinetically controlled alkylation of (+)-nopinone", Tetrahedron Letters (2002), 43, 6957-6959, K.R. Campos, S. Lee, M. Journet, J.J. Kowal, D. Cai, R.D. Larsen, P.J. Reider. |
| 146. | "Effective Lithiation of 3-Bromopyridine: Synthesis of 3-Pyridine Boronic Acid and Variously 3-Substituted Pyridines", Tetrahedron Letters (2002), 43, 4285, D. Cai, R.D. Larsen, P.J. Reider. |
| 145. | "Efficient Synthesis of the Optically Active Dihydropyrimidinone of a Potent a1A-Selective Adrenoceptor Antagonist", Can J. Chem (2002), 80, 646, D.R. Sidler, N Barta, W Li, E Hu, L mtty, N. Ikemoto, J.S. Campbell, M. Chartrain, K. Gbewonyo, R. Boyd, E.G., Corley, R.G. Ball, R.D. Larsen, P.J. Reider. |
| 144. | "Asymmetric Synthesis of 1,2,3-Trisubstituted Cyclopentanes and Cyclohexanes as Key Compenents of Substance P Antagonists", J. Org. Chem. (2002), 67, 5993-6000, J.T. Kuethe, A. Wong, J Wu, I.W. Davies, P.G. Dormer, C.J. Welch, M.C. Hillier, D.L. Hughes, P.J. Reider. |
| 143. | "Experimental and Theoretical Studies on the Oxidative Addition of Palladium(0) to ß-chlorovinamidinium salts", Tetrahedron Letters, (2001), 57,24, 5061-5066, I.W. Davies, J Wu, J-F |

| | |
|---|---|
| | Marcoux, M Taylor, D Hughes, P.J. Reider and R.J. Deeth |
| 142. | "Asymmetric Synthesis of *cis*-aminochromanol", Tetrahedron Letters, (2001), 42,50, 8743-8745, K.B. Hansen, P. Rabbat, S.A. Springfield, P.N. Devine, E.J.J. Grabowski, P.J. Reider |
| 141. | "Radical Alkylation of *N*-alkyl 1,2,4-triazoles", Tetrahedron Letters, (2001), 42,42, 7353-7355, K.B. Hansen, P.Rabbat, S.A. Springfield, R. Desmond, P.N. Devine, E.J.J. Grabowski, P.J. Reider |
| 140. | "Asymmetric Synthesis of (2S,3S)-3-hydroxy-2-phenylpiperidine Via Ring Expansion", Tetrahedron Letters, (2001), 42,36, 6223-6225, J. Lee, T. Hoang, S. Lewis, S.S. Weissman, D. Askin, R.P. Volante, P.J. Reider |
| 139. | "A Highly Efficient Synthesis of 2-[3-aminopropyl]-5,6,7,8-tetrahydronaphthyridine via a Double Suzuki Reaction and a Chichibabin Cyclization", Tetrahedron Letters (2001), 42, 6811, M. Palucki, D.L. Hughes, N. Yasuda, C. Yang, P.J. Reider. |
| 138. | "Practical Routes Toward the Synthesis of 2-halo- and 2-alkylamino-4-pyridine-carboxaldehydes", Tetrahedron Letters (2001), 42, 6815, L.F. Frey, K. Marcantonio, D.E. Frantz, J.A. Murry, R.D. Tillyer, E.J.J. Grabowski, P.J. Reider. |
| 137. | "A General Preparation of Pyridines and Pyridones via the Annulation of Ketones and Esters", J. Org. Chem. (2001), 66(12), 4194-4199, J-F. Marcoux, F-A. Marcotte, J. Wu, P. Dormer, I.W. Davies, D. Hughes, P.J. Reider. |
| 136. | "Controlled Semihydrogenation of Aminoalkynes Using Ethylenediamine as a Poison of Lindlar's Catalyst", J. Org. Chem. (2001), 66(10), 3634-3635, K.R. Campos, D. Cai, M. Journet, J.J. Kowal, R.D. Larsen, P.J. Reider. |
| 135. | "Highly Regioselective Friedlaender Reaction", Org. Lett. (2001), 3(8), 1101-1103, Y. Hsiao, N.R. Rivera, N. Yasuda, D.L. Hughes, P.J. Reider. |
| 134. | "Molybdenum-catalyzed Asymmetric Allylic Alkylation Reactions Using Mo(CO)6 asPrecatalyst", Adv. Synth. Catal. (2001), 343(1), 46-50, M. Palucki, J.M. Um, D.A. Conlon. N. Yasuda, D.L. Hughes, B. Mao, J. Wang, P.J. Reider. |
| 133. | "A Double Ring Closing Metathesis Reaction in the Rapid, Enantioselective Synthesis of NK-1 Receptor Antagonists", Org Lett. (2001), 3(5), 671-674, D.J. Wallace, J.M. Goodman, D.J. Kennedy, A.J. Davies, C.J. Cowden, M.S. Ashwood, I.F. Cottrell, U.H. Dolling, P.J. Reider. |
| 132. | "Asymmetric Bioreductions: Application to the Synthesis of Pharmaceuticals", J. Mol., Catal. B: Enzym. (2001), 11(4-6), 503-512, M. Chartrain, R. Greasham, J. Moore, P.J. Reider, D. Robinson, B. Buckland. |
| 131. | ".beta.-Regioselective Intermolecular Heck Arylation of N,N-disubstituted Allylamines", Tetrahedron Lett. (2001), s42(2), 159-162, J. Wu, J-F. Marcoux, I.W. Davies, P.J. Reider. |
| 130. | "A General [3 + 2 + 1] Annulation Strategy for the Preparation of Pyridine N-oxides", Org. Lett. (2001), 3(2), 209-211, I.W. Davies, J-F. Marcoux, P.J. Reider. |
| 129. | "Preparation and Novel Reduction Reactions of Vinamidinium Salts", J. Org. Chem. (2001), 66(1), 251-255, I.W. Davies, M. Taylor, J-F. Marcoux, J. Wu, P.G. Dormer, D. Hughes, P.J. Reider. |

| 128. | "Improved Method for Rapid Evaluation of Chiral Stationary Phase Libraries", Org. Lett. (2001), 3(1), 95-98, C.J. Welch, S.D. Pollard, D.J. Mathre, P.J. Reider. |
| 127. | "Stereoselective Hydrogen Bromide-promoted Hydrogenation of an .alpha.-hydroxy Oxime", Tetrahedron Lett. (2000), 41(42), 8021-8025, I.W. Davies, M. Taylor, J-F. Marcoux, L. Matty, J. Wu, D. Hughes, P.J. Reider. |
| 126. | "Highly Enantioselective 1,2-Addition of Lithium Acetylide –Ephedrate Complexes: Spectroscopic Evidence for Reaction Proceeding via a 2:2 Tetramer, and X-ray Characterization of Related Complexes", J. Am. Chem. Soc. (2000), 122(45), 11212-11218, F. Xu, R.A. Reamer, R. Tillyer, J.M. Cummins, E.J.J. Grabowski, D.B. Collum, J.C. Huffman, P.J. Reider. |
| 125. | "A Practical Synthesis of a COX-2-Specific Inhibitor", J. Org. Chem. (2000), 65(25), 8415-8420, I.W. Davies, J-F. Marcoux, E.G. Corley, M. Journet, D-W. Cai, M. Palucki, J. Wu, R.D. Larsen, K. Rossen, P.J. Pye, L. DiMichele, P. Dormer, P.J. Reider. |
| 124. | "Hydrogen Iodide-Promoted Reduction of .beta.-Chlorovinamidinium Salts", Org. Lett. (2000), 2(21), 3385-3387, I.W. Davies, M. Taylor, D. Hughes, P.J. Reider |
| 123. | "Practical Modifications and Applications of the Sharpless Asymmetric Aminohydroxy-lation in the One-Pot Preparation of Chiral Oxazolidine-2-Ones", Org. Lett. (2000), 2(18) 2821-2824, N.S. Barta, D.R. Sidler, K.B. Somerville, S.A. Weissman, R.D. Larsen, P.J. Reider. |
| 122. | "Highly Asymmetric Dihydroxylation of 1-aryl-1'-pyridyl alkenes", Tetrahedron Lett. (2000), 41(25), 4865-4869, X. Wang, M. Zak, M. Maddess, P. O'Shea, R. Tillyer, E.J.J. Grabowski, P.J. Reider. |
| 121. | "Annulation of Ketones with Vinamidinium Hexafluorophosphate Salts:  An Efficient Preparation of Trisubstituted Pyridines", Org. Lett. (2000), 2(15), 2339-2341, J-F. Marcoux, E.G. Corley, K. Rossen, P. Pye, J. Wu, M.A. Robbins, I.W. Davies, R.D. Larsen, P.J. Reider. |
| 120. | "Selective Monolithiation of 2,5-dibromopyridine with butyllithium", Tetrahedron Lett. (2000), 41(22), 4335-4338, X. Wang, P. Rabbat, P. O'Shea, R. Tillyer, E.J.J. Grabowski, P.J. Reider. |
| 119. | "An Efficient Preparation of Vinamidinium Hexafluorophosphate Salts", J. Org. Chem. (2000), 65(15), 4571-4574, I.W. Davies, J-F. Marcoux, J. Wu, M. Palucki, E.G. Corley, M.A. Robbins, N. Tsou, R.G. Ball, P. Dormer, R.D. Larsen, P.J. Reider. |
| 118. | "Rhodium-carbenoid-mediated Intermolecular O-H Insertion Reactions:  A Dramatic Additive Effect.  Application in the Synthesis of an Ascomycin Derivative", Tetrahedron Lett. (2000), 41(12), 1877-1881, T. Nelson, Z.J. Song, A.S. Thompson, M. Zhao, DeMarco, R.A. Reamer, M.F. Huntington, E.J.J. Grabowski, P.J. Reider. |
| 117. | "Synthesis of an Anti-Methicillin-Resistant Staphylococcus Aureus (MRSA) Carbapenem via Stannatrane-Mediated Stille Coupling", Org. Lett. (2000), 2(8), 1081-1084, M.S. Jensen, Yang, Y. Hsiao, N. Rivera, K.M. Wells, J.Y. Chung, N. Yasuda, D.L. Hughes, P.J. Reider |
| 116. | "A Practical and Efficient Preparation of the Releasable Naphthosultam Side Chain of a Novel Anti-MRSA Carbapenem", J. Org. Chem. (2000), 65(5), 1399-1406, R.A. Miller, G.R. Humphrey, D.R. Lieberman, S.S. Ceglia, D.J. Kennedy, E.J.J. Grabowski, P.J. Reider. |
| 115. | "Rapid Assembly of Substituted Dihydrocyclohepta[3,4]pyrrolo[1,2-a]indoles via Novel, Carbene-Based, Rearrangement Reaction, J. Am. Chem. Soc. (2000), 122(6), 1215-1216, L.F. Frey, R.D. |

| | Tillyer, S.G. Ouellet, R.A. Reamer, E.J.J. Grabowski, P.J. Reider. |
|---|---|
| 114. | "Bioreactor Systems in Drug Metabolism:  Synthesis of Cytochrome P450-Generated Metabolites", <u>Metabolic Engineering</u>  (2000), 115-125, T.H. Rushmore, P.J. Reider, D. Slaughter, C. Assang, M. Shou. |
| 113. | "Practical Asymmetric Synthesis of an Endothelin Receptor Antagonist", <u>J. Org. Chem.</u> (1999), 64(26), 9658-9667, Z.J. Song, M. Zhao, R. Desmond, P. Devine, D.M. Tschaen, R. Tillyer, L. Frey, R. Heid, F. Xu, B. Foster, J. Li, R. Reamer, R. Volante, E.J.J. Grabowski U.H. Dolling, S. Okada, Y. Kato, E. Mano, P.J. Reider. |
| 112. | "Efficient and Practical Synthesis of a Potent anti-MRSA.beta.-Methylcarbapenem Containing a Releasable Side Chain", <u>J. Am. Chem. Soc.</u> (1999), 121(49), 11261-11266, G.R. Humphrey, R.A. Miller, P.J. Pye, K. Rossen, R.A. Reamer, A. Maliakal, S.S. Ceglia, E.J.J. Grabowski, R.P. Volante, P.J. Reider. |
| 111. | "Sequential Nitromethane Conjugate Addition/Elimination-Pd-Catalyzed Allylation of .beta.-Trifloxy Acrylates.  Application to Carbapenem Synthesis", <u>Org. Lett.</u> (1999), 1(11), 1783-1785, J.Y.L. Chung, E.J.J. Grabowski, P.J. Reider. |
| 110. | "A highly Convergent Synthesis of a Fibrinogen Receptor Antagonist", <u>J. Org. Chem.</u> (1999), 64(21), 7751-7755, F.W. Hartner, R.J. Cvetovich, F-R. Tsay, J.S. Amato, B. Pipik, E.J.J. Grabowski, P.J. Reider. |
| 109. | "Practical Chemoenzymatic Synthesis of a 3-pyridylethanolamino.beta.3 adrenergic receptor Agonist", <u>Tetrahedron Lett.</u> (1999), 40(37), 6739-6743, J.Y.L. Chung, G-J, Ho, M. Chatrain, Roberge, D. Zhao, J. Leazer, R. Farr, M. Robbins, K. Emerson, D.J. Mathre, J.M. McNamara, D.L. Hughes, E.J.J. Grabowski, P.J. Reider. |
| 108. | "Enantioselective Alkynylation of Aromatic Aldehydes Catalyzed by Readily Available Chiral Amino Alcohol-Based Ligands", <u>Synthesis</u> (1999), (Spec. Iss.), 1453-1458, Z. Li, V. Upadhyay, A.E. DeCamp, L. DiMichele, P.J. Reider. |
| 107. | "(1S,2R)-1-aminoindan-2-ol (1H-inden-2-ol, 1-amino-2,3-dihydro-(1S-cis)-)", <u>Org. Synth.</u> (1999), 76, 46-56, J.F. Larrow, E. Roberts, T.R. Verhoeven, K.M. Ryan, C.H. Senanayake, E.N. Jacobsen, P.J. Reider. |
| 106. | "(R )-(+)- and (S)-(-)-2,2'-bis(diphenylphosphino)-1,1'binaphyl (BINAP) (phosphine, [1,1'binaphthalene]-2,2'diylbis[diphenyl-, (R ) and (S))", <u>Org. Synth.</u> (1999), 76, 6-11, D. Cai, J.F. Payack, D.R. Bender, D.L. Hughes, T.R. Verhoeven, P.J. Reider. |
| 105. | "Synthesis of benzofuroquinolizine for .alpha.-2 adrenoceptor antagonsit MK-912:  an O-analogue of the Pictet-Spengler reaction", <u>Tetrahedron Lett.</u> (1999), 40(27), 4917-4920, J. Albaneze-Walker, K. Rossen, R.A. Reamer, R.P. Volante, P.J. Reider. |
| 104. | "Resolution of 1,1'-bi-2-naphtol (1,1'-binaphthalene]-2,2'-diol), <u>Org. Synth.</u> (1999), 76, 1-5, Cai, D.L. Hughes, T.R. Verhoeven, P.J. Reider. |
| 103. | "Metabolic Interactions Between Mibefradil and HMG-CoA Reductase Inhibitors:  An In Vitro Investigation with Human Liver Preparations", <u>Br. J. Clin. Pharmacol.</u> (1999), 47(3), 291-298, T. Prueksaritanont, M. Bennett, C. Tang, Y. Meng, C. Assang, P. Lu, J.H. Lin, T.A. Baillie, P.J. Reider. |
| 102. | "Efficient Syntheses of 2-(3',5'-difluorophenyl)-3-(4'-methylsulfonylphenyl)cyclopent-2-enone, a |

| | |
|---|---|
| | potent COX-2 inhibitor", <u>Tetrahedron</u> (1999), 55(19), 6001-6018, D. Zhao, F. Xu, C-Y. Chen, R.D. Tillyer, E.J.J. Grabowski, P.J. Reider, C Black, N Ouimet and P Prasit. |
| 101. | "A Chemical Synthesis of Nicotinamide Adenine Dinucleotide (NAD+)", <u>Chem. Commun,</u> (Cambridge) (1999), (8), 729-730, J. Lee, H. Churchill, W-B. Choi, J.E. Lynch, F.E. Roberts R.P. Volante, P.J. Reider. |
| 100. | "A Novel, Highly Enantioselective Ketone Alkynylation Reaction Mediated by Chiral Zinc Aminoalkoxides", <u>Angew. Chem., Int. Ed.</u> (1999), 38(5), 711-713, L. Tan, C-Y. Chen, R.D. Tillyer, E.J.J. Grabowski, P.J. Reider. |
| 99. | "Semisynthesis of an Antifungal Lipopeptide Echinocandin", <u>J. Org. Chem.</u> (1999), 64(7), 2411-2417, M. Journet, D. Cai, L.M. DiMichele, D.L. Hughes, R.D. Larsen, T.R. Verhoeven P.J. Reider. |
| 98. | "Oxidation of Primary alcohols to Carboxylic Acids with Sodium Chlorite Catalyzed by TEMPO and Bleach", <u>J. Org. Chem.</u> (1999), 64(7), 2564-2566, M. Zhao, J. Li, E. Mano, Z. Song, D.M. Tschaen, E.J.J. Grabowski, P.J. Reider. |
| 97. | "Highly Chemoselective Trichloroacetimidate-Mediated Alkylation of Ascomycin:  A Convergent, Practical Synthesis of the Imunosuppressant L-733,725, <u>J. Org. Chem.</u> (1999), 64(6), 1859-1867, Z. Song, A. DeMarco, M. Zhao, E.G. Corley, A.S. Thompson, J. McNamara, Y. Li, D. Rieger, P. Sohar, D.J. Mathre, D.M. Tschaen, R.A. Reamer, M.F. Huntington, G-J. Ho, F-R. Tsay, K. Emerson, R. Shuman, E.J.J. Grabowski, P.J. Reider. |
| 96. | "A CLFSE/MM study on the Role of Ligand Bite-Angle in Cu(II)-Catalyzed Diels-Alder Reactions", <u>Tetrahedron Lett.</u> (1999), 40(7), 1233-1236, I.W. Davies, R.J. Deeth, R.D. Larsen, P.J. Reider. |
| 95. | "Crystallization-induced Asymmetric Transformation:  Stereospecific Synthesis of L-768,673, <u>Tetrahedron</u> (1999), 55(4), 909-918, Y-J. Shi, K.M. Wells, P.J. Pye, W-B. Choi, H.R.O. Churchill, J.E. Lynch, A. Maliakal, J.W. Sager, K.Rossen, R.P. Volante, P.J. Reider |
| 94. | "Improved Stereoselectivity in the Heterogeneous Catalytic Synthesis of Enalapril Obtained Through Multidimensional Screening", <u>Tetrahedron Lett.</u> (1999), 40(5), 831-834, M. Huffman, P.J. Reider. |
| 93. | "Enantioselective alkynylation of Aromatic Aldehydes Catalyzed by Readily Available Chiral Amino Alcohol-Based Ligands", <u>Synthesis</u> (1999), 1453-1458, Z. Li, V. Upadhyay, A. DeCamp, L. DiMichele, P.J. Reider. |
| 92. | "Enantioselective 1,4-addition of aryllithium reagents to α,β-unsaturated *tert*-butyl esters in the presence of chiral additives", 1998, <u>Tetrahedron: Asymmetry</u>, 9,10, 1651-1655, F. Xu, R.D. Tillyer, D.M. Tschaen, E.J.J. Grabowski, P.J. Reider |
| 91. | "[2.2]PHANEPHOS-Ruthenium(II) Complexes: Highly active asymmetric catalysts for the hydrogenation of ß-ketoesters", <u>Tetrahedron Letters</u>, (1998), 39/25, 4441-4444, P.J. Pye, K. Rossen, R.A. Reamer, R.P. Volante, P.J. Reider |
| 90. | "An Efficient Asymmetric Synthesis of a Potent COX-2 Inhibitor L-784,512", <u>Tetrahedron Letters</u>, (1998), 39,23, 3961-3964, L. Tan, C-y Chen, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 89. | "A Highly Enantioselective Asymmetric Hydrogenation Route to ß-(2R,3S)-methyltryptophan", |

| | |
|---|---|
| | Tetrahedron Letters, (1998), 39,21, 3455-3458, R.S. Hoerrner, D. Askin, R.P. Volante, P.J. Reider |
| 88. | "An Improved and Practical Procedure for the Synthesis of Substituted Phenylacetylpyridines", Tetrahedron Letters, (1998), 39,13, 1717-1720, M. Journet, C. Dongwei, R.D. Larsen, P.J. Reider |
| 87. | "A Practical Preparation of Diisopropyl Phosphoryl Protected Amino Acids", Tetrahedron Letters, (1998), 39,52, 9583-9586, K.M.J. Brands, K. Wiedbrauk, J.M. Williams, U.-H. Dolling, P.J.Reider |
| 86. | "Efficient Synthesis of N-arylpiperazinones Via a Selective Intramolecular Mitsunobu Cyclodehydration", Tetrahedron Letters, (1998), 39,41, 7459-7462, S.A. Weissman, S. Lewis, D. Askin, R.P. Volante, P.J. Reider |
| 85. | "An Efficient Asymmetric Hydrogenation Approach to the Synthesis of the Crixivan® Piperazine Intermediate", Tetrahedron Letters, (1998), 39,38, 6823-6826, K. Rossen, P.J. Pye, L.M. DiMichele, R.P. Volante, P.J. Reider |
| 84. | "A Novel Chromium Trioxide Catalyzed Oxidation of Primary Alcohols to theCarboxylic Acids", Tetrahedron Letters (1998), 39 5323-5326, M. Zhao, J. Li, Z. Song, R. Desmond, D. Tschaen, E.J.J. Grabowski, P.J. Reider. |
| 83. | "Ni-catalyzed Nucleophilic Conjugate Additions of Grignard and Organozincate Reagents to Substituted 4-Vinylpyridines.  General Synthesis of Phosphodiesterase IV Inhibitors". Tetrahedron, (1998), 54, 1185-1195, I.N. Houpis, J. Lee, I. Dorziotis, A. Molina  R.A. Reamer, R.P. Volante and P.J. Reider. |
| 82. | "Crystallization-Induced Asymmetric Transformation:  Stereospecific Synthesis of L-768,673", Tetrahedron (1998), 909-918, Y-J. Shi, K. Wells, P. Pye, W-B. Choi, H. Churchill, J. Lynch, A. Maliakal, J. Sager, K. Rossen, R. Volante, P.J. Reider. |
| 81. | "Practical Synthesis of Anti-Methicillin-Resistant Staphylococcus Aureus (MRSA) Carbapenem L-742,728", J. Org. Chem. (1998), 63, 5438-5446, N. Yasuda, M. Huffman G-J. Ho, L. Xavier, C. Yang, K. Emerson, F-R. Tsay, Y. Li, M. Kress, D. Rieger, S. Karady  P. Sohar, N. Abramson, A. DeCamp, D. Mathre, A. Douglas, U-H. Dolling, E. Grabowski, P.J. Reider. |
| 80. | "A Stereoselective Synthesis of a 2-functionalized-methyl-1β-methylcarbapenem KeyIntermediate via Decarboxylation, Chem. Commun. (1998), 1817-1818, W-B. Choi, J. Lee, J. Lynch, R. Volante, R. Reamer, P.J. Reider. |
| 79. | "Practical Synthesis of α-Amino Acids Using CIS-Aminoindanol Derived Hippuric Acid Amide as a Glycine Enolate Equivalent", Tetrahedron Letters, (1998), 39(22), 3679-3682, J. Lee, W-B. Choi, J. Lynch, R. Volante, P.J. Reider. |
| 78. | "A Stereospecific Decarboxylation; a Key Reaction to an Intermediate for .beta.-Methyl-carbapenems", Synth. Appl. Isot. Labelled Compd. 1997, W-B. Choi, H.R.O. Churchill, J.E. Lynch, A.S. Thompson, G.R. Humphrey, R.P. Volante, I. Shinkai, P.J. Reider. |
| 77. | "Nickel Catalyzed Addition of Organozincates to Optically Pure Vinylic Sulfoxides.  Synthesis of the Phosphodiesterase IV Inhibitor L-765,527 (CDP-840)", Tetrahedron Letters, (1997), 38,41, 7131-7134, I.N. Houpis, A. Molina, I. Dorziotis, R.A. Reamer, R.P. Volante, P.J. Reider |
| 76. | "A Convenient and Economical Method for the Preparation of DIP-Chloride™ and Its Application |

| | |
|---|---|
| | in the Asymmetric Reduction of Aralkyl Ketones", <u>Tetrahedron Letters</u> (1997), 38(15), 2641-2644. M. Zhao, A.O. King, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 75. | "A Stereospecific Decarboxylation; a Key Reaction to an Intermediate for B-Methylcarba-penems, "W.-B. Choi, H.R.O. Churchill, J.E. Lynch, A.S. Thompson, G.R. Humphrey, R.P. Volante, P.J. Reider, I. Shinkai, D.K. Jones and D.C. Liotta, *Synthesis and Applications of Isotopically Labelled Compounds* Proceedings of the Sixth International Symposium, Phil. PA 14-18 September 1997, Ed. J.R. Heys and D.G. Melillo, John Wiley and Sons, London 1998. |
| 74. | "Advances in AIDS Chemotherapy:  The Asymmetric Synthesis of CRIXIVAN[TM]". <u>Chimia</u> 51 (1997), 306, P.J. Reider. |
| 73. | "Synthesis of the Orally Active Spiroindoline-Based Growth Hormone Secretagogue, MK-677". <u>Tetrahedron</u>, (1997), 53(32), 10983-10992.  P.E. Maligres, I. Houpis, Rossen, A. Molina, J. Sager, V. Upadhyay, K.M. Wells, R.A. Reamer, J.E. Lynch, Askin, R.P. Volante, P. Houghton and P.J. Reider. |
| 72. | "Nosylaziridines:  Activated Aziridine Electrophiles".  <u>Tetrahedron Letters</u>, (1997), 38(30), 5253-5256.  P.E. Maligres, M.M. See, D. Askin and P.J. Reider. |
| 71. | "Mechanistic Study of the Jacobsen Asymmetric Epoxidation of Indene", <u>J. Org. Chem.</u> (1997), (62(7), 2222-2229, D.L. Hughes, G.B. Smith, Ji Liu, G.C. Dezeny, C. Senanayake, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 70. | "Syntheses of Indoles via a Palladium-Catalyzed Annulation Between Iodoanilines and Ketones", <u>J. Org. Chem.</u>, (1997), 62(9), 2676-2677, C. Cheng, D.R. Lieberman, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 69. | "A Conformational Toolbox of Oxazoline Ligands", <u>Tetrahedron Letters</u>, (1997), 38(7), 1145-1148, I.W. Davies, L. Gerena, D. Cai, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 68. | "A Highly Diastereoselective Electrochemical Epoxidation", <u>Tetrahedron Letters</u>, (1997) 38(5), 777-778, K. Rossen, R.P. Volante, P.J. Reider |
| 67. | "Practical Asymmetric Synthesis", <u>Chemistry & Industry</u>, (1996**)**, 412, I.W. Davies, P.J. Reider. |
| 66. | "Concise Synthesis of Conformationally Constrained Pybox Ligands", <u>J. Org. Chem.</u>, (1996) 61(26), 9629-9630, I.W. Davies, L. Gerena, N. Lu, R.D. Larsen, P.J. Reider |
| 65. | "Tandem Asymmetric Transformations:  An Asymmetric 1,2-Migration from a Higher  Order Zincate Coupled with a Stereoselective Homoaldol Reaction", <u>J. Am. Chem. Soc.</u> (1996), 118(47), 11970-11971, J.C. McWilliams, J.D. Armstrong, N. Zheng, M. Bhupathy, R.P. Volante, P.J. Reider |
| 64. | "Mechanistic Studies on the Diastereoselective Halohydroxylation of .Gamma.-.Delta. Unsaturated Carboxamides", <u>Tetrahedron Letters,</u> (1996), 37(38), 6843-6846, K. Rossen, R.A. Reamer, R.P. Volante, P.J. Reider |
| 63. | "Regioselective Nucleophilic Substitutions of Fluorobenzene Derivatives", <u>Tetrahedron</u> <u>Letters</u>, (1996), 37(36), 6439-6442, K.M. Wells, Y-J. Shi, J.E. Lynch, G.R. Humphrey, R.P. Volante, P.J. Reider |
| 62. | "Asymmetric Synthesis of Conformationally Constrained cis-1-amino-1-phenyl-2- cyclohexanol", |

| | |
|---|---|
| | Tetrahedron: Asymmetry, (1996), 7(5), 1501-1506, C.H. Senanayake, R.D. Larsen, L.M. DiMichele, J. Liu, P.H. Toma, R.G. Ball, T.R. Verhoeven, P.J. Reider |
| 61. | "Practical Asymmetric Synthesis", Chem. Ind. (London), (1996), (11), 412-415, I.W. Davies, P.J. Reider |
| 60. | "Practical Route to a New class of LTD4 Receptor Antagonists", J. Org. Chem., (1996), 61(10), 3398-405, R.D. Larsen, E.G. Corley, A.O. King, J.D. Carroll, P. Davis, T.R. Verhoeven, M. Labelle, J.Y. Gauthier, P.J. Reider |
| 59. | "The Role of 4-(3-phenylpropyl)pyridine N-oxide (P3NO) in the Manganese-Salen-Catalyzed Asymmetric Epoxidation of Indene", Tetrahedron Letters, (1996), 37(19) 3271-3274, C.H. Senanayake, G.B. Smith, K.M. Ryan, L.E. Fredenburgh, J. Liu, Roberts, D.L. Hughes, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 58. | "An Expedient One-Pot Synthesis for Protected 2-thia-5-azabicyclo[2.2.1]heptan-3-ones. Versatile Intermediates in the Synthesis of Carbapenem Sidechains", Tetrahedron Letters, (1996), 37(17), 2919-2, K.M.J. Brands, G. Marchesini, J.M. Williams, U.H. Dolling, P.J. Reider |
| 57. | "Application of Indane-Derived C2-Asymmetric bis(oxazolines) in Two-Point Binding Asymmetric Diels-Alder Reactions", Tetrahdron Letters, (1996), 37(11), 1725-6, I.W. Davies, C.H. Senanayake, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 56. | "Application of a Ritter-Type Reaction to the Synthesis of Chiral Indane-Derived C2- Symmetric bis(oxazolines), Tetrahedron Letters, (1996), 37(6), 813-14, I.W. Davies C.H. Senanayake, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 55. | "Cyclic Imidate Salts in Acyclic Stereochemistry:  Diastereoselective *Syn*-Epoxidation of 2-Alkyl-4-Enamides to Epoxyamides".  Tetrahedron, (1996), 52(9), 3327-3338, P.E. Maligres  S.A. Weissman, V. Upadhyay, S.J. Cianciosi, R.A. Reamer, R.M. Purick, J. Sager, K. Rossen, K.K. Eng, D. Askin, R.P. Volante and P.J. Reider. |
| 54. | "Practical Route to a New Class of LTD4 Receptor Anagonists", J. Org. Chem., (1996), (61)10, 3398-3405, R.D. Larsen, E.G. Corley, A.O. King, J.D. Carroll, P. Davis, T.R. Verhoeven, P.J. Reider. |
| 53. | "A Mechanistic Study of Ester Olefinations Using Dimethyltitanocene".  Organometallics, (1996), 15(2), 663-7. D.L. Hughes, J.F. Payack, D. Cai, T.R. Verhoeven, P.J. Reider. |
| 52. | "A Convergent Synthesis of a Novel Non-Peptidyl Growth Hormone Secretagogue, L-692,429". Tetrahedron Letters, (1995), 36(52), 9445-8.  M. Bhupathy, J.J. Bergan, J.M. McNamara, R.P. Volante, P.J. Reider. |
| 51. | "An Unusual Stereoselective Decarboxylation:  A Key Reaction to an Important Intermediate for Carbapenem Antibiotics".  J. Org. Chem., (1995), 60(26), 8367-70, W. Choi, H.R.O., Churchill, J.E. Lynch, R.P. Volante, I. Shinkai, D.K. Jones, D.C. Liotta, P.J. Reider. |
| 50. | "The Behavior of Indene Oxide in the Ritter Reaction:  A Simple Route to *cis*-aminoindanol", Tetrahedron Letters, (1995), 36,23, 3993-3996, C.H. Senanayake, F.E. Roberts, L.M. DiMichele, K.M. Ryan, J. Liu, L.E. Fredenburgh, B.S. Foster, A.W. Douglas, R.D. Larsen, T.R. Verhoeven, P.J. Reider |
| 49. | "Simple and Efficient Resolution of 1,1'-bis-2-naphthol".  Tetrahedron Letters, (1995), 36(44), |

| | |
|---|---|
| | 7991-4.  D. Cai. D.L. Hughes, T.R. Verhoeven, P.J. Reider. |
| 48. | "Asymmetric Hydrogenation of 3-alkylidene-2-piperidones Using Noyori's Catalyst.  Effect of N-substituents on the Enantioselectivity".  Tetrahedron Letters, (1995), 36(41), 7379-82. J.Y.L. Chung, D. Zhao, D.L. Hughes, J.M. McNamara, E.J.J. Grabowski, P.J.Reider. |
| 47. | "Highly Diastereoselective Diels-Alder Reaction Mediated by a Chiral Auxiliary Derived from Aminoindanol:  The Role of Conformation on Diastereoselectivity".  Tetrahedron Letters, (1995), 36(42), 7619-22.  I.W. Davies, C.H. Senanayake, L. Castonguay, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 46. | "Regio- and Stereocontrolled Syntheses of Cyclic Chiral Cis-Amino Alcohols from 1,2- Diols or Epoxides".  Tetrahedron Letters, (1995), 36(42), 7615-18.  C.H. Senanayake, L.M. DiMichele, J. Liu, L.E. Fredenburgh, K.M. Ryan, F.E. Roberts, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 45. | "Asymmetric Hydrogenation of Tetrahydropyrazines:  Synthesis of (S)-piperazine-2-tert-butylcarboxamide, An Intermediate in the Preparation of the HIV Protease Inhibitor Indinavir".  Tetrahedron Letters, (1995), 36(36), 6419-22.  K. Rossen, S.A. Weissman, J. Sager, R.A. Reamer, D. Askin, R.P. Volante, P.J. Reider. |
| 44. | "A Practical Synthesis of 5-(chloromethyl)furo[2,3-b]pyridine, a Key Intermediate for the HIV Protease Inhibitor, L-754,394".  J. Heterocycl. Chem., (1995), 32(4), 1283-7. M. Bhupathy, D.A. Conlon, K.M. Wells, J.R. Nelson, K. Rossen, J.W. Sager, R.P. Volante, B.D. Dorsey, P.J. Reider. |
| 43. | "A Practical Synthesis of the 5-chloromethylfuro[2,3-b]pyridine pharmacophore".  Tetrahedron Letters, (1995), 36(26), 4571-4.  W-B. Choi, I.N. Houpis, H.R.O. Churchill, A. Molina, J.E. Lynch, R.P. Volante, A.O. King, P.J. Reider. |
| 42. | "Asymmetric Reduction of Keto Oxime Ethers Using Oxazaborolidine Reagents.  The Enantioselective Synthesis of Cyclic Amino Alcohols".  Tetrahedron Letters, (1995), 6(25) 4337-40.  R.D. Tillyer, C. Boudreau, D. Tschaen, U.-H. Dolling, P.J. Reider. |
| 41. | "Michael Additions of 3,3-dimethylacrylamides and Amines:  Synthesis of the Growth Hormone Secretagogue L-692,585".  Synth. Commun., (1995), 25(14), 2197-202.  K.M. Wells, K. Rossen, D. Askin, F.W. Hartner, Jr., R.P. Volante, P.J. Reider. |
| 40. | "Diastereoselective Syn-epoxidation of 2-alkyl-4-enamides to Epoxyamides:  Synthesis of the Merck HIV-1 Protease Inhibitor Epoxide Intermediate".  Tetrahedron Letters, (1995), 36(13), 2195-8.  P.E. Maligres, V. Upadhyay, K. Rossen, S.J. Cianciosi, R.M. Purick, K. Eng, R.A. Reamer, D. Askin, R.P. Volante, P.J. Reider. |
| 39. | "Synthesis of Functionalized Furo[2,3-b]pyridines Via Iodopyridones.  Preparation of a Key Intermediate to a New HIV Protease Inhibitor L-754,394".  Tetrahedron Letters, (1994), 35(50), 9355-8.  I.N. Houpis, W-B. Choi, A. Molina, H. Churchill, J.E. Lynch, R.P. Volante, P.J. Reider. |
| 38. | "Synthesis of Chiral 2,2'-Bis(diphenylphosphino)-1,1'-binaphthyl (BINAP) via a Novel Nickel-Catalyzed Phosphine Insertion". J. Org. Chem., (1994), 59(23), 7180-1.  D. Cai J.F. Payack, D.R. Bender, D.L. Hughes, T.R. Verhoeven, P.J. Reider. |
| 37. | "Synthesis of the 5-HT1D Receptor Agonist MK-0462 via Pd-catalyzed CouplingReaction".  Tetrahedron Letters, (1994), 35(38), 6981-4.  C. Chen, D.R. Lieberman, R.D. Larsen, R.A. Reamer, T.R. Verhoeven, P.J. Reider. |

13

| 36. | "Synthesis of a New Generation Reverse Transcriptase Inhibitor via the BC13/GaC13-Induced Condensation of Anilines with Nitriles (Sugasawa Reaction)". Tetrahedron Letters, (1994), 35(37), 6811-14.  I.N. Houpis, A. Molina, A.W. Douglas, L. Xavier, J. Lynch, R.P. Volante, P.J. Reider. |
|---|---|
| 35. | "Nature of N-Bromosuccinimide in Basic Media:  The True Oxidizing Species in the Hofmann Rearrangement". J. Am. Chem. Soc., (1994), 116(17), 7947-8.  C.H. Senanayake, L.E. Fredenburgh, R.A. Reamer, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 34. | "Highly Diastereoselective Reaction of a Chiral, Non-racemic Amide Enolate with (S)- glycidyl tosylate.  Synthesis of the Orally Active HIV-1 Protease Inhibitor L-735,524". Tetrahedron Letters, (1994), 35(5), 673-6.  D. Askin, K. Eng., K. Rossen, R.M.Purick, K.M. Wells, R.P. Volante, P.J. Reider. |
| 33. | "Magnesium-assisted Imidazole Formation from Unreactive Ureas." Tetrahedron Letters, (1994), 35(32), 5775-8.  C.H. Senanayake, L.E. Fredenburgh, R.A. Reamer, J. Liu, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 32. | "Enantioselective Synthesis of 1,3-dioxygen-substituted Chiral Building Blocks". Synlett, (1994), (3), 199-200.  C.H. Senanayake, R.D. Larsen, T.J. Bill, J. Liu, E.G. Corley, P.J. Reider. |
| 31. | "A Stereoselective Synthesis of a Key 1ß-methylcarbapenem Intermediate via a Diastereo- selective Decarboxylation". Tetrahedron Letters, (1994), 35(15), 2275-8.  W-B. Choi, H.R.O. Churchill, J.E. Lynch, A.S. Thompson, G.R. Humphrey, R.P. Volante, I. Shinkai, P.J. Reider. |
| 30. | "A Facially-Selective Protonation Controls the Stereochemistry of a Key Intermediate in the Synthesis of 1ß-Methylcarbapenems". J. Org. Chem., (1994), 59(14), 3749-51.  D.K. Jones, D.C. Liotta, W-B. Choi, R.P. Volante, I. Shinkai, H.R.O. Churchill, J.E. Lynch, P.J. Reider. |
| 29. | "Improved Fischer Indole Reaction for the Preparation of N,N-Dimethyltryptamines: Synthesis of L-695,894, a Potent 5-HT1D Receptor Agonist". J. Org. Chem., (1994), 59(13), 3738-41.  C. Chen, C.H. Senanayake, T.J. Bill, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 28. | "Aluminum-Amine Complexes for the Conversion of Carboxylic Esters to Amides. Application to the Synthesis of LTD4 Antagonist MK-0679". J. Org. Chem., (1994), 59(6), 1231-3.  D.R. Sidler, T.C. Lovelace, J.M. McNamara, P.J. Reider. |
| 27. | "Palladium Catalyzed Diastereoselective Addition of Secondary Alcohols to Acyloxy-azetidinones". Bioorg. Med. Chem. Lett., (1993), 3(11), 2393-6.  A.M. Madar, G.R. Humphrey, A.S. Thompson, T.R. Verhoeven, P.J. Reider. |
| 26. | "Stereocontrolled Functionalization of the Diene System of Compactin." Tetrahedron Letters, (1993), 34(38), 6021-4.  C.H. Senanayake, T.J. Bill, L.M. DiMichele, C. Chen, R.D. Larsen, T.R. Verhoeven, P.J. Reider. |
| 25. | "A Practical Chemoenzymic Synthesis of an LTD4 Antagonist." Tetrahedron: Asymmetry, (1993), 4(5), 865-874.  D.L. Hughes, Z. Song, G.B. Smith, J.J. Bergan, G.C. Dezeny, E.J.J. Grabowski, P.J. Reider |
| 24. | "An Efficient Synthesis of LTD4 Antagonist L-699,392". J. Org. Chem., (1993), 58(14), 3731-5.  A.O. King, E.G. Corley, R.K. Anderson, R.D. Larsen, T.R. Verhoeven, Y.B. Xiang, M. Belley, lY. Leblanc, P.J. Reider, et al. |
| 23. | "Towards the Synthesis of HIV-protease Inhibitors.  Synthesis of Optically Pure 3- carboxyl- |

| | |
|---|---|
| | decahydroisoquinolines". <u>Tetrahedron Letters</u>, (1993), 34(16), 2593-6.  I.N. Houpis, A. Molina, R.A. Reamer, J.E. Lynch, R.P. Volante, P.J. Reider. |
| 22. | "Condensation of 2-methylbenzoxazole with Aromatic Aldehydes Bearing Acidic Protons. A Convenient Coupling in the Synthesis of the HIV-reverse Transcriptase Inhibitor  L-696,229". <u>J. Org. Chem.</u>, (1993), 58(11), 3176-8.  I.N. Houpis, a. Molina, J.E. Lynch, R.A. Reamer, R.P. Volante, P.J. Reider. |
| 21. | "Rabbit Liver Esterase-mediated Enantioselective Synthesis of 2-arylpropanoic acids". <u>Tetrahedron Letters</u>, (1992), 33(40), 5901-4.  C.H. Senanayake, T.J. Bill, R.D. Larsen, J. Leazer, P.J. Reider. |
| 20. | "Friedel-Crafts Cyclization of 2-(3-Indolythio)propionic Acids.  An Unusual Rearrangement Leading to 4-sulfur-substituted tricyclic indoles". <u>Tetrahedron Letters</u>, (1992), 33(33), 4717-20.  J.Y. Chung, R.A. Reamer, P.J. Reider. |
| 19. | "Enzymes and Practical Asymmetric Synthesis:, <u>Pure and Applied Chemistry</u>, (1992), 64, 1939. M. Bhupathy, P.J. Reider, et. al. |
| 18. | "A Modified Bischler-Napieralski Procedure for the Synthesis of 3-aryl-3,4-dihydroiso-quinolines". <u>J. Org. Chem.</u>, (1991), 56(21), 6034-8.  R.D. Larsen, R.A. Reamer, E.G. Corley, P. Davis, E.J.J. Grabowski, I. Shinkai, P.J. Reider. |
| 17. | "Regioselective Fischer Indole route to 3-unsubstituted Indoles".  <u>J. Org. Chem.</u>, (1991), 56(9), 3001-6.  D. Zhao, D.L. Hughes, D.R. Bender, A.M. DeMarco, P.J. Reider. |
| 16. | "Lipase-catalyzed Asymmetric Hydrolysis of Esters Having Remote Chiral/Prochiral Centers". <u>J. Org. Chem.</u>, (1990), 55(26), 6252-9.  D.L. Hughes, J.J. Bergan, J.S. Amato, E.J.J. Grabowski, P.J. Reider. |
| 15. | "Synthesis of (5R,10S,11R)-(+)-10,11-dihydro-5-methyl-5H-dibenzo[a,d]cyclohepten-5, 10-imin-11-ol:  A Hydroxylated Metabolite of MK-0801".  <u>J. Org. Chem.</u>, (1990), 55(1),  299-304. R.D. Larsen, P. Davis, E.G. Corley, T.R. Lamanec, E.J.J. Grabowski, P.J. Reider. |
| 14. | "α-Hydroxy Esters as Chiral Reagents:  Asymmetric Synthesis of 2-arylpropionic Acids". <u>J. Am. Chem. Soc.</u>, (1989), 111(19), 7650-1.  R.D. Larsen, E.J.J. Corley, E.J.J.  Grabowski, P.J. Reider. |
| 13. | "Synthesis of Unsymmetrical Dithioacetals:  An Efficient Synthesis of a Novel LTD4 Antagonist, L-660,711".  <u>J. Org. Chem.</u>, (1989), 54(15), 3718-21.  J.J. McNamara, J.L. Leazer, M. Bhupathy, J.S. Amato, R.A. Reamer,, E.J.J. Grabowski, P.J. Reider. |
| 12. | "Synthesis of Chiral Dithioacetals:  a Chemoenzymic Synthesis of a Novel LTD4 Antagonist".  J. Org. Chem., (1989), 54(8), 1787-8.  D.L. Hughes, J.J. Bergan, J.S. Amato, E.J.J. Grabowski, P.J.Reider. |
| 11. | "Chirality and Practical Synthesis".  <u>Chem. Ind.</u> (London), (1988), (12), 394-8. P.J. Reider. |
| 10. | "Synthesis of (*R)-serine-2-d and Its Conversion to the Broad-spectrum Antibiotic Fludalanine". <u>J. Org. Chem.</u>, (1987), 52(15), 3326-34.  R.S. Conn, P. Davis, V.J. Grenda, A.J. Zambito, E.J.J. Grabowski, P.J. Reider |
| 9. | "Crystallization-induced Asymmetric Transformation:  Stereospecific Synthesis of a Potent Peripheral CCK Antagonist".  <u>J. Org. Chem.</u>, (1987), 52(5), 955-7.  P. Davis, D.L. Hughes, |

|    | E.J.J. Grabowski, P.J. Reider. |
|----|----|
| 8. | "A Synthesis of Ibogamine".  <u>J. Org. Chem.</u>, (1985), 50(9), 1464-7.  M.E. Kuehne, P.J. Reider. |
| 7. | "Maytansinoids".  <u>Alkaloids</u> (Academic Press), (1984), 23, 71-156.  D.M. Roland, P.J. Reider. |
| 6. | "The Mechanism of Serine Fluorodehydroxylation:  Carbon-13 and Fluorine-19 NMR Studies".  <u>Tetrahedron Letters</u>, (1984), 25(27), 2851-4.  A.W. Douglas, P.J. Reider. |
| 5. | "Total Synthesis of (-)Maysine".  <u>J. Am. Chem. Soc.</u>, (1983), <u>105</u>, 5015.  A.I. Meyers and P.J. Reider. |
| 4. | "Total Synthesis of Thienamycin:  A New Approach from Aspartic Acid".  <u>Tetrahedron Letters</u>, (1982), 23(22), 2293-6.  E.J.J. Grabowski, P.J. Reider. |
| 3. | "Synthetic Approaches to Thienamycin:  Carbon-carbon Bond Formation at C-4 of Azetidin-2-ones".  <u>Tetrahedron Letters</u>, (1982), 23(4), 379-82.  R. Rayford, E.J.J. Grabowski, P.J. Reider. |
| 2. | "Total Synthesis of (+)-maytanisol.  The Common Precursor to the Maytansinoids".  <u>J. Am. Chem. Soc.</u>, (1980), 102(21), 6597-8.  A.I. Meyers, A.L. Campbell, P.J. Reider. |
| 1. | "Stereoselective Synthesis of Threo-3-hydroxy-2-methylcarboxylic Acids Using Alkoxyalkyl Propionates",  <u>J. Am. Chem. Soc.</u> (1979), 101(9), 2501-2.  A.I. Meyers, P.J. Reider. |

## PATENTS

1. "An Improved Method for the Synthesis of Carbapenems Including Thienamycin, Penems and Oxapenem Carboxylic Acids". P.J. Reider and E.J.J. Grabowski. Case #16670IB - Antibiotic Synthesis filed 10/23/81.

2. "Preparation of 2-Deutero-D-Serine". E.J.J. Grabowski and P.J. Reider. US Patent #4,582,931, 4/15/86.

3. "Process for Resolution and Racemization of Amines with Acidic a-Hydrogens". P.J. Reider and E.J.J. Grabowski. Case #17383. US Patent #4,859,771, 8/22/89.

4. "Process for Unsymmetrical Dithioacetals and Dithioketals". P.J. Reider, J. McNamara, J. Amato, J. Leazer, and R. Reamer. US Patent #4,883,878, 11/28/89.

5. "Process for Preparing Leukotriene Antagonists", D.L. Hughes, J.J. Bergan, P.J. Reider, E.J.J. Grabowski, and J.S. Amato, European Patent #89313350.4, January 31, 1990; U.S. Patent #5,070,022, December 3, 1991.

6. "Resolution of a Carboxylic Acid", E.G. Corley, E.J.J. Grabowski, R.D. Larsen, and P.J. Reider, US Patent application 1989.

7. "Racemization of a Carboxylic Acid", R.D. Larsen and P.J. Reider, US Patent Application 1989.

8. "Process for Making an Epoxide", D. Askin, K. Eng., P.E. Maligres, K. Rossen, R.P. Volante, V. Upadhyay, P.J. Reider, PCT Int. Application 1995.

9. "Process for Making HIV Protease Inhibitors Containing N-tert-butyl-2-piperazine-carboxamide Derivative", K. Rossen, D. Askin, R.J. Varsolona, R.P. Volante, P.J. Reider, PCT Int. Application 1995.

10. "Process for Making HIV Protease Inhibitors", D. Askin, K. Rossen, R.J. Varsolona, K.M. Wells, P.J. Reider, PCT Int. Application.

11. "Preparation of ß-methylcarbapenem Intermediates", W-B. Choi, I. Shinkai, G.R. Humphrey, A.S. Thompson, R.P. Volante, P.J. Reider, Eur. Pat. Application.

12. "Racemization of a Carboxylic Acid, e.g., Ibuprofen Enantiomer", R.D. Larsen, P.J. Reider.

13. "Enzymic Preparation of Dithioacetal Quinoline Leukotriene Antagonists", D.L. Hughes, J.J. Bergan, E.J.J. Grabowski, J.S. Amato, P.J. Reider, US Pat Application.

14. "Resolution of a Carboxylic Acid", E.J. Corley, R.D. Larsen, E.J.J. Grabowski, P.J. Reider, US Patent Application.

15. Preparation of Quinolines Containing Unsymmetrical Dithioacetals and Dithioketals", J.S. Amato, J.M. McNamara, J.L. Leazer, R.A. Reamer, P.J. Reider, Eur. Pat. Application.

16. "A Process for the Preparation of 3(S)-amino-1,3-dihydro-1-methyl-2H-1,4-benzodiazepin-2- one from Its Racemate", E.J.J. Grabowski, P.J. Reider, Eur. Pat. Application.

17. "2-Deutero-D-serine", E.J.J. Grabowski, P.J. Reider, US Pat. Application.

18. "Antibiotic Synthesis", E.J.J. Grabowski, P.J. Reider, Eur. Pat. Application.

19. "Method of Synthesizing Furo[2,3-B]Pyridine Carboxylic Acid Esters", I. Houpis, A.Molina, J.E. Lynch, H.R.O. Churchill, R.P. Volante, W-B. Choi, P.J. Reider. Case #19204.  US Patent #5,489,685, 2/6/96.

20. "Conversion of Indene to (IS)-Amino-(2R)-Indanol Free of Any Stereoisomer by Combination of Dioxygenase Bioconversion and Chemical Steps", B.C. Buckland, N.C. Connors, M.C. Chartrain, F.P. Gailliot, R.L. Greasham, B. Jackey, B. Heimbuch, C. Lee, R.C. Olewinski, Jr., F.E. Roberts, T.R. Verhoeven, C.H. Senanayake, P.J. Reider, Case #19464IA, U.S. Patent #5,858,737.

21. "Process for Making HIV Protease Inhibitors", D. Askin, K. Rossen, R. Varsolona, R. Volante, K. Wells, P.J. Reider, Case  #19045CC, U.S. Patent #5,861,512.

22. "Method of Preparing Phosphodiesterase IV Inhibitors", W-B. Choi, H.R.D. Churchill J.E. Lynch, R.P. Volante, P.J. Reider, U.S. Patent #5,808,082.

23. "Controlled-release Pharmaceutical Preparations Containing Dihydroxy Open-acid and Salts of HMG-Co-A Reductase Inhibitors". R.D. Tillyer, P.J. Reider, E.J.J. Grabowski, F. Xu J.M. Vega. U.S. Patent Application

24. "Preparation and Formulation of Crystalline Simvastatin Acid Calcium Salt for Pharmaceutical Use as a HMG-CoA Reductase and CYP3A Inhibitor. R.D. Tillyer, P.J. Reider, E.J.J. Grabowski, F. Xu. U.S. Patent Application.

25. "Manufacture of Pyrazinone Compounds for Thrombin Inhibitors". D. Askin, F.J. Fleitz, R.S. Hoerrner, S. Lewis, P.E. Maligres, P.J. Reider, R.P. Volante, S.A. Weissman. British UK Patent Application

26. "Process for Stereoselective Synthesis of Enalapril". M.A. Huffman, P.J. Reider, Leblond, Y. Sun. U.S. Patent Application

27. "Titanium Catalyzed Preparation of Carbapenem Intermediates". P.J. Pye, P.J. Reider, K. Rossen, R.P. Volante. U.S. Patent Application

28. "Process for Preparing 4-alkoxycarbonyl-N-alkyl-(S)-piperazine-2-carboxamide". P.J. Pye, P.J. Reider, K. Rossen, R.P. Volante. British UK Patent Application

29. "Preparation of .beta.-methyl carbapenem Intermediates". W-B. Choi, J. Lee, J.E. Lynch, P.J. Reider, R.P. Volante. U.S. Patent Application

30. "Process for Enhancing the Optical Purity of 2R-[1-hydroxy-1-trifluoromethyl-3-cyclopropylpropyn-2yl]-4-chloroaniline". C.Y. Chen, P.J. Reider, E.J.J. Grabowski, L. Tan, R.D. Tillyer. U.S. Patent Application

**LECTURES**

1)  April 1982 - University of Vermont, Burlington MRL Speakers List Presentation - "Total Synthesis of Thienamycin - A New Approach From Aspartic Acid".

2)  Oct. 1982 - Colorado State University – Merck Speakers List Presentation

3)  April 1983 - Guelph-Waterloo Research Center for Graduate Work in Chemistry – MRL Speakers List Presentation

4)  May 1984 - Middle Atlantic Regional Meeting - ACS Newark, N.J. - MRL Speakers List Presentation

5)  February 1985 - Wayne State University
    MRL Speakers List Presentation

6)  July 1986 - Gordon Research Conference - Organic Reactions and Processes Invited Lecture "The Complex Problem of Small Molecules - Fludalanine".

7)  November 1986 - University of Illlnois, Champaign-Urbana MRL Speakers List Presentation:   "Stereospecific Synthesis of a Potent Peripheral CCK Antagonist".

8)  March 1987 - Emory University
    MRL Speakers List Presentation

9)  November 1987 - Colorado State University "Organic Synthesis, Practically".

10) March 1988 - Society for Chemical Industry (London) Symposium: Chirality Recognition in Synthesis. Invited Lecture. "Chirality and Practical Syntheses".

11) September 1988 - Gulf Coast Chemistry Meeting, Invited Lecture Pennsacola,   Florida  - "Selective  Synthesis  of  Unsymmetrical Dithioacetals: LTD4 Antagonists".

12) March 1989 - University of Maryland  - MRL Speaker's List Presentation

13) April 1989 - Florida State University  - MRL Speaker's List Presentation

14) July 1989 - Gordon Research Conference - Heterocyclic Chemistry. Invited Lecture "Heterocycles and Practical Asymmetric Synthesis".

15) December 1989 - Invited Lecturer - Pacific Basins Chemical Meeting, Honolulu, Hawaii

16) February 1990 - New York Academy of Science. Invited Lecturer - "Practical Asymmetric Synthesis".

17) February 1990 - University of Florida, Gainesville - MRL Speakers List Presentation

18) March 1990 - Emory University - MRL Speaker's List Presentation

19) January 1991 - French American Chemical Society, Captiva Island, Florida - Invited Lecturer

20) September 1991 - Gulf Coast Chemistry Conference, Invited Lecture "Practical Asymmetric Synthesis"

21) January 1992 - University of Pittsburgh - Invited Lecturer

22) March 1993 - Chiral Technologies Conference, Florida - Invited Lecturer

23) May 1993 - Chiral USA Conference, Washington, DC - Invited Lecturer

24) September 1993 - Gulf Coast Chemistry Conference, Florida - Invited Lecturer

25) October 1993 - University of Illinois at Urbana-Champaign  - Invited Lecturer

26) March 1994 - San Diego ACS Meeting - Invited Lecturer

27) September 1994 - Virginia Tech University - Invited Lecturer

28) December 1994 - Sheffield Stereochemistry Symposium (London) - Invited Lecturer

29) March 1995 - Harvard University - Invited Lecturer

30) March 1995 - Emory University - Invited Lecturer

31) April 1995 - Burroughs Wellcome Company
Invited Lecturer

32) June 1995 - University of Montreal - Invited Lecturer

33) October 1995 - Fine Chemistry Society, London - Invited Lecturer

34) December 1995 - Pacific Basins ACS Meeting (Hawaii) - Invited Lecturer

35) February 1996 - Princeton University - Invited Lecturer

36) March 1996 - University of Buffalo - Invited Lecture

37) April 1996 - Lehigh University - Invited Lecturer

38) May 1996 - Syntex Roche Symposium - University of Colorado at Boulder -
Invited Lecturer

39) September 1996 - Gulf Coast Chemistry Conference, Pensacola Beach, Florida -
Invited Lecturer

40) October 1996 - Engineering Foundation Conference, Boston, Invited Lecturer -
"Opportunities for Biocatalysis in the Pharmaceutical Industry:  Biology as a Chemical
Tool"

41) December 1996 - University of California, Irvine - Invited Lecturer

42) January 1997 - Presentation to the AP Chemistry Class at Nottingham High School -
Hamilton, New Jersey

43) March 1997 - CHIREX - 3rd Intl. Conf. On Process Development Chemistry, Amelia
Island, Florida, Keynote Address - "Opportunities for Biocatalysis in the Pharmaceutical
Industry:  Biology as a Chemical Tool"

44) April 1997 - University of Pennsylvania - Invited Lecturer

45) April 1997 - New Swiss Chemical Society Meeting, Switzerland, Invited Lecturer - "The Asymmetric Synthesis of CRIXIVAN™ and Other HIV Therapeutical Agents"

46) June 1997 - 35th National Organic Chemistry Symposum , Trinity University, San Antonio, Texas, Plenary Lecture, "New Therapies for AIDS - The Asymmetric Synthesis of CRIXIVAN™"

47) August 1997 - 16th International Congress of Heterocyclic Chemistry, Montana State University, Bozeman, Invited Lecturer, "New Therapies for AIDS - The Asymmetric Synthesis of CRIXIVAN™"

48) October 1997 - Synthelabo Recherche, Paris, France, Invited Lecturer, "The Asymmetric Synthesis of CRIXIVAN™, Indinavir, An Orally Active HIV Protease Inhibitor"

49) October 1998 - 8th Brazilian Meeting on Organic Synthesis, Sao Pedro, Brazil, Invited Lecture "Practical Asymmetric Synthesis:  Reactions Mediated by Chiral Aminoalkoxides"

50) April 1999 - University of California San Francisco Pharmchem Seminar - Invited Lecturer

51) May 1999 - Drug Metabolism Annual Meeting, Skytop, PA - Invited Lecturer

52) July 1999 - 16th International Organic Chemistry Symposium, Cambridge, UK, Invited Lecturer, "Practical Asymmetric Synthesis"

53) October 1999 – Baekeland Award Symposium Honoring Eric Jacobsen, New York City - Invited Speaker

54) March 2000 - NY Academy of Sciences, Chemical Sciences Section - Invited Speaker

55) May 2000 - Kohout Lecturer, Penn State University, Invited Lecturer, "Advances in Anti-Viral Drug Therapies for the Treatment of AIDS"

56) January 2001 – Stanford University - Invited Lecturer

57) August 2001 – Royal Society of Chemistry Annual Conference, Birmingham, UK - International Highlight Lecture, "Selectivity in Synthesis"

58) July 2002 – Gordon Research Conference – "Synthesis of NK1 Receptor Antagonists -- It's Not Nice to Fool Mother Nature"

59) October 2002 – Frontiers in Organic Chemistry, 7th Biennial Organic Symposium, University of Illinois, Invited Lecturer, "Synthesis of Carbapenem Antibiotics & NK1 Receptor Antagonists - It's Not Nice to Fool Mother Nature"

60) November 2002 – Invited Lecturer - Colorado State University

61) August 2003 – 19th International Congress of Heterocyclic Chemistry, Colorado State

University - "Chemistry, Selectivity and the Biological Interface"

62) January 2004 – Connecticut Organic Chemistry Symposium – Invited Lecturer, "Chemistry, Selectivity and the Biological Interface"

63) April 2004 – New York University Department of Chemistry – "It's Not Nice To Fool Mother Nature:  Synthesis of Pharmaceutically Active Molecules"

64) April 2004 – Department of Chemical Engineering 290 Seminar Series, University of California Santa Barbara - "It's Not Nice To Fool Mother Nature:  Synthesis of Pharmaceutically Active Molecules"

65) May 2004 – 2004 Visions in Chemistry Symposium – "Chemistry, Selectivity and the Biological Interface"

66) October 2004 – Lecture, California Institute of Technology – "Chemistry, Selectivity and the Biological Interface"

67) March 2005 – Speaker – Department of Biochemistry, University of Texas Southwestern Medical Center - "Chemistry, Selectivity and the Biological Interface"

68) April 2005 – 2005 Organic Synthesis Lecturer, University of California Irvine - "Chemistry, Selectivity and the Biological Interface"

69) April 2005 – Symposium International en Synthese Organique de L'Universite de Montreal 2005 – Université of Montréal - "Chemistry, Selectivity and the Biological Interface"

70) May 2005 – University of Toronto Symposium - "Chemistry, Selectivity and the Biological Interface"

71) May 2005 – Scripps Distinguished Lectureship Series - "Chemistry, Selectivity and the Biological Interface"

72) February 2006 – Chem 250 Course, California Institute of Technology - "Chemistry, Selectivity and the Biological Interface"

73) July 2006 – Gordon Research Conference on Heterocyclic Compounds - "25 Years of Heterocyclic Chemistry – It's Better To Be Lucky Than Smart"

74) November 2006 – Seaborg Symposium, University of California Los Angeles – "25 Years of Heterocyclic Chemistry – It's Better To Be Lucky Than Smart"

75) November 2006 – Pomona College – "The CRIXIVAN™ Story"

76) December 2006 – University of Melbourne – "Targeted Therapies for Cancer – Discovery and Development of AMG-0706"

77) December 2006 – CSIRO Molecular & Health Technologies - "Targeted Therapies for Cancer – Discovery and Development of AMG-0706"

78) December 2006 – Australian National University - "Targeted Therapies for Cancer – Discovery and Development of AMG-0706"

79)  December 2006 – University of Queensland - "Targeted Therapies for Cancer – Discovery and Development of AMG-0706"

80)  December 2006 – Australian University New South Wales - "Targeted Therapies for Cancer – Discovery and Development of AMG-0706"

81)  April 2007 – University of California, Berkeley – "It's Better To Be Lucky Than Smart"

82)  October 2007 – San Diego State University – "It's Better To Be Lucky Than Smart: Discovery and Development of Novel Anti-Tumor Agents"

83)  October 2007 – Invited Lecturer – Colorado State University

84)  July 2008 -- NINTH TETRAHEDRON SYMPOSIUM Challenges in Organic and Bioorganic Chemistry Berkeley, CA-- Invited Lecturer

85)  March 2014 -  Burack Award Lecture –
     "Chemistry in Service to Society: 35 Years of Success and Failure in Bringing New Medicines to the Patients who Need Them"

86)  March 2014 – Invited Lecture – University of Vermont

# EXHIBIT B

# Journal of Medicinal Chemistry®

Registered in U.S. Patent and Trademark Office
© Copyright 2008 by the American Chemical Society

Volume 51, Number 18
September 25, 2008

JMCMAR 51(18) 5471–5886 (2008)
ISSN 0022-2623

## Perspective

Arumugam Kodimuthali,   5471   **Recent Advances on Phosphodiesterase 4 Inhibitors for the Treatment of**
S. Sugin Lal Jabaris, and Manojit Pal*        **Asthma and Chronic Obstructive Pulmonary Disease**

## Letters

5490  **Discovery of Potent and Selective Small-Molecule PAR-2**
■     **Agonists**

Jimmi Gerner Seitzberg, Anne Eeg Knapp,
Birgitte Winther Lund, Sine Mandrup Bertozzi,
Erika A. Currier, Jian-Nong Ma, Vladimir Sherbukhin,
Ethan S. Burstein, and Roger Olsson*

5494  **Optimizing Natural Products by Biosynthetic**
■     **Engineering: Discovery of Nonquinone Hsp90 Inhibitors**

Ming-Qiang Zhang, Sabine Gaisser,
Mohammad Nur-E-Alam, Lesley S. Sheehan,
William A. Vousden, Nikolaos Gaitatzis, Gerrard Peck,
Nigel J. Coates, Steven J. Moss, Markus Radzom,
Teresa A. Foster, Rose M. Sheridan, Matthew A. Gregory,
S. Mark Roe, Chrisostomos Prodromou, Laurence Pearl,
Susan M. Boyd, Barrie Wilkinson, and Christine J. Martin*

5498  **Oversulfated Chondroitin Sulfate: Impact of a Heparin**
■     **Impurity, Associated with Adverse Clinical Events, on**
      **Low-Molecular-Weight Heparin Preparation**

Zhenqing Zhang, Michel Weïwer, Boyangzi Li,
Melissa M. Kemp, Tyler H. Daman, and Robert J. Linhardt*

3766    J. Med. Chem. 2008, 51, 3766–3779

# Design, Synthesis, and Biological Evaluation of Potent c-Met Inhibitors

Noel D. D'Angelo,*,† Steven F. Bellon,‡ Shon K. Booker,† Yuan Cheng,† Angela Coxon,§ Celia Dominguez,† Ingrid Fellows,†
Douglas Hoffman,‖ Randall Hungate,† Paula Kaplan-Lefko,§ Matthew R. Lee,‡ Chun Li,⊥ Longbin Liu,† Elizabeth Rainbeau,†
Paul J. Reider,† Karen Rex,§ Aaron Siegmund,† Yaxiong Sun,‡ Andrew S. Tasker,† Ning Xi,† Shimin Xu,† Yajing Yang,§
Yihong Zhang,§ Teresa L. Burgess,§ Isabelle Dussault,§ and Tae-Seong Kim†

*Departments of Medicinal Chemistry, Molecular Structure, Oncology Research, Pharmaceutics, and Pharmacokinetics and Drug Metabolism,
Amgen Inc., One Amgen Center Drive, Thousand Oaks, California 91320-1799*

Received May 23, 2008

c-Met is a receptor tyrosine kinase that plays a key role in several cellular processes but has also been
found to be overexpressed and mutated in different human cancers. Consequently, targeting this enzyme
has become an area of intense research in drug discovery. Our studies began with the design and synthesis
of novel pyrimidone 7, which was found to be a potent c-Met inhibitor. Subsequent SAR studies identified
22 as a more potent analog, whereas an X-ray crystal structure of 7 bound to c-Met revealed an unexpected
binding conformation. This latter finding led to the development of a new series that featured compounds
that were more potent both in vitro and in vivo than 22 and also exhibited different binding conformations
to c-Met. Novel c-Met inhibitors have been designed, developed, and found to be potent in vitro and in
vivo.

## Introduction

c-Met is a receptor tyrosine kinase that is normally activated by binding its natural ligand hepatocyte growth factor, also known as scatter factor (HGF/SF$^a$). The binding of HGF to c-Met induces several complex signaling pathways and results in cell proliferation, motility, migration, and survival.[1–3] These cellular activities are important during normal development and wound healing but can lead to cancer when the pathway is deregulated. For example, c-Met has been found to be overexpressed or mutated in human cancers, and in many instances, the overexpression of c-Met has been correlated with advanced disease stage and poor prognosis.[4–7] As a result, c-Met has attracted considerable attention as a potential target for cancer treatment.[8–10]

A variety of approaches have been used to target c-Met. These include antibody-based therapies,[11–14] truncated HGF fragments,[15–17] decoy receptors,[18] the targeting of the extracellular c-Met semaphorin domain to prevent dimerization,[19] ribozyme-based treatments,[20,21] and small-molecule kinase inhibitors.[22–28] Most of the strategies prevent ligand-mediated activation of the receptor, but small-molecule inhibitors are predicted to inhibit c-Met activity irrespective of the activation mechanism. This

* To whom correspondence should be addressed. Address: One Amgen Center Drive, Mail Stop 29-2-C, Thousand Oaks, CA 91320-1799. Phone: 805-313-6550. Fax: 805-480-3016. E-mail: dangelo@amgen.com.
† Department of Medicinal Chemistry.
‡ Department of Molecular Structure.
§ Department of Oncology Research.
‖ Department of Pharmaceutics.
⊥ Department of Pharmacokinetics and Drug Metabolism.

$^a$ Abbreviations: Ac, acetyl; ANOVA, analysis of variance; ATP, adenosine triphosphate; BSA, bovine serum albumin; DCM, dichloromethane; DMAP, 4-dimethylaminopyridine; DME, 1,2-dimethoxyethane; DMF, N,N-dimethylformamide; ED, effective dose; HGF, hepatocyte growth factor; HTRF, homogeneous time-resolved fluorescence; IGFR, insulin-like growth factor receptor; IP, intraperitoneal injection; iv, intravenous; KDR, kinase insert domain receptor; LiHMDS, lithium hexamethyldisilazide; NBS, N-bromosuccinimide; PD, pharmacodynamic; PK, pharmacokinetic; RON, recepteur d'origine nantais; SAR, structure–activity relationship; SF, scatter factor; S-Phos, 2-Dicyclohexylphosphino-2′,6′-dimethoxybiphenyl; TFAA, trifluoroacetic anhydride; TFA, trifluoroacetic acid; THF, tetrahydrofuran.



**Figure 1.** Small-molecule c-Met inhibitors and the design of the pyrimidone series.

is significant because it is known that c-Met can be activated in a ligand-dependent manner as well as in a ligand-independent manner.[6] Therefore, a small-molecule c-Met inhibitor could benefit a different, and potentially larger, cancer patient population.

Several small-molecule c-Met inhibitors have recently been reported.[25] Examples of these include Pfizer's PF-2341066 (1),[26] Sugen's SU11274 (2),[23] and Kirin's acylthiourea 3[29] (Figure 1). Compound 3 was of particular interest because of its reported cellular activity (IC$_{50}$ = 8.7 nM in A431 cells). This led us to consider constrained versions of 3 as possible c-Met inhibitors. We first examined benzothiazole 4 and found it to be a potent c-Met inhibitor (c-Met $K_i$ = 17 nM). However, its selectivity over other kinases such as kinase insert domain receptor (KDR), recepteur d'origine nantais (RON), and insulin-like growth factor receptor (IGFR) was modest (4- to 13-fold).[30] Our replacing the benzothiazole core with a naphthalene ring system (5) decreased c-Met potency

*Potent c-Met Inhibitors*

**Scheme 1**[a]



[a] Reagents and conditions: (i) LiHMDS, DMF, MeI, 0 °C to rt; (ii) Br₂, CHCl₃, 0 °C; (iii) 3-fluoro-4-methoxyphenylboronic acid, Pd₂(dba)₃, S-Phos, K₃PO₄, PhMe, 100 °C; (iv) ArylZnCl, Pd(PPh₃)₄, THF, 60 °C; (v) HOAc, HBr, 120 °C; (vi) MeSO₃H, TFA, reflux; (vii) Cl(CH₂)₃Br, K₂CO₃, DMF; (viii) amine, NaI, K₂CO₃, DMF, 70 °C; (ix) DMAP, 1,4-dioxane, 110 °C; (x) pyridine, 1,4-dioxane, 110 °C; (xi) DMAP, 1,4-dioxane, 120 °C, μW; and (xii) DMAP, pyridine, 1,4-dioxane, 90 °C, μW.

($K_i$ = 89 nM) but had little effect on KDR and RON selectivity (9- and 3-fold, respectively). Greater selectivity, especially against KDR, was desired to limit potential off-target toxicity as well as to ensure that any in vivo activity was a consequence of targeting c-Met. Nevertheless, we were encouraged by the fact that a conformational restriction of compound 3 could provide potent c-Met inhibitors.

Therefore, we considered an alternative mode of constraining the acylthiourea moiety of compound 3, which lead to the design of pyridazine 6 and pyrimidone 7. The former was actually more potent against KDR ($K_i$ = 56 nM) and RON ($K_i$ = 79 nM) than against c-Met ($K_i$ = 201 nM) and was therefore not pursued further. However, 7 was found to inhibit the kinase activity of c-Met ($K_i$ = 39 nM) potently. In addition, 7 was selective against KDR (greater than 30-fold), RON (20-fold), and IGFR (50-fold). With this promising result, we explored the SAR around the four main regions of 7 (rings A−D).

**Chemistry**

The synthesis of the D-ring analogs began with the alkylation of pyrimidone **8**[31] at the N(3) position to provide pyrimidone 9 (Scheme 1). Bromination, followed by a Suzuki coupling with 3-fluoro-4-methoxyphenylboronic acid that used the palladium-S-Phos complex afforded bicycle **10**.[32] O-demethylation, followed by the coupling of the methylthiopyrimidine moiety to various benzylzinc halides, afforded phenols **11−13**.[33] Chlorides **16−21** were prepared in three routine steps via the debenzylation of quinoline **14**,[34] the attachment of the 3-chloropropyl group, and the displacement of the terminal chloride by the desired amine. Chlorides **16−21** were coupled to phenol 11 in the presence of pyridine or DMAP to produce analogs **22−27**.

The B-ring analogs were prepared next. Bromination of pyrimidones **28** and **29**,[35−37] followed by Suzuki coupling to 3-fluoro-4-methoxyphenylboronic acid, afforded methyl ethers **30** and **31** (Scheme 2).[38] The removal of the methyl ether under acidic conditions produced phenols **32** and **33**, which were subjected to S_NAr coupling with 4-chloro-6,7-dimethoxyquinoline to afford analogs **34** and **35**. N-methylation of **34** by the use of sodium hydroxide and methyl iodide afforded compound 7, thereby completing the synthesis of the B-ring set of analogs.

**Scheme 2**[a]



[a] Reagents and conditions: (i) Br₂, CHCl₃, 0 °C; (ii) 3-fluoro-4-methoxyphenylboronic acid, Pd(PPh₃)₄, Na₂CO₃, DME, H₂O, 100 °C, μW; (iii) HOAc, HBr, 120 °C; (iv) 4-chloro-6,7-dimethoxyquinoline, DMAP, PhMe, CHCl₃, 180 °C; and (v) 2 N NaOH, MeI, 1,4-dioxane, 40 °C.

**Scheme 3**[a]



[a] Reagents and conditions: (i) NBS, CHCl₃; (ii) NaN₃, DMF, 0 °C; (iii) H₂, Pd/C, EtOAc, THF; and (iv) RCOCl, Et₃N, DCM, 0 °C.

**Scheme 4**[a]



[a] Reagents and conditions: (i) Cu, KOH, DMF, pyridine, 110 °C, μW.

Compound 7 served as a convenient intermediate to prepare analogs that are substituted at the benzylic position. Benzylic bromination converted 7 into bromide **36**, and the subsequent displacement of this bromide with sodium azide, followed by hydrogenation, afforded amine **37** as a racemic mixture (Scheme 3). Acylation of this amine under standard conditions afforded amides **38−40** and urea **41**. We prepared two other A-ring analogs by coupling phenols **12** and **13** to chloride **16** to produce compounds **42** and **43**, with a para-methyl and a para-fluoro substituent, respectively (Scheme 4).

The N-linked A-ring analogs began with the demethylation of biaryl **10** to produce phenol **44** (Scheme 5). The displacement of the thiomethyl group under acidic conditions with different anilines in the microwave produced phenols **45−47**. The coupling of these phenols to either chloride **16** or 4-chloro-6,7-dimethoxyquinoline produced compounds **48−51**.

Analogs **55** and **56** were prepared in a slightly different manner because phenol **44** was first coupled to 4-chloro-6,7-dimethoxyquinoline to produce intermediate **52** (Scheme 6). The thiomethyl group was hydrolyzed under oxidative conditions by the use of urea hydrogen peroxide in acetonitrile and TFA to produce **53**. The resultant hydroxyl moiety was converted to

**Scheme 5**[a]



[a] Reagents and conditions: (i) HOAc, HBr, 120 °C; (ii) RNH₂, concd HCl, 120 °C, μW; (iii) 4-chloro-6,7-dimethoxyquinoline, DMAP, 1,4-dioxane, 120 °C, μW; and (iv) 16, Cu, KOH, DMF, pyridine, 110 °C, μW.

**Scheme 6**[a]



[a] Reagents and conditions: (i) 4-chloro-6,7-dimethoxyquinoline, DMAP, pyridine, 1,4-dioxane, 110 °C; (ii) urea hydrogen peroxide, TFA, MeCN, 0 °C; TFAA, 0 °C to rt; (iii) POCl₃, N,N-dimethylaniline, 125 °C to rt; and (iv) RNH₂, concd HCl, 1,4-dioxane, 60 °C, μW.

**Scheme 7**[a]



[a] Reagents and conditions: (i) NaH, BnBr, DMF, 0 °C to rt; (ii) Pd(PPh₃)₄, t-BuOC(O)CH₂ZnCl, THF, 60 °C; (iii) TFA, DCM, 0 °C to rt; (iv) (COCl)₂, DCM, DMF; 59, Et₃N, 0 °C to greater than rt; (v) 4-fluoroaniline, concd HCl, 1,4-dioxane, 125 °C; (vi) BBr₃, DCM; and (vii) 16, DMAP, pyridine, 1,4-dioxane, 130 °C.

the corresponding chloride 54 by the use of POCl₃. The subsequent displacement of the chloride with different amines, again under acidic conditions in the microwave, produced analogs 55 and 56.

We prepared C-ring pyridine analog 62 by beginning with the protection of commercially available 6-bromopyridin-3-ol as benzyl ether 57 (Scheme 7). Negishi coupling to 2-tert-butyoxy-2-oxoethylzinc chloride, followed by TFA hydrolysis, afforded acid 58.[39] The conversion of 58 to the corresponding acyl chloride, followed by the addition of 59 and Et₃N, produced

60. This was converted to phenol 61 in two steps and was then coupled to chloride 16 to afford 62.

## Results and Discussion

**SAR and Lead Generation.** The enzyme activity of 7 supported our hypothesis that the pyrimidone series could afford good enzyme potency against c-Met. To facilitate subsequent SAR studies, we examined the X-ray structure of a cocrystal of 7 bound to c-Met (Figure 2). This X-ray revealed that 7 occupies the ATP binding site of c-Met. As a result, 7 can be assumed to be an ATP-competitive inhibitor of c-Met. In addition, the benzyl moiety of 7 (ring A) fits into a hydrophobic pocket that is formed by ILE1145 at the back end, which we refer to as the ILE1145 binding pocket. This pocket could be probed with different phenyl substituents to improve potency. Also, the benzyl position is orientated toward a channel in the c-Met backbone, which suggests that benzyl substituents could fit into this channel and provide additional interactions with c-Met.

In terms of the pyrimidone B ring, the X-ray revealed that the carbonyl is twisted away from the Asp1222 residue and directly forms a hydrogen bond with Lys1110. As a result, the polar Asp1222 residue is presented with the hydrophobic C—H group of the B ring, which suggests a potential energy penalty. In addition, there is a fairly tight steric environment around the B and C rings; therefore, we expected SAR opportunities here to be more limited.

The quinoline portion (ring D) on the left side forms hydrogen bonds with the Pro1158 and Met1160 residues and also maintains van der Waals interactions with the c-Met backbone. In addition, this quinoline system is directed toward a solvent-exposed area, which provides an opportunity for the introduction of polar, water-solubilizing groups. We began our optimization studies of 7 here.

The introduction of a carbon tether, which contains different tertiary amines, off of the quinoline D-ring was examined first. A three-carbon tether between these amines and the quinoline had previously been determined to be the optimal length for improving the potency; therefore, we examined different amines at the end of this tether.[40,41] All of the amines improved the c-Met enzyme relative to 7, a finding that can be explained by the van der Waals interactions that are gained between the carbon tether and the c-Met backbone (Table 1). Of these amines, the morpholine (22) and N-methylpyrazine (25) derivatives afforded the greatest increase in potency.

Substitutions of the B-ring pyrimidone core were explored next (Table 2). The removal of the N-methyl group (34) reduced enzyme potency by about 3-fold, whereas the introduction of a methyl group at the 6-position (35) lowered the potency by an additional factor of 5. Overall, these two changes reduced the potency more than 10-fold, which supports the hypothesis that this portion of the molecule is sensitive to substitution. In view of these results, we did not pursue further SAR studies around the pyrimidone core or on the fluorophenyl C ring.

We conducted SAR studies to explore different substituents at the benzyl position and on the phenyl A ring. For the former, the X-ray cocrystal structure of 7 (Figure 2) suggested that substituents could gain van der Waals interactions with a channel in the c-Met backbone, thereby improving potency. In addition, because this channel was solvent accessible, polar substituents were considered. However, amine 37, amides 38−40, and urea 41 provided little improvement in potency (Table 3). In fact, 41 decreased the potency by about 10-fold. Overall, these results

**Figure 2.** X-ray cocrystal of **7** bound to c-Met.

**Table 1.** c-Met Enzyme Activity of Analogs **22**−**27**[a]



| compd | R | $K_i$ (nM)[b] |
|---|---|---|
| 7 | Me | $39 \pm 6$ |
| 22 | | $8.9 \pm 1.3$ |
| 23 | | $12 \pm 1$ |
| 24 | | $29 \pm 2$ |
| 25 | | $9.2 \pm 1.4$ |
| 26 | | $21 \pm 1$ |
| 27 | | $33 \pm 6$ |

[a] See the Experimental Section for assay details. [b] Average of four experiments.

suggested that whereas the benzyl substitution could certainly be tolerated, no obvious benefit was gained from it.

In terms of the phenyl ring SAR, two additional analogs were made that incorporated different substituents at the para position (Table 4). These compounds had enzyme potencies that were similar to that of **22**, which suggests that small substituents were well tolerated at this position. Because these compounds had enzyme potencies that were similar to that of **22** and also because SAR studies on the nitrogen-linked A rings (see Table 5) indicated that these substituents provided the best increase in potency, further SAR studies were not pursued.

**N-Phenyl Analogs.** To this point, the most potent compounds exhibited a $K_i$ of around 10 nM in the enzyme assay. However,

**Table 2.** c-Met Enzyme Activity of B-Ring Analogs **7**, **34**, and **35**[a]



| compd | R | R′ | $K_i$ (nM)[b] |
|---|---|---|---|
| 7 | H | Me | $39 \pm 6$ |
| 34 | H | H | $107 \pm 4$ |
| 35 | Me | H | $489 \pm 74$ |

[a] See the Experimental Section for assay details. [b] Average of four experiments.

**Table 3.** c-Met Enzyme Activity of Benzyl-Substituted A-Ring Analogs[a]



| compd | R | $K_i$ (nM)[b] |
|---|---|---|
| 7 | H | $39 \pm 6$ |
| 37 | $NH_2$ | $72 \pm 11$ |
| 38 | $NH(CO)CH_2NMe_2$ | $30 \pm 5$ |
| 39 | $NH(CO)CH_2CH_3$ | $71 \pm 14$ |
| 40 | $NH(CO)CH_2CH_2SCH_3$ | $52 \pm 11$ |
| 41 | $NH(CO)NMe_2$ | $368 \pm 55$ |

[a] See the Experimental Section for assay details. [b] Average of four experiments.

to improve the potency further, we next considered replacing the carbon linkage between the A and B rings with a nitrogen atom. This change would allow for an additional hydrogen bond to be gained with Phe1223 (adjacent to Asp1222, Figure 2), potentially via a bridging water molecule, thereby improving enzyme potency.

To test this hypothesis, N-phenyl analog **48** was synthesized, and the SAR around the phenyl A ring was explored (Table 5). Our replacing the carbon linkage with a nitrogen linkage actually reduced the enzyme potency to a small extent, as a comparison of compounds **7** and **48** indicates. The introduction of a fluoro group at the ortho or meta position had a minimal impact on enzyme potency. However, substitution at the para position increased the potency because the 4-fluoro derivative (**50**) has a binding affinity of 14 nM. Larger groups at this position (e.g.,

Case 1:21-cv-01338-MFK Document 472 Filed 05/31/24 Page 355 of 547 PageID #: 26464

*8770 Journal of Medicinal Chemistry, 2008, Vol. 51, No. 18* D'Angelo et al.

**Table 4.** c-Met Enzyme Activity of A-Ring Analogs **42** and **43**[a]

| compd | R | $K_i$ (nM)[b] |
|---|---|---|
| 22 | H | $8.9 \pm 1.3$ |
| 42 | Me | $9.6 \pm 0.7$ |
| 43 | F | $17 \pm 2$ |

[a] See the Experimental Section for assay details. [b] Average of four experiments.

**Table 5.** c-Met Enzyme Activity of *N*-Phenyl A-Ring Analogs[a]

| compd | R' | R | Ki (nM)[b] |
|---|---|---|---|
| 48 | Me | H | $63 \pm 7$ |
| 49 | Me | 2-F | $45 \pm 4$ |
| 50 | Me | 4-F | $14 \pm 1$ |
| 51 | morpholine-N-propyl | 4-F | $4.9 \pm 0.5$ |
| 55 | Me | 3-F | $38 \pm 6$ |
| 56 | Me | 4-CF$_3$ | $136 \pm 12$ |

[a] See the Experimental Section for assay details. [b] Average of four experiments.

**56**) decreased the potency, which suggests that the substitution at this position is fairly sensitive to a substituent's steric size. Having determined that the 4-fluoro group provided the best potency for the *N*-phenyl A ring we decided to reintroduce the morpholine tail off of the quinoline D ring to improve the potency further. Toward this end, analog **51** was prepared and was found to be about 3 times more potent than both **50** and carbon-linked analog **43**, which indicates that our changing the carbon linkage to a nitrogen linkage has a beneficial impact on enzyme activity.

An X-ray cocrystal structure of **50** provided some insight into this observation (Figure 3). Surprisingly, the binding conformation of **50** differed significantly from that of **7**. Most notably, the pyrimidone carbonyl of **50** forms a direct hydrogen bond with the backbone of Asp1222, whereas C-linked analog **7** has its carbonyl pointed toward the Lys1110 primary amine (Figure 2). In addition, the N(1) pyrimidone nitrogen of **50** is bridged to Lys1110 through hydrogen bonding to a crystallographically resolved water molecule, which indirectly preserves the hydrogen bond between the pyrimidone carbonyl of **7** and this amino acid. Therefore, the different pyrimidone orientation results in



**Figure 3.** X-ray cocrystal of **50** bound to c-Met.

the formation of an additional hydrogen bond with c-Met. A comparison of Figures 2 and 3 reveals that the A and C rings of both compounds adopt the same orientation relative to the c-Met backbone. Therefore, the conformational preferences of these two compounds dictate their respective pyrimidone B-ring orientations and hence their binding conformations to the protein. The additional hydrogen bond that was gained as a result of the changed pyrimidone conformation and the introduction of the para-fluoro substituent are the most plausible explanations of the increase in potency that was observed with nitrogen-linked compounds (e.g., **50** and **51**) compared with carbon-linked compounds (e.g., **7**). It should be noted that **50**, like **7**, binds to c-Met in the ATP pocket which indicates that **50** is an ATP-competitive inhibitor. This conclusion can also be applied to other pyrimidone molecules such as **22** and **51** because of their structural similarities to **7** and **50**, respectively.

The X-ray cocrystal of **50** also provided another clue as to how enzyme potency could be further improved. The dihedral angle between the fluorophenyl C ring and the pyrimidone B ring is 18°. To determine whether this dihedral angle corresponds to an energetically favored conformation, we examined an energy diagram that used 5-phenylpyrimidone as a surrogate for the B and C rings (Figure 4, top). As this graph indicates, a dihedral angle of 18° is about 1.5 kcal/mol above the energy minimum, which suggests that compounds like **50** and **51** incur a significant energy penalty to adopt the conformation with which they bind to c-Met.

To eliminate this energy barrier, we envisioned replacing the fluorophenyl C ring with a pyridine ring on the basis of the energy diagram of pyridin-2-yl pyrimidone (Figure 4, bottom). This diagram suggests that for a pyridine ring a dihedral angle of 20° or less provides the lowest energy conformation, which is in contrast with the phenylpyrimidone systems in which such a dihedral angle is energetically disfavored. As a result, we expected analogs with a pyridine B ring to be more potent because of the low-energy barrier that is required for them to bind c-Met. On the basis of this reasoning, we examined analog **62** and found it to be one of the most potent analogs of the series thus far ($K_i = 3.4 \pm 0.7$ nM). However, the increase in potency compared with that of **51** ($K_i = 4.9$ nM) was virtually negligible, at least in the enzyme assay. This could be the result of removing the C-ring fluoro group, a change that could offset any gain in potency that was obtained by the use of the pyridine ring.

**In Vitro Cell Assays.** Some of the more potent compounds that were identified in the enzyme assay were tested for their ability to inhibit HGF-mediated c-Met phosphorylation in PC3 cells, a human prostate cancer cell line, and CT26 cells, a murine

*Potent c-Met Inhibitors*





**Figure 4.** Torsional profiles of 5-phenyl pyrimidone (top) and pyridin-2-yl pyrimidone (bottom) for the dihedral angle highlighted in red. The coplanar structures shown are defined with a dihedral angle of 0°. Energy profiles were calculated on the basis of gas-phase quantum mechanic calculations by the use of density functional theory.

**Table 6.** IC$_{50}$ Values of Lead Analogs Against PC3 and CT26 Cell Lines[a]

| compd | $K_i$ (nM)[b] | PC3 IC$_{50}$ (nM)[b] | CT26 IC$_{50}$ (nM)[b] |
|---|---|---|---|
| 7 | 39 | 313 | 368 |
| 43 | 17 | 161 | 196 |
| 51 | 4.9 | 64 | 82 |
| 62 | 3.4 | 39 | 59 |

[a] See the Experimental Section for assay details. [b] Average of four experiments, with the exception of the PC3 and CT26 values for **62**, which are the average of two experiments.

cell line that is derived from a colon carcinoma (Table 6). In general, the compounds were slightly more potent in PC3 cells than they were in CT26 cells. In addition, the compounds generally exhibited a 10-fold shift in potency from enzyme to cell. Most significantly, the trends observed for enzyme potency for these compounds correlated with those that were observed for their cellular activities. Thus, the conversion of **7** to **43** resulted in improved cell potency as well as improved enzyme potency. Our changing the carbon linkage of **43** to a nitrogen linkage (**51**) improved enzyme and cellular potencies by an additional factor of 3. Finally, our replacing the fluorophenyl C ring of **51** with a pyridine ring (**62**) further improved cellular potency and made **62** the most potent analog that was prepared in this series.

**Enzyme Selectivity.** The selectivity of certain compounds against KDR, RON, and IGFR was examined next, and the results are outlined in Table 7. A noticeable trend is that the carbon-linked compounds (**7**, **22**, and **43**) were more selective against these enzymes than were the nitrogen-linked compounds (**50**, **51**, and **62**). This result might be explained by the differences in binding conformations that are demonstrated by **7** (Figure 2) and **50** (Figure 3). In particular, the different selectivity profiles most likely are the result of the different pyrimidone orientations because the A and C rings virtually occupy the same space in both cases. Whereas the decrease in selectivity was undesirable, the selectivity, especially that against KDR, was still high enough for **51** and **62** to justify further in vivo studies on these compounds, as well as on **22**.

**Table 7.** Enzyme Selectivity of Key Compounds[a]

| compd | c-Met $K_i$ (nM)[b] | KDR $K_i$ (nM)[c,d] | Ron $K_i$ (nM)[c,d] | IGFR $K_i$ (nM)[f] |
|---|---|---|---|---|
| 7 | 39 | >1300 | 581 | 1030 |
| 22 | 8.9 | 422 | 195 | 1450 |
| 43 | 17 | >3000 | 706 | 860 |
| 50 | 14 | 382 | 80 | 70 |
| 51 | 4.9 | 139 | 28 | 22 |
| 62 | 3.4 | 83 | 1.3 | 51 |

[a] See the Experimental Section for assay details. [b] Average of four experiments. [c] Value is the result of a single measurement, with the exception of **22**, which is the average of two experiments. [d] Phosphorylated KDR. [e] Phosphorylated Ron. [f] Value is the result of a single experiment.



**Figure 5.** Effect of **22** and **51** on HGF-mediated c-Met phosphorylation at 2 h postdose. Asterisk denotes $p < 0.0001$ compared with the HGF group (black bar). Bars represent the mean ± standard deviation ($n = 3$). Circles represent mean plasma concentration ± standard deviation.

The selectivities of compounds **22**, **51**, and **62** were also examined against a larger panel of tyrosine kinases and serine/threonine kinases. In this panel, the three compounds exhibited low selectivity (less than 10-fold) against only a small number of kinases (LCK, BTK, and cFMS). For most of the examined kinases, selectivities were greater than 100-fold.[42]

**In Vivo Studies.** Compound **22** from the carbon-linked series and compounds **51** and **62** from the nitrogen-linked series were evaluated for their pharmacokinetic (PK) properties and pharmacodynamic (PD) effects. All three compounds exhibited good PK profiles when they were given intravenously (iv) to rats, with half lives that ranged from 2.4 to 4 h, volumes of distribution that ranged from 3.0 to 5.4 L/kg, and clearances that ranged from 0.56 to 1.9 L/h/kg. Compound **22** had the highest bioavailability with a value of 100%, whereas **51** and **62** had values of 34 and 48%, respectively. Given the promising PK profiles of these compounds, we decided to evaluate all three compounds in a PD assay.

These compounds were administered to mice by either oral gavage (PO) or intraperitoneal injection (IP) (10, 30, or 100 mg/kg). Recombinant human HGF was injected iv at 2 h postdose. Livers were then harvested, and c-Met phosphorylation was quantified. Treatment with **22**, **51**, and **62** led to the dose-dependent inhibition of c-Met phosphorylation (Figures 5 and 6). Compound **22** exhibited an ED$_{90}$ of approximately 100 mg/kg (Figure 5). Consistent with the enzyme and cell data, analogs **51** and **62** exhibited increased potencies, with ED$_{90}$ values of ~30 mg/kg (Figures 5 and 6).

**Conclusions**

Overall, we have developed a novel and potent chemical series for targeting c-Met in vitro and in vivo. Our initial lead



**Figure 6.** Effect of **62** on HGF-mediated c-Met phosphorylation at 2 h postdose. Asterisk denotes $p < 0.0001$ compared with the HGF group (black bar). Bars represent the mean ± standard deviation ($n = 3$). Circles represent mean plasma concentration ± standard deviation.

compound **7** was found to be a potent c-Met inhibitor and was subsequently developed into the more potent analog **22**. However, an X-ray crystal structure of **7** bound to c-Met revealed an unexpected binding conformation. This result led to the design and synthesis of nitrogen-linked A-ring analogs **50** and **51**, which were more potent than **22** both in vitro and in vivo but were also less selective against other enzymes. The X-ray crystal structure of **50** revealed a binding conformation that was different from that of the carbon-linked analogs. This finding helps explain the potency and enzyme selectivity differences between the two series. This X-ray structure led to the design and synthesis of pyridine analog **62** as a means of minimizing dihedral angle strain between the B and C rings. As a result, **62** proved to be the most potent compound in this series both in vitro and in vivo.

## Experimental Section

**Chemistry.** All reactions were conducted on the benchtop and were run under nitrogen by the use of a Teflon-coated magnetic stir bar at the indicated temperature. Reactions that were run at an elevated temperature were run in an oil bath at the indicated temperature. Microwave reactions were run in a CEM Discover microwave that was equipped with the PowerMAX feature that used the settings described below. All solvents and reagents that were obtained from commercial sources were used without further purification. The removal of solvents was conducted by the use of a rotary evaporator, and the residual solvent was removed from nonvolatile compounds by the use of a vacuum manifold that was maintained at ~1 torr. All reported yields are isolated yields.

Analytical TLC was performed with EMD 0.25 mm silica gel 60 plates with a 254 nm fluorescent indicator. Plates were developed in a covered chamber and were visualized with ultraviolet light. Flash chromatography refers to column chromatography, as described by Still, that uses EMD silica gel 60 (230–400 mesh) as the stationary phase.[43] ISCO purification refers to a Teledyne ISCO purification system that uses RediSep columns in the size that is noted as well as the solvent system and gradients that are noted.

[1]H NMR spectra were obtained on a Bruker BioSpin GmbH magnetic resonance spectrometer. [1]H NMR spectra are reported as chemical shifts in parts per million (ppm) relative to an internal solvent reference. Peak multiplicity abbreviations are as follows: s (singlet), br s (broad singlet), d (doublet), dd (doublet of doublets), t (triplet), q (quartet), qn (quintet), and m (multiplet).

We conducted analytical HPLC and mass spectroscopy by the use of a reverse-phase Agilent 1100 series HPLC–MS by using the methods that are noted for each compound in the Supporting Information. The retention time ($t_R$) was recorded in minutes by

the use of UV detection at 254 nm. High-resolution MS measurements were obtained by the use of electrospray ionization on a Thermo Scientific linear ion trap (LTQ) Orbitrap spectrometer.

Elemental Analyses (C, H, N) were obtained from Atlantic Microlab in Norcross, Georgia.

**3-Methyl-2-(methylthio)pyrimidin-4(3$H$)-one (9).** Compound **8** (6.29 g, 44.2 mmol) was suspended in DMF (100 mL) and was cooled to 0 °C, and additional DMF (50 mL) was added. Solid LiHMDS (9.58 g, 57.3 mmol) was added in one portion, and the reaction was stirred at 0 °C. MeI (3.6 mL, 57.8 mmol) was added via syringe, and the reaction was warmed to room temperature and was stirred for 20.75 h. At this time, it was poured into 300 mL of H$_2$O and was extracted exhaustively with EtOAc. The organic extracts were combined, were dried over Na$_2$SO$_4$, were filtered, were concentrated, and were purified on silica gel (3:1 → 3:2 → 1:1 hexanes/EtOAc) to produce **9** (3.79 g, 55%). [1]H NMR (400 MHz, CDCl$_3$, δ): 7.76 (d, $J = 6.4$ Hz, 1H), 6.20 (d, $J = 6.4$ Hz, 1H), 3.52 (s, 3H), 2.58 (s, 3H). MS (ES) $m/z$: 157 (M + H$^+$).

**5-(3-Fluoro-4-methoxyphenyl)-3-methyl-2-(methylthio)pyrimidin-4(3$H$)-one (10).** Compound **9** (3.31 g, 21.2 mmol) was dissolved in chloroform (50 mL) and was cooled to 0 °C under argon. Bromine (1.25 mL, 25.4 mmol) was added via syringe, and the reaction was stirred at 0 °C for 35 min, at which time TLC analysis indicated the complete consumption of starting material. The reaction was quenched with 40 mL of saturated NaHCO$_3$, was warmed to room temperature, and was stirred overnight. The reaction was extracted with DCM (3 × 25 mL), and the organic extracts were combined, were dried over Na$_2$SO$_4$, were filtered, and were concentrated to produce 5-bromo-3-methyl-2-(methylthio)pyrimidin-4(3$H$)-one (4.98 g, 100%), which did not require further purification. [1]H NMR (400 MHz, CDCl$_3$, δ): 8.07 (s, 1H), 3.58 (s, 3H), 2.58 (s, 3H). MS (ES) $m/z$: 235 (Br79, M + H$^+$), 237 (Br81, M + H$^+$).

5-Bromo-3-methyl-2-(methylthio)pyrimidin-4(3$H$)-one (14.77 g, 62.8 mmol), 3-fluoro-4-methoxyphenylboronic acid (20.11 g, 118.3 mmol), Pd$_2$(dba)$_3$ (1.869 g, 2.04 mmol), $S$-Phos (3.45 g, 8.40 mmol), and K$_3$PO$_4$ (42.27 g, 199.1 mmol) were suspended in PhMe (200 mL). Argon was bubbled through the solution for 5 min, and the reaction was then placed in a preheated oil bath (100 °C) and was stirred for 6.25 h, at which time LCMS analysis indicated a complete reaction. The reaction was cooled to room temperature and was allowed to stand overnight. It was then diluted with DCM (200 mL) and was filtered through a 1in plug of silica gel that was washed exhaustively with MeOH, EtOAc, and DCM. (Some solid material that was stuck in the flask had to be taken up in water and extracted with EtOAc separately). The filtrate (and EtOAc extracts) were combined and concentrated, which resulted in an orange solid. This was treated with hexanes and was filtered, and the resultant light-yellow solid was repeatedly washed with hexanes and was dried under high vacuum to afford **10** (15.85 g, 90%) as a light-yellow solid. For analytical purposes, a sample was washed with EtOAc, and the resultant white solid was dried under vacuum. [1]H NMR (400 MHz, CDCl$_3$, δ): 7.93 (s, 1H), 7.46 (d, $J = 12.8$ Hz, 1H), 7.40 (d, $J = 8.8$ Hz, 1H), 6.99 (t, $J = 8.8$ Hz, 1H), 3.94 (s, 3H), 3.59 (s, 3H), 2.61 (s, 3H). MS (ES) $m/z$: 281 (M + H$^+$).

**General Procedure for the Synthesis of 11−13. 2-Benzyl-5-(3-fluoro-4-hydroxy-phenyl)-3-methylpyrimidin-4(3$H$)-one (11).** To a 500 mL three-necked round-bottomed flask that contained **10** (10 g, 36 mmol) and Pd(PPh$_3$)$_4$ (4.5 g, 3.9 mmol) in THF (50 mL) was added benzylzinc bromide (100 mL, 0.5 M in THF, 42 mmol). The flask was then placed in a preheated (60 °C) oil bath, and the reaction was stirred for 2 h and was then allowed to cool to ambient temperature. The reaction was quenched with saturated NH$_4$Cl, DCM (300 mL) was added, and the mixture was stirred overnight. The layers were separated, and the organic phase was collected, was dried over Na$_2$SO$_4$, was filtered, and was concentrated.

The crude material was put in a 1000 mL three-necked round-bottomed flask, and acetic acid (140 mL, 31 mmol) and hydrobromic acid (340 mL, 48%, 31 mmol) were added. The flask was fit with a reflux condensor, and the mixture was stirred at 135 °C for 4 h. The mixture was filtered while it was still hot, and the filtrate

*Potent c-Met Inhibitors*

*Journal of Medicinal Chemistry, 2008, Vol. 51, No. 18* **5773**

was cooled to ambient temperature. The filtrate was filtered, and the solid that was collected was washed with hexanes to afford **11** (9.2 g, 82% over two steps) as an off-white solid. $^1$H NMR (400 MHz, CDCl$_3$, δ): 8.05 (s, 1H), 7.52 (dd, J = 12.1, 2.0 Hz, 1H), 7.40−7.21 (m, 6H), 7.00 (t, J = 8.4 Hz, 1H), 6.20 (br s, 1H), 4.20 (s, 2H), 3.51 (s, 3H). MS (ES) m/z: 311 (M + H$^+$).

**4-Chloro-6-methoxyquinolin-7-ol (15).** 7-(Benzyloxy)-4-chloro-6-methoxyquinoline (36 g, 0.11 mol) was dissolved in TFA (200 mL), and CH$_3$SO$_3$H (13.9 mL, 0.214 mol) was added in one portion. The reaction was heated at reflux for 3 h and was then cooled to room temperature and concentrated. Aqueous 2.5 N NaOH was added to raise the pH of the solution to 7, which caused precipitation. The resultant solid was crushed, was stirred vigorously for 1 h, and was then filtered. The solid was collected and was dried under high vacuum to afford **15** (22 g, ∼100%) as a brown solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.66 (d, J = 5.0 Hz, 1H), 7.64 (d, J = 5.0 Hz, 1H), 7.42 (s, 1H), 7.40 (s, 1H), 4.00 (s, 3H), 2.31 (s, 1H). MS (ES) m/z: 210 (M + H$^+$).

**General Procedure for the Synthesis of 16−21. 4-Chloro-6-methoxy-7-(3-morpholino-propoxy)quinoline (16).** Compound **15** (11 g, 53 mmol), 3-chloro-1-bromopropane (26 mL, 265 mmol), and K$_2$CO$_3$ (69 g, 500 mmol) were suspended in DMF (400 mL) and were stirred at room temperature for 16 h. The suspension was filtered, and the filtrate was concentrated and diluted with EtOAc and water. The organic layer was separated, was dried over Na$_2$SO$_4$, was filtered, and was concentrated to afford a brown solid, which was directly used in the next step.

This brown solid was diluted with DMF (800 mL) and NaI (11.8 g, 79 mmol) and K$_2$CO$_3$ (36 g, 265 mmol) and morpholine (27.7 mL, 318 mmol) were added. The reaction was heated to 70 °C and was stirred for 16 h. It was then cooled to room temperature, was diluted with water (2 L), and was extracted two times with EtOAc. The organic extracts were combined, were dried over sodium sulfate, were filtered, and were concentrated to produce a dark-brown solid. This material was recrystallized in DCM−hexanes to afford **16** (12 g, 67% over two steps) as a light-brown solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.60 (d, J = 4.5 Hz, 1H), 7.55 (d, J = 4.5 Hz, 1H), 7.45 (s, 1H), 7.37 (s, 1H), 4.21 (t, J = 6.3 Hz, 2H), 3.97 (s, 3H), 3.60−3.55 (m, 4H), 2.46 (t, J = 7.0 Hz, 2H), 2.41−2.35 (m, 4H), 1.97 (qn, J = 6.0 Hz, 2H). MS (ES) m/z: 337 (M + H$^+$).

**General Procedure for the Synthesis of 22−24 and 26. 2-Benzyl-5-(3-fluoro-4-(6-methoxy-7-(3-morpholinopropoxy)quinolin-4-yloxy)phenyl)-3-methylpyrimidin-4(3H)-one (22).** Phenol **11** (200 mg, 0.645 mmol), chloride **16** (261 mg, 0.774 mmol), and DMAP (24 mg, 0.20 mmol) were suspended in 1,4-dioxane in a microwave vial. The vial was then sealed and was heated in the microwave to 120 °C at 300 W for 20 min. The reaction was then concentrated and was purified on prep HPLC (1 → 80% MeCN/water with 0.1% TFA over 60 min). The fractions with product were collected, were concentrated, and were diluted with DCM. MP-carbonate beads were added, and the suspension was stirred for 10 min and was filtered. The beads were washed with MeOH and CH$_2$Cl$_2$ three times, and the filtrate was concentrated to afford **22** (154 mg, 39%) as a yellow glass. $^1$H NMR (400 MHz, CDCl$_3$, δ): 8.50 (d, J = 5.3 Hz, 1H), 8.15 (s, 1H), 7.72 (dd, J = 11.6, 2.0 Hz, 1H), 7.59−7.53 (m, 2H), 7.45 (s, 1H), 7.41−7.25 (m, 6H), 6.49 (dd, J = 5.3, 0.9 Hz, 1H), 4.28 (t, J = 6.7 Hz, 2H), 4.23 (s, 2H), 4.04 (s, 3H), 3.75−3.70 (m, 4H), 3.55 (s, 3H), 2.58 (t, J = 7.2 Hz, 2H), 2.53−2.46 (m, 4H), 2.19−2.08 (m, 2H). MS (ES) m/z: 611 (M + H$^+$). Anal. Calcd for (C$_{35}$H$_{35}$FN$_4$O$_5$·0.2CH$_2$Cl$_2$): C, H, N.

**2-Benzyl-5-(3-fluoro-4-(6-methoxy-7-(3-(pyrrolidin-1-yl)propoxy)quinolin-4-yloxy)-phenyl)-3-methylpyrimidin-4(3H)-one (23).** By using chloride **17** and by following the procedure that was used to prepare **22**, we obtained **23** (4%) as a white solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.50 (d, J = 8.0 Hz, 1H), 8.30 (s, 1H), 7.93 (dd, J = 16.0, 4.0 Hz, 1H), 7.74 (d, J = 8.0 Hz, 1H), 7.53 (s, 1H), 7.51 (t, J = 8.0 Hz, 1H), 7.41−7.26 (m, 6H), 6.51 (d, J = 8.0 Hz, 1H), 4.29 (s, 2H), 4.21 (t, J = 8.4 Hz, 2H), 3.96 (s, 3H), 3.52 (s, 3H), 2.62−2.52 (m, 2H), 2.52−2.40 (m, 4H, buried

under DMSO peak), 2.04−1.97 (m, 2H), 1.73−1.65 (m, 4H). MS (ES) m/z: 595 (M + H$^+$). HRMS calcd for C$_{35}$H$_{36}$FN$_4$O$_4$ (M + H$^+$), 595.2721; found, 595.2712. Analytical HPLC: 97.9%. t$_R$ = 5.47.

**5-(4-(7-(3-(1H-1,2,4-Triazol-1-yl)propoxy)-6-methoxyquinolin-4-yloxy)-3-fluorophenyl)-2-benzyl-3-methylpyrimidin-4(3H)-one (24).** By using chloride **18**, we prepared compound **24** by following the procedure that was used to prepare **22**, with the following modifications: pyridine (2.5 mL) and 1,4-dioxane (1.25 mL) were both used, and the reaction was run in the microwave at 90 °C and 150 W for 10 min. Compound **24** was isolated in 3% yield as an off-white solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.57 (s, 1H), 8.50 (d, J = 5.3 Hz, 1H), 8.29 (s, 1H), 7.99 (s, 1H), 7.92 (dd, J = 12.5, 1.6 Hz, 1H), 7.74 (d, J = 8.3 Hz, 1H), 7.55 (s, 1H), 7.51 (t, J = 8.8 Hz, 1H), 7.41−7.25 (m, 6H), 6.52 (d, J = 5.3 Hz, 1H), 4.41 (t, J = 6.9 Hz, 2H), 4.28 (s, 2H), 4.18 (t, J = 6.0 Hz, 2H), 3.97 (s, 3H), 3.52 (s, 3H), 2.41−2.30 (m, 2H). MS (ES) m/z: 593 (M + H$^+$). HRMS calcd for C$_{33}$H$_{30}$FN$_6$O$_4$ (M + H$^+$), 593.2313; found, 593.2299. Analytical HPLC: 96.8%. t$_R$ = 5.22.

**2-Benzyl-5-(4-(7-(3-(4-ethylpiperazin-1-yl)-propoxy)-6-methoxyquinolin-4-yloxy)-3-fluorophenyl)-3-methylpyrimidin-4(3H)-one (26).** By using chloride **20**, and by following the procedure that was used to prepare **24**, we obtained **26** (10%) as a white solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.50 (d, J = 5.1 Hz, 1H), 8.29 (s, 1H), 7.92 (d, J = 12.6 Hz, 1H), 7.74 (d, J = 8.7 Hz, 1H), 7.53 (s, 1H), 7.50 (t, J = 12.0 Hz, 1H), 7.42−7.25 (m, 6H), 6.51 (d, J = 4.7 Hz, 1H), 4.28 (s, 2H), 4.19 (t, J = 5.8 Hz, 2H), 3.95 (s, 3H), 3.52 (s, 3H), 2.61−2.30 (m, 12H), 2.05−1.90 (m, 2H), 0.99 (t, J = 7.0 Hz, 3H). MS (ES) m/z: 638 (M + H$^+$). HRMS calcd for C$_{37}$H$_{41}$FN$_5$O$_4$ (M + H$^+$), 638.3143; found, 638.3135. Analytical HPLC: 97.5%. t$_R$ = 4.70.

**General Procedure for the Synthesis of 25 and 27. 2-Benzyl-5-(3-fluoro-4-(6-methoxy-7-(3-(4-methylpiperazin-1-yl)propoxy)quinolin-4-yloxy)phenyl)-3-methylpyrimidin-4(3H)-one (25).** Phenol **11** (258 mg, 0.832 mmol), chloride **19** (350 mg, 0.999 mmol), and DMAP (10 mg, 0.083 mmol) were suspended in pyridine (4.0 mL) and 1,4-dioxane (1.0 mL) and were heated in an oil bath at 110 °C over the weekend, at which time the solvent evaporated. More pyridine and 1,4-dioxane were added, and stirring was continued until about half of the starting material had been consumed, according to LCMS analysis. The reaction was cooled to room temperature, was concentrated, and was purified on silica gel (0 → 10% 2 M ammonia in MeOH/DCM). The fraction with product was collected, was concentrated, and was purified by HPLC. The fraction with product was treated with ammonium hydroxide and was extracted with 5% MeOH/DCM. The organic extracts were washed with saturated NaHCO$_3$, were dried over sodium sulfate, were filtered, and were concentrated to afford **25** (40 mg, 8%) as a light-yellow solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.50 (d, J = 5.1 Hz, 1H), 8.29 (s, 1H), 7.92 (dd, J = 12.5, 2.0 Hz, 1H), 7.74 (d, J = 12.0 Hz, 1H), 7.53 (s, 1H), 7.50 (t, J = 12.0 Hz, 1H), 7.41−7.27 (m, 6H), 6.51 (d, J = 5.3 Hz, 1H), 4.28 (s, 2H), 4.19 (t, J = 6.4 Hz, 2H), 3.95 (s, 3H), 3.52 (s, 3H), 2.46 (t, J = 7.0 Hz, 2H), 2.50−2.25 (m, 8H), 2.15 (s, 3H), 1.97 (qn, J = 7.0 Hz, 2H). MS (ES) m/z: 624 (M + H$^+$). HRMS calcd for C$_{36}$H$_{39}$FN$_5$O$_4$ (M + H$^+$), 624.2986; found, 624.2962. Analytical HPLC: 98.8%. t$_R$ = 4.91.

**2-Benzyl-5-(3-fluoro-4-(7-(3-(4-hydroxy-piperidin-1-yl)propoxy)-6-methoxyquinolin-4-yloxy)phenyl)-3-methylpyrimidin-4(3H)-one (27).** By using chloride **21**, and by following the procedure that was used to prepare **25**, except NMP was used instead of pyridine, and was added after the mixture was stirred overnight. Compound **27** was isolated in 6% yield as an off-white solid as a TFA salt. $^1$H NMR (500 MHz, CD$_3$OD, δ): 8.45 (d, J = 5.5 Hz, 1H), 8.23 (s, 1H), 7.81 (dd, J = 11.9, 2.1 Hz, 1H), 7.67 (s, 1H), 7.65 (d, J = 7.1 Hz, 1H), 7.43 (t, J = 8.4 Hz, 1H), 7.40−7.36 (m, 3H), 7.33−7.28 (m, 3H), 6.58 (d, J = 5.2 Hz, 1H), 4.31 (s, 2H), 4.28 (t, J = 5.9 Hz, 2H), 4.03 (s, 3H), 3.77 (br s, 1H), 3.56 (s, 3H), 3.14−3.05 (m, 2H), 2.93−2.86 (m, 2H), 2.65−2.55 (m, 2H), 2.22 (qn, J = 7.0 Hz, 2H), 1.99−1.93 (m,

2H), 1.73−1.65 (m, 2H). MS (ES) *m/z*: 625 (M + H$^+$). Analytical HPLC: 98.9%. $t_R$ = 5.32.

**General Procedure for the Synthesis of 32 and 33. 2-Benzyl-5-(3-fluoro-4-hydroxy-phenyl)pyrimidin-4(3H)-one (32).** We brominated 2-benzyl-pyrimidin-4(3H)-one (**28**) by following the procedure that was used for the bromination of **9** to afford 2-benzyl-5-bromopyrimidin-4(3H)-one in 29% yield.

2-Benzyl-5-bromopyrimidin-4(3H)-one (100 mg, 0.379 mmol), 3-fluoro-4-methoxyphenylboronic acid (128 mg, 0.756 mmol), Pd(PPh₃)₄ (22 mg, 0.019 mmol), and Na₂CO₃ (1 M in water, 0.5 mL, 0.5 mmol) were suspended in DME (1.5 mL) and were heated in the CEM microwave to 100 °C at 75 W for 10 min. The reaction was cooled to room temperature and was diluted with water and DCM. The organic layer was collected, was dried over sodium sulfate, was filtered through celite, and was concentrated. Purification via silica gel chromatography (ISCO column, 12 g, 0 → 5% MeOH/DCM) afforded **30** (86 mg, 74%) as a white solid.

Finally, we converted **30** to phenol **32** by following the demethylation procedure (HBr and HOAc) that was used to prepare **11**. Compound **32** was isolated in 65% yield as a white solid. $^1$H NMR (400 MHz, $d_6$-DMSO, δ): 12.88 (s, 1H), 9.98 (s, 1H), 8.09 (s, 1H), 7.58 (dd, *J* = 13.3, 2.3 Hz, 1H), 7.39−7.30 (m, 5H), 7.29−7.22 (m, 1H), 6.95 (t, *J* = 8.8 Hz, 1H), 3.89 (s, 2H). MS (ES) *m/z*: 297 (M + H$^+$).

**2-Benzyl-5-(3-fluoro-4-hydroxyphenyl)-6-methylpyrimidin-4(3H)-one (33).** Compound **33** was prepared from 2-benzyl-6-methyl-pyrimidin-4(3H)-one (**29**) with the same three-step sequence that was used to synthesize **32**. $^1$H NMR (400 MHz, $d_6$-DMSO, δ): 12.67 (br s, 1H), 9.90 (br s, 1H), 7.39−7.31 (m, 4H), 7.28−7.23 (m, 1H), 7.03 (dd, *J* = 12.6, 2.0 Hz, 1H), 6.94 (t, *J* = 8.8 Hz, 1H), 6.85 (dd, *J* = 8.4, 1.6 Hz, 1H), 3.83 (s, 2H), 2.07 (s, 3H). MS (ES) *m/z*: 311 (M + H$^+$).

**2-Benzyl-5-(4-(6,7-dimethoxyquinolin-4-yloxy)-3-fluorophenyl)pyrimidin-4(3H)-one (34).** Compound **32** (100 mg, 0.334 mmol), 4-chloro-6,7-dimethoxyquinoline (113 mg, 0.505 mmol), and DMAP (41 mg, 0.336 mmol) were suspended in PhMe (2 mL) and CHCl₃ (1 mL) and were heated in the microwave to 180 °C (with variable power) for 20 min and then for an additional 10 min. The reaction was then cooled to room temperature, was concentrated, was treated with DCM, and was filtered. The white solid was collected, and the filtrate was concentrated and purified via silica gel chromatography (ISCO column, 40 g, 0 → 5% MeOH/DCM) to afford, after combining with the solid collected earlier, **34** (86 mg, 53%) as a white solid. $^1$H NMR (400 MHz, CDCl₃, δ): 10.77 (br s, 1H), 8.52 (d, *J* = 5.3 Hz, 1H), 8.22 (s, 1H), 7.74 (dd, *J* = 11.4 Hz, 2.1 Hz, 1H), 7.59 (s, 1H), 7.60−7.55 (m, 1H), 7.45 (s, 1H), 7.43−7.30 (m, 6H), 6.51 (d, *J* = 5.3 Hz, 1H), 4.09 (s, 2H), 4.08 (s, 3H), 4.07 (s, 3H). MS (ES) *m/z*: 484 (M + H$^+$). HRMS calcd for C₂₈H₂₃FN₃O₄ (M + H$^+$), 484.1673; found, 484.1649. Analytical HPLC: 96.9%. $t_R$ = 1.66.

**2-Benzyl-5-(4-(6,7-dimethoxyquinolin-4-yl-oxy)-3-fluorophenyl)-6-methylpyrimidin-4(3H)-one (35).** By following the procedure that was used to prepare **34**, we prepared compound **35** from phenol **33** in 24% yield as a white solid. $^1$H NMR (400 MHz, CDCl₃, δ): 8.49 (d, *J* = 5.1 Hz, 1H), 7.60 (s, 1H), 7.45 (s, 1H), 7.42−7.26 (m, 6H), 7.19 (d, *J* = 8.2 Hz, 1H), 6.53 (d, *J* = 5.1 Hz, 1H), 4.07 (s, 3H), 4.06 (s, 3H), 3.96 (s, 2H), 2.34 (s, 3H). MS (ES) *m/z*: 498 (M + H$^+$). HRMS calcd for C₂₉H₂₅FN₃O₄ (M + H$^+$), 498.1829; found, 498.1812. Analytical HPLC: 95.2%. $t_R$ = 2.36.

**2-Benzyl-5-(4-(6,7-dimethoxyquinolin-4-yl-oxy)-3-fluorophenyl)-3-methylpyrimidin-4(3H)-one (7).** Compound **34** (25 mg, 0.052 mmol) was dissolved in DMF, and K₂CO₃ (11 mg, 0.080 mmol) and MeI (0.004 mL, 0.06 mmol) were added. The reaction was stirred at 43 °C (oil bath temperature) for 2 h, was diluted with DCM, and was washed with water twice and with brine once. The organic layer was dried over sodium sulfate, was filtered, was concentrated, and was purified on silica gel chromatography (ISCO column, 12 g, 0 → 5% MeOH/DCM) to afford a 6:1 mixture of 7 and the undesired O-methylated isomer (11 mg, 42% total yield). This mixture was purified via HPLC (70 → 100% MeCN/water

with 0.1% TFA) to afford pure **7**. $^1$H NMR (400 MHz, CDCl₃, δ): 8.52 (d, *J* = 5.3 Hz, 1H), 8.16 (s, 1H), 7.73 (dd, *J* = 11.7, 2.1 Hz, 1H), 7.60 (s, 1H), 7.57 (dd, *J* = 9.4, 0.9 Hz, 1H), 7.45 (s, 1H), 7.42−7.25 (m, 6H), 6.51 (d, *J* = 6.8, 0.8 Hz, 1H), 4.23 (s, 2H), 4.08 (s, 3H), 4.07 (s, 3H), 3.56 (s, 3H). MS (ES) *m/z*: 498 (M + H$^+$). Anal. Calcd for (C₂₉H₂₄FN₃O₄·0.1CH₂Cl₂): C, H, N.

**2-(Bromo(phenyl)methyl)-5-(4-(6,7-dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-3-methylpyrimidin-4(3H)-one (36).** Compound **7** (300 mg, 0.604 mmol) was diluted with CHCl₃, and NBS (0.24 g, 1.3 mmol) was added. The reaction was heated at reflux for 3 h, and then more NBS (53 mg, 0.30 mmol) was added. After another 2 h, the reaction was cooled to room temperature, was concentrated, and was purified via column chromatography (0 → 5% MeOH/DCM). A second column chromatography was necessary that used EtOAc as the eluent to afford pure **36** (113 mg, 32%) as a tan solid. $^1$H NMR (400 MHz, CDCl₃, δ): 8.44 (d, *J* = 5.3 Hz, 1H), 8.09 (s, 1H), 7.65 (dd, *J* = 11.6, 2.0 Hz, 1H), 7.50 (s, 1H), 7.51−7.43 (m, 3H), 7.41 (s, 1H), 7.38−7.28 (m, 3H), 7.25−7.18 (m, 1H), 6.43 (d, *J* = 5.3 Hz, 1H), 6.13 (s, 1H), 3.97 (s, 6H), 3.55 (s, 3H). MS (ES) *m/z*: 576 (Br79, M + H$^+$), 578 (Br81, M + H$^+$).

**2-(Amino(phenyl)methyl)-5-(4-(6,7-dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-3-methylpyrimidin-4(3H)-one (37).** Compound **36** (130 mg, 0.226 mmol) was dissolved in DMF (3 mL) and was cooled to 0° C. NaN₃ (18 mg, 0.28 mmol) was added, and the reaction was stirred for 1 h. It was then concentrated, treated with CHCl₃ and DCM, washed with water, and dried over sodium sulfate. The organic phase was decanted and concentrated and was taken directly to the next step.

The crude material was diluted with EtOAc and THF, and Pd−C (10% by weight, 24 mg) was added. The reaction was then stirred under a balloon of hydrogen for 4.5 h, was flushed with nitrogen, and was filtered through a pad of celite. The filtrate was concentrated and purified via silica gel chromatography (ISCO aminopropyl column, 40 g, 0 → 5% MeOH/DCM) to afford **37** (31 mg, 27% yield over two steps) as a yellow oil. $^1$H NMR (400 MHz, CDCl₃, δ): 8.51 (d, *J* = 5.0 Hz, 1H), 8.41 (s, 1H), 7.93 (dd, *J* = 12.3, 1.8 Hz, 1H), 7.76 (d, *J* = 8.5 Hz, 1H), 7.54 (s, 1H), 7.51 (t, *J* = 8.8 Hz, 1H), 7.44−7.34 (m, 5H), 7.32−7.27 (m, 1H), 6.53 (d, *J* = 5.0 Hz, 1H), 5.31 (s, 1H), 3.96 (s, 6H), 3.50 (s, 3H), 2.73 (br s, 2H). MS (ES) *m/z*: 513 (M + H$^+$). Anal. Calcd for (C₂₉H₂₅FN₄O₄·0.5CH₂Cl₂): C, H, N.

**General Procedure for the Synthesis of 38−41. N-((5-(4-(6,7-Dimethoxyquinolin-4-yl-oxy)-3-fluorophenyl)-1-methyl-6-oxo-1,6-dihydropyrimidin-2-yl)(phenyl)methyl)-2-(dimethylamino)acetamide (38).** Amine **37** (25 mg, 0.049 mmol) was diluted with DCM and was cooled in an ice-water bath. Et₃N (0.034 mL, 0.25 mmol) and 2-(dimethylamino)acetyl chloride hydrochloride salt (9 mg, 0.06 mmol) were added, and the reaction was stirred at room temperature until TLC analysis indicated a complete reaction. More Et₃N and 2-(dimethylamino)acetyl chloride hydrochloride salt were added as needed to afford a complete reaction. Upon completion, the reaction was concentrated and purified via silica gel chromatography (ISCO column, 12 g, 0 → 5% MeOH/DCM) to afford **38** (14 mg, 48% yield) as a tan solid. $^1$H NMR (400 MHz, CDCl₃, δ): 8.57 (d, *J* = 8.3 Hz, 1H), 8.52 (d, *J* = 5.3 Hz, 1H), 8.23 (s, 1H), 7.73 (dd, *J* = 11.6, 2.0 Hz, 1H), 7.59 (s, 1H), 7.60−7.55 (m, 1H), 7.46 (s, 1H), 7.43−7.35 (m, 5H), 7.32 (t, *J* = 8.4 Hz, 1H), 6.51 (d, *J* = 5.3 Hz, 1H), 6.34 (d, *J* = 8.3 Hz, 1H), 4.07 (s, 3H), 4.06 (s, 3H), 3.54 (s, 3H), 3.01 (s, 2H), 2.32 (s, 6H). MS (ES) *m/z*: 598 (M + H$^+$). HRMS calcd for C₃₃H₃₃FN₅O₅ (M + H$^+$), 598.2466; found, 598.2444. Analytical HPLC: 96.9%. $t_R$ = 2.43.

**N-((5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-1-methyl-6-oxo-1,6-dihydropyrimidin-2-yl)(phenyl)methyl)-propionamide (39).** By using propionyl chloride, and by following the procedure that was used to prepare **38**, we obtained **39** as an off-white solid. $^1$H NMR (300 MHz, CDCl₃, δ): 8.52 (d, *J* = 5.3 Hz, 1H), 8.18 (s, 1H), 7.71 (dd, *J* = 11.6 Hz, 2.0 Hz, 1H), 7.59 (s, 1H), 7.60−7.54 (m, 1H), 7.44 (s, 1H), 7.42−7.31 (m, 6H), 7.30−7.24 (m, 1H), 6.51 (dd, *J* = 5.3, 0.7 Hz, 1H), 6.31 (d, *J* = 7.6 Hz, 1H), 4.07 (s, 3H), 4.06 (s, 3H), 3.52 (s, 3H), 2.31 (dq, *J* =

*N*-((5-(4,6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-1-methyl-6-oxo-1,6-dihydropyrimidin-2-yl)(phenyl)methyl)-3-(methylthio)propanamide (40). By using 3-(methylthio)propanoyl chloride, and by following the procedure that was used to prepare 38, we obtained 40 (47%) as an off-white solid. $^1$H NMR (300 MHz, CDCl$_3$, δ): 8.53 (d, $J = 5.3$ Hz, 1H), 7.72 (dd, $J = 11.6$ Hz, 2.1, 1H), 7.59 (s, 1H), 7.59−7.54 (m, 1H), 7.53−7.47 (m, 1H), 7.48 (s, 1H), 7.42−7.37 (m, 5H), 7.32 (t, $J = 8.3$ Hz, 1H), 6.51 (d, $J = 5.3$ Hz, 1H), 6.30 (d, $J = 7.5$ Hz, 1H), 4.07 (s, 3H), 4.06 (s, 3H), 3.52 (s, 3H), 2.84−2.77 (m, 2H), 2.61−2.55 (m, 2H), 2.09 (s, 3H). MS (ES) *m/z*: 615 (M + H$^+$). HRMS calcd for C$_{33}$H$_{32}$FN$_4$O$_5$S (M + H$^+$), 615.2077; found, 615.2067. Analytical HPLC: 96.2%. $t_R = 1.87$.

**3-((5-(4,6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-1-methyl-6-oxo-1,6-dihydro-pyrimidin-2-yl)(phenyl)methyl)-1,1-dimethylurea (41).** By using dimethylcarbamic chloride, and by following the procedure that was used to prepare 38, we obtained 41 as an off-white solid. $^1$H NMR (300 MHz, CDCl$_3$, δ): 8.53 (d, $J = 5.1$ Hz, 1H), 8.19 (s, 1H), 7.72 (dd, $J = 11.6$ Hz, 2.0, 1H), 7.59 (s, 1H), 7.60−7.55 (m, 1H), 7.45 (s, 1H), 7.42−7.36 (m, 5H), 7.31 (t, $J = 8.3$ Hz, 1H), 6.51 (d, $J = 5.1$ Hz, 1H), 6.26−6.22 (m, 1H), 6.19−6.14 (m, 1H), 4.08 (s, 3H), 4.06 (s, 3H), 3.54 (s, 3H), 2.96 (s, 6H). MS (ES) *m/z*: 584 (M + H$^+$). Anal. Calcd for (C$_{32}$H$_{30}$FN$_5$O$_5$·0.3CH$_2$Cl$_2$): C, H, N.

**General Procedure for the Synthesis of 42, 43, and 51. 2-(4-Methylbenzyl)-5-(3-fluoro-4-(6-methoxy-7-(3-morpholino-propoxy)-quinolin-4-yloxy)phenyl)-3-methylpyrimidin-4(3*H*)-one (42).** 4-Chloro-6-methoxy-7-(3-morpholinopropoxy)quinoline (16, 116.7 mg, 0.346 mmol), 2-(4-methylbenzyl)-5-(3-fluoro-4-hydroxyphenyl)-3-methylpyrimidin-4(3*H*)-one (12, 120.6 mg, 0.372 mmol), copper powder (9.8 mg, 0.15 mmol), and solid KOH (56.1 mg, 1.0 mmol) were suspended in DMF (1 mL) and pyridine (1 mL) and were heated in the CEM microwave to 110 °C at 110 W for 18 min. The reaction was cooled to room temperature. We ran five more reactions in the microwave by using the same reagents in approximately the same amounts. For all six runs, the total amounts of 16 and 12 used were 1.164 g (3.457 mmol) and 1.417 g (4.370 mmol), respectively. Once completed, all six reactions were combined and were poured into 1 N NaOH (39 mL), which was then diluted with DCM. The layers were separated, and the aqueous phase was extracted repeatedly with DCM. The organic phases were combined, were dried over sodium sulfate, were filtered, were concentrated, and were purified on HPLC (1 → 70% MeCN/water with 0.1% TFA over 55 −65 min). The fractions with product were collected, were concentrated, and were repurified on HPLC (10 → 95% MeCN/water with 0.1% TFA). The fractions with product were collected, were concentrated, were diluted with DCM (~5 mL), and were treated with polymer-supported carbonate (560 mg, MP-carbonate, Argonaut Aquatics, 2.75 mmol/g). The suspension was stirred for 75 min and was then filtered. The filtrate was concentrated and was dried under high vacuum to afford 42 (115.0 mg, 5%) as a rust-colored solid. $^1$H NMR (400 MHz, CDCl$_3$, δ): 8.53 (d, $J = 5.5$ Hz, 1H), 8.16 (s, 1H), 7.74 (dd, $J = 9.6$, 2.0 Hz, 1H), 7.60 (s, 1H), 7.60−7.52 (m, 2H), 7.32 (t, $J = 8.3$ Hz, 1H), 7.21−7.13 (m, 4H), 6.54 (d, $J = 5.5$ Hz, 1H), 4.30 (t, $J = 6.5$ Hz, 2H), 4.19 (s, 2H), 4.06 (s, 3H), 3.83−3.78 (m, 4H), 3.56 (s, 3H), 2.80−2.60 (m, 6H), 2.36 (s, 3H), 2.25−2.17 (m, 2H). MS (ES) *m/z*: 625 (M + H$^+$). Anal. Calcd for (C$_{36}$H$_{37}$FN$_4$O$_5$·0.6CH$_2$Cl$_2$): C, H, N.

**2-(4-Fluorobenzyl)-5-(3-fluoro-4-(6-methoxy-7-(3-morpholinopropoxy)quinolin-4-yloxy)phenyl)-3-methylpyrimidin-4(3*H*)-one (43).** By using phenol 13, and by following the procedure that was used to prepare 42, we obtained 43 (1%) as a rust-colored solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 8.50 (d, $J = 5.3$ Hz, 1H), 8.27 (s, 1H), 7.91 (dd, $J = 12.5$, 2.0 Hz, 1H), 7.73 (d, $J = 8.4$ Hz, 1H), 7.53 (s, 1H), 7.50 (t, $J = 8.6$ Hz, 1H), 7.42 (s, 1H), 7.34 (dd, $J = 8.5$, 5.8 Hz, 2H), 7.19 (t, $J = 8.9$ Hz, 2H), 6.51 (d, $J = 5.3$ Hz, 1H), 4.27 (s, 2H), 4.21 (t, $J = 6.5$ Hz, 2H), 3.95 (s, 3H), 3.59 (t, $J = 4.5$ Hz, 4H), 3.54 (s, 3H), 2.50−2.44 (m, 2H),

2.42−2.37 (m, 4H), 1.98 (qn, $J = 6.0$ Hz, 2H). MS (ES) *m/z*: 629 (M + H$^+$). Anal. Calcd for (C$_{35}$H$_{34}$F$_2$N$_4$O$_5$·0.2CH$_2$Cl$_2$) C, H, N: Found, 65.90; Calcd, 65.48.

**5-(3-Fluoro-4-(6-methoxy-7-(3-morpholino-propoxy)quinolin-4-yloxy)phenyl)-2-(4-fluorophenylamino)-3-methylpyrimidin-4(3*H*)-one (51).** By using phenol 47, and by following the procedure that was used to prepare 42, we obtained 51 (6%) as a tan solid. $^1$H NMR (400 MHz, d$_6$-DMSO, δ): 9.06 (s, 1H), 8.49 (d, $J = 5.3$ Hz, 1H), 8.09 (s, 1H), 7.87 (dd, $J = 12.8$, 1.7 Hz, 1H), 7.67 (d, $J = 8.8$ Hz, 1H), 7.57−7.51 (m, 3H), 7.46−7.39 (m, 2H), 7.22 (t, $J = 8.8$ Hz, 2H), 6.49 (d, $J = 5.1$ Hz, 1H), 4.21 (t, $J = 5.7$ Hz, 2H), 3.95 (s, 3H), 3.63−3.57 (m, 4H), 3.57 (s, 3H), 2.50−2.35 (m, 6H), 2.06−1.93 (m, 2H). MS (ES) *m/z*: 630 (M + H$^+$). Anal. Calcd for (C$_{34}$H$_{33}$F$_2$N$_5$O$_5$·0.4CH$_2$Cl$_2$): C, H, N.

**5-(3-Fluoro-4-hydroxyphenyl)-3-methyl-2-(methylthio)pyrimidin-4(3*H*)-one (44).** Compound 10 (10.0 g, 35.8 mmol) was dissolved in HOAc (60 mL) and 48% aqueous HBr (240 mL). The flask was equipped with a reflux condenser and was placed in a preheated oil bath (115−120 °C) and was stirred for 3 h. The reaction was then cooled to room temperature and was poured into a 2 L Erlenmeyer flask. Saturated NaHCO$_3$ (1.3 L) was added in portions over 1 h, and the solution was stirred overnight at room temperature. Then, 5 N NaOH (100 mL) was added, and stirring was continued for 20 min. The suspension was filtered, and the solid was collected and dried under high vacuum at 60 °C to afford 44 (9.8 g, ~100%) as a white solid. $^1$H NMR (400 MHz, CDCl$_3$, δ): 7.95 (s, 1H) 7.51 (dd, $J = 11.9$, 2.0 Hz, 1H), 7.30−7.25 (m, 1H), 7.02 (t, $J = 8.8$ Hz, 1H), 5.33 (br s, 1H), 3.61 (s, 3H), 2.65 (s, 3H). MS (ES) *m/z*: 267 (M + H$^+$).

**General Procedure for the Synthesis of 48−50. 5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-3-methyl-2-(phenylamino)-pyrimidin-4(3*H*)-one (48).** Phenol 44 (508.1 mg, 1.908 mmol) was suspended in aniline (4.5 mL), and concentrated HCl (3 drops) was added. The suspension was sealed in a microwave vial and was heated in the CEM microwave to120 °C at 100 W for 10 min. The reaction was diluted with EtOAc (~100 mL) and was washed with 1 N NaOH (3 × 25 mL). The aqueous washings were combined and were extracted with EtOAc (10 mL). This EtOAc extraction was washed with 1 N NaOH (20 and 10 mL). Finally, all of the aqueous extractions were combined, were washed with Et$_2$O (3 × 15 mL), and were treated with 1 N HCl to lower the pH to about 8. The aqueous phase was extracted with EtOAc, and these organic extracts were combined and were washed with water (3 × 10 mL) and 1 N NaOH. The pH of these aqueous washings was adjusted with to be around 6 by concentrated HCl and then 1 N NaOH, and this aqueous phase was extracted with EtOAc and Et$_2$O. These organic extracts were combined, were dried over sodium sulfate, were filtered, were concentrated, and were dried under high vacuum to afford phenol 45 (466.1 mg, 78%).

Phenol 45 (210.3 mg, 0.6756 mmol), 4-chloro-6,7-dimethoxyuinoline (247.2 mg, 1.106 mmol, and DMAP (29.8 mg, 0.244 mmol) were suspended in 1,4-dioxane (4.0 mL) and were heated in the CEM microwave to 120 °C at 300 W for 20 min. The reaction was briefly cooled and was then reheated under the same conditions for 15 min. The reaction was cooled to room temperature once more, was concentrated, and was purified via HPLC (10 → 95% MeCN/water with 0.1% TFA). The fractions with product were collected, were concentrated, and were filtered through a plug of silica gel with EtOAc and then with 5% MeOH/EtOAc. The filtrate was concentrated and was again filtered through silica gel with EtOAc. Fractions with product were collected, were concentrated, and were dried under high vacuum to afford 48 (20.9 mg, 6%). For analytical purposes, a 4 mg aliquot was purified on a pipet silica gel column (50:1 → 25:1 DCM/MeOH) to afford analytically pure material. $^1$H NMR (400 MHz, CDCl$_3$, δ): 8.50 (d, $J = 5.3$ Hz, 1H), 7.97 (s, 1H), 7.66 (dd, $J = 11.9$, 2.0 Hz, 1H), 7.60 (s, 1H), 7.52−7.38 (m, 7H), 7.25−7.20 (m, 2H), 6.51 (dd, $J = 5.3$, 1.0 Hz, 1H), 4.07 (s, 3H), 4.05 (s, 3H), 3.69 (s, 3H). MS (ES) *m/z*: 499 (M + H$^+$). HRMS calcd for C$_{28}$H$_{24}$FN$_4$O$_4$ (M + H$^+$), 499.1782; found, 499.1767. Analytical HPLC: 96.6%. $t_R = 1.74$.

**5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-2-(2-fluorophenylamino)-3-methylpyrimidin-4(3H)-one (49).** By using phenol **46** (prepared in the same manner as **45** above) and 4-chloro-6,7-dimethoxyquinoline, and by following the procedure that was used to prepare **48**, we obtained **49** (1%) as an off-white solid. [1]H NMR (400 MHz, $d_6$-DMSO, $\delta$): 9.12 (s, 1H), 8.57 (s, 1H), 8.05 (s, 1H), 7.87 (d, $J$ = 12.5 Hz, 1H), 7.73−7.22 (m, 8 H), 6.61 (s, 1H), 3.97 (s, 6H), 3.58 (s, 3H). MS (ES) $m/z$: 517 (M + H[+]). HRMS calcd for $C_{28}H_{23}F_2N_4O_4$ (M + H[+]), 517.1687; found, 517.1667. Analytical HPLC: 98.1%. $t_R$ = 2.27.

**5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-2-(4-fluorophenylamino)-3-methylpyrimidin-4(3H)-one (50).** By using phenol **47** (prepared in the same manner as **45** above) and 4-chloro-6,7-dimethoxyquinoline, and by following the procedure that was used to prepare **48**, we obtained **50** (6%) as an off-white solid. [1]H NMR (400 MHz, $d_6$-DMSO, $\delta$): 9.06 (s, 1H), 8.66 (s, 1H), 8.12 (s, 1H), 7.92 (d, $J$ = 13.1 Hz, 1H), 7.73 (d, $J$ = 9.8 Hz, 1H), 7.68−7.63 (m, 1H), 7.53−7.47 (m, 3H), 7.51−7.47 (m, 1H), 7.23 (t, $J$ = 8.9 Hz, 2H), 6.74 (m, 1H), 4.00 (s, 6H), 3.57 (s, 3H). MS (ES) $m/z$: 517 (M + H[+]). HRMS calcd for $C_{28}H_{23}F_2N_4O_4$ (M + H[+]), 517.1687; found, 517.1670. Analytical HPLC: 95.1%. $t_R$ = 2.24.

**5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-3-methyl-2-(methylthio)-pyrimidin-4(3H)-one (52).** Phenol **44** (2.82 g, 10.6 mmol), 4-chloro-6,7-dimethoxyquinoline (2.10 g, 9.40 mmol), and DMAP (110.1 mg, 0.901 mmol) were suspended in pyridine (30 mL) and 1,4-dioxane (15 mL), and the reaction flask was heated in an oil bath (110 °C) while the reaction was stirred under argon overnight. The reaction was cooled to room temperature, was diluted with water (75 mL), and was filtered. The solid was washed with water and was dried under high vacuum to afford **52** (2.50 g, 59%). [1]H NMR (400 MHz, $d_6$-DMSO, $\delta$): 8.50 (d, $J$ = 5.1 Hz, 1H), 8.29 (s, 1H), 7.90 (dd, $J$ = 12.4, 1.7 Hz, 1H), 7.72 (d, $J$ = 8.8 Hz, 1H), 7.54 (s, 1H), 7.50 (t, $J$ = 8.6 Hz, 1H), 7.42 (s, 1H), 6.52 (d, $J$ = 5.3 Hz, 1H), 3.95 (s, 6H), 3.52 (s, 3H), 2.62 (s, 3H). MS (ES) $m/z$: 454 (M + H[+]).

**5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-2-hydroxy-3-methylpyrimidin-4(3H)-one (53).** Compound **52** (8.90 g, 19.6 mmol), was dissolved in a solution of MeCN (288 mL) and TFA (32 mL), which was then cooled to −5 °C in a dilute dry-ice/acetone bath. Urea hydrogen peroxide (7.37 g, 78.4 mmol) was added, and the reaction was stirred for 5 min. TFAA (10.90 mL, 78.40 mmol) was added dropwise via a dropping funnel while the temperature was maintained at −5° C. The reaction was stirred at this temperature for 30 min and was then allowed to warm up to room temperature, where it was stirred for 3 h. The reaction was then diluted with DCM and H₂O, and the layers were separated. The aqueous phase was extracted with DCM, and the organic phases were combined, were dried over sodium sulfate, were filtered, were concentrated, and were dried in vacuo at 100 °C over the weekend to afford **53** (10.00 g, 95% yield) as a beige solid. [1]H NMR (300 MHz, CDCl₃, $\delta$): 10.50 (d, $J$ = 5.44 Hz, 1H), 8.70 (d, $J$ = 6.6 Hz, 1H), 7.86 (s, 1H), 7.69 (s, 1H), 7.69−7.55 (m, 2H), 7.49 (d, $J$ = 8.5 Hz, 1H), 7.36 (t, $J$ = 8.3 Hz, 1H), 6.80 (d, $J$ = 6.1 Hz, 1H), 4.15 (s, 3H), 4.13 (s, 3H), 3.42 (s, 3H). MS (ES) $m/z$: 424 (M + H[+]).

**General Procedure for the Synthesis of 55 and 56. 5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-2-(3-fluorophenylamino)-3-methylpyrimidin-4(3H)-one (55).** Compound **53** (~240 mg, 0.57 mmol) was dissolved in POCl₃ (16 mL) and *N,N*-dimethylaniline (1.6 mL). The reaction was heated to 125 °C for 8.5 h and was then cooled to room temperature and was stirred overnight. It was then concentrated and diluted with DCM (~125 mL). The organic phase was washed with saturated sodium bicarbonate (25 and 17 mL), was dried over sodium sulfate, was filtered, and was concentrated. Crude chloride **54** was dissolved in 1,4-dioxane (15 mL) and was used for the next step.

This solution (5 mL) was put in a microwave vial, and 3-fluoroaniline (0.2 mL, 2 mmol) and concentrated HCl (1 drop) were added. The vial was sealed and was heated in the CEM microwave to 60 °C at 60 W for 5 min. The reaction was then cooled to room temperature, was concentrated, and was filtered

through a plug of silica gel (EtOAc, 2:1 EtOAc/MeOH → 3:2 MeOH/EtOAc). The filtrate was concentrated and was purified on HPLC (10 → 95% MeCN/water with 0.1% TFA). The fractions with product were collected, were concentrated, and were purified two times on a silica gel plug (EtOAc → 1% MeOH/EtOAc the first time, EtOAc the second time) to afford **55** (14.4 mg) as a light-yellow solid. [1]H NMR (400 MHz, $d_6$-DMSO, $\delta$): 9.14 (s, 1H), 8.59 (d, $J$ = 5.5 Hz, 1H), 8.17 (s, 1H), 7.91 (d, $J$ = 13.6 Hz, 1H), 7.72 (d, $J$ = 8.5 Hz, 1H), 7.60 (s, 1H), 7.60−7.53 (m, 1H), 7.51−7.38 (m, 4H), 7.00−6.94 (m, 1H), 6.63 (d, $J$ = 5.0 Hz, 1H), 3.96 (s, 6H), 3.59 (s, 3H). MS (ES) $m/z$: 517 (M + H[+]). HRMS calcd for $C_{28}H_{23}F_2N_2O_4$ (M + H[+]), 517.1687; found, 517.1672. Analytical HPLC: 95.0%. $t_R$ = 6.37.

**5-(4-(6,7-Dimethoxyquinolin-4-yloxy)-3-fluorophenyl)-3-methyl-2-(4-(trifluoro-methyl)phenylamino)pyrimidin-4(3H)-one (56).** By using 5 mL of the same solution of crude chloride **54**, and by following the procedure that was used to prepare **55**, we obtained **56** (12.8 mg) as a light-yellow solid. [1]H NMR (400 MHz, $d_6$-DMSO, $\delta$): 9.30 (s, 1H), 8.50 (d, $J$ = 5.5 Hz, 1H), 8.15 (s, 1H), 7.93−7.82 (m, 3H), 7.75−7.68 (m, 3H), 7.54 (s, 1H), 7.46 (t, $J$ = 8.5 Hz, 1H), 7.42 (s, 1H), 6.52 (d, $J$ = 5.0 Hz, 1H), 3.96 (s, 6H), 3.61 (s, 3H). MS (ES) $m/z$: 567 (M + H[+]). HRMS calcd for $C_{29}H_{23}F_4N_4O_4$ (M + H[+]), 567.1655; found, 567.1638. Analytical HPLC: 95.5%. $t_R$ = 6.96.

**5-(Benzyloxy)-2-bromopyridine (57).** A suspension of sodium hydride (3.808 g, Aldrich 60%, 95.20 mmol) and DMF (25 mL) was cooled in an ice-water bath under nitrogen, and 2-bromo-5-hydroxypyridine (14.28 g, 82.07 mmol) was added via syringe as a solution in DMF (120 mL) over 35 min. The reaction was warmed to room temperature, was stirred under nitrogen for 40 min, and was then cooled again in an ice-water bath. Benzyl bromide (12.0 mL, 98 mmol) was added via syringe, and the reaction was warmed to room temperature and was stirred for 90 min. It was then poured into 2.5% aqueous HCl (400 mL), and the pH of the aqueous layer was raised to 14 with 5 N NaOH and was then lowered to 12 with concentrated HCl, which caused precipitation. The solution was decanted, and the decanted liquid was extracted with EtOAc (3 × 300 mL). Organic extracts were combined, were dried over sodium sulfate, were filtered, and were concentrated. The concentrate and the precipitate were combined, were diluted with EtOAc (~400 mL), and were washed with water (3 × 150 mL). The organic phase was dried over sodium sulfate, was filtered, was concentrated, and was filtered through a 2in silica gel with EtOAc. The filtrate was concentrated and was dried under high vacuum to afford **57** (22.9 g). [1]H NMR (400 MHz, CDCl₃, $\delta$): 8.14 (d, $J$ = 3.1 Hz, 1H), 7.43−7.35 (m, 6H), 7.16 (dd, $J$ = 8.6, 3.1 Hz, 1H), 5.10 (s, 2H). MS (ES) $m/z$: 264 (Br79, M + H[+]), 266 (Br81, M + H[+]).

**2-(5-(Benzyloxy)pyridin-2-yl)acetic Acid (58). 57** (22.9 g, 86.7 mmol) and Pd(PPh₃)₄ (11.3 g, 9.78 mmol) were dissolved in THF (100 mL). Argon was bubbled through for 5 min, and then 2-*tert*-butoxy-2-oxoethylzinc (199 mL, 0.5 M in Et₂O, 99.5 mmol) was added via syringe. The flask was equipped with a reflux condensor and was placed in a preheated oil bath (60 °C) and was stirred under argon. After 4 h, more Pd(PPh₃)₄ (0.62 g, 0.54 mmol) was added. Stirring was continued at reflux for 1 h, and then the reaction was cooled to room temperature and was quenched with 250 mL of a 1:1 solution of saturated ammonium chloride and saturated EDTA (disodium salt). The layers were separated, and the aqueous phase was extracted with EtOAc (200 mL). The organic extracts were combined, were dried over sodium sulfate, were filtered, and were concentrated. After the mixture sat at room temperature overnight, a precipitate formed, so the suspension was refiltered, and the filtrate was concentrated and was filtered through a 2in silica gel with 5:1 → 2:1 hexanes/EtOAc → EtOAc.

The filtrate was concentrated, was dissolved in DCM (250 mL), and was cooled to 0 °C in an ice-water bath under argon. TFA (30 mL, 404 mmol) was added via syringe, and the reaction was allowed to warm to room temperature while being stirring overnight.

The next morning, an additional 30 mL of TFA was added, and stirring was continued at room temperature. After 5 h, the reaction was concentrated, was poured into 10% aqueous sodium carbonate

(200 mL), and was diluted with DCM (150 mL). More 10% aqueous sodium carbonate (100 mL) was added, and the layers were separated. The aqueous layer was washed with DCM (2 × 150 mL), and the organic extracts were then extracted with 10% aqueous sodium carbonate (100 mL) and 1 N NaOH (50 mL). All aqueous phases and extractions were combined, and the pH was lowered to about 8 by concentrated HCl, which caused precipitation. This suspension was filtered, and the pH of the filtrate was lowered to about 4 by concentrated HCl, which caused more precipitation. This suspension was also filtered, and the solid was allowed to dry in the air for ~3 days and was then dried under high vacuum at 60 °C to afford **58** (11.323 g, 57% over 3 steps). $^1$H NMR (400 MHz, $d_6$-DMSO, δ): 12.50−12.21 (br s, 1H), 8.24 (d, $J$ = 3.0 Hz, 1H), 7.48−7.30 (m, 6H), 7.27 (d, $J$ = 8.5 Hz, 1H), 5.17 (s, 2H), 3.66 (s, 2H). MS (ES) $m/z$: 244 (M + H$^+$).

**5-(5-(Benzyloxy)pyridin-2-yl)-3-methyl-2-(methylthio)pyrimidin-4(3H)-one (60).** Acid **58** (11.323 g, 46.55 mmol) was suspended in DCM (200 mL), and DMF (0.25 mL) was added. Then, (COCl)$_2$ (4.5 mL, 52 mmol) was added dropwise via syringe over 25 min, which caused vigorous gas evolution. The reaction was stirred at room temperature for about 10 min, and salt **59** (15.71 g, 54.74 mmol) was added. The suspension was cooled to 0 °C, triethylamine (23.0 mL, 165 mmol) was added via syringe, and DCM (3.5 mL) was added to rinse the sides of the flask. The solution was allowed to warm to room temperature and was stirred for 41 h. The reaction was then quenched with water (175 mL), and the layers were separated. The aqueous phase was extracted with DCM (2 × 150 mL), and the organic extracts and phases were combined, were dried over MgSO$_4$, were filtered, were concentrated, and were filtered through silica gel (~2 in) with DCM → 100:1 → 10:1 DCM/MeOH. The fractions with product were collected, were concentrated, and were filtered again through silica gel with DCM → 100:1 → 10:1 DCM/MeOH. We repeated this process one last time by using an eluent system of DCM → 100:1 → 50:1 DCM/MeOH. Fractions with product were collected and concentrated, and the solid was washed with hexanes, Et$_2$O, and EtOAc and was filtered. The solid was collected and was set aside as batch no. 1. The filtrate was collected, concentrated, and refiltered, and the solid was washed with DCM. This filtrate was purified on silica gel (~2 in, DCM → 50:1 → 10:1 → 5:1 DCM/MeOH), and the fractions with product were combined with the solid that was set aside earlier (batch no. 1), were concentrated, and were dried under high vacuum to afford **60** (5.21 g, 69% purity, 23% yield). For characterization purposes, a small amount of **60** (prepared separately) was washed with MeOH and acetone and was dried in vacuo. $^1$H NMR (400 MHz, CDCl$_3$, δ): 8.69 (s, 1H), 8.41 (d, $J$ = 2.8 Hz, 1H), 8.32 (d, $J$ = 8.9 Hz, 1H), 7.48−7.28 (m, 6H), 5.15 (s, 2H), 3.62 (s, 3H), 2.64 (s, 3H). MS (ES) $m/z$: 340 (M + H$^+$).

**2-(4-Fluorophenylamino)-5-(5-(6-methoxy-7-(3-morpholinopropoxy)quinolin-4-yloxy)-pyridin-2-yl)-3-methylpyrimidin-4(3H)-one (62).** A 100 mL round-bottomed flask was charged with **60** (1.05 g, 3.09 mmol) and 1,4-dioxane (25 mL). Then, 4-fluoroaniline (1.5 mL, 16 mmol) and concentrated HCl (0.04 mL, 1 mmol) were added, and the flask was fit with a reflux condenser, was put in a preheated oil bath (120−125 °C), and was stirred under nitrogen. After 1 day, 1.5 mL of 4-fluoroaniline was added, and stirring was continued at reflux for 1 week total. The reaction was then cooled to room temperature, was concentrated, and was filtered through 2 in of silica gel with DCM → 20:1 DCM/MeOH. Fractions with product were collected, were concentrated, and were taken to the next step.

The material was diluted with DCM (20 mL) and BBr$_3$ (4.0 mL, 1.0 M in DCM, 4.0 mmol) was added via syringe, which caused precipitation to occur. The flask was placed in a water bath, was stirred under argon for 45 min, and was then quenched with saturated NaHCO$_3$ (40 mL). The aqueous phase was extracted with 10:1 DCM/MeOH (4 × 100 mL, 50 mL) and 4:1 DCM/MeOH (2 × 150 mL, 50 mL, 150 mL), and the organic extracts were combined, were dried over sodium sulfate and magnesium sulfate, were filtered, and were concentrated to afford phenol **61** (1.157 g, 53% purity, 63% yield over 2 steps).

Phenol **61** (574 mg, 1.84 mmol), chloride **16** (458.9 mg, 1.36 mmol), and DMAP (20.9 mg, 0.18 mmol) were dissolved in pyridine (4.6 mL) and 1,4-dioxane (2.3 mL) in a 50 mL round-bottomed flask. The flask was fit with a reflux condenser, was placed in a preheated oil bath (130−135 °C), and was stirred under nitrogen for 5 h.

The reaction was cooled to room temperature, was poured into 1 N NaOH (17 mL), and was extracted with DCM (4 × 30 mL, 2 × 50 mL). The organic extracts were combined, were dried over magnesium sulfate, were concentrated, and were filtered through silica gel (2 in, 10:1 → 5:1 DCM/MeOH → 5:1 DCM/2 N ammonia in MeOH). The filtrate was concentrated and was purified on silica (20:1 → 10:1 DCM/2 N ammonia in MeOH). It was repurified on silica gel (10:1 DCM/2 N ammonia in MeOH) to afford **62** (106.8 mg, 13%) as a light-orange solid. $^1$H NMR (400 MHz, CDCl$_3$, δ): 8.75 (s, 1H), 8.54−8.51 (m, 2H), 8.47 (d, $J$ = 8.8 Hz, 1H), 7.55 (s, 1H), 7.55−7.51 (m, 1H), 7.50−7.45 (m, 3H), 7.13 (t, $J$ = 8.6 Hz, 2H), 6.54 (d, $J$ = 5.3 Hz, 1H), 6.46 (s, 1H), 4.29 (t, $J$ = 6.7 Hz, 2H), 4.04 (s, 3H), 3.75−3.72 (m, 4H), 3.71 (s, 3H), 2.59 (t, $J$ = 7.1 Hz, 2H), 2.53−2.47 (m, 4H), 2.15 (qu, $J$ = 6.8 Hz, 2H). MS (ES) $m/z$: 613 (M + H$^+$). Anal. Calcd for (C$_{33}$H$_{33}$FN$_6$O$_5$·0.4CH$_2$Cl$_2$): C, H, N.

**c-Met and KDR Enzyme Assays.** $K_i$ values for specific compounds were derived from IC$_{50}$ measurements versus the c-Met and KDR kinases that were determined by the use of homogeneous time-resolved fluorescence (HTRF) assays, as previously described.[44] We tested molecules in a 10-point serial dilution by using an ATP concentration of two-thirds the $K_m$ value that was determined experimentally and was calculated by the use of the Eadie−Hofstee and Lineweaver−Burke methods.

**Cell-Based Assays.** According to ref 27, PC3 and CT26 cells were obtained from the American Type Culture Collection (ATCC, Rockville, MD). Cells were grown as monolayers by the use of standard cell culture conditions. IC$_{50}$ measurements of compound activities on HGF-mediated c-Met autophosphorylation were determined in serum-starved PC3 (human) or CT26 (mouse) cells by the use of a quantitative electrochemiluminescent immunoassay. Cells were plated at a density of 20 000 cells/well in 96-well plates. After plating (24 h), cells were starved in media that contained 0.1% BSA for 16 to 20 h. Cells were then treated with a 10-point serial dilution of each tested compound for 1 h at 37 °C, followed by stimulation with optimal concentrations of recombinant human HGF for 10 min at 37 °C. Cells were washed once with PBS and were lysed (1% Triton X-100, 50 mM Tris pH 8.0, 100 mM NaCl, 300 μM Na$_3$VO$_4$, and protease inhibitors). Cell lysates were incubated with a biotin-labeled goat-anti-c-Met antibody (BAF358 for human and c-Met and BAF527 for mouse, R&D Systems, Minneapolis, MN) for capture, followed by a mouse antiphosphotyrosine antibody 4G10 (Upstate, Charlottesville, VA) and a BV-tag-labeled antimouse IgG (BioVeris, Gaithersburg, MD) as the detection antibody. Levels of c-Met phosphorylation were measured on a BioVeris M-series instrument. The IC$_{50}$ values are calculated by the use of the Xlfit4-parameter equation.

**Pharmacodynamic Assay.** According to ref 27, the effect of **22**, **51**, and **62** on HGF-mediated c-Met phosphorylation in vivo was evaluated in the liver of female BALB/c mice. Compounds were administered by either PO or IP at 10, 30, or 100 mg/kg. After a single dose (2 h), 12 μg human HGF was injected iv to phosphorylate c-Met in the liver. After HGF injection (5 min), the livers were harvested, and levels of phosphorylated c-Met were determined by a quantitative electrochemiluminescent assay. c-Met phosphorylation that was measured in livers from mice that were injected with BSA and were treated with vehicle served as a negative control and indicated the background level. Livers from mice that were injected with HGF and were treated with vehicle established the maximal level of c-Met phosphorylation in the liver. Statistical significance was evaluated by analysis of variance (ANOVA), followed by the Bonferroni/Dunn post hoc test by the use of StatView software v5.0.1. Data represent the mean ($n$ = 3) ± standard deviation.

D'Angelo et al.

**Crystallography.** Crystals of c-Met were grown as previously described.[27] Compounds were dissolved in DMSO to a final concentration of 20 mM and were then mixed with c-Met protein to a final DMSO concentration of 4% prior to crystallization. Crystals were grown from 12% PEG 6K, 1.0 M LiCl$_2$, and 0.1 M sodium citrate, pH 5.0. Large crystals that were suitable for data collection were obtained by microseeding. Data were collected on a FRE that was equipped with an RaxisII++ and were scaled by the use of the Denzo/Scalepack programs. We solved the structures by molecular replacement by using the published c-Met structure 1R1W as a search model and the program AMORE. The structures were built and refined by the use of COOT and REFMAC. All Figures were prepared by the use of PyMOL.

**Acknowledgment.** We thank Jean-Christophe Harmange, Ron Hermenau, and Mark Norman for their assistance in preparing this manuscript. We also thank Howie Yu for his assistance in retrieving and compiling analytical data.

**Supporting Information Available:** Elemental analyses and HPLC methods for key compounds and X-ray data for **7** and **50**. This material is available free of charge via the Internet at http://pubs.acs.org.

## References

(1) Longati, P.; Comoglio, P. M.; Bardelli, A. Receptor Tyrosine Kinases as Therapeutic Targets: The Model of the Met Oncogene. *Curr. Drug Targets* **2001**, *2*, 41–55.

(2) Haddad, R.; Lipson, K. E.; Webb, C. P. Hepatocyte Growth Factor Expression in Human Cancer and Therapy with Specific Inhibitors. *Anticancer Res.* **2001**, *21*, 4243–4252.

(3) Maulik, G.; Shrikhande, A.; Kijima, T.; Ma, P. C.; Morrison, P. T.; Salgi, R. Role of the Hepatocyte Growth Factor Receptor, c-Met, in Oncogenesis and Potential for Therapeutic Inhibition. *Cytokine Growth Factor Rev.* **2002**, *13*, 41–59.

(4) Matsumoto, K.; Date, K.; Shimura, H.; Nakamura, T. Acquisition of Invasive Phenotype in Gallbladder Cancer Cells Via Mutual Interaction of Stromal Fibroblasts and Cancer Cells as Mediated by Hepatocyte Growth Factor. *Jpn. J. Cancer Res.* **1996**, *87*, 702–710.

(5) Jeffers, M.; Rong, S.; Vande Woude, G. F. Enhanced Tumorigenicity and Invasion-Metastasis by Hepatocyte Growth Factor/Scatter Factor-Met Signaling in Human Cells Concomitant with Induction of the Urokinase Proteolysis Network. *Mol. Cell. Biol.* **1996**, *16*, 1115–1125.

(6) Birchmeier, C.; Birchmeier, W.; Gherardi, E.; Vande Woude, G. F. Met, Metastasis, Motility and More. *Nat. Rev. Mol. Cell Biol.* **2003**, *4*, 915–925.

(7) Corso, S.; Comoglio, P. M.; Giordano, S. Cancer Therapy: Can the Challenge Be MET? *Trends Mol. Med.* **2005**, *11*, 284–292.

(8) Ma, P. C.; Maulik, G.; Christensen, J.; Salgia, R. C-Met: Structure, Functions, and Potential for Therapeutic Inhibition. *Cancer Metastasis Rev.* **2003**, *22*, 309–325.

(9) Christensen, J. G.; Burrows, J.; Salgia, R. c-Met as a Target for Human Cancer and Characterization of Inhibitors for Therapeutic Intervention. *Cancer Lett.* **2005**, *225*, 1–26.

(10) Dussault, I.; Kaplan-Lefko, P.; Jun, T.; Coxon, A.; Burgess, T. L. HGF- and c-Met-Targeted Drugs: Hopes, Challenges, and their Future in Cancer Therapy. *Drugs Future* **2006**, *31*, 819–825.

(11) Cao, B.; Su, Y.; Oskarsson, M.; Zhao, P.; Kort, E. J.; Fisher, R. J.; Wang, L. M.; Woude, G. F. V. Neutralizing Monoclonal Antibodies to Hepatocyte Growth Factor/Scatter Factor (HGF/SF) Display Antitumor Activity in Animal Models. *Proc. Natl. Acad. Sci. U.S.A.* **2001**, *98*, 7443–7448.

(12) Kim, K. J.; Wang, L.; Su, Y. C.; Gillespie, G. Y.; Salhotra, A.; Lal, B.; Laterra, J. Systemic Anti-Hepatocyte Growth Factor Monoclonal Antibody Therapy Induces the Regression of Intracranial Glioma Xenografts. *Clin. Cancer Res.* **2006**, *12*, 1292–1298.

(13) Burgess, T.; Coxon, A.; Meyer, S.; Sun, J.; Rex, K.; Tsuruda, T.; Chen, Q.; Ho, S. Y.; Li, L.; Kaufman, S.; McDorman, K.; Cattley, R. C.; Sun, J.; Elliot, G.; Zhang, K.; Feng, X.; Jia, X. C.; Green, L.; Radinsky, R.; Kendall, R. Fully Human Monoclonal Antibodies to Hepatocyte Growth Factor with Therapeutic Potential Against Hepatocyte Growth Factor/c-Met-Dependent Human Tumors. *Cancer Res.* **2006**, *66*, 1721–1729.

(14) Martens, T.; Schmidt, N. O.; Eckerich, C.; Fillbrandt, R.; Merchant, M.; Schwall, R.; Westphal, M.; Lamszus, K. A Novel One-Armed Anti-c-Met Antibody Inhibits Glioblastoma Growth In Vivo. *Clin. Cancer Res.* **2006**, *12*, 6144–6152.

(15) Date, K.; Matsumoto, K.; Shimura, H.; Tanaka, M.; Nakamura, T. HGF/NK4 is a Specific Antagonist for Pleiotrophic Actions of Hepatocyte Growth Factor. *FEBS Lett.* **1997**, *420*, 1–6.

(16) Tomioka, D.; Maehara, N.; Kuba, K.; Mizumoto, K.; Tanaka, M.; Matsumoto, K.; Nakamura, T. Inhibition of Growth, Invasion, and Metastasis of Human Pancreatic Carcinoma Cells by NK4 in an Orthotopic Mouse Model. *Cancer Res.* **2001**, *61*, 7518–7524.

(17) Brockmann, M. A.; Papadimitriou, A.; Brandt, M.; Fillbrandt, R.; Westphal, M.; Lamszus, K. Inhibition of Intracerebral Glioblastoma Growth by Local Treatment with the Scatter Factor/Hepatocyte Growth Factor-Antagonist NK4. *Clin. Cancer Res.* **2003**, *9*, 4578–4585.

(18) Michieli, P.; Mazzone, M.; Basilico, C.; Cavassa, S.; Sottile, A.; Naldini, L.; Comoglio, P. M. Targeting the Tumor and its Microenvironment by a Dual-Function Decoy Met Receptor. *Cancer Cell* **2004**, *6*, 61–73.

(19) Kong-Beltran, M.; Stamos, J.; Wickramasinghe, D. The Sema Domain of Met Is Necessary for Receptor Dimerization and Activation. *Cancer Cell* **2004**, *6*, 75–84.

(20) Abounader, R.; Ranganathan, S.; Lal, B.; Fielding, K.; Book, A.; Dietz, H.; Burger, P.; Laterra, J. Reversion of Human Glioblastoma Malignancy by U1 Small Nuclear RNA/Ribozyme Targeting of Scatter Factor/Hepatocyte Growth Factor and c-Met Expression. *J. Natl. Cancer. Inst.* **1999**, *91*, 1548–1556.

(21) Kim, S. J.; Johnson, M.; Koterba, K.; Herynk, M. H.; Uehara, H.; Gallick, G. E. Reduced c-Met Expression by an Adenovirus Expressing a c-Met Ribozyme Inhibits Tumorigenic Growth and Lymph Node Metastases of PC3-LN4 Prostate Tumor Cells in an Orthotopic Nude Mouse Model. *Clin. Cancer Res.* **2003**, *9*, 5161–5170.

(22) Sattler, M.; Pride, Y. B.; Ma, P.; Gramlich, J. L.; Chu, S. C.; Quinnan, L. A.; Shirazian, S.; Liang, C.; Podar, K.; Christensen, J. G.; Salgia, R. A Novel Small Molecule Met Inhibitor Induces Apoptosis in Cells Transformed by the Oncogenic TPR-MET Tyrosine Kinase. *Cancer Res.* **2003**, *63*, 5462–5469.

(23) Wang, X.; Le, P.; Liang, C.; Chan, J.; Kiewlich, D.; Miller, T.; Harris, D.; Sun, L.; Rice, A.; Vasile, S.; Blake, R. A.; Howlett, A. R.; Patel, N.; McMahon, G.; Lipson, K. E. Potent and Selective Inhibitors of the Met [Hepatocyte Growth Factor/Scatter Factor (HGF/SF) Receptor] Tyrosine Kinase Block HGF/SF-Induced Tumor Cell Growth and Invasion. *Mol. Cancer Ther.* **2003**, *2*, 1085–1092.

(24) Christensen, J. G.; Schreck, R.; Burrows, J.; Kuruganti, P.; Chan, E.; Le, P.; Chen, J.; Wang, X.; Ruslim, L.; Blake, R.; Lipson, K. E.; Ramphal, J.; Do, S.; Cui, J. J.; Cherrington, J. M.; Mendel, D. B. A Selective Small Molecule Inhibitor of c-Met Kinase Inhibits c-Met-Dependent Phenotypes In Vitro and Exhibits Cytoreductive Antitumor Activity In Vivo. *Cancer Res.* **2003**, *63*, 7345–7355.

(25) Cui, J. J. Inhibitors Targeting Hepatocyte Growth Factor Receptor and their Potential Therapeutic Applications. *Expert Opin. Ther. Pat.* **2007**, *17*, 1035–1045.

(26) Zou, H. Y.; Li, Q.; Lee, J. H.; Arango, M. E.; McDonnell, S. R.; Yamazaki, S.; Koudriakova, T. B.; Alton, G.; Cui, J. J.; Kung, P. P.; Nambu, M. D.; Los, G.; Bender, S. L.; Mroczkowski, B.; Christensen, J. G. An Orally Available Small-Molecule Inhibitor of c-Met, PF-2341066, Exhibits Cytoreductive Antitumor Efficacy through Antiproliferative and Antiangiogenic Mechanisms. *Cancer Res.* **2007**, *67*, 4408–4417.

(27) Bellon, S. F.; Kaplan-Lefko, P.; Yang, Y.; Zhang, Y.; Moriguchi, J.; Rex, K.; Johnson, C. W.; Rose, P. E.; Long, A. M.; O'Connor, A. B.; Gu, Y.; Coxon, A.; Kim, T. S.; Tasker, A.; Burgess, T. L.; Dussault, I. c-Met Inhibitors with Novel Binding Mode Show Activity against Several Hereditary Papillary Renal Cell Carcinoma-Related Mutations. *J. Biol. Chem.* **2008**, *283*, 2675–2683.

(28) Albrecht, B. K.; Harmange, J.-C.; Bauer, D.; Berry, L.; Bode, C.; Boezio, A. A.; Chen, A.; Choquette, D.; Dussault, I.; Fridrich, C.; Hirai, S.; Hoffman, D.; Larrow, J. F.; Kaplan-Lefko, P.; Lin, J.; Lohman, J.; Long, A. M.; Moriguchi, J.; O'Connor, A.; Potashman, M. H.; Reese, M.; Rex, K.; Siegmund, A.; Shah, K.; Shimanovich, R.; Springer, S. K.; Teffera, Y.; Yang, Y.; Zhang, Y.; Bellon, S. F. Discovery and Optimization of Triazolopyridazines as Potent and Selective Inhibitors of the c-Met Kinase. *J. Med. Chem.* **2008**, *51*, 2879–2882.

(29) Fujiwara, Y.; Senga, T.; Nishitoba, T.; Osawa, T.; Miwa, A.; Nakamura, K. Quinoline Derivative and Quinazoline Derivative Inhibiting Self-Phosphorylation of Hepatocyte Proliferator Receptor, and Medicinal Composition Containing the Same. PCT Int. Appl. WO03000660A1, 2003.

(30) Compound **4** exhibited a $K_i$ of 219 nM against KDR, a $K_i$ of 65 nM against RON, and a $K_i$ of 211 nM against IGFR. Harmange, J. C.; Booker, S.; Bauer, D.; Kim,T. S.; Cheng, Y.; Xu, S.; Xi, N.; Kim, J. L.; Tasker, A. Preparation of Heteroaryloxy Substituted Quinolines for Treating or Preventing HGF Mediated Diseases. PCT Int. Appl. WO05073224A2, 2005.

(31) Spychala, J. A Facile Preparation of N2-Arylisocytosines. *Synth. Commun.* **1997**, *27*, 1943–1949.

(32) Walker, S. D.; Barder, T. E.; Martilelli, J. R.; Buchwald, S. L. A Rationally Designed Universal Catalyst for Suzuki-Miyaura Coupling Processes. *Angew. Chem., Int. Ed.* **2004**, *43*, 1871–1876.

(33) Angiolelli, M. E.; Casalnuovo, A. L.; Selby, T. P. Palladium-Catalyzed Cross-Coupling of Benzylzinc Reagents with Methylthio N-Heterocycles: A New Coupling Reaction with Unusual Selectivity. *Synlett* **2000**, *6*, 905–907.

(34) Thomas, A. P.; Hennequin, L. F. A.; Ple, P. A. Qinoline Derivatives Inhibiting the Effect of Growth Factors such as VEGF. PCT Int. Appl. WO9813350A1, 1998.

(35) Ife, R. J.; Leach, C. A. Amidine Derivatives as Gastric Acid Secretion Inhibitors. PCT Int. Appl. WO9426715A1, 1994.

(36) Brown, D. J.; Cronin, B. J.; Lan, S. B.; Nardo, G. Heterocyclic Amplifiers of Phleomycin. VII. Phenyl-, Tolyl-, Phenoxy- and Benzylpyrimidines: Also Some Carbocyclic Analogs. *Aust. J. Chem.* **1985**, *38*, 825–833.

(37) Lokensgard, J. P.; Fischer, J. W.; Bartz, W. J. Synthesis of *N*-(α-Methoxyalkyl) Amides from Imidates. *J. Org. Chem.* **1985**, *50*, 5609–5611.

(38) Suzuki, A. Recent Advances in the Cross-Coupling Reactions of Organoboron Derivatives with Organic Electrophiles, 1995−1998. *J. Organomet. Chem.* **1999**, *576*, 147–168, and references therein.

(39) Negishi, E.; King, A. O.; Okukado, N. J. Selective Carbon−Carbon Bond Formation via Transition Metal Catalysis. 3. A Highly Selective Synthesis of Unsymmetrical Biaryls and Diarylmethanes by the Nickel- or Palladium-Catalyzed Reaction of Aryl- and Benzylzinc Derivatives with Aryl Halides. *J. Org. Chem.* **1977**, *42*, 1821–1823.

(40) Potashman, M.; Kim, T. S.; Bellon, S.; Booker, S.; Cheng, Y.;Kim, J. L.; Tasker, A.; Xi, N.; Xu, S.; Harmange, J. C.; Borg, G.; Weiss, M.; Hodous, B. L.; Graceffa, R.; Buckner, W. H.; Masse, C. E.; Choquette, D.; Martin, M. W.; Germain, J.; Dipietro, L. V.; Chaffee, S. C.; Nunes, J. J.; Buchanan, J. L.; Habgood, G. J.; McGowan, D. C.; Whittington, D. A. Preparation of Heteroaryl Substituted Napthalenes as Inhibitors of Lck, VEGFR, and/or HGF Related Activity. PCT Int. Appl. WO05070891A2, 2005.

(41) Harmange, J. C.; Booker, S.; Bauer, D.; Kim, T. S.; Cheng, Y.; Xu, S.; Xi, N.; Kim, J. L.; Tasker, A. Preparation of Heteroaryloxy Substituted Quinolines for Treating or Preventing HGF Mediated Diseases. PCT Int. Appl. WO05073224A2, 2005.

(42) A table of the studied kinases is presented in the Supporting Information.

(43) Still, W. C.; Kahn, M.; Mitra, A. Rapid Chromatographic Technique for Preparative Separations with Moderate Resolution. *J. Org. Chem.* **1978**, *43*, 2923–2925.

(44) Polverino, A.; Coxon, A.; Starnes, C.; Diaz, Z.; DeMelfi, T.; Wang, L.; Bready, J.; Estrada, J.; Cattley, R.; Kaufman, S.; Chen, D.; Gan, Y.; Kumar, G.; Meyer, J.; Neervannan, S.; Alva, G.; Talvenheimo, J.; Montestruque, S.; Tasker, A.; Patel, V.; Radinsky, R.; Kendall, R. AMG 706, an Oral, Multikinase Inhibitor that Selectively Targets Vascular Endothelial Growth Factor, Platelet-Derived Growth Factor, and Kit Receptors, Potently Inhibits Angiogenesis and Induces Regression in Tumor Xenografts. *Cancer Res.* **2006**, *66*, 8715–8721.

JM8006189

# EXHIBIT C

Case 1:21-cv-01338-MFK   Document 472   Filed 05/31/24   Page 366 of 547   PageID #: 26475



http://pubs.acs.org/joc

# JOC

## *The Journal of Organic Chemistry*

VOLUME 71   NUMBER 10   MAY 12, 2006

JOCEAH



PUBLISHED BY THE AMERICAN CHEMICAL SOCIETY

# JOC *The Journal of Organic Chemistry*

*The Journal of Organic Chemistry* (ISSN 0022-3263) is published biweekly by the American Chemical Society at 1155 16th St., N.W., Washington, DC 20036. Periodicals postage paid at Washington, DC, and additional mailing offices. POSTMASTER: Send address changes to *The Journal of Organic Chemistry*, Member & Subscriber Services, P.O. Box 3337, Columbus, OH 43210.

**American Chemical Society**
1155 16th St., N.W.
Washington, DC 20036
(202) 872-4600
TDD (202) 872-6076
Fax (202) 776-8264

**Journal Publications**
American Chemical Society
2540 Olentangy River Road
P.O. Box 3330, Columbus, OH 43210
(614) 447-3665
Fax (614) 447-3745
E-mail acsproof@acs.org

**Member & Subscriber Services**
P.O. Box 3337
Columbus, OH 43210

*Members contact:*
(614) 447-3776; (800) 333-9511
Fax (614) 447-3671
E-mail service@acs.org

*Agencies & institutions contact:*
(614) 447-3674; (888) 338-0012
Fax (614) 447-3671
E-mail liblink@acs.org

**Advertising Office**
Centcom, Ltd.
676 East Swedesford Road
Suite 202, Wayne, PA 19087-1612
(610) 964-8061

**Publications Division**
Robert D. Bovenschulte, *President*
Brian D. Crawford, *Senior Vice President*

**Journal Production & Manufacturing Operations**
Anne C. O'Melia, *Vice President*;
Teresa K. Lewandowski, *Director*;
Debora A. Bittaker, *Journals Editing Manager*; Mary B. Harig, *Senior Editor*;
Susan H. Reich, *Senior Associate Editor*;
Yolanda L. Steiman, *Assistant Editor*;
Brandi Fowler, *Staff Editor*;
Theresa A. Massey, *Production Assistant*

**Sales & Marketing/Publications**
Dean J. Smith, *Vice President*
Matthew J. Price, *Director*,
*Product Marketing*



Canadian GST Reg. No. 127571347
Printed in the USA

**Copyright Permission:** See copyright status form for certain rights (http://pubs.acs.org). Reprographic copying beyond that permitted by Section 107 or 108 of the U.S. Copyright Act is allowed, provided that the current per article fee is paid to the Copyright Clearance Center. Tel: (978) 750-8400. Republication or reproduction for sale of articles or abstracts in this journal is permitted only by written permission from the Copyright Office, ACS, Washington, DC. Tel: (202) 872-4368. Fax: (202) 766-8112. E-mail: copyright@acs.org.

### EDITORIAL INFORMATION

**Instructions for Authors and Copyright Status Form:** See the first printed issue of each volume or visit the Publications Division Web site (http://pubs.acs.org). Please conform to these instructions when submitting manuscripts.

**Manuscript Submission:** Submit via the secure ACS Web site (http://pubs.acs.org/joc).

**Accepted Papers and Proofs:** Direct correspondence to Journal Publications, Columbus, OH. Tel: (614) 447-3665, Fax: (614) 447-3745. E-mail: acsproof@acs.org.

**Journal Policies:** The American Chemical Society and its Editors assume no responsibility for the statements and opinions advanced by contributors. Registered names and trademarks, etc., used in this publication, even without specific indication thereof, are not to be considered unprotected by law.

**Document Number:** At the end of each document is a 9-character code that serves as a link between the printed and electronic products and facilitates retrieval of the document in electronic form.

**Digital Object Identifier (DOI):** The DOI identification system for digital media has been designed to provide persistent and reliable identification of digital objects. Information on the DOI and its governing body, the International DOI Foundation, can be found at http://www.doi.org. In the Web editions of ACS journals, the DOI appears at the top of the HTML version of an article and at the bottom of the first page in its PDF version; in the printed editions, the DOI appears in the same location as in the PDF version.

### 2006 SUBSCRIPTION AND ORDERING INFORMATION

|  |  | North America | Outside North America* |
|---|---|---|---|
| **Printed Edition** | Members | $ 200 | $ 450 |
|  | Student Members | $ 150 | $ 400 |
|  | Institutional | $2310 | $2560 |
| **Web Edition**† | Members | $ 85 | $ 85 |
| **Print/Web Combination**† | Members | $ 285 | $ 535 |

* Air service included. † For Institutional rates, call M&SS Agency & Institutional Customer Service.

**Web Edition:** This journal is available to subscribers via the Internet. Members may contact Customer Service. Tel: (614) 447-3776 or (800) 333-9511. E-mail: service@acs.org. Institutional subscribers may contact Agency & Institutional Customer Service. Tel: (614) 447-3674 or (888) 338-0012. Fax: (614) 447-3671. E-mail: liblink@acs.org. For additional details, visit the Publications Division Web site (http://pubs.acs.org).

**New and Renewal Subscriptions:** Send with payment to American Chemical Society, P.O. Box 182426, Columbus, OH 43218-2426.

**Subscription Donations:** Members may donate/share their personal subscriptions to/with libraries but only after 5 years from the date of publication.

**Change of Address:** Notify Member & Subscriber Services, ACS, Columbus, OH. Tel: (614) 447-3776 or (800) 333-9511. Fax: (614) 447-3671. E-mail: address@acs.org. Include both old and new addresses and a mailing label from a recent issue.

**Microfilm, Microfiche, Back Issue, and Printed Edition Single Issue Orders:** Send requests to Publications Support Services, ACS, Washington, DC. Tel: (202) 872-4376. Fax: (202) 872-6325. E-mail: pss@acs.org. Printed edition not available prior to 2002.

**Bulk Reprint Orders:** For quotes and information, contact Cadmus Reprints. Tel: (888) 257-2134 or (410) 819-3995. Fax: (410) 820-9765.

**Claims for Issues Not Received:** Claims will be honored only if submitted within 90 days of the issue date for subscribers in North America or within 180 days of the issue date for all other subscribers. Members may contact Customer Service. Tel: (614) 447-3776 or (800) 333-9511. E-mail: service@acs.org. Institutional subscribers may contact Agency & Institutional Customer Service. Tel: (614) 447-3674 or (888) 338-0012. Fax: (614) 447-3671. E-mail: liblink@acs.org.

**Supporting Information (SI):** SI from 1995 to present is available free of charge from the journal's home page (http://pubs.acs.org/joc). For information on electronic access, send E-mail to journalhelp@acs.org. SI prior to 1995 is available, for a fee, from Publications Support Services. Tel: (202) 872-4376. Fax: (202) 872-6325. E-mail: pss@acs.org.

© Copyright 2006 American Chemical Society

# JOC Note

# A Practical Synthesis of 2-((1H-Pyrrolo[2,3-b]pyridine-4-yl)methylamino)-5-fluoronicotinic Acid

Xin Wang,* Ben Zhi,* Jean Baum, Ying Chen, Richard Crockett, Liang Huang, Shawn Eisenberg, John Ng, Robert Larsen, Mike Martinelli, and Paul Reider

*Chemical Process R & D, Amgen Inc., One Amgen Center Drive, Thousand Oaks, California 91320-1799*

xinw@amgen.com

*Received February 7, 2006*

A practical synthesis of a key pharmaceutical intermediate, 2-[(1H-pyrrolo[2,3-b]pyridine-4-yl)methylamino]-5-fluoronicotinic acid (1), is described. To introduce the aminomethyl moiety of 2 via a palladium-catalyzed cyanation/reduction sequence, a regioselective chlorination of 7-azaindole via the N-oxide was developed. A highly selective monodechlorination of 2,6-dichloro-5-fluoronicotinic acid was discovered to afford the nicotinic acid 3. The two building blocks 2 and 3 were then coupled to complete the preparation of 1.

The 7-azaindoles constitute an important class of compounds in pharmaceuticals.[1] As part of an ongoing drug discovery program in our laboratories, we required an efficient synthesis of 2-[(1H-pyrrolo[2,3-b]pyridin-4-yl)methylamino]-5-fluoronicotinic acid (1) containing the key component 4-aminomethyl-7-azaindole (2). Neither the azaindole 2 nor 2-chloro-5-fluoronicotinic acid (3) was commercially available, thus requiring independent syntheses of these building blocks. Herein we wish to report a chromatography-free synthesis that is suitable for the preparation of kilogram quantities of 1.

Introduction of the aminomethyl group of 2 required selective functionalization of azaindole. As chlorination of 7-azaindole N-oxide (6) has been reported to occur primarily at the 4-position with POCl₃² or MeSO₂Cl³ to afford 5, the overall approach of N-oxide formation, chlorination, and aminomethylation was considered to be the most practical (Scheme 1). The oxidation of 7-azaindole was investigated using oxidants reported in the literature,[4-8] such as 3-chloroperbenzoic acid (MCPBA),[4] $H_2O_2$/HOAc,[5] or $H_2O_2$/MeReO₃.[6] The 7-azaindole N-oxide (6) is prepared in yields ranging from 60 to 71%. The chemical conversions in all the cases were good to excellent (>90%). Due to the high solubility of the azaindole N-oxide 6 in water, isolation of the product was very tedious, requiring multiple extractions. For example, with MCPBA in DCM, the reaction was completed cleanly in less than 10 h. However, upon aqueous workup (eight extractions with DCM), only a 50% yield of the azaindole N-oxide 6 was obtained while the remaining product remained in the aqueous phase. In addition, the isolated azaindole N-oxide 6 was contaminated with 5% of 3-chlorobenzoic acid. Fortuitously, precipitation was observed after all the reagents were mixed. The product was isolated directly by filtration and was identified as the azaindole N-oxide MCBA salt 7. After further optimization, a cosolvent mixture of DME/heptane (1:2) was found to be optimal for the isolation, affording the azaindole N-oxide MCBA salt 7 in 89% yield.

The conversion of azaindole N-oxide 6 to the chloroazaindole 5 required modification of the literature procedure[4b] using neat POCl₃ or MeSO₂Cl in DMF to limit the formation of the major side product 3-chloro-7-azaindole. We always obtained better results with POCl₃ over MeSO₂Cl. The typical ratio of 4-chloro-7-azaindole (5) and 3-chloro-7-azaindole in the reaction mixture was 7:1 from azaindole N-oxide 6 in neat POCl₃. The ratio, however, improved to 12:1 when azaindole N-oxide MCBA salt 7 was used. Upon workup, 4-chloro-7-azaindole (5) was isolated in 80% yield with enrichment of the isomeric ratio to 35:1. The purity of the product was satisfactory for use in the next step without further purification.

The introduction of the dimethylamino group of 2 from the 4-chloro-7-azaindole (5) was accomplished by a two-step process. As a cyano moiety is an excellent precursor to an aminomethyl group through reduction, a palladium-catalyzed coupling of the chloride with cyanide was developed. Applying Jin and Confalone's conditions[7] using a Pd-dppf catalyst system and zinc cyanide, the 4-cyano-7-azaindole (8) was prepared in 70% isolated yield. The 4-cyano-7-azaindole (8) was then subjected to LAH reduction[8] to afford 4-aminomethyl-

(1) (a) Mérour, J.; Joseph, B. *Curr. Org. Chem.* **2001**, *5*, 471. (b) Allegretti, M.; Anacardio, R.; Cesta, M. C.; Curti, R.; Mantovanini, M.; Nano, G.; Topai, A.; Zampella, G. *Org. Process Res. Dev.* **2003**, *7*, 209. (c) Marminon, C.; Pierre, A.; Pfeiffer, B.; Perez, V.; Leonce, S.; Joubert, A.; Baily, C.; Renard, P.; Hickman, J.; Prudhomme, M. *J. Med. Chem.* **2003**, *46*, 609. (d) Ahmed, M.; Bromidge, S. WO Appl. 200366632. (e) Soudararajan, N.; Benoit, S.; Gingras, S. U.S. Patent Appl. US2004/0044025 A1. (f) Alvarez, M.; Puentis, J.; Bleda, D. U.S. Patent Appl. US2004/0058939 A1. (g) Liang, C.; Sun, L.; Wei, C. E.; Tang, P. C.; McMahon, G.; Hirth, K. P.; Cui, J. U.S. Patent Appl. US2004/0053924 A1. (h) Patel, V..F.; Askew, B.; Booker, S.; Chen, G.; Dipietro, L. V.; Germain, J.; Habgood, G. J.; Huang Q.; Kim, T.; Li, A.; Nishimura, N.; Nomak, R.; Riahi, B.; Yuan, C. C.; Elbaum, D. U.S. Patent Appl. US2003/3203922 A1.

(2) (a) Clark, B. A. J.; Patrick, J. *J. Chem. Soc., Perkin Trans. 1* **1974**, 2207. (b) Cheng, C. C.; Chang, C. P.; Yu, W. S.; Hung, F. T.; Liu. Y. I.; Wu, G. R.; Chou, P. T. *J. Phys. Chem.* **2003**, *107*, 1459.

(3) Thibault, C.; L'Heureux, A.; Bhide, R. S.; Reul, R. *Org. Lett.* **2003**, *23*, 5023.

(4) (a) Schneller, S.; Luo J. *J. Org. Chem.* **1980**, *45*, 4045. (b) Antonini, I.; Claudi, F.; Cristalli, G.; Franchetti, P.; Grifantini, M.; Martelli, S. *J. Med. Chem.* **1982**, *25*, 1258.

(5) Clark, B. A. J.; Parrick, J. *Tetrahedron* **1974**, *30*, 475.

(6) (a) Jiao, Y.; Yu, H. *Synlett* **2001**, *1*, 73. (b) Coperet, C.; Adolfsson, H.; Khuong, T. V.; Yudin, A. K.; Sharpless, K. B. *J. Org. Chem.* **1998**, *63*, 1740.

(7) Jin, F.; Confalone, P. N. *Tetrahedron Lett.* **2000**, *41*, 3271.

(8) (a) Cimino, G.; Gavagnin, M.; Sodano, G.; Spinella, A.; Strazzullo, G.; Schmitz, F. J.; Yalamanchili, G. *J. Org. Chem.* **1987**, *52*, 2301. (b) Kalivretenos, A. G.; Nakanishi, K. *J. Org. Chem.* **1993**, *58*, 6596.

10.1021/jo0602571 CCC: $33.50 © 2006 American Chemical Society
Published on Web 04/05/2006

**SCHEME 1.    Preparation of 4-Aminomethyl-7-azaindole (2)**



**SCHEME 2.    Selective Dechlorination of 2,6-Dichloro-5-fluoronicotinic Acid (3)**



**SCHEME 3.    Coupling of 2 and 3**



7-azaindole (2) in 74% yield. Various catalytic hydrogenation methods using Pd[9] or Ni[10] were also tested but were unsatisfactory, producing several byproducts.

There are two known routes for preparing 2-chloro-5-fluoronicotinic acid (3).[11,12] Each requires four steps from commercially available starting materials. In a Rhone Poulenc patented process,[11] the acid 3 was prepared from 2-hydroxynicotinic acid by applying a nitration, chlorination, nitro reduction, and Sandmeyer reaction sequence in an overall 7.9% yield. In an Abbott process,[12] only the yield for a Raney nickel reduction (30%) was reported for a four-step sequence, including esterification, selective displacement with NaSMe, Raney nickel reduction, and saponification, from 2,6-dichloro-5-fluoronicotinic acid (4).

These current literature syntheses of 2-chloro-5-fluoronicotinic acid (3) suffer from low yields and are not scalable. To gain access to 3, the selective monodechlorination of the commercially available 2,6-dichloro-5-fluoronicotinic acid (4) at the 6-position was explored (Scheme 2). We initially screened a hydrogenation process[13] by applying a variety of different Pd/Cl catalysts without success. The selectivity was poor in all the cases, resulting in a mixture of chlorinated products. However,

(9) (a) White, J. D.; Yager, K. M.; Yakura, T. *J. Am. Chem. Soc.* **1994,** *116,* 1831. (b) Jasys, V. J.; Kelbaugh, P. R.; Nason, D. M.; Phillips, D.; Rosnack, K. J.; Saccomano, N. A.; Stroh, J. G.; Volkmann, R. A. *J. Am. Chem. Soc.* **1990,** *112,* 6696.

(10) Vergne, F.; Aitken, D. J.; Husson, H. P. *J. Org. Chem.* **1992,** *57,* 6071.

(11) Haylor, B. D. Eur. Pat. Appl. 94110578.5.

(12) Winn, M.; De, B.; Zydowsky, T. M.; Altenbach, R. J.; Basha, F. Z.; Boyd, S. A.; Brune, M. E.; Buckner, S. A.; Crowell, D.; Drizin, I.; Hancock, A. A.; Jae, H.; Kester, J. A.; Lee, J. Y.; Mantei, R. A.; Marsh, K. C.; Novosad, E. I.; Oheim, K. W.; Rosenberg, S. H.; Shiosaki, K.; Sorensen, B. K.; Spina, K.; Sullivan, G. M.; Tasker, A. S.; von Geldern, T. W.; Warner, R. B.; Opgenorth, T. J.; Kerkman, D. J.; DeBernardis, J. F. *J. Med. Chem.* **1993,** *36,* 2676.

(13) (a) Johnstone, R. W.; Wilby, A. H.; Entwistle, I. D. *Chem. Rev.* **1985,** *85,* 129. (b) Brieger, G.; Nestrick, T. J. *Chem. Rev.* **1974,** *74,* 567.

it was gratifying to find that selective dechlorination of 4 to 2-chloro-5-fluoronicotinic acid (3) occurred cleanly under homogeneous conditions using Pd(OAc)₂/Et₃N/HCOOH.[9] The selectivity was about 50:1 in favor of the 6-position. The desired isomer 2-chloro-5-fluoronicotinic acid (2) was isolated in 70% yield.

Final coupling of 4-aminomethyl-7-azaindole (2) and 2-chloro-5-fluoronicotinic acid (3) went smoothly to produce the desired product 1 in 70% isolated yield (Scheme 3). Several factors[14] were critical for the coupling reaction to be successful. A high reaction concentration (1.9 mol/L) and 2 equiv of 4-aminomethyl-7-azaindole (2) were essential for the reaction to go to completion. The reaction was slow, requiring elevated temperatures (130 °C) and a long reaction time (48 h). 1-Pentanol was the best solvent, while decomposition occurred in other high boiling solvents, such as DMF, DMAC, and DMSO. NaHCO₃ was the best base as inferior results were obtained in the cases of other common bases, such as Et₃N, Hunig's base, Na₂CO₃, and KOtBu.

In conclusion, we have developed a practical synthesis of the 4-substituted 7-azaindole 1 and its intermediates in high yield and purity. The process is suitable for large-scale production. The key steps include the highly selective monodechlorination of 4 to afford 3 and a much improved chlorination of the N-oxide intermediate 7.

**Experimental Section**

**7-Azaindole N-Oxide 3-chlorobenzoate (7).** To a solution of 7-azaindole (19.83 kg, 167.9 mol) in DME/heptane (1:2, 294 L) was added 3-chloroperbenzoic acid (85 wt %, 46.2 kg, 194.9 mol)

(14) Preliminary reaction parameters were established during the preparation of a structurally similar compound, AMG 706, and details of those results will be published elsewhere.

portionwise at 8 to 26 °C. Precipitation occurred after half of the 3-chloroperbenzoic acid was added. The slurry was stirred at room temperature for 2.5 h. The precipitate was filtered and washed with DME/heptane (1:2, 100 L). The product was dried to yield an off-white solid (43.58 kg, 89.2%). mp 144.1−146.0 °C. $^1$H NMR (400 MHz, DMSO-$d_6$) δ 13.22 (1H, bs), 12.53 (1H, s), 8.16 (1H, d, $J =$ 6.2 Hz), 7.86−7.93 (2H, m), 7.63−7.72 (2H, m), 7.54 (1H, t, $J =$ 8.0 Hz), 7.46 (1H, d, $J =$ 3.0 Hz), 7.07 (1, dd, $J =$ 6.3, 1.4 Hz), 6.58 (1H, d, $J =$ 3.1 Hz), 6.39 (1H, d, $J =$ 3.3 Hz). $^{13}$C NMR (100 MHz, DMSO-$d_6$) δ 166.5, 138.6, 133.7, 133.3, 132.5, 131.5, 130.9, 129.2, 128.2, 126.9, 124.4, 120.6, 116.5, 102.6. Anal. Calcd for $C_{14}H_{11}ClN_2O_3$: C, 57.84; H, 3.81; N, 9.64. Found: C, 57.88; H, 3.83; N, 9.79.

**4-Chloro-7-azaindole (5).** To 7-azaindole *N*-oxide 3-chlorobenzoate (7) (43.4 kg, 149.3 mol) was added POCl$_3$ (170.4 kg) at room temperature. The solution was heated to 55 °C, and then heating was removed. The temperature slowly went up to 74 °C in about 1 h without external heating. The mixture was further heated to 85−90 °C for 18 h. *Caution: Two exothermic events were observed during a DSC study of the reaction mixture, one at 50−60 °C and the other at 105−110 °C. To prevent a runaway reaction on scale, the solution was first heated to 55 °C and then heated slowly to 85−90 °C.* The solution was cooled to 50 °C, and POCl$_3$ was distilled off in vacuo. The residue was dissolved in acetonitrile (100 L) and quenched with slow addition of H$_2$O (100 L) while keeping the temperature under 50 °C. The mixture was basified to pH 9 with 50% NaOH solution. The slurry was allowed to cool to room temperature, and the precipitates were filtered. The wet cake was reslurried with H$_2$O (200 L), filtered, and dried to afford the product (18.15 kg, 80%). mp 175.3−177.0 °C. $^1$H NMR (400 MHz, DMSO-$d_6$) δ 12.07 (1H, s), 8.18 (1H, d, $J =$ 5.2 Hz), 7.59 (1H, d, $J =$ 3.2 Hz), 7.16 (1H, d, $J =$ 5.2 Hz), 6.50 (1H, d, $J =$ 3.3 Hz). $^{13}$C NMR (100 MHz, DMSO-$d_6$) δ 149.0, 143.1, 134.0, 127.2, 118.6, 115.14, 97.89. Anal. Calcd for $C_7H_5ClN_2$: C, 55.10; H, 3.30; N, 18.36. Found: C, 55.20; H, 3.30; N, 18.32.

**4-Cyano-7-azaindole (8).** A suspension of 4-chloro-7-azaindole (5) (18.15 kg, 118.9 mol) in dimethylacetamide (100 L) was degassed by pulling vacuum on the reactor and then filling with nitrogen. To this suspension was added zinc powder (0.72 kg, 11 mol), diphenylphosphinoferrocene (2.09 kg, 3.77 mol), zinc cyanide (8.2 kg, 69.8 mol), and tris(dibenzylideneacetone) dipalladium (1.74 kg, 1.9 mol) at room temperature. The mixture was heated at 120 °C for 2 h and was cooled to 100 °C. Water (306 L) was added over 45 min at 90−100 °C. The mixture was then cooled to room temperature over 3 h. The crude product was filtered and was washed with H$_2$O (2 × 68 L). To a solution of 3 N HCl (75 L) was added the product wet cake, and the mixture was stirred for 3 h at room temperature. The insolubles were removed by filtration. To the filtrate was added 50% NaOH until pH 12 was reached. Filtration and drying afforded the pure product (12.28 kg, 70%). mp 195.1−197.0 °C. $^1$H NMR (400 MHz, DMSO-$d_6$) δ 12.43 (1H, s), 8.45 (1H, d, $J =$ 4.9 Hz), 7.88 (1H, d, $J =$ 3.4 Hz), 7.58 (1H, d, $J =$ 4.9 Hz), 6.70 (1H, d, $J =$ 3.4 Hz). $^{13}$C NMR (100 MHz, DMSO-$d_6$) δ 148.5, 142.4, 130.2, 119.6, 118.2, 116.9, 98.3. Anal. Calcd for $C_8H_5N_3$: C, 67.12; H, 3.52; N, 29.35. Found: C, 66.91; H, 3.38; N, 28.99.

**4-Aminomethyl-7-azaindole (2).** To a solution of LAH (3.15 kg, 82.9 mol) in THF (108 L) was added 4-cyano-7-azaindole (5.9 kg, 40.0 mol) in portions over 45 min. The mixture was heated to 40 °C for 1 h. The reaction mixture was cooled to 10 °C and was quenched with 25% NaOH (13 L). The mixture was then filtered through a bed of silica gel. To the filtrate was added a saturated HCl solution in 1-propanol (10.65 kg) at room temperature. The

product precipitated as the dihydrochloride salt and was isolated by filtration. To a solution of the dihydrochloride salt in H$_2$O (22.7 L) was added solid NaOH (2.6 kg, 65 mol). The temperature rose to 60 °C. The solution was stirred until the product started to crystallize. The mixture was then cooled to room temperature. The product was isolated by filtration and washed with H$_2$O (10 L) (3.54 kg, 74%). mp 131.7−133.0 °C. $^1$H NMR (400 MHz, DMSO-$d_6$) δ 11.58 (1H, bs), 8.17 (1H, d, $J =$ 5.3 Hz), 7.41 (1H, d, $J =$ 3.5 Hz), 7.12 (1H, d, $J =$ 5.3 Hz), 6.55 (1H, d, $J =$ 3.5 Hz), 4.02 (1H, s), 1.92 (2H, bs). $^{13}$C NMR (100 MHz, DMSO-$d_6$) δ: 148.3, 144.6, 142.7, 125.0, 117.9, 112.9, 98.1, 42.8. Anal. Calcd for $C_8H_9N_3$: C, 65.29; H, 6.16; N, 28.55. Found: C, 65.15; H, 6.31; N, 28.22.

**2-Chloro-5-fluoronicotinic Acid (3).** To a 12-L round-bottomed flask were added dimethylacetamide (3.24 L), Pd(OAc)$_2$ (5.89 g, 0.262 mol), PPh$_3$ (134.9 g, 0.51 mol), Et$_3$N (2.15 L, 15.4 mol), HCOOH (95 wt %, 430 mL, 10.3 mol), and 2,6-dichloro-5-fluoronicotine acid (1.08 kg, 5.14 mol). The reaction mixture was heated at 60 °C for 7 h. The heating was stopped, and brine (13 L) was added. The mixture was cooled to room temperature over 12 h. The mixture was filtered through a pad of Celite and was rinsed with brine (2 × 1 L). HCl (12 N, 1 L) was added into the filtrate slowly to pH 0−1. The mixture was extracted with isopropyl acetate (2 × 10.8 L). The organic phase was dried (Na$_2$SO$_4$). The isopropyl acetate was evaporated under reduced pressure. 1,2-Dichloroethane (2.5 L) was added to the residue. The mixture was heated at reflux (87 °C) for 1 h and was cooled to −15 °C over 12 h. The slurry was filtered and dried in an oven under vacuum for 24 h to afford the pure product (632 g, 70%). mp 132.9−134.0 °C. $^1$H NMR (300 MHz, DMSO-$d_6$) δ 14.15 (1H, bs), 8.63 (1H, d, $J =$ 3.1 Hz), 8.20 (1H, dd, $J =$ 8.8, 3.1 Hz). $^{13}$C NMR (100 MHz, DMSO-$d_6$) δ 164.6, 157.9 (d, $^1J_{C-F} =$ 256.1 Hz), 142.7, 139.9 (d, $^2J_{C-F} =$ 25.8 Hz), 129.3 (d, $^3J_{C-F} =$ 4.3 Hz), 127.1 (d, $^2J_{C-F} =$ 21.5 Hz). $^{19}$F NMR (DMSO-$d_6$) δ −129.1 (d, $J =$ 9.1 Hz). Anal. Calcd for $C_6H_3$-ClFNO$_2$: C, 41.05; H, 1.72; N, 7.98. Found: C, 40.92; H, 1.83; N, 7.79.

**2-((1H-Pyrrolo[2,3-b]pyridine-4-yl)methylamino)-5-fluoronicotinic Acid (1).** A mixture of 2-chloro-5-fluoronicotinic acid (50 g, 0.29 mol), 4-aminomethyl-7-azaindole (88 g, 0.6 mol), and NaHCO$_3$ (76 g, 0.9 mol) in pentanol (150 mL) was heated to 130 °C for 48 h. MeOH (150 mL) and H$_2$O (150 mL) were added to the mixture. The mixture was cooled to room temperature over 5 h. HCl (12 N) was added slowly to adjust the pH to 4−5. The mixture was stirred further for 1 h. Filtration and washing with H$_2$O (500 mL) afforded the product. The solid was slurried in MeOH (250 mL) at 70 °C for 4 h. The mixture was cooled to room temperature and filtered to provide the pure product as an off-white solid (57 g, 70%). mp 215.0−217.0 °C. $^1$H NMR (400 MHz, DMSO-$d_6$) δ 11.63 (s, 1H), 8.54 (bs, 1H), 8.26 (d, $J =$ 3.1 Hz, 1H), 8.13 (d, $J =$ 4.9 Hz, 1H), 7.96 (dd, $J =$ 8.8, 3.1, 1H), 7.43 (t, $J =$ 2.9 Hz, 1H), 6.92 ($J =$ 4.9 Hz, 1H), 6.55 (dd, $J =$ 3.3, 1.9 Hz, 1H), 4.96 (s, 2H). $^{13}$C NMR (100 MHz, DMSO-$d_6$) δ 168.1, 155.2, 150.9 (d, $^1J_{C-F} =$ 239.7 Hz), 148.5, 142.6, 140.6 (d, $^2J_{C-F} =$ 24.1 Hz), 140.5, 126.5 (d, $^2J_{C-F} =$ 20.7 Hz), 125.5, 117.9, 113.0, 106.3, 98.1, 41.9. $^{19}$F NMR (DMSO-$d_6$) δ −144.7 (d, $J =$ 9.1 Hz). Anal. Calcd for $C_{14}H_{11}FN_4O_2$: C, 58.74; H, 3.87; N, 19.57. Found: C, 58.51; H, 4.00; N, 19.88.

**Supporting Information Available:** $^1$H, $^{13}$C, and $^{19}$F NMR spectra for compounds **1** and **3**, and $^1$H and $^{13}$C NMR for compounds **2, 5, 7,** and **8**. This material is available free of charge via the Internet at http://pubs.acs.org.

JO0602571

# EXHIBIT D

Case 1:21-cv-01338-MFK   Document 472   Filed 05/31/24   Page 372 of 547 PageID #: 26481

# TETRAHEDRON LETTERS

The International Journal for the Rapid Publication of Preliminary Communications in Organic Chemistry

*Founded jointly by Sir Robert Robinson and R. B. Woodward*

### Editors

**B. Ganem**
**Lin Guo-Qiang**
**E. J. Thomas**
**J. Wood**
**Y. Yamamoto**
**S. Z. Zard**



**ELSEVIER**

Typeset in India by Scientific Publishing (P) Ltd, Chennai. Printed in Great Britain by The Alden Group, Oxford



0040-4039(20060717)47:29;1-9

# TETRAHEDRON LETTERS

## EXECUTIVE BOARD OF EDITORS FOR TETRAHEDRON PUBLICATIONS

*Chairman:* **Professor B. Ganem**
*Editor Emeritus:* **Professor H. H. Wasserman**

**Professor D. L. Boger,** The Scripps Research Institute, La Jolla, CA, USA

**Professor S. G. Davies,** University of Oxford, Oxford, UK

**Professor B. Ganem,** Department of Chemistry & Chemical Biology, Baker Laboratory, Cornell University, Ithaca, NY 14853-1301, USA
Fax: 1 607 255 8422; e-mail: tetlett@cornell.edu

**Professor L. Ghosez,** Université Catholique de Louvain, Belgium

**Professor Lin Guo-Qiang,** Shanghai Institute of Organic Chemistry, Chinese Academy of Sciences, 354 Fenglin Road, Shanghai 200032, China
Fax: 86 21 64166263; e-mail: tetrahed@pub.sioc.ac.cn
(Senior Referees, Professor L.-X. Dai, Professor T.-Y. Luh, Professor H. N. C. Wong)

**Professor Y. Hashimoto,** University of Tokyo, Tokyo, Japan

**Professor T. Hayashi,** Kyoto University, Kyoto, Japan

**Professor S. F. Martin,** University of Texas, Austin, TX, USA

**Professor W. B. Motherwell,** University College, London, UK

**Professor M. Shibasaki,** The University of Tokyo, Japan

**Professor T. Shioiri,** Meijo University, Nagoya, Japan

**Professor R. J. K. Taylor,** University of York, UK
(Associate Editors, Dr. P. A. O'Brien and Dr. D. K. Smith)

**Professor E. J. Thomas,** School of Chemistry, The University of Manchester, Oxford Road, Manchester M13 9PL, UK
Fax: 44 161 275 4622; e-mail: tetlet@man.ac.uk
(Associate Editor, Professor J. A. Joule)

**Professor H. Waldmann,** Max-Planck-Institut für Molekulare Physiologie, Dortmund, Germany

**Professor H. H. Wasserman,** Yale University, New Haven, CT, USA

**Professor C.-H. Wong,** The Scripps Research Institute, La Jolla, CA, USA

**Professor J. Wood,** Department of Chemistry, Yale University, PO Box 208107, New Haven, CT 06520-8107, USA
Fax: 1 203 432 0796; e-mail: tetlett@yale.edu

**Professor Y. Yamamoto,** Department of Chemistry, Graduate School of Science, Tohoku University, Sendai 980-8578, Japan
Fax: 81 22 217 6784; e-mail: tetlet@mail.tains.tohoku.ac.jp
(Associate Editor, Professor M. Hirama)

**Professor S. Z. Zard,** Laboratoire de Synthèse Organique, Ecole Polytechnic, F-91128 Palaiseau Cedex, France
Fax: 33 (0) 1 69 33 3057; e-mail: tetlet@polytechnique.fr
(Associate Editor, Dr. B. Sire)

*Editors of the Tetrahedron Organic Chemistry Series:* **Professor J.-E. Bäckvall,** University of Stockholm, Sweden
**Professor Sir J. E. Baldwin, FRS,** Dyson Perrins Laboratory, Oxford, UK
**Professor R. M. Williams,** Colorado State University, Fort Collins, USA

### BOARD OF CONSULTING EDITORS

**A. Alexakis,** University of Geneva, Switzerland
**J.-E. Bäckvall,** University of Stockholm, Sweden
**V. Balzani,** University of Bologna, Italy
**M. Banwell,** Australian National University, Canberra, Australia
**A. G. M. Barrett,** Imperial College, London, UK
**C. Bolm,** RWTH Aachen, Germany
**E. M. Carreira,** ETH, Zürich, Switzerland
**G. W. Coates,** Cornell University, Ithaca, NY, USA
**D. Corey,** University of Texas Southwestern, Medical Center, Dallas, TX, USA
**E. J. Corey,** Harvard University, Cambridge, MA., USA
**J. Cossy,** ESPCI, Paris, France
**D. P. Curran,** University of Pittsburgh, PA, USA
**S. J. Danishefsky,** Columbia University, New York, NY, USA
**A. Dondoni,** University of Ferrara, Italy
**D. A. Evans,** Harvard University, Cambridge, MA, USA
**P. A. Evans,** Indiana University, Bloomington, IN, USA
**S. Florio,** University of Bari, Italy
**G. C. Fu,** MIT, Cambridge, MA, USA

**N. Fusetani,** University of Tokyo, Japan
**S. Ikegami,** Teikyo University, Kanagawa, Japan
**T. Katsuki,** Kyushu University, Fukuoka, Japan
**Y. Kishi,** Harvard University, Cambridge, MA, USA
**P. Knochel,** Ludwigs-Maximilians-University, Munich, Germany
**P. Kocienski,** University of Leeds, UK
**Y. Langlois,** Université de Paris-Sud, Orsay, France
**E. Lee,** Seoul National University, Seoul, Korea
**S. V. Ley,** University of Cambridge, UK
**B. H. Lipshutz,** University of California, Santa Barbara, CA, USA
**X.-Y. Lu,** Shanghai Institute of Organic Chemistry, China
**D. MacMillan,** California Institute of Technology, Pasadena, CA, USA
**P. D. Magnus,** University of Texas at Austin, TX, USA
**L. N. Mander,** Australian National University, Canberra, Australia
**G. Mehta,** Indian Institute of Science, Bangalore, India
**G. Molander,** University of Pennsylvania, Philadelphia, PA, USA

**J. Moore,** University of Illinois at Urbana-Champaign, IL, USA
**T. Mukaiyama,** Kitasato Institute, Tokyo, Japan
**K. C. Nicolaou,** Scripps Research Institute, La Jolla, CA, USA
**R. Noyori,** Nagoya University, Japan
**S. Omura,** Kitasato Institute, Tokyo, Japan
**G. Ourisson,** Centre National de la Scientific Strasbourg, France
**L. E. Overman,** University of California Irvine, CA, USA
**I. Paterson,** University of Cambridge, UK
**G. Pattenden,** University of Nottingham, UK
**S. Roberts,** University of Liverpool, UK
**S. L. Schreiber,** Harvard University, Cambridge, MA, USA
**V. Snieckus,** Queen's University, Kingston, Canada
**Y. Thebtaranonth,** Mahidol University, Bangkok, Thailand
**K. Tomioka,** Kyoto University, Japan
**J. D. Wuest,** University of Montreal, Canada
**H. Yamamoto,** University of Chicago, IL, USA
**M. Yus,** University of Alicante, Spain

## PUBLISHED WEEKLY

**Orders, claims, and journal enquiries:** please contact the Customer Service Department at the Regional Sales Office nearest you: **Orlando:** Elsevier, Customer Service Department, 6277 Sea Harbor Drive, Orlando, FL 32887-4800, USA; phone: (877) 8397126 or (800) 6542452 [toll free number for US customers]; (+1) (407) 3454020 or (+1) (407) 3454000 [customers outside US]; fax: (+1) (407) 3631354 or (+1) (407) 3639661; e-mail: usjcs@elsevier.com or elspcs@elsevier.com; **Amsterdam:** Elsevier, Customer Service Department, PO Box 211, 1000 AE Amsterdam, The Netherlands; phone: (+31) (20) 4853757; fax: (+31) (20) 4853432; e-mail: nlinfo-f@elsevier.com; **Tokyo:** Elsevier, Customer Service Department, 4F Higashi-Azabu, 1-Chome Bldg., 1-9-15 Higashi-Azabu, Minato-ku, Tokyo 106-0044, Japan; phone: (+81) (3) 5561 5037; fax: (+81) (3) 5561 5047; e-mail: jp.info@elsevier.com; **Singapore:** Elsevier, Customer Service Department, 3 Killiney Road, #08-01 Winsland House I, Singapore 239519; phone: (+65) 63490222; fax: (+65) 67331510; e-mail: asiainfo@elsevier.com

© 2006 Elsevier Ltd.



Available online at www.sciencedirect.com



SCIENCE @ DIRECT·

Tetrahedron
Letters

Tetrahedron Letters 47 (2006) 5045–5048

# Effect of microwave heating on Ullmann-type heterocycle-aryl ether synthesis using chloro-heterocycles

Noel D. D'Angelo,[a] Joseph J. Peterson,[b] Shon K. Booker,[a] Ingrid Fellows,[c] Celia Dominguez,[a] Randall Hungate,[a] Paul J. Reider[a] and Tae-Seong Kim[a,*]

[a]*Department of Chemistry Research and Development, Amgen Inc., One Amgen Center Drive, Thousand Oaks, CA 91320-1799, United States*
[b]*Department of Chemistry, Rochester Institute of Technology, 85 Lomb Memorial Drive, Rochester, NY 14623-5603, United States*
[c]*Chemistry Department, California State University Fresno, 2555 E. San Ramon Ave, Fresno, CA 93740, United States*

Received 14 January 2006; revised 12 May 2006; accepted 17 May 2006

**Abstract**—Ullmann ether synthesis was conducted on a variety of chloro-heterocycles with different phenols using optimized conditions involving copper powder and cesium carbonate. On many substrates, microwave heating afforded higher yields in significantly shorter reaction times compared to conventional heating conditions. These findings provide a facile method for aryl ether synthesis from chloropyridines, chloroquinolines, and chlorobenzothiazoles.
© 2006 Elsevier Ltd. All rights reserved.

The Ullmann ether synthesis has been widely employed in organic chemistry since its discovery in the early 20th century.[1] In particular, the copper-mediated coupling of aryl halides and phenols has proven to be one of the primary methods for aryl ether synthesis.[2] Initially, this reaction required high temperatures (>200 °C) and toxic solvents and often afforded low yields. Consequently, its scope was rather limited.[3-6] However, recent modifications have allowed for this reaction to be run under milder conditions (90–110 °C) on chemically diverse substrates, often furnishing products in high yields.[7] These improvements have been achieved mainly by the introduction of palladium[8] and copper catalysis.[9] With these improvements, the scope of the Ullmann ether synthesis has been extended to heterocycle-alkyl ether synthesis.[10] To our knowledge, however, there has been no report on its application to heterocycle-aryl ether synthesis to date.

The advent of microwave technology has provided another means of improving the efficiency of many organic reactions.[11] This technology has also been explored for the Ullmann ether synthesis by Wu and later by Wang for synthesis of aryl ethers and *N*-aryl heterocycles.[12] Cherng reported microwave-assisted nucleophilic substitution of halo-heterocycles with sodium phenoxide on pyridine, quinoline, isoquinoline, pyrazine, and pyrimidine systems.[13] However, with inactivated heterocycles such as halopyridines, the coupling reaction is still difficult and requires a large excess of the phenoxide and toxic solvents such as HMPA for best yields even for iodopyridines.[13c]

Here we report a facile method with microwave irradiation for Ullmann ether synthesis between electronically diverse phenols and nitrogen containing chloro-heterocycles such as chloropyridines, chloroquinolines, and chlorobenzothiazoles. Chloro-heterocycles are stable and easy to make relative to bromo- and iodo-heterocycles, but, as a consequence, they are also less reactive. Thus, the primary objective was to determine how effective microwave heating would be in improving the yields of Ullmann ether synthesis between different phenols and chloro-heterocycles.

Our first approach was to identify the optimized reaction conditions using 4-chloropyridinium hydrochloride (**1**) and phenol (**2**, R = H). This was performed by systematically varying the solvent, copper source, and base under

---

*Keywords*: Ullmann ether synthesis; Microwave.
* Corresponding author. Tel.: +1 805 447 8895; fax: +1 805 480 3016; e-mail: tkim@amgen.com

0040-4039/$ - see front matter © 2006 Elsevier Ltd. All rights reserved.
doi:10.1016/j.tetlet.2006.05.103

5046                     N. D. D'Angelo et al. / Tetrahedron Letters 47 (2006) 5045–5048

microwave (CEM, Discover®) conditions of 100 °C and 60 W for 10 min. The first conditions examined used copper powder, DMF, and potassium hydroxide and afforded 4-phenoxypyridine (3) in 20% yield. Changing the copper source to copper(I) salts such as CuI and CuCl resulted in yields ranging from 8% to 11%. Likewise, with other solvents such as NMP, toluene, and a 1:1 DMF/pyridine mixture, the yields were still below 10%. The base had the greatest influence on the reaction, and while $K_3PO_4$, $K_2CO_3$, and KOH also afforded yields under 10%, the use of $Cs_2CO_3$ in the presence of copper powder in DMF afforded 3 in 69% isolated yield.[14] Once these optimized conditions had been identified, they were used in all subsequent conventional heating and microwave reactions.[15]

Using these conditions, the Ullmann ether synthesis of 1 with different phenols was conducted in order to investigate the sensitivity of this reaction to electronics. For this series, the phenol was varied from electron donating to electron withdrawing, and the Ullmann ether synthesis was then conducted on the bench top and in the microwave using the optimized conditions. The isolated yields were then compared and are summarized below in Table 1.

Two noteworthy trends are apparent. First, the yields in most cases were higher in the microwave than on the bench top, demonstrating the advantage of using the microwave for these substrates. This is important from a practical point of view, as the reactions under conventional heating were run under nitrogen for 18 h in a 100 °C oil bath, while the microwave reactions took 10 min. Second, under microwave conditions, the yields observed increased with more electron deficient phenols. No such trend was observed on the reactions under conventional heating, suggesting that microwave heating is especially beneficial for electron-deficient phenols.

For the next series, different chloro-heterocycles and halopyridines were explored using phenol (2) as the nucleophile. For this series, the reactions were run under the same conditions as before, and again the yields

in the microwave and on the bench top were obtained and are summarized in Table 2. For the first three aryl chlorides, the yields on the bench top and in the microwave were similar, with the microwave yields being about 10% higher. The similar yields could be the result of these chloro-heterocycles being more reactive than 4-chloropyridine.

Different halopyridines were also explored, where the halide substituent and its position were varied. For these experiments, 2-chloropyridine, 2-bromopyridine, and 2-iodopyridine were studied, as well as their 4-halopyridine counterparts. The chloropyridine substrates showed low reactivity under conventional heating conditions, regardless of 2-, 3-, or 4-positioning. The yields under conventional heating clearly improved when bromine and iodine were used. The microwave conditions afforded moderate to good yields for all three halogenated substrates, however the improvement in yield relative to the conventional heating conditions was most dramatic for the chloropyridine species. Finally, under microwave conditions, 2-chloropyridine and 4-chloropyridine afforded the desired product in moderate to good yield, while 3-chloropyridine hardly gave any product. From these results, one can conclude that microwave heating is most advantageous for chloro-heterocycle substrates, in terms of shortening reaction times and, most significantly, improving reaction yields.

In summary, microwave heating can be quite effective in improving the yields and decreasing the reaction times of Ullmann ether synthesis, especially for couplings that are otherwise sluggish and low yielding. Primarily, microwave heating enables the use of less reactive chloro-heterocycles for these couplings, thereby expanding their synthetic utility. Even for reactive substrates such as iodopyridines, microwave heating affords the advantage of dramatically decreased reaction times (10 min vs 18 h) with similar, if not better, yields. These conditions should facilitate the synthesis of aryl ethers and thereby aid in the discovery of new drug candidates. Further efforts toward this end will be reported in due course.

**Table 1.** Effect of microwave on Ullmann ether synthesis yields with different phenols



| Entry | R | Product | Conventional heating yield[a] (%) | Microwave heating yield[a] (%) |
|---|---|---|---|---|
| 1 | H | (3) | 17 | 69 |
| 2 | 4-Methoxy | (4) | 36 | 34 |
| 3 | 4-Methyl | (5) | 31 | 38 |
| 4 | 4-Fluoro | (6) | 26 | 76 |
| 5 | 3-Fluoro | (7) | 29 | 72 |
| 6 | 2-Fluoro | (8) | 23 | 79 |

[a] Isolated yield.

**Table 2.** Effect of microwave on Ullmann ether synthesis yields with different heterocycles

$$\text{Het-X (1.0 eq.)} \quad + \quad \text{HO}\!\!-\!\!\bigcirc \quad \xrightarrow[\text{DMF, 100 °C, 60 Watts (microwave only)}]{\text{copper powder (0.1 eq.), Cs}_2\text{CO}_3 \text{ (3 eq.),}} \quad \text{Het-O}\!\!-\!\!\bigcirc$$

2 (R=H)                                                                    9-13

| Entry | Het–X | Product | Conventional heating yield[a] (%) | Microwave heating yield[a] (%) |
|---|---|---|---|---|
| 1 | 4-Chloroquinoline | (9) | 72 | 80 |
| 2 | 2-Chloropyrimidine | (10) | 85 | 97 |
| 3 | 2-Chlorobenzothiazole | (11) | 76 | 87 |
| 4 | 4-Bromopyridine | 4-Phenoxypyridine (3) | 32 | 83 |
| 5 | 4-Iodopyridine | 4-Phenoxypyridine (3) | 82 | 75 |
| 6 | 3-Chloropyridine | 3-Phenoxypyridine (12) | Trace | 4 |
| 7 | 2-Chloropyridine | 2-Phenoxypyridine (13) | 11 | 49 |
| 8 | 2-Bromopyridine | 2-Phenoxypyridine (13) | 64 | 83 |
| 9 | 2-Iodopyridine | 2-Phenoxypyridine (13) | 91 | 86 |

[a] Isolated yield.

## Acknowledgements

We thank Professors Stephen Buchwald and Eric Jacobsen and Dr. Michael Martinelli for helpful discussion and encouragement.

## References and notes

1. Ullmann, F.; Sponagel, P. *Ber. Dtsch. Chem. Ges.* **1905**, *38*, 2211–2212.
2. Ullmann, F. *Ber. Dtsch. Chem. Ges.* **1904**, *37*, 853–854.
3. Lindley, J. *Tetrahedron* **1984**, *40*, 1433–1456.
4. Sawyer, J. S. *Tetrahedron* **2000**, *56*, 5045–5065.
5. LeMaire, M. *Chem. Rev.* **2002**, *102*, 1359–1469.
6. Kunz, K.; Scholz, U.; Ganzer, D. *Synlett* **2003**, *15*, 2428–2439.
7. Ley, S. V.; Thomas, A. W. *Angew. Chem. Int. Ed.* **2003**, *42*, 5400–5449.
8. (a) Mann, G.; Hartwig, J. F. *Tetrahedron Lett.* **1997**, *46*, 8005–8008; (b) Aranyos, A.; Old, D. W.; Kiyomori, A.; Wolfe, J. P.; Sadighi, J. P.; Buchwald, S. L. *J. Am. Chem. Soc.* **1999**, *121*, 4369–4378; (c) Ding, S.; Gray, N. S.; Ding, Q.; Schultz, P. G. *Tetrahedron Lett.* **2001**, *42*, 8751–8755; (d) Kataoka, N.; Shelby, Q.; Stambuli, J. P.; Hartwig, J. F. *J. Org. Chem.* **2002**, *67*, 5553–5566.
9. (a) Marcoux, J. F.; Doye, S.; Buchwald, S. L. *J. Am. Chem. Soc.* **1997**, *119*, 10539–10540; (b) Chan, D. M. T.; Monaco, K. L.; Wang, R.-P.; Winters, M. P. *Tetrahedron Lett.* **1998**, *39*, 2933–2936; (c) Evans, D. A.; Katz, J. L.; West, T. R. *Tetrahedron Lett.* **1998**, *39*, 2937–2940; (d) Lam, P. Y. S.; Clark, C. G.; Saubern, S.; Adams, J.; Winters, M. P.; Chan, D. M. T.; Combs, A. *Tetrahedron Lett.* **1998**, *39*, 2941–2944; (e) Palomo, C.; Oiarbide, M.; Lopez, R.; Gomez-Bengoa, E. *Chem. Commun.* **1998**,

2091–2092; (f) Goodbrand, H. B.; Hu, N. X. *J. Org. Chem.* **1999**, *64*, 670–674; (g) Ma, D.; Xia, C. *Org. Lett.* **2001**, *3*, 2583–2586; (h) Gujadhur, R. K.; Bates, C. G.; Venkataraman, D. *Org. Lett.* **2001**, *3*, 4315–4317; (i) Buck, E.; Song, Z. J.; Tschaen, D.; Dormer, P. G.; Volante, R. P.; Reider, P. J. *Org. Lett.* **2002**, *4*, 1623–1626; (j) Lu, Z.; Twieg, R. J.; Huang, S. D. *Tetrahedron Lett.* **2003**, *44*, 6289–6292; (k) Ma, D.; Cai, Q. *Org. Lett.* **2003**, *5*, 3799–3802; (l) Cristau, H. J.; Cellier, P. P.; Hamada, S.; Spindler, J. F.; Taillefer, M. *Org. Lett.* **2004**, *6*, 913–916.
10. (a) Wolter, M.; Nordmann, G. E.; Job, G. E.; Buchwald, S. L. *Org. Lett.* **2002**, *4*, 973–976; (b) Torraca, K. E.; Huang, X.; Parrish, C. A.; Buchwald, S. L. *J. Am. Chem. Soc.* **2001**, *123*, 10770–10771.
11. (a) Kappe, C. O. *Angew. Chem. Int. Ed.* **2004**, *43*, 6250–6284; (b) Lidstrom, P.; Tierney, J.; Wathey, B.; Westman, J. *Tetrahedron* **2001**, *57*, 9225–9283; (c) Santagada, V.; Perissutti, E.; Caliendo, G. *Curr. Med. Chem.* **2002**, *9*, 1251–1283; (d) Whittaker, A. G.; Mingos, D. M. P. *J. Chem. Soc. Dalton Trans.* **2002**, *21*, 3967–3970.
12. (a) Wu, Y. J.; He, H. *Tetrahedron Lett.* **2003**, *44*, 3445–3446; (b) Wu, Y. J.; He, H.; L'Heureux, A. *Tetrahedron Lett.* **2003**, *44*, 4217–4218; (c) Li, F.; Wang, Q.; Ding, Z.; Tao, F. *Org. Lett.* **2003**, *5*, 2169–2171.
13. (a) Cherng, Y. J. *Tetrahedron* **2002**, *58*, 887–890; (b) Cherng, Y. J. *Tetrahedron* **2002**, *58*, 1125–1129; (c) Cherng, Y. J. *Tetrahedron* **2002**, *58*, 4931–4935.
14. Microwave irradiation of just the copper powder in DMF, followed by coupling using conventional heating at 100 °C for 18 h afforded only a modest increase in the yield of **3**, from 17% to 25%.
15. *General microwave reaction procedure*: 4-chloropyridine hydrochloride (224 mg, 1.5 mmol) and phenol (221 mg, 2.24 mmol) were suspended in DMF (3.3 ml) in a microwave vial and copper powder (9.5 mg, 0.15 mmol, Aldrich 99%, 1–5 μm), and cesium carbonate (1.45 g, 4.45 mmol)

were added. The vial was sealed, shaken for 10 s, and then placed in the microwave (CEM, Discover®). The reaction was run by ramping the temperature setting to 100 °C over 5 min and then maintaining this temperature setting for 10 min. For the entire experiment, the power setting was held at 60 W. The reaction was then cooled to room temperature and diluted with $CH_2Cl_2$ (25 ml). The organic phase was washed with 1 N NaOH (60 ml) and water, dried over sodium sulfate, filtered, and concentrated. The

crude material was purified via flash chromatography (50:1 $CH_2Cl_2$/MeOH) to afford 4-phenoxypyridine (3, 175 mg, 69%) as a white solid: $^1$H NMR (400 MHz, $CDCl_3$) $\delta$ 8.48 (d, $J = 4.0$ Hz, 2H), 7.44 (t, $J = 8.0$ Hz, 2H), 7.29–7.25 (m, 1H), 7.11 (d, $J = 8.0$ Hz, 2H), 6.85 (d, $J = 8.0$ Hz, 2H); MS (API-ES) calcd for $C_{11}H_{10}NO$ $(MH)^+$: 172.1, found 172.0 $m/z$; Elemental analysis calcd for $C_{11}H_9NO$: C, 77.17; H, 5.30; N, 8.18. Found: C, 77.02; H, 5.25; N, 8.06.

# EXHIBIT E

Case 1:21-cv-01338-MFK   Document 472   Filed 05/31/24   Page 379 of 547 PageID #: 26488



# The Journal of Organic Chemistry

VOLUME 70   NUMBER 24   NOVEMBER 25, 2005

JOCEAH

UW-MADISON
CHEMISTRY LIBRARY



# JOC *The Journal of Organic Chemistry*

*The Journal of Organic Chemistry* (ISSN 0022-3263) is published biweekly by the American Chemical Society at 1155 16th St., N.W., Washington, DC 20036. Periodicals postage paid at Washington, DC, and additional mailing offices. POSTMASTER: Send address changes to *The Journal of Organic Chemistry*, Member & Subscriber Services, P.O. Box 3337, Columbus, OH 43210.

**American Chemical Society**
1155 16th St., N.W.
Washington, DC 20036
(202) 872-4614
TDD (202) 872-6076
Fax (202) 776-8264

**Journal Publications**
American Chemical Society
2540 Olentangy River Road
P.O. Box 3330, Columbus, OH 43210
(614) 447-3665
Fax (614) 447-3745
E-mail acsproof@acs.org

**Member & Subscriber Services**
P.O. Box 3337
Columbus, OH 43210

*Members & individuals contact:*
(614) 447-3776; (800) 333-9511
Fax (614) 447-3671
E-mail service@acs.org

*Agencies & institutions contact:*
(614) 447-3674; (888) 338-0012
Fax (614) 447-3671
E-mail liblink@acs.org

**Advertising Office**
Centcom, Ltd.
676 East Swedesford Road
Suite 202, Wayne, PA 19087-1612
(610) 964-8061

**Publications Division**
Robert D. Bovenschulte, *President*
Brian J. Crawford, *Senior Vice President*

**Journals Publishing Group**

*Journal Publications*
Anne C. O'Melia, *Assistant Director*;
Debora Ann Bittaker, *Journals Editing Manager*; Mary B. Harig, *Senior Editor*;
Susan H. Reich, *Senior Associate Editor*;
Susan B. Hatfield, *Associate Editor*;
Yolanda L. Steiman, *Assistant Editor*;
Theresa A. Massey, *Production Assistant*

*Composition Services*
Teresa K. Lewandowski, *Assistant Director*

**Sales & Marketing/Publications**
Dean J. Smith, *Vice President*
Matthew J. Price, *Director*,
*Product Marketing*



Canadian GST Reg. No. 127571347
Printed in the USA

**Copyright Permission:** See copyright status form for certain rights (http://pubs.acs.org). Reprographic copying beyond that permitted by Section 107 or 108 of the U.S. Copyright Act is allowed, provided that the current per article fee is paid to the Copyright Clearance Center, Tel: (978) 750-8400. Republication or reproduction for sale of articles or abstracts in this journal is permitted only by written permission from the Copyright Office, ACS, Washington, DC, Tel: (202) 872-4368. Fax: (202) 766-8112. E-mail: copyright@acs.org.

## EDITORIAL INFORMATION

**Instructions for Authors and Copyright Status Form:** See the first issue of each volume or visit the Publications Division Web site (http://pubs.acs.org). Please conform to these instructions when submitting manuscripts.

**Manuscript Submission:** Submit via the secure ACS Web site (http://pubs.acs.org/joc).

**Accepted Papers and Proofs:** Direct correspondence to Journal Publications, Columbus, OH. Tel: (614) 447-3665. Fax: (614) 447-3745. E-mail: acsproof@acs.org.

**Journal Policies:** The American Chemical Society and its Editors assume no responsibility for the statements and opinions advanced by contributors. Registered names and trademarks, etc., used in this publication, even without specific indication thereof, are not to be considered unprotected by law.

**Document Number:** At the end of each document is a 9-character code that serves as a link between the printed and electronic products and facilitates retrieval of the document in electronic form.

**Digital Object Identifier (DOI):** The DOI identification system for digital media has been designed to provide persistent and reliable identification of digital objects. Information on the DOI and its governing body, the International DOI Foundation, can be found at http://www.doi.org. In the Web editions of ACS journals, the DOI appears at the top of the HTML version of an article and at the bottom of the first page in its PDF version; in the printed editions, the DOI appears in the same location as in the PDF version.

## 2005 SUBSCRIPTION AND ORDERING INFORMATION

|  |  | North America | Outside North America* |
|---|---|---|---|
| **Printed Edition** | Members | $ 174 | $ 403 |
|  | Student Members | $ 131 | $ 360 |
|  | Institutional | $2139 | $2368 |
| **Web Edition**† | Members | $ 75 | $ 75 |
| **Print/Web Combination**† | Members | $ 249 | $ 478 |

* Air service included. † For Institutional rates, call M&SS Agency & Institutional Customer Service.

**Web Edition:** This journal is available to subscribers via the Internet. Members may contact Customer Service. Tel: (614) 447-3776 or (800) 333-9511. E-mail: service@acs.org. Institutional subscribers may contact Agency & Institutional Customer Service. Tel: (614) 447-3674 or (888) 338-0012. Fax: (614) 447-3671. E-mail: liblink@acs.org. For additional details, visit the Publications Division Web site (http://pubs.acs.org).

**New and Renewal Subscriptions:** Send with payment to American Chemical Society, P.O. Box 182426, Columbus, OH 43218-2426.

**Subscription Donations:** Members may donate/share their personal subscriptions to/with libraries but only after 5 years from the date of publication.

**Change of Address:** Notify Member & Subscriber Services, ACS, Columbus, OH. Tel: (614) 447-3776 or (800) 333-9511. Fax: (614) 447-3671. E-mail: address@acs.org. Include both old and new addresses and a mailing label from a recent issue.

**Microfilm, Microfiche, Back Issue, and Printed Edition Single Issue Orders:** Send requests to Publications Support Services, ACS, Washington, DC. Tel: (202) 872-4376. Fax: (202) 872-6325. E-mail: pss@acs.org. Printed edition not available prior to 2001.

**Bulk Reprint Orders:** For quotes and information, contact Cadmus Reprints. Tel: (888) 257-2134 or (410) 819-3995. Fax: (410) 820-9765.

**Claims for Issues Not Received:** Claims will be honored only if submitted within 90 days of the issue date for subscribers in North America or within 180 days of the issue date for all other subscribers. Members and individuals may contact Customer Service. Tel: (614) 447-3776 or (800) 333-9511. E-mail: service@acs.org. Institutional subscribers may contact Agency & Institutional Customer Service. Tel: (614) 447-3674 or (888) 338-0012. Fax: (614) 447-3671. E-mail: liblink@acs.org.

**Supporting Information (SI):** SI from 1995 to present is available free of charge from the journal's home page (http://pubs.acs.org/joc). For information on electronic access, send E-mail to journalhelp@acs.org. SI prior to 1995 is available, for a fee, from Publications Support Services. Tel: (202) 872-4376. Fax: (202) 872-6325. E-mail: pss@acs.org.

© Copyright 2005 American Chemical Society

Case 1:21-cv-01338-MFK   Document 472   Filed 05/31/24   Page 381 of 547 PageID #: 26490

# JOC Note

## A Soluble Base for the Copper-Catalyzed Imidazole N-Arylations with Aryl Halides[†]

Longbin Liu,* Mike Frohn, Ning Xi, Celia Dominguez, Randy Hungate, and Paul J. Reider

*Chemical Research and Discovery, Amgen Inc., One Amgen Center Drive, Thousand Oaks, California 91320*

*lliu@amgen.com*

Received August 4, 2005

CuI-catalyzed N-arylation of imidazoles with aryl bromides has been achieved in a near-homogeneous system that utilizes tetraethylammonium carbonate as base, 8-hydroxyquinoline as ligand, and H$_2$O as cosolvent. Preliminary results with aryl chlorides are also reported.

Copper-catalyzed C–N, C–O, and C–S bond formations between aryl halides and NH, OH, SH-containing heterocycles have evolved as a major method for the synthesis of novel heterocyclic compounds.[1] One exception, however, has been the imidazole N-arylation with aryl halides.

N-Arylimidazoles have been recorded in medicinal,[2] biological,[3] and recently, in the area of N-heterocyclic carbene chemistry.[4] Traditionally, these compounds were synthesized via S$_N$Ar substitution of imidazoles with aryl halides bearing electron-withdrawing substituents[5] or via the Ullmann-type coupling at high temperatures.[6] The Lam–Chan reaction (Cu-catalyzed cross-coupling between imidazoles and aryl boronic acids) has emerged as a method of choice partly because it requires much lower temperatures.[7] However, it is often necessary to optimize the conditions (solvent,[8] base,[9] additive,[10] and substrate types[11]) for a given reaction. In addition, one is limited by the high cost and poor availability of functionalized boronic acids.

Other types of cross-coupling reagent for the synthesis of N-arylimidazoles include (p-Tol)Pb(OAc)$_3$,[12] (Ph)$_3$Bi,[13] ArSnR$_3$,[14] ArSi(OR)$_3$F$^-$,[15] and Ar$_2$IBr.[16] These reagents are generally less accessible, and some are highly toxic.

† This article is dedicated to Prof. Gilbert Stork on the occasion of his 84th birthday.

(1) For reviews on Cu-catalyzed coupling reactions: see (a) Lindley, J. Tetrahedron 1984, 40, 1433–1456. (b) Ley, S. V.; Thomas, A. W. Angew. Chem., Int. Ed. 2003, 42, 5400–5449. (c) Kunz, K.; Scholz, U.; Ganzer, D. Synlett 2003, 2428–2439. (d) Beletskaya, I. P.; Cheprakov, A. V. Coord. Chem. Rev. 2004, 248, 2337–2364. For recent examples of Cu-catalyzed N-arylations with aryl halides, see: (e) Klapars, A.; Huang, X.; Buchwald, S. L. J. Am. Chem. Soc. 2002, 124, 7421–7428 and references therein. (f) Okano, K.; Tokuyama H.; Fukuyama, T. Org. Lett. 2003, 5, 4987–4990. (g) Kwong, F. Y.; Buchwald, S. L. Org. Lett. 2003, 5, 793–796. (h) He, H.; Wu, Y.-J. Tetrahedron Lett. 2003, 44, 3385–3386.

Therefore, methods that circumvent these limitations are highly desirable.

In 1999, Buchwald reported the first catalytic Ullmann coupling of imidazoles with aryl halides at low temperatures (110 °C) with (CuOTf)$_2$–PhH as catalyst.[17] Key features of the Buchwald protocol are (1) the use of

(2) For examples of cAMP PDE inhibitor, see: (a) Venuti, M. C.; Stephenson, R. A.; Alvarez, R.; Bruno, J. J.; Strosberg, A. M. J. Med. Chem. 1988, 31, 2136–2145. Thromboxane synthase inhibitor: (b) Martinez, G. R.; Walker, K. A. M.; Hirschfeld, D. R.; Bruno, J. J.; Yang, D. S.; Maloney, P. J. J. Med. Chem. 1992, 35, 620–628. (c) Iizuka, K.; Akahane, K.; Momose, D.; Nakazawa, M. J. Med. Chem. 1981, 24, 1139–1148. (d) Cozzi, P.; Carganico, G.; Fusar, D.; Grossoni, M.; Menichincheri, M.; Pinciroli, V.; Tonani, R.; Vaghi, F.; Salvati, P. J. Med. Chem. 1993, 36, 2964–2972. (e) Qiao, J. X.; Cheng, X.; Modi, D. P.; Rossi, K. A.; Luettgen, J. M.; Knabb, R. M.; Jadhav, P. K.; Wexler, R. R. Bioorg. Med. Chem. Lett. 2005, 15, 29–35. Angiotensin-II agonist: (f) Wan, Y.; Wallinder, C.; Plouffe, B.; Beaudry, H.; Mahalingam, A. K.; Wu, X.; Johansson, B.; Holm, M.; Botoros, M.; Karlen, A.; Pettersson, A.; Nyberg, F.; Faendriks, L.; Gallo-Payet, N.; Hallberg, A.; Alterman, M. J. Med. Chem. 2004, 47, 5995–6008. Cardiotonic agent: (g) Sircar, I.; Weishaar, R. E.; Kobylarz, D.; Moos, W. H.; Bristol, J. A. J. Med. Chem. 1987, 30, 1955–1962 and references therein. (h) Güngör, T.; Fouquet, A.; Teulon, J.-M.; Provost, D.; Cazes, M.; Cloarec, A. J. Med. Chem. 1992, 35, 4455–4463. Carbonic anhydrase inhibitor: (i) Lo, Y. S.; Nolan, J. C.; Maren, T. H.; Welstead, W. J., Jr.; Gripshover, D. F.; Shamblee, D. A. J. Med. Chem. 1992, 35, 4790–4794. AMPA antagonist: (j) Ohmori, J.; Shimizu-Sasamata, M.; Okada, M.; Sakamoto, S. J. Med. Chem. 1996, 39, 3971–3979. COX inhibitor: (k) Almansa, C.; Bartroli, J.; Belloc, J.; Cavalcanti, F. L.; Ferrando, R.; Gomez, L. A.; Ramis, I.; Carceller, E.; Merlos, M.; Garcia-Rafanell, J. J. Med. Chem. 2004, 47, 5579–5582. PDE4 inhibitor: (l) Jiang, W.; Guan, J.; Macielag, M. J.; Zhang, S.; Qiu, Y.; Kraft, P.; Bhattacharjee, S.; John, T. M.; Haynes-Johnson, D.; Lundeen, S.; Sui, Z. J. Med. Chem. 2005, 48, 2126–2133. Bradykinin B1 antagonist: (m) Su, D.-S.; Markowitz, M. K.; Murphy, K. L.; Wan, B.-L.; Zrada, M. M.; Harrell, C. M.; O'Malley, S. S.; Hess, J. F.; Ransom, R. W.; Chang, R. S.; Wallace, M. A.; Raab, C. E.; Dean, D. C.; Pettibone, D. J.; Freidinger, R. M.; Bock, M. G. Bioorg. Med. Chem. Lett. 2004, 14, 6045–6048. CB-1 antagonist: (n) Lange, J. H. M.; van Stuivenberg, H. H.; Coolen, H. K. A. C.; Adolfs, T. J. P.; McCreary, A. C.; Keizer, H. G.; Wals, H. C.; Veerman, W.; Borst, A. J. M.; de Looff, W.; Verveer, P. C.; Kruse, C. G. J. Med. Chem. 2005, 48, 1823–1838. PDGFR inhibitors: (o) Zhong C.; He, J.; Xue, C.; Li, Y. Bioorg. Med. Chem. 2004, 12, 4009–4015 and references therein.
(3) Tyr$^{244}$–His$^{240}$ cross-link was found in the active site of cytochrome c oxidase: (a) Yoshikawa, S.; Shinzawa-Itoh, K.; Nakashima, R.; Yaono, R.; Yamashita, E.; Inoue, N.; Yao, M.; Fei, M. J.; Libeu, C. P.; Mizushima, T.; Yamaguchi, H.; Tomizaki, T.; Tsukihara, T. Science 1998, 280, 1723–1729. (b) Bambal, R. B.; Hanzlik, R. P. Chem. Res. Toxicol. 1995, 8, 729–735.
(4) For a recent account, see: Herrmann, W. A. Angew. Chem., Int. Ed. 2002, 41, 1290–1309.
(5) Bambal, R.; Hanzlik, R. B. J. Org. Chem. 1994, 59, 729–732. Also, see ref 2a,d,h,j.
(6) Jacobs, C.; Frotscher, M.; Dannhardt, G.; Hartmann, R. W. J. Med. Chem. 2000, 43, 1841–1851. Also, see ref 2b,c,j.
(7) (a) Lam, P. Y. S.; Clark, C. G.; Saubern, S.; Adams, J.; Winters, M. P.; Chan, D. M. T.; Combs, A. Tetrahedron Lett. 1998, 39, 2941–2944. (b) Combs, A. P.; Saubern, S.; Rafalski, M.; Lam, P. Y. S. Tetrahedron Lett. 1999, 40, 1623–1626. (c) Lam, P. Y. S.; Vincent, G.; Clark, C. G.; Deudon, S.; Jadhav, P. K. Tetrahedron Lett. 2001, 42, 3415–3418. (d) Collman, J. P.; Zhong, M.; Zhang, C.; Costanzo, S. J. Org. Chem. 2001, 66, 7892–7897. For the use of polymer-supported Cu catalyst, see: (e) Chiang, G. C. H.; Olsson T. Org. Lett. 2004, 6, 3079–3082.
(8) For reactions performed in H$_2$O or MeOH, see: (a) Collman, J. P.; Zhong M.; Zeng, Li.; Costanzo, S. J. Org. Chem. 2001, 66, 1528–1531. (b) Lan, J.-B.; Chen, L.; Yu, X.-Q.; You, J.-S.; Xie, R. G. Chem. Commun. 2004, 2, 188–189.
(9) A "base-free anaerobic" system: Berkel, S. S.; Hoogenband, A.; Terpstra, J. W.; Tromp, M.; Leeuwena, P. W. N. M.; Strijdoncka, G. P. F. Tetrahedron Lett. 2004, 45, 7659–7662.
(10) Use of molecular sieves: (a) Evans, D. A.; Katz, J. L.; West, T. R. Tetrahedron Lett. 1998, 39, 2937–2940. (b) References 7a and 11.
(11) Electron-rich substrates may result in low yield under the oxidative condition (Collman J. P.; Zhong, M. Org. Lett. 2000, 2, 1233–1236), except with excess ArB(OH)$_2$ or in protic solvents (cf. ref 8b).

JOC *Note*



**FIGURE 1.** Ligands for Cu-catalyzed N-arylations of imidazoles.

stoichiometric amount (relative to halide) of 1,10-phenanthraline (**I**, Figure 1) along with a secondary ligand, dibenzylidene acetone (dba, 5%), for maintaining reproducibility, (2) high substrate concentrations ([ArX] ≈ 2.5−5 M), and (3) the use of relatively insoluble inorganic base (Cs$_2$CO$_3$) in nonpolar solvent (xylenes). This procedure was modified by Hanzlik, who used DMF (20%) as cosolvent to accommodate the poor solubility of functionalized substrate (N-Ac-L-His-OMe) in the synthesis of N$^\tau$-arylhistidine derivatives (12% yield from iodobenzene).[18]

Subsequently, Buchwald has shown that 1,2-diamines (10%, such as **II**), in combination with catalytic amounts of **I** (10−20%), promoted CuI-catalyzed coupling of imidazoles with aryl iodides in dioxane or DMF.[19] Recently, Cristau et al.[20] reported that salicylaldehyde-derived ligands such as **III** (20%) promoted Cu$_2$O-catalyzed N-arylations of imidazoles with aryl halides in MeCN. These examples represented significant advances in the synthesis of N-arylazoles in general and N-arylimidazoles in particular. Most importantly, they demonstrated the critical role of ligands in Cu-catalyzed cross-coupling reactions with aryl halides. However, both Buchwald and Cristau's systems still rely on the use of excess Cs$_2$CO$_3$ at high substrate concentrations (>1.7 M). As a result, maintaining efficient mixing of these highly heterogeneous, multicomponent systems presents an operational challenge that may affect the reproducibility of these reactions, especially on large scales. So far, most of the aryl halides reported in the N-arylation of imidazoles, already limited in examples, were aryl iodides,[21] with only four tested substrates being aryl bromides.[22] Clearly there is a need to develop a process that allows direct coupling of a wide range of aryl halides with imidazoles,

(12) (a) López, A. P.; Avendano, C.; Menéndez, J. C. *Tetrahedron Lett.* **1992**, *33*, 659−662. (b) *J. Org. Chem.* **1995**, *60*, 5678−5682. (c) Elliott, G. I.; Konopelski, J. P. *Org. Lett.* **2000**, *2*, 3055−3057. (d) Fedorov, A. U.; Finet, J.-P. *Eur. J. Org. Chem.* **2004**, *9*, 2040−2045.
(13) Fedorov, A. Y.; Finet, J.-P. *Tetrahedron Lett.* **1999**, *40*, 2747−2748.
(14) Lam, P. Y. S.; Clark, C. G.; Saunern, S.; Adams, J.; Averill, K.; Chan, D. M. T.; Combs, A. P. *Synlett* **2000**, 674−676.
(15) Lam, P. Y. S.; Deudon, S.; Averill, K. M.; Li, R.; He, M. Y.; DeShong, P.; Clark, C. G. *J. Am. Chem. Soc.* **2000**, *122*, 7600−7601.
(16) Nontransition metal catalyzed direct arylation in ionic liquid: Wang, F.-Y.; Chen, Z.-C.; Zheng, Q.-G. *J. Chem. Res.* **2004**, 206−207.
(17) Kiyomori, A.; Marcoux, J.-F.; Buchwald, S. L. *Tetrahedron Lett.* **1999**, *40*, 2657−2660.
(18) Yue, W.; Lewis, S. I.; Koen, Y. M.; Hanzlik, R. P. *Bioorg. Med. Chem. Lett.* **2004**, *14*, 1637−1640.
(19) (a) Klapars, A.; Antilla, J. C.; Huang, X.; Buchwald, S. L. *J. Am. Chem. Soc.* **2001**, *123*, 7727−7729. A later publication suggested that either *trans*-1,2-cyclohexanediamine or 1,10-phenanthroline was sufficient for aryl iodides: (b) Antilla, J. C.; Baskin, J. M.; Barder, T. E.; Buchwald, S. L. *J. Org. Chem.* **2004**, *69*, 5578−5587.
(20) Cristau, H.-J.; Cellier, P. P.; Spindler, J.-F.; Taillefer, M. *Chem.−Eur. J.* **2004**, *10*, 5607−5622. This report appeared after the completion of our own work. As a result, we have not performed direct comparison with ligand **III**.
(21) Proline-promoted Ullmann coupling: (a) Cai, Q.; Zhu, W.; Zhang, H.; Zhang, Y.; Ma, D. *Synthesis* **2005**, 496−499. (b) Ma, D.; Cai, Q. *Synlett* **2004**, 128−130.

**SCHEME 1**



by far the least reactive NH-containing azoles in cross-coupling reactions. We wish to disclose an alternative system that employs a *soluble* base (1.1 equiv) and a readily available ligand for the CuI-catalyzed N-arylation of imidazoles with aryl iodides, aryl bromides, and even aryl chlorides.

During a study on the Goldberg amidation under the Buchwald protocol,[23] we discovered that bis(tetraethylammonium) carbonate, (Et$_4$N)$_2$CO$_3$ (TEAC),[24] which unlike K$_2$CO$_3$ or Cs$_2$CO$_3$ dissolves in the mixture, promotes the CuI-catalyzed N-arylation of benzimidazoles with aryl halides in DMF. For example, the reaction between 2-bromoaniline and formamide led to 2-(1H-benzo[d]-imidazol-1-yl)benzenamine (**1**) as the major product (Scheme 1).[25] Presumably, the initial amidation product was converted in situ into benzimidazole,[26] the latter then underwent *rapid* N-arylation with the remaining aryl bromide to form the observed end product (**1**).

Support for the above hypothesis can be drawn from the reaction between *benzimidazole* and 2-bromoaniline: the desired product (**1**) was formed cleanly in high yield with TEAC (96%) in contrast to low (~40%) conversion with other bases such as K$_2$CO$_3$.[27]

The superiority of TEAC as base for the N-arylation is further illustrated in Table 1. Under the conditions of Buchwald,[17,19a,b] 1-iodo-3,5-bis(trifluoromethyl)benzene was converted to **2** in >97% yield after 10 h with TEAC, whereas twice as much time was needed to reach similar conversion with Cs$_2$CO$_3$ as base. Similarly, with the less reactive substrate 1-bromo-3,5-dimethylbenzene, the use of TEAC resulted in higher conversion to **3** (61%) than of Cs$_2$CO$_3$ (44%).[27] To the best of our knowledge, this is the first time an organic carbonate salt had been reported in metal-catalyzed cross-coupling with aryl halides.[28] Most significantly, the improved efficiency in the reaction of 1-bromo-3,5-dimethylbenzene suggested that TEAC as a base might be useful in expanding the scope of

(22) A ligandless N-arylation of (S)-1-(3-bromophenyl)-ethylamine under microwave heating (195 °C and 2−3 h): Wu, Y.-J.; He, H.; L'Heureux, A. *Tetrahedron Lett.* **2003**, *44*, 4217−4218.
(23) See ref 1e and references therein.
(24) (a) TEAC is very soluble in most organic solvents and gives nearly homogeneous reaction mixtures. The commercial material from Fluka (90% or 95%) was used in this study. (b) Other soluble bases such as pyridine and TBAF did not yield any products.
(25) Based on LC−MS analyses. Some optimizations were carried out under microwave heating at various temperatures.
(26) This type of in situ conversion to benzimidazole had been observed before (personal communication with Prof. Stephen L. Buchwald at MIT, 2004).
(27) (a) Conversion based on LC−MS analyses. The isolated yield of **1** was 63% from TEAC. (b) These reactions were run in a sealed tube without using any inert gases. (c) Examples of other inorganic bases screened include Cs$_2$CO$_3$, K$_3$PO$_4$, CaCO$_3$, and MgO. These experiments were conducted under microwave heating (Smith Synthesizer, from Personal Chemistry, 180 °C, 20 min total) under identical conditions (CuI, **IV**, DMF).

**TABLE 1.   Effect of Bases on Reaction Rate[a,e]**

| aryl Halide | product | base (equiv) | conversion (yd) % |
|---|---|---|---|
| | | TEAC (1.0) | >97 (76)[b] |
| | **2** | Cs₂CO₃ (2.0) | 87[b] 94 (70)[c] |
| | | TEAC (1.0) | 61 (32)[d] |
| | **3** | Cs₂CO₃ (2.0) | 44 (20)[d] |

[a] 110 °C, ArX (1.0), BzImd (1.15), CuI (10%), ligand (20%), DMF (1.0 mL). [b] 10 h. [c] 22 h. [d] 60 h. [e] **I** was used with Cs₂CO₃, whereas **II** (cf. ref 19a) was used for TEAC.

imidazolyl N-arylations from traditional aryl iodides as substrates to include aryl bromides in general.

Indeed, further optimization of the reaction conditions led to the following observations: (1) 8-hydroxyquinoline (**IV**)[29] is more effective as a ligand than either 1,10-phenanthroline (**I**)[17] or the 1,2-diamine ligands (**II**);[19] (2) the ratio of **IV** to CuI (10% mol) can be reduced from the conventional 2:1 to 1:1 without noticeable reduction in the reaction yield; (3) addition of a small amount of $H_2O$ as cosolvent significantly accelerates the N-arylation reaction.[30] These findings have made it possible, for the first time, to effectively *convert nonactivated[31] aryl bromides to N-aryl benzimidazoles at reasonable temperatures (130 °C)*. Table 2 summarizes the reaction of benzimidazole with a wide range of aryl bromides under the current protocol.[32,33] The reaction worked well with aryl bromides bearing both nonpolar and polar (OH, NH₂, OMe, SMe) groups except for the nitrile group that was hydrolyzed to the carboxyamide (**6**, entry 5).

Cu-catalyzed N-arylations are known to be very sensitive to steric hindrance. In Table 3, substrates with varying degrees of substitution proximal to the reaction centers (excluding chelating groups[31]) were examined. When either *o*-alkyl-substituted aryl bromides or 2-alkyl imidazoles were reacted with their nonhindered counterparts, modest yields were still achieved (entries 2–5).[33]

(28) (a) (NH₄)₂CO₃ and polymer-supported carbonate were ineffective. (b) TEAC as carboxylating reagents: Arcadi, A.; Inesi, A.; Marinelli, F.; Rossi, L.; Verdecchia, M. *Synlett* **2005**, 67–70 and references therein. (c) TEAC as base for sulfide synthesis: Feroci, M.; Inesi, A.; Rossi, L. *Synth. Commun.* **1999**, *29*, 2611–2615.

(29) For use of quinolinol ligands in biaryl ether synthesis, see: Fagan, P. J.; Hauptman, E.; Shapiro, R.; Casalnuovo, A. *J. Am. Chem. Soc.* **2000**, *122*, 5043–5051.

(30) (a) We found the optimal ratio to be 10–26% $H_2O$ in DMF (v/v). $H_2O$ also accelerates reactions with Cs₂CO₃ to a smaller extent. For example, **3** (Table 2) reached 80 and 60% after 7 h with TEAC and Cs₂CO₃ (Aldrich) as bases, respectively. Both reactions went to completion after 24 h. (b) Effect of $H_2O$ on the amination reactions has been controversial. For a recent example, see: Meyers, C.; Maes, B. U. W.; Loones, K. T. J.; Bal, G.; Lemière, G. L. F.; Dommisse, R. A. *J. Org. Chem.* **2004**, *69*, 6010–6017.

(31) A comparison between Scheme 1 and Table 1 offers an example of possible chelation (substrate based) assisted Cu catalysis. We suspect that this was the case in the N-arylation of purine (ref 19b).

(32) A small amount of ethylation products,(5–10%), likely by TEAC, of benzimidazole or **IV**, was observed (LC–MS), especially with long reaction times. 8-MeO-quinoline (Trécourt, F.; Mallet, M.; Mongin, F.; Quéguiner, G. *Synthesis* **1995**, 1159–1162) as ligand is somewhat less, but still, effective for the reaction.

(33) Lower yields were often obtained for polar imidazoloids (see Table 2, entries 3 and 4), partially due to loss of products during workup and purifications.

**TABLE 2.   N-Arylation of Benzimidazole with ArBr[a]**

| entry | Ar-X | product | yield |
|---|---|---|---|
| 1 | | | **4**, 85[b] |
| 2 | | | **3**, 90[c] |
| 3 | | | **5**, 62 |
| 4 | | | **1**, 67 |
| 5 | | | **6**, 87 |
| 6 | | | **7**, 64[d] |
| 7 | | | **8**, 88 |
| 8 | | | **9**, 87 |
| 9 | | | **10**, 83 |

[a] Conditions: 130 °C for 16 h, ArBr (1.0), BzImd (1.15), TEAC (1.0), CuI (10%), **IV** (10%), DMF (1.0 mL), H₂O (0.1 mL). [b] 24 h. [c] 70 h at 120 °C. [d] 64 h, (~10% **5** was formed).

However, only a trace of the product was observed when 2-phenyl imidazole and 2-bromotoluene (entry 6) were coupled, suggesting that concurrent steric hindrance from both substrates is incompatible in the current system.

Preliminary results also suggest that the current system can be applied to aryl chlorides. For example *p*-CF₃-PhCl and *m*-Me-PhCl[34] were converted to **17** and **18** in 50 and 40% isolated yields, respectively (Figure 2). To date, this constitutes *the first soluble copper-ligand system that at relatively low temperatures catalyzes the N-arylation of an imidazole by ArCl*.[35]

In summary, a near homogeneous system for the synthesis of *N*-arylimidazoles has been established that features the use of a readily available, crystalline ligand (**IV**), $H_2O$ as cosolvent, and a soluble carbonate (TEAC) as base. The system is effective for aryl iodide, aryl bromides, and, to a less extent, for simple aryl chlorides. It is anticipated that, because it is homogeneous, this

(34) (a) No regioisomers were detected. (b) In the absence of TEAC and ligand (**IV**), only a trace amount of **18** was formed.

(35) (a) Nanoparticles of Cu coated with Cu₂O were reported to catalyze N-arylation of imidazole with activated chlorides (DMSO, 150 °C): Son, S. U.; Park, I. K.; Park, J.; Hyeon, T. *Chem. Commun.* **2004**, 778–779. (b) Cu(II) apatites were recently reported in the N-arylation of imidazoles with chloroarenes: Choudary, B. C.; Sridhar, C.; Kantam, M. L.; Venkanna, G. T.; Sreedhar, B. *J. Am. Chem. Soc.* **2005**, *127*, 9948–9949.

JOC*Note*

**TABLE 3. N-Arylation of Imidazoles with Aryl Bromides**[d]

| entry | imidazole | product | yield |
|-------|-----------|---------|-------|
| 1 | N=\\NH | N=\ (3,5-dimethylphenyl) | 11, 80[a] |
| 2 | N=\ (2-methyl)\NH | (dimethylphenyl with 2-methylimidazole) | 12, 64 |
| 3 | N=\\NH | (2-methylphenyl) | 13, 47[b] |
| 4 | benzimidazole (2-methyl) NH | (N-phenyl benzimidazole) | 14, 45[c] |
| 5 | imidazole (2-isopropyl) NH | (2-isopropyl, dimethylphenyl) | 15, 40 |
| 6 | imidazole (2-phenyl) NH | (2-phenyl, dimethylphenyl) | 16, trace |

[a] Cs$_2$CO$_3$ was used as base (cf. ref 30a). [b] 74% when 2-methyl iodobenzene was used. [c] 36 h. [d] Conditions: 130 °C for 16 h (unless otherwise noted), TEAC (1.0), CuI (10%), **IV** (10%), DMF–H$_2$O (1.0–0.1 mL).

system will make it possible for copper-catalyzed N-arylations to be studied spectroscopically. It also promises to lead to the discovery of even better catalyst systems.

## Experimental Section

**Typical Experimental Procedure for Table 2.** In a pressure reaction vessel (a 10-mL microwave tube was used in this case) equipped with a magnetic stirring bar was added benzimidazole (0.17 g, 1.43 mmol), CuI (0.019 g, 0.1 mmol),



**FIGURE 2.** N-Arylimidazoles from aryl chlorides (130 °C, 60 h).

8-hydroxyquinoline (**IV**, 0.015 g, 0.1 mmol), bis(tetraethylammonium) carbonate (TEAC, 95%, 0.37 g, 1.1 mmol), and aryl bromide (1.0 mmol). DMF (1.0 mL) and H$_2$O (0.1 mL) were added, and the vessel was capped with a rubber septum. The system was stirred while degassed under vacuum and purged with nitrogen three times. The septum was either replaced with a pressure cap or kept if the system was allowed to remain connected to nitrogen supply. The reaction mixture was heated to 130 °C in an oil bath for 16 h whereby an aliquot was taken for HPLC and LC–MS analyses. Upon cooling to room temperature, the mixture was subject to one of the following procedures for product isolation. The purified product was subject to $^1$H NMR, HPLC, LC–MS, HRMS, $^{13}$C NMR, or elemental analyses.

**Method A.** The almost homogeneous mixture was loaded onto a silica column (with MeOH/CH$_2$Cl$_2$ rinse) and eluded first with 1:1 mixture of hexanes/EtOAc, then with either MeOH in EtOAc or MeOH (for very polar products 2 N NH$_3$ in MeOH was used) in CH$_2$Cl$_2$.

**Method B.** The mixture was diluted with EtOAc (20 mL) and washed with H$_2$O, NH$_4$Cl (saturated), H$_2$O, and NaHCO$_3$ (saturated). The organic layer was dried over Na$_2$SO$_4$, concentrated, and subject to flash chromatography.

**Acknowledgment.** We thank Prof. Stephen L. Buchwald for providing helpful suggestions and encouragement.

**Supporting Information Available:** Detailed experimental procedures and compound characterization data. This material is available free of charge via the Internet at http://pubs.acs.org.

JO051640T

# EXHIBIT F

# TETRAHEDRON LETTERS

The International Journal for the Rapid Publication of Preliminary Communications in Organic Chemistry

*Founded jointly by Sir Robert Robinson and R. B. Woodward*

*Editors*

**B. Ganem**
**Lin Guo-Qiang**
**E. J. Thomas**
**J. Wood**
**Y. Yamamoto**
**S. Z. Zard**





0040-4039(20051024)46:43:1-H

233




# TETRAHEDRON LETTERS

## EXECUTIVE BOARD OF EDITORS FOR TETRAHEDRON PUBLICATIONS

*Chairman:* **Professor B. Ganem**
*Editor Emeritus:* **Professor H. H. Wasserman**

**Professor D. L. Boger,** The Scripps Research Institute, La Jolla, CA, USA

**Professor S. G. Davies,** University of Oxford, Oxford, UK

**Professor B. Ganem,** Department of Chemistry & Chemical Biology, Baker Laboratory, Cornell University, Ithaca, NY 14853-1301, USA
Fax: 1 607 255 8422; e-mail: tetlett@cornell.edu

**Professor L. Ghosez,** Université Catholique de Louvain, Belgium

**Professor Lin Guo-Qiang,** Shanghai Institute of Organic Chemistry, Chinese Academy of Sciences, 354 Fenglin Road, Shanghai 200032, China
Fax: 86 21 64166263; e-mail: tetrahed@pub.sioc.ac.cn
(Senior Referees, Professor L.-X. Dai, Professor T.-Y. Luh, Professor H. N. C. Wong)

**Professor S. F. Martin,** University of Texas, Austin, TX, USA

**Professor W. B. Motherwell,** University College, London, UK

**Professor G. H. Posner,** Johns Hopkins University, Baltimore, MD, USA

**Professor M. Shibasaki,** The University of Tokyo, Japan

**Professor T. Shioiri,** Meijo University, Nagoya, Japan

**Professor R. J. K. Taylor,** University of York, UK
(Associate Editors, Dr. P. A. O'Brien and Dr. D. K. Smith)

**Professor E. J. Thomas,** School of Chemistry, The University of Manchester, Oxford Road, Manchester M13 9PL, UK
Fax: 44 161 275 4622; e-mail: tetlet@man.ac.uk
(Associate Editor, Professor J. A. Joule)

**Professor H. Waldmann,** Max-Planck-Institut für Molekulare Physiologie, Dortmund, Germany

**Professor H. H. Wasserman,** Yale University, New Haven, CT, USA

**Professor C.-H. Wong,** The Scripps Research Institute, La Jolla, CA, USA

**Professor J. Wood,** Department of Chemistry, Yale University, PO Box 208107, New Haven, CT 06520-8107, USA
Fax: 1 203 432 0796; e-mail: tetlett@yale.edu

**Professor Y. Yamamoto,** Department of Chemistry, Graduate School of Science, Tohoku University, Sendai 980-8578, Japan
Fax: 81 22 217 6784; e-mail: TL@yamamoto1.chem.tohoku.ac.jp
(Associate Editor, Professor M. Hirama)

**Professor S. Z. Zard,** Laboratoire de Synthèse Organique, Ecole Polytechnic, F-91128 Palaiseau Cedex, France
Fax: 33 (0) 1 69 33 3057; e-mail: tetlet@polytechnique.fr
(Associate Editor, Dr. B. Sire)

*Editors of the Tetrahedron Organic Chemistry Series:* **Professor J.-E. Bäckvall,** University of Stockholm, Sweden
**Professor Sir J. E. Baldwin, FRS,** Dyson Perrins Laboratory, Oxford, UK
**Professor R. M. Williams,** Colorado State University, Fort Collins, USA

### BOARD OF CONSULTING EDITORS

A. Alexakis, University of Geneva, Switzerland
J.-E. Bäckvall, University of Stockholm, Sweden
V. Balzani, University of Bologna, Italy
M. Banwell, Australian National University, Canberra, Australia
A. G. M. Barrett, Imperial College, London, UK
C. Bolm, RWTH Aachen, Germany
E. M. Carreira, ETH, Zürich, Switzerland
G. W. Coates, Cornell University, Ithaca, NY, USA
D. Corey, University of Texas Southwestern, Medical Center, Dallas, TX, USA
E. J. Corey, Harvard University, Cambridge, MA, USA
J. Cossy, ESPCI, Paris, France
D. P. Curran, University of Pittsburgh, PA, USA
S. J. Danishefsky, Columbia University, New York, NY, USA
A. Dondoni, University of Ferrara, Italy
D. A. Evans, Harvard University, Cambridge, MA, USA
P. A. Evans, Indiana University, Bloomington, IN, USA
S. Florio, University of Bari, Italy
G. C. Fu, MIT, Cambridge, MA, USA

N. Fusetani, University of Tokyo, Japan
S. Ikegami, Teikyo University, Kanagawa, Japan
T. Katsuki, Kyushu University, Fukuoka, Japan
Y. Kishi, Harvard University, Cambridge, MA, USA
P. Knochel, Ludwigs-Maximilians-University, Munich, Germany
P. Kocienski, University of Leeds, UK
Y. Langlois, Université de Paris-Sud, Orsay, France
E. Lee, Seoul National University, Seoul, Korea
S. V. Ley, University of Cambridge, UK
B. H. Lipshutz, University of California, Santa Barbara, CA, USA
X.-Y. Lu, Shanghai Institute of Organic Chemistry, China
D. MacMillan, California Institute of Technology, Pasadena, CA, USA
P. D. Magnus, University of Texas at Austin, TX, USA
L. N. Mander, Australian National University, Canberra, Australia
G. Mehta, Indian Institute of Science, Bangalore, India
G. Molander, University of Pennsylvania, Philadelphia, PA, USA

J. Moore, University of Illinois at Urbana Champaign, IL, USA
T. Mukaiyama, Kitasato Institute, Tokyo, Japan
K. C. Nicolaou, Scripps Research Institute, La Jolla, CA, USA
R. Noyori, Nagoya University, Japan
S. Omura, Kitasato Institute, Tokyo, Japan
G. Ourisson, Centre National de la Scientific Strasbourg, France
L. E. Overman, University of California, Irvine, CA, USA
I. Paterson, University of Cambridge, UK
G. Pattenden, University of Nottingham, UK
S. Roberts, University of Liverpool, UK
S. L. Schreiber, Harvard University, Cambridge, MA, USA
V. Snieckus, Queen's University, Kingston, Canada
Y. Thebtaranonth, Mahidol University, Bangkok, Thailand
K. Tomioka, Kyoto University, Japan
J. D. Wuest, University of Montreal, Canada
H. Yamamoto, University of Chicago, IL, USA
M. Yus, University of Alicante, Spain

#### PUBLISHED WEEKLY

Orders, claims, and journal enquiries: please contact the Customer Service Department at the Regional Sales Office nearest you: **Orlando:** Elsevier, Customer Service Department, 6277 Sea Harbor Drive, Orlando, FL 32887-4800, USA; phone: (877) 8397126 or (800) 6542452 [toll free number for US customers]; (+1) (407) 3454000 or (+1) (407) 3454000 [customers outside US]; fax: (+1) (407) 3631354 or (+1) (407) 3639661; e-mail: usjcs@elsevier.com or elspcs@elsevier.com; **Amsterdam:** Elsevier, Customer Service Department, PO Box 211, 1000 AE Amsterdam, The Netherlands; phone: (+31) (20) 4853757; fax: (+31) (20) 4853432; e-mail: nlinfo-f@elsevier.com; **Tokyo:** Elsevier, Customer Service Department, 4F Higashi-Azabu, 1-Chome Bldg., 1-9-15 Higashi-Azabu, Minato-ku, Tokyo 106-0044, Japan; phone: (+81) (3) 5561 5037; fax: (+81) (3) 5561 5047; e-mail: jp.info@elsevier.com; **Singapore:** Elsevier, Customer Service Department, 3 Killiney Road, #08-01 Winsland House I, Singapore 239519; phone: (+65) 63490222; fax: (+65) 67331510; e-mail: asiainfo@elsevier.com

© 2005 Elsevier Ltd.

Available online at www.sciencedirect.com



SCIENCE DIRECT®

Tetrahedron Letters



ELSEVIER

Tetrahedron Letters 46 (2005) 7315–7319

# Regio-controlled synthesis of *N*-substituted imidazoles

Ning Xi,* Shimin Xu, Yuan Cheng, Andrew S. Tasker,
Randall W. Hungate and Paul J. Reider

*Chemistry Research and Discovery, Amgen Inc., One Amgen Center Dr., Thousand Oaks, CA 91320, USA*

Received 9 August 2005; revised 17 August 2005; accepted 25 August 2005
Available online 12 September 2005

**Abstract**—A regio-specific synthesis of *N*-substituted imidazoles is described. Readily available α-amino acids are converted to α-aminocarbonyl derivatives and reacted with various isothiocyanates to give *N*-substituted cyclic thioureas. Oxidative or reductive desulfurization of the cyclic thioureas affords structurally diversified imidazoles in good to excellent yields.
© 2005 Elsevier Ltd. All rights reserved.

Substituted imidazoles are a class of pharmaceutically important heterocyclic compounds, several of which have been incorporated in marketed drugs such as cimetidine and losartan.[1] There are a number of methods available for the construction of this ring system.[2] However, no practical protocol exists for the regio-controlled synthesis of *N*-substituted imidazoles. A conventional way to prepare *N*-alkyl substituted imidazoles is to alkylate the imidazole nitrogen with appropriate electrophiles, such as alkyl halides.[3] Recently, palladium or copper catalyzed imidazole couplings with aryl halides[4] or arylboronic acids[5] are the methods of choice to access *N*-aryl imidazoles. Nonetheless, all these methods suffered from the same intrinsic poor regio-selectivity due to the tautomeric nature of the imidazole ring. Any regio-selectivity seen in the reaction was primarily attributed to the steric effects of the substituents, which are distinct for each reactant.[6] We describe herein a method to synthesize structurally diversified *N*-substituted imidazoles in a regio-specific fashion from readily accessible starting materials.

Within this context, we found that the Marckwald synthesis[7] could be expanded to prepare regio-specific *N*-substituted imidazoles. As detailed in Scheme 1, the protected α-aminocarbonyl analogs **2** can be prepared from the amino acids **1** through many known procedures, such as Weinreb amide method and Nierenstein

**Scheme 1.** Synthetic approach to *N*-substituted imidazoles from α-amino acids.

reaction.[8] Removal of the protecting group R provides the α-aminocarbonyl compounds **3**. Condensation of **3** with various isothiocyanates or a thiocyanate salt (i.e. KSCN, originally used in the Marckwald synthesis) leads to the *N*-substituted cyclic thioureas **5** through the acyclic thiourea intermediates **4**. By choosing either $R_1$ in amino acids or $R_4$ in isothiocyanates to be a hydrogen atom, regio-specific thioureas **5** are readily obtained. This regio-specificity is maintained during the following desulfurization step, leading to the desired imidazoles **6a** or **6b**.

We used the β-ketoester **10** as an example for our initial study. As shown in Scheme 2, condensation of Boc-phenylalanine **7** with ethyl malonate potassium salt **8** afforded the intermediate **9** in 95% yield.[9] [1]H NMR indicated that

*Keywords*: Imidazoles; Regio-controlled synthesis; Amino acids; Cyclic thioureas.

* Corresponding author. Tel.: +1 805 447 2285; fax: +1 805 480 3016; e-mail: nxi@amgen.com

0040-4039/$ - see front matter © 2005 Elsevier Ltd. All rights reserved.
doi:10.1016/j.tetlet.2005.08.138

*N. Xi et al. / Tetrahedron Letters 46 (2005) 7315–7319*



**Scheme 2.** Reagents and conditions: (i) CDI, MgCl$_2$, 95%; (ii) HCl/EtOAc, rt, 1 h, 100%.

compound **9** exists mainly in keto form in CDCl$_3$ (>99%). Removal of the Boc group with saturated HCl

in EtOAc provided the amine salt **10** as a white solid quantitatively. This salt was fairly stable: it could be stored at room temperature for 6 months without noticeable degradation (monitored by HPLC-MS and NMR).

We selected three reagents, methyl, piperidinoethyl, and *p*-iodophenyl isothiocyanates (**11a**, **11c**, and **11d**, respectively), to couple with the salt **10** for their structural diversity. All reactions were performed in hot ethanol, and triethyl amine was used as the base to neutralize the formed hydrogen chloride. As shown in Table 1,

**Table 1.** Synthesis of cyclic thioureas **12a–d** and imidazoles **14a–d** from phenylalanine



| No. | R$_4$NCS | Cyclic thiourea | Imidazole |
|---|---|---|---|
| 1 | MeNCS **11a** | **12a** (80%)[a] | **14a** (74%)[d] |
| 2 | KNCS **11b** | **12b** (81%)[b] | **14b** (75%)[d] |
| 3 | **11c** | **12c** (75%)[c] | **14c** (71%)[d] |
| 4 | **11d** | **12d** (80%)[c] | **14d** (82%)[e] |

Reagents and conditions: (i) EtOH, Et$_3$N, reflux, 12 h; (ii) 1:3 *t*-BuOH/H$_2$O, 90 °C, 12 h; (iii) EtOH, Et$_3$N, 50 °C, 4 h; then 10% PPTS, toluene, reflux, 4 h; (iv) Raney Nickel, EtOH, reflux, 16 h; (v) H$_2$O$_2$, AcOH, rt, 5 min.
[a] Yield from reaction condition (i).
[b] Yield from reaction condition (ii).
[c] Yield from reaction condition (iii).
[d] Yield from reaction condition (iv).
[e] Yield from reaction condition (v).



**Scheme 3.** Acyclic thioureas formed in hot ethanol reaction. See text for details.

**Table 2.** Synthesis of imidazoles from various α-amino acids



| Entry | Amino acid | $R_4NCS$ | Cyclic thiourea | Yield(%) | Imidazole | Yield (%) |
|---|---|---|---|---|---|---|
| 1 | Phenylalanine | (tetrahydrofurfuryl)NCS | 15a | 68[a] | 16a | 71[c] |
| 2 | Phenylalanine | (m-tolyl)NCS | 15b | 85[a] | 16b | 80[d] |
| 3 | Leucine | KNCS | 15c | 84[b] | 16c | 81[c] |
| 4 | Leucine | (4-nitrophenyl)NCS | 15d | 80[a] | 16d | 85[d] |
| 5 | 2-Phenylglycine | KNCS | 15e | 84[b] | 16e | 82[d] |
| 6 | 2-Phenylglycine | (m-tolyl)NCS | 15f | 83[a] | 16f | 86[c] |
| 7 | Sarcosine | KNCS | 15g | 80[b] | 16g | 68[c] |
| 8 | N-Methyl phenylalanine | KNCS | 15h | 84[b] | 16h | 75[d] |
| 9 | Proline | KNCS | 15i | 82[b] | 16i | 70[d] |

Reagents and conditions: (i) EtOH, Et₃N, 50 °C, 4 h; then 10% PPTS, toluene, reflux, 4 h; (ii) 1:3 t-BuOH/H₂O, 90 °C, 12 h; (iii) Raney Nickel, EtOH, reflux, 16 h; (iv) H₂O₂, AcOH, rt, 5 min.

[a] Yield from reaction condition (i).
[b] Yield from reaction condition (ii).
[c] Yield from reaction condition (iii).
[d] Yield from reaction condition (iv).

methyl isothiocyanate **11a** reacted with **10** to give the cyclic thiourea **12a** in 80% yield, which is in accordance with the direct formation of the cyclic thiourea in the Marckwald synthesis. Similarly, coupling of **10** with KNCS in hot aqueous *tert*-butanol afforded the cyclic thiourea **12b** in 81% yield (Table 1, entry 2).[10] Coupling of **11c** and **11d** with **10**, however, led to a 3:2 mixture of the cyclic and acyclic thioureas (**12c** and **13c**) and the acyclic thiourea **13d**, respectively (for structures of **13c** and **13d**, see Scheme 3). In both cases, prolonged heating did not improve the yields of the cyclized products **12c** and **12d** (monitored by LC–MS at 254 and 210 nm).

Clearly, a more effective method was needed for the cyclodehydration of **13c,d** to form **12c,d**. In a test study, the acyclic thiourea **13d** was dissolved in toluene and heated to 120 °C for 4 h in the presence of 10% pyridinium *p*-toluenesulfonate (PPTS).[11] As expected, the cyclic thiourea **12d** was obtained in 88% isolated yield. To combine the acyclic thiourea formation and the subsequent cyclodehydration into a one-pot process, the reaction mixture of **11c** with **10** was concentrated in vacuo and directly subjected to the PPTS catalyzed cyclization. The desired cyclic thiourea **12c** was isolated in 75% yield after refluxing in toluene for 4 h. Generally, the yields of this one-pot procedure to form cyclic thioureas are good to excellent, as can be seen in Tables 1 and 2.

Conversion of cyclic thioureas to imidazoles can be achieved under either oxidative[12] or reductive[13] conditions. We chose two established methods, that is, Raney Nickel/EtOH and $H_2O_2$/AcOH, to remove the sulfur. As exemplified in Table 2, the two protocols provided comparable results for the imidazole formation. For molecules that are susceptible to oxidative conditions, a reductive desulfurization is preferred, and vice versa. For example, the tetrahydrofuran analog **15a** favors Raney Nickel reduction, whereas the iodo analog **12d** requires oxidative condition for removal of sulfur atom due to the phenyl iodide functionality.

The method was applied to a variety of amino acids and isothiocyanates, providing structurally diversified imidazoles, as illustrated in Table 2. Disubstituted imidazoles, **16c**, **16e**, and **16g**, were also prepared for comparison. Amino acids with both alkyl and aryl side chains are good substrates, as seen within entries 3 and 5. The substitution on the amino group showed little effect on the cyclization and desulfurization steps, as exemplified by sarcosine, *N*-methyl phenylalanine, and proline (entries 7–9). Thus, the elusive bicyclic imidazole **16i** was conveniently prepared. Most notably, the two imidazole regioisomers, **14a** and **16h**, were readily available with unambiguous regio-specificity using this method.[14]

In summary, we demonstrated that a variety of amino acids are convenient starting materials for the syntheses of *N*-substituted imidazoles in a regio-controlled manner. Many functional groups, such as ester, iodo, nitro, and iodole moieties, are compatible with the process. In addition, reducible or oxidizable functional groups in the cyclic thioureas are tolerated by using different

desulfurization conditions. Further elaboration at the 2-position of the imidazole ring is possible with the transition metal catalyzed coupling reactions. We are currently evaluating these reactions and the results will be reported in due course.

## References and notes

1. For recent reviews, see: Menge, W. M. P. B.; Timmerman, H. *Pharmacochem. Lib.* **1998**, *30*, 145 (Histamine H₃ Receptor).
2. Grimmett, M. S. In *Comprehensive Heterocyclic Chemistry II*; Katritzky, A. R., Rees, C. W., Scriven, E. F. V., Eds.; Elsevier Science: Oxford, 1996; Vol. 3, pp 185–211.
3. Grimmett, M. S. In *Comprehensive Heterocyclic Chemistry II*; Katritzky, A. R., Rees, C. W., Scriven, E. F. V., Eds.; Elsevier Science: Oxford, 1996; Vol. 3, pp 108–116.
4. Sezen, B.; Samers, D. *J. Am. Chem. Soc.* **2003**, *125*, 5274–5275.
5. Collman, J. P.; Zhong, M. *Org. Lett.* **2000**, *2*, 1233–1236.
6. Joule, J. A.; Mills, K.; Smith, G. F. *Heterocyclic Chemistry*, 3rd ed.; Chapman & Hall: London, 1995; pp 372–373.
7. Marckwald, W. *Chem. Ber.* **1892**, *25*, 2354.
8. Hartley, J. A.; Hazrati, A.; Kelland, L. R.; Khanim, R.; Shipman, M.; Suzenet, F.; Walker, L. F. *Angew. Chem., Int. Ed.* **2000**, *39*, 3467–3470; Husbands, S.; Suckling, C. A.; Suckling, C. J. *Tetrahedron* **1994**, *50*, 9729–9742; Dondoni, A.; Perrone, D. *Synthesis* **1993**, *11*, 1162–1176; Lygo, B. *Synlett* **1992**, *10*, 793–795.
9. Satoh, K.; Imura, A.; Miyadera, A.; Kanai, K.; Yukimoto, Y. *Chem. Pharm. Bull.* **1998**, *46*, 587–590.
10. For the formation of acyclic thioureas, see: Winterfeld, G. A.; Khodair, A. I.; Schmidt, R. R. *Eur. J. Org. Chem.* **2003**, 1009.
11. Ac₂O/MeOH condition was also successfully used for the cyclization, see: Fuentes, J.; Pradera, M. A.; Robina, I. *Tetrahedron* **1991**, *47*, 5797; Fuentes, J.; Moreda, W.; Ortiz, C.; Robina, I.; Welsh, C. *Tetrahedron* **1992**, *48*, 6413.
12. (a) Grivas, S.; Ronne, E. *Acta Chem. Scand.* **1995**, *49*, 225; (b) Karkhanis, D. W.; Field, L. *Phosphorus, Sulfur Silicon Relat. Elem.* **1985**, *22*, 49; (c) Frachey, G.; Crestini, C.; Bernini, R.; Saladino, R.; Mincione, E. *Heterocycles* **1994**, *38*, 2621; (d) Dener, J. M.; Zhang, L.-H.; Rapoport, H. *J. Org. Chem.* **1993**, *58*, 1159.
13. O'Connell, J. F.; Parquette, J.; Yelle, W. E.; Wang, W.; Rapoport, H. *Synthesis* **1988**, 767. For reviews, see: Belen'kii, L. I. In *Chemistry of Organosulfur Compounds: General Problems*; Belen'kii, L. I., Ed.; Ellis Horwood: Chichester, 1990; Chapter 9.
14. A typical procedure for synthesizing the N-substituted imidazoles from α-aminocarbonyl salt **13** is as follows: A solution of salt **13** (3.0 g, 1 equiv), an isothiocyanate (1.2 equiv) and triethylamine (1.5 equiv) in 50 mL of ethanol was heated to 50 °C for 4 h. The reaction mixture was then concentrated in vacuo to dryness. The residue was suspended in 50 mL of toluene with PPTS (0.1 equiv). The mixture was heated to 120 °C for 4 h and then cooled to room temperature. The resulted solution was diluted with 50 mL of ethyl acetate, washed with 50 mL of saturated aqueous NaHCO₃ solution and brine, and dried over Na₂SO₄. The organic phase was concentrated in vacuo and the residue was re-crystallized with 50% EtOAc/hexanes to give the desired cyclic thiourea.
A suspended solution of cyclic thiourea and Raney nickel (5 equiv) in EtOH (50 mL) was heated to reflux for 8 h.

Case 1:21-cv-01338-MFK   Document 472   Filed 05/31/24   Page 392 of 547 PageID #: 26501

After cooling the reaction mixture to room temperature, Raney nickel was removed by filtration through a Celite pad. The filtrate was concentrated in vacuo and the residue was treated with 1 N HCl in ether. The imidazole HCl salt was purified by crystallization in an ether/MeOH mixture. Alternatively, the desulfurization step can also be carried out under oxidative condition: to a solution of cyclic thiourea (1.00 mmol) in glacial acetic acid (5 mL) was added 30% $H_2O_2$ aqueous solution (4 equiv, 4.00 mmol) slowly. After 5 minutes, the reaction was cooled to 0 °C and quenched with 10 mL of 10% $K_2CO_3$ solution. The pH of the mixture was adjusted to pH ∼ 9 with 2 N NaOH solution. The solution was extracted with 50 mL of EtOAc and the organic phase was separated, washed with 20 mL of brine, dried over $Na_2SO_4$, and concentrated in vacuo. The crude product was treated with 1 N HCl in ether to form imidazole HCl salt, which was crystallized in an ether/MeOH mixture.

Selected data ($^1$H NMR, 400 MHz, δ ppm): Compound **12d** (chloroform-*d*): 10.97 (1H, s), 7.83 (2H, d, $J = 7.8$ Hz), 7.17–7.34 (5H, m), 7.07 (2H, d, $J = 8.2$ Hz), 4.00 (2H, q, $J = 6.8$ Hz), 3.84 (2H, s), 3.27 (2H, s), 1.62 (1H, s), 1.14 (3H, t, $J = 7.0$ Hz); LC–MS *m/z*: 479.4 [M+H]$^+$. Compound **13d** (chloroform-*d*): 7.76 (2H, d, $J = 7.8$ Hz), 7.22–7.40 (6H, m), (2H, d, $J = 7.8$ Hz), 6.13–6.22 (1H, m), 5.57–5.66 (1H, m), 3.87–4.09 (3H, m), 2.94–3.14 (2H, m), 2.58–2.84 (2H, m), 1.21 (3H, t, $J = 7.3$ Hz); LC–MS *m/z*: 497.4 [M+H]$^+$. Compound **14c** (methanol-*d₄*): 9.15 (1H, s),

7.20–7.37 (5H, m), 4.75 (2H, m), 4.17 (2H, q, $J = 6.8$ Hz), 4.12 (2H, s), 4.06 (2H, s), 3.70 (3H, m), 3.51 (2H, d, $J = 7.0$ Hz), 1.96 (4H, m), 1.26 (2H, t, $J = 4.0$ Hz), 1.20 (3H, t, $J = 8.0$ Hz); LC–MS *m/z*: 356.3 [M+H]$^+$. Compound **14d** (methanol-*d₄*): 9.19 (1H, s), 8.03 (2H, d, $J = 7.8$ Hz), 7.34 (7H, m), 4.19 (2H, s), 4.01 (2H, q, $J = 6.8$ Hz), 3.85 (2H, s), 1.12 (3H, t, $J = 6.8$ Hz); LC–MS *m/z*: 446.8 [M+H]$^+$. Compound **16a** (methanol-*d₄*): 8.91 (1H, s), 7.19–7.38 (5H, m), 4.40 (1H, d, $J = 12.5$ Hz), 4.12–4.23 (4H, m), 4.11 (2H, s), 3.98 (2H, s), 3.90 (1H, q, $J = 6.9$ Hz), 3.79 (1H, q, $J = 6.9$ Hz), 2.11–2.21 (1H, m), 1.90–2.01 (2H, m), 1.60–1.71 (1H, m), 1.24 (3H, t, $J = 7.0$ Hz); LC–MS *m/z*: 329.0 [M+H]$^+$. Compound **16b** (chloroform-*d*): 7.55 (1H, s), 7.08–7.36 (9H, m), 3.94–4.01 (4H, m), 3.48 (2H, s), 2.40 (3H, s), 1.12 (3H, t, $J = 7.2$ Hz); LC–MS *m/z*: 335.3 [M+H]$^+$. Compound **16d** (methanol-*d₄*): 9.21 (1H, s), 8.45 (2H, d, $J = 8.2$ Hz), 7.82 (2H, d, $J = 8.2$ Hz), 3.97 (2H, q, $J = 6.8$ Hz), 3.85 (2H, s), 2.62 (2H, d, $J = 7.4$ Hz), 1.91–2.01 (1H, m), 1.06 (3H, t, $J = 7.0$ Hz), 0.96 (6H, d, $J = 6.3$ Hz); LC–MS *m/z*: 332.1 [M+H]$^+$. Compound **16h** (DMSO-*d₆*): 9.06 (1H, s), 7.22–7.37 (4H, m), 7.17 (1H, d, $J = 6.7$ Hz), 4.17 (2H, s), 4.09 (2H, d, $J = 6.7$ Hz), 3.93 (3H, s), 3.60 (2H, s), 1.18 (3H, t, $J = 6.7$ Hz); LC–MS *m/z*: 259.0 [M+H]$^+$. Compound **16i** (chloroform-*d*): 7.32–7.38 (1H, m), 4.16 (2H, q, $J = 7.2$ Hz), 3.97 (2H, t, $J = 7.0$ Hz), 3.50–3.59 (2H, m), 2.72–2.82 (2H, t, $J = 8.0$ Hz), 2.56–2.66 (2H, m), 1.17–1.30 (3H, t, $J = 7.0$ Hz); LC–MS *m/z*: 194.9 [M+H]$^+$.

# EXHIBIT G

Newsroom  |  Directory  |  Meetings & Events  |  Support the NAS

ABOUT THE NAS  |  MEMBERSHIP  |  PROGRAMS  |  PUBLICATIONS  |  MEMBER LOGIN

Search Site 🔍

|  Programs  |  Awards  |  NAS Award for Chemistry in Service to Society                    Share



**NAS Award** for Chemistry in Service to Society

### Awards

2024 Awards

How to Nominate

Alphabetical Listing

Awards by Field

Award Lectures

Looking Forward

The Science Explained

Connect with Awards

**Cultural Programs**

**Distinctive Voices**

**Human Gene Editing Initiative**

**Kavli Frontiers of Science**

**LabX**

**US-UK Scientific Forum**

**Blavatnik US-Israel Scientific Forum**

**From Research to Reward**

**The Science Behind It**

**Science & Entertainment Exchange**

**Engagement Opportunities Committee on International Security and Arms Control**

**Committee on Human Rights**

**Committee on Science, Engineering, Medicine, and Public Policy**

**Committee on Women in Science, Engineering and Medicine**

**Government-University-Industry Research Roundtable**

**NAS Colloquia (inactive)**

**National Academies Keck Futures Initiative (inactive)**

#### About the NAS Award for Chemistry in Service to Society

Established by E. I. du Pont de Nemours & Company, the NAS Award for Chemistry in Service to Society is awarded biennially for contributions to chemistry, either in fundamental science or its application, that clearly satisfy a societal need. The award is given in alternate years to chemists working in industry and to those in academia, government, and nonprofit organizations. The award is presented with a $20,000 prize.

#### Most Recent Recipient



**Hye Kyung Timken**, Chevron Technical Center, will receive the 2023 NAS Award for Chemistry in Service to Society.

Timken's groundbreaking work on innovative catalysts has been instrumental in making oil refineries safer, and fossil fuels more environmentally friendly.

**Read more about Timken's work»**

#### Award History

Since 1991 the award has recognized the profound benefits of chemistry to society and how advances in chemistry have led to greater economic wealth and a better quality of life. Two recipients of the NAS Award for Chemistry in Service to Society have gone on to win a National Medal of Science (**Harold S. Johnston** 1997; **Marvin H. Caruthers** 2006) and one recipient has proceeded to win a Nobel Prize (Medicine; **Paul C. Lauterbur** 2003).

*Recipients:*

**Hye Kyung Timken (2023)**
For her contributions to the development of the ionic liquid-based ISOALKY technology that can be applied to hundreds of plants worldwide to reduce the industrial process hazard of fuel production.
**Read more about Timken's work»**

**Susan Solomon (2021)**
For her influential and incisive application of atmospheric chemistry to understand our most critical environmental issues – ozone layer depletion and climate change – and for her effective communication of environmental science to leaders to facilitate policy changes.
**Read more about Solomon's work»**
**Watch Solomon's acceptance speech»**

**John C. Martin (2019)**
For his contributions to the development of antiviral medications used to treat even the most refractory of the deadly diseases, including HIV/AIDS, HCV, HBV, CMV, and flu, impacting hundreds of millions of individuals around the world and for his tireless efforts to ensure all of humanity, rich and poor alike, benefit.
**Read more about Martin's work»**
**Watch Martin's acceptance speech»**

**Leroy E. Hood (2017)**
For his invention, commercialization and development of multiple chemical tools that address biological complexity, including the automated DNA sequencer that spearheaded the human genome project.
**Read more about Hood's work»**
**Watch Hood's acceptance speech»**

**Bruce D. Roth (2015)**
For his discovery, synthesis and commercial development of atorvastatin (Lipitor), the most successful cholesterol lowering medicine in history, which has extended the lifespan of millions of people worldwide.

Read more about Roth's work»

Watch Roth's acceptance speech»

**Edward C. Taylor (2013)**

For his contributions to heterocyclic chemistry, in particular the discovery of the new-generation antifolate pemetrexed, approved for the treatment of mesothelioma and non-small cell lung cancer and under clinical investigation for treatment of a variety of other solid tumors.

Watch Taylor's acceptance speech»

**Paul J. Reider (2011)**

For his contributions to the discovery and development of numerous approved drugs, including those for treating asthma and for treating AIDS.

**John D. Roberts (2009)**

For seminal contributions in physical organic chemistry, in particular the introduction of NMR spectroscopy to the chemistry community.

**Arthur A. Patchett (2007)**

For innovative contributions in discoveries of Mevacor, the first statin that lowers cholesterol levels, and of Vasotec and Prinivil for treating hypertension and congestive heart failure.

**Marvin H. Caruthers (2005)**

For his invention and development of chemical reagents and methods currently used for the automated synthesis of DNA oligonucleotides (i.e., the "gene machine").

**Paul S. Anderson (2003)**

For his scientific leadership in two drugs approved for the treatment of AIDS and for his widely cited basic research related to the glutamate receptor.

**Paul C. Lauterbur (2001)**

For his research on nuclear magnetic resonance and its applications in chemistry and medicine, and his contributions to the development of magnetic resonance imaging in medicine.

**C. Grant Willson (1999)**

For his fundamental contribution to the chemistry of materials that produce micropatterns in semiconductors, and for its widespread application in the microelectronics industry for the benefit of society.

**Ernest L. Eliel (1997)**

For his seminal and far-reaching contributions in organic stereochemistry and for his wise and energetic leadership in professional societies that represent the interests of chemists and of society, both in the United States and abroad.

**P. Roy Vagelos (1995)**

For his fundamental contributions to the understanding of fatty acid biosynthesis, cholesterol metabolism, and phospholipid metabolism, and for his leadership at Merck that led to the discovery of a number of important therapeutic and preventive agents.

**Harold S. Johnston (1993)**

For his pioneering efforts to point out that man-made emissions could affect the chemistry of the stratosphere, in particular, the danger of the depletion by nitrogen oxide of the earth's critical and fragile ozone layer.

**Vladimir Haensel (1991)**

For his outstanding research in the catalytic reforming of hydrocarbons, that has greatly enhanced the economic value of our petroleum natural resources.

# National Academy of Sciences

| ABOUT THE NAS | ACTIVITIES & PROGRAMS | | | PUBLICATIONS | RESOURCES |
|---|---|---|---|---|---|
| Mission | Awards | US-UK Scientific Forum | Committee on Human Rights | Proceedings (PNAS) | Newsroom |
| History | Cultural Programs | US-Israel Blavatnik Scientific Forum | Committee on Science, Engineering, Medicine, and Public Policy | PNAS Nexus | Member Directory |
| Organization | Distinctive Voices Lecture Series | From Research to Reward | | National Academies Press | Meetings & Events |
| Leadership and Governance | Human Gene Editing Initiative | The Science Behind It | Committee on Women in Science, Engineering, and Medicine | Biographical Memoirs | Locations |
| Membership | | Science & Entertainment Exchange | | Issues in Science and Technology | Careers |
| Policy Studies and Reports | Kavli Frontiers of Science Symposia | | Government-University-Industry Research Roundtable | | |
| Giving to NAS | LabX | Committee on International Security and Arms Control | | | |

Directory | Meetings & Events | Support the NAS

Copyright © 2023 National Academy of Sciences. All rights reserved.

Privacy Statement | Institutional Policies and Procedures | Terms of Use

NATIONAL
ACADEMIES

Sciences
Engineering
Medicine

# EXHIBIT H





Français  English





## Prix Galien Canada



The Prix Galien Canada - Innovative Product Award is presented every year to the company that has developed a drug product launched on the Canadian market and judged by the Jury to have made the most significant overall contribution to patient care in Canada in terms of efficacy, safety, benefits and innovation.

HOME
SUBMISSION
2020 VIRTUAL PRESENTATION
PRIX GALIEN 25 YEARS (2019)
JURY
LAUREATES
PHOTO GALLERY
CONTACTS

Powered by SiteKreator

# EXHIBIT I

Paul J. Reider, Ph.D                                         August 24, 2022

I have testified as an expert in the following cases within the last four years:

- *Pharmacyclics LLC v Alvogen*, C.A. No 1:19-cv-00434-CFC-CJB (D. Del.);

- *Lundbeck/Takeda v. Lupin Ltd,* C.A. No. 18-88-LPS (D. Del.);

- *Boehringer Ingelheim Pharma v. Aurobindo Pharma USA*, Case No. 17-7887 (MAS)(LHG) (D.N.J.);

- *Flatwing Pharma v. Anacor Pharma*, IPR2018-00168,-0169,-0170,-0171;

- *Incyte Corp v. Concert Pharmaceuticals*, Case IPR2017-01256, Patent No. 9,249,149;

- *LeoPharma v. Perrigo UK*, Case No. 16-430 (SLR) (D. Del.);

- *Janssen Ortho LLC v. Juno* (Australian Federal Court);

- *Janssen Ortho LLC v. United States*, 1:13-cv-00296 (Ct. Int'l Trade).

# EXHIBIT J

**OPENING EXPERT REPORT OF DR. PAUL J. REIDER
REGARDING INVALIDITY OF U.S. PATENT NOS. 10,596,162 and 10,603,314**

**EXHIBIT J: LIST OF MATERIALS CONSIDERED**

| Description (Cite) | Bates |
|---|---|
| U.S. Patent No. 10,596,162 | PUMAWYETH-TAG00000001 |
| U.S. Patent No. 10,603,314 | PUMAWYETH-TAG00000048 |
| April 9, 2010 Non-Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012477 |
| July 14, 2010 Amendment (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012666 |
| September 14, 2010 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012708 |
| October 13, 2010 Response to Non-Final Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012755 |
| September 27, 2013 Non-Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012858 |
| February 27, 2014 Request for Reconsideration (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012881 |
| May 2, 2014 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00013066 |
| August 20, 2014 Request for Continued Examination (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00013027 |
| August 20, 2015 Response to Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00013283 |
| September 29, 2014 Non-Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00013046 |
| May 21, 2015 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00013255 |
| December 9, 2015 Non-Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00027505 |
| March 9, 2016 Response to Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00027606 |
| May 9, 2016 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00027868 |
| August 1, 2016 Response to Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00027988 |
| September 26, 2016 Non-Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028014 |
| December 27, 2016 Request for Reconsideration (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028058 |
| March 28, 2017 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028071 |

| Description (Cite) | Bates |
|---|---|
| July 28, 2017 Response to Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028090 |
| February 23, 2018 Request for Continued Examination (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028122 |
| June 14, 2018 Response to Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028318 |
| December 13, 2018 Response to Office Action (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028378 |
| February 14, 2019 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028401 |
| August 14, 2019 Amendment and Response (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028425 |
| September 17, 2019 Non-Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028465 |
| December 17, 2019 Applicant Response excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028466 |
| August 12, 2016 Non-Final Rejection (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029432 |
| November 14, 2016 Response to Office Action (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029553 |
| January 24, 2017 Final Rejection (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029565 |
| February 22, 2018 Response to Office Action (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029620 |
| June 8, 2018 Non-Final Rejection (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029637 |
| December 7, 2018 Response to Office Action (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029655 |
| February 8, 2019 Non-Final Rejection (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00029757 |
| May 7, 2019 Response to Office Action  (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00030342 |
| June 27, 2019 Non-Final Rejection (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00030353 |
| October 28, 2019 Response to Office Action  (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00030379 |
| Deposition Transcript of Sridhar Rabindran and Exhibits (dated May 9, 2023) | N/A |
| U.S. Patent No. 6,002,008 | AZ-PW-TAG00421627 |
| U.S. Patent No. 6,251,912 | AZ-PW-TAG00421272 |
| Provisional Application No. 60/671,287 | AZ-PW-TAG00420655 |
| United States Published Patent Application No. 2006/023046 | AZ-PW-TAG00423333 |
| International Patent Publication No. WO 2003/103676 | AZ-PW-TAG00423803 |

| Description (Cite) | Bates |
|---|---|
| Plaintiffs' Supplemental Responses and Objections to AstraZeneca's Interrogatory No. 1 (May 19, 2023) | N/A |
| Gilotrif Prescribing Information, April 2022 | AZ-PW-TAG00421359 |
| Iressa label 2015 | AZ-PW-TAG00423242 |
| Tarceva Prescribing Information, October 2016 | AZ-PW-TAG00423181 |
| Vizimpro Prescribing Information, December 2020 | AZ-PW-TAG00420848 |
| September 11, 2009 EGFRM update for LLG Meeting PPT | AZ-PW-TAG00290627–42 |
| December 1, 2009 EGFRM update for LLG Meeting PPT | AZ-PW-TAG00290433–47 |
| April 2009 "Inhibitor of Mutation Activated & Gatekeeper EGFR (IAMGE) PPT | AZ-PW-TAG00317425–51 |
| "The Discovery of AZD9291 PPT" | AZ-PW-TAG00120871–92 |
| February 3, 2005 Draft Manuscript | WYETH-TAG01062562–2568 |
| "Structure and Reactivity Based Development of Covalent Inhibitors of the Activating and Gatekeeper Mutant Forms of the Epidermal Growth Factor Receptor (EGFR) PPT | AZ-PW-TAG00121823–47 |
| "Inhibition of EGF receptor signalling: The Discovery of AZD9291" PPT | AZ-PW-TAG00126754–805 |
| July 12, 2013 Approval Letter for NDA No. 201292 (GILOTRIF (afatinib) tablets) . | AZ-PW-TAG00421135 |
| May 5, 2003 Approval Letter for NDA No. 021399 (IRESSA (gefitinib tablets) | AZ-PW-TAG00420649 |
| November 18, 2004 Approval Letter for NDA No. 021743 (TARCEVA (erlotinib) tablets) | AZ-PW-TAG00423411 |
| *A Phase 2, Randomized, Open-Label Study Of Single Agent CI-1033 In Patients With Advanced Non-SmallCell Lung Cancer*, ClinicalTrials.gov (June 23, 2005) https://clinicaltrials.gov/study/NCT00050830?term=NCT00050830&rank=1&tab=history&a=1 | AZ-PW-TAG00422585 |
| *Study Evaluating EKB-569 in Advanced Non-Small Cell Lung Cancer*, ClinicalTrials.gov (Aug. 20, 2009), https://clinicaltrials.gov/ct2/show/NCT00067548 | AZ-PW-TAG00423403 |
| *Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell LungCancer*, ClinicalTrials.gov (Dec. 16, 2005), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&tab=history&a=1 | AZ-PW-TAG00422783 |
| *Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell LungCancer*, ClinicalTrials.gov (April 6, 2018), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&a=18&tab=history | AZ-PW-TAG00421081 |

| Description (Cite) | Bates |
|---|---|
| *Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell LungCancer*, ClinicalTrials.gov (April 13, 2018), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&a=1&tab=table | AZ-PW-TAG00422035 |
| News Release, "Clovis Oncology and Avila Therapeutics Sign $209 Million Partnership for the Worldwide Development and Commercialization of EGFR Mutant-Selective Inhibitor" (May 25, 2010) | MGH000033455-58 |
| *FDA Issues Advice to Make Earliest Stages of Clinical Drug Development More Efficient* (January 12, 2006), available at http://web.archive.org/web/20060207140647/http://www.fda.gov/bbs/topics/news/2006/NEW01296.html | AZ-PW-TAG00421751 |
| L. Allen et al., *CI-1033, an Irreversible pan-erbB Receptor Inhibitor and its Potential Application for the Treatment of Breast Cancer*, 30(5) Seminars in Oncology 65–78 (2003) | AZ-PW-TAG00421919 |
| J. Ashby & D. Paton, *The Influence of Chemical Structure on the Extent and Sites of Carcinogenesis for 522 Rodent Carcinogens and 55 Different Human Carcinogen Exposures*, 286 Mutation Res. 3–72 (1993) | AZ-PW-TAG00421148 |
| J. Baselga & S. Averbuch, *ZD1839 ('Iressa') as an Anticancer Agent*, 60 Supp. 1 Drugs 33 (2000) | AZ-PW-TAG00421431 |
| G. Begley & L. Ellis., 483 *Raise Standards for Preclinical Cancer Research*, Nature 531–33 (2012) | AZ-PW-TAG00423210 |
| Bradley, *A review of radiation dose escalation trials for non-small cell lung cancer within the Radiation Therapy Oncology Group*, Semin. Oncology (2005) | AZ-PW-TAG00423330 |
| A. Bridges, *The Rationale and Strategy Used to Develop a Series of Highly Potent, Irreversible, Inhibitors of the Epidermal Growth Factor Receptor Family of Tyrosine Kinases, 6 Current Medicinal Chemistry* 825 (1999) | AZ-PW-TAG00420806 |
| C. Bruns et al., *Blockade of the Epidermal Growth Factor Receptor Signaling by a Novel Tyrosine Kinase Inhibitor Leads to Apoptosis of Endothelial Cells and Therapy of Human Pancreatic Carcinoma*, 60 Cancer Res. 2926–35 (2000) | AZ-PW-TAG00422636 |
| Calvo et al., *Administration of CI-1033, an Irreversible Pan-erbB Tyrosine Kinase Inhibitor, is Feasible on a 7-day On, 7-Day Off Schedule: A Phase I Pharmacokinetic and Food Effect Study*, 10 Clin. Canc. Res. 7112-7120 (2004) | AZ-PW-TAG00422923 |
| T. Carter et al., *Inhibition of drug-resistant mutants of ABL, KIT, and EGF receptor kinases*, 102(31) PNAS 11011–16 (2005) | AZ-PW-TAG00423480 |
| D. Cross et. al., *AZD9291, an Irreversible EGFR TKI, Overcomes T790M-Mediated Resistance to EGFR Inhibitors in Lung Cancer*, Cancer Discovery 1047–61 (2014) | AZ-PW-TAG00422083 |
| J. Dancey, *Epidermal Growth Factor Receptor Inhibitors in Clinical Development*, 58(3) Int. J. Radiation Oncology Bio. Phys. 1003–1007 (2004) | AZ-PW-TAG00422710 |

| Description (Cite) | Bates |
|---|---|
| D. Das & J. Hong, *Irreversible Kinase Inhibitors Targeting Cysteine Residues and their Applications in Cancer Therapy*, 20 Mini-Reviews in Medicinal Chemistry, 1732–53 (2020) | AZ-PW-TAG00421590 |
| K. Dearfield et al., *Genotoxicity in Mouse Lymphoma Cells of Chemicals Capable of Michael Addition*, 6 Mutagenesis 519 (1991) | AZ-PW-TAG00422765 |
| Denny, *Irreversible Inhibitors of the erbB family of protein tyrosine kinases*, 9 Pharmacology and Therapeutics 253 (2002) | AZ-PW-TAG00421814 |
| J. DiMasi, et al., *Innovation in the pharmaceutical industry: New estimates of R&D costs*, 47 Journal of Health Economics 20 (2016) | AZ-PW-TAG00422987 |
| E. Eder et al., *The Possible Role of α,β-unsaturated Carbonyl Compounds in Mutagenesis and Carcinogenesis*, 67 Toxicology Letters 87 (1993) | AZ-PW-TAG00422906 |
| M. Finlay et al., *Discovery of a Potent and Selective EGFR Inhibitor (AZD9291) of Both Sensitizing and T790M Resistance Mutations That Spares the Wild Type Form of the Receptor*, 57 J. Med. Chem. (2014) 8249−8267 | AZ-PW-TAG00423444 |
| D. Fry et al., *A Specific Inhibitor of the Epidermal Growth Factor Receptor Tyrosine Kinase*, 265 Science 1093, 1093–95 (1994) | AZ-PW-TAG00421130 |
| D. Fry, *Inhibition of the Epidermal Growth Factor Receptor Family of Tyrosine Kinases as an Approach to Cancer Chemotherapy: Progression from Reversible to Irreversible Inhibitors*, 82 Pharmacol. Ther. 207 (1999) | AZ-PW-TAG00423309 |
| D. Fry, *Site-Directed Irreversible Inhibitors of the erbB Family of Receptor Tyrosine Kinases as Novel Chemotherapeutic Agents for Cancer*, 15 Anti-Cancer Drug Design 3 (2000) | AZ-PW-TAG00422839 |
| N. Godin-Heymann *et al.*, *The T790M 'gatekeeper' mutation in EGFR mediates resistance to low concentrations of an irreversible EGFR inhibitor*, 7 Mol. Can. Ther. 874–79 (2008) | AZ-PW-TAG00421823 |
| R. Govindan, MD, Phase III Failure Rates in Oncology Drugs Unacceptable, 16 ONCOLOGY NEWS INT'L at 1 (Aug. 1, 2007), https://www.cancernetwork. com/articles/phase-iii-failure-rates-oncology-drugs-unacceptable | AZ-PW-TAG00422808 |
| V. Grünwald & M. Hidalgo, *Developing Inhibitors of the Epidermal Growth Factor Receptor for Cancer Treatment*, 95 J. Nat'l Cancer Institute 851–867 (June 18, 2003) | AZ-PW-TAG00422739 |
| D. Hanahan et al, *Less is more, regularly: metronomic dosing of cytotoxic drugs can target tumor angiogenesis in mice,* 105(8) The Journal of Clinical Medicine 1045–47 (2000) | AZ-PW-TAG00422932 |
| S. Hanks & T. Hunter, *Protein Kinases 6: The Eukaryotic Protein Kinase Superfamily: Kinase (Catalytic) Domain Structure and Classification*, 9 FAESB J. 576–596 (1995) | AZ-PW-TAG00423263 |
| M. Hildalgo et al., *Phase 1 trial of EKB-569, an irreversible inhibitor of the epidermal growth factor receptor (EGFR), in patients with advanced solid tumors*, 21 Proceedings of ASCO 17a 63–66 (2002) | AZ-PW-TAG00422735 |

| Description (Cite) | Bates |
|---|---|
| P.A. Janne et al., *Multicenter, Random, Phase II Trial of CI-1033 Irreversible Pan-ERBB Inhibitor, for Previously Treated Advanced Non-Small Cell Lung Cancer*, 25 J. Clinical Oncology 3936–3944 (Sept. 1, 2007) | AZ-PW-TAG00422799 |
| S. Kobayashi et al., *EGFR Mutation and Resistance of Non-Small-Cell Lung Cancer to Gefitinib*, N Engl. J. Med. 786–792 (2005) | AZ-PW-TAG00422211 |
| E. Kwak et al., *Irreversible inhibitors of the EGF receptor may circumvent acquired resistant to gefitinib*, 102 Proc. Natl. Acad. Sci. 7665–70 (2005) | AZ-PW-TAG00422937 |
| E. Kwak, *The Role of Irreversible HER Family Inhibition in the Treatment of Patients with Non-Small Cell Lung Cancer*, 16 The Oncologist 1498–1507 (2011) | AZ-PW-TAG00422810 |
| H-J Lee *et al.*, *Noncovalent Wild-type-Sparing Inhibitors of EGFR T790M*, 3 Cancer Disc. 168–81, 170 (2013) | AZ-PW-TAG00421800 |
| A. Levitzki & A. Gazit, *Tyrosine Kinase Inhibition: An Approach to Drug Development*, 267 Science 1782 (1995) | AZ-PW-TAG00421792 |
| M. Li et al., *A Detouring Experience Not Recommended: Lessons Learned from PF00299804*, 82 Cancer Res. 3662 (Oct. 2022) | AZ-PW-TAG00423433 |
| X. Lu et al, *Targeting EGFRL858R/T790M and EGFRL858R/T790M/C797S resistancemutations in NSCLC: Current developments in medicinal chemistry*, 38 Med. Res. 1550–81 (2018) | AZ-PW-TAG00423371 |
| T. Lynch, *Activating Mutations in the Epidermal Growth Factor Receptor Underlying Responsiveness of Non–Small-Cell Lung Cancer to Gefitinib*, 350(21) New England Journal of Medicine 2129–2139 (2004) | AZ-PW-TAG00422371 |
| C. Ma et al., *Ty90M and acquired resistant to EGFR TKI: a literature review of clinical reports*, J. Thoracic Disease ( 2011) | AZ-PW-TAG00423424 |
| W. Pao et al., *Acquired Resistance to Lung Adenocarcinomas toGefitinib or Erlotinib is Associated with a Second Mutation in the EGFR Kinase Domain*, 2 PLOS Medicine 225–35 (2005) | AZ-PW-TAG00422132 |
| B.K. Park et al., *Role of Drug Disposition in Drug Hypersensitivity: A Chemical, Molecular, and Clinical Perspective*, 11 Chem. Res. Toxicol. 969–88 (1998) | AZ-PW-TAG00422884 |
| F. Prinz *et al.*, *Believe it or not: how much can we rely on published data on potential drug targets*, 10 Nature Rev. Drug Discov., 712 (2011) | AZ-PW-TAG00420777 |
| Rabindran et al., *Antitumor Activity of HKI-272, an Orally Active, Irreversible Inhibitor HER-2 Tyrosine Kinase*, 64 Cancer Res. 3958 (2004) | AZ-PW-TAG00422627 |
| T. Reungwetwattana & G. Kho Dy, *Targeted Therapies in Development for Non-Small Cell Lung Cancer*, 12 J. Carcinogenesis 22–29 (2013) | AZ-PW-TAG00421442 |
| G. Rishton, *Reactive compounds and in vitro false positives in HTS*, 2(9) Elsevier Science Ltd., 382–84 (1997) | AZ-PW-TAG00422045 |
| L. Sequist et al., *Neratinib, an Irreversible Pan-ErbB Receptor Tyrosine Kinase Inhibitor: Results of a Phase II Trial in Patients With Advanced Non–Small-Cell Lung Cancer*, 28 J. Clinical Oncology 3076–83 (2010) | AZ-PW-TAG00422948 |

| Description (Cite) | Bates |
|---|---|
| J. Settleman *et al.*, *Communication in Drug Development: "Translating" Scientific Discovery* 164 Cell 1101 (2016) | AZ-PW-TAG00420773 |
| Shin et al, *A Phase I Clinical and Biomarker Study of CI-1033, a Novel Pan-ErbB Tyrosine Kinase Inhibitor in Patients with Solid Tumors*, 37 Proceedings of ASCO 82a (2001) | AZ-PW-TAG00422820 |
| J. Smaill et al., *Tyrosine Kinase Inhibitors. 17. Irreversible Inhibitors of the Epidermal Growth Factor Receptor: 4-(Phenylamino)quinazoline- and 4-(Phenylamino)pyrido[3,2-d]pyrimidine-6-acrylamides Bearing Additional Solubilizing Functions*, 43 J. Med. Chem. 1380 (2000) | AZ-PW-TAG00420711 |
| R. Sordella, *Gefitinib-Sensitizing* EGFR *Mutations in Lung Cancer Activate Anti-Apoptotic Pathways*, 305 Science 1163 (2004) | AZ-PW-TAG00420926 |
| T. Suzuki *et al.*, *Blackwell Publishing Asia Pharmacological characterization of MP-412 (AV-412), a dual epidermal growth factor receptor and ErbB2 tyrosine kinase inhibitor* 98(12), Cancer Sci., 1977–1984 (2007) | AZ-PW-TAG00422354 |
| C. Torrance et. al, *Combinatorial chemoprevention of intestinal neoplasia*, 6(8) Nature Medicine 1024–1028 (2000) | AZ-PW-TAG00421744 |
| P. Traxler, *Protein Tyrosine Kinase Inhibitors in Cancer Treatment*, 7 Exp. Opin. Ther. Patents 571 (1997) | AZ-PW-TAG00422969 |
| P. Traxler et al., *Use of a Pharmacophore Model for the Design of EGF-R Tyrosine Kinase Inhibitors: 4-(Phenylamino)pyrazolo[3,4-d]pyrimidines*, 40 J. Med. Chem. 3601 (1997) | AZ-PW-TAG00423001 |
| P. Traxler, *Tyrosine kinase inhibitors in cancer treatment (Part II)*, 8(12) Exp. Opin. Ther. Patents 1599 (1998) | AZ-PW-TAG00421471 |
| P. Traxler et al., *Preclinical Profile of PKI166 – a Novel and Potent EGFR Tyrosine Kinase Inhibitor for Clinical Development*, 5 Clin. Cancer Res. 3750(s), Abstract # 100 (1999) | AZ-PW-TAG00423799 |
| P. Traxler, *Tyrosine Kinases as Targets in Cancer Therapy – Successes and Failures*, 7 Expert Op. Therapeutic Target 215 (2003) | AZ-PW-TAG00423029 |
| H.R. Tsou *et al.*, *Optimization of 6,7-Dibsutituted-4-(arylamino)quinoline-3-carbonitriles as Orally Active, Irreverisble Inhibitors of Human Epidermal Growth Factor Receptor-2 Kinase Activity*, 48 J. Med. Chem. 1107 (2005) | AZ-PW-TAG00422049 |
| S. Vogl, Neratinib *Is Approved: Should We Reject It Anyway?*, The ASCO Post (December 25, 2017) , http://www.ascopost.com/issues/december-25-2017/neratinib-is-approved-should-we-reject-it-anyway/ | AZ-PW-TAG00421253 |
| R. Ward et al., *Structure- and Reactivity-Based Development of Covalent Inhibitors of the Activating and Gatekeeper Mutant Forms of the Epidermal Growth Factor Receptor (EGFR)*, J. of Medicinal Chemistry (2013) | AZ-PW-TAG00421895 |
| A. Wissner et al., *Synthesis and Structure—Activity Relationships of 6,7-Disubstituted 4-Anilinoquinoline-3-carbonitriles. The Design of an Orally Active, Irreversible Inhibitor of the Tyrosine Kinase Activity of the Epidermal Growth Factor Receptor (EGFR) and the Human Epidermal Growth Factor Receptor-2 (HER-2)*, 46 J. Med. Chem. 49–63 (2002) | AZ-PW-TAG00421707 |

| Description (Cite) | Bates |
|---|---|
| F. Wittlinger & S. Laufer, *The pre-clinical discovery and development of osimertinib used to treat non-small cell lung cancer*, 16 Expert Opinion on Drug Discovery 1091 (2021) | AZ-PW-TAG00422341 |
| N. Wright and G. Goss, *Third-generation epidermal growth factor receptor tyrosine kinase inhibitors for the treatment of non-small cell lung cancer*, 8 Translational lung cancer research, S247–S264 (2019) | AZ-PW-TAG00423353 |
| H. Yu et al., *Phase 2 study of intermittent pulse dacomitinib in patients with advanced non-small cell lung cancers*, 112 Lung Cancer 195 (2017) | AZ-PW-TAG00421143 |
| Amivantamab and Lazertinib as a Potential Option for EGFR-Mutant NSCLC, Targeted Oncology, https://www.targetedonc.com/view/amivantamab-and-lazertinib-as-a-potential-option-for-egfr-mutant-nsclc (last visited July 28, 2023) | AZ-PW-TAG00424012 |
| Yuhan's Lung Cancer Treatment Lazertinib Wins Approval, The Korea Herald, http://www.koreaherald.com/view.php?ud=20210118001003 (last visited July 28, 2023) | AZ-PW-TAG00423924 |
| W. Zhou et al., *Novel mutant-selective EGFR kinase inhibitors against EGFR T790M*, 462 Nature 1070–74 (2009) | AZ-PW-TAG00423463 |
| Study Evaluating the Safety, Tolerability, and Pharmacokinetics (PK) of HKI-357 Administered Orally to Healthy Subjects, ClinicalTrials.gov, available at https://www.clinicaltrials.gov/study/NCT00550381 | AZ-PW-TAG00423892 |
| All materials cited in the Opening Expert Report of Dr. Paul J. Reider Regarding Invalidity of U.S. Patent Nos. 10,596,162 and 10,603,314 | N/A |

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PUMA BIOTECHNOLOGY, INC.    )
and WYETH LLC,    )
    )
    Plaintiffs/Counterclaim-Defendants,    )
    )
        v.    )    C.A. No. 21-1338-MFK
    )
ASTRAZENECA    )
PHARMACEUTICALS    )
LP and ASTRAZENECA AB,    )
    )
    Defendants/Counterclaim-Plaintiffs.    )
    )

## REPLY EXPERT REPORT OF DR. PAUL J. REIDER REGARDING INVALIDITY OF U.S. PATENT NOS. 10,596,162 AND 10,603,314

Dated: October 5, 2023

Paul J. Reider, Ph.D.

## Table of Contents

I.      INTRODUCTION ............................................................................................. 1

II.     SCOPE OF OPINIONS ................................................................................... 3

III.    EDUCATION AND EXPERIENCE .............................................................. 4

IV.     MATERIALS CONSIDERED ........................................................................ 4

V.      LEGAL STANDARDS .................................................................................... 5

VI.     SUMMARY OF OPINIONS ........................................................................... 5

VII.    CLAIM CONSTRUCTION ............................................................................ 6

        A.      "Ligand-Binding Pocket" ................................................................... 6

        B.      "Irreversible EGFR Inhibitor" .......................................................... 8

        C.      The Requirement of *In Vivo* Activity and Clinical Utility for the
                Irreversible EGFR Inhibitors of the Asserted Claims .......................... 11

VIII.   PRIORITY DATE ......................................................................................... 15

        A.      The Asserted Claims Are Not Entitled to a Priority Date of February 3,
                2005 .................................................................................................... 15

        B.      The Asserted Claims Are Not Entitled to a Priority Date of April 15, 2005 ........ 20

                1.      The '483 and '989 provisionals do not describe or enable a method
                        of treating gefitinb and/or erlotinib resistant NSCLC ............................. 20

                2.      The '483 and '989 provisionals do not disclose daily
                        administration of irreversible EGFR inhibitors. ....................................... 22

        C.      The Applicants Did Not "Conceive" of the Asserted Claims by December
                2, 2004 ................................................................................................. 24

IX.     THE ASSERTED CLAIMS ARE NOT ENABLED ........................................ 28

        A.      Dr. Jorgensen's Definition for the Irreversible EGFR Inhibitors
                Encompassed by the Asserted Claims Is Erroneous and Contrary to the
                Court's Construction ........................................................................... 30

                i.      Dr. Jorgensen erroneously relies on Stamos 2002 to give structure
                        to the irreversible EGFR inhibitors encompassed by the asserted
                        claims. ........................................................................................... 31

ii.  Dr. Jorgensen erroneously extends Stamos 2002 to irreversible EGFR inhibitors. ............................................................ 40

iii.  Dr. Jorgensen erroneously extends Stamos 2002 to EGFR having a T790M mutation. .......................................................... 45

iv.  Dr. Jorgensen inappropriately limits the irreversible EGFR inhibitors encompassed by the asserted claims to small molecules .......... 49

B.  The POSA Would Not Have Been Able to Make and Use Osimertinib .............. 59

C.  The POSA Would Not Have Been Able to Make and Use a Unit Dosage Calculated to Provide a Therapeutic Effect .......................... 71

X. THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION .................................... 74

A.  The Patents-in-Suit Do Not Describe a Class of Small Molecule N-heteroaryl Compounds .......................................... 76

B.  The Patents-in-Suit Do Not Describe a Method of Treating Comprising Administration of a Unit Dose .............................. 83

C.  The Patents-in-Suit Do Not Describe "wherein the irreversible EGFR inhibitor is not CL-387,785" ...................................... 86

XI. THE ASSERTED CLAIMS ARE ANTICIPATED ............................................ 88

A.  Allen 2003 .......................................................... 88

B.  Zacharchuk US 2005 ................................................... 89

C.  Yoshimura 2005 ...................................................... 90

D.  Calvo 2004 .......................................................... 91

E.  Grünwald 2003 ....................................................... 92

F.  Hidalgo 2002 ........................................................ 93

G.  Shin 2001 ........................................................... 94

H.  Prior Use of CI-1033 ................................................. 95

I.  Prior Use of EKB-569 ................................................. 97

XII. THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS ................................... 98

A.  The Asserted Claim of the '162 Patent Would Have Been Obvious .................. 98

    i.  Kobayashi 2005 in Combination with One or More of Wissner 2002, Allen 2003, and/or Rabindran 2004 ................................................. 98

    ii.  Kwak 2005 in Combination with One or More of Hildalgo 2002 and/or Rabindran 2004 ............................................................... 99

    iii.  Carter 2005 in Combination with Allen 2003, Hidalgo 2002, and/or Wissner 2002 .............................................................. 100

  B.  The Asserted Claims of the '314 Patent Would Have Been Obvious ................ 100

    iv.  Agus 2003 in Combination with One or More of Calvo 2004, Wissner 2002, Hidalgo 2002, Denny 2002, and/or Dancey 2004 .......... 100

    v.  Allen 2003 Alone or in Combination with One or More of Learn 2004 and/or Agus 2003 ......................................................... 102

    vi.  Zacharchuk US 2005 Alone or in Combination with One or More of Discafini 1999 and/or Wissner 2002 .................................. 103

    vii.  Yoshimura 2005 Alone or in Combination with One or More of Wissner 2002, Agus 2003, and/or Dancey 2004 ..................................... 104

    viii.  NCT00266877 2005 in Combination with Rabindran 2004 and One or More of Zacharchuk US 2005 and/or Dancey 2004 ................... 105

XIII.  CONCLUSION ................................................................... 105

XIV.  SUPPLEMENTATION ............................................................. 105

## I.  INTRODUCTION

1.      I, Paul J. Reider, Ph.D., have been retained as an expert witness on behalf of Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca AB (collectively, "Defendants" or "AstraZeneca") in this patent litigation.

2.      In particular, I have been asked to offer opinions on U.S. Patent Nos. 10,596,162 (the "'162 patent") and 10,603,314 (the "'314 patent"). I understand that Plaintiffs Puma Biotechnology, Inc. ("Puma") and Wyeth LLC ("Wyeth") (collectively, "Plaintiffs") have sued AstraZeneca for infringement of the '162 and '314 patents based on AstraZeneca's manufacture, marketing, and sale of its Tagrisso® (osimertinib mesylate) pharmaceutical product. I understand that Plaintiffs are now asserting claim 1 of the '162 patent and claims 1, 3, and 9 of the '314 patent (collectively, the "asserted claims") against AstraZeneca.

3.      I previously prepared an Opening Expert Report of Paul J. Reider, Ph.D. Regarding Invalidity of U.S. Patent Nos. 10,596,162 and 10,603,314 dated July 28, 2023 ("Reider Opening"), which includes my opinions that the asserted claims are not enabled, lack written description, are anticipated, would have been obvious, and are not entitled to a priority date of either February 3, 2005 or April 15, 2005. I also previously prepared a Rebuttal Expert Report of Paul J. Reider Regarding Secondary Considerations, Non-infringement, and Damages dated September 7, 2023 ("Reider Rebuttal"), which includes my opinion regarding the meaning of "ligand-binding pocket" in the asserted claims, among other opinions.

4.      I understand that Plaintiffs have served a Rebuttal Expert Report of Frederick Hausheer M.D. dated September 8, 2023 ("Hausheer Rebuttal"), in which Dr. Hausheer responds, in part, to my Opening Expert Report and opines that the asserted claims are novel, not obvious, enabled, meet the written description requirement, and "are entitled to claim priority to

the February 3, 2005 filing date of the '483 Provisional Application as well as the April 15, 2005 filing date of the '989 Provisional Application."  Hausheer Rebuttal, Table of Contents, ¶79. I understand that Plaintiffs have also served a Rebuttal Expert Report of Dr. William L. Jorgensen on Enablement and Written Description dated September 8, 2023 ("Jorgensen Rebuttal"), in which Dr. Jorgensen responds to my Opening Expert Report and opines that the asserted claims are enabled and supported by the written description requirement. *See* Jorgensen Rebuttal, Table of Contents. I understand that Plaintiffs have also served a Rebuttal Expert Report of Dr. Glen J. Weiss, M.D., M.B.A dated September 4, 2023 ("Weiss Rebuttal"), in which Dr. Weiss responds to the Opening Expert Report of Dr. Benjamin Levy regarding indefiniteness of the asserted claims. I understand that Dr. Levy is another expert witness for Defendants in this case.

5.     In this report I respond, in part, to the Rebuttal Expert Reports of Drs. Hausheer and Jorgensen. I also respond, in part, to paragraphs 148–165 of Dr. Weiss's Rebuttal Expert Report regarding the meaning of "ligand-binding pocket." For the reasons discussed in my Opening Expert Report, and the additional reasons discussed in this Reply Expert Report, I maintain my opinions that the asserted claims are not enabled, lack written description, are anticipated, would have been obvious, and are not entitled to a priority date of either February 3, 2005 or April 15, 2005. For the reasons discussed in my Rebuttal Expert Report, and the additional reasons discussed in this Reply Expert Report, I maintain my opinion that the "ligand-binding pocket" referred to in claim 1 of the '314 patent is in the extracellular region of EGFR.

6.     I reserve the right to respond to additional arguments from Plaintiffs, including any arguments regarding the validity of the asserted claims, if any, in a subsequent report.

7.     I am being compensated at my usual and customary hourly rate of $800 per hour. My compensation does not depend, in any way, on the outcome of this case.

8.      I reserve the right to provide testimony—including at a hearing, in deposition, or through declaration—that explains, elaborates upon, or provides background and context regarding: (a) the opinions and information set forth in this report; (b) the testimony that I might give in deposition or through declaration; (c) the testimony that other fact witnesses or expert witnesses may give or have given at a hearing, in deposition, or through declaration; (d) additional opinions that I form in response to opening expert reports, rebuttal expert reports, briefs, arguments, or other materials submitted by or on behalf of any party to this litigation; (e) additional opinions relating to facts that come to light through discovery after the date of this expert report; and (f) additional opinions in response to any arguments that Plaintiffs or their expert(s) may assert.

9.      I also reserve the right to prepare, present, and testify, including at a hearing, in deposition, or through declaration, concerning demonstrative exhibits that illustrate, explain, elaborate upon, or provide background and context regarding any of (a) through (f) above.

## II.  SCOPE OF OPINIONS

10.      I have reviewed Dr. Hausheer's and Dr. Jorgensen's Rebuttal Reports, which both respond to my Opening Report. I have been asked by counsel for AstraZeneca to consider and respond to Dr. Hausheer's and Dr. Jorgensen's opinions regarding enablement, written description, anticipation, obviousness, and priority of the Asserted Claims. I have also been asked to consider Dr. Hausheer's and Dr. Jorgensen's opinions regarding the meaning of various claim terms and Dr. Hausheer's opinions regarding conception and reduction to practice.  The opinions that I expressed in my prior reports have not changed based on Dr. Jorgensen's and Dr. Hausheer's reports.  I note that both reports respond to opinions offered by other experts that AstraZeneca has retained.  I understand that those experts are addressing those responses.  In the

3

███████████████████████████████████

event that I do not directly respond to any opinion offered by Dr. Hausheer or Dr. Jorgensen, it should not be taken to mean that I agree with Dr. Hausheer or Dr. Jorgensen.

11.     I have also reviewed paragraphs 148–165 of the Weiss Rebuttal Report and have been asked by counsel for AstraZeneca to respond to his opinions therein.

## III. EDUCATION AND EXPERIENCE

12.     I incorporate by reference my education and experience described in Section III of my Opening Report dated July 28, 2023.

13.     My academic background, technical expertise, and list of publications are set forth in my curriculum vitae, attached as Exhibit A to my Opening Report.

14.     A full list of the litigation matters in which I have testified or given deposition testimony within the last four years is attached as Exhibit I to my Opening Report.

## IV. MATERIALS CONSIDERED

15.     I incorporate by reference the materials considered as described in Section IV of my Opening Report and as listed in Exhibit J to my Opening Report. I also incorporate by reference the materials considered as described in Section IV of the Rebuttal Report and as listed in Exhibit K to my Rebuttal Report.

16.     Additionally, in providing this report, I have considered the materials listed in Exhibit M to this report.

17.     I have further relied upon my education and my knowledge and experience from decades of practicing, researching, and teaching chemistry.

18.     My opinions are informed by the collection of materials I have considered. In setting forth my opinion, I have discussed in particular a number of these documents. In the body of my report, I have specified illustrative documents. In doing so, I have not provided an exhaustive discussion of all documents in the materials I have considered, which may further

4

support my opinions and which I may be asked to testify on throughout this litigation. I further understand that expert discovery is ongoing, and that I may be asked to testify regarding other materials that further support my opinions but have not yet been provided to me or to AstraZeneca's counsel.

19.     I reserve the right to modify and/or supplement any of my opinions as needed, in response to (a) new information and evidence I receive, (b) further scientific analysis demonstrating a need to supplement, (c) new issues that may arise, (d) any additional discovery, arguments, evidence, or testimony presented in this case, and (e) any decisions or orders by the Court.

20.     In response to any assertions made by any party or its experts in any submissions or during discovery, I expect to respond as appropriate or to provide additional evidence or testimony.

21.     If asked to testify, I may be required to explain the opinions and analyses described in the body of this report. I reserve the right to use demonstratives in support of my testimony.

## V.  LEGAL STANDARDS

22.     In forming my opinions, I applied the legal standards set forth in Section V of my Opening Report and in Section V of my Rebuttal Report, which were provided to me and explained to me by counsel for AstraZeneca.

## VI. SUMMARY OF OPINIONS

23.     As I will discuss in further detail below, it is my opinion that the asserted claims are not entitled to a priority date of either February 3, 2005 or April 15, 2005. It is also my opinion that the applicants did not "conceive" of the claimed technology by December 2, 2004.

24.     It is my opinion that the asserted claims are not enabled and lack written description. Dr. Jorgensen's proposed definition for the irreversible EGFR inhibitors encompassed by the asserted claims is erroneous and contrary to the Court's claim construction order. It is my opinion that the POSA would not have been able to make and use the full scope of compounds encompassed by Dr. Jorgensen's definition, which includes at least hundreds of millions of compounds. In particular, the POSA would not have been able to make and use osimertinib. It is also my opinion that the POSA would not have been able to make and use a unit dosage calculated to provide a therapeutic effect for each of the irreversible EGFR inhibitors encompassed by the asserted claims. The asserted claims also lack written description as to Dr. Jorgensen's proposed definition for the irreversible EGFR inhibitors encompassed by the asserted claims. The patents-in-suit do not describe this class of compounds, nor do the patents-in-suit describe a method of treating comprising administration of a unit dose of each of the compounds in that class.

25.     It is my opinion that the asserted claims are anticipated by the prior art and would have been obvious over the prior art. I have considered Dr. Hausheer's opinions regarding non-anticipation and non-obviousness. For the reasons discussed below, as well as in my Opening Report, I maintain my opinions that the asserted claims are anticipated by the prior art and would have been obvious over the prior art.

26.     It is also my opinion that the "ligand-binding pocket" referred to in claim 1 of the '314 patent is in the extracellular region of EGFR.

## VII.    CLAIM CONSTRUCTION

### A.  "Ligand-Binding Pocket"

27.     Despite the clear language of claim 1 of the '314 patent itself, which specifies irreversible EGFR inhibitor binding "to cysteine 773 residue in the ***ligand-binding pocket of***

*EGFR* or cysteine 805 residue in the ***ligand-binding pocket of erb-B2***" ('314 patent, claim 1)

Dr. Jorgensen nonetheless states that the POSA "would know the specified cysteine residues

(*i.e.*, Cys773 and Cys805) are within the *intracellular* kinase domain (*i.e.*, the tyrosine kinase

domain) of EGFR." Jorgensen Rebuttal, ¶ 53.

28.     As I explained in my Rebuttal Report, the ligand-binding pocket of EGFR (and

HER2) are part of the extracellular domain of the enzyme, as was well known in 2005 and 2006.

This is reflected in the patent specification and the literature of the time. Reider Rebuttal, ¶¶ 136

–139.

29.     The sole assertion Dr. Jorgensen makes to support his contrary interpretation of

"ligand-binding pocket" as intracellular is a single sentence: "Since ATP is a ligand that binds to

the ATP-binding pocket, this pocket is also sometimes referred to as the ligand-binding pocket."

Jorgensen Rebuttal, ¶ 53. But ATP is not considered a ligand of EGFR or HER2: the patent

specification in describing the ligands of EGFR does not mention ATP (*see, e.g.*, '314 patent,

1:58–59), and the literature at the time similarly does not describe ATP as a ligand. *See* Reider

Rebuttal, ¶¶ 136–139.

30.     Even the literature Dr. Jorgensen cites for the structure of EGFR contradicts his

assertion.  Dr. Jorgensen cites "Wee 2017" for the structure of EGFR (Jorgensen Rebuttal, ¶ 53),

but that reference makes clear that ligand-binding occurs in the extracellular domain of EGFR:

"From  N-terminal to C-terminal, the EGFR consists of (1) an extracellular ligand binding and

dimerization arm (exons 1–16), (2) a hydrophobic transmembrane domain (exon 17), and (3) the

intracellular tyrosine kinase and C-terminal tail domains (exons 18–28)." P. Wee & Z. Wang,

*Epidermal Growth Factor Receptor Cell Proliferation Signaling Pathways*, 9(52) Cancers 1

(2017) (PUMAWYETH-TAG00036079) ("Wee 2017") at 3.  Wee 2017 lists the EGFR ligands

and does not describe ATP as a ligand.  Wee 2017 at 5 ("Aside from the EGF, six other EGFR

ligands have been described.  These include transforming growth factor-α (TGF-α),

amphiregulin (AREG), epiregulin (EREG), betacellulin (BTC), heparin-binding EGF-like

growth factor (HB-EGF), and epigen (EPI).").

31.    Dr. Jorgensen does not dispute that the patents-in-suit neither enable nor describe

irreversible EGFR inhibitors that covalently bind to a cysteine in the extracellular ligand-binding

pocket of EGFR.  Thus, giving the asserted claims of the '314 patent their proper construction

makes clear that the claims are not enabled and lack written description support for at least this

reason.

### B.  "Irreversible EGFR Inhibitor"

32.    I understand that the Court has construed the term "irreversible epidermal growth

factor receptor (EGFR) inhibitor that covalently binds to [cysteine 773 residue in the ligand-

binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2/ to

cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation]" as: *A

compound that irreversibly inhibits EGFR and covalently binds to [cysteine 773 residue in the

ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-

B2/cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation]."*

Claim Construction Order (Exhibit N), p.13–18. In construing this claim term, I understand that

the Court specifically rejected the Plaintiffs' proposed construction: "A low molecular weight N-

(heteroaryl)-aniline compound having a Michael acceptor that covalently binds to [cysteine 773

residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding

pocket of erb-B2/cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M

mutation]." *Id.* at 13–14. In doing so, I understand that the Court found that "irreversible EGFR inhibitor" should be construed functionally rather than structurally. *Id.* at 16 – 17.[1]

33.     Contrary to the Court's explicit construction of the "irreversible EGFR inhibitor" claim term as functional rather than structural, Dr. Jorgensen appears to now propose essentially the same structural definition that the Court has already rejected, shown in the chart below. Dr. Jorgensen's opinions ignore and contradict the Court's ruling.

| Plaintiffs' Proposed Construction During Claim Construction (Rejected by the Court) | Dr. Jorgensen's Definition (Jorgensen Rebuttal, ¶47) |
|---|---|
| *"A low molecular weight N-(heteroaryl)-aniline compound having a Michael acceptor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2."* | *"a POSA would understand the term to include a small molecule N-heteroaryl compound containing (a) a nitrogen in the N-heteroaryl ring system that makes a hydrogen bond with the Met769 or its equivalent in the hinge region, (b) an aryl or heteroaryl group residing in the lipophilic region, and (c) a Michael acceptor, particularly acrylamide-based, which can access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2), in the ligand binding pocket of the intracellular kinase domain"* |

34.     In proposing a structural, rather than functional, definition, Dr. Jorgensen among other things improperly narrows the irreversible EGFR inhibitors encompassed by the asserted claims to "small molecules." *See, e.g.*, Jorgensen Rebuttal, ¶ 104. Dr. Jorgensen reasons that the POSA "would know the specified cysteine residues (*i.e.*, Cys773 and Cys805) are within the *intracellular* kinase domain (*i.e.*, the tyrosine kinase domain) of EGFR" and "only small molecule compounds could enter the cell and access the intracellular tyrosine kinase domain to bind with the designated cysteine residues." *Id*; *see also id.*, ¶ 57 ("It was clear from this crystal

---

[1] I understand from counsel for AstraZeneca that there is a typographical error in the Court's Claim Construction Opinion, and "structurally rather than functionally" on page 16 should read instead: "functionally rather than structurally."

structure that the ligand binding site could accommodate only certain types of small molecule compounds, and that "larger" compounds cannot access and simply won't fit in the binding pocket of the EGFR kinase domain."). As discussed further below in Section IX.iv, Dr. Jorgensen is incorrect that the irreversible EGFR inhibitors encompassed by the asserted claims must be limited to small molecules because "only small molecule compounds could enter the cell."  (Moreover, even were Dr. Jorgensen correct that as of 2005 or 2006 only small molecules could enter the cell, this would confirm the patent's express intent to claim beyond what the specification enables or conveys possession of and instead to capture future innovation.  As I have been informed, a patent claim to a perpetual motion machine is invalid because not enabled even though such machines are impossible.)

35.     As I explained in my Opening Report, the shared specification of the patents-in-suit specifically defines the compounds encompassed by the claims to include "a larger compound, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNA-zymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof." '314 patent, 13:3–13; *see, e.g.*, Reider Opening, Section XII.A.1.

36.     Dr. Jorgensen improperly dismisses the plain definition provided in the specification, stating instead that "a POSA would understand that such "larger" compounds may be administered in combination with a small molecule irreversible EGFR inhibitor. A POSA would not have considered the irreversible EGFR inhibitor to be the larger compound." Jorgensen Rebuttal, ¶104. That is a clear misreading of the patents-in-suit, which both make clear that the irreversible EGFR inhibitor "may be any compound which binds to cysteine 773 of EGFR (SEQ ID NO: 1)" and that "[t]he term 'drug' or *'compound' as used herein refers to a*

10

*chemical entity or biological product, or combination of chemical entities or biological products*, administered to a person to treat or prevent or control a disease or condition." '314 patent, 3:57–59, 13:3–6 (emphasis added).  This makes clear the intent of the patents-in-suit to claim the use not just of irreversible EGFR inhibitors that are small molecules but those that are "biologic products" as well.  Indeed, this point is reinforced in the next sentence of the specification: "The chemical entity or biological product *is preferably, but not necessarily a low molecular weight compound, but may also be a larger compound*, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNAzymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof."  *Id*., 13:7–13 (emphasis added). Dr. Jorgensen's assertion that the specification describes the use of larger compounds only in connection with combination therapy is not a correct reading of the specification. *See* Jorgensen Rebuttal, ¶ 104.

37.    Dr. Jorgensen acknowledges that the asserted claims are not enabled to their full scope as defined in the specification (including larger compounds), to the extent he admits that the specification does not teach "larger" irreversible EGFR inhibitors, and that the POSA would have had no knowledge of such inhibitors. *See* Jorgensen Rebuttal, ¶ 104 ("As I understand it, the literature on covalent enzyme inhibitors at the time of the invention concerned only small-molecule inhibitors bearing small electrophilic warheads. To this day, I am not aware of consideration of covalent inhibitors that is not based on small molecules.").

### C.  The Requirement of *In Vivo* Activity and Clinical Utility for the Irreversible EGFR Inhibitors of the Asserted Claims

38.    Dr. Jorgensen insists that determining *in vivo* activity and/or clinical utility of the irreversible EGFR inhibitors encompassed by the asserted claims is "irrelevant towards predicting whether a given EGFR TKI would provide irreversible inhibition." Jorgensen

11

Rebuttal, ¶139. Dr. Jorgensen also asserts that properties such as selectivity, cell permeability, bioavailability, pharmacokinetic properties, and nontoxicity are not required by the asserted method of treatment claims. *Id.*, ¶ 140; *see also id.*, ¶ 165 ("once again, Dr. Reider is attempting to incorrectly incorporate clinical efficacy as a claim limitation.  As I have already explained, clinical trial efficacy, which is solely focused on FDA approval, is not a  limitation of the Asserted Claims and is irrelevant to the enablement inquiry."); *see also id.*, ¶ 212 ("Toxicity is not even a limitation of the Asserted Claims."). Dr. Jorgensen is incorrect.

39.      First, it is absurd to suggest that the asserted claims, which claim methods of treating NSCLC ***in a patient***, are disconnected from *in vivo* activity or clinical utility.  I understand that the Court construed the preamble of all the asserted claims to require the claimed methods to be carried out with the intentional purpose of treating gefitinib and/or erlotinib resistant NSCLC (or that with the T790M mutation in SEQ ID NO:1) in a patient.  Claim Construction Order (Exhibit N), 5–7.  Dr. Jorgensen fails to explain how a clinician would carry out the claimed method with the intentional purpose of treating such a patient if he or she were administering a compound that had no *in vivo* activity and/or clinical utility.  Administration of a compound that was inactive *in vivo*, lacked clinical utility, or had an unacceptable toxicity profile would not be consistent with the intentional purpose of treating the patient.  I understand that the Court's Claim Construction Order indicates that the intentional purpose set forth in the preamble should be given its plain and ordinary meaning (*see id.*, 10). Dr. Jorgensen's contention that the asserted claims encompass the intentional administration of a compound that has no *in vivo* activity, lacked clinical utility, and/or has an unacceptable toxicity profile is not consistent with the plain and ordinary meaning of the preamble.

40.     Second, Dr. Jorgensen ignores the requirement of all the asserted claims that the irreversible inhibitor be administered in a unit dosage, which requires administration of "a predetermined quantity of active material calculated to produce the desired therapeutic effect." *See, e.g.*, '162 patent, 9:37–42. Dr. Jorgensen does not acknowledge this requirement in his report, let alone explain how an inhibitor that lacks *in vivo* activity, clinical utility, or has an unacceptable toxicity profile could be administered in a "predetermined quantity" that is "calculated to produce the desired therapeutic effect." *Id.*

41.     Even Dr. Hausheer acknowledges that the claim term "unit dose" is defined to include a "therapeutic effect." Dr. Hausheer opines (wrongly) that the POSA would understand this term to mean only "irreversible inhibition of EGFR to address gefitinib and/or erlotinib resistance **in patients** having gefitinib and/or erlotinib resistant NSCLC." Hausheer Rebuttal, ¶¶ 715, 716.  I do not agree that a POSA would understand "the desired therapeutic effect" in administering a drug to treat a NSCLC patient to be irreversible inhibition of EGFR.  Irreversible inhibition is a mechanism of action, not a therapeutic effect observable in a patient.  In any event, even Dr. Hausheer's definition of unit dose as requiring "irreversible inhibition of EGFR to address gefitinib and/or erlotinib resistance in patients having gefitinib and/or erlotinib resistant NSCLC" requires *in vivo* activity, clinical utility, and lack of toxicity—since irreversible EGFR inhibition to address gefitinib and/or erlotinib resistance **in a patient** with resistant NSCLC requires the drug to act on the NSCLC in the patient.  Similarly, Dr. Hausheer's definition requires the irreversible EGFR inhibitor to have adequate solubility, bioavailability, cell permeability, and metabolic properties, since an irreversible EGFR inhibitor cannot inhibit EGFR and address gefitinib and/or erlotinib resistance in a patient if the drug does not get into the NSCLC cells in sufficient concentration to irreversibly inhibit the EGFR (which Dr.

Jorgensen asserts must occur in the intracellular portion of the enzyme) and address gefitinib and/or erlotinib resistance.  Dr. Jorgensen's failure to address these requirements renders his opinions irrelevant to the proper enablement and written description analysis even under Dr. Hausheer's definition of the "unit dosage" to be administered.

42.     Dr. Hausheer also asserts that the specification "teaches a POSA the unit dose of the irreversible inhibitors to be used in the claimed methods," pointing to the specification's statements that the "total daily dosage is projected to be from about 1 to 1000 mg, preferably from about 2 to 500 mg...." *Id.*, ¶ 717. Dr. Hausheer, however, is incorrect because an inhibitor that lacks *in vivo* activity, clinical utility, or has an unacceptable toxicity profile cannot be calculated to produce the desired therapeutic effect in any amount, let alone an amount between 1 to 1000 mg.  More to the point, Dr. Hausheer is incorrect that an irreversible EGFR inhibitor can be administered in such a broad range; the therapeutic window of most EGFR inhibitors are much narrower (if such a window exists at all).  As discussed in my Opening Report, finding a predetermined amount calculated to produce the desired therapeutic effect is very challenging. In fact, therapeutic windows for HKI-272, EKB-569, and HKI-357 for use within the claims have still not been established to this day. *See, e.g.*, Reider Opening, Section XII.A.2.a).

43.     Third, Dr. Jorgensen himself asserts that, to meet the requirement of the claims, the irreversible EGFR inhibitor must enter the cell in order to form a covalent bond with the kinase domain of the enzyme.  *E.g.*, Jorgensen ¶ 104 ("A POSA would know that such 'larger' compounds would not be able to enter the cell and access the intracellular tyrosine kinase domain to bind with the designated cysteine residues.").  But the ability to enter the cell and access the intracellular domain of EGFR will depend, among other things, on various

considerations including cell permeability that Dr. Jorgensen erroneously dismisses as irrelevant (*see id.*, ¶140) and fails to address in his enablement and written description opinions.

44.     Fourth, while Dr. Jorgensen similarly dismisses the selectivity of an irreversible EGFR inhibitor as irrelevant, he then opines that the POSA would reject most alkylating substituent options for the irreversible EGFR inhibitor because many were "well known to be highly reactive and unselective" and hence a POSA would not consider them "viable options." Jorgensen Rebuttal, ¶ 219.  I agree with Dr. Jorgensen that an irreversible EGFR inhibitor that was insufficiently selective for EGFR (that is, that also too potently inhibited other enzymes or alkylated other important biological molecules present in the body) would not be viewed by a POSA as a "viable option" for carrying out the claimed methods of treatment, among other reasons because no predetermined amount of such an inhibitor would be "calculated to produce the desired therapeutic effect," as required by the asserted claims.  Dr. Jorgensen fails to address the issue of selectivity in his enablement or written description opinions.

## VIII.   PRIORITY DATE

### A.  The Asserted Claims Are Not Entitled to a Priority Date of February 3, 2005

45.     The asserted claims of the '162 and '314 patents are not entitled to a priority date of February 3, 2005 (the filing date of the '483 provisional) because the '483 provisional does not disclose (i) the T790M mutation, (ii) NSCLC with a T790M mutation, (iii) gefitinib and or erlotinib resistant NSCLC with a T790M mutation, or (iv) irreversible EGFR inhibitors as a treatment for gefitinib and/or erlotinib resistant NSCLC with a T790M mutation.

46.     Dr. Hausheer opines that the '483 provisional discloses NSCLC having the T790M mutation because it states that "[m]echanisms underlying acquired drug resistance . . . . by analogy with the bcr-abl inhibitor imatinib (gleevec) . . . could involve additional mutations in the kinase domain that suppress drug binding." Hausheer Rebuttal Report

15

¶ 95 (citing '483 provisional, ¶ 64). I disagree that the '483 provisional's discussion of imatinib demonstrates that the '483 provisional describes or enables treatment of gefitinib and/or erlotinib resistance with the T790M mutation.

47.    First, the '483 provisional does not analogize *treatment* of gefitinib and/or erlotinib resistant NSCLC with treatment of resistant CML with the BCR-ABL inhibitor. The long paragraph discussing imatinib does not discuss *treatment* of resistant CML, but rather discusses possible mechanisms of resistance. '483 provisional, [0064].

48.    The '483 provisional goes on to **distinguish** mechanisms of gefitinib and/or erlotinib resistant NSCLC to mechanisms of resistance to the bcr-abl inhibitor imatinib. The application notes that "[m]echanisms underlying drug resistance are unknown." *Id.* After speculating that gefitinib and/or erlotinib resistance "**could** involve additional mutations in the kinase domain that suppress drug binding," the '483 provisional states that tumor DNA from a relapsed gefitinib responder had "no secondary mutations in the gene." *Id; see also id.* [0066] ("None of the 40 drug resistant clones contained a secondary EGFR mutation . . . ."); '483 provisional, [0068]. The provisional ultimately concludes that "alternative mechanisms underlie gefitinib resistance." *Id.*; *see also id.* [0069] ("[R]esistance to gefitinib emerges rapidly *in vitro* and is associated with altered receptor trafficking, which may reduce drug binding.").

49.    As I discussed in my Opening Report, the '483 provisional also discloses only *in vitro* data and, in particular, *in vitro* data on the effects of irreversible inhibitors in NSCLC *without* a secondary mutation. '483 provisional, [0066], [0068].

50.    The POSA in 2005 would not understand the applicants to be in possession of a method of treating patients with gefitinib and/or erlotinib resistant NSCLC having the T790M mutation in view of this paragraph.

████████████████████████████████████████████████

51.     Dr. Hausheer also opines that as of February 2005 it was "known in the art that a mutation at position 790 of the EGFR protein, known as the T790M mutation, confers resistance to reversible tyrosine kinase inhibitors." Hausheer Rebuttal Report ¶ 95. Dr. Hausheer's assertion is inconsistent with the applicants' own correspondence, which shows that the applicants did not recognize the T790M mutation as conferring resistance at that time. *Se*e Dec. 20, 2004 Email from D. Bell re: EGFR in NCIH1975 ("T790M may not be associated with Iressa resistance . . . .") (INV-00001559); Dec. 6, 2004 Email from D. Bell re: Preliminary EGFR result ("To clarify, we cannot currently exclude the possibility that the T790M mutation may be associated with Iressa response.") (INV-00000173–79 at 173); R. Sordella, *Gefitinib-Sensitizing EGFR Mutations in Lung Cancer Activate Anti-Apoptotic Pathways*, 305 Science 1163 (2004) (identifying the H1975 cell line as gefitinib sensitive); Feb. 11 2005 Email from T. Lynch re: Confidential Political Gossip (INV-00000705) ("The DFCI will be publishing a paper in the NEJM in 2 weeks describing a resistance mutation that they found in a patient who progressed on iressa . . . . they have found that the Wyeth compound worked particularly well in this setting."); Feb. 24, 2005 Email from J. Settleman re: collaboration (INV-00000726–31) ("[Investigators at Beth Israel, together with the Dana Farber group] describe a commercially available drug CL-387,785 as an irreversible EGFR inhibitor, which is effective in suppressing signaling from sensitized EGFR mutants that harbor a secondary mutation at codon 790 making them resistant to Iressa."); Rabindran Dep. Tr. 188:8–189:7, Exhibit 8.

52.     Dr. Hausheer further opines that the claims of the '483 application enable the treatment of gefitinib and/or erlotinib resistant NSCLC because they provide "working examples demonstrating that resistant human cell lines were sensitive to the irreversible EGFR inhibitors HKI-357 and EKB-569 . . . . [A] POSA would understand that similar results would be seen

upon treatment of a patient with gefitinib and/or erlotinib resistant NSCLC having the T790M mutation with irreversible EGFR inhibitors, and it would not require undue experimentation for a POSA to practice the T790M Embodiment." Hausheer Rebuttal Report ¶ 201.

53.     Dr. Hausheer provides no support for his suggestion that *in vitro* testing of two irreversible EGFR inhibitors in resistant cells without the T790M mutation would suggest to the POSA that irreversible EGFR inhibitors would also inhibit *in vitro* resistant cells *with* the T790M mutation. As the applicants themselves recognized, "[u]nderstanding the mechanism by which previously sensitive tumors become resistant is essential to designing clinical strategies to convert short-terms responses into durable remissions." INV-00000089. For example, the T790M mutation confers resistance to gefitinib and /or erlotinib by restoring ATP's affinity for EGFR. *See* Reider Reb. ¶ 82; C. Yun et al., *The T790M mutation in EGFR kinase causes drug resistance by increasing the affinity for ATP*, 105 PNAS 2070 (2008) . I disagree that the POSA in 2005 could conclude from the testing in the '483 provisional that irreversible EGFR inhibitors would be effective in NSCLC having the T790M mutation.

54.     Moreover, Dr. Hausheer cites nothing to support his assertion that *in vitro* testing of irreversible EGFR inhibitors in resistant cells without the T790M mutation would enable and show possession of the use of irreversible EGFR inhibitors to treat patients with gefitinib and/or erlotinib resistant NSCLC having the T790M mutation with an irreversible EGFR inhibitor.  In fact, during prosecution of the Asserted Claims, the applicants distinguished the Asserted Claims from the prior art by arguing that *in vitro* data is not sufficient to show therapeutic effect.  *See, e.g.*, 314 Patent Prosecution History, Feb. 27, 2014 Amendment and Response, at 6 (PUMAWYETH-TAG00012886) ("Kobayashi does not teach or suggest a method of treating cancer in a patient with a cancer having a T790M mutation in EGFR . . . [r]ather, Kobayashi

18

██████████████████████████

relates to laboratory work performed in an attempt to elucidate the mechanisms of secondary drug resistance."); *see also* '314 Patent Prosecution History, February 27, 2014 Response to Office at 7 (PUMAWYETH-TAG00001046-54); '162 Patent Prosecution History, November 14, 2016 Amendment and Response to Office Action at 6 (PUMAWYETH-TAG00010990-96).

55.     Additionally, for the reasons discussed in my Opening Report, I disagree that the examples in the '483 provisional application discloses "working examples." *See* Reider Op. §§ XII.A.5, C.5.

56.     The '483 provisional's discussion of *in vitro* testing of just two structurally similar irreversible inhibitors does not enable the use of irreversible EGFR inhibitors generally to treat gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. In particular, the '483 provisional provides no guidance or examples of mutant-selective irreversible EGFR inhibitors capable of treating patients with the T790M mutation. *See* Reider Op. §§ XII.A.5.c, C.5.c. Developing such inhibitors would have required undue experimentation. *See* Reider Op. §§ XII.A.6, C.6.

57.     Dr. Hausheer opines that "wherein the irreversible inhibitor is not CL-387,785" as required by Claim 1 of the '162 Patent is adequately disclosed in the '483 Provisional. It is not. The basis for Dr. Hausheer's opinion is that "CL-387,785 does not have the structural features that are common to the irreversible inhibitors that are suitable for use in the claimed method of treating," and "[a]ccordingly, the '483 Provisional discloses and enables this limitation." Hausheer Rebuttal Report at ¶ 169. But Claim 1 of the '162 Patent does not have any structural limitations, as determined by the Court's claim construction.

58.     In addition, nothing in the specification of the '162 Patent provides the necessary support for this limitation. *See*, *infra* Section X.C. The '483 Provisional discloses even less

information.  The '483 Provisional discloses only two irreversible EGFR inhibitors (EKB-569 and HKI-357) and does not describe a class of compounds or structural features that includes those two compounds but **excludes** CL-387,785.  In fact, CL-387,785 was a predecessor compound to EKB-569 and HKI-357EKB-569. INV00000726 (CL-387785 aka EKI-785 is an earlier compound from which EKB, and the HKIs were derived.").  It is inconsistent for Dr. Hausheer to suggest that the disclosures include support for excluding CL-387,785 while including all other irreversible EGFR inhibitors.

59.     With respect to the remaining limitations of the asserted claims, I disagree that the '483 provisional describes or enables the claimed invention for the same reasons I disagree that the patents-in-suit adequately describe and enable the claimed invention. In addition, the Asserted Claims are not entitled to a Priority Date of February 3, 2005 for the same reasons that the claims are not entitled to a priority date of April 15, 2005, discussed in the next section.

**B.  The Asserted Claims Are Not Entitled to a Priority Date of April 15, 2005**

60.     The asserted claims are also not entitled to a priority date of April 15, 2005 (the filing date of the '989 provisional) at least because the '989 provisional does not (1) describe or enable treatment of patients prior to treatment with gefitinib and/or erlotinib or (2) describe daily administration of irreversible EGFR inhibitors.

61.     With respect to the remaining limitations of the asserted claims, I disagree that the '989 provisional describes or enables the claimed invention for the same reasons I disagree that the patents-in-suit adequately describe and enable the claimed invention.

1.The '483 and '989 provisionals do not describe or enable a method of treating gefitinb and/or erlotinib resistant NSCLC.

62.     Dr. Hausheer contends that the '483 provisional discloses treatment of patients with gefitinib and/or erlotinib prior to treatment with gefitinib and/or erlotinib because it (i)

mentions that patients may not respond to EGFR-TKIs to any measurable degree (Hausheer Reb. ¶ 88) and (ii) through its discussion of imatinib, because "[a]s of February 2005, it was known that BCR-ABL kinase mutations can occur prior to treatment with imatinib," (Hausheer Reb. ¶ 89–90).

63.     As I explained in my Opening Report, although the '483 provisional states that patients may not respond to EGFR-TKIs at all, it does not provide any examples of patients having primary resistance or any examples of treating patients having primary resistance. *See* Reider Op. ¶ 231. The '483 provisional provides one example that describes cells from relapsed gefitinib responders. '483 provisional, [0064].

64.     Moreover, for the reasons I provided in Section VII.A above, the '483 provisional's discussion of imatinib does not describe or enable treatment of patients with gefitinib and/or erlotinib resistant NSCLC. The lone sentence referring to BCR-ABL kinase inhibition makes no reference to primary resistance. '483 provisional, [0064]. Even if it were known in the art that BCR-ABL kinase mutations can occur prior to treatment with imatinib,[2] the '483 provisional does not describe *treatment* of any such patients. '483 provisional, [0064]. And, as I described above, the '483 provisional distinguishes mechanisms of resistance in the BCR-ABL kinase to gefitinib and/or erlotinib resistant NSCLC. *See, e.g.*, ¶ [47-49].

65.     As to the '989 publication, Dr. Hausheer relies primarily on Figure 9, which he opines "demonstrates gefitinib and/or erlotinib resistance in an NSCLC patient having the T790M mutation." Hausheer Reb. ¶ 134. But the '989 publication does not associate T790M in pretreated patients with "gefitinib and/or erlotinib resistant NSCLC." Rather, the applicants

---

[2] Dr. Hausheer relies on Shah 2002 for his conclusion that it was known in February 2005 that BCR-ABL mutations can occur prior to treatment with imatinib. I note that Shah 2002 is not cited in the '483 provisional.

repeatedly refer to the T790M mutation as a mechanism of *acquired* resistance. '989 provisional at 25 (stating that T790M is found in "some recurrent tumors"); id. at 27 (explaining that the T790M mutation appears to contribute to "acquired resistance" and describing T790M as an "acquired mutation"). Thus Example 9's testing in the H1975 cell line does not describe or enable treatment of patients with primary resistance. Moreover, neither the '483 nor the '989 provisionals include any examples of treatment of patients with primary resistance.

> 2.   The '483 and '989 provisionals do not disclose daily administration of irreversible EGFR inhibitors.

66.   Dr. Hausheer opines that the '483 and '989 provisionals disclose "daily" administration of irreversible EGFR inhibitors according to the claimed method because the provisionals discuss daily administration of gefitinib and/or erlotinib and compare gefitinib and erlotinib to irreversible EGFR inhibitors. *See* Hausheer Reb. ¶¶ 102, 105. Gefitinib and erlotinib are reversible inhibitors. Thus, the discussion of daily administration of gefitinib or erlotinib does not describe daily administration of irreversible EGFR inhibitors.

67.   Dr. Hausheer also relies on publications referenced in the '483 and '989 provisionals discussing studies of EKB-569 and HKI-272 and concludes that these references "reflect the knowledge of a POSA regarding these inhibitors and support the teachings of the Patents-in-Suit to use irreversible inhibitors in dose ranges similar to the conventional daily dosing of gefitinib and/or erlotinib." *See* Hausheer Reb. ¶ 103. Dr. Hausheer cites two publications—Tejpar 2004 and Greenberger 2000—both of which discuss the same irreversible EGFR inhibitor, EKB-569. Dr. Hausheer also cites Rabindran 2004, which discloses only *in vitro* data relating to HKI-272. I disagree that these publications reflect the POSA's knowledge that all irreversible EGFR inhibitors falling within the claims are to be administered with daily

dosing.[3] In addition, Dr. Hausheer's suggestion that daily dosing is within "the knowledge of a

POSA" (¶ 103) is inconsistent with the position the applicants took during prosecution of the

Asserted Claims.  During prosecution, the applicants added the limitation for "daily"

administration to the claimed method to distinguish the teachings of the prior art.  *See* '314

Patent Prosecution History, August 14, 2019 Amendment, claim 29 (PUMAWYETH-

TAG00028426); '162 Patent Prosecution History, May 7, 2019 Amendment, claim 23

(PUMAWYETH00030344).  Dr. Hausheer does not dispute that the provisional applications fail

to describe expressly daily administration of irreversible inhibitors, and applicants' assertion to

the Patent Examiner contradicts Dr. Hausheer's assertion that a POSA would assume daily

administration from his or her knowledge of the prior art.

68.     Dr. Hausheer similarly opines that the POSA would "understand the rationale

behind daily administration of TKIs." *See* Hausheer Reb. ¶ 105. This too fails to demonstrate that

the '483 and '989 provisionals describe daily administration. Moreover, as I explained in my

Opening Report, the POSA would have understood that covalent inhibitors presented significant

toxicity concerns due to their mechanism of action and therefore patients may not be able to

tolerate daily doses. Indeed, episodic dosing was customary for other cytotoxic agents to balance

toxicity and efficacy. See Reider Op. ¶ 239. Dr. Hausheer states that it is "irrelevant" that the

POSA would have understood a variety of dosing schedules were available, but fails to address

the concerns the POSA would have had with daily dosing. See Hausheer Reb. ¶ 106.

69.     Dr. Hausheer also points to "differences seen between gefitinib and irreversible

inhibitors in experiments testing the resistant cell lines," (¶ 105) but this opinion is nonsensical.

---

[3] To the extent Dr. Hausheer is correct that the POSA in 2005 would understand that irreversible
EGFR inhibitors are to be dosed in daily dosages, his opinion further demonstrates that the
asserted claims were anticipated and obvious.

23

*In vitro* testing in cell lines does not equate to daily dosing. In addition, Dr. Hausheer does not explain how "altered EGFR turnover" or "a significant increase in EGFR internalization" could equate to daily dosing. *See* Hausheer Reb. ¶ 105. I see no reason why that would be the case.

### C. The Applicants Did Not "Conceive" of the Asserted Claims by December 2, 2004.

70.    Dr. Hausheer opines that the applicants conceived of the Asserted Claims of the '314 Patent by June 8, 2004. Hausheer Rebuttal ¶ 227. In addition, Dr. Hausheer opines that the applicants conceived of claim 1 of the '162 Patent by December 2, 2004. I disagree with Dr. Hausheer's opinions. Based on my review of the materials cited by Dr. Hausheer, the patent specification, and the materials cited in my report, it is my opinion that the applicants cannot establish an earlier date of conception for any of the Asserted Claims. I note that the only dates that Dr. Hausheer identifies in his report as the alleged dates of conception are June 8, 2004 and December 2, 2004. To the extent that Dr. Hausheer points to any other alleged date of conception, I reserve the right to respond.

71.    As an initial matter, Dr. Hausheer concedes that the alleged inventors did not conceive of the idea "to determine if the T790M confers resistance to gefitinib and/or erlotinib is NSCLC patients" until December 2, 2004. Hausheer Rebuttal ¶ 244. Dr. Hausheer admits that the applicants could not have conceived of treating gefitinib and/or erlotinib resistant NSCLC with a T790M mutation any earlier than December 2, 2004. At the same time, Dr. Hausheer alleges that the Asserted Claims of the '314 Patent cover only two embodiments, one of which is treatment of patients with T790M. Regardless of whether Dr. Hausheer's opinion as to the scope of the '314 Patent are correct, the applicants cannot have conceived of the subject matter of the Asserted Claims of the '314 Patent before December 2, 2004 when (at best) the applicants first considered evaluating T790M. Because the applicants had no idea to treat NSCLC patients with

T790M before December 2, 2004, any earlier alleged date of conception for either patent is unsupported.

72.    In support of his assertion that the applicants conceived of claim 1 of the '162 Patent by December 2, 2004, Dr. Hausheer cites a number of communications among some of the applicants.  These documents do not support a conception date of December 2, 2004.  Instead, the documents reflect that in some tumor samples received from a patient, Dr. Bell, one of the applicants, identified the presence of T790M.  However, the applicants did not understand the import of T790M, stating just a few days later that "we cannot exclude the possibility that the T790M mutation may be associated with Iressa response."  INV00000173.

73.    Dr. Hausheer himself describes the December 2 email as  "proposed next steps" to see if T790M confers resistance.  Hausheer Rebuttal ¶ 243 (citing various documents).    This is far from an established and permanent idea of the claimed methods.  And in fact, as discussed in my Opening Report, additional documents from the applicants demonstrate that the applicants misunderstood the role of T790M and believed that it "may be associated with Iressa response" (December 6, 2004, email; INV-00000173), "may not be associated with Iressa resistance in this [the double mutant] context" (December 20, 2004 email, INV-00001559), or was "a variant we don't understand" (January 19, 2005, email, INV-00000627).  *See* Opening Report ¶¶ 225–227.

74.    In addition to not recognizing the role of T790M as of December 2004, the applicants were far from a complete and permanent idea of a method of treating patients with gefitinib and/or erlotinib resistant NSCLC with an irreversible EGFR inhibitor.  Dr. Hausheer points to no evidence that the applicants had conceived of administering any irreversible EGFR inhibitor to a patient having gefitinib and/or erlotinib resistant NSCLC with a T790M mutation.  Nor are there any discussions of a proposal to so administer an irreversible EGFR inhibitor as of

25

December 2004.  Instead, as discussed above, the named inventors were uncertain of the significance of the T790M mutation then and, even in January 2005, did not suggest administering an irreversible EGFR inhibitor to a patient identified as having the T790M mutation.

75.     It was not until the applicants learned of the work done by others on T790M that the applicants added T790M to the '989 provisional application.  *See* Opening Report ¶¶ 225–227.

76.     I note that nowhere in the documents cited by Dr. Hausheer did the applicants have a permanent and concrete idea to administer a broad class of irreversible EGFR inhibitors to patients with gefitinib and/or erlotinib resistant NSCLC (with or without a T790M mutation). At most, the inventors evaluated the embodiments in the specification—HKI-272, HKI-357, and EKB-569—in specific cell lines.  But the applicants did not conceive of an idea to use any irreversible EGFR inhibitor to treat any gefitinib and/or erlotinib resistant NSCLC.  Dr. Hausheer does not cite to any evidence to suggest that they did.

77.     In addition, Dr. Jorgensen opines that the irreversible EGFR inhibitors of the claimed methods are limited to small molecule irreversible EGFR inhibitors with what he calls "key structural requirements."  (Jorgensen ¶ 60, 138, 182).  I disagree with Dr. Jorgensen's opinion.  *See*, *e.g.*, Section IX.A below.  If Dr. Jorgensen is correct (he is not), Dr. Hausheer has cited no evidence to suggest that the applicants had a concrete and permanent idea that inhibitors with Dr. Jorgensen's "key structural requirements" could be used to treat gefitinib and/or erlotinib resistant NSCLC (with or without a T790M mutation).  Indeed, the documents cited by Dr. Hausheer indicate that the work done by the applicants was limited to just three compounds—HKI-272, HKI-357, and EKB-569.

26

██████████████████████████████████████████████████

78.     To the extent that Dr. Hausheer opines that the applicants conceived of the Asserted Claims before December 2004, despite acknowledging that the applicants were not even aware of T790M until December 2004, I disagree.  The documents and materials that Dr. Hausheer cites cannot establish an earlier date of conception.

79.     For example, Dr. Hausheer cites a V Foundation proposal, Hausheer Rebuttal ¶ 226, to support a conception date of June 8, 2004.  First, the proposal appears to relate to work with the V Foundation, not Wyeth.  Second, the document recognizes a **suggestion** that there is "acquired drug-resistance" after response to gefitinib.  The document goes on to propose "aims" to investigate gefitinib resistance.  INV0000089 (Clinical Support Agreement).  The document recognizes that the mechanism for any resistance is unknown.  INV0000089-90.  The document states that "the findings will have important implications for clinical treatment."  INV0000090. The document does not mention what could be used for treatment, let alone mention irreversible EGFR inhibitors.  At best, the document reflects a proposal for investigation of acquired gefitinib resistance.  It does not convey a fixed idea of the claimed methods of treatment.

80.     Dr. Hausheer also cites an agreement between MGH and Wyeth on June 9, 2004. This agreement reflects that the applicants had not conceived of the subject matter of the asserted claims. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

████████████████████.  Simply, the agreement does not support an earlier date of conception.

81.     Dr. Hausheer also cites to various documents spanning June 2004 until December 2004.  Hausheer Rebuttal ¶¶ 227–242.  These documents do not demonstrate conception of any of the Asserted Claims.  In fact, as discussed above and in my Opening Report, ¶¶ 225–227, the correspondence amongst the inventors, including those after December 2004, demonstrate that the inventors had not conceived of the subject matter of the Asserted Claims and, instead, understood T790M to confer sensitivity, not resistance.

82.     The materials cited by Dr. Hausheer do not change my opinion that the applicants did not conceive of the subject matter of the asserted claims prior to the filing of the '717 PCT.

83.     In addition, as discussed above, the applicants cannot establish that they are entitled to priority of either February 3, 2005 or April 15, 2005 for the Asserted Claims because neither the '483 provisional nor the '989 provisional provide support for all limitations of the Asserted Claims.  For the same reasons, the applicants cannot rely on the provisional applications to establish constructive reduction to practice.

## IX. THE ASSERTED CLAIMS ARE NOT ENABLED

84.     As I explained in my Opening Report, the asserted claims are not enabled because the POSA would not have been able to make and use the full scope of the claimed methods for treating gefitinib and/or erlotinib resistant NSCLC that are recited in the asserted claims.  *See* Reider Opening, Section XII. The number of compounds that potentially function as irreversible EGFR inhibitors and covalently bind to the designated cysteine residues is vast and essentially limitless. *See id.* The task of determining which of those candidates function as required by the asserted claims—that is, that irreversibly inhibit EGFR and covalently bind to the designated cysteine residue—as well as the further required task of determining for any particular candidate

the dose calculated to achieve the desired therapeutic effect are highly challenging, unpredictable, and highly burdensome. *See id.* By contrast, the shared specification of the patents-in-suit provides extremely limited guidance, as it describes only three compounds for carrying out the asserted claims, all having similar structure, no working example of the treatment of a patient having gefitinib and/or erlotinib resistant NSCLC is provided, and no guidance is given as to how to determine a unit dose of any irreversible EGFR inhibitor. *See id.*

85.     In his rebuttal report, Dr. Jorgensen opines that "the patent specification has sufficient disclosure to enable a POSA to make and use irreversible EGFR TKIs and recognize known or new ones that would bind with the designated cysteine residue in the EGFR kinase domain and provide irreversible inhibition...." Jorgensen Rebuttal, ¶ 101. Relying in part on Dr. Jorgensen, Dr. Hausheer opines that the POSA "would be able to make and use the full scope of the claimed invention by following the teachings described in the specification using routine techniques well-known in the art." Hausheer Rebuttal, ¶ 708. Specifically, Dr. Hausheer relies on Dr. Jorgensen's opinions regarding "the EGFR inhibitors that are suitable for use in the claimed methods of treating." *Id.*, ¶ 712. Dr. Hausheer additionally opines that the shared specification of the patents-in-suit "teaches a POSA the unit dose of the irreversible inhibitors to be used in the claimed methods" to the extent that it discloses a particular dose range. *Id.*, ¶ 717. Dr. Hausheer also opines that the shared specification teaches "the types of resistant patients to which the claimed methods are directed." *Id.*, ¶ 732.

86.     I have considered the enablement arguments set forth in both Dr. Jorgensen's and Dr. Hausheer's Rebuttal Reports. For the reasons discussed below, as well as in my Opening Report, I disagree 1) with Dr. Jorgensen's conclusion that the POSA would have been able to make and use the irreversible EGFR inhibitors encompassed by the asserted claims, and 2) with

29

Dr. Hausheer's conclusion that the asserted claims are enabled. I maintain my opinions provided in my Opening Report that the asserted claims are **_not_** enabled.

### A. Dr. Jorgensen's Definition for the Irreversible EGFR Inhibitors Encompassed by the Asserted Claims Is Erroneous and Contrary to the Court's Construction

87. As discussed above in Section VIII.B, the Court specifically construed the irreversible EGFR inhibitor claim term as it appears in the '314 and '162 patents-in-suit as "[a] compound that irreversibly inhibits EGFR and covalently binds to" the designated cysteine residues. Claim Construction Order, p. 14. Despite acknowledging that the irreversible EGFR inhibitor claim term has been "defined by the Court primarily in terms of its function" (Jorgensen Rebuttal, ¶ 106) Dr. Jorgensen nevertheless reads structure into the claims by defining the genus of irreversible EGFR inhibitors encompassed by the asserted claims to include compounds having "certain common structural features that perform the function of covalent binding with the designated cysteine residue...." *Id*. Specifically, Dr. Jorgensen states that "a POSA would understand the term to include a small molecule N-heteroaryl compound containing (a) a nitrogen in the N-heteroaryl ring system that makes a hydrogen bond with the Met769 or its equivalent in the hinge region, (b) an aryl or heteroaryl group residing in the lipophilic region, and (c) a Michael acceptor, particularly acrylamide-based, which can access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2), in the ligand-binding pocket of the intracellular kinase domain." *Id.*, ¶ 47.

88. To arrive at his structural definition for the irreversible EGFR inhibitors encompassed by the asserted claims, Dr. Jorgensen relies on a single crystal structure for the reversible EGFR inhibitor erlotinib bound to the kinase domain of wild-type ("WT") epidermal growth factor receptor ("EGFR"). *See, e.g.*, Jorgensen Rebuttal, ¶¶ 57–59; J. Stamos et al., *Structure of the Epidermal Growth Factor Receptor Kinase Domain Alone and in Complex with*

*a 4-Anilinoquinazoline Inhibitor*, 277(48) Journal of Biological Chemistry 46265 (2002) ("Stamos 2002") (reporting crystal structure for erlotinib bound to WT-EGFR). Despite the fact that the asserted claims are directed to ***irreversible*** EGFR inhibitors for resistant NSCLC, which I understand includes EGFR ***having a T790M mutation***, Dr. Jorgensen extends the erlotinib/WT-EGFR crystal structure to dictate the "common structural features" of the compounds encompassed by the asserted claims. Jorgensen Rebuttal, ¶ 106; *see, e.g.*, *id.*, ¶¶ 57–60. Dr. Jorgensen also limits the compounds encompassed by the asserted claims to "small molecules" on the basis that larger compounds would be unable to enter a cell, despite express language to the contrary in the patents themselves. *See, e.g.*, *id.*, ¶ 57; Section VIII.B. For the reasons discussed below, I disagree with Dr. Jorgensen that the erlotinib/WT-EGFR crystal structure described in Stamos 2002 is an appropriate or accurate model for providing structure to the irreversible EGFR inhibitors encompassed by the asserted claims. I also disagree that the asserted claims are limited to small molecules.

> i.   Dr. Jorgensen erroneously relies on Stamos 2002 to give structure to the irreversible EGFR inhibitors encompassed by the asserted claims.

89.    Stamos 2002 reports a crystal structure of the kinase domain of EGFR in complex with erlotinib, which is a known reversible EGFR inhibitor marketed as Tarceva®. *See* Stamos 2002 at Abstract. Because it is a reversible inhibitor, erlotinib does not covalently bind to EGFR. Stamos 2002 states that the EGFR used in the crystal structure was prepared from "DNA encoding residues 672-998 [] amplified from full-length EGFR cDNA by PCR...." Stamos 2002 at 46266. Since it does not indicate that the EGFR had any known mutations, either sensitizing or resistance mutations, Stamos 2002 appears to be reporting a WT-EGFR structure. Stamos highlights the following interactions between erlotinib and WT-EGFR:

> Erlotinib lies with the N1- and C8-containing edge of the quinazoline directed toward the peptide segment connecting N- and

31

> C-lobes, with the ether linkages projecting past the connecting segment into solvent and the anilino substituent on the opposite end sequestered in a hydrophobic pocket. The N1 of the quinazoline accepts an H-bond from the Met[769] amide nitrogen. The other quinazoline nitrogen atom (N3) is not within H-bonding distance of the Thr766 side chain (4.1 Å), but a water molecule bridges this gap.

*Id.* at 46270.

90.    In the erlotinib structure below, taken from Dr. Jorgensen's Rebuttal Report (Jorgensen Rebuttal, ¶ 56), I have highlighted these interactions with the erlotinib molecule as follows: the "N1- and C8-containing edge of quinazoline" is circled in red, the anilino substituent "sequestered in a hydrophobic pocket" is circled in green, the N1 of the quinazoline that "accepts an H-bond from Met[769]" is circled in blue, and the N3 quinazoline nitrogen atom that "bridges" the Thr766 side chain via a water molecule is circled in orange. Stamos 2002 at 46270.



91.    While Dr. Jorgensen acknowledges these key interactions highlighted by Stamos 2002 (*see* Jorgensen Rebuttal, ¶¶ 58–59), he then goes on to conclude in the very next paragraph that the "key structural requirements had been established as tyrosine kinase inhibitors of EGFR activity: an N-heteroaryl scaffold containing a ring nitrogen that makes a hydrogen bond with Met769 or its equivalent in the hinge region of the intracellular tyrosine kinase domain; and an

aryl or heteroaryl group residing in the lipophilic region of the kinase domain." *Id.*, ¶ 60. Dr.
Jorgensen's generalized "structural requirements" are not supported by the far more specific
interactions reported by Stamos 2002. For comparison, in the chart below I have listed the
interactions highlighted by Stamos 2002 for the erlotinib/WT-EGFR complex side-by-side with
the generalizations Dr. Jorgensen sets forth in his report (*id.*, ¶¶ 58–59).

| Interactions Highlighted by Stamos 2002 | Dr. Jorgensen's Generalized "Structural Requirements" |
|---|---|
| "N1- and C8-containing edge of the quinazoline directed toward the peptide segment connecting N- and C-lobes" | "N-heteroaryl scaffold containing a ring nitrogen that makes a hydrogen bond with Met769 or its equivalent" |
| "N1 of the quinazoline accepts an H-bond from the Met$^{769}$ amide nitrogen" | |
| "anilino substituent on the opposite end sequestered in a hydrophobic pocket" | "an aryl or heteroaryl group residing in the lipophilic region of the kinase domain" |
| "quinazoline nitrogen atom (N3)" "bridges [] gap" with "Thr766 side chain (4.1 Å)" via a water molecule | -- |

Stamos 2002 at 46270; Jorgensen Rebuttal, ¶60.

92.     Without support, Dr. Jorgensen generalizes the specific N1- and C8- interactions
of erlotinib's quinazoline core structure reported in Stamos 2002 to broadly conclude that ***any***
"N-heteroaryl scaffold containing a ring nitrogen" may be used for making an EGFR inhibitor.
A quinazoline is one particular bicyclic N-heteroaryl molecule, containing an N1 nitrogen and a
carbon at C8. In contrast, the genus of possible N-heteroaryl scaffolds is vast, encompassing at
least hundreds of options, including mono-cylic and bi-cyclic compounds, as well as higher-
order fused ring systems containing three, four, or more rings (each of which may be substituted
with practically limitless options and configurations). (A chart of a small sample of 63 N-
heteroaryl compounds is shown below in Section IX.118.) At the same time, because Dr.

Jorgensen's requirement for an "N-heteroaryl scaffold containing a ring nitrogen" includes mono-cyclic systems as well, it ignores the "N1- and C8-containing edge" interaction highlighted by Stamos 2002. The mono-cyclic compounds that fall within Dr. Jorgensen's "structural requirements" do not have a "C8," or its equivalent, on a neighboring fused ring— because a mono-cyclic compound comprises only one ring, by definition. Similarly, Dr. Jorgensen's "N-heteroaryl" definition ignores the bridge interaction between the Thr766 side chain and N3 nitrogen atom of quinazoline to the extent that a single nitrogen atom in the aryl ring is sufficient to meet Dr. Jorgensen's definition—his definition does not require an N3 nitrogen, or its equivalent. There is no support in Stamos 2002 to suggest that any compound having an N-heteroaryl scaffold containing a ring nitrogen would bind to WT-EGFR, let alone maintain the same, or equivalent, interactions as highlighted by Stamos 2002. In fact, for the reasons just discussed, Dr. Jorgensen's definition encompasses compounds that would ***not*** maintain the interactions highlighted by Stamos 2002.

93.     Dr. Jorgensen also inappropriately generalizes the interaction of the anilino substituent of erlotinib in the "hydrophobic pocket" of WT-EGFR to a broad "structural requirement" for ***any*** aryl or heteroaryl group." The 4-anilino group of erlotinib is one specific non-heteroaromatic substituent (that may be substituted; the 4-anilino group of erlotinib is substituted with an ethynyl group). In contrast, the genus of possible aryl *and* heteroaryl groups is even larger than the genus of N-heteroaryl scaffolds discussed above. "Aryl and heteroaryl groups" encompass the entire universe of aromatic substituents, including having any number of fused rings, as well as the entire universe of heteroaromatic substituents—which are any aromatic substituents having a heteroatom (such as N or O) within the ring(s). In addition, these ring systems may be substituted with practically limitless options and configurations. Stamos

2002 describes a 4-anilino interaction with a hydrophobic pocket in WT-EGFR; there is no support in Stamos 2002 to suggest that *any* aryl or heteroaryl group would similarly interact with the hydrophobic pocket.

94.     While Stamos 2002 suggests that the N3 of the quinazoline may be substituted with carbon (i.e., resulting in a quinolone) and still retain inhibitor affinity, this does not support a broad generalization that *any* N-heteroaryl group will suffice. *See* Stamos 2002 at 46271 ("The less robust nature of this water mediated H-bond between erlotinib and EGFRK parallels the relatively small effect on inhibitor affinity seen for substitution with carbon for N3..."). A quinoline is one specific bicyclic N-heteroaryl molecule, containing a single N1-nitrogen. At most, Stamos 2002 suggests that a quinoline analog may be substituted for erlotnib's quinazoline structure and have a relatively small effect on reversible binding. Stamos 2002 does not suggest what ring substitutions, if any, would be required for such a quinoline analog to retain inhibitor affinity. Nor does Stamos 2002 suggest that *all* quinazoline analogs would retain inhibitor affinity regardless of their substitution pattern.

95.     To further support his structural definition, Dr. Jorgensen identifies four "main N-heteroaryl scaffolds" for which he argues "[t]he SAR with respect to EGFR inhibition was shown to be generally transferable between these types of compounds": 1) quinazoline, 2) 3-cyanoquinoline, 3) pyridopyrimidine, and 4) pyrrolopyrimidine. Jorgensen Rebuttal, ¶¶ 61–62. However, while certain compounds having some EGFR inhibitory activity may be based on one or more of these "main" scaffolds, there is no support in Stamos 2002, nor does Dr. Jorgensen point to any other support, to suggest that *all* compounds having one of the four "main" scaffolds would inhibit EGFR. There is nothing in Stamos 2002 to suggest that *all* quinazolines or 3-cyanoquinolines, let alone *all* pyridopyrimidines or pyrrolopyrimidines—two scaffolds nowhere

35

mentioned in Stamos 2002—would inhibit WT-EGFR and maintain the same, or equivalent interactions as erlotinib. The four "main N-heteroaryl scaffolds" from Dr. Jorgensen's report are reproduced below for reference. *Id.*, ¶ 62.



96.      However, even if Stamos 2002 suggested that any compound having a quinazoline, 3-cyanoquinoline, pyridopyrimidine, or pyrrolopyrimidine structure may be useful for inhibiting EGFR (which it does not, as discussed above), that still would not provide any support to extend the definition to ***all*** N-heteroaryl scaffolds containing a ring nitrogen as Dr. Jorgensen does. Quinazoline, 3-cyanoquinoline, pyridopyrimidine, and pyrrolopyrimidine are each a specific, bi-cyclic, N-heteroaromatic molecule. In contrast, the genus of all N-heteroaryl scaffolds contains at least hundreds of ***additional*** scaffolds, including mono-cyclic and bi-cyclic as well as higher-order systems containing three, four, or more rings, and any number of nitrogens and/or other heteroatoms, which all told would encompass trillions of additional compounds. Indeed, all of the prior art EGFR inhibitor structures that Dr. Jorgensen points out in his report are based on one of the four "main N-heteroaryl scaffolds" (quinazoline, 3-

cyanoquinoline, pyridopyrimidine, and pyrrolopyrimidine) and nearly all have a 4-anilino substituent—Dr. Jorgensen does not point to any other prior art examples of other N-heteroaryl scaffolds containing a ring nitrogen, or examples of other "aryl or heteroaryl groups" despite his attempt to capture such compounds with his broad structural definition. *See, e.g.*, Jorgensen Rebuttal, ¶¶ 56, 61, 63, 70, 71, 72, 133, 134, 145, 147, 160, 183, 189, 190, 202, 203. Neither Stamos 2002 nor Dr. Jorgensen's "structure-activity relationship (SAR) information" (*id.*, ¶ 60) can justify his broad structural definition.

97.     Even if a POSA were to recognize *all* N-heteroaryl scaffolds containing a ring nitrogen and having an aryl or heteroaryl substituent as being potentially useful for EGFR inhibition (which he or she would not have, as discussed above), there was no guidance from which the POSA could have determined *how all such structures would bind* to WT-EGFR, let alone EGFR with a T790M mutation. The erlotinib/WT-EGFR crystal structure reported in Stamos 2002 does not tell the POSA how *every* compound based on an N-heteroaryl scaffold "makes a hydrogen bond with the Met769 or its equivalent in the hinge region," or whether an aryl or heteroaryl substituent group will "resid[e] in the lipophilic region." Jorgensen Rebuttal, ¶ 47. Stamos 2002 tells the POSA how erlotinib may bind to WT-EGFR.

98.     Even with regard to the prior art EGFR inhibitor structures that Dr. Jorgensen explicitly points out in his Rebuttal Report, it is unclear whether these compounds meet his own structural definition. *See, e.g.*, Jorgensen Rebuttal, ¶¶ 56, 61, 63, 70, 71, 72, 133, 134, 145, 147, 160, 183, 189, 190, 202, 203. Dr. Jorgensen does not provide any explanation or support to show how any of those compounds (other than erlotinib) interact with WT-EGFR, let alone EGFR having a T790M mutation, to the extent that "a nitrogen in the N-heteroaryl ring system [] *makes*

*a hydrogen bond with the Met769 or its equivalent in the hinge region*," and "an aryl or heteroaryl group *resid[es] in the lipophilic region*." *Id.*, ¶ 47 (emphasis added).

99.     As I explained in my Opening Report, modeling of the inhibitor-kinase interaction was difficult and varied substantially depending upon the structures being studied. *See* Reider Opening, Section XII.A.2. Proposed binding models for EGFR were demonstrably inconsistent. *See id.* (discussing inconsistent models for ATP-competitive EGFR inhibitors independently proposed by Ciba-Geigy/Novartis and Parke-Davis). Indeed Stamos 2002 acknowledges that its reported erlotinib/WT-EGFR crystal structure "differ[s] in detail" from depictions of other quinazolines binding to EGFR generated by computational methods. Stamos 2002 at 46270. Stamos 2002 also cautions that while "close association among some parts of the intracellular domains is probable," "[t]he present data do not permit us to conclude that these [intermolecular] contacts also arise in a cellular context." *Id.* at 46271.

100.     I note that while Stamos 2002 is referenced in the patents-in-suit—among 35 other articles (*e.g.*, '314 patent, 19:1-22:9)—the erlotinib/WT-EGFR crystal structure that Dr. Jorgensen's broad structural definition is based upon is nowhere discussed in the patents-in-suit, nor are the supposed structural requirements generated by Dr. Jorgensen stated or discussed anywhere in the patents-in-suit.

101.     While Dr. Jorgensen states that the "common structural features" listed in his definition for the irreversible EGFR inhibitors encompassed by the asserted claims are based on "the remainder of the claim, the disclosure in the Patents-in-Suit, and known irreversible EGFR TKIs" (Jorgensen Rebuttal, ¶ 106), Dr. Jorgensen's definition is not commensurate with either the patents-in-suit or the even the prior art EGFR inhibitors that Dr. Jorgensen explicitly points to in his Rebuttal Report. As discussed in my Opening Report, the claims merely define the

38

encompassed irreversible EGFR inhibitors by function, and the patents-in-suit provide only three structurally-similar embodiments. *See* Reider Opening, Sections VI, VIII. As discussed above in this Section, Dr. Jorgensen's structural definition is far broader than the four "main N-heteroaryl scaffolds" he points to. Dr. Jorgensen's definition is at the same time too narrow to encompass even the prior art EGFR inhibitors that he relies on. For example, Dr. Jorgensen states that "it was known that 6-acrylamides of quinazolines and pyridopyrimidines were 'robust, irreversible inhibitors of the epidermal growth factor receptor....'" and depicts the structure of "Compound 8," which bears an indoline group at C4 of the quinazoline scaffold. Dr. Jorgensen labels the indoline a "heteroaryl group," but that is incorrect. The indoline substituent on Compound 8 is *not* a heteroaryl group, and thus does not fit Dr. Jorgensen's own definition. Jorgensen Rebuttal, ¶ 203.

102.    Dr. Jorgensen appears to acknowledge that his definition is not comprehensive—that it does not describe *all* irreversible EGFR inhibitors encompassed by the asserted claims, but merely that the claims "include" the compounds falling within his definition. Jorgensen Rebuttal, ¶ 47. Indeed, Dr. Jorgensen's definition does not appear to account for at least the subset of irreversible EGFR inhibitors encompassed by the asserted claims that bind at Cys805 of erb-B2. While Dr. Jorgensen highlights the erlotinib/*WT-EGFR* crystal structure reported in Stamos 2002, he does not attempt to provide any parallel analysis for the subset of compounds that may bind at Cys805 of *erb-B2* according to the asserted claims. Even if the POSA understood the "common structural features" to make and use all of the irreversible EGFR inhibitors according to the asserted claims based on the erlotinib/WT-EGFR crystal structure of Stamos 2002 (which I disagree with, for the reasons discussed above), that does not provide any explanation for how the POSA would also be able to make and use the entire subset of irreversible EGFR inhibitors

that bind to Cys805 of *erb-B2.* Dr. Jorgensen does not provide any explanation or support for why the POSA would expect that a compound meeting his "common structural features" of an N-heteroaryl ring system and an aryl or heteroaryl group would "make a hydrogen bond with the Met69 or its equivalent" *in erb-B2*, or that the aryl or heteroaryl group would "resid[e] in the lipophilic region" *of erb-B2*. *Id.*, ¶ 47.

      ii.  Dr. Jorgensen erroneously extends Stamos 2002 to irreversible EGFR inhibitors.

103.    Since Stamos 2002 reports a crystal structure for a ***reversible*** EGFR inhibitor that is ***not*** covalently bound to WT-EGFR (or EGFR with a T790M mutation), Dr. Jorgensen next imports a substructure capable of covalent binding, i.e., a "warhead," into his definition for irreversible EGFR inhibitors encompassed by the asserted claims. Dr. Jorgensen identifies "a Michael acceptor, particularly acrylamide-based which can access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2), in the ligand binding pocket of the intracellular kinase domain." Jorgensen Rebuttal, ¶ 47. Dr. Jorgensen asserts that "based on well-established SAR and molecular modeling information, the placement of the acrylamide-based sidechain was at the 6-position to achieve the required covalent binding and irreversible inhibition." Jorgensen Rebuttal, ¶ 72. Dr. Jorgensen, however, does not account for how importing a Michael acceptor or other alkylating agent onto a reversible EGFR inhibitor structure may change how the inhibitor compound interacts with and/or binds to EGFR.

104.    In fact, the POSA would have known that appending a warhead capable of covalent binding ***does*** substantially change how an inhibitor interacts with EGFR. In 2004, Akula et al. reported two different binding modes to EGFR—reversible and irreversible—based on an analysis of dozens of 4-anilinoquinoline analogs (i.e., one of Dr. Jorgensen's "main N-heteroaryl scaffolds" (Jorgensen Rebuttal, ¶ 61)) bearing acrylamide-based Michael acceptors.

*See* N. Akula et al., *Binding modes of 6,7 di-substituted 4-anilinoquinoline-3-carbonitriles to EGFR*, 14 Bioorganic & Medicinal Chemistry Letters 3397 (2004) ("Akula 2004"). In "reversible binding mode," "it was observed that most of the ligands with good binding energy retained the crystal structure orientation...[t]he most active ligand 5 not only showed good binding energy but also maintained the N-H···[1]N intermolecular H-bonding interaction with M769 and O-H···[3]N interaction of the 3-cyano group with the Thr766 of the protein as exhibited by the crystal structure ligand." *Id.* at 3398. However, in reversible binding mode, "the distance between the Michael acceptor side chain and the sulfhydryl group of the C773 of the protein was 5.97 Å, which is more than the permissible distance for a covalent linkage." *Id.* In contrast, in irreversible binding mode, "most of the ligands moved away from the binding site, while maintaining the covalent linkage...The most active ligand 5 also moved out of the pocket resulting in a loss of the hydrogen bonding interactions...It could be clearly seen from this study that when the ligand formed a covalent linkage with the C773, it could not occupy the binding site in its entirety." *Id.* at 3399. Akula 2004 concludes that "[i]t became clear from these studies that these ligands ***cannot satisfy both the conditions of formation of a covalent linkage with the sulfhydryl group of C773 and also hydrogen bond interactions at the binding site*** as reported [in Stamos 2002]." *Id.* at 3397 (emphasis added).

105.     Thus, the POSA would have recognized based on Akula 2004 that having an "N-heteroaryl ring system that makes a hydrogen bond with the Met769 or its equivalent in the hinge region" as required by Dr. Jorgensen's definition means that a 6-substituted Michael acceptor will be placed at "more than the permissible distance for a covalent linkage." Jorgensen Rebuttal, ¶ 47; Akula 2004 at 3398. Conversely, forming a covalent linkage with EGFR will result in loss of the hydrogen bonding interactions. *Id.* at 3399. In other words, the POSA would have known

that an irreversible EGFR inhibitor cannot satisfy Dr. Jorgensen's "common structural features." As demonstrated within the class of 4-anilinoquinolines—one of Dr. Jorgensen's "main N-heteroaryl scaffolds" (Jorgensen, ¶ 61)—either the inhibitor may "make a hydrogen bond with the Met769 or its equivalent in the hinge region" as required by Dr. Jorgensen's definition *or* it may "access the designated cysteine residue"—but not both. Jorgensen Rebuttal, ¶ 47.

106.     Not only is Dr. Jorgensen's definition for the warhead internally inconsistent and therefore erroneous, it is also not commensurate in scope with the rest of his structural definition for the irreversible EGFR inhibitors encompassed by the claims. Dr. Jorgensen admits that his requirement for a "Michael acceptor, particularly acrylamide-based" (Jorgensen Rebuttal, ¶ 47) is based on prior art work performed "[w]ell before the priority date" on quinazoline, 3-cyanoquinoline, and pyridopyrimidine scaffolds. *Id.*, ¶ 68; *see id.*, ¶ 67. Thus, there is no support for limiting the covalent warhead to only Michael acceptors, "particularly acrylamide-based" where Dr. Jorgensen's definition broadly encompasses *all* N-heteroaryl ring systems having an aryl or heteroaryl substituent. *See id.* As discussed above, this definition is vast, encompassing at least hundreds of options, including mono-cyclic and bi-cyclic compounds, as well as higher-order fused ring systems containing three, four, or more rings (each of which may be substituted with practically limitless options and configurations). In contrast, Dr. Jorgensen's support for limiting the universe of covalent warheads to only Michael acceptors, "particularly acrylamide-based" is based on only a few of these scaffold options.

107.     Indeed, by classifying acrylamide-based Michael acceptors as an "optimal group," Dr. Jorgensen implicitly acknowledges that his definition for the covalent warhead is far narrower than the possible scope of alkylating agents available to the POSA—and therefore narrower than the scope of alkylating agents capable of forming irreversible EGFR inhibitors.

42

Jorgensen Rebuttal, ¶ 68. In my Opening Report, I explained that the POSA would have been aware of alkylating moieties that had been explored in irreversible EGFR inhibitors, including vinylsulfonamides and vinylsulfones, in addition to acrylamides. *See* Reider Opening, ¶ 471. I also listed a host of other examples of alkylating agents that the POSA would have been aware of. *Id.* Indeed, researchers have used non-Michael acceptor, non-acrylamide-based alkylating agents to make irreversible EGFR inhibitors that covalently bind to cysteine 797 of the kinase domain including, for example, epoxyamides and phenoxyacetamides. *See* C. Carmi et al., *Novel Irreversible Epidermal Growth Factor Receptor Inhibitors by Chemical Modulation of the Cysteine-Trap Portion*, 53 J. Med. Chem 2038 (2010) ("Carmi 2010"). Dr. Jorgensen himself acknowledges that "Tsou 2005 also studied Michael acceptors that were not acrylamide-based...." Jorgensen Rebuttal, ¶ 72, FN3; *see also* H. Tsou et al., *Optimization of 6,7-Disubstituted-4-(arylamino)quinoline-3-carbonitriles as Orally Active, Irreversible Inhibitors of Human Epidermal Growth Factor Receptor-2 Kinase Activity*, 48 J. Med. Chem. 1107 (2005) (AZ-PW-TAG00422049) ("Tsou 2005") at 1118, Table 5. By limiting his definition to "a Michael acceptor, particularly acrylamide-based" (*id.*, ¶ 47), Dr. Jorgensen does not capture the full scope of possible irreversible EGFR inhibitors, and thus Dr. Jorgensen's definition **cannot** describe the structural features common to all irreversible EGFR inhibitors that bind to cysteine 797 of the kinase domain.

108.    In any event, the POSA would have no way of knowing whether a given Michael acceptor, "particularly acrylamide-based," appended to **any** N-heteroaryl scaffold according to Dr. Jorgensen's definition, would in fact "access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2)" without testing each and every compound. Jorgensen Rebuttal, ¶ 47. Dr. Jorgensen suggests that because certain Michael acceptor moieties had been reported to

covalently bind and irreversibly inhibit Cy773 of EGFR "for various EGFR TKIs," then the "POSA would readily be able to confirm that EGFR inhibitors containing an acrylamide-based Michael acceptor group would provide irreversible inhibition via covalent interaction with the designated cysteine residue." *Id.*, ¶ 132. As the POSA would have known from Akula 2004, however, even positioning a covalent warhead 5.97 Å from Cys773 is "more than the permissible distance for a covalent linkage" to form. Akula 2004 at 3398. For example, the POSA would have known that certain 4-anilinoquinazolines bearing an acrylamide Michael acceptor—thus meeting Dr. Jorgensen's structural definition—exhibited only partially irreversible binding, or no irreversible binding. *See, e.g.*, J. Smaill et al., *Tyrosine Kinase Inhibitors. 15. 4-(Phenylamino)quinazoline and 4-(Phenylamino)pyrido[d]pyrimidine Acrylamides as Irreversible Inhibitors of the ATP Binding Site of the Epidermal Growth Factor Receptor*, 42 J. Med. Chem. 1803 at 1805 (1999) ("Smaill 1999); *see also* Carmi 2010 at 2042 (reporting 4-anilinoquinazolines bearing various covalent warheads as "only partially irreversible"). Indeed, Dr. Jorgensen appears to acknowledge that the POSA would not be able to determine whether a given compound covalently binds and irreversibly inhibits EGFR based on the "common structural features" set forth in his definition, rather the POSA would have to test each and every compound. Jorgensen Rebuttal, ¶ 106; *see id.*, ¶ 137 (explaining that "a POSA was aware of routine assays that were employed to determine 'irreversible' inhibition....Thus, by the time of the invention, a POSA would recognize the key structural features of irreversible EGFR TKIs and knew how to achieve irreversible EGFR inhibitors").  Such testing would not be easy or routine, particularly given the vast number of compounds potentially falling within the category of irreversible EGFR inhibitors covalently binding to cysteine 797 in the kinase domain.

iii.  Dr. Jorgensen erroneously extends Stamos 2002 to EGFR having a T790M mutation.

109.     In relying on the Stamos 2002 crystal structure of erlotinib complexed with WT-EGFR to supposedly give structure to the irreversible EGFR inhibitors encompassed by the asserted claims, Dr. Jorgensen dismisses the need for a crystal structure of EGFR having a T790M mutation. Dr. Jorgensen argues that "a POSA would not need such a crystal structure of EGFR having a T790M mutation. The specification demonstrates the ability of irreversible EGFR TKIs to inhibit the kinase activity of the T790M mutant...Based on this, a POSA would understand that the cysteine residue would remain positioned for covalent modification in the T790M EGFR mutant." Jorgensen Rebuttal, ¶ 131. That "the cysteine residue would remain positioned for covalent modification" with respect to the three embodiments described in the patents-in-suit (*see* Reider Opening, ¶ 137 (discussing the three preferred embodiments of the patents-in-suit)), however, does not tell the POSA whether the cysteine residue would be accessible to ***any*** N-heteroaryl compound within Dr. Jorgensen's definition. More specifically, this does not tell the POSA whether or how the binding site of WT-EGFR may change upon introduction of a T790M mutation, or how the inhibitor compound should be modified accordingly. To the extent that Dr. Jorgensen suggests that "a POSA would know that many residue mutations would not significantly modify the binding site" and it would be "straightforward to gauge the potential effects of mutants by molecular modeling" (Jorgensen Rebuttal, ¶ 164), I observe that he has offered no such "straightforward" molecular modeling for EGFR having a T790M mutation.

110.     In fact, the POSA would have expected the T790M mutation to have a substantial effect on the erlotinib/WT-EGFR binding model relied on by Dr. Jorgensen. First, the POSA would have appreciated that EGFR having a T790M mutation did ***not*** bind in the same way to

erlotinib as with WT-EGFR because EGFR having a T790M mutation was known to be ***resistant*** to erlotinib. *See, e.g.*, S. Blencke et al., *Mutation of Threonine 766 in the Epidermal Growth Factor Receptor Reveals a Hotspot for Resistance Formation against Selective Tyrosine Kinase Inhibitors*, 278(17) The Journal of Biological Chemistry 15435 (2003) ("Blencke 2003") at 15437 (discussing "Kinase-active EGFR Mutants Resistant to Quinazoline Inhibitors," including "[i]n the case of EGFR, this clinically relevant mutation replaces Thr-766 by methionine..."); *see also id.* at 15435 ("ZA1839 (Iressa®) and OSI-774 (Tarceva®) are already in late stages of clinical development, but the structural determinants of the EGFR kinase domain required for quinazoline binding and potentially involved in resistance formation have not been analyzed yet.").

111.    In addition, Stamos 2002 highlights one of the key interactions of erlotinib with WT-EGFR at the binding site is a water-mediated bridge between the N3 quinazoline nitrogen atom of erlotinib with the Thr766 side chain of WT-EGFR. Stamos 2002 at 46270. Thr766 is the same Thr790 that is switched for a methionine residue in the T790M mutant of EGFR. Thus, the POSA would have understood that one of the key interactions between erlotinib and WT-EGFR would be ***removed*** in EGFR having a T790M mutation. The POSA would therefore expect compounds that bind to EGFR having a T790M mutation to have different structural features than those suggested by the Stamos 2002 WT-WGFR crystal structure.

112.    Indeed, in a modeling study of erlotinib bound to EGFR having a T790M mutation, it was shown that the methionine substitution causes a "steric clash with the acetylene moiety of erlotinib." M. Hossam et al., *Covalent EGFR Inhibitors: Binding Mechanisms, Synthetic Approaches, and Clinical Profiles*, 349 Arch. Pharm. Chem. Life Sci. 573 (2016) ("Hossam 2016"). The authors explained that the substitution of threonine 790 for "a bulkier"

methionine means "H-bond formation is halted and steric clash occurs between the hinge and the specificity pocket. Therefore, binding of inhibitors to EGFR is sterically hindered." *Id.* at 574. With respect to the hydrogen bond formation in WT-EGFR between N1 of erlotinib's quinazoline scaffold and "the backbone amide NH of M793 of EGFR," the authors explain that "these interactions are likely to be disrupted in drug-resistant EGFR-T790M." In addition, "[d]ue to the T to M mutation, the water-mediated hydrogen bond between N3 of the quinazoline core and the side chain of T790 is lost." *Id.* at 574, Fig. 2. Thus, far from "not significantly modify[ing] the binding site" as Dr. Jorgensen suggests (Jorgensen Rebuttal, ¶ 164), "straightforward" molecular modeling of this mutation in EGFR shows that the key binding interactions highlighted in the erlotinib/WT-EGFR crystal structure by Stamos 2002—and incorporated into Dr. Jorgensen's definition for the irreversible EGFR inhibitors encompassed by the asserted claims—are likely lost with the T790M mutation.

113.    In fact, even as of 2020, the "binding pose with EGFR T790M remains unclear" for osimertinib—the compound Dr. Jorgensen contends is encompassed by his structural definition for the irreversible EGFR inhibitors encompassed by the asserted claims. X. Yan et al., *Structural Basis of AZD9291 Selectivity for EGFR T790M*, 63 J. Med. Chem. 8502 (2020) ("Yan 2020") at Abstract. Yan 2020 reported that "[s]imulation-generated structural models suggest that the binding pose of AZD9291 [osimertinib] with T790M differs from its binding pose with the WT, and that AZD9291 interacts extensively with the gatekeeper residue (Met 790) in T790M but not with Thr 790 in the WT, which explains why AZD9291 binds T790M with higher affinity." *Id.*

114.    In particular, Yan 2020 found that osimertinib "preferentially adopts the flipped pose with T790M but not with the WT EGFR kinase." *Id.* at 8505. In the "flipped" binding pose,

"the phenyl moiety of the indole group points toward the gatekeeper residue." *Id.* at 8503. "The flipped pose is similar to the unflipped pose in maintaining the 'hinge' hydrogen bonds between AZD9291 and the backbone amide/carbonyl groups of Met 793, but the two poses differ in that, in the flipped pose, the indole moiety is rotated by ~180° and the phenyl moiety of the indole points toward the side chain of Met 790." *Id.* "[I]n the unflipped pose with WT EGFR, the indole moiety of AZD9291 was located relatively distal from the Thr 790 side chain...." *Id.* at 8504. "Analysis of the binding process showed that AZD9291 first entered the binding site in the unflipped conformation. After entering the binding site, both the binding pose of AZD9291 and the conformation of the binding site fluctuated significantly." *Id.* The authors suggest that because osimertinib adopted the flipped pose after entering the binding site and approaching Met 790 that "the T790M mutation helps induce the flipped pose by interacting with the molecule during binding." *Id.* The authors also found that "the unflipped pose may not be compatible with bond formation due to the large distance between the warhead and the thiol group and that instead the flipped pose may be the one conducive to bond formation." *Id.* at 8505.

115.    The simulation-generated models in Yan 2020 "were confirmed by experimentally determined EGFR/T790M complex crystal structures." Yan 2020 at 8506. In particular, "[t]he EGFR kinase in T790M/ccAZD9291 adopted a conformation previously unobserved in crystal structures. In this structure, the C-helix is kinked, with the N-terminal half of the helix...displaced by 4-7 Å from the αC-in position of the helix...Apparently related to the displacement of the N-terminal half of the C-helix, a part of the A-loop...formed a short helix closely associating with the N-lobe." *Id.* The authors found that "[d]espite the unique C-helix conformation, the overall conformation of the T790M/ccAZD9291 structure was more similar to the active conformation of EGFR...than to the inactive conformation." *Id.*

116.     Therefore, since the binding pose of osimertinib with EGFR having a T790M mutation remained "elusive" even as of 2020 (Yan 2020 at 8503), the POSA could not have had any understanding as to how a compound with osimertinib's structural features would bind to EGFR having a T790M mutation. The binding pose for osimertinib to EGFR having a T790M mutation is the exact opposite from WT-EGFR, and therefore opposite from Dr. Jorgensen's model based on WT-EGFR binding. In fact, a binding pose for osimertinib based on WT-EGFR does not allow for covalent binding at all, and hence also does not allow for irreversible inhibition.

        iv.   Dr. Jorgensen inappropriately limits the irreversible EGFR inhibitors encompassed by the asserted claims to small molecules.

117.     As discussed above in Section VIII.B, Dr. Jorgensen's structural definition limits the genus of irreversible EGFR inhibitors encompassed by the asserted claims to "small molecule inhibitors," despite the plain language of the shared specification of patents-in-suit. *See, e.g.*, Jorgensen Rebuttal, ¶ 104. By excluding non-small molecules from his structural definition, however, Dr. Jorgensen concedes that the POSA would not have been enabled to make and use this subset of compounds—because the patents-in-suit do not provide any examples or guidance to make such compounds.

118.     Dr. Jorgensen reasons that "it would be clear to a POSA that the irreversible EGFR inhibitors of the Asserted Claims are small molecular inhibitors" because "[a] POSA would know that only small molecule compounds could enter the cell and access the intracellular tyrosine kinase domain to bind with the designated cysteine residues." Jorgensen Rebuttal, ¶ 104. Dr. Jorgensen is incorrect, however, that because "only small molecule compounds could enter the cell" that larger compounds are necessarily excluded from the plain language of the specification and from the irreversible EGFR inhibitors encompassed by the asserted claims. *Id.*

As one example, the POSA would have been aware of antibody-drug conjugates ("ADCs") as an option for cancer treatment. ADCs are large compounds comprised of an antigen capable of selectively delivering a linked cytotoxic molecule payload to the desired site within the body. Once the linker is cleaved (which can occur either outside or inside the cell), the cytotoxic payload is released and acts upon the cell. ADCs were being evaluated and administered to patients as early as 1983. Ford, CHJ, *Localisation and toxicity study of a vindesine-anti-CEA conjugate in patients with advanced cancer*, Br. J. Cancer 47:035-042 (1983).  In addition, the first ADC approved for a cancer treatment was in 2000. *See* Mylotarg FDA Approval Letter (2000). ADCs have continued to be evaluated and developed for cancer treatment, including for targeting TKI-resistant NSCLC. *See, e.g.*, P. Jänne et al., *Efficacy and Safety of Patritumab Deruxtecan (HER3-DXd) in EGFR Inhibitor-Resistant, EGFR-Mutated Non-Small Cell Lung Cancer*, Cancer Discovery 75 (2022) (describing patritumab deruxtecan, "a novel, investigational, HER3-directed ADC composed of a human immunoglobuin G1 mAb to HER3 (patritumab) covalently linked to a topoisomerase I inhibitor payload (MAAA-1181a, an exatecan derivative) via a tetrapeptide-based cleavable linker"); M. Miller et al., *A New Class of Antibody-Drug Conjugates with Potent DNA Alkylating Activity*, 15(8) Mol. Cancer Ther. 1870 (2016) (describing a new class of potent DNA alkylating agent ADCs for cancer therapy). While development of ADCs is complex and challenging,[4] a POSA in 2005 would have been aware of

---

[4] Development of an anti-cancer ADC requires, among other things, selection or development of an appropriate antibody, linker, and cytotoxic payload to selectively deliver the payload to the appropriate cells and release it in a manner promoting its desired activity.  This has proved very challenging, as demonstrated for example by Pfizer/Wyeth's experience with Mylotarg, which was first approved in 2000 but subsequently withdrawn in 2010, when full clinical studies raised serious doubts about Mylotarg's safety and efficacy. See Dep't of Health & Human Services, FDA, "Wyeth Pharmaceuticals, Inc.; Withdrawal of Approval of New Drug Application for Mylotarg, 76 Fed. Reg. 72955 (Nov. 28, 2011).  In 2017, Mylotarg was approved with different dosing that addressed the safety and efficacy concerns (showing too how challenging it can be to determine a dose calculated to achieve the desired therapeutic effect).

the possibility of developing an ADC that would act as irreversible EGFR inhibitor that forms a covalent bond with cysteine 797 of the EGFR kinase domain, though the specification of the Patents-in-Suit describes no examples of such an ADC and would not enable a POSA to make and use one. The POSA Would Not Have Been Able to Make and Use the Full Scope of Compounds in Dr. Jorgensen's Genus

119.    As I explained in my Opening Report, the irreversible EGFR inhibitors as defined in the asserted claims potentially encompass many trillions of compounds. *See, e.g.*, Reider Opening, Section XII.A.1. Dr. Jorgensen states that he disagrees with my assessment (Jorgensen Rebuttal, ¶ 108), yet I observe that he does not specify the number of compounds encompassed by his structural definition. In fact, even accepting Dr. Jorgensen's definition for the irreversible EGFR inhibitors encompassed by the asserted claims (which definition is incorrect, for the reasons discussed above in Section IX.A), his definition still encompasses a practically limitless number of compounds.

120.    As a simple, very conservative illustration, I have adapted a chart below showing a small sample of 63 "N-heteroaryl compounds containing [] a nitrogen in the N-heteroaryl ring system," according to Dr. Jorgensen's definition. Jorgensen Rebuttal, ¶ 47. Each of these compounds are then substituted with "an aryl or heteroaryl group" according to Dr. Jorgensen's definition. *Id.* Conservatively focusing on only N-heteroaryl groups (specifically, those illustrated in my chart below)—a small fraction of  Dr. Jorgensen's "aryl or heteroaryl groups[s]"—and conservatively assuming substitution at a single site on the N-heteroaryl "scaffold" (each N-heteroaryl scaffold has multiple potential substitution sites), this yields 3,969 compounds (63 x 63).



Wikipedia - Heterocyclic Compound, *available at*
https://en.wikipedia.org/wiki/Heterocyclic_compound (last visited October 5, 2023) (excerpted).

121.    According to Dr. Jorgensen's definition, these compounds may be substituted

with any substituent group in any substitution pattern. Focusing, for example, on only the

substituent options provided for "$R_1$, $R_2$, $R_3$, and $R_4$" in U.S. Patent No. 6,002,008 ("the '008

patent), which is specifically cited in the patents-in-suit as including the three embodiments

███████████████████

EKB-569, HKI-357, and HKI-272 (*see, e.g.*, '314 patent, 13:50–58), this gives a minimum of

205 substituent options. *See* U.S. Patent No. 6,002,008 (AZ-PW-TAG00421627) ("'008 patent")

at 5:47–6:55. The '008 patent lists the following substituent options for "$R_1$, $R_2$, $R_3$, and $R_4$":

> hydrogen, halogen, alkyl of 1-6 carbon atoms, alkenyl of 2-6 carbon atoms, alkynyl of 2-6 carbon atoms, alkenyloxy of 2-6 carbon atoms, alkynyloxy of 2-6 carbon atoms, hydroxymethyl, halomethyl, alkanoyloxy of 1-6 carbon atoms, alkenoyloxy of 3-8 carbon atoms, alkynoyloxy of 3-8 carbon atoms, alkanoyloxymethyl of 2-7 carbon atoms, alkenoyloxymethyl of 4-9 carbon atoms, alkynoyloxymethyl of 4-9 carbon atoms, alkoxymethyl of 2-7 carbon atoms, alkoxy of 1-6 carbon atoms, alkylthio of 1-6 carbon atoms, alkylsulphinyl of 1-6 carbon atoms, alkylsulphonyl of 1-6 carbon atoms, alkylsulfonamido of 1-6 carbon atoms, alkenylsulfonamido of 2-6 carbon atoms, alkynylsulfonamido of 2-6 carbon atoms, hydroxy, trifluoromethyl, cyano, nitro, carboxy, carboalkoxy of 2-7 carbon atoms, carboalkyl of 2-7 carbon atoms, phenoxy, phenyl, thiophenoxy, benzyl, amino, hydroxyamino, alkoxyamino of 1-4 carbon atoms, alkylamino of 1-6 carbon atoms, dialkylamino of 2 to 12 carbon atoms, aminoalkyl of 1-4 carbon atoms, N-alkylaminoalkyl of 2-7 carbon atoms, N,N-dialkylaminoalkyl of 3-14 carbon atoms, phenylamino, benzylamino,



*Id.*

122.    If each of the 3,969 compounds is substituted only once, this yields 813,645

compounds (3,969 x 205). If each of those compounds is substituted a second time, this yields

166,797,225 compounds (813,645 x 205). Pharmaceutical compounds generally, and EGFR

inhibitor compounds specifically, typically bear multiple substituents. For example, EKB-569

has five substitutions (3-cyano, 6-dimethylaminobutenamide, 7-ethoxy, and chlorine and fluorine

substitutions on the 4-anilino ring), HKI-357 also has five (3-cyano, 6-

dimethylaminobutenamide, 7-ethoxy, and chlorine and fluorobenzyloxy on the 4-anilino ring),

and HKI-272 also has five (3-cyano, 6-dimethylaminobutenamide, 7-ethoxy, and chlorine and

pyridin-2-yl methoxy on the 4-anilino ring). Even a very conservative estimate shows that Dr.

Jorgensen's definition encompasses a bare minimum of hundreds of millions of compounds—

and this is before substituting with "a Michael acceptor, particularly acrylamide-based"

according to Dr. Jorgensen's definition, which would further substantially increase the scope of

potential compounds. Jorgensen Rebuttal, ¶ 47.

123.    While Dr. Jorgensen criticizes my reliance on the '008 patent to illustrate the

breadth of the irreversible EGFR inhibitors encompassed by the asserted claims, he

acknowledges that "theoretically the genus of the '008 patent could encompass a large number of

3-cyanoquinoline-based compounds...." Jorgensen Rebuttal, ¶ 113. Dr. Jorgensen similarly

criticizes my reliance on U.S. Patent No. 6,251,912 ("the '912 patent"). *See* Jorgensen Rebuttal,

¶119–123. Dr. Jorgensen appears to argue that the genus of compounds described in the '008 and

'912 patents should be narrowed to those meeting the "handful of structural features that

provided irreversible inhibition of EGFR through covalent binding at the designated cysteine

residue" that the POSA "would already be aware of." *Id*; *see also, e.g.*, *id.*, ¶ 121. I understand

that enablement requires the disclosures of a patent to contain a description of the claimed

54

invention that is sufficiently full and clear to enable a person of ordinary skill in the field to make

and use, or practice, the full scope of the claimed invention, not merely a subset. *See* Reider

Opening, ¶¶45–46. Therefore, I understand that the question for enablement is not whether the

POSA would have been able to make and use compounds having "structural features" well

known in the prior art, or a subset of the compounds encompassed by the asserted claims, but

whether the POSA would have been able to make and use all of the irreversible EGFR inhibitors

encompassed by the asserted claims. As discussed above in this Section, even adopting Dr.

Jorgensen's structural definition for the irreversible EGFR inhibitors encompassed by the

asserted claims (which I disagree with, as discussed above in Section IX.A), that definition still

encompasses hundreds of millions of compounds.

124.    For the reasons discussed in my Opening Report, the POSA would not have been

able to make and use the full scope of irreversible EGFR inhibitors encompassed by the asserted

claims. *See* Reider Opening, Section XII. For the same reasons, the POSA also would not have

been able to make and use the full scope of irreversible EGFR inhibitors encompassed by Dr.

Jorgensen's narrowed, structural definition, which still encompasses at least hundreds of millions

of compounds. There is no guidance in the patents-in-suit beyond three structurally-similar

embodiments (*see, e.g.*, *id.*, ¶ 137) for how to identify the compounds encompassed by the

asserted claims.

125.    In addition, the POSA also would not have been able to identify compounds

meeting Dr. Jorgensen's structural definition based on the erlotinib/WT-EGFR crystal structure

reported in Stamos 2002, as discussed above in Section IX.A. Without an accurate crystal

structure or model for an irreversible EGFR inhibitor binding to EGFR having a T790M

mutation—which the POSA did not have, *see* Section IX.A above—the POSA would not have

55

been able to determine whether all "small molecule N-heteroaryl compound[s] containing [] a nitrogen in the N-heteroaryl ring system" "make[] a hydrogen bond with the Met769 or its equivalent in the hinge region" of WT-EGFR, let alone EGFR having a T790M mutation, according to Dr. Jorgensen's definition. Jorgensen Rebuttal, ¶ 47. The POSA also would not have been able to determine whether an "aryl or heteroaryl group" on all of those compounds "resid[es] in the lipophilic region" of EGFR. *Id.* Similarly, the POSA would not have been able to determine whether "a Michael acceptor, particularly acrylamide-based" is able to "access the designated cysteine residue" without testing each and every compound for covalent, irreversible binding. *See* Section IX.A above. In any event, as discussed above in Section IX.A, to the extent modeling information was available the POSA would have expected based on Akula 2004 that an irreversible EGFR inhibitor ***cannot*** simultaneously meet all requirements of Dr. Jorgensen's structural definition—either the inhibitor may "make a hydrogen bond with the Met769 or its equivalent in the hinge region" as required by Dr. Jorgensen's definition ***or*** it may "access the designated cysteine residue"—but not both.

126.    To the extent that Dr. Jorgensen argues that positioning of the Michael acceptor was "well-established" (Jorgensen Rebuttal, ¶ 69) with "the 6-position as an optimal place for this moiety," his generalization is supported only by references to specific compounds having 4-anilinoquinazoline, 4-anilinoquinoline-3-carbonitrile, 4-(arylamino)quinoline-3-carbonitrile, and

4-anilinopyridopyrimidine scaffolds. *See id.*, ¶67-69 (citing Tsou 2005, "Wissner 2003,"[5] "Smaill 1999,"[6] "Smaill 2000,"[7] and "Smaill 2001"[8]).

127. First, Dr. Jorgensen is incorrect that the POSA would have recognized that it was "well-established" that the 6-position was an optimal placement for a Michael acceptor, even as to quinazoline, quinoline, and/or pyridopyrimidine scaffolds. For example, in Smaill 1999, the authors report that "initial modeling studies of the binding of reversible anilinoquinazoline and anilinopyridopyrimidine inhibitors suggested a binding mode" such that "the 6-acrylamido side chain is optimally placed for reaction with Cys-773 in its most stable binding mode, whereas the 7-acrylamido side chain would require some movement in the binding site to allow it to approach close enough to the sulfur for Michael addition to occur. This is consistent with the kinetics of alkylation, which show extremely rapid alkylation by the 6-acrylamide and much slower *alkylation by the 7-acrylamide*." Smaill 1999 at 1804 (emphasis added). Thus, Smaill 1999 suggests that placement of the Michael acceptor at either the 6- or 7- position may lead to alkylation for the anilinoquinazoline and anilinopyridopyrimidine compounds investigated. Indeed, Dr. Jorgensen himself acknowledges that "structural modifications were made in the known quinazoline, 3-cyanoquinoline, and pyridopyrimidine classes of reversible EGFR TKIs,

---

[5] A. Wissner et al., *Synthesis and Structure-Activity Relationships of 6,7-Disubstituted 4-Anilinoquinoline-3-carbonitriles*, 46 J. Med. Chem. 49 (2003) (AZ-PW-TAG00421707) ("Wissner 2003").

[6] J. Smaill et al., *4-(Phenylamino)quinazoline and 4-(Phenylamino)pyrido[d]pyrimidine Acrylamides as Irreversible Inhibitors of the ATP Binding Site of the Epidermal Growth Factor Receptor*, 42 J. Med. Chem. 1803 (1999) (AZ-PW-TAG00421612) ("Smaill 1999").

[7] J. Smaill et al., *Irreversible Inhibitors of the Epidermal Growth Factor Receptor*, 43 J. Med. Chem. 1380 (2000) (AZ-PW-TAG00420711) ("Smaill 2000").

[8] J. Smaill et al., *6-Substituted 4-Anilinoquinazolines and 4-Anilinopyrido[3,4-d]pyrimidines as Soluble, Irreversible Inhibitors of the Epidermal Growth Factor Receptor*, 44 J. Med. Chem. 429 (2001) (AZ-PW-TAG00422863) ("Smaill 2001").

in which Michael acceptors were placed at **_the 6- or 7-position_** of the quinazoline and 3-cyanoquinoline, or the analogous position of the pyridopyrimidine scaffold." Jorgensen Rebuttal, ¶ 67 (emphasis added); *see also id.*, ¶ 72.

128.    Second, even if Dr. Jorgensen were correct that the 6-position was the "optimal place" for a Michael acceptor on the specific quinazoline, quinoline, and/or pyridopyrimidine compounds investigated (which I disagree with), that would not alter the fact that Michael acceptors or other alkylating warheads at other positions might also be capable of covalently binding to cysteine 797 and irreversibly inhibiting EGFR.  (Smaill 1999 shows this, for example, for quinazolines with a warhead at the 7-position.)  The Asserted Claims are not limited to "optimal" irreversible EGFR inhibitors and thus the full scope of the Asserted Claims potentially encompasses irreversible EGFR inhibitors with Michael Acceptors or other warheads at positions other than the 6 position, even for compounds with a quinazoline, quinoline, or pyridopyrimidine scaffold. Dr. Jorgensen does not dispute that the specification neither describes nor enables irreversible EGFR inhibitors with warheads at these other positions.

129.    Similarly, Dr. Jorgensen's assertion that the 6-position was the "optimal place" for a Michael acceptor on the specific quinazoline, quinoline, and/or pyridopyrimidine compounds investigated would not inform a POSA what the optimal place for a Michael acceptor would be for **_other_** N-heteroaryl scaffolds within Dr. Jorgensen's structural definition, let alone where to place a Michael acceptor such that it "can access the designated cysteine residue." Jorgensen Rebuttal, ¶¶ 47, 69. As discussed above, the genus of all N-heteroaryl scaffolds contains at least hundreds of additional scaffolds, including mono-cyclic and bi-cyclic as well as higher-order systems containing three, four, or more rings, and any number of nitrogens and/or other heteroatoms. Placement for a Michael acceptor was certainly not "well-

established" for any of these hundreds of other potential scaffolds. Jorgensen Rebuttal, ¶ 74. Indeed, the vast majority would not even have a 6-position. To the extent Dr. Jorgensen argues that the POSA would have only known to place a Michael acceptor at the 6-position of known scaffolds, he implicitly acknowledges that the POSA would **not** have known where to place a Michael acceptor on little-explored or unexplored N-heteroaryl scaffolds that fall within Dr. Jorgensen's definition.

### B.  The POSA Would Not Have Been Able to Make and Use Osimertinib

130.    Osimertinib, developed by AstraZeneca and marketed as Tagrisso®, was a significant innovation, offering the first safe and effective treatment for patients with NSCLC having the T790M mutation. *See* Reider Rebuttal, ¶ 49. As I explained in my Rebuttal Report, AstraZeneca sought a mutant-selective, wild-type sparing inhibitor that avoids toxicity associated with early generation irreversible EGFR inhibitors, used a pyrimidine scaffold developed by AstraZeneca and not discussed in the patents-in-suit, modeled the binding mode of that scaffold to develop improved compounds and determine where to place an appropriate Michael acceptor, and performed painstaking, non-routine preclinical and clinical development of its candidate compounds. *Id.*, ¶ 50. Even Dr. Jorgensen concedes that osimertinib has "properties improved over many of the prior irreversible inhibitors," and that osimertinib's selective binding to mutant EGFR is an "improvement over other irreversible EGFR TKIs...." Jorgensen Rebuttal, ¶¶ 78, 143.

131.    Osimertinib is based on a pyrimidine scaffold—a six-membered ring with two nitrogens—bearing a methylindole substituent and an anilino group substituted with methoxy, dimethylaminoethyl-methylamino, and a propenamide (3-carbon) Michael acceptor. Osimertinib's chemical structure is shown directly below. Osimertinib's structure bears no

similarity to any of the embodiments described in the patents-in-suit, nor any of the prior art

EGFR inhibitor compounds that Dr. Jorgensen explicitly points to in his Rebuttal Report.



Tagrisso® Prescribing Information at 6.

132.    In contrast to osimertinib, the compounds described as embodiments of the

patents-in-suit (HKI-357, HKI-272, and EKB-569) are all based on quinoline scaffolds—a 10-

membered bicyclic fused ring system with one nitrogen. All three compounds have the same

substitution pattern and substituents: 3-cyano, 4-anilino, 7-ethoxy, and a 6-

dimethylaminobutenamide (4-carbon) Michael acceptor. The structures for  HKI-357, HKI-272,

and EKB-569 are shown directly below.



'314 patent, Fig. 2B.

133.    Similarly, the EGFR inhibitor compounds described in the prior art and explicitly

relied on by Dr. Jorgensen to form his structural definition for the irreversible EGFR inhibitors

encompassed by the patents-in-suit are all limited to bicyclic fused ring systems: quinazoline, 3-

cyanoquinoline, pyridopyrimidine, and pyrrolopyrimidine. *See, e.g.*, Jorgensen Rebuttal, ¶ 61.

Dr. Jorgensen's "4 main N-heteroaryl scaffolds" are reproduced directly below. Nearly all of Dr.

Jorgensen's prior art compounds bear 4-anilino groups. *See* ¶135 below.



quinazolines



3-cyanoquinolines



pyridopyrimidines



pyrrolopyrimidines

*Id.*, ¶ 61.

134.    In the chart below, I compare the structural elements of osimertinib with all of the

prior art EGFR inhibitor compounds that Dr. Jorgensen explicitly points to in his Rebuttal

Report. Osimertinib's core structural features are a clear departure from both the prior art and the

patents-in-suit. There is no overlap between osimertinib's overall scaffold, and even its choice

of aryl substituent, and either the prior art or the patents-in-suit.

| Compound | Scaffold | Aryl/heterocycle substituent | Alkylating group |
|---|---|---|---|
| Osimertinib | Pyrimidine | methylindole | acrylamide |
| HKI-357 | 3-cyanoquinoline | N-anilino (substituted) | Dimethylamino-butenamide |
| HKI-272 | 3-cyanoquinoline | N-anilino (substituted) | Dimethylamino-butenamide |
| EKB-569 | 3-cyanoquinoline | N-anilino (substituted) | Dimethylamino-butenamide |

| Gefitinib | Quinazoline | N-anilino (substituted) | -- |
|---|---|---|---|
| Erlotinib | Quinazoline | N-anilino (substituted) | -- |
| Wissner 2000 - 8 | 3-cyanoquinoline | N-anilino (substituted) | -- |
| PD 165557 | pyridopyrimidine | N-anilino (substituted) | -- |
| PD 158780 | pyridopyrimidine | N-anilino (substituted) | -- |
| CPG 59326 | pyrrolopyrimidine | N-anilino (substituted) | -- |
| PD 168393 | quinazoline | N-anilino (substituted) | acrylamide |
| CI-1033 | quinazoline | N-anilino (substituted) | acrylamide |
| PD 174265 | quinazoline | N-anilino (substituted) | acrylamide |
| GW-2016 | quinazoline | N-anilino (substituted) | -- |
| Smaill 1999 - 5a | quinazoline | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 5e | quinazoline | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 5f | quinazoline | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 6a | pyridopyrimidine | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 6e | pyridopyrimidine | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 6f | pyridopyrimidine | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 7a | pyridopyrimidine | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 7e | pyridopyrimidine | N-anilino (substituted) | acrylamide |
| Smaill 1999 - 7f | pyridopyrimidine | N-anilino (substituted) | acrylamide |
| Smaill 1888 - 8 | quinazoline | indoline | acrylamide |
| afatinib | quinazoline | N-anilino (substituted) | Dimethylamino-butenamide |
| dacomitinib | quinazoline | N-anilino (substituted) | Piperidnyl-butenamide |
| PKI-166 | pyrrolopyrimidine | aminobenzyl | -- |

*See, e.g.*, Jorgensen Rebuttal, ¶¶ 56, 63, 70, 71, 72, 133, 134, 145, 160, 189, 190, 202, 203.

135.    While Dr. Jorgensen constructed his definition for irreversible EGFR inhibitors to capture osimertinib (*see* Jorgensen Rebuttal, ¶47), the POSA could have only developed osimertinib—out of the at least hundreds of millions of compounds in Dr. Jorgensen's definition—through hindsight. In any event, as discussed above in Section IX.A, his definition is not supported by the patents-in-suit, the prior art, or the knowledge of the POSA.

136.    To create a path from the patents-in-suit to osimertinib, Dr. Jorgensen begins his analysis with an inhibitor of *a different kinase*—imatinib is a BCR-ABL kinase inhibitor for the treatment of chromic myeloid leukemia ("CML"). *See* Jorgensen Rebuttal, ¶82.  I disagree with Dr. Jorgensen that the POSA would understand the specification of the patents-in-suit to be teaching a POSA to look at structures of BCR-ABL kinase inhibitors for guidance.

137.    *First*, the POSA would have known that a mutation in BCR-ABL analogous to the T790M mutation in EGFR rendered BCR-ABL resistant to imatinib. *See* Blencke 2003 at Abstract. Blencke 2003 reports that a Thr-315 substitution with isoleucine rendered BCR-ABL resistant to inhibition by imatinib (STL-571). *Id.* The authors explain that "[t]he corresponding mutation in the epidermal growth factor receptor (EGFR) tyrosine kinase replaced Thr-766 of the EGFR by methionine and dramatically reduced the sensitivity of EGFR to inhibition by selective 4-anilinoquinazoline inhibitors...." *Id.* The POSA would not have been guided by a compound that inhibits a different kinase *and* was known to have dramatically reduced sensitivity to a mutation analogous to the very one (T790M) in seeking to overcome gefitinib and/or erlotinib resistant NSCLC.

138.    *Second*, the POSA also would have appreciated that "Thr[315] is...a *key requirement* for the ability of [the imatinib] class of compounds to inhibit Abl," and Thr 315 is analogous to the Thr 766 in EGFR that is *replaced* in EGFR having a T790M mutation. *See* T.

Schindler et al., *Structural Mechanism for STL-571 Inhibition of Abelson Tyrosine Kinase*, 289

Science 1938 (2000) (PUMAWYETH-TAG00039830) ("Schindler 2000") at 1939 (emphasis

added); Blencke 2003 at 15437 ("Alignment of the amino acid residues surrounding Thr-315 in

Abl with the EGFR sequence reveals a conserved threonine residue in the equivalent position

766 of the EGFR."). Since the POSA would have known that threonine is switched with

methionine in EGFR having a T790M mutation, and that the analogous threonine in BCR-ABL

was ***required*** for imatinib-like compounds to inhibit that kinase, the POSA would have avoided

the imatinib structure.

139.    ***Third***, the POSA would have avoided relying on imatinib because they would

have known that the inactive binding conformation for imatinib in BCR-ABL was likely ***not***

analogous to the inactive binding conformation in EGFR. Schindler 2000 explains that "[c]ritical

to the binding of [imatinib] is the adoption by the kinase of an inactive conformation, in which a

centrally located 'activation loop' is not phosphorylated." Schindler 2000 at Abstract. While the

"'active' conformation of the loop is very similar in all known structures of active kinases,"

"[t]here is...great diversity in the conformations of this loop in inactive protein kinases...." *Id.* at

1938. Thus, for this additional reason, the POSA could not have had any expectation that

imatinib's binding to BCR-ABL would provide guidance for designing a compound that inhibits

EGFR.

140.    ***Fourth***, the POSA would have known that imatinib binding to BCR-ABL is

highly specific and therefore would not have expected the imatinib scaffold to be transferable to

the EGFR context. Schindler 2000 reports an "exceptional level of surface complementarity"

between the aromatic rings of the inhibitor and the protein residues. Schindler 2000 at 1939. The

authors report that "[t]he snug fit ***hardly allows for any modification*** on either the inhibitor or

the kinase domain without **compromising binding affinity**." *Id.* (emphasis added). Thus, the POSA could not expect to be able to take the imatinib structure, **modify it**, and then expect that it would bind to and inhibit a **different** kinase.

141.     **Fifth**, the POSA would not have expected imatinib's phenylamino-pyrimidine scaffold to be active in the EGFR context. Schindler 2000 reports that "[t]he residues that contact STI-571 [imatinib] in the Abl kinase are either identical in the Src-family tyrosine kinases, or are substituted conservatively. Nevertheless, the phenylamino-pyrimidines are **virtually inactive** against the Src-family tyrosine kinases." Schindler 2000 at 1939 (emphasis added). Thus, the POSA would not have had any expectation that phenylamino-pyrimidines would have inhibitory activity in EGFR if they did not have activity in the Src-family tyrosine kinases that are **identical** (or nearly identical) to BCR-ABL. Schindler 2000 attributes this "interesting aspect of the interaction between STI-571 [imatinib] and the Abl kinase" to "specificity that is also achieved at a level beyond simple sequence requirements." *Id.*

142.     Even if a POSA were to understand the specification to be teaching guidance based on imatinib's structure (which I disagree with, for at least the reasons discussed above), the POSA would **not** have analogized its binding mode to the Stamos 2002 erlotinib/WT-EGFR crystal structure as Dr. Jorgensen suggests. Jorgensen Rebuttal, ¶¶83-84. As discussed above, the POSA would have known that "[c]ritical to the binding of [imatinib] is the adoption by the kinase of an inactive conformation." Schindler 2000 at Abstract.  In contrast, the POSA would known that in the Stamos 2002 erlotinib/WT-EGFR crystal structure, the "A-loop of EGFRK adopts an 'active' conformation"—not an inactive conformation. Stamos 2002 at 46267. Dr. Jorgensen is relying on the wrong model.

143.     Instead, the POSA would have looked to the crystal structure for lapatinib bound
to EGFR, which is reported to have "an inactive-like conformation...that is very different from
the active-like structure bound by the selective EGFR inhibitor OSI-774 (Tarceva) described [in
Stamos 2002]." E. Wood et al., *A Unique Structure for Epidermal Growth Factor Receptor
Bound to GW572016 (Lapatinib): Relationships among Protein Conformation, Inhibitor Off-
Rate, and Receptor Activity in Tumor Cells*, 64 Cancer Research 6652 (2004) ("Wood 2004") at
Abstract. Lapatanib is a reversible EGFR inhibitor with a 4-anilinoquinazoline structure similar
to erlotinib. *Id.* at 6653, Table 1 (depicting structures of GW572016 (lapatinib) and OSI-774
(erlotinib)).

144.     Wood 2004 explains that "[t]he structure of GW572016/EGFR is very different
from the structure of OSI-774/EGFR. These differences include the shape of the ATP-binding
site, the position of the C helix, the conformations of the COOH-terminal tail and activation
loop, and the hydrogen bonding pattern with the quinazoline ring of the inhibitors." *Id.* at 6656.
For example, "[t]he ATP binding site of GW572016/EGFR has a larger back pocket than...OSI-
774/EGFR." *Id.* The larger pocket accommodates the larger 3-fluorobenzyl-oxy group of
GW572016, in contrast to the smaller anilino group of erlotinib. *See id.* In addition, "the
quinazoline rings of OSI-774 and GW572016 hydrogen bond with EGFR differently": while
"[t]he quinazoline N1 of both compounds accepts a hydrogen bond from the main chain NH of
Met769," "N3 of GW572016 makes a water-mediated hydrogen bond to the side chain of
Thr830." *Id.* at 6658. In contrast, "N3 of OSI-774 makes a water-mediated hydrogen bond with
the side chain of Thr766." *Id.* In GW572016, "[t]he side chain of Thr766 ...points *away* from the
quinazoline and hydrogen bonds to the backbone carbonyl of Arg752." *Id.* (emphasis added).
Wood 2004 suggests that while the T790M mutation in EGFR was shown to cause resistance to

66

4-anilinoquinazoline PD153035, which "has a small 4-aniline substituent and is predicted to share a similar binding mode" to erlotinib, T790M "may not affect inhibition by compounds that bind like GW572016." *Id.* Wood 2004 also highlights the importance of receptor tertiary structure, suggesting that it "may be a key component of inhibitor selectivity." *Id.* Thus, the POSA would have been guided by the inactive conformation binding model of Wood 2004 rather than the active conformation binding of Stamos 2002. *Id.*

145.    Dr. Jorgensen nonetheless argues that the "POSA would readily envision a binding mode for molecules with an aminopyrimidine core like imatinib or its truncated version, compound 2" by "analogy to the [Stamos 2002] crystal structure for EGFR kinase with erlotinib." Jorgensen Rebuttal, ¶ 83. This despite the fact that erlotinib and imatinib are two entirely different scaffolds and the erlotinib crystal structure shows binding to WT-EGFR, not EGFR having a T790M mutation. Dr. Jorgensen's "vision" for an aminopyrimidine binding model (*see* Jorgensen Rebuttal, ¶ 85), however is plainly inconsistent with the orientation and hydrogen-bonding pattern of imatinib complexed with BCR-ABL in the reported crystal structure. I have reproduced below Figure 2(B) from Schindler 2000, showing a schematic drawing of the ABL kinase interactions with STI-571 variant "Compound 2." I have highlighted the Met318 interaction in purple, the Thr315 interaction in orange, and the amido-pyridine ring of Compound 2 in blue.



Schindler 2000, 1940, Fig. 2B.

146.    Schindler 2000, Figure 2B (above) clearly shows that the key interactions of

Compound 2 (shown below) with the BCR-ABL kinase are 1) the pyridine (substituent of

pyrimidine) nitrogen interaction with Met318 (highlighted in purple), and 2) the secondary

amine (substituent of pyrimidine) interaction with Thr315 (highlighted in orange). Schindler also

shows the amido-pyridine ring of Compound 2 (highlighted in blue) is placed toward the

activation ("DFG") loop (Asp381 Phe 382), and is not within bonding distance of anything,



Schindler 2000 at 1939, Fig. 1A.[9]

---

[9] The structure for Compound 2 in Schindler 2000 appears to be incorrect—"N-N" in the
structure should be "N-H."

68

147.     In contrast, Dr. Jorgensen's "vision" for Compound 2's binding to EGFR has the pyrimidine nitrogen (highlighted below in purple) bound to the methionine residue, and the amido-pyridine group in proximity to Cys773—which is inconsistent with the imatinib/BCR-ABL crystal structure reported in Schindler 2000. Jorgensen Rebuttal, ¶ 83, 85.



Schindler 2000 at 1939, Fig. 1A.[10]

148.     Based on his erroneous "vision," Dr. Jorgensen next argues that the "acrylamide moiety *meta* to the amino group of the core replacing the pyridyl-amide group" yields an irreversible EGFR inhibitor. Jorgensen Rebuttal, ¶¶ 83, 87. However, the POSA could only make such a replacement if they *already knew* the structure of osimertinib and how it binds to EGFR having a T790M mutation—as Dr. Jorgensen has done. *Compare* Jorgensen Rebuttal, ¶ 87 (depicting a binding scheme for Schindler 2000's Compound 2/osimertinib with EGFR) *with* X. Lu et al., *Targeting EGFR$^{L858R/T790M}$ and EGFR$^{L858R/T790M/C797S}$ resistance mutations in NSCLC: Current developments in medicinal chemistry*, 38 Med. Res. Rev. 1550 (2018) (AZ-PW-TAG00423379) ("Lu 2017") at 1558, Fig. 6 (depicting virtually the same schematic representation in 2017 of the binding interactions between osimertinib and EGFR having a T790M mutation). Not only would the POSA have had no information to guide them to this specific substitution as of the priority date, the information the POSA *did have*, i.e., the imatinib/BCR-ABL crystal structure in Schindler 2000, suggested that making such a

---

[10] *See* FN9.

substitution would not yield an irreversible inhibitor at all because it would not place the warhead within binding distance of anything.

149.     That Dr. Jorgensen's suggestion for appending an alkylating agent "*meta* to the amino group of the core" to make an irreversible EGFR inhibitor is purely based on hindsight is confirmed by the fact that it does not hold true for most of the 3rd generation inhibitors discussed in Dr. Jorgensen's Rebuttal Report. Jorgensen Rebuttal, ¶ 87. For example, Dr. Jorgensen's suggestion to place a covalent warhead "meta to the amino group of the core" would give *incorrect* chemical structures for WZ4002, rocelitinib, avitinib, olumutinib, PF-0645998, and naquotinib, placing the covalent warhead on the wrong end of each molecule. *See* Jorgensen Rebuttal, ¶¶ 92, 93, 96–98, 100; *see also* Reider Opening, ¶ 117 (picturing chemical structures for certain 3rd generation EGFR inhibitors, including WZ4002, rocicletinib, YH25448, nazartinib, avitinib, olmutinib, PF-0645998, PF-06747775). This shows that Dr. Jorgensen's "model" is transparently designed to target osimertinib; it clearly does not enable the full class, including at least WZ4002, rocelitinib, avitinib, olumutinib, PF-0645998, and naquotinib—compounds that Dr. Jorgensen himself insists fall within his definition for the irreversible EGFR inhibitors encompassed the by asserted claims. Jorgensen Rebuttal, ¶ 90.

150.     Similarly, Dr. Jorgensen's suggestion that the POSA would next "[f]urther finetun[e]" the compound by "(a) incorporating a water solubilizing sidechain at the solvent exposed position *ortho* to the acrylamide..., (b) conducting a routine scan of aryl and heteroaryl groups to replace the pyridyl group on the pyrimidine core, and (c) exploring other small groups to replace the methyl group *para* to the acrylamide moiety" to arrive at the exact structure for osimertinib is purely based on hindsight. Jorgensen Rebuttal, ¶ 87. None of these substitutions were suggested by the specification of the patents-in-suit, the prior art, particularly for a

pyrimidine-based scaffold—and Dr. Jorgensen does not point to any such teaching or suggestion. In fact, the POSA would have had practically limitless options for substituents and placement of those substituents, and would have had no guidance from the patents-in-suit or prior art to arrive at osimertinib—a needle in a haystack of at least hundreds of millions of compounds.

151.    In addition, to the extent the POSA relied on the Stamos 2002 erlotinib/WT-EGFR crystal structure to design an inhibitor, that model could only lead to a WT-EGFR inhibitor, not osimertinib—a compound that targets the T790M EGFR double mutant and *spares WT*.

### C. The POSA Would Not Have Been Able to Make and Use a Unit Dosage Calculated to Provide a Therapeutic Effect

152.    The asserted claims require administering to a patient a pharmaceutical composition comprising a unit dosage of an irreversible EGFR inhibitor. The patents-in-suit specifically define the "unit dose" to be "physically discrete units suitable as unitary dosage for the subject, each unit containing *a predetermined quantity of active material calculated to produce the desired therapeutic effect* in association with the required diluents; i.e., carrier, or vehicle." '314 patent, 9:33–37 (emphasis added). The unit dose of the asserted claims plainly requires an amount of an irreversible EGFR inhibitor that produces a therapeutic effect—*i.e*., the treatment of gefitinib and/or erlotinib resistant NSCLC *or* the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1 in a patient. I disagree with Dr. Hausheer to the extent he asserts that I "focus[ed] on FDA approval as the standard for enablement." Hausheer Rebuttal, ¶ 709. Rather, my understanding is that enablement of the asserted claims requires the POSA to be able to determine the amount that treats gefitinib and/or erlotinib resistant NSCLC (or gefitinib and/or erlotinib resistant NSCLC with a T790M mutation

in SEQ ID NO:1) in a patient for each irreversible EGFR inhibitor encompassed by the asserted claims without undue experimentation.

153.    As I explained in my Opening Report, the task of determining a dose calculated to achieve the desired therapeutic effect (*i.e.*, the treatment of gefitinib and/or erlotinib resistant NSCLC **or** the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1) for any irreversible EGFR inhibitor would be highly challenging, unpredictable, and highly burdensome. Reider Opening, Section XII. As discussed above in Section IX.118, the scope of irreversible EGFR inhibitor compounds encompassed even by Dr. Jorgensen's structural definition would include at least hundreds of millions of compounds. To identify a unit dose for **each** of those compounds, the POSA would have to determine whether it is active against NSCLC cancer cells resistant to gefitinib and/or erlotinib, or against NSCLC cancer cells having the T790M mutation *in vivo* (including, for example, whether it is able to permeate the cell membrane and achieve adequate drug concentrations inside the cell), whether it is selective to that target (so as not to cause unwanted effects or be depleted by unintended targets), whether it has suitable pharmacokinetics and bioavailability, and whether it is safe and tolerable at effective doses, among other things. *See* Reider Opening, Section XII. These determinations are challenging even for individual compounds, let alone for the essentially limitless genus of compounds whose use is claimed according to Dr. Jorgensen's structural definition. *See id.* In fact, no therapeutic dose may ultimately be found for a given compound.

154.    While Dr. Hausheer acknowledges the "unit dose" definition provided in the specification, he nonetheless argues that the term "does not impose any requirement of an 'effective amount' into the Asserted Claims" and "does not contain...safety and efficacy requirements...." Hausheer Rebuttal, ¶ 715. Dr. Hausheer states that the "POSA would

understand that the 'therapeutic effect' being discussed in the specification is irreversible inhibition of EGFR to address gefitinib and/or erlotinib resistance in patients having gefitinib and/or erlotinib resistant NSCLC." *Id.*, ¶ 716. Dr. Hausheer argues that "the specification of the Patents-in-Suit teaches a POSA the unit dose of the irreversible inhibitors to be used in the claimed methods," specifically it "teaches that the 'total daily dosage is projected to be from about 1 to 1000 mg, preferably from about 2 to 500 mg.'" *Id.*, ¶ 717. For support, Dr. Hausheer points to the "ranges used by targeted therapy for EGFR inhibition to this day," arguing that they are the same as the "range of dosages taught in the specification, including the preferred range of 2 to 500 mg...." *Id.*, ¶ 718.

155.    As an initial matter, I observe that Dr. Jorgensen appears to have an understanding of the asserted claim requirements that is contrary to Dr. Hausheer's definition for "therapeutic effect," which acknowledges that irreversible inhibition of EGFR occurs ***in a patient***. *See* Hausheer Rebuttal, ¶ 716. By dismissing standard drug development considerations including *in vivo* activity, selectivity, cell permeability, bioavailability, pharmacokinetic properties, toxicity, and clinical utility as "irrelevant" to the asserted claims,  Dr. Jorgensen appears to be taking the position that the claimed methods of treating do not actually require treatment of a patient. *See, e.g.*, Jorgensen Rebuttal, ¶¶ 139, 140, 142. I observe, however, that when it is helpful to his arguments, Dr. Jorgensen nonetheless argues that the asserted claims require cell permeability such that inhibitors can enter the cell (*e.g., id.*, ¶ 104), and that the POSA would take selectivity into account in choosing an acrylamide-based Michael acceptor (*id.*, ¶ 219).

156.    In my opinion, it is absurd to suggest that the asserted claims, which claim methods of treating NSCLC ***in a patient***, are disconnected from *in vivo* activity or clinical utility.

An inhibitor that lacks *in vivo* activity, clinical utility, or has an unacceptable toxicity profile cannot be calculated to produce the desired therapeutic effect in any amount, let alone an amount between 1 to 1000 mg.  More to the point, Dr. Hausheer is incorrect that an irreversible EGFR inhibitor can be administered in such a broad range; the therapeutic window of most EGFR inhibitors is much narrower (if such a window exists at all).  As discussed in my Opening Report, finding a predetermined amount calculated to produce the desired therapeutic effect is very challenging. *See, e.g.*, Reider Opening, Section XII.A.2.a).

157.     Dr. Hausheer does not disagree with me that determining whether a given inhibitor is active *in vivo*, is selective, has suitable pharmacokinetics and bioavailability, is safe and tolerable, among other things, would have been highly challenging, unpredictable, and highly burdensome. Instead, he dismisses "safety and efficacy" as not required by the asserted claims. Hausheer Rebuttal, ¶ 715. In doing so, Dr. Hausheer appears to acknowledge that the POSA would **not** have been able to determine which of the at least hundreds of millions of irreversible EGFR inhibitor compounds in Dr. Jorgensen's structural definition would be suitable for administration to a patient in an amount that produces a therapeutic effect, *i.e.*, that treats gefitinib and/or erlotinib resistant NSCLC **or** gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1, without undue experimentation.

## X.  THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION

158.     As I explained in my Opening Report, the asserted claims are invalid for lack of written description because the patents-in-suit fail to describe either the irreversible EGFR inhibitors that fall within the claimed methods, or methods of treating patients having gefitinib and/or erlotinib resistant NSCLC with a unit dose calculated to achieve the desired therapeutic effect. *See* Reider Opening, Section XIII. As such, the POSA would not have understood the

74

applicants to have been in possession of either the irreversible EGFR inhibitors that fall within the asserted claims or the claimed methods of treating.

159.     In his rebuttal report, Dr. Jorgensen opines that the "scope of irreversible EGFR inhibitors" is adequately supported by the written description of the patents-in-suit. Jorgensen Rebuttal, ¶ 174. Relying in part on Dr. Jorgensen, Dr. Hausheer opines that the specification demonstrates that the inventors possessed the full scope of the claimed invention as of the priority date...." Hausheer Rebuttal, ¶ 838. Specifically, Dr. Hausheer relies on Dr. Jorgensen's opinions that "the specification demonstrates possession of the irreversible inhibitors that are suitable for use in the claimed methods." *Id.*, ¶ 842 Dr. Hausheer additionally opines that the shared specification of the patents-in-suit "indicates to a POSA that the inventors had possession of the unit dose of the irreversible inhibitors to be used in the claimed methods at the time of filing." *Id.*, ¶ 847. Dr. Hausheer also opines that the shared specification "teaches the full scope of the claimed invention as it relates to the types of gefitinib and/or erlotinib resistant NSCLC claimed." *Id.*, ¶ 857.

160.     I have considered the written description arguments set forth in both Dr. Jorgensen's and Dr. Hausheer's Rebuttal Reports. For the reasons discussed below, as well as in my Opening Report, I disagree 1) with Dr. Jorgensen's conclusion that the scope of irreversible EGFR inhibitors encompassed by the asserted claims are supported by the written description of the patents-in-suit, and 2) with Dr. Hausheer's conclusion that the specification demonstrates that the inventors possessed the full scope of the claimed invention. I maintain my opinions provided in my Opening Report that the asserted claims are invalid for lack of written description.

### A. The Patents-in-Suit Do Not Describe a Class of Small Molecule N-heteroaryl Compounds

161.    As I discussed in my Opening Report, the patents-in-suit describe only three structurally similar embodiments—HKI-272, HKI-357, and EKB-569—which are all 4-anilinoquinoline-3-carbonitriles, bearing a dimethylaminobutenamide Michael acceptor at the 6-position of the quinoline ring, an ethoxy substituent at the 7-position of the quinoline ring, and a chlorine at the meta position of the aniline ring. *See, e.g.*, Reider Opening, Section XIII.A.1.a). Beyond these three compounds, the patents-in-suit do not otherwise describe any structural features common to the irreversible EGFR inhibitors encompassed by the asserted claims. *Id.*

162.    In light of the lack of any explicit description in the patents-in-suit, Dr. Jorgensen points to known compounds, including ***reversible*** EGFR inhibitors described in prior art references cited in the specification to support his structural definition for the irreversible EGFR inhibitors encompassed by the asserted claims, i.e., "a small molecule N-heteroaryl compound containing (a) a nitrogen in the N-heteroaryl ring system that makes a hydrogen bond with the Met769 or its equivalent in the hinge region, (b) an aryl or heteroaryl group residing in the lipophilic region, and (c) a Michael acceptor, particularly acrylamide-based, which can access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2), in the ligand binding pocket of the intracellular kinase domain – that performed the function of covalent binding with the cysteine residue, thereby providing irreversible inhibition." Jorgensen Rebuttal, ¶ 176. Specifically, Dr. Jorgensen points to 3-cyanoquinoline, quinazoline, pyridopyrimidine, and pyrrolopyrimidine structures, including EKB-569, HKI-272, HKI-357, CI-1033, gefitinib, erlotinib, PKI-166, and lapatinib. *See, e.g.*, Jorgensen Rebuttal, ¶ 177.

163.    The prior art compounds referenced in the patents-in-suit, however, do not show that the applicants were in possession of Dr. Jorgensen's structural class of N-heteroaryl

compounds. All of the compounds Dr. Jorgensen points to share one of four specific molecular scaffolds: 3-cyanoquinoline, quinazoline, pyridopyrimidine, or pyrrolopyrimidine. In contrast, as discussed above in Section IX.A, the genus of possible N-heteroaryl scaffolds is vast, encompassing at least hundreds of options, including mono-cyclic and bi-cyclic compounds, as well as higher-order fused ring systems containing three, four, or more rings (each of which may be substituted with practically limitless options and configurations). The POSA's knowledge of prior art EGFR compounds does not support a broad structural definition encompassing *any* N-heteroaryl scaffold.

164.    In addition, as discussed above, the POSA's knowledge of prior art EGFR compounds that Dr. Jorgensen relies on for his structural definition does not support substitution with *any* aryl or heteroaryl group. As discussed above in Section IX.i, nearly all of the prior art compounds that Dr. Jorgensen points to have a 4-anilino group. The 4-anilino group is one specific non-heteroaromatic substituent. In contrast, the genus of possible aryl and heteroaryl groups is even larger than the genus of N-heteroaryl scaffolds discussed above. "Aryl and heteroaryl groups" encompass the entire universe of aromatic substituents, including having any number of fused rings, as well as the entire universe of heteroaromatic substituents—which are any aromatic substituents having a heteroatom (such as N or O) within the ring(s). In addition, to the extent that Dr. Jorgensen suggests that "it was known that different aryl or heteroaryl groups in the lipophilic region of the kinase domain could be used interchangeably in different N-heteroaryl scaffolds to achieve/retain EGFR inhibitory activity" (Jorgensen Rebuttal, ¶ 184), such "interchangeability" would be limited to the specific scaffolds and aryl and/or heteroaryl substitutions reported in the prior art—not interchangeability of *any* aryl or heteroaryl group on

*any* N-heteroaryl ring system. Dr. Jorgensen's broad definition is not supported by the prior art EGFR inhibitor compounds that he points to.

165.     Finally, Dr. Jorgensen's requirement for "a Michael acceptor, particularly acrylamide-based" is inconsistent with the rest of his structural definition. Jorgensen Rebuttal, ¶ 176. As discussed in my Opening Report, the POSA would have known that there were vast options for alkylating agents. *See, e.g.*, Reider Opening, ¶ 471. In contrast, Dr. Jorgensen's Michael acceptor requirement is based on the POSA's supposed knowledge that "irreversible EGFR TKIs such as CI-1033 (quinazoline-based) and EKB-569 (3-cyanoquinoline-based) contained an acrylamide-based Michael acceptor that covalently binds to the designated cysteine-residue." Jorgensen Rebuttal, ¶177. There is no support for limiting the covalent warhead to only Michael acceptors, "particularly acrylamide-based" where the rest of Dr. Jorgensen's definition broadly encompasses *all* N-heteroaryl ring systems having *any* aryl or heteroaryl substituent. As discussed above, the genus of N-heteroaryl ring systems is vast, encompassing at least hundreds of options, including mono-cyclic and bi-cyclic compounds, as well as higher-order fused ring systems containing three, four, or more rings (each of which may be substituted with practically limitless options and configurations). In contrast, Dr. Jorgensen's support for limiting the universe of covalent warheads to *only* Michael acceptors, "particularly acrylamide-based" is based on only a couple of these scaffold options.

166.     Similarly, the POSA would have no way of knowing whether a given Michael acceptor, "particularly acrylamide-based," appended to *any* N-heteroaryl scaffold according to Dr. Jorgensen's definition, would in fact "access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2)" without testing each and every compound. Jorgensen Rebuttal, ¶ 176. In addition, even if Dr. Jorgensen were correct that the 6-position was the "optimal"

placement for a Michael acceptor on the specific quinazoline, quinoline, and/or pyridopyrimidine compounds investigated (which I disagree with), that does not tell the POSA what the optimal place for a Michael acceptor would be for *other* N-heteroaryl scaffolds within Dr. Jorgensen's structural definition, such that it "can access the designated cysteine residue." *Id.*, ¶¶ 176, 186, 187

167.    Dr. Jorgensen addresses the exclusion of CL-387,785 from the '162 patent asserted claim, stating that CL-387,785 "does not contain an acrylamide-based Michael acceptor, but rather possesses an alkyne moiety," and thus "it would be logical to exclude this compound from the claim, at least because it is distinct from the preferred acrylamide-based irreversible EGFR TKIs." Jorgensen Rebuttal, ¶ 180. I observe, however, that Dr. Jorgensen's reason for justifying the exclusion of CL-387,785 is the very same reason that he *includes* "a Michael acceptor, particularly acrylamide-based" in his structural definition—that the POSA would have known that such covalent warheads were used in prior art irreversible EGFR inhibitors. *Id.*, ¶¶ 176, 177 ("an acrylamide-based Michael acceptor moiety [was] known at the time of the invention"). Dr. Jorgensen's justification for the exclusion of CL-387,785 is also inconsistent with his reasoning for *expanding* his structural definition from the 3-cyanoquinoline, quinazoline, pyridopyrimidine, and pyrrolopyrimidine scaffolds "reported by the time of the invention" to *any* N-heteroaryl ring system. *Id.*, ¶ 177.

168.    As I discussed above in Section IX.118, even if the POSA understood the applicants to be in possession of a class of N-heteroaryl compounds according to Dr. Jorgensen's structural definition (which I disagree with, for the reasons discussed above), this definition would encompass a minimum of hundreds of millions of compounds. The POSA would not have recognized the applicants to be in possession of at least hundreds of millions of irreversible

EGFR inhibitors. In addition, the POSA could not have recognized the applicants to be in possession of N-heteroaryl compounds containing "a nitrogen in the N-heteroaryl ring system *that makes a hydrogen bond with the Met769 or its equivalent in the hinge region*," "an aryl or heteroaryl group *residing in the lipophilic region*," or "a Michael acceptor...*which can access the designated cysteine residue (Cys773 of EGFR or Cys805 of erb-B2)*...." according to Dr. Jorgensen's definition at least because the POSA did not have any crystal structure showing the binding mode for an irreversible inhibitor with EGFR having a T790M mutation. Jorgensen Rebuttal, ¶ 176; *see, e.g.,* Reider Opening, ¶ 352. Without an accurate crystal structure or model for how compounds meeting Dr. Jorgensen's structural definition bind to EGFR *and* erb-B2, the POSA could have no way of knowing whether each compound in fact 1) hydrogen bonds with Met769, 2) has an aryl or hetero aryl group that resides in the lipophilic region, or 3) whether the Michael acceptor can access the designated cysteine—and thus, would not have understood the applicants to be in possession of all compounds within the definition.

169.     While Dr. Jorgensen argues that the Stamos 2002 erlotinib/WT-EGFR crystal structure "would be useful to a POSA in using irreversible EGFR TKIs, and if desired designing additional irreversible EGFR TKIs" (Jorgensen Rebuttal, ¶ 177), this crystal structure was not an accurate or appropriate model for *irreversible* EGFR inhibitor binding to EGFR *having a T790M mutation*, and would not have provided any information to the POSA. As discussed above in Section IX.iv the POSA would have known that reversible and irreversible binding modes to EGFR are entirely different such that forming a covalent linkage with EGFR would result in loss of the hydrogen bonding interactions required by Dr. Jorgensen's definition. In addition, the T790M mutation would have a significant effect on the binding mode such that "binding of inhibitors to EGFR is sterically hindered." Hossam 2016 at 574. The POSA also

would have known that EGFR may take either an active or an inactive conformation—and that these conformations result in very different binding structures affecting the shape of the ATP-binding site, the position of the C helix, the conformations of the COOH-terminal tail and activation loop, and the hydrogen bonding pattern with inhibitors, for example. *See* Section IX.iii above. For at least these reasons, the POSA could not have recognized the applicants to be in possession of irreversible EGFR inhibitors meeting Dr. Jorgensen's definition.

170.     Specifically, Dr. Jorgensen is incorrect that "a POSA would not need [] a crystal structure of EGFR having a T790M mutation." Jorgensen Rebuttal, ¶ 214. Dr. Jorgensen argues that the specification demonstrates the ability of irreversible EGFR TKIs to inhibit the kinase activity of the T790M mutant...Based on this, a POSA would understand that the cysteine residue would remain positioned for covalent modification in the T790M EGFR mutant." *Id*. That "the cysteine residue would remain positioned for covalent modification" with respect to the three embodiments described in the patents-in-suit, however, does not tell the POSA whether the cysteine residue would be accessible to **any** N-heteroaryl compound within Dr. Jorgensen's definition. More specifically, this does not tell the POSA whether or how the binding site of WT-EGFR may change upon introduction of a T790M mutation, or how the inhibitor compound should be modified accordingly. Dr. Jorgensen opines that a POSA would have "knowledge regarding the well-established SAR of the various types of EGFR inhibitors." Jorgensen Rebuttal, ¶178.  As discussed throughout my reports, this is not true. A POSA would have had little information from which to predict whether a particular compound could irreversibly bind EGFR.

171.     Dr. Jorgensen also opines that "[t]he claims cover only those EGFR inhibitors that are capable of accessing the intracellular tyrosine kinase domain of EGFR (ATP binding cite)

and covalently binding to the designated cysteine residue in the ligand binding pocket of the kinase domain, thereby providing irreversible inhibition." Jorgensen Rebuttal, ¶ 176. In doing so, Dr. Jorgensen acknowledges that activity, cell permeability, solubility, and pharmacokinetic activity of the compounds are relevant (and necessary) to determining whether a compound is an irreversible EGFR inhibitors within the claims. Dr. Jorgensen fails to address these requirements. He points to no disclosures in the specification showing the applicants were in possession of a class of compounds that have the requisite activity to be used in the claimed methods.

172.    In addition, the POSA could not have recognized the applicants to be in possession of osimertinib specifically, as Dr. Jorgensen suggests. Jorgensen Rebuttal, ¶ 192. As discussed above in Section IX.B, osimertinib is a clear departure from the prior art on which Dr. Jorgensen grounds his structural definition—both in terms of structure and selectivity. Osimertinib's chemical structure bears no similarity to any of the embodiments described in the patents-in-suit, nor any of the prior art EGFR inhibitor compounds that Dr. Jorgensen explicitly points to in his Rebuttal Report. The POSA could have only developed osimertinib—out of the at least hundreds of millions of compounds in Dr. Jorgensen's definition—through hindsight. *See* Section IX.B above. In addition, to the extent the POSA relied on the Stamos 2002 erlotinib/WT-EGFR crystal structure as Dr. Jorgensen suggests, that model could only lead to a WT-EGFR inhibitor, not osimertinib—a compound that targets the T790M EGFR double mutant and ***spares WT***.

173.    In any event, Dr. Jorgensen acknowledges that the larger compounds encompassed by the asserted claims are ***not*** adequately described such that the POSA would have understood the applicants to be in possession of such compounds to the extent he asserts

that the POSA would have understood that the asserted claims to be limited to small molecule compounds. Jorgensen Rebuttal, ¶176. Contrary to the plain language of the patents-in-suit, Dr. Jorgensen asserts that the "POSA would understand that such irreversible EGFR TKIs are small molecule compounds, and cannot be 'larger' compounds such as proteins, oligonucleotides, etc." Jorgensen Rebuttal; ¶ 176; *see* '314 patent, 13:3-13 (explaining that the compounds of the invention include "a larger compound, for example, an oligomer of nucleic acids, amino acids, or carbohydrates including without limitation proteins, oligonucleotides, ribozymes, DNA-zymes, glycoproteins, siRNAs, lipoproteins, aptamers, and modifications and combinations thereof."). Dr. Jorgensen argues that the "claims cover only those EGFR inhibitors that are capable of accessing the intracellular tyrosine kinase domain of EGFR (ATP binding site) and covalently binding to the designated cysteine residue in the ligand-binding pocket of the kinase domain...." Jorgensen Rebuttal, ¶ 176. For the reasons discussed above in Section IX.A.iv, I disagree that Dr. Jorgensen's concerns regarding intracellular access would exclude "larger" compounds. The POSA would have known, for example, that large molecules ADC could be used for cancer treatment.

## B.  The Patents-in-Suit Do Not Describe a Method of Treating Comprising Administration of a Unit Dose

174.    As discussed above in Section IX.C, the asserted claims require administering to a patient a pharmaceutical composition comprising a unit dosage of an irreversible EGFR inhibitor. The patents-in-suit specifically define the "unit dose" to be "physically discrete units suitable as unitary dosage for the subject, each unit containing *a predetermined quantity of active material calculated to produce the desired therapeutic effect* in association with the required diluents; i.e., carrier, or vehicle." '314 patent, 9:33–37 (emphasis added). The unit dose of the asserted claims plainly requires an amount of an irreversible EGFR inhibitor that produces

a therapeutic effect—*i.e.*, the treatment of gefitinib and/or erlotinib resistant NSCLC *or* the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1 in a patient. I disagree with Dr. Hausheer to the extent he asserts that I "focus[ed] on FDA approval as the standard for written description." Hausheer Rebuttal, ¶ 838. Rather, my understanding is that the claimed methods of treating comprising administration of a unit dose are adequately described where the POSA could recognize that the applicants were in possession of an amount that treats gefitinib and/or erlotinib resistant NSCLC (or gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1) in a patient for each irreversible EGFR inhibitor encompassed by the asserted claims.

175.    As I explained in my Opening Report, the task of determining a dose calculated to achieve the desired therapeutic effect (*i.e.*, the treatment of gefitinib and/or erlotinib resistant NSCLC *or* the treatment of gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1) for any irreversible EGFR inhibitor would be highly challenging, unpredictable, and highly burdensome. Reider Opening, Sections XII.A.2; XIII.A.2. As discussed above in Section IX.118, the scope of irreversible EGFR inhibitor compounds encompassed even by Dr. Jorgensen's structural definition would include at least hundreds of millions of compounds. To identify a unit dose for *each* of those compounds, the POSA would have to determine whether it is active against NSCLC cancer cells resistant to gefitinib and/or erlotinib, or against NSCLC cancer cells having the T790M mutation *in vivo* (including, for example, whether it is able to permeate the cell membrane and achieve adequate drug concentrations inside the cell), whether it is selective to that target (so as not to cause unwanted side effects or be depleted by unintended targets), whether it has suitable pharmacokinetics and bioavailability, and whether it is safe and tolerable at effective doses, among other things. *See* Reider Opening, Sections XII.A.2; XIII.A.2.

These determinations are challenging even for individual compounds, let alone for the essentially limitless genus of compounds whose use is claimed according to Dr. Jorgensen's structural definition. *See id.* In fact, no therapeutic dose may ultimately be found for a given compound.

176.    While Dr. Hausheer acknowledges the "unit dose" definition provided in the specification, he nonetheless argues that the term "does not impose any requirement of an 'effective amount' into the Asserted Claims" and "does not contain...safety and efficacy requirements...." Hausheer Rebuttal, ¶¶ 715, 844. Dr. Hausheer states that the "POSA would understand that the 'therapeutic effect' being discussed in the specification is simply irreversible inhibition of EGFR to address gefitinib and/or erlotinib resistance in patients having gefitinib and/or erlotinib resistant NSCLC." *Id.*, ¶ 846. Dr. Hausheer argues that "[t]he specification of the Patents-in-Suit indicates to a POSA that the inventors had possession of the unit dose of the irreversible inhibitors to be used in the claimed methods," specifically it "teaches that the 'total daily dosage is projected to be from about 1 to 1000 mg, preferably from about 2 to 500 mg.'" *Id.*, ¶ 847.

177.    In my opinion, it is absurd to suggest that the asserted claims, which claim methods of treating NSCLC **in a patient**, are disconnected from *in vivo* activity or clinical utility. An inhibitor that lacks *in vivo* activity, clinical utility, or has an unacceptable toxicity profile cannot be calculated to produce the desired therapeutic effect in any amount, let alone an amount between 1 to 1000 mg.  More to the point, Dr. Hausheer is incorrect that an irreversible EGFR inhibitor can be administered in such a broad range; the therapeutic window of most EGFR inhibitors are much narrower (if such a window exists at all).  As discussed in my Opening Report, finding a predetermined amount calculated to produce the desired therapeutic effect is very challenging. *See, e.g.*, Reider Opening, Section XII.A.2.a).

178.     Dr. Hausheer does not disagree with me that determining whether a given inhibitor is active *in vivo*, is selective, has suitable pharmacokinetics and bioavailability, is safe and tolerable, among other things, would have been highly challenging, unpredictable, and highly burdensome. Instead, he dismisses "safety and efficacy" as not required by the asserted claims. Hausheer Rebuttal, ¶ 715. In doing so, Dr. Hausheer appears to acknowledge that the POSA would **not** have recognized that the applicants were in possession of unit doses calculated to produce the desired therapeutic effect, *i.e.*, that treats gefitinib and/or erlotinib resistant NSCLC **or** gefitinib and/or erlotinib resistant NSCLC with a T790M mutation in SEQ ID NO:1, for each of the at least hundreds of millions of irreversible EGFR inhibitor compounds in Dr. Jorgensen's structural definition.

### C.   The Patents-in-Suit Do Not Describe "wherein the irreversible EGFR inhibitor is not CL-387,785"

179.     Dr. Hausheer opines that the specification adequately supports the exclusion of CL-387,785 from claim 1 of the '162 Patent. Hausheer ¶ 862-–863. I disagree. Dr. Hausheer's opinion is based on his "understanding" that Dr. Jorgensen "has opined that this compound does not fall within the class of compounds taught by the specification as suitable for use within the claimed methods of treating." Hausheer Rebuttal ¶ 862. Dr. Hausheer's understanding is incorrect. CL-387,785 has the "common structural features" that Dr. Jorgensen describes (although the Michael acceptor is an alkyne moiety, not Dr. Jorgensen's preferred acrylamide-based moiety). Jorgensen ¶ 74. In fact, Dr. Jorgensen points to CL-387,785 as, in his opinion, giving a POSA information about the structure for irreversible EGFR inhibitors. Jorgensen ¶¶ 41, 105.

180.     Dr. Hausheer "notes" that the specification "distinguished" CL-387,785 from HKI-272, HKI-357, and EKB-569 because CL-387,785 has a chloride at position 3 of the aniline

group, and that is sufficient to exclude the compound from the claims. I disagree. The specification notes that CL-387,785 lacks a chloride at position 3, but states it is effective in the context of T790M and embraces CL-387,785.

181.     Dr. Jorgensen opines that "it would be logical to exclude [CL-387,785] from the claim, at least because it is distinct from the preferred acrylamide-based irreversible EGFR TKIs." Jorgensen ¶ 180. This opinion makes little sense. Under the Court's construction, CL-387,785 is an irreversible EGFR inhibitor. Even under Dr. Jorgensen's "common structural features" approach, CL-387,785 would be an irreversible EGFR inhibitor. That Dr. Jorgensen says "acrylamide-based" Michael acceptors are preferred, does not exclude other Michael acceptors even under his approach.

182.     Dr. Jorgensen also states as reasons for excluding CL-387,785 are "[t]he specification explicitly discloses the work performed by others using CL-387,785 [], and the structure of CL-387,785 was known in the art." But Dr. Jorgensen similarly opines that prior work performed on HKI-272, EKB-569, and HKI-357 was cited in the specification and the structures of those compounds were known in the art. See, e.g., Jorgensen ¶¶ 43, 67.

183.     As I explained in my Opening Report, in order for a negative limitation—such as wherein the irreversible EGFR inhibitor is not CL-387,785—to have adequate written description support, the reason to exclude the element must be described in the specification. Reider Opening ¶ 56. There is no such support here. Irreversible EGFR inhibitor is a broad term that would encompass CL-387,785. That is true even under Dr. Jorgensen's (incorrect) approach. Instead of excluding CL-387,785, the specification embraces the compound as an irreversible EGFR inhibitor that appears to be effective for T790M. Drs. Hausheer's and

Jorgensen's opinions further confirm that is the case. For these reasons "wherein the irreversible EGFR inhibitor is not CL-387,785" does not have adequate written description support.

## XI. THE ASSERTED CLAIMS ARE ANTICIPATED

184. Dr. Hausheer disagrees that the asserted claims are anticipated by each the following prior art references (or prior art uses). I have considered Dr. Hausheer's opinions regarding lack of anticipation. I disagree with Dr. Hausheer for all of the reasons provided in my Opening Report, and for the additional reasons provided below. I maintain my opinions that the asserted claims are anticipated by each of the following prior art references (or prior art uses), to the extent that the asserted claims are adequately described and enabled. To be clear, I maintain that the asserted claims are not adequately described or enabled, but if the *in vitro* data and disclosures in the specification are sufficient to enable or describe the asserted claims, then the claims are anticipated for the reasons explained below.

### A. Allen 2003

185. 67. Dr. Hausheer disagrees that Allen 2003 anticipates the asserted claims because Allen 2003 supposedly "does not discuss gefitinib and/or erlotinib resistant NSCLC" and "does not contemplate the treatment of NSCLC having a T790M mutation" as required by the asserted claims. Hausheer Rebuttal, ¶¶ 404, 416. While Dr. Hausheer acknowledges that Allen 2003 "reports that EGFRvIII is present in 16% of NSCLC," he states that "Allen 2003 does not identify this mutation as a gefitinib and/or erlotinib-resistance mutation" and disagrees that gefitinib and/or erlotinib resistant NSCLC is "necessarily" present in Allen 2003. *Id.*, ¶¶ 404, 406, 416. Dr. Hausheer also states that "to the extent Allen 2003 can be said to teach that EGFRvIII confers resistance to gefitinib and/or erlotinib in NSCLC....such gefitinib and/or erlotinib resistance is not within the scope of the Asserted Claims." *Id.*, ¶ 407.

186.     In my opening report, I explained that Allen 2003 reports that CI-1033 has been shown to inhibit the constitutively activated and highly tumorigenic variant of erbB-1, EGFRvIII, and that EGFRvIII is a mutated form of EGFR that is associated with gefitinib resistance. *See, e.g.*, Reider Opening, ¶ 530. Thus, while Allen 2003 does not expressly describe EGFRvIII as a mutated form of EGFR associated with gefitinib resistance, this claim limitation is inherently disclosed in Allen 2003. In addition, to the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Allen 2003 necessarily discloses treatment of gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *Id.*, ¶ 580. Allen 2003 reports several Phase I clinical studies of CI-1033, including in patients having NSCLC. *Id.*, ¶ 581.

187.     To the extent that Dr. Hausheer argues that Allen 2003 "does not disclose the ***daily administration of a unit dosage*** of an irreversible EGFR TKI that covalently binds to cysteine 773 in EGFR to overcome gefitinib and/or erlotinib resistant NSCLC, including NSCLC with the T790M mutation," and "does not disclose **orally administering daily a unit dosage** of an irreversible EGFR inhibitor to a patient with gefitinib and/or erlotinib resistant NSCLC," he is incorrect. Hausheer Rebuttal, ¶¶ 408, 411 (emphasis added); *see also id.*, ¶ 417. Allen 2003 clearly reports Phase I clinical studies wherein patients were administered oral, daily doses ranging from 2 mg/day to 1000 mg/day. *See, e.g.*, Reider Opening, ¶ 532.

**B.  Zacharchuk US 2005**

188.     Dr. Hausheer disagrees that Zacharchuk US 2005 is prior art to the patents-in-suit. Hausheer Rebuttal, ¶ 420. For the reasons discussed in my opening report, and above in Section VIII, I disagree with Dr. Hausheer that Zacharchuk US 2005 does not qualify as prior art to the patents-in-suit. *See* Reider Opening, Section X.

189.     Dr. Hausheer also disagrees that Zacharchuk US 2005 anticipates the asserted claims because it "relate[s] to a method of treating or inhibiting cancer in a human treated with gefitinib comprising re-treating with gefitinib alone or in combination with other cytotoxic agents or chemotherapeutic agents and an effective amount of EGFR kinase inhibitor," and the POSA would understand this to be "a significant departure from the embodiments and Asserted Claims...." Hausheer Rebuttal, ¶¶ 424, 428. Dr. Hausheer also disagrees that Zacharchuk US 2005 reports "administering EKB-569 to NSCLC patients with any resistance-conferring mutation, nor specifically to a patient having a T790M mutation." *Id.*, ¶ 429.

190.     In my opening report, I explained that Zacharchuk US 2005 describes the use of EKB-569 in two patients with ***recurrence*** of NSCLC after these patients were treated with gefitinib. Reider Opening, ¶¶ 539, 547. In addition, Zacharchuk US 2005 discloses that CL-387,785 inhibited EGFR containing a secondary mutation in the kinase domain, which the POSA would understand to be the T790M mutation. *Id.*, ¶¶ 541, 548. Thus, Zacharchuk US 2005 discloses treatment of gefitinib and/or erlotinib resistant NSCLC, and treatment of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation as required by the asserted claims.

**C.  Yoshimura 2005**

191.     Dr. Hausheer disagrees that Yoshimura 2005 is prior art to the patents-in-suit. Hausheer Rebuttal, ¶ 434. For the reasons discussed in my opening report, and above in Section VIII, I disagree with Dr. Hausheer that Yoshimura 2005 does not qualify as prior art to the patents-in-suit. *See* Reider Opening, Section X.

192.     Dr. Hausheer also disagrees that Yoshimura 2005 anticipates the asserted claims because it supposedly "does not discuss a method of treatment for gefitinib and/or erlotinib resistant NSCLC" and "does not report administering EKB-569 to NSCLC patients with any secondary resistance mutation, nor specifically the T790M mutation." Hausheer Rebuttal, ¶¶

90

436, 443. Dr. Hausheer also disagrees that Yoshimura 2005 "expressly disclose[s] covalent binding, or binding to the cysteine-773 amino acid residue...or the cysteine-805 amino acid residue..." *Id.*, ¶ 437. Dr. Hausheer also disagrees that oral administration as required by claim 9 of the '314 patent, and daily administration are not disclosed by Yoshimura. *Id.*, ¶¶ 440, 444.

193.     In my opening report, I explained that Yoshimura 2005 describes the use of EKB-569 in a phase I study of patients with NSCLC, and reports that EKB-569 was effective in two patients after resistance to gefitinib. Reider Opening, ¶ 565. Yoshimura also summarizes results from Kobayashi NEJM 2005, which found CL-387,785 strongly inhibited cells with the T790M point mutation, and Kwak 2005, which reported that gefitinib-resistant clones without the T790M mutation were sensitive to EKB-569. *Id.*, ¶ 566. In my opening report, I explained that because EKB-569 irreversibly inhibits EGFR by forming a covalent bond with cysteine 773 residue, Yoshimura 2005's disclosure of EKB-569 inherently discloses an irreversible EGFR inhibitor that covalently binds to cysteine 773. *Id.*, ¶ 568. In addition Yoshimura 2005 explains that patients in a Phase I study received once daily treatment of EKB-569, where EKB-569 was administered orally. *Id.*, ¶ 567, 578. Thus, Yoshimura 2005 discloses treatment of gefitinib and/or erlotinib resistant NSCLC, and treatment of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation as required by the asserted claims. Yoshimura 2005 also discloses covalent binding to cysteine 773, and daily, oral administration of an irreversible EGFR inhibitor as required by the asserted claims.

### D.  Calvo 2004

194.     Dr. Hausheer disagrees that Calvo 2004 anticipates the asserted claims because it supposedly "does not inherently disclose treating a patient with gefitinib and/or erlotinib-resistant NSCLC, nor to patient [sic] with the T790M mutation." Hausheer Rebuttal, ¶ 448. Dr. Hausheer also argues that Calvo 2004 does not disclose daily administration of an irreversible

EGFR inhibitor, and does not expressly disclose covalent binding to cysteine 773. *Id.*, ¶¶ 450, 451, 455.

195.    In my opening report, I explained that Calvo 2004 reports Phase I clinical studies of CI-1033, including patients with NSCLC. Reider Opening, ¶¶5 87, 592. To the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Calvo 2004 necessarily discloses treatment of gefitinib and/or erlotinib resistant NSCLC and gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. I also explained that patients were administered daily, oral doses of 250 mg or 300 mg of CI-1033 in the Phase I clinical study reported in Calvo 2004. *Id.*, ¶¶ 588, 593. I also explained that Calvo 2004 explicitly discloses that CI-1033 forms a covalent bond with cysteine 773 of EGFR. *Id.*, ¶¶ 589, 594. Thus, Calvo 2004 discloses treatment of gefitinib and/or erlotinib resistant NSCLC, and treatment of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation as required by the asserted claims. Calvo 2004 also discloses covalent binding to cysteine 773, and daily, oral administration of an irreversible EGFR inhibitor as required by the asserted claims.

### E.  Grünwald 2003

196.    Dr. Hausheer disagrees that Grünwald 2003 anticipates the asserted claims because it supposedly "does not inherently disclose treating a patient with gefitinib and/or erlotinib-resistant NSCLC, nor a patient with the T790M mutation." Hausheer Rebuttal, ¶¶ 459, 468. Dr. Hausheer also argues that Grünwald 2003 "does not identify the EGFRvIII mutation as a gefitinib and/or erlotinib-resistance mutation," and "to the extent Grünwald 2003 can be said to teach that EGFRvIII confers resistance to gefitinib and/or erlotinib in NSCLC...such gefitinib and/or erlotinib resistance is not within the scope of the Asserted Claims." *Id.*, ¶¶ 462, 464, 465, 471. Dr. Hausheer also disagrees that Grünwald 2003 "discloses[] the daily administration of a

unit dosage of an irreversible EGFR TKI that covalently binds to cysteine 773 in EGFR to overcome gefitinib and/or erlotinib resistant NSCLC, including NSCLC with the T790M mutation." *Id.*, ¶ 466, 473.

197.     In my opening report, I explained that Grünwald 2003 reports that both CI-1033 and EKB-569 had been used in patients with NSCLC. Reider Opening, ¶¶ 599, 604. To the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Grünwald 2003 necessarily discloses treatment of gefitinib and/or erlotinib resistant NSCLC and gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. I also explained that Grünwald 2003 states that CI-1033 was administered to patients with NSCLC in daily doses ranging from 50-750 mg and EKB-569 was administered to patients with NSCLC in daily doses ranging from 25-125 mg. *Id.*, ¶¶ 600, 605. Thus, Grünwald 2003 discloses treatment of gefitinib and/or erlotinib resistant NSCLC, and treatment of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation as required by the asserted claims. Grünwald 2003 also discloses daily administration of an irreversible EGFR inhibitor as required by the asserted claims.

## F.  Hidalgo 2002

198.     Dr. Hausheer disagrees that Hildalgo 2002 anticipates the asserted claims because it supposedly does not "inherently disclose[] treating a patient with gefitinib and/or erlotinib-resistant NSCLC having T790M." Hausheer Rebuttal, ¶¶ 479, 485. Dr. Hausheer also argues that Hidalgo 2002 "does not disclose the daily administration of a unit dosage of an irreversible EGFR TKI to overcome gefitinib and/or erlotinib resistant NSCLC, including NSCLC with the T790M mutation. *Id.*, ¶¶ 480, 486.

199.     In my opening report, I explained that Hidalgo 2002 describes the use of EKB-569 in a Phase I trial in patients with advanced solid tumors, including patients with NSCLC. Reider Opening, ¶¶ 609, 615. To the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Hidalgo 2002 necessarily discloses treatment of gefitinib and/or erlotinib resistant NSCLC and gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. I also explained that Hidalgo 2002 reports that patients in the Phase I clinical study were administered daily doses of 25 mg, 50 mg, 75 mg, and 125 mg of EKB-569. *Id.*, ¶¶ 610, 616. Thus, Hidalgo 2002 discloses treatment of gefitinib and/or erlotinib resistant NSCLC, and treatment of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation as required by the asserted claims. Hidalgo 2002 also discloses daily administration of an irreversible EGFR inhibitor as required by the asserted claims.

**G.  Shin 2001**

200.     Dr. Hausheer disagrees that Shin 2001 anticipates the asserted claims because it supposedly does not "inherently disclose[] treating a patient with gefitinib and/or erlotinib-resistant NSCLC having T790M. Hausheer Rebuttal, ¶¶492, 498. Dr. Hausheer also argues that Shin 2001 "does not disclose the daily administration of a unit dosage of an irreversible EGFR TKI to overcome gefitinib and/or erlotinib resistant NSCLC, including NSCLC with the T790M mutation," and that oral administration is not disclosed. *Id.*, ¶¶493, 497, 499. Dr. Hausheer also argues that Shin 2001 does not "disclose[] a method of treatment for gefitinib and/or erlotinib resistant NSCLC by administering an irreversible EGFR inhibitor that binds covalently to the cysteine 773 amino acid residue...or the cysteine 805 amino acid residue...." *Id.*, ¶494.

201.     In my opening report, I explained that Shin 2001 reports that CI-1033 was administered in a Phase I study of patients with incurable solid tumors, including non-small cell

lung carcinomas. Reider Opening, ¶¶622, 627. To the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, Shin 2001 necessarily discloses treatment of gefitinib and/or erlotinib resistant NSCLC and gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. I also explained that Shin 2001 reports that patients were administered daily, oral doses of CI-1033 at nine different dosage strengths (50-560 mg/day). *Id.*, ¶¶623, 628, 632. I also explained that CI-1033 forms covalent bonds with cysteine 773 of EGFR and cysteine 784/805 of erbB2. *Id.*, ¶¶624, 625, 629. Thus, Shin 2001 discloses treatment of gefitinib and/or erlotinib resistant NSCLC, and treatment of gefitinib and/or erlotinib resistant NSCLC having a T790M mutation as required by the asserted claims. Shin 2001 also discloses daily, oral administration of an irreversible EGFR inhibitor as required by the asserted claims. Shin 2001 also discloses an irreversible EGFR inhibitor that covalently binds to cysteine 773, as required by the asserted claims.

### H.  Prior Use of CI-1033

202.    Dr. Hausheer disagrees that the prior use of CI-1033 anticipates the asserted claims, in part, because the prior use clinical trials "were not accessible to the public." Hausheer Rebuttal, ¶503. Dr. Hausheer, however, appears to ignore the fact that all of the limitations of the asserted claims are disclosed by references that were publicly available prior to the priority date.

203.    Dr. Hausheer next dismisses the disclosures of Shin 2001, Allen 2003, and Calvo 2004 regarding the prior use of CI-1033 "for the reasons I have discussed above" and responds to the disclosures of NCT00050830, a clinical study reference, in isolation. Hausheer Rebuttal, ¶508. Dr. Hausheer argues that "NCT00050830 does not disclose the administration of CI-1033 to a patient with gefitinib and/or erlotinib-resistant NSCLC, nor to a patient with the T790M mutation." *Id.*, ¶¶509, 518. Dr. Hausheer also argues that I do not "demonstrate that this clinical

trial predates the priority dates to which the Patents-in-Suit are entitled." *Id.* ¶¶511, 520. Dr. Hausheer also argues that NCT00050830 does not "necessarily disclose[] administering daily a pharmaceutical composition comprising a unit dosage of CI-1033 to a gefitinib and/or erlotinib resistant NSCLC patient" and "does not disclose that an irreversible EGFR inhibitor that binds covalently to the cysteine 773 amino acid residue of the tyrosine kinase domain of EGFR was necessarily administered to a gefitinib and/or erlotinib resistant NSCLC patient." *Id.*, ¶¶513, 521.

204.    In my opening report, I explained that Shin 2001, Allen 2003, NCT00050830, and Calvo 2004 report administration of CI-1033 to patients with gefitinib and/or erlotinib resistant NSCLC having the T790M mutation prior to any applicable filing date. Reider Opening, ¶634. To the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, then Shin 2001, Allen 2003, NCT00050830, and Calvo 2004 necessarily constituted prior use of CI-1033 to treat patients having gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation. *Id.*, ¶¶635, 641. I explained that CI-1033 reportedly forms a covalent bond with the cysteine 773 of EGFR. *Id.*, ¶¶633, 639. I also explained that daily doses of CI-1033 were administered at nine different dosage strengths (50-560 mg/day) in the Phase I study described in Shin 2001; daily doses ranging from 2 mg/day to 1000 mg/day were administered in the Phase I studies described in Allen 2003; and daily oral doses of 250 mg or 300 mg of CI-1033 were administered in the Phase I study described in Calvo 2004. *Id.*, ¶¶636, 642. Thus, these references together constitute a prior use of CI-1033 to treat patients having gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, with daily administration of an irreversible EGFR inhibitor that covalently binds with cysteine 773.

### I.   Prior Use of EKB-569

205.    Dr. Hausheer disagrees that the prior use of EKB-569 anticipates the asserted claims, in part, because the prior use clinical trials "were not accessible to the public." Hausheer Rebuttal, ¶503. Dr. Hausheer, however, appears to ignore the fact that all of the limitations of the asserted claims are disclosed by references that were publicly available prior to the priority date.

206.    Dr. Hausheer next dismisses the disclosures of Hidalgo 2002 regarding the prior use of EKB-569 "for the same reasons" that Dr. Hausheer disagrees that Hidalgo 2002 anticipates the patents-in-suit. Hausheer Rebuttal, ¶525. Dr. Hausheer then proceeds to respond to the disclosures of NCT00067548, a clinical study reference, in isolation. Dr. Hausheer argues that "NCT00067548 does not disclose the administration of EKB-569 to a patient with gefitinib and/or erlotinib-resistant NSCLC, nor to a patient with the T790M mutation." *Id.*, ¶¶526, 536. Dr. Hausheer also argues that I do not "demonstrate that this clinical trial predates the priority dates to which the Patents-in-Suit are entitled." *Id.* ¶¶529, 538. Dr. Hausheer also argues that NCT00067548 does not "necessarily demonstrate[] administering daily a pharmaceutical composition comprising a unit dosage of EKB-569 to a gefitinib and/or erlotinib resistant NSCLC patient" and does not disclose "administering an irreversible EGFR inhibitor that binds covalently to the cysteine 773 amino acid residue of the tyrosine kinase domain of EGFR...." *Id.*, ¶¶528, 539.

207.    In my opening report, I explained that Hidalgo 2002 and NCT00067548 report administration of EKB-569 to patients with gefitinib and/or erlotinib resistant NSCLC having the T790M mutation prior to February 2, 2005. Reider Opening, ¶647. To the extent that Plaintiffs contend that a portion of patients with NSCLC have gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the T790M mutation, then Hidalgo 2002 and NCT00067548 necessarily constituted prior use of EKB-569 to treat patients having gefitinib

and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib resistant NSCLC having the

T790M mutation. *Id.*, ¶¶648, 654. I explained that EKB-569 reportedly forms a covalent bond

with the cysteine 773 of EGFR. *Id.*, ¶¶646, 652. I also explained that EKB-569 was administered

in daily doses of 25 mg, 50 mg, 75 mg, and 125 mg in the Phase I clinical study reported in

Hidalgo 2002. *Id.*, ¶¶649, 655. Thus, these references together constitute a prior use of EKB-569

to treat patients having gefitinib and/or erlotinib resistant NSCLC, or gefitinib and/or erlotinib

resistant NSCLC having the T790M mutation, with daily administration of an irreversible EGFR

inhibitor that covalently binds with cysteine 773.

## XII.   THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS

208.     Dr. Hausheer disagrees that the asserted claims would have been obvious over

each of the following prior art combinations. I have considered Dr. Hausheer's opinions

regarding non-obviousness. I disagree with Dr. Hausheer for all of the reasons provided in my

Opening Report, and for the additional reasons provided below. I maintain my opinions that the

asserted claims would have been obvious over each of the following prior art combinations, to

the extent that the asserted claims are adequately described and enabled.  To be clear, I maintain

that the asserted claims are not adequately described or enabled, but if the *in vitro* data and

disclosures in specification are sufficient to enable or describe the asserted claims, then the

claims would have been obvious for the reasons explained below.

### A.  The Asserted Claim of the '162 Patent Would Have Been Obvious

  i.  Kobayashi 2005 in Combination with One or More of Wissner 2002, Allen
      2003, and/or Rabindran 2004

209.     While Dr. Hausheer states that this combination of prior art references "does not

disclose every limitation" of the asserted claims, he does not actually point to ***any*** limitation of

the asserted claims that is not disclosed by this combination of references. Hausheer Rebuttal,

98

¶680. In addition, while Dr. Hausheer states that he does not "agree that a POSA would have been motivated to combine these references with a reasonable expectation of successfully arriving at the claimed invention," he does not provide *any* reason that the POSA would not have been motivated with a reasonable expectation of success. *See id.*, Section X.B.3.(a).(ii).

210. As I explained in my opening report, Kobayashi 2005 describes the use of an irreversible EGFR inhibitor—CL-387,785—in a method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO. 1 in a patient. Reider Opening, ¶662. For the reasons provided in my opening report, it is my opinion that the POSA would have been motivated with a reasonable expectation of success to combine Kobayashi 2005 with their knowledge of other known irreversible EGFR inhibitors, including EKB-569 (described in Wissner 2002), CI-1033 (described in Allen 2003), and HKI-272 (described in Rabindran 2004) to arrive at the use of an irreversible EGFR inhibitor in a method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO. 1 in a patient. *Id.*, ¶664.

ii. Kwak 2005 in Combination with One or More of Hildalgo 2002 and/or Rabindran 2004

211. While Dr. Hausheer states that he "disagrees" that the '162 patent asserted claim would have been obvious over this combination of prior art, he does not provide any argument for why the claimed technology would *not* have been obvious over Kwak 2005 in combination with one or more of Hidalgo 2002 and/or Rabindran 2004. Hausheer Rebuttal, Section X.B.4.

212. As I explained in my opening report, if the asserted claims are found to be adequately enabled and have written description support, then Kwak 2005 describes the use of an irreversible EGFR inhibitor—including HKI-272, HKI-357, and EKB-569—in a method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO. 1 in a patient. Reider Opening, ¶675. For the reasons provided in my opening report, it is my

99

opinion that the POSA would have been motivated with a reasonable expectation of success based on Kwak 2005 to combine the use of irreversible EGFR inhibitors, including HKI-272, HKI-357, and EKB-569 in the described method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation with the daily administration of a pharmaceutical composition comprising a unit dosage taught in Hidalgo 2002 and Rabindran 2004. *Id.*, ¶679.

      iii.  Carter 2005 in Combination with Allen 2003, Hidalgo 2002, and/or Wissner 2002

213.    While Dr. Hausheer states the he "disagrees" that the '162 patent asserted claim would have been obvious over this combination of prior art, he does not provide any argument for why the claimed technology would ***not*** have been obvious over Carter 2005 in combination with Allen 2003, Hidalgo 2002, and/or Wissner 2002. Hausheer Rebuttal, Section X.B.5.

214.    As I explained in my opening report, Carter 2005 describes the use of irreversible EGFR inhibitors—CL-387,785, CI-1033, and EKB-569—in a method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation in SEQ ID NO. 1 in a patient. Reider Opening, ¶685. For the reasons provided in my opening report, it is my opinion that the POSA would have been motivated with a reasonable expectation of success based on Carter 2005 to combine the use of irreversible EGFR inhibitors EKB-569 and CI-1033 in the described method of treating gefitinib and/or erlotinib resistant NSCLC having a T790M mutation with the daily administration of a pharmaceutical composition comprising a unit dosage taught in Hidalgo 2002 and Allen 2003. *Id.*, ¶688.

**B.  The Asserted Claims of the '314 Patent Would Have Been Obvious**

      iv.  Agus 2003 in Combination with One or More of Calvo 2004, Wissner 2002, Hidalgo 2002, Denny 2002, and/or Dancey 2004

215.    While Dr. Hausheer states that this combination of prior art references "does not disclose every limitation of the asserted claims," he does not actually point to ***any*** limitation of

the asserted claims that is not disclosed by this combination of references. Hausheer Rebuttal, Section X.A.4.(a).(i). Dr. Hausheer then appears to argue that the "POSA would not be expected to combine [these references] with a reasonable expectation of successfully achieving the claimed invention" because, supposedly "Agus 2003 teaches away from daily dosing." Hausheer Rebuttal, Section X.A.4.(a).(ii).

216.    I disagree with Dr. Hausheer that every limitation of the asserted claims is not disclosed in this combination of prior art references, and I also disagree that the POSA would not have combined these references with a reasonable expectation of success in arriving at the claimed technology. *See* Reider Opening, Section XV.B.1. As I explained in my Opening Report, the POSA would have been motivated based on their knowledge of Phase I dosing studies of CI-1033 to modify the suggested weekly dosing schedule of Agus to arrive at daily administration of irreversible EGFR inhibitor CI-1033 with a reasonable expectation of success. *Id.*, ¶699. While Agus 2003 provides general suggestions for dosing TKIs, far from "teach[ing] away from daily dosing" (Hausheer Rebuttal, ¶598), it acknowledges that appropriate dosage amounts will depend on a variety of factors. *See* Reider Opening, ¶701. For the reasons discussed in my opening report, it is my opinion that the POSA would have looked to clinical dosing studies for CI-1033 to determine an appropriate dosage amount, and would have arrived at a daily administration schedule for CI-1033. *Id.* Indeed, Dr. Hausheer appears to acknowledge that "conventional, daily dosing" of irreversible inhibitors was within "the knowledge of a POSA." *E.g.*, Hausheer Rebuttal, ¶103.  For the reasons discussed in my opening report, it is my opinion that the POSA would have been motivated with a reasonable expectation of success to modify Agus 2003 in view of Calvo 2004, Wissner 2002, and/or Hidalgo 2002 to arrive at the claimed technology. *See* Reider Opening, Section XV.B.1.

v. Allen 2003 Alone or in Combination with One or More of Learn 2004 and/or Agus 2003

217. While Dr. Hausheer states that this combination of prior art references "does not disclose every element of Asserted Claims..." (Hausheer Rebuttal, ¶608), he does not actually point to *any* limitation of the asserted claims that is not disclosed by this combination of references. Hausheer Rebuttal, Section X.A.5.(a).(i). Dr. Hausheer then argues that the "[e]ven if there was a motivation to combine...a POSA would not have a reasonable expectation of success of arriving at the claimed methods of treatment," because, supposedly "Agus 2003 teaches away from daily dosing" and thus "a POSA would not be motivated to combine Agus 2003 with any of the other prior art references disclosing daily administration of a unit dose of an irreversible EGFR inhibitor to a patient with gefitinib and/or erlotinib resistant NSCLC." Hausheer Rebuttal, ¶619.

218. I disagree with Dr. Hausheer that every limitation of the asserted claims is not disclosed in this combination of prior art references, and I also disagree that the POSA would not have combined these references with a reasonable expectation of success in arriving at the claimed technology. *See* Reider Opening, Section XV.B.2. As I explained in my Opening Report, the POSA would have been motivated with a reasonable expectation of success to use irreversible EGFR inhibitor CI-1033 in a method for treating gefitinib and/or erlotinib resistant NSCLC based on Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003. *See id.* Specifically, Dr. Hausheer is incorrect that the POSA would not have been motivated with a reasonable expectation of success to arrive at the daily administration of the asserted claims. Indeed, Dr. Hausheer appears to acknowledge that "conventional, daily dosing" of irreversible inhibitors was within "the knowledge of a POSA." *E.g.*, Hausheer Rebuttal, ¶103. For the reasons discussed in my opening report, it is my opinion that the POSA would have been

motivated with a reasonable expectation of success by Allen 2003 alone or in combination with Learn 2004 and/or Agus 2003 to arrive at the claimed technology. *See* Reider Opening, Section XV.B.2.

> vi.  Zacharchuk US 2005 Alone or in Combination with One or More of Discafini 1999 and/or Wissner 2002

219.    While Dr. Hausheer states that this combination of prior art references "does not disclose all the limitations of the asserted claims," he does not actually point to ***any*** limitation of the asserted claims that is not disclosed by this combination of references. Hausheer Rebuttal, Section X.A.6.(a).(i). Dr. Hausheer then argues that the POSA would not have a reasonable expectation of successfully arriving at the claimed methods, in part, because the "teachings of Zacharchuk 2005 are a departure from the claimed methods of treating...." Hausheer Rebuttal, ¶636.

220.    I disagree with Dr. Hausheer that every limitation of the asserted claims is not disclosed in this combination of prior art references, and I also disagree that the POSA would not have had a reasonable expectation of success in arriving at the claimed technology. *See* Reider Opening, Section XV.B.3. As I explained in my Opening Report, Zacharchuk US 2005 teaches a method of treating gefitinib resistant NSCLC with a quinzaoline-based EGFR inhibitor and states a ***preference*** for irreversible EGFR inhibitors. *Id.*, ¶741. Far from being a "departure from the claimed methods," Zacharchuk 2005 ***describes*** the claimed methods. For the reasons discussed in my opening report, it is my opinion that the POSA would have been motivated with a reasonable expectation of success by Zacharchuk US 2005 alone or in combination with one or more of Discafini 1999 and/or Wissner 2002 to arrive at the claimed technology. *See* Reider Opening, Section XV.B.3.

103

vii.   Yoshimura 2005 Alone or in Combination with One or More of Wissner 2002, Agus 2003, and/or Dancey 2004

221.     While Dr. Hausheer states that this combination of prior art references "does not disclose all the limitations of the asserted claims," he does not actually point to **any** limitation of the asserted claims that is not disclosed by this combination of references. Hausheer Rebuttal, Section X.A.7.(a).(i). Dr. Hausheer then argues that "because of Agus 2003's focus on overdosing, a POSA would not be motivated to combine Agus 2003 with any of the other prior art references disclosing daily administration of irreversible inhibitors..." Hausheer Rebuttal, ¶648.

222.     I disagree with Dr. Hausheer that every limitation of the asserted claims is not disclosed in this combination of prior art references, and I also disagree that the POSA would not have been motivated with a reasonable expectation of success to arrive at the claimed technology. *See* Reider Opening, Section XV.B.4. As I explained in my Opening Report, Yoshimura 2005 describes the use of an irreversible EGFR inhibitor—EKB-569—in a method for treating gefitinib and/or erlotinib resistant NSCLC. *Id.*, ¶761. In addition, Yoshimura 2005 describes daily administration of a pharmaceutical composition comprising a unit dosage of EKB-569. *Id.*, ¶763. Indeed, Dr. Hausheer appears to acknowledge that "conventional, daily dosing" of irreversible inhibitors was within "the knowledge of a POSA." *E.g.*, Hausheer Rebuttal, ¶103. Thus, contrary to Dr. Hausheer's suggestion that the POSA would not be motivated to arrive at daily administration based on combination with Agus 2003, the POSA would have been motivated with a reasonable expectation of success to arrive at the claimed technology, including daily administration of an irreversible EGFR inhibitor, based on at least Yoshimura 2005 **alone**. *Id.*, ¶765.

viii.   NCT00266877 2005 in Combination with Rabindran 2004 and One or More
of Zacharchuk US 2005 and/or Dancey 2004

223.    Dr. Hausheer does not attempt to state that this combination of prior art references does not teach every limitation of the asserted claims. While Dr. Hausheer states that the "POSA would not be motivated to combine the teachings of NCT00266877 with one or more of Rabindran 2004, Zacharchuk 2005, and/or Dancey 2004 with a reasonable expectation of success of arriving at the claimed invention," he does not provide any reason that the POSA would ***not*** have arrived at the claimed technology. Hausheer Rebuttal, ¶656.

224.    As I explained in my opening report, NCT00266877 2005 reports a Phase II clinical trial in which HKI-272 is administered to patients having gefitinib and/or erlotinib resistant NSCLC. Reider Opening, ¶779. Rabindran 2004 describes the daily administration of a unit dosage of HKI-272. *Id.*, ¶781. For the reasons discussed in my opening report, the POSA would have been motivated with a reasonable expectation of success to combine the teachings of NCT00266877 2005 with Rabindran 2004 to arrive at a method of treating comprising "administering daily to the patient having gefitinib and/or erlotinib resistant NSCLC a pharmaceutical composition comprising a unit dosage of an irreversible EGFR inhibitor. *Id.*, ¶782.

## XIII.  CONCLUSION

225.    For the reasons set forth above, it is my opinion that the asserted claims a) are not entitled to a priority date of either February 3, 2005 or April 15, 2005; b) are not enabled; c) lack written description; d) are anticipated; and 3) would have been obvious over the prior art.

## XIV.  SUPPLEMENTATION

226.    All of my opinions set forth above are based on my review of the patents-in-suit, the materials listed in the Materials Considered in Exhibit M, and my professional experience. I

reserve the right to modify my opinions, if necessary, based on further review and analysis of evidence in this case, including review and analysis of any information that may be provided to me subsequent to the date of this report. Any such modifications or supplementation would be reflected in any testimony I might give. I also reserve the right to prepare demonstratives, charts, and other visual aids for use at any subsequent hearings or at trial.

# EXHIBIT M

**REPLY EXPERT REPORT OF DR. PAUL J. REIDER REGARDING
INVALIDITY OF U.S. PATENT NOS. 10,596,162 and 10,603,314**

**EXHIBIT M: LIST OF MATERIALS CONSIDERED**

| Description (Cite) | Bates |
|---|---|
| U.S. Patent No. 10,596,162 | PUMAWYETH-TAG00000001 |
| U.S. Patent No. 10,603,314 | PUMAWYETH-TAG00000048 |
| File History of U.S. Patent No. 10,603,314 | PUMAWYETH-TAG00010676 |
| File History of U.S. Patent No. 10,596,162 | PUMAWYETH-TAG00000095 |
| February 27, 2014 Amendment and Response (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00012886 |
| February 27, 2014 Response to Office (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00001046 |
| August 14, 2019 Amendment, claim 29 (excerpt from U.S. Patent No. 10,603,314 File History) | PUMAWYETH-TAG00028426 |
| November 14, 2016 Amendment and Response to Office Action (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH-TAG00010990 |
| May 7, 2019 Amendment, claim 23 (excerpt from U.S. Patent No. 10,596,162 File History) | PUMAWYETH00030344 |
| U.S. Patent No. 6,002,008 | AZ-PW-TAG00421627 |
| U.S. Patent No. 6,251,912 | AZ-PW-TAG00421272 |
| U.S. Provisional App. 60/649,483 | PUMAWYETH-TAG00011424 |
| U.S. Provisional App. 60/671,989 | PUMAWYETH-TAG00011457 |
| International Patent Publication No. WO 2003/103676 | AZ-PW-TAG00423803 |
| United States Published Patent Application No. 2006/023046 | AZ-PW-TAG00423333 |
| Tagrisso® Prescribing Information | AZ-PW-TAG00203312 |
| *Study Evaluating the Safety Of HKI-272 (Neratinib) In Subjects With Advanced Non-Small Cell LungCancer*, ClinicalTrials.gov (Dec. 16, 2005), https://clinicaltrials.gov/study/NCT00266877?term=NCT00266877&rank=1&tab=history&a=1 | AZ-PW-TAG00422783 |
| *A Phase 2, Randomized, Open-Label Study Of Single Agent CI-1033 In Patients With Advanced Non-SmallCell Lung Cancer*, ClinicalTrials.gov (June 23, 2005) https://clinicaltrials.gov/study/NCT00050830?term=NCT00050830&rank=1&tab=history&a=1 | AZ-PW-TAG00422585 |
| *Study Evaluating EKB-569 in Advanced Non-Small Cell Lung Cancer*, ClinicalTrials.gov (Aug. 20, 2009), https://clinicaltrials.gov/ct2/show/NCT00067548 | AZ-PW-TAG00423403 |
| Dec. 20, 2004 Email from D. Bell re: EGFR in NCIH1975 | INV-00001559 |
| Dec. 6, 2004 Email from D. Bell re: Preliminary EGFR result | INV-00000173 |
| Jan. 19, 2005 Email from Haber to Bell | INV-00000627 |
| Feb. 11 2005 Email from T. Lynch re: Confidential Political Gossip | INV-00000705 |
| Feb. 24, 2005 Email from J. Settleman re: collaboration | INV-00000726 |
| Attachment to Jun. 8, 2004 Email from Settleman to Bell - Draft Proposal | INV-00000089 |
| Dec. 6, 2004 Email from Gore to Bell | INV-00000173 |
| Appendix A to June 9, 2004 Wyeth-MGH Research Agreement | MGH000000072 |
| Akula et al., *Binding modes of 6,7 di-substituted 4-anilinoquinoline-3-carbonitriles to EGFR*, 14 Bioorganic & Medicinal Chemistry Letters 3397 | AZ-PW-TAG00432723 |

REPLY EXPERT REPORT OF DR. PAUL J. REIDER REGARDING
INVALIDITY OF U.S. PATENT NOS. 10,596,162 and 10,603,314

EXHIBIT M: LIST OF MATERIALS CONSIDERED

| | |
|---|---|
| (2004) | |
| L. Allen et al., *CI-1033, an Irreversible pan-erbB Receptor Inhibitor and its Potential Application for the Treatment of Breast Cancer*, 30(5) Seminars in Oncology 65–78 (2003) | AZ-PW-TAG00421919 |
| S. Blencke et al., *Mutation of Threonine 766 in the Epidermal Growth Factor Receptor Reveals a Hotspot for Resistance Formation against Selective Tyrosine Kinase Inhibitors*, 278(17) The Journal of Biological Chemistry 15435 (2003) | AZ-PW-TAG00421499 |
| Calvo et al., *Administration of CI-1033, an Irreversible Pan-erbB Tyrosine Kinase Inhibitor, is Feasible on a 7-day On, 7-Day Off Schedule: A Phase I Pharmacokinetic and Food Effect Study*, 10 Clin. Canc. Res. 7112-7120 (2004) | AZ-PW-TAG00422923 |
| C. Carmi et al., *Novel Irreversible Epidermal Growth Factor Receptor Inhibitors by Chemical Modulation of the Cysteine-Trap Portion*, 53 J. Med. Chem 2038 (2010) | AZ-PW-TAG00432579 |
| T. Carter et al., *Inhibition of drug-resistant mutants of ABL, KIT, and EGF receptor kinases*, 102(31) PNAS 11011–16 (2005) | AZ-PW-TAG00423480 |
| J. Dancey, *Epidermal Growth Factor Receptor Inhibitors in Clinical Development*, 58(3) Int. J. Radiation Oncology Bio. Phys. 1003–1007 (2004) | AZ-PW-TAG00422710 |
| Denny, *Irreversible Inhibitors of the erbB family of protein tyrosine kinases*, 9 Pharmacology and Therapeutics 253 (2002) | AZ-PW-TAG00421814 |
| C. Discafani et al., *Irreversible Inhibition of Epidermal Growth Factor Receptor Tyrosine Kinase with In Vivo Activity by N-[4-[(3-Bromophenyl)amino]-6-quinazolinyl]-2-butynamide (CL-387,785)*, 57 BIOCHEMICAL PHARMACOLOGY 917 917–925 (1999) | AZ-PW-TAG00422362 |
| V. Grünwald & M. Hidalgo, *Developing Inhibitors of the Epidermal Growth Factor Receptor for Cancer Treatment*, 95 J. Nat'l Cancer Institute 851–867 (June 18, 2003) | AZ-PW-TAG00422739 |
| M. Hidalgo et al., *Phase 1 trial of EKB-569, an irreversible inhibitor of the epidermal growth factor receptor (EGFR), in patients with advanced solid tumors*, 21 Proceedings of ASCO 17a 63–66 (2002) | AZ-PW-TAG00422735 |
| M. Hossam et al., *Covalent EGFR Inhibitors: Binding Mechanisms, Synthetic Approaches, and Clinical Profiles*, 349 Arch. Pharm. Chem. Life Sci. 573 (2016) | AZ-PW-TAG00433087 |
| P. Jänne et al., *Efficacy and Safety of Patritumab Deruxtecan (HER3-DXd) in EGFR Inhibitor-Resistant*, EGFR-Mutated Non-Small Cell Lung Cancer, Cancer Discovery 75 (2022) | AZ-PW-TAG00432671 |
| S. Kobayashi et al., *EGFR Mutation and Resistance of Non-Small-Cell Lung Cancer to Gefitinib*, N Engl. J. Med. 786–792 (2005) | AZ-PW-TAG00422211 |
| E. Kwak et al., *Irreversible inhibitors of the EGF receptor may circumvent acquired resistant to gefitinib*, 102 Proc. Natl. Acad. Sci. 7665–70 (2005) | AZ-PW-TAG00422937 |
| Learn et al., *Resistance to Tyrosine Kinase Inhibition by Mutant Epidermal Growth Factor Receptor Variant III Contributes to the Neoplastic Phenotype of Glioblastoma Multiform*, 10 CLIN. CANCER RESEARCH 3216 (2004) | AZ-PW-TAG00421121 |
| X. Lu et al., *Targeting EGFR$^{L858R/T790M}$ and EGFR$^{L858R/T790M/C797S}$ resistance mutations in NSCLC: Current developments in medicinal* | AZ-PW-TAG00423379 |

**REPLY EXPERT REPORT OF DR. PAUL J. REIDER REGARDING**
**INVALIDITY OF U.S. PATENT NOS. 10,596,162 and 10,603,314**

**EXHIBIT M: LIST OF MATERIALS CONSIDERED**

| | |
|---|---|
| *chemistry*, 38 Med. Res. Rev. 1550 (2018) | |
| M. Miller et al., *A New Class of Antibody-Drug Conjugates with Potent DNA Alkylating Activity*, 15(8) Mol. Cancer Ther. 1870 (2016) | AZ-PW-TAG00432551 |
| Rabindran et al., *Antitumor Activity of HKI-272, an Orally Active, Irreversible Inhibitor HER-2 Tyrosine Kinase*, 64 Cancer Res. 3958 (2004) | AZ-PW-TAG00422627 |
| T. Schindler et al., *Structral Mechanism for STL-571 Inhibition of Abelson Tyrosine Kinase*, 289 Science 1938 (2000) | PUMAWYETH-TAG00039830 |
| Shin et al, *A Phase I Clinical and Biomarker Study of CI-1033, a Novel Pan-ErbB Tyrosine Kinase Inhibitor in Patients with Solid Tumors*, 37 Proceedings of ASCO 82a (2001) | AZ-PW-TAG00422820 |
| J. Smaill et al., *Tyrosine Kinase Inhibitors. 15. 4-(Phenylamino)quinazoline and 4-(Phenylamino)pyrido[d]pyrimidine Acrylamides as Irreversible Inhibitors of the ATP Binding Site of the Epidermal Growth Factor Receptor*, 42 J. Med. Chem. 1803 at 1805 (1999) | AZ-PW-TAG00421612 |
| J. Smaill et al., *Irreversible Inhibitors of the Epidermal Growth Factor Receptor*, 43 J. Med. Chem. 1380 (2000) | AZ-PW-TAG00420711 |
| J. Smaill et al., *6-Substituted 4-Anilinoquinazolines and 4-Anilinopyrido[3,4-d]pyrimidines as Soluble, Irreversible Inhibitors of the Epidermal Growth Factor Receptor*, 44 J. Med. Chem. 429 (2001) | AZ-PW-TAG00422863 |
| R. Sordella, *Gefitinib-Sensitizing EGFR Mutations in Lung Cancer Activate Anti-Apoptotic Pathways*, 305 Science 1163 (2004) | AZ-PW-TAG00420926 |
| J. Stamos et al., *Structure of the Epidermal Growth Factor Receptor Kinase Domain Alone and in Complex with a 4-Anilinoquinazoline Inhibitor*, 277(48) Journal of Biological Chemistry 46265 (2002) | PUMAWYETH-TAG00039915 |
| H. Tsou et al., *Optimization of 6,7-Disubstituted-4-(arylamino)quinoline-3-carbonitriles as Orally Active, Irreversible Inhibitors of Human Epidermal Growth Factor Receptor-2 Kinase Activity*, 48 J. Med. Chem. 1107 (2005) | AZ-PW-TAG00422049 |
| P. Wee & Z. Wang, *Epidermal Growth Factor Receptor Cell Proliferation Signaling Pathways*, 9(52) Cancers 1 (2017) | PUMAWYETH-TAG00036079 |
| A. Wissner et al., *Synthesis and Structure-Activity Relationships of 6,7-Disubstituted 4-Anilinoquinoline-3-carbonitriles*, 46 J. Med. Chem. 49 (2002) | AZ-PW-TAG00421707 |
| E. Wood et al., *A Unique Structure for Epidermal Growth Factor Receptor Bound to GW572016 (Lapatinib): Relationships among Protein Conformation, Inhibitor Off-Rate, and Receptor Activity in Tumor Cells*, 64 Cancer Research 6652 (2004) | AZ-PW-TAG00432742 |
| X. Yan et al., *Structural Basis of AZD9291 Selectivity for EGFR T790M*, 63 J. Med. Chem. 8502 (2020) | AZ-PW-TAG00433142 |
| N. Yoshimura et al., *EKB-569, A new irreversible epidermal growth factor receptor tyrosine kinase activity in patients with non-small cell lung cancer with acquired resistance to gefitinib*, 51 Lung Cancer 363–368, (December 10, 2005) | AZ-PW-TAG00008475 |
| C. Yun et al., *The T790M mutation in EGFR kinase causes drug resistance by increasing the affinity for ATP*, 105 PNAS 2070 (2008) | AZ-PW-TAG00423347 |
| Opening Report of Paul J. Reider | N/A |

**REPLY EXPERT REPORT OF DR. PAUL J. REIDER REGARDING
INVALIDITY OF U.S. PATENT NOS. 10,596,162 and 10,603,314**

**EXHIBIT M: LIST OF MATERIALS CONSIDERED**

| | |
|---|---|
| Rebuttal Report of Paul J. Reider | N/A |
| Rebuttal Report of Frederick Hausheer | N/A |
| Rebuttal Report of William L. Jorgensen | N/A |
| Rebuttal Report of Glen J. Weiss | N/A |
| Deposition Transcript of Sridhar Rabindran and Exhibits (May 9, 2023) | N/A |
| Memorandum and Order on Claim Construction (Mar. 29, 2023) (D.I. 121) | N/A |
| All materials cited in the Reply Expert Report of Dr. Paul J. Reider Regarding Invalidity of U.S. Patent Nos. 10,596,162 and 10,603,314 | N/A |

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUMA BIOTECHNOLOGY, INC. and WYETH LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 21-cv-1338-MFK |
| ASTRAZENECA PHARMACEUTICALS LP and ASTRAZENECA AB, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Puma Biotechnology, Inc. and Wyeth LLC have sued AstraZeneca

Pharmaceuticals LP and AstraZeneca AB (collectively AstraZeneca) for infringement of

two patents: United States Patent Nos. 10,603,314 (the '314 patent) and 10,596,162

(the '162 patent). The plaintiffs contend that AstraZeneca's drug Tagrisso (osimertinib)

infringes at least claim 1 of both the asserted patents. The parties dispute the meaning

of four terms in those claims.[1] In this opinion, the Court sets forth its construction of the

disputed claim terms.

## Background

Puma and AstraZeneca are biopharmaceutical companies that commercialize

---

[1] The parties initially disputed eight terms but indicated in their Amended Joint Claim Construction Chart that they reached agreement on four of those terms. In addition, the exact language of three of the four remaining claim terms differs slightly between the '314 and '162 patents, but neither party contends that those differences are material to their proposed constructions.

drugs to treat cancer and other illnesses. Puma licensed the rights for the patents-in-suit from Wyeth, and both Puma and AstraZeneca have developed treatments for non-small cell lung cancer (NSCLC). NSCLC is associated with overactivity of the epidermal growth factor receptor (EGFR), an enzyme that is involved in cell division and growth. Drugs that treat this condition are known as EGFR tyrosine kinase inhibitors (TKIs), and these TKIs bind to certain parts of the EGFR to prevent the enzyme from triggering cancerous cell growth.

Some TKIs—including gefitinib and erlotinib—are "reversible inhibitors," which "form non-covalent bonds" with the EGFR or "bind to the [EGFR] in a way that may dissociate over time." Joint Claim Constr. Br. at 8, 10. Reversible inhibitors are effective in treating some but not all forms of NSCLC. To treat gefitinib and/or erlotinib-resistant non-small cell lung cancer ("g/e-resistant NSCLC"), "irreversible inhibitors were developed that covalently bind to specific amino acid residues . . . that are located" at a specific part of the EGFR. *Id.* at 8. These "irreversible inhibitors form strong bonds that do not break under physiologic conditions." *Id.* at 10.

The plaintiffs contend that AstraZeneca's irreversible EGFR inhibitor Tagrisso (osimertinib) infringes both the patents-in-suit. The '314 patent claims methods of treating g/e-resistant NSCLC, and the '162 Patent claims methods of treating g/e-resistant NSCLC having a specific mutation—the "T790M mutation"—in the EGFR. The claimed methods involve administering daily a "unit dosage" of an irreversible EGFR inhibitor that covalently binds to a specific part of the enzyme.[2]

_____

[2] The '314 Patent refers to this part of the EGFR as the "cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2." '314 Patent at 35:58–60. The '162 Patent refers to it as "cysteine 773 of the

2

## Discussion

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). During claim construction, a court is to construe the words of a claim in accordance with their "ordinary and customary meaning," namely "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). Sometimes, the meaning of a term is not immediately apparent, and a court will need to look to other sources to determine "what a person of skill in the art would have understood disputed claim language to mean." *Innova*, 381 F.3d at 1116. These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* Expert testimony is one form of extrinsic evidence, but it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted).

Claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). But "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156

---

catalytic domain within the SEQ ID NO: 1 having a T790M mutation." '162 Patent at 35:55–56. The '162 Patent also specifies a "unit dosage of 2-500 mg." *Id.* at 35:54.

F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also, Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Finally, there are two exceptions to the general rule that claim terms are given their ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). "To disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *See Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (internal quotation marks omitted); *see also, Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").

   1.    **"A method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer [in a patient in need thereof / having a T790M mutation in SEQ ID NO: 1 in a patient]"**[3]

         a.    *The plaintiffs' proposed construction:*

               i.    The preamble is not limiting; plain and ordinary meaning.

---

[3] The brackets indicate language that differs between the two patents. The '314 Patent claims "a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer in a patient in need thereof." '314 Patent at 35:51–52. The '162 Patent claims "a method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1 in a patient." '162 Patent at 35:48–51.

    b.    *AstraZeneca's proposed construction:*

        i.    The preamble is limiting; "Administration of an effective
amount of drug to a patient diagnosed with gefitinib and/or erlotinib
resistant non-small cell lung cancer [having a T790M mutation in SEQ ID
NO: 1 ('162 Patent, Claim 1)] for the purpose of providing a therapeutically
beneficial effect on the gefitinib and/or erlotinib resistant non-small cell
lung cancer.  An effective amount is an amount that results in a beneficial
effect for at least a statistically significant fraction of patients considering
both its pharmacologic effectiveness and its physiological safety."

    c.    *The Court's construction:*

        i.    The preamble is limiting; plain and ordinary meaning

As a threshold matter, the Court agrees with AstraZeneca that the claims'
preambles are limiting.  "[C]laim construction analysis of statements of intended
purpose in methods of using apparatuses or compositions has tended to result in a
conclusion that such preamble language is limiting."  *Eli Lilly & Co. v. Teva Pharms. Int'l
GmbH*, 8 F.4th 1331, 1341 (Fed. Cir. 2021).  This is because "claims to methods of
using such apparatuses or compositions are *not directed to what the method 'is,'* but
rather they typically rely entirely on *what the method 'does[,]'*" which "is usually recited in
[the claim's] preamble."  *Id.* (emphasis added).  On patents that "are directed to
methods, and more specifically to methods of using a composition for a specific
purpose[,]" the Federal Circuit "ha[s] generally construed statements of intended
purpose in such method claims as limiting."  *Id.*

In this case, the intrinsic evidence reflects that the patents are directed to
"methods of using a composition for a specific purpose."  *Id.*  Both patents are titled

5

"*Method* for Treating Gefitinib Resistant Cancer," they repeatedly state that the invention "provides a *method* for treating gefitinib/erlotinib resistant cancer" in at least one embodiment, and they both claim "administering daily . . . a pharmaceutical *composition* . . . ." '314 Patent at 1:1–2, 3:46–48, 7:25–26, 35:54–56; '162 Patent at 1:1–2, 3:51–53, 7:28–29, 35:48–54 (emphasis added). In light of these statements, and considering that the preambles expressly recite "[a] *method* for treating gefitinib and/or erlotinib resistant non-small cell lung cancer," *id.* at 35:52–53; *id.* at 35:48–49 (emphasis added), the Court concludes that the preambles are "statements of intended purpose" that the Federal Circuit has "generally construed . . . as limiting." *Lilly*, 8 F.4th at 1341.

The plaintiffs argue that *Lilly* is inapplicable because in this case "[t]he body of the claims fully recites how g/e-resistant NSCLC is treated." Joint Claim Constr. Br. at 25. Yet although the claims in *Lilly* "reference [the claimed treatment] . . . only in the preambles," the Federal Circuit concluded that "[t]he preambles limit the scope of the claims because these claims would not read on, for example, the performance of the same method step to treat other conditions." *Lilly*, 8 F.4th at 1342. In reaching that conclusion, the court in *Lilly* held that "the treatment . . . [was] central to the inventions of the challenged patents" because there were "extensive discussions of [the] treatment in every section of the patents' written description." *Id.* The same is true in this case: the Summary describes the claimed treatment method, lists compounds used in preferred embodiments, and describes various other embodiments about monitoring and analyzing the cancer; the Detailed Description is divided into a "Gefitinib and Erlotinib Resistant Cancers" section and a "Method of Treating a Patient" section; and the Examples include an "Analysis of Recurrent [non-small cell lung cancer] and

6

Generation of Gefitinib-Resistant NCI-H1650 Cells" and an "Analysis of Recurrent Lung Cancers with Acquired Resistance to Gefitinib."  '314 Patent at 3–4, 6–12, 13–15; '162 Patent at 3–4, 6–12, 13–15.  This indicates that "the preambles [were] not merely statements of effect but rather statements of *the intentional purpose for which the methods must be performed*."  *Lilly*, 8 F.4th at 1342 (emphasis added).  The Court concludes that the preamble is limiting, just as the Federal Circuit "has not hesitated to hold preambles limiting when they state an intended purpose for methods of using a compound."  *Id.*

Although the preamble is limiting, AstraZeneca's proposed construction is unduly narrow.  *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.") (internal quotation marks omitted).  AstraZeneca is correct that "the preambles should be construed consistent with the plain meaning," Joint. Claim Constr. Br. at 22, but its proposed construction would require (1) the method to involve administering an "effective amount" of the drug "for the purpose of providing a therapeutically beneficial effect," and (2) the patient to be diagnosed with g/e-resistant NSCLC.  Federal Circuit precedent similarly precludes the Court from adopting either of these limitations.

AstraZeneca argues that the preamble requires administering an "effective amount" of the drug.  It points out that the phrase "effective amount" appears several times in the specification, which states that the term "indicates an amount that results in a beneficial effect for at least a statistically significant fraction of patients[.]"  '314 Patent at 8:46–47; '162 Patent at 8:49–50.  AstraZeneca contends that because the specification states that "the terms 'effective' and 'effectiveness' includes both

7

pharmacological effectiveness and physiological safety," *id.* at 13:14–16; *id.* at 13:15–17, the treatment must be administered with the purpose of providing a therapeutically beneficial effect.

Yet as the plaintiffs note, neither the preambles nor the claims at issue include the words "effective amount" or "therapeutically beneficial," and the claims use different language—either "a unit dosage" or "a unit dosage of 2-500 mg"—to describe the amount of the pharmaceutical composition to administer. *Id.* at 35:56; *id.* at 35:54. The term "unit dose" also appears in the specification, which defines it as "physically discrete units suitable as unitary dosage for the subject, each unit containing a predetermined quantity of active material calculated to produce the desired therapeutic effect in association with the required diluents[.]" *Id.* at 34–38; *id.* at 38–42. Although the plaintiffs' reliance on *Bristol-Meyers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368 (Fed. Cir. 2001), is misplaced because this case is "not like cases in which the administration of a specified amount is the same regardless of the purpose," *Lilly*, 8 F.4th at 1342 (citing *Bristol-Myers Squibb*, 246 F.3d at 1375), this definition of "unit dose" does not support AstraZeneca's assertion that the preamble requires administration of an "effective amount." The definitions of both "effective amount" and "unit dosage" concern an amount or quantity of the drug, which means that the term "unit dosage" in the claims would be superfluous if the preamble already required administering an "effective amount." "Claims must be interpreted with an eye toward giving effect to all terms in the claim," *Becton, Dickinson & Co. v. Tyco Healthcare Group*, 616 F.3d 1249, 1257 (Fed. Cir. 2010), and adopting AstraZeneca's construction would "be contrary to the principle that claim language should not be treated as meaningless." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006).

8

*Becton* and *Bicon* thus preclude the Court from interpreting the patents to require an "effective amount" when the claims expressly use the term "unit dosage." And because AstraZeneca's argument for a "therapeutically beneficial" purpose depends on the specification's definition of the word "effective," there is also no basis to read in a specific purpose—"therapeutically beneficial" or otherwise.

The Court also declines to read the claims as only encompassing treatment of patients already diagnosed with g/e-resistant NSCLC. The claims describe administering the drug "to the patient *having* [g/e-resistant NSCLC]," but the words "diagnose" or "diagnosis" do not appear in the preamble or the body of the claims. '314 Patent at 35:54–55; '162 Patent at 35:50–52 (emphasis added). AstraZeneca supports its argument by pointing to a section of the specification discussing the process of diagnosing gefitinib and/or erlotinib sensitivity or resistance. Yet "it is long-settled that even though 'claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim.'" *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (quoting *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1237 (Fed. Cir. 2001)). If the Court limited the claims to only those patients diagnosed with g/e resistant NSCLC, then the term "having" would be superfluous because any patient who is diagnosed with the disease necessarily "has" the condition. Such an interpretation would be impermissible for the same reasons that limiting the claims to administering an "effective amount" would make the term "unit dosage" meaningless. *See Becton*, 616 F.3d at 1257, *Bicon,* 441 F.3d at 951. As a result, the Court will not construe the preamble to only include patients diagnosed with the disease.

Lastly, AstraZeneca appeared to contend at oral argument that the preamble

required construction because otherwise a doctor with no intention to treat g/e-resistant NSCLC—or even knowledge that a patient has the condition—could infringe the patent. But "questions that do not go to claim scope, but instead go to infringement" at claim construction. *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).

In short, AstraZeneca's proposed construction of the preambles inappropriately seeks to import limitations from the specification. *See Phillips*, 415 F.3d at 1323 (there is a "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification."). The Court concludes that the preambles do not require further construction; they retain their plain and ordinary meaning.

### 2. "gefitinib and/or erlotinib resistant non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1]"[4]

    a.    *The plaintiffs' proposed construction*

        i.    plain and ordinary meaning

    b.    *AstraZeneca's proposed construction:*

        i.    "non-small cell lung cancer [having a T790M mutation in SEQ ID NO: 1] that has progressed after initiation of treatment with gefitinib and/or erlotinib."

    c.    *The Court's construction:*

        i.    plain and ordinary meaning

At its core, the parties' dispute regarding this term concerns the meaning of the

---

[4] The '314 Patent states "gefitinib and/or erlotinib resistant non-small cell lung cancer." '314 Patent at 35:54–55. The '162 Patent states "gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1." '162 Patent at 35:51–53.

word "resistant." The plaintiffs contend that the Court need not construe this term, while AstraZeneca argues that the phrase "gefitinib and/or erlotinib resistant" only encompasses treatment of cancers that have already been determined to be resistant to gefitinib and/or erlotinib. To support its argument, AstraZeneca points to one embodiment claiming a method of treating non-small cell lung cancer in a subject "after the subject has initiated gefitinib and/or erlotinib treatment." '314 Patent at 3:50–52; '162 Patent at 3:55–56.

But although "[c]ancers may be diagnosed as gefitinib and/or erlotinib resistant after treatment with gefitinib and/or erlotinib has commenced," they may also be "diagnosed as gefitinib and/or erlotinib resistant *prior to treatment* with such compounds." *Id.* at 7:57–61; *id.* at 7:60–64 (emphasis added). The specification states that "[i]n another embodiment, the present invention provides a method of treating cancer, comprising administering to a subject having a mutation in EGFR." *Id.* at 5:32–34; *Id.* at 5:36–38. It then makes it clear that this mutation—which it refers to as the "T790M mutation"—"confers resistance to gefitinib and/or erlotinib" treatment. *Id.* at 5:37–38; *Id.* at 5:41–42. AstraZeneca's proposed construction, which limits the claims to treatment of cancers that have *already* been treated with gefitinib and/or erlotinib, would exclude this embodiment, in contravention of controlling Federal Circuit precedent. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.").

The Court is not persuaded by the evidence that AstraZeneca cites to justify its position. AstraZeneca appears to argue that it is proper to exclude the embodiment

11

discussing the T790M mutation (the "T790M Embodiment") because that embodiment "provides a method of treating *cancer*" rather than "a method of treating *gefitinib and/or erlotinib resistant cancer.*" Joint Claim. Const. Br. at 46 (emphasis added). Although not all forms of non-small cell lung cancer resist gefitinib and/or erlotinib, AstraZeneca fails to explain why patents that specifically claim a method of treating g/e-resistant NSCLC would include an embodiment that encompasses a form of cancer other than what the claimed method treats.[5] Considering that both the embodiment encompassing treatment "after the subject has initiated gefitinib and/or erlotinib treatment" and the T790M Embodiment concern the same method—administering "a pharmaceutical composition comprising an irreversible [EGFR] inhibitor"—the absence of the word "resistant" is not a sufficient basis to exclude the T790M Embodiment. '314 Patent at 3:53–55, 4:36–37; '162 Patent at 3:58–60, 4:40–41.

AstraZeneca's other arguments are similarly unavailing. It appeared to concede at oral argument that its construction would render the T790 Embodiment meaningless, and it argued that the prosecution history justifies such an interpretation because the inventors initially sought a claim with the language "a method of treating cancer" but later cancelled that claim. Joint Claim Const. Br. at 47. Yet to the extent that AstraZeneca is arguing that the inventors disclaimed any interpretation encompassing the T790M Embodiment, the inventors' actions were not "so clear as to show reasonable clarity and deliberateness" and "so unmistakable as to be unambiguous

---

[5] The patents are titled "Method for Treating Gefitinib Resistant Cancer," the preambles state that the invention claimed is "[a] method for treating gefitinib and/or erlotinib resistant non-small cell lung cancer," and AstraZeneca points to no evidence suggesting that the patents claim treatment of cancer that is not resistant to gefitinib or erlotinib. '314 Patent at 1:1–2, 35:51–53; '162 Patent at 1:1–2, 35:48–50.

evidence of disclaimer":  the inventors did not specify their reasons for cancelling that specific claim in their amendment, and the final patents still include that language as an embodiment.  *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (internal citation and quotation marks omitted).

AstraZeneca also contends that if the claim term does not require prior treatment with gefitinib or erlotinib, the claims are invalid for indefiniteness.  The Court declines to decide a validity issue at this stage.  The appropriate course is to construe the patents properly and determine validity later; not to use a validity-based argument as a means of claim construction.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014) ("Courts should be cautious not to allow claim construction to morph into a mini-trial on validity.").

The Court therefore concludes that the terms "gefitinib and/or erlotinib resistant non-small cell lung cancer" and "gefitinib and/or erlotinib resistant non-small cell lung cancer having a T790M mutation in SEQ ID NO: 1" have their plain and ordinary meaning; no further construction is needed.

3.  **"irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to [cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2 / to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation]"[6]**

a.  *The plaintiffs' proposed construction:*

i.  A low molecular weight N-(heteroaryl)-aniline compound

---

[6] The '314 Patent claims an "irreversible epidermal growth factor receptor (EGFR) inhibitor that covalently binds to cysteine 773 residue in the ligand-binding pocket of EGFR or cysteine 805 residue in the ligand-binding pocket of erb-B2."  '314 Patent at 35:57–60.  The '162 Patent claims an "irreversible EGFR inhibitor that covalently binds to cysteine 773 of the catalytic domain within the SEQ ID NO: 1 having a T790M mutation."  '162 Patent at 35:54–56.

having a Michael acceptor that covalently binds to [cysteine

773 residue in the ligand-binding pocket of EGFR or cysteine

805 residue in the ligand-binding pocket of erb-B2 / cysteine

773 of the catalytic domain within the SEQ ID NO: 1 having

a T790M mutation]."

    b.    *AstraZeneca's proposed construction:*

        i.    "A compound that permanently inhibits EGFR and covalently

binds to [cysteine 773 residue in the ligand-binding pocket of

EGFR or cysteine 805 residue in the ligand-binding pocket of

erb-B2 / cysteine 773 of the catalytic domain within the SEQ

ID NO: 1 having a T790M mutation]."

    c.    *The Court's construction:*

        i.    "A compound that irreversibly inhibits EGFR and covalently

binds to [cysteine 773 residue in the ligand-binding pocket of

EGFR or cysteine 805 residue in the ligand-binding pocket of

erb-B2 / cysteine 773 of the catalytic domain within the SEQ

ID NO: 1 having a T790M mutation]."

The parties also disagree regarding the proper construction of the term

"irreversible epidermal growth factor receptor (EGFR) inhibitor."  The plaintiffs argue

that the term should be construed as "a low molecular weight N-(heteroaryl)-aniline

compound having a Michael acceptor," but the Court agrees with AstraZeneca that the

intrinsic evidence does not support this interpretation.

"When a patentee explicitly defines a claim term in the patent specification, the

patentee's definition controls."  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d

14

1363, 1380 (Fed. Cir. 2009). As AstraZeneca points out, the specification states that "the irreversible EGFR inhibitor may be any compound which binds to cysteine 773 of EGFR (SEQ ID NO: 1)." '314 Patent at 3:57–59; '162 Patent at 3:62–64. The specification also defines the terms "drug" or "compound" as "a chemical entity or biological product, or combination of chemical entities or biological products" that is "*preferably, but not necessarily a low molecular weight compound, but may also be a larger compound*, for example, an oligomer of nucleic acids, amino acids, or . . . lipoproteins, aptamers, and modifications and combinations thereof." '314 Patent at 9:3–13; '162 Patent at 13:4–14 (emphasis added). Based on these statements, AstraZeneca contends that an irreversible EGFR inhibitor is "any compound"—regardless of its molecular weight—that performs the claimed function.

The plaintiffs respond that the definition of "compound" does not preclude their construction because an irreversible EGFR inhibitor is "any compound *which binds to cysteine 773 of EGFR*." Joint Claim Constr. Br. at 55 n.13 (emphasis in original). They then rely on the declaration of their expert Dr. Jeffrey Winkler to argue that a person of ordinary skill in the art would understand the phrase "binds to cysteine 773 of EGFR" as referring only to "low molecular weight N-(heteroaryl)-aniline compound[s] having a Michael acceptor." *Id.* AstraZeneca cites to the declaration of its expert Dr. Paul Reidler to dispute this assertion, contending that "were the claim to be so construed, the structural class encompassing the examples of the patent is far narrower—the class of 4-anilino-quinazolines and 4-anilino-quinoline-3-carbonitrile." Joint. Claim Const. Br. at 54 n.12. The Court need not decide this issue, however, because it is only where the intrinsic evidence is ambiguous that a court may rely on extrinsic evidence to construe a claim term. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711

F.3d 1348, 1360 (Fed. Cir. 2013). In this case, the intrinsic evidence is sufficiently clear—particularly when considered in light of the parties' technology tutorials and arguments at the claim construction hearing—that the Court should construe the term "irreversible EGFR inhibitor" structurally rather than functionally.

The "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Eon Corp.*, 815 F.3d at 1318 (internal citation and quotation marks omitted). At oral argument, the plaintiffs contended that their definition of the term aligns with the patent's description because Figure 2-B shows that the irreversible inhibitors in the preferred embodiments have the structure they propose. Yet "claims should not be limited 'to preferred embodiments or specific examples in the specification,'" *VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 653 (Fed. Cir. 2022) (internal citation omitted), and the only express mention of the compounds' structure in the specification itself is a reference to the "chloride moieties" and "aniline" ring of those same three inhibitors. '314 Patent at 18:41–42; '162 Patent at 18:35–36. In contrast, the specification repeatedly discusses irreversible inhibitors in the context of their role and effectiveness in treating g/e-resistant NSCLC.[7] This focus on what the irreversible inhibitors *do*—rather than what

---

[7] (1) The Summary states "[t]he inventors of the present invention have surprisingly discovered that irreversible EGFR inhibitors are effective in the treatment of [g/e-resistant NSCLC];" (2) Figures 4A and 4B "show Effectiveness of ERBB inhibitors in suppressing the T790M EGFR mutant;" (3) the Detailed Description notes that "irreversible EGFR inhibitors, which covalently cross-link the receptor, are effective in inhibiting cancers with the T790M mutation;" (4) the inventors "compared the ability of gefitinib and irreversible ERBB family inhibitors to suppress signaling via downstream effectors of EGFR" and found that the irreversible inhibitors were more effective; and (5) the specification includes a subsection regarding "Inhibition of T790M EGFR Signaling and Enhanced Cell Killing by Irreversible Inhibitors." '314 Patent at 3:43–46, 5:58–59, 7:16–20, 16:58–17:3, 17:28–18:67; '162 Patent at 48–51, 5:61–62, 7:19–23, 16:53–65, 17:23–18:61.

they *are*—leads the Court to conclude that a functional definition of the term "stays true to the claim language" and "most naturally aligns with the patent's description." *Eon Corp.*, 815 F.3d at 1318. The Court therefore declines to adopt the plaintiffs' proposed construction.

There is more support for AstraZeneca's proposed construction. "[C]laims are interpreted with an eye toward giving effect to all terms in the claim," *Bicon*, 441 F.3d at 950, and the Federal Circuit "instructs that different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).

In this case, the patents state that the claimed method involves an "irreversible EGFR inhibitor that covalently binds[.]" '314 Patent at 35:57–58; '162 Patent at 35:54–55. The plaintiffs appear to argue that AstraZeneca's proposed construction is unnecessary because covalent binding and irreversible inhibition are the same, and "[t]he patent claims require only that the irreversible EGFR inhibitor covalently bind with the specified cysteine residues." Joint Claim Const. Br. at 57. Although courts have declined to give meaning to all terms where the terms "are very similar in meaning" and "where the patentee used different words to express similar concepts," *Innova*, 381 F.3d at 1119, the plaintiffs point to no intrinsic evidence indicating that the patents treat inhibiting an enzyme and binding to a cysteine residue as similar concepts. Rather, the implication of claiming irreversible inhibitors that covalently bind is that there are also irreversible inhibitors that do not, and the specification suggests as much when it states that "[a]ll three drugs are irreversible inhibitors, *most likely* via a covalent bond with the cys773 residue . . . or the cys805 of ERBB2." '314 Patent at 16:17-19; '162 Patent at 16:13–15 (emphasis added). An irreversible inhibitor therefore must be more than just

17

an inhibitor that "covalently binds to cysteine 773 residue," as otherwise the term "covalently binds" would be "unnecessary and superfluous as the patentee could have easily used the term [irreversible EGFR inhibitor] alone."  *Innova*, 381 F.3d 1111, 1119.

The Court therefore adopts AstraZeneca's proposed construction—with one modification.  The plaintiffs are correct that there is no mention of "permanent" or "permanently inhibit" in the claim, specification, or prosecution history, and AstraZeneca conceded at oral argument that it believes "irreversible" and "permanent" have the same meaning.  Because "merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction," *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004), the Court sees no basis to adopt the phrase "permanently inhibits" in its claim construction.  Rather, the Court will construe the term in question as "a compound that irreversibly inhibits EGFR" but otherwise adopt AstraZeneca's construction.

    **4.**    **"a pharmaceutical composition comprising a unit dosage "**

        a.    *The plaintiffs' proposed construction:*

                i.    The specification's definition controls; no further construction necessary.

        b.    *AstraZeneca's proposed construction:*

                i.    "a pharmaceutical composition comprising a physically discrete unit suitable as unitary dosage for the patient, each unit containing an effective amount of the irreversible inhibitor in association with the required diluents; i.e. carrier, or vehicle.  An effective amount is an amount that results in a beneficial effect for at least a statistically significant fraction

18

of patients considering both its pharmacologic effectiveness
and its physiological safety."

    c.    *The Court's construction:*

        i.    The specification's definition controls; no further construction
necessary.

The parties do not dispute the meaning of "pharmaceutical composition," but
AstraZeneca argues that the term "unit dosage" requires construction. The Court
agrees with the plaintiffs that the definition of "unit dosage" as stated in the specification
does not require further construction.

As discussed previously, "[w]hen a patentee explicitly defines a claim term in the
patent specification, the patentee's definition controls." *Martek*, 579 F.3d at 1380. "To
act as its own lexicographer, a patentee must 'clearly set forth a definition of the
disputed claim term' other than its plain and ordinary meaning." *Thorner v. Sony
Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness,
Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "It is not enough for a
patentee to simply disclose a single embodiment or use a word in the same manner in
all embodiments, the patentee must 'clearly express an intent' to redefine the term. *Id.*
(quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir.
2008)).

In this case, the specification expressly defines a "unit dose" as "physically
discrete units suitable as unitary dosage for the subject, each unit containing a
predetermined quantity of active material calculated to produce the desired therapeutic
effect in association with the required diluents; i.e. carrier, or vehicle." '314 Patent at
9:34–38; '162 Patent at 9:38–42. AstraZeneca does not dispute that a patentee's

definition of a term controls, but it proposes construing the phrase "a predetermined quantity of active material calculated to produce the desired therapeutic effect" in the patent's definition as "an effective amount of the irreversible inhibitor."  Joint Claim Constr. Br. at 64–65.  AstraZeneca argues that this construction is both necessary and based on the specification, which (1) states that the compositions are administered "in a therapeutically effective amount" immediately after defining "unit dose," and (2) defines "effective" or "effectiveness" as including "both pharmacologic effectiveness and physiological safety."  '314 Patent at 9:40–41, 13:15–16; '162 Patent at 9:43–45, 13:16–17.

AstraZeneca's belief that the plaintiffs wish to "maintain ambiguity of the 'therapeutic effect' that may or may not be required," Joint Claim Constr. Br. at 65, is not a basis for rewriting the definition of "unit dosage" as stated in the specification. Considering that the patents both defined the term "effective amount" and used it repeatedly in other parts of the specification, the inventors "could easily have included the word[s] '[effective amount]' in the claim language" when defining a "unit dosage." *Takeda Pharm. Co. Ltd. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014).  "In the absence of their decision to do so, however," the Court will not "take it upon [itself] to rewrite the claim that way."  *Id.*; *see also Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x. 961, 965-66 (Fed. Cir. 2014) ("Contrary to Appellants' suggestion, the patentee's use of the prefix in the tables demonstrates that it knew how to specify racemic 3-isobutylGABA as distinguished from the compound generally and chose not to do so in claim 2.").  Consequently, the Court holds that the term "unit dosage" does not require construction beyond the definition as stated in the specification.

**Conclusion**

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order. The parties are directed to file by April 7, 2023 a joint status report addressing any scheduling issues going forward and reporting on the history and current status of any settlement discussions. The Court will set a further status hearing if necessary after reviewing the joint status report.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 29, 2023