IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WYETH LLC,                                    )
                                              )
        Plaintiff/Counterclaim-Defendant,     )
                                              )
        v.                                    )
                                              )    C.A. No. 21-1338-MFK
ASTRAZENECA PHARMACEUTICALS LP                )
and ASTRAZENECA AB,                           )
                                              )
        Defendants/Counterclaim-Plaintiffs.   )
                                              )

## ASTRAZENECA' OPENING BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR A NEW TRIAL LIMITED TO INVALIDITY

OF COUNSEL:
Christopher N. Sipes
Einar Stole
Megan P. Keane
Eric R. Sonnenschein
Kaveh V. Saba
Priscilla Dodson
Alexander Trzeciak
Ashley Winkler
Melissa Keech
Tobias Ma
Elaine Nguyen
Robert T. McMullen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Dated: June 14, 2024

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for AstraZeneca
Pharmaceuticals LP and
AstraZeneca AB*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................... 1

II.     LEGAL STANDARD .................................................................................................... 1

III.    AZ IS ENTITLED TO JMOL OF NO INDUCED INFRINGEMENT ............................ 1

        A.      No Reasonable Jury Could Find Direct Infringement ............................................ 2

                1.      No Intentional Purpose of Treating G/E Resistant NSCLC....................... 2

                2.      No Evidence Of Treatment Of Patients Under First-Line And
                        Adjuvant Indications With G/E Resistant NSCLC .................................... 5

        B.      No Reasonable Jury Could Find Induced Infringement ......................................... 7

IV.     AZ IS ENTITLED TO JMOL OF INVALIDITY ............................................................ 9

        A.      The Asserted Claims Are Not Enabled ................................................................. 9

                1.      The Patents-In-Suit Do Not Enable A POSA To Practice The
                        Claimed Invention With The Full Scope Of Irreversible EGFR
                        Inhibitors ............................................................................................... 11

                2.      Undue Experimentation Would Be Needed To Identify The "Unit
                        Dosage" Of The Compounds Encompassed By The Asserted
                        Claims ..................................................................................................... 15

                3.      The Patents-In-Suit Do Not Enable A POSA To Practice The Full
                        Scope Of Treating "G/E Resistant NSCLC"............................................ 19

        B.      The Asserted Claims Lack Written Description.................................................... 20

                1.      The Patents-In-Suit Fail To Show Possession Of The Full Scope Of
                        Irreversible EGFR Inhibitors Of The Asserted Claims............................ 22

                2.      The Patents-In-Suit Fail To Show Possession Of The Full Scope Of
                        The "Unit Dosage" Of The EGFR Inhibitors ........................................... 24

                3.      The Patents-In-Suit Fail To Show Possession Of The Full Scope Of
                        The Claimed Methods Of Treating G/E Resistant NSCLC ...................... 25

        C.      The Asserted Claims Of The '314 Patent Are Anticipated ................................... 25

        D.      The Asserted Claims Would Have Been Obvious ................................................ 26

E.      Alternatively, The Court Should Grant A New Trial On Invalidity ..................... 29

V.      AZ IS ENTITLED TO JMOL ON THE ISSUE OF DAMAGES ................................... 30

VI.      CONCLUSION ................................................................................................................ 30

## <u>TABLE OF ABBREVIATIONS</u>

| Abbreviation | Term |
|---|---|
| LR | Delaware Local Rule(s) |
| Defendants or AZ | collectively, AstraZeneca Pharmaceuticals LP and AstraZeneca AB |
| Plaintiff or Wyeth | Wyeth LLC |
| the '314 patent | U.S. Patent No. 10,603,314 (JTX-1) |
| the '162 patent | U.S. Patent No. 10,596,162 (JTX-2) |
| patents-in-suit or Wyeth's patents | '314 patent and '162 patent |
| the Asserted Claims | claims 1, 3, and 9 of the '314 patent and claim 1 of the '162 patent |
| Feb. 2, 2005 provisional | U.S. Provisional Patent Application 60/649,483 (filed Feb. 2, 2005) |
| Apr. 15, 2005 provisional | U.S. Provisional Patent Application 60/671,989 (filed Apr. 15, 2005) |
| Tagrisso | AstraZeneca's accused Tagrisso® product |
| osimertinib | active ingredient in Tagrisso |
| NSCLC | non-small cell lung cancer |
| g/e | gefitinib and/or erlotinib |
| g/e resistant NSCLC | gefitinib and erlotinib resistant NSCLC |
| 2L | Tagrisso's Second-Line Indication |
| 1L | Tagrisso's First-Line Indication |
| Adjuvant | Tagrisso's Adjuvant Indication |
| Tr. | Transcript from May 13–17, 2024 Jury Trial |
| JTX-# | Joint exhibit admitted during the May 13–17, 2024 Jury Trial |
| DTX-# | Defendants' exhibit admitted during the May 13–17, 2024 Jury Trial |
| PX-# | Plaintiff's exhibit admitted during the May 13–17, 2024 Jury Trial |
| POSA | person of ordinary skill in the art |
| JMOL | judgment as a matter of law |
| SJ | summary judgment |

iv

## TABLE OF CITED TRIAL EXHIBITS

| Trial Exhibit | Description |
|---|---|
| JTX-1 | U.S. Patent No. 10,603,314 |
| JTX-2 | U.S. Patent No. 10,596,162 |
| JTX-3 | U.S. Provisional Application No. 60/649,483 (Filing date Feb. 3, 2005) |
| JTX-4 | U.S. Provisional Application No. 60/671,989 (Filing date April 15, 2005) |
| JTX-5 | Tagrisso (osimertinib) Prescribing Information (11/2015) |
| JTX-14 | Tagrisso (osimertinib) Prescribing Information (Rev. 06/2023) |
| JTX-32 | Jeffrey A. Engelman et al., MET Amplification Leads to Gefitinib Resistance in Lung Cancer by Activating ERBB2 Signaling, 316 Science 1039 (2007) |
| JTX-33 | William Pao et al., Acquired Resistance of Lung Adenocarcinomas to Gefitinib or Erlotinib Is Associated with a Second Mutation in the EGFR Kinase Domain, 2 PLoS Med. 0225 (2005) |
| PX-178 | 1-4-05 Haber email re cell lines for egfr |
| PX-211 | 12-2-04 Bell email to Haber re Good News/Bad News |
| PX-286 | S. Maheswaran et al., Detection of Mutations in EGFR in Circulating Lung-Cancer Cells, 359 N. Engl. J. Med. 366 (2008) |
| PX-300 | L. Ye et al., Detection of Low-level EGFR c.2369 C > T (p.Thr790IVlet) Resistance Mutation in Pre-treatment Non-small Cell Lung Carcinoma Harboring Activating EGFR Mutations and Correlation with Clinical Outcomes, 26 Pathology & Onc. Res. 2371 (2020) |
| PX-533 | Opening Expert Report of Alice Berger, Ph.D. Appendix C - Summary of Studies Analyzing Pre-treatment Prevalence of T790M |
| DTX-7 | Prosecution History of U.S. Patent No. 10,596,162 |
| DTX-36 | June 14, 2018 Final Rejection (excerpt from U.S. Patent No. 10,603,314 File History) |
| DTX-58 | Feb. 28, 2005 Draft of Eunice Kwak et al., An irreversible inhibitor of the epidermal growth factor receptor may circumvent acquired resistance to gefitinib (Attachment to email) |
| DTX-60 | Email from D. Haber dated March 2, 2005 attaching Feb. 28, 2005 Draft |
| DTX-65 | Email from J. Settleman dated Feb. 24, 2005 |
| DTX-83 | Clovis Press Release, Clovis Oncology and Avila Therapeutics Sign $209 Million Partnership for the Worldwide Development and Commercialization of EGFR Mutant-Selective Inhibitor (2010) |
| DTX-100 | Nadia Godin-Heymann et al., The T790M "gatekeeper" mutation in EGFR mediates resistance to low concentrations of an irreversible EGFR inhibitor, 7 Mol. Cancer Ther. 874 (2008) |
| DTX-112 | Susumu Kobayashi et al., EGFR Mutation and Resistant of Non-Small-Cell Lung Cancer to Gefitinib, 352 New Eng. J. Med. 786 (2005) |
| DTX-114 | Eunice Kwak, The Role of Irreversible HER Family Inhibition in the Treatment of Patients with Non-Small Cell Lung Cancer, 16 The Oncologist 1498 (2011) |
| DTX-117 | Ho-June Lee et al., Noncovalent Wild-type-Sparing Inhibitors of EGFR T790M, 3 Cancer Disc. 168 (2013) |

| Trial Exhibit | Description |
|---|---|
| DTX-125 | NCCN Clinical Practice Guidelines in Oncology, Non-Small Cell Lung Cancer, Version 3.2023 (Apr. 13, 2023) |
| DTX-192 | Marc Denis et al., EGFR T790M Resistance Mutation in Non-Small Cell Lung Carcinoma, 444 Clinica Chimica Acta 81 (2015) |
| DTX-212 | D. Cross et al., AZD9291, an Irreversible EGFR TKI, Overcomes T790M Mediated Resistance to EGFR Inhibitors in Lung Cancer, 4 Cancer Discovery 1046 (2014) |
| DTX-236 | Email from I. Gore dated Dec. 6, 2004 |
| DTX-237 | Email from D.l Haber dated Jan. 19, 2005 |
| DTX-245 | Email from D. Bell dated Dec. 20, 2004 |
| DTX-388 | U.S. Patent No. 6,002,008 |
| DTX-706 | Email from Daniel Haber dated Feb. 25, 2005 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 318 Pat. Infringement Litig.*,
578 F. Supp. 2d 711 (D. Del. 2008), *aff'd*, 583 F.3d 1317 (Fed. Cir. 2009) ...........................27

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
759 F.3d 1285 (Fed. Cir. 2014)...........................................................................................21, 23

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
501 F.3d 1307 (Fed. Cir. 2007)...................................................................................................3

*Adasa Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ...................................................................................................30

*Allergan Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014)...................................................................................................28

*ALZA Corp. v. Andrx Pharms., LLC*,
603 F.3d 935 (Fed. Cir. 2010) ..................................................................................................19

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023).......................................................................................................10, 14, 21

*Amgen Inc. v. Sanofi*,
987 F.3d 1080 (Fed. Cir. 2021), *aff'd*, 598 U.S. 594 (2023) ............................................10, 13

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc)...........................................................................21, 24

*Baxalta Inc. v. Genentech, Inc.*,
81 F.4th1362 (Fed. Cir. 2023) .............................................................................................10, 14

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010).................................................................................................6

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
40 F.3d 1223 (Fed. Cir. 1994)...................................................................................................28

*Carrier Corp. v. Goodman Glob., Inc.*,
2016 WL 698652 (D. Del. Feb. 22, 2016) ..................................................................................1

*E-Pass Techs., Inc. v. 3Com Corp*,
473 F.3d 1213 (Fed. Cir. 2007)...................................................................................................3

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
 8 F.4th 1331 (Fed. Cir. 2021) ...........................................................................26

*Global-Tech Appliances, Inc. v. SEB S.A.*,
 563 U.S. 754 (2011) .............................................................................................9

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
 940 F.3d 680 (Fed. Cir. 2019) ............................................................................8

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
 941 F.3d 1149 (Fed. Cir. 2019) ..........................................................10, 14, 21

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
 10 F.4th 1330 (Fed. Cir. 2021) .....................................................................21, 24

*Lightning Lube, Inc. v. Witco Corp.*,
 4 F.3d 1153 (3d Cir. 1993) ..................................................................................1

*M2M Sols. LLC v. Enfora*, Inc.,
 167 F. Supp. 3d. 665 (D. Del. 2016) .................................................................30

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
 687 F.3d 1377 (Fed. Cir. 2012) ..........................................................................9

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
 194 F.3d 1250 (Fed. Cir. 1999) ..........................................................................9

*MorphoSys AG v. Janssen Biotech, Inc.*,
 358 F. Supp. 3d 354 (D. Del. 2019) ..................................................................24

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*,
 851 F.3d 1270 (Fed. Cir. 2017) ........................................................................25

*Pannu v. Iolab Corp.*,
 155 F.3d 1344 (Fed. Cir. 1998) ..........................................................................1

*Pernix Ireland Pain DAC v. Alvogen Malta Ops. Lt.*,
 323 F. Supp. 3d 566 (D. Del. 2018) ..................................................................21

*Promega Corp. v. Life Techs. Corp.*,
 875 F.3d 651 (Fed. Cir. 2017) .......................................................................7, 30

*In re Rosuvastatin Calcium Pat. Litig.*,
 2009 WL 4800702 (D. Del. Dec. 11, 2009) .......................................................3

*Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
 785 F.3d 625 (Fed. Cir. 2015) ............................................................................7

*Takeda Pharms., U.S.A., Inc. v. W.-Ward Pharm. Corp.*
    2018 WL 6521922 (D. Del. Dec. 12, 2018).........................................................8

*Tyco Healthcare Group LP v. Ethicon Endo-Surgery*,
    774 F.3d 968 (Fed. Cir. 2014).........................................................................29

*Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018).........................................................................8

*Wilburn v. Maritrans GP Inc.*,
    139 F.3d 350 (3d Cir. 1998).............................................................................30

*Windsor Shirt Co. v. New Jersey Nat'l Bank*,
    793 F. Supp. 589 (E.D. Pa. 1992) ...................................................................30

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010).......................................................................30

*Wyeth & Cordis Corp. v. Abbott Labs.*,
    720 F.3d 1380 (Fed. Cir. 2013)...............................................................10, 15

**Statutes**

35 U.S.C. §§ 102, 103 ..........................................................................................9

35 U.S.C. § 112 ....................................................................................................9

**Other Authorities**

Fed. R. Civ. P. 50 .................................................................................................1

Fed. R. of Civ. P. 50(a) ........................................................................................1

Fed. R. of Civ. P. 50(b) ........................................................................................1

Fed. R. Civ. P. 59(a) ...........................................................................................29

## I.  INTRODUCTION

AZ moved for JMOL pursuant to Federal Rule of Civil Procedure 50(a), D.I. 448, which the Court took under advisement, *see* Tr. 1060:11–13. AZ now moves for Renewed JMOL pursuant to Rule 50(b) on the following issues: (1) no induced infringement, (2) invalidity, and (3) no damages. AZ also moves in the alternative for a new trial only with respect to invalidity.[1]

## II.  LEGAL STANDARD

The Court may grant JMOL "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50. "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). In other words, a party seeking JMOL "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied by the jury's verdict cannot in law be supported by those findings." *Carrier Corp. v. Goodman Glob., Inc.*, 2016 WL 698652, at *2 (D. Del. Feb. 22, 2016) (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998)).

## III.  AZ IS ENTITLED TO JMOL OF NO INDUCED INFRINGEMENT

AZ is entitled to JMOL of no induced infringement because there is not a legally sufficient evidentiary basis upon which a reasonable jury could have found in Wyeth's favor. Wyeth failed to adduce legally sufficient evidence to show either that prescribers directly infringed the claims

---

[1] For the reasons stated during claim construction and later proceedings, AZ objects to all claim constructions decided against it and preserves all objections and rights to appeal such constructions. In addition, for the reasons stated in the record, AZ objects to the improper admission or exclusion of evidence or improper jury instructions decided against it and preserves all objections and rights to appeal such orders and rulings.

or that AZ induced them to do so. The jury's verdict is not supported by substantial evidence for any Tagrisso indication.

### A.    No Reasonable Jury Could Find Direct Infringement

Wyeth contends that prescribers (doctors or other healthcare providers) directly infringe by prescribing Tagrisso, but it failed to adduce any evidence on at least two elements—that prescribers (1) ***intend to treat g/e resistant NSCLC*** when prescribing Tagrisso, as required by the Court's claim construction, and (2) ***actually treat g/e resistant NSCLC***, that is, administer Tagrisso to a patient who ***has*** g/e resistant NSCLC. JMOL of non-infringement in AZ's favor is thus required.

#### 1.    No Intentional Purpose of Treating G/E Resistant NSCLC

The preambles of Asserted Claims recite methods of "treating [g/e resistant NSCLC] in a patient." At claim construction, the Court ruled that the preambles are limiting and are a statement of "***the intentional purpose for which the methods must be performed***." D.I. 121 at 4–7. The Court reiterated this ruling in its MIL Order, observing a "distinction between ***intending to treat g/e resistant NSCLC*** and knowing that the patient being treated has g/e resistant NSCLC. ***The former is required by the patent***; the latter isn't." D.I. 419 at 6.[2]

But, for each of the three accused indications, Wyeth failed to present any evidence that a single alleged direct infringer actually prescribed Tagrisso ***with the intent of treating g/e resistant NSCLC***. Wyeth called no prescriber, for example, to testify about his/her intent when prescribing Tagrisso during the accused period. Nor did it attempt to introduce other evidence of prescribers' intent, such as through surveys. Wyeth cannot even point to its own expert, Dr. Weiss, as a supposed direct infringer because he has not prescribed Tagrisso since Wyeth's patents issued.

---

[2] All emphases are added unless otherwise noted. Internal citations and quotations in have generally been omitted. Upon the Court's request, trial exhibits may be filed or otherwise provided.

Tr. 206:13–15.[3] *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313–14 (Fed. Cir. 2007) (no substantial evidence of inducement where "the record contains no evidence of actual users having operated the [accused product] in an infringing manner" such as "witness testimony of actual ... users, or surveys of [defendant's] customers"). This failure of proof is fatal to Wyeth's infringement claim because Tagrisso could be prescribed for a variety of non-infringing intentional purposes. *See id.* at 1313 ("[A] patentee must either point to specific instances of direct infringement or show that the accused [product] necessarily infringes[.]"); *E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1223 (Fed. Cir. 2007) (patentee insisting someone must have directly infringed failed to "introduc[e] testimony of even one such user").

Moreover, Dr. Weiss did not opine that other prescribers prescribe Tagrisso with an intent to treat g/e resistant NSCLC, nor could Wyeth have elicited such testimony. "Generally, expert witnesses are not permitted to testify regarding intent, motive, or state of mind, or evidence by which such state of mind may be inferred." *In re Rosuvastatin Calcium Pat. Litig.*, 2009 WL 4800702, at *8 (D. Del. Dec. 11, 2009). This Court ruled that the experts here could not "render an opinion that would be helpful to the jury regarding whether the evidence shows that a person or entity had knowledge of a fact or acted willfully, intentionally, or recklessly." D.I. 408 at 6.

In any event, Dr. Weiss's testimony that doctors "are well aware that resistance to gefitinib or drugs like gefitinib are a big problem" and "it's better to give Tagrisso up front to delay or to prevent the T790M resistance from being a problem," even if credited, amounts at most to testimony about prescribers' knowledge. *E.g.*, Tr. 187:22–188:10, 188:24–189:15; *see also* Tr. 1074:17–24 (Wyeth's closing argument pointing to Dr. Weiss's testimony about doctors' "awareness" of resistance in an attempt to satisfy the intent requirement). But this testimony about

---

[3] All record citations throughout this brief are exemplary only.

*knowledge* or *awareness* speaks nothing to the claims' *intentional purpose* requirement under the Court's claim construction. Wyeth presented no evidence that any prescriber prescribed Tagrisso **because** they wanted to treat g/e resistant NSCLC. Wyeth's infringement claim therefore fails.

Dr. Weiss's testimony about prescribers' knowledge also cannot be reasonably credited as evidence of relevant intent. *E.g.*, Tr. 187:22–188:10, 188:24–189:15. Alleged knowledge of potential **future** resistance with g/e to be "prevented" or "delayed" is not evidence of prescribers' intent to **treat** g/e resistant NSCLC, as required by the claims, when prescribing Tagrisso. His testimony is also plainly inapplicable to the Adjuvant context, which has nothing to do with g/e at all, let alone g/e resistant NSCLC. Wyeth presented no evidence that g/e are used in the adjuvant context—indeed, they are not. *See, e.g.*, DTX-125.21 (adjuvant treatment guidelines reflecting g/e are not options); Tr. 723:10–724:21, 739:19–740:1 (Adjuvant is directed to a different (non-metastatic) patient population than 1L or 2L (metastatic)). Thus, there is no evidence that prescribers in the Adjuvant setting choose Tagrisso (the only approved EGFR TKI in that setting) **over g/e** or that they would have any plausible reason to be thinking or concerned about resistance to drugs they would not use. Moreover, Dr. Weiss testified that the claim applies only to patients who "have received or [would] be eligible for [g/e]." Tr. 181:3–22. While that view of the scope of the claim is disputed, *see infra* § IV.A.3, no reasonable jury could have credited that testimony and also found infringement: there is no evidence Adjuvant patients are eligible for g/e.

Dr. Weiss's testimony about the preamble is also incoherent as a whole and could not reasonably have been credited by the jury. In conclusory fashion, Dr. Weiss opined that the preambles—which set forth the required intent—apply **only when treating patients who have T790M**. Tr. 184:10–20 ("Does [Element 1[a]] apply to all of the uses in those indications with the pretreatment patients? A. **No, it does not.** Q. Why doesn't it apply to every patient for those

indications? A. ***Because not every patient in their pretreatment cancer will have a T790M mutation***."), 199:25–200:13 (Dr. Weiss's analysis of "Element 1[a]" is the same for both patents); D.I. 476-1 at PDX-GJW-14 ("Element 1[a]" refers to the preambles). Dr. Weiss, however, offered no evidence as to why or how having T790M (even unbeknownst to the prescriber) would cause the prescriber to have a ***different (and allegedly infringing) intent*** than when treating a patient who lacks T790M. This failure is no accident. In his expert reports and deposition, Dr. Weiss made clear the basis underlying his trial opinion that meeting the preamble depends on the patient's T790M status: prescribers may intend to treat g/e resistant NSCLC ***when—and only when—they observe a positive test result for T790M***.[4] But Wyeth later sought, and the Court granted, exclusion of evidence on that issue, D.I. 419 at 6, rendering Dr. Weiss's opinion at trial incomplete, incoherent, and not substantial evidence.

### 2.    No Evidence Of Treatment Of Patients Under First-Line And Adjuvant Indications With G/E Resistant NSCLC

The Asserted Claims also require treating a "patient having [g/e resistant NSCLC]." This language, which concerns patients' actual status, comes from the body of the claims and is separate from the intent requirement set forth in the preambles. *See* D.I. 121 at 9 ("having" language not superfluous of the preambles). Dr. Weiss acknowledged that, at a minimum, g/e resistant NSCLC requires that "***patients do not respond*** to reversible inhibitors like [g/e]." Tr. 218:11–15; *see also* Tr. 181:3–14 (Weiss), 738:2–7 (Dr. Bivona). But Wyeth presented no evidence of patients treated according to Tagrisso's 1L or Adjuvant indications who would not respond if given g/e.

Drs. Weiss and Berger opined about the prevalence of pre-treatment ***T790M***, but having

---

[4] *See* D.I. 401 at 7 n.3 (citing Weiss agreeing "when a physician is prescribing Tagrisso in a first-line setting and there is ***no test showing detection of T790M***, they would ***not*** be administering Tagrisso to a patient with the ***purpose of treating [g/e] resistance***").

T790M is not synonymous with having g/e resistant NSCLC. *See, e.g.*, JTX-2 at Asserted Claim 1 ("patient having *[g/e] resistant [NSCLC]* having a *T790M mutation*"). "Claims must be interpreted with an eye toward giving effect to all terms in the claim." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010). Equating "having a T790M mutation" with "having g/e resistant NSCLC" would improperly vitiate the "having g/e resistant NSCLC" language. *See id.* Wyeth was required to demonstrate that accused prescriptions involved patients who **have g/e resistant NSCLC**, whether or not they also have T790M. It failed to do so.

Dr. Weiss provided no testimony that the jury could reasonably credit as evidence that patients treated with Tagrisso in accordance with the 1L and Adjuvant indications, in fact, have g/e resistant NSCLC. Dr. Weiss acknowledged that having T790M in the pretreatment context does not mean the patient would not respond to g/e. Rather, he testified that having pretreatment T790M generally means the patient could have g/e resistant NSCLC **at some point in the future**. *See, e.g.*, Tr. 188:2–10 (Dr. Weiss opining that "it's better to give Tagrisso up front to **delay** or to **prevent** the T790M resistance from being a problem"), 189:5–15 (T790M patients "have a shorter duration of time **before they progress**"), 189:21–190:2 ("these patients' cancers **will eventually** or **will develop resistance** or have resistance from the get-go"). Those patients do not "have" g/e resistant NSCLC at the time of prescription, nor did Dr. Weiss present any evidence that they do.

The published literature—including several of the studies that Dr. Berger used to calculate her 35% T790M prevalence figure—confirms that the detection of pretreatment T790M does not mean the patient has g/e resistant NSCLC, and Wyeth presented no contrary evidence. *See, e.g.*, Tr. 242:14–243:2 (Dr. Berger discussing PX-533); Tr. 743:7–21, 747:14–748:12 (Dr. Bivona, pretreatment T790M does not mean g/e resistant NSCLC); PX-286, 9 ("The presence of rare T790M alleles in pretreatment tumor specimens did not preclude dramatic responses to" g/e);

DTX-192.3 ("detection of the T790M mutation in tumors of TKI-naive patients should not prevent them from being treated with an EGFR TKI, and thus has no clinical consequence at the moment"); PX-300 at 8 (suggesting that "tumors with low-level T790M are also sensitive to" g/e). No substantial evidence supports that patients treated with Tagrisso in the 1L and Adjuvant settings have g/e resistant NSCLC, let alone all patients who have T790M.

For the same reasons, even if there were substantial evidence that some Tagrisso patients in the 1L and Adjuvant settings have g/e resistant NSCLC (there is not), there is no evidence of the ***prevalence*** of g/e resistant NSCLC in those settings. Wyeth's damages base is premised on T790M alone, rather than on the prevalence of g/e resistant NSCLC as required by the claim. Nor is there any evidence of prevalence with which doctors prescribe Tagrisso with the required intentional purpose. Thus, JMOL of no damages for the 1L and Adjuvant indications is also warranted. *See Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017).

### B.      No Reasonable Jury Could Find Induced Infringement

JMOL in favor of AZ is also warranted because Wyeth failed to present legally sufficient evidence that AZ has ***induced*** direct infringement. Indeed, even if doctors' Tagrisso prescriptions did directly infringe the Asserted Claims (and they do not), no reasonable jury could find based on the record that AZ induced such infringement. "Inducement can be found where there is evidence of active steps taken to encourage direct infringement, which can be found in advertising an infringing use or instructing how to engage in an infringing use." *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630–31 (Fed. Cir. 2015). AZ does not promote Tagrisso to treat g/e resistant NSCLC. *See, e.g.*, Tr. 724:22–725:2, 725:16–726:5, 726:11–18.

The Tagrisso labeling does not provide a legally sufficient evidentiary basis upon which a reasonable jury could find induced infringement either. When proof of specific intent depends on the label accompanying the marketing of a drug, "the label must encourage, recommend, or

promote infringement." *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018). But here, the evidence established that the labeling does not do that for either the 1L or Adjuvant indications. Neither indication, nor the associated patient selection criteria, mentions resistance or T790M. *See, e.g.*, JTX-14 at 1–3; Tr. 741:5–742:4, 749:4–19, 736:24–737:13; *see also* Tr. 726:11–18 (Ms. Miller testifying AZ does not promote 1L Tagrisso for pre-treatment patients who have T790M). To the contrary, those indications are directed to patients who do *not* have g/e resistant NSCLC because they require patients to have "sensitizing mutations"—mutations in patients expected to *benefit* from g/e, not be resistant to it. Tr. 741:5–742:4, 749:4–19, 736:24–737:13. Indeed, as to the 1L context, the patients being treated could also receive g/e. *See, e.g.*, Tr. 743:22–744:9; DTX-0125.39. Even if the labeling does not ***exclude*** infringing uses in the 1L and Adjuvant contexts, that would not be sufficient for inducement, especially where, as here, there are substantial non-infringing uses (Wyeth contends only 35% infringe). *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 702 (Fed. Cir. 2019) (SJ, non-infringement where drug had "substantial non-infringing uses," "[m]erely describing the infringing use, or knowing of the possibility of infringement, will not suffice"). Dr. Weiss pointed to the labeling's mechanism section, and similar information on an AZ website, but there is no evidence that those mentions of T790M have anything to do with the 1L and Adjuvant indications, or that they (or any other AZ materials) actually caused any prescriber to infringe. *Takeda Pharms., U.S.A., Inc. v. W.-Ward Pharm. Corp.* 2018 WL 6521922, at *6 (D. Del. Dec. 12, 2018) ("Causation cannot be inferred through mere speculation."). That mechanism information was included in the 2015 label—when only the 2L indication, which requires T790M, was approved. *See* Tr. 175:3–176:2, 177:2–5; JTX-5 at 10.

There is also no evidence that AZ actively promotes the 2L indication. As Ms. Katy Miller

testified, AZ deliberately stopped promoting Tagrisso's 2L use in 2018—before the patents issued—and either retired or destroyed the related promotional materials. *See, e.g.*, Tr. 724:22–725:2, 725:16–726:5. Thus, that AZ has not removed its 2L indication from the Tagrisso labeling is not sufficient evidence of inducement or intent to cause others to directly infringe. To the extent Wyeth relies on AZ's activities prior to issuance of the patents-in-suit in 2020, moreover, such activities cannot support a finding of induced infringement. *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1261 (Fed. Cir. 1999).

Finally, JMOL is appropriate because Wyeth made no showing that AZ knew, or should have known, that the allegedly inducing acts constitute infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Katy Miller testified, for example, that AZ does not intend for patients having T790M to receive Tagrisso under the 1L setting. Tr. 730:20–22; *see also* Tr. 729:3–8. And there has been no evidence that AZ understood the 1L and Adjuvant indications would be treating "g/e resistant NSCLC." JMOL of non-infringement is therefore warranted.

## IV.    AZ IS ENTITLED TO JMOL OF INVALIDITY

AZ is entitled to JMOL of invalidity on lack of enablement and written description, 35 U.S.C. § 112, or alternatively, JMOL of invalidity on anticipation and obviousness, 35 U.S.C. §§ 102, 103. To the extent the Court determines the claim limitations of the Asserted Claims are satisfied for section 112, they would be disclosed in the prior art under sections 102 and 103. Wyeth did not introduce a legally sufficient basis upon which a reasonable jury could conclude otherwise.

### A.    The Asserted Claims Are Not Enabled

Overwhelming evidence established that the patents-in-suit fail to disclose sufficient information to enable a POSA to make and use the full scope of the Asserted Claims without undue experimentation. *See MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012). The undisputed evidence established that the Asserted Claims are broadly

9

directed to the use of a vast genus of structurally diverse compounds for treating g/e resistant NSCLC: (1) using *any* compound that functions to covalently bind to cysteine 773 and irreversibly inhibit EGFR that is (2) administered to a patient in a "unit dosage"—*i.e.*, "a predetermined quantity of active material *calculated to produce the desired therapeutic effect*." D.I. 121 at 19–20; JTX-1 at 9:33–38; Tr. 193:24–194:12, 535:8–20, 569:5–16, 572:2–21, 972:2–13. What is more, the Asserted Claims claim use of those compounds to treat the full sweep of g/e resistant NSCLC in patients, without limitation to any particular mechanism of resistance. Tr. 218:7–219:7, 631:3–632:7, 634:10–635:3, 635:13–636:5, 659:12–16, 660:3–10. The record established that the patents fail to enable the full scope of these claims, and no reasonable jury could have concluded otherwise. JMOL on lack of enablement is therefore required.

As the Supreme Court reaffirmed recently, claims like the Asserted Claims that encompass a broad, functionally-defined genus of compounds are invalid for lack of enablement as a matter of law where the specification fails to enable the full scope of the claims. *See Amgen Inc. v. Sanofi*, 598 U.S. 594, 611 (2023) ("The more one claims, the more one must enable."). And the Federal Circuit has repeatedly held that, as here, claims directed to a genus of compounds defined not by their structure, but rather by their function and the targets to which they bind, lack enabling support as a matter of law. *See, e.g.*, *Amgen Inc. v. Sanofi*, 987 F.3d 1080, 1086-88 (Fed. Cir. 2021), *aff'd*, 598 U.S. 594 (2023) (JMOL, no enablement); *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th1362, 1366–67 (Fed. Cir. 2023) (SJ, no enablement); *see also Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1386 (Fed. Cir. 2013) (SJ, no enablement). Moreover, the Federal Circuit has also consistently concluded, as a matter of law, that claims like the Asserted Claims that are directed to methods of treating a condition by administering any of a broad genus of compounds also lack enabling support. *See, e.g.*, *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1165 (Fed.

Cir. 2019) (JMOL, no enablement or written description).

### 1. The Patents-In-Suit Do Not Enable A POSA To Practice The Claimed Invention With The Full Scope Of Irreversible EGFR Inhibitors

The Asserted Claims are defined functionally—they cover the use of any compound that treats g/e resistant NSCLC, regardless of structure, that meets two *functional* requirements: (1) irreversibly inhibits the EGFR protein and (2) covalently binds to the designated portion of the target EGFR enzyme. *See* JTX-1 & JTX-2 at Asserted Claims; D.I. 121 at 14, 16–17. As a result, the Asserted Claims encompass a vast universe of chemical compounds of varying structures—at least *hundreds of billions* of possibilities—that may potentially meet these functional requirements. Tr. 535:8–20, 537:9–18; *see also* Tr. 990:17–991:1, 991:20–992:2, 992:8–11 (Jorgensen, testifying that he previously referred to the '008 patent (DTX-388)—a patent cited in the specification (JTX-1 at 13:50–51)—as describing *trillions* of irreversible compounds). But the patents-in-suit *fail to teach which compounds* will meet both functional requirements, leaving it to the POSA to undertake the extraordinarily onerous and unpredictable task of doing so. *E.g.*, Tr. 396:24–400:1, 404:10–405:9, 405:18–406:21, 413:4–414:3, 419:18–420:14, 421:19–422:4, 422:20–423:14, 425:12–428:3; D.I. 451-1 at 45:7–11; D.I. 451-3 at 47:16–22, 48:8–14.

Identifying which of the billions of compounds encompassed within the scope of the Asserted Claims meet both functional requirements to practice the claimed invention would require undue experimentation, including as analyzed under the *Wands* factors. The POSA would need to *make and test each one* to figure out which compounds have the functionally-claimed properties. Tr. 535:12–539:19, 567:12–568:21; DTX-388. The patents-in-suit provide virtually no guidance on which chemical structures will enable a POSA to synthesize a compound that has *both* of the functional properties of the Asserted Claims. While the specification states that the irreversible EGFR inhibitors of the invention may be "any compound" which binds to cysteine

773 of EGFR (SEQ ID NO: 1)—encompassing a vast array of small molecules, and also encompassing a laundry list of "larger compound[s]"—the patents-in-suit fail to describe which of these would have the functional properties of the Asserted Claims. JTX-1 at 3:57–59; Tr. 539:3–19, 566:16–567:4, 568:7–21, 572:2–21, 575:19–576:10. The patents-in-suit describe a mere three species (HKI-272, EKB-569, and HKI-357) with the same general structural features—*e.g.*, the **same core** (3-cyanoquinoline), **same warhead** (dimethylaminobutenamide), and **same chlorine** substituent—and only minor structural differences. JTX-1 at 3:56–57, 7:26–36; Tr. 512:14–20, 575:5–13. Beyond identification of these three species, the patents-in-suit say nothing about which structural features would render a compound capable of the two-claimed functions to practice the claimed methods. That includes non-enabled small molecules like osimertinib (Tagrisso's active ingredient), which has a **different core**, **different warhead**, and **no chlorine** substituent, as well as other third generation inhibitors such as WZ4002, olmutinib, and rociletinib. Tr. 512:14–513:13, 518:17–525:5, 566:15–567:4, 575:5–18; D.I. 451-2 at 137:23–138:08, 139:19–139:23, 176:9–14, 177:17–178:13 (Kwak, discussing DTX-114 and contrasting quinazoline-based inhibitors, *e.g.*, HKI-272, with "new and structurally distinct" pyrimidine-based inhibitors, including WZ4002).

Although Wyeth offered conclusory testimony from its expert Dr. Jorgensen to dispute the lack of enablement, his testimony underscores that the patents-in-suit fail to enable the full scope of the Asserted Claims. For example, Dr. Jorgensen conceded that the full scope of the claims is vast. Tr. 992:8–11 (admitting there are "multiple trillions of compounds" within the class of 3-cyanonquinolines alone). Dr. Jorgensen further testified that a POSA could "envision" "many covalent inhibitors that could be created" beyond those explicitly referenced in the specification that would fall within the scope of the Asserted Claims. *Compare* JTX-1 at 2:62–64 (referencing "quinazolines, pyridopyrimidines and pyrrolopyrimidines") *with* Tr. 972:6–13 ("[O]ne can

imagine irreversible inhibitors made with the quinazoline core, [pyrido]pyrimidine core, pyrrolopyrimidine, and ***other cores for kinase inhibitors***") *and* 977:9–10 ("[O]ne can envision a world of cores."). These cores, according to Dr. Jorgensen, could be "elaborate[d] … infinitely." Tr. 993:6–8. For example, compounds with warheads beyond those disclosed in the patents-in-suit—such as epoxides (Tr. 528:21–530:17)—could irreversibly inhibit EGFR and covalently bind to cysteine 773. Wyeth did not elicit testimony from Dr. Jorgensen disputing that.

Moreover, Wyeth did not elicit testimony from Jorgensen that a POSA could make and use the ***full scope*** of these claimed inhibitors to ***both*** covalently bind EGFR *and* irreversibly inhibit EGFR as claimed without undue experimentation—at most, eliciting testimony that a POSA could make ***some*** irreversible inhibitors, using structures the POSA was already aware of. Tr. 982:16–983:12 ("I have publications where we only had to ***make a handful of compounds*** and we had irreversible inhibitors"), 977:5–978:4 (testifying that a POSA would "definitely be focusing on ***proven*** cores"), 981:4–982:15 (testifying that the POSA could "take his or her ***favorite core***" and an "acrylamide" warhead to make covalent inhibitors). This was not legally sufficient evidence for the jury to find that the ***full scope*** of the claims were enabled. *Amgen*, 987 F.3d at 1088 ("[N]o reasonable factfinder could conclude that there was adequate guidance" where only a "small subset of examples of antibodies c[ould] predictably be generated.").

Even for the genus of inhibitors about which he did testify, Dr. Jorgensen's testimony emphasizes the unpredictability in the field. Dr. Jorgensen did not dispute that the POSA would need to engage in trial and error to make and use the claimed inhibitors to practice the claimed methods. Tr. 983:6–10 (testifying that the patents are "telling a POSA, hey, you need to be checking out irreversible inhibitors and you ***may*** come up with compounds that will show benefits against these resistant forms of cancer"); *see also* Tr. 976:2–4 (describing a core that could "***potentially***"

13

be used), 982:6–12 ("So a [POSA] could take his or her favorite core and ***see if they can*** make the hydrogen bond to that nitrogen, have a substituent that's in that region where the aryl group interacts with the protein. That's a little extra glue that helps the interaction with that aryl group and ***figure out*** where to put the warhead, the acrylamide, and bingo, you have covalent inhibitors."). Dr. Jorgensen's testimony that a POSA, with the information in the specification, could simply make and test irreversible EGFR inhibitors was insufficient for the jury to find that the Asserted Claims are enabled. *See, e.g.*, *Amgen*, 598 U.S. at 613–14 (specification's instruction to engage in trial and error not enabling, even if a POSA could subsequently "make and use every undisclosed but functional [embodiment]"); *Idenix*, 941 F.3d at 1161 ("It is not enough to identify a 'target' to be the subject of future testing. A specification that requires a POSA to 'engage in an iterative, trial-and-error process to practice the claimed invention' does not provide an enabling disclosure."). And, even if Dr. Jorgensen was correct (he was not) that a POSA would not have to synthesize more than a "handful" of compounds to obtain an irreversible inhibitor, Tr. 982:16–983:4, his trial-and-error approach still constitutes undue experimentation. *Baxalta*, 81 F.4th at 1367 (even if trial-and-error process "predictably and reliably generate[d] new claimed [embodiments] ***every time***," that "does not take the process out of the realm of the trial-and-error approaches rejected in *Amgen*").

Moreover, Dr. Jorgensen's attempt to narrow the universe of compounds that a POSA would have to make and test by asserting that a POSA would be aware of certain restrictions on structural modifications is similarly legally insufficient. *First*, Dr. Jorgensen critically failed to point to any language in the ***specification*** defining any restrictions on the claimed inhibitors' structure, relying instead on his own conclusory opinion as to the alleged knowledge of a POSA. Such knowledge cannot remedy the specification's deficiencies. *See, e.g.*, *Idenix*, 941 F.3d at

14

1160–61 ("A patent owner is required to provide an enabling disclosure *in the specification*; it cannot simply rely on the knowledge of a [POSA] to serve as a substitute for the missing information in the specification."). Indeed, Dr. Jorgensen's reliance on such outside knowledge, "*weighs against enablement*, not for it," as it "leaves a POSA searching for a needle in a haystack to determine which" compounds meet the functional requirements. *Id.* at 1161–62. *Second*, even if Dr. Jorgensen's restrictions reduced the potential number of compounds within the scope of the Asserted Claims (although he notably declined to estimate the still enormous scope), Wyeth at best elicited testimony on the difficulty of testing *some* compounds, but no testimony that testing the *full* scope of claimed inhibitors would be routine. Thus, even were Dr. Jorgensen's restrictions appropriate (they are not), JMOL is warranted because no reasonable jury could find that a POSA would have been able to make and use even the full scope of this universe of EGFR inhibitors without undue experimentation. *See, e.g.*, *Wyeth*, 720 F.3d at 1385.

It is also undisputed that the patents-in-suit do not enable categories of compounds that the specification states come within the scope of the claims, including the expressly enumerated "larger compound[s]." Tr.  566:15–567:4,  574:12–575:2;  JTX-1 at 13:3–13. While such compounds would have been *conceivable* to a POSA (*e.g.*, antibody-drug conjugates that bind at cysteine 773 and act within the cell, Tr. 499:7–14, 994:10–995:7; D.I. 451-1 at Tr. 217:07–217:20, 217:23–218:19; D.I. 451-4 at 212:25–213:3), the patents-in-suit provide no examples of any such compounds and no guidance for how to make them, and doing so would have been highly unpredictable, involving vast amounts of research, Tr. 572:4–574:17. Indeed, Wyeth did not meaningfully dispute that the patents-in-suit identify such larger compounds but do not enable a POSA to make and use them.

### 2.  Undue Experimentation Would Be Needed To Identify The "Unit Dosage" Of The Compounds Encompassed By The Asserted Claims

The record evidence also established that an extraordinary and undue amount of experimentation, including under the *Wands* factors, would be required to identify the "unit dosage" for each of the myriad irreversible EGFR inhibitors encompassed within the scope of the Asserted Claims. *E.g.*, Tr. 568:25–571:13, 575:19–576:10, 627:15–628:2, 674:8–685:7, 705:13–713:17. There is no legally sufficient basis for a reasonable jury to have concluded otherwise.

The Asserted Claims require that the irreversible EGFR inhibitors be administered to a patient in a "unit dosage"—that is, "a predetermined amount calculated to produce the desired therapeutic effect." D.I. 121 at 19–20; JTX-1 at 9:34–38. Identifying the "unit dosage" for even just *a single compound* is highly unpredictable and involves tremendous amounts of work and experimentation, including *in vitro* and *in vivo* tests, tests analyzing a given compound's pharmacokinetics, safety and toxicity studies, and formulation work, all before necessary clinical studies in human patients. Tr. 569:17–25, 570:20–571:2, 674:8–683:5; *see also* Tr. 939:18–23, 999:19–25, 1001:11–21; D.I.451-1 at 133:13–133:15; D.I. 451-2 at 43:4–43:7, 45:12–45:18, 73:4–10, 83:21–84:3; D.I. 451-3 at 47:16–22, 48:8–14, 110:2–9. Yet the only experiments described by the specification are limited *in vitro* (*i.e.*, petri dish) experiments testing three irreversible EGFR inhibitors (HKI-272, EKB-569, and HKI-357). Tr. 683:13–684:14. These *in vitro* experiments are not enough to determine a "unit dosage," even for those three inhibitors including because such experiments often do not reflect what happens when a drug is administered *in a patient*. Tr. 333:25–334:14, 337:10–15, 656:3–10, 677:11–678:13, 681:11–17, 938:8–18, 999:19–25, 1001:11–21; D.I. 451-4 at 129:07–131:11 (Sordella, "I don't think that anybody would be able to infer from [the *in vitro* experiment in Figure 4B of the specification] what is the exact concentration that you would be able to use in a patient."); *see also* Tr. 1000:1–17 (Taft, also *in vivo* data in animals does not translate to a unit dosage in humans). For example, a POSA may learn only once

16

a compound is administered to a patient that the compound cannot permeate the cell or make it to the target site. Tr. 419:18–420:14, 531:5–23, 677:18–678:13, 680:17–681:17, 1001:24–1002:13.

Moreover, the record evidence established that scientists would not be able to find *any* "unit dosage" for many compounds, because such compounds will not provide a desired therapeutic effect at a concentration that a patient can tolerate. Tr. 334:6–14, 336:22–337:3, 681:3–10; D.I. 451-1 at 147:15–147:22. And there is no dispute that a POSA would avoid a toxic dose in calculating the desired therapeutic effect for the claimed unit dosage. Tr. 939:24–940:5 (Hausheer, agreeing "you'll want to avoid administering a toxic dose in order to achieve the desired therapeutic effect"). With respect to the three inhibitors tested in the specification, for example, the unrebutted record demonstrates there is no "unit dosage" at which these compounds can be administered to practice the Asserted Claims. Tr. 570:1–19, 627:19–628:6, 1000:18–24. As Wyeth's expert Dr. Hausheer acknowledged, clinical trials were necessary to determine the maximum tolerated dose (*i.e.*, MTD, the highest amount of the drug that could be administered to a patient) and revealed that the MTD varies at 320 mg for HKI-272 and 75 mg for EKB-569, while the MTD of HKI-357 (which was never tested in patients) remains unknown today. Tr. 941:9–12, 943:16–944:1; *see also* Tr. 336:1–21 (Haber, admitting that as of April 2005 the dose for HKI-272 was not known); D.I. 451-1 at 163:3–9 (similar). Other post-priority work, such as the experimentation reported by the named inventors in the Godin-Heymann 2008 publication (DTX-100), determined that the doses used in the *in vitro* experiments of the specification *could not be used* in a patient because those doses were five times greater than the MTD of HKI-272. DTX-100 at 877; Tr. 336:22–337:3, 339:3–11, 707:2–709:9, 943:2–6, 942:10–943:13, 998:14–999:18; *see also* DTX-117.6; Tr. 560:24–562:6, 563:19–564:10; D.I. 451-1 at 145:2–8. Thus, the patents-in-suit do not describe the specific "unit dosage" for even a single irreversible EGFR inhibitor that

17

could be used to practice the method of the Asserted Claims. *E.g.*, Tr. 570:1–7.

Moreover, despite the significant experimentation that would have been required for a POSA to identify the "unit dosage" of even a single embodiment, to practice the ***full scope*** of the Asserted Claims, the POSA would be required to separately determine the unit dosage for each compound within the scope of the claims (that is, if a unit dosage could be found at all). Tr. 571:3–5 (Determining the unit dose for one drug in a class, will not disclose the dosing for other drugs in the class because "[e]very molecule is unique."), 1002:14–22 ("You can't take the results from one compound and expect it's going to be the same with another compound unless you test it."). Thus, the amount of experimentation required to identify the "unit dosage" of the ***full scope*** of the billions of irreversible EGFR inhibitors encompassed by Asserted Claims would be nearly infinite, and would be compounded by the unpredictability in the field and the lack of guidance in the specification. Tr. 568:25–570:11, 571:6–13; *see also* Tr. 638:18–639:2.

Wyeth contends that the patents-in-suit enabled the "unit dosage" largely on the premise that the specification discloses broad potential dosing ranges—specifically, that the total daily dosage is "projected" to be from about 1 to 1000 mg, preferably from about to 2 to 500 mg. JTX-1 at 8:63–65. But the record evidence established that these ranges did not disclose to a POSA the claimed "unit dosage" nor provide the POSA any meaningful guidance in finding the "unit dosage" for a given compound. Tr. 570:8–19, 575:16–18, 576:7–10, 710:3–711:6 (Taft, explaining that even the narrower range of 2 to 500 mg describes "a 250-fold range of possible doses, and there's really no guidance provided"); *see also* Tr. 656:3–10. To the contrary, substantial additional experimentation including clinical trials would have been necessary to determine a unit dosage for a given compound. *See supra*. And, the record establishes that for many compounds, including the specification's HKI-272 and EKB-569, many doses—or even the vast majority of doses—within

18

these ranges are toxic and not unit dosages, Tr. 708:19–709:9, 710:3–711:9, 943:19–22. Taken together, the specification's broad ranges merely shift the burden to a POSA to do the vast and unpredictable experimentation needed to figure out the "unit dosage." Tr. 570:12–571:5, 650:2–7, 656:3–10, 710:3–711:6, 716:16–21; *see also ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941 (Fed. Cir. 2010) (specification's naming of various "approaches to achieving" claimed dosage form provided POSA with "only a starting point, a direction for further research" that still required "an iterative, trial-and-error approach to practice the claimed invention").

Further compounding the lack of enablement, the patents-in-suit do not teach the property irreversible EGFR inhibitors would need to achieve the desired therapeutic effect in a g/e resistant NSCLC patient—that is, mutant-selectivity. Tr. 988:19–24; D.I. 451-1 at 145:13–22, 172:4–12, 177:20–178:12, 178:15–19. To the contrary, the patents teach ***the opposite***, instructing the POSA to target the physiologic ***wild-type*** EGFR that is found in healthy cells. Tr. 560:24–562:6, 563:19–564:10, 575:15–16, 598:21–599:5, 628:7–22, 629:7–16, 667:11–14; D.I. 451-2 at 180:18–181:06; *see also* DTX-117.6; DTX-114.8. Though it would not have been understood by a POSA in 2005, today it is understood that preferentially inhibiting such wild-type EGFR leads to toxicity that prevents the use of second-generation EGFR inhibitors, like those disclosed in the specification, to practice the Asserted Claims. Tr. 629:17–630:15; *see also* DTX-83; DTX-212.2, .4.

### 3.    The Patents-In-Suit Do Not Enable A POSA To Practice The Full Scope Of Treating "G/E Resistant NSCLC"

The specification also fails to enable the Asserted Claims because, based on the disclosures in the specification and otherwise known in the prior art, a POSA would not have been able to practice the full scope of the Asserted Claims, which require treating "the patient having [g/e] resistant [NSCLC]." JTX-1 at 35:55–56. The Asserted Claims are drawn to any form of "g/e resistance"—whether the mechanism is known or unknown—and the specification teaches that all

g/e resistance regardless of mechanism can be treated using the patents' approach of a wild-type targeting irreversible EGFR inhibitor. Tr. 630:21–632:7, 634:2–636:11; D.I. 121 at 10–13; JTX-1 at 6:34–35, 6:60–62, 7:25–8:44, 17:53–18:6; DTX-36.10–.11.

Setting aside the fact that the specification does not describe *any* working example of administering a unit dosage of an irreversible EGFR inhibitor to treat *any* g/e resistant NSCLC patient, undisputed evidence established that the specification fails to teach how to treat broad categories of g/e resistant NSCLC. For example, it is undisputed that the patents-in-suit fail to enable a POSA to treat the broad category of patients with g/e resistant NSCLC who will not respond to g/e because they lack sensitizing mutations, JTX-1 at 8:39–44, 17:46–49; D.I. 451-4 at 178:7–14, 180:7–25, 182:13–19; Tr. 166:1–4, 180:13–20, 218:20–22, 630:21–632:7, 634:20–636:11, 945:22–24, 947:19–948:13, as well as other forms of g/e resistant NSCLC, including for example NSCLC with MET amplification or harboring a KRAS mutation, Tr. 218:16–219:7, 630:21–632:3, 635:5–636:5, 660:3–10, 944:3–945:3, 945:9–14; JTX-1 at 16:4–7; *see also* JTX-32 at 1–2; JTX-33 at 2, 6; DTX-36.10–.11.[5] The specification thus fails to enable a POSA to practice the full scope of g/e resistant patients encompassed by the Asserted Claims without undue experimentation, including as analyzed by the *Wands* factors.

**B.      The Asserted Claims Lack Written Description**

JMOL should also be entered in favor of AZ that the Asserted Claims are invalid for lack of written description. The written description requirement ensures "that the inventor actually

---

[5] Though Wyeth attempts to avoid the specification's non-enablement of g/e resistance due to MET amplification because it had not yet been biologically defined in 2005, Wyeth ignores that the specification expressly describes the claimed invention as treating still-unidentified resistance mechanisms. *E.g.*, JTX-1 at 17:53–18:6; Tr. 630:21–632:7, 660:3–10; DTX-36.10–.11. Moreover, the lack of understanding concerning the biology of g/e resistant NSCLC in 2005 evidences non-enablement, proving the nascent nature of the art and the amount of experimentation a POSA would have been required to attempt to practice the claimed method.

invented the invention claimed," *Amgen*, 872 F.3d at 1373, and that "the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353–54 (Fed. Cir. 2010) (en banc). As with enablement, the risk of inadequate written description is "especially acute with genus claims that," like the Asserted Claims here, "use functional language to define the boundaries of a claimed genus." *Amgen*, 872 F.3d at 1349. Such claims "may simply claim a desired result . . . without describing species that achieve that result," constituting an impermissible "attempt[] to preempt the future before it has arrived." *Id*. at 1353; *see also AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014) ("Functionally defined genus claims can be inherently vulnerable to invalidity challenge for lack of written description support."); *Pernix Ireland Pain DAC v. Alvogen Malta Ops. Lt.*, 323 F. Supp. 3d 566, 618 (D. Del. 2018). And thus, the Federal Circuit has consistently held that claims like the Asserted Claims are invalid due to lack of written description as a matter of law. *See, e.g.*, *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1334 (Fed. Cir. 2021) (JMOL, no written description); *Idenix*, 941 F.3d at 1165 (JMOL, no enablement or written description); *Ariad*, 598 F.3d at 1358 (JMOL, no written description).

Adequate written description of such genus claims requires "the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *AbbVie*, 759 F.3d at 1299. "A patentee may not," as the applicants did here, "disclose only a particular species and leav[e] it to others to explore the unknown contours of the claimed genus." *Pernix*, 323 F. Supp. 3d at 629; *AbbVie*, 759 F.3d at 1300. Here, the trial record does not present a legally sufficient evidentiary basis upon which a reasonable jury could

find that the inventor demonstrated possession of the full scope of the Asserted Claims.

> **1.      The Patents-In-Suit Fail To Show Possession Of The Full Scope Of Irreversible EGFR Inhibitors Of The Asserted Claims**

The evidence established as a matter of law that the inventors lacked possession of the full scope of the irreversible EGFR inhibitors claimed, and that (1) the disclosures in the specification of the patents-in-suit fail to describe species that are representative of the full scope of the Asserted Claims (either structurally or functionally), and (2) there are no structural features common to the genus of irreversible EGFR inhibitors covered by the Asserted Claims. *See supra* § IV.A.1.

For example, the lack of written description is demonstrated by the failure of the patents-in-suit to describe EGFR inhibitors that are either functionally or structurally like the third-generation inhibitors that Wyeth now asserts fall within the claims. As to *structure*, the record evidence established that medicinal chemists classify compounds by scaffold (that is, the core structure of the compound), and the only species disclosed in the patents-in-suit (HKI-272, EKB-569, HKI-357), are all of the same general structural class: they all have a cyanoquinoline core, which is characteristic of so-called "second generation" EGFR inhibitors. Tr. 510:22–511:22, 564:21–24. These are structurally distinct from, and not representative of, numerous other irreversible EGFR inhibitors covered by the Asserted Claims (as asserted by Wyeth), including pyrimidine-based irreversible EGFR inhibitors (containing a pyrimidine core) that are characteristic of the so-called "third generation" inhibitors like osimertinib and others (*e.g.*, WZ4002). Tr. 512:14–20, 560:21–565:1, 566:15–567:4, 574:12–575:5; D.I. 451-2 at 137:23–138:08, 139:19–139:23, 176:9–14, 177:17–178:13 (discussing DTX-114); *see also supra* § IV.A.1. As to *function*, undisputed evidence establishes that, like other first and second generation inhibitors, the only species in the specification were all designed to *target wild-type EGFR*. Tr. 514:5–6, 561:16–23; D.I. 451-2 at 180:18–181:06; DTX-117.6. It is undisputed that the

22

specification ***does not describe the wild-type sparing***, "mutant selective" profile of third generation EGFR inhibitors. Tr. 559:21–562:6; *see also* Tr. 989:7–988:24, 990:4-8; D.I. 451-1 at 145:13–22. Thus, the accused compound osimertinib itself exemplifies that the patents-in-suit do not disclose representative number of species to demonstrate full possession of the scope of EGFR inhibitors that Wyeth contends are encompassed by the Asserted Claims, as it is both structurally and functionally different than what the patents-in-suit describe, which the Patent Examiner recognized when concluding that "Tagrisso appears not to be representative of the broadly claimed irreversible inhibitors" in the patents-in suit. Tr. 558:16–565:2; DTX-36.11. JMOL on lack of written description in favor of AZ is therefore warranted. *See, e.g.*, *Abbvie*, 759 F.3d at 1300.

Moreover, the patents-in-suit also fail to describe a representative number of species or common structural features in other structural respects, including that the patents-in-suit disclose compounds with only one specific warhead—a dimethylaminobutenamide, which belongs to the class of warheads called Michael acceptors—and do not describe embodiments with the myriad of other warheads—including epoxides—that would fall within the broad class of EGFR inhibitors encompassed by the Asserted Claims. *See supra* § IV.A.1; Tr. 512:14–20, 575:5–13. Indeed, the record evidence establishes the structural diversity of the class (*e.g.*, different core structures, different substituent groups, including different warheads, and varying molecular weights) and demonstrates that there are no structural features common to the genus of irreversible EGFR inhibitors. *See supra* § IV.A.1. In addition, while it is ***conceivable*** that a POSA could have made such a compound, nowhere does the specification demonstrate that the inventors had possession of the "larger molecules" that the specification states can be used in carrying out the claimed methods. *See supra* § IV.A.1; *see also* D.I. 451-1 at 216:21–218:19.

Although Wyeth offered conclusory testimony from its expert Dr. Jorgensen to dispute the

lack of written description, his unsupported opinions were not sufficient evidence from which a reasonable jury could conclude the Asserted Claims are adequately described. Dr. Jorgensen did not testify that the specification discloses a representative number of irreversible EGFR inhibitors, nor did he testify that there are structural features common to the genus of irreversible EGFR inhibitors, such that the POSA could distinguish between compounds that function as claimed and those that do not. *E.g.*, *Juno*, 10 F.4th at 1339 ("The [patent] provides no amino acid sequences or other distinguishing characteristics of the scFvs that bind. Simply put, the [patent] claims a 'problem to be solved while claiming all solutions to it ... cover[ing] any compound later actually invented and determined to fall within the claim's functional boundaries.'") (quoting *Ariad*, 598 F.3d at 1353); *MorphoSys AG v. Janssen Biotech, Inc.*, 358 F. Supp. 3d 354, 366–67 (D. Del. 2019) (granting SJ for claims covering "any and all CD38 antibodies that satisfy broad functional tests, yet the specification does not teach the necessary correlation between those claimed functional properties ... and the structural characteristics ... of antibodies having those properties").

### 2. The Patents-In-Suit Fail To Show Possession Of The Full Scope Of The "Unit Dosage" Of The EGFR Inhibitors

The record established as a matter of law that the patents-in-suit fail to show possession of the full scope of "unit dosages" of irreversible EGFR inhibitors encompassed by the Asserted Claims. As discussed above, the genus of EGFR inhibitors encompassed by the Asserted Claims is vast, and the patents-in-suit fail to demonstrate possession of the "unit dosage" of even a ***single*** irreversible EGFR inhibitor, much less the full scope of claimed "unit dosages." *See supra* § IV.A.2; Tr. 637:10–25. No reasonable jury could have concluded otherwise. For example, the specification does not show possession of a unit dosage for any of the three identified species, and later experimentation confirmed that the applicants could not have been in possession because these inhibitors cannot be administered to patients in amounts calculated to produce the therapeutic

effect. *See supra* § IV.A.2. And, even had the specification disclosed a unit dosage for them (it did not), such a dosage would not be representative of the full scope as the unit dosage must be determined for each claimed compound. *See supra* § IV.A.2.

### 3. The Patents-In-Suit Fail To Show Possession Of The Full Scope Of The Claimed Methods Of Treating G/E Resistant NSCLC

JMOL of lack of written description is also warranted because the patents-in-suit lack any evidence that the applicants were in possession of treatments of the full range of claimed g/e resistant NSCLC. As discussed above, the claims encompass a method of treating ***all forms*** of g/e resistance, despite lacking any evidence that the methods would work across the full range of g/e resistant NSCLC. *See supra* § IV.A.3. The lack of written description is particularly conspicuous here, given that the applicants themselves recognized when they filed their patent application that the "mechanisms underlying acquired drug resistance [were] not well understood," and that "the mechanisms underlying treatment failure in cases lacking secondary EGFR mutations remain[ed] unexplained." JTX-1 at 6:34–45, 6:59–62. The applicants nonetheless taught in their specification that administering an irreversible EGFR inhibitor to a patient regardless of resistance mechanism would treat g/e resistance in a patient. *See supra* § IV.A.3; JTX-1 at 17:59–18:6.

### C. The Asserted Claims Of The '314 Patent Are Anticipated

As an alternative to JMOL on lack of enablement and written description, the Court should grant JMOL that the Asserted Claims of the '314 patent are anticipated. AZ presented clear and convincing evidence that the prior art Allen 2003 (DTX-73) reference disclosed each and every element of the Asserted Claims of the '314 patent—at least to the same extent as the specification patents-in-suit. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270, 1273 (Fed. Cir. 2017) (anticipated if prior art reference discloses every element of a claim). Wyeth did not adduce a legally sufficient evidentiary basis to conclude otherwise.

As Dr. Reider testified, Allen 2003 disclosed a method of treating g/e resistant NSCLC in a patient in need thereof comprising a unit dosage of an irreversible EGFR inhibitor that covalently binds to cysteine 773 residue in the ligand binding pocket of EGFR because it described administration of CI-1033—an inhibitor that covalently binds as claimed—to approximately forty NSCLC patients in daily doses of 50 to 650 mg/day. Tr. 583:24–584:15, 584:23–585:10, 586:8–13, 586:19–587:2. Moreover, Allen 2003 discloses that 16% of NSCLC patients have an EGFRvIII mutation, and a POSA in 2005 would have known that EGFRvIII is gefitinib-resistant—as shown in prior art like Learn 2004 (DTX-116). Tr. 587:5–8, 587:12–588:19. Allen 2003 thus disclosed each and every element of claim 1 of the '314 patent—and provided at least as much information as the '314 patent itself. Tr. 589:9–23. Allen 2003 also discloses the additional elements of claims 3 and 9 of the '314 patent, because it is administered orally. Tr. 589:23–24.

### D.    The Asserted Claims Would Have Been Obvious

As an alternative to JMOL on lack of enablement and written description, the Court should grant JMOL that the Asserted Claims would have been obvious. "A party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021). Here, if the specification is found to provide enabling and/or written description support for the Asserted Claims, then the prior art's disclosures likewise adequately taught the alleged invention. That is, Wyeth cannot have it both ways—if the prior art provides the information necessary to allow a POSA to practice the alleged invention (as Wyeth incorrectly argues with respect to 112 issues), then, as the record demonstrates, the Asserted Claims would have been obvious because the POSA would have had a reasonable expectation of success in using the prior

art to practice the claimed methods. *See, e.g.*, *In re 318 Pat. Infringement Litig.*, 578 F. Supp. 2d 711, 736 (D. Del. 2008), *aff'd*, 583 F.3d 1317 (Fed. Cir. 2009) ("[T]he court agrees with defendants that [the patent] cannot both be non-obvious and enabled."). Wyeth did not present a legally sufficient evidentiary basis upon which a reasonable jury could have concluded otherwise.

*'314 Patent.* JMOL should be granted that the Asserted Claims of the '314 patent are obvious over the combination of Allen 2003 (DTX-73) and Agus 2003 (DTX-71). Tr. 590:3–5; 591:10–592:5. Agus 2003 describes a method for treating g/e resistant NSCLC with certain irreversible EGFR inhibitors (CI-1033, EKB-569) that covalently bind at cysteine 773 in the EGFR ligand-binding pocket. Tr. 590:7–591:16. While Agus 2003 teaches administration of a weekly dose, the POSA would have been motivated to combine it with Allen 2003—which discloses oral administration of CI-1033 to NSCLC patients in daily doses of 50 to 650 mg/day, *supra* § IV.C— to arrive at the claimed invention. Tr. 584:19–585:7, 590:3–591:2, 591:25–592:5.

*'162 Patent.* JMOL should be granted that Asserted Claim 1 of the '162 patent is obvious over the combination of Allen 2003 (DTX-73) and Kobayashi 2005 (DTX-112, published Feb. 23, 2005). A POSA would have been motivated to combine Kobayashi 2005—which identifies T790M as a mechanism of g/e resistance in NSCLC patients, describes *in vitro* activity of an irreversible EGFR inhibitor that covalently binds to cysteine 773 (CL-387,785) against T790M, and encouraged the POSA to use such results to develop "alternative" inhibitors, DTX-112.6—with Allen 2003—which teaches daily administration of an irreversible EGFR inhibitor (CI-1033) to gefitinib-resistant NSCLC patients, *supra* § IV.C—to arrive at the claimed invention. Tr. 578:16– 579:8, 579:12–580:1, 581:17–583:23.

Wyeth sought to antedate Kobayashi 2005, arguing the applicants conceived of the '162 patent's claimed invention by Dec. 2, 2004, and diligently reduced it to practice through the filing

of the Apr. 15, 2005 provisional.[6] But no substantial evidence supports this. Conception is "the formation in the mind of the inventor, of a defined and permanent idea of the ***complete and operative invention***, as it is hereafter to be applied in practice," *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994), and "must be supported by corroborating evidence," *Allergan Inc. v. Apotex Inc.*, 754 F.3d 952, 967–968 (Fed. Cir. 2014).

Here, no reasonable jury could conclude that the applicants had a "defined and permanent idea," as the evidence shows that they did not appreciate T790M was associated with g/e resistance before they read Kobayashi 2005. Tr. 326:17–21 (discussing DTX-236), 328:2–8 (discussing DTX-245), 329:7–19 (discussing DTX-237), 339:17–340:2, 578:2–19. The applicants wrote in their Feb. 2, 2005 provisional that "alternative mechanisms"—***not*** a "secondary mutation" like T790M (not mentioned)—underlie resistance. Tr. 930:4–931:14; JTX-3 at [64], [66]. Also, no evidence shows that the applicants had used irreversible EGFR inhibitors to address T790M resistance prior to reading Kobayashi 2005, demonstrating both that they did not actually have the claimed idea (they did nothing to pursue it) and, given the unpredictability, they could not have had any operative idea of the invention. *See* JTX-3 at [66] (Feb. 2, 2005 provisional reporting testing of irreversible inhibitors only in cells lacking a secondary mutation). Rather, the first time the use of irreversible EGFR inhibitors to address T790M appears in the applicants' documents is in a draft manuscript ***after*** Kobayashi 2005. *See* Tr. 322:14–17, 581:8–13; JTX-4 at 40.

Moreover, the document Wyeth relied on to allege a conception date of Dec. 2, 2004 is ***not*** corroborating—not only does it say nothing about irreversible inhibitors, it reflects that the applicants had only the hypothesis to test "***if*** T790M confers resistance," PX-211, which, along

---

[6] There is no dispute that the Feb. 2, 2005 provisional does not describe or enable claim 1 of the '162 patent. Tr. 858:6–8, 861:15–21; *see also* DTX-7.1220, .1222.

with other record evidence, confirms that the applicants did not have "a definite and permanent idea" of the "complete and *operative* invention" of a method for treating g/e resistant NSCLC having T790M using irreversible EGFR inhibitors. Tr. 325:11–13. In fact, as expressed in an email later that month, the same applicant performed some investigation and concluded "T790M may *not* be associated with Iressa resistance." DTX-245; Tr. 328:2–8; *see also, e.g.*, DTX-236; DTX-237; JTX-3 at [64], [66]. No subsequent documentation evidences even an interest in T790M—let alone the complete and operative invention—until after the inventors read Kobayashi 2005. *See* PX-178, 1–2 (Jan. 2005 email "coordinat[ing] the various pieces of the resistance story," focusing on certain cell lines, none the T790M-containing cells the inventors tested after reading Kobayashi); JTX-3 at [64], [66]; DTX-65.1 (Haber one day after Kobayashi 2005: Kobayashi authors "describe ... an irreversible EGFR inhibitor ... effective in suppressing" double mutants having T790M); DTX-706 (Haber: "we were scooped" by Kobayashi 2005); DTX-58.12 (Feb. 28, 2005 draft manuscript attached to DTX-60: "it is of considerable interest that an irreversible inhibitor ... was recently shown to" inhibit the T790M mutant).

The applicants also did not "diligently reduce[]" the claimed invention "to practice." There was no evidence of "reasonably continuing activity to reduce the invention to practice" between Dec. 2, 2004 and Kobayashi 2005's publication (*i.e.*, Feb. 23, 2005), such as performing laboratory experiments or drafting patent applications. *E.g.*, *Tyco Healthcare Group LP v. Ethicon Endo-Surgery*, 774 F.3d 968, 974–75 (Fed. Cir. 2014). Thus, no substantial evidence supports a priority date earlier than Feb. 23, 2005, or that Kobayashi 2005 is not prior art.

### E.   Alternatively, The Court Should Grant A New Trial On Invalidity

If the Court does not grant JMOL on the above-described invalidity grounds and the infringement verdict is upheld, the Court should grant a new trial limited to invalidity. Fed. R. Civ. P. 59(a). As explained above, the jury's verdict that the Asserted Claims are not invalid under

Sections 112, 102, and/or 103 is against the clear weight of the evidence. *See, e.g.*, *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 363–64 (3d Cir. 1998). Close scrutiny of the verdict is warranted where, as here, the subject matter does not lie "within the ordinary knowledge of jurors." *Windsor Shirt Co. v. New Jersey Nat'l Bank*, 793 F. Supp. 589, 601 (E.D. Pa. 1992).

## V.  AZ IS ENTITLED TO JMOL ON THE ISSUE OF DAMAGES

At trial, Wyeth requested damages based on a reasonable royalty following a hypothetical negotiation. The jury awarded $107.5 million in damages. D.I. 457 at 11. The jury's award, however, is premised on a legally insufficient basis, and thus the Court should grant JMOL of no damages. *See Promega*, 875 F.3d at 666. In addition to the lack of substantial evidence regarding Wyeth's alleged royalty base, *see supra* § III.A.2, Wyeth's evidence on royalty rate is also insufficient. Wyeth's expert Dr. Rao based his opinion as to royalty rate on his analysis of six BioSci database licenses. Fatally, however, Rao did not perform the baseline comparability analysis required to provide a legally sufficient basis for his opinion based on these licenses. *E.g.*, *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 915 (Fed. Cir. 2022); *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010). Rao ***did not have*** patent information for three licenses and thus could not have performed the necessary analysis. Tr. 375:25–379:15, 767:19–769:25. For the remaining three licenses, Rao failed to properly account for their technological differences with the hypothetical license. Tr. 379:23–381:1, 768:6–9, 770:1–772:5. To the extent Rao considered other information (Pfizer-Puma license, LES Surveys), he again failed to perform the comparability analysis. Tr. 381:17–20, 592:23–593:13, 595:3–596:14, 765:16–767:18, 772:6–773:25; *see also M2M Sols. LLC v. Enfora*, Inc., 167 F. Supp. 3d. 665, 678 (D. Del. 2016).

## VI.    CONCLUSION

For the foregoing reasons, AZ's motion should be granted.

/s/ Andrew E. Russell
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)

OF COUNSEL:                         SHAW KELLER LLP
Christopher N. Sipes               I.M. Pei Building
Einar Stole                        1105 North Market Street, 12th Floor
Megan P. Keane                     Wilmington, DE 19801
Eric R. Sonnenschein               (302) 298-0700
Kaveh V. Saba                      kkeller@shawkeller.com
Priscilla Dodson                   arussell@shawkeller.com
Alexander Trzeciak                 nhoeschen@shawkeller.com
Ashley Winkler                     edibenedetto@shawkeller.com
Melissa Keech                      *Attorneys for AstraZeneca*
Tobias Ma                          *Pharmaceuticals LP and*
Elaine Nguyen                      *AstraZeneca AB*
Robert T. McMullen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Dated: June 14, 2024

31